**Ashley M. Gjovik, JD**
*In Propria Persona*
(415) 964-6272
ashleymgjovik@protonmail.com
Boston, MA

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

IN RE:

ASHLEY M. GJOVIK,
            DEBTOR/PLAINTIFF

U.S. DEPARTMENT
OF EDUCATION
      &
MAXIMUS EDUCATION,
DBA AIDVANTAGE
            DEFENDANTS.

CHAPTER: 7
DEBTOR CASE NO: 25–11496
ADVERSARY CASE NO: TBD

JUDGE CHRISTOPHER J. PANOS
ADVERSARY PROCEEDING

COMPLAINT AND REQUEST
FOR DISCHARGE OF STUDENT
LOAN DEBT
11 U.S.C. § 523(A)(8).

# TABLE OF CONTENTS

Summary ........................................................................... 2

   Jurisdiction & Venue ................................................3

   Parties .................................................................3

Legal Standards ...............................................................4

Factual Background ..........................................................5

Student Loans Owed .........................................................7

Undue Hardship & Dischargeability under 11 U.S.C. 523(a)(8)................... 8

   The Plaintiff/Debtor's Income, Assets, And Expenses .....................................8

   The Plaintiff/Debtor's Health, Age, Education, And Personal Or Family Circumstances.......................................................9

   The Plaintiff/Debtor's Ability to Find a Higher-Paying Job (Persistence of Hardship) ......................................................... 10

   The Impact of the Discharge that the Plaintiff/Debtor Will Receive in the Bankruptcy Case ...................................................... 13

   "Personalized Misfortune" that is Not of the Fault of the Plaintiff/Debtor....... 14

   Payment Plan is Insufficient ....................................... 18

Public Policy: Garmon Preemption, Single Sovereign, and Judicial Estoppel .. 21

Conclusion & Relief Requested ....................................................... 23

# Complaint to Determine the Dischargeability of Federal Student Loans

## Summary

1.  Ashley Marie Gjovik, *pro se* Plaintiff/Debtor, hereby brings this action for the discharge of her federal student loan debt under the "undue hardship" provision set out in 11 U.S.C. § 523(a)(8)[1] and under equitable principles. Plaintiff/Debtor seeks a declaratory judgment that the student loan debt may be discharged. Fed. R. Bankr. P. 7001–7087.

2.  This case presents the extraordinary circumstance of a debtor seeking student loan discharge when the federal government has already determined through its own enforcement proceedings that a third party should bear financial responsibility for the damages that would, and were intended to, satisfy the debt at issue.

3.  Plaintiff Ashley Gjovik incurred ~$81,238 in federal student loans to obtain a law degree, which would have been easily repaid from her $386,382 annual compensation package at Apple Inc. However, after she engaged in protected whistleblowing activity and labor organizing, Apple unlawfully terminated her employment in retaliation. The NLRB investigated and found sufficient merit (substantial evidence) to file a complaint requiring Apple to pay compensatory damages to remedy the financial devastation caused by the illegal termination.

4.  Now, four years later, while the government's own retaliation case remains stalled without trial, the Department of Education seeks to collect a student loan debt that would be paid by money that the NLRB determined Apple should pay as part of its remedial obligation. This places Plaintiff in the impossible position of paying for an education that illegal retaliation has rendered worthless, using income artificially suppressed by the same illegal conduct the government has formally condemned. Beyond satisfying traditional undue hardship requirements, this case presents

---

[1] *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 124 S. Ct. 1905, 1912, 158 L. Ed. 2d764 (2004); *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 278 (2010) ("the bankruptcy court must make an independent determination of undue hardship").

compelling equitable grounds for discharge based on judicial estoppel, government unity principles, and NLRB preemption. The government cannot benefit from its own contradictory positions by collecting debt it has elsewhere determined another party owes.

## Jurisdiction & Venue

5.      This Complaint is commenced pursuant to sections 523(a)(8) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 7001(1)(2) and (9) of the Federal Rules of Bankruptcy Procedure.

6.      This inquiry is undertaken through a formal adversary proceeding in the bankruptcy court. *Fed. R. Bankr. P. 7001 to 7087. United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260, 130 S.Ct. 1367 176 L. Ed. 2d 158 (2010); Fed. R. Bankr. P. 7001(6).[2] The Plaintiff/Debtor consents to the entry of final orders or judgment by the Bankruptcy Court in this matter.

7.      The Plaintiff/Debtor filed this case under Chapter 7 of the Bankruptcy Code (Case No. 25-11496) on July 21 2025. This Court thus has jurisdiction over this action under 28 U.S.C. § 1334(b). L.R., D. Mass. 201.

8.      This proceeding to determine the dischargeability of a debt is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and (2). See 28 U.S.C. § 157(b)(2)(I) (core proceedings include "determinations as to the dischargeability of particular debts"). *In Re: Beleno Carney, Karina,* Chapter 7 Case No. 20-40723-CJP; Adv. Pro. No. 20-4039-CJP, (March 20, 2023).

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to the claim occurred in Massachusetts, and the Plaintiff/Debtor resides in Massachusetts.

## Parties

10.      Plaintiff is the Debtor ("Plaintiff/Debtor") in the underlying bankruptcy

---

[2] U.S. Dept. of Education, Federal Student Aid, https://studentaid.gov/manage-loans/forgiveness-cancellation/bankruptcy

case and resides at Boston, Massachusetts.

11.     Defendant, the Department of Education oversees and is responsible for the federal student loan program. 20 U.S.C. § 1070. Linda E. McMahon is the Secretary of the United States Department of Education. In her official capacity, the Secretary of Education has the power to enforce, pay, compromise, waive, or release any claim held by the Department of Education.

12.     Defendant, Maximus Education (d.b.a. Aidvantage) is a loan servicer for the federal direct loan program. Maximus is the largest student loan company in the world has been "accused of subjecting student loan borrowers to a wide range of harms and abusive practices" and "because of its unique position as the sole servicer for student loans in default, any errors or abuses on Maximus's part can have devastating consequences for some of the most vulnerable student loan borrowers."[3]

13.     Defendants will be served with a copy of the Adversary Complaint and Summons. Plaintiff/Debtor will complete the U.S. Dept. of Justice's 11 U.S.C. § 523(a)(8) Attestation form requested by government in assessing these types of discharge requests.[4]

## Legal Standards

14.     According to the U.S. Supreme Court, one of the "central purposes" of the bankruptcy system "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner,* 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934)).

15.     The Bankruptcy Code implements this "fresh start" principle by "*forgiv[ing] [the debtor's] existing debt*" and "*restor[ing] the debtor to economic*

---

[3] Student Borrower Protection Center & CWA, *Customer Disservice*, March 2022, https://protectborrowers.org/wp-content/uploads/2022/03/CWA_SBPC_MAXIMUS.pdf
[4] 15.4.3.8.3.1 https://library.nclc.org/article/new-process-discharge-student-loans-bankruptcy

*productivity.*"[5]

16.     For many years, student loans were ordinarily dischargeable to the same extent as other forms of consumer debt. Starting in the 1970s, however, Congress enacted a series of statutes that made it progressively more difficult for debtors to discharge student loans.[6]

17.     The dischargeability of student loans is governed by § 523(a)(8), which provides:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt— (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for— (A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

11.     .S.C. § 523(a)(8).

12.     Demonstrating an undue hardship is presently the only way a debtor may discharge a student loan in bankruptcy.[7] "The creditor bears the initial burden of establishing that the debt is of the type excepted from discharge under § 523(a)(8)." *Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon),* 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010). The debtor then bears the burden of proving undue hardship. *Id.* The standard of proof is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

## Factual Background

13.     Plaintiff/Debtor has four student loans totaling ~$81,238. The outstanding balance of the student loans Plaintiff/Debtor is seeking to discharge in this adversary

---

[5] Rafael I. Pardo & Michelle R. Lacey, *Undue Hardship in the Bankruptcy Courts: An Empirical Assessment of the Discharge of Educational Debt*, 74 U. CIN. L. REV. 405, 414 (2005).
[6] Congressional Research Service, *Bankruptcy and Student Loans,* Hevin M. Lewis, Legislative Attorney, Report No. R45113, July 18, 2019.
[7] Congressional Research Service, *Bankruptcy and Student Loans,* Hevin M. Lewis, Legislative Attorney, Report No. R45113, July 18, 2019.

proceeding is ~$154,345.59. Plaintiff/Debtor incurred the student loans while attending Santa Clara University School of Law where Plaintiff/Debtor was pursuing a law degree with a specialization in human rights law.

14.    Plaintiff/Debtor completed her course of study and received a law degree (Juris Doctor) and a Certificate in Public International Law in 2022. Plaintiff/Debtor is not currently employed.

15.    Santa Clara University School of Law ("Santa Clara Law," FAFSA 001326) charged tuition of ~$1,956 per unit and estimated at $49,720 per year for the four-year part-time program (~$200,000 total).[8] Plaintiff/Debtor received a partial "Emery Merit Scholarship" (with GPA requirements) during the program which reduced her cost by $10,000 each year.

16.    Before her prior employer, Apple Inc, unlawfully terminated her employment, Plaintiff/Debtor earned a salary of $169,000 annually and total compensation of $386,382 in 2020. Prior to her termination, Plaintiff/Debtor also used the employer's benefit of $5,000/year education assistance reimbursement to pay off her undergraduate loans.

17.    Plaintiff/Debtor does not have the ability to make payments on the student loans while maintaining a minimal standard of living herself and her household, as her gross monthly income is currently $0, and monthly expenses are $4,720. (25–11496, Dkt. 1).

18.    In addition, Plaintiff/Debtor's financial circumstances are unlikely to materially improve over a significant portion of the repayment period as Plaintiff/Debtor faced illegal retaliation which has inhibited future earning capacity due to denylisting and prevented obtainment of employment in the field for which the education was received.

---

[8] Santa Clara University, Tuition and Student Fees, https://web.archive.org/web/20210419185624/https://www.scu.edu/media/offices/bursar/2021-22-Tuition-&-Student-Fees-Schedule-Law-March-2021-1.pdf; Santa Clara Law, Costs, https://law.scu.edu/admissions/financial-aid/costs/

# Student Loans Owed

19.     One of the unsecured debts owed by the Plaintiff/Debtor and listed in Schedule E/F consists of four student loans owing to Defendants U.S. Department of Education and Maximus/Aidvantage (account no. 9764706753–1).

20.     With accumulated interest, Defendants claim that the amount that is owed on the student loans when this case was filed is $81,238. The loans were incurred to pay tuition at Santa Clara University School of Law.

- 1-14 Direct Loan – Unsubsidized, Direct, 2018, $19,628.09, 6.6%
- 1-15 Direct Loan - Unsubsidized, Direct, 2019, $20,214.45, 6.08%
- 1-16 Direct Loan - Unsubsidized, Direct, 2020, $20,681.19, 4.3%
- 1-17 Direct Loan - Unsubsidized, Direct, 2021, $20,714.12, 5.28%

21.     Plaintiff/Debtor's entered an Income-Driven Repayment Plan (SAVE) in 2023. Plaintiff/Debtor has paid $4,921.69 on these loans.

22.     On July 4, 2025, the U.S. President signed P.L. 119-21 into law and eliminated Plaintiff/Debtor's repayment plan ("SAVE"). Borrowers enrolled in SAVE are now forced to enroll in a different plan by July 1, 2028.  "If they wait, though they currently can't be required to make payments, they will see their loans explode with interest."[9]

23.     Interest will resume accruing on SAVE plan loans starting August 1, 2025.[10] SAVE is currently legally enjoined, designated by the U.S. Dept. of Education as "illegal," and thus does not provide adequate alternative relief.[11]  The remaining statutory IBR plan "requires payments of 10 percent of discretionary income and has a

---

[9] NPR, *What borrowers should know about student loan changes in the One Big Beautiful Bill,* https://www.npr.org/2025/07/24/nx-s1-5477646/student-loan-repayment-forgiveness-trump
[10] CBS News, Are you a student loan borrower? Here's how the One Big Beautiful Bill Act could affect you. (July 12 2025). https://www.cbsnews.com/news/big-beautiful-bill-changes-student-loan-repayment/
[11] U.S. Dept. of Ed*., U.S. Department of Education Continues to Improve Federal Student Loan Repayment Options, Addresses Illegal Biden Administration Actions*, July 9 2025, https://www.ed.gov/about/news/press-release/us-department-of-education-continues-improve-federal-student-loan-repayment-options-addresses-illegal-biden-administration-actions

repayment period of 20 years." [12]

24.    Plaintiff/Debtor had previously taken out student loans for her undergrad. Plaintiff/Debtor's first federal student loans (FFELP Stafford Subsidized and Direct Unsubsidized) were taken out in 2005 through 2011, when she graduated with her undergraduate Bachelor of Science degree.

25.    Plaintiff/Debtor consolidated her loans in 2014 and owed ~$80,000 in student loans debt. Even with her high income at Apple, and using Apple's sponsored employee student loan consolidation program, it took Plaintiff/Debtor until October 21, 2020 (nearly a decade) to pay off her undergraduate student loans.

26.    The current law school loans were taken out eight years ago and went into repayment in 2022. Plaintiff/Debtor made reasonable efforts to earn income, manage expenses, and repay her loan. Plaintiff/Debtor contacted Dept. of Education regarding payment options for their loan, enrolled in an income driven repayment plan, and made all required payments on the loan prior to the repayment freeze. [13]

27.    Plaintiff/Debtor made initial payments using remaining savings rather than seeking forbearance. Despite financial devastation from retaliation, she chose to honor payment obligations using limited resources.

28.    Debtor had perfect pre-termination payment history with all credit cards, medical bills, and undergraduate student loans paid off. Plaintiff/Debtor exhausted her savings and other resources before seeking relief and only sought discharge after savings were depleted and all other options exhausted.

## Undue Hardship & Dischargeability under 11 U.S.C. 523(a)(8).

## The Plaintiff/Debtor's Income, Assets, And Expenses

29.    The Plaintiff/Debtor cannot now, or in the foreseeable future, maintain a

---

[12] Federal Student Aid, *(GEN-25-04) Federal Student Loan Program Provisions Effective Upon Enactment Under the One Big Beautiful Bill Act,* https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2025-07-18/federal-student-loan-program-provisions-effective-upon-enactment-under-one-big-beautiful-bill-act

[13] At a Glance: Department of Justice's New Process for Student Loan Bankruptcy Discharge Cases

reasonable, minimal standard of living and still afford to make payments on the Plaintiff/Debtor's student loans.

30. Plaintiff/Debtor's expenses equal or exceed the debtor's income, thus under U.S. DOJ guidelines, the debtor lacks a present ability to pay. Because the Plaintiff/Debtor's income is zero, there is no impact to the ability to pay student loans through "reducing living expenses."

31. Plaintiff/Debtor has been unemployed for most of the last four years, and during that time, other than the one year employment at Northeastern University and limited contract work, the sole source of income for herself has been public assistance and public donations, which barely suffice for the necessities of life.

32. The Plaintiff/Debtor has accumulated no substantial assets. She owns no real estate or vehicles and has no retirement account. Plaintiff/Debtor emptied her 401(k) and all savings due to employer retaliation. There is no evidence of any significant asset to which she could have recourse to pay her student loans.

33. Plaintiff/Debtor's annual salary at Apple was $169,000. Debtor also received ~$90,000 in Restricted Stock Unit vesting every six months as part of performance and retention compensation package. Plaintiff/Debtor lost $386,382 annual income due to wrongful termination and would not be in bankruptcy but for employer's illegal retaliation. The current law school student loan balance represents less than three months of her prior annual income (20.7% of total income).

34. Prior to the unlawful termination, all of Plaintiff/Debtor's credit cards were paid off with perfect payment history. There was no history of financial mismanagement or inability to service debt. Plaintiff/Debtor already successfully paid off a similar amount of student loan debt (her undergraduate student loans), though it took her nine years.

35. At the time she was terminated, Plaintiff/Debtor's only debt was law school student loans which she previously expected to be able to pay off in a single payment upon graduation in 2022.

## The Plaintiff/Debtor's Health, Age, Education, And

## PERSONAL OR FAMILY CIRCUMSTANCES

36.  Multiple lines of evidence support that Plaintiff/Debtor is entitled to a presumption that she will remain unable to repay the loan in the future.

37.  Debtor has multiple diagnosed mental health conditions (i.e., anxiety, depression, PTSD, and ADHD), and ongoing health complications from toxic waste exposure (2017-2020) impacting her income potential and worsened by financial stress. Disabilities increase medical costs, limit employment opportunities, and create issues with the ability to handle litigation stress.

38.  Due to extensive toxic waste exposure caused by Apple's unlawful hazardous waste disposal activities and increased likelihood of developing cancer and disease, Plaintiff/Debtor faces potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income.

39.  The United District Court of Northern California dismissed Debtor's "toxic tort" claims, including compensatory damages and requests for future medical monitoring and medical care, for reasons unrelated to the merit of the claims. The U.S. EPA is taking formal enforcement action against Apple under RCRA, yet two attempts by Plaintiff/Debtor at interlocutory appeal to Ninth Circuit have been unsuccessful. *Ashley M. Gjovik v. Apple Inc.*, 23-cv-04597-EMC, N.D. Cal., 2023-; 24-6058; 25-2028.

## THE PLAINTIFF/DEBTOR'S ABILITY TO FIND A HIGHER-PAYING JOB (PERSISTENCE OF HARDSHIP)

40.  Debtor cannot practice law due to employer's retaliation and public defamation and cannot return to an engineering career due to same employer's prior and ongoing denylisting. Plaintiff/Debtor's ripening age, limited resources, public notoriety, and desperate circumstances make career restart realistically impossible. There is no path to income that would be sufficient to service this student loan debt.

41.  Debtor had a high-paying career in "Big Tech" until Apple fired and denylisted her. Plaintiff/Debtor had a nascent career in law until Apple fired and denylisted her and continues to denylist her incessantly in court. Plaintiff/Debtor had

a successful career as a "program manager" until Apple and Northeastern University unlawfully terminated her employment and denylisted her.

42.    Plaintiff/Debtor's original undergraduate education focus was biological science; however, she cannot return to that field without taking out additional loans to pursue a Ph.D. nor would she be accepted after Northeastern University unlawfully terminated her employment from their Civil and Environmental Engineering department.

43.    Law firms will not hire someone in active, high-profile dispute with major corporation, especially Apple Inc. There have already been character and fitness implications from harassment, defamation, and the ongoing litigation. Further, Apple's influence as one of the largest and most powerful corporations in history makes employment in the legal field realistically impossible.

44.    The public nature of these retaliation cases create a permanent career barrier, Apple knows this, and Apple has intentionally poured gasoline on the fire for years. For example, Apple's defense attorneys went on a Wikipedia editing spree in 2024 and added Plaintiff/Debtor's Wikipedia biographic article (which she does not want but Wikipedia refuses to delete), to her alma mater, Santa Clara Law's Wikipedia article as a "Notable Alumni."

45.    Plaintiff/Debtor is listed on the Santa Clara Law Notable Alumni list with only 14 other people (exclusively judges, elected politicians, U.S. Department Secretaries and Directors, and the Plaintiff/Debtor).[14] Apple's legal team has concurrently vandalizes the Plaintiff/Debtor's article for years, usually to suggest Plaintiff/Debtor is mentally unstable, filed false claims and made false statements, and that she is acting in bad faith. They then share the URL to the article with their own edits in their social media harassment as "evidence" of their claims against her.

46.    This follows years of Apple's legal team using social media accounts to engage with Plaintiff/Debtor, and/or post about her, accusing her of dishonesty and

---

[14] Wikipedia, Santa Clara University School of Law,
https://en.wikipedia.org/wiki/Santa_Clara_University_School_of_Law

unethical conduct, and threatening her with bankruptcy (using that term specifically) and general devastation if she was to pursue/continue to pursue justice against Apple, with the first threats arising after she reported Apple to the government and prior to her termination.

47.    Further, Apple's defense attorneys have been constantly requesting sanctions against Plaintiff/Debtor in the civil litigation, often for demonstrably false reasons and/or reasons with no legal basis. Plaintiff/Debtor filed the civil lawsuit only after the extensive delays in prosecution by the U.S. government, and now regularly faces additional denylisting and defamation arising out of the civil proceeding. In academic studies, corporate employers are known to intentionally bankruptcy whistleblower employees through legal proceedings as a form of retaliation.[15]

48.    Further, based on the track-record of these career-litigator law firm partners, Plaintiff/Debtor faces a real risk of financial sanctions from the court, regardless of law or fact. This may enable additional denylisting (with court findings of misconduct manufactured by Apple's lawyers), but if there are financial sanctions, it could also force her into a second bankruptcy proceeding within the next few years.

49.    Any employment Plaintiff/Debtor is able to obtain going forward is nearly certain to pay dramatically less than the careers for which she was educated and trained (law, program management, and engineering). Research on whistleblower retaliation frequently finds if whistleblowers are able to ever rejoin the workforce, their earnings are usually on average 67% less than their prior employment.[16]

50.    Student loan systems assumes a degree retains earning potential. However, here, a prior employer's illegal conduct destroyed that potential. These loans funded a career that no longer exists but for the employer's legal violations. Forcing repayment when degree is worthless due to retaliation contradicts the loan program's purpose.

---

[15] Kenny, K., Fotaki, M. The Costs and Labour of Whistleblowing: Bodily Vulnerability and Post-disclosure Survival. *J Bus Ethics* 182, 341–364 (2023). https://doi.org/10.1007/s10551-021-05012-x
[16] Kenny, K., Fotaki, M. The Costs and Labour of Whistleblowing: Bodily Vulnerability and Post-disclosure Survival. *J Bus Ethics* 182, 341–364 (2023). https://doi.org/10.1007/s10551-021-05012-x

## THE IMPACT OF THE DISCHARGE THAT THE PLAINTIFF/DEBTOR WILL RECEIVE IN THE BANKRUPTCY CASE

51.     Plaintiff/Debtor's Chapter 7 bankrupt petition requests discharge of $73,107.74 in credit card debt and medical bills. (25-11496, Dkt. 1). This adversary proceeding requests declaratory relief regarding the additional discharge of ~$81,238 of student loan debt. The total requested discharge is ~$154,345.59 in unsecured debt. (25-11496, Dkt. 1 at 36).

52.     Discharge of Plaintiff/Debtor's credit card and medical debts will provide her a "fresh start" where she will hopefully be able to find work (expected to be low paying) and relocate to somewhere with a lower cost of living. Plaintiff/Debtor will hopefully be able to slowly rebuild her life; however, Plaintiff/Debtor's student loans (if not discharged) would require her to pay a significant amount of her income to the U.S. government for 10-20 years. Further, the current payment schemes incentivizes Plaintiff/Debtor to not enter the workforce at all, in order to avoid student loan payments and to instead seek loan forgiveness at the end of the term.

53.     Even if Plaintiff/Debtor's request for a general discharge under Chapter 7 is granted, she is still deeply burdened by her student loan debt. Plaintiff/Debtor is not incapacitated or unable to work in any typical sense. Instead, Plaintiff/Debtor has been prevented from  being a productive member of the U.S. workforce due to the unlawful actions of two institutions and the inaction of the government.

54.     Further, if Plaintiff/Debtor is not able to make payments for some time but then is able to find a mid-range paying job, after accruing interest during her unemployment, she will then be forced to pay off a debt nearly twice as large as the original amount. (See Tables 1-2).

55.     The professions for which Plaintiff/Debtor was educated and trained for require professional investment for networking and marketing. When "climbing the ladder" in the highly competitive fields of law, tech, and the like, investments such as conferences, professional affiliations, reputation management, relocation/travel, and professional development are critical to success. All of these things require investment

of discretionary income.

56.     Plaintiff/Debtor's student loan debt, if not discharged, will not only burden her current income for decades, but it will prevent her from rebuilding her career that the unlawful retaliation destroyed. Without discharge, she is trapped in a cycle where the debt prevents the very career recovery that could resolve the debt.

## "Personalized Misfortune" that is Not of the Fault of the Plaintiff/Debtor

57.     Evidence will demonstrate that Plaintiff/Debtor suffers from "personalized misfortune, disability, and unique underprivilege." Further, this bankruptcy results from factors beyond her reasonable control (i.e., illegal retaliation by institutional actors that destroyed her ability to utilize the education for which the loans were obtained).

### 1. Apple Inc

58.     Plaintiff/Debtor worked for Apple Inc from February 23 2015-September 10 2021. In her final role at the company her title was "Senior Engineering Program Manager" and her annual salary was $169,000.

59.     Plaintiff/Debtor is the subject of a high-profile whistleblower retaliation case involving her former employer, Apple Inc. The government has conducted a thorough investigation and found sufficient evidence of illegal conduct to seek formal relief.

60.     The federal government has already determined that Apple Inc. is liable for backpay and compensatory damages sufficient to cover Plaintiff/Debtor's credit card debt, medical bills, and student loans. The government's complaint expressly seeks monetary relief that would remedy the financial devastation caused by the illegal termination.

"Wherefore, as part of the remedy for the unfair labor practices described above in paragraph 8 the General Counsel seeks an Order requiring Respondent to: (1) offer employee Gjøvik reinstatement to her former job position or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed; (2) send a letter to Gjøvik apologizing for suspending

and terminating her, expunge all Respondent's records of such suspension and termination, and inform her, in writing, that her suspension and termination have been expunged from Respondent's records and will not be used against her in any way; (3) make employee Gjøvik whole for all losses incurred as a result of the unfair labor practices described above, including for all direct and foreseeable pecuniary harm incurred as a result of her unlawful suspension an termination; and (4) should Gjøvik waive reinstatement, provide a neutral job reference to all prospective employers with the correct job titles and positions of employee Gjøvik."

(NLRB Complaint, Case No. 32-CA-282142, 32-CA-283161, Dec. 18 2024).

61.    The government has made formal findings that Apple Inc. engaged in unlawful retaliation against Plaintiff/Debtor for protected activity.

"...(c) About August 4, 2021, Respondent suspended its employee Gjøvik. (d) About September 9, 2021, Respondent discharged its employee Gjøvik. (e) Respondent engaged in the conduct described above in paragraphs 8(c) and 8(d), because Gjøvik engaged in the conduct described above in paragraphs 8(a) and 8(b), and to discourage employees from engaging in these or other concerted activities. By the conduct described above in paragraphs 5 through 8 Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act. 10. The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act..."

(NLRB Complaint, Case No. 32-CA-282142, 32-CA-283161, Dec. 18 2024).

62.    Plaintiff/Debtor's current inability to service her student loans is directly and proximately caused by Apple's illegal termination. But for the unlawful firing, Plaintiff/Debtor would have retained her $386,382 annual income and could easily service these loans. The government's own complaint establishes this clear causal chain.

63.    There is no dispute regarding the facts of the underlying violations (i.e., termination, etc.) or Apple's substantial ability to pay as a major corporation. Further, in 2022 a California CUIAB Administrative Law Judge also found the evidence shows that Apple terminated Plaintiff/Debtor's employment for "reasons other than misconduct."

"The claimant received notice from the vice president that she was being discharged. The notice was vague and incomplete and stated that the claimant had disclosed confidential information and had not fully

participated in some investigation. Although the claimant requested specific information from the employer, no specific information was provided. Prior to the separation of the employment the claimant received great performance reviews and prior to the separation the claimant received no oral or written warning notifying her that job was in jeopardy. At all times the claimant performed her job duties to the best of her ability..... In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work. Since the claimant performed her job duties to the best of her ability and had not received warnings putting her on notice that her job was in jeopardy, the claimant was discharged for reasons other than misconduct and she is qualified for benefits under section 1256."

(California Unemployment Insurance Appeals Board, Case No. 7253819, July 27 2022).

64.    Yet despite the government's findings of liability, there is no guarantee of eventual payment. Apple has been able to drag out the enforcement litigation indefinitely, with the case already spanning over four years without resolution or trial. Further, in March 2025, a member of Apple's noticed defense counsel was nominated to become the new General Counsel of the NLRB, putting Apple's own lawyers in a position to end the Plaintiff/Debtor's case against the company.[17]

65.    This leaves Plaintiff/Debtor facing decades of financial hardship while awaiting speculative recovery from proceedings the government controls but has failed to expedite, despite having made definitive findings of liability and damages.

## 2. NORTHEASTERN UNIVERSITY

66.    The only full time employment Plaintiff/Debtor was able to obtain after Apple's public termination of her employment and defamatory accusations against her, was under a one year contract renewable for five years, with Northeastern University. The role paid an annual salary and total compensation of $100,000 and her title was "Program Manager."

---

[17] EPI, Nominating Crystal Carey as NLRB General Counsel, March 26, 2025, https://www.epi.org/policywatch/nominating-crystal-carey-as-nlrb-general-counsel/ ("Morgan Lewis is one of the largest management-side law firms that currently represents corporations known for violating workers' rights, including Amazon, SpaceX, Apple, and Tesla. Morgan Lewis is also pursuing the legal challenge that the NLRB is unconstitutional, despite several former NLRB members being employed at the firm. By nominating Carey as the NLRB general counsel, President Trump has reaffirmed that the NLRB will rule on the side of employers over workers.")

67.     Her role required, among other things, managing the federal grant-funded "pre-award and post-award administration" of a $20M project. From Sept. 2023 until her termination in Sept. 2024, Plaintiff/Debtor refused to participate in what she reasonably believed constituted unethical accounting activities, fraud and deceit, legal violations related to human research, and research misconduct.

68.     Northeastern University expressly terminated Plaintiff/Debtor in Sept. 2024 due to her refusal to engage in potentially unlawful conduct, with the university previously issuing a performance improvement plan that, among other illegal rules, prohibited her from speaking with Legal, HR, or Research Compliance teams and demanded she "admit" she does not "understand" "regulations" or "compliance policies."

69.     Plaintiff/Debtor filed NLRB charges in May 2024 and September 2024 (01-CA-342355, 01-CA-350371) regarding unfair labor practices and unlawful work rules. The NLRB issued at least a partial merit determination in spring 2025, but no complaint has yet been issued. Northeastern University's position to NLRB as to its "*Wright Line*" defense appears to be that it terminated her due to her insisting on proper accounting records related to NSF grant funded projects, at the same time Northeastern University was being audited by NSF.[18]

70.     In Sept.-Dec. 2024, Plaintiff/Debtor realized the misconduct she witnessed likely constituted grant fraud against the federal government including federal agencies (NSF, NIH, NOAA, and U.S. EPA). Plaintiff/Debtor filed complaints with multiple U.S. government agencies and law enforcement, providing thousands of documents and extensive evidence of institutional wrongdoing. This led to a joint federal task force investigation and an extension the NSF/DOJ enforcement actions taken against Northeastern University in 2015.[19]

---

[18] NSF OIG, *Performance Audit of Subaward Costs – Northeastern University,* February 6, 2025, https://oig.nsf.gov/reports/audit/performance-audit-subaward-costs-northeastern-university
[19] U.S. DOJ, *Northeastern University to Pay $2.7 Million for Failing to Account for Federal Research Funds,* August 18, 2015, https://www.justice.gov/usao-ma/pr/northeastern-university-pay-27-million-failing-account-federal-research-funds

71.     In February 2025, "Northeastern University agreed to repay $616,695 of grant money to the National Science Foundation after a federal audit found evidence of financial mismanagement on several of the institution's research projects."[20] This was the same audit that was occurring when she refused to falsify finance and accounting records related to NSF grants, and for which Northeastern University claims was its "lawful" reason for terminating the Plaintiff/Debtor. With the recent leadership changes at the NLRB, it will be Apple's defense counsel deciding if this is indeed a "legitimate" reason to fire an employee.

72.     Further, Northeastern University terminated Plaintiff/Debtor's employment with inflammatory language and accusations that effectively completed the professional denylisting initiated by Apple.  Northeastern University's subsequent conduct has included defamation and continued denylisting in violation of Massachusetts whistleblower protection laws (Mass. Gen. Laws ch. 149 § 19; G.L. ch. 151B), further cementing the professional exclusion that prevents Plaintiff/Debtor from utilizing her education and rejoining the workforce.

73.     The researchers and administrators at Northeastern University intentionally exploited Plaintiff/Debtor's vulnerability due to Apple's retaliation, attempted to coerce and manipulate her into participating in questionable and unlawful activities, and then retaliated when she refused to compromise her professional ethics and engage in potentially unlawful conduct.

## PAYMENT PLAN IS INSUFFICIENT

74.     Under any payment plan, the Plaintiff/Debtor will spend 10-20 years making payments that don't reduce the debt, based on income that's artificially suppressed by retaliation. This isn't repayment - it's punishment. The 10% "retaliation tax" is only proportional to her retaliation-damaged circumstances. For the purposes of this proceeding, Debtor/Plaintiff is essentially artificially poor due to external

---

[20] Inside Higher Ed, *Northeastern Will Pay Back $600,000 to NSF,* February 18, 2025, https://www.insidehighered.com/news/quick-takes/2025/02/18/northeastern-will-pay-back-600000-nsf

retaliation and thus denying a discharge of these loans would create a permanent financial penalty for Debtor/Plaintiff's protected activities, and the subsequent retaliation.

75.    Plaintiff/Debtor is essentially being forced into a payment plan designed for people who genuinely can't earn more when she is only in that situation because of illegal retaliation. The system is treating the symptom (low income) instead of the cause (retaliation preventing proper income).

**Table 1: Comparison of Income-Driven Repayment (IDR) and Income-Contingent Repayment (ICR) Plans at varying income levels.**

| Plan | Estimated Annual Income | Monthly Payment | Total Amount to be Paid | Estimated End of Term | Estimated End Balance |
|---|---|---|---|---|---|
| Federal IBR Plan | $0 | $0 | $0 | June 2045 | $170,397 |
| | $40,000 | $138 | $21,461 | June 2045 | $148,936 |
| | $60,000 | $304 | $61,461 | June 2045 | $108,936 |
| | $70,000 | $388 | $81,461 | June 2045 | $87,287 |
| | $80,000 | $471 | $101,461 | June 2045 | $57,692 |
| | $100,000 | $638 | $126,420 | March 2043 | $0 |
| Federal ICR Plan | $0 | $0 | $0 | Nov 2048 | $185,629 |
| | $40,000 | $406 | $92,043 | Nov 2048 | $90,772 |
| | $60,000 | $736 | $116,647 | Sep 2039 | $0 |
| | $70,000 | $774 | $112,552 | Feb 2038 | $0 |
| | $80,000 | $779 | $111,641 | July 2037 | $0 |
| | $100,000 | $882 | $107,424 | March 2036 | $0 |
| | $386,000 | $1,548 | $93,293 | July 2030 | $0 |

(studentaid.gov, customized "loan simulator," July 2025).



(studentaid.gov IDR and ICR, "loan simulator," July 2025).

76.    Denying a discharge of these loans turns her law degree into a permanent punishment rather than an investment. This is exactly the type of situation where courts should say: this isn't what income-driven repayment was designed for - this is systematic unfairness that requires discharge.

77.    If Plaintiff/Debtor were to enroll in income-restricted repayment plans, the U.S. Dept. of Education website suggests that if she were to have no income, and make no payments, the total amount owed in 2045 would be $170,397 under IBR and $185,629 under ICR.

78.    However, if the retaliation ends, the Plaintiff/Debtor has her reputation restored, and her career recovers so she can start earning income, she would then be paying 10% of ~$170,000, not ~$81,238. In this situation, the repayment plan would provide a penalty for success, causing the debtor to have to pay double what is owed

because she recovered from the retaliation.

## Table 2: Comparison of Other Repayment Plans
## for Debtor's Student Loans

| Plan | Monthly Payment | Estimated End of Term | Estimated End Balance | Total Amount to be Paid |
|---|---|---|---|---|
| Extended Graduated Repayment Plan | $374-630 | October 2049 | $0 | $161,451 |
| Extended Fixed Repayment Plan | $508 | October 2049 | $0 | $148,404 |
| Graduated Repayment Plan | $551-1,653 | October 2034 | $0 | $110,101 |
| Standard Repayment Plan | $931 | October 2034 | $0 | $104,297 |

(studentaid.gov, customized "loan simulator," July 2025).

79.     If Plaintiff/Debtor's student loans are not discharged, she faces either a future life in poverty with a meaningless payment plan when there was little likelihood she could ever pay anything (*In re* Bronsdon, 2010 WL 147798, Bankr. D. Mass. Jan. 8, 2010) or she would be forced to submit to essentially a 10% retaliation tax on debt that is doubled from the amount she originally planned to pay prior to the retaliation.

80.     If Plaintiff/Debtor is successful in her retaliation claims against Apple and/or Northeastern University, and is able to obtain enough funds to pay her student loans, she will not be paying the debt with *earned income* from her legal career, but instead would be paying it with *damages money* that her retaliating ex-employers already owe her for destroying her career.

81.     The debt would be paid off with compensation for the harm, not with productive work. The student loans would be satisfied by retaliation damages, not by using Plaintiff/Debtor's education. This would be fundamentally unjust.

## Public Policy: Garmon Preemption, Single Sovereign, and Judicial Estoppel

82.     In addition to meeting the statutory requirements for undue hardship

discharge, Plaintiff/Debtor seeks relief under established equitable principles that prevent the government from benefiting from its own contradictory conduct across federal agencies.

83. The federal government, through the NLRB, has taken the formal position that Apple Inc. owes Plaintiff/Debtor compensatory damages sufficient to cover her student loan debt. Having established this liability in an official government proceeding, the government cannot now argue in this Court that Plaintiff/Debtor should pay these same debts herself. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

84. The government's contradictory positions are:

- (a) in the retaliation proceeding, that Apple owes Plaintiff/Debtor money to remedy the financial harm from illegal termination (which includes credit card debt, medical bills, and student loan obligations); and

- (b) in this proceeding, that Plaintiff/Debtor should pay those same loans despite the government's own finding that Apple bears responsibility for her financial devastation.

85. Federal agencies are instrumentalities of a single sovereign and cannot disclaim each other's formal findings. *Koretoff v. Vilsack*, 775 F.3d 19, 25 (1st Cir. 2014). The Department of Education cannot ignore the NLRB's determination that another party bears financial responsibility for Plaintiff/Debtor's current circumstances.

86. The NLRB has exclusive jurisdiction over unfair labor practices and their remedial consequences. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). Requiring Plaintiff/Debtor to pay student loans when the NLRB has determined the employer should remedy her financial harm interferes with the NLRB's exclusive remedial authority and undermines the coherent enforcement of federal labor policy. This Court should defer to the NLRB's ongoing remedial proceedings rather than create conflicting obligations that would undermine federal labor law enforcement and create an inequitable double collection scenario.

87. Here, the government should have to show that non-discharge serves a legitimate purpose when government has identified a different liable party, the

discharge denial does not contradict government's own factual findings, that speculative future recovery justifies current hardship when government could expedite remedy, and how forcing payment when degree's value was destroyed by illegal conduct serves public policy. The evidence will show that excepting the Plaintiff/Debtor's student loans from Chapter 7 discharge would impose an undue hardship on Plaintiff/Debtor and would be contrary to public policy.

88.     Further, the government can't argue this precedent will incentivize false claims, because they're the ones who investigated and found merit. The government validated Debtor/Plaintiff's claims through their own process. The Debtor/Plaintiff essentially just requests this Court and U.S. Dept. of Education to acknowledge and take Judicial Notice what another federal agency already decided.

## Conclusion & Relief Requested

89.     This case presents an exceptionally strong basis for student loan discharge under the totality of circumstances test. The Plaintiff/Debtor faces permanent inability to use an expensive law degree due to employer retaliation for whistleblowing. With documented government agency support, legal victories, and clear evidence of illegal conduct by employers, this case demonstrates undue hardship that will persist indefinitely through no fault of the Plaintiff/Debtor.

90.     An income-based repayment plan would turn Plaintiff/Debtor into a permanent indentured servant, paying 10% of whatever income retaliation allows Plaintiff/Debtor to earn, for the rest of Plaintiff/Debtor's working life. This is exactly the kind of permanent economic disability that bankruptcy discharge is supposed to prevent. It's contrary to public policy to deny discharge when the government has already determined who should pay but won't enforce it while the education financed by the loans has been rendered worthless by the same illegal conduct.

91.     Wherefore, Plaintiff/Debtor respectfully requests that the Court determine that Plaintiff/Debtor's student loan(s) debt to Defendants are dischargeable under 11 U.S.C. 523(a)(8), and that the Court grant Plaintiff/Debtor such other and

further relief to which she may show themselves entitled.

I declare under penalty of perjury under the laws of the United States of America, and in compliance with Fed.R.Bankr.P. Rule 9011, that the foregoing is true and correct.

Executed on July 29 2025 in Boston, Massachusetts.

Respectfully submitted,



**/s/ Ashley M. Gjovik**
*Pro Se / In Propria Persona*

18 Worcester Sq. Apt. 1
Boston, Massachusetts, 02118

(415) 964-6272

Dated: July 29 2025