**Ashley M. Gjøvik, JD**
*In Propria Persona*
(415) 964-6272
ashleymgjovik@protonmail.com
Boston, MA

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:<br><br>ASHLEY M. GJOVIK,<br><br>DEBTOR. | CHAPTER 7 CASE NO: 25–11496<br>ADVERSARY PROCEEDING NO. 25-01104<br>JUDGE CHRISTOPHER J. PANOS<br><br>DEBTOR'S RESPONSE TO TRUSTEE'S APPLICATION FOR EMPLOYMENT (DKT. 14-15) WITH CONTINGENT NON-OPPOSITION, AND DEBTOR'S ASSOCIATED REQUEST FOR SPECIAL MASTERS AND ADVISORS<br><br>FRCP RULES 16, 53, 706<br>FRBP RULE 2014<br>BANKRUPTCY CODE §§ 105, 327<br>U.S. CODE § 3729 |

# TABLE OF CONTENTS

**BACKGROUND** ................................................................................................ **4**

**UNPRECEDENTED COMPLEXITY REQUIRING EXPERT GUIDANCE** ...... **11**

    The Government-Initiated Constitutional and Civil Rights Crisis ..................... 11

    Intersecting Statutory Framework Conflicts ................................................... 14

**NECESSITY OF SPECIALIZED ADVISORS** ............................................ **15**

    Constitutional Law Special Master ................................................................ 15

    False Claims Act Special Master/Advisor ...................................................... 16

    Executive Agency Advisor/Auditor ................................................................ 16

**PUBLISHED GUIDANCE & CONGRESSIONAL REPORTING** ................... **16**

**CONCLUSION** ................................................................................................ **17**

## DEBTOR'S CONDITIONAL AND CONTINGENT NON-OPPOSITION TO TRUSTEE'S REQUESTS AT DKT 14-15; AND REQUEST FOR ADVISORS AND SPECIAL MASTERS

1. Debtor, Ashley Marie Gjovik, files this response to the Trustee's abrupt and unexplained conversion of this case to an asset case (Dkt. 13) and Trustee's requests for employment of large law and accounting firms with tasks to include managing the complex tax implications of a large recovery from some unknown asset along with a seemingly unfounded and invasive professional audit and reconciliation of Debtor's personal finances (Dkt. 14-15).

2. The Debtor is now put in a position where she has to respond to these seemingly bizarre, highly prejudicial, and unprecedented filings by the Trustee. The Debtor must file objections to protect her rights, while not having any context as to what is happening in her own case, which forced her to attempt to reverse-engineer what occurred in order to identify any plausible and lawful explanation as to why it would be occurring – and the Debtor only finds one explanation and responds accordingly.

3. Under information and belief, as detailed below, Debtor believes that it appears this Chapter 7 bankruptcy case has now been transformed into a federal law enforcement action – where, upon Debtor's forced disclosure of a unique potential legal claim, the case created a new vested property interest in the Debtor's estate, triggered the government's obligation to liquidate that asset through the DOJ's exclusive jurisdiction over deciding the procedural mechanisms for liquidating that specific asset, and that specific asset was ready to liquidate due to Debtor's efforts prior to filing, and fully within the DOJ's control to liquidate.

4. Accordingly, if this theory is accurate, the Debtor respectfully requests this Court consider appointing specialized advisors and special masters pursuant to Federal Rule of Civil Procedure 53 and 706, and/or Federal Rule of Civil Procedure 2014(a), the U.S. Court's inherent authority to manage complex proceedings, and to effectuate the Congressional intent of 31 § U.S.C. 3729.

5. Because this apparent unfolding and cascading crisis of constitutional, consumer, and civil rights law appears to have been triggered by the U.S. government itself, and these masters and advisors will be tasked with protecting the U.S. Constitution and interests of the people of the United States, as well as mitigating the harm caused to the Debtor due to the DOJ's failure to take action on this matter prior to Debtor having to file for bankruptcy, the Debtor requests the costs for these advisors be borne by the Department of Justice from its apparent anticipated 31 § U.S.C. 3729 recovery share.

6. If Debtor's theory below is correct and the court is willing to appoint such masters and advisors to also ensure the Debtor's rights are protected and/or the harm to Debtor through this unprecedented process is minimized and only proportional to the actual potential economic benefit that the Debtor will receive, the Debtor does not object to Trustee's asset conversion at Dkt. 13 or requests for employment at Dkt. 14-15, or the unavoidable resulting chaos that is about to ensue.

7. However, if Debtor's theory herewithin is not correct, the Debtor demands disclosure from the Trustee as to why the Trustee would request something so unfounded and highly prejudicial to the Debtor's interests, without any apparent legitimate basis, and with no direct communication to the Debtor on this matter. The Debtor would oppose the Trustee's requests and ask the court for a hearing about this matter, and to consider sanctions against the government for what appears to be state-sponsored whistleblower retaliation via a bankruptcy proceeding.

8. Debtor also notes that even if the Trustee's applications at Dkt. 14-15 are not actually related to the FCA as theorized, and the Trustee has taken these actions for either legitimate or illegitimate reasons, that based on the fact pattern established by Debtor's reverse engineering and detailed below, that it appears the U.S. government would still be obligated to pursue this FCA claim regardless of whatever else it is that they're currently doing here.

# BACKGROUND

9. This case began as a somewhat routine and voluntary Chapter 7 no-asset bankruptcy case, filed on July 21 2025 (25-11496), and accompanied by a student loan discharge application filed as an 11 U.S.C. § 523(a)(8) Adversary Proceeding on July 29 2025 (25-01104). The total amount requested to be discharged in both cases is $154,345.59 with $73,107.74 of nonpriority unsecured debt and $81,237.85 of student loan debt. The Debtor's property totaled only $14,574 with $8 cash. (25-11496 Dkt. 1).

10. However, through a series of government-compelled actions under bankruptcy law, following months of prior engagement between the Debtor and U.S. DOJ, and combined with good faith happenstance – it appears this case has evolved into an unprecedented legal proceeding that merges bankruptcy law with False Claims Act enforcement, while also implicating administrative proceedings and injunctive litigation, and creating novel Constitutional issues and procedural complexities that appear to have no precedent or existing framework.

11. The relevant subsequent procedural timeline within this bankruptcy case are as follows.

- On July 22 2025, the Debtor first contacted the assigned Trustee to start sharing information and engage in the Chapter 7 process. Emails were exchanged and documents were provided.
- On July 29 2025 at 4:15 PM, the Debtor provided a courtesy copy of her Adversary Proceeding complaint to the Trustee and also commented that believed she was "supposed to tell [the Trustee] whenever there's potential legal claims, in case [the Trustee] want[s] to pursue them" and asked the Trustee to tell her if the Trustee "want[s] more information about [a new issue with her current apartment] or any others" noting "there's a few more things that could be done but [she doesn't] have the time/resources to do [herself], like an FCA case against [an entity])."
- On July 29 2025, the Trustee replied ordering that the Debtor "need[s] to list in [her] schedules all possible claims that [she] had as of the day [she]

filed the bankruptcy petition." On July 29 2025, Debtor replied and confirmed she would file a revised schedule with expanded legal claims.

- After filing her student loan discharge case on July 29 2025, the Debtor served her A.P. Complaint and Summons on the U.S. Attorney General via certified mail on July 31 2025 and it was noted by USPS as received on August 4 2025 at 8:11 AM. (25-01104, Dkt. 4-1).

- In Debtor's August 4 2025 Adversary Proceeding complaint, the Debtor pled, including under "Personalized Misfortune that is Not of the Fault of the Plaintiff/Debtor," details of a fact pattern underlying a complaint she had made with U.S. Department of Justice prior, details that she had participated in a prior investigation with U.S. Dept. of Justice providing evidence and interviews, explained that the investigation appeared to be abandoned or stalled, and noted that she also had a retaliation claim against the same entity with an executive labor agency that she feared was about to be dismissed by that executive agency in bad faith after the head of the agency was replaced by the same counsel defending one of her ex-employers from her at the same agency.

- On August 4 2025 at 12:53 PM, the Debtor, via a process server, served the U.S. Attorney Leah B. Foley with Debtor's A.P. Complaint and Summons. The process server provided Debtor confirmation on August 6 2025 and the Certificate of Service was filed by Debtor on August 6 2025 at Dkt. 5.

- On August 4 2025 at 1:19 PM, the Debtor emailed the Clerk's office ("Pro Se Filings" email) her certificate of service of the U.S. the Attorney General's office, the U.S. Dept. of Education, the loan servicer. The filing also noted that service was underway for the U.S. District Attorney. On August 4 2025 at 3:49 PM, the Clerk posted Debtor's pro se filing of Debtor's certificate of service (Dkt. 4).

- On August 4 2025 at 3:51 PM, Debtor emailed the Clerk's office ("Pro Se Filings" email) her amended 106 and 107 forms. On page six of the filing,

Debtor noted under Schedule A/B Question 33: "False Claims or related citizen-type criminal/fraud enforcement action against [an entity]."

- On August 4 2025 at 4:31 PM, the Clerk posted the Debtor's pro se filing of her amended schedules to the docket at Dkt. 11. On August 4 2025 at 4:39 PM, Debtor then also notified the Trustee she had filed her amended documents and attached a copy. The Trustee never responded, has not communicated with her after, and may now actually be a procedural witness.

- On August 5 2025, at a federal hearing in a case that was the Debtor's primary potential source for any speculative recovery (long-running whistleblower litigation against a prior employer with the employer undertaking a Scorched Earth defense), that Defendant stated it did not plan to settle the case and also refused to participate in a settlement conference. (3:23-cv-04597, Dkt. 242).

- On August 5 2025, the executive agency that Debtor complained in her A.P. Complaint may dismiss her meritorious charge for unlawful reasons, and where the charge represented similar and overlapping facts as the U.S. DOJ FCA matter, then proceeded to dismiss Debtor's case based on the employer entity's own position statement and without referencing the Debtor's position statement or evidence, making multiple false statements and violating their own law and procedure, exposing the Debtor's personal medical information for no reason, and violating the Debtor's rights under multiple federal statutes.

- On August 11 2025, the Debtor filed her "Financial Management Course Certificate" at Dkt. 11.

- On August 13 2025, two days later, the Trustee updated this Chapter 7 2025 case to an "Asset" case instead of "No Asset" (Dkt. 13) but did not communicate with Debtor or describe what this new Asset is in the filing.

- On August 15 2025 at 10 AM, the Trustee filed an application for employment to retain a law firm to, among other things, assist with the

"liquidation and recovery of estate assets" and to assist the Trustee in investigating Debtor's finances. (Dkt. 14).

- On August 15 2025 at 11:44 AM, not knowing what the filing was about, Debtor contacted the Trustee mentioning she saw the filing about retaining the law firm and stated she would work with the firm about "whatever they'd like to know" and she was "more than happy to cooperate and provide whatever they need."

- On August 15 2025 at 1:10 PM, the Trustee filed a second application for employment, this time to hire an accounting firm including Principal Accountants charging up to $565/hr. The request includes services for preparing tax returns, advising about tax implications of asset recovery, responding to government proofs of claim for taxes, and also to perform what appears to be the most extensive financial audit and reconciliation of the finances of someone who filed a good faith Chapter 7 no-asset, no-income case in the history of modern bankruptcy law. (Dkt. 15).

- The 341 Meeting of the Creditors is scheduled for August 21 2025 and as of the August 15 2025 filings, the docket shows no claims have been filed by any creditors.

12.     Upon review and contemplation, searching for an explanation as to what may be occurring, the Debtor only found two options. Either her bankruptcy case has merged with a U.S. DOJ FCA case, or the U.S. Office of the Trustee has gone rogue.

13.     Under the first theory, which seems to be the most likely, it appears that when the Debtor filed her A.P. Complaint against the U.S. government and/or served the A.P. Complaint to the U.S. the Attorney General and U.S. District Attorney directly, that the Debtor may have inadvertently triggered the first-to-file provisions under the False Claims Act of 1863, on or around August 4 2025.

14.     It also appears that upon filing the A.P. Complaint in federal court and to a public docket, that the Debtor may have also triggered the public disclosure requirements under the False Claims Act of 1863, thus extinguishing the rights of any

future relators from this current DOJ case which is assumably based primarily or entirely on her own disclosures and evidence.

15.   It also appears that upon making the public disclosure (31 USC §3730(e)(4)), being the original source, and being first-to-file (31 USC §3730(b)(5)), within a bankruptcy proceeding requiring forced asset disclosures, the federal government created a new vested property interest within Debtor's estate and was then subsequently compelled to liquidate that new asset.

16.   It also appears that upon the Debtor providing the DOJ a 'turnkey' FCA case prior to her filing her bankruptcy, it vested the DOJ's ability to take enforcement action on the matter, thus creating an obligation for the DOJ to pursue the FCA claim in order to effectuate national law enforcement policy and to seize and return tax pay funds stolen by a wrongdoer.

17.   Typically, a Trustee in a no-asset case is only paid $60 and expenses are limited due to there being no recovery and instead only a discharge. Thus, any expenses would need to be justified by the potential for recovery, and further, expenses would require that a creditor file claims for the Trustee to pay those creditors.

18.   In a case without assets, with no hidden assets, with no claims filed, and with no Meeting of the Creditors, it would be outrageous for a Trustee to request employment of multiple firms for extensive audits and consulting. Further, it would also be inexplicable how a high-value asset could suddenly be "created" within a couple weeks of filing a no asset case and without any typical Trustee investigation and no communication with the Debtor on the matter.

19.   Thus, only a FCA vesting and liquidation could have transformed this no-asset case into a major asset case, and would assumably require and probably justify the administration of comprehensive financial examinations of the Debtor, and create the need to invest substantial funds immediately into preparation of complex tax implications.

20.   Also, the U.S. government's obligations created by this sequence of events would assumably be vested regardless of if creditors filed claims and would also create

new deadlines for U.S. DOJ to respond to the FCA case with Debtor/the Estate as the relator, within a Chapter 7 bankruptcy case (31 USC §3730(b)(2)). This assumably will also trigger some unusual case management procedures in order to formalize the transfer of the case to DOJ to liquidate.

21. This may force the U.S. District Attorneys and/or the Attorney General's office into the bankruptcy case because a bankruptcy Trustee, while an agent of the U.S. DOJ, does not get to independently decide if DOJ will or will not pursue a FCA claim. Therefore, the liquidation of a single-asset that is a FCA case, would have to be transferred to the DOJ enforcement/litigation teams.

22. While typically the DOJ could pursue a case like this itself without a qui tam relator, the bankruptcy legal framework here appears to compel DOJ to take the case with the Estate of Ashley Gjovik as the qui tam relator. Otherwise, DOJ would assumably violate bankruptcy laws if it declined to pursue this FCA claim, and instead chose to pursue it later on its own and without compensating the original-source relator Estate.

23. It also appears that the U.S. executive agency's Aug. 5 rogue dismissal of Debtor's valid retaliation claim against the entity in question, after the FCA asset was already created against the same entity, then created a new legal claim for the Debtor against the U.S. government for unlawfully violating her rights (42 USC §1983, 18 USC §1961, and others) and depriving Debtor's creditors of money they are owed.

24. The U.S. government, under bankruptcy law, would then own those claims against itself and be obligated to remedy the error, especially when that error obstructed other possible asset recovery claims (31 U.S.C. § 3729), deprived the government of the ability to recover stolen tax payer funds (18 U.S.C. § 371, 18 USC § 1505), violated Article III Sect. 3, conflicted with Unitary Executive and Single Sovereign theories, and was preempted by the DOJ's exclusive litigation authority including the asset created and owned by DOJ in this case (28 USC §516). The DOJ's constitutional law enforcement authority clearly preempts conflicting administrative agency actions, even if legitimate.

25. In conclusion, the Debtor cannot think of any other plausible, lawful, and proportional explanation for the Trustee's filings at Dkt. 14-15 (which include complex tax implications for an unknown large asset, the sudden vesting of a new asset, and require an invasive audit of the Debtor) without even holding a meeting of the creditors and with no claims yet filed. Therefore, the Debtor proceeds under this FCA theory.

26. If Debtor's theory is correct (and assumably DOJ cannot yet communicate it with the Debtor directly but would have assumably filed sealed documents to the court with an explanation for Trustee's requests), the Debtor wants the court to know she does not object to this situation generally but does have many serious concerns about how this will be executed that must be addressed, as detailed below.

27. The transmogrification of this case threatens concrete federal constitutional and statutory rights, including the Thirteenth Amendment prohibition on involuntary servitude (forced labor as a government witness in order to pay off debts to creditors), separation of powers principles, Fifth Amendment protection against self-incrimination, and FCA relator rights.

28. The intersection of these legal frameworks creates procedural complexity requiring specialized expertise to protect constitutional rights and preserve congressionally-designed enforcement mechanisms. The Debtor proposes the court bring in relevant Masters and Advisors, including the roles suggested below.

29. However, if the actions taken by the Trustee in this case at Dkt. 13-15 do not reflect the Debtor's theory of what is occurring, the Debtor strongly objects to the Trustee's requests for employment and failure to communicate with her, and demands disclosure as to why the U.S. government would make such requests.

30. If no proper explanation can be provided, the Debtor requests the court consider sanctions against the U.S. government and/or Trustee for requesting such harmful and prejudicial actions against a good faith Chapter 7 no-asset debtor in what would appear to be retaliation for her whistleblower activities and/or her student loan discharge case filed against the U.S. government on July 29 2025.

# UNPRECEDENTED COMPLEXITY REQUIRING EXPERT GUIDANCE

31.  Under the FCA theory above, this case appears to present the first-ever intersection of Chapter 7 bankruptcy proceedings with compelled False Claims Act enforcement and relatorship, with the sole estate asset in this case becoming an already prepared, turnkey FCA qui tam case that vested upon the initiation of the bankruptcy proceeding as discuss above – then merged the bankruptcy case with the associated student loan discharge case and a queued formal federal law enforcement action – placing three different DOJ teams on three different claims that all intersect at the FCA and with the same Debtor. The Debtor's bankruptcy case appears to have become DOJ's own enforcement case that the Debtor, Creditors, and Trustee are to now be carried along for the ride.

32.  In addition to the many separation of powers concerns implicated by the situation, there are also extensive civil rights concerns due to the Debtor's vulnerable position in the case, with her creditor's interest controlling the bankruptcy proceeding, and the DOJ enforcement action and conversion to a large asset case triggering unprecedent procedural complexity with a severe and irreparable risk of harm to the Debtor.

## THE GOVERNMENT-INITIATED CONSTITUTIONAL AND CIVIL RIGHTS CRISIS

33.  **Thirteenth Amendment Involuntary Servitude**: For example, the government's compelled FCA enforcement may require debtor's ongoing participation as relator and key witness while simultaneously liquidating her estate for creditor benefit, creating a constitutionally prohibited forced labor scenario where the debtor must work for the government to pay her creditors.

34.  **Fourth Amendment Unreasonable Search and Seizure**: For example, the new government-mandated comprehensive asset investigation into a Debtor's finances, where a no-asset case would typically have no investigation at all, exceeds constitutional bounds when triggered solely by the government's own enforcement

actions rather than debtor misconduct, transforming a routine no-asset case into an invasive financial examination that could result in the seizure and conversion of her exempt property.

35. **Fifth Amendment and Right to Counsel**: The Debtor filed a no-asset Chapter 7 case with reasonable expectation of minimal financial review typical in such proceedings. DOJ's enforcement actions transformed this into a major asset case requiring comprehensive financial audit that would never have occurred absent government intervention. This government-created examination now forces debtor to choose between bankruptcy compliance requiring full disclosure of all financial transactions and purchases, and Fifth Amendment protection against self-incrimination regarding transactions that, for example, while lawful under state law, may hypothetically implicate federal enforcement concerns when combined with the parallel enforcement proceedings initiated by the federal government.

36. **Procedural Due Process:** The Debtor filed a routine Chapter 7 no-asset case with established procedural expectations under existing bankruptcy law. Government actions have fundamentally transformed this into an unprecedented legal proceeding combining bankruptcy, FCA enforcement, and administrative law without providing notice, hearing, or opportunity to be heard regarding:

- The transformation from no-asset to major asset case
- The intersection of bankruptcy and FCA enforcement frameworks
- The novel procedural mechanisms that will govern this unprecedented situation (hence this filing)
- The constitutional protections that should apply to this hybrid proceeding (hence this filing)
- The scope and nature of government examination powers in this context (hence this filing)

37. **Substantive Due Process:** The government has created a legal proceeding that has never existed before: compelled FCA enforcement through bankruptcy estate liquidation; and without establishing constitutional safeguards, procedural

protections, or limiting principles. The Debtor is being subjected to:

- Novel government powers with undefined scope and limitations
- Unprecedented intersection of enforcement mechanisms designed to operate independently
- Conflicting legal frameworks without established procedural hierarchy
- Government examination and enforcement powers that exceed those contemplated by existing statutory schemes

38. **Fundamental Fairness:** The unprecedented nature of these proceedings requires balancing government enforcement interests against constitutional harms to the Debtor. Prolonged litigation would subject the Debtor to extended involuntary servitude, ongoing self-incrimination dilemmas, and sustained constitutional violations without clear limiting principles. Due process requires procedures that minimize constitutional harm when the government's enforcement interests can be achieved through less burdensome means, such as efficient settlement mechanisms that accomplish the same enforcement goals without unnecessarily prolonged constitutional violations.

39. **Separation of Powers and Article III Standing Issues**: Concurrently, in addition to the FCA issues, the debtor's pending U.S. EPA citizen suit (notice served, filing planned September 1 2025) faces government claims of "ownership" or other obstruction, undermining the very congressional enforcement mechanisms designed to check executive inaction. Further, the U.S. government absorption of debtor's public interest and injunctive relief claims could risk elimination of her constitutional standing to pursue these enforcement mechanisms.

40. **Sovereign Immunity and Regulatory Takings:** Concurrently, in addition to the FCA issues, the government's assumption of debtor's claims against state and local governments could destroy her ability to pursue those claims due to sovereign immunity, while "taking" of citizen suit enforcement rights eliminates the congressional checks on agency inaction that these statutes were designed to provide.

## Intersecting Statutory Framework Conflicts

41. **False Claims Act Procedural Complexities**: The compelled nature of this FCA case creates unprecedented issues including relator share calculations, estate versus individual rights to recovery, first-to-file protections triggered by bankruptcy disclosure rather than intentional FCA filing, and government "election" procedures when they were compelled to take the case.

42. **Department of Justice Law Enforcement Obligation Conflicts:** DOJ's exclusive federal law enforcement authority (28 USC §516) creates mandatory obligations to pursue fraud claims involving taxpayer funds, but bankruptcy law forces DOJ to accomplish this core governmental function through a private citizen's estate rather than normal enforcement mechanisms.

43. This compels the Debtor to serve as involuntary figurehead on federal enforcement actions while preventing DOJ from utilizing standard prosecutorial tools and procedures. Bankruptcy law's property vesting requirements transform what should be straightforward government fraud recovery into a procedurally constrained enforcement action that neither party would voluntarily choose, creating institutional conflicts where neither DOJ nor the Debtor can pursue their preferred legal strategies.

44. **Administrative Procedure Act Compliance Crisis**: Government agencies generally do not have formal mechanisms for challenging each other's potentially invalid decisions, and as such would require independent APA compliance review of government actions affecting debtor's rights as intersecting with FCA enforcement.

45. Debtor's bankruptcy filing resulted in part from multiple federal agencies' unlawful actions to sabotage otherwise meritorious claims as already detailed in her 2023 civil RICO lawsuit (3:23-cv-04597) and continuing through this day, as noted with the Aug. 5 2025 dismissal. These agency decisions could now also threaten to undermine DOJ's current enforcement efforts.

46. The government may not be able to cleanly pursue enforcement while burdened by other agencies' potentially unlawful prior decisions, and while the DOJ's law enforcement authority preempts executive agency action, the DOJ may lack clear

mechanisms to address this institutional conflict. Independent expertise may be required to audit prior agency decisions for legal compliance; identify available mechanisms for reconciling conflicting government positions; and prevent prior agency failures from destroying current legitimate enforcement actions.

47. **Environmental Citizen Suit Statutory Preservation:** Congressional enforcement mechanisms face destruction if DOJ can assume and dismiss citizen suits they originally refused to bring if they delay long enough to bankrupt the same citizen activists. This requires independent protection of the statutory rights Congress designed to operate as checks on executive inaction and as such the Debtor does not plan on asking for DOJ's permission and abandonment prior to filing on Sept. 1 2025.

48. **Bankruptcy Closure and Finality Issues**: The intersection of FCA enforcement with Chapter 7 proceedings fundamentally conflicts with bankruptcy's core principle of providing debtors a definitive fresh start through case closure. FCA litigation can extend for years through appeals, challenges, and discovery of additional defendants, potentially requiring indefinite case administration and ongoing debtor participation as key witness. This contradicts Chapter 7's design to provide quick discharge and closure, creating unprecedented questions about whether bankruptcy finality can coexist with active federal litigation that depends on estate assets.

## NECESSITY OF SPECIALIZED ADVISORS

49. This procedural complexity requires specialized constitutional, statutory, and administrative law expertise to prevent constitutional error, provide guidance for novel issues, preserve congressionally-designed enforcement mechanisms, and ensure fair proceedings for all parties.

### Constitutional Law Special Master

50. This unprecedented situation requires expert guidance to prevent constitutional violations and protect civil rights throughout these proceedings. Debtor suggests the appointment of one or more Constitutional Law Special Masters to advise, coordinate, and counsel the court and parties through whatever mechanism the court

finds proper.

### FALSE CLAIMS ACT SPECIAL MASTER/ADVISOR

51. The dual compelled nature of this FCA enforcement creates unprecedented procedural issues requiring expert guidance to protect statutory relator rights and establish proper bankruptcy precedent including share calculations, first-to-file analysis, estate vs. individual rights, government election procedures, removal and jurisdiction authority, precedential analysis, development of a bad-faith-copycat prevention framework, and guidance on FCA as a bankruptcy asset as an issue of first impression in the First Circuit, and the liquidation procedure as an issue of first impression federally.

52. The court may also want to consider appointing a Pro Bono FCA attorney for the Debtor, who voluntarily entered bankruptcy pro se, but did not voluntarily enter an apparently massive FCA enforcement action pro se.

### EXECUTIVE AGENCY ADVISOR/AUDITOR

53. The intersection of multiple federal agencies' conflicting decisions and procedure may require independent operational analysis and auditing to assist both the Court and government in resolving institutional conflicts.

54. This advisor/auditor could serve as an independent analyst to examine government decisions, provide guidance on resolving inter-agency problems, and facilitate administrative coordination.

## PUBLISHED GUIDANCE & CONGRESSIONAL REPORTING

55. Further, given the unprecedented nature of these intersecting legal issues, specialized advisors could be used to provide findings and recommendations suitable for published decisions to establish proper precedent and prevent future procedural chaos in similar cases.

56. The Court may also want to invite amicus briefs from constitutional law scholars, bankruptcy practitioners, FCA specialists, and administrative law experts to

ensure comprehensive analysis of these issues of first impression. However, in which case, the Court should consider bifurcating proceedings to close the Chapter 7 case and allow Debtor to move forward with her life while maintaining separate proceedings to resolve the larger institutional and legal issues for future guidance.

57. In addition, the unprecedented intersection of FCA enforcement with bankruptcy proceedings reveals gaps in federal statutory frameworks that require GAO and Congressional attention through hearings and potential legislative reform to provide clear guidance for future FCA/bankruptcy intersections. Advisors could provide recommendations for institutional reforms to prevent similar inter-agency conflicts and constitutional crises in future cases involving multiple federal enforcement mechanisms.

## CONCLUSION

58. In conclusion, the Debtor conditionally and contingently does not oppose the Trustee's requests for employment at Dkt. 14-15 if the requests are in support of the FCA theory detailed within, as long as the court is willing to take actions to mitigate the harm caused by this unique and unprecedented situation.

59. In the alternative, if the Asset conversion and requests at Dkt. 14-15 do not reflect the FCA theory within, the Debtor request the court schedule a hearing or otherwise demand disclosures from the Trustee as to the basis for such otherwise unjustifiable requests and conduct, that appear to not only irreparably harm the Debtor but also waste tax payer funds, corrupt the bankruptcy process, and deter other debtors from filing for bankruptcy due to what appears on this docket to be unjustified punishment of this Debtor without explanation.

60. Debtor also notes that due to the Clerk's established procedures around attorney efiling, she is not allowed to efile on PACER, has to file documents via email through the Clerk's office and with delay waiting for the Clerk to file and only during business hours, and Debtor is also not directly notified when documents are filed to her own case's docket other than BNC Certificates of Mailing. For example, as

discussed, the U.S. Trustee filed a request for what appears facially to be highly prejudicial and unfounded requests against a insolvent no-asset debtor, including implied allegations of misconduct by her, and the Debtor was not even directly notified (she's regularly manually checking PACER – which requires her to pay money to the U.S. government to even view). There is already irreparable harm in this case.

61. The Debtor also notes real world concerns about her physical safety and wellbeing as a key government witness and information, while she is also insolvent, does not have safe or secure housing, has disabilities and medical issues, cannot afford basic necessities, and is regularly facing threats of harm from her retaliating ex-employers and her current landlord. The Debtor will need the governments protection.

62. That all said, because this apparent FCA enforcement effectuates federal policy, would return stolen tax payer funds, would punish wrongdoers, would pay off legitimate debts to her creditors, would create beneficial frameworks for federal grant fraud enforcement, and would also miraculously have the Debtor enter a Chapter 7 proceeding insolvent but allow her to exit the proceeding apparently very wealthy (!?), the Debtor consents generally to this unfolding insanity.

63. I declare under penalty of perjury under the laws of the United States of America, and in compliance with Fed.R.Bankr.P. Rule 9011, that the foregoing is true and correct. Executed on August 19 2025 in Boston, Massachusetts.

Respectfully submitted,

**/s/ Ashley M. Gjovik**
*In Propria Persona*
18 Worcester Square, Apt 1
Boston, MA 02118
Dated: August 19 2025