**Ashley M. Gjøvik, JD**
*In Propria Persona*
(415) 964-6272
ashleymgjovik@protonmail.com
Boston, MA

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **IN RE:**<br><br>**ESTATE OF<br>ASHLEY M. GJOVIK,** | **CHAPTER 7 CASE NO: 25-11496**<br>**A.P. NO. 25-01104**<br><br>**JUDGE CHRISTOPHER J. PANOS**<br><br>**DEBTOR'S RESPONSE TO TRUSTEE DEGIACOMO'S NOTICE OF ABANDONMENT AT DKT. 25**<br><br>**DECLARATION OF DEBTOR**<br><br>**FED. R. BANKR. P. RULE 9013** |

# DECLARATION OF DEBTOR ASHLEY MARIE GJOVIK

Pursuant to 28 U.S.C.§ 1746, I, Ashley M. Gjovik, hereby declare as follows:

    1.    My name is Ashley Marie Gjovik. I am a self-represented Debtor in this above captioned matter. I make this Declaration based upon my personal knowledge and in support of Debtor′s Response to Trustee's Notice of Abandonment at Dkt. 25.

    2.    I have personal knowledge of all facts stated in this Declaration, and if called to testify, I could and would testify competently thereto.

    3.    I swear under penalty of perjury that the facts alleged in my concurrently filed Response are true and correct to the best of my knowledge, and it was filed for a lawful and legitimate purpose, and that I've attached Exhibits A-D which are all true and correct copies of those documents.

    4.    I declare under penalty of perjury under the laws of the United States of America, and in compliance with Fed.R.Bankr.P. Rule 9011, that the foregoing is true and correct.

Executed on Sept. 12 2025 in Boston, Massachusetts.

Respectfully submitted,

*/s/* Ashley M. Gjovik
*In Propria Persona*
18 Worcester Square, Apt 1
Boston, MA 02118
Dated: Sept. 12 2025

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be served upon parties (Trustee) via the Court′s electronic filing system and email on or around Sept. 12 2025 (when the pro se clerk posts it). The Trustee will also be served via email on Sept. 12 2025

# EXHIBITS

**Exhibit A** - Email Exchange Between Debtor and Trustee, July 29, 2025 (discussing 18 Worcester Sq claims and rough valuation)

**Exhibit B** – Memorandum "InRe_Gjovik_Cause_of_Action_Dutt_18W_LandlordTenant_ 20250903"

**Exhibit C** – Memorandum "InRe_Gjovik_Cause_of_Action_Matses_18W_Harassment_Extortion_ 20250907"

**Exhibit D** – Email Exchange Between Debtor and Trustee, Sept. 08, 2025 (Providing copies of individual PDFs of previously transmitted memos during the meeting between Trustee and Debtor to discuss legal claims)

# EXHIBIT A

# Re: Chapter 7 Bankruptcy Case No. 25-11496

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Mark G. DeGiacomo<mdegiacomo@harrisbeachmurtha.com> |
| CC | Jennifer Babula<jbabula@harrisbeachmurtha.com> |
| Date | Tuesday, July 29th, 2025 at 4:15 PM |

Hello Mr. DeGiacomo,

I just wanted to let you know as a courtesy, and potentially required service/notice, that I filed my complaint requesting student loan discharge today and I'm attaching copies. If you require service more formal than email, please let me know and I'll do so.

I also wanted to let you know that the city inspected my apartment today due to a pest infestation and cited my landlord for a significant number of habitability violations and raised the issue that it appears my "apartment" may be an illegal conversation of basement storage space and could be condemned. My landlord has been charging me $2,600-3,000/month since late 2023 and there's potentially a lawsuit there to recoup rent payments. I think I'm supposed to tell you whenever there's potential legal claims, in case you want to pursue them, so let me know if you want more information about this or any others (there's a few more things that could be done but I don't have the time/resources to do myself, like an FCA case against NEU).

Respectfully,
-Ashley

—

Ashley M. Gjøvik
BS, JD, PMP

Sent with [Proton Mail](#) secure email.

On Wednesday, July 23rd, 2025 at 3:24 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

> Hi Mr. DeGiacomo,
>
> Thank you for your quick response and clear instructions. Ms. Babula contacted me about the documents and portal, and I have now uploaded all requested documents thus far, so that's all set.
>
> I'm attaching a copy of the most recent civil complaint (fifth amended) and a copy of the docket for the case, and also uploaded them to the portal. If you'd like to see the NLRB complaint that US government filed against Apple for terminating my employment in 2021, I can also share that as well. The NLRB complaint demanded that Apple reinstate me, pay me backpay and compensatory damages, and apologize. (Compensatory damages would include credit card and medical debt). Apple is fighting it and we haven't gone to trial yet.
>
> Acknowledged about student loans, donations, and legal representation. Re: legal representation, I understand you probably suggest that as a default suggestion in complex cases. I have no money to pay a lawyer and it

# Re: Chapter 7 Bankruptcy Case No. 25-11496

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Mark G. DeGiacomo <mdegiacomo@harrisbeachmurtha.com> |
| CC | Jennifer Babula <jbabula@harrisbeachmurtha.com> |
| Date | Monday, August 4th, 2025 at 4:39 PM |

Hello!

I filed my updated schedules regarding legal claims and the Pro Se Clerk just posted it a few moments ago (attached).

I sent my landlords a notice of anticipated litigation (within or outside the bankruptcy proceeding) and I can share a copy with you if you'd like. They appear to have violated a lot of laws, most of it is strict liability / facial contract violations, and some of the claims have treble damages. It's probably enough to pay off Chase and BOA, at least.

Regarding my Apple litigation, you haven't asked for updates but you also haven't abandoned the case, so I wanted to let you know we have a status conference tomorrow. The hearing is 2:30 PM PT / 5:30 PM ET, via Zoom. The Joint Case Mgmt Statement is [here](). I'm asking for a Alternative Dispute Resolution procedure called Early Neutral Evaluation that's a type of settlement conference that uses a mock-trial format. Its my understanding I cannot actually agree to any settlements without your ok unless you abandon the claim or the case closes, so I will be respectful of that.

| | |
|---|---|
| Case Name: | Gjovik v. Apple Inc. |
| Case Number: | [3:23-cv-04597-EMC]() |
| Filer: | |
| Document Number: | 236 (No document attached) |

**Docket Text:**

**CLERK'S NOTICE SETTING STATUS CONFERENCE.**

**Joint Status Report due by 7/29/2025.**

**Status Conference set for 8/5/2025, at 2:30 PM in San Francisco, - Videoconference Only before Judge Edward M Chen. This proceeding will be held via a Zoom webinar.**

**ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG INTO ZOOM NO LATER THAN 2:20 PM.**

**Webinar Access: All counsel, members of the public, and media may access the webinar information at [https://www.cand.uscourts.gov/emc]()**

# Re: Chapter 7 Bankruptcy Case No. 25-11496

| | |
|---|---|
| From | Mark G. DeGiacomo <mdegiacomo@harrisbeachmurtha.com> |
| To | Ashley Gjovik<ashleymgjovik@protonmail.com> |
| Date | Monday, August 25th, 2025 at 1:37 PM |

Ashley

Just hold the check for now.

I'm on vacation this week but, as we discussed, I would like to set up a call during which we can discuss all of your causes of action and the bankruptcy case in general. Would you be available for such a call on September 8 at 1 PM? In advance of our call I think it would be helpful if you would draft a brief summary concerning each cause of action, including the claims and defenses that have been asserted to this point. I would ask that you keep the summaries to no more than two pages per case. I will read the summaries prior to our meeting which should help move things along. Remember that I am not your attorney and I cannot provide you any legal advice. However, if you have any questions concerning the bankruptcy process, I can answer them during our call.

Mark.


Sent from my iPhone


**Mark G. DeGiacomo** | Partner

Direct: 617.457.4039 | Email: mdegiacomo@harrisbeachmurtha.com



**HARRISBEACHMURTHA.COM**

Boston Office | 33 Arch Street, 12th Floor, Boston, MA 02110-2320

617.457.4000 | Fax: 617.482.3868





> On Aug 25, 2025, at 12:18 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:
>
> Hello,
>
> I wanted to let you know that my landlord, Searatt Dutt, returned my security deposit ($2,904) to me via certified mail on Saturday 8/23 without explanation. This is assumably in response to my ongoing complaints, including demand for them to remedy the many unlawful lease terms for my current apartment, including multiple violations of

MA security deposit laws.
>
> In response I sent her an email noting that I received her mail, but I reminder her I'm in bankruptcy so I cannot cash the check or agree to any sort of settlement with her regarding those claims without reporting it to the Trustee and waiting for the Trustee to decide what to do.
>
> I'm attaching the documents she mailed me with a scan of the check, the email I sent her in response, and the 8/1 notice I send her demanding she remedy violations, including related to the security deposit. I also have reports from and with the city I can share if you want more context on this, including a police report filed against her boyfriend on 8/17 for criminal harassment and an attempted forced entry.
>
> If I need to update my schedules again to add the check as property, please let me know, but otherwise I was going to treat it as a settlement offer that has not been accepted at this time. Its my understanding that if a lawsuit is filed against her and her boyfriend over this, that MA law provides treble damages for security deposit violations, so this would be undervalued.
>
> -Ashley
>
> —
> Ashley M. Gjøvik
> BS, JD, PMP
>
> Sent with Proton Mail<https://proton.me/mail/home> secure email.
>
> On Friday, August 15th, 2025 at 11:44 AM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:
> Hi Mr. DeGiacomo,
>
> i just wanted to let you know that the Court in my Apple civil litigation still has not posted the minutes from 8/5 hearing but the Judge did mention he was considering letting us go to dual summary judgement and that would be about 4-5 months out. I don't know if he will make a decision about the request for the Early Neutral Evaluation since he seemed to be preferring summary judgement (which I had requested as my preference as well).
>
> I also wanted to let you know that [redacted]

>

> I have also been preparing to draft a demand letter for the landlord about the issues at the apartment (false advertising, tenancy law) but there's no deadline there. I did stop paying rent as of 7/31 until he fixes the habitability issues.
>
> I saw your filing to the court today about retaining a law firm so I wanted to let you know right away about these updates and assume I would be working with the firm on this and whatever they'd like to know from me -- more than happy to cooperate and provide whatever they need about the claims or my own finances.
>
> -Ashley

# Exhibit B (Memo I)

**Estate Memorandum:**

"InRe_Gjovik_Cause_of_Action_Dutt_18W_LandlordTenant_20250903"

**Ashley M. Gjovik, JD**
*In Propria Persona*
(415) 964-6272
ashleymgjovik@protonmail.com
Boston, MA

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

IN RE:

ASHLEY M. GJOVIK,

DEBTOR.

CHAPTER 7 CASE NO: 25–11496
TRUSTEE: MARK G. DEGIACOMO

TRUSTEE INVESTIGATION OF
ESTATE CAUSES OF ACTION

MEMORANDUM:
LANDLORD/TENANT

RE: 18 WORCESTER SQUARE
LANDLORD: SEERATT DUTT
AGENT: ALEX MATSES

**RESERVATION OF RIGHTS:** This memorandum is prepared solely for Bankruptcy Estate administration purposes and does not constitute admissions, waivers, or binding characterizations. All rights are reserved to pursue alternative theories and claims, and to assert all available privileges and defenses in proceedings. This memorandum is prepared under the work product doctrine and may not be used by adverse parties in any proceeding or defense against Gjovik or the Estate.

# Landlord/Tenant (18 Worcester Square)

In Sept. 2023, Gjovik contacted Seeratt Dutt on Zillow Rentals about a listing that Dutt and her boyfriend, Alex Matses, made advertising Dutt's apartment at 18 Worcester Square Unit 1 in Boston. The deed shows the property is owned by Dutt, and not Matses. On Sept. 16 2023, Matses contacted Gjovik about the rental listing and they discussed the apartment. Gjovik disclosed she had just received an offer of employment from NEU and was given a short deadline to relocate.

On Sept. 19 2023, Matses informed Gjovik her application for renting the apartment was approved and asked Gjovik to sign a lease. Between Sept. 19 and Sept. 20, Gjovik paid Dutt $6,037.50. On Sept. 21, Dutt and Matses provided Gjovik the "fully signed lease" dated Sept. 19 2023. The original lease term was from Sept. 22 2023 – Aug. 31 2024 with rent of $2,625 each month. The lease was then extended on May 16 2024 to extend through August 31 2025. Dutt and Matses also increased the cost of rent to $3,000/month. On June 2 2025, Dutt and Gjovik renewed the lease again through August 31 2025. The lease included unlawful terms related to security deposits, late fees, move-out costs, litigation, liability waivers ("the Tenant(s) agrees to hold the Landlord harmless from any claims or damages unless caused solely by the Landlord's negligence") and other unlawful terms.

The Zillow advertisement noted the apartment was a "one bedroom" that had "750 sq ft" of living space. Gjovik's lease with Dutt describes the unit as "residential dwelling" that has "1 bedroom." Upon arrival, it was clear the apartment was much smaller then what was advertised (552sqft), was not a one bedroom (city records show its a studio), was probably an unlawful basement conversion, was in terrible condition with pests, insects, filth, poor plumbing and electrical, no screens on windows, and other issues. Gjovik complained to Dutt and Matses, but Matses generally refused to fix anything. Despite Dutt being the property owner, Gjovik almost exclusively dealt with Matses as the "agent" in the lease for "complaints." Matses is also a licensed construction supervisor and when he finally agreed to make repairs, he used his father's staff to do unpermitted repairs in the unit during their work hours.

The unit was in an 1850 basement that upon first attempt to convert to residential ~1990, was denied by the city, but was approved as a variance by the zoning board. There was also a warning from the city the 1980s that the entire building appeared to be uninhabitable. It appears there have been no meaningful repairs, upgrades, or maintenance. Dutt has not taken out permits since purchasing the property in 2018 and did not even register the rental unit with the city ISD as required.

The boiler room directly shares a wall with the tenant's bedroom, creating a direct pathway for water damage, moisture infiltration, and associated health hazards. On July 9 2025, a water heater burst without and safety mechanisms, resulting in water pouring out at full pressure into the boiler room. After only five minutes of equipment discharge, there was already one foot of standing water in the boiler room and three to six inches of standing water in Gjovik's bedroom. The sound of waterfalls woke Gjovik up, she discovered the issue, and had to manually shut off the water to the entire building. Despite these efforts, the damage already done required immediate carpet removal, water damage remediation, and gutting and reconstruction of the shared wall. The remediation process also revealed pre-existing mold contamination within the shared wall cavity, indicating long-term moisture problems that the landlord failed to address despite the tenant's prior complaints regarding persistent odors emanating from the wall.

Further, it was discovered that the basement mechanical area, including the boiler room containing water heaters and building mechanical systems, completely lacks any drainage infrastructure whatsoever. The building's admitted reliance on cracks in the floor for water disposal fundamentally violates the basic principles of proper drainage system design and constitutes a per se violation of MA plumbing code requirements, including risk of catastrophic damage to adjoining rowhomes.

Gjovik also reported a pest infestation to the city and MA government on and around July 25 2025

and based on her description of conditions, the city requested to perform an inspection, which Gjovik agreed. The city filed a ticket that became a public 311 case. Matses found it and demanded Gjovik close withdraw her complaint. Gjovik refused to withdraw the complaint and Matases continued to retaliate.

On July 29 2025, Boston Inspectional Services conducted an inspection and documented violations: rodent infestation, holes in walls in the living room and bathroom, gaps in cabinets in kitchen around trash, cracks in bedroom floor, windows missing screens, brick walls crumbling and with gaps, rug boarder with sharp tacks uncovered, kitchen counter not secured or sealed properly, recess lights not secure, and cross metering. The inspection resulted in a referral to the Building Departments, noting the unit appears to be an illegal basement conversion. The unit did not have required bedroom windows or two required modes of egress, and the only windows in the apartment were completely barred shut. In August 2025, Gjovik was able to get the Fire Captain to force Dutt and Matses to remove the bars from the only two windows, and also remove Matses' and Dutt's abandoned gas grill and propane tank.

Gjovik sent a Notice and Demand for Compliance to Dutt and Matses on Aug. 1 2025, where she also began withholding rent until they correct a long list of issues and also settle with her regarding claims including false advertising and premise liability issues. Matses and Dutt expressly refused to acknowledge the document and attempted to insist Gjovik send it via Certified Mail while concurrently threatening Gjovik with further retaliation, attempting to extort her, and also complaining about Gjovik's bankruptcy.

Gjovik also complained about what appears to be immediately condemnable conditions in the apartment. The foundation is thin concrete poured on dirt, cracked and without moisture barrier. There's active groundwater/rainwater infiltration during normal Boston weather through foundation, fieldstone, and up through kitchen flooring. The bedroom wall is directly shared with boiler room (no fire separation or moisture barrier). The porch is in a public alley surrounded by a insecure fence at risk of collapse.

There is no drainage in the basement and the water heater hydroexplosion in July 2025 flooded Gjovik's bedroom and the boiler room with no drainage other than "cracks in foundation". The kitchen sink repeatedly backflows with sewage backup into bathtub (ie spaghetti coming up through bathtub drain). There's no pump, moisture barriers, drainage, or water proofing for a basement residential unit. There's groundwater/rainwater infiltration into the unit through fieldstone, foundation, other vectors. There's multiple leaks and floods in unit and common area in basement from Sept 2023 - July 2025. The electrical panel/breaker was installed ~1982 and never maintained or upgraded. Matses recently fabricated an electrical permit while hiring someone for "half the price" to supposedly correct the cross-metering issues (20-30% of apartment circuits on a HOA pane), but not upgrading the panel or electrical. Plugs fall out of loose outlets; cords get hot, flickering lights; and no moisture control around low outlets.

There's no HVAC or ventilation in the unit other than windows on far exterior wall, opposite of bedroom. Have to keep windows open, even in the winter, in order to now suffocate due to $CO_2$ buildup. No screens on windows, many holes in walls, including hole in living room that goes directly to the exterior. There's also a broken intercom and no way to contact the apartment rom the front of the building. There's no security system or alarms on ground level windows. There's also pest issues in the unit and throughout building. The city scheduled a follow-up inspection for the original issues which have not been corrected, but Gjovik is still awaiting the building inspection and/or condemnation.

No formal defenses have been asserted but Matses has made written and verbal (recorded) statements that likely constitute unlawful threats, extortion, obstruction, and retaliation. Matses' defense will likely be that he's not the owner of the property and the lease states Dutt is the landlord. There will be additional memorandum about Matses' separate liability. Dutt has not attempted to make any defenses at this time and its unclear if she could make any without incurring additional civil and criminal liability (reckless endangerment, fraud, conspiracy, etc.). Gjovik already filed a police report in August 2025.

# Exhibit C (Memo II)

**Estate Memorandum:**

"InRe_Gjovik_Cause_of_Action_Matses_18W_Harassment_Extortion_20250907"

**Ashley M. Gjovik, JD**
*In Propria Persona*
(415) 964-6272
ashleymgjovik@protonmail.com
Boston, MA

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:<br><br>ASHLEY M. GJOVIK,<br><br>DEBTOR. | CHAPTER 7 CASE NO: 25-11496<br>TRUSTEE: MARK G. DEGIACOMO<br><br>TRUSTEE INVESTIGATION OF ESTATE CAUSES OF ACTION<br><br>MEMORANDUM:<br>RECKLESS ENDANGERMENT, HARASSMENT, EXTORTION, & OBSTRUCTION<br><br>ALEX MATSES<br>SEERATT DUTT/MATSES<br>18 WORCESTER SQUARE APT. 1<br>BOSTON, MA, 02118 |

**RESERVATION OF RIGHTS:** This memorandum is prepared solely for Bankruptcy Estate administration purposes and does not constitute admissions, waivers, or binding characterizations. All rights are reserved to pursue alternative theories and claims, and to assert all available privileges and defenses in proceedings. This memorandum is prepared under the work product doctrine and may not be used by adverse parties in any proceeding or defense against Gjovik or the Estate.

## Premise Liability, Reckless Endangerment, Harassment, Extortion, Obstruction. (18 Worcester Sq., Dutt & Matses)

Debtor has resided at 18 Worcester Sq. Apt 1. since Sept. 2023. The "apartment" (an illegal basement conversion not even registered with the city) is owned by Seeratt Dutt (a.k.a. Matses, Narang Matses), and the lease is between Debtor and Seeratt ("Dutt"). It appears Dutt changed her name from "Seeratt Dutt" to "Seeratt Narang Matses" "vide affidavit' around June 2023, yet entered the lease with Debtor in Sept. 2023, and communicated with Debtor ongoing, as Seeratt Dutt, and never corrected Debtor that her surname may no longer be Dutt. Alex Matses ("Matses") is assumed to be the boyfriend of property owner Seeratt, with no marriage certificate available online. The lease notes that Alex Matses is the "agent" of Seeratt for complaints and issues. Matses' conduct includes harassment, tampering, fraud, extortion, blackmail, attempted forced entry, reckless endangerment, and obstruction.

On July 25, 2025, Debtor called City of Boston about a pest infestation. The City opened Case #101006196687 and scheduled inspection. This case became ISD Case No. 848-712 and 849-279, with notice of violations and demand for compliance served to Dutt. On July 28, Matses discovered the public 311 case and demanded Debtor withdraw her complaint with the city. Matses threatened hostile living conditions if she refused to withdraw the complaint about pest issues, and and began overt retaliation for Debtor's protected activity.

On July 31, Matses threatened to charge Debtor for pest control expenses, unilaterally claiming the contractor report would blame her for pest issues. Debtor responded that he couldn't charge her for the pest issue when their building defects, specifically holes in walls and no window screens, enabled pest entry. On August 3, before the pest control contractor arrived, Matses arrived early and began patching holes in bathroom walls and installing window screens. When Debtor asked if he was trying to hide evidence before the contractor inspection, Matses acknowledged that was his intent. Debtor ordered him to leave. Debtor provided the contractor a sworn declaration upon arrival, documenting the attempted evidence tampering including before/after photos with the fresh pink spackle.

On August 1 at 10:27 PM, Debtor sent formal legal notice to Matses and Dutt documenting habitability violations, complaining of fraud and reckless endangerment, a notice of withholding rent, demanding 5-day written compliance plan, and instituting litigation hold. The notice referenced Matses' construction license CS-111987 and stated the violations constituted "knowing and willful misconduct." On August 2 at 12 PM, Matses refused to accept hand delivery of paper copy of the notice. He first demanded certified mail, then that his lawyer would contact Gjovik, then refused to provide lawyer contact information. The lease required complaints be sent to his email address which he said he refused. Matses also asked Debtor if she "want to continue [her] lease" and asked if she wanted to continue living at the premise, despite her lease extending through 2026. Matses also "complained about [her] being in Bankruptcy." On August 3, Matses demanded rent with interest, threatened fines, and against threatened pest control costs. No lawyer ever contacted Debtor. These conversations were recorded.

Matses continued this line of conduct for over a week, while refusing to repair the majority of the issues, continuing to refuse to discuss Gjovik's complaints, and also making false statements. For example, Gjovik demanded he they remove the bars soldered on her only egress (windows) that left her with no egress in case of a fire. Matses told her it was not unlawful and suggested the fire department approved it and it would somehow be unlawful to remove the bars. Then Matses suggested if he removed the bars, the apartment would be unsafe and people would break into Debtor's apartment and harm her, and told her she would be financial responsible for installing a security system. Debtor called the Fire

Captain, insisted on documented the multiple fire code violations, and the Fire Captain personally observed and confirmed that Matses promptly removed the bars from the windows/egress.

Around August 12, Matses demanded Debtor provide him "real-time updates" on the quality of her showers and baths. Debtor complained this was "creepy." Matses said if she did not immediately complain about water pressure and/or heat issues in her showers, she waived her ability to complaint.

Debtor had complained about the lack of drainage in the basement following a severe flood caused by a burst water heater in July 2025, her shared bedroom wall with the water heater room that was found full of mold, and complained to the City about the flood and violations. On August 13, Debtor then complained about being "formally locked out of the boiler room with a locked door and sign specifically prohibiting [her] from entering" after reporting violations. She noted this occurred after the " explosion and flood" that damaged her shared bedroom wall, and that landlords "have access -- but I do not." Debtor called this "clearly retaliation for my complaints and an attempt to prevent me from gathering evidence."

On August 14, Matses justified the lockout claiming "access to the mechanical room is limited to unit owners and their contractors strictly for safety reasons and not as a retaliatory action," despite Debtor's bedroom wall being directly shared with the mechanical room where emergencies had occurred, and Debtor being the only person able to notice the flood and promptly turn off the water to the building before there was catastrophic damage. Matses told her in case of any future emergency she must contact him and Dutt directly and they will coordinate, and instructed Debtor she is not allowed to talk to other residents or neighbors if she thinks there may be an active emergency.

On August 14 at 11:02 AM, Debtor heard noises and found "four men in yellow safety jackets running around the basement with [the HOA president]" who were "acting frantic" about water leaks and boiler room pump issues. When Debtor entered the hallway to ask questions, HOA President Ron insisted she "go back into [her] room." When contractors tried to provide information, "Ron interrupted and tried to prevent them from telling me anything." Ron told Debtor she didn't need to know about the water emergency and again told her again to "go to [her] room." Ron also claimed the washer/dryer area wasn't part of her leasehold and that "he doesn't want [her] in the hall way (my primary egress)."

On August 12-13, Matses repeatedly rescheduled electrical work. On August 13 at 11:59 PM, Debtor raised concerns about working on a 1982 breaker without permits, with active water hazards and leaks, and questioned the one-hour timeframe for complex cross-metering work. She noted Matses had "cancelled the appointment with Barbara's electrician and found one you said would do the same work for 'half the price.'" On August 14, Matses claimed electrical work would be "completed to code" but admitted "I do not yet have confirmation on whether the permit has been issued." On August 15, Matses provided electrical permit number E1764459 for work scheduled the next day. City database verification shows this permit number does not exist.

On August 15 at 11:48 PM, Matses sent a threatening email demanding control over bedroom door configuration in Debtor's studio apartment. The unit has no ventilation system and the bedroom wall is directly shared with a boiler room containing four gas water heaters. Debtor had removed folding doors to improve airflow and prevent CO/CO2 buildup that could cause suffocation, due to the condemnable lack of ventilation/mechanical and no windows other than the opposite side of the studio. Matses threatened: "If you are not able to [reinstall doors], I will arrange this on your behalf" or send a third party to forcibly install it, and. indicated he would charge her for forced reinstallation of doors that could block life-saving airflow. Matses also demanded control over curtain choices in Debtor's bedroom and made additional controlling demands about her personal space.

On August 16 at 1:31 AM, Debtor sent a detailed response explicitly stating her fear of Matses and requesting cessation of contact. She wrote: "I was hoping we could refrain from repeatedly emailing back

and forth accusations (this is now the twelfth accusatory email from you in just three days - and this one is sent to me at midnight no less). It's not very productive and it seems like you might just be enjoying trying to make me feel bad and trying to trigger me to engage in conflict-focused dialogue with you." She described his behavior as "very concerning" and stated: "I can't understand what you might be achieving with your emails tonight about all of this other than desiring to control the configuration of my bedroom (and thus me and my body) and also intentionally trying to cause me physical harm and emotional distress. If that's true, its very disturbing and causes me to be fearful."

Debtor explicitly compared Matses' conduct to past abusive relationships, writing: "I'm feeling very distressed speaking with Mr. Matses due to his continued refusal to discuss my concerns in good faith, and instead his insistence on blaming me for things, threatening me, and making strange (and honestly creepy) attempts to control my behavior, my body, and the objects in my private home. I've had some negative relationships in the past that included these types of abusive control tactics from men, and I've seen the kind of behavior that Mr. Matses appears to be engaging in and actively escalating, can quickly spiral out of control." She described him as "trying to control me like some weird ex-boyfriend" and stated: "I'm afraid of him and don't want contact with him." She specifically requested that property owner Dutt be present for any future visits and asked Matses to "stop spending so much time in my home with me alone while concurrently making these threats and trying to control me." The email concluded with Debtor pleading: "Please give me a break from this for at least a couple days. It's so unsettling and inappropriate."

Despite Debtor's explicit "no contact" demand from her 1:31 AM email, on August 17 Matses appeared at the property and attempted forced entry to Debtor's unit. This occurred less than 16 hours after Debtor had explicitly stated "I'm afraid of him and don't want contact with him" and requested he "stop spending so much time in my home with me alone while concurrently making these threats." Debtor has audio recordings of Matses attempting to force his way into the unit. When the entry failed due to Debtor having barricaded her door (because "there's no deadbolt I can use to keep him out and because he still has keys to my home"), Matses then texted Debtor requesting access to enter the unit. The text requests came after his physical attempt to break in had been unsuccessful, showing continued attempts to gain entry despite both the failed forced entry and Debtor's explicit prohibition on contact. In her later account of the incident, Debtor noted she had "continued to keep my door barricaded following his attempted entry" and "purchased, at my own expense, security locks/bolts/bars to secure the windows and door to keep him out in case he tried to force his way in again."

Debtor filed Police Report #252067974 the same day, documenting what she described as "accelerating threats, extortion attempts, demands I withdraw complaints, harassment, attempt frame-ups, and failure to actually make critical repairs, among other issues" that culminated in the attempted forced entry. She noted in her police report that Matses' "conduct has been wildly inappropriate, highly unlawful, and constantly escalating -- which makes me fear for my safety." The attempted breaking and entering occurred one day after Debtor had explicitly compared Matses' behavior to "abusive control tactics from men" and stated she was afraid he would harm her. This summary does not include all of the misconduct, but attempts to a paint a picture of the dynamic and misconduct.

Matses holds Massachusetts Construction Supervisor License (CS-111987). Charles Construction, owned by Matses' father, has been involved in the misconduct. Matses brought company trucks and crew to perform unpermitted repairs during their regular work hours. Despite operating since the 1960s with extensive government contracts, the company has zero BBB complaints, suggesting systematic complaint suppression. Matses used his professional construction license and company resources to intimidate and threaten a Debtor, because she filed government complaints.

# Exhibit D

Email Exchange Between Debtor and Trustee, Sept. 08, 2025 (Providing copies of individual PDFs of previously transmitted memos during the meeting between Trustee and Debtor to discuss legal claims)

## Re: Ashley Gjovik | Chapter 7 Case 25-11496

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Mark G. DeGiacomo<mdegiacomo@harrisbeachmurtha.com> |
| Date | Monday, September 8th, 2025 at 1:35 PM |

Hi, Here's all the memos added individually

—

**Ashley M. Gjøvik**
BS, JD, PMP

Sent with Proton Mail secure email.

---

**2.68 MB**    23 files attached

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_Matses_18W_Harassment_Extortion_20250907.pdf 119.07 KB

InRe_Gjovik_Cause_of_Action_Dutt_18W_LandlordTenant_20250903.pdf 112.26 KB

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Trustee_Decision_

InRe_Gjovik_CONFIDENTIAL_

InRe_Gjovik_Cause_of_Action_

InRe_Gjovik_Cause_of_Action_