**Ashley M. Gjøvik, JD**
*In Propria Persona*
(415) 964-6272
ashleymgjovik@protonmail.com
Boston, MA

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

IN RE:

ASHLEY M. GJOVIK.

CHAPTER 7 CASE NO: 25–11496

JUDGE CHRISTOPHER J. PANOS

DEBTOR'S REPLY TO
THE TRUSTEE'S
NOTICE OF
ABANDONMENT
(DKT. 40)

WITH A COPY OF THE
10/9/25 93A DEMAND
LETTER REGARDING NOW
REVERTED CLAIMS.

# DEBTOR'S RESPONSE TO THE TRUSTEE'S NOTICE OF ABANDONMENT (DKT 40).

1.      Debtor Ashley M. Gjovik, files this response to the Trustee's second Notice of Abandonment regarding 18 Worcester Sq. (Dkt. 40).

2.      Trustee DeGiacomo filed his first Notice of Abandonment regarding 18 Worcester Sq. on Sept. 11 2025 at Dkt. 25.

3.      Gjovik filed a response with objections on Sept. 12 2025 at Dkt. 32 and then filed a Proof of Service on Sept. 22 2025 at Dkt. 37.

4.      Then, later on Sept. 22 2025, Trustee DeGiacomo filed a second Notice of Abandonment regarding 18 Worcester Sq at Dkt. 40.

5.      Gjovik incorporates her prior objections, concerns, and complaints noted in her first response at Dkt. 25 and supplement at Dkt. 38. Gjovik continues to not object to the reversion of her claims back into her possession.

6.      Gjovik does object to Trustee DeGiacomo's latest actions in his second Notice of Abandonment, apparently confirming Gjovik's prior suspicions that the Trustee appeared to have previously intentionally bifurcated her claims, blocked her strongest claims, and obstructed her claims against certain named parties (i.e., Charles Construction Company, Ron Payne, the 18 Worcester Square Condominium and Trustees, and the Matses family).

7.      On Sept. 22 2025, the Trustee's second Notice then also abandoned those claims in a haphazard memo full of typos and placeholders, and which it appears was either intentionally incorrect or Trustee DeGiacomo did not even bother to proofread the paper prior to filing the Notice to this court.

8.      Further, instead of simply confirming he meant to abandon all claims in his Sept. 11 2025 Notice of Abandonment, Trustee DeGiacomo's second Notice posted it as a new abandonment and thus then added an additional fifteen-day delay on Gjovik's ability to pursue her legal rights and defend her interests in an active and heated dispute regarding the property where she current lives, which appeared to be yet another action taken by Trustee DeGiacomo in favor of these parties and against the interests of Gjovik and the Estate.

9.      Regardless, as of today, now 15 days have passed since Trustee DiGiacomo's second Notice of Abandonment and no objections were filed by creditors, thus under relevant rules and statutes, all claims related to these parties and property have now reverted back to Gjovik.

10.      Accordingly, this morning Gjovik mailed her thirty-day Demand Letters regarding 18 Worcester Square to those parties. A true and correct copy of the letter  is attached to this response for transparency.

Dated: October 9 2025

Respectfully submitted,

**/s/ Ashley M. Gjovik**
*In Propria Persona*
18 Worcester Square, Apt 1
Boston, MA 02118

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be served upon the relevant parties (Trustee DeGiacomo) via the Court's electronic filing system.

# Exhibit

## Chapter 93A Demand Letter dated October 9, 2025

**Ms. Seeratt Dutt**
a.k.a. *Seeratt Narang Matses*
23 Main St, Byfield, MA, 01922
seerattd@gmail.com

**Mr. Alexander Steven Matses**
 a.k.a. *Alex Matses*
23 Main St, Byfield, MA, 01922
amatses@gmail.com

**The 18 Worcester Sq. Condominium Trust**
c/o Ronald Payne, Trustee, 18 Worcester Sq. # 4
ron@paynecollinsdesign.com

**Charles Construction Company, Inc**.
200 Sutton Street,
North Andover, MA, 01845
amatses@charlesconstructioncompany.com

**South End Corporation, Inc.**
a.k.a. *Lawrence Stephen Abeln*
Lawrence.Abeln@thunderbird.asu.edu
70 W Lynwood St.,
Phoenix, Arizona, 85003

# Mass. General Laws Ch. G.L. c. 93A

## 18 Worcester Sq., Boston,
### Suffolk County, Massachusetts

On this day of Oct. 10 2025, under the provisions of Massachusetts General Laws, Chapter 93A, Section 9, I hereby make a written demand for relief. Starting on or about Sept. 2023, and continuing ongoing, the following unfair and deceptive acts have occurred as part of a larger pattern of unlawful and unsafe activity which has harmed my business and property and caused me distress and physical injury.

These unfair and deceptive acts and practices are independently actionable and concurrently unlawful Chapter 93A. I believe the parties listed above are liable for some or all of the harm caused by these violations – independently, jointly, vicariously, or otherwise.

These complaints and this request for relief arise out of my residence and experience living at 18 Worcester Sq. Unit 1 starting in Sept. 2023 and ongoing. The Unit 1 apartment is fundamentally uninhabitable, was never a lawful residential space, no other Victorian rowhome buildings use the basement next to the mechanical and utilities as a bedroom, and the conditions of the "apartment" create an acute threat to health and safety. I have been injured by the premise and negligent and dangerous

conditions, and also by a variety of unlawful, threatening, and extortionate conduct underlying and associated with the "apartment" and the related schemes that created and maintain this situation.

# BACKGROUND

## THE 18 WORCESTER SQ. PROPERTY & BUILDING

The lot for 18 Worcester Sq. in Boston was purchased in 1860. The construction of the 18 Worcester Sq. building was completed in the early 1860s, with the first owner residing in the building with his family by 1866. (Boston Evening Transcript, Nov. 14 1866). The foundation is "earth" and "stone" (Mass. Historical Comm. BOS.1419; Boston Groundwater Trust) – with uncovered portions of the basement today still revealing a dirt floor surrounded by the original fieldstone slabs.

18 Worcester Sq. was sold in 1895 and then in 1902 was converted to a "fraternity house" for Boston University Medical School (Phi Alpha Gamma Beta; Boston Herald, Oct. 11 1902). The building was sold again in 1924 and that owner converted the building into a Lodging House in 1943. The building was sold again in the 1970s and renovations were undertaken in 1972 to convert the building into apartments – including installing the original bathroom, kitchen, and laundry facilities in the basement. At that time, the 1972 permit application claimed the building had legal occupancy for five units. In January 1978, the property was sold again and now conveyed to Martha M. Mattox of Cape Cod.

In March 1978, the City of Boston sent a notice to Mattox and 18 Worcester Sq. complaining that the building does not have any record of legal occupancy for apartments. Additional permits were then filed in an attempt to bring the building up to code in order to legalize the occupancy for four apartments, quickly abandoning the idea of a fifth apartment in the basement. (Permit 1592, "legalize occupancy for four apartments").

The licensed builder and contractor for this work was "Provincetown Boatworks, Inc" – a company in Cape Cod chartered to construct and repair ships, boats, and watercraft. The architect specialized in designing veterinary hospital and animal shelters. The city approved the permit and the work on the four apartments was completed by the end of 1979.

In 1982, the owner of 18 Worcester Sq. filed a permit to install electrical outlets, circuits, plugs, lights, and a panel for the basement, referring to the basement as an "apartment." In 1988, the owner filed additional permits for maintenance and repairs but noted it was only "four apartments" and said the homeowner would do the work herself. In 1990, the owner filed a new permit asking again to change the occupancy to five apartments and to "install" the "basement apartment." The application listed no architect, contractor, or licensed builder – only the homeowner. The application was denied due to violating zoning code section 8-7 (forbidden), 15-1 (area is excessive), and 17-1 (usable open space is insufficient).

The Worcester Square rowhomes supposedly have the most uniform layouts of all the Boston historic Victorian neighborhoods, with double basement, bow fronted, mansard roofed row houses in Italianate style. (National Registry of Historic Places, PH00006505, March 30 1973). 18 Worcester Sq. has

never filed floorplans or other building plans with the city or state, however other Worcester Sq. townhomes have and due to the uniform construction, they are directly comparable. (See Appendix A).

All published Worcester Sq. plans show their "Unit 1" as a two-level living space that includes bedrooms on the first floor, and a kitchen and living room in the basement. 18 Worcester Sq. appears to be the only Worcester Sq. building to bifurcate the basement (the "garden" level) and the first floor into two different apartments. Further, the majority of Worcester Sq. basements either never, or no longer, include dedicated mechanical space and/or boiler rooms. The majority of the basements are dedicated kitchen and dining spaces averaging around 900 sqft.

Only four other basements are/were configured like 18 Worcester Sq. with a shared common hallway, a dedicated boiler room, a shared mechanical and electrical panel space, and other shared service and storage spaces. In these basements, the portion of the Unit 1 living space averages around 520 sqft. None of these basements contain bedrooms – not even the layouts without boiler rooms. All bedrooms are on the first floor or higher floors.

18 Worcester Sq. is the only rowhome with a bedroom in the basement, and it's one of the few buildings that has nearly ½ the basement space dedicated to water heaters, mechanical, and utilities. No one else has done this -- and it is a reckless, unsafe, and improper concept. The Trustees and owners of 18 Worcester Sq. seem to understand this issue, and it is probably one of the reasons they quickly locked the Boiler Room so Unit 1 could not view or document the conditions.

In 1990, the owner of 18 Worcester Sq. appealed the denial of her request for a basement studio apartment with five sentences. The justification for requesting legal occupancy of the basement apartment was that "low cost housing stock is needed in the city of Boston," "the request is in character with the residential stock in the area," and would not disturb others.

The reasons provided by the owner were insincere and false. Critically, the request was not "in character with the residential stock in the area" because no other buildings bifurcated Unit 1 into two separate apartments, no buildings placed a bedroom in the basement, and certainly no other buildings created a studio apartment next to mechanical, boilers, and utilities for the building. Second, if there was an honest concern about "low cost housing" then the Master Deed created less than 10 years later should have restricted the sale and rental price for Unit 1, but it did not. Further, in 2025 the owner of Unit 1 is attempting to rent the 435 sq ft basement studio for $3,000/month.

The Board of Appeal approved the variance under the condition the apartment "must meet I.S.D. requirements for basement apartments." The Board ordered the Building Commissioner to grant the permit. In 1992, the City approved the permit, but noted the owner had already installed most of the apartment (kitchen, electrical, etc.) so there was "no work" left to approve. In 1993-1994, the owner filed additional permits for repairs in Unit #2 and again noted she would do the work herself and without professionals or contractors.

In Dec. 1998, the owner sold the building to South End Corporation, a company created in May 1998. In Jan. 1999, South End Corporation then created the Master Deed and Declaration of Trust, converting the building into condominiums, and took out a lien on the building and all of the property within. The corporation was incorporated and managed by one person, Lawrence S. Abeln. Abeln was also the first and exclusive Trustee of the 18 Worcester Sq. HOA in 1999.

Ronald Payne purchased the first condominium unit (Unit 4) in Jan. 1999, deeded to him by Lawrence S. Abeln and South End Corporation. Around the same time a Right of First refusal was created for the owner of Unit 2 regarding Unit 1, as it appears the same person was using both units, as is standard for these rowhomes where "Unit 1" is a combination of the basement and first floor.

Around that time the owner of Units 1-2 filed permits to upgrade the electrical in Unit 1 and upgrade the sink, tub, dryer, stove, and dishwasher. However, the main permit incorrectly claimed, "Unit 1" was "Floor One" instead of "basement," and listed the owner as someone who is not named on any deed. One contractor cancelled a permit application due to lack of payments and the only contractor remaining for the "renovation" was a plumber.

A couple of months later, Abeln sold Unit 1 for $74,000 to the first "owner" of the basement apartment and the owner of Unit 2 released the Right of First Refusal. Unit 1 was conveyed again in 2002, and then again in 2005 to Stephanie Adams who held it until 2018. In 2005, the next and last permit was taken out for Unit 1 when Adams applied for a permit to install a security alarm system.

In 2006, Boston University constructed and opened the National Emerging Infectious Diseases Laboratories facility 1,500 feet away from 18 Worcester Sq. The facility is one of the nation's only Biosafety Level 4 laboratories. The BSL-4 designation was not approved until 2018 due to fierce community opposition. The proximity of the laboratory was never disclosed to Gjovik prior to, or during her lease. [1]

# The Apartment

Dutt purchased Unit 1 on May 25 2018 for $495,000 from Stephanie Adams. Dutt took out a $396,000 mortgage for Unit 1 in May 2018 which required her to live in Unit 1 as her primary residence. Then, on Aug. 20 2021, Dutt replaced her first Unit 1 mortgage with a new $377,000 mortgage which required that Dutt use Unit 1 as her primary residence for at least one year.

On Aug. 6 2021, Matses sold his own property at the time (7 Charles St. #1, Newburyport) for $400,000 cash. On Nov. 15 2021, Dutt and Matses then jointly purchased a different property (23 Main St., Newbury, Byfield, MA). Their second property was purchased for $900,000 and is listed as a 3,500+ sq ft three bedroom house more than an acre of land. The property was listed for sale on Sept. 30, 2021 , contingent on Oct. 8 2021 and sold on Nov. 15 2021.

However, public records suggest that Dutt was already living at 23 Main St. around August 2020. Further, the Zillow rental history for 18 Worcester Sq. Unit 1 shows that Dutt first tried to rent Unit 1 in April 2020 and appears to have rented to at least three different tenants from 2020-2021, 2021-2022, and 2022-2023, prior to Gjovik's tenancy. This would have assumably been in direct violation of both of Dutt's mortgages and may be one of the reasons Dutt failed to register Unit 1 as a rental with the city, which is required by law.

Further, between 2023-2025, Alex Matses made multiple, repeated statements to Gjovik that he and/or Dutt had purchased and installed the current kitchen appliances (fridge, freezer, dishwasher, etc.).

---

[1] BSL-4 laboratories routinely process "the world's most deadly viruses" and "the most dangerous organisms known to mankind such as Ebola and weaponized anthrax." (MIT, 2010; Science, 2005).

in Unit 1 Matses also claimed multiple times that Dutt had personally installed the current wood fence around the patio. Matses also repeatedly implied the carpet in Unit 1 was not older than five years.

Stephanie Adams sold Unit 1 to Seeratt Dutt on May 25 2018. Adams listed Unit 1 on March 8 2018 and advertised Unit 1 on real estate websites and also in the newspaper. An article advertising Unit 1 stated multiple times that Unit 1 is 552 sqft and a studio apartment: "***There's no denying that at 552 square feet, the studio is small.***" (*Compact condo comes at moderate price*, Boston Hearld, March 24 2018). The article also notes that the building was likely constructed in the 1870s. The 2018 property listings also include a second "lot" size of 436 sqft (which appear to represent the actual square footage of the unit).

The 2018 Boston Herald article also included photos of Unit 1 taken by Boston Herald staff showing that Unit 1, in 2018, prior to Seeratt Dutt purchasing Unit 1, the apartment already had the current kitchen appliances and the wood fence around the patio. The 2018 photos also shows the current carpet – already appearing aged and discolored.

When Dutt and/or Matses captured and posted photos of Unit 1 on Zillow, at some point between 2020-2023, the photos showed Dutt was already concealing half of the old carpet with a rug, showed an A/C unit in the window (which appears to be the same equipment they kept in Unit 1 and the storage cave next to the coal chute), and what appears to be placeholder furniture but no typical possessions, as if Dutt never even lived in the apartment.

In Feb. 2022, the Master Deed for 18 Worcester Sq. was amended with requirements related to rentals. The amendment added a section titled "Rental Restriction" that said, "leasing of a unit if prohibited without the prior written consent of the Trustees." Gjovik was told that Dutt was the only owner to rent their unit and that the amendment was in response to Dutt.

The amendment also noted that any rental must be for the entire unit and cannot be less than six months, the lease must be provided to the Trustees, and the lease must include language incorporating the Master Deed and Declaration of Trust. The amendment also attempted to waive any/all liability by the Trustees and Condo in any claims by a tenant. Dutt never included these terms in the lease she signed with Gjovik. It's unclear if Dutt provided a copy of the lease with Gjovik to the Trustees, but if she did, the Trustee's then also approved the use of unlawful terms and debt structures in the rental agreement.

## The Rental

The 2023 rental advertisement for 18 Worcester Sq. was listed on Zillow. The ad claimed the unit was a "one-bedroom" apartment with a "total interior livable area" of 750 sq ft. The advertisement also claimed there was "central cooling" and "in unit" laundry. The ad further claimed the building was constructed in 1910 and the rental included a "yoga room," a "balcony," and "outdoor" space.

The city assessor website and the Master Deed for the building state Unit 1 is a 552 sq ft studio. The Master Deed expressly states that the Trustee and signatory (Lawerence Abeln of South End Corporation) had not verified the sq ft but did state that 552 sq ft included a storage unit in the back of the basement, under the stoop, with an unsealed coal chute. In the unit, there's no mechanical ventilation and the only "cooling" was the A/C that Dutt and Matses stored in that unfinished storage area in the basement with a coal chute. There's no yoga room or balcony. The laundry is in a shared hallway.

A recent manual measurement and calculation of the square footage provided a total square footage of about 435 sqft in Unit 1. The Master Deed acknowledged the 552 sqft for Unit 1 included the storage space and  Dutt did not include that storage space in the lease, and thus bifurcated Unit 1 (in violation of the Master Deed rules) but did include the combined sqft in her advertisements for the unit violating numerous statutes and common law requirements for truthful advertising and good faith contracts.

The 552 sqft calculation also appears to include the shared hallway and laundry area. Dutt's inflated 750 sqft estimate apparently also included the outdoor patio and additional common areas. Further, of the actual 435sqft within Unit 1, there are roughly only 260 sqft of usable living space beyond the kitchen, bathroom, and cabinets/closets. When Gjovik contacted Dutt about the unit in 2023, Gjovik expressed she had just received a job offer and needed to move to Boston within a week, but also stressed that she is used to living in large apartments and requires at least 700 sqft of space. At no point did Dutt or Matses tell Gjovik that the unit was actually less than 750 sqft.

In Sept. 2023, Gjovik contacted Dutt on Zillow Rentals about the listing  advertising Dutt's apartment at 18 Worcester Square Unit 1. On Sept. 16 2023, Matses contacted Gjovik about the rental listing, and they discussed the apartment. Gjovik disclosed she had just received an offer of employment from Northeastern University and was given a short deadline to relocate from Upstate NY.

On Sept. 19 2023, Matses informed Gjovik her application for renting the apartment was approved and asked Gjovik to sign a lease. Between Sept. 19 and Sept. 20, Gjovik paid Dutt $6,037.50. On Sept. 21, Dutt and Matses provided Gjovik the "fully signed lease" dated Sept. 19 2023. The original lease term was from Sept. 22 2023 – Aug. 31 2024 with rent of $2,625 each month. The lease was then extended on May 16 2024 to extend through August 31 2025. Dutt also increased the cost of rent to $3,000/month. On June 2 2025, Dutt and Gjovik renewed the lease again through August 31 2026.

Gjovik started making complaints upon move-in including about pest infestations, holes in the walls, issues with the windows and floors, plumbing and electrical issues, issues with the clothes washer – but most issues were never resolved, or if they were, it was only after 1-3 weeks of Matses first blaming Gjovik and attempting to force Gjovik to pay for repairs or do them herself.

Gjovik is a well know whistleblower, lawyer, and activist who has been fighting her prior employer (Apple Inc) over their hazardous waste management practices since 2021 including multiple lawsuits, government investigations, and federal enforcement actions. Apple nearly killed Gjovik with its toxic gas leaks and illegal toxic waste dumping at a semiconductor fab in Santa Clara, California in 2020. Gjovik previously made a lot of money working at Apple until she was publicly fired in retaliation for her complaints, and she has been pursuing retaliation litigation in order to obtain her backpay and other money that is owed to her. The job at Northeastern University was the one and only job offer she could obtain post-termination due to Apple's denylisting, and it was critically important for her to succeed in that role while also continuing to successfully pursue her litigation against Apple.

However, that is not what happened. Upon moving into 18 Worcester Sq. she quickly discovered it had less than ½ the space that was advertised, it was missing fundamental capabilities such as water barriers and ventilation, it had disgusting pest infestations with active vectors of holes in the walls and floor, and quickly made Gjovik ill and depressed. Further, because Gjovik had lost all of her savings, she was unable to move – which she would have immediately if she had the means. Instead, she became increasingly ill and

depressed, the conditions grew worse and issues fluctuated with the season (insects, cold, water intrusion, etc.), Dutt's already high and dramatically overpriced rent continued to increase up to $3,000/month, which helped drive Gjovik into Chapter 7 bankruptcy in 2025.

The situation at 18 Worcester Sq. became untenable in July of 2025 after a water heater burst and flooded Gjovik's apartment within minutes (because there was no drainage in the basement, no emergency controls in the boiler room, no water barrier between the boiler room and the bedroom, and the bedroom floor is full of cracks and gaps). The sound of waterfalls woke Gjovik up; she discovered the issue and had to manually shut off the water to the entire building. Despite these efforts, the damage already done required immediate carpet removal, water damage remediation, and gutting and reconstruction of the shared wall.

It was during this disaster and the subsequent clean-up that Gjovik discovered there was no drainage, the extent of the cracked foundation and floor, the poor condition of the fieldstone throughout the basement, that there was mold in her bedroom wall (and she previously complained about an odor and allergic rection which was ignored by Dutt and Matses for two years), she also discovered Dutt and Matses had been cross-metering the unit, that the electrical was 40 years old, and she also heard from the contractors working on the flood clean-up that it was their understanding the basement was never actually "finished" and the supervisor repeatedly referred to it as the "Silence of the Lambs" basement.

Then, apparently agitated by the flood and basement disturbance, a mouse or shrew started terrorizing Gjovik and her dog for weeks in Unit 1. Gjovik repeatedly complained and asked for help but Matses took his typical approach of blaming Gjovik, refusing to hire professionals, taking some half-action which was wholly ineffective, and then badgering Gjovik in hope she dropped her concerns.

On July 25, 2025, Gjovik called City of Boston about the pest infestation and to sanity check Matses' latest plan – which in this case was to douse the basement in peppermint oil instead of hiring pest control or engaging in actual pest management activities. Based on Gjovik's description of conditions of Unit 1, the city requested to perform a habitability inspection and Gjovik agreed. The City opened Case #101006196687 and scheduled an inspection. This case became ISD Case No. 848-712 and 849-279, with notice of violations and demand for compliance served to Dutt.

The city filed a ticket on July 25 2025 that became a public 311 case. On July 28, Matses discovered the public 311 case and demanded Gjovik withdraw her complaint with the city. Matses threatened hostile living conditions if she refused, Gjovik complained Matses conduct was illegal and asked him to stop, he did not stop, she did not back down, and Matses then engaged in ongoing overt threats and retaliation against Gjovik in response to Gjovik's complaints, injuries, and protected activity.

On July 29 2025, Boston Inspectional Services conducted an inspection and documented violations: rodent infestation, holes in walls in the living room and bathroom, gaps in cabinets in kitchen around trash, cracks in bedroom floor, windows missing screens, brick walls crumbling and with gaps, rug boarder with sharp tacks uncovered, kitchen counter not secured or sealed properly, recess lights not secure, cross metering, and other isseus. The inspection also resulted in a referral to the Building Departments, noting the unit appears to be an illegal basement conversion. The unit did not have required bedroom windows or two required modes of egress, and the only windows in the apartment were completely barred shut.

Gjovik sent a Notice and Demand for Compliance to Dutt and Matses on Aug. 1 2025, where she also began withholding rent until they correct a long list of issues and also settle with her regarding claims including false advertising and premise liability issues, including refusing prior rent due to fraud and uninhabitable conditions. Matses and Dutt expressly refused to acknowledge receipt of the document and attempted to insist Gjovik send it via Certified Mail while concurrently threatening Gjovik with further retaliation, attempting to extort her, and also complaining about Gjovik's bankruptcy.

On August 2 at 12 PM, Matses refused to accept hand delivery of paper copy of the notice. He first demanded certified mail, then said that his lawyer would contact Gjovik, then refused to provide lawyer's contact information. The lease required complaints be sent to Matses' email address but Matses said he refused to accept complaints there, or generally at all. Matses also asked Gjovik if she "want to continue [her] lease" and asked if she wanted to continue living at the premise, despite her lease extending through 2026. Matses also complained about her being in Bankruptcy.

In early August 2025, Gjovik was able to get the Fire Captain to force Dutt and Matses to remove the bars from the only two windows and also remove Matses' and Dutt's abandoned gas grill and propane tank, which they had refused to remove and left a full propane tank at the property without explanation. Matses fought with Gjovik about the barred windows and fire code violations, even attempting to tell Gjovik the fire department may want the bars on the windows or that it could be unlawful to remove them, which resulted in the Fire Captain coming on site to personally supervise Matses removing the bars and propane. Matses loaded the BBQ and propane into his Charles Construction Company work truck (see Appendix B).

On July 31 2025, while Matses was still trying to get Gjovik to withdraw her complaints about the mice, Matses threatened to create fabricated debts and charge Gjovik for pest control expenses, unilaterally claiming the contractor report would blame her for pest issues. Gjovik responded that Matses couldn't charge her for the pest issue when there are egregious building defects including holes in walls and no screens on the windows. Matses agreed, but then on August 3, moments before the pest control contractor was to arrive, Matses arrived at Unit 1 early and began patching the holes in bathroom walls and installing screens on the windows. Gjovik asked if Matses was trying to conceal evidence of the defects before the contractor arrived and so those defends would not be included in his report on the cause of the infestation. Matses acknowledged that it was his intent. Gjovik ordered Matses to leave as Matses was making good on his threat to manufacture debts and charge Gjovik for those false debts to coerce her to withdraw complaints and/or as retaliation for her complaints about the mouse, including this "frame up."

On Aug. 3 2025, Gjovik drafted and provided the contractor a sworn declaration upon arrival, documenting the attempted evidence tampering including before/after photos with the fresh pink spackle. She also provided the contractor copies of her text messages and emails with Matses on the matter, and her history of two years of complaints to Matses about insect infestations. It was clear Matses was actually trying to frame her, and would fabricate those debts, and try to collect them from her – which is a racket and criminal nonsense. On August 3, Matses also confronted Gjovik about her rent withholding and threatened her with a usurious late- fee debt scheme, and then threatened her again with more pest control debts and extortion.

Matses continued this line of conduct for over a week, while refusing to repair the majority of the issues, continuing to refuse to discuss Gjovik's complaints, and also making ridiculous threats and false statements. For example, Gjovik demanded he remove the bars soldered on her only egress (windows) that left her with no egress in case of a fire. Matses told her it was not unlawful and suggested the fire department approved it and it would somehow be unlawful to remove the bars. Then Matses suggested if he removed the bars, the apartment would be unsafe, and people would break into Gjovik's apartment and harm her. Matses told her she would be financially responsible for installing a security system if she wanted to survive. Once again, Gjovik told Matses his statement and conduct was illegal and unprofessional.

On August 13, following her government complaints, notice and demand for compliance, and her criticism of Matses' rackets -- Gjovik was then prohibited from entering or viewing the boiler room with a locked door and sign specifically prohibiting her from entering. Gjovik called this "clear retaliation for my complaints and an attempt to prevent me from gathering evidence." The lock was installed by Ron Payne, Payne threatened Gjovik and declared she no longer had access to the common areas or any of the mechanical or utilities, and Matses and Dutt expressed they were aware, involved, and agreed. This was days after Ron Payne also received a copy of the 8/1 Notice and Demand for Compliance.

On August 14, Matses justified the lockout claiming "access to the mechanical room is limited to unit owners and their contractors strictly for safety reasons and not as a retaliatory action," despite Gjovik's bedroom wall being directly shared with the mechanical room where emergencies had just occurred, and Gjovik being the only person able to notice the flood and promptly turn off the water to the building before there was catastrophic damage. Matses told Gjovik that going forward if there are any future emergency she must contact him and Dutt directly and they will coordinate, and he instructed Gjovik she is not allowed to talk to other residents or neighbors if she thinks there may be an active emergency. Gjovik told Matses, once again, the things he was saying were illegal and profoundly illogical.

On August 14 at 11:02 AM, Gjovik heard noises in the hallway and found "four men in yellow safety jackets running around the basement with Ron" who were "acting frantic" about water leaks and boiler room pump issues. When Gjovik entered the hallway to ask questions, Ron insisted she "go back into [her] room." When contractors tried to provide information, "Ron interrupted and tried to prevent them from telling [her] anything." Ron told Gjovik she didn't need to know about the water emergency and again told her again to "go to [her] room." Ron also claimed the washer/dryer area wasn't part of her leasehold and that "he doesn't want [her] in the hallway." Gjovik informed Ron that what he was saying was unlawful and she has a right to the property as part of her leasehold and refused to leave the hallway.

On August 12-13, Matses repeatedly rescheduled electrical work. On August 13 at 11:59 PM, Gjovik raised concerns about working on a 1982 breaker without permits, with active water hazards and leaks, and questioned the one-hour timeframe for complex cross-metering. She noted Matses had "cancelled the appointment with Barbara's electrician and found one you said would do the same work for 'half the price.'" On August 15, Matses provided electrical permit number E1764459 for work scheduled the next day. The permit was not issued by the city for two weeks after the work was completed and the electrician who did the work is a young twenty-something who has only been licensed for a couple years.

On August 15 at 11:48 PM, Matses sent a threatening email demanding to control the bedroom in Gjovik's studio apartment. The unit has no ventilation system, and the bedroom wall is directly shared

with a boiler room containing four gas water heaters. Gjovik had removed the folding doors to improve airflow and prevent CO/CO2 buildup that could cause suffocation, due to the condemnable lack of ventilation/mechanical and no windows other than the opposite side of the studio. Gjovik got very ill in the winter of 2024 after she had to shut the windows due to the cool weather and she then began sleeping for 16-20 hours a day and ended up in the hospital. Gjovik also experienced other health issues during this time and while at Unit 1, including related to her hair and skin, sinuses, fatigue and energy level, and other bodily systems. The extreme fatigue and excessive sleeping especially signals that the lack of ventilation is a serious issue that could result in death or other serious injury, the deficit needs urgently addressed, and any configuration that made the safety issues worse needed to be mitigated.

Matses demanded she re-partition the studio bedroom to obstruct and block the little air flow that came into the sleeping area. He said if she did not reinstall the doors, that he "will arrange this on [her] behalf" and threatened to hire a contractor forcibly enter and install the doors, and then indicated he would fabricate more false debts and charge her for reinstallation of doors that could block life-saving airflow. Matses also demanded control over curtain choices in Gjovik's living room (in order to hide the neglected fieldstone and water damages) and made additional controlling demands about her personal space.

On August 16 at 1:31 AM, Gjovik sent a detailed response to Dutt and Matses expressing her concern and fear of Matses and requesting cessation of contact. She wrote: "I was hoping we could refrain from repeatedly emailing back and forth accusations (this is now the twelfth accusatory email from you in just three days - and this one is sent to me at midnight no less). It's not very productive and it seems like you might just be enjoying trying to make me feel bad and trying to trigger me to engage in conflict-focused dialogue with you." She described his behavior as "very concerning."

Gjovik explicitly compared Matses' conduct to past abusive relationships, writing: "I'm feeling very distressed speaking with Mr. Matses due to his continued refusal to discuss my concerns in good faith, and instead his insistence on blaming me for things, threatening me, and making strange (and honestly creepy) attempts to control my behavior, my body, and the objects in my private home. I've had some negative relationships in the past that included these types of abusive control tactics from men, and I've seen the kind of behavior that Mr. Matses appears to be engaging in and actively escalating, can quickly spiral out of control." She described him as "trying to control me like some weird ex-boyfriend" and stated: "I'm afraid of him and don't want contact with him."

Gjovik he specifically requested that the property owner Dutt be present for any future visits and asked Matses to "stop spending so much time in my home with [her] alone while concurrently making these threats and trying to control [her]." The email concluded with Gjovik pleading: "Please give me a break from this for at least a couple days. It's so unsettling and inappropriate."

Despite Gjovik's explicit "no contact" demand,  on August 17 2025, Matses appeared at the property and attempted to force entry in to Gjovik's unit. This occurred less than 16 hours after Gjovik had explicitly said she did not want contact with him. Gjovik has audio recordings of Matses attempting to force his way into the unit. When the entry failed due to Gjovik having barricaded her door (because "there's no deadbolt I can use to keep him out and because he still has keys to my home"), Matses then texted Gjovik requesting access to enter the unit. The text requests came after his physical attempt to break in had been

unsuccessful, showing continued attempts to gain entry despite both the failed forced entry and Gjovik's explicit prohibition on contact.

In her later account of the incident to Dutt, Gjovik noted she had "continued to keep my door barricaded following his attempted entry" and "purchased, at my own expense, security locks/bolts/bars to secure the windows and door to keep him out in case he tried to force his way in again."

Gjovik filed a Police Report the same day, documenting what she described as "accelerating threats, extortion attempts, demands I withdraw complaints, harassment, attempt frame-ups, and failure to actually make critical repairs, among other issues" that culminated in the latest debt racket and attempted forced entry. She noted in her police report that Matses' "conduct has been wildly inappropriate, highly unlawful, and constantly escalating -- which makes me fear for my safety." The attempted breaking and entering occurred one day after Gjovik had explicitly compared Matses' behavior to "abusive control tactics from men" and stated she was afraid he would harm her. On August 21, 2025, Dutt abruptly returned Gjovik's security deposit without explanation. Gjovik emailed Dutt several times requesting repairs and offering to coordinate with her to get the work done without Matses. Dutt did not respond for weeks.

On Sept. 172025, Matses emailed Gjovik announcing he would be coming to her home in the next week, despite Gjovik's no contact demands and her filing a police report. Dutt then repeatedly insisted Gjovik may only communicate with Matses about her tenancy and the property, and that Dutt did not want to talk to Gjovik. Gjovik protested and refused – again demanding she be able to work directly with Dutt or otherwise not have to communicate with Matses.

In late September/early October 2025, following Gjovik's complaints about continued lack of repairs and dangerous conditions, Dutt claimed via email that she was unaware what repairs were needed (despite receiving multiple detailed lists since August 1, 2025) and said she assumed all issues had been resolved. Dutt continued to refuse to acknowledge that Gjovik made complaints or what those complaints were about.

In Sept.-Oct. 2025, strange actions occurred in Gjovik's bankruptcy and with the private Trustee regarding Dutt, Matses, Ron Payne, Charles Construction Company, and related to 18 Worcester Sq. It appeared there was some sort of coordination attempt to obstruct Gjovik's claims against these parties and about the building, the actions included criminal conduct, and it was reported to the DOJ. That's all that needs to be said about that at the moment, and if that was what was occurring, a remedy for all of that (including the deranged damage caused to Gjovik's four-year long Apple litigation that occurred as part of that scheme), needs to be part of the remedy in this case.

On October 7, 2025, Dutt again falsely claimed in writing that all repairs have been completed and now demanded Gjovik provide a new list of outstanding issues. The city inspection was specifically rescheduled to October 15, 2025 because the violations documented in July remained uncorrected and Dutt was notified of that with another request for repairs. In response to Dutt's latest denial, Gjovik provided a detailed accounting on October 8, 2025 documenting dozens of violations and issues raised since July including the open ISD issues, with only minimal corrections made while other critical issues remained unaddressed. Dutt did not respond.

Throughout September-October 2025, Dutt continued to refuse to acknowledge or respond to substantive complaints while simultaneously claiming ignorance of any problems, and insisting Gjovik only

communicate with Matses about repairs, despite Matses' unlawful conduct and consistent refusal to make repairs, demonstrating a pattern of bad faith obstruction designed to avoid corrective action and liability, while knowing the open issues have already caused Gjovik hard, could cause her more harm, and could even be fatal to her and/or her dog – showing both Dutt and Matses have a reckless disregard for human life and an aggressive disregard for basic legal compliance.

# DE FACTO PARTIES

The only person that Gjovik is in contract with regarding 18 Worcester Sq. Unit 1 is Seeratt Dutt. However, due to the acts and omissions of numerous other entities – the de facto parties in this action also include, at least, Alex Matses individually, Alex Matses' employer Charles Construction Company, Ron Payne, the 18 Worcester Sq. owner, and the 18 Worcester Sq. Trustees. These parties appear to be jointly and/or independently liable under at least theories of control, agency, vicarious liability, negligence, condonation, trusts and trustees, condominium interest structure, licensure, professional standards, respondent superior, corporate structure, conspiracy,  material aid, racketeering, and as individual tortfeasors. However, if these claims must proceed to litigation, all of these parties will be included for harms caused, and the liability theories, structure, and contributions will be determined in litigation.

The Master Deed for 18 Worcester Sq. was created on or around Jan. 14 1999 by South End Corporation, Inc. and signed by the company's President and Treasurer, Lawrence S. Abeln. The Master Deed also created the 18 Worcester Sq. Condominium Trust and at that time, Mr. Abeln was noted as the original and current Trustee. As of today, the owner of 18 Worcester Sq. Master Deed is still South End Corporation and Lawrence Abeln. However, South End Corporation was dissolved in 2007 and Abeln has not filed paperwork regarding the building for twenty years.

The Master Deed and Declaration of Trust established the "Trustees" for 18 Worcester Sq. and one of those Trustees, Ron Payne, has used this authority when attempting to issue verbal rules, orders, demands, and threats against Gjovik including forbidding Gjovik from using common areas or accessing her own utilities, including her electrical panel. Payne also installed a lock on the boiler room door, following Gjovik's complaints about safety and compliance issues with the boiler room, and informed Gjovik that everyone else has access but she will not be provided access.

Alexander Matses and Seeratt Dutt have repeatedly attempted to claim that Alex Matses is the only person Gjovik can contact if Gjovik has concerns or requests regarding habitability, repairs, maintenance, or other complaints about the premise. While Mr. Matses does not own the property, is not a landlord, signed no contract regarding the rental, and is not part of the condominium – both Dutt and Matses have insisted that Matses is a sort of de facto landlord and owner, despite Gjovik's objections and complaints about Matses. Further, Mr. Matses is a construction supervisor and project manager at Charles Construction Company and repeatedly used company resources (staff, equipment, tools) during work hours, to visit the premise under the guise of repairs or maintenance, though Mr. Matses rarely repaired anything and frequently tried to blame Gjovik for whatever her complaint was about.

Mr. Matses insistence on managing any/all construction-related matters for Unit 1 arose directly out of his professional experience managing construction projects and his position at Charles Construction Company. Mr. Matses frequently spoke to Gjovik about his work at Charles Construction Company in in

an attempt to convey credibility regarding his expertise in construction and thus also his view of the condition of Unit 1. However, upon review, most of the projects Mr. Matses told Gjovik about, as listed on the Charles Construction Company website, were almost entirely renovations of buildings owned by Charles Construction Company and part of its existing Sutton industrial park (though the company's marketing of these projects did not disclose the addresses or connection, and the city paperwork for the projects often used shell companies that created an appearance the construction contractor for the work was not actually Charles Construction Company when it was actually the same people).

When Gjovik tried to challenge Matses about habitability issues, Matses often claimed he had never worked on residential projects and was not aware of laws regarding residential construction. In 2022, one year prior to Gjovik leasing Unit 1, Charles Construction Company (including Alex Matses) settled a six-year long lawsuit against Charles Construction and one of its trust/shell companies, filed by the Trustees of a Condominium building in Rowley, complaining the Charles Construction Company and Matses family were responsible for constructing the condominiums but were negligent and breached their fiduciary duties with "widespread deficiencies in the design, construction, and development" of the building. (1677-CV-00439). Alex Matses was involved in the construction and then the lawsuit through 2022. Further, in 2023, when Gjovik entered the lease for Unit 1 and made her first habitability complaints, Matses was also leading project management of the Company's construction of a large children's daycare center located at his family's Sutton industrial park in North Andover.

In addition, Matses brought company trucks and crew to perform unpermitted repairs during their regular work hours. Matses and the company exercised control over premises through Mates as entity performing work/maintenance or running operations as a general contractor. Matses was a de facto point of contact and his company workers were only ones with access to do repairs. Dutt attempted to delegate all responsibility to Matses and the company. Gjovik had no other avenue for repairs. Matses and Charles Construction Co. may have assumed duties of premises owner and would therefore be liable for the dangerous conditions they knew about but failed to remedy or even made worse. When a professional (especially licensed construction supervisor) encounters conditions posing imminent danger and has superior knowledge of the danger, knows an occupant is at risk, and takes some action suggesting they'll address the issue but then abandons the situation – they had duty to complete the work safely, or warn of dangers clearly, or not increase the risk – and Matses failed to fulfill all of those duties.

This is a nonexclusive summary of parties and liability theories, and Gjovik reserves all rights to add additional parties and theories.

# 93A Complaints & Grievances

## Deception & Theft [2]

---

[2] See, e.g. MA Gen L ch 239 § 8a; G.L. c. 186, §15B(1); 940 CMR 3.17; 940 CMR 3.16 (2) – ("any person or other legal entity subject to this act, who fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction."); Harper & James, Torts, § 7.14; Restatement: Torts, § 529; Williston, Contracts (2d ed.) §§ 1497-1499; *VMark Software, Inc. v. EMC Corp.*, 37

- Leasing an uninhabitable 1860 basement apartment with multiple, egregious violations of health/safety, residential, rental,  fire, and building code; including the requirements of 105 CMR 410.000;
- Renting an "apartment" and "condo" that was never registered as a rental with the city (CBC 9-1.3), advertised with materially false terms, and in a manner which violates the Master Deed and Declaration of Trust;
- Creating and publishing advertisements with false material terms in an attempt to obtain a long-term lease agreement with inflated rent based on fraudulent statements and coerced by extortionate lease terms ("bait and switch" with a stick);
- Inflating the square footage of a rental property by nearly 100% in advertisements and legal documents with the inflation including areas specifically not included in the lease (storage), common areas owned by the condominium, and an unenclosed, unheated, outdoor patio;
- Renting an "apartment" under terms that would induce someone to rent who would require double the space available in the unit (> 700 sqft) with false statements made in order to obtain higher and unjustified rental income, when the usable space available in the unit is < 350 sqft (RE100C17), and then accusing the tenant of being at fault for the lack of space;
- Demanding an initial security deposit amount exceeding the first month's rent, expressly stating interest will not be paid on the amount, and claiming that "professional carpet cleaning" is required by default and otherwise will be deducted from the security deposit regardless of condition;
- Cross-metering where ~30% of the Unit 1 electrical load was wired to the condominium common meter and owner refused to explain if tenant had been paying both the Unit 1 and common bill, or if the condominiums had been paying part of her electrical charges, and if any money was owed either way;
- The cross-metering was apparently established years prior and appeared to be by-design to benefit the owner, with repeated requests made by Matses to the tenant to drop the issue;

---

Mass. App. Ct. 610, 617 n. 9 (1994) citing *Zimmerman v. Kent,* 31 Mass. App. Ct. 72, 77, 575 N.E. 2d 70 (1991) -- ("defendant made a false representation of a material fact for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff did rely upon the representation as true, to his damage."); *Marram v. Kobrick Offshore Fund, Ltd.,* 442 Mass. 43, 62 ("a negligent misrepresentation may be so extreme or egregious as to constitute a violation of G. L. c. 93A, § 11"); *Underwood v. Risman,* 414 Mass. 96, 99-100 (1993) ("A duty exists under [G.L.]c. 93A to disclose material facts known to a party at the time of a transaction."); *Robichaud v. Owens-Illinois Glass Co.,* 313 Mass. 583, 585 (1943) ("A fraud, however, may be perpetrated by an implied as well as by an express representation."); RE99R16: Residential Rental - Landlord/Tenant Issues (2016); *Commonwealth v. Chatham Development Co., Inc.*, 49 Mass. App. Ct. 525, 527 (2000) ($2,000 in civil penalties and $8,000 in attorney fees assessed under G.L. c. 93A for unlawful lease provision, including late fee charges for  payments less than 30 days late); *Copley Management v. Andersen, Boston Housing Court,* 89-SP-52386 (Kerman, J., May 3, 1991); Taylor v. Burke, 69 Mass. App. Ct. 77 (2007); *Peebles v. JRK Property Holdings, Inc.,* SJC-13702 (August 1, 2025); *Perry v. Equity Residential Management, LLC,* U.S. District Court, District of Massachusetts, Civil Action No. 12-10779-RWZ (August 26, 2014) (G.L. 186, §15B(1)(b) does not authorize landlords to charge prospective tenants an application fee, amenity fee, a community fee or an upfront pet fee).

- Advertising a "one bedroom apartment" that is actually studio and also failing to disclose the unit is 12"-28" below grade/subterranean and an 1860 basement;

- Theft and fraudulent inducement of a vulnerable, disabled, out-of-state victim into a tenancy based on false representations, material omissions, demonstrably false assertions, and fraud;

- Bait-and-switch advertising by displaying patio furniture prominently in the rental advertisement and showing the unit with this furniture as an apparent included amenity, only to reveal additional monthly charges for the furniture during lease negotiations, and upon arrival finding the furniture is in extremely poor condition and not even usable. This practice of advertising amenities as included while concealing material fees and lack of functionality constitutes deceptive advertising designed to attract tenants with false promises of value.

# EXTORTION & COERCION [3]

---

[3] See, e.g., M.G.L. c. 93A, *et seq.*;  940 CMR 7.00, *et seq.;* 105 CMR 410, *et seq.*; Mass. Ann. Laws. ch. 271, § 49(a); Mass. Gen. Laws ch. 186, § 15B(1); MA Gen L ch 186 § 18; *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975);  *Renovator's Supply, Inc. v. Sovereign Bank,* 72 Mass. App. Ct. 419, 430 (2008); P*epsi-Cola Metro. Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 18 (1st Cir. 1985) (describing as unfair practice under G. L. c. 93A, § 11, "form of extortion" in which one business uses "wedge" to force another business into doing "what otherwise it could not be legally required to do"); *H1 Lincoln, Inc. vs. South Washington Street, LLC, & others.* 489 Mass. 1 (2022) – (defendants committed fraudulent misrepresentation by repeatedly stating that a LLC owned the leased premises, when in fact the property was owned by realty trusts, engaged in "stringing along" tactics, and causing  months of delay in the permitting process. Defendants  exploited their false warranty of title and resisted resolving the ownership discrepancy to gain leverage. The aim of these tactics was to extort an adverse modification to the lease terms which would allow the defendants to avoid judgment liens arising from their defaults on the lease); *Anthony's Pier Four, Inc.*, 411 Mass. at 474-476 (commercial extortion violating G. L. c. 93A, § 11 when defendant landowner abused its right to approve changes in the plaintiff's development plan, in breach of contract, to coerce the plaintiff into making financial concessions not required under the contract); 18 U.S. Code §§ 880, 891; *United States v. Andrino*, 501 F.2d 1373, 1377 (9th Cir. 1974)–(absence of formal "loan"' and specified "interest" rates inconsequential, provided that evidence sufficiently, displays actual extension of credit v accrual of debt, and man1festat1on of coercion to collect loan); *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992) ("extortionate quality" of using breach of contract as "lever to obtain advantage" for breaching party makes such conduct unfair under G. L. c. 93A); *Peabody Essex Museum, Inc. v. United States Fire Ins. Co.*, 802 F.3d 39, 54 (1st Cir. 2015) (describing c. 93A misconduct in insurance context as "shifting, specious defenses" to "string[] out the process" in order to "force" insured into accepting unfavorable settlement); *Pepsi-Cola Metro. Bottling Co.*, 754 F.2d at 18 (evidence that defendant engaged in scheme of commercial extortion was sufficient to support determination that defendant was "guilty of a willful violation of [G. L. c. 93A, § 11]"); *Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.*, 858 F.3d 666, 674 (1st Cir. 2017) ("one business's stringing along of another to the other's detriment can satisfy" standard for unfair conduct under G. L. c. 93A, § 11; describing how defendant had "strung [plaintiff ] along" so as to "take advantage of [the plaintiff's] financial exposure" to impose new and adverse contract terms); *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55-56 (1st Cir. 1998) (characterizing defendant's misrepresentation of its intentions in order to "extract a favorable settlement" from plaintiff as "stringing out the process"); *United States v. Totaro,* 550 F~2d 957, 958 (4th Cir.), cert. denied, 431 U.S. 920 (1977); *Carney v. Rotkin, Schmerin & McIntyre,* 206 Cal. App. 3d 1513 (1988) – (false statements alleging fabricated sanctions and fines in order to obtain consideration from the victim); *George v. Jordan Marsh Co.*, 359 Mass. 244 (1971) ("Agents of a department store badgered and harassed ta woman by calling her late at night and threatening to revoke her credit, intending to intimidate her to pay a debt she did not owe or guarantee... she experienced severe emotional distress"); Restatement (Second) of Torts, § 46.

- Creation and attempted collection of interests, fees, and charges not permitted by law, including unlawful cleaning fees, late fees, "furnishing fees," etc.;
- Charging a Security Deposit that is more than first month rent, not providing interest, not completing move-in statement of conditions;
- Creation of a usurious late fee structure of 1% of monthly rent per day, per month, of unpaid rent – starting after only three-days, with no upper limit, and which accrues concurrently and continuously across unpaid months (i.e., apparent 324% annual interest rate, with effective rate of 192% "fee" on top of principal);[4] while also claiming contractual immunity from tenant and consumer protection laws which authorize mitigation of damages including rent withholding.
- Claim that owner can unilaterally decide the lease was breached and demand the full amount of the remaining lease is immediately due, and assumably add the 1% per day interest rate on the total sum, with daily accrual and no max;
- Manufacturing fake debts through unlawful conduct (including false allegations and frame-ups); and threatening to collect those fake debts through unlawful means;
- Fabricating obligations and rules that do not exist and enforcing those unilateral decrees in furtherance of unlawful schemes;
- Threatening to blame tenant for long-running, building-wide pest issues and staging the property to hide the owner's violations before inspections; evidence tampering before government and contractor inspections, demanding withdrawal of government complaints, providing false information to contractors and inspectors;
- Owners family members and/or associates attempting to enter apartment without permission, after explicit "no contact" demand from victim following harassing late night emails threatening suffocation, trespassing, and fabricated debts;
- Threats of harm  in response to request to repair the floor/foundation and fieldstone, with threats specifically demanding long curtains be hung to hide the fieldstone decay and that carpet be installed to hide the gaps and cracks;
- Threats of harm and false debts in response to requests to install mechanical ventilation and concerns about suffocation, with demands to install partitions in the unit creating a box around the bed and shared wall with gas water heaters in order to maintain the façade the studio is somehow a "one bedroom;"
- Use of coercive or extortionate tactics to extract undeserved concessions; use, or the express or implicit threat of the use, of criminal means to cause harm to person, reputation, or property as a means of enforcing repayment; Threatening financial liability to pressure complaint withdrawal and using bankruptcy status as leverage;
- Locking tenant out of boiler room and mechanical areas to prevent documentation of safety issues and violations, following government complaints and a request for building inspections.

---

[4] Massachusetts usury law prohibits taking more than 20 percent annual interest. M.G.L. c. 271, § 49. The usurious character of a loan depends on the amount of interest charged or contracted for, rather than the amount actually paid.

# DANGEROUS CONDITIONS [5]

- Sleeping area wall is directly shared with boiler room and five water heaters with gas hook-ups, but no fire separation or moisture barrier; and no window or emergency egress;
- No HVAC or mechanical ventilation in Unit 1, and no ventilation in the unit other than windows on far exterior wall, opposite of bedroom. Tenant got terribly ill last winter after closing windows due to the temperature, ended up in urgent care with symptoms of $CO_2$ exposure (extreme fatigue), no diagnosis at that time, assumed to be caused to the lack of ventilation/oxygen;
- Minimum habitable openable window area for ~450 sqft studio is 18sq ft (4%) but openable window area in Unit 1 is 9.96 sq ft (2.2%). The current glass in Unit 1 compared to the advertised 750 sqft is 1.3%. Mechanical ventilation shall be installed and maintained;
- Burst water heater in early July 2025 with near instant flooding of bedroom and boiler room and no drainage other than "cracks in foundation", reports to city triggered installation of first sump, but was forbidden from viewing, and locked out of boiler room and told cannot access common areas;
- There's no pump, moisture barriers, drainage, or water proofing for a basement residential unit with groundwater and rain infiltration through the fieldstone, foundation, and floor, with cracks and gaps in the floor and muddy soiled carpet accumulating brick and stone dust, dirt, moisture, insects, and mouse feces;
- The kitchen sink repeatedly backflows with sewage backup into bathtub (i.e., spaghetti coming up through bathtub drain) violating cross-connection control requirements by allowing contamination between different waste streams;
- Unit 1 had barred windows with no direct egress (single exit through common hallway) from ?-August 2025;
- Propane grill stored on patio less than 10 feet from building and Unit 1 despite tenant complaints and repeated requests to remove it;
- Mold identified in bedroom wall in July 2025 following two years of complaints of odors and allergy symptoms, yet no mold investigation or remediation in the walls and the building envelope;

---

[5] See, e.g., 410.270(A)(3); 410.220; M.G.L. c. 143 § 3R); 410.630(A)(9); Mass. Fire Code Section 14.10.1.1.2; Boston Fire Code Section 21.06; Mass. State Building Code 780, R310, 9th; 105 CMR 410; *DiMarzo v. American Mut. Ins. Co.,* 389 Mass. 85 , 101 (1983) – (Court found landlord liable for assault/battery due to poor construction of the flimsy door to the tenant's apartment which not provide adequate security and was in violation of the State Sanitary Code);527 CMR 12.00 – (owners shall allow occupants access to their dwelling unit's electrical distribution panel at all times"); 248 CMR 10.00; 248 CMR 10.02(14) Basic Principle 14; 780 CMR; R310.1; 248 CMR 10.14(7)(a);  105 CMR 410.630(13); 410.500 410.630(A)(12); iability under G.L. c. 93A for nondisclosure of actual defects: "Off-site physical conditions" may require disclosure if the conditions " if the existence of those conditions is of sufficient materiality to affect the habitability, use, or enjoyment of the property and, therefore, render the property substantially less desirable or valuable to the objectively reasonable buyer." *Urman v. South Boston Savings Bank,* 424 Mass. 165, 169-170 (1997).

- Refusal to allow entry to mechanical and utility areas; refusal to provide access to circuit breakers, water heater, and utility meters.
- Broken intercom and no way to contact the apartment from the front of the building.
- No security system or alarms on ground level windows; no automatically locking exterior door; threat made that if bars removed from windows (fire code violation corrective action) that people would then break into the unit and physical harm the tenant but that would be the tenants fault and problem to deal with;
- Foundations, floors, walls, doors, ceilings are not watertight, pest resistant, free of holes, cracks, loose plaster and other defects, and they create a risk of injury and allow for pests to enter;
- Refusal to provide deadbolt or take-back key from non-owner who tenant filed a police report about; residence is not capable of being secured against unlawful entry.
- Electrical is out of date and not maintained; plugs fall out of loose outlets; cords get hot; flickering lights; and no moisture control around low outlets;
- Repeatedly refusing to acknowledge complaints and concerns about dangerous conditions, refusing to investigate or correct issues, refusing to make repairs, retaliation against tenant for raising concerns, and repeatedly threatening tenant with harm if she continues to complain.

## Defective Conditions & Premise Liability [6]

- Minimum habitable glass window area for ~450 sqft studio is 36 sqft (8%) but the glass window area in Unit 1 is 16.4 sq ft (3.6%). The current glass in Unit 1 compared to the advertised 750 sqft is .02%.
- Walls and ceilings have cracks and loose plaster, are not cleanable or weather-tight; floors have cracks, crevices, and open areas where rodents and insects may reside, with ongoing pest

---

[6] See, e.g., Mass. Gen. Laws ch. 93A, *et seq.*; 940 CMR 3.17; 105 CMR 410, *et seq.*; 780 CMR; 410.570(A) & (C)—(the landlord must keep common areas safe and sanitary); Mass.ch. Laws ch. 142, Section 19; G.L. c. 148, §26A; Mass. State Building Code 780, R310, 9th; Mass. Gen. Laws ch. 111, § 127L; Mass. Gen. Laws ch. 239, § 8A; 105 CMR 410; *Urman v. South Boston Savings Bank,* 424 Mass. 165, 170 & n. 8 (1997) (liability under Mass. Gen. Laws ch. 93A for nondisclosure of actual defects existing on, or directly affecting, the property that had been sold); *King v. G & M Realty Corp.*, 373 Mass. 658, 661 *376 (1977); *Markarian v. Simonian,* 373 Mass. 669 , 675-676 (1977); *Richard H. Crowell vs. Frederick Mccaffrey,* 377 Mass. 443 (1979); *Boston Hous. Auth. v. Hemingway,* 293 N.E.2d 831 (Mass. Sup. Ct. 1973) – (there is an implied warranty of habitability in every lease or rental agreement); A Guidebook on IPM and Structural Repairs, the Boston Housing Authority's Integrated Pest Management Program (IPM); 248 CMR 10.00; 248 CMR 10.02(14) Basic Principle 14; *Stephen Wolfberg Vs. William Hunter* & another, 385 Mass. 390 (1982); *Fontaine v. Ebtec,* 415 Mass. 309 , 324-326 (1993); *Haddad v. Gonzalez,* 410 Mass. 855 (1991)[cannot nullify the warranty of habitability by giving a discount in rent]; *McKenna v. Begin,* 3 Mass. App. Ct. 168, 170-171 (1975); *Boston Housing Auth. v. Hemingway,* 363 Mass. 184, 200-01 (1973)-- (landlord violates the warranty of habitability from the time they have knowledge of conditions that may endanger or impair your health, safety, or well-being); 410.500(A) – ("Landlords must maintain all building and structural elements in compliance with accepted standards. They must be maintained in good repair, free from defects and cracks, and protected from weather conditions, pests and mold."); *Ndoro V. Torres*, Appeals Court of Massachusetts, No. 23-P-165 ( 2024)--(a "nine-month delay in replacing the rotting bathroom underflooring also constituted a sufficiently substantial and material breach of the implied warranty of habitability which…established a violation of c. 93A").

infestation issues (cockroaches, millipedes, flies, mosquitos, silverfish, spiders, etc. since Sept. 2023);

- Floor penetrations are intentionally concealed by carpet and not repaired, wall penetrations also concealed and not caulked or sealed, wall penetrations around baseboard heat not sealed, voids behind cabinets and around windows and conduits;

- Foundation is thin concrete poured on dirt, cracked and without moisture barrier with groundwater/rainwater infiltration into the unit through fieldstone, foundation, other vectors;

- Failure to provide and install screens for exterior windows that are tight fitting and prevent entrance of pests;

- Cross-metering: 20-30% of apartment circuits on wrong panel and did not want to correct it, but city cited violation and then hired electrician for "half the price," then did unpermitted electrical work on 40+ year panel during active water leaks, and work completed prior to the city issuing the permit;

- Electrical panel/breaker installed ~1982 and never maintained or upgraded; inadequate for residential load and electrical service is not of sufficient amperage to meet the reasonable needs of the occupants;

- Porch is in a public alley surrounded by an insecure fence at risk of collapse;

- Multiple leaks and floods in unit and common area in basement from Sept 2023 - July 2025.

- Many holes in walls, ceiling, and floor, including a hole in living room that passed directly to the exterior and could see outside from living room (-Aug. 2025);

- Dishwater outflow not permanently connected to sink drain; repeatedly disconnected and flooded kitchen;

- Signs of water infiltration including damp/wet spots on fieldstone and floor, musty odors, visible mud stains and mold growth, and swollen wood with no record of any drainage system, water proofing, grading, or sump pump;

- Cabinets and doors are cheap, flimsy, and made of problematic materials like particle board which swells and harbors organisms.

# OPPRESSION & OBSTRUCTION [7]

---

[7] See, e.g., M.G.L. c. 93A, *et seq.*; 940 CMR 3.17; M.G.L. c. 93 Section 102; Mass. Ann. Laws. ch. 265, § 13C; 35 MASS. PRAC., Consumer Law §§ 5:21, 5:33 (2d ed.); *DiMarzo v. American Mut. Ins. Co.*, 389 Mass. 85 , 102 (1983); MA Gen L ch 186 § 18; Harper & James, Torts, § 7.14; Restatement: Torts, § 529; Williston, Contracts (2d ed.) §§ 1497-1499; *Boston Five Cents Sav. Bank v. Brooks*, 309 Mass. 52, 55-56 ("Deception need not be direct.... Declarations and conduct calculated to mislead ... which ... do mislead one ... acting reasonably are enough to constitute fraud"); *Kannavos v. Annino*, 247 N.E.2d 708, 356 Mass. 42 (1969); *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.*, (2013) 55 Cal.4th 1169, 1174-1175 (cannot rely on the integration clause, or the parol evidence rule, to prevent a plaintiff from presenting extrinsic evidence to show a lease was procured by fraud); *Kelly McClain v. Octagon Plaza, LLC*, 159 CA4th 784, 71 CR3d 885 (2008) – (exculpatory language or disclaimers in the lease did not insulate landlord from liability for fraud or prevent tenant from demonstrating justified reliance based on representations of landlord); *Feeney Bros. Excavation LLC v. Morgan Stanley & Co.*, 2020WL 2527851, at *9 (D. Mass. May 18, 2020) (liability under Chapter 93A may = be based on other causes of action, such as a breach of the covenant of good faith and fair dealing or negligent misrepresentation); *Brewster Wallcovering Co. v. Blue Mt.*

- Creating a rental agreement and contract with unlawful, predatory, and extortionate terms that violate public policy and statutory rules  including unlawful terms related to security deposits, move-out costs, litigation, liability waivers, and other unlawful terms and which was entered with inequality of bargaining power, deceptive sales techniques, confusing and hidden language, and terms which are outrageous and which attempt to leave the buyer without a remedy for the seller's default or intentional misconduct;

- Failing to meet basic obligations while also imposing requirements of tenant not required by lease agreement, not authorized by law, and not for a proper purpose;

- Attempting to control a residential premise and property interest, or supporting another party's unilateral declaration of control, despite no legal basis for that control, and use of unlawful means to assert and facilitate the control, and the control being in furtherance of unlawful schemes;

- Dodging service of complaints including refusing to accept complaints, claiming complaints were never received, or otherwise claiming ignorance of complaints made verbally, via electronic mail, in paper and personally delivered, sent via postal mail, and other methods;

- While concurrently dodging complaints, they also repeatedly claim no knowledge of issues or concerns due to the concurrent avoidance and denial of the complaints about issues and concerns.

- Modifying, reverting, and creating new instructions for the method and form of complaints with every outcome resulting in refusal to acknowledge complaints and/or respond to the subject matter of the complaints;

- On Aug. 1 2025, tenant requested names and contact information for insurance carriers with policy numbers and rental claims history, within 15 days – but there was never any response;

- When responding to complaints and either making limited repairs or refusing to make repairs, relying upon a professional licensure, professional business, and reputation, or otherwise leveraging reputational and professional credibility in order to mislead and conceal the extent of damage and the true requirement for repairs and corrective action;

- Owner landlord disclaiming her non-delegable duties under the implied warranty of habitability requiring that she communicate with the tenant, provide alternative agents, and make required repairs;

- Refusal to obtain required permits, and refusal to do required repairs and renovations in order to avoid requesting permits, and if permits are requested, not signing the permit applications and doing the work prior to the permit being issued;

- Systematic avoidance of government oversight and intimidation, and making threats in order to prevent and obstruct government investigations;

---

*Wallcoverings, Inc.,* 68 Mass. App. Ct. 582,605-06 & n.55 (Mass. App. 2007); *Hebert v. Vantage Travel Service, Inc.,* 444 F.Supp.3d 233, 250 (D. Mass. 2020) -- (enforcing a waiver of a consumer plaintiff's claim under a statute such as Chapter 93A would be contrary to public policy), quoting *Doe v. Cultural Care, Inc.,* No. 10-cv-11426-DJC, 2011 WL 1048624, at *7-8 (D. Mass. Mar. 17,2011); G. L. c. 93A, § 11 ("a limitation of liability provision provides no protection for defendants who willfully or knowingly engage in unfair or deceptive conduct"); *Rental Property Management Services v. Hatcher,* SJC-12373, Supreme Judicial Court Boston, 2018.

- Demanding government complaints be withdrawn and future government complaints are not filed;
- Threats of harm (financial, reputational, health/safety, emotional) if the victim does not withdraw existing complaints or cease making complaints;
- Tampering, falsification, and obstruction prior to and during professional inspections;
- Increasing the severity and intensity of harassment as needed in order to maintain unlawful operations;
- Expressly discriminating against the victim due to her disabilities and protected activities;
- Taking actions to disgrace, embarrass, humiliate, and harm the reputation of the victim as retaliation and extortion in furtherance of unlawful objectives;
- Disrupting and interfering with the victim's professional work, contractual obligations, and litigation and legal claims;
- Damaging, destroying, devaluing, and otherwise harming the victim's property interest including real property, chattel property, and fiscal interests;
- Creating dangerous living conditions to retaliate against complaints;
- Making false and misleading representations as to legal representation, the status of legal matters, the role of attorneys, contact with attorneys, and willingness to discuss settlement;
- False and misleading representations about property ownership, corporate affiliations and interests, and contracts and legal authority;
- Exploiting the victim's existing PTSD, financial and physical safety vulnerabilities, professional obligations, and reputational concerns as opportunities for further coercion and extortion;
- Responding to the tenant's concerns about threats to physical safety by making threats of physical harm;
- Building Trustees attempting to disclaim any liability for their actions at the building under property, tenant, tort, contract, and other laws as well as fines and penalties in Declaration of Trust and Master Deed.

# RELIEF REQUESTED [8]

---

[8] *Rice v. Price*, 340 Mass. 502, 510-511 (1960) – (all damages suffered as a proximate result of misleading representations, including all "out of pocket" expenses incurred in connection with the transaction, so as to restore the status quo ante, as if the transaction had never occurred); *Zimmerman v. Kent,* 31 Mass. App. Ct. 72, 82 (1991); *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785 (9th Cir.1982)—(costs of the hours fruitlessly spent trying to manage, mitigate, or self-repair the hopelessly defective and uninhabitable premise, structures, elements, and appliances); *VMark Software, Inc. v. EMC Corp.*, 37 Mass. App. Ct. 610 (1994); *Danca v. Taunton Savings Bank,* 385 Mass. 1, 9 (1982); *Anzalone v. Strand,* 14 Mass. App. Ct. 45, 48-49 & n. 2 (1982); Howard J. Alperin, 14C Mass. Practice: Summary of Basic Law, section17.61 "Fraudulent misrepresentation—Damages" (1st ed. & Supp. 2010-2011)—("'[O]ut of pocket' damages gives the plaintiff the difference between the value of what he received and the price he paid. This rule compensates the plaintiff for what he lost because of the fraud…"'[B]enefit of the bargain' damages gives the plaintiff the difference between the value of what the plaintiff received, and the value of what plaintiff would have received if the defendant's representations had been true); *DiMarzo v. American Mut. Ins. Co.,* 389 Mass. 85, 101 (1983) ("Under c. 93A, the plaintiff is entitled to recover for all losses which were the foreseeable

Therefore, I hereby demand the following relief. As a result of this unfair or deceptive act or practice, I suffered injury or loss as follows:

- Actual, proximate, and out of pocket damages: rent and utilities paid, expenses for repairs and mitigations, medical expenses and costs, property damage, personal security expenses, attorneys fees and legal costs, property damage, conversion, and destruction, etc.;
- Benefit of the bargain and other consequential damages: interference with business and professional activities, and damage to ongoing litigation;
- Emotional distress, pain and suffering, physical harm, and mental injuries;
- Harm to my dog (injuries, exposure to harmful substances, insects and rodents, etc.), and harm to me by having to worry about the harm to my dog, who is my Emotional Support Animals.
- Refund of prior rent paid; liquidation of remaining lease; moving expenses and relocation costs;
- Restitution for unjust enrichment; Fees and costs; Fines and statutory penalties;
- A stipulated no-contact agreement regarding Alex Matses;
- A stipulated agreement that the defendant will either properly convert 18 Worcester Square to an actual apartment (including installation of ventilation and drainage, and relocating the gas hookups and other mechanical); or agree to not rent the space to tenants unless that occurs; or withdraw the occupancy claim and treat the space as basement storage or other non-residential use like commercial or office space;
- and provide a declaration that Gjovik does not owe any debts to any of the defendants or otherwise related to 18 Worcester Square.

# Conclusion

Chapter 93A gives you the opportunity to provide a good-faith response to this letter within thirty days, where you can choose to remedy the harm caused to the victim without court involvement. If a good faith and reasonable settlement offer is not made within thirty days, I will initiate legal formal legal action in the Superior Court that requests treble damages, fees, and costs (§ 12, 68).

---

consequences of the defendant's unfair or deceptive act or practice"); *Bank of New Orleans & Trust Co. v. Phillips,* 415 So. 2d 973, 976 (La. App. 1982) (actual damages as used in unfair and deceptive trade practices act include humiliation and mental anguish); *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 939 (Tex.), cert. denied, 449 U.S. 1015 (1980) (actual damages as used in deceptive trade practices act include damages [including mental suffering] recoverable at common law); *Leardi v. Brown*, 394 Mass. 151 , 158 (1985); *Maillet v. ATF-Davidson, Co.*, 407 Mass. 185 (1990) (under the amended version of Section 9 (1), the invasion of any legally protected right was compensable, including invasions in the form of injury to the person*); *Berman & Sons v. Jefferson*, 379 Mass. 196 , 198 (1979) –(a landlord's attempts to repair defective conditions in an apartment have no bearing on the calculation of a rent abatement for the time periods during which the defects persist); *Kenney v. Rust,* 17 Mass. App. Ct. 699 , 704 (1984); *Harold Brown Vs. David Leclair.,* 20 Mass. App. Ct. 976, September 11, 1985; Cruz Mgmt. Co. v. Wideman, 417 Mass. 771, 775 (1994); Darmetko v. Boston Housing Auth., 378 Mass. 758 (1979); *McKenna v. Begin,* 5 Mass. App. Ct. 304 (1977)—(the damages are the difference between the "value of the premises as warranted" and the value of the premises in their actual (defective) condition); Restatement (First) Of Restitution § 1 (1937).

The legislative objective of this process is to encourage a settlement that would provide the base relief the victim would receive from the court if they were forced to bring that litigation, which encourages the wrongdoers to not force the victim to have to take the matter to court. 93A encourages this by concurrently threatening the wrongdoer(s) with a 2-3x multiplier of the actual damages if the case does have to go to litigation.[9] The first notice of a possible 93A case was sent on August 1 2025 and delivered to Seeratt Dutt, Alex Matses, and Ron Payne – but there was no corrective actions and only additional misconduct.[10] The Aug. 1 2025 Notice and Demand for Compliance is also referenced and incorporated here within.

Finally, these allegations made here within are not exclusive, and I reserve all rights to make additional or different claims unless a settlement is reached, and I do not waive any rights in future negotiations or litigation. I hope we can find a way to remedy this situation so I can move on with my life, and hopefully will not have to think about 18 Worcester Square again going forward.

**Dated: October 9 2025**

Sincerely,

/s/ **Ashley M. Gjovik, J.D.**
18 Worcester Sq. Unit 1, Boston, Massachusetts, 02118
ashleymgjovik@protonmail.com
(415) 964-6272

---

[9] "[T]he multiple damages authorized by G. L. c. 93A 'are essentially punitive in nature.'" *Kraft Power Corp. v. Merrill,* 464 Mass. 145, 157 (2013), quoting *Darviris v. Petros,* 442 Mass. 274, 283-284 (2004). See *International Fid. Ins. Co. v. Wilson*, 387 Mass. 841, 856 (1983) ("The multiple damage provisions of c. 93A are designed to impose a penalty"). In providing for multiple damages when defendants willfully or knowingly engage in unfair or deceptive conduct, the Legislature was registering its "displeasure with the proscribed conduct and its desire to deter such conduct" by "encourag[ing] vindicative lawsuits." Id. at 857, quoting *McGrath v. Mishara*, 386 Mass. 74, 85 (1982). See *Haddad v. Gonzalez,* 410 Mass. 855, 869 (1991) ("It is established that deterrence is an important goal of the multiple damages provisions of c. 93A").
[10] *DiMarzo v. American Mut. Ins. Co.*, 389 Mass. 85 , 102 (1983) –(the court found bad faith conduct and violations of 93A when a landlord received a notice from a tenant but still refused to investigate the tenants complaints or make repairs).

## Appendix A: Floor Plans



*Worcester Square Basement Floor Plan sketch (AMG, 10/8/2025)*



*13-15 Worcester Sq., 2005 Basement/Garden Floor Plan for reference.*



*12-16 Worcester Sq., 2006 Basement/Garden Floor Plan for reference.*



*17-21 Worcester Sq., 2006 Basement/Garden Floor Plan for reference.*

# Appendix B: Example Photos

## July 2025 – August 2025
## Basement Boiler Room (left, flooded)
## and the Unit 1 Storage Cave (right).



The photo on the left shows the boiler room and water heaters on the wall (left) that is directly shared with the Unit 1 bedroom. The photo on the right shows the Unit 1 "storage" space that is under the stoop with a coal chute. This space is included in the Master Deed sqft, and was included in Dutt's rental sqft, but the storage was not leased to Gjovik, and the space is clearly not habitable.



Additional July 2025 photos in the Boiler Room and of the wall shared with the Unit 1 bedroom.

Photo on the right shows groundwater / moisture infiltration through the cracked foundation.



Photo of the mid-August installation of a lock on the Boiler Room door and sign informing Unit 1 that they do not have access and are not authorized to view or enter the Boiler Room, following Gjovik's August 1 2025 Notice and Demand for Compliance, with photos of the Boiler Room, provided to Ron Payne.

**August 2025**
**Root Cause findings from Pest Control**
**Regarding the Unit 1 Rodent Infestation**



Photo of space under/behind the stove showing large gaps in the cabinets and wall connecting to the shared hallway and closet, with mouse feces and in the access way, under the stove, and in the closet. Also under the stove was mouse carcasses, mouse poison containers, and dead insects.

## Examples of Gaps and Cracks in the Foundation & Floor of the Unit 1 Bedroom (2025)



# Examples of Gaps and Cracks in the Foundation, Fieldstone,
# & Floor of the Unit 1 Living Room (2025)



## 2024-2025 | 18 Worcester Sq. Unit 1
## Kitchen Sewage Backing Up into the Bathtub, Again;
## & current state of the Toilet.

 



## August 2025 – Hole in the Living Room Wall to Exterior, Rodent Feces; Mouse



# August 6-8 2025 | Charles Construction Company at 18 Worcester Sq. for the Fire Dept. Corrective Actions at Unit 1; Notice for Ron/HOA





EIGHTEEN WORCESTER SQUARE | 93A THIRTY-DAY DEMAND LETTER



 Cut on dotted line.

## Instructions

1. Please use a laser or laser-quality printer.

2. Adhere shipping label to package with tape or glue - DO NOT TAPE OVER BARCODE. Be sure all edges are secure. Self-adhesive label is recommended.

3. Place label so that it does not wrap around the edge of the package.

4. Each shipping label number is unique and can be used only once - DO NOT PHOTOCOPY.

5. Please use this shipping label on the "ship date" selected when you requested the label.

6. If a mailing receipt is required, present the article and Online e-Label Record at a Post Office for postmark.

**9410 8301 0935 5006 4642 95**

Print Date: **2025-10-09**
Ship Date: **2025-10-09**

PRIORITY MAIL®    $10.40
Extra Services:    $3.95
Fees:    $0.00
Total:    $14.35

From:    **ASHLEY GJOVIK**
**18 WORCESTER SQ APT 1**
**BOSTON MA 02118-2945**

To:    **18 WORCESTER SQ CONDO TRUST C/O RON PAY**
**APT 4**
**18 WORCESTER SQ**
**BOSTON MA 02118-2945**

* Commercial Pricing PRIORITY MAIL® rates apply. There is no fee for USPS Tracking® service on PRIORITY MAIL® service with use of this electronic rate shipping label. Refunds for unused postage paid labels can be requested online 30 days from the print date.

**UNITED STATES POSTAL SERVICE®** *Thank you for shipping with the United States Postal Service!*
*Check the status of your shipment on the USPS Tracking® page at usps.com*





*Cut on dotted line.*

## Instructions

1. Please use a laser or laser-quality printer.

2. Adhere shipping label to package with tape or glue - DO
   NOT TAPE OVER BARCODE. Be sure all edges are secure.
   Self-adhesive label is recommended.

3. Place label so that it does not wrap around the edge of
   the package.

4. Each shipping label number is unique and can be used
   only once - DO NOT PHOTOCOPY.

5. Please use this shipping label on the "ship date"
   selected when you requested the label.

6. If a mailing receipt is required, present the article and
   Online e-Label Record at a Post Office for postmark.

9410 8301 0935 5006 4642 88

| | |
|---|---|
| Print Date: **2025-10-09** | |
| Ship Date: **2025-10-09** | |

| | |
|---|---|
| PRIORITY MAIL® | $10.40 |
| Extra Services: | $3.95 |
| Fees: | $0.00 |
| Total: | $14.35 |

**From:** ASHLEY GJOVIK
18 WORCESTER SQ APT 1
BOSTON MA 02118-2945

**To:** SOUTH END CORPORATION
LAWRENCE ABELN
70 W LYNWOOD ST
PHOENIX AZ 85003-1205

\* Commercial Pricing PRIORITY MAIL® rates apply. There is no fee for USPS Tracking®
service on PRIORITY MAIL® service with use of this electronic rate shipping label.
Refunds for unused postage paid labels can be requested online 30 days from the
print date.

---

**UNITED STATES POSTAL SERVICE®** *Thank you for shipping with the United States Postal Service!*
*Check the status of your shipment on the USPS Tracking® page at usps.com*



 Cut on dotted line.

## Instructions

1. Please use a laser or laser-quality printer.

2. Adhere shipping label to package with tape or glue - DO NOT TAPE OVER BARCODE. Be sure all edges are secure. Self-adhesive label is recommended.

3. Place label so that it does not wrap around the edge of the package.

4. Each shipping label number is unique and can be used only once - DO NOT PHOTOCOPY.

5. Please use this shipping label on the "ship date" selected when you requested the label.

6. If a mailing receipt is required, present the article and Online e-Label Record at a Post Office for postmark.

**9410 8301 0935 5006 4643 18**

| | |
|---|---|
| Print Date: **2025-10-09** | PRIORITY MAIL® $10.40 |
| Ship Date: **2025-10-09** | Extra Services: $3.95 |
| | Fees: $0.00 |
| | Total: $14.35 |

From: **ASHLEY GJOVIK**
**18 WORCESTER SQ APT 1**
**BOSTON MA 02118-2945**

To: **ALEXANDER MATSES**
**23 MAIN ST**
**BYFIELD MA 01922-1216**

\* Commercial Pricing PRIORITY MAIL® rates apply. There is no fee for USPS Tracking® service on PRIORITY MAIL® service with use of this electronic rate shipping label. Refunds for unused postage paid labels can be requested online 30 days from the print date.

**UNITED STATES POSTAL SERVICE®** *Thank you for shipping with the United States Postal Service!*
*Check the status of your shipment on the USPS Tracking® page at usps.com*



 Cut on dotted line.

## Instructions

1. Please use a laser or laser-quality printer.

2. Adhere shipping label to package with tape or glue - DO NOT TAPE OVER BARCODE. Be sure all edges are secure. Self-adhesive label is recommended.

3. Place label so that it does not wrap around the edge of the package.

4. Each shipping label number is unique and can be used only once - DO NOT PHOTOCOPY.

5. Please use this shipping label on the "ship date" selected when you requested the label.

6. If a mailing receipt is required, present the article and Online e-Label Record at a Post Office for postmark.

**9410 8301 0935 5006 4643 01**

Print Date: **2025-10-09**

Ship Date: **2025-10-09**

| | |
|---|---|
| PRIORITY MAIL® | $10.40 |
| Extra Services: | $3.95 |
| Fees: | $0.00 |
| Total: | $14.35 |

From: **ASHLEY GJOVIK**
**18 WORCESTER SQ APT 1**
**BOSTON MA 02118-2945**

To: **CHARLES CONSTRUCTION COMPANY**
**200 SUTTON ST**
**NORTH ANDOVER MA 01845-1656**

* Commercial Pricing PRIORITY MAIL® rates apply. There is no fee for USPS Tracking® service on PRIORITY MAIL® service with use of this electronic rate shipping label. Refunds for unused postage paid labels can be requested online 30 days from the print date.

**UNITED STATES POSTAL SERVICE®** *Thank you for shipping with the United States Postal Service!*
*Check the status of your shipment on the USPS Tracking® page at usps.com*



 *Cut on dotted line.*

## Instructions

1. Please use a laser or laser-quality printer.

2. Adhere shipping label to package with tape or glue - DO NOT TAPE OVER BARCODE. Be sure all edges are secure. Self-adhesive label is recommended.

3. Place label so that it does not wrap around the edge of the package.

4. Each shipping label number is unique and can be used only once - DO NOT PHOTOCOPY.

5. Please use this shipping label on the "ship date" selected when you requested the label.

6. If a mailing receipt is required, present the article and Online e-Label Record at a Post Office for postmark.

**9410 8301 0935 5006 4642 71**

| | |
|---|---|
| Print Date: **2025-10-09** | PRIORITY MAIL®   $10.40 |
| Ship Date: **2025-10-09** | Extra Services:   $3.95 |
| | Fees:   $0.00 |
| | Total:   $14.35 |

From:   **ASHLEY GJOVIK**
**18 WORCESTER SQ APT 1**
**BOSTON MA 02118-2945**

To:   **SEERATT DUTT - MATSES**
**23 MAIN ST**
**BYFIELD MA 01922-1216**

* Commercial Pricing PRIORITY MAIL® rates apply. There is no fee for USPS Tracking® service on PRIORITY MAIL® service with use of this electronic rate shipping label. Refunds for unused postage paid labels can be requested online 30 days from the print date.

**UNITED STATES POSTAL SERVICE®** *Thank you for shipping with the United States Postal Service!*
*Check the status of your shipment on the USPS Tracking® page at usps.com*