**Ashley M. Gjovik, JD**
*In Propria Persona*
(415) 964-6272
amgjovik@gmail.com
Boston, MA

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

IN RE:

ASHLEY M. GJOVIK,
        DEBTOR/PLAINTIFF

U.S. DEPARTMENT
OF EDUCATION;
MAXIMUS, INC,
MAXIMUS EDUCATION,
LLC D.B.A. AIDVANTAGE,
        DEFENDANT(S).

CHAPTER 7 BANKRUPTCY
ADVERSARY PROCEEDING
CASE NO: 25-01104
JUDGE CHRISTOPHER J. PANOS

REQUEST FOR DISCHARGE OF
STUDENT LOAN DEBT, 11 U.S.C. §
523(A)(8).

Opposition to Defendant Maximus's
    Motion to Dismiss (Dkt. 14) .

Request for Corrected Filing for Proof of
    Claim 1-1.

Request to Amend Defendants to also add
    "Maximus, Inc."

# Table of Contents

I.  SUMMARY ......................................................... 3

*The Ch.7 case & this Adversary Proceeding* ............................. 3

*Maximus, Inc. aka Maximus Federal Services aka Maximus Education, LLC aka Aidvantage.* ....................................................... 4

*Maximus' objections are contrary to law and fact.* .................. 6

II.  MAXIMUS IS ACTING AS A BANKRUPTCY CREDITOR. .................. 8

*Maximus filed a claim in this proceeding.* ............................ 8

*The case is currently docketed with one defendant.* ................. 9

*It is well established that the U.S. Dept. of Education does not properly control or manage its contractors.* ................................... 10

III.  STUDENT LOAN DISCHARGES ARE EFFECTUATED THROUGH DECLARATORY RELIEF (RULE 57; 28 U.S.C. § 2201) ...................... 11

*Adversary Proceedings seeking declaratory relief should resolve the entire controversy at issue with all interested parties.* ................... 12

*Impleader (Joinder of Third-party Claims) is appropriate when a loan servicer controls administration of the debt at issue, making them an Indispensable Party.* ..................................................... 15

IV.  MAXIMUS IS REQUESTING DISMISSAL UNDER DEFENSES OF IMMUNITY, NOT FOR FAILURE TO STATE A CLAIM. ....................... 17

*Private student loan servicers frequently assert a variety of types of government immunity.* ................................................... 18

*Maximus knows it has liability and is trying to avoid that liability by unilaterally claiming it has no liability.* ............................... 22

*Maximus' is unlawfully disclaiming liability for negligent or intentional violations of state and federal law.* .................................. 23

V.  BANKRUPTCY COURTS ARE COURTS OF EQUITY & EQUITY SEEKS TO RESOLVE THE ENTIRE CONTROVERSY. ......................................... 24

*Maximus is a Debt Collector which has repeatedly been found to have*

*violated consumer protection laws.* ................................................*25*

**VI.    MAXIMUS' PROOF OF CLAIM IN THIS CASE IS FALSE AND/OR
MISLEADING.** ...........................................................................**26**

*Maximus failed to identify which loans underly the student loan debt
Claim.* ....................................................................................*26*

*Maximus's Proof of Claim included a 2010 Master Promissory Note for a
group of inactive and fully paid-off Sallie Mae & MOHELA loans.* .........*27*

*Maximus filed a Claim for less than what appears to be actually owed.* ....*29*

*Maximus did not include the 2018 Master Promissory Note underlying three
of four loans.* ..........................................................................*29*

*Plaintiff's Objection and Request for Amendment/Correction.* ................*32*

**VII.   THE BANKRUPTCY COURT IN THE DISTRICT OF MA HAS EXCLUSIVE
JURISDICTION OVER MAXIMUS' COMPLIANCE WITH DISCHARGE ORDERS
IN THIS CASE.** ...........................................................................**34**

*There is no pre-defined process to enforce relief against a nonparty for
student loan discharges.* ..............................................................*34*

*If the current administration proceeds with plans to transfer student loan
administration to the SBA or Treasury, Maximus would be the only
Defendant remaining.* .................................................................*37*

**VIII. CONCLUSION** ............................................................**39**

# Opposition to Maximus's
# 12(b)(6) Motion to Dismiss

## I. Summary

### The Ch.7 Case & This Adversary Proceeding

1.      Plaintiff, Ashley M. Gjovik, filed a petition for Chapter 7 bankruptcy on July 21 2025 (Case No. 25-11496) and initiated this Adversary Proceeding on July 29 2025 requesting discharge of her federal student loan debt under the "undue hardship" provision set out in 11 U.S.C. § 523(a)(8). The Adversary Proceeding Complaint requested a declaratory judgment that the Plaintiff's student loan debt may be discharged with the remainder of her Chapter 7 debt.

2.      The Adversary Proceeding Complaint and Cover Page form lists the Defendants as including U.S. Department of Education and Maximus Education LLC d.b.a. "Aidvantage." (25-01104, Dkt. 1). The U.S. Bankruptcy Court Clerk's office docketed the case with both entities joined/merged as one defendant. The Court's Summons for this case was addressed to both parties as a merged entity. (25-01104, Dkt. 2 at 1).

---

Case 25-01104   Doc 2   Filed 07/29/25   Entered 07/29/25 15:34:34   Desc Summons in an Adversary   Page 1 of 2

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

In re    Ashley Marie Gjovik                         Related Bankruptcy Case: 25−11496
                                                     Chapter 7
              Debtor                                 Judge Christopher J. Panos

         Ashley Marie Gjovik                         Adversary Proceeding: 25−01104
                Plaintiff
         vs.
         U.S. Department of Education Maximus d.b.a. Aidvantage
                Defendant

**SUMMONS IN AN ADVERSARY PROCEEDING**

---

3.     The Summons and Complaint for this case were served on the United States Attorney General and the U.S. Dept. of Education on July 31 2025. (25-01104, Dkt. 4-1). The Summons and Complaint were then also served on the Boston U.S. District Attorney's Office and Maximus Education, LLC d.b.a. Aidvantage on Aug. 4 2025. (25-01104, Dkt. 5-1). Service was attempted on Maximus on July 31 2025 via the mailing address that was posted on their website but USPS returned the mail on Aug. 2 2025, noting: "*Moved, Left no Address.*" (25-01104, Dkt. 4-1, ¶ 7).

4.     The Plaintiff contacted Maximus about the issue on Aug. 4 2025. The company confirmed they changed their Loan Servicing mailing address. Maximus waived the requirement for Certified Mail and asked the Plaintiff to fax them the Complaint and Summons instead. The Plaintiff faxed the documents to the number provided, uploaded the documents to the Aidvantage Customer Service portal under "Bankruptcy – Chapter 7", and efiled a Proof of Service. (¶ 7-8). Note that screenshots of this were included in the Proof of Service (Dkt. 4-1 at 19), however the Plaintiff's Aidvantage online account today shows no history of ever uploading documents.

## Maximus, Inc. aka Maximus Federal Services aka Maximus Education, LLC aka Aidvantage.

5.     Maximus Education, LLC, is a Delaware corporation formed in 2021.[1] Del. C. Title 8, Ch. I, § 122. Maximus Education, LLC is a wholly-owned subsidiary of Maximus Inc. In Massachusetts, the LLC's corporate filings list three "Managers" who are the same Senior Vice Presidents of Legal, Finance, and Federal Contracts as for Maxmius, Inc.[2] Job postings for "Aidvantage" are also posted simply as jobs working directly for "Maximus."[3] Maximus, Inc is a for-profit, publicly traded corporation that was founded in 1975.[4] In 2024, Maximus reported an annual revenue of $5.31B.[5]

---

[1] Maximus, Inc, Subsidiaries, United States Securities and Exchange Commission.
[2] Mass. Sec. of State, Entity ID 001540149, MAXIMUS EDUCATION, LLC
[3] CWA, Customer Disservice: Maximus, March 2022, https://protectborrowers.org/wp-content/uploads/2022/03/CWA_SBPC_MAXIMUS.pdf
[4] Maximus, Company Information, FAQ, https://investor.maximus.com/company-info/faq
[5] Maximus Reports Fourth Quarter and Full Year Results for Fiscal Year 2024, Nov. 20 2024.

Maximus defines its business as government contracting and attributes the majority of its revenue to contracts with the federal government.[6] (Ex. R.) The U.S. Dept. of Education has awarded Maximus large contracts ($848M+) for student loan servicing and debt collection starting in at least 2013 and Maximus has managed federal debt collection for the Dept. of Education since at least 2000.[7]

6.      Maximus Education, LLC has a student loan servicing license through Massachusetts (Lic. No. AFSLS2241381). (Ex. K). It also holds debt collection licenses in other states. Maximus Education LLC services student loans primarily through its "Aidvantage" business line. ("*In October 2021, we acquired the Navient student loan contract, rebranded as Aidvantage.*")[8] The "acquisition" was a contract novation.[9] (Ex. T). Navient (previously known as Sallie Mae) was permanently banned from servicing federal student loans due to its "years of failures and lawbreaking."[10] Navient transferred at least 800 of its servicing employees to Maximus.[11] (Ex. T).

7.      "Aidvantage" is a Fictious Business Name created in 2021 for Maximus Education, LLC in Virginia and which is also registered in Boston (CC463551). Practically, "Aidvantage" is simply an informal code-name for the government contract previously managed by Navient, and the legal entity is Maximus, Inc (including wholly owned subsidiaries). Among other issues, Maximus should not be using a Fictious Name in Court Filings as DBAs and Trade Names are not legal entities.

8.      Maximus Education LLC d.b.a. Aidvantage ("Maximus") is a creditor in this Bankruptcy proceeding, designated as Creditor #21021127 and #21011449. The U.S. Department of Education is also a Creditor in this Bankruptcy proceeding and is designated as Creditor # 21011451. Maximus filed a claim against the Plaintiff (Claim No.: 1) on Aug. 19 2025, regarding the Plaintiff's student loan debt. 11 U.S. Code §

---

[6] Maximus, Inc, 2024 10-K, United States Securities and Exchange Commission, pg6.
[7] Law 360, Maximus Wins $848M DOE Contract To Run Student Debt Center, Oct. 2. 2013.
[8] Maximus, Inc, 10-K, United States Securities and Exchange Commission, pg5-6 (2023).
[9] Maximus, Maximus Federal Student Loan Servicing Contract Novation Completed, Oct. 20 2021.
[10] CFPB, CFPB Bans Navient from Federal Student Loan Servicing and Orders the Company to Pay $120 Million for Wide-Ranging Student Lending Failures, Sept. 12 2024.
[11] Maximus, Maximus Federal Student Loan Servicing Contract Novation Completed, Oct. 20 2021.

501(a). Maximus' claim designated the debt as unsecured "money loaned" and identifies themselves only as "Aidvantage" filing on "behalf of the U.S. Department of Education" and as "the creditor's attorney or authorized agent." (Cl. 1-1).

9.     The Adversary Proceeding Complaint was amended in August 25 2025 and was served to U.S. Dept. of Ed. via the efiling system (Dkt. 8) and to Maximus via email with electronic mail service accepted by lawyers for Maximus. (Dkt. 12). Depending on the relevant rules, Maximus had 14-30 days to file a response, with a deadline no later then end of Sept. 2025. Instead, Maximus didn't respond for two months, then abruptly filed a Motion to Dismiss at Dkt. 14. (Dkt. 14-1).

10.     Maximus Education, LLC's filing to this court also fails to disclose its parent company of Maximus Inc, and its other entities, who do administer key activities for bankruptcy proceedings for Dept. of Ed (including filing claims – see the section below about the inaccurate and misleading claim filed in this case by Maximus), who proposes lawsuit against debtors to DOJ, who are considered "hearing officials" in wage garnishment cases including making and writing agency decisions, and who also manage all debt collection for Dept. of Education – among other omissions. (Dkt. 15).

## Maximus' Objections

11.     Lawyers from Husch Blackwell who are representing Maximus called the Plaintiff around Fri. Aug. 22 2025 and attempted to persuade her (knowing she's *pro se*), to voluntarily remove Maximus from the defendants list for this case, insisting she made a mistake and does not understand how defendants or liability work for these cases. Counsel also repeatedly claimed they represent "Aidvantage" without mentioning Maximus, despite Aidvantage not actually being a legal entity.

12.     Defense counsel repeatedly insisted that Maximus/Aidvantage cannot be a defendant because it cannot "discharge [her] student loans." The Plaintiff informed counsel that she already explained why she added them in her Complaint and Amended Complaint (allegations the corporation systemically refuses to respect court orders regarding bankruptcy loan discharges and continues collecting on discharged det). She

also clarified that U.S. Dept. of Ed. cannot "discharge" debt in bankruptcy proceedings either – only Bankruptcy Court Judges can Order a discharge, so Maximus' argument is frivolous. This court also frequently dockets cases with both the agency and the servicer, and has also issued Discharge Orders against both entities. (Ex. B).

13.     The Plaintiff said she may be willing to remove Maximus from the case if she could obtain some sort of legally binding agreement from Maximus that if her loan debt was discharged in this proceeding, that they would treat the Order as also applying to them and agree to not violate that order, but also warned them that doing so out of court would likely count as a settlement and because she's in Chapter 7, any settlement offer would need to go through Trustee DeGiacomo instead of her. She repeatedly told them it seems simpler for them to just file a Declaration to the case saying they don't plan on participating and will let U.S. Dept. of Ed. handle the proceeding, and swear that they will respect any Order of this court. They refused – repeatedly.

14.     Instead, Mr. Seidler from Husch Blackwell emailed the Plaintiff on Aug. 27 2025 implying her request was a out of court settlement, and asked for a two-week extension to file their own Answer while they consider her request for a settlement. (Dkt 12 at 8). The Plaintiff responded reiterating the points above, and reminding counsel she cannot approve settlements without the Trustee and that because they are a federal contractor, they also should not be negotiating deals about their contract obligations behind DOE/DOJ's back. The plaintiff added the DOJ lawyers to the email chain (Dkt 12 at 7).

15.     Mr. Zavala from Husch Blackwell then responded asking the Plaintiff to "please agree informally not to seek a default judgment against [them] for 2 weeks... as a professional courtesy." The Plaintiff responded reminding them she filed an Amended Complaint and accordingly they already have two more weeks to respond. She added, "I would not agree to not seek a default judgement generally, because a default judgement would just be a court judgement documenting your clients existing obligations." (Dkt. 12 at 6). Mr. Zavala responded accepted service of the Amended Complaint and also suggested that the U.S. DOJ should issue an email-decision

declaring Maximus is "an improper party to the discharge lawsuit." (Dkt 12 at 5).

16.     Plaintiff responded that federal employees cannot issue legally binding court orders if they are not Judges or simply by sending emails, even if its DOJ. The Plaintiff explained that if Maximus wants DOJ to request that Maximus be removed, then DOJ needs to file a Motion requesting that, not just emails. The plaintiff also added:

> "I believe Aidvantage/Maximus is a proper defendant in addition to the U.S. government, due to what appears to be a coordinated scheme to not recognize bankruptcy discharge orders as applying to Aidvantage/Maximus. To protect my rights and ensure that if a discharge order is granted I would not still face collections, I have no intention of waiving my position in the complaint."

Zavala responded that there is "no scheme" but that they "understand [her] position regarding [the allegations of a scheme]." (Dkt. 12 at 4). That was Aug. 27 2025 and Maximus did not contact the Plaintiff again until she received a paper copy of their Oct. 21 2025 12(b)(6)Motion to Dismiss in her home mailbox on Oct. 25 2025.

17.     The Plaintiff complained to them on Oct. 25 2025 that "[she does] not see ...any statement that [they] would actually recognize a discharge order as binding on [Maximus/]Aidvantage and if a discharge was granted, that [they] would not then continue to try to collect on the debt." Mr. Zavala's response was "Unfortunately, we do not have authority from our client Aidvantage to accept your settlement offer" and they will not "enter into a settlement agreement with [her] simply to correct a legal error in [her] complaint." Zavala then asked the Plaintiff for "a stipulation of voluntary dismissal." The Plaintiff responded on Oct. 27 2025 complaining again about their behavior and provided them a final "safe-harbor" warning. Maximus never responded.

## II.   STUDENT LOAN SERVICERS ARE BANKRUPTCY CREDITORS.

### MAXIMUS FILED A CLAIM IN THIS PROCEEDING.

18.     By filing a claim against a bankruptcy estate, the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the

bankruptcy court's equitable power. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59 and n. 14 (1989). When Creditors file proofs of claim, it establishes Creditor standing in an adversary proceeding and enables the Debtor to obtain a discharge against those creditors' claims. *In re Dorsey*, 870 F.3d 359 (5th Cir. 2017). Maximus filed a claim and has a creditor number. For the purposes of the proceeding, Maximus is a creditor. Like the Apple Card with Apple Inc and Goldman Sachs, certain business decisions have let to sort of hybrid/dual-entity between Maximus and the Dept. of Ed., that is not easily classified, but is definitely liable is all its forms.

19.    The term "claim" means a "right to payment," including "legal" or "equitable," or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5)(A),(B). A "claim" is a "right to payment" with Congressional intent for the "broadest possible" definition of "claim." *Pennsylvania DPW v. Davenport,* 495 U.S. 552, 588 (1990) – (noting bankruptcy code "contemplates that all legal obligations of the debtor . . . will be able to be dealt with in the bankruptcy case," quoting 1978 Legislative History). Maximus filed a claim against the bankruptcy estate, thereby "bringing themselves within the equitable jurisdiction of the bankruptcy court." *Langenkamp v. Culp,* 498 U.S. 42 (1990).

## THE CASE IS CURRENTLY DOCKETED WITH ONE DEFENDANT.

20.    As a threshold matter, this Adversary Proceeding is currently docketed by the Court with one defendant. The court also issued a Summons for one defendant. The Summons that the Plaintiff served on Maximus in August 2025 did not list Maximus as a separate party.

21.    Maximus even filed their Motion in PACER (asking to be removed as a defendant), as the party "U.S. Dept. of Education." This means, Maximus' attorneys would have selected the party they represent as "U.S. Dept. of Education," and then electronically filed their Motion confirming they are U.S. Dept. of Education, while the content of their filing claims they are an entirely distinct party and asks to be removed from a lawsuit with only one party. Because Maximus is not listed as a separate

defendant in this matter, they have no response obligations or deadlines, and thus Maximus's request seems irrational unless you consider Maximus' likely motives.

---

**Case 25-01104    Doc 2    Filed 07/29/25    Entered 07/29/25 15:34:34    Desc Summons in an Adversary    Page 1 of 2**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re | Ashley Marie Gjovik | Related Bankruptcy Case: 25−11496 |
| | | Chapter 7 |
| | Debtor | Judge Christopher J. Panos |
| | Ashley Marie Gjovik | Adversary Proceeding: 25−01104 |
| | Plaintiff | |
| | vs. | |
| | U.S. Department of Education Maximus d.b.a. Aidvantage | |
| | Defendant | |

**SUMMONS IN AN ADVERSARY PROCEEDING**

---

## IT IS WELL ESTABLISHED THAT THE U.S. DEPT. OF EDUCATION DOES NOT PROPERLY CONTROL OR MANAGE ITS CONTRACTORS.

22.    In 2019, a US District Court in California issued a preliminary injunction against the U.S. Dept. of Education enjoining the agency from engaging in collection efforts for certain debts arising out of student loans for Corinthian schools. *Manriquez v Devos*, 3:17-cv-07210-SK, Dkt. 130, pg 4, (N.D. Cal., Oct. 24 2019). The U.S. Dept. of Education was then found to have violated the injunction by its contractors (including Maximus) sending inaccurate and prohibited communications to borrowers of enjoined debts, reporting negative information about borrowers to credit agencies, and garnished wages for enjoined debts. The U.S. Dept. of Education's "efforts to comply with the preliminary injunction" were limited providing "guidance" consisting "of a single email with three brief sentences of instruction….The email does not even mention the existence of the preliminary injunction." *Manriquez v Devos*, 3:17-cv-07210-SK, Dkt. 130, pg 4, (N.D. Cal., Oct. 24 2019). (Ex. O-P).

23.    The U.S. Dept. of Education's rejected defense was that "the federal loan

servicers each have their own systems, processes, and procedures, as well as their own unique contract with the Department. The Department does not have the ability to directly input directions or controls into the non-default servicers' systems." *Manriquez v Devos*, 3:17-cv-07210-SK, U.S. Dept. of Education Compliance Report, Dkt. 130, pg 12, (N.D. Cal., Sept. 18 2019). The agency further elaborated that when they need to "direct[] the servicer to take a particular action, the Department communicates directly with the servicer and the servicer has the responsibility to make the necessary changes to the servicer's system or follow up on individual borrower issues." *Manriquez v Devos*, 3:17-cv-07210-SK, U.S. Dept. of Education Compliance Report, Dkt. 130, pg 13, (N.D. Cal., Sept. 18 2019). (Ex. O-P).

24.   More recently, in 2024 the Congressional U.S. House Committee on Education and the Workforce subpoenaed the CEO of Maximus (Bruce Caswell), in Aug. 29 2024 regarding Maximu's "rulemaking" activities with the department and planned communications to borrows with student loan debts regarding the terms of their debts. The Committee was subpoenaed Maximus directly instead of subpoenaing the Dept. of Education.

## III. STUDENT LOAN DISCHARGES ARE EFFECTUATED THROUGH DECLARATORY RELIEF (RULE 57; 28 U.S.C. § 2201)

25.   11 U.S. Code § 523 details "exceptions to discharge" in bankruptcy proceedings. Fed. Rule B. Pro. 4007 and 7001 authorize "Adversary Proceedings" "to determine whether a debt is dischargeable" and then to "obtain a declaratory judgment." 7001(f),(i). *Crocker v. Navient Solutions, LLC*, No. 18-20254 (5th Cir. 2019). A bankruptcy discharge is a "substantive right." *Nat'l Gypsum Co. v. NGC Settlement Tr. & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1063 (5th Cir. 1997).

26.   The Declaratory Judgment Act (28 U.S.C. § 2201), permits federal courts to grant declaratory relief in cases of controversy; stating that district courts "may declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought." 28 U.S. Code § 2201(a); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 638, 645 (1st Cir. 2019). A bankruptcy court is a "Court of the United States" and accordingly, has the power to hear and decide matters under the Declaratory Judgment Act. 28 U.S.C. §§ 2201-2202; *In re: Tashanna B. Golden, Golden v. National Collegiate Student Loan Trust,* 1-17-01005-ess, pg 49 (E.D. N.Y. May 7 2025).

27. Bankruptcy Code Section 105 also grants the bankruptcy court power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. The Declaratory Judgment Act has "'a broad, remedial purpose and, therefore, should be construed liberally.'" *In re: Tashanna B. Golden, Golden v. National Collegiate Student Loan Trust,* 1-17-01005-ess, pg 49 (E.D. N.Y. May 7 2025) citing *Akzona Inc. v. E.I. duPont de Nemours & Co.*, 662 F. Supp. 603, 615 (D. Del. 1987).

### Adversary Proceedings seeking declaratory relief should resolve the entire controversy at issue with all interested parties.

28. The standard for exercising discretion to hear a declaratory judgment action is whether a declaratory judgment will settle the controversy and clarify the legal relations in issue. *Samuel Goldwyn, Inc. v. United Artists Corporation,* 3 Cir., 113 F.2d 703, 709 (1940). Declaratory judgment should not be granted to determine particular issues without settling the entire controversy. *Sears, Roebuck and Co. v. Zurich Insurance Company*, 422 F.2d 587 (7th Cir. 1970). In lawsuits against the government, if the relief sought would require someone to take some action, that person is an indispensable party even if they are not the liable party. See *Williams v. Fanning,* 332 U.S. 490, 493 (1947); *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 96 (1949). See also 5 U.S.C. § 702 ("The United States may be named as a defendant... and a ... decree may be entered against the United States; provided that any mandatory or injunctive decree shall specify the... officers... personally responsible for compliance.").

29. A federal court may Declare "the existence or nonexistence of any right,

duty, power, liability, privilege, disability, or immunity or of any fact upon which such legal relations depend, or of a status." (FRCP Rule 57. Declaratory Judgment Notes of Advisory Committee on Rules—1937). Declaratory judgments should afford relief from uncertainty and insecurity with respect to legal relations. *American Automobile Ins. Co. v. Freundt*, 103 F.2d 613, 619 (7th Cir. 1939); *Aetna Casualty & Surety Co. v. Quarles,* 92 F.2d 321, 324 (4th Cir. 1937).

30.    These judgements "declare rights so that parties can conform their conduct to avoid future litigation" and provide "practical assistance in setting the underlying controversy to rest." *Aldrich v. Young,* No. 13-CV-10466-DPW, 2013 WL 3802436, at *9 (D. Mass. July 18, 2013), aff'd, No. 13-1966, 2015 WL 13926793 (1st Cir. Dec. 22, 2015); *State of R.I. v. Narragansett Indian Tribe,* 19 F.3d 685, 693 (1st Cir. 1994). Accordingly, when an interested party requests a Declaratory Judgement, "all parties having an interest therein or adversely affected must be made parties or be cited." (FRCP Rule 57. Declaratory Judgment Notes of Advisory Committee on Rules—1937).  This concept is reinforced by the FRCP Rule 19(b) joinder factors.

31.    In this situation, if the Court renders a debt discharge judgement in Maximus' absence while Maximus is in *de facto* control of the debt at issue, and is known to continue to unlawfully collect on discharged debts, it would greatly prejudice the Plaintiff's rights. Rule 19(b)(1). Further, if Maximus is not a "party" to a discharge Order regarding the debt it controls there is no clear path to seek redress if/when Maximus violates the Court's order regarding that debt, and so a judgement issued in Maximus' absence would not be adequate. Yet, this is the only venue for a requesting a discharge of this specific debt. Rule 19(b)(3),(4).

32.    Finally, under Rule 19(b)(2), the court could include "protective provisions in the judgement" including shaping the relief to anticipate the need to for the Plaintiff to file a motion for sanctions against Maximus in the future (such as including them in the text of the order, even if they are not a party) however this still retains significant uncertainty and risk regarding enforcement of any order.

33.    The controversy in this case about parties and arising out of Maximus's *de*

*facto* control of government debts and its established response to bankruptcy discharge orders is primarily a factual question for the court. "[T]he language of Rule 19(b) leaves the court with great latitude, and requires a factual determination more than a legal one." *ConnTech Dev. Co. v. University of Conn. Educ. Properties Inc.,* 102 F.3d 677, 682 (2d Cir. 1996). See also, 4 James Wm. Moore, Moore's Federal Practice § 19.05[1][A]. Thus, the Plaintiff attaches extensive exhibits and incorporates many sources by reference, and respectfully requests the court consider the factual circumstances.

34.    Practically, if this court were to issue a discharge order for the student loan debt, and the order only included the U.S. Dept. of Education but not Maximus, and Maximus continued to collect on that discharged debt as its known to do (including debt collection communications, submitting negative credit information to credit reporting companies, incurring interest and fines, sending loans into default, garnishing wages and tax returns, etc.); and considering the established non-response of U.S. Dept. of Education regarding complaints about similar contractor negligence and misconduct (likely because complaints about Maximus are routed to Maximus, as detailed below); the Plaintiff would then need to return to this court, re-open the bankruptcy, and request sanctions against the U.S. Dept. of Education including holding the agency in contempt until they can force Maximus to comply with the order out-of-court, or else the court will have to re-serve Maximus, and joinder them after the fact, or otherwise try to drag them back into court. This situation represents a fact pattern that exemplifies the need to include a third-party in the list of required defendants.

35.    Courts generally hold that a party to a multi-party contract, whose rights, obligations, and liabilities thereunder would be affected if the relief sought were granted, is an indispensable party. See *MasterCard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 386 (2d Cir. 2006) (noting principle that presence of party to contracts at issue is required) (citing *Crouse-Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 701 (2d Cir. 1980), and *Lomoyaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) ("No procedural principle is more deeply imbedded in the common law than that, in an

action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable."). *CP Solutions PTE, Ltd. V General Electric Co, et al*, 3:04-cv-02150-JBA, Dkt. 207, (July 1 2007).

36.   Maximus is currently party to multiple federal contracts creating obligations for it to administer this specific student loan debt from a variety of angles, including general servicing. Maximus is also the entity that is managing bankruptcy proceedings from within Dept. of Education. (Ex. S). Maximus is also the entity required to enter the data reflecting a discharge and ensure collection efforts are stopped. (Ex. S). Maximus is also the entity who would receive questions and complaints from the borrower regarding this debt if collection efforts did not stop. (O-Q). Meanwhile, the US Dept. of Education has repeatedly explained it does not control its own systems and also ultimately cannot control Maximus. (Ex. O-P). Yet, Maximus now claims its improper to include Maximus in this proceeding despite any judgement primarily affecting Maximus, and the U.S. Dept. of Education being unable to implement a discharge (literally) without Maximus.

## IMPLEADER (JOINDER OF THIRD-PARTY CLAIMS) IS APPROPRIATE WHEN A LOAN SERVICER CONTROLS ADMINISTRATION OF THE DEBT AT ISSUE, MAKING THEN AN INDISPENSABLE PARTY.

37.   Third-party practice, or impleader may be used only against "a nonparty." When plaintiff sues defendant, and defendant brings in a third party, defendant then becomes known as "defendant and third-party plaintiff." The original plaintiff remains the plaintiff, and the nonparty brought into the action is the third-party defendant. This can include public entities, as contribution claims can be allowed against the US government (such as under the Federal Tort Claims Act). *United States v. Yellow Cab Co.,* 340 U.S. 543 (1951).[12]

38.   Maximus is an Indispensable Party under FRCP Rule 19(b). Maximus is

---

[12] Henry Rose, Impleader of the United States for Contribution under the Federal Tort Claims Act, 1 Buff. L. Rev. 16 (1951).

properly subject to service and did appear and the inclusion of Maximus in the proceeding will not deprive the court of jurisdiction. By nature of its contract with U.S. Dept. of Education, its exclusive administration of the debt at issue, and its voluntarily action taken in filing a Claim for that debt in this bankruptcy, Maximus has "claim[ed] an interest relating to the subject of the action" and further "is so situated that disposing of the action in [Maximus's] absence may "as a practical matter impair or impede the [parties] ability to protect the interest" regarding compliance with orders from this court. In addition, excluding Maximus may also "leave an existing party" (the U.S. Dept. of Education and Plaintiff) "subject to a substantial risk of incurring... inconsistent obligations because of [Maximus'] interest." Rule 19 (a)(1).

39.    A discharge "operates as an injunction" against an extensive list of actions that a creditor might take to collect on the discharged debt. 11 U.S.C. § 524(a)(2), (3). Thus, a violation of a Declaratory Judgement is the same as a violation of an injunction, and either may result in a finding of Contempt of Court. If the court order does not include Maximus and Maximus proceeds to violate a court order only expressly binding to the U.S. Dept of Education, the agency will then be left facing a risk of sanctions, and forced to implead, join, or otherwise request to have Maximus formally added to this proceeding.

40.    "A third-party claim may be brought under Fed. R.Civ.P. 14(a) when the third party's liability is in some way dependent on the outcome of the main claim, or when the third-party is secondarily liable." *Eastern Enterprises v. Shalala*, 942 F. Supp. 684 (D. Mass. 1996). "This creates a situation of derivative or secondary liability, meaning the third party's liability depends on the original defendant being found liable first. Common bases of contingent or derivative liability by which third parties may be impleaded include indemnity, subrogation, contribution, and warranty. Impleader is frequently used for indemnification." *Lehman v. Revolution Portfolio L.L.C.*, 166 F.3d 389, 393 (1st Cir. 1999). Maximus itself argues this is the case here.

41.    In any case where a consumer owes a debt and the debt-holder has employed or contracted other parties to administer the debt on its behalf, and the third-

party then engages in conduct which violated federal law or court orders arising from that debt – there is a controversy regarding liability. This is true whether the matter is related to a bankruptcy proceeding, civil lawsuit, or an enforcement action under a consumer protection statute. In financial disputes with contractors or other outsourcing, it is common to see contribution and indemnification defenses, cross-claims, interpleader, impleader, and other motions related to third-party practice. It is diligent, if not required, to proactively include a party in a proceeding where that party has an interest, contractual legal obligation, independent liability, and could plead these defenses.

## IV.    MAXIMUS IS REQUESTING DISMISSAL UNDER DEFENSES OF IMMUNITY, NOT FOR FAILURE TO STATE A CLAIM.

42.    A motion brought by a defendant to dismiss an adversary proceeding is governed by Civil Rule 12(b), made applicable to this proceeding by Bankruptcy Rule 7012(b). Fed. R. Civ. Pro Rule 12(b)-(i) are incorporated into the Federal Rules of Bankruptcy for Adversary Proceedings via Rule 7012(b). Thus, if a Defendant in an Adversary Proceeding would like to file a Fed. R. Civ. Pro. Rule 12(b)(6) motion, they must do so prior to filing a their Answer, within the deadline for filing an Answer. Under FRBP 7012 (1)(a), an Answer must be filed within 30 days of a Summons being issued and under FRBP 7015 (incorporating Fed. R. Civ. P. 15) the Answer must be filed within 14 days of service of the Amended Complaint.

43.    Fed. Rule B. Pro. Rule 7014 ("Third-Party Practice") incorporates Fed. R. Civ. P. 14 applies in an adversary proceeding. ("The plaintiff may assert against the third-party defendant any claim arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim… The third-party defendant must then assert any defense under Rule 12 and any counterclaim under Rule 13(a)."). Fed. R. Civ. P. 14(a)(3). When a claim is asserted against a plaintiff, the plaintiff may bring in a third party if this rule would allow a defendant to do so." Fed. R. Civ. P. 14(b).

44.    Fed. Rule B. Pro. 7002 incorporates FRCP Rule 19 for Required Joinder of

Parties in Adversary Proceedings. Rule 19 requires that "a person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if... that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may...leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Rule 19(1)(1)(A)-(B).

45.    The court should allow impleader on any colorable claim of derivative liability that will not unduly delay or otherwise prejudice the ongoing proceedings." *Lehman v. Revolution Portfolio L.L.C.*, 166 F.3d 389, 393 (1st Cir. 1999).  The courts have broad discretion to allow a party to implead a third-party if permitting impleader will further the purposes of Rule 14 by avoiding circuity of actions or by eliminating duplication of suits based upon closely related matters. Wright, Miller, & Kane, Federal Practice & Procedure: Civil 2d § 1442.

46.    After the third-party defendant is brought in, the court has discretion to strike the third-party claim if it is obviously unmeritorious and can only delay or prejudice the disposition of the plaintiff's claim. (Rule 14, *Notes of Advisory Committee on Rules—1963 Amendment*). Here Maximus is a required party to Declaratory or other Injunctive relief, has already appeared, and will not delay the proceeding if Maximus simply agrees to respect any court order as legally binding on the corporation (and its various entities) as well as the government.  Third parties can be joined by court order, and even if they refuse, the court can order them into the proceeding as an "involuntary" party. Rule 19(a)(2).

## PRIVATE STUDENT LOAN SERVICERS FREQUENTLY ASSERT A VARIETY OF TYPES OF GOVERNMENT IMMUNITY.

47.    In 2021, Senator Elizabeth Warren formally complained to the Maximus CEO about his corporation attempting to avoid liability for consumer protection

violations by claiming "sovereign immunity" as a government contractor.[13] In *Bodor v Maximus Federal Services*, Maximus, argued that as a government contractor, it was entitled to sovereign immunity. The District Court explained to Maximus that regardless of other considerations, "sovereign immunity" is not a defense against liability for unlawful debt collection. *Bodor v. Maximus Federal Services*, Case 5:19-cv-05787-JMG Dkt 97, pg 7 (Oct. 22nd, 2021).[14] One month later, in recognition of the harm Maximus' defenses caused borrowers, the latest federal servicing contracts now explicitly prohibit the use of sovereign immunity defenses.[15]

> USDS Servicer acknowledges that it is not the U.S. Department of Education, and is not acting as the U.S. Government under this Contract. As such the USDS Servicer acknowledges that any claim or defense of Sovereign Immunity or Qualified Immunity is not applicable to work performed under the Contract and any Task Order issued under the Contract.

"Contract for USDS Servicers" (in honor of Maximus' legal dept.).[16]

48.    Maximus also claimed a defense of "contractor immunity", "however, this immunity... does not protect a government contractor who violates federal law and the government's explicit instructions." *Bodor v. Maximus Federal Services*, Case 5:19-cv-05787-JMG Dkt 97, pg 13-14 (Oct. 22nd, 2021). 15A MOORE'S FEDERAL PRACTICE - CIVIL § 105.21 (2021). A government contractor may not claim "derivative immunity" when it has "exceeded [its] authority," its authority "was not validly conferred" or it "violates the government's explicit instructions." *Campbell-Ewald Co.*

---

[13] Senator Elizabeth Warren letter to Bruce L. Caswell Chief Executive Officer and President Maximus Federal Services, Inc., November 22, 2021
[14] "The Department of Education ("ED") has stated that "third party collectors of defaulted student loans . . . [are] subject to the Fair Debt Collection Practices Act." 55 Fed. Reg. 40120 (1990). Similarly, the Federal Deposit Insurance Company ("FDIC") refers to the administrative offset of monies payable by the government as collecting a debt. 12 C.F.R. 313.21." *Bodor* at 7.
[15] Press Release, U.S. Dep't of Educ., U.S. Department of Education Increases Servicer Performance, Transparency, and Accountability Before Loan Payments Restart (Oct. 15, 2021).
[16] Contract for USDS Servicers, Attachment J, Business Operations Servicing Requirements, see also U.S. Dep't of Educ., The Next Generation of Loan Servicing: The Unified Servicing and Data Solution (USDS), Federal Student Aid (FSA) (Apr. 2023).

*v. Gomez*, 577 U.S. 153 (2016).[17]

> "Student-loan servicers face allegations of unfair and deceptive practices, fraud, and other consumer-protection violations, and they are battling lawsuits filed by state attorneys general and private plaintiffs. ... The servicers have attempted to conflate and exploit preemption, derivative-sovereign-immunity, and intergovernmental-immunity defenses to expand the sovereign shield to cover their conduct ... servicers have argued that they act on behalf of the federal government—because of their contractual relationships with the Department of Education—as a defense ... When the sovereign shield expands, avenues for consumer redress shrink. As shown in the student-loan servicing context, government contractors use the sovereign shield to evade state regulation, federal oversight, and liability under state and federal law. By exploiting preemption and immunity defenses, the servicers and their advocates seek to extend the sovereign shield to protect themselves from judicial and legislative review of their practices. **When it works, consumers are left without redress, even when they have been victims of fraud, misrepresentation, or other illegal practices.** Borrowers cannot even rely on the traditional flexibility available to consumers in a free market: They cannot choose or change their assigned servicer."[18]

49.    The federal government's sovereign immunity does not cloak the actions of contractors. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016), ("Do federal contractors share the Government's unqualified immunity from liability and litigation? We hold they do not."). See also, *New York ex rel. James v. Pennsylvania Higher Education Assistance Agency,* WL 2097640 (2020).

50.    In Dec. 2021, after Navient was banned from servicing student loans, Maximus took-over Navient's contractor and became a principal federal student loan servicer. For nearly a decade prior, Maximus "also managed the platform used for all student loan borrowers in default ... DMCS" and Maximus also manages "the U.S. Department of Education Default Resolution Group" including "the call centers

---

[17] See, Kate Sablosky Elengold & Jonathan D. Glater, *The Sovereign Shield*, 73 STAN. L.REV. 969 (2021) – ("Servicers argue that their relationship with the federal Department of Education constitutes a defense to their actions... Their arguments thus seamlessly and confusingly interweave preemption, derivative-sovereign-immunity, and intergovernmental-immunity doctrines, fashioning from the muddle an argument for application of a far-reaching sovereign shield.")
[18] Kate Sablosky Elengold & Jonathan D. Glater, The Sovereign Shield, 73 STAN. L.REV. 969 (2021)

responsible for assisting federal student loan borrowers in default." In addition, Maximus is also the "Business Process Operations" vendor for the Office of Federal Student Aid for all borrowers and it "answers borrowers' repayment questions" about their debts.[19] (Contract CONT_IDV_91003120D0005).

51.    DMCS is the system of record for all federally-held defaulted student loans and provides Maximus access to "all records and information related to defaulted loans" and also the ability to "designate individual borrowers for tax refund seizure and social security offset." (Contract CONT_AWD_91003125C0011).[20] In Feb. 2025, Maximus' DMCS contract was renewed with a $150M sole source agreement. This means that if a bankruptcy court  was to order the discharge of a federal student loan debt, and that debt was serviced by Maxmius, but Maximus failed to comply with the discharge order, then Maximus as servicer could report negative credit information about the debt and put the borrower into default, at which point Maximus the servicer would transfer the debt to Maximus the federal debt collector, who would then further demand the borrower pay the discharged debt and it would flag the account for wage garnishment and other punitive measures.

52.    If the borrower was to call the U.S. Dept. of Education for help, the borrower would speak with Maximus the federal customer service provider and if the borrower wanted to file a complaint against Maximus, it would be Maximus who would advise the borrow on what options are available and direct them to the Dept. of Ed. Ombudsman Group, which is also Maximus. If the borrower complained about unlawful garnishment, Maximus would transfer the borrower to Maximus to complain about Maximus.[21] If a borrower complained about Fair Credit Reporting Act violations, Maximus would transfer the borrower to Maximus to complain about Maximus. Id at

---

[19] CWA, New Investigation Reveals Evidence of Widespread Failure and Abuse by World's Largest Student Loan Company, March 14, 2022, https://cwa-union.org/news/releases/new-investigation-reveals-evidence-of-widespread-failure-and-abuse-worlds-largest
[20] U.S. Dept. of Education, *Collections on Defaulted Loans* ("ED's Default Resolution Group, at the office of Federal Student Aid, oversees the collections process for all defaulted loans that are held by ED."), https://studentaid.gov/manage-loans/default/collections
[21] Maximus Federal Services, FSA Next Gen BPO Multiple-Award IDIQ Contract, https://studentaid.gov/sites/default/files/maximus-federal-services.pdf

13. If the borrower complained about Maximus engaging in fraud and wanted to file an OIG complaint, the borrower would be routed through Maximus. Id at 13.

53.    In Feb. 2024, Maximus was fined $8M by DOJ for rigging assessments of its performance by hiring its own monitors who then cherry-picked data to manufacture favorable assessments with "inaccurate or misleading" information to get larger bonuses.[22] Maximus is also responsible for "identify[ing] candidates for litigation" and "prepar[ing the] litigation package" for DOJ. Id at 14. If a borrower upsets Maximus, Maximus could, apparently, retaliate by suggesting the DOJ sue the borrower.

54.    Maximus's mismanagement of the government's student loan debt collection system combined with its *de facto* control over Dept. of Education systems and processes related to student loan debts, recently led a federal judge to take the unusual step of holding then-Education Secretary Betsy DeVos in contempt of court due to Maximus seizing wages of former for-profit college students, in violation of a federal court order, and with U.S. Dept. of Education claiming to be helpless as to Maximus' actions – acting like the agency works for Maximus and not the other way around.[23] *Manriquez v Devos*, 3:17-cv-07210-SK, Dkt. 130 (N.D. Cal., Oct. 24 2019).

### Maximus knows it has liability and is trying to avoid that liability by unilaterally claiming it has no liability.

55.    Maximus' 2024 10-K shareholder disclosures regarding "Risk Factors" includes a section on Litigation and Legal Compliance which confirms Maximus understands that consumer protection regulations apply to its activities related to debt management and that its legal liability around its student loan servicing and debt collection activities is a material risk to the company.  Maximus' expressly disclosed that it is "subject to a variety of lawsuits and other claims... related to contracts,

---

[22] DOJ, 2020 Census Contractor Agrees to Pay $8,000,000 to Settle Fraud Allegations, Feb. 2025, https://www.justice.gov/usao-ndia/pr/2020-census-contractor-agrees-pay-8000000-settle-fraud-allegations

[23] NPR, *DeVos Held In Contempt Of Court For Enforcing Loans On Defrauded College Students*, Oct. 25 2019, https://www.npr.org/2019/10/25/773334681/devos-held-in-contempt-of-court-ed-department-fined-100-000-in-student-loan-case

subcontracts.... and compliance with **... laws governing student loans.**"[24] (emphasis added). Maximus added their "business operates within a variety of complex regulatory environments" including "the Fair Debt Collection Practices Act." Id at 77. (Ex. R).

56.    Maximus' corporate disclosures warn that "adverse findings could lead to criminal, civil, or administrative proceedings" and they "could be faced with penalties, fines, suspension, or debarment," and "significant monetary damages or **injunctive relief.**" (emphasis added). They add that "the result of which could have a material adverse effect on [their] operating results, cash flows, and financial condition." Id at 21 and 77. They also note that "adverse findings could also have a material adverse effect on [them] because of [their] reliance on government contracts." They further note that "litigation and other legal claims are subject to inherent uncertainties" including the "costs of litigation" and "unpredictable court .. decisions." Id. (Ex. R).

57.    In this case, Maximus argues it has no liability or role in this proceeding because it is a government contractor. Yet, Maximus' corporate disclosures contradict this position and instead disclose Maximus believes it has more legal risk then typical for-profit corporations **because of** its role a federal contractor. (Ex. R). Maximus' disclosures about risks expressly point to vulnerabilities arising out "the laws and regulations that govern [their] role as a contractor to agencies and departments of the U.S. federal government" and "as a government contractor subject to the types of regulatory schemes described... [they] are subject to an increased risk of investigations, criminal prosecution, civil fraud, whistleblower lawsuits, and other legal actions and liabilities to which other private sector companies are not."[25]

## Maximus' is unlawfully disclaiming liability for negligent and/or intentional violations of state and federal law.

58.    Maximus's "Aidvantage" website is the only location to review loan

---

[24] Maximus, 2024 10-K, pgs 21, US SEC, https://investor.maximus.com/sec-filings/annual-reports/content/0001032220-24-000094/0001032220-24-000094.pdf
[25] Maximus, 2024 10-K, pg 21, US SEC, https://investor.maximus.com/sec-filings/annual-reports/content/0001032220-24-000094/0001032220-24-000094.pdf

servicing information for active student loans serviced by Maximus. The website
"Terms of Service" expressly disclaims any and all liability for any related misconduct
by the company, employees, or agents "whether based in contract, tort, negligence,
strict liability or otherwise, for any direct, indirect, incidental, common law, statutory,
regulatory, consequential, compensatory, punitive, or special damages." [26] CFPB
warned that "student loan servicers may attempt to rely on waivers or other covered
terms and conditions in creditor contract clauses to defend against legal actions by
consumers" and complained those tactics are unethical. [27]

59.    Maximus's disclaimers also allege that in order for a borrower to access
servicing information or contact the servicer, the borrower must "agree to submit to
the personal and exclusive jurisdiction and venue of the state and federal courts located
within Fairfax County, Virginia." [28] The FDCPA prohibits debt collectors from bringing
legal actions in inconvenient venues and this would also exclude bankruptcy court
jurisdiction for most debtors. Even Maximus' federal contract instructs that "the
Contractor shall comply with all applicable Federal, State and local laws, executive
orders, rules and regulations applicable to its performance under this contract." [29]

## V.    BANKRUPTCY COURTS ARE COURTS OF EQUITY & EQUITY SEEKS TO RESOLVE THE ENTIRE CONTROVERSY.

60.    Bankruptcy courts are granted original jurisdiction to conduct proceedings
under the Bankruptcy Act and "are essentially courts of equity" which
"characteristically proceed in summary fashion to deal with the assets of the bankrupt
they are administering." *Katchen v. Landy*, 382 U.S. 323 (1966); *Local Loan Co. v. Hunt,*
292 U.S. 234 (1934). It is "the aim of equity to have all interested parties in court and

---

[26] Aidvantage, Website terms of use and disclaimer, https://aidvantage.studentaid.gov/terms
[27] CFPB, Registry of Supervised Nonbanks that Use Form Contracts to Impose Terms and
Conditions that Seek to Waive or Limit Consumer Legal Protections, 12 CFR Part 1092, [Docket
No. CFPB-2023-0002] RIN 3170-AB14 (2023).
[28] Aidvantage, Website terms of use and disclaimer, https://aidvantage.studentaid.gov/terms
[29] Maximus Federal Services & U.S. Dept. of Education, page 99, FSA Next Gen BPO Multiple-
Award IDIQ Contract, Contract No. 91003120D0005

to render a complete decree, adjusting all rights and protecting the parties against future litigation."[30] ("*Equity delights to do justice and not by halves*.").

61.    The bankruptcy courts "have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession." *Thompson v. Magnolia Petroleum Co*., 309 U.S. 478 (1940).   "Proceedings in bankruptcy are in the nature of proceedings *in rem,* adjudications of bankruptcy and orders of discharge being, as this Court clearly has treated them, in every essential particular decrees in equity determining a status." *Local Loan Co. v. Hunt*, 292 U.S. 234, 241 (1934). The bankruptcy courts "also deal in a summary way with 'matters of an administrative character, including questions between the bankrupt and his creditors, which are presented in the ordinary course of the administration of the bankrupt's estate." *Katchen v. Landy,* 382 U.S. 323, 327 (1966).

## MAXIMUS IS A DEBT COLLECTOR
### WHICH HAS REPEATEDLY BEEN FOUND TO
### HAVE VIOLATED CONSUMER PROTECTION LAWS.

62.    The U.S. Dept. of Education exclusively relies on Maximus as its only contractor managing debt collection for defaulted loans. *Manriquez v Devos*, 3:17-cv-07210-SK, U.S. Dept. of Education Compliance Report, Dkt. 111-2, pg 12, (N.D. Cal., Sept. 18 2019). The Dept. of Education admits that for debt collection activities, Maximus uses aliases including the "Default Resolution Group (DRG)" and "Debt Management and Collections System (DMCS)." Id. (U.S. Contract No. ED-FSA-13-C-0021). (Ex. O-P). Maximus appears to favor aliases, LLCs, and dbas in order to mask its extensive control over the agency.

63.    In *Bodor v Maximus Federal Services*, a U.S. District Court determined that Maximus is legally a "Debt Collector" of defaulted student loans for the government and the plaintiff alleged plausible claims that Maximus engaged in unlawful debt collection act for which Maximus is independently liable for. *Bodor v. Maximus Federal*

---

[30] W. Hudson R. Unger, Equity Delights to Do Justice and Not by Halves, 33 DICK. L. REV. 248 (1929). Available at: https://insight.dickinsonlaw.psu.edu/dlra/vol33/iss4/6

*Services*, Case 5:19-cv-05787-JMG Dkt 97, pg 7 (Oct. 22 2021) – (denying Maximus'
Motion for Summary Judgment under Fair Debt Collection Practices Act).[31] (Ex. Q).

64.    Maximus' 10-K claims that "under the name Aidvantage, [they] are an
independent and conflict-free customer service provider assisting borrowers with
Department of Education-originated loans."[32] Maximus is admittedly leveraging the
"Aidvantage" alias in an attempt to separate itself from its own conflicts and poor
reputation. In addition, Senator Warren complained in 2021 that Maximus directly
benefits by having its Maximus Education arm lead borrowers into default and then
transfer the cases to the Maximus Federal Services arm who runs the agency's default
and debt collection program, to then collect on those debts.[33] (Ex. R).

## VI. Maximus' Proof of Claim in this case is false and/or misleading.

65.    Maximus filed a Claim to the Chapter 7 case regarding Plaintiff's student
loan debt. (Claim 1-1). Maximus designated the debt as unsecured "*money loaned*,"
identified themselves only as "*Aidvantage*," said they were filing "*on behalf of*" U.S.
Department of Education, and claimed to be "*the creditor's attorney or authorized
agent.*" (Cl. 1-1).

66.    The stated title of the person who filed the Claim matches open job
postings at Maximus for the same role (Ex. L), but the bankruptcy Claim only notes the
contract codename "*Aidvantage*" and does not mention Maximus.[34]

### Maximus failed to identify which loans Underly the Student Loan Debt Claim.

---

[31] "The Department of Education ("ED") has stated that "third party collectors of defaulted
student loans . . . [are] subject to the Fair Debt Collection Practices Act." 55 Fed. Reg. 40120
(1990). Similarly, the Federal Deposit Insurance Company ("FDIC") refers to the administrative
offset of monies payable by the government as collecting a debt. 12 C.F.R. 313.21." *Bodor* at 7.
[32] Maximus, 2024 10-K, US SEC, pg6.
[33] Senator Elizabeth Warren letter to Bruce L. Caswell Chief Executive Officer and President
Maximus Federal Services, Inc., November 22, 2021
[34] Maximus, *Fin Proc Clerk III - Claims (Aidvantage),* Remote, Full-Time. ("Work on moderately
difficult assignments, resolving issues and ensuring the integrity of accounting/financial data.")

67.     Rule 3001(c)(1) and Official Form 410 require that filers "attach redacted copies of any documents that support the claim, such as… invoices" or "itemized statements of running accounts." Maximus's Proof of Claim does not identify any specific loans, despite each loan having a dedicated loan identification number already assigned. Maximus' Proof lists "Principal Transfer Effective Dates," "Post Date," Transaction Code and Amounts for interest – without designating which loan(s) those transactions actually apply to.

68.     Maximus' Proof also lists the "Declining Balance" only as $80,363.06 and lists the "Principal" as $0 for every line. One entry has no interest noted and its unclear what the transaction was, and the remainder of the entries are a combination of interest being charged and then apparently reverted. (CL. 1-1).

69.     The documentation the U.S. Dept. of Education and DOJ directly provided the Plaintiff for the Attestation includes a different printout view, but from what appears to be the same system Maximus used. The government's version did include identification regarding each loan, and it differentiated paid/inactive loans (Loans No. 1-13) with active loans still currently requiring re-payment (Loans No. 14-17). The DOJ version also shows the status of each loan, the date of distribution, the principal disbursed, the loan holder, the amount pending, and the interest rate for each. (Ex. G).

70.     The version Maximus filed as Proof of the Claim included none of this information. Maximus's Proof of Claim does not identify any specific loans, any loan origination dates or schools, the debt owner, the interest rates, or the principal amounts. Maximus instead only claimed a total dollar amount of $80,363.06 (Cl. 1-1, Part 2, page 4) which is also incorrect. It's almost as if Maximus chose the most ambiguous and confusing printout view that they could select.

### Maximus's Proof of Claim included a 2010 Master Promissory Note for a group of Inactive and fully paid-off Sallie Mae & Mohela loans.

71.     Further, Maximus's the Proof of Claim also includes a copy of a 2010 Master Promissory Note signed by the Plaintiff for completely different loans (Cl. 1-1,

Part 2, page 5). The MPN was for her undergraduate degree and which were serviced by Sallie Mae, then transferred to MOHELA/SoFi, and repaid in full on Oct. 29 2020. (Ex. F-G). Master Promissory Notes ("MPN") are specialized contracts used to facilitate loan disbursement with contractual terms of repayment. Loans are disbursed "under" the MPN.

72.    34 CFR § 685.102. Rule 3001(c)(1) and Official Form 410 require that a Creditor include written proof of the claim: "attach redacted copies of any documents that show that the debt exists," including "redacted copies of any documents that support the claim, such as… promissory notes" and "any assignments or transfers of the debt."

73.    The Plaintiff completed three U.S. Dept. of Ed. Subsidized/Unsubsidized Loan MPNs between 2010-2021. This is reflected on the U.S. Dept. of Ed. Student Aid website including one MPN signed on Aug. 11 2010 for the Plaintiff's undergraduate studies at Portland State University and then two more MPNs for law school at Santa Clara University, signed on April 2 2018 and Aug. 11 2021. (Ex. C). The Plaintiff also entered a Federal Direct Consolidation Loan Promissory Note in 2012 after she graduated with her undergraduate degree, and consolidated her outstanding Dept. of Ed./Sallie Mae loans at that time into an ICR Plan under the new Promissory Note, then later re-consolidated under MOHELA/SoFi in 2015. The earlier 2010 MPN appears to only cover two Subsidized ($2,212) and Unsubsidized ($3,291) Direct loans disbursed to the Plaintiff in Sept. 2011.

74.    Maximus' Proof of Claim implies it believes the paid-off debt from 2010-2011 is still an active debt, and accordingly that the amount Maximus claimed ($80,363.06) includes that paid-off debt in addition to the current active loan debt. Maximus also implies it believes the paid-off debt was transferred to Maximus from Sallie Mae or MOHELA. However, when asked on Form 410 if the claim was acquired from someone else, Maximus said "no." (1-1 at 1, Q.2). When a creditor's bankruptcy Claim arises out of debts which have already been paid or are otherwise stale/discharged, that is a valid ground for filing objections. *Hann v. ECMC,* 711 F.3d

235 (1st Cir. 2013); In re Girard, 243 B.R. 894 (M.D.Ala. 1999).

## Maximus filed a Claim for less than what Appears to be actually owed.

75.    In the Plaintiff's Complaint she notes that she believes she owes $81,238 for her four outstanding student loans. (Dkt. 1-1 at 3, Dkt. 8 at 3). The amount Maximus claimed in Claim 1-1 ($80,363.06) does not align with the amount reflected in the loan documentation provided by DOJ ($81,237.85) or the amount the Plaintiff saw she owed via her Aidvantage online account ($81,238) when the Plaintiff filed her Complaint for this case (Ex. I). The DOJ report included a loan directory output and a table showing principle + interest accrued, which the Plaintiff included in her DOJ total, and is also what she saw she owed on the Aidvantage website.

76.    Today the Aidvantage website says the Plaintiff owes $82,336.24 and the Student Aid U.S. Dept. of Education website says the Plaintiff owes $81,982.32. (Ex. I). The amount Maximus claimed in Claim 1-1 ($80,363.06) appears to be a raw total of the principle after the Plaintiff was able to pay off some of the principle prior, but does not include interest accrued once the loans entered repayment.

77.    It's a demonstrable fact that Maximus could have filed a Proof of Claim that actually identified the loans and their complete balances, because that information was provided by DOJ and is posted on Dept. of Ed.'s website. A student loan discharge request in bankruptcy is based on the student loan Claim filed by the Creditor. If the claim filed is less than what's owed for student loan debt (which is not discharged by default), then some of the debt could remain following a discharge.

## Maximus did not include the 2018 Master Promissory Note Underlying three of four loans.

78.    As noted, the Plaintiff completed two Subsidized/Unsubsidized Loan MPNs for law school at Santa Clara University, where she attended from 2018-2022. During this time, the Plaintiff's loans were serviced by Navient and servicing communications were sent from "Navient - Department of Education Loan Servicing."

79.     The Plaintiff signed the first MPN for Santa Clara University on April 2 2018. (Ex. D). The first loan disbursement is noted on the DOJ's print-out as occurring on Aug. 9 2018, assumably under the first law school MPN contract. There were then additional disbursements on Aug. 12 2019 and Aug. 12 2020, again assumably under the 2018 Santa Clara University MPN. (Ex. G).

80.     On Aug. 11 2021, the Plaintiff received an email from Santa Clara University claiming that she had not signed a MPN for her law school loans and instructed her to urgently sign and submit a MPN to the U.S. Dept. of Ed. (Ex. J). The same day, Aug. 11 2021, the Plaintiff then signed a second MPN for Santa Clara University. (Ex. C).  DOJ's printout then shows the fourth and final disbursement of the loans at issue in this proceeding occurring on Aug. 11 2021. (Ex. G). Navient communicated the disbursement on Aug. 18 2021. This disbursement assumably occurred under the second Santa Clara University MPN.

81.     Maximus's Proof of Claim does not include the 2018 Santa Clara University MPN, but does includes the MPN from August 2021 (which only supports one of the three claimed loans), and then also strangely includes the 2010 MPN for paid-off debt from Portland State University.

82.     Borrowers may have loans disbursed under a MPN "for a single academic year or multiple academic years" but "loans may no longer be made under an MPN ...one year after... if no disbursements are made... or ten years after the date the borrower signed the MPN or the date the Secretary receives the MPN." 34 CFR § 685.102. If the school uses the multi-year feature, then a prior MPN from a different school general can be re-used if that prior school also authorized multi-year use, however if a new MPN is filed by the borrower, then once the Dept. of Ed. receives the loan origination record from the current school, " it links the loan to the pending master promissory note that arrived most recently."[35]

83.     The plaintiff filed her 2018 MPN directly to the Dept. of Ed. on their

---

[35] U.S. Dept. of Ed., FSA Partners, Direct Loan School Guide, Direct Loan Origination, Disclosure Statements, and Master Promissory Notes, pg 6-63 (2000).

website and so they should have linked her law school loans to the 2018 MPN they already had on file. If they didn't, then some version of Maximus and/or Navient is likely responsible for that error.

84.    If MPNs extend at least one year, and then can be used for disbursement for up to ten years after, then the date the 2010 Portland State University MPN would be set to expire would be around Aug. 11 2021. The date the Plaintiff was contacted with urgent and unexplained request to file a new MPN for her law school was Aug. 11 2021. Between 2018-2022, the Plaintiff only borrowed Direct Unsubsidized loans which the 2018 MPN should have covered.  Thus, it appears that Navient and/or Maximus and/or Santa Clara University and/or Dept. of Ed. may have disregarded the Plaintiff's 2018 MPN and her intention to have her loans now disbursed under that agreement; and instead disbursed the first three years of the Plaintiff's law school student loans under the prior, incomplete 2010 MPN.

85.    Further, the Plaintiff hand-signed a paper copy of the Portland State University MPN (serviced by Sallie Mae) on July 26 2010. However, only the first page was scanned. The first page was also stamped as received by the Dept. of Education on Aug. 2 2012.  However, the U.S. Dept. of Ed. website also links to a longer HTML version, that removed the hand-signed date, and instead that version claimed the MPN was "submitted" to them by the borrower on Aug. 11 2010. (Ex. E).  The digital version also only notes the borrower agreed to the terms and conditions but not that the borrower reviewed or signed it, or agreed to electronic MPNs, or that the borrower's identity was confirmed to match their FSA ID.

86.    The borrower MPN archive on the agency's website states in the Plaintiff's account that *The PDF version of your MPN is the official document on record.* The digital version of the Plaintiff's 2010 MPN (but not the one-page scanned version) states "*I understand that each loan made under this MPN is separately enforceable based on a true and exact copy of this MPN*." The agency's documentation warns that if the MPNs are not handled correctly they may not be "legally binding" and thus may not "require

borrowers to replay their Direct Loans."[36]  For  the 2010 MPN, Maximus' Proof of Claim and the U.S. Dept. of Ed. website only provide the first page of the scanned paper version. It also appears to be agency policy that schools have no obligation to retain promissory notes after the department accepts them and thus the department's one-page version of the eight-page 2010 contract would assumably be the only remaining version.[37] By the terms of the contract, the PDF version is the only legally binding version and it must be complete and accurate, and this one is not.[38]

87.    The Plaintiff was also part of the AG Navient Multistate Class Action lawsuit class and received a settlement of $450 in July of 2022 "as compensation for certain harm resulting from Navient's alleged forbearance steering practice." Further, the Plaintiff recently discovered Santa Clara University falsely reported her graduation status as "withdrawn" instead of "graduated," which the university said they corrected but the updates are not reflected in the student loan data systems yet. Its entirely possible one of these parties disbursed at least 75% of the loans without a legally binding contract, but if they made that mistake, they need to be honest about it in court.

## PLAINTIFF'S OBJECTION AND REQUEST FOR AMENDMENT/CORRECTION.

88.    On the flip side, if the Plaintiff's 2018-2020 law school student loans were disbursed under the correct 2018 MPN, then Maximus filing the 2010 MPN to support a Proof of Claim could be illegal under many legal frameworks and also constitute an unlawful attempt to collect debt. *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1261 (11th Cir. 2014) (the filing of a proof of claim can constitute an act to collect a debt within the meaning of the Fair Debt Collection Practices Act).

---

[36] U.S. Dept. of Ed., FSA Partners, Direct Loan School Guide, Direct Loan Origination, Disclosure Statements, and Master Promissory Notes, pg 6-63 (2000).
[37] U.S. Dept. of Ed., FSA Partners, Direct Loan School Guide, Direct Loan Origination, Disclosure Statements, and Master Promissory Notes, pg 6-63 (2000).
[38] U.S. Dept. of Ed., FSA Partners, Vol. 8 — Direct Loan and FFEL Programs, 2002–2003

89.    Filing a false claim in a bankruptcy proceeding can also give rise to findings of Contempt and other sanctions. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417 (6th Cir. 2000); *B-Real, LLC v. Chaussee (In re Chaussee)*, 399 B.R. 225, 240 (B.A.P. 9th Cir. 2008). In *Crawford v. LVNV Funding,* a debt-collection agency filed a proof of claim on a stale debt. The court compared the filing of a stale proof of claim to the filing of a stale lawsuit and found that the creditor's actions would likely subject it to liability within the broad scope of FDCPA § 1692e and § 1692f). *Crawford v. LVNV Funding*, 758 F.3d 1254 (11th Cir. 2014), cert. denied, 135 S. Ct. 1844 (2015).[39]

90.    If the Plaintiff's 2018-2020 law school student loans were disbursed incorrectly under a 2010 MPN and not the 2018 MPN the Plaintiff actually intended to be bound by, then Maximus' Proof of Claim would be incomplete and misleading, and also implicate a number of other legal concern including lack of mutual assent and other theories of invalid contracts, and potential fraud.

91.    A recent Bankruptcy Court decision sanctioned a creditor that filed an inaccurate proof of claim by awarding attorney's fees to the debtor. *In re Simmons*, No. 22-680 (Bankr. D. S.C. Aug. 31, 2022). See also, *Rogers v. B-Real, L.L.C. (In re Rogers),* 391 B.R. 317, 323 (Bankr.M.D.La.2008) ("Rule 9011 can be used to sanction a creditor that files a proof of claim without proper prefiling investigation and support.").[40]

92.    Accordingly the Plaintiff/Debtor "objects" generally to the Claim filed at 1-1 but does not "Object" under 11 USC 502 as it appears a valid claim is required in order to request discharge in the Adversary Proceeding, and accordingly the Plaintiff respectfully requests this court to order the Defendant(s) to correct any issues and provide a written explanation of their claim and its legal basis, and filed an amended claim for this student loan debt.

---

[39] Joseph W. Sherman, Another Arrow in the Quiver: Preserving the Fresh Start in Debt Collection by Creating a National Registry for Discharge Orders, 33 EMORY BANKR. DEV. J. 269 (2016).
[40] 209 CMR, § 18.25 (1) ("A student loan servicer may not use unfair, deceptive, or unconscionable means in servicing any student loan... misrepresenting or omitting any material information in connection with the servicing of a student loan including, but not limited to, misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a student loan, the terms and conditions of the loan agreement or the student loan borrower's obligations under the student loan.").

# VII. THE BANKRUPTCY COURT IN THE DISTRICT OF MA HAS EXCLUSIVE JURISDICTION OVER MAXIMUS' COMPLIANCE WITH DISCHARGE ORDERS IN THIS CASE.

93.     The response to a party violating a Bankruptcy Discharge order is filing a Motion for Contempt in the same Bankruptcy Proceeding.  A bankruptcy court lacks the authority to enforce discharge injunctions issued by bankruptcy courts in other districts. *Crocker v. Navient Solutions, LLC*, No. 18-20254 (5th Cir. 2019). Rule 71 requires that the order sought to be enforced be made in favor of that person. It is not enough that the person seeking to enforce obedience be indirectly benefited by the decree. See *United States v. American Society of Composers, Authors and Publishers,* 341 F.2d 1003, 1007-1008 (2d Cir.1965), cert. denied, 382 U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965).

94.     Fed. Rule B. Pro. 7071 incorporates Fed. R. Civ. P. 71  ("When an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."). However, this rule applies only in very narrow circumstances and  only when the Order benefits the non-party, not binds them. It permits a person, not a party to the action, in whose favor an order has been made, to enforce obedience to the order by the same process as if he were a party. See *Woods v. O'Brien*, 78 F.Supp. 221 (D. Mass. 1948).

## THERE IS NO PRE-DEFINED PROCESS TO ENFORCE RELIEF AGAINST A NONPARTY FOR STUDENT LOAN DISCHARGES.

95.     As a preliminary matter, the U.S Dept. of Education has repeatedly and formally claimed, including within Rules published to the Federal Register, that the agency is the sole entity for ensuring legal compliance of its student loan contractors. Department of Education, 34 CFR, 83 FR 10619, Doc. No. 2018-04924, pg 10619-10622 (03/12/2018). Concurrently, OIG audits complained that the U.S. Dept. of Education

rarely disciplines or penalizes its contractors despite high failure rates. [41]

96.     The U.S. Dept. of Education has also contracted bankruptcy management to Maximus. The U.S. Dept. of Education regularly relies on Maximus to manage agency adjudications regarding federal loans including hearing administration and drafting agency decisions and hearing responses and "it is not clear who writes the final decision." [42] Agency records confirm that "contracted employees" are "hearing officials" and "impartial adjudicators" for student loan wage garnishment cases, including reviewing evidence and making binding decisions. U.S. Dept. of Education, Private Collection Agency (PCA) Procedures Manual, Section 7.3.2 (2016). The agency's DPO contract with Maximus also includes extensive contractual responsibilities related to bankruptcy proceedings.

| *Maximus Performance Work Statement* | |
|---|---|
| *Business Process Operations Program (IDIQ 91003120D0005)* [43] | |
| *Discharge Processing* *(Intake, review, follow-up, and post-determination processing)* | |
| *Bankruptcy Processing Support* | Supporting bankruptcy processing by timely filing proof of claims and reviewing court-ordered repayment plans. |
| Timely filing proof of claims ($8.37/task) | Completing a bankruptcy proof of claim form and submitting to federal court for filing. |
| Timely review of repayment plans and escalating to FSA ($12.56/task) | Reviewing bankruptcy repayment plans/orders to identify the objectionable language and/or applying details of an order. Escalating to FSA as needed. |
| Other Bankruptcy Support Processing ($8.37/task) | This includes other Bankruptcy Support Processing activities not included in the above list. |

---

[41] GBH, *Federal Watchdog Issues Scathing Report On Ed Department's Handling Of Student Loans,* 2019, https://www.wgbh.org/news/national/2019-02-14/federal-watchdog-issues-scathing-report-on-ed-departments-handling-of-student-loans
[42] Deanne Loonin, *Illusory Due Process: The Broken Student Loan Hearing System*, 11 U.C. Irvine L. Rev. 173,180-81 (2020).
[43] U.S. Dept. of Ed., Maximus Federal Services, FSA Next Gen BPO Multiple-Award IDIQ Contract, https://studentaid.gov/sites/default/files/maximus-federal-services.pdf

| *Collection/Default Activities Processing* | |
|---|---|
| Administrative Wage Garnishment (AWG) ($29.30/task) | Identify candidates for garnishment (non-payers, not working toward resolution… initiate due process notice… establish voluntary repayment agreements with borrowers who respond to notice… monitor accounts for events that require suspension of AWG (bankruptcy, etc.), respond to inquiries from employers and borrowers… send stop garnishment notices (fax), and issue refunds. |
| Litigation Referrals ($50.22/task) | Identify candidates for litigation, prepare litigation package, support reconciliation with DOJ, update accounts to conform with terms of judgment, prepare release and satisfaction of judgment packages, and notify DOJ of discharge requests. |
| *Fair Credit Reporting Act (FCRA) Credit Dispute Processing* | |
| Responding to Disputes (E-Oscar, Trade, and Direct) ($25.11/task) | Reviewing, researching, and responding to disputes submitted by borrowers to Credit Reporting Agencies (CRA's), ACDV's, Trade block lifts, and direct disputes received under applicable FCRA regulations and submitting manual adjustments. |

*Manual excerpt from Pages 11 and 14.*

97.    The PCA handbook and 2022 servicer contract indicates Maximus is responsible for transmission of all bankruptcy documentation to U.S. Dept. of Education. This includes "any Summons and Complaint," "any Motion for Sanctions/Contempt," "any Documentation detailing any Adversary Proceedings… naming the Department of Education," any "objection to a proof of claim filed by or on behalf of [the Dept. of Ed.]," or any "Bankruptcy Plans with IDR or PSLF permissions."[44] (That means Maximus will receive, record, and route this filing!)

98.    The DPO IDV contract requires that Maximus "shall ensure and maintain compliance with federal consumer protection laws and regulations (e.g., the Fair Credit Reporting Act, the Fair Debt Collections Practices Act, the Truth in Lending Act, etc.), including the timely completion of processes related to these laws and regulations" and

---

[44] U.S. Dept. of Education, Private Collection Agency (PCA) Procedures Manual, Section 17.3.4 (2016); USDS_Awards_91003123D0001, Maximus Education, LLC (2022).

"shall review, investigate, and process error and dispute resolutions."[45] U.S. Dept. of Education's contract also requires that Maximus is to "monitor changes in regulations and laws for compliance, and deploy new processes, procedures, and enhancements to all impacted associates as directed by FSA and/or [Maximus]." Id at 35. The contract also claims that Maximus is responsible for ensuring regulatory compliance by any subcontractors. Id at 81.

### IF THE CURRENT ADMINISTRATION PROCEEDS WITH PLANS TO MOVE STUDENT LOANS TO COMMERCE OR TREASURY, MAXIMUS WOULD BE THE ONLY DEFENDANT REMAINING.

99.    In addition, this year the U.S. government has committed to moving ownership of student loan debt to another federal agency that is not the Dept. of Education. There have already been official statements that ownership of federal student loan debt would be moved to the Department of Commerce, Treasury, and/or Small Business Administration (SBA).[46] ("I don't think the Education [Department] should be handling the loans," Trump said. "That's not their business.).[47] A MOU was drafted moving part of the Dept. of Ed. debt collection team to the Treasury this year. *State of New York v. McMahon* (1:25-cv10601), Dkt. 147-1 (6/10/25). Workforce Training related programs were also moved to Dept. of Labor.[48]

100.    In July 2025, the Supreme Court ok'd the Dept. of Education to continue restructuring and transferring responsibility to other agencies, including terminating the employment of 1,400 employees at the Dept. of Education.[49]  The employees had been on paid leave since March 2025 and "absence of those staffers already had caused problems in the office that handles student loans" including "delays and breakdowns

---

[45] Maximus Federal Services & U.S. Dept. of Education, 4.4.4 Consumer Financial Protection, page 33, FSA Next Gen BPO Multiple-Award IDIQ Contract, Contract No. 91003120D0005
[46] American Progress, *Moving Federal Student Loans From the Department of Education to the Small Business Administration Would Make Borrowing Riskier* (Apr 17, 2025).
[47] Politico Pro, *Trump floats moving $1.6T student loan portfolio to Treasury, other agencies* (3/6/25).
[48] Fortune, *$1.6 trillion of student loans are up in the air as Trump moves in on the Department of Education,* July 14, 2025.
[49] AP, *Supreme Court allows Trump to lay off nearly 1,400 Education Department employees,* July 14 2025.

in federal systems."[50] Experts warned that "students will… have fewer places to turn to when their rights are violated." Id.

101.    The only other oversight body for federal student loan programs has traditionally been the CFPB. However, in April 2025, "officials at the Consumer Financial Protection Bureau circulated a memo instructing staff to 'deprioritize' student loan matters at the watchdog agency, where they are trying to cut about 90% of the workforce."[51]

> "At the Department of Education, meanwhile, mass layoffs have wiped out the Federal Student Aid office teams that were in charge of regularly checking loan servicers' work for mistakes and getting them fixed. The moves have left borrower advocates aghast, warning that former students will have far less recourse if servicers — who have long been a magnet for consumer complaints and have sometimes faced legal crackdowns for defrauding customers — mishandle their loans. 'It means that the sorry state of the student loan system will only get worse — servicers can cut back on customer service, lose paperwork, and lie to borrowers knowing that no one is watching and they will never face justice,' said Mike Pierce, executive director of the Student Borrower Protection Center, and former CFPB staffer during the Obama administration."[52]

102.    It sounds like today Maximus is already *de facto* running operations at the U.S. Dept. of Education. Further, its unclear what would happen with student loan discharge proceedings if student loans were also moved out of the U.S. Dept. of Education, but it seems clear that if the Dept. of Education was no longer responsible for student loans, that it would not be the proper defendant in these cases and that Discharge Orders against that agency may be difficult to enforce.

103.    What we do know, is that there is at least one corporation who already has more control than U.S. Dept. of Education does regarding effectuating debt management and collection decisions for federal loans, including bankruptcy Discharge Orders. That corporation is Maximus, Inc.

104.    It also stands to reason that Maximus may be dedicating so much time and

---

[50] Fortune, *$1.6 trillion of student loans are up in the air as Trump moves in on the Department of Education,* July 14, 2025.
[51] Yahoo, *How Trump has wiped out the teams that protect student borrowers,* April 19 2025.
[52] Yahoo, *How Trump has wiped out the teams that protect student borrowers,* April 19 2025.

money into injecting itself into this bankruptcy proceeding where it claims it doesn't' want to be (including filing Declarations drafted by their senior executives in support of obstructing the Plaintiff's requested relief) – Maximus is probably aware that if student loans are moved out of U.S. Dept. of Education, that for the near future, Maximus would likely be a necessary and indispensable participant in any federal discharge proceeding going forward despite the company's own liability – and perhaps that is exactly why Maximus seems to be frantically attempting to manufacture a federal court order waiving them of any liability on this topic generally. Corporations don't earn $5B/year in revenue on accident.

## VIII.   Conclusion

105.   In conclusion, Maximus Education, LLC is properly included in this Adversary Proceeding. Maximus has an interest in the debt at issue and is also directly and independently responsible for implementing any discharge court order from these proceedings. There is extensive evidence supporting allegations that Maximus is deeply involved in debt management for federal loans, has repeatedly made serious mistakes in that management that violated the rights of borrowers, and the company is also quite willing put forward innovative defenses in order to try to escape liability, such as this private, for-profit corporation trying to claim sovereign immunity.

106.   Maximus is also in a unique position to obstruct a discharge order from this court, and in such a way that even the U.S. Dept. of Education apparently does not even have access to intervene themselves. Further, as seen in recent cases, without Maximus as a party, the only option for a federal court to intervene in response to Maximus' violation of court orders was to directly sanction the Secretary of Education and hold her in contempt, for the actions and omissions of Maximus. In addition, if student loans were moved out of the U.S. Dept. of Ed., and this court created precedent to never include Maximus in these case, its entirely unclear who would be included and who could effectuate this court's orders.

107.   Wherefore, Plaintiff/Debtor respectfully requests that the Court DENY

Maximus' motion and GRANT the Plaintiff's request to also add the Maximus Inc. parent company (due to the discovery that the parent company and its additional sub-companies are also involved in managing federal debts and bankruptcy discharges).

108.    In addition or in the alternative, the Court could also GRANT an Order with Declaratory Relief as to the Court's expectation of Maximus's compliance with this Court's Orders regarding bankruptcy discharges of federal student loans.

109.    Wherefore, Plaintiff/Debtor also respectfully requests that the Court GRANT the Plaintiff's request for correction and clarity as to Claim 1-1 filed by Maximus and U.S. Dept. of Ed, and ORDER the part(ies) to refile the Claim with corrected information, an explanation for the basis of the claim including which MPNs the loans were disbursed under and if those complete MPN documents still exist, and to clearly identify which loans are active and part of the claim.

110.    I declare under penalty of perjury under the laws of the United States of America, and in compliance with Fed.R.Bankr.P. Rule 9011, that the foregoing is true and correct. I also respectfully request a hearing with oral arguments if the court is to consider granting Maximus' request. If so, the Plaintiff would also like to present a PowerPoint presentation to the court and DOJ/Dept. of Ed. about the public policy concerns at issue and consumer rights at risk arising from Maximus' request.

111.    Executed    on    October    31    2025    in    Boston,    Massachusetts.


Respectfully submitted,


**/s/ Ashley M. Gjovik**
*Pro Se / In Propria Persona*

18 Worcester Sq. Apt. 1
Boston, Massachusetts, 02118

(415) 964-6272

Dated: October 31 2025

## CERTIFICATE OF SERVICE

This Response was emailed to the pro se clerk with a request to docket to the Adversary Proceeding, and to also post a copy to the main Ch. 7 docket. In doing so the U.S. Dept. of Ed. and the Trustee are served. It appears that Maximus is now served copies of filings as they were able to file this Motion as if they are an existing party, and are now listed as defense counsel for U.S. Dept. of Ed. along with DOJ. Regardless, I will also email them a copy once its posted to the docket.

# IX.   <u>EXHIBITS</u>

## A. EXHIBIT: CASE 25-01104 DOCKET

LIVE database

**25-01104** Gjovik v. U.S. Department of Education Maximus d.b.a. Aidvan
**Case type:** ap **Related bankruptcy:** 25-11496 **Judge:** Christopher J. Panos
**Date filed:** 07/29/2025 **Date of last filing:** 10/21/2025

# Parties

**Ashley Marie Gjovik**
18 Worcester Square
Apt 1
Boston, MA 02118
415-964-6272
ashleymgovok@protonmail.com
SSN / ITIN: xxx-xx-2419
*Added: 07/29/2025*
*(Plaintiff)*
PRO SE

| | | |
|---|---|---|
| **U.S. Department of Education Maximus d.b.a. Aidvantage** | represented by | **Brendan T. Mockler** |

**U.S. Department of Education Maximus d.b.a.
Aidvantage**
*Added: 07/29/2025*
*(Defendant)*

represented
by

**Brendan T. Mockler**
United States Attorney's Office
District of Massachusetts
One Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748-3242
brendan.mockler@usdoj.gov
*Assigned: 08/20/25*

**Emily C. Shanahan**
Husch Blackwell LLP
One Congress Street
Suite 3102
Boston, MA 02114
617-598-6727
617-598-6790 (fax)
emily.shanahan@huschblackwell.com
*Assigned: 10/21/25*

## B. EXHIBIT: EXAMPLE ORDER WITH U.S. DEPT. OF ED + SERVICER

Case 14-01177    Doc 43    Filed 04/08/15    Entered 04/08/15 09:57:45    Desc Main
Document      Page 1 of 1

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF MASSACHUSETTS

| |
|---|
| In re<br><br>SARAH E. WEEKS, |
| SARAH E. WEEKS,<br><br>      Plaintiff,<br><br>v.<br><br>DEPARTMENT OF EDUCATION/NELNET,<br><br>      Defendant |

Chapter 7
Case No. 14-12391

Adv. Proc. No. 14-01177

#### DEFAULT JUDGMENT

The plaintiff having filed a complaint to determine the dischargeability of her student loan debt to the United States of America, through its Department of Education; the defendant having failed to answer; the plaintiff having moved for judgment by default; the defendant having failed again to respond; good cause having been stated; and the Court being satisfied that the plaintiff is entitled to the relief awarded herein; the Court hereby ORDERS, ADJUDGES, and DECLARES that the student loan debt of the plaintiff, Sarah E. Weeks, to the defendant, the Department of Education of the United States of America / NELNET, is subject to the  discharge that the plaintiff has received in her bankruptcy case and accordingly is discharged.

Date: April 8, 2015

_____
Frank J. Bailey
United States Bankruptcy Judge

## C. EXHIBIT: U.S. DOE MPNs (ASHLEY GJOVIK)



**EXHIBIT C: U.S. DEPT. OF EDUCATION MPNs (ASHLEY GJOVIK)**



## D. EXHIBIT: U.S. DOE 2018 MPN (ASHLEY GJOVIK)



10/30/25, 5:27 PM                    (2889) All mail | ashleymgjovik@protonmail.com | Proton Mail

## Master Promissory Note Confirmation

From    donotreply@studentloans.gov <donotreply@studentloans.gov>

To      ashleymariehenderson@icloud.com

Date    Monday, April 2nd, 2018 at 8:47 PM



Dear Ashley M Henderson,

You successfully submitted your Direct Loan Master Promissory Note (MPN). We will send an
electronic confirmation of your completed MPN to SANTA CLARA UNIVERSITY within 24 hours.

Your school will tell you what loans, if any, you are eligible to receive. If you have questions regarding
your loan eligibility, the next steps in the processing of your loan, when the loan will be disbursed
(paid out), or no longer wish to receive the loan, contact your school's financial aid office.

After the first disbursement of your loan has been made, your loan will be assigned to a loan servicer
and you will receive the servicer's name, address and contact information. Your servicer will service,
answer questions about, and process payments on your loan after you enter repayment.

To view a list of loan servicers and their contact information, visit StudentLoans.gov and click on the
"Additional Information" link on the "Contact Us" page.

Sincerely,

U.S. Department of Education
Federal Student Aid
William D. Ford Federal Direct Loan Program

Do not reply directly to this email.

If you wish to contact us, email StudentLoanSupport@ed.gov.

Connect with us:

# E. EXHIBIT: DOE 2010 GJOVIK MASTER PROMISSORY NOTE (PDF)

**Direct Loans**

Federal Direct Stafford/Ford Loan
Federal Direct Unsubsidized Stafford/Ford Loan
**Master Promissory Note**
**William D. Ford Federal Direct Loan Program**
Warning: Any person who knowingly makes a false statement, or misrepresentation on this form will be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C 1097.

OMB No. 1845-0007
Form Approved
Exp. Date 06/31/2011

**SECTION A: BORROWER INFORMATION** — READ THE INSTRUCTIONS IN SECTION F BEFORE COMPLETING THIS SECTION

1. Driver's License State and No.

2. Social Security No.

3. E-mail Address (optional)

4. Name and Address

5. Date of Birth

6. Area Code/Telephone No.

7. References: List two persons with different U.S. addresses...

Name

Permanent Street Address

City, State, Zip Code

Area Code/Telephone No.

Relationship to Borrower

**SECTION B: SCHOOL INFORMATION - TO BE COMPLETED BY THE SCHOOL**

| 8. School Name and Address | 9. School Code/Branch | 10. Identification No. |
|---|---|---|
| Portland State University<br>1721 South West Broadway<br>Cramer Hall, Room 341<br>Portland, OR 97201-0000 | G03216 | 542312419M11G03218001 |

**SECTION C: BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS • READ CAREFULLY BEFORE SIGNING BELOW**

11. This is a Master Promissory Note (MPN) for one or more Federal Direct Stafford/Ford (Direct Subsidized) Loans and/or Federal Direct Unsubsidized Stafford/Ford (Direct Unsubsidized) Loans. I request a total amount of Direct Subsidized Loans and/or Direct Unsubsidized Loans under this MPN not to exceed the allowable maximums under the Act ("the Act" is defined in Section E under Governing Law). My school will notify me of the loan type and loan amount that I am eligible to receive. I may cancel a loan or request a lower amount by contacting my school. Additional information about my right to cancel a loan or request a lower amount is included in the Borrower's Rights and Responsibilities Statement and in the disclosure statements that will be provided to me.

12. Under penalty of perjury, I certify that:

A. The information I have provided on this MPN and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

B. I will use the proceeds of loans made under this MPN for authorized educational expenses that I incur and I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility.

C. If I owe an overpayment on a Federal Pell Grant, Federal Pell Grant, Federal Supplemental Educational Opportunity Grant, Academic Competitiveness Grant (ACG), National Science or Mathematics Access to Retain Talent (SMART) Grant, or Leveraging Educational Assistance Partnership Grant, I have made satisfactory arrangements to repay the amount owed.

D. If I am in default on any loan received under the Federal Perkins Loan Program (including National Direct Student Loans), the William D. Ford Federal Direct Loan (Direct Loan) Program, or the Federal Family Education Loan (FFEL) Program, I have made satisfactory repayment arrangements with the holder to repay the amount owed.

E. If I have been convicted of, or pled nolo contendere (no contest) or guilty to, a crime involving fraud in obtaining funds under Title IV of the Higher Education Act of 1965 (HEA), as amended, I have completed the repayment of the funds to the U.S. Department of Education (ED) or to the loan holder in the case of a Title IV federal student loan.

12. For each Direct Subsidized Loan and Direct Unsubsidized Loan I receive under this MPN, I make the following authorizations:

A. I authorize my school to certify my eligibility for the loan

B. I authorize my school to credit my loan proceeds to my student account at the school

C. I authorize my school to pay to ED any refund that may be due up to the full amount of the loan.

D. I authorize ED to investigate my credit record and report information about my loan status to persons and organizations permitted by law to receive that information

E. Unless I notify ED differently, I authorize ED to defer repayment of principal on my loan while I am enrolled at least half time at an eligible school

F. I authorize my school and ED to release information about my loan to the references on the loan and to members of my immediate family, unless I submit written directions otherwise

G. I authorize my schools, lenders and guarantors, ED, and their agents to release information about my loan to each other

H. I authorize my schools, ED, and their respective agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at the current or any future number that I provide for my cellular telephone or other wireless device using automated dialing equipment or artificial or prerecorded voice or text messages

14. I will be given the opportunity to pay the interest that ED charges during grace, in-school deferment, forbearance, and other periods as provided under the Act, including during in-school deferment periods. Unless I pay the interest, I understand that ED may add unpaid interest that is charged on each loan made under this MPN to the principal balance of that loan (this is called "capitalization") at the end of the grace, deferment, forbearance, or other period. Capitalization will increase the principal balance on my loan and the total amount of interest I must pay.

15. I understand that ED has the authority to verify information reported on this MPN with other federal agencies.

**SECTION D: PROMISE TO PAY**

16. I promise to pay to ED all loan amounts disbursed under the terms of this MPN, plus interest and other charges and fees that may become due as provided in this MPN. I understand that more than one loan may be made to me under this MPN. I understand that by accepting any disbursement issued at any time under this MPN, I agree to repay the loan associated with that disbursement. I understand that, within certain timeframes, I may cancel or reduce the amount of a loan by refusing to accept or by returning all or a portion of any disbursement that is issued. Unless I make interest payments, interest that ED charges on my loans during grace, in-school, deferment, forbearance, and other periods will be added to the principal balance of the loan as provided under the Act. If I do not make a payment on a loan made under this MPN when it is due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement. My signature certifies that I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Request, Certifications, Authorizations, and Understandings in Section C, the Notice About Subsequent Loans Made Under this MPN in Section E, and the terms and conditions described in Section E of this MPN and in the Borrower's Rights and Responsibilities Statement.

I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.

17. Borrower's Signature

18. Today's Date (mm-dd-yyyy)  07/26/10

Page 1 of 4    RECEIVED AUG 0 2 2010    Revised 03/2009/004202

## EXHIBIT: 2010 GJOVIK MPN (HTML – NOT OFFICIAL)



10/30/25, 3:54 PM                                    Master Promissory Note: Federal Direct PLUS Loan

# Direct Loans

**Federal Direct Stafford/Ford Loan**
**Federal Direct Unsubsidized Stafford/Ford Loan**
**Master Promissory Note**
**William D. Ford Federal Direct Loan Program**

OMB No. 1845-0007
Form Approved
Exp. Date 05/31/2011

Warning: Any person who knowingly makes a false statement or misrepresentation on this form will be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

*SECTION A: BORROWER INFORMATION*                    *READ THE INSTRUCTIONS IN SECTION F BEFORE COMPLETING THIS SECTION*

1. Driver's License State and No.                    2. Social Security No.

3. E-mail Address (optional)

4. Name and Address                                  5. Date of Birth

ASHLEY M HENDERSON                                   6. Area Code/Telephone No.

7. References: List two persons with different U.S. addresses who have known you for at least three years. The first reference should be a parent or legal guardian.

Name                        1.                       2.

Permanent Street Address

City, State, Zip Code

Area Code/Telephone No.

Relationship to Borrower

*SECTION B: SCHOOL INFORMATION - TO BE COMPLETED BY THE SCHOOL*

8. School Name and Address                    9. School Code/Branch      10. Identification No.

PORTLAND STATE UNIVERSITY                     G03216                     542312419M11G03216001
1721 SOUTH WEST BROADWAY  CRAMER HALL ROOM 341
PORTLAND, OR 972010000
*SECTION C: BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS - READ CAREFULLY BEFORE SIGNING BELOW*

11. This is a Master Promissory Note (MPN) for one or more Federal Direct Stafford/Ford (Direct Subsidized) Loans and/or Federal Direct Unsubsidized Stafford/Ford (Direct Unsubsidized) Loans. I request a total amount of Direct Subsidized Loans and/or Direct Unsubsidized Loans under this MPN not to exceed the allowable maximums under the Act ("the Act" is defined in Section E under Governing Law). My school will notify me of the loan type and loan amount that I am eligible to receive. I may cancel a loan or request a lower amount by contacting my school. Additional information about my right to cancel or request a lower amount is included in the Borrower's Rights and Responsibilities Statement and in the disclosure statements that will be provided to me.

12. Under penalty of perjury, I certify that:

A. The information I have provided on this MPN and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

B. I will use the proceeds of loans made under this MPN for authorized educational expenses that I incur and I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility.

13. For each Direct Subsidized Loan and Direct Unsubsidized Loan I receive under this MPN, I make the following authorizations:

A. I authorize my school to certify my eligibility for the loan.

B. I authorize my school to credit my loan proceeds to my student account at the school.

C. I authorize my school to pay to ED any refund that may be due up to the full amount of the loan.

D. I authorize ED to investigate my credit record and report information about my loan status to persons and organizations permitted by law to receive that information.

E. Unless I notify ED differently, I authorize ED to defer repayment of principal on my loan while I am enrolled at least half -time at an eligible school.

F. I authorize my school and ED to release information about my loan to the references on the loan and to members of my immediate family, unless I submit written directions otherwise.

G. I authorize my schools, lenders and guarantors, ED, and their agents to release information about my loan to each other.

https://studentaid.gov/app/viewMpnHTML.action?docId=2017110712475845548                    1/12

10/30/25, 3:54 PM                                    Master Promissory Note: Federal Direct PLUS Loan

**C.** If I owe an overpayment on a Federal Perkins Loan, Federal Pell Grant, Federal Supplemental Educational Opportunity Grant, Academic Competitiveness Grant (ACG), National Science or Mathematics Access to Retain Talent (SMART) Grant, or Leveraging Educational Assistance Partnership Grant, I have made satisfactory arrangements to repay the amount owed.

**D.** If I am in default on any loan received under the Federal Perkins Loan Program (including National Direct Student Loans), the William D. Ford Federal Direct Loan (Direct Loan) Program, or the Federal Family Education Loan (FFEL) Program, I have made satisfactory repayment arrangements with the holder to repay the amount owed.

**E.** If I have been convicted of, or pled *nolo contendere* (no contest) or guilty to, a crime involving fraud in obtaining funds under title IV of the Higher Education Act of 1965 (HEA), as amended, I have completed the repayment of the funds to the U.S. Department of Education (ED) or to the loan holder in the case of a Title IV federal student loan.

**H.** I authorize my schools, ED, and their respective agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at the current or any future number that I provide for my cellular telephone or other wireless device using automated dialing equipment or artificial or prerecorded voice or text messages.

**14.** I will be given the opportunity to pay the interest that ED charges during grace, in school, deferment, forbearance, and other periods as provided under the Act, including during in-school deferment periods. Unless I pay the interest, I understand that ED may add unpaid interest that is charged on each loan made under this MPN to the principal balance of that loan (this is called "capitalization") at the end of the grace, deferment, forbearance, or other period. Capitalization will increase the principal balance on my loan and the total amount of interest I must pay.

**15.** I understand that ED has the authority to verify information reported on this MPN with other federal agencies.

*SECTION D: PROMISE TO PAY*

**16.** I promise to pay to ED all loan amounts disbursed under the terms of this MPN, plus interest and other charges and fees that may become due as provided in this MPN. **I understand that more than one loan may be made to me under this MPN.** I understand that by accepting any disbursement issued at any time under this MPN, I agree to repay the loan associated with that disbursement. I understand that, within certain timeframes, I may cancel or reduce the amount of a loan by refusing to accept or by returning all or a portion of any disbursement that is issued. Unless I make interest payments, interest that ED charges on my loans during grace, in-school, deferment, forbearance, and other periods will be added to the principal balance of the loan as provided under the Act. If I do not make a payment on a loan made under this MPN when it is due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement. My signature certifies that I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Request, Certifications, Authorizations, and Understanding in Section C, the Notice About Subsequent Loans Made Under this MPN in Section E, and the terms and conditions described in Section E of this MPN and in the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

**17. Borrower's Signature**     ASHLEY M HENDERSON                          **18. Today's Date (mm-dd-yyyy)**

*SECTION E: MPN TERMS AND CONDITIONS*

**GOVERNING LAW**

The terms of this Application and Master Promissory Note (MPN) will be interpreted in accordance with the Higher Education Act of 1965, as amended (20. U.S.C. 1070 *et seq.*), the U.S. Department of Education's (ED's) regulations, as they may be amended in accordance with their effective date, and other applicable federal laws and regulations (collectively referred to as the "Act"). Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN.

**DISCLOSURE OF LOAN TERMS**

This MPN applies to Federal Direct Stafford/Ford (Direct Subsidized) Loans and Federal Direct Unsubsidized Stafford/Ford (Direct Unsubsidized) Loans. Under this MPN, the principal amount that I owe, and am required to repay, will be the sum of all disbursements that are made (unless I reduce or cancel any disbursements as explained below under Loan Cancellation), plus any unpaid interest that is capitalized and added to the principal amount.

At or before the time of the first disbursement of each loan, a disclosure statement will be sent to me identifying the amount of the loan and additional terms of the loan. Important additional information is also contained in the Borrower's Rights and Responsibilities Statement accompanying this MPN. The Borrower's Rights and Responsibilities Statement and any disclosure statement I receive in connection with any loan under this MPN are hereby incorporated into this MPN.

Loans disbursed under this MPN are subject to the annual and aggregate loan limits specified under the Act. I may request additional loan funds to pay for my educational costs up to the annual and aggregate loan limits by contacting my school's financial aid office. My school will determine if I am eligible for any additional loan funds. I will be notified of any increase or other change in the amount of my loan.

My eligibility for Direct Subsidized Loans and Direct Unsubsidized Loans may increase or decrease based on changes in my financial circumstances. My school will notify me of any changes in my eligibility. I will be notified of any increase or decrease in the amount of my loan.

I understand that each loan made under this MPN is separately enforceable based on a true and exact copy of this MPN.

**LOAN CANCELLATION**

I may pay back all or part of a disbursement within the timeframes set by the Act, as explained in the Borrower's Rights and Responsibilities Statement and in a disclosure statement that I will receive. If I return the full loan amount within those timeframes, I will not incur any loan fee or interest charges. If I return part of a disbursement within those timeframes, the loan fee and interest charges will be reduced in proportion to the amount returned.

**INTEREST**

Unless ED notifies me in writing of a lower rate, the interest rate for any loan I receive under this MPN is determined using a formula specified in the Act. As explained in the Borrower's Rights and Responsibilities Statement, I will be notified of the actual interest rate for each loan that I receive.

10/30/25, 3:54 PM                    Master Promissory Note: Federal Direct PLUS Loan

| 70,000 | 806 | 96,667 | 456 | 164,285 | 535 | 101,890 | 87 | 71,721 | 30 | 46,934 | 253 | 148,551 | 197 | 133,106 | 587 | 106,551 | 587 | 106,551 |
| 80,000 | 920 | 110,477 | 522 | 187,754 | 632 | 116,445 | 87 | 71,721 | 30 | 46,934 | 253 | 157,373 | 197 | 138,907 | 587 | 128,146 | 587 | 128,146 |
| 90,000 | 1,036 | 124,287 | 587 | 211,224 | 711 | 131,002 | 87 | 71,721 | 30 | 46,934 | 253 | 163,227 | 197 | 141,925 | 587 | 152,967 | 587 | 152,967 |
| 100,000 | 1,151 | 138,096 | 652 | 234,693 | 790 | 145,556 | 87 | 71,721 | 30 | 46,934 | 253 | 166,457 | 197 | 142,386 | 587 | 181,224 | 587 | 181,224 |
| 110,000 | 1,266 | 151,906 | 717 | 258,162 | 869 | 160,111 | 87 | 71,721 | 30 | 46,934 | 253 | 167,172 | 197 | 142,385 | 587 | 213,485 | 587 | 213,485 |
| 120,000 | 1,381 | 165,716 | 782 | 281,632 | 948 | 174,668 | 87 | 71,721 | 30 | 46,934 | 253 | 167,172 | 197 | 142,385 | 587 | 250,281 | 587 | 250,281 |
| 130,000 | 1,496 | 179,525 | 848 | 305,101 | 1,024 | 189,224 | 87 | 71,721 | 30 | 46,934 | 253 | 167,172 | 197 | 142,385 | 587 | 292,313 | 587 | 292,313 |
| 138,500 | 1,594 | 191,264 | 903 | 325,050 | 1,094 | 201,596 | 87 | 71,721 | 30 | 46,934 | 253 | 167,172 | 197 | 142,385 | 587 | 332,912 | 587 | 332,912 |

[1] The **estimated** payments were calculated using a fixed interest rate of 6.80%.

[2] This repayment plan is available only to borrowers who have an outstanding balance on Direct Loan Program loans that exceeds $30,000, and who had no outstanding balance on a Direct Loan Program loan as of October 7, 1998 or on the date they obtained a Direct Loan Program loan on or after October 7, 1998.

[3] These amounts are fixed, rounded to the nearest dollar, and calculated based on a 25-year repayment term.

[4] This is your beginning payment, which may increase during your 10-year repayment term.

[5] Assumes a 5% annual income growth (Census Bureau).

[6] The **estimated** payments were calculated using the formula requirements in effect during 2006.

[7] HOH is Head of Household; assumes a family size of two.

*Transaction History*

Your identity was confirmed based on the information associated with your FSA ID on:

You agreed to use an electronic MPN on:

You reviewed your draft MPN and confirmed that you read, understood, and agreed to the Borrower Request, Certifications, Authorizations, and Understandings, Promise to Pay, MPN Terms and Conditions, Important Notices and Borrower's Rights and Responsibilities Statement on:

You signed your MPN on:

You reviewed your signed MPN on:

You confirmed your acceptance of the terms and conditions of this MPN and submitted it to us on:     Wed Aug 11 01:03:04 EDT 2010

Plaintiff's Opposition to Maximus' Motion to Dismiss | A.P. Case 25-01104 | Page 51

## F. EXHIBIT: MAXIMUS/AIDVANTAGE ACCOUNT SUMMARY (GJOVIK)



**aidVantage**

# Printable Account Information

ASHLEY GJOVIK
18 WORCESTER SQ
APT 1
BOSTON, MA 021182945
Account # 9764706753

Cancel    Print

Here is the payoff information for your loans as of 10/30/2025.

## Please remit payments to:

Aidvantage - Federal Student Aid Loan Servicing
P.O. Box 4450
Portland, OR 97208-4450

## Payment Information

| | |
|---|---|
| Date of Last Payment Received | 00/00/0000 |
| Amount of Last Payment Received | $0.00 |
| Monthly Payment Amount* | $131.67 |
| Next Payment Due Date | 08/11/2026 |
| Unpaid Other Fees | $0.00 |
| Total Amount Due by 08/11/2026 | $0.00 |
| Past Due Amount | $0.00 |

*This Monthly Payment Amount reflects one or more loans being in a reduced payment plan, which means it may go up or down on an annual basis depending on income fluctuations and other factors.

## Balance Information

| | |
|---|---|
| Unpaid Principal | $80,363.06 |
| Unpaid Interest | $1,973.18 |
| Unpaid Other Fees | $0.00 |
| Current Balance | $82,336.24 |

**Loan: 1-01 Stafford - Subsidized**
Current Payment Plan: Level

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 11/07/2008 | $4,500.00 | $0.00 | 6.000% | 6.000% |

**Loan: 1-02 Stafford - Unsubsidized**
Current Payment Plan: Level

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 05/27/2009 | $800.00 | $0.00 | 6.800% | 6.800% |

**Loan: 1-03 Stafford - Subsidized**
Current Payment Plan: Level

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 06/10/2009 | $1,000.00 | $0.00 | 6.000% | 6.000% |

**Loan: 1-04 Stafford - Unsubsidized**
Current Payment Plan: Level

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 06/16/2009 | $1,200.00 | $0.00 | 6.800% | 6.800% |

**Loan: 1-05 Direct Loan - Subsidized**
Current Payment Plan: Income-Contingent Repayment

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 09/17/2010 | $5,500.00 | $0.00 | 4.500% | 4.500% |

**Loan: 1-06 Direct Loan - Unsubsidized**
Current Payment Plan: Income-Contingent Repayment

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 09/17/2010 | $7,000.00 | $0.00 | 6.800% | 6.800% |

**Loan: 1-07 Stafford - Subsidized**
Current Payment Plan: Level

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 09/16/2009 | $4,500.00 | $0.00 | 5.600% | 5.600% |

**Loan: 1-08 Stafford - Subsidized**
Current Payment Plan: Level

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 02/05/2010 | $1,000.00 | $0.00 | 5.600% | 5.600% |

**Loan: 1-09 Stafford - Unsubsidized**
Current Payment Plan: Level

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 02/05/2010 | $1,395.00 | $0.00 | 6.800% | 6.800% |

**Loan: 1-10 Direct Loan - Subsidized**
Current Payment Plan: Income-Contingent Repayment

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 09/16/2011 | $2,212.00 | $0.00 | 3.400% | 3.400% |

**Loan: 1-11 Direct Loan - Unsubsidized**
Current Payment Plan: Income-Contingent Repayment

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 09/16/2011 | $3,291.00 | $0.00 | 6.800% | 6.800% |

**Loan: 1-12 DL Consolidated - Subsidized**
Current Payment Plan: Income-Contingent Repayment

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 06/15/2012 | $2,401.98 | $0.00 | 6.550% | 6.800% |

**Loan: 1-13 DL Consolidated - Subsidized**
Current Payment Plan: Income-Contingent Repayment

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| Paid In Full | 06/26/2012 | $652.92 | $0.00 | 2.110% | 2.360% |

**Loan: 1-14 Direct Loan - Unsubsidized**
Current Payment Plan: Saving on a Valuable Education

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| No Payment Due | 08/09/2018 | $20,500.00 | $19,383.62 | 6.600% | 6.600% |

**Estimated Payment Schedule**

| | Schedule Begin Date | Schedule End Date |
|---|---|---|
| 15months @$31.76 | 08/11/2026 | 10/11/2027 |
| 120months @$220.06 | 11/11/2027 | 10/11/2037 |

**Loan: 1-15 Direct Loan - Unsubsidized**
Current Payment Plan: Saving on a Valuable Education

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| No Payment Due | 08/12/2019 | $20,500.00 | $19,979.44 | 6.080% | 6.080% |

**Estimated Payment Schedule**

| | Schedule Begin Date | Schedule End Date |
|---|---|---|
| 15months @$32.74 | 08/11/2026 | 10/11/2027 |
| 120months @$222.28 | 11/11/2027 | 10/11/2037 |

**Loan: 1-16 Direct Loan - Unsubsidized**
Current Payment Plan: Saving on a Valuable Education

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| No Payment Due | 08/12/2020 | $20,500.00 | $20,500.00 | 4.300% | 4.300% |

**Estimated Payment Schedule**

| | Schedule Begin Date | Schedule End Date |
|---|---|---|
| 15months @$33.59 | 08/11/2026 | 10/11/2027 |
| 120months @$211.14 | 11/11/2027 | 10/11/2037 |

**Loan: 1-17 Direct Loan - Unsubsidized**
Current Payment Plan: Saving on a Valuable Education

| Status | Disbursement Date | Original Principal | Unpaid Principal | Interest Rate | Statutory Interest Rate |
|---|---|---|---|---|---|
| No Payment Due | 08/11/2021 | $20,500.00 | $20,500.00 | 5.280% | 5.280% |

**Estimated Payment Schedule**

| | Schedule Begin Date | Schedule End Date |
|---|---|---|
| 15months @$33.58 | 08/11/2026 | 10/11/2027 |
| 120months @$222.30 | 11/11/2027 | 10/11/2037 |

## G. EXHIBIT: LOAN INFORMATION PROVIDED BY DOJ/DOE

### Loan Information Relevant to Completing the Attestation

Re : . Gjovick, Ashley
**Adv. No. : 25-01104**
Dear Borrower,

This letter contains information about your student loan payment history and student loan servicing for student loans held by the Department of Education ("ED"). This information has been obtained by ED from its information systems. You may use it, in addition to any information you have, to complete the Attestation. You may rely on the information provided here in completing your Attestation. However, if you believe the information provided here is inaccurate, you should explain that in your Attestation and provide what you believe is the correct information. Also, if you believe the information below is incomplete, please provide any additional relevant information in your Attestation.

Loan Information (Attestation Questions 5,6,7)[4]

Monthly payment *Estimate* amount under the Standard Repayment Plan for ED held loans only:   **$ 958.48**

| Loan # | Loan Holder Name | Loan Date | Loan Amount | Loan Type | Loan Status | Principal [5] | Interest | Date Entered Repayment [6] |
|--------|------------------|-----------|-------------|-----------|-------------|---------------|----------|----------------------------|
| 21 | DEPT OF ED/AIDVANTAGE | 2021-08-11 | $ 20,500.00 | DIRECT STAFFORD UNSUB | Bankruptcy, Active | $ 20,500.00 | $ 214.12 | 11/18/2022 |
| 20 | DEPT OF ED/AIDVANTAGE | 2020-08-12 | $ 20,500.00 | DIRECT STAFFORD UNSUB | Bankruptcy, Active | $ 20,500.00 | $ 181.19 | 11/18/2022 |
| 19 | DEPT OF ED/AIDVANTAGE | 2019-08-12 | $ 20,500.00 | DIRECT STAFFORD UNSUB | Bankruptcy, Active | $ 19,979.44 | $ 235.01 | 11/18/2022 |
| 18 | DEPT OF ED/AIDVANTAGE | 2018-08-09 | $ 20,500.00 | DIRECT STAFFORD UNSUB | Bankruptcy, Active | $ 19,383.62 | $ 244.47 | 11/18/2022 |

[4] This chart only includes your loans held by the Department of Education. It does not include private loans, FFELP loans not held by ED, or HEAL loans.
[5] Amounts rounded to the nearest dollar.
[6] Periods spent in In-School deferment and Grace period after this repayment date will not count towards calculating the second prong presumption that the loans have been in repayment for more than 10 years.

## EXHIBIT F: LOAN INFORMATION PROVIDED BY DOJ/DOE

```
CLASS-115-LOAN DIRECTORY ------------------------------- EDADVS F    08/13/25
>NXT SCR 115 SSN ___ __ ____ _ PG __ OWN _____ ST ____ GU __ LN __ DT __ __ __
SSN ▮▮▮▮2419 1  NAME ASHLEY      M GJOVIK                    *BKRT*
                                     1ST                                  SALE
  LOAN OWNER            PG PD  STAT GU  DISB  DISB PRIN  AMT OUT   INT RT ELIG
_ 01 899577 US DEPT OF  GS     PIFB ED 110708  4500.00      .00   6.000 Y
_ 02 899577 US DEPT OF  GS     PIFB ED 052709   800.00      .00   6.800 Y
_ 03 899577 US DEPT OF  GS     PIFB ED 061009  1000.00      .00   6.000 Y
_ 04 899577 US DEPT OF  GS     PIFB ED 061609  1200.00      .00   6.800 Y
_ 05 898578 US DEPT OF  D1     PIFB ED 091710  5500.00      .00   4.500 Y
_ 06 898578 US DEPT OF  D2     PIFB ED 091710  7000.00      .00   6.800 Y
_ 07 897577 US DEPT OF  GS     PIFB ED 091609  4500.00      .00   5.600 Y
_ 08 897577 US DEPT OF  GS     PIFB ED 020510  1000.00      .00   5.600 Y
_ 09 897577 US DEPT OF  GS     PIFB ED 020510  1395.00      .00   6.800 Y
_ 10 898578 US DEPT OF  D1     PIFB ED 091611  2212.00      .00   3.400 Y
_ 11 898578 US DEPT OF  D2     PIFB ED 091611  3291.00      .00   6.800 Y
_ 12 899578 US DEPT OF  D6 F1  PIFB ED 061512  2401.98      .00   6.550 Y
_ 13 899578 US DEPT OF  D6 F1  PIFB ED 062612   652.92      .00   2.110 Y
_ 14 898578 US DEPT OF  D2     FORN ED 080918 20500.00 19383.62  6.600 Y
_ 15 898578 US DEPT OF  D2     FORN ED 081219 20500.00 19979.44  6.080 Y
_ 16 898578 US DEPT OF  D2     FORN ED 081220 20500.00 20500.00  4.300 Y
_ 17 898578 US DEPT OF  D2     FORN ED 081121 20500.00 20500.00  5.280 Y
I007 CURRENTLY ON FIRST PAGE
PFKEYS:1-9=BIP.5=OPRIN/INT.6=DATES.7=DELQ.8=AMTOUT.9=OTHINT.10=BRCH/FEE ASSMT
```

## H. EXHIBIT: MOHELA/SOFI PAID IN FULL (2020)

10/16/25, 2:44 PM                         All mail | ashleymgjovik@protonmail.com | Proton Mail

### Paid In Full Notice

| From | MOHELA <gopaperless@mohela.com> |
|------|----------------------------------|
| To | Ashley Gjovik<ashleygjovik@icloud.com> |
| Date | Thursday, October 29th, 2020 at 1:05 PM |

   

A message regarding the subject referenced above has been delivered to your MOHELA inbox for SoFi servicing.
Please log into your account at sofi.mohela.com to access this information.

Thank you,

Mohela

You received this email because you are a MOHELA customer and signed up for our Go Paperless program. Replies to this message
are not monitored. If you would like to contact us or cancel your participation in MOHELA's Go Paperless program, call our
Customer Service Department at 877.292.7470. We respect your privacy. See our Privacy Policy

Payoff Payment Confirmation                                                                 10/21/20, 4:50 PM

        

# Payoff Payment Confirmation

**Account Number**          

**Confirmation Number**

**Payment Effective Date**      10/21/20

**Payment Account**         

**Total Amount**            $27,564.25

| Loan Number | Loan Type | Payoff Amount | Disbursement Date |
|---|---|---|---|
| 1 | SoFi-Refi 10 Year Term | $27,564.25 | 07/08/2015 |

A Paid in Full letter will be sent approximately 30-45 days after loans are paid in full.

*"Copyright © 2020 Higher Education Loan Authority of the State of Missouri(MOHELA). All Rights Reserved."*          **NMLS Resource Center**
NMLS # 1442770

https://sofi.mohela.com/DL/secure/borrower/calculator/earlyPayoffOLPConfirmation.aspx                     Page 1 of 1

## I.  EXHIBIT: AMOUNT OWED (FSA MY AID/GJOVIK)

Dashboard  •  My Aid

# My Aid

| LOANS | GRANTS |
|---|---|

Download My Aid Data    Learn More

### 19 Loans

*3 Servicers*
*Total original amount awarded: $118,952*

View Breakdown

**$81,982.32**
Total Balance ⑦

● $80,363.06
Principal ⑦

● $1,619.26
Interest ⑦

HELPFUL LINKS

Explore Repayment Options

Try the Loan Simulator

Learn About Public Service Loan Forgiveness (PSLF)

Explore Income-Driven Repayment Options

Learn About Loan Consolidation

7/25/25, 12:05 AM                              Loans | My Aid | Federal Student Aid

Dashboard   •   My Aid

# My Aid

| LOANS | GRANTS |
|---|---|

**Download My Aid Data**   Learn More

---

🛈  **STUDENT AID TIP**
Making payments while you are in a deferment or forbearance can save you money in interest.

---

## 19 Loans

*3 Servicers*
*Total original amount awarded: $118,952*

### View Breakdown

**$81,237.85**
Total Balance ⓘ

$80,363.06
Principal ⓘ

$874.79
Interest ⓘ

**HELPFUL LINKS**

Explore Repayment Options

Try the Loan Simulator

Learn About Public Service Loan Forgiveness (PSLF)

Explore Income-Driven Repayment Options

Learn About Loan Consolidation

## J.  EXHIBIT: 2021 EMAIL FROM SCU RE: MPN

10/30/25, 3:57 PM                    (2887) All mail | ashleymgjovik@protonmail.com | Proton Mail

## ACTION REQUIRED-Master Promissory Note needed

From   SCU LawFinancialAid <lawfinancialaid@scu.edu>

BCC    Ashley Gjovik <AGjovik@scu.edu>

Date   Tuesday, August 10th, 2021 at 11:51 AM

You are receiving this email because you have not completed one or more of the required Master Promissory Notes (MPN). MPN's are needed for both the unsubsidized loan AND the PLUS loan. Please follow the instructions below. You can check the status of your submitted requirements on studentaid.gov (screen shots below). **We are notified electronically when it is complete so you do not need to respond to this email.**





# K. EXHIBIT: MAXIMUS EDUCATION, LLC LICENCES

10/29/25, 12:17 PM                                        Consumer Access - Company





## Maximus Education, LLC

| NMLS ID: 2241381 | Street Address: 1600 Tysons Boulevard Suite 1400 McLean, VA 22102 Mailing Address: 1600 Tysons Boulevard Suite 1400 McLean, VA 22102 | Phone: 703-712-4000 Toll-Free Number: 800-722-1300 Fax: Not provided | Website: https://www.aidvantage.studentaid.gov Email: licensing@maximus.com |

Other Trade Names : Aidvantage

Prior Other Trade Names : None

Prior Legal Names : None

Sponsored MLOs : 0

| Fiscal Year End: 09/30 | Formed in: Delaware, United States | Date Formed: 09/01/2021 | Stock Symbol: None | Business Structure: Limited Liability Company |

Regulatory Actions : None posted in NMLS.

**Branch Locations**  No Branch Locations in NMLS

**State Licenses/Registrations**  (Displaying 19 Active of 19 Total)

| Regulator | Lic/Reg Name | Authorized to Conduct Business | Consumer Complaint |
|---|---|---|---|
| **Arizona** | Collection Agency License | Yes | **Submit to Regulator** |
| **California - DFPI** | Student Loan Servicing License | Yes | **Submit to Regulator** |
| **Connecticut** | Federal Student Loan Servicer Registrant | Yes | **Submit to Regulator** |
| **Idaho** | Collection Agency License | Yes | **Submit to Regulator** |
| **Illinois** | Student Loan Servicer License | Yes | **Submit to Regulator** |
| **Kentucky** | Federal Student Loan Servicer License | Yes | **Submit to Regulator** |
| **Maine** | Student Loan Servicer | Yes | **Submit to Regulator** |
| **Maryland** | Collection Agency License | Yes | **Submit to Regulator** |
| **Massachusetts** | Automatic Federal Student Loan Servicer License | Yes | **Submit to Regulator** |

| Lic/Reg #: AFSLS2241381 | Original Issue Date : 11/01/2021 |
|---|---|

| Status : Approved | Status Date: 06/05/2025 | Renewed Through : 2025 |

Other Trade Names used in Massachusetts : Aidvantage

| Start | End | Authorized to Conduct Business |
|---|---|---|
| 11/1/2021 | Present | Yes |

View Resident/Registered Agent(s) for Service of Process ▸

View Resident/Registered Agent(s) for Service of Process ▸

| | | | |
|---|---|---|---|
| Minnesota | Student Loan Servicer - Federal Contract | Yes | **Submit to Regulator** |
| Montana | Consumer Loan License | Yes | **Submit to Regulator** |
| New Jersey | Federal Contract Student Loan Servicer License | Yes | **Submit to Regulator** |
| New York | Student Loan Servicer License | Yes | **Submit to Regulator** |
| North Dakota | Collection Agency License | Yes | **Submit to Regulator** |
| Oregon | Student Loan Servicer License - Federal Contract | Yes | **Submit to Regulator** |
| Rhode Island | Student Loan Servicer Registration | Yes | **Submit to Regulator** |

https://www.nmlsconsumeraccess.org/EntityDetails.aspx/COMPANY/2241381                                           1/2

---

10/29/25, 12:17 PM                               Consumer Access - Company

| | | | |
|---|---|---|---|
| **South Dakota** | Money Lender License | Yes | **Submit to Regulator** |
| **Virginia** | Qualified Education Loan Servicer-Federal Contractor | Yes | **Submit to Regulator** |
| **Washington** | Consumer Loan Company License | Yes | **Submit to Regulator** |

| | |
|---|---|
| Regulatory Actions | While some state and federal agencies may add actions taken in previous years against a licensee, the majority are adding only new actions from 2012 or later. To view complete information regarding regulatory actions posted by the agency, click any regulator link. |

No regulatory actions have been posted in NMLS.

Information made available through NMLS Consumer Access<sup>SM</sup> is derived from NMLS (Nationwide Multistate Licensing System / Nationwide Mortgage Licensing System and Registry), the financial services industry's online registration and licensing database. NMLS was created by the **Conference of State Bank Supervisors (CSBS)** and the **American Association of Residential Mortgage Regulators (AARMR)** and is owned and operated by the **State Regulatory Registry LLC (SRR)**, a wholly owned subsidiary of CSBS. For more information about the System, please visit the NMLS Resource Center or the **NMLS Federal Registry Resource Center** websites. | **Download PDF Reader**

## L. EXHIBIT: MAXIMUS "FIN PROC CLERK III – CLAIMS (AIDVANTAGE)"

10/30/25, 1:31 AM                          Fin Proc Clerk III - Claims (Aidvantage) at MAXIMUS 95276

## MAXIMUS

# Fin Proc Clerk III - Claims (Aidvantage)

| | | |
|---|---|---|
| $ | Pay | $19.00 - $24.00 / hour |
| ⦿ | Location | Remote |
| ⏱ | Employment type | Full-Time |

**This job is now closed**

Apply to similar jobs

Job Description                                                    ⌃

Req#: 95276

Employer Industry: Business Process Management and Technology Solutions

Why Consider this Job Opportunity:
- Competitive pay up to $24.00 an hour
- Opportunity for growth and career advancement within the organization
- Work remotely with a hardwired internet connection
- Private work area and adequate power source provided
- Chance to contribute to improved outcomes for citizens and government-sponsored programs

What to Expect (Job Responsibilities):
- Work on moderately difficult assignments, resolving issues and ensuring the integrity of accounting/financial data
- Prepare account reconciliations and various analyses supporting month end/quarter end financials

https://www.talentify.io/job/fin-proc-clerk-iii-claims-aidvantage---maximus-95276                          1/3

10/30/25, 1:31 AM                    Fin Proc Clerk III - Claims (Aidvantage) at MAXIMUS 95276

- Collaborate with team members to deliver high-quality results

What is Required (Qualifications):
- High School diploma or equivalent with Associates degree and/or 2-4 years of experience
- Additional training or education in area of specialization
- Must reside in the U.S.
- Must be a U.S. citizen
- Must be able to pass a criminal background check

How to Stand Out (Preferred Qualifications):
- FSA Department of Education experience preferred

#BusinessProcessManagement #TechnologySolutions #RemoteWork #CompetitivePay
#CareerOpportunity

We prioritize candidate privacy and champion equal-opportunity employment. Central to our
mission is our partnership with companies that share this commitment. We aim to foster a fair,
transparent, and secure hiring environment for all. If you encounter any employer not
adhering to these principles, please bring it to our attention immediately.
We are not the EOR (Employer of Record) for this position. Our role in this specific opportunity
is to connect outstanding candidates with a top-tier employer.

About the company                                                                          ⌄

Notice

Talentify is an Equal Opportunity Employer. All qualified applicants will receive consideration for employment without
regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or protected veteran
status.

Talentify provides reasonable accommodations to qualified applicants with disabilities, including disabled veterans.
Request assistance at accessibility@talentify.io or 407-000-0000.

Federal law requires every new hire to complete Form I-9 and present proof of identity and U.S. work eligibility.

An Automated Employment Decision Tool (AEDT) will score your job-related skills and responses. Bias-audit & data-
use details: www.talentify.io/bias-audit-report. NYC applicants may request an alternative process or accommodation
at aedt@talentify.io or 407-000-0000.

Other job opportunities

## M. EXHIBIT: MAXIMUS "COUNSEL – STUDENT LOAN COMPLAINCE"



10/30/25, 1:45 AM                              Counsel - Student Loan Compliance - Maximus

See more jobs

**Counsel - Student Loan Compliance**

Maximus    Manchester, NH    30+ days ago

| Apply |
| --- |

**Want to know if you're a fit?**
**Upload your resume and let our AI show you.**

| Upload Resume |
| --- |

| Have An Account? Log In |
| --- |

### Description

Description & Requirements

The Counsel, Student Loan Compliance will oversee the Compliance Management System, ensuring regulatory compliance and effective operation. In addition, this person will manage the maintenance of risk assessments for Department of Education programs, review and revise compliance standard operating procedures, and provide legal support for compliance issues. This position will report to the Assistant General Counsel- Student Loans.

Essential Duties and Responsibilities:

- Assess, update, and oversee the operation of the company's Compliance Management System, including regulatory change management, consumer complaint response, and audit remediation.

- Manage the maintenance of the Company's regulatory risk assessment for the Department of Education programs.

- Review, update, and revise compliance standard operating procedures.

- Provide legal guidance for the tracking, response to, and management of identified compliance issues.

https://www.monster.com/job-openings/counsel-student-loan-compliance-manchester-nh--1a0bc0f0-aa82-473c-b130-1e9193a45d8e                1/5

- Review training materials; operational policies and procedures; regulatory compliant responses; and borrower-facing materials to ensure these materials align with contractual requirements, federal law, and state law.

- Manage legal research related to state licensing and servicing requirements. Establish policies and practices that minimize legal risk.

- Provide legal counsel and support for regulatory examination response

- Work closely with the Assistant General Counsel - Federal Student Loan Compliance with managing the day-to-day operations of the department and legal questions from operational management.

Minimum Requirements

- JD from an accredited law school and admission to one or more State Bars is required.

- 7-10 years of experience

Additional Minimum Requirements:

- Legal experience specific to student loan servicing compliance at a government agency, law firm, and/or in-house environment

#TrendingJobs #HotJobs0528LI #HotJobs0528FB #HotJobs0528X #HotJobs0528TH #HotJobs0624LI #HotJobs0624FB #HotJobs0624X #HotJobs0624TH
EEO Statement

Maximus is an equal opportunity employer. We evaluate qualified applicants without regard to race, color, religion, sex, age, national origin, disability, veteran status, genetic information and other legally protected characteristics.

Pay Transparency

Maximus compensation is based on various factors including but not limited to job location, a candidate's education, training, experience, expected quality and quantity of work, required travel (if any), external market and internal value analysis including seniority and merit systems, as well as internal pay alignment. Annual salary is just one component of Maximus's total compensation package. Other rewards may include short- and long-term incentives as well as program-specific

## N. EXHIBIT: CFPB WARNING RE: BANKRCUPY DISCHARGE & UNLAWFUL COLLECTION

BILLING CODE:  4810-AM-P

**BUREAU OF CONSUMER FINANCIAL PROTECTION**

**12 CFR Chapter X**

**Bulletin 2023-01:** Unfair Billing and Collection Practices After Bankruptcy Discharges of Certain Student Loan Debts

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Compliance bulletin and policy guidance.

**SUMMARY:** The Consumer Financial Protection Bureau (CFPB) is issuing this Compliance Bulletin and Policy Guidance (Bulletin) to address the treatment of certain private student loans (hereinafter referred to as "student loans") following bankruptcy discharge.  In order to secure a discharge of "qualified education loans" in bankruptcy, borrowers must demonstrate that the loans would impose an undue hardship if not discharged.  Student loans that are not "qualified education loans" (hereinafter referred to as "non-qualified student loans"), however, are discharged under standard bankruptcy discharge orders.  In recent supervisory work, CFPB examiners identified servicers that did not determine whether education loans were qualified or non-qualified.  As a result, servicers improperly returned non-qualified education loans to repayment after a bankruptcy concluded and continued to bill and collect payments on the loans, even though the borrowers' bankruptcy discharges released them from these debts.  This conduct violated the Consumer Financial Protection Act's (CFPA's) prohibition on unfair, deceptive, or abusive acts or practices.  CFPB examiners directed the servicers to cease collection of discharged loans and take remedial action, which includes conducting a multi-year lookback and issuing refunds to affected consumers.  In its oversight, the CFPB will pay particular attention to servicers' practices in connection with student loans that are the subject of bankruptcy discharge

1

orders, including whether discharged debts are being collected contrary to bankruptcy court orders.

**DATES:** This bulletin is applicable on **[INSERT DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].**

**FOR FURTHER INFORMATION CONTACT:** Miya Tandon, Counsel, Office of Supervision Policy, at 202-695-4901; Matt Liles, Senior Counsel, Office of Supervision Policy, at 202-701-3828. If you require this document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov.*

**SUPPLEMENTARY INFORMATION:**

I.      **Background**

After a debtor files for bankruptcy, a judge issues an order of discharge that releases a debtor from personal liability for all debts unless they are exempted. Some types of student loans are not discharged by general orders of discharge and receive special treatment under section 523(a)(8) of the Bankruptcy Code. Borrowers with these obligations must prove the debt would impose an undue hardship if not discharged. The Bankruptcy Code identifies these debts as:

   a.   Loans that are made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution;

   b.   Loans that meet the definition of a "qualified education loan," as defined in section 221(d)(1) of the Internal Revenue Code of 1986;[1] or

   c.   Obligations to repay funds received as an educational benefit, scholarship, or stipend.[2]

The Internal Revenue Code specifies that qualified education loans are those that are incurred:

_____

[1] 11 U.S.C. 523(a)(8).
[2] 11 U.S.C. 523(a)(8)(A)(ii).

1. Solely to pay for the cost of attendance less scholarships or certain other payments;

2. At institutions eligible to participate in Federal student aid programs under Title IV of the Higher Education Act of 1965; and

3. While attending at least half-time.[3]

In practice, the majority of student loans meet one of the criteria for special treatment under the Bankruptcy Code, and therefore, are not discharged by a general order of discharge.[4]

Importantly, however, some loans for educational purposes that borrowers may think of as "private student loans" are not exempt from the general order of discharge,[5] including:

- Loans made to attend non-Title IV schools (that is, schools that are not permitted to process U.S. Federal student aid, such as unaccredited schools and foreign schools);[6]

- Loans made to cover fees and living expenses incurred while studying for the bar exam or other professional exams;[7]

- Loans made to cover fees, living expenses, and moving costs associated with medical or dental residency;

- Loans made in amounts in excess of the cost of attendance;[8]

---

[3] 26 U.S.C. 221(d)(1).
[4] For example, the majority of student loans are Federal loans made or insured under Title IV of the Higher Education Act. *See* Report of the CFPB Education Loan Ombudsman, https://files.consumerfinance.gov/f/documents/cfpb_education-loan-ombudsman_report_2022-10.pdf (Oct. 2022), pp. 7-8.
[5] *See, e.g., In re McDaniel*, 590 B.R. 537, 545 (Bankr. D. Colo. 2018) (noting that merely labeling a product a "student loan" does not subject it to the undue hardship standard); *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 605 (2d Cir. 2021); *In re McDaniel*, 973 F.3d 1083, 1092 (10th Cir. 2020); *In re Crocker*, 941 F.3d 206 (5th Cir. 2019), as revised (Oct. 22, 2019).
[6] *See Crocker*, 941 F.3d at 217-18 (noting that qualified educational expenses must be used to attend an "eligible educational institution," which section 25A(f)(2) of the Internal Revenue Code defines as eligible to participate in Title IV programs).
[7] *Id.* (bar study loan subject to standard bankruptcy discharge); *see also In re Campbell*, 547 B.R. 49, 61 (Bankr. E.D.N.Y. 2016).
[8] 26 U.S.C. 221(d)(2) (limiting a qualified educational expense to "the cost of attendance"); *see, e.g., Homaidan*, 3 F.4th at 599 (affirming discharge of loans made in excess of the cost of attendance).

3

- Loans to students attending school less than half-time;[9] and

- Other loans made for non-qualified higher education expenses.[10]

Any private loans in these categories are discharged by standard bankruptcy discharge orders, just like most other unsecured consumer debts.[11]  In addition to not fitting the definition of "qualified education loan," these loans are not made, insured, or guaranteed by a governmental unit, and are not educational benefits, scholarships, or stipends.  The obligations at issue here are originated as loans requiring repayment; educational benefits, scholarships, and stipends, in contrast, are grants, where repayment is only triggered if the student fails to meet a condition of the grant.  Indeed, the Second, Fifth, and Tenth Circuits – the only circuits to analyze the issue fully – have held that the educational benefit exclusion does not apply to student loans.[12]

## II.    Unfair Acts or Practices in Handling Student Loans Post-Bankruptcy

The CFPB has authority to conduct oversight of student loan servicing, including by citing servicers for unfair, deceptive, or abusive acts or practices.[13]  Congress defined an unfair act or practice as one that:

(A) Causes or is likely to cause substantial injury to consumers which is not reasonably avoidable, and

(B) Such substantial injury is not outweighed by countervailing benefits to consumers or to competition.[14]

---

[9] *See* 26 U.S.C. 221(d)(1)(C) (defining a "qualified education loan" as a loan made to an "eligible student"); 20 U.S.C. 1091(b)(3) (defining "eligible student" as someone attending at least half-time).
[10] 26 U.S.C. 221(d)(1) (requiring a qualified education loan only be used to pay "qualified higher education expenses").
[11] *See, e.g., Homaidan,* 3 F.4th at 605; *McDaniel,* 973 F.3d at 1092; *Crocker,* 941 F.3d at 206.
[12] *See Homaidan,* 3 F.4th at 604-05; *McDaniel,* 973 F.3d at 1092; Crocker, 941 F.3d at 224.
[13] *See* title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) (establishing the CFPB's authority).  Under the Dodd-Frank Act, all covered persons or service providers are prohibited from committing unfair, deceptive, or abusive acts or practices in violation of the Act.
[14] 12 U.S.C. 5531(c)(1).

4

Through its supervisory activities, CFPB examiners found that servicers of various types of student loans failed to maintain policies or procedures for distinguishing between loan types that are discharged in the regular course of a bankruptcy proceeding (generally, non-qualified education loans) and loan types that require consumers to initiate an adversarial proceeding and meet the "undue hardship" standard to receive bankruptcy relief. Some servicers relied entirely on loan holders to distinguish among the loans and did not determine whether holders had in fact done so. Nor did they take any other steps to evaluate whether or not the loans were qualified education loans. Consequently, examiners identified accounts where servicers, following a bankruptcy involving non-qualified education loans, resumed collecting on loans that had been discharged by bankruptcy courts.

CFPB examiners determined that student loan servicers engaged in an unfair act or practice, in violation of the Dodd-Frank Act, when they resumed collection of debts that were discharged by bankruptcy courts.[15] The conduct caused or was likely to cause substantial injury to consumers because the representations made to consumers in billing statements and other collection attempts were likely to result in consumers making payments they did not owe. In fact, CFPB examiners also observed that after exiting bankruptcy and being presented with bills from their student loan servicers, most borrowers made payments toward the debts, sometimes paying thousands of dollars on discharged debts. Since the consumers could not control the servicers' actions, consumers could not reasonably avoid the injury. Lastly, the substantial injury was not outweighed by countervailing benefits to consumers or competition, as there was

---

[15] Depending on the facts and circumstances, returning consumers to repayment status on debts discharged in bankruptcy may also implicate deceptive or abusive acts or practices, or other unfair acts or practices under the CFPA, sections 1031, 1036; 12 U.S.C. 5531, 5536.

5

no value to consumers or competition in servicers collecting debts that had already been discharged by operation of bankruptcy court orders.

In addition to directing the servicers to revise their policies and procedures to prevent the collection of discharged loans, CFPB examiners directed them to do a multi-year lookback resulting in refunds to affected borrowers.[16]

### III.    Supervision and Enforcement

The CFPB's supervisory observations and consumer complaints show that servicers continued to make collection attempts on student loans that were discharged through bankruptcy in many instances.  This conduct violates Federal consumer financial law.[17]  The CFPB expects servicers to proactively identify student loans that are discharged without an undue hardship showing and permanently cease collections following a standard bankruptcy discharge order. The CFPB is prioritizing student loan servicing oversight work in deploying its supervision and enforcement resources in the coming year, including a focus on evaluating whether lenders and servicers cease collection of student loans once they have been discharged.[18]

In its student loan servicing oversight work, the CFPB plans to pay particular attention to:

a.    Whether student loan servicers continue to collect on loans that are discharged by a bankruptcy discharge order;

---

[16] In addition, CFPB examiners have separately cited student loan servicers for deceptive conduct that violates the CFPA when the servicers misrepresented to consumers that student loans are never dischargeable in bankruptcy or conveyed to consumers that their loans are not dischargeable because those consumers have completed bankruptcy. *Supervisory Highlights, Fall 2014*, section 2.5.5, https://files.consumerfinance.gov/f/201410_cfpb_supervisory-highlights_fall-2014.pdf and *Supervisory Highlights, Fall 2015*, section 2.5.3, https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf.

[17] Practices of this kind might also violate State laws, including State prohibitions on unfair or deceptive practices and State student loan servicing statutes.

[18] To the extent that continued attempts to collect result in improper accrual and collection of interest on discharged education loans, such practices may result in the provision of any report of examination or related information identifying possible tax law noncompliance to the Commissioner of Internal Revenue, per 12 U.S.C. 5514(b)(6).

b. Whether servicers and loan holders have adequate policies and procedures to identify loans that are discharged by a bankruptcy discharge order and loans that require the borrower to go through an adversarial proceeding to demonstrate that they meet the undue hardship standard; and

c. Whether servicers provide accurate information to borrowers about the status of their loans and the protections that bankruptcy offers.[19]

In exercising its supervisory and enforcement discretion, the CFPB will consider the extent to which entities engage in proactive review and remediation. For example, where servicers or loan holders identify errors, they can expand their analysis to include a review of all accounts exiting bankruptcy going back to their earliest available data and provide full remediation where they wrongfully collected from any borrower. In addition, servicers can proactively categorize loans based on whether they can be discharged, so their policies and procedures do not require individual determinations at the time of bankruptcy. In future supervisory and enforcement work, the CFPB will assess servicers' processes and determine whether necessary remediation was adequate to compensate borrowers for the errors.

## IV.    Conclusion

The CFPB will continue to review closely the practices of student loan servicers for potential unfair, deceptive, or abusive acts or practices. Examiners will determine whether servicers of private student loans return loans to repayment status after a standard bankruptcy discharge has released the borrowers from these debts. The CFPB will use all appropriate tools, including its supervisory authority, enforcement authority, and referrals to State and other

---

[19] This list is not exhaustive. The CFPB may also scrutinize additional practices related to discharged student loans.

Federal authorities where appropriate to hold entities accountable if they engage in unfair, deceptive, or abusive acts or practices in connection with these bankruptcy-related practices.

**V.    Regulatory Requirements**

This is a general statement of policy under the Administrative Procedure Act (APA). It is intended to provide information regarding the CFPB's general plans to exercise its supervisory and enforcement discretion for institutions under its jurisdiction and does not impose any legal requirements on external parties, nor does it create or confer any substantive rights on external parties that could be enforceable in any administrative or civil proceeding. Because no notice of proposed rulemaking is required in issuing the Bulletin, the Regulatory Flexibility Act also does not require an initial or final regulatory flexibility analysis. The CFPB has also determined that the issuance of the Bulletin does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring approval by the Office of Management and Budget under the Paperwork Reduction Act.

**Rohit Chopra,**

*Director, Consumer Financial Protection Bureau.*

## O. EXHIBIT: MANRIQUEZ V. DEVOS (CONTEMPT)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, et al., | Case No.  17-cv-07210-SK |
| Plaintiffs, | **ORDER REGARDING SANCTIONS** |
| v. | Regarding Docket Nos. 125, 126 |
| ELISABETH DEVOS, et al., | |
| Defendants. | |

On June 19, 2018, this Court issued a preliminary injunction.  (Dkt. 70.)  There is no dispute that Defendants have violated the preliminary injunction issued in this case.  (Dkts. 125, 126.)  Through counsel, Defendants express regret and argue that remedial measures are the most appropriate response to their conduct.  (Dkt. 125.)  In contrast, Plaintiffs argue that Defendants should be held in civil contempt and subject to monetary sanctions for their noncompliance.  (Dkt. 126.)  Having carefully considered the submissions of the parties, relevant legal authority, and the record in the case, and having had the benefit of oral argument, the Court HEREBY FINDS Defendants in CIVIL CONTEMPT and ORDERS that Defendants pay SANCTIONS in the amount of $100,000, for the reasons set forth below.

### BACKGROUND

This matter arises out of the claims of approximately 110,000 students who attended schools operated and owned by Corinthian Colleges, Inc. ("Corinthian"), who sought or seek relief from their student loans from the Department of Education (the "Department"), and who challenge the method developed by Secretary DeVos (the "Secretary") for determining whether the students are eligible for relief (the Department of Education and Secretary DeVos, collectively "Defendants").

United States District Court
Northern District of California

1    Plaintiffs allege that, before 2017, the Defendants used a process that Plaintiffs call the
2    "Corinthian Job Placement Rate Rule" or "Corinthian Rule" by which the Defendants provided
3    full relief from federal loans to students who attended certain Corinthian programs. (Dkts. 35, 47.)
4    Between 2010 to 2014, Corinthian made false and misleading statements regarding Corinthian's
5    job placement rates. (*Id.*) A summary of the relevant programs and related dates of enrollment
6    were posted on the Department's website in two documents referred to as the "Lists." (Dkt. 35-6.)
7    Students who attended the programs identified on the Lists could submit an attestation form
8    seeking relief from their federal loans. (Dkts. 35, 47.)

9    Starting on January 20, 2017, Defendants stopped processing claims under the Corinthian
10   Rule. (*Id.*) After abandoning the Corinthian Rule, Defendants implemented a new rule in which
11   they instead granted partial to full relief for borrowers who had attended the Corinthian schools.
12   (*Id.*) There is no dispute that Defendants created and used a new methodology, which Plaintiffs
13   named the "Average Earnings Rule," to determine which borrowers are entitled to relief from their
14   student loans and how much relief they should obtain. (Dkt. 60.) There is also no dispute that
15   Defendants used information obtained from the Social Security Administration in implementing
16   the Average Earnings Rule. (Dkt. 60.) Plaintiffs allege that Defendants' action in obtaining
17   information from the Social Security Administration violates the Privacy Act of 1974, 5 U.S.C. §
18   552a. (Dkt. 58, ¶¶ 279-302.)

19   Plaintiffs sought, among other forms of relief, full relief for all students who had attended
20   the Corinthian schools during the designated time period. (Dkt. 58, ¶ 257.) Plaintiffs posited
21   several other, independent reasons why the Defendants' abandonment of the Corinthian Rule is
22   illegal: (1) the action is arbitrary, capricious, and unlawful, (2) the action constitutes arbitrary,
23   unlawful retroactive lawmaking in violation of 5 U.S.C. §§ 706(2)(A) and (C), and (3) the action
24   is a violation of due process. (Dkt. 58, ¶¶ 279, 303-319.) In addition, Plaintiffs attacked the
25   Defendants' inaction during a long period of time when the Corinthian Rule was not in place but
26   Defendants provided no relief. (Dkt. 58, ¶¶ 280-296.) Plaintiffs challenged that inaction as the
27   unlawful withholding of agency action and unreasonably delayed agency action. (*Id.*)
28   On May 25, 2018, the Court granted in part and denied in part Plaintiffs' motion for

2

1    preliminary injunction. (Dkt. 60.)  The Court granted Plaintiffs' request to enjoin Defendants

2    from engaging in collection efforts of Plaintiffs' loans using the Average Earnings Rule and

3    ordered Defendants to "cease all efforts to collect debts from Plaintiffs and any other borrower

4    who has successfully completed an attestation form." (Dkt. 70.)  The Court also ordered the

5    Defendants to halt any action to collect a loan from Plaintiffs and other students who fall into the

6    previously-identified groups and to provide forbearance to that group of students. (Dkt. 70.)

7        In turn, Defendants appealed the Court's ruling to the Ninth Circuit Court of Appeal. (Dkt.

8    81.)  With the exception of Plaintiffs' then-pending motion for class certification (Dkt. 47), the

9    Court stayed the proceedings pending appeal before the Ninth Circuit. (Dkt. 88.)  The parties

10   appeared for oral argument before the Ninth Circuit on February 8, 2019, and both parties filed

11   supplemental briefing with the circuit court on March 5, 2019. (Dkt. 126.)  The Ninth Circuit has

12   yet to render an opinion on the appeal.  The Court certified a class of Plaintiffs on October 15,

13   2018. (Dkt. 96.)  On July 15, 2019, Plaintiffs filed a motion to lift the stay and enforce the

14   preliminary injunction, and Plaintiffs notified the Court that Defendants were in substantial

15   noncompliance with the preliminary injunction. (Dkt. 103.)  Defendants opposed the motion (Dkt.

16   104), and the Court heard oral argument on August 19, 2019.  The Court denied the motion to lift

17   the stay without prejudice and ordered Defendants to file a report regarding the status of

18   compliance with the preliminary injunction.

19       Defendants filed their compliance report on September 18, 2019 (the "Compliance

20   Report"). (Dkt. 111.)  The Compliance Report indicated that the Department had erroneously sent

21   16,034 notices that payments were due to Corinthian borrowers.[1] (*Id.* at 17.)  In response to those

22   notices, 3,298 Corinthian borrowers made one or more payments. (*Id.*)  As of the time of the

---

[1] Defendants must individually review each application for federal loan relief to determine whether the applicant falls within the class certified by the Court. (Dkt. 111-2 n.2.)  Because Defendants have not yet completed the process of determining which applicants are class members, Defendants have construed the Court's preliminary injunction as applying to all applicants for federal loan relief who attended Corinthian schools until each applicant's class status has been determined.  The total potential class consists of 74,781 individuals who have either received partial relief under the Average Earnings Rule or who have a pending application for relief.  The Court agrees that the preliminary injunction applies to all potential Corinthian borrowers who may be members of the certified class and refers to those individuals herein as "Corinthian borrowers."

3

1   report, the Department had not fully identified the Corinthian borrowers affected by the incorrect

2   notices, had not yet sent them a notice describing the error, and had not yet issued any refunds for

3   the payments received in violation of the injunction. (*Id.*) The Department also mistakenly

4   notified at least 3,000 Corinthian borrowers that their loans were entering repayment, rather than

5   stopped collection or forbearance status. (*Id.*) After the preliminary injunction was issued,

6   Defendants provided adverse reports to credit reporting agencies for 847 Corinthian borrowers and

7   collected on the loans of 1,808 Corinthian borrowers through wage garnishment or offsets from

8   tax refund. (*Id.*)

9         Before Plaintiffs' discovery of the noncompliance and the Court's intervention,

10   Defendants' efforts to comply with the preliminary injunction were limited to sending electronic

11   mail messages to their third-party companies that service the loans. (*Id.*) Defendants entered into

12   contracts with nine different federal loan servicers to manage non-defaulted loans and one

13   contractor to manage defaulted loans. (Dkt. 111-2 at 12.) After the Court entered the preliminary

14   injunction, Defendants sent what they call "guidance" regarding the injunction to their servicers.

15   (Dkt. 111-2.) The "guidance" consists of a single email with three brief sentences of instruction

16   and an equally cursory three sentence notification to be sent to affected borrowers. (Dkt. 111-5.)

17   Sent on May 29, 2018, the email was only sent to the service providers managing the accounts of

18   the named plaintiffs and declarants in this action. (Dkt. 111-2 at 16.) Only on July 5, 2018, did

19   Defendants email all service providers with that it styled a "Forbearance Request for Partially

20   Approved Claims" instructing them to place an attached list of borrowers in forbearance. (Dkt.

21   111-6.) The email does not even mention the existence of the preliminary injunction. (*Id.*)

22   Defendants report that they received email confirmation from only eight of the nine servicers that

23   they had followed the instructions. (Dkt. 111-2 at 17.) Defendants sent no follow-up emails and

24   took no further action to ensure compliance with the preliminary injunction prior to Plaintiffs'

25   realization that Defendants had violated the preliminary injunction. (Dkt. 111-2.)

26         Defendants' Compliance Report is silent as to the normal actions one would expect from

27   an entity facing a binding court order: multiple in-person meetings or telephone calls to explain

28   the preliminary injunction and to confirm that the contractors were complying with the

United States District Court
Northern District of California

4

1    preliminary injunction. Defendants' attempt to comply with the preliminary injunction consisted

2    of a single email to each service provider and partial confirmation of receipt of those emails.

3                                              **ANALYSIS**

4            A Court may hold a party in civil contempt when the party has displayed "disobedience to

5    a specific and definite court order by failure to take all reasonable steps within the party's power

6    to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir.

7    1993). A party's behavior "need not be willful" to justify a finding of civil contempt. *In re*

8    *Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987). "[T]here is no good

9    faith exception to the requirement of obedience to a court order." *Dual-Deck*, 10 F.3d at 695;

10   *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("it matters not with what intent the

11   [contemnor] did the prohibited act"). "Substantial compliance" is a defense to civil contempt that

12   exists where there are a few minor violations despite the fact that "every reasonable effort has

13   been made to comply." *Id.* (citing *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1378-

14   79 (9th Cir. 1986). Like private parties, government agencies and officials may be subject to civil

15   contempt. *See Sierra Club v. Ruckelshaus*, 602 F. Supp. 892, 903 (N.D. Cal. 1984).

16           Civil contempt is coercive. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512

17   U.S. 821, 828 (1994) (noting that "[t]he paradigmatic coercive, civil contempt sanction […]

18   involves confining a contemnor indefinitely until he [or she] complies with an affirmative

19   command"). Thus, "the contemnor is able to purge the contempt […] by committing an

20   affirmative," remedial act. *Id.* Sanctions for civil contempt are also appropriate "to (1) compel or

21   coerce obedience to a court order, and/or (2) compensate the contemnor's adversary for injuries

22   resulting from the contemnor's noncompliance." *Ahearn ex rel. N.L.R.B. v. Int'l Longshore &*

23   *Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1131 (9th Cir. 2013). In considering what

24   sanctions are justified, "[t]he private or public rights that the decree sought to protect are an

25   important measure of the remedy." *McComb*, 336 U.S. at 191. When civil contempt is at issue,

26   the party moving for a contempt finding bears the burden of showing by clear and convincing

27   evidence that contemnors violated a specific and definite order of the court. *F.T.C. v. Affordable*

28   *Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (quoting *Stone v. City and County of San Francisco*,

                                                   5

United States District Court
Northern District of California

1    968 F.2d 850, 856 n.9 (9th Cir. 1992)).  "The burden then shifts to the contemnors to demonstrate

2    why they were unable to comply."  *Id.*  Good faith – or the absence thereof – "may help to

3    determine an appropriate sanction."  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019)

4    (discussing *McComb*, where "persistent contumacy" justified sanctioning the contemnor).

5            Here, there is no question that Defendants violated the preliminary injunction.  There is

6    also no question that Defendants' violations harmed individual borrowers who were forced to

7    repay loans either through voluntary actions or involuntary methods (offset from tax refunds and

8    wage garnishment) and who suffered from the adverse credit reporting.  Defendants have not

9    provided evidence that they were unable to comply with the preliminary injunction, and the

10   evidence shows only minimal efforts to comply with the preliminary injunction.  The Court

11   therefore finds Defendants in civil contempt.

12           The only question is the type of relief that is appropriate in this situation.  The Court finds

13   that a monetary sanction of $100,000, paid by Defendants, to a fund held by Plaintiffs' counsel, is

14   the best method to remedy Defendants' wrongful acts.  Given that there are over 16,000 borrowers

15   who have suffered damages from Defendants' violation of the preliminary injunction and given

16   that there may be some administrative expenses to remedy the harm, the Court finds the amount

17   reasonable.

18           The Court ORDERS the parties to meet and confer regarding the method by which

19   Plaintiffs will set up the fund and administer the fund.  As noted above, the Court contemplates

20   that some portion of the fund will be used for administrative expenses.  The parties must submit

21   their proposed plan for administering the fund no later than November 15, 2019.

22           In addition, the Court ORDERS that Defendants provide a status report regarding their

23   attempts to comply with the preliminary injunction on a monthly basis beginning November 1,

24   2019, to be filed no later than the first of each successive month.  Each report must include the

25   following information:

26           1.      Defendants' progress toward identifying which of the 74,781 potential class

27                   members are class members;

28           2.      The repayment status of each potential and confirmed class member;

United States District Court
Northern District of California

6

3.    Whether each potential and confirmed class member was erroneously taken out of forbearance or stopped collections status and whether the correct status has been restored;

4.    Whether each potential and confirmed class member made a payment or multiple payments due to Defendants' negligence, and whether refunds have been issued;

5.    Whether each potential and confirmed class member was erroneously subjected to wage garnishment or tax offset due to the Defendants' negligence, and whether refunds have been issued;

6.    Whether each potential and confirmed class member was subject to adverse credit reporting due to Defendants' negligence, and whether each false credit report has been corrected;

7.    Whether each potential and confirmed class member has received the revised notice of Defendants' noncompliance, to be approved by the Court;

8.    Whether Defendants have established a hotline and webpage specifically for Corinthian borrowers;

9.    Any other information relevant to the Defendants' compliance with the preliminary injunction.

The Court further ORDERS that Defendants submit a revised notice to be sent to the entire potential class regarding Defendants' noncompliance with the preliminary injunction and their forthcoming efforts to fully comply.  Defendants shall meet and confer with Plaintiffs and submit a proposed notice to the Court for approval no later than November 15, 2019.

///

///

///

///

///

The Court does not foreclose the possibility that, if Defendants fail to comply with preliminary injunction in a timely manner, the Court will impose additional sanctions, including the appointment of a Special Master to ensure compliance with the preliminary injunction.  At this time, the Court will provide Defendants an opportunity to correct the previous mistakes and work with Plaintiffs to compensate the injured individuals.

**IT IS SO ORDERED**.

Dated: October 24, 2019

SALLIE KIM
United States Magistrate Judge

United States District Court
Northern District of California

8

## P. EXHIBIT: MANRIQUEZ V. DEVOS (COMPLIANCE REPORT EX)
Case 3:17-cv-07210-SK   Document 111-2   Filed 09/18/19   Page 12 of 34

collecting payments on the loans, advising borrowers on how to better manage their federal

student loan obligations, responding to customer service inquiries, and performing other

administrative tasks associated with maintaining a loan on behalf of the Department.

The Department works with nine different federal loan servicers for borrowers who are

not in default on their federal student loans, also known as non-defaulted borrowers:

CornerStone, FedLoan Servicing (PHEAA), Granite State – GSMR, Great Lakes Educational

Loan Services, Inc. (Great Lakes), HESC/ Edfinancial, MOHELA, Navient, Nelnet, and OSLA

Servicing. The Department also currently works with one contractor, Maximus, to assist in the

management of defaulted federal student loans. Maximus is also generally known as the Default

Resolution Group (DRG), and its system is sometimes referred to as the Debt Management and

Collections System (DMCS). Collectively, the servicers manage millions of loan records for

federal student loan borrowers.[14]

The federal loan servicers each have their own systems, processes, and procedures, as

well as their own unique contract with the Department. The Department does not have the ability

to directly input directions or controls into the non-default servicers' systems.[15]  Instead, when

the Department needs to perform follow-up with a servicer or directs the servicer to take a

particular action, the Department communicates directly with the servicer and the servicer has

---

[14] An individual federal student loan borrower may have loan records with more than one servicer, and a loan
account may include more than one loan record.
[15] In the Declaration of Sara Hayhurst in Support of the Department's Opposition to Plaintiffs' Motion to Lift Stay
and Enforce Preliminary Injunction ("Hayhurst Declaration") filed previously in this case, it was represented that the
Department does not have access to servicers' systems.  *See* Hayhurst Decl. ¶ 10, ECF No. 104-1.  To clarify, the
Department does not have direct access that allows it to make changes to servicers' records or systems, but some
users at the Department have read-only access to certain non-default servicers' systems.  For defaulted borrowers,
the Department has employees that have direct access to enter data and direct work on a defaulted borrower's loan
records.  However, this type of activity for borrower defense applicants with federal student loans in default has
been managed through the new borrower defense platform, the Customer Engagement Management System
("CEMS"), since the Department's transition of its interactions with the federal loan servicers for borrower defense
purposes to that platform in the fall of 2018, as described later in this section.

9

platform as to whether they have responded to the Department's directives and reflects the
changes servicers have made in their own systems to borrowers' records to respond to the
Department's CEMS system requests in the CEMS system. The new platform ensures the
Department tracks and manages the borrower defense requests and provides a portal to securely
manage borrowers' personally identifiable information.

Prior to the implementation of the CEMS system in the fall of 2018, the Department
implemented changes to the repayment statuses of non-defaulted borrower defense applicants by
communicating directly with their servicers, as appropriate.  For defaulted borrowers, prior to the
fall of 2018, at times Department staff made changes directly to the loan records in DCMS to put
defaulted borrowers in stopped collections status. Since the fall of 2018 and the transition of the
Department's borrower defense-related servicer communications to the CEMS platform, the
Department uses the CEMS platform to communicate needed changes to defaulted borrowers'
repayment statuses to the defaulted loan federal loan servicer, Maximus, and relies on that
servicer to make the requested changes.

***The Department's general instructions to servicers about borrower defense in 2018***

As noted above, even before the Court issued its preliminary injunction, the Department's
practice was to place borrowers who submitted borrower defense applications into forbearance
and stopped collections status, as appropriate.  Under the Department's standard forbearance
policy, a forbearance is limited to 12 months to balance federal taxpayers' exposure and mitigate
potential harm to a borrower with extended forbearances as interest continues to accrue on the
loans. If forbearance or stopped collections status is still necessary at the end of the 12 months,
such as because a borrower defense application is still pending, the Department would send

11

## Q. EXHIBIT: BODOR V. MAXIMUS FDS (DEBT COLLECTOR)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAIMARIA BODOR, <br> Individually and on behalf of all others <br> similarly situated <br><br> Plaintiffs, <br><br> v. <br><br> MAXIMUS FEDERAL SERVICES, INC. <br><br> Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> :     Civil No. 5:19-cv-05787-JMG <br> : <br> : <br> : <br> : <br> : |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                           **October 22, 2021**

### OVERVIEW

Plaintiff Jaimaria Bodor alleges her 2018 tax return was improperly seized by the U.S. government due to a lapse by Defendant Maximus Federal Services, Inc. ("Maximus"), a purported collector of student loan debt, in violation of the Fair Debt Collection Practices Act ("FDCPA"). Before the Court is Defendant's Motion for Summary Judgment, which the Court denies for the reasons discussed below.

### I.    BACKGROUND AND ALLEGATIONS OF PLAINTIFFS

Plaintiff asserts a claim individually and on behalf of a class of similarly situated persons against Defendant for engaging in abusive, deceptive, and unfair debt collection practices prohibited by the FDCPA, 15 U.S.C. §1692. Am. Compl. ¶4, ECF No. 29.

The Department of Education, Office of Federal Student Aid ("FSA"), administers student financial aid programs authorized under Title IV of the Higher Education Act of 1965. 79 Stat.

1

1219. In 2013, FSA entered into a contract with Defendant, a government services company, to operate, maintain, and continue development of FSA's Debt Management and Collection System, ("DMCS"). Defendant's Statement of Facts ("DSOF") ¶ 1, ECF No. 64-1. DMCS is used to service FSA's portfolio of defaulted student loans. *Id.* Congress requires federal agencies to refer delinquent nontax debt, such as defaulted student loan debt, to the U.S. Department of the Treasury ("Treasury") for collection, including through administrative offset, which means withholding funds payable by the United States to satisfy a debt. 31 U.S.C. § 3716(c)(6); DSOF ¶ 7-8 n.1. Pursuant to this authority, Treasury operates a centralized Treasury Offset Program ("TOP"), *see* 31 C.F.R. § 285.5(a)(1), which offsets payments, such as tax refunds, that are intended to be made to a delinquent student loan borrower and applies those payments to any delinquent debts held by FSA. DSOF ¶ 7 n.1.

In 2012, Plaintiff took out two federal loans in order to attend a school owned by the now-defunct for-profit education company, Corinthian Colleges. Plaintiff's Statement of Facts ("PSOF") ¶ 123, ECF No. 69-3. In 2014, after allegedly receiving an inadequate education, Plaintiff defaulted on her loans. PSOF ¶124. Under the Higher Education Act, federal loan borrowers, like Plaintiff, are eligible for loan discharge if the college or university for which the loans were obtained misled them. Am. Compl. ¶ 19.

On March 13, 2019, Plaintiff filed a Borrower Defense to Repayment Application ("BD") to stop collections on her loans, with the specific goal of preventing the forced collection of her 2018 tax refund. PSOF ¶ 127. Once a borrower files a BD application, their loan is stayed from collection. Defendant's Motion for Summary Judgment ("Def. MSJ") 9, ECF No. 64. Defendant is responsible for manually recognizing and applying BD tags to a borrower's account to prevent the DMCS system from referring an account to a private collection agency ("PCAs") or to

2

Treasury for a TOP offset. DSOF ¶ 15; Def. MSJ 21. On April 25, 2019, Plaintiff's 2018 tax

refund of $79.00 was improperly withheld because Defendant delayed in applying a BD tag to

her account. PSOF ¶ 132. The withholding of Plaintiff's tax refund resulted in this lawsuit.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Facts are material if they "might affect the outcome of the suit under the governing law."

*Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine

if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

(quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the

nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and

citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving

party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324

(internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of

the [nonmovant's] position will be insufficient; there must be evidence on which the jury could

reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir.

2015) (quoting *Anderson*, 477 U.S. at 252).

3

### III.    DISCUSSION

#### A.    Standing

Defendant first argues that Plaintiff lacks standing to bring forth her claim. To establish standing under Article III of the Constitution, a plaintiff must (1) demonstrate an injury in fact, which is a harm that is (a) both concrete and actual or imminent, and (b) not conjectural or hypothetical; (2) show causation, which is a fairly traceable connection between the alleged injury in fact and the alleged conduct of a defendant; and (3) demonstrate redressability, which is a substantial likelihood that the requested relief will remedy the alleged injury in fact. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). "The requirements for standing do not change in the class action context." *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017). "Named plaintiffs, [such as Plaintiff], who represent a class must allege and show that they personally have been injured." *Id.*

Defendant claims that Plaintiff can demonstrate neither a concrete injury nor causation to establish standing. Def. MSJ 17. As to the injury element, Defendant argues that Plaintiff did not sustain an injury because the $79.00 that was mistakenly seized from her 2018 tax refund was returned to her six months later. Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("POMSJ") 14, ECF No. 69-2. Plaintiff counters that she suffered direct personal harm by losing the use of her money and the ability to earn interest for six months. *Id.* The Court finds that Plaintiff has suffered an injury. "So long as an injury affects the plaintiff in a personal and individual way, the plaintiff need not suffer any particular type of harm to have standing." *In re Horizon Healthcare Servs. Data Breach Litig.*, 846 F.3d 625, 636 (3d Cir. 2017). "For standing purposes, a loss even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic*

4

*Holding Corp.* 137 S. Ct. 973, 983 (2017). "In fact, several sister circuits have held that temporary loss of use of money is itself a sufficiently concrete injury to establish standing." *Pontes v. Rowan Univ.*, 2021 WL 4145119, at *8 n.5 (3d Cir. Sept. 13, 2021) (citing cases). Plaintiff's claims to economic loss, even temporary, is a concrete and actual injury sufficient to establish standing.

Defendant next claims that Plaintiff cannot show that her injury was caused by its conduct. Def. MSJ 19. The Court finds sufficient causation exists in the record. Article III's causation requirement is "akin to 'but for' causation in tort and may be satisfied even where the conduct in question might not [be] a proximate cause of the harm." *Finkelman v. NFL*, 810 F.3d 187, 193 (3d Cir. 2016) (citation omitted). An "indirect causal relationship will suffice," provided there is a "fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant." *Id.* at 193-194. Defendant says its role was limited to the application of an electronic tag to Plaintiff's account on April 29, 2019, four days after Treasury garnished her 2018 tax refund. Def. MSJ 19. However, without Defendant's delay in applying this tag, Plaintiff's tax refund would not have been garnished. Said otherwise, but for Defendant's failure to timely tag Plaintiff's account, Plaintiff's tax refund would not have been seized.

Defendant also argues that it was a victim of external factors beyond its control, meaning that any injury to Plaintiff is not "fairly traceable" to Defendant's conduct. Def. MSJ 19. Defendant's emphasis on external intervening forces is not persuasive. The traceability requirement is met even where intervening events sever the chain of proximate causation between the conduct and the injury at issue. *See Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (3d Cir. 2013). "But for" is a lesser standard than proximate cause and "but for" causation is all that is needed for standing purposes. Defendant's conduct has met that standard and satisfied the causation requirement necessary to establish standing.

5

### B. FDCPA

Having rejected Defendant's standing argument, the Court now turns to the substance of Plaintiff's FDCPA claims. Defendant first moves for summary judgment on the grounds that it did not engage in "debt collection activity," a threshold requirement for FDCPA claims. Defendant then argues that it did not violate §1692(e) because it never communicated with Plaintiff, and similarly argues that it did not engage in any unfair or unconscionable debt collection practices in violation of §1692(f). Defendant further contends that, even if it did violate the FDCPA, it is still entitled to summary judgment because it meets the requirements for a bona fide error defense. Finally, Defendant argues that Plaintiff's claims are barred by the immunity afforded to government contractors. Keeping in mind that "[t]he FDCPA is a remedial statute, and we construe its language broadly so as to effect its purposes," *Allen ex rel. Martin v. LaSalle Bank, N.A.,* 629 F.3d 364, 367 (3d Cir. 2011) (citation omitted), the Court considers each argument in turn and declines to enter summary judgment.

#### 1. Debt Collection Activity

First we examine Defendant's threshold argument that it did not engage in any debt collection activity. The Court finds sufficient evidence of debt collection activity by Defendant.

"To prevail on any FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a debt as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing,* 765 F.3d 299, 303 (3d Cir. 2014). The only element at issue in this case is the third – whether Defendant engaged in "debt collection" activity. Def. MSJ 19. "The FDCPA regulates 'debt collection' without defining the term." *Simon v. FIA Card Servs. N.A.* 732 F.3d 259, 265 (3d Cir. 2013). The FDCPA however,

6

states that "to be liable under the statute's substantive provisions, a debt collector's targeted conduct must have been taken 'in connection with the collection of any debt,' e.g., 15 U.S.C. §§ 1692c(a)—(b), 1692d, 1692e, 1692g, or in order 'to collect any debt.'" *Id.*

Defendant argues that "there is no evidence of any 'collection activity' taken by [them]." Def. MSJ 19. Defendant maintains its only activity relating to Plaintiff is the attachment of an electronic tag to her account within DMCS, and its role in applying an electronic tag does not constitute "collection activity." Def. MSJ 19. However, courts have long considered wage and account garnishment to be debt collection activity. *See Carmichael v. Pressler & Pressler, LLP,* 646 Fed. Appx. 192 (3d Cir. 2016) (where wage garnishment was assumed to be collection activity).[1]

The Department of Education ("ED") has stated that "third party collectors of defaulted student loans . . . [are] subject to the Fair Debt Collection Practices Act." 55 Fed. Reg. 40120 (1990). Similarly, the Federal Deposit Insurance Company ("FDIC") refers to the administrative offset of monies payable by the government as collecting a debt. 12 C.F.R. 313.21.

The court is satisfied that sufficient evidence exists for a reasonable jury to find that Defendant engaged in collection activity.

---

[1] *See e.g. Fed. Hous. Admin., Region No. 4 v. Burr*, 309 U.S. 242, 245–46, (1940). ("Garnishment and attachment commonly are part and parcel of the process, provided by statute, for the collection of debts."); *Parker v. Pressler & Pressler, LLP,* 650 F. Supp. 2d 326 (D.N.J. 2009)(where garnishing wages was considered a lawful means to collect on a judgement); *Micks v. Gurstel Law Firm, P.C.,* 365 F. Supp. 3d 961, 974 (D. Minn. 2019) (where it was not disputed that garnishment constituted collection activity).

### 2. Violation of U.S.C. § 1692 (e) - Communication

Having determined that the jury could find that Defendant engaged in debt collection activity, the Court now turns to Defendant's communication argument. There is a genuine dispute as to whether Defendant communicated with Plaintiff, and so summary judgement is denied.

15 U.S.C. § 1692(e) states "a debt collector may not use false, deceptive, or misleading representation or means in connection with the collection of any debt." The statute further provides that it is a violation to make a "false representation of . . . the character, amount, or legal status of any debt." 15 U.S.C. § 1692(e). The term "communication" has been broadly defined. *See Cole v. Toll*, 2007 U.S. Dist. LEXIS 85173, at *12 (M.D. Pa. Nov. 16, 2007). The Act defines "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692(a)(2).

Defendant says it never "communicated" with Plaintiff. Def. MSJ 21; DSOF ¶ 65. Defendant asserts that there is no evidence that [it] violated U.S.C. §1692(e) because it only purportedly had [communication] with Treasury regarding [Plaintiff's] account and even then, "there is no evidence [Defendant] communicates directly with Treasury," only via FSA's DMCS system which has "internal logic" that identifies accounts with BD tags and then automatically generates a report to Treasury. Def. MSJ 21-22.

But the record belies this point. The record shows that DMCS is a system exclusively operated and maintained by Defendant and its reports to Treasury are based on the tags Defendant manually place on their accounts. Def. MSJ 9, 21. Defendant's own corporate representative explained that applying tags is "a way of telling [T]reasury don't offset monies until told otherwise." POMSJ 8. Pursuant to Defendant's contract with FSA, Defendant assumed

8

responsibilities for communicating about TOP eligible and ineligible borrowers to Treasury.
POMSJ 24. Courts have also held that debt collectors such as Defendant can violate §1692e by
representing material information to third parties like Treasury.[2]

Further, Defendant "staffs and operates FSA's inbound call centers, its intake facility for
correspondence, and its correspondence unit for composing custom written responses to certain
inquiries." DSOF ¶ 3. The record shows that Defendant operates the call center and communicates
with borrowers in writing, but Defendant's employees do not identify themselves and borrowers
have no way of knowing they are communicating with Defendant's employees. PSOF ¶ 65;
POMSJ 9.

On these facts, a reasonable jury could find that Defendant communicated with Plaintiff.

### 3. Violation of U.S.C. § 1692 (f) – Unfair and Unconscionable Means

Plaintiff further claims that Defendant violated § 1692f and § 1692f(1) by collecting on
defaulted student loan debts, using unfair or unconscionable means. Am. Compl. ¶ 62. This section
of the statute states: "A debt collector may not use unfair or unconscionable means to collect or
attempt to collect any debt." 15 U.S.C. § 1692f.  The statute further provides that it is a violation

---

[2] *See e.g., Sullivan v. Equifax, Inc.*, 2002 U.S. Dist. LEXIS 7884  (E.D. Pa. Apr. 19, 2002)
(applying § 1692e to communication to credit reporting agency); *Scott v. Portfolio Recovery
Assocs., LLC*, 139 F. Supp. 3d 956, 967 (S.D. Iowa 2015) (applying § 1692e to communications
to employer for purposes of garnishing plaintiff's wages); *Plummer v. Atl. Credit $ Fin., Inc.*, 66
F. Supp. 3d at 491-92 (S.D. N.Y. 2014) (collecting cases that "have recognized that
communications with a third party are actionable under the [FDCPA]").

9

to collect any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f and § 1692f(1).

Plaintiff claims that Defendant failed to cease collection activity and caused her account to be garnished after she filed her BD application using unfair and unconscionable means. POMSJ 19. Defendant asserts there is no evidence [it] violated the statute by an unfair collection and further, the circumstances that led Treasury to offset Plaintiff's 2018 tax refund were caused by external factors outside of their control.[3] DSOF ¶39;  Def. MSJ 23. Defendant argues that Plaintiff's §1692(f) claim also fails because Defendant had adequate policies and procedures in place to stop the collection activity.  Def. MSJ 24.

But the record could reasonably support a rejection of Defendant's claim that external factors alone were responsible for the garnishment of Plaintiff's tax return, and that Defendant had adequate policies and procedures in place to prevent such a garnishment. POMSJ 12. For example, in April 1, 2019, when Defendant received a large influx of BD applications, it already had an existing backlog of its own making, and its 2019 Performance Assessment indicated it had failed to hire enough staff. *Id.* Defendant's system was designed with a "blind spot" which was incapable of identifying some involuntary payments, like Plaintiff's, that were entered before a BD tag was applied.  Def.  MSJ  30;  POMSJ  31.  Designing  the  system  this  way  could  be  considered unreasonable. *Id.*

Additionally, courts have held that erroneously garnishing a student loan debtor's wages is a violation of §1692(f). *See Micks v. Gurstel Law Firm, P.C.,* 365 F. Supp. 3d 961, 974 (D.

_____

[3] These factors included: the depletion of funding, an FSA imposed hold on accounts, higher than expected volume, and a backlog of BD application work. DSOF ¶¶ 39-41.

Minn. 2019) (debt collector violated § 1692f by garnishing wages after student loan judgment was vacated). *Demarais* observes "an erroneous garnishment" on an extinguished debt violates 15 U.S.C. 1692(f). *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 697 (8th Cir. 2017).[4]

Whether external forces beyond Defendant's control or failures in their own policies and procedures caused and justified the mistaken seizure of Plaintiff's tax refund are genuinely disputed material facts appropriate for resolution by the finder of fact.

### 4. Bona Fide Error Defense

Defendant claims that even if its actions violated the FDCPA, it is entitled to summary judgment because it is shielded from liability by the Bona Fide Error Defense. Def. MSJ 25. As the name implies, Defendant claims that Plaintiff's tax refund was withheld due to a bona fide error for which Defendant cannot be liable. Def. MSJ 27. Again, a genuine dispute of fact precludes a conclusion that this defense prevails as a matter of law.

"Where a defendant moves for summary judgment based on an affirmative defense, it would bear the burden of proof at trial and must show that it has produced enough evidence to support the findings of fact necessary to win on summary judgment." *Johnson v. Mattress Warehouse, Inc.*, No. 20-891, 2021 WL 4206722, at *2 (E.D. Pa. Sept. 16, 2021) (internal quotation marks and citation omitted).

15 U.S.C.§ 1692k(c) states "a debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." Accordingly, to avail itself of the defense,

---

[4] *See also Deangelo v. LVNV Funding LLC*, 2020 WL 3468061, at *6 (D.N.J. June 25, 2020) (time-barred debt).

11

Defendant will have to establish: (1) the alleged violation was unintentional, (2) the alleged violation resulted from a bona fide error, and (3) the bona fide error occurred despite procedures designed to avoid such errors. *Beck v. Maximus, Inc.,* 457 F.3d 291, 297-298 (3d Cir. 2006). "Procedures . . . are processes that have mechanical or other such regular orderly steps designed to avoid errors like clerical or factual mistakes." *Daubert v. NRA Group, LLC.,* 861 F.3d 382 (3d Cir. 2017). "Procedures . . . to avoid error[s] [are] strictly construed to require a special system be established to assure that no initial errors occur and that a checking mechanism be maintained to catch any errors that slip through the system." *Thomka v. A.Z. Chevrolet, Inc.* 619 F. 2d 246 (3d Cir. 1980).

Defendant maintains that it meets the requisite elements of the defense because (1) the withholding of Plaintiff's tax refund was unintentional, (2) the withholding of the tax return was a bona fide error and (3) Defendant's relevant procedures were reasonably designed to prevent the error. Def. MSJ 25-30.

Defendant claims the first element is satisfied because there was no intent on its part as Defendant is "wholly unaware a borrower has submitted a BD application . . . until it receives the requisite information from CEMS, and the tax offsets occur as part of an automated system." Def. MSJ 26-27. Defendant maintains the second element is satisfied because "the[ir] brief delay in applying the relevant tags was caused by a confluence of external factors; and the application of an electronic code to a borrower's account is the type of "clerical error" that serves as the basis for a bona fide defense." MSJ 28. Defendant claims element three is satisfied because the record shows that its procedures were reasonably designed, reasonably adapted to avoid the error alleged by Plaintiff, and worked with a high degree of effectiveness; and although there was a "blind spot" in the system, it only affected a limited number of borrowers. Def. MSJ 28-30.

12

Again, there are facts in the record contrary to these arguments. Although there were extenuating external factors such as an application volume increase and funding delays, the record shows that there may have been policies or procedures that could have prevented Defendant's FDCPA violations that were either not followed, not reasonable, or inherently flawed. Def. MSJ 34. For example, Defendant argues that its manual procedures mistakenly left a "blind spot" which impacted a reasonable and very limited number of borrowers (approximately .04%), but there is other evidence in the record that this "blind spot" impacted at least 8.7 percent of all DMCS borrowers who submitted a BD application. POMSJ 13. In a letter to Defendant, ED spoke of Defendant's failure to protect Plaintiff and thousands of other borrowers from improper offsets as a failure by Defendant to "properly follow the instructions" of its contract, causing "significant harm" to student borrowers. POMSJ 35. The record also indicates that Defendant's leadership had not evaluated whether its policies and procedures complied with the FDCPA, Defendant's employees had no verbal training on FDCPA compliance, and its corporate representatives were unaware if Defendant had any written policies concerning the FDCPA. POMSJ 30.

Whether Defendant's actions were intentional, whether external factors caused the delay, and whether Defendant had reasonably designed policies and procedures in place despite their "blind spot" are material disputes to be determined by the jury.

### 5. Contractor Immunity

Defendant also claims the defense of "contractor immunity" because it was acting pursuant to a valid contract with, and at the direction of the FSA. Def. MSJ 31. "Private government contractors are entitled to derivative sovereign immunity if (1) the government authorized the contractor's actions and (2) the government validly conferred that authorization. However, this

13

immunity is not absolute or unqualified. It does not protect a government contractor who violates federal law and the government's explicit instructions." 15A MOORE'S FEDERAL PRACTICE - CIVIL § 105.21 (2021).

In 2016, the Supreme Court clarified that a government contractor may not claim "derivative immunity" when it has "exceeded [its] authority," its authority "was not validly conferred" or it "violates the government's explicit instructions." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016).

As to the first element, Defendant claims it has a government contract to "operate and maintain FSA's DMCS system," and the terms of the contract are "dictated" and "heavily regulated" by FSA. Def. MSJ 32. It maintains this element is satisfied because FSA has the authority to operate and maintain the DCMC system and "validly conferred" the contract to Defendant. Def. MSJ 33. It claims they did not violate the express directions of FSA by neglecting to apply the BD tag within five days as provided for in the contract. Defendant further maintains any delays were "caused by external factors entirely outside of [their] control." Def. MSJ 33. It argues that "[Plaintiff] is not entitled to attack the validly conferred and approved procedures of FSA," which they were following. Def. MSJ 31.

The record provides ample room for reasonable, contrary interpretation of Defendant's claims. The contract with the government gives Defendant considerable discretion. POMSJ 6. It does not mandate a specific process. *Id*. Specific language in the contract states "[t]he Contractor [Maximus] shall determine how best to meet the Government's needs." POMSJ 34. Similarly, the contract directs Defendant to "establish a process" to identify improper involuntary payments for refund but does not provide specific parameters. PSOF ¶ 5.

14

The record also indicates there was an explicit directive from FSA to process BD tag requests within five business days. POSJM 31. Defendant's corporate representatives testified that, despite never being told it could suspend this five-day deadline, Defendant made a unilateral decision to cease processing pending BD tag requests. POMSJ 31, 35. In fact, the FSA sent Defendant a "letter of concern" in October 2019 regarding Defendant's alleged failure to follow certain contractual terms and instructions in applying the requisite tags in the DMCS system to cease collection activity. Def. MSJ 34. The Court finds reasonable disputes of fact exist which foreclose a finding that Defendant's claim of governmental immunity must prevail as a matter of law.

## IV.   CONCLUSION

For the reasons discussed above Defendant's motion for summary judgment is denied. An order to this effect shall follow.

BY THE COURT:

/s/ John M. Gallagher
JOHN M. GALLAGHER
United States District Court Judge

15

# R. EXHIBIT: MAXIMUS SEC FILINGS

EXHIBIT 21.1

**Subsidiaries of Maximus, Inc.**

| Name of Subsidiary* | Jurisdiction of Incorporation or Organization |
|---|---|
| 2020 Company, LLC | Illinois |
| Ascend Management Innovations LLC | Tennessee |
| BZ Bodies Ltd | England & Wales |
| Child Welfare Assessments Pty Ltd | Australia |
| Connect Assist Holdings Ltd | England & Wales |
| Connect Assist Ltd | England & Wales |
| InjuryNet Australia Pty Ltd | Australia |
| InSysCo, Inc. | Virginia |
| Interactive Technology Solutions, LLC | Maryland |
| ITEQ Holding Company, Inc. | Maryland |
| MAX Solutions Pty Ltd | Australia |
| Maximus Australia Holding Company Pty Ltd | Australia |
| Maximus BC Health Benefit Operations Inc. | British Columbia |
| Maximus BC Health Inc. | British Columbia |
| Maximus Canada Services, Inc. | Canada |
| Maximus Canada, Inc. | Canada |
| Maximus Co., Ltd. | Korea |
| Maximus Companies Ltd | England & Wales |
| Maximus Consulting Services, Inc. | Virginia |
| Maximus Education, LLC | Delaware |
| Maximus Federal Consulting, LLC | Delaware |
| Maximus Federal IT, LLC | Virginia |
| Maximus Federal Services, Inc. | Virginia |
| Maximus Federal Systems, LLC | Maryland |
| Maximus Gulf Company Ltd | Saudi Arabia |
| Maximus Higher Education, Inc. | Virginia |
| Maximus Human Services, Inc. | Virginia |
| Maximus Services LLC | Delaware |
| Maximus US Services, Inc. | Indiana |
| Maximus UK Services Ltd | England & Wales |
| Optimos LLC | Maryland |
| Policy Studies LLC | Colorado |
| PSI Services Holding LLC | Delaware |
| Stirling Institute of Australia Pty Ltd | Australia |
| VES Group, Inc. | Texas |
| Veterans Evaluation Services, Inc. | Illinois |
| Veterans Evaluation Services, Inc. | Texas |

\* Other subsidiaries have been omitted from this list because, considered in the aggregate, they would not constitute a significant subsidiary under Securities and Exchange Commission Regulation S-X, Rule 1-02(w).

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

(Mark one)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended September 30, 2024**

☐ **TRANSITIONAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____.**

**Commission file number: 1-12997**

# maximus

**Maximus, Inc.**
*(Exact name of registrant as specified in its charter)*

| Virginia | 54-1000588 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1600 Tysons Boulevard, McLean, Virginia | 22102 |
| (Address of principal executive offices) | (Zip Code) |

(703) 251-8500
(Registrant's telephone number, including the area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, no par value | MMS | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | |
| Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of outstanding voting stock held by non-affiliates of the registrant as of March 31, 2024, was $5,068,972,205 based on the last reported sale price of the registrant's Common Stock on The New York Stock Exchange as of the close of business on that day.

There were 60,295,271 shares of the registrant's Common Stock outstanding as of November 12, 2024.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's definitive proxy statement relating to its 2025 annual meeting of shareholders are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. The Registrant's definitive proxy statement will be filed with the U.S. Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

**MAXIMUS 2024 10-K (SEC)**

Table of Contents

**Risks Pertaining to Legal Compliance**

*We are subject to review and audit by governments at their sole discretion and, if any improprieties are found, we may be required to refund revenue we have received or forego anticipated revenue, which could have a material adverse impact on our revenue and our ability to bid in response to RFPs.*

We are subject to audits, investigations, and reviews relating to compliance with the laws and regulations that govern our role as a contractor to agencies and departments of the U.S. federal government, state, local, and foreign governments, and otherwise in connection with performing services in countries outside of the United States. Adverse findings could lead to criminal, civil, or administrative proceedings, and we could be faced with penalties, fines, suspension, or debarment. Adverse findings could also have a material adverse effect on us because of our reliance on government contracts. We are subject to periodic audits by U.S., federal, state, local, and foreign governments for taxes. We are also involved in various claims, arbitrations, and lawsuits arising in the normal conduct of our business, including but not limited to bid protests, employment matters, contractual disputes, and charges before administrative agencies.

*We may be subject to fines, penalties, and other sanctions if we fail to comply with laws governing our business.*

Our business operates within a variety of complex regulatory environments, including but not limited to the FAR, Federal Cost Accounting Standards, the Truth in Negotiations Act, the Fair Debt Collection Practices Act (and similar national, state, and foreign laws), the Foreign Corrupt Practices Act, the United Kingdom Bribery Act, as well as the regulations governing Medicaid and Medicare and accounting standards. If a government audit finds improper or illegal activities by us or we otherwise determine that these activities have occurred, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeiture of profits, suspension of payments, fines, and suspension or disqualification from doing business with the government. Any such determination could adversely impact our ability to bid in response to RFPs in one or more jurisdictions. Further, as a government contractor subject to the types of regulatory schemes described above, we are subject to an increased risk of investigations, criminal prosecution, civil fraud, whistleblower lawsuits, and other legal actions and liabilities to which other private sector companies are not, the result of which could have a material adverse effect on our operating results, cash flows, and financial condition.

*Adverse judgments or settlements in legal disputes could harm our operating results, cash flows, and financial condition.*

From time to time, we are subject to a variety of lawsuits and other claims. These may include lawsuits and claims related to contracts, subcontracts, securities compliance, employment and wage claims, and compliance with Medicaid and Medicare regulations, as well as laws governing student loans and child support enforcement. Adverse judgments or settlements in some or all of these legal disputes may result in significant monetary damages or injunctive relief. In addition, litigation and other legal claims are subject to inherent uncertainties, and management's view of these matters may change in the future. Those uncertainties include, but are not limited to, costs of litigation, unpredictable court or jury decisions, and the differing laws and attitudes regarding damage awards among the states and countries in which we operate.

*We may be precluded from bidding and performing certain work due to other work we currently perform.*

Various laws and regulations prohibit companies from performing work for government agencies that might be viewed as an actual or apparent conflict of interest. These laws limit our ability to pursue and perform certain types of work. For example, some of our businesses assist government agencies in developing RFPs for various government programs. In those situations, the divisions involved in operating such programs would likely be precluded from bidding on those RFPs. Similarly, regulations governing the independence of Medicaid enrollment brokers and Medicare appeal providers prevent us from providing services to other organizations such as health plans and providers.

*We may face liabilities arising from divested or discontinued businesses.*

We have divested a number of businesses. The transaction documents for those divestitures typically contain a variety of representations, warranties, and indemnification obligations. We have faced, and continue to face, indemnification claims and liabilities from alleged breaches of representations or warranties.

21

**MAXIMUS 2024 10-K (SEC)**

Table of Contents

## 7. ACQUISITIONS AND DIVESTITURES

### IT vendor acquisition

On February 14, 2024, we acquired part of a vendor who has performed IT services for us over several years for cash consideration of $ 18.0 million. Almost all of the consideration was allocated directly to the most significant asset, the acquired workforce. The value of this asset will be amortized over eight years. This asset is anticipated to provide support across all three of our operating segments.

### Aidvantage

On October 6, 2021, we completed the acquisition of the student loan servicing business from Navient, rebranded as Aidvantage. This business is a part of our U.S. Federal Services Segment and supplements our existing portfolio of services to the U.S. Department of Education.

The purchase price was contingent upon future volumes within an acquired contract, up to a maximum payment of $ 65.0 million. At acquisition, we estimated the fair value of this liability, based upon a probability-weighted assessment of the potential outcomes, of $18.5 million. We updated this liability each quarter, with changes recorded to our statement of operations, as we updated our estimate of fair value. We made our final payment in May 2024 and, accordingly, we have no remaining liability at September 30, 2024, compared to a liability of $7.5 million at September 30, 2023. Total payments made since acquisition were $19.3 million.

We recorded a single intangible asset related to the customer contract and relationship of $ 16.7 million, which was amortized over 27 months. The goodwill balance, representing the difference between the identifiable assets acquired and the estimated obligation, represents the assembled workforce, as well as the knowledge base acquired.

### Stirling Institute of Australia Pty Ltd (Stirling)

On June 1, 2022, we acquired  100% of the share capital of Stirling for an estimated purchase price of $ 4.1 million (A$5.7 million Australian Dollars). Stirling provides vocational training to Australians seeking to improve their knowledge and qualifications. We acquired this business to complement our existing employment services. The business was integrated into our Outside the U.S. Segment. We recorded goodwill and intangible assets of $2.3 million and $1.8 million, respectively, related to the acquisition.

### BZ Bodies Limited (BZB)

On January 31, 2022, we acquired 100% of the share capital of BZB for a purchase price of $ 2.5 million (£1.9 million); the consideration was principally comprised of an estimate of contingent consideration payable upon future performance, which was paid in full in fiscal year 2024. BZB provides weight management services for adults, children, and vulnerable groups in the United Kingdom. We acquired this business to complement our services within the United Kingdom. The business was integrated into our Outside the U.S. Segment. We recorded goodwill and intangible assets of $1.4 million and $1.3 million, respectively, related to the acquisition.

### Divestitures

We have sold a number of components of our Outside the U.S. Segment:

- In November 2023, we sold our businesses in Italy and Singapore, as well as our employment services business in Canada, recording a loss on sale of $1.0 million. During the fourth quarter of fiscal year 2023, we recorded an impairment charge of $ 2.9 million related to these assets.

- In March 2023, we sold our commercial practice in the United Kingdom, resulting in a  pre-tax loss of $0.6 million. The cash consideration had a fair value of $16.0 million, to be received in installments. At September 30, 2024, we have installments remaining of $ 5.8 million.

- In March 2023, we sold our Swedish subsidiary for cash consideration of $ 0.4 million, resulting in a small loss.

66

**MAXIMUS 2024 10-K (SEC)**

Table of Contents

Amortization expense related to deferred contract costs for the years ended September 30, 2024, 2023, and 2022 was $ 9.8 million, $12.7 million, and $8.9 million, respectively. These amounts were recorded within our "cost of revenue" on our consolidated statements of operations.

## 15. COMMITMENTS AND CONTINGENCIES

### Litigation

We are subject to audits, investigations, and reviews relating to compliance with the laws and regulations that govern our role as a contractor to agencies and departments of federal, state, local, and foreign governments. Adverse findings could lead to criminal, civil, or administrative proceedings, and we could be faced with penalties, fines, suspension, or debarment. Adverse findings could also have a material adverse effect on us because of our reliance on government contracts. We are subject to periodic audits by federal, state, local, and foreign governments for taxes. We are also involved in various claims, arbitrations, and lawsuits arising in the normal conduct of our business, which include but are not limited to bid protests, employment matters, contractual disputes, and charges before administrative agencies. Except for the matters described below for which we cannot predict the outcome, we do not believe the outcome of any existing matter would likely have a material adverse effect on our consolidated financial position, results of operations, or cash flows.

We evaluate developments in our litigation matters and establish or make adjustments to our accruals as appropriate. A liability is accrued if a loss is probable and the amount of such loss can be reasonably estimated. If the risk of loss is probable, but the amount cannot be reasonably estimated, or the risk of loss is only reasonably possible, a potential liability will be disclosed but not accrued, if material. Due to the inherent uncertainty in the outcome of litigation, our estimates and assessments may prove to be incomplete or inaccurate and could be impacted by unanticipated events and circumstances, adverse outcomes, or other future determinations.

### MOVEit Cybersecurity Incident Litigation

As the Company has previously disclosed, on May 31, 2023, Progress Software Corporation, the developer of MOVEit, a file transfer application used by many organizations to transfer data, announced a critical zero-day vulnerability in the application that allowed unauthorized third parties to access its customers' MOVEit environments. Maximus uses MOVEit for internal and external file sharing purposes, including to share data with government customers related to Maximus's services in support of certain government programs. Based on its review of the impacted files to date, the Company has provided notices to individuals whose personal information, including social security numbers, protected health information, and/or other personal information, may have been included in the impacted files.

On August 1, 2023, a purported class action was filed against Maximus Federal Services, Inc. (a wholly-owned subsidiary of Maximus, Inc.) in the U.S. District Court for the Eastern District of Virginia arising out of the MOVEit cybersecurity incident – Bishop v. Maximus Federal Services, Case No. 1:23-cv-01019 (U.S. Dist. Ct. E. D. VA). The plaintiff, who purports to represent a nationwide class of individuals, alleges, among other things, that the Company's negligence resulted in the compromise of the plaintiff's personally identifiable information and protected health information. The plaintiff seeks damages to be proved at trial. Over the course of the next year, twelve similar cases were filed in federal courts across the country (inclusive of one case filed in state court and removed to federal court by the Company).

On October 4, 2023, the United States Judicial Panel on Multidistrict Litigation granted a Motion to Transfer creating a Multidistrict Litigation (MDL) in the District of Massachusetts for all cases related to the MOVEit cybersecurity incident. Each of the actions pending in federal courts are now centralized in the MDL.

The parties participating in the MDL have submitted briefing on an omnibus motion to dismiss Plaintiffs' claims pursuant to Rule 12(b)(1) challenging Plaintiffs' standing to bring this suit. That motion is currently pending with the Court. The Court has also named Maximus as a bellwether defendant in the MDL. Maximus and the other bellwether defendants anticipate filing motions to dismiss the pending actions pursuant to Rule 12(b)(6). Maximus and the other bellwether defendants will participate in phased discovery, with limited discovery prior to the Court's decision on the Rule 12 motions, and, if applicable, full discovery following the Court's decision on those motions.

**MAXIMUS 2024 10-K (SEC)**

## S. EXHIBIT: MAXIMUS/AIDVANTAGE STUDENT LOAN FEDERAL CONTRACTS (EXCERPTS RE BANKRUCPY)

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS *OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30* | | 1. REQUISITION NUMBER | | | PAGE 1 OF 141 |
|---|---|---|---|---|---|

| 2. CONTRACT NO. 91003120D0005 | 3. AWARD/EFFECTIVE DATE JUN 23, 2020 | 4. ORDER NUMBER | 5. SOLICITATION NUMBER | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|

**7. FOR SOLICITATION INFORMATION CALL:**
a. NAME Hilbert Caesar
Hilbert.Caesar@ed.gov
b. TELEPHONE NUMBER *(No collect calls)* 202-377-3654
8. OFFER DUE DATE/ LOCAL TIME

**9. ISSUED BY** CODE FSA-ACQ
US Department of Education
FSA - Acquisitions, 830 First St NE - Suite 91F3
Washington DC 20202

**10. THIS ACQUISITION IS** ☐ UNRESTRICTED OR ☐ SET ASIDE: ___ % FOR:
☐ SMALL BUSINESS
☐ HUBZONE SMALL BUSINESS
☐ SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS
☐ WOMEN-OWNED SMALL BUSINESS (WOSB) ELIGIBLE UNDER THE WOMEN-OWNED SMALL BUSINESS PROGRAM
☐ EDWOSB
☐ 8 (A)
NAICS: 522320
SIZE STANDARD:

| 11. DELIVERY FOR FOB DESTINA-TION UNLESS BLOCK IS MARKED ☐ SEE SCHEDULE | 12. DISCOUNT TERMS Net 30 | 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | 13b. RATING |
|---|---|---|---|
| | | | 14. METHOD OF SOLICITATION ☐ RFQ ☐ IFB ☐ RFP |

**15. DELIVER TO** CODE FSA-COO
FSA CHIEF OPERATING OFFICER
830 First Street, NE
WASHINGTON DC 20202

**16. ADMINISTERED BY** CODE FSA-ACQ
US Department of Education
FSA - Acquisitions, 830 First St NE - Suite 91F3
Washington DC 20202

**17a CONTRACTOR/ OFFEROR.** CODE 00034866 FACILITY CODE
MAXIMUS FEDERAL SERVICES, INC.
3120 FAIRVIEW PARK DRIVE
SUITE 400
FALLS CHURCH VA 22042

CAGE: 8AMZ8
TIN: 202998066    DUNS: 364221593
TELEPHONE NO.

**18a. PAYMENT WILL BE MADE BY** CODE FSA-BUD
Budget Group/Invoice Admin
US Department of Education/FSA/CFO/BG/FSAA
830 First Street, NE, Suite 54B1
Washington DC 20202-0001

☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED ☒ SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| Please | see continuation page for line item details. | | | | |
| | *(Use Reverse and/or Attach Additional Sheets as Necessary)* | | | | |

| 25. ACCOUNTING AND APPROPRIATION DATA See Schedule | 26. TOTAL AWARD AMOUNT *(For Govt. Use Only)* $0.00 |
|---|---|

☐ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA ☐ ARE ☐ ARE NOT ATTACHED
☐ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA ☒ ARE ☐ ARE NOT ATTACHED

☒ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 1 COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED

☒ 29. AWARD OF CONTRACT: REF. _____ OFFER DATED JUN 23, 2020 . YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR (b) (6) | 31a. UNITED STATES OF AMERICA *(SIGNATURE OF CONTRACTING OFFICER)* Soo Kang | Digitally signed by Soo Kang Date: 2020.06.23 19:08:58 -04'00' |
|---|---|---|
| 30b. NAME AND TITLE OF SIGNER *(Type or print)* (b) (6) | 31b. NAME OF CONTRACTING OFFICER *(Type or print)* Soo Kang 202-377-3798 soo.kang@ed.gov | 31c. DATE SIGNED JUN 23, 2020 |
| 30c. DATE SIGNED June 22, 2020 | | |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 *(REV. 2/2012)*
Prescribed by GSA - FAR (48 CFR) 53.212

**Attachment Page**

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0005

| | |
|---|---|
| Application Processing -Approved | Reviewing an application, recipient records, supporting documentation, reviewing qualifying payments and employment, escalating to FSA for final decision and applying determination. |
| Application Processing - Denied/Ineligible | Reviewing an application, recipient records, supporting documentation, reviewing qualifying payments and employment, and escalating to FSA as needed or applying determination. |
| PSLF/TEPSLF Reconsideration | Reviewing requests for reconsideration, drafting dispute summary as needed, and/or escalating to FSA as needed. |
| Manual Payment Counting | Reviewing past borrower payments and financial histories, and other supporting information, to determine whether a payment is qualifying for PSLF purposes. |
| Other PSLF/TEPSLF Processing Tasks | This includes other PSLF/TEPSLF Processing activities not included in the above list. |
| *Deferment Processing* | |
| Deferments Processing | Reviewing an application, recipient records, supporting documentation, and other available data to make a deferment determination for one of the available deferment types authorized under the Higher Education Act and regulations thereof. |
| *Forbearance Processing* | |
| Forbearances Processing | Reviewing an application, recipient records, supporting documentation, and other available data to make a deferment determination for one of the available forbearance types authorized under the Higher Education Act and regulations thereof. |
| *Discharge Processing (Intake, review, follow-up, and post-determination processing)* | |
| Discharge Processing | Reviewing an application, recipient records, supporting documentation, and other available data (e.g. servicing histories, school records, non-ED data, etc.) to perform a pre-determination and apply FSA's final determination for any of the discharge categories authorized under the Higher Education Act and regulations thereof. |
| *Bankruptcy Processing Support* | Supporting bankruptcy processing by timely filing proof of claims and reviewing court-ordered repayment plans. |
| Timely filing proof of claims | Completing a bankruptcy proof of claim form and submitting to federal court for filing. |
| Timely review of repayment plans and escalating to FSA | Reviewing bankruptcy repayment plans/orders to identify the objectionable language and/or applying details of an order. Escalating to FSA as needed. |
| Other Bankruptcy Support Processing | This includes other Bankruptcy Support Processing activities not included in the above list. |
| *Total & Permanent Disability Discharge Processing* | Reviewing an application for Discharge due to Total and Permanent Disability, performing a pre-determination, applying FSA's final determination, and performing on-going monitoring as needed. |
| TPD Application Processing - Approved | Processing a manual application/matched application for TPD Discharge – Approved |
| TPD Application Processing - Denied | Processing a manual application/matched application for TPD Discharge – Denied |

**Attachment Page**

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0005

| | |
|---|---|
| TPD Annual Monitoring - Approved | Manually reviewing annual income documentation from TPD applicants who are undergoing their 3-year monitoring and approving. |
| TPD Annual Monitoring - Denied | Manually reviewing annual income documentation from TPD applicants who are undergoing their 3-year monitoring and denying. |
| Other TPD Processing | This includes other TPD Processing activities not included in the above list. |
| *Borrower Defense Processing* | |
| Borrower Defense Application Processing (Intake, review, and follow-up) | All activities necessary to ensure the case creation, reviewing case details, following up with parties as needed, applying forbearance, and assigning the case to the appropriate party. **Note:** After a borrower defense claim is submitted or created; the Contractor will review the claim for completeness and accuracy prior to sending to FSA for review of the borrower defense claim. |
| Borrower Defense Requests for Reconsideration Processing (Intake, review, and follow-up) | All activities necessary to ensure the case creation, reviewing case details, following up with parties as needed, applying forbearance, and assigning the case to the appropriate party. **Note:** In addition to reviewing this can include, drafting summary of issue as needed, and/or escalating to FSA as needed. |
| Discharge Request (Post-determination Processing) | Post-determination processing is the phase of the lifecycle when a determination or decision is made on the application or a "Request for Reconsideration" and then the decision needs to be processed. This includes processing a stop forbearance, processing of interest credit requests, refund requests, and providing school notification. <br><br> Interest Credit Request:  Review each loan and calculate the interest credit amount based on calculation from FSA. Apply the interest adjustment transaction on the servicing system.  Annotate the borrower account with information on why the interest credit was applied. Update the system with the interest credit request status and interest amount, date, and calculation information. Upload notices/documentation related to the interest credit to the system. <br><br> Refund Request:  Review each loan and determine if a refund must be applied to the loan based on the information in the system. Apply for the refund (if applicable) to the loan on the servicing system and annotate the servicing system on why the refund has occurred. Update the system with the refund request status, amount, date, and all notices sent to the borrower. |
| Other Borrower Defense Processing Tasks | This includes other Borrower Defense Processing Task activities not included in the above list. |
| *Cohort Default Rate (CDR) Appeals Processing* | |
| CDR Appeal Review/Research and escalation | Review CDR appeals received, research issues presented and data, summarize findings, and escalate to FSA as needed. |
| CDR Appeal Response | Drafting CDR response as needed. |

**Attachment Page**

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0005

| Other Cohort Default Rate Processing | This includes other Cohort Default Rate Processing activities not included in the above list. |
|---|---|
| *Fair Credit Reporting Act (FCRA) Credit Dispute Processing* | |
| Responding to Disputes (E-Oscar, Trade, and Direct) | Reviewing, researching, and responding to disputes submitted by borrowers to Credit Reporting Agencies (CRA's), ACDV's, Trade block lifts, and direct disputes received under applicable FCRA regulations and submitting manual adjustments. |
| *Office of Inspector General (OIG) Fraud Referral Case Management and Resolution Processing* | |
| Complete intake referrals | Complete intake of referrals received from the OIG. |
| Research Fraud referrals | Research fraud referrals received from the OIG, including collecting additional data from FSA stakeholder offices, systems, or schools. |
| Initial Risk Tier Determination | Analyze referrals to determine initial risk tier designation. |
| Initiate and execute final referral disposition | Initiate and execute final disposition of referrals in coordination with FSA stakeholder offices. |
| Other OIG Fraud Referral Processing | Analyze fraud referrals to identify process and control improvements to prevent or detect fraud. |
| *Feedback Center & Ombudsman Group Case Management and Resolution Processing* | |
| Feedback/Dispute Non-Call Case Intake, Screening, and Assignment | All activities necessary to ensure the case creation and assignment to the appropriate parties. |
| Feedback/Dispute Case Research and Escalation | All activities necessary to contact appropriate parties; compile and evaluate information relevant to the case; execute contacts to complainants; negotiate acceptable resolutions; craft and send outgoing messages; determine whether subsequent contacts require case re-work. |
| Feedback/Dispute Case Closure | All activities necessary to properly document steps taken to resolve the matter; update the case record in the system with accurate data concerning case topic, resolution type, and outcome, and closing date. |
| Other Feedback Center & Ombudsman Processing | This includes other Feedback Center & Ombudsman Processing activities not included in the above list. |
| *Collection/Default Activities Processing* | |
| Administrative Wage Garnishment (AWG) | Identify candidates for garnishment (non-payers, not working toward resolution), locate employer and verify employment, process employer certification forms, initiate due process notice (cause DMCS system to send notice), establish voluntary repayment agreements with borrowers who respond to notice, draft hearing responses to borrowers who request a hearing in response to notice, monitor accounts for events that require suspension of AWG (bankruptcy, etc.), respond to inquiries from employers and borrowers, notify employers when payment in full is imminent, send stop garnishment notices (fax), and issue refunds. |
| Treasury Offset/Federal Salary Offset | Establish voluntary repayment agreements with borrowers who respond to notice, draft hearing responses to borrowers who request a hearing in response to notice, respond to calls from borrowers who have been offset, respond to hardship claims, and issue refunds. |

**Attachment Page**

Title: FSA Next Gen BPO Multiple-Award IDIQ Contract
Contract No. 91003120D0005

| | |
|---|---|
| Litigation Referrals | Identify candidates for litigation, prepare litigation package, support reconciliation with DOJ, update accounts to conform with terms of judgment, prepare release and satisfaction of judgment packages, and notify DOJ of discharge requests. |
| Loan Rehabilitation | Counsel borrowers on benefits and requirements of the program, review borrower financial docs and calculate monthly payment amount, send rehabilitation agreement letter to borrower, and review signed rehabilitation agreement for acceptability. |
| Title IV Reinstatement | Counsel borrowers on TIV requirements, monitor accounts for reinstatement eligibility, send reinstatement letter, and update NSLDS status. |
| Other Collection/Default Activities | Establish reasonable and affordable repayment agreements, incarceration verifications, and manual CAIVRS updates. |
| *Miscellaneous Life of Loan & Grant Processing* | |
| Account Research and Response for Disputes/Escalations | Reviewing escalated inquiries, drafting correspondence as needed. |
| Account Research and Escalations | Reviewing escalated inquiries and escalating to FSA as needed. |
| Reviewing and Responding to Control Mail | Reviewing, preparing, and responding to control correspondence. Control correspondence includes items sent to Federal Student Aid from the White House, Members of Congress, State Attorneys General, the Department of Education's Office of Inspector General, and other high Government officials.  In addition, FSA may at its discretion designate other items as a control mail item. |
| Responding to General Correspondence/Requests for Information | Manual responses to customer correspondence/requests when needed (e.g. sending documents, histories, addressing questions, etc.) |
| NSLDS/Enrollment Reporting Updates and Changes | Manually reviewing and adjusting NSLDS and/or enrollment reporting as needed. |
| Payment Exception and Refund Processing | Payment research and Reapplication of payments and/or refund processing. |
| Account Status Change and Manual Adjustments | Reviewing accounts to perform manual adjustments as needed (e.g. repayment and billing adjustments, conversion to repayment, adjusting account status, removing and/or reapplying borrower benefits, name change/SSN merge, et cetera). |
| Manual Skip Tracing | Performing skip tracing activities to locate and verify a customer's address, telephone number, or other contact details. |
| Other Life of Loan & Grant Processing | This includes other Life of Loan & Grant Processing activities not included in the above list. |

| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS | | | 1. REQUISITION NUMBER | | PAGE 1 OF  72 |
|---|---|---|---|---|---|
| OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30 | | | EDOFSA-09-000622 | | |
| 2. CONTRACT NO | 3. AWARD/EFFECTIVE DATE | 4. ORDER NUMBER | 5. SOLICITATION NUMBER | | 6. SOLICITATION ISSUE DATE |
| ED-FSA-09-D-0015 | JUN 17, 2009 | | EDOFSA-09-000622 | | |
| 7. FOR SOLICITATION INFORMATION CALL: | a. NAME<br>Nicholas Chung<br>nicholas.chung@ed.gov | | b. TELEPHONE NUMBER (No collect calls) 202-377-3635 | | 8. OFFER DUE DATE/ LOCAL TIME |

**9. ISSUED BY** CODE **FSA-FS2**

United States Department of Education
Federal Student Aid/Mission Support Group
830 First St NE - Suite 91F3
Washington DC 20202

**10. THIS ACQUISITON IS**

☐ UNRESTRICTED OR   ☐ SET ASIDE:     % FOR:
☐ SMALL BUSINESS   ☐ EMERGING SMALL BUSINESS
☐ HUBZONE SMALL BUSINESS
NAICS:
SIZE STANDARD:   ☐ SERVICE-DISABLED VETERAN- OWNLED SMALL BUSINESS   ☐ 8(A)

| 11. DELIVERY FOR FOB DESTINA TION UNLESS BLOCK IS MARKED<br><br>☐ SEE SCHEDULE | 12. DISCOUNT TERMS<br>0 Days<br>0%<br>Net 30 | 13a. ☐ THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | 13b. RATING<br><br>14. METHOD OF SOLICITATION<br>☐ RFQ   ☐ IFB   ☐ RFP |
|---|---|---|---|

**15. DELIVER TO** CODE

**16. ADMINISTERED BY** CODE **FSA-FS2**

United States Department of Education
Federal Student Aid/Mission Support Group
830 First St NE - Suite 91F3

| 17a. CONTRACTOR/ OFFEROR CODE **00018575** FACILITY CODE | 18a. PAYMENT WILL BE MADE BY CODE |
|---|---|
| SLM CORPORATION<br>C/O MONETRAY PROCESSING<br>P.O. BOX 4600<br>WILKES BARRE PA 187734600<br><br>TELEPHONE NO. 317-598-4633 | TIN: 522013874<br>CAGE: 3GKW7<br>DUNS: 160002218 |

☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

**18b.** SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED  ☐ SEE ADDENDUM

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| Please | see continuation page for line item details. | | | | |

(Use Reverse and/or Attach Additional Sheets as Necessary)

| 25. ACCOUNTING AND APPROPRIATION DATA | 26. TOTAL AWARD AMOUNT (For Govt. Use Only) |
|---|---|
| See Schedule | $5,000,000.00 |

☒ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4  FAR 52.212-3 AND 52.212-5 ARE ATTACHED.  ADDENDA  ☐ ARE  ☒ ARE NOT ATTACHED

☒ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4.  FAR 52.212-5 IS ATTACHED.  ADDENDA  ☑ ARE  ☐ ARE NOT ATTACHED

☒ 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN __1__ COPIES TO ISSUING OFFICE.  CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED

☐ 29. AWARD OF CONTRACT:  REF. _____ OFFER DATED _____  YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS:

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER) |
|---|---|
| 30b. NAME AND TITLE OF SIGNER (Type or print) | 30c. DATE SIGNED 6/17/09 | 31b. NAME OF CONTRACTING OFFICER (Type or print) Mike Whisler | 31c. DATE SIGNED 6/17/09 |

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

**STANDARD FORM 1449** (REV. 3/2005)
Prescribed by GSA - FAR (48 CFR) 53.212

## NSLDS

62. The Servicer shall provide the National Student Loan Clearinghouse monthly updates to their federally serviced portfolio. National Student Clearinghouse (NCS) will provide weekly updates to NSLDS for all FFEL and DL loans in the FSA portfolio. NSLDS will provide the servicer with weekly enrollment data that include NSC updates.

## Additional Requirements for Federally Held Portfolio

63. The servicer shall receive collateral in imaged and paper format and if received in paper format image it should be imaged in a format that can be ported easily to another system (Non-proprietary)
64. The servicer shall verify collateral for all loans received in a sale within 45 days and if any collateral is missing the missing collateral will be obtained from the seller.
65. The servicer shall provide for FSA access to the imaging and serving system to view images, make annotations on borrower accounts and have complete access to view FSA data.
66. The servicer shall provide a means for FSA to make a final determination on eligibility of borrowers for entitlements, such as discharge due to Closed School, Death, etc., and compromise offers.
67. The servicer shall report loans to NSLDS and credit bureaus.
68. The servicer shall cancel loans and make all financial adjustments when needed.
69. The servicer shall place loans, where the borrower has applied for bankruptcy, into a bankruptcy status, prepare a Proof-of-Claim and

All_IntermediateReq_v6.0                                                          10

---

## Attachment A-2

provide any additional support needed to defend the loan against bankruptcy discharge.
70. The servicer shall accurately prepare and respond to control correspondence (correspondence sent to FSA from the White House, Congress, and other high government officials) and meet control turnaround times established by the U.S. Department for FSA.
71. The servicer shall respond to written and email questions and requests timely and accurately.
72. The servicer shall respond and resolve customer complaints; and create and execute a plan to escalate complaints to FSA and the Ombudsman.
73. The servicer shall have the ability to provide borrower interest rate discounts and assess late fees if directed to do so by FSA.
74. The servicer shall accurately and timely complete and return Loan Verification Certificates received from consolidating lenders.
75. The servicer shall assign loans to DMCS for collection once they reach 360 days delinquent.  If a loan is assigned in error the loan will be reinstated onto the servicer's system.

## T. EXHIBIT: NAVIENT CONTRACT NOVATION (2021)



# Press Releases

## NEWS & EVENTS

Overview ⊙

Press Releases ⊙

IR Calendar ⊙

Presentations ⊙

Email Alerts ⊙

# Maximus Federal Student Loan Servicing Contract Novation Completed

October 20, 2021 4:47pm EDT      📄 **Download as PDF**

*U.S. Department of Education Approves Transfer of Contract from Navient to Maximus*

RESTON, Va.--(BUSINESS WIRE)-- Maximus (NYSE:MMS), a leading provider of government services worldwide, announced today that the contract novation to transfer the loan servicing for U.S. Department of Education-owned student loan accounts from Navient to Maximus received all necessary approvals from the U.S. Department of Education Office of Federal Student Aid (FSA). Maximus replaces Navient as the contractor for loan servicing of 5.6 million Department of Education-owned student loan accounts.

The accounts will transition to Maximus's servicing division, Aidvantage, by year end, after a series of communications to borrowers. The loans will remain on the same student loan servicing technology platform, owned by Fiserv, and approximately 800 Navient employees who previously worked on the Department of Education loan servicing team will transfer to Maximus.

"We are pleased to report the completion of the contract novation of the U.S. Department of Education owned student loan accounts. We look forward to supporting FSA as an independent, conflict free provider, committed to providing an enhanced focus on the borrower experience and to help fulfill FSA's mission," stated Teresa Weipert, General Manager, Maximus Federal Services.

"We welcome our new colleagues joining us from Navient, many of whom have decades of service and bring a deep understanding of the borrower experience," commented Weipert. "To help ensure a smooth transition, Navient will subcontract to Maximus for the first 90 days."

**About Maximus**

Since 1975, Maximus (NYSE:MMS) has operated under its founding mission of *Helping Government Serve the People*®, enabling citizens around the globe to successfully engage with their governments at all levels and across a variety of health and human services programs. Maximus delivers innovative business process management and

## U. EXHIBIT: "BORROWERS BESIEGED" (May 27 2025)

**EDUCATION IN AMERICA**

# Borrowers Besieged

Student debtors are under attack on all sides. Government contractors make their life miserable, and financial predators are poised to capitalize.

 BY **DAVID DAYEN**
MAY 27, 2025



Credit: Illustration by Ryan Inzana

*This article appears in the* **June 2025** *issue of* The American Prospect *magazine.* **Subscribe here**.

https://prospect.org/2025/05/27/2025-05-27-borrowers-besieged-student-debt/                    1/17

In April, the Department of Education **announced** that it would resume collection on defaulted student loans for the first time in five years. Loan collections were paused during the pandemic in 2020 to offer some breathing room, but once confirmed as education secretary, Linda McMahon put a stop to that. "American taxpayers will no longer be forced to serve as collateral for irresponsible student loan policies," she vowed in a statement.

Roughly **5.3 million student borrowers** who haven't paid for more than 360 days were thrown into collections on May 5, and **government data** shows that another 5.59 million could hit default status within six months. And the federal government's powers to force repayment far outstrip those of private businesses.

The Treasury Offset Program matches borrower information with government payments, and commandeers those funds to pay the loans. Tax refunds (including from low-income supports like the Earned Income Tax Credit) can be taken entirely, and so can a portion of monthly Social Security payments for retirees and people with disabilities. As a cherry on top, the Offset Program **charges the borrower a $20 fee** for the privilege of having their money taken. The Education Department also uses a different program, after giving 30 days' notice, to garnish up to 15 percent of a borrower's weekly wages.

### *More from David Dayen*

Because federal collections statutes have not changed since 1996, only $750 per month is protected from Social Security seizures, meaning that the Offset Program can push borrowers into poverty. None of this requires a court order, and there is no statute of limitations on collections.

But it's misleading to say that the *government* is grabbing wages and tax refunds and Social Security checks. A private company known as a loan servicer handles day-to-day operations on every federal student loan. But when borrowers slip into default, loans get transferred to the Default Resolution Group (DRG), managed by a *different* private company, a contractor called **Maximus**. This creates borrower confusion about who the point of contact even is.

McMahon's Education Department has urged borrowers in default to **contact the DRG** to understand their options. But Maximus **has been sued** before for **giving improper information** to borrowers looking to escape default, and for **snatching tax refunds** of borrowers who should have been excluded from collections; the latter case **reached an undisclosed settlement** last year. In a third lawsuit, then-Education Secretary Betsy DeVos was **found in contempt of court** in 2019 for failing to stop Maximus collections against defrauded borrowers. Maximus reportedly **failed to hire enough staff** to properly tag borrowers who should have had their wages and government payments protected.

The watchdogs enlisted to look out for students have been effectively recalled by the Trump administration.

It would be incorrect to identify Maximus as a *uniquely* poor student loan servicer. Virtually all companies contracted by the government to manage student loans have been found to violate standards and practices. Navient, once the largest, was eventually **barred from servicing** entirely. And several state attorneys general are **investigating MOHELA**, another large servicer, over miscalculating billing payments and mishandling paperwork, following up on a **lawsuit filed by the American Federation of Teachers** last year.

The basic problem is that servicers lack any incentive to help borrowers deal with loans in distress. "One student loan servicer employee once told me that the goal was to get the borrower off the phone as fast as possible," said Rohit Chopra, former director of the Consumer Financial Protection Bureau (CFPB) and prior to that the agency's student loan ombudsman. The endless passing of borrowers between servicers and the financial imperative to rush borrowers into bad options turns the process into something Kafka would recognize.

The failures of contracted private companies boosts the fortunes of a separate set of private companies that are primed to prey on borrowers. For those in or nearing default, this could take the form of "debt relief" operators that pledge to improve a borrower's situation, but which offer nothing that someone isn't already entitled to under the law. As the $1.6 trillion federal student loan system erodes—which could accelerate if Republicans in Congress follow through on their intention to make loans more expensive and more punitive— would-be students seeking skills could be overrun by private lenders with even shoddier financing options, for-profit education programs dangling worthless degrees, or a combination of both.

Many of the worst abuses in higher education were contained by regulatory safeguards in the past several years. But those protections are under threat of being rolled back. And the watchdogs enlisted to look out for students have been effectively recalled by the Trump administration, precisely at the moment when collections are back and repayment pressures are rising.

"It's sort of a perfect storm facing borrowers," said Abby Shafroth, director of the Student Loan Borrower Assistance Project at the National Consumer Law Center. "As they restart this process, they will have no help."

**ONE PROBLEM FACING BORROWERS** is the sheer complexity of the process, and the incentives of the contractors involved. The Education Department **terminated contracts** with private student debt collection agencies in 2022, after **years of evidence** of **unlawful behavior**. But payment seizure and garnishment practices are now in the hands of Maximus, which effectively operates as debt collector and servicer, two tasks that often come into conflict.

For example, borrowers threatened by wage garnishment have the right to request a hearing to contest collection. But responses to that request go through Maximus, which is paid per loan in its portfolio, and

therefore has a financial interest to keep people in default. The wage garnishment hearing process "has never worked," said Thomas Gokey, co-founder of the Debt Collective, a student borrower advocacy group. "If you submitted a request for a hearing, it was getting flushed down a black hole." A **2020 law review article by Deanne Loonin** reinforces this claim, arguing that the hearings "offer no more than an illusion of due process."

In 2019, the last time collections were turned on, 1.2 million borrowers made voluntary payments, according to a **CFPB report**. But that does *nothing* for their default status unless the payments are routed through **loan rehabilitation**, a process where borrowers can avoid default if they agree in writing to make nine payments over a ten-month period. The company in charge of explaining that is … Maximus.

"I don't think anyone feels responsible for borrowers in default," said one government source who works on student loans.

The rules themselves can harm borrowers. In loan rehabilitation, involuntary garnishment of wages or government benefits *can continue* during the first five voluntary payments. Borrowers can also **consolidate** defaulted loans into one payment, including income-driven repayment, which limits payments to a percentage of wage income, often lowers payments to $0 for the lowest-income borrowers, and forgives the balance after 20 to 25 years. But because loan consolidation cancels credit toward debt forgiveness and capitalizes interest into the unpaid balance, the amount owed gets higher, and if borrowers are steered by self-interested servicers into the wrong option, their monthly payment could go *up*.



Credit: Leisa Thompson/The Ann Arbor News via AP

Given the availability of affordable options like income-driven repayment, the number of borrowers in default **should really be zero**. But the Trump administration's actions aren't helping. In response to a court order blocking the Biden administration's **generous** income-driven repayment plan in February, the Education Department **pulled down applications** for three other IDR plans and loan consolidation, while **issuing a memo** to stop processing nearly two million existing IDR applications. (The department announced it would restart processing those applications, but not before collections begin.)

The last round of student loan debt collection also demonstrates the dangers of expecting private companies to administer public processes fairly. When the COVID pandemic hit in March 2020, Congress turned debt collection off for defaulted student loans in the CARES Act, and the Education Department **promised to follow through**. But Elizabeth Barber, a 59-year-old home health aide earning $12.89 an hour, **explained in a federal lawsuit** that her paycheck continued to be garnished repeatedly. Her hours were cut during COVID, and the money being taken was critical to her survival, as her checking account was empty and she was past due on water and electric bills.

"I don't understand why the government keeps taking my money away after it passed a law that says they will stop," **Barber said** at the time.

In the first six months after passage of the CARES Act, the Education Department's **inspector general reported**, more than $582 million was illegally garnished from over 390,000 defaulted borrowers. And

Document      Page 120 of 130

though the Biden administration was more sympathetic to the plight of student debtors, it took them a while to wrap their arms around a devilishly convoluted system on autopilot. Some garnishments continued to August 2021, *17 months* after the CARES Act became law, according to internal documents uncovered by the **Student Borrower Protection Center**. Some loans being garnished were already paid in full.

Atrocious recordkeeping was to blame. Maximus, which manages wage garnishment, conceded to the Education Department that most employer addresses where it was sending stop-garnishment letters were invalid. At one point, the servicer started googling employer phone numbers and cold-calling, and later resigned itself to "hav[ing] done what we can" to stop garnishments in an email to the department in February 2021. Some collections continued for six months after that.

Yet when the Education Department needed to find a loan servicer in 2021 to take over Navient's portfolio of 5.5 million loans, it allowed a transfer to Aidvantage, **a division of Maximus**, making Maximus America's largest student loan servicer. Almost immediately, Aidvantage was accused by borrowers of **not contacting them** in a timely fashion and **issuing incorrect demands** for payments.

In a statement, Maximus spokesperson Eileen Rivera called the company "a conflict-free partner to government" and directed all specific questions to the Education Department. Questions for the Education Department were not returned.

"It raises questions about how the department is communicating with borrowers in default, or handling requests for review," said Shafroth. "Will borrowers have opportunity to challenge the debt and get into repayment?"

If not, bottom-feeders from the outside are circling.

**THERE'S A SMALL BIT OF TEXT** at the Office of Federal Student Aid's (FSA) **website** about getting out of default, several screens down the page, that advises, "If you are contacted by a company asking you to pay 'enrollment,' 'subscription,' or 'maintenance' fees to help you get out of default, you should walk away. Your loan holder will help you with your defaulted loan for **free**."

Those 39 words buried on a government website are unlikely to provide enough protection. "This is going to be a massive opportunity for debt relief scammers," said Sam Levine, who ran the Bureau of Consumer Protection at the Federal Trade Commission (FTC) during the Biden administration. "They are going to say, 'This is last chance to get Biden debt relief, call us now.' They're going to impersonate the Department of Education. They always take news events as hooks."

**Several separate schemes uncovered** by the CFPB in recent years demonstrate how they work. Debt relief companies obtain leads, including from credit reporting agencies, to identify distressed student borrowers. They then use direct mail, telemarketing calls, or online advertising to reach those borrowers, offering to help them navigate the admittedly byzantine student loan process for an up-front fee. Performance SLC, for example, **charged between $1,000 and $1,400** to file applications for loan consolidation, income-driven repayment, and other options. Another scheme, GST Factoring, charged **up to 40 percent of a borrower's outstanding debt**, plus a monthly processing fee.

Some companies actually perform document preparation for borrowers, which is a better outcome than others who appear to do nothing at all other than take fees. But it shouldn't cost anything to file student loan repayment applications with the government. "Debt relief companies collect the same information from borrowers that the borrower would be inputting from their own computer on studentaid.gov," Shafroth said. In some cases, companies ask for borrowers' credentials to log in to the government portal for them, which makes it difficult for borrowers to wrest back control of the loan once they realize they've been scammed.

"The hot new idea is the old 2007 idea, let private lenders back into the space."

In **one of the worst examples**, Prosperity Benefit Services mailed "Time Sensitive" notices promising "complete loan forgiveness," with a telephone number to call. When borrowers made the calls, representatives would claim they were affiliated with the Department of Education, and that they could offer "guaranteed" forgiveness in as little as a few months. All borrowers had to do was hand over personal information and bank account authorization for the up-front monthly payments. **According to a lawsuit** from the FTC, Prosperity frequently did no work to secure any payment modifications. Because the scheme took place during the COVID-era student loan payment pause, some borrowers only found out years later that they still had loan obligations. Over $20 million was siphoned from consumers before the government learned of it.

The FTC mostly enforces debt relief scams under the Telemarketing Sales Rule, which prohibits up-front fees and misrepresentations about savings. But the agency put in place an **Impersonation Rule** to stop companies pretending to be from the government or other businesses. Its first use was in the Prosperity case, and last June, a federal court immediately **halted the scheme and froze the company's assets**. A later **settlement** permanently shut down the enterprise.

Under President Biden, the FTC and CFPB did a lot of work to root out student debt relief scams. The FTC employed additional tools, like the new Impersonation Rule and a **provision of the Gramm-Leach-Bliley Act** prohibiting anyone from falsely obtaining a consumer's financial information. Agencies also began to name individual defendants in their lawsuits. But with the Trump administration's zeal for deregulation, these tools could disappear, and scam artists could work their way back to victims. "You do wonder, will there be a cottage industry of people wanting to profit off people's pain?" Chopra asked.

While bringing cases provides a deterrent effect, Levine says that it's so easy to set up one of these operations that law enforcers are constantly running a losing race. Defunct companies also sell their leads to upstart firms, who rerun and replicate the scams. Levine thinks enforcers need to go one step further. "They should look where there are patterns of payments and processors who are serving the debt relief operators," he said. The FTC **did this in 2021**, banning Automatic Funds Transfer Services (AFTS) from processing payments after uncovering its participation in a student debt relief scheme.

Levine doubted that the Trump administration would go there, given **Republican resistance** to a similar initiative in the Obama years that tried to stop banks from processing payments for payday lenders and other high-risk businesses. But FTC spokesperson Nicole Drayton told the *Prospect* that going after companies like AFTS that "substantially assist or facilitate unlawful telemarketing activity such as a student loan debt relief scam … is often important to stopping the fraud and returning its proceeds to consumers." She added that the FTC would continue to police debt relief scams, including by using the Impersonation Rule and naming individual defendants, as it did in a **recent case in March**.

Meanwhile, the legitimate system for getting student loan assistance is so difficult to navigate that borrowers may be attracted to other options. "The best strategy to stop scammy debt relief is to have good student loan servicing," Levine said.

**MILLIONS OF STUDENT BORROWERS** can't keep up with their loan payments now, but House Republicans' solution is to price out the borrowers of the future. On April 29, the House Education and Workforce Committee marked up its contribution to the giant budget reconciliation bill, aimed mostly at reducing $330 billion in college financial aid over a decade, and funneling that money into tax cuts for the rich.

The Republican bill eliminates all but two repayment programs. A standard plan with a fixed interest rate would last between 10 and 25 years, depending on the amount borrowed. Single debtors carrying the average amount of student debt as of the end of 2024 ($38,374) and the current 6.3 percent interest rate would owe $432 a month, and would pay close to $3,000 per year more than under the cheapest Biden-era plan, according to an **analysis** by the Student Borrower Protection Center. The alternative, an income-driven repayment plan, would last 30 years before the balance is extinguished, and offer little assistance to most borrowers unless they don't earn much.

More important, the Republican bill imposes a lifetime cap on available loan amounts: $50,000 for undergraduates, $100,000 for graduate students, and $150,000 for students in professional programs like medicine or law. These figures are almost certainly inadequate to cover a full course of study, and other financial aid would be harder to access as well. Pell grants would only be available to "full-time" students

with 30 hours of coursework per academic year. Part-time students who must work to sustain themselves would be locked out of those grants.

Democrats on the committee outlined the stark choices facing aspiring college enrollees if the bill were to pass. "Students would be forced to turn to predatory lenders looking to profit off the desire to get an education," said Rep. Jahana Hayes (D-CT). Corporate lobbyists seem to agree, though they put it differently. "It's a victory, and it certainly opens up market opportunity," Robert Moran, who represents private student lenders, **told Politico**.

Since changes embedded in the Affordable Care Act of 2010 established direct federal lending, private student loans make up only about **7 percent of the market**. But the corrosion of direct lending offers private actors a ray of hope. SoFi, the leading private refinancing company for student loans, saw originations **increase 71 percent** year over year in the fourth quarter of 2024, and stay at **roughly that level** in Q1 2025.

"I think the old Sallie Mae is the new Sallie Mae," said Julie Margetta Morgan, president of the Century Foundation and a former CFPB and Department of Education official. She's referring to the largest private student lender in the U.S. prior to 2010, which benefited from a government guarantee that backstopped losses on its portfolio. After direct lending, Sallie Mae immediately **fired 30 percent of its staff**. The company got into servicing—under the name Navient, which was **kicked out** of the servicing market. "They wanted to retain elements of the business that could be the ticket to success," Margetta Morgan said. "The hot new idea is the old 2007 idea, let private lenders back into the space."

# Up, Up and Away

Under a proposed Republican bill, monthly payments on student loans would be much higher.



Expected payment for a family of four with two dependents under income-based repayment plans. Analysis via the Student Borrower Protection Center.

Indeed, in a February note on its **website**, Sallie Mae rebranded itself as an "education solutions company" that offers planning resources and "responsible private student loans to cover any gaps in financing." The note warns that federal student loans allow families to "overborrow" and lead to "unsustainable levels of debt." The implication is clear: make the federal system stingier so families will be forced into the arms of lenders like Sallie Mae. There's even been talk about **selling off the entire student loan portfolio** to the private market.

One hurdle is that students, particularly ones who can't afford their loans currently, will not be seen as a solid credit risk. Interest rates will be much higher than what's available in the federal system. Teaser rates and other enticements could attract borrowers, but without the government backstop, it's hard to see how legitimate private lenders can find success.

Illegitimate ones, however, might have a shot, especially in the regulatory free-fire zone the Trump administration is establishing. "I definitely think it's true that you'll see people turning to payday loans, or the equivalent of a payday loan but it's on an app," said Thomas Gokey of the Debt Collective.

Chopra believes that paying for student lending could drift into other credit markets. Credit cards could see rising balances, or there could be increases in home equity loans, eroding the transparency we currently have

into the student loan market. "When you squeeze someone who can't pay, they might meet that obligation by getting on a treadmill of debt," Chopra said.

Sketchy lenders aren't the only entities that could see new life under the Republican student loan overhaul. The bill repeals two critical regulations aimed at ensuring colleges and universities are high-quality. The gainful employment rule requires that program graduates can get employed in their field of study and earn enough to pay off the debt. The 90/10 rule forces educational institutions to derive at least 10 percent of their revenue from something other than federal financial aid, requiring schools to find legitimate tuition sources and not just feed off student loans.

These rules attack the for-profit college sector, which **dates back to the 19th century** but which really ramped up after the Higher Education Act of 1965 authorized federal assistance for college students. During the Obama years, rampant abuses at for-profit colleges piled up, including high-pressure sales tactics that misled students about job placement, substandard coursework, piles of forced debt, and diplomas with no value for career advancement. Amid state and federal enforcement and tightening regulatory standards, dozens of campuses **went out of business**.

That was a win for students and taxpayers, Chopra explained. "If we care about stopping waste, fraud, and abuse, we cannot allow for-profit schools chowing down on public funds to not deliver something of value to students." But removing the gainful employment and the 90/10 rules while also diminishing the federal student loan system could bring for-profits roaring back. Worse, while during the previous for-profit college bubble, students who were defrauded by their schools were able to eventually **have their loans canceled**, another provision of the Republican bill would block such loan forgiveness. Victims of crime would have to essentially pay for the crimes committed against them.

Of course, for-profits of the past relied entirely on federal loans, and if that system breaks, the economics may not make sense anymore. But at the nexus of shady private lenders and shady education programs are companies that do both. And even before Congress succeeds in wiping away regulatory obstacles, these innovators are inching their way back onto the field.

**CHRIS BELCHER WAS AN EX-MARINE** selling windows who wanted to break into software sales. Ads kept popping up in his Facebook feed promising exactly that, and he bit. Prehired touted a six-week training course that would **guarantee** a tech sales job with $60,000 in earnings.

The coursework was online, self-directed, and somewhat rudimentary; Belcher told me the first class involved setting up email signatures in Microsoft Outlook. Recruits could go at their own pace. "Basically it was like, you take care of what we're telling you to do, and we'll help you get a job," he said. But the way Prehired

structured payment was noteworthy: A contract entitled the company to **12.5 percent of their graduates' eventual income**, until they paid off $30,000.

The concept is known as an income share agreement (ISA), a privatized version of income-driven repayment with vague and sometimes harmful terms. Purdue University experimented with them, but among the earliest adopters were Silicon Valley venture capital firms. "You had people who thought they would hack higher education by offering these companies that were both student lender and education provider," said Mike Pierce, a former CFPB official and executive director of the Student Borrower Protection Center, which has **warned of the dangers** of ISAs.

Along with allegedly deceptive marketing tactics and more aggressive debt collection buried in the contractual fine print, ISA providers were insistent that they weren't offering loans, and therefore didn't have to provide several borrower protections. When the Education Department **issued guidance** in 2022 that ISAs actually were loans, following on **similar guidance from the CFPB**, many of the programs dried up, **including at Purdue**.

Economic hardship offers a target-rich environment for financial schemes.

Prehired was **founded** in 2017. Recruits were told that they wouldn't start paying part of their incomes until they finished the course and earned the $60,000 salary promised in the pitch within 12 months. Belcher never finished the course, but he became a recruiter for the company, targeting the program to the military, which was his background. Belcher brought a few companies to Prehired that were seeking sales recruits, but none would ever convert. Meanwhile, students found him on LinkedIn and reached out, complaining that Prehired wasn't helping them land a job. Belcher was being paid on commission, and also wasn't making any money.

Belcher quit after a few months and went back to the window industry. "I got a callback from Prehired and they said, 'Hey you got a job.' I said, 'I didn't finish the course and the window industry isn't the same as software sales.' But they wanted their money." **Evidence** later showed that Prehired debt collectors tried to coerce students into converting their ISAs into settlement agreements that would be "beneficial" for them. But the settlements would make the payments contractually obligatory with little recourse.

The phone calls continued until early 2022, when Belcher and **more than 280 other Prehired students** became defendants in simultaneous debt collection lawsuits filed in Delaware, where the company was incorporated but nowhere near many of the defendants. Prehired claimed the loans were in default and sought a $25,000 judgment against each borrower, giving them 15 days to respond. When Delaware's consumer protection unit questioned the lawsuits, Prehired **voluntarily dropped the cases**, but then refiled them through a private arbitration platform, despite no student ever signing an arbitration agreement.

By this point, Prehired alumni were **organizing** through **posts on LinkedIn**. Some appealed to then-Washington state Attorney General Bob Ferguson, who **filed a lawsuit** in June 2022 to shut down Prehired; three months later, the company filed for bankruptcy. The CFPB and 11 states **sued Prehired**, eventually leading to a settlement whereby the bankruptcy court ordered Prehired to shut down, return $4.2 million to students, and cancel another $27 million in ISAs.

This all seemed like old news until late last year, when Prehired somehow resurrected under the name **FastTrack**. Virtually everything about the FastTrack sales pitch is **identical to Prehired**; in its **testimonial section**, it includes comments from students who explicitly reference Prehired. Initially, the website included **blogs authored by Prehired founder Joshua Jordan**, though if you look at the site now, the blogs are **attributed to Tre Scinta**. It is not clear whether FastTrack has any students or if they've just set up the website, which claims that "hundreds" have been helped.

Pierce's Student Borrower Protection Center **informed state AGs** who settled with Prehired that the company appeared to have popped up with a new name, which they claimed could be a violation of the settlement. But after everything was documented in **The Verge**, Bill Stiber, who identifies himself as co-founder of FastTrack and a successful Prehired graduate, insisted that the company is a wholly separate entity that merely licensed Prehired's intellectual property from the bankruptcy estate. Stiber added that Jordan was not involved with the company.

Stiber and Jordan didn't respond to questions from the *Prospect*.

**DURING CHOPRA'S TENURE**, the CFPB was not only active in shuttering Prehired, but taking action against other ISA schemes arising from Silicon Valley accused of deceiving students, like **BloomTech**. But when advocates saw Prehired transformed into FastTrack, they did not take their concerns to the CFPB, which by that point had been shut down itself for two months. In fact, state attorneys general who settled the Prehired case in 2023 **recently asked Vought** why consumer refunds for students have still not been processed, and why he hasn't answered emails about the matter.

Enforcement of financial scams has withered under acting CFPB director and Project 2025 architect Russ Vought, and student loans are no exception. The agency's student loan ombudsman, Julia Barnard, was initially fired in a mass purge before being **reinstated by a federal judge**. Barnard was not part of the second attempted mass purge in April, also blocked by the same judge, but her **entire staff was**. Among the dozen-plus enforcement actions left over from Chopra's tenure that Vought has dropped is a **proposed $2.25 million settlement** with the National Collegiate Student Loan Trusts, a servicer of private student loans accused of improper debt collection. And in an **April memo** announcing enforcement priorities, acting CFPB chief legal officer Mark Paoletta stated that the bureau would "deprioritize" student loans.

President Trump **said in March** that, in conjunction with closing the entire Education Department, he would move the student loan portfolio to the Small Business Administration, an agency with a **tattered history** of managing federal credit programs. It's unclear whether that has moved forward, and it would likely require congressional action. But the Education Department has **fired the entire staff** at the Office of Federal Student Aid charged with oversight of student loan servicers.

There's a clear through line between sending cops off the beat and inviting would-be thieves to come out of the shadows. "I think there's clearly a Trump effect on these kinds of operations," said Pierce. "You have Linda McMahon **making the case** for short-term workforce training as a substitute for higher education. That's an open sign for scammers."

Economic hardship offers a target-rich environment for financial schemes. Credit reporting on student loan delinquencies, which resumed during the Trump administration, was responsible for an **overall drop in U.S. credit scores** for only the **second time in a decade**. Over 26 million borrowers are **not current on their student loans**, and credit hits make home mortgages, auto loans, and even renting more expensive. Consumer debt overall has **hit an all-time high**, and more than 40 percent of Americans under 30 say they are "barely getting by" financially, according to the **Harvard Youth Poll**. And that's before tariffs and supply shocks could tip the economy into recession.

When I **wrote about for-profit colleges** a decade ago, I talked to a corporate finance manager at one of the biggest networks, Corinthian Colleges, who told me that during the economic carnage of the Great Recession, her bosses were thrilled. Economic precarity leads to people seeking new skills, and desperation breeds susceptibility to pitchmen promising an escape hatch into the middle class.

Restarting student debt collections, limiting financial aid, and tossing out anyone who would monitor whether the alternatives borrowers seek out are legitimate seems like what a financial predator would do to lay the groundwork for a crime wave if they were in charge of the government. And it's worth pointing out that Donald Trump **paid a $25 million settlement** before winning the presidency in 2016 over his own for-profit real estate training enterprise, called Trump University.

But even before the Trump tsunami, borrowers weren't exactly having an easy time. The agencies manning the student loan program are underfunded, and their contractors are borderline indifferent. The rules are complicated and not well articulated. At least the predators have good marketing and slick communications.

The situation is a classic case of privatization ending up worse for everyone involved, because of the profit motive's inevitable conflicts with the public interest. The IRS is the biggest payment collector in the world, and could easily do the job of handling monthly student loan checks. In 2014, the Obama administration even **tested** eliminating servicer middlemen and taking student loan operations in-house. But fully undoing privatization would take manpower and money, and Washington's allergy to any of that means the broken system keeps rolling along.

When you recognize the deep anger borrowers have about their student loans and the unfairness of the system, you begin to understand why they've given up on government fixes and could be attracted to snake oil. In a **viral TikTok video**, a social worker with the handle @themath_aintmathin explains how she's been in an income-driven repayment program since 2011, in which time her loan balance nearly doubled due to interest accrual, from $46,000 to almost $90,000. "You want to know why people are pissed off about their student loans? It's not because we can't get anyone else to pay them for us. It is because you have set it up where we

https://prospect.org/2025/05/27/2025-05-27-borrowers-besieged-student-debt/                        16/17

*Borrowers Besieged - The American Prospect*

can never pay them off ourselves … Anyone who still doesn't see that this is rigged against us can get fucked!"

Why would anyone caught up in what they see as a rigged game expect the government to help them? Isn't it logical for them to pay for assistance they could get for free, if it means someone will actually answer the phone? Doesn't it make sense for them to run screaming from a perceived public-sector fraud, even if the result could be an actual private-sector one? The consequence of hollowing out government is a loss of trust, a core desire of anti-government ideologues. Rather than seeing what's happening to the student loan system as a confluence of disconnected horrors, it may just be a plan working to perfection.

This article appears in **Jun 2025 Issue**.

---

© 2025 The American Prospect, Inc. | All Rights Reserved

Powered by Newspack