**Ashley M. Gjøvik, JD**
*In Propria Persona*
(415) 964-6272
ashleymgjovik@protonmail.com
Boston, MA

# United States Bankruptcy Court

## District of Massachusetts

|  |  |
|---|---|
| **In Re:** | **Chapter 7 Case No: 25–11496** |
| | **Judge Christopher J. Panos** |
| **Estate of Ashley M. Gjovik,** | **Debtor's Declaration and Exhibits In Support of the Motion for Sanctions against Apple Inc. (Dkt. 58, 59, 63).** |

# DECLARATION & EXHIBIT

Pursuant to 28 U.S.C. § 1746, I, Ashley M. Gjovik, hereby declare as follows:

1. I am the Debtor in the Chapter 7 bankruptcy case 25-11496. I filed a Motion for Sanctions against Creditor Apple Inc for a willful violation of the automatic bankruptcy stay (11 U.S.C. § 362) on Feb. 20 2026.

2. It's my understanding that the Estate holds my pre-petition executory contracts which includes any contracts with Creditor Apple Inc entered prior to July 21 2025. *In re Corporación de Servicios Médicos Hospitalarios de Fajardo,* 805 F.2d 440 (1st Cir. 1986); *In re National Environmental Waste Corp.*, 191 B.R. 832 (Bankr. E.D. Cal. 1996).

3. It's my understanding that the automatic bankruptcy stay is not impacted by property abandonment, that the stay applies to all property of the debtor, and the stay is active during the bankruptcy proceeding until the court rules otherwise – and prohibits, among other things, "*commencing or continuing litigation*" against the Debtor. § 362(c)(1); 362(a)(5).

4. It's my understanding that pre-petition employment agreements, including confidentiality agreements (*In re Hruby,* 512 B.R. 262, 274 (Bankr. D. Colo. 2014 -- employer must seek stay relief before pursuing injunctive enforcement of confidentiality provisions against Chapter 7 debtor) and sometimes even collective bargaining agreements (*NLRB v. Bildisco and Bildisco*, 465 U.S. 513 (1984)) are subject to the automatic stay. It's my understanding that a post-petition contract would not be subject to the stay, but that a different legal test applies to post-petition claims based on pre-petition contracts. *In re New England Marine Servs., Inc.,* 174 B.R. 391, 397 (Bankr. E.D.N.Y. 1994).

5. It's my understanding that in order to lift the Stay a Creditor/Entity must simply file a motion to the bankruptcy court and unless the court acts, after 30 days the stay is lifted for the claim. § 362(e*); In re Midway Airlines, Inc.*, 167 B.R. 880, 883 (Bankr. N.D. Ill. 1994). If Apple filed their motion to lift the say on the same day it instead filed the Letter requesting sanctions for a pre-petition executory contract (Feb. 18 2026), and the court had not responded, the stay would have been lifted nearly two weeks ago, but Apple still has not filed a motion and denies the stay applies to them.

6. In Feb. – March 2026, Creditor Apple Inc filed papers in civil litigation in the Northern District of California (*Gjovik v. Apple Inc*, 3:23-cv-04597) alleging violations of a pre-petition contract(s)

between it and the Debtor, including both pre-petition facts and post-petition facts, and arguing they represent the same legal nexus and basis for requesting relief that includes but is not limited to: injunctions, gag orders, compelled deletion of speech, findings of contempt, and other sanctions.

7.      It's my understanding that Apple has knowledge of the bankruptcy proceeding and the stay, that it violated the stay with its actions described above, it was put on notice of its violations, and it refused to remedy its violation, refused to restore status quo, and instead continued with its violations in violation of the Bankruptcy code. *In re Dyer*, 322 F.3d 1178 (9th Cir. 2003). It's my understanding that if Apple has requested to have the stay lifted, its current defense as to why the stay did not apply, would actually be its arguments for "cause" for relief from the stay rather than why the stay does not apply, because the stay does apply. *In re West Elecs.*, 852 F.2d 79 (3d Cir. 1988).

8.      On March 30 2026, I filed amended schedules to this Bankruptcy case including for the pre-petition executory contracts and added my employment contracts with Apple. These contracts were not listed prior because they offered the Estate no benefit and there were no counterclaims pled by Apple in the retaliation lawsuit based on those agreements, so they seemed irrelevant at the time. Because Apple is now attempting to enforce pre-petition contract(s), I have formally added them to the paperwork for this case.

9.      On March 7 2026, I filed supporting exhibits to this bankruptcy case docket capturing Apple's subsequent motions and filings. They were posted March 9 2026 to Dkt. 63 (25-11496).

10.      On March 11 2026, Creditor Apple filed a "*Motion Retain Confidentiality Designations*" for the same underlying claims that were the basis of this motion for a violation of stay, and now clarifying their sole legal authority cited is the pre-petition executory employment contract and repeatedly comparing the current allegations (about 2026 speech about pre-petition conduct/matters) to the supposed reason they fired the Debtor in 2021, indicating they believe there's a pre-petition violation of the contract and their request for relief arises from the same nexus as their current claims about the same contract. In both cases, they claim that public information, worker complaints about work conditions, and employee's own personal experiences are "confidential." (Dkt. 304-305). A true and correct copy of Apple's filings (Motion to Retain Designations, Motion to Seal, three Declarations, and two Proposed Orders) is attached as Exhibit A.

11.      On March 12-13 2026, I filed my Opposition (Dkt. 307) to Apple's Motion to Enforce the

Protective Order (Dkt. 294). My Opposition highlighted that Apple was belligerently claiming that public information, including a public clinical trial with federal government partnership, the allegations pled in the same lawsuit and summarized by the Judge in his prior orders, and an employee's pre-petition workplace complaints and personal experiences, were somehow "confidential." A true and correct copy of my filings (Opposition, Declaration, Request for Judicial Notice, Proposed Order) is attached as Exhibit B.

12.     On March 19 2026, Apple filed a Reply to their Motion to Enforce the Protective Order making the same and similar arguments as prior, but now also claiming that an NLRB dismissal of 2021 charges, which is currently under appeal with the NLRB Office of Appeal, that Apple previously said no binding legal or factual decision, and was dismissed by their own defense counsel upon her being appointed the NLRB General Counsel, is now evidence supporting their claims against the Debtor (Dkt. 294, 312-313). A true and correct copy of Apple's filings (Reply, Request for Judicial Notice, Proposed Order) is attached as Exhibit C.

13.     On March 20 2026, Apple filed an Opposition to the Motion for Discovery Sanctions under 26(G) arguing they have a right to a Protective Order because of the pre-petition executory contract, that they have no obligation to sign discovery materials, and that unsigned and unserved discovery matters and court papers can unilaterally great a secret prior restraint on other parties regarding public information, existing labor complaints, and the allegations in that lawsuit. A true and correct copy of Apple's filing is attached as Exhibit D.

14.     On March 25-26 2026 I filed an Opposition to Apple's Motion to Retain Confidentiality Designations (Dkt. 320-322) highlighting the "confidential" information was almost entirely made public already by Apple, there information in dispute represented at least two formal, public, medical studies; and NIH and the Harvard IRB oversight group were investigating Apple over Apple's claims that any of the study information was "confidential" and that they are retaliating against participants who complained about recruitment and declined to participate. A true and correct copy of my filings (Opposition, Declaration, Request for Judicial Notice, Proposed Order) is attached as Exhibit E.

15.     On March 27 2026 I filed an Reply to my Motion for Sanctions against Apple for violating Rule 26(G) (Dkt. 302, 325). I again highlighted that the information in dispute is public information, mostly made public by Apple, has been public for years, that Apple is required to sign its legal papers,

that Apple refused to correct its failure to sign/serve its legal papers, and Apple's confidentiality claims were thus a nullity and any later motions or other papers filed claiming otherwise were also nullities and sanctionable conduct. This would assumably include Apple's current defense to this pending motion for sanctions in the Bankruptcy case. A true and correct copy of my filing is attached as Exhibit F.

16.     On March 26 2026, I filed a second, new NLRB charge against Apple based on Apple's counsel's misconduct. The same day, counsel for Apple in the bankruptcy case, Andrew Troop, emailed me and threatened me with Rule 11 sanctions if I did not withdraw this motion and ask to cancel the April 2 2026 hearing with this Court. A true and correct version of the NLRB charge is attached as Exhibit G.

17.     I have spent considerable time, money, and effort in responding to all of Apple's filings which constitute the violation of the stay, which Apple refused to withdraw, and which I believe Apple intentional made as burdensome as possible (such as challenging things we previously agreed did not need to be challenged). I believe I'm owed reparations in the form of compensatory and punitive damages from Apple due to their willful and continuing violations. *In re Schwartz-Tallard,* 803 F.3d 1095 (9th Cir. 2015).

18.     I declare under penalty of perjury under the laws of the United States of America, and in compliance with Fed.R.Bankr.P. Rule 9011, that the foregoing is true and correct.

Executed on March 30 2026 in San Jose, California.

Respectfully submitted,

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 30 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be served upon parties (Apple and the Trustee) via the Court′s electronic filing system (when the pro se clerk posts it). Apple already has copies of all of these as well served through efiling as they are court/legal documents in the civil litigation.

# EXHIBIT A

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:     +1 650 614 7400
Facsimile:     +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
 2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:     +1 202 339 8400
Facsimile:     +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK, | Case No. 23-cv-4597-EMC |
| Plaintiff, | **DEFENDANT APPLE INC.'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| APPLE INC., | |
| Defendant. | Date:     April 16, 2026<br>Time:     1:30 p.m.<br>Dept:     Courtroom TBD<br>1301 Clay Street<br>Oakland, CA 94612<br>Judge:     Honorable Kandis A. Westmore |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND .............................................................................. 3

       A.    Plaintiff Challenges Apple's Limited Confidentiality Designations
             Pertaining to Her Deposition Testimony.................................................. 3

       B.    Public Disclosure of Apple's Confidential Product-Related Information and
             Studies Concerning Internal Code Words and Internal Product-Related
             Studies Will Harm Apple ......................................................................... 4

III.   LEGAL STANDARD ......................................................................................... 5

IV.    ARGUMENT ...................................................................................................... 6

       A.    Plaintiff Has Not Challenged Many of Apple's Confidentiality
             Designations. ............................................................................................ 6

       B.    The Court Should Retain Apple's Remaining At Issue Designations Over
             Plaintiff's Challenge................................................................................. 6

             1.    Public Disclosure of Apple's Confidential Product-Related
                   Information Concerning Internal Code Words for Products and
                   Internal Product-Related Studies Will Harm Apple................................ 6

             2.    No Countervailing Interests Warrant Public Disclosure of Apple's
                   Confidential Product-Related Information and Studies. ........................... 7

       C.    Plaintiff's Anticipated Arguments Lack Merit. ........................................ 8

             1.    Apple Did Not Waive Confidentiality. ................................................... 9

             2.    Apple Did Not Designate Information Already In the Public
                   Domain. ................................................................................................. 9

             3.    Information Plaintiff Learned During Her Employment Pursuant to
                   Her Confidentiality Agreements with Apple Can Also Be Properly
                   Designated Under the Protective Order. ............................................... 10

             4.    Plaintiff's Remaining Arguments are Meritless..................................... 12

V.     CONCLUSION ................................................................................................ 14

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barrington v. United Airlines, Inc.*,
  339 F.R.D. 644 (D. Colo. 2021) ................................................................................................. 13

*Collateral Analytics LLC v. Nationstar Mortg. LLC*,
  No. 18-CV-00019-RS (JSC), 2019 WL 3779191 (N.D. Cal. Aug. 12, 2019) ......................... 11

*DVD Copy Control Ass'n Inc. v. Bunner*,
  116 Cal. App. 4th 241 (2004) ................................................................................................... 10

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497, 138 S.Ct. 1612 (2018) ....................................................................................... 12

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
  331 F.3d 1122 (9th Cir. 2003) ..................................................................................................... 5

*Lin v. Solta Med., Inc.*,
  No. 21-CV-05062-PJH, 2024 WL 2112893 (N.D. Cal. Apr. 11, 2024) ............................... 6, 7

*Pub. Citizen v. Liggett Grp., Inc.*,
  858 F.2d 775 (1st Cir. 1988) ..................................................................................................... 11

*In re Roman Catholic Archbishop*,
  661 F.3d 417 (9th Cir. 2011) ....................................................................................................... 5

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984) ..................................................................................................................... 11

*United States v. Bulger*,
  283 F.R.D. 46 (D. Mass. 2012) ................................................................................................. 11

**Rules**

Fed. R. Civ. P. 26(c) .......................................................................................................... 2, 5, 10, 11

Fed. R. Civ. P. 26(g)(2) .................................................................................................................. 12

Local Rule 5-5(a) ............................................................................................................................ 12

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

## NOTICE OF MOTION AND MOTION

**TO PLAINTIFF ASHLEY GJOVIK:** PLEASE TAKE NOTICE that on April 16, 2026, at 1:30 p.m. in a courtroom to be determined (TBD) of the above-titled Court, located at 1301 Clay Street, Oakland, CA 94612, Defendant Apple Inc. will and hereby does move the Court for an Order retaining Apple's designations of portions of Plaintiff's deposition transcript as Confidential pursuant to Paragraph 6.3 of the Protective Order (Dkt. No. 235).

This Motion is made on the grounds that (1) Plaintiff agrees that some of Apple's confidential designations may be redacted from the public record; and (2) the limited confidentiality designations Plaintiff challenges relate to confidential internal product code words and study information, public disclosure of this information will harm Apple, and there are no countervailing interests that warrant publicly disclosing the information. Specifically, Apple moves to retain all unchallenged confidentiality designations (including those Plaintiff agrees Apple may redact), as well as the confidentiality designations for testimony related to Apple's product-related information contained at the following pages of Plaintiff's deposition transcript: 164:10-11, 164:14, 164:15-16, 164:25, 165:13-23, 166:1-2, 166:4, 166:14, 167:17, 167:20, 168:19, 169:1, 169:10, 169:25, 170:9, 176:16, 197:18, 197:21, 205:17, 225:25, 226:1, 226:3, 226:4, 236:14-15, i5 (351), i6 (352), i8 (354), i20 (366), i22 (368), i28 (374). This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Melinda S. Riechert ("Riechert Decl."), the accompanying Declaration of Mike DiVincent ("DiVincent Decl."), the complete pleadings and records on file, and other evidence and arguments as may be presented at the hearing on this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Apple moves to retain confidentiality designations related to portions of the transcript of Plaintiff's deposition taken on December 16, 2025. During her deposition, Plaintiff testified about confidential internal code words used for Apple products as well as her understanding of confidential internal product-related studies that she learned about during her employment at Apple. The parties met and conferred and Plaintiff did not oppose redacting from the public record many

- 1 -

of Apple's designations, but challenged others. Apple agreed to de-designate some portions of the transcript Plaintiff challenged but continues to assert that others should be treated as confidential. Specifically, Apple retains the designations Plaintiff agreed to redact and the following pages of the deposition transcript she specifically challenged: 164:10-11, 164:14, 164:15-16, 164:25, 165:13-23, 166:1-2, 166:4, 166:14, 167:17, 167:20, 168:19, 169:1, 169:10, 169:25, 170:9, 176:16, 197:18, 197:21, 205:17, 225:25, 226:1, 226:3, 226:4, 236:14-15, i5 (351), i6 (352), i8 (354), i20 (366), i22 (368), i28 (374).

The remaining at-issue designations pertain to confidential Apple product-related information that fall into two buckets: (1) internal code words for Apple products; and (2) descriptions of internal product-related research and development studies. As set forth in the DiVincent Declaration, Apple will suffer harm if this internal product-related information is disclosed to the public. Indeed, Federal Rule of Civil Procedure 26(c)(1)(G) expressly acknowledges that this court may properly issue an order requiring that "***confidential research, development, or commercial information not be revealed or be revealed only in a specified way***" (emphasis added).

Additionally, there are no countervailing public or private interests that compel disclosure of Apple's confidential product-related code words and descriptions of its research and development studies. No privacy interests are present. Plaintiff intentionally publicly disseminated information about Apple's confidentiality designations prior to any ruling by this Court as to whether Apple's confidentiality designations should be retained (*see* Dkt. No. 294), and continues to do so. *See* Dkt. Nos. 297, 301, 301-1, 302, 302-1, and 302-2. There also are no important public issues involved. Plaintiff is not prohibited from using this testimony in support of her case, so long as she does so consistent with the Protective Order. *See also* Dkt. No. 303 (order from Judge Chen confirming "[t]he sealing does not prevent her from litigating her case.").

Apple respectfully requests the Court grant its motion to retain the confidentiality of the designations Plaintiff has not appropriately challenged as well as those she did challenge (*i.e.*, any designation Apple did not agree to de-designate).

APPLE'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS; MPA [23-CV-4597-EMC]

## II.   FACTUAL BACKGROUND

### A.   Plaintiff Challenges Apple's Limited Confidentiality Designations Pertaining to Her Deposition Testimony

Apple took Plaintiff's deposition on December 16, 2025. Riechert Decl. ¶ 2. Not knowing what Plaintiff might say in response to the questions posed, during the deposition Apple designated a large portion of the transcript Confidential under the Protective Order but, after discussion on the record, the parties agreed that Apple would, upon receipt, review the transcript and provide more limited designations. *Id*. Ex. A (141:18-142:25). Plaintiff thanked Apple for agreeing to do so. *Id*. Apple received the transcript on January 7, 2026, and provided more limited confidentiality designations to Plaintiff and the court reporter on February 4, 2026, prior to the expiration of Plaintiff's deadline to correct her deposition testimony. *Id*. ¶¶ 3-4, Ex. B. Paragraph 6.2 of the Protective Order requires Plaintiff to do the following to challenge Apple's designations:

> The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order.

Dkt. No. 235 ¶ 6.2

Instead of proceeding under the terms of the Protective Order, Plaintiff violated the Protective Order by publicly disseminating the information Apple had designated as confidential.[1] Plaintiff also sent generalized complaints about Apple's designations—but it was not until February 18, 2026, that Plaintiff provided Apple a spreadsheet itemizing her position as to each of Apple's confidentiality designations; in that spreadsheet, she indicated she did not object to redacting many of the designations. Riechert Decl. ¶ 5, Ex. C.

Apple reviewed Plaintiff's itemized list and responded on March 4, 2026, within the fourteen days required by the Protective Order. *Id*., Ex. D. Apple's response confirmed it was withdrawing its designations as to some of the challenged testimony as part of the meet and confer

---

[1] Plaintiff's violation of the Protective Order is the subject of Apple's pending Motion to Enforce the Protective Order. *See* Dkt. No. 294. Plaintiff further violated the Protective Order by again publicly disclosing the information designated confidential in her recent filings. *See* Dkt. Nos. 297, 301, 301-1, 302, 302-1, and 302-2.

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

process, but retaining its designations as to other testimony that Plaintiff did not object to redacting as well as the challenged testimony at the following pages of Plaintiff's deposition transcript: 164:10-11, 164:14, 164:15-16, 164:25, 165:13-23, 166:1-2, 166:4, 166:14, 167:17, 168:19, 169:1, 169:10, 169:25, 170:9, 176:16, 197:18, 197:21, 205:17, 225:25, 226:1, 226:3, 226:4, 236:14-15, i5 (351), i6 (352), i8 (354), i20 (366), i22 (368), i28 (374).[2] *Id*. In lieu of responding to Apple's narrowed designations, Plaintiff filed a meritless motion for sanctions against Apple. *Id*. ¶ 7; *see also* Dkt. No. 302.

**B.** **Public Disclosure of Apple's Confidential Product-Related Information and Studies Concerning Internal Product-Related Studies Will Harm Apple**

Each of the remaining challenged designations relate to Apple's internal product-related information that it takes steps to ensure remain confidential and not disclosed to the public, specifically its internal code words for products and Plaintiff's description of the content, methods, and processes of internal product-related research and development studies. DiVincent Decl. ¶¶ 3-11. Apple, one of the world's leading technology companies, maintains its competitive advantage by adhering to strict confidentiality requirements for all past and present product research and development. *Id*. ¶¶ 3-5 Apple will suffer harm if this information is placed into the public record. *Id*. ¶¶ 6-7.

Given Apple's position in the technology market, there is an entire industry outside of Apple trying to figure out what products and services Apple is working on, how it develops its products and services, what studies it is conducting, how it is conducting those studies, and the results of those studies. *Id*. ¶ 6. Publicly disclosing a portion of components of Apple's internal code words undermines Apple's efforts to provide layered security over its confidential research and development. *Id*. ¶¶ 6-8. Publicly disclosing the contents, methods, processes, and equipment used in various internal Apple studies provides a competitive advantage to Apple's competitors—big

---

[2] In preparing this Motion, Apple identified a word at 167:20 that it inadvertently omitted from the designations it previously provided. Apple includes this designation in this Motion pursuant to Paragraph 5.3 of the Protective Order (Dkt. No. 235). *See* Riechert Decl., Ex. E. Given that Plaintiff challenged every other reference to this term, Apple assumes she will also challenge this additional reference.

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

and small—who can leverage Apple's processes and methods to iterate competing products or services without undertaking the cost and burden of trying studies and methods that do not work, particularly code words and studies for products that remain on the market. *Id*. ¶¶ 6-7, 9-11. This type of internal research and development and confidential business information is specifically described in the Federal Rules of Civil Procedure as the type of information this Court can fashion processes to protect from public disclosure. *See* Fed. R. Civ. P. 26(c)(1)(G).

### III.    LEGAL STANDARD

Generally, if a party challenges whether documents have been properly designated as confidential, the party seeking to maintain confidentiality pursuant to a protective order "has the burden of establishing that there is good cause to continue the protection of the discovery material." *In re Roman Catholic Archbishop*, 661 F.3d 417, 424 (9th Cir. 2011). When a party challenges the confidentiality of information under a protective order, the court conducts a two-step analysis. "First, it must determine whether particularized harm will result from disclosure of information to the public." *Id.* at 424 (internal quotation omitted). The party seeking to maintain confidentiality must "allege specific prejudice or harm." *Id*. (internal quotation omitted). Thus, "a party asserting good cause bears the burden, for each particular designation it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) (citation omitted).

"Second, if the court concludes that such harm will result from disclosure of the discovery documents, then it must proceed to balance the public and private interests to decide whether maintaining a protective order is necessary." *In re Roman Catholic Archbishop*, 661 F.3d at 424. The court considers the following non-exhaustive factors:

> (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Id*. at 424 n.5 (internal quotation omitted).

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

## IV.    ARGUMENT

### A.    Plaintiff Has Not Challenged Many of Apple's Confidentiality Designations.

Plaintiff's response did not challenge many of Apple's confidentiality designations because she agrees to allowing Apple to redact the information from the public record. Riechert Decl., Exs. C and E. Plaintiff's response confirms she does not oppose redacting this testimony, stating that she "does not object" to treatment in the way that Confidential information is to be treated under the Protective Order (*i.e.*, she does not object to redacting it). *Id*. Accordingly, the Court should grant Apple's motion as to these designations to confirm these designations will be treated as Confidential pursuant to the Protective Order because Plaintiff has not challenged them. And even if this Court interprets her response as a challenge, they qualify for protection as discussed below.

### B.    The Court Should Retain Apple's Remaining At Issue Designations Over Plaintiff's Challenge.

#### 1.    Public Disclosure of Apple's Confidential Product-Related Information Concerning Internal Code Words for Products and Internal Product-Related Studies Will Harm Apple.

It is well-established that "ongoing business processes, procedures, and strategies" for "products that remain in the market" that are "closely guarded" by companies because "exposing them would give competitors insight into these processes" can properly be designated confidential, as their disclosure would cause particularized harm. *Lin v. Solta Med., Inc.*, No. 21-CV-05062-PJH, 2024 WL 2112893, at *3 (N.D. Cal. Apr. 11, 2024). The Court should find the same here.

The challenged confidentiality designations pertain to code words for Apple products and descriptions of the content, methods, and processes for highly complex product-related research and development studies. DiVincent Decl. ¶ 7. Apple treats this information as confidential and implements multiple safeguards to limit access to this information. *Id*. ¶¶ 3-6. The code word and studies discussed in this testimony pertain to products that remain on the market and exposing this information to the public could give Apple's competitors insight into its confidential research and development methods, process, and equipment. *Id*. ¶¶ 7-11. Doing so will harm Apple. *Id*.

- 6 -

**2.     No Countervailing Interests Warrant Public Disclosure of Apple's Confidential Product-Related Information and Studies.**

This case involves a single plaintiff asserting wrongful termination and retaliation claims that have nothing to do with the information Apple designated confidential. There is no reason the information contained in the challenged designations needs to be in the public record, let alone any reason sufficient to overcome the harm to Apple of public disclosure. Indeed, none of the *In re Roman Catholic Archbishop* factors suggest disclosure is appropriate, and the second factor (*i.e.*, improper purpose) weighs heavily in support of retaining confidentiality.

**Factor 1.** There are no privacy rights at issue. Apple's confidentiality designations relate to internal code words for Apple's products and descriptions of the content, method, and processes of internal Apple product related studies. *See* DiVincent Decl. ¶¶ 7-11. Plaintiff's privacy is not at issue because her testimony is about the general methods and processes of the studies—not, contrary to her repeated protestations, her body or her personal experiences.

**Factors 2 and 3.** There is no proper purpose supporting public disclosure of this information outside of Plaintiff's prosecution of this litigation, which she can do under seal. Plaintiff instead publicized this information to an audience totally divorced from this case, unrelated to her pursuit of her claims. *See* Dkt. No. 235 ¶ 1 (protective orders are intended to facilitate "production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted"). Plaintiff's improper purpose is aptly illustrated by the blatant violations of the Protective Order at issue in Apple's Motion to Enforce the Protective Order and reflected in its accompanying evidence filed under seal. *See* Dkt. No. 294. Notwithstanding this Court's attempt to explain the Protective Order process to Plaintiff on February 20, 2026, Plaintiff again publicized the challenged confidential designations in her recent filings after Apple moved to enforce the Protective Order. *See* Dkt. Nos. 297, 301, 301-1, 302, 302-1, 302-2. Plaintiff's intentional and repeated violations of the Protective Order prior to this Court ruling on any challenge to Apple's confidentiality designations militates heavily in favor of an improper purpose. *See Lin*, 2024 WL 2112893, at *3 (finding Factor 2 "strongly support[ed] sealing" where "Plaintiff [was] seeking to

- 7 -

APPLE'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

make these materials public only after violating the protective order by impermissibly disseminating them"). The Court should not condone such behavior by finding a proper purpose under these circumstances.

**Factor 4.** Apple's internal code words and Plaintiff's description of Apple internal product-related research and development studies do not relate to matters of important public health and safety.

**Factor 5.** The information Apple designated confidential is irrelevant to the adjudication of Plaintiff's remaining claims. And there is no unfairness or inefficiency in retaining the designations even if Plaintiff wants to use this information in support of her case. Plaintiff has knowledge of this information by virtue of her employment with Apple (and her confidentiality obligations as an Apple employee), and Apple does not object to her using this testimony if she abides by the requirements of the Protective Order when doing so.

**Factor 6.** Apple is not a public entity or official and this factor is inapplicable.

**Factor 7.** This case does not involve important public issues. Plaintiff's remaining claims all relate to her individual experience as an employee at Apple and all flow from her allegations that Apple retaliated against her by wrongfully terminating her employment. Apple denies her allegations and will prove it terminated Plaintiff for publicly publishing confidential product-related information and for failing to cooperate in an internal investigation. *See* Dkt. No. 218 at 41-46 (Affirmative Defenses). Neither her allegations nor Apple's defense of her claims raise any important public issue.

### C. Plaintiff's Anticipated Arguments Lack Merit.

Apple anticipates, based on Plaintiff's other filings and correspondence to date, that her opposition will likely hinge on three primary arguments: (1) Apple waived confidentiality; (2) the information Apple seeks to designate is in the public domain; and (3) anything she personally learned while working at Apple cannot be considered confidential within the meaning of the Protective Order. Plaintiff has, in effect, previewed her opposition in the Motion for Sanctions she filed. *See* Dkt. No. 302. But none of these arguments has merit.

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

### 1. **Apple Did Not Waive Confidentiality.**

Ignoring her own agreement on the record to allow Apple to narrow its confidentiality designations after receiving the transcript, Plaintiff now contends that Apple waived its right to do so because it did not provide narrowed designations by January 6, 2026 (*i.e.*, 21 days post-deposition). *See* Dkt. 302 at 8-12. As discussed above, Apple designated a large section of the transcript as confidential at the deposition once Plaintiff began testifying regarding knowledge she gained of Apple as an Apple employee, at least some of which might implicate the very type of product development and internal research at issue here. *See* Dkt. No. 235 ¶ 5.2(b) (requiring that "for testimony given in deposition," a designating party "identify on the record, before the close of the deposition … all protected testimony"). But Apple made clear at the deposition its intent to narrow its designations upon receipt of the transcript, once it could review the official record of what Plaintiff had said and evaluate whether particular testimony was or was not Confidential. Apple never waived the right to treat this section of the transcript as confidential; in fact it did exactly as the parties agreed it would do on the record.

Apple did not receive the transcript until January 7, 2026 (and of course, Apple could not have provided narrowed designations until it received the transcript and had an opportunity to review it). After receiving the transcript, counsel for Apple prepared a chart and emailed it to (a) the court reporter within 30 days (so the court reporter knows what portions of the transcript to designate as confidential before it was finalized with any corrections from the deponent) and (b) Plaintiff so she knew what was being designated confidential and would treat the testimony accordingly or challenge the designations if she chose to do so. Riechert Decl., ¶ 4. Plaintiff's complaints about being included in the email cc: line makes no sense. Plaintiff admits Apple provided her with its narrowed designations—so she knows what she was required to treat as confidential until any challenges are ruled upon, and what is at issue for any challenges she wanted to make. Nothing more is required and there was no waiver of the confidentiality designations.

### 2. **Apple Did Not Designate Information Already In the Public Domain.**

Plaintiff will also likewise assert that confidential information related to internal product-related research and development studies is already in the public record because she generically

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

referenced these types of studies in her Second Amended Complaint and Fourth Amended Complaint, and in turn Judge Chen referenced those portions of her complaints in various orders. *See* Dkt. No. 302 at 13-14.[3] Plaintiff ignores that a generic allegation that Apple conducted studies in a certain category, or to study a certain issue, is different from testifying to Plaintiff's understanding of the methods, processes, or equipment used in internal product-related research and development studies. Federal Rule of Civil Procedure 26(c)(1)(G) expressly acknowledges that this court may properly issue an order that "***confidential research, development, or commercial information not be revealed or be revealed only in a specified way***" (emphasis added). Here, context matters. Plaintiff's testimony pertaining to what she describes as the methods, processes, and equipment of the studies goes far beyond anything she included in any of the various iterations of her complaint, and warrants the designation.

**3.**      **Information Plaintiff Learned During Her Employment Pursuant to Her Confidentiality Agreements with Apple Can Also Be Properly Designated Under the Protective Order.**

Finally, Plaintiff will likely assert that the Protective Order cannot be used to designate the information she testified about because she had independent knowledge of this information through her employment at Apple. *See* Dkt. No. 302 at 12. Plaintiff is incorrect. The Protective Order defines "Confidential" as any information or tangible things "that qualify for protection under Federal Rule of Civil Procedure 26(c)." Dkt. No. 235 ¶ 2.2. Rule 26(c)(1)(G) provides protection for "confidential research, development, or commercial information." Testimony purporting to describe Apple's internal product-related research and development studies clearly qualify for protection under Rule 26(c).

Plaintiff attempts to evade this clear provision by asserting her independent knowledge of these studies, if based on information she learned during her employment at Apple, cannot be

---

[3] Plaintiff also provides a generic list of other places she believes this information may be publicly disclosed but provides no evidence or link to allow for Apple or this Court to assess the validity of these claims. *See* Dkt. No. 302 at 13; *accord DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004) (holding with respect to trade secrets, "[p]ublication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient or otherwise limited so that it does not become generally known to the relevant people, i.e., potential competitors or other persons to whom the information would have some economic value.").

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

covered by the Protective Order. *See* Dkt. No 302 at 12 (citing Dkt. No. 235 ¶ 3(b)). But subsection 3(b) does not somehow transmute confidential product-related research and development that she learned about during her employment under an obligation of confidentiality to Apple into information Plaintiff is free to publicly disseminate once she provides it in discovery in this litigation. Nor would any such interpretation make any sense; an employee cannot retain confidential documents of her former employer and then produce them in litigation, or testify about confidential information she learned during employment in the course of litigation, and then claim the employer is impotent to designate that discovery material as Confidential (meaning the documents and testimony could be publicly filed and otherwise disseminated).

A court in this district has previously (and correctly) rejected the same argument. *See Collateral Analytics LLC v. Nationstar Mortg. LLC*, No. 18-CV-00019-RS (JSC), 2019 WL 3779191, at *4 (N.D. Cal. Aug. 12, 2019) (finding documents qualified for designation under protective order notwithstanding that party opposing designation had received information pre-litigation; "Simply put, there is nothing to suggest that the Protective Order's lack of protection for 'any information known to the Receiving Party prior to disclosure' operates to remove independent contractual confidentiality obligations in place for pre-litigation documents containing confidential commercial information such that those documents should be public for purposes of litigation."). Plaintiff's testimony described her understanding of confidential internal product-related research and development studies that she learned about during her employment with Apple under an express agreement with Apple to keep such information confidential. *See* DiVincent Decl. ¶¶ 3-5, 7-11. Plaintiff's attempt to disavow her confidentiality obligations based on a tortured interpretation of the Protective Order should be disregarded, just as this Court disregarded the same argument in *Collateral Analytics*.

Plaintiff will likely also claim violations of her First Amendment rights (*see* Dkt. No. 302 at 14), but that does not change the analysis. The First Amendment's presumptive right of access "does not extend traditionally or functionally to discovery material." *United States v. Bulger*, 283 F.R.D. 46, 59 (D. Mass. 2012). Instead, "first amendment scrutiny of protective orders must be made within the framework of Rule 26(c)'s requirement of good cause." *Pub. Citizen v. Liggett*

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

*Grp., Inc.*, 858 F.2d 775, 788 (1st Cir. 1988) (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)). Plaintiff's First Amendment concerns are not dispositive, as she suggests; they are embedded within Rule 26(c)'s "good cause" standard, which Apple addresses above and satisfies.[4]

### 4.      Plaintiff's Remaining Arguments are Meritless

Plaintiff's "Motion for Sanctions" also raises a host of other misplaced arguments—which Apple anticipates she will repeat in her opposition here—that should be summarily rejected.

***First***, Apple has never sought to enforce a "blanket" confidentiality designation. *See* Dkt. No. 302 at 8. This argument ignores that the Parties agreed on the record that Apple would review the transcript on receipt and provide narrower confidentiality designations. *See* Riechert Decl., Ex. A (141:18-142:25). Plaintiff cannot cry foul about a process she agreed to.

***Second***, Plaintiff's reliance on Federal Rule of Civil Procedure 26(g)(2) and Local Rule 5-5(a) are misplaced. *See* Dkt. No. 302 at 8-12. Rule 26(g)(2) applies to formal discovery requests, responses, or objections (*i.e.*, interrogatories, requests for admission, requests for production of documents). Local Rule 5-5(a) requires a certain method of service of process for "any pleading or other paper presented for filing." Apple's confidentiality designations are not a discovery request, response, or objection, and were not presented for filing when Apple notified the court reporter and Plaintiff of the designations. In any event, Plaintiff indisputably received Apple's narrowed designations, and these rules do not require more.

***Third***, Plaintiff's belief that Apple obtained the protective order and made its designations for an improper purpose is pure speculation and legally irrelevant. *See* Dkt. No. 302 at 15-20. Apple is entitled to have a Protective Order in place to govern confidential information that may be generated or exchanged in the course of this lawsuit, and cannot be limited to examples it provided to the Court during a hearing explaining why it was asking for a Protective Order against such a vexatious litigant who has intentionally disclosed Apple's confidential information in the past (and continues to do so). Moreover, contrary to Plaintiff's suggestion, Apple is not seeking to designate

---

[4] Any references to the National Labor Relations Act ("NLRA") are similarly misplaced. As the Supreme Court has noted, "the particulars of dispute resolution procedures in Article III courts … are usually left to other statutes and rules — not least the Federal Rules of Civil Procedure…", rather than the NLRA. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 138 S.Ct. 1612, 1627 (2018).

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-cv-4597-EMC]

as confidential testimony about Plaintiff's "own body" or physiology or "her own workplace complaints." Apple is seeking to retain confidentiality over Plaintiff's deposition testimony about internal product-related code words and internal research and development studies, nothing more. That she described Apple's confidential research and development studies in the context of specific concerns she had based on her understanding of the methods, processes, or equipment used in those studies does not somehow render that testimony outside the scope of the Protective Order.

**Fourth**, Plaintiff's claim that allowing Apple to designate portions of her testimony confidential is essentially a dispositive ruling in favor of Apple (*see* Dkt. 302 at 2, n. 2) shows her fundamental misunderstanding of what the Protective Order does and, more importantly, what it does not do. The Protective Order simply governs the use of information generated or exchanged during discovery in this matter through trial, which will have a separate order governing the use of confidential information. *See* Dkt. No. 235 ¶ 3 ("Any use of Protected Material at trial shall be governed by a separate agreement."). The application of the Protective Order does not result in any dispositive ruling. *See Barrington v. United Airlines, Inc.*, 339 F.R.D. 644, 648-49 (D. Colo. 2021) ("[T]his court recognizes Ms. Barrington's concerns that a protective order would perpetuate the very conduct that she challenges, *i.e.*, United's policies and procedures that result in secrecy. However, this substantive issue cannot—and should not—be resolved in the context of a protective order. Entering a blanket protective order is not equivalent to determining that United's practices are proper or improper.").

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Apple respectfully requests this Court enter an Order retaining its Confidentiality designations, including both those that Plaintiff agrees can be redacted from the public record and those Plaintiff challenges that Apple seeks to retain (*i.e.*, any designation Apple did not agree to de-designate).

Dated: March 11, 2026                                    ORRICK, HERRINGTON & SUTCLIFFE LLP


By:          *Melinda S. Riechert*
_____
MELINDA S. RIECHERT
Attorney for Defendant
APPLE INC.

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS; MPA
[23-CV-4597-EMC]

Docusign Envelope ID: 44213BB9-F990-473F-9D13-3A976B2F1E1D

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:     +1 650 614 7400
Facsimile:     +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:     +1 202 339 8400
Facsimile:     +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>             Plaintiff,<br><br>      v.<br><br>APPLE INC.,<br><br>             Defendant. | Case No. 23-cv-4597-EMC<br><br>**DECLARATION OF MICHAEL DIVINCENT IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS AND MOTION TO SEAL**<br><br>Date:      April 16, 2026<br>Time:     1:30 p.m.<br>Dept:     Courtroom TBD<br>           1301 Clay Street<br>           Oakland, CA 94612<br>Judge:    Honorable Kandis A. Westmore |

Docusign Envelope ID: 44213BB9-F990-473F-9B13-3A876B2F1E1D

I, Michael DiVincent, declare as follows:

1.      I am a Senior Director of Human Engineering at Apple Inc. ("Apple") and have worked for Apple since 2008 (and in my current Senior Director role since 2018).  In my role at Apple, I have managed a number of internal Apple product-related user studies, and am familiar with Apple's processes with respect to the confidentiality of such studies. I submit this declaration in support of Apple's Motion to Retain Confidentiality Designations and Apple's Motion to Seal. I have personal knowledge as to the facts set forth in this declaration. If called as a witness, I could and would testify competently thereto.

2.      Apple is a leading multinational technology company that designs, develops, and sells consumer electronics, software, and online services. Apple's core products include the iPhone, iPad, Mac computers, Apple Watch, Apple TV, and AirPods. Its core services include the App Store, iCloud, Apple Music, and Apple TV+.

3.      Apple devotes significant time, money, and resources to developing innovative products and services to stay at the leading edge of the industry. Because Apple employees can obtain access to non-public information related to Apple's development and refinement of its products and services, Apple requires employees to agree to a Confidential and Intellectual Property Agreement ("IPA") as a condition of their employment with Apple. The IPA covers information an Apple employee learns about proprietary product-related information that is not generally known outside of Apple and/or product-related information that Apple treats as confidential. This type of confidential product-related information includes, but is not limited to, trade secrets, research and development records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services. Apple treats this information as confidential, and requires its employees to do so, regardless of whether the product or service is ultimately developed, marketed, used, or rejected by Apple because things that Apple tries that do not work or are rejected are equally valuable to Apple's competitors as the products and services that Apple sends to market.

4.      Apple has a robust research and development process that is constantly evaluating the functionality of its existing products and services to make them better, as well as developing

- 1 -

Docusign Envelope ID: 44213BB9-F990-473F-9D13-3A976B2F1F1D

new products and services that are at the leading edge of the technology industry. To do this, Apple sometimes asks employees if they are willing to volunteer to participate in select internal user studies. Participation in these studies is voluntary, and each participant signs an Informed Consent Form ("ICF") to participate in the study that explains the data the study is collecting and how Apple uses that data. The ICFs also reiterate the employee's confidentiality obligations. An example of the type of language used in an ICF follows: "**YOUR CONFIDENTIALITY OBLIGATIONS**: By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple." Participants can stop participating in a study after a study begins if they change their mind.

5.      Many of Apple's internal product-related studies are confidential, and employees are expected to treat them as such. The data retrieved through these studies is only available to a limited and identified group of employees who have a need to know this information based on the work they are doing related to the product or service. Apple often assigns random user numbers to each participant in the study so that any data collected does not identify the participant. In other instances, data is aggregated without individual identification. Apple managers typically do not have access to data indicating whether any of their employees are participating in user studies. Participants are reimbursed for participating in these internal studies. The IPA covers studies that employees learn about through their employment with Apple that they decline to participate in, as well as studies the employee volunteer to participate in.

6.      Given Apple's position in the market, there is an entire industry outside of Apple whose focus is trying to figure out what products and services Apple is working on, how it develops its products and services, what studies it is conducting, how it is conducting those studies, and the results of those studies. The purpose of this industry is to gain a competitive advantage over Apple by gleaning insight into what Apple is working on and how it develops its products. Apple has maintained its position in the market by introducing innovative products and services that are unexpected or novel. Apple's ability to provide unique technological solutions and to surprise customers with new or better solutions is a foundation of Apple's success. This success relies on

- 2 -

DIVINCENT DECLARATION
[23-CV-4597-EMC]

Docusign Envelope ID: 44213BB9-F990-473F-9D13-3A976B2F1F1D

Apple's ability to conduct confidential research and development. Allowing this industry to have access to Apple's confidential product-related information—particularly information about the content, methods, or processes of Apple's internal product-related studies—harms Apple. This harm does not just flow from access by other multinational technology companies competing against Apple across the spectrum of products and services Apple provides, but it also arises from any entrepreneur seeking to cheaply create applications developed for Apple's devices by using Apple's methods and processes without the cost and burden of determining the best approach to any particular study.

7. I have reviewed Apple's confidentiality designations in this matter that Plaintiff has challenged. The challenged portions fall into two buckets of information that Apple treats as confidential and takes measures to protect from public disclosure, as described above: (1) testimony that purports to describe internal code words used for Apple's products and services; and (2) testimony that purports to describe the content, methods, and processes for internal Apple product-related studies. It is my opinion that disclosure of this information will cause harm to Apple.

8. Apple often uses code words for existing and future products and services it is refining or developing to add an additional level of security in the event of an improper or unlawful leak of confidential information about the development of these products or services. A person with access to the meaning of code words will know specifics about the product or service that Apple is developing that others who are not privy to the code words will not. This type of information is highly sought after by the industry that exists to obtain insight into Apple's development processes. The public disclosure of Apple's code words may also require Apple to redesignate its code words to correct for this breach of security, which will in turn require informing employees using such code words to have to redesignate the code words in their internal product-related materials.

9. Similarly, in my experience, competitors and other third parties regularly try to obtain insight into the content, methods, and processes of Apple's research and development. The remaining confidentiality designations that Plaintiff challenges appear to relate to her descriptions of several internal user studies Apple conducted. I am familiar with the studies Plaintiff discusses. While Apple also supports external studies that may be publicly available, I believe Plaintiff is

- 3 -

DIVINCENT DECLARATION
[23-CV-4597-EMC]

referring to internal studies and not external studies based her testimony about the methods and processes she believes were used in these studies. Plaintiff's testimony discusses her understanding of the content, methods, and processes of these studies, to include equipment used in the study. Whether certain methods, processes, or equipment was used or not used is confidential. Permitting this information to be publicly disclosed will harm Apple by allowing competitors to use and rely upon Apple's internal research and development processes.

10.    The studies she discusses relate to collecting data that assisted Apple with developing software and hardware to refine how its devices and features function. These types of studies are attempting to facilitate solutions to incredibly complex research and development problems. It is my opinion that permitting a competitor to learn Apple's internal methods and processes, including the specific equipment used and testing conducted, will harm Apple because it will assist competitors in directly competing against Apple without enduring the iterative cost of figuring out which measurements are relevant and which equipment can be used to best provide data necessary to complete the study. This could in turn enable competitors to bring products and services to market at a lower cost than Apple because they are not required to spend as much time and money on refining their testing processes to solve highly technical issues, like the complex issues these studies addressed. Indeed, these studies relate to Apple product features that remain in use in the market.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 4 -

DIVINCENT DECLARATION
[23-CV-4597-EMC]

11.      As stated above, my review of Plaintiff's testimony indicates that she is testifying about her understanding of internal Apple product-related research and development studies, not external studies. To my knowledge Apple has not publicly disclosed the methods, processes, or equipment used in the internal product-related studies she testified about. Likewise, publicly available information about external studies conducted by research institutions that Apple may have supported do not disclose the methods, processes, or equipment used in Apple's internal product-related research and development studies that are not publicly disclosed. Indeed, the methods, processes, and equipment used in external studies often varies from Apple's internal studies. For example, there are external studies related to women's health regarding some of the issues Plaintiff testified about, but these could differ from Apple's internal studies in terms of content, scope, duration, questions asked, information gathered, and, in some cases, equipment used.

I certify under penalty of perjury and pursuant to the laws of the United States that the foregoing is true and correct.

Executed March 11, 2026, in Cupertino, California.

*Michael DiVincent*
_____

MICHAEL DIVINCENT

- 5 -

DIVINCENT DECLARATION
[23-cv-4597-EMC]

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK, | Case No. 23-cv-4597-EMC/KAW |
| Plaintiff, | **EXHIBITS A, B, AND C FILED UNDER SEAL** |
| v. | **DECLARATION OF MELINDA S. RIECHERT IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS** |
| APPLE INC., | |
| Defendant. | Date: April 16, 2026 |
| | Time: 1:30 p.m. |
| | Dept: Courtroom TBD |
| | 1301 Clay Street |
| | Oakland, CA 94612 |
| | Judge: Honorable Kandis A. Westmore |

I, Melinda S. Riechert, declare as follows:

1.      I am an attorney admitted to practice law in the state of California and am a partner at the firm Orrick, Herrington & Sutcliffe LLP. I am counsel for defendant Apple Inc. ("Apple") in this action. I submit this declaration in support of Apple's Motion to Retain Confidentiality Designations. I have personal knowledge as to the facts set forth in this declaration. If called as a witness, I could and would testify competently thereto.

2.      As counsel for Apple, I took Plaintiff's deposition in this action on December 16, 2025. Not knowing what Plaintiff might say in response to my questions during the deposition that could be confidential I designated a large portion of the transcript as Confidential but reached an agreement with Plaintiff on the record that Apple would review the transcript upon receipt and would provide more limited confidentiality designations. Plaintiff thanked me for committing to providing more limited designations following a review of the transcript. *See*, Ex. A (141:18-142:25). A true and correct copy of excerpts of the transcript for Plaintiff's December 16, 2025, deposition containing information Apple retains as Confidential is attached as **Exhibit A**, with the unredacted version filed under seal.

3.      On January 7, 2026, the certified court reporter provided the transcript of Plaintiff's December 16, 2025 deposition to me via email.

4.      On February 4, 2026, counsel for Apple provided its more limited and targeted Confidentiality designations for the deposition transcript by emailing them simultaneously to the court reporter and Plaintiff. A true and correct copy of Apple's confidentiality designations for the transcript of Plaintiff's December 16, 2025 deposition is attached as **Exhibit B,** with the unredacted version filed under seal. The unredacted portions represent compromises Apple made during meet and confer for which it is not moving to retain. The redacted portions reflect designations presented in Apple's motion.

5.      Following some generalized complaints about Apple's designations, on February 18, 2026, plaintiff emailed me an excel spreadsheet containing her responses to each of Apple's confidentiality designations. Apple construed this spreadsheet as Plaintiff attempting to formally

- 1 -

RIECHERT DECL. ISO APPLE'S MOT. TO RETAIN
CONFIDENTIALITY DESIGNATIONS
CASE NO. 23-CV-4597-EMC/KAW

challenge its confidentiality designations pursuant to Paragraph 6.2 of the Protective Order. A true and correct copy of Plaintiff's challenges to Apple's confidentiality designations is attached as **Exhibit C,** with the unredacted version filed under seal. The unredacted portions represent compromises Apple made during meet and confer for which it is not moving to retain. The redacted portions reflect designations presented in Apple's motion. There were many designations that Plaintiff asserted she did not believe were confidential but did not object to allowing Apple to redact the information from public filings.  Plaintiff also asserted challenges to some of Apple's designations.

6.     Apple reviewed Plaintiff's challenges and, on March 4, 2026, I responded to Plaintiff's challenges indicating which of designations Apple was withdrawing and which designations Apple was retaining, while also noting that Apple did not treat any designations that she did not object to redacting as a challenge to confidentiality. A true and correct copy of my March 4, 2026, letter to Plaintiff detailing Apple's response is attached as **Exhibit D**.

7.     In lieu of responding to Apple's meet and confer, Plaintiff filed her own Motion for Sanctions against Apple, indicating that she does not agree with Apple's confidentiality designations. *See* Dkt. No. 302.

8.     To avoid ambiguity, attached as **Exhibit E** is a summary of Apple's understanding of the status of each of its confidentiality designations related to Plaintiff's December 16, 2025 deposition including those Plaintiff agrees she is not challenging, those Apple agrees to de-designate, and those that are at issue because Plaintiff challenged the designations and Apple intends to retain the designations. The chart also indicates which designations Apple believes should be retained.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

RIECHERT DECL. ISO APPLE'S MOT. TO RETAIN
CONFIDENTIALITY DESIGNATIONS
[23-CV-4597-EMC-KAW]

9.      Mr. DiVincent signed his declaration in support of this motion via DocuSign and concurred that it may be filed in support of Apple's Motion to Retain Confidentiality Designations.

I certify under penalty of perjury and pursuant to the laws of the United States that the foregoing is true and correct.

Executed March 11, 2026, in Menlo Park, California.

Dated: March 11, 2026

*/s/ Melinda S. Riechert*
Melinda S. Riechert

RIECHERT DECL. ISO APPLE'S MOT. TO RETAIN
CONFIDENTIALITY DESIGNATIONS
[23-CV-4597-EMC-KAW]

# EXHIBIT A

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

```
            ::: INDEX OF EXHIBITS :::

  NUMBER          DESCRIPTION                        PAGE

  Exhibit 9       September 12, 2017, email           127
                  chain; Subject:  Glimmer
                  Announcements (Various Bates
                  numbers starting with
                  APL_GAELG_00002762 - 11 pages)

  Exhibit 10      July 25, 2018, email; Subject:      171
                  Filer:  Your digital copy
                  (APL_GAELG_00002780 -
                  APL_GAELG_00002787)

  Exhibit 11      Pearl Hand Carry (Various           187
                  Bates numbers starting with
                  (APL_GAELG_00002864 - 7 pages)

  Exhibit 12      May 8, 2019, email; Subject:        196
                  Agreement Complete –      HWE
                  Informed Consent Agreement
                  (APL_GAELG_00002788 -
                  APL_GAELG_00002795)

  Exhibit 13      August 13, 2020, email;             202
                  Subject: Agreement Complete –
                  HWE Living On with [redacted]
                  (APL_GAELG_00002805 -
                  APL_GAELG_00002819)

  Exhibit 14      Plaintiff's Fifth Amended           233
                  Complaint (78 pages)

  Exhibit 15      Twitter posts                       233
                  (APL_GAELG_00002247)

  Exhibit 16      August 17, 2021 email chain;        241
                  Subject: HE 3D Ear Scan
                  Invitation!
                  (APL_GAELG_00002296 -
                  APL_GAELG_00002300)

  Exhibit 17      Twitter posts                       241
                  (APL_GAELG_00002274 -
                  APL_GAELG_00002279)
```



A.   It's the 14 -- page 14 on the PDF?

Q.   Yeah.  Yes, 14th page.

A.   Okay.  Go ahead.

Q.   Is this a copy of an email that you sent to Robert McKeon?

A.   It looks like it, yeah.

Q.   The redacted portion -- you see the word "redacted" --

A.   Yep.

Q.   -- in the document?  You understand that it refers to         .  Do you understand what         is?

A.   I believe that was the new phone that had that new camera and the new form factor, and this is -- looks like September, so I would have just gotten a version of it.

Q.   So does that refresh your recollection that you got the new version of the phone in September of 2017?

A.   I'm not sure, but that sounds right.  And I kind of also remember there was limited hardware available for distribution for that model. Normally -- the point of the LiveOn on the Apple devices was to have dev-fused versus the production, which is what this email is about because they want to gather more logs than they can from customers.



Production reflects more of a customer version.  So this exchange is about the production version.

Q.  That's way beyond my question.

A.  Okay.

Q.  Okay.  Do -- did you receive the new ▮▮▮ the week of August -- September 11 to 15th?

A.  I don't recall when I got it.

Q.  And was the ▮▮▮ new iPhone with camera that you received, was that a production device?

A.  Yeah.  That's what I was just saying.

Q.  And what's the difference between a production device and a development device?

A.  Just for the record, I was trying to explain that, and you interrupted me and said it was not relevant, and now you're asking me the same information.

Q.  No.  I said it wasn't responsive to my question.  So I ask you a question, you answer that question.  Then I ask you another question, you answer that question.  I didn't say it wasn't relevant.  I just said it wasn't responsive to my question.  If we can just focus on answering the questions, we'll move along a lot quicker.

A.  Okay.  So the general terms of production and development hardware within the Apple internal



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)          December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

that would normally be impossible on customer devices with the production configuration.  And so it was unusual for me to have a production device because I was being asked to live on development so I could -- they hoped -- hit bugs, software and hardware, and gather logs and allow debug by the engineering teams where we normally couldn't do that for customers.  So I was confused why there were -- this email representing me being confused why stated -- the documentation assumably said that certain things were being gathered, and they weren't being gathered on my phone -- that phone.

Q.  And on September 18, you were inquiring about why Gobbler was not saving Bio Data; is that correct?

A.  Yeah.  So I don't remember this, and I must have been referencing some kind of, like, document that was talking about it.  It says I just got my -- said ▮▮▮ last week and Glimmer isn't saving any -- I put upper caps -- Bio Data.  I'm on current -- this must be an operating system or, no, in hardware.  I don't know -- I don't know what that redaction is.

Q.  Assuming that's ▮▮▮.

A.  Oh, I'm on current ▮▮▮?  Both of those.  I



got my ▮▮▮▮ last week and I'm on current ▮▮▮▮ hardware?

Q.   Let's assume that.

A.   Okay.  And every day I've checked.  I've seen --

Q.   Actually it's ▮▮▮▮.  Sorry.  ▮▮▮▮▮▮▮▮.

A.   Oh, so that's the new software.  The new, like, .o release.  I might -- might have been released around that time.

"And every day I've checked.  I've seen nothing in the biometric kit."  And there's a radar saying, "Glimmer not gathering any data."  And then that looks like it was sent to Robert McKeon Aloe.

Q.   And what biodata were you expecting it to save?

A.   So to get the -- to get the ▮▮▮, those were -- everyone wanted a ▮▮▮.  We were so excited about that, and it was a very cool thing if you could get one of Apple's very --

Q.   The question is, what bio --

A.   I was on a LiveOn -- sorry.

Q.   What biodata did you expect it to save?

A.   Whatever is reflected in the operations program LiveOn for ▮▮▮.  To get the ▮▮▮ you had to be in a formal LiveOn program, which generally was



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                     December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.  Yes.  And in that email -- is that an email that you sent?

A.  Yeah.  It looks like to Steve Clucas.  He used to be in our product integrity team and then he was a manager in the QA team.

Q.  I didn't ask you that.  I just asked if this is an email that you sent.

A.  Yeah.

Q.  And you indicated that Glimmer, which we've been calling Gobbler, is disabled.

A.  What is -- can you tell me what the redactions are?

Q.  I think that's the same number.

A.  So there's a bunch of redactions on this document.  "Is Glimmer disabled on" redacted "or should I file a bug" --

(Reporter admonition.)

THE WITNESS:  "Is Glimmer disabled on" redacted --

BY MS. RIECHERT:

Q.  And the redaction is ███.

A.  ███?  Oh, ███ software release.

"Or should I file a bug".  And then "my last" redacted.

Q.  And that's ███.



A.  -- "was prod-fused and Glimmer worked fine on" --

(Reporter clarification.)

THE WITNESS:  Prod.  Oh, sorry.  Prod like production fused, F-U-S-E-D.

So the fusings are one of the differences between the development and production devices we were talking about earlier.

What was your question, Melinda?

BY MS. RIECHERT:

Q.  And the last redaction is data -- ████████, ████████████.

A.  Okay.  So -- so I mentioned earlier that I first had the prod-fused ████ due to the limited hardware availability, so at some point they gave me a dev-fused ████.  So this appears to be when I had the dev-fused.  And then the software updates are alphabetical.  So ██████ -- you have the .o and then you have a B, and a C, and a D.  So this would be like a spring release.  And then the E would be the one after it.  So it sounds like I moved from the ██████ release to the E release, and then when I moved to the E release, Glimmer wasn't working.

Q.  And was that issue resolved?

A.  I don't know.  I would also get -- the



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

hardware, it can only come from Apple.  But it's --

Q.  So the answer is yes.

A.  Yeah.

Q.  Okay.  If it's a yes-or-no question, did Apple provide it to you, then you can just say, "Yes, it did" or, "No, it didn't."

A.  But that's misleading because I don't want it to sound like Apple is just giving you a free customer iPhone.  It's an Apple engineering build specific for the program that can only come from Apple for the purpose of the program.

Q.  And you got the device for you to use and to test; correct?

A.  Yes.  Insofar as using was generally the testing except for some programs which had the extra obligations like ██, which we just talked about. I remember there was a lot of, like, homework in addition to just the "use it and if you find issues, report those issues."

Q.  And some of these were production fused; correct?

A.  They really never, no.  And so that ██ being production fused was unusual and the result of there being such limited hardware available for the LiveOn program.  Because, again, the general point



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

of the LiveOn was to have employees living on the development hardware that allowed more in-depth debug and logging than you would ever find on a customer device.

Q.   And if it was production dev-fused like the ███, you had less access to test -- test apps and features; is that correct?

A.   Not necessarily and it depends on the different levels of development.  So, like, the production fused -- dev-fused is one of them. There's other things that do at a hardware level that's certainly for security for customers.  So it depends on what type of development model and level it is.

It also depends on what software you're installing, and they're generally different software versions of each of the releases, and some of them will have, like, a future release with a ton of new changes and you'll see a lot of different stuff. But then sometimes they'll have ones that you can't really see much different.  And then if you have, like, internal stuff specific to those new features, it's only been that -- it's -- it's very -- it's -- this is not an easy to define or predictable answer for you.  I'm sorry.



**TALTY COURT REPORTERS, INC.**     **131**
**408.244.1900 - www.taltys.com**

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.   Exhibit 9.

A.   Oh, the 9_2 from September 12?

Q.   Correct.

A.   I don't recall.  I don't know if I had a copy of this, and it's not clear who the distribution is.

Q.   So you don't recall whether you received it?

A.   Uh-uh.

Q.   You said you received several iPhones.  Do you remember how many iPhones relating to LiveOn studies that you participated in between August of 2017 and September of 2021?

A.   That information would be directly available to you in my iTrack history if they still retained it.  But I would guess probably over a dozen.

Q.   And were all of those development versions that you had for the LiveOn study?

A.   No.  The ███ we were discussing, that was production fused in a limited hardware availability for LiveOn.  Those emails stated it was production fused.

Q.   And in order to get this iPhone for the LiveOn -- the LiveOn iPhone phone, you had to participate in a LiveOn study; correct?

A.   Not always.  So this is what I was saying,



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  From August 2018, I don't.

Q.  Okay.

MS. RIECHERT:  It's 12:00 o'clock.  Time for a lunch break.  How long -- let's go off the record and then we'll discuss how long everybody needs.

THE VIDEOGRAPHER:  This marks the -- this marked the end of Media Number 2.  We are now going off the record.  The time is 12:06 p.m.

(Lunch recess:  12:06 p.m. to 1:02 p.m.)

-oOo-

::: AFTERNOON SESSION :::

THE VIDEOGRAPHER:  We are going on the record at 1:02 Pacific Standard Time.  This marks the beginning of Media Number 3 in the deposition of Ashley Gjovik on December 16, 2025.

Please continue.

BY MS. RIECHERT:

Q.  With respect to the protective order issue, we are designating this portion of the transcript as subject to the protective order.  Once we get the transcript itself, we will go back to you and tell you which words or which sentences or which questions or which answers we want to be held confidential.  So right now we're being cautious because I don't know what your answers are going to

be by designating everything related to this as confidential, but that doesn't mean I intend to permanently keep it that way.  As soon as I get the transcript, I will let me know which words, which sentences, we need to designate as confidential, and the rest of it we'll unrelease.

Does that make sense?

A.  Yeah.  Thank you, ma'am.  And then so I can request a copy too so it's, like, a joint thing?  It's not just --

Q.  Yes.

A.  Okay.

Q.  Yeah.  You'll have a copy of the transcript.  When we get a copy, you'll get a copy.  And you -- and then I will send you an email maybe with the transcript and say, "Here are the parts that we deem confidential.  The rest of it is not subject to the protective order."

A.  So do I -- do I still have to request my own or you guys -- I just get a copy when you get a copy?

Q.  That's up to the court reporter whether they give you a copy or you have to go somewhere and look at it or whether you have to buy it.  I don't know anything about that.  I know I have to buy it.



the default was if you were listed individually, it would still end up in your inbox even if it went also to a group you were on.

Q. So as long as the email went to you individually, it would come into your -- into your inbox?

A. I believe so.

Q. Okay. And did you create folders on -- you used Outlook; is that correct?

A. No, I didn't use Outlook. Apple will be so mad at you when they read this part. They're going to get so mad at you. No, I used Apple Mail.

Q. Okay. And does that have folders?

A. Yeah. So the back end of Apple Mail is the same thing where Sieve is creating those folders. I also -- ███████████████████████████
████████████████████████████████
█████████████████████████████
██████████
████████████████████████████████
██████████████████████████████
█████████████████████████████████████
████████████████████████████████████
████████████████████

Q. Focus on the question. The question was did



pretty good chance I was going to put it in some folder versus keeping it in my inbox.

Q.  I just wanted to clarify that I understand something.  You got a production-fused phone initially for the ▮▮▮ project; is that correct?

A.  That's my recollection, yeah.

Q.  That is or is not?

A.  Is.

Q.  Yes.  And then did you later get a development-fused phone?

A.  Yeah.  I believe it was very short after.

Q.  Okay.  And did you have the Glimmer app on the development-fused phone?

A.  I assume I -- if it was built into the operating system at the time, then, yes, it definitely would have been.

Q.  Okay.

A.  I think it was.

Q.  And did you understand that the development-fused phone gave you full access to Glimmer?

A.  The full access is kind of a vague term because there's going to be different tiers depending on whose version of configuration is what and what kind of software they're running and all of



And, yes, I did worry about saying no to stuff, but there was some stuff I'd just draw the line, I didn't want to do.

Q. But you said to Dan, "Hey, they asked me to participate in this ear study, and I don't want to do it," is that what you said essentially?

A. I think I was complaining more generally of, like, Apple is doing some really invasive stuff that seems weird. Like when they were doing the ███████████████████████████████████████████████. I was pointing out, like, I think Apple is crossing some lines --

(Reporter clarification and admonition.)

THE WITNESS: They were doing ███████████ studies where they were ██████████████████████████████████, and I said I think that's too far.

BY MS. RIECHERT:

Q. And did you ask to participate in that study?

A. No.

Q. Or did you agree to participate -- excuse me -- in that study?

A. Oh, and the one I also pulled out of --

Q. Hold on a second. I didn't hear the answer on the ██████████ study.



A.  No.

Q.  Okay.  Are there other -- was that in 2021 by the way?

A.  I think they started asking about that stuff in, like, 2019.  And then they were still asking in -- by 2021.  I said no.

Q.  Okay.  Were there other studies that you were asked to participate in that you said, no, thank you?

A.  Yes.  There was one that I had signed up for and pulled out because I didn't realize the terms until it was underway and it bothered me, which was the █████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████ ██████████████████████████████████████ ██████████████████████, and I found that very disturbing.

Q.  And so you pulled out of the study?



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  The NDA part and the ████████████████

████████████████████████████████████████████.

Q.  My question was did you pull out of the ████████ study once you found out these NDA required -- were required?

A.  I used -- I did it for a little while and I don't think I actually signed a formal "I'm not doing this anymore," but I stopped, like, putting stuff in the app, and I stopped using the sensor and just -- like, didn't -- just tried to, like, fade away from it.

Q.  But you didn't send an email to anybody saying, "Hey, I don't want to participate in the ████████ study anymore"?

A.  I don't think I've ever sent an email like that.

Q.  Okay.  And did you find any negative impact of you of not -- no longer participating in the study in the sense of using the app and the like?

A.  Possibly.  Like, I -- and I watched the managers, because I worked for these executives, go through the data where they can see what employees participate in stuff and how much they are participating, and it does -- it is meaningful data for them and it can lead to performance decisions.



And so I knew this -- that because all this is done with my employee name and ID number and data, that in the reporting, that it would be seen if I'm participating or not or how much I'm participating, and I had been told that they would get notice from some of these LiveOn programs like the iPhone operations.  That -- like Dan and Dave had told me that they heard from Sabih Khan's LiveOn program that I was one of the best LiveOn people, and I was really helping them with that program.  And they even told my managers that and it was celebrated and that kind of stuff ended up in my review.  So it's intuitive to me that if it can end up in my review and support my good performance that it could also do the opposite if I behave opposite.

Q.  And when did you stop participating in the ▇▇▇ study?

A.  Is that a question?

Q.  Yes.  When did you stop participating in the ▇▇▇ study?

A.  I don't recall.

Q.  Can you give me an estimate on the year?

A.  No.

Q.  Did anybody -- sorry.  Did I interrupt you?

A.  Oh, I was just going to say there should be



email records of when I was enrolled and when I stopped submitting data and stuff.  Like, it's something you could check.  I can't remember though.

Q.  Did anybody ever say anything negative to you because you were no longer participating in that study?

A.  It's possible it could have been Raz -- sorry.  R-A-Z, Raz, by Jay Golden, J-A-Y G-O-L-D-E-N.  He was one of those LiveOn PMs that was under Dan's new LiveOn team when he took it over from John Basanese, and he saw that data and he harassed me a lot, like, in a friendly way but still a lot of harassing and sometimes about participation in programs.  I don't remember if he said something specific about this, though, but it's possible he did.

Q.  Did either of your managers ever comment on the fact that you were no longer participating in the ████ study?

A.  Dave really didn't get that information because he was Mac-specific products and he wasn't in the same stuff Dan was.  But, like I said, I talked to Dave -- or to Dan.  I remember complaining generally to Dan about this stuff.

Q.  So Dave didn't know whether you were



participating in the ████ study?

A. I don't -- I would have to speculate, but with Dan I assume he is because it became under his team and he had way more access to that kind of information in his role and it was cross-product for his role, where Dave's wasn't. So I'm not going to speculate on Dave's knowledge.

Q. Do you know if Dan ever said anything negative to you about the fact that you were no longer participating in the ████ study?

A. He might have because he directly benefited from having more people providing data for that stuff.

Q. You don't have a recollection of his doing so?

A. I don't remember his direct responses on this stuff, no. But I know that there wasn't anything, like, overtly supportive or making any kind of changes.

Q. Okay. So you mentioned that you were not happy with Dan -- you mentioned to Dan that you were not happy with the Glimmer/Gobbler app, the studies on yoga and swimming and monitoring vitals, the ear app. You said you didn't want to participate. The weird -- the weird stuff about ████ studies.



Was there anything else you said to Dan about your unhappiness with studies that Apple was doing?

A.   Yeah.  I think it was generally just kind of like a -- we need a boundary here of what -- because, you know, I would do a lot of the LiveOn on, like, a Mac computer and file bugs and stuff. And that's a lot different than my employer asking to request status of ████████████.  And so it was kind of, like, I feel like we need to sort as a company what we're doing here generally and using myself as kind of case study of my reaction to some of those requests.  But as -- I don't remember them ever really doing anything different, and I remember even making privacy, kind of, invasion complaints even I think, like, in May 2021 --

Q.   Way beyond my question.

A.   Okay.

Q.   You said Dan brushed it off.  Do you recall the gist of what he said when you said, "I don't like these creepy studies that Apple's doing"?

A.   He typically brushed most of my complaints off, so it would be a similar --

Q.   On this -- on this -- on this -- yeah. Focus on my question.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  Yeah.

Q.  You said that you didn't like these creepy studies that Apple was doing.  Can you give me the gist of what Dan said in response?

A.  Yes.  He just really wouldn't, like, respond.  He'd kind of like acknowledge he was listening and then just change the subject.

Q.  So he didn't say anything in response to that comment that those -- that comment you made on the subject?  Just changed the subject?

A.  I mean, that was his typical.  He just didn't really address the stuff and he would change the subject and not really -- tried to avoid whatever the thing was.

MS. RIECHERT:  Okay.  So now I believe I've marked -- nope.  I'd like to mark as Exhibit Number 10 the document that's at tab 2-02.

(DEPOSITION EXHIBIT 10 WAS MARKED.)

THE VIDEOGRAPHER:  Exhibit 10.

BY MS. RIECHERT:

Q.  So this document relates to the ███ LiveOn study.  Did you receive a copy of this email?

A.  Sent 2018.  Looks like it was sent to my work email, attached a document from user studies at Apple.  That looks like an email I would have



**TALTY COURT REPORTERS, INC.**                **171**
408.244.1900 - www.taltys.com

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

received.  I don't recollect receiving it though.

Q.  And would you have put it in your LiveOn subfolder to your employee stuff folder?

A.  Probably.

Q.  Okay.  And did you receive a new device for participating in this study?

A.  I don't recollect.  Sometimes it would be the existing device and they'd enroll you in a study for it or sometimes they'd give you a new one.

Q.  Do you know if the device you received was dev-fused?

A.  Assumably.  It almost always was.

Q.  Do you know what "███" refers to?

A.  I'm trying to remember.  I believe the ███ was the phone with the new camera and it was a large one, and I think ███ might have been the one with the new camera but it was a smaller form factor.  Is that right?

Q.  I'm asking the questions.

A.  Oh, I don't -- I don't remember.  We usually needed, like, a matrix to remember.

MS. RIECHERT:  Okay.  I'd like to mark as Exhibit Number 11, a document that's at tab 12-03 [sic].

/ / /



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

iPhone studies already.

Q.   Right.

A.   And I had been for years and they were directly cited in my reviews that the example I gave you of things I didn't want to participate in --

(Reporter clarification.)

THE WITNESS:  Okay.  The -- the things I -- I declined to participate in were things like the exercise studies or ears.  Those were completely different studies.  I had been a accomplished LiveOn participant in iPhone and -- especially iPhone, but also, like, Mac and some other LiveOns for years. It was already directly said in my reviews.  I was already on the LiveOn lists.  I was automatically invited.  So this was not the same.  This was not comparable to a one-off invitation for a ▮▮▮▮▮ study that I had not previously participated in.  I was a long-term participant in the iPhone -- a variety of iPhone LiveOn programs.

BY MS. RIECHERT:

Q.   And you said that you didn't sign the ICF because you didn't -- you pretended it wasn't happening.  You therefore knew the type of information that was in the ICF; right?

A.   Most of the Apple -- I don't think that's an



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)          December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

you're in that line already where everyone is signing, so, like, that -- when I knew that was my iPad sign.  Because you're in the line.  You just quickly -- and if you wanted to sit and read that agreement, you can't even see it until you're at the iPad.  And then you're in a line with everyone behind you and then the ex-Marine or ex-FBI or ex-CIA person is trying to get everyone through so they can distribute those products in that one-hour period.

So, no, no, I did not generally sit down and read the whole thing.  I just quickly signed it and tried to move on the way specifically for these LiveOn programs because of that setup Apple designed and the other reasons I stated.

BY MS. RIECHERT:

Q.  So how many of these trainings did you go to?

A.  Probably between maybe 8 and 12.

Q.  And they were one-hour long; is that correct?

A.  Generally at least 45 minutes.  I think the longest one might have been for ▮▮▮▮ for that new phone because they were very paranoid about that one was probably 90.



**TALTY COURT REPORTERS, INC.**
**408.244.1900 - www.taltys.com**

183

THE VIDEOGRAPHER:  Exhibit 12.

MS. RIECHERT:  Thank you.

THE WITNESS:  Okay.  It's open.

BY MS. RIECHERT:

Q.  So looking at Exhibit 12, is this an email that you received in -- on May 8, 2019?

A.  It says it was sent, so looks like my email but it's partially redacted.  And that's the date stated.  But I don't recall receiving this, but I probably did.

Q.  Would you have put that in your folder for LiveOn?

A.  Probably.

Q.  Okay.  So the redacted portion of this says, "████  HWE  ██████."  Does that mean anything to you?

A.  ████ would have been the new iPhone that would have been launching in September 2019.  The █ would have been, I think, the -- did they do a new iPad in 2019?  Or not -- the iPod -- iPod?  The █ is usually for iPods.  They might have.  I think it was a developer one actually.

Q.  And what was the ██████ HWE LiveOn study?

A.  HWE is hardware engineering, so I don't know what LiveOn study means in regards to the entire



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

hardware engineering organization.

Q.  Did you receive a new device in connection with this study -- the ▮▮▮▮ HWE study?

A.  I don't recall.  It should be in Apple's records.  But we -- we would get emails that look a lot like this when they want us to -- whether we have the -- like an existing model of a phone or we have the new one when they want us to start installing and living on the new .o release before it goes to customers, which is usually in September to go to customers.  And around May is WWDC, Apple's big annual conference, where they often would announce some of the big features that they are working on.  And that software release is generally when they would, like, start sending the emails saying, "We want everyone now living on this. Everyone move."  And you -- in order to do that, you generally have to sign the stuff, and that's kind of generally what it looks like.  And then once you do that, it unlocks.  In the engineering tools we'd have the ability to even install the app.  Because until you sign that, you can't even install it.  So you get the email, like, everyone start living on it.  "We want to converge" is a term they use so they are getting more data of the failures and the



errors and the bugs -- having us fail bugs so they can really start getting it ready that it would be ready to go to customers in September.  So based on this timing, that's assumably what that was -- was me moving whatever device I had existing or a new one to that new release and sometimes they would use that term "LiveOn" also just for the software, not necessarily a new hardware.

Q.  And this email indicates that you have completed the LiveOn registration for this ██████ HWE device with the numbers I gave you previously.  Then it sends you a copy of the user study informed consent form; correct?

(Reporter clarification.)

THE WITNESS:  I'm not sure where this request came from.

BY MS. RIECHERT:

Q.  That wasn't my question.

A.  I'm not sure what the workflow was for this.  I think I -- I'm not sure what the workflow was.  The request came from iOS request which is a team --

Q.  None of that is my question.  My question is -- this document says that you had completed the registration of the ICF agreement, and then they send you a copy of it; correct?



A.  Use completed a LiveOn program -- you said registration.  I don't see registration.  I'm trying to tell you what I think what -- the tool.  I think this was an MPS tool where you just request to add to a program and so it approves you, and then the -- it like prefabs sign this thing and you click "yes" and then it just sends you this.  And then it -- that's how you get the access unlocked to be able to install the builds.  It's like a web tool.

Q.  Right.  So the redacted information, as I told you before, is ███████.  And so please confirm that you, in fact, received the informed consent form for this study because you had completed the agreement?

A.  That's what I'm saying.  I don't know.  And what they label it doesn't necessarily mean what exactly it was.  There was some human -- I know their names -- of who write these up and sometimes they mess up.  So I'm saying I think this was -- I don't know what the workflow was leading to this email.  I can confirm this email --

Q.  I didn't ask you that.  I asked if you received this document that indicated that you had completed the H -- the █████ Hardware ████████ LiveOn program agreement?



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

put the unredacted version up so that Ashley can see it.

BY MS. RIECHERT:

Q.  And this is, by the way, for the ████, A- -- I think this is the one.  The ████ HWE LiveOn ICF.

A.  Yeah.  This looks more like the hardware agreement when I have the -- probably the new phone. It's usually a month or two before it's announced to customers, so August fits that timeline.

Q.  So do you believe you received this email?

A.  So it looks right.  I don't recall specifically, but it fits the timeline and looks like other emails I received.

Q.  And it says "Living On."  Is your understanding Living On and LiveOn are the same things?

A.  Not necessarily, but I mean that was what I said earlier where they use a bunch of different terminology.  There was no set terminology for this stuff.  They'd call it "Carry" sometimes.  They called it other things.  It was something we complained about generally that there was no consistency with the terminology they used.

Q.  And then it asks you -- it says you've been approved for the program, and it asked you to



actually -- I did participate in, but you didn't really know what it was going to be until you show up. There was one where it was -- I think it was, like, a ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████.

There was a couple other ones where I showed up and they had you, like, ████████████████████ ███████████████████████████████████████ ████████████████████. There was a couple weird ones like that. And then I got a lot of emails about different types of, like, running or exercise or swimming or yoga. There were -- there was the ██████ one. There were other ███ ones. There's TV ones. There was -- I was on the watch program basically every year, so I'd get the new watch hardware and do the watch LiveOn with them. It was -- it was fine. And then there was, like, some outdoor stuff too they'd do. And there's more too. Like I can sit and, like, think and try to give you more, but there was a variety.

Q. And you said there was an HIV one? Is that



what you said?

A. There was a bunch of the -- the HID team -- human interface design team had strange ones. Like the ██████████████████████████████. They were generally very uncomfortable though. I can't remember the years I did those. I think it was like 2018 -- 2017, 2018. And, like I said, you don't really know what you're doing until you show up, and I remember both of these I complained that I was, like, very physically uncomfortable and that led me to participate far less in those.

Q. And did you receive ICF forms for those ones, the HID studies?

A. I didn't have -- I didn't have copies of a lot of this stuff. It might have been deep in my inbox and I just didn't take it before I was fired and lost access. And as you know, I've requested copies of all these and you guys refused to provide them.

Q. So you don't recall -- do you recall that you did get ICF forms for these HID ones?

A. Like I said, not everything was called "ICF." That's why I don't think we should just label everything ICF, but they generally had some



kind of paperwork associated.

Q.   That consisted of a consent form of some type?

A.   Not necessarily consent.  Just something you're signing.

Q.   And they described the study; is that right?

A.   Generally, no.  It was my recollection from whatever it was, it was just mostly a reminder to not tell anyone anything about what you're doing.

Q.   So when you agreed to the one about ████████ ████████████ for a while, did you know that's what was going to happen?

A.   No.

Q.   Okay.  But you did sign some kind of paperwork before that telling you to keep it confidential?

A.   Assumably.  Apple required that for basically everything.

Q.   Okay.  And then similarly the one where you ██████████████████████████████████████████ ████████████████, you participated in that one; correct?

A.   Yeah.  And I didn't know that's what that was.  And I also was, like, ██████████████████ ██████████████████████████



movements and stuff. And that one was, like, I think, like 90 minutes.

Q. And was that 2017, '18 time frame?

A. Sounds right.

Q. And were you asked to sign paperwork before you participated in that study?

A. I don't recall directly, but generally always.

Q. And then any other HID studies that you did participate in?

A. There was -- I don't remember the details, but I feel like there was a few others. Not the ███████████ one. That one was very unique. But other ones where they were doing some kind of ████████████████████████████████████. And with those ones they don't give you a device to take with you. You're just kind of showing up to be a body for them to use on their own tools.

Q. And when were the ██████████████ studies?

A. I think that was maybe around 2018.

Q. And were you asked to sign documents before those studies as well?

A. I don't recall specifically, but generally always, yes.



Q.  Okay.  And you were asked to keep everything confidential; right?

A.  Generally always, yes.

Q.  Okay.  And you said there was a telephony team.  Did you participate in some study from the telephony team?

A.  That was the ███████████.  They were, I think, trying to see if the ██████████████

████████████████████████████████████████████

██████████████████████████████.

Q.  Okay.  And you participated in that study?

A.  Yeah.

Q.  Okay.  Then the running, exercising, swimming, yoga, did you participate in any of those?

A.  No.

Q.  Okay.  And what about the TV study?  Did you participate in that?

A.  Yeah.  I did, I think, at least two Apple TV LiveOn ones.  And those were more of the if-you-find-issues file bugs.  But I think they also have sent out occasionally surveys.  So sometimes just a general feedback but then also sometimes they'd be targeted of a specific functionality.  And I remember using that because I had trouble, like, debugging the TV at home and it had complicated ways

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  Absolutely, because it was moved under his team.  He managed them.

Q.  So he knew which studies you were invited to participate in?

A.  They were his studies.

Q.  Okay.  And did he know which studies you agreed to participate in?

A.  They were his studies.

Q.  The question is do you know if Dan knew whether -- which studies you agreed to participate in?

A.  I can't speculate what he knew or not, but he would have access to all that information and an incentive to know those -- that information, and I've also seen him frequently look into information exactly like that during review season.

Q.  And were all of these studies under Dan's team?

A.  No.

Q.  Which ones were under Dan's team?

A.  Dan took over one of the LiveOn groups that was previously, I believe, in operations.  It was the Jay Gordon, Eric Brown.  I can't remember the guy's name that led it.  And they managed that ████, the ████████ one where they wanted to know



**TALTY COURT REPORTERS, INC.**            **225**
408.244.1900 - www.taltys.com

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

███████████████████████████████████████████.  It was under my manager Dan West.  He would have managed the NDAs ██████████████████████.  They also had the ████████████████████ one.  They had some of those FaceID ones, like the Divya makeup one, but that was more of a temporary -- more like event-based one.  They also managed the iPad and Apple TV LiveOn programs.  Most of those went through Dan's team.  There are more.

Q.  And do you know if your manager knew which studies you declined to participate in?

A.  Dan or Dave?

Q.  Either.

A.  Dan would know.  He would have access to that kind of information.  Dave could find out.  I mean, people would say stuff to them all the time, and I'd hear, like, secondhand comments about stuff I said or didn't say.

Q.  Did either Dan or Dave ever tell you that you had to participate in a study?

A.  I was strongly encouraged on some of them, and I remember being asked --

Q.  Listen to the question.  Did Dan or Dave ever tell you that -- I forgot my question now.  Let me look it up.



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

emails to you guys.  I said indefinitely I did not want to participate in the ear scanning study.

Q.  And was there a reason for that?

A.  Yeah.  And that was one of the things I raised to Dan that I feel like it crossed a line. It was too far of an invasion of privacy to ask employees to participate in something like that because it's hard for employees to say no and that is too invasive of our privacy and bodily autonomy.

Q.  And what did you feel invasive about an ear scanning study?

A.  Ears are very personal, and they are an -- they're an orifice.  You know, it's a bodily orifice.  It's kind of like the ███████████ █████████████████████.  Not as bad as that one, but it's like that -- that's something that's so personal that it doesn't seem appropriate for an employer to ask.  And because I participated in these studies, I know that it involves pressing up against my body, putting things, like, on my body. Things where I'm like -- like I mentioned earlier, physically uncomfortable during the process, even somewhat painful.  And like the thought of -- and they can last a long time.  So, like, the thought of Apple spending a bunch of time scanning, like, the



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

**automatic** 149:12,20 151:12

**automatically** 109:17 143:5,24,25 144:4 149:15 150:21 176:14

**autonomy** 236:9 264:2

**availability** 122:15 134:19

**avoid** 20:13 171:13 250:13

**aware** 50:10 57:13 100:16,25 298:17,18

**awkward** 338:21

███ 203:4,5

**B**

**B-A-S-A-N-E-S-E** 161:17

██████ 165:13

**back** 17:6 19:8 31:17,23 47:13 74:24 141:21 147:14 155:15 173:2 221:17 232:25 238:23 239:3,23 252:13 257:15 258:4 266:6,7 272:4 275:1,13 276:17 278:15, 21 279:20 280:16,21 281:1 285:7,9 289:3,10 292:1 294:17 295:2 297:11 298:13 310:4 314:15 316:8 334:17

**backfired** 321:17

**background** 54:11 79:25 187:12 296:12 297:23 298:12 303:9 304:16

**backlash** 255:13

**backups** 320:16

**bad** 146:16 236:15 329:24 339:25

**badge** 182:13,17,19

**badged** 181:19

**balance** 213:20

**balancing** 341:11,13

**Balasupranarian** 220:18

**Balsuranian** 222:21

**banner** 241:15

**bar** 231:25 232:5 233:1

**Basanese** 161:14,16 168:11 193:20

**based** 34:23 73:9,17,23, 24 98:13 107:3 199:3 220:23 283:11,14 284:16 337:13

**basic** 270:22

**basically** 128:21 188:22 205:19 207:18 239:20 267:10 271:20 327:12 330:4

**basis** 10:7,8

**Bates** 51:12,16 56:21 74:3 95:24 97:12 139:13, 21 189:13 244:15 245:11 247:5 279:6,15 318:12

**batterygate** 290:21 291:1

**bed** 165:14,21 205:17

██████ 165:13,14 166:4, 14 167:17,20 168:19 169:1,10 225:25

**beginning** 64:25 106:21 141:14 182:12,17 201:8 221:23

**begins** 247:22

**behalf** 8:13

**behave** 167:15

**behavior** 59:16,17

**belief** 40:4

**believed** 55:15 71:11 335:25

**belonged** 290:5

**belonging** 284:21

**beneath** 292:6,10

**benefit** 14:6 228:22

**benefited** 169:11 216:8

**Bernie** 146:16

**Bethany** 54:3

**big** 77:11 110:16 198:12, 13 205:5

**biggest** 237:9

**binary** 292:14

**binding** 34:14 35:13 51:6

251:1

**bio** 115:14,20 116:20

**biodata** 116:14,22 119:19 120:20

**biometric** 89:22 116:11

**biometrics** 83:18 84:2 89:19 104:19 110:14 111:1 268:2

**Bippa** 222:21

**bit** 143:1 159:12 188:24 260:10

**black** 181:8 182:4

**blackmail** 295:16

**blanket** 66:9

**block** 326:1

**blocked** 326:8 328:18 329:11 336:3

**blow** 244:10

**blur** 281:7,22 282:4,9,12, 14,20 283:8

**blurred** 276:21 281:14 282:8,18,19 283:5

**blurring** 277:1 281:5,6

**blurry** 18:8

**Board** 34:11

**bodily** 236:9,13

**body** 208:18 236:20 281:24 301:12

**bold** 146:9

**bonus** 28:24 162:22 163:4,22

**bonuses** 28:22 158:20 162:16

**book** 18:22 19:1

**bookmark** 308:20

**books** 18:17 19:18

**Booms** 8:24

**booze** 85:5

**bore** 276:18

**bothered** 110:16 159:21 160:24 165:12 257:2 260:5,7

**bottom** 51:9,20 52:2 56:20 173:10 191:9 318:10,12

**bound** 34:5,25 35:1,4,10

**boundary** 170:5

**box** 149:24 316:21

**brag** 237:11

**bragged** 237:8

**bragging** 238:5

**brain** 323:1

**brainstorm** 312:14

**brainstorming** 312:12

**brand** 246:13

**breach** 55:24 56:6 237:24 298:24 299:16

**breached** 253:9

**breaching** 53:5

**break** 19:7 39:25 45:7 64:11,14,17 141:4 221:15,16 315:22 316:2

**bring** 24:6 64:12 107:9 185:25

**broad** 33:18,20,24 35:15 47:10,11 48:19 58:1,17 98:12,21 101:1 129:15 299:10

**broadly** 36:20

**broken** 123:4

**brought** 107:4,10,16,20 108:2,4 160:4 257:22 258:19 263:2

**Brown** 225:23

**brushed** 160:22 170:19, 22

**bucket** 22:25

**bug** 119:16 121:16,23 123:25 137:5

**bugs** 115:5 135:18 136:25 137:10 170:7 186:10 199:1 209:20 228:16 230:23

**build** 123:16,25 130:9 138:5,6,7 144:18,19

**building** 181:8 182:4 204:14



Case 5:23-cv-04597-EJD Document 63-2 Filed 03/30/26 Page 75 of 804
Case 5:23-cv-04597-EMC Document 304-2 Filed 03/30/26 Page 75 of 94
Document    Page 75 of 804

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

**builds** 200:9

**built** 46:23 47:4 97:1 144:16 145:6 153:14

**bullet** 61:1,13

**bunch** 58:9 69:24 88:14, 15 110:24 121:14 128:4 161:7 203:18 206:2 216:1 236:25 266:4 273:5 312:6 326:12 333:7

**business** 44:20 49:23 50:4,10 52:16,19,24 54:20 56:25

**busy** 156:2 237:6

**buy** 114:5 119:1 142:24, 25

---

**C**

**C-A-N-N-I-F-F-E** 339:5

**C-A-R-R-Y** 128:15

**C-O-H-E** 258:14

**California** 8:9,15 9:5,8 232:10,25 238:11 253:16 301:25 302:22 344:15

**call** 80:13,15,21 81:5,6 84:10,11 86:15 100:20, 21 124:6,7,8,9 129:3 136:21 185:20 202:11 203:20 228:14 238:21 259:6

**called** 26:20 69:13 82:25 84:10,13 90:25 128:2,14 140:1 148:5,9 173:18 178:10 179:6 181:8 187:16 203:21 206:23 248:7 271:8 272:14 331:24

**calling** 10:22 13:9,15,17 30:11 33:8 40:6 81:2,22, 23 82:23 121:10 179:5 238:19

**Calls** 30:24 50:17 51:17

**camera** 83:2,17,19,20 84:2 85:2 92:22 102:2,3, 25 103:1,3,5 104:18 112:13 113:8 159:20 172:15,17 271:16

**cameras** 89:22 102:6 272:1

**canceled** 332:16 335:7

**Canniffe** 339:5,13

**capability** 257:1

**capable** 300:13 301:10

**caps** 73:3 115:20

**capture** 235:19 279:19

**captured** 105:21 106:5 124:11 126:13,25 127:5, 8,16 156:20 272:22 273:2,9,10 287:17

**capturing** 155:18 247:11 301:11

**card** 222:12,17

**care** 212:1 300:15

**career** 159:8 162:15 213:24

**cares** 243:9 275:6

**carry** 102:21 128:14,15 129:3 136:9,22 137:10 178:19 187:17,21 203:20

**Carry/liveon** 137:13

**carrying** 129:12 230:20

**case** 8:9,21 10:13 11:10 12:8 13:6,23 14:8 20:22 21:5 33:25 57:3 170:12 184:10 185:2,3,20,21 186:19 233:15 250:12 253:24 288:20 294:15

**cases** 66:19 102:5 184:14

**casually** 160:5 258:20

**categories** 43:8

**category** 43:17 152:2 163:25 315:18

**catering** 90:9

**caused** 100:10 213:5

**cautious** 22:8 141:24

**caveats** 43:18

**celebrated** 167:11 218:10 224:7

**cellular** 128:20

**censor** 93:4 273:14,22 274:7

**centered** 53:21,22

**Certified** 9:5,9

████████ 164:11,16 170:9 226:4 236:15

**chain** 70:10 298:10,14 311:4 320:5

**chair** 205:6 208:13 209:7

**challenge** 17:10,14 64:1

**challenges** 269:21,22

**challenging** 215:20

**chance** 153:1 257:9

**change** 17:11 68:12 102:4 135:24 171:7,12 182:5 217:10,11 260:8, 17 264:25 265:7 273:16 302:14 312:20 322:12 327:24

**changed** 10:17 26:13,15 150:12 171:10 189:10 249:13 263:8 264:19 323:4

**changing** 45:13,14 143:15 263:20 264:25 265:1 320:12,14 321:2,8

**channel** 311:19,23 313:14,23

**channels** 254:17 255:16

**character** 232:8,16

**characterizing** 240:6

**characters** 53:14,20

**charge** 195:14 326:19

**Charlene** 323:9,10,22 324:6 325:20,21 330:3

**Charlene's** 323:16 324:20

**chat** 24:10,12,13,18 25:13,15 26:7 29:2 49:19 53:2 64:13 85:7,13 280:1 311:20 312:8,17 313:6, 17

**chats** 257:23,24

**check** 19:8,9 137:24 155:24 156:7 168:3 182:11 186:20 246:1 256:18 260:15,18 262:5, 6 275:17 278:21 280:16 281:2 286:15 289:3,11, 23 291:8 303:8

**checked** 116:4,10 182:11,16 234:19,22,24 235:2 286:19

**checking** 104:2 297:24

**checkpoint** 182:3

**checkpoints** 96:25

**cheek** 249:16

**Cher** 295:11,13,19 296:19 297:5,16,20 298:2,7,15,17,19,20,24 299:3,15 300:5 301:5,8 302:23 303:1,6,15,20 304:23

**Cher's** 297:12,17

**chest** 300:12

**Chez** 318:6 319:8

**choose** 144:17

**chose** 296:15 301:6

**chronologically** 322:25

**CIA** 196:11

**circles** 205:7 207:11 212:3 214:1,2

**circular** 323:11,22 324:6

**cite** 158:18 216:4

**cited** 176:4 266:17 294:5

**civil** 11:23 233:15

**claim** 63:8 317:4,6

**clarification** 13:11 14:24 34:9 37:20 58:19 80:17 81:14 85:16 96:10 120:15 122:3 140:21 145:25 148:24 161:15 164:13 176:6 182:15 190:14 196:18 199:14 204:11 219:5 220:10 222:16 227:15 230:9 239:12 248:2 259:20 266:23 267:1 268:10 276:10 281:19 290:20 293:16 297:9 338:5

**clarify** 44:7,13 87:17 91:7 136:7 153:3 310:22

**clarifying** 129:25

**cleaning** 146:19

**clear** 35:10 43:1 128:7 134:5 152:1 212:6



**confirming** 70:1 290:11

**confluence** 105:10,17 288:9

**confused** 115:8,9

**confusing** 178:10 251:21 252:12

**Congress** 36:21 37:6 38:1 39:23 74:9 85:24 266:22 267:4,5,19 268:19,24,25 294:5,9

**connect** 296:19

**connected** 136:20

**connection** 29:4,15 51:24 66:7 87:21 198:2 202:4 204:7 210:9 232:8 277:20

**consensual** 267:10,11 269:5

**consensus** 312:8

**consent** 70:15 71:6,12, 18,22 72:5 74:20,21 94:15 173:10,19 177:3,4 178:8,15 179:6,16,19,22 180:20 181:1 188:6 199:13 200:12 201:13 202:5 207:2,4

**consenting** 19:22

**consequences** 218:17

**considered** 55:25 252:5 285:1 286:11

**considers** 285:2 286:5

**consisted** 207:2

**consistency** 203:23

**consistent** 180:16

**consistently** 336:8

**constant** 101:15

**constantly** 262:3 320:13, 14 321:2

**constitutional** 238:10 253:15 255:6,23

**consumer** 165:17

**consumer-facing** 44:21

**contact** 232:17

**contained** 179:14 180:11

**content** 20:10 76:4 111:18,19,22 180:14,15

**context** 87:25 195:21 333:11,13

**continue** 65:2 111:25 141:16 154:12,14 155:17 222:1 331:14,17 332:11, 14,19 333:1,18 334:12 342:5

**continued** 123:24 124:1 154:21,24 155:16 190:10

**continuing** 94:1 138:25 308:8

**contract** 177:10

**contracting** 272:20

**contractual** 178:12,13

**contrary** 174:12

**control** 25:25 42:7 45:25

**controlling** 42:4

**converge** 198:24 230:23

**converged** 216:9

**conversation** 14:17 286:23,24

**conversations** 214:6 265:12 335:5,11,16

**cool** 116:18 118:14 119:14 165:16,17

**coordinate** 212:5

**copies** 57:22 77:3 94:10 152:13 206:15,19 245:24 288:20 298:3 324:1 338:1

**copy** 16:9 25:4 29:3,14 49:22 50:4 56:18 61:16 93:15,16 94:18 112:4 134:5 139:3 142:9,13,14, 20,21,23 171:22 199:12, 25 201:12,19 202:20 234:2 275:5 276:15 277:1 306:25 307:2 308:24 316:17 320:18,21 343:1,4,8,10,15 344:4,8

**core** 221:5,12 263:15 265:10,11,17,24 328:21

**corner** 51:10 56:20 318:13

**correct** 25:2 27:2 28:14

30:4,22 31:5 44:4 49:25 50:12,16 51:12,14 52:13, 16,24 55:10,16 56:7 57:18,25 61:2 66:24 70:8 71:23 72:5 73:7 75:9,10, 15 76:7,22 80:14 83:10 88:2 89:5 92:11 93:5 94:7,16,17 95:19 98:8 102:19 103:3 104:8 105:12,15 109:4 111:22, 23 115:15 117:11,20 118:16,24 119:7 124:2 125:12 127:25 130:13,21 131:7 132:2,9,10 133:2,8 134:3,24 136:16 139:10 146:22 147:9 148:19 149:9 152:19 153:5 154:6 156:21 162:8,9 163:18 173:4 175:22 177:5 179:15,23 180:2, 12 183:21 186:25 190:6 192:6 193:2 196:21 199:13,25 201:10,14,19, 23 207:22 211:9,12 212:25 217:13 218:8 227:22 229:20 232:4 234:8,11,14,18,21 235:3, 8 240:22 242:23 243:3,7, 14 244:2 245:3 246:20 247:25 248:19 249:8 252:25 263:10 268:20,24 269:18 270:7 279:8,9,12 281:5,8,14 283:6 286:6, 18 287:6,8,10,15,18,21 288:17 290:1 291:9 296:10,18 297:1,6,16 303:11 307:7,18 309:3,6 311:11,14 315:7,16 318:3,7,23 319:17 320:8 324:20 328:14 332:5 335:17 338:3 340:15,20

**corrections** 16:13,19

**correspondence** 308:24

**corruption** 320:17

▮▮▮▮▮▮▮▮ 165:18

**cost** 42:16

**counsel** 8:16 25:14

**country** 223:14

**counts** 25:23,25 55:20

**couple** 52:6 85:9 119:3 160:4 178:23 179:8 184:10 205:10,13 229:5, 6 264:15 276:18 278:13, 24 343:12

**court** 8:8,13,14 9:1,17 16:7 21:14,25 142:22 294:15 344:14

**cover** 195:16

**coverage** 193:17 195:1,2, 11,16 230:1

**covered** 63:6 205:5 291:16

**coverup** 312:10

**COVID** 204:9,12,14

**coworker** 88:12

**coworkers** 58:11 136:12 156:25 158:7 193:20 250:22 253:3,13,14 254:4,6,15,25 255:5 256:2,6,8,15 257:17,20 258:8,13 302:1,3 341:12

**Craig** 266:21,24 267:18 268:18,21

**crap** 181:9

**crashed** 137:3

**create** 42:6 145:10,16 147:8 148:1,2,5 149:12 150:1 231:23 247:13

**created** 143:12,25 148:12 195:24 311:20 312:21 313:7 316:21 327:6 332:6

**creating** 147:15 312:17

**creative** 283:25

**credibility** 10:18 11:15 12:12 14:5,11 15:19 17:1,6,8,11,14

**credited** 257:14

**creepy** 160:16 162:4 170:21 171:2

**criminal** 232:19 295:15

**critical** 21:1 32:1 261:1

**cropped** 244:12

**cross-functional** 326:13

**cross-product** 169:5

**cross-reference** 280:23

**crossed** 212:21,24 236:5 238:22

**crossing** 164:12



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)          December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

cultural 128:5

culture 242:16

current 115:20,25 116:1
232:24

custody 344:13

custom 114:7

customer 46:4 113:1
114:4 115:1 125:23
126:7 130:9 131:4 137:4
154:2 228:16 273:17
274:10

customers 80:24 112:25
114:10,14,17 115:8
125:25 131:12 184:6
198:10,11 199:3 203:9
273:25 274:2,10

cycle 337:17

cycles 336:25

━━━━━━ D ━━━━━━

█████ 112:11 113:5,8
115:19,24,25 116:1,16,
17,24 121:25 122:14,16
130:16,22 131:6 134:18
153:5 172:14 183:23

████ 171:21 172:13,16

████████ 122:12

D-U-B 202:12

████ 197:17

██████ 197:15 200:11,
24

daily 117:4

██████ 122:11,18,22

damage 162:14

Dan 28:1,3,6 144:23
160:4,13,17 161:12,17,
19 162:3 163:14 164:4
167:7 168:22,23,24
169:3,8,21 170:1,19
171:4 192:8 193:19
195:13 212:9,11 224:13,
15,20,23 225:9,21 226:2,
12,14,19,23 229:7,23
236:5 249:25 261:22
316:18 317:9 318:17,22
319:7,10,25 320:2 324:2,
4,5,7,10,18,19 325:1,18,
20 326:7,24 327:2,14

328:5 329:10 330:1,15,
22 331:5,14,17 332:14,
19 333:18 334:6,11,17
335:5,11 336:2,13
337:15,18,20,21,23
338:2,20

Dan's 168:10 225:17,20
226:9 323:12

dark 187:12

data 66:23 67:16 68:10,
15 69:8,11,13 70:7,11
80:23 115:14,20 116:12
122:11 125:4 126:4
136:1 166:22,24 167:2
168:2,11 169:12 187:11,
23 198:25 229:3 242:18
268:8 271:6 272:17,19,
20 288:3 292:2,8,9,13
320:24 322:5

date 57:11 78:10,15,20
79:2,4,6,7 197:8 232:15
314:17

dated 57:12 66:14 311:8

dates 155:20 307:8
321:19

dating 165:20

Dave 27:24 28:3,5 137:9
167:7 168:20,23,25
212:12 224:16 226:12,
15,19,23 230:2,4 261:22
307:6,17 324:3 325:1,2,
20 327:2,6,14,21,25
328:5,20 337:24 338:2,
20,21,23

Dave's 144:23 169:6,7

day 23:19 116:4,10 127:3
140:2 144:9,21 146:19
311:21

de- 261:24

deal 21:9

debug 114:25 115:6
129:22 131:3

debugging 114:11 126:4,
6 209:25

December 8:5 65:1
120:25 123:10 141:15
221:25 316:25

decide 13:22 35:6 55:12
143:9 150:8 151:18

decided 211:11 212:18

decisions 166:25

deck 288:12,21 289:1

declaration 10:14 11:11

decline 210:22 212:3

declined 176:8 210:23,25
222:6 226:11

declining 222:10 240:14,
15

deem 142:16

deep 206:16

Deepa 159:22 220:18
263:18 265:4,11,23,24
266:3

deeper 300:19

default 95:6,13 129:13
145:7 147:1 188:20
220:6 221:5 223:4,8
263:21,22

defendant 8:6,20,23,25

defense 32:1

define 31:6 32:22 38:9
46:10 68:16 70:24 79:13
103:10 118:25 129:16
131:24

defined 32:23,25 37:11,
13 38:3 39:3,5 45:4
55:24

defining 37:1 178:17

definition 37:14 38:6,21,
25 39:8 128:8,9 295:5

definitive 96:19

delay 344:1,6

delaying 343:19

delete 125:17 127:5

deleted 320:24 321:4,13
322:2

deleting 111:18

delight 184:5,6

demands 73:4

denied 324:19

deny 139:10 189:3
324:23

denying 103:9

department 262:9,15,19,
21

dependent 212:4

depending 153:24

depends 131:8,13,15

deposition 8:5,11 9:14,
25 13:2 14:18 16:7,8
17:4,16,19 19:23 23:4,6,
16,19 24:3 25:20 29:8
50:2 53:7 56:13 63:1,11
64:25 65:3,5 75:25 85:15
100:11 127:20 141:14
171:18 187:2 196:25
202:16 221:24 233:4,16,
21 241:8,24 274:20
278:6 292:22 306:9,22
307:22 309:11 310:19
314:24 316:12 317:23
342:7,13,19 343:2
344:12,13

depositions 10:10 18:23

depth 54:18 268:14

Der 293:20 294:9

describe 249:7

describing 312:2

description 185:15
249:14

design 41:8,10,20 43:2,
21 46:21 48:10,13,22
49:3,6 54:17 102:3,6,22
185:18 206:3 271:19

designate 62:25 63:11
142:5 143:4

designated 65:5,8 66:3
75:18 280:25 305:20
306:2

designating 63:16 64:15
141:19 142:1 244:6

designation 52:8 178:10

designed 183:14

designing 327:12

designs 43:4 44:11,15
54:15

desire 325:20

desk 18:13

desktop 18:16 19:20



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)
ASHLEY GJOVIK vs APPLE INC.

December 16, 2025

**duly** 9:8

**duress** 213:4

**DVT** 138:3,4

**dying** 330:13

---

**E**

**E-A-R** 161:24

**E-R-T-E-L-L** 339:4

**E-SIGN** 72:8

**ear** 161:24 163:17,23 164:5 169:23 233:24 236:2,10 237:9,12 238:5

**earlier** 39:13 57:21 74:14 96:15 103:11 109:19 122:8,13 124:7 127:12 154:5 160:1 174:17 203:18 219:3 234:22 235:4 236:21 237:8 245:21 256:7 285:13 292:2 344:4

**early** 216:5,21,23 232:12 295:22 323:15

**ears** 176:9 235:20 236:12 237:1,8,12,13,14,22 238:4

**easier** 40:13 277:10 340:8

**easy** 46:15 131:24

**eavesdropping** 259:4

**economy** 323:11,23 324:6

**edited** 280:15

**editing** 278:25

**editor** 275:19 276:4

**editorial** 275:12

**editors** 275:18 277:2

**education** 178:24

**effect** 9:17 57:6,8 157:8 158:13 227:8

**Effective** 18:22

**effort** 184:18 325:7,9

**efforts** 257:16 323:5 324:23 325:7,15,19 326:8 328:18 329:11,16 330:8,15,23 336:3,10

**eighth** 139:12

**Ekelemchi** 239:14

**elaborate** 291:23

**electronic** 60:10

**eliminate** 276:8 283:2

**email** 26:16,17,19 53:11, 15,16,17,24 55:17,19 56:3 66:13,25 67:2,17, 18,19,23,24,25 68:1,2,7, 8,19,22 69:1,2,5,9,12,15, 20,25 70:2,10,12,14,22 71:5,8,12,17,21 72:9 73:10,18,25 77:18 78:8 81:9 86:6,14,18 87:21,24 88:2,3,7,9,11,18 91:15, 22 92:1,3,7,11 93:10,14, 18,21,22 96:22 97:6,12, 19 98:1,3 99:13,18,19,24 100:2 106:24 112:4,24 115:9 120:25 121:1,7 123:11 133:23 139:1,5, 12,14,22 140:1,11,14,16, 17,18,25 142:15 143:4, 19,24 144:8 145:1,2,10 146:8,9,20,22,23 147:4 148:1 150:11,25 152:16 154:21 155:5 158:11 163:20 166:12,15 168:1 171:22,24,25 173:3 189:13 190:15 191:8 197:5,7 198:23 199:9 200:21 201:9,25 202:1 203:10 234:16 235:9,22 237:4,19 239:9,10,19 240:18 249:20 258:23 263:24 264:24 265:22 306:13,16 308:13,20,23, 24 309:13,17,20,23 310:24 315:7,19 324:17, 19,21 325:3

**email's** 186:21

**emailed** 158:9 310:1 313:2

**emailing** 239:20

**emails** 27:10 69:24 87:9 97:7 100:5 107:24 123:22 134:20 135:23 139:18 140:2,7 143:3,4,9 144:20 145:11,19 146:7, 14,21 147:24 148:12 149:13,17,20 150:4,20 151:8,12 152:12 157:10, 14 161:20 198:5,15 203:13 205:14 231:7

234:7,10 235:6,10,12,17, 18 236:1 237:23 238:24 239:2,4 240:1,4,10,11, 12,14,19,21 241:12,18, 19 252:14 261:20 263:13 280:19 311:1,2 315:3 323:25 324:2,5,7,9,10, 16,18 335:9,13,17 336:6 337:18

**embedded** 136:20

 121:21,22

**emphasized** 274:3

**empire** 316:25

**employed** 30:1,19 31:14, 15,20

**employee** 39:16 41:14 117:23 119:11 128:1 148:6,9,13,17 149:5,17, 21 150:9,16,22 151:4,11, 13,19 152:7,18 167:2 172:3 214:19 239:18 250:2,7,19 266:17 288:11 289:18 294:7 295:14 298:20 299:3,18 300:3,6 314:11 316:23 341:14

**employee's** 34:22

**employees** 41:15 114:21 118:4 126:2 131:1 144:7 166:22 181:12 184:10 218:15 232:19 235:7 236:7,8 238:7 242:14,17 250:20 254:20 257:13 259:23 264:10 266:12,13 268:9 272:18 299:5,9,21 305:11,13 336:19

**employees'** 164:15 229:4

**employer** 170:8 236:18 238:12

**employment** 26:3 29:5, 15,23,25 31:2,4,12 33:16 39:20 43:3 50:11,16 52:12,22 57:6,17 61:12 66:7,21 74:16,17 87:22 88:8 188:12 204:20 211:23 289:21 290:13 294:19 307:3 315:14

**enable** 103:1

**encompass** 33:24

**encourage** 229:8,19

**encouraged** 226:21 229:13 257:8

**encouraging** 229:1,24 265:6 296:1

**end** 15:5,7 64:19 141:7 147:2,14 160:19 167:13 221:18 246:17 285:7,9 304:8 308:9 337:16 344:18

**ended** 43:3 100:24 101:12 103:22 146:4 167:12 212:14 216:1

**ending** 247:6 308:1,16 342:23

**ends** 100:14 288:14

**enforce** 34:16 62:23

**enforcement** 20:9,13,19 37:5

**engage** 240:3,5 254:18

**engaged** 20:7 250:2

**engineer** 26:11

**engineering** 26:23 27:7, 8,14,17 41:10,25 54:17 96:12 110:1 114:1,21 115:7 126:1 130:9 135:22 136:10 143:13 159:19 173:9,18 187:15 195:23 197:24 198:1,20 214:14 215:24 216:22 220:9,11 235:7 249:8 260:22 263:25 264:11 268:22 270:22 271:19 296:12 300:6 303:9 304:16 311:23

**engineers** 135:22

**enroll** 172:8

**enrolled** 168:1

**ensure** 230:25 271:20

**ensuring** 228:2

**enter** 98:14 189:25

**entered** 34:14 201:5

**entire** 197:25 272:17

**entities** 36:18

**entitled** 10:1 11:6 86:6 173:9 299:19

**environmental** 253:2



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

**meddling** 327:18

**media** 64:20,25 141:7,14 221:19,24 254:11,14 294:14 344:12

**medical** 296:6

**medications** 23:9

**Medium** 268:5,14 269:13

**meet** 107:8 291:15 342:8, 11

**meet-and-confer** 342:20

**meeting** 16:1 105:9 182:8 258:20 338:1 341:6

**meetings** 72:15 105:11 107:5,11,17,23 108:3,13 177:13 214:6 250:6 263:16 265:9,11,16 336:20 338:19 340:15,25 341:1

**Melinda** 8:19 12:23 17:14 20:22 39:25 51:7 52:6 63:20 64:9 114:16 122:9 125:22,23 239:9,15 333:21 334:4,8 335:3 343:19

**Melinda's** 125:22

**member** 137:21

**memo** 306:25

**memory** 107:3

 176:16

226:4

**mentality** 214:8

**mention** 13:1 22:7 224:6

**mentioned** 38:17 42:22 57:4 89:10 92:4 122:13 143:2 160:1 169:20,21 193:18 194:19 196:11 224:3 230:16 236:21 313:17 320:14 326:9 331:9,22 341:10

**mentioning** 34:19 163:14

**mentor** 216:2

**merge** 264:6

**merged** 12:1 264:8

**mess** 146:18 185:3 200:19

**message** 295:10 296:9 316:17 319:23 320:5 340:22

**messages** 266:5 311:10, 13,15 314:2,6 320:10,13, 15,19 321:24 322:6

**messy** 27:9

**met** 107:22 108:7,14 311:24

**methods** 126:11

**metric** 137:7 292:14,17

**metrics** 288:3 292:3,5,8, 9,10,12

**Michael** 8:12

**micromanaging** 326:20

**mid** 340:1

**middle** 214:3 275:22

**middlewoman** 277:2

**midpoint** 123:6

**midway** 138:7 193:5 211:2,5

**midyear** 336:14,15 337:2, 9,16 338:3,8,11,15,23 339:1,6,14,21,24 340:7

**midyears** 337:3 340:4

**Mike** 338:13,14 339:4,9, 10,11,12,16

**military** 77:11 270:13

**million** 144:20

**mind** 73:11,17 182:5 239:16

**minds** 274:3

**mine** 105:23 109:16 110:4,14 111:10 219:12 242:10,11 246:15 338:22 344:5

**minute** 185:14

**minutes** 40:8 84:14,19 101:14 103:25 183:22 185:6 208:2 221:17

**mischaracterization** 48:18 71:13 76:23 132:3 133:9

**mischaracterizing** 177:7 240:4 335:2

**misconduct** 56:11,17,18

**misleading** 18:3 35:25 81:25 87:4 89:13 130:7 133:14 277:14 333:10

**misread** 186:22

**missing** 154:10

**misusing** 64:5

**mixed** 77:15 79:18

**model** 46:21 48:1,3 83:3, 17 112:21 119:17 131:13 135:10,25 192:23 193:1, 5 198:7 268:2

**models** 33:22 84:1 101:25 118:4 119:11 135:12 136:2 138:1,21 269:17

**modification** 162:9

**modifications** 114:13

**modified** 80:23

**Moen** 339:4

**monitor** 161:8,22 162:7

**monitored** 135:20 242:17

**monitoring** 136:2 165:15 169:23

**month** 82:16 83:4,5,9 107:9 127:2 135:4 157:14 203:8 245:13

**monthly** 155:24

**months** 135:4 250:11

**moral** 232:7,16

**morning** 9:13 23:13

**mouth** 177:7 229:16

**move** 28:11 72:19 113:23 138:23 144:22 148:12,16 149:2,13 152:2,3,16,18 183:13 184:22 198:17 293:8 329:11 333:5

**moved** 53:14 95:1,3 122:21,23 150:5 151:10 152:24 193:19 220:19 225:1 320:18

**movements** 208:1

**moving** 199:5 321:10 329:13

**MPS** 77:12 101:13,15,25

102:17 103:24 143:22 145:6 173:14 181:8,16 194:21 200:4 242:25

 164:11,16 170:9 226:4 236:14,15

**multi** 148:15

**multiple** 26:13 40:1 42:18 66:17 82:6 89:3 92:21 95:22 135:1 154:8 159:3 178:11 246:18 247:9 248:10 254:5 259:9 261:23 264:9 265:14 295:17 319:22 322:24 323:7 330:16 333:14 334:5 337:14

**murky** 125:13

**Muslim** 314:13

---

**N**

**nag** 135:23

**naked** 290:22 299:12 300:8,9,25 301:1,12

**named** 248:24

**names** 19:17 82:7 100:17 200:18 269:25 313:20

**narrative** 40:6,12

**narrow** 33:21 35:14 39:17 44:8 58:1

**national** 34:10,15,23 51:1 253:18 301:24

**NDA** 165:22 166:1,4 177:1

**NDAS** 72:14 165:18 226:1,3

**necessarily** 21:13 100:14 131:8 148:20,25 185:15 188:19 199:8 200:16 203:17 207:4

**needed** 27:16 50:14 72:11 86:21 92:15 93:12 172:21 192:10 194:24 205:8 214:21 264:24 302:17 323:12 334:25 337:15

**negative** 99:9 166:17 168:4 169:9 218:17 222:9,22 223:10 250:10, 13 255:14 322:13,16 340:8



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

originally 25:7 144:14

originals 245:15

Orrick 8:22,24 291:20

OS 221:5,12 263:15
265:10,11,17,24 328:21

outcome 251:2

outdoor 205:22

outline 20:4

Outlook 147:9,10

output 75:17 78:16 187:9

outputting 75:18

outs 285:16

overbroad 34:21 59:12,
15 177:17

overreact 260:13

override 149:25

oversaw 220:14

overtly 169:18

overused 71:9

overview 185:10

overwhelming 174:8

▬▬▬▬ 164:10,14,25
169:25

owns 302:20

———————————

**P**

p.m. 141:8,9 221:20,21,
23 274:24,25 275:2
316:5,6,7,9 344:17,18

Pacific 8:4 64:24 141:13

pages 26:1 65:7 66:2
75:14 105:10 173:8
188:22 233:13 244:1,9
248:20 272:5 288:9
298:16 305:19 306:1

paid 234:11,14,20 235:1,
5,6 309:2,5,23 310:6
315:7

painful 236:23

panic 339:22 341:19

panopticon 247:1

paper 293:19

papers 267:24 269:6,7
271:18 273:6

paperwork 87:9 96:13
207:1,15 208:5 210:9

paragraph 38:25 233:13

paramount 214:14

paranoid 183:24

parking 77:10 104:4
270:13

part 17:7,8 25:23 26:1
29:24 33:25 61:21 66:18
67:12 74:22 82:2 86:11,
20 89:12 90:25 95:2
96:18 97:19,24 98:2,5
107:22 125:15,20 147:11
156:11 158:9 162:19
163:2,8,11,25 166:1
175:25 185:7,9 189:25
193:15 194:16 214:7,8
215:10 216:24 220:7
261:19 308:1

partially 197:8

participant 176:11,18
223:22 224:4

participants 212:10

participate 66:23 67:16
68:10,14 69:7 72:4,12,17
86:17,25 87:2 88:19 89:1
134:24 136:5,15 137:16
158:24 159:5 160:2
162:12,21 163:23 164:5,
18,21 165:8 166:13,23
169:24 174:20,21,23,25
175:3 176:5,8 182:9
187:20 193:2,12 204:20,
24 205:1 206:11 208:10
209:5,14,17 210:3,18,23
211:12 212:18,23,25
213:2,4,6,8 214:21
218:23 219:2,17,24
220:2,17 221:1,9 222:6,
11,23 223:18 224:25
225:4,7,10 226:11,20
227:3,12 228:4,25
235:21,23 236:2,7
238:25 239:4,23 240:2
310:2

participated 52:23 54:6
82:21 134:11 158:22
176:17 207:21 208:6
209:11 212:7 216:14,15
217:16 218:3,9,10,16
220:14 221:3 222:3,25

223:6 236:18

participating 69:22 70:5,
7 72:22 73:6 74:22
136:25 159:10 160:9
162:25 163:6 166:18,24
167:4,16,19 168:5,18
169:1,10 172:6 174:19
211:10 212:22 215:9
218:7,11 254:23 255:24

participation 72:6 89:11
158:18 168:13 177:14
211:21,25 212:13 213:16
214:16,23 215:2 216:11
217:3,6 218:10,13
219:21 223:11 224:6,9,
19 227:22 228:12,16,23
229:4

partners 12:21

parts 58:24 142:16
301:12

partway 144:13 213:14

passed 231:25 232:10,13

patchy 107:3

patent 273:15 285:14,16

pay 27:21 28:19 128:20
158:20 343:5,6,7,9,10,11

paying 272:19

PDF 112:1 279:18 298:16

PDFS 246:9

Pearl 85:20 86:17 87:1
91:18,25 92:10,19,21,23
93:1,4,7,11 94:16 101:11
102:19,20 103:7,10,14,
15 104:11,12 187:16,21
188:1 287:10,12,14
288:3 292:2,8,9

pending 152:11 331:1,4

people 45:16,19,24 55:9
71:22 77:12 85:9 89:20
100:9 102:5,17,23
104:20 105:2 107:8,22
108:7,11,16 129:14
135:25 150:15,18 151:17
158:7 159:2,3 166:1
167:9 169:12 185:4
189:17,20 192:10
215:20,21 217:20,23
218:22 224:18 226:3,16
247:10 248:10 249:12
250:25 272:20 273:20
276:25 302:13 312:6,9

313:22 329:14 331:3,25
332:2,8 333:14,15 334:6
337:23

people's 22:11 105:24
107:1 109:15

percent 120:12

perfect 262:6

performance 137:8
158:17 162:15,22 163:4
166:25 167:14 211:18,22
212:12,14,15 213:23
219:19 250:10 336:15
337:1 338:9,11,15,24
339:2,7,14,21,24 340:1,9

period 82:5,20 95:22
119:3 154:3,22 155:25
156:17 157:15 183:10
205:17 235:19 237:17
249:15 295:22

periods 40:1

permanent 290:23

permanently 142:3 264:8

permitted 299:4 304:22,
24 305:2,3,5,9

person 18:2 107:5,17
182:14 183:8 185:3
262:6 275:9 313:19
316:23 329:22

personal 25:22 60:11
77:15 78:5 79:19 107:25
109:25 110:2 129:11
216:1 228:22 236:12,17
237:13 264:6

personality 220:24

personality-wise 218:21

pertaining 101:23

Pete 339:4

Peter 339:13

petty 238:16

phase 78:3,21 79:9 94:16

phases 77:8 78:2 82:6

phone 43:2 45:12,15
77:5,6,9,16,22,23 78:4,5,
6,14 79:12 80:4,7,12,14,
15,22 81:3,6,10,21,22,23
82:2,17,24 83:5,10,20
84:1,3 95:19,21,23 102:3
108:24 111:9,10,17



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

343:6,9 344:7

**right-hand** 51:10 56:20 318:12

**rights** 32:2 34:22 36:3 39:15 40:3

**risk** 152:3 343:18,25

**risky** 163:1

**road** 42:5

**roadmap** 184:17

**Robert** 93:11 99:18,19 104:7 112:5 116:13 133:24 139:2 140:16,24 268:4 269:8

**role** 26:15,18 90:25 104:5 125:4 139:24 158:20 169:5,6 211:20 212:4 214:10 322:23 323:6 324:24 325:8,12,15,19 328:19 329:17 336:3,11

**role-play-type** 85:3

**roles** 26:13 218:22 228:2

**rolled** 194:8

**room** 88:14 180:18 181:16 184:25 194:20 205:5 209:10

**rooms** 177:14

**RSU** 28:16

**rule** 11:5 13:20 17:21 30:13,14

**rules** 11:23 18:1 50:21

**run** 158:23

**running** 83:16 146:12 153:25 161:6 196:3 205:15 209:13 273:17

**Ryan** 8:24

---

**S**

**S-A-B-I-H** 120:16

**S-A-D** 221:14

**S-C-H-I-F-F-E-R** 275:10

**Sabih** 117:1 120:3,17 167:8 215:13,14 216:13, 14,18 217:7,12

**sacrifice** 219:21

**sacrifices** 220:22

**Sadini** 221:11 222:3,10

**safe** 184:24

**safety** 20:18 22:10,11 341:16,18

**San** 8:9,15 344:14

**sanity** 256:18 260:15,18 262:5,6

**sat** 88:14 205:6

**save** 24:14 116:15,22 119:19 120:21

**saving** 115:14,19

**scan** 237:22

**scanning** 236:2,11,25 238:4

**scans** 235:20 238:6

**scare** 181:9

**Scarlett** 295:11,13,20 301:5,8 303:15,20 304:23

**schedule** 86:14 156:3

**scheduled** 310:1

**Schiffer** 243:16 275:9,25 276:24 277:8 294:21 297:2

**school** 18:17 214:3

**scope** 100:25

**screen** 24:5 76:1 185:22 205:12 207:20 247:14

**screenshot** 264:23 287:1 292:19 297:21 313:24 316:20 320:3,7 322:7,8,9

**screenshots** 233:17 263:13 280:22 287:20,24 288:2 292:7 297:4

**sealed** 20:24

**season** 225:16

**Seating** 136:22

**SEC** 36:4,18

**secondary** 98:16 175:14

**secondhand** 226:17

**secrecy** 35:12 45:22 174:8 178:12 242:20

**secret** 37:10,13,16,23 42:3 48:8 60:22 61:8 62:4,16 178:1 184:5,19 238:2,8 262:4 302:6,11, 17

**secretion** 236:15

**secrets** 36:23 37:2,3 38:14,16 41:5

**section** 38:25 63:1

**security** 42:18 54:20 96:14 98:15 103:24 114:14,18 131:12 242:13 246:8,21 247:23 262:13 273:19 295:14 302:9

**sees** 300:14

**select** 125:8

**selected** 117:23

**self-identified** 182:7

**send** 53:25 91:15 92:1 95:17 98:16 106:14 107:24 111:5,6,8 125:8 135:23 142:15 144:12 145:11 146:3 151:18 166:12 189:24 199:25 201:19 202:3 240:19 245:16 250:22 263:24 265:1 276:17 291:10,13, 17 301:7 310:14 324:8 327:16 342:15

**sender** 145:17

**sending** 53:23 92:3 143:14 198:15 261:20 266:1 280:18 291:12

**sends** 199:12 200:7 204:1

**senior** 27:7,13,16 54:2,3 159:19 214:14 215:14 249:7 250:20 256:13 258:14 268:21

**sense** 17:3 107:19 109:18 142:7 166:19 192:16 195:23 196:4 262:2

**sensitive** 22:7 41:16 42:12,21 45:9,16 54:23

**sensor** 92:20,25 165:14 166:9

 161:7

**sentence** 56:2

**sentences** 141:22 142:5

**separate** 22:1,3 150:2 184:25 190:22 264:12 268:13 312:17 313:6

**separately** 70:19

**September** 27:18 83:21 112:14,17 113:6 115:13 134:2,12 189:19 197:18 198:10 199:3 286:11 307:3

**serial** 138:20

**service** 128:20

**session** 86:7 103:22 141:11 185:12

**set** 149:14,19 150:3 151:6,7,12 191:15 203:19 219:15 317:5,9, 17 318:22,25 319:7,12

**settings** 264:2

**settlement** 34:15,24 51:1,2 57:3

**setup** 147:16 183:14 250:9

**severity** 213:13

■ 165:20

■ 166:2

**Shack** 94:20,24 95:1,5, 11,15

**shake** 14:17

**share** 24:4 34:1 37:2,3 41:18 43:6 70:14 71:5, 12,17,21 254:19 256:17, 21 260:16,17,19 261:2,4, 8,11,12,25 265:21 288:18 292:7,18 294:20 295:19 296:6 297:15,19, 23 298:1 299:4,7,19 300:4 301:13 304:22 305:11 319:15 344:4

**shared** 21:3 85:23 155:13 212:9,11 215:5 247:10 271:21 272:7 277:4 286:10,14 288:15,19,25 289:4,9,12,14,16,20,24 290:1 293:18,22 294:8, 14 298:15 299:13 319:16

**sharing** 54:16,25 184:16 246:23 254:10,13 255:11 260:10 264:20 266:1

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

**speculate** 15:16,18,20 106:17,19,22 107:13 108:19 109:2 169:2,7 225:12 229:15 303:21,23 321:18

**speculating** 107:16 123:23 126:21

**speculation** 108:6,10 303:22,25

**spell** 19:17 219:7 239:14, 15 266:25 323:18

**spelled** 165:14 251:2

**spend** 146:19 184:18 185:7 249:1 336:24

**spending** 156:12 236:25

**spent** 71:1

**Spiegel** 293:20 294:9

▬▬▬ 206:4 207:10 208:13 209:7

**spoke** 103:24 109:8

**spot** 90:1

**spotlighting** 331:25

**spots** 90:3

**spring** 122:20

**spun** 205:7

**spying** 160:16 162:5

**SQA** 26:21

**squares** 53:19

**SSP** 70:15

**stab** 46:24

**stability** 135:11

**staff** 190:16 191:8,9,11 192:3 263:16 265:9,16 336:20 337:15,20 341:5

**staging** 148:14

**stalking** 295:16

**stance** 195:23

**stand** 24:9 29:6 49:20 85:18 175:23 181:25

**standalone** 47:3 143:7

**Standard** 8:4 64:24 141:13

**standing** 211:19 213:24

219:20

**staring** 59:21

**start** 40:23 184:3 189:19, 20 198:8,15,23 199:2 322:25

**started** 52:21 58:12 97:22 109:21 111:13 165:4 189:17 210:8 216:13 232:12 250:17 304:11 311:22 328:15,16

**starting** 8:18 24:24 29:25 259:1 322:21

**starts** 246:11,15 314:14

**startup** 54:8

**state** 8:17 73:11,17 139:23 232:1,3 238:11 253:16

**stated** 44:5 48:19 60:23 61:9 62:5,12 114:20 115:10 134:20 183:15 197:9

**statement** 84:13 133:14 261:18 340:20

**statements** 12:1 58:11 63:8 64:6 240:13

**states** 114:25 232:1,4

**stating** 248:7

**status** 170:9

**stayed** 195:7

**staying** 135:19

**stealth** 102:5 185:20

**stenographic** 90:15,21

**step** 163:7 182:6

**steps** 264:11 310:4

**Steve** 121:3

**stick** 28:10 319:5

**stipulation** 10:23 11:20 12:24

**stitched** 247:8

**stop** 13:18 110:24 159:17 167:16,19 227:14,17 238:17 239:20,21 250:9, 22 256:2,6 257:10,17,20 261:3 301:19

**stopped** 149:10 150:2

166:8,9 168:2

**storage** 280:24,25

**store** 114:5

**stored** 154:6,15 156:18

**stores** 119:4,6,10

**stories** 181:11

**straightforward** 13:3,5

**strange** 26:20 73:2 206:3 339:23

**strangely** 73:18

**strap** 161:7

**strategy** 186:3 340:5

**stretch** 283:17

**string** 318:2

**strings** 247:18 276:7 282:12

**strongly** 226:21 229:1,8, 13,19,23

**structure** 327:13

**struggling** 86:12 104:19

**stuck** 195:6 314:18

**studies** 76:12 89:11 104:21 134:11 136:6,16 137:17,19 152:6 155:11 158:6 161:4 162:12 163:16 164:15 165:7 169:22,25 170:2,21 171:3,24 174:20 176:1,9, 10 178:19,21 179:7 181:1 184:10,14 204:19, 22 206:14 208:9,20,23 210:6,17,23 211:8 212:18,22 213:2 216:11, 15 217:4,7,17,20,23 218:3,7,16 219:2,16 220:3,8,17 221:2,3,9 222:4,7,11,23 223:11,17, 22,24 224:5,7,24 225:3, 5,6,8,10,17 226:11 228:5,12,19 229:2,3,4 230:1,3,15 236:19 238:6 254:23 255:1,7 256:2 270:14 330:17,24 331:8

**study** 18:23 69:23 72:4, 13,23 73:7 74:20,23 80:5 81:12,21 82:2 83:9 85:20 86:17,25 87:1 88:25 89:2,5,14,24 93:11 94:15,25 101:11 102:19,

20 103:7,10,14,15 104:11,12,13,15 105:1,3 124:23,25 133:16 134:17,24 136:17 152:17 154:7 158:13 162:21,23 163:5,18,23 164:5,10,19, 22,25 165:13,25 166:4, 14,19 167:17,20 168:6, 19 169:1,10 170:12 171:22 172:6,8 173:9,18 174:19,21 175:4,8,15 176:17 177:2,4 178:7,15 188:2,5,18 193:2,3 197:23,25 198:3 199:12 200:13 204:7 207:6 208:6 209:5,11,16 210:3, 10 212:24 213:17 216:24 219:25 223:6,7 226:20 227:3 228:25 229:9,14, 19,23 230:17 231:4,21 235:21 236:2,11 239:5 240:24 255:24 256:6 270:12 287:10,12,13,14

**stuff** 18:24 19:7,16 20:17, 23,24 32:5,7 35:11 41:12,13,15,17,20,23 42:2,3,11,18,20 43:19 45:15 46:1 54:19,22 63:22 64:6 71:10 72:16 73:1 74:1 82:7 84:9 85:7, 23,25 87:10 89:21 94:25 96:18,25 97:17 101:2 104:5 105:10,17,25 107:9,10 108:1 111:8,15 114:9 117:4 119:9 124:4 125:3,8 126:5 128:17,21, 24 131:19,22 144:10,18 145:6,7 147:21,22 148:6, 9,13,15,16,17 149:1,5, 17,18,21,22 150:5,6,8,9, 14,15,22 151:4,8,10,11, 13,19,20,21 152:1,8,13, 18 155:21 156:4,13 157:2 158:24 159:1,6,20, 21 160:7,10,11,24 164:1, 2,8 165:4 166:9,23 167:12 168:2,22,24 169:13,17,25 170:7 171:12 172:3 174:13 177:16,17 178:2 184:19, 23 188:16,20 189:10 191:18 192:22 198:18 202:3 203:20 205:6,22 206:16 208:1 214:11 220:12,23 221:6 226:16, 17 227:18 229:21 238:16,18,22 240:5 248:10 253:4,8 254:11 258:5 260:23,24 261:3,



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

21,25 262:7 263:19,22 264:5 267:22 268:3 270:14 273:8 274:11 276:19 281:18,23 285:17 286:11 288:10,11,14,15 291:13 294:14 296:2,4 298:6,15,16 299:11 300:7 302:14 303:22 308:18 315:17 320:18, 20,21,23 322:10 331:2 339:17

**styled** 85:6

**subfolder** 145:11 148:8 150:22 151:4 172:3

**subject** 20:11 21:8,16 65:8 141:20 142:17 171:7,10,13 305:20 306:2

**subjects** 307:5 322:12

**submitted** 74:8

**submitting** 168:2

**substance** 241:18,19

**substantive** 16:22,23,25

**succeed** 159:5

**success** 158:19 212:4,19 228:1 292:16

**successful** 211:25 212:2 220:25 292:5,10

**sued** 147:17,21 295:15

**suggest** 135:25 193:9

**suggested** 109:19 111:7 227:11

**suggesting** 229:1

**suggestions** 186:14

**Suite** 311:22

**summarized** 324:8

**summary** 184:1 266:2

**super** 235:14 341:12,16

**support** 167:14 253:22 317:4,8

**supportive** 169:18

**supports** 37:4

**supposed** 52:20 78:5,17 109:22 128:19 195:13 210:1 340:4

**supposedly** 110:22

**surface** 284:2,15

**surname** 25:3

**surprise** 45:16,18,24 178:4 184:5,6

**surprised** 340:6

**surveillance** 242:16 321:16

**survey** 72:9 136:25

**surveys** 209:21 231:11, 18

**suspend** 342:19

**suspended** 262:20 263:1 264:14

**SWE** 311:23

**swear** 9:3

**swimming** 161:6,21 162:7 163:16 169:23 205:16 209:14

**swipe** 182:13,19

**switch** 138:8

**switched** 46:12 83:25 144:24

**switching** 307:4 321:25

**sworn** 9:8

**system** 47:1 76:2 81:16 87:10 95:2,13 107:6 115:21 145:16 153:15 187:23 189:10 221:6 230:6 234:13,18,21 265:18

**systematic** 311:25 312:20

**systemic** 238:19

**systems** 26:18,21 136:10 195:15 230:13 320:17 321:16 337:25 338:17,19

---

**T**

---

⬛⬛⬛⬛⬛ 205:4

⬛⬛⬛ 116:6

**tab** 24:1 25:13 29:2 49:19 53:2 56:10 64:13 127:19 171:17 172:23 186:22 187:1 196:24 202:15

233:3,19 241:7,23 274:17 292:21 295:8 306:8,18 307:21 309:9 314:23 316:11 317:22

**taking** 23:9 53:10 124:15, 22 163:10 187:6 245:8 281:24 290:22 300:13,14 301:9,11 304:10 334:7

**talk** 32:5,7 59:9 66:10 75:24 76:17 143:1 159:21,22,25 180:25 184:18 214:11 219:13 255:22 258:17 262:12 263:4 290:10 312:18 322:15 334:22 335:1 341:16 342:24

**talked** 36:15 74:14 85:8,9 101:13 102:2 103:11,12 130:16 156:25 159:12,13 168:23 215:14 218:24 219:4 220:6 256:8,11,14, 16 257:18,19 258:22 260:6 265:13 269:19 271:14 285:12 286:21 288:7,8 289:15 300:24 333:13 336:4 338:16 339:17,18 341:5 344:2

**talking** 35:17 43:1 44:9, 10,19 47:21,25 54:12 64:4 67:6 71:1 99:1 104:16 115:18 122:8 138:17 150:13 177:2 180:21 181:3 217:2,3 229:2 239:21 240:16 249:9 250:22 255:11,18 258:4 259:5 262:8 264:24 266:15 267:23,25 268:6,14 270:6 271:10, 18 273:6 276:3 292:4 293:17 294:23 300:16,22 314:6 315:18 330:12,20 332:3 333:8 338:13

**talks** 217:25 218:5 246:25 340:5

**Talty** 8:14 344:13

**tapped** 195:10

**Tara** 216:1 218:1,2

**targeted** 209:23 312:1,18

**targeting** 123:7

**task** 120:6 156:10

**tasks** 120:10 125:3 204:4 231:12

**team** 26:20 70:15 86:11, 12,20 87:7 91:18,25 92:9 117:1 120:14 121:4,5 123:3 136:10 137:9,20 144:19,22,23 150:19 168:10 169:4 177:15 192:9 193:16,18 195:20 199:21 205:4 206:2,3 209:5,6 212:9 214:8 215:6,13 225:2,18,20 226:9 242:13,25 246:8, 21 247:23 260:22 268:6, 15 269:9,23 302:10 327:10 329:12,18 330:17,18,23 331:7,25

**teams** 89:8 114:1 115:7 143:13 230:24 265:18 304:16 326:13,16,20,21, 24,25 327:3,5,15,21 331:1 336:7

**technical** 273:6

**technically** 41:11 150:24

**technologies** 89:16

**Technology** 25:24

**teleconference** 8:12

⬛⬛⬛⬛⬛ 205:4 209:4,6

**Telerama** 293:14,18,19 294:9

**telling** 12:4 14:3,6 38:10 46:14,19 60:8 69:5 77:24 160:1 162:3 207:15 259:15,25 261:20 280:11 337:18,20 339:9

**tells** 302:10

**temporal** 252:3,13

**temporary** 226:6

**tended** 260:13

**term** 46:7,15,22 68:17 84:25 89:13 100:6,9 128:11 153:22 198:24 199:7 230:17 271:22 272:14 282:5,11 284:22 292:12 299:10 304:24 305:2 311:15 325:22

**terminal** 75:17 78:15 187:9

**terminated** 293:24

**terminating** 290:13 307:3

**termination** 27:5,12,25

---



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

28:14 40:10 41:3,4 61:11,12 62:3 306:25 308:13 309:6

**terminology** 203:19,23 230:19 291:24

**terms** 32:17 33:17,20,21, 24 34:5,16,19,25 35:14 38:20 47:12 50:24 51:3,5 58:17 59:1,2,8,10,11,16 62:22 64:6 76:17 84:12 87:4 100:17 113:24 128:4 129:15 165:11 177:16,22 179:11 295:1, 6 315:12 344:2

**terrified** 262:2

**test** 18:17 91:18,25 92:10 128:2 130:13 131:6 192:21 195:1,2,4,11,16 341:11,13

**testified** 9:9 36:9 258:9

**testifying** 10:2

**testimony** 10:13,15,16 11:10,11,12,14 12:7,8,9, 11 13:6,8 14:5,7,8 63:4, 11 71:13

**testing** 47:6,11 78:24 81:18 86:12,13,21,23 87:8,11 89:8 90:2,9 91:11,13 118:9 119:9 130:15 135:11 186:9 310:8

**text** 53:22 61:15 187:13 201:15,16,18 247:17 258:24 265:22 266:2 275:17 276:7,20 281:9, 13 283:11,14,18,23 284:8,12,14,16 295:10 297:5,7 314:9 316:17 318:2,17 319:25 320:1 321:24 322:6 340:21

**text-wise** 282:23

**texted** 264:14 285:8

**texts** 275:19,24,25 319:10,17 320:3 321:1

**thanking** 217:20

**theme** 143:15

**thing** 13:1 45:9 46:22,23 47:4 78:13,17 101:13 103:21 116:18 120:11 124:25 142:9 147:15 150:17 161:24 171:14

175:25 177:10 178:9 181:24 183:12 185:8,11, 16 200:6 213:17 230:18 255:2 257:2 262:11 264:9 270:7 293:15 304:15 315:15,19

**things** 11:23 12:24 18:4,5 20:20 21:6 22:8 33:24 34:2 35:1,19,21 39:16 40:3 42:4 55:5 75:18 85:3 93:7,17 96:16 111:16 115:11 119:7,9 124:25 125:4 131:11 138:14 161:1 163:13 176:5,7,8 177:7,11 178:11 203:16,21 207:24 213:3,21 215:21 232:18 236:4,20,21 237:4 251:9, 11,19 253:19 255:16,18, 22 257:25 260:3 264:3, 25 265:1 270:11 271:21 289:5,12,16 290:11 298:9 311:16 319:2 322:13,16 325:23 326:5, 12,23 328:7 329:19,20 331:9

**thinking** 97:25 214:18 336:5

**thinks** 184:4 300:14

**thought** 43:7,8 55:5,23 56:5 70:18 73:22 106:25 151:20 162:21 165:16,17 201:3 212:19 213:19,23 236:23,24 238:9,14,22 247:16 251:9,11,18,20, 23 252:4,5 253:1,7 255:16 256:10 257:8 260:11 262:5,9,16 282:23 283:4,17,18,22 284:6,14 285:7 286:16 299:23,25 300:4 327:15, 22 338:21 340:3

**thousand** 343:12

**thousands** 140:2 144:8

**thread** 297:5

**tickets** 320:23 321:3,12 322:1

**tied** 36:7 158:19

**tiers** 114:2 153:23

███████ 116:6

**time** 8:4 14:8 22:7 23:15 26:15,21 27:5,11 30:1,2,

19 31:19 32:12,15 40:1, 10 41:3,4 42:25 43:3,14 44:1,16 47:19 48:6,15 49:8,15 57:11,14 64:21, 24 71:1 72:15 73:10 75:10 77:7 82:14,20 83:1,25 88:20 91:1 92:19 94:21,23 100:18 105:16 107:22 109:11 116:9 120:4 124:5,10,21 126:12,18 141:3,8,13 147:21 150:12,13 153:15 154:17,22 155:9,11 156:12 159:4 161:2,14 162:2,5 163:12,14 175:18 177:25 184:18 185:25 190:8,19,21 191:2,8 195:12 202:3 207:25 208:3,15,19 221:16,20,23 226:16 232:25 235:19 236:24,25 237:17 238:18 249:1,15 251:17 252:22 253:24 254:22 255:7 256:3 262:22 270:18 273:24 274:5,24 275:2 289:18 291:6 295:22,25 301:20 307:9 313:1,24 316:5,9 332:21,22 336:24 340:19,22 342:3,11,12, 19,21,23 344:16,18

**timed** 321:15

**timeline** 119:2 192:12 203:9,12 268:7 269:19 270:6,10,11

**times** 22:16 26:13 66:17 89:3 160:5 206:5 229:5 230:11 237:17 249:14 261:23 264:15 265:14 276:18

**timestamp** 56:24,25 57:1

**timestamped** 244:20

**timestamps** 246:1

**timing** 199:4 201:6 246:2 298:5

**tint** 143:16

**tired** 342:6

**title** 27:13,16 100:4 249:15 316:24

**titled** 100:3 243:8

**titles** 228:20

**TJ's** 318:6

**TJS** 319:8

**today** 10:2,16 12:10 20:3 22:19 23:3,6 34:22 41:22 120:20 273:15

**today's** 344:11

**told** 52:7 55:4,22 77:14 92:13 159:2 161:19 162:5 163:14 167:5,7,11 184:1 196:12 200:11 201:8 216:19 217:19 223:21 227:14,17 228:3 230:4 239:6,9,10,19 240:3,5,9,17 242:21 250:15,21 256:15 259:11 260:9 261:4 264:15,18, 22 265:8 266:12 288:16 296:12 303:4 310:3 327:21 331:23 336:17,18 337:21,24 341:15

**tolerable** 325:1

**Tom** 263:14 264:13,18

**ton** 89:18 131:18 133:20 139:24 150:4 151:1 174:22 261:20

**tongue** 249:16

**tons** 88:16 260:23

**tool** 200:3,4,9

**tools** 196:5 198:20 208:18 210:1 291:22,25 293:6,11 294:22,25

**top** 88:4,18 247:4 249:11 313:20

**topic** 22:5 69:24 108:8 143:5 254:20 260:14 296:2 312:19,21

**topics** 20:14 36:2 186:11 258:21

**topless** 300:15

**totally** 246:11,16,22 304:6

**touch** 20:9

**touched** 213:17

**tracking** 205:13 206:4 207:21 208:15

**tracks** 321:8

**trade** 36:23 37:2,10,13, 16,23 38:14,16 41:5 48:8 60:22 61:7 62:4,15 238:2



**vaguely** 86:10 88:13 139:17 192:4,5

**values** 174:12 220:24

**Van** 144:19

**variations** 128:5

**variety** 93:2 126:11 176:19 205:24 231:6

**verbal** 10:22 12:24

**Verge** 111:24 159:14 243:8,17 247:10 248:8, 14 261:6 263:9 264:20 266:19 270:17 271:3 274:16 275:5,9,20,24 277:7,20,25 278:11 279:2,7,8,10 281:3,4 291:19 296:16,24 297:2

**verification** 98:13 189:24 190:3,4

**verify** 288:10,13,17

**version** 100:19 106:9 109:20 110:5 112:15,17 113:1,2 114:6,19 118:14, 15,23 123:20 126:3,5 132:14 133:4,6 135:2 153:24 191:14 195:24 196:9 203:1 210:5,7 230:21 231:9,10,13 279:16

**versions** 57:21 131:17 133:10 134:16 137:15 278:25 280:14,15 312:7

**versus** 40:5,18 68:23 73:3 95:5 112:23 123:7 144:4,25 148:15 149:14 150:18 152:23 153:2 163:11 201:4 213:22 283:11 284:16 312:23

**vice** 215:14 216:3 268:21

**video** 8:5,11 59:21 60:1 110:25 111:8 159:19 220:9,11 247:3,6,13 260:22 278:5,8,9,11,16, 19,23 279:2,3,7,8,16,17, 19,21,24 281:12,25 282:17,21 283:1 287:4 296:18,25 344:11

**videos** 124:16 155:14 247:8,9,12,15,19 248:11 276:7 278:14,24 279:1 280:7,9 281:24 288:7

**view** 126:24 211:20,24 273:18

**viewed** 215:18 250:9

**violate** 34:19 60:20 62:15 261:22

**violated** 50:25 311:2

**violating** 55:9 61:7 62:3 213:13

**violation** 51:7 60:20 62:10 341:21

**violations** 60:6 61:1,6 255:17

**violence** 308:15

**visceral** 213:21 237:2

**visible** 43:23

████ 161:8,22 162:8 165:16 169:23

**voluntary** 86:7 88:25 89:2,3,4,12 211:9,11,13, 15 212:1,16

**volunteers** 89:1

**VP** 215:16

---

**W**

---

**W-A-I-B-E-L** 341:14

**W-E-L-L-S-W-A-R-R-E-N** 323:19

**W-E-S-T** 161:17

**Waibel** 308:25 341:10,14

**wait** 15:5,7 17:5 99:7 103:10 175:11 310:4

**waiting** 344:5

**wanted** 21:14 32:5 37:17 72:25 85:10 116:17 118:5 119:17 136:1 144:3 146:15 147:23 151:21 153:3 154:22 161:7 165:20 177:19 183:4 194:25 205:12 225:25 230:5,19 235:21 237:7 238:17,20 253:21 256:18 259:11 260:3,4, 15,18 261:4 262:4,5 281:25 283:2,10 284:1,3 298:19 301:8 324:25 326:7 331:13,16,21 332:11,14,19 341:15

**wanting** 22:9 45:23 214:17 220:24 237:21

**warning** 340:3

**warnings** 59:18

**warrant** 61:11

**warranting** 61:10 62:2

**watch** 135:9 136:18 137:6 205:18,19,20 278:16

**watched** 166:20

**watching** 159:2 229:3

**water** 310:8

**ways** 41:9 95:16,17 126:11 209:25 263:23

**wearing** 89:20

**web** 200:9 280:14 287:2

**web-based** 52:18

**website** 66:18

**websites** 17:18 19:14

**week** 113:6 115:19 116:1 119:3 127:3

**weekly** 155:24

**weeks** 107:8

**weird** 12:23 28:7 77:11 101:17 143:15 161:4 164:9 169:25 205:5,12, 13 207:20 238:16 246:16 287:13 303:12

**well-known** 89:22

**Wells-warren** 323:10,17

**West** 28:1,3,6 161:17,20 192:8 226:2 316:19 317:4,9,17 318:3,6 319:11 322:22 323:5 326:7 329:10

**whatsoever** 276:9,11

**whichever** 109:8

**whim** 195:5

**whispered** 258:1

**whistleblower** 36:3 302:3

**white** 187:13 271:18 273:5

**whitelist** 91:17,23 92:8, 16 143:20 156:24 157:7,

9,11,13,20,22,23,25

**whitelisted** 99:25 100:3 302:23 303:1,6,11,15,20 304:6,12 305:15,17

**whitelisting** 304:4

**wife** 178:2 184:8,24

**willingness** 256:25

**wiped** 319:21 320:11,23

**wireless** 209:10

**wiretapping** 259:5

**withdraw** 34:16 37:22 51:3 60:13,17 62:24 213:15

**withhold** 20:10

**women** 90:9 91:1,6,11,13 311:22 313:15

**wonderful** 253:17

**wondering** 237:18

**word** 37:15,23,24 39:6,8, 12 46:11,17 68:20 75:5 80:9 87:18 92:20,24 93:4 100:12 112:7 143:2 191:9 227:9 247:1 267:9 326:2,3,4

**worded** 57:20 72:24

**words** 60:7 61:24 68:23, 25 141:22 142:4 157:7 158:13 177:6 227:6,8 229:15 247:18 293:8 310:15 315:9

**work** 41:10 54:13 77:15, 17 79:11,18 80:7,13,21 81:3,21,23,25 82:23,25 96:17 114:16 117:25 118:6,9,12 119:15 123:14,20 124:19 128:17,22 129:2,11 135:6 137:12 143:8 147:21 154:2 166:2 171:24 184:9,12,23 186:8 191:10 192:22 212:5 214:18 216:4,20 217:13 218:18,21 219:15 221:6 222:14,19 243:9 249:22,25 250:16 254:17 258:10 259:2,3 264:7 265:18 268:15 271:19 275:6 288:7 301:17,21 302:21 315:18 320:24 323:11 324:6 327:5



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

**328:**15,16 **330:**23 **331:**14,17,21 **332:**12,15,19 **333:**19 **334:**12 **340:**3 **343:**17 **344:**1

**worked** 30:2 35:19,22 54:7 76:25 83:2 108:8 110:23 122:1 123:18 144:19 147:16 166:21 193:21 194:3 195:22 220:8,12 221:11 257:11 258:11 260:23 265:14 271:20 272:1 285:10 302:9,10

**workers** 256:15

**workflow** 106:1,12 109:12 110:10 111:6 124:14,20 125:7 126:16 154:10 158:2,3 196:2,8 199:19,20 200:20 201:21 263:25

**workflows** 96:25

**working** 54:9 107:6 122:23 124:2 137:3 149:25 150:18 152:11,17 185:9 196:6 198:14 253:19,20 296:20 297:12 323:11,22 326:10 327:4 329:19,21,23 331:24 332:4 333:1,19

**workload** 325:10

**workplace** 302:2 308:15

**works** 83:15 105:19 145:9,23 154:2 190:25 193:18 258:5 262:7 271:16,17

**world** 237:10

**worldwide** 52:16,23

**worried** 162:17,25 214:12 260:10

**worry** 164:1 182:25

**worst** 185:2 250:11 319:2

**wrapping** 338:15

**write** 200:18 238:23 239:3 243:17 259:19 333:22

**writing** 259:13,22 323:21 336:6

**written** 10:13 11:11 12:8 35:4 62:12 337:25

**wrong** 15:18 34:17 110:11 181:11 288:15

**wrote** 243:16 275:10 289:17 293:14,19,21 296:24 333:22

**WW** 202:9,11

**WWDC** 198:11 202:12

---

### Y

**Y-A-N-N-I-C-K** 323:20

**Yannick** 323:20

**year** 34:14 95:9 167:22 202:3 205:19 210:6 232:23

**years** 42:8 52:6 73:12,16,24 74:25 75:11,22 95:22 107:4 176:3,12 206:6 229:11 232:21 246:14 261:17 266:7 285:15,18 295:17 313:21

**yes-or-no** 12:13,18 130:4 157:3

**yoga** 161:6,21 162:6 163:16 169:23 205:16 209:14

████  197:15,23 198:3 199:10 200:24

---

### Z

**Zoe** 243:16 259:12,18 266:11 270:17 271:2 272:7 275:9,11,15,25 276:2,23 277:1,8,17,18,20 278:10,19 279:16 280:7,10,19 282:18,20 287:1,14 288:22,25 290:1,6,12 291:6 292:18 294:21 296:10,12,16,19,20,22,23 297:2,23 298:2,6,11

**zoom** 8:11 9:15 17:4,17 233:24 242:3 246:4



# EXHIBIT B

*CONFIDENTIAL*

***Ashley Gjovik v. Apple Inc.***
**N.D. Cal. Case No. 23-cv-4597-EMC**

**APPLE INC.'S CONFIDENTIALITY DESIGNATIONS PURSUANT TO THE JULY 7, 2025, STIPULATED PROTECTIVE ORDER FOR THE DEPOSITION OF ASHLEY GJOVIK TAKEN ON DECEMBER 16, 2025.**

Apple Inc. designates the deposition transcript as indicated below. While pages 66–305 were initially marked confidential, Apple has now limited its designation to only the specific testimony identified in the chart below.

| Cite Page(s):Line(s) | Designation | Text |
|---|---|---|
| 5:11 | Confidential | ██ |
| 112:11 | Confidential | ██ ; ██ |
| 113:5 | Confidential | ██ |
| 113:8 | Confidential | ██ |
| 115:19 | Confidential | ██ |
| 115:24 | Confidential | ██ |
| 115:25 | Confidential | ██ |
| 116:1 | Confidential | ██ ; ██ |
| 116:6 | Confidential | ██ ; ████ |
| 116:16 | Confidential | ██ |
| 116:17 | Confidential | ██ |
| 116:24 | Confidential | ██ ; ██ |
| 121:21 | Confidential | ██ |
| 121:22 | Confidential | ██ ; ██ |
| 121:25 | Confidential | ██ |
| 122:11 | Confidential | ██ |
| 122:12 | Confidential | ████ |

*CONFIDENTIAL*

| Cite Page(s):Line(s) | Designation | Text |
|---|---|---|
| 122:14 | Confidential | █████ |
| 122:16 | Confidential | ███ |
| 122:18 | Confidential | ████ |
| 122:22 | Confidential | ████ |
| 130:16 | Confidential | ███ |
| 130:22 | Confidential | ███ |
| 131:6 | Confidential | ███ |
| 134:18 | Confidential | ███ |
| 138:3 | Confidential | DVT |
| 138:4 | Confidential | DVT |
| 138:5 | Confidential | PVT |
| 138:7 | Confidential | PVT |
| 147:16-24 | Confidential | ████████████████ |
| 153:5 | Confidential | ███ |
| 161:6-9 | Confidential | go to yoga or running or swimming where they wanted to strap a bunch of sensors on me and, like, monitor all my vitals while I was, like, exercising in some Apple lab |
| 161:21-22 | Confidential | yoga and swimming where they would monitor your vitals |

*CONFIDENTIAL*

| Cite Page(s):Line(s) | Designation | Text |
|---|---|---|
| 162:6-8 | Confidential | the yoga and swimming programs where they would monitor your vitals |
| 163:16 | Confidential | swimming and yoga |
| 164:10-11 | Confidential | |
| 164:14 | Confidential | |
| 164:15-16 | Confidential | |
| 164:25 | Confidential | |
| 165:13-24 | Confidential | , and I found that very disturbing. |
| 166:1-2 | Confidential | |
| 166:4 | Confidential | |
| 166:14 | Confidential | |
| 167:17 | Confidential | |
| 168:19 | Confidential | |
| 169:1 | Confidential | |
| 169:10 | Confidential | |
| 169:23 | Confidential | yoga and swimming and monitoring vitals |
| 169:25 | Confidential | |

*CONFIDENTIAL*

| Cite Page(s):Line(s) | Designation | Text |
|---|---|---|
| 170:9 | Confidential | ████████ |
| 171:21 | Confidential | █ |
| 172:13 | Confidential | █ |
| 172:14 | Confidential | █ |
| 172:16 | Confidential | █ |
| 176:16 | Confidential | ██ |
| 183:23 | Confidential | █ |
| 197:15 | Confidential | █ HWE ██ |
| 197:17 | Confidential | █ |
| 197:18 | Confidential | █ |
| 197:21 | Confidential | █ |
| 197:23 | Confidential | █ |
| 198:3 | Confidential | █ |
| 199:10 | Confidential | █ |
| 200:11 | Confidential | ██ |
| 200:24 | Confidential | █ Hardware ██ |
| 203:4 | Confidential | █ , A |
| 203:5 | Confidential | █ |
| 205:4-9 | Confidential | ████████████ |

*CONFIDENTIAL*

| Cite Page(s):Line(s) | Designation | Text |
|---|---|---|
| 205:11-13 | Confidential | ███████████████████████ |
| 205:15-16 | Confidential | running or exercise or swimming or yoga |
| 205:17 | Confidential | ███ ; ██ |
| 206:4-5 | Confidential | ███████████████ |
| 207:10-11 | Confidential | ██████████ |
| 207:20-21 | Confidential | ███████████████ |
| 207:24-25 | Confidential | ███████████████ |
| 208:1 | Confidential | movements and stuff |
| 208:13 | Confidential | ██████ |
| 208:15 | Confidential | ████████████ |
| 208:17-18 | Confidential | be a body for them to use on their own tools |
| 208:19 | Confidential | ██████████ |
| 209:4 | Confidential | telephony |
| 209:6 | Confidential | telephony |
| 209:7 | Confidential | ██████ |
| 209:8-10 | Confidential | ███████████████ |
| 209:13-14 | Confidential | running, exercising, swimming, yoga |
| 225:25 | Confidential | ███ ; ██ |
| 226:1 | Confidential | ████████████ |

*CONFIDENTIAL*

| Cite Page(s):Line(s) | Designation | Text |
|---|---|---|
| 226:3 | Confidential | ███████████████ |
| 226:4 | Confidential | ███████████████ |
| 236:14-15 | Confidential | ████████████████████ |
| i5 (351) | Confidential | ███; █████████; █████ |
| i6 (352) | Confidential | █████ |
| i8 (354) | Confidential | █████ |
| i9 (355) | Confidential | ███; ███; █████████; ███; ████████; █████ |
| i11 (357) | Confidential | DVT; █████ |
| i12 (358) | Confidential | exercising |
| i20 (366) | Confidential | ███████; █████████; █████ |
| i22 (368) | Confidential | █████ |
| i25 (371) | Confidential | PVT |
| i28 (374) | Confidential | █████; ███; █████ |
| i30 (376) | Confidential | █████ |
| i31 (377) | Confidential | swimming; █████████████; █████████; █████ |
| i32 (378) | Confidential | ████ |
| i34 (380) | Confidential | ████ |
| i35 (381) | Confidential | yoga; █████ |

# EXHIBIT C

| Cite Page(s):Line(s) | Apple's Designation | Apple's Justification Provided | Text Designated by Apple | Objections by Employee Ashley Gjovik |
|---|---|---|---|---|
| 5:11 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 112:11 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 113:5 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 113:8 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 115:19 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 115:24 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 115:25 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:1 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:6 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:16 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:17 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:24 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 121:21 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 121:22 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 121:25 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:11 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:12 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:14 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:16 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:18 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:22 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 130:16 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 130:22 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 131:6 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 134:18 | Confidential | None | [REDACTED] | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 138:3 | Confidential | None | DVT | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development  phase |
| 138:4 | Confidential | None | DVT | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development  phase |
| 138:5 | Confidential | None | PVT | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development  phase |
| 138:7 | Confidential | None | PVT | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development  phase |
| 147:16-24 | Confidential | None | [REDACTED] | This is not "Confidential" but I agree Apple can redact this due to the sensitve nature of the comment, with the caveat that I will challenge the redacting if Apple makes claims or deffenses which make this quote material or otherwise important to have un-redacted. |

| | | | | |
|---|---|---|---|---|
| 153:5 | Confidential | None | ▮ | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 161:6-9 | Confidential | None | go to yoga or running or swimming where they wanted to strap a bunch of sensors on me and, like, monitor all my vitals while I was, like, exercising in some Apple lab | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 161:21-22 | Confidential | None | yoga and swimming where they would monitor your vitals | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 162:6-8 | Confidential | None | the yoga and swimming programs where they would monitor your vitals | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 163:16 | Confidential | None | swimming and yoga | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 164:10-11 | Confidential | None | ▮ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 164:14 | Confidential | None | ▮ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 164:15-16 | Confidential | None | ▮ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 164:25 | Confidential | None | ▮ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 165:13-24 | Confidential | None | ▮ , and I found that very disturbing. | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 166:1-2 | Confidential | None | ▮ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 166:4 | Confidential | None | ▮ | This is a public brand name and there is no justification to claim it is confidential. |
| 166:14 | Confidential | None | ▮ | This is a public brand name and there is no justification to claim it is confidential. |
| 167:17 | Confidential | None | | This is a public brand name and there is no justification to claim it is confidential. |
| 168:19 | Confidential | None | | This is a public brand name and there is no justification to claim it is confidential. |
| 169:1 | Confidential | None | | This is a public brand name and there is no justification to claim it is confidential. |
| 169:10 | Confidential | None | | This is a public brand name and there is no justification to claim it is confidential. |
| 169:23 | Confidential | None | yoga and swimming and monitoring vitals | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 169:25 | Confidential | None | ▮ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |

| | | | | |
|---|---|---|---|---|
| 170:9 | Confidential | None | ████████ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 171:21 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 172:13 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 172:14 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 172:16 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 176:16 | Confidential | None | █████ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 183:23 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 197:15 | Confidential | None | █ HWE ████ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. However "HWE" is an industry standard term and should not be redacted. |
| 197:17 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 197:18 | Confidential | None | █ | This is simply the letter " █ and is not confidential. |
| 197:21 | Confidential | None | █ | This is simply the letter " █ and is not confidential. |
| 197:23 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 198:3 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 199:10 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 200:11 | Confidential | None | ██ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 200:24 | Confidential | None | █ Hardware ███ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. However the term "Hardware" should not be redacted. |
| 203:4 | Confidential | None | █, A | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit However, the letter "A" is not confidentail and should not redacted. |
| 203:5 | Confidential | None | █ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 205:4-9 | Confidential | None | ████████ | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 205:11-13 | Confidential | None | ████████ | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 205:15-16 | Confidential | None | running or exercise or swimming or yoga | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 205:17 | Confidential | None | █; █ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 206:4-5 | Confidential | None | ███████ | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 207:10-11 | Confidential | None | ████ | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 207:20-21 | Confidential | None | ███████ | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |

| Line | Designation | | Text | Objection |
|---|---|---|---|---|
| 207:24-25 | Confidential | None | | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 208:1 | Confidential | None | movements and stuff | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 208:13 | Confidential | None | | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 208:15 | Confidential | None | | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 208:17-18 | Confidential | None | be a body for them to use on their own tools | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 208:19 | Confidential | None | | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 209:4 | Confidential | None | telephony | This is an industry standard term and is not Confidential and should not be redacted. |
| 209:6 | Confidential | None | telephony | This is an industry standard term and is not Confidential and should not be redacted. |
| 209:7 | Confidential | None | | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 209:8-10 | Confidential | None | | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 209:13-14 | Confidential | None | running, exercising, swimming, yoga | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 225:25 | Confidential | None | | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 226:1 | Confidential | None | | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 226:3 | Confidential | None | | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 226:4 | Confidential | None | | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 236:14-15 | Confidential | None | | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i5 (351) | Confidential | None | | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. ███ is a public brand name and should not be redacted, its not confidential. |
| i6 (352) | Confidential | None | | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i8 (354) | Confidential | None | | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i9 (355) | Confidential | None | | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| i11 (357) | Confidential | None | DVT; | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |

| i12 (358) | Confidential | None | exercising | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
|---|---|---|---|---|
| i20 (366) | Confidential | None | ████; ████; ██ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i22 (368) | Confidential | None | ████ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i25 (371) | Confidential | None | PVT | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development phase |
| i28 (374) | Confidential | None | ████; ██; ████ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i30 (376) | Confidential | None | ████ | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| i31 (377) | Confidential | None | swimming; ████████; ████ ████ | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. re "swimming" This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i32 (378) | Confidential | None | ██ | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| i34 (380) | Confidential | None | ██ | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i35 (381) | Confidential | None | yoga; ██ | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. re: Yoga, This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |

# EXHIBIT D



**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400

**orrick.com**

March 4, 2026

*Via Email*

Ashley Gjovik
ashleymgjovik@protonmail.com

**Melinda Riechert**

**E** mriechert@orrick.com
**D** +1 650 614 7423
**F** +1 650 614 7401

**Re:**   *Ashley Gjovik v. Apple Inc.*
   **N.D. Cal. Case No. 23-cv-4597-EMC**
   **Meet and Confer regarding Apple's Confidentiality Designations**

Dear Ashley:

This letter responds to your challenges to Apple's confidentiality designations related to your December 16, 2025 deposition, which you provided in an Excel spreadsheet on February 18, 2026.[1]

For many of Apple's designations, you indicated you do not believe the designated material is Confidential but that you do not object to Apple redacting this information from the public record. Apple does not understand you to have made a challenge to any of these designations within the meaning of the Protective Order.

We address below the designations you have challenged.

1.   **Internal Code Names**

While you have generally not objected to Apple redacting testimony related to code names, there are a few designations that appear to be in issue.

First, you have asked Apple to de-designate certain words contained within the codenames because you contend that, on their own, those words are not Confidential. While Apple disagrees with your premise, in the spirit of cooperation, Apple will agree to de-designate the following words contained in the parentheses:

   **Willing to de-designate**: 197:15 ("HWE"), 200:24 ("Hardware"), 203:4 ("A")

Second, you contend that the following designations of a particular letter are not Confidential:

---

[1] Although neither your February 18, 2026 email nor the spreadsheet you attached recited that any challenges to confidentiality were being made in accordance with Paragraph 6.2 of the Protective Order (as that paragraph requires; *see* Dkt. No. 235 ¶ 6.2), we are treating that email and attachment from you as having been intended to initiate a meet and confer under that paragraph.

Ashley Gjovik
March 4, 2026
Page 2



**Retains Confidential designation**: 197:18, 197:21

Apple will not de-designate this challenged testimony. In context, this testimony relates to the meaning of the letter within Apple's internal code names for product development and should be treated as Confidential consistent with the other code name designations. Therefore, Apple continues to believe these designations are appropriate and should be treated consistent with the other designations related to Apple's code.

**2. Industry Terminology**

You contend the certain designations refer to standard industry terms that should not be redacted. While Apple disagrees with your position, in the spirit of cooperation, Apple will agree to de-designate this material.

**Willing to de-designate**: 138:3, 138:4, 138:5, 138:7, 209:4, 209:6, i25 (371)

**3. Apple's Internal Studies**

You contend the following designations relating to your testimony purporting to characterize certain internal Apple studies cannot be considered Confidential based on a variety of objections, including because some of this testimony relates to what you claim is protected concerted activity under the National Labor Relations Act ("NLRA"):

161:6-9, 161:21-22, 162:6-8, 163:16, 164:10-11, 164:14, 164:15-16, 164:25, 165:13-24, 166:1-2, 166:4, 166:14, 167:17, 168:17, 168:19, 169:1, 169:10, 169:23, 169:25, 170:9, 176:16, 205:15-16, 205:17, 208:1, 208:17-18, 209:13-14, 225:25, 226:1, 226:3, 226:4, 236:14-15, i5 (351), i6 (352), i8 (354), i12 (358), i20 (366), i22 (368), i28 (374), i31 (377) ("swimming"), i34 (380), i35 (381) ("yoga")

Apple disagrees with your contention as well as your suggestion that the NLRA dictates whether and to what extent the federal court overseeing your wrongful termination suit against Apple can properly order that discovery material from that case be treated as Confidential. As an initial matter, the NLRB has already determined that your revealing "confidential product development information about [an Apple] study" is not "protected activity" under the NLRA. Sept. 25, 2025 Order Withdrawing Certain Allegations of Consolidated Complaint, Order Partially Dismissing Charge 32-CA-282142, Order Dismissing Charge 32-CA-283161 and Notice of Right of Appeal (Sept. 25, 2025) at 2. And in any event, Apple disputes any suggestion that the NLRA somehow overrides or voids basic procedural rules that govern litigation in federal court, including those related to protective orders. *See, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 499, 515 (2018); Fed. R. Civ. P. 26(c) (protective order may appropriately "requir[e] that … confidential research, development, or commercial information not be revealed or be revealed only in a specified way").

You also contend that this testimony is protected under "a variety of laws and public policy." This vague catch-all is not a meaningful attempt to meet and confer. Assuming the "laws and public policy"

Ashley Gjovik
March 4, 2026
Page 3



you are referencing relate to what you assert are your privacy rights, you are again incorrect. Apple did not ask any questions about your personal physiology or any private matter. Nor did your responses relate to your personal physiology or any other private matter. Instead, the testimony related to internal Apple studies, the majority of which you chose not to participate in. Whether you disagree with Apple's decision to conduct those studies, or how Apple conducted them, is irrelevant to determining about whether the subject matter and processes of those studies are properly designated as Confidential under the Protective Order.

Some of these designations you object to on the basis that they are public brand names; however, that ignores that the context of the discussion relates to the content, methods, or processes of internal Apple product-related studies.

However, in the spirit of cooperation Apple is willing to compromise and agree to de-designate certain of the citations referenced above—namely, all those that are not included in the following list:

> **Retains Confidential designation**: 164:10-11, 164:14, 164:15-16, 164:25, 165:13-23 (de-designating only ", and I found that very disturbing."), 166:1-2, 166:4, 166:14, 167:17, 168:19, 169:1, 169:10, 169:25, 170:9, 176:16, 205:17, 225:25, 226:1, 226:3, 226:4, 236:14-15, i5 (351), i6 (352), i8 (354), i20 (366), i22 (368), i28 (374)

Apple will not de-designate these challenged portions, which reflect your characterization of the content, methods, and processes of certain internal Apple product-related studies.

## II.     CONCLUSION

Please advise if you agree to the narrowed list of designations set forth in this letter, or if you continue to challenge any or all of Apple's designations (and, if so, which ones).

To be clear, Apple's designations do not prohibit you from relying upon this testimony in support of your case. Indeed, Apple's confidentiality designations and the Protective Order entered by the Court simply require certain procedural safeguards to be utilized (*e.g.*, a motion to seal) to ensure that Confidential information is not publicly disclosed.

Please let us know if you agree with the above compromises. We look forward to your response and hope to resolve these issues without the need for further motion practice. In the interim, the Protective Order requires you to treat the material Apple has designated Confidential as such, until such time as the Court rules otherwise. You must comply with the Court's Order while this process plays out.

Very truly yours,

Melinda Riechert

Melinda Riechert

# EXHIBIT E

**Summary of Status of Apple's Confidentiality Designations**

| No.[1] | Cite | Status | Retain? |
|---|---|---|---|
| 1. | 5:11 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 2. | 112:11 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 3. | 113:5 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 4. | 113:8 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 5. | 115:19 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 6. | 115:24 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 7. | 115:25 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 8. | 116:1 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 9. | 116:6 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |

---

[1] Entry Nos. added to this summary for the Court's convenience. These number references were not included in Apple's confidentiality designations or Plaintiff's spreadsheet. The designations have also been re-ordered to appear sequentially based on deposition transcript page number.

| 10. | 116:16 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
|-----|--------|----|-----|
| 11. | 116:17 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 12. | 116:24 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 13. | 121:21 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 14. | 121:22 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 15. | 121:25 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 16. | 122:11 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 17. | 122:12 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 18. | 122:14 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 19. | 122:16 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 20. | 122:18 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 21. | 122:22 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |

| 22. | 130:16 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
|---|---|---|---|
| 23. | 130:22 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 24. | 131:6 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 25. | 134:18 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 26. | 138:3 | **AGREED:** Apple compromises and agrees to de-designate the term "DVT". | No |
| 27. | 138:4 | **AGREED:** Apple compromises and agrees to de-designate the term "DVT". | No |
| 28. | 138:5 | **AGREED:** Apple compromises and agrees to de-designate the term "PVT". | No |
| 29. | 138:7 | **AGREED:** Apple compromises and agrees to de-designate the term "PVT". | No |
| 30. | 147:16-24 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 31. | 153:5 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 32. | 161:6-9 | **AGREED:** Apple compromises and agrees to de-designate the testimony "go to yoga or running or swimming where they wanted to strap a bunch of sensors on me and, like, monitor all my vitals while I was, like, exercising in some Apple lab". | No |
| 33. | 161:21-22 | **AGREED:** Apple compromises and agrees to de-designate the testimony "yoga and swimming where they would monitor your vitals". | No |

3

| 34. | 162:6-8 | **AGREED:** Apple compromises and agrees to de-designate the testimony "the yoga and swimming programs where they would monitor your vitals". | No |
|---|---|---|---|
| 35. | 163:16 | **AGREED:** Apple compromises and agrees to de-designate the testimony "swimming and yoga". | No |
| 36. | 164:10-11 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 37. | 164:14 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 38. | 164:15-16 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 39. | 164:25 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 40. | 165:13-24 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation.<br><br>However, Apple compromises and agrees to de-designate the last line, stating ", and I found that very disturbing." | Yes, In Part |
| 41. | 166:1-2 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 42. | 166:4 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 43. | 166:14 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 44. | 167:17 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 45. | 167:20 | **AT ISSUE**: Inadvertently left out of Apple's initial designations. It is a duplicate of other designations that Plaintiff has challenged, and, pursuant to Paragraph 5.2 of the Protective Order, Apple now identifies and retains the designation. | Yes |
| 46. | 168:19 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |

| 47. | 169:1 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
|---|---|---|---|
| 48. | 169:10 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 49. | 169:23 | **AGREED:** Apple compromises and agrees to de-designate the testimony "yoga and swimming and monitoring vitals". | No |
| 50. | 169:25 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 51. | 170:9 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 52. | 171:21 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 53. | 172:13 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 54. | 172:14 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 55. | 172:16 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 56. | 176:16 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 57. | 183:23 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 58. | 197:15 | **AGREED:** Plaintiff compromises and agrees most of this testimony may be redacted because it is not material to her lawsuit. Apple compromises and agrees to de-designate the term "HWE" per Plaintiff's request. | Yes, In Part |

| 59. | 197:17 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
|---|---|---|---|
| 60. | 197:18 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 61. | 197:21 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 62. | 197:23 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 63. | 198:3 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 64. | 199:10 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 65. | 200:11 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 66. | 200:24 | **AGREED:** Plaintiff compromises and agrees most of this testimony may be redacted because it is not material to her lawsuit.<br><br>Apple compromises and agrees to de-designate the term "Hardware" per Plaintiff's request. | Yes, In part. |
| 67. | 203:4 | **AGREED:** Plaintiff compromises and agrees most of this testimony may be redacted because it is not material to her lawsuit.<br><br>Apple compromises and agrees to de-designate the term "A" per Plaintiff's request. | Yes, In Part |
| 68. | 203:5 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 69. | 205:4-9 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |

| 70. | 205:11-13 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
|---|---|---|---|
| 71. | 205:15-16 | **AGREED:** Apple compromises and agrees to de-designate the testimony "running or exercise or swimming or yoga". | No |
| 72. | 205:17 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 73. | 206:4-5 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted.<br><br>To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |
| 74. | 207:10-11 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted.<br><br>To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |
| 75. | 207:20-21 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted.<br><br>To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |
| 76. | 207:24-25 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted.<br><br>To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |
| 77. | 208:1 | **AGREED:** Apple compromises and agrees to de-designate the following: "movements and stuff". | No |
| 78. | 208:13 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted.<br><br>To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |

| 79. | 208:15 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted. To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |
|---|---|---|---|
| 80. | 208:17-18 | **AGREED:** Apple compromises and agrees to de-designate the testimony "be a body for them to use on their own tools". | No |
| 81. | 208:19 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted. To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |
| 82. | 209:4 | **AGREED:** Apple compromises and agrees to de-designate the following: "telephony". | No |
| 83. | 209:6 | **AGREED:** Apple compromises and agrees to de-designate the following: "telephony". | No |
| 84. | 209:7 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted. To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |
| 85. | 209:8-10 | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted. To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |
| 86. | 209:13-14 | **AGREED:** Apple compromises and agrees to de-designate the testimony "running, exercising, swimming, yoga". | No |
| 87. | 225:25 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 88. | 226:1 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |

| 89. | 226:3 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
|---|---|---|---|
| 90. | 226:4 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 91. | 236:14-15 | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 92. | i5 (351) | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 93. | i6 (352) | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 94. | i8 (354) | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 95. | i9 (355) | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 96. | i11 (357) | **AGREED:** Plaintiff compromises and agrees one term on this page may be redacted because it is not material to her lawsuit. Apple agrees to de-designate the term "DVT". | Yes, in part. |
| 97. | i12 (358) | **AGREED:** Apple compromises and agrees to de-designate the word "exercising". | No |
| 98. | i20 (366) | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 99. | i22 (368) | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 100. | i25 (371) | **AGREED:** Apple compromises and agrees to de-designate the following: "PVT". | No |
| 101. | i28 (374) | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 102. | i30 (376) | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted.<br><br>To the extent Plaintiff is challenging, Apple seeks to retain this designation because it relates to an internal research study. | Yes |

| 103. | i31 (377) | **AGREED:** Plaintiff compromises and agrees on term on this page may be redacted because it is not material to her lawsuit.<br><br>Apple compromises and agrees to de-designate the term "swimming" per Plaintiff's request. | Yes, In Part |
| 104. | i32 (378) | **AGREED:** Plaintiff compromises and agrees this testimony may be redacted because it is not material to her lawsuit. | Yes |
| 105. | i34 (380) | **AT ISSUE**: Plaintiff challenges Apple's designation and Apple retains the designation. | Yes |
| 106. | i35 (381) | **AGREED:** Plaintiff compromises and agrees one term on this page may be redacted because it is not material to her lawsuit.<br><br>Apple compromises and agrees to de-designate the term "yoga" per Plaintiff's request. | Yes, In Part |

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK, | Case No. 23-cv-4597-EMC |
| Plaintiff, | **PROPOSED ORDER GRANTING DEFENDANT APPLE INC.'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS** |
| v. | |
| APPLE INC., | Dept:      Courtroom TBD |
| Defendant. | 1301 Clay Street |
| | Oakland, CA 94612 |
| | Judge:    Honorable Kandis A. Westmore |

**PROPOSED ORDER**

Defendant Apple Inc. ("Apple")'s Motion to Retain Confidentiality came for hearing before this Court on April 16, 2026. Having reviewed the pleadings and papers on file in this action, and having considered the arguments of counsel and Plaintiff Ashley Gjovik, and good cause appearing, IT IS HEREBY ORDERED:

Apple's Motion to Retain Confidentiality is **GRANTED**. The Court finds that good cause exists to retain Apple's confidentiality designations because Plaintiff has not challenged certain designations pursuant to the Protective Order and, as to those designations she did challenge, revealing Apple's internal product related code words and Apple's internal product related studies would cause particularized harm to Apple and the balance of public and private interests support maintaining these designations pursuant to the Protective Order. *See In re Roman Catholic Archbishop*, 661 F.3d 417, 424 (9th Cir. 2011). Specifically, this Court finds the designations identified in Exhibit A to the Declaration of Melinda Reichert which were redacted in the public filing but presented to this Court under seal remain Confidential pursuant to the Protective Order.

The Court further **ORDERS** Plaintiff to de-publish any material subject to this Order—as well as all other publications and republications of that same material—and **DIRECTS** the Clerk of Court to seal Plaintiff's filings at Dkt. Nos. 278, 284, 285, 297, 301, 301-1, 302, 302-1, and 302-2.

**IT IS SO ORDERED.**

DATED:

By:_____
Hon. Kandis A. Westmore
United States Magistrate Judge
.

PROPOSED ORDER GRANTING APPLE'S MOT.
RETAIN CONFIDENTIALITY DESIGNATIONS
CASE NO. 23-CV-4597-EMC

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
APPLE INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK, | Case No. 23-cv-4597-EMC |
| Plaintiff, | **DEFENDANT APPLE INC.'S ADMINISTRATIVE MOTION TO SEAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| APPLE INC., | |
| Defendant. | Dept:    Courtroom TBD |
| | 1301 Clay Street |
| | Oakland, CA 94612 |
| | Judge:   Honorable Kandis A. Westmore |

## NOTICE OF MOTION AND MOTION

NOTICE is hereby given by Apple Inc. ("Apple") of the filing of this motion pursuant to N.D. Cal. Civil Local Rules 7-11 and 79-5(c) and Judge Westmore's Standing Order for Civil Cases. This motion seeks to seal material Apple designated as Confidential pursuant to the Protective Order (Dkt. No. 235) that is referenced in Apple's Motion to Retain Confidentiality Designations or the supporting evidence, which are being filed contemporaneously herewith, as well as Plaintiff's recent filings at Dkt. Nos. 297, 301, 301-1, 302, 302-1, and 302-2, on the grounds that good cause exists to seal information Apple designated as Confidential pursuant to the Protective Order (Dkt. No. 235) until such time as any challenges to those designations have been ruled upon.

This request is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Melinda S. Riechert, the complete pleadings and records on file, and other evidence and arguments as may be presented at the hearing on this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to N.D. Cal. Civil Local Rules 7-11 and 79-5(c) and Judge Westmore's Standing Order for Civil Cases, Apple respectfully moves for an order filing under seal of the following material submitted in connection with its Motion to Retain Confidentiality Designations: (1) the portions of excerpts of Plaintiff's deposition transcript that contain material Apple designated as Confidential pursuant to the Protective Order attached as Exhibit A to the Declaration of Melinda S. Riechert in Support of Apple's Motion to Retain Confidentiality; (2) portions of Apple's confidentiality designations for Plaintiff's deposition attached as Exhibit B to the Declaration of Melinda S. Riechert in Support of Apple's Motion to Retain Confidentiality; (3) portions of Plaintiff's challenges to Apple's confidentiality designations; and (4) Plaintiff's recent filings at Dkt. No. 297, 301, 301-1, 302, 302-1, and 302-2 that contain information Apple designated confidential that the Court has not yet ruled upon.

/ / /

/ / /

- 1 -

APPLE'S ADMIN. MOT. TO SEAL; MP&A
CASE NO. 23-CV-4597-EMC

"A 'good cause' showing under Rule 26(c) will suffice to keep sealed records attached to non-dispositive motions." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006). The Court has good cause to seal the records at issue here for several reasons.

*First*, a legitimate public interest that warrants sealing is preserving the integrity of this Court's Protective Order and its confidentiality designation process. The Protective Order requires information designated Confidential to be treated as Confidential until the Court rules upon any challenge to the designation. *See* Dkt. No. 235 ¶ 6.3. Indeed, publicly filing material designated as Confidential by a party before a challenge to the Confidential designation has been ruled upon is a "flagrant and deliberate violation" of a court order that harms the integrity of the judicial process. *Ma v. San Francisco Estuary Inst.*, No. 23-CV-05060-JCS, 2026 WL 388720, at *5 (N.D. Cal. Feb. 11, 2026) (sanctioning *pro se* plaintiff for publicly filing material designated as confidential). Sealing is necessary so the Court can review the unredacted material and determine whether Plaintiff violated the Protective Order, without requiring Apple to publicly file at this time material it has designated as Confidential for which there has not yet been any ruling about any challenges to those designations.

*Second*, if sealing is denied, material that Apple has designated as Confidential would be publicly filed, which would perpetuate the very harm the Protective Order is intended to prevent. Apple is asking the Court to enter an order confirming designated testimony remains Confidential under the Protective Order; it makes little sense to require Apple (or allow Plaintiff) to further publish that same information in order to obtain relief.

*Third*, Apple has taken the least restrictive approach by publicly filing redacted versions of the documents at issue. Only the portions containing or describing material Apple has designated as Confidential—and which the Court must review to determine whether a violation of the Protective Order has occurred—are withheld from public view. Redacting these specific sections ensures that the public has access to all non-designated material, while allowing the Court to review the relevant content in full and maintaining the integrity of the confidentiality designation process. As to Plaintiff's recent filings, they should be sealed in their entirety because Plaintiff continues to flagrantly disregard this Court's orders. Sealing Plaintiff's recent filings until

APPLE'S ADMIN. MOT. TO SEAL; MP&A
CASE NO. 23-CV-4597-EMC

the Court rules on that issue, and the parties can in turn identify the specific portions of her filings that require redactions consistent with the Court's ruling, is the most efficient method to address her continued violations of the Protective Order through additional public filings including the same designated material.

*Fourth*, under the terms of the Protective Order, until such time as Plaintiff's challenges are resolved, the information Apple designated as Confidential is entitled to protection to preserve the integrity of this Court's orders and processes. *See* Dkt. No. 235 ¶ 6.3).

*Fifth*, as set forth in Apple's contemporaneously filed Motion to Retain Confidentiality Designations, good cause exists to preserve Apple's confidentiality designations because Apple will suffer harm from public disclosure and there are no countervailing interests supporting public disclosure.

On March 10, 2026, consistent with the requirements of this Court's Local Rules, Apple asked Plaintiff whether she would agree/stipulate to an order to seal material Apple designated as Confidential that is referenced in Apple's Motion to Retain Confidentiality Designations and evidence to be filed in support of Apple's Motion, as well as her recent filings at Dkt. Nos. 297, 301, 301-1, 302, 302-1, and 302-2, until such time as any challenges to those designations have been ruled upon. *See* Decl. of Melinda S. Riechert in Support of Admin. Mot. to Seal, filed herewith, ¶ 2. Plaintiff did not agree. *Id*.

For the foregoing reasons, Apple respectfully requests that the Court enter an order sealing 1) the portions of excerpts of Plaintiff's deposition transcript that contain material Apple designated as Confidential pursuant to the Protective Order attached as Exhibit A to the Declaration of Melinda S. Riechert in Support of Apple's Motion to Retain Confidentiality Designations; (2) portions of Apple's confidentiality designations for Plaintiff's deposition that contain material Apple designated as Confidential pursuant to the Protective Order attached as Exhibit B to the Declaration of Melinda S. Riechert in Support of Apple's Motion to Retain Confidentiality Designations; (3) portions of Plaintiff's challenges to Apple's confidentiality designations that contain material Apple designated as Confidential pursuant to the Protective Order attached as Exhibit C to the Declaration of Melinda S. Riechert in Support of Apple's Motion to Retain

Confidentiality Designations; and (4) Plaintiff's recent filings at Dkt. No. 297, 301, 301-1, 302, 302-1, and 302-2 that contain material Apple designated Confidential pursuant to the Protective Order.

Dated: March 11, 2026                    ORRICK, HERRINGTON & SUTCLIFFE LLP

By:        */s/ Melinda S. Riechert*
MELINDA S. RIECHERT
Attorney for Defendant
APPLE INC.

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:    +1 650 614 7400
Facsimile:     +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:     +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:     +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>                    Plaintiff,<br><br>          v.<br><br>APPLE INC.,<br><br>                    Defendant. | Case No. 23-cv-4597-EMC<br><br>**DECLARATION OF MELINDA S. RIECHERT IN SUPPORT OF DEFENDANT APPLE INC.'S ADMINISTRATIVE MOTION TO SEAL**<br><br><br>Dept:        Courtroom TBD<br>             1301 Clay Street<br>             Oakland, CA 94612<br>Judge:      Honorable Kandis A. Westmore |

I, Melinda S. Riechert, declare as follows:

1.      I am an attorney admitted to practice law in the state of California and am a partner at the firm Orrick, Herrington & Sutcliffe LLP. I am counsel for defendant Apple Inc. in this action. I submit this declaration in support of Apple's Administrative Motion to Seal, which seeks an order sealing material Apple designated as Confidential pursuant to the Protective Order (Dkt. No. 235) that is referenced in Apple's Motion to Retain Confidentiality and evidence in support thereof. I have personal knowledge as to the facts set forth in this declaration. If called as a witness, I could and would testify competently thereto.

2.      I e-mailed Plaintiff on March 10, 2026, and asked her to stipulate to the relief requested in Apple's Motion to Seal. Plaintiff did not agree.

I certify under penalty of perjury and pursuant to the laws of the United States that the foregoing is true and correct.

Executed February March 11, 2026, in Menlo Park, California.

Dated: March 11, 2026

*/s/ Melinda S. Riechert*
Melinda S. Riechert

RIECHERT DECL. ISO
APPLE'S ADMIN. MOT. TO SEAL
Case No. 23-cv-4597-EMC

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:     +1 650 614 7400
Facsimile:      +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1 415 773 5700
Facsimile:      +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:     +1 202 339 8400
Facsimile:      +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK, <br><br> Plaintiff, <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | Case No. 23-cv-4597-EMC <br><br> **[PROPOSED] ORDER GRANTING DEFENDANT APPLE INC.'S ADMINISTRATIVE MOTION TO SEAL** <br><br> Dept:      Courtroom TBD <br>              1301 Clay Street <br>              Oakland, CA 94612 <br> Judge:    Honorable Kandis A. Westmore |

**PROPOSED ORDER**

Pursuant to Local Rules 7-11 and 79-5, Defendant Apple Inc. ("Apple") filed an Administrative Motion to File Under Seal ("Motion") in connection with its Motion to Retain Confidentiality, and good cause to seal having been shown, the Court GRANTS Apple's Motion and Orders sealed the following:

| Document Description | Portions Sought to Be Sealed |
| --- | --- |
| Exhibit A to the Declaration of Melinda Riechert in Support of Apple's Motion to Retain Confidentiality | Portions of Plaintiff's deposition transcript containing material designated by Apple as Confidential pursuant to the Protective Order (highlighted in yellow in the filed under seal version) that Apple seeks to retain as Confidential. |
| Exhibit B to the Declaration of Melinda Riechert in Support of Apple's Motion to Retain Confidentiality | Portions of Apple's confidentiality designations containing material designated by Apple as Confidential pursuant to the Protective Order (highlighted in yellow in the filed under seal version) that Apple seeks to retain as Confidential. |
| Exhibit C to the Declaration of Melinda Riechert in Support of Apple's Motion to Retain Confidentiality | Portions of Plaintiff's challenges to Apple's confidentiality designations containing material designated by Apple as Confidential pursuant to the Protective Order (highlighted in yellow in the filed under seal version) that Apple seeks to retain as Confidential. |
| Dkt. No. 297 | Entire document until such time as the Court rules on Apple's Motion to Retain Confidentiality and more limited designations can be determined based on the Court's ruling. |
| Dkt. No. 301 | Entire document until such time as the Court rules on Apple's Motion to Retain Confidentiality and more limited designations can be determined based on the Court's ruling. |
| Dkt. No. 301-1 | Entire document until such time as the Court rules on Apple's Motion to Retain Confidentiality and more limited designations can be determined based on the Court's ruling. |
| Dkt. No 302 | Entire document until such time as the Court rules on Apple's Motion to Retain Confidentiality and more limited designations |

| | |
|---|---|
| | can be determined based on the Court's ruling. |
| Dkt. No. 302-1 | Entire document until such time as the Court rules on Apple's Motion to Retain Confidentiality and more limited designations can be determined based on the Court's ruling. |
| Dkt. No. 302-2 | Entire document until such time as the Court rules on Apple's Motion to Retain Confidentiality and more limited designations can be determined based on the Court's ruling. |

**IT IS SO ORDERED.**

DATED:

By: _____

Hon. Kandis A. Westmore
United States Magistrate Judge

.

[PROPOSED] ORDER GRANTING APPLE'S
MOT. TO SEAL
[23-CV-4597-EMC-KAW]

# EXHIBIT B

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(415) 964-6272
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**Ashley M. Gjovik**,

*an individual*,

  Plaintiff,

vs.

**Apple Inc.**,

*a corporation,*

  Defendant.

**Case No.**

**3:23-CV-04597-EMC**

**Plaintiff's Opposition to Defendant's Motion at Dkt. 294 with Memorandum of P&A. (Corrected)**

**HEARING:**
**Location: Oakland (TBD)**
**Date: April 2 2026**
**Time: 1:30 PM**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................**0**

**INTRODUCTION/SUMMARY** ......................................................................... **1**

**ISSUES TO BE DECIDED**................................................................................**3**

**BACKGROUND & STATEMENT OF FACT** ..................................................**4**

    **THE PROTECTIVE ORDER: APPLE'S BAD FAITH LITIGATION WEAPON** ...............................................**5**

    **THE DEPOSITION, THE BLANKET DESIGNATION, AND NULLITY OF FEB. 4.** ........................................**5**

    **FEBRUARY 4, FEBRUARY 16, AND APPLE'S IMMEDIATE RETALIATION.** ............................................**6**

    **APPLE'S OWN WITNESS CONCEDES HE CAN'T DETERMINE IF THE INFORMATION SHARED WAS ALREADY INTENTIONALLY PUBLIC.** ............................................................................................**7**

**ARGUMENT** ....................................................................................................**7**

    **WHAT APPLE SEEKS TO SUPPRESS HAS BEEN PUBLIC YEARS, WAS KNOWN TO PLAINTIFF FOR YEARS, AND APPLE ENTERED A CONTRACT PROMISING IT WOULD NOT SAY ITS SECRET.** ............................................................................................................**7**

        *No Valid Designation Existed — The Threshold Bar Apple Cannot Cross* .............................................**7**

        *The Protective Order's Own Text Excludes Every Item Apple Designated*..................................**8**

        *Five Years of Public Disclosure in 4+ Jurisdictions Across 3+ Countries* .................................**9**

        *Apple's 2021 Conduct Establishes the Pattern & the Judicial Admission* ................................**11**

        *The April 2025 NLRB Settlement Prohibits Apple From Doing Exactly This* .....................................**12**

        *Apple's Motion Has an Illegal Objective Under Bill Johnson's Footnote 5* ......................................**13**

        *The Deletion Demand Is a Prior Restraint That Cannot Be Sustained*.................................................**14**

        *Apple's Four Cases Are Inapplicable* .................................................................................**15**

    **DEFENDANT'S MOTION HAS NO COGNIZABLE LEGAL AUTHORITY** .................................**15**

    **MULTIPLE INDEPENDENT JURISDICTIONAL BARS PRECLUDE ANY RELIEF**.....................**16**

    **DEFENDANT HAS NOT AND CANNOT SATISFY THE LEGAL STANDARDS FOR THE RELIEF IT SEEKS** ................................................................................................ **19**

    **DEFENDANT'S MOTION IS RELIEF ON UNPLED, WAIVED COUNTERCLAIM** .....................**20**

    **DEFENDANT CANNOT SEEK EQUITY WITH UNCLEAN HANDS** ...........................................**21**

    **THE MODEL PROTECTIVE ORDER IS LEGALLY PROBLEMATIC** ........................................**22**

    **DEFENDANT'S MOTION IS AN UNAUTHORIZED SUMMARY JUDGMENT MOTION** ...........**24**

**CONCLUSION AND RELIEF REQUESTED** .........................................................................**26**

# TABLE OF AUTHORITIES

### CASES

*Anheuser-Busch*, 367 NLRB No. 132 ------------------------------------------------------------------------------------- 14

*Apple Inc. v. Rivos*, 2024 WL 748394 (N.D. Cal. Feb. 23, 2024). ------------------------------------------------ 20

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ----------------------------------------------------------------- 27

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). -------------------------------------------------------- 15

*BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002) ------------------------------------------------------------- 14

*Beckman Indus.*, 966 F.2d at 475–76 ------------------------------------------------------------------------------------ 23

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 737 n.5 (1983) -------------------------------------- 14

*Butterworth v. Smith*, 494 U.S. 624 (1990) --------------------------------------------------------------------------- 21

California Code of Civil Procedure § 425.16 ------------------------------------------------------------------------- 19

*Can-Am Plumbing, Inc. v. NLRB*, 321 F.3d 145, 149 (D.C. Cir. 2003) ------------------------------------------ 14

*Cantwell v. Northrop Grumman Corp.*, 2004-SOX-75 (ALJ Feb. 9, 2005) ------------------------------------------8

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 887–88 (2009). ------------------------------------------------ 23

*CBS v. Davis*, 510 U.S. 1315, 1317 (1994) ------------------------------------------------------------------------------ 15

*Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–66 (1978). ------------------------------------------------------------------3

*Frazier v. Heebe*, 482 U.S. 641, 645 (1987). ----------------------------------------------------------------------------- 24

*Gambale v. Deutsche Bank AG*, 377 F.3d 133 (2d Cir. 2004) ---------------------------------------------------- 21

*Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) -----------------------------------------------9

*Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) --------------------------------------------------- 16

*Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). -------------------------------------------------- 20

*Glacier Northwest*, 598 U.S. 771 (2023). -------------------------------------------------------------------------------- 18

*In re Hruby*, 512 B.R. 262, 274 (Bankr. D. Colo. 2014) --------------------------------------------------------------- 17

*In re Schwartz*, 954 F.2d 569, 571–72 (9th Cir. 1992) ---------------------------------------------------------------- 17

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) ------------------------------8

*Kamakana v. City & County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006) ---------------------------------------4

*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244-45 (1933). ------------------------------- 22

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994); *Peacock v. Thomas*, 516 U.S. 349 (1996). ----------------------------------- 21

*Lipscher v. LRP Publications*, 266 F.3d 1305, 1323 (11th Cir. 2001) ------------------------------------------- 24

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525–26 (1986). ---------------------------------------- 23

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 526 (1986) ------------------ 13

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ----------------------------------------------------------------3

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976), ------------------------------------------------------------- 27

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 590 (1976) ------------------------------------------------------- 15

*New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001). ----------------------------------------------------------- 26

*Newport v. Calpine Corp.*, 2007-ERA-7 (ALJ Feb. 12, 2008) ------------------------------------------------------------------ 10

*Newsham v. Lockheed*, 190 F.3d 963 (9th Cir. 1999) ------------------------------------------------------------------------------ 19

*Pochiro v. Prudential Ins. Co.*, 827 F.2d 1246, 1249 (9th Cir. 1987)------------------------------------------------------ 21

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996)------------------------------------------------ 27

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996) ---------------------------------------- 14

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996).-----------------------------------------2

*Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 790 (1st Cir. 1988)-------------------------------------------------9

*Rasawehr v. Bey* (Ohio S. Ct. 2020). --------------------------------------------------------------------------------------------- 20

*Rasawehr v. Twitter, Inc.*, No. 3:21-cv-01644 (N.D. Cal.) (----------------------------------------------------------------- 15

*Reno v. ACLU*, 521 U.S. 844, 870 (1997). -------------------------------------------------------------------------------------- 20

*Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997) -------------------------------------------------------- 15

*Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 380–83 (1992). ------------------------------------------------------ 23

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).--------------------------------------------------- 27

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959) ------------------------------------------- 14

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959). -------------------------------------------2

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). ------------------------------------------------------------------------------- 17

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984) --------------------------------------------------------------------------3

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984) ---------------------------------------------------------------------9

*Seattle Times*, 467 U.S. at 33; *Kamakana*, 447 F.3d at 1179 --------------------------------------------------------------- 25

*Smith v. Hewlett Packard Co.*, 2005-SOX-88 to 92 (ALJ Feb. 21, 2006) --------------------------------------------- 10

*United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009). --------------------------------------------------------------- 24

*United States v. Will*, 449 U.S. 200, 215 (1980). ----------------------------------------------------------------------------- 25

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ----------------------------------------------------------------- 23

*Willy v. Coastal Corp.*, 503 U.S. 131, 135 (1992) ---------------------------------------------------------------------------- 24

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) -----------------------------------------------------------3

*Wooley v. Maynard*, 430 U.S. 705 (1977). -------------------------------------------------------------------------------------- 23

## STATUTES

11 U.S.C. § 362(a)-----------------------------------------------------------------------------------------------------------------------3

11 U.S.C. § 362(a)(1)----------------------------------------------------------------------------------------------------------------- 22

11 U.S.C. § 362(a)(1), (6).---------------------------------------------------------------------------------------------------------- 26

28 U.S.C. § 2071----------------------------------------------------------------------------------------------------------------------- 24

28 U.S.C. § 2071(a). ----------------------------------------------------------------------------------------------------------------- 24

28 U.S.C. § 2072(b)--------------------------------------------------------------------------------------------------------------18, 24

28 U.S.C. § 2201 ---------------------------------------------------------------------------------------------------------------------- 17

28 U.S.C. § 636(b)(1)(A).----------------------------------------------------------------------------------------------------------- 18

29 U.S.C. § 101 ------------------------------------------------------------------------------------------------------------------2, 18

Cal. Civ. Code § 1580 -------------------------------------------------------------------------------------------- 23

Cal. Lab. Code §§ 232.5, 1102.5-----------------------------------------------------------------------------------3

California Civil Code § 51.9 --------------------------------------------------------------------------------------- 18

California Government Code § 12940(h) ------------------------------------------------------------------------- 19

California Government Code § 12964.5 --------------------------------------------------------------------------- 19

California Labor Code § 1102.5 ----------------------------------------------------------------------------------- 27

California Labor Code § 96(k) ------------------------------------------------------------------------------------- 19

Speak Out Act, Pub. L. No. 117-224 (2022) -------------------------------------------------------------------- 18

## RULES

Fed. R. Civ. P. 13(a)(1)-------------------------------------------------------------------------------------------- 21

Fed. R. Civ. P. 26(g)(2) -------------------------------------------------------------------------------------- 2, 3, 8

Fed. R. Civ. P. 26(g)(2).------------------------------------------------------------------------------------------- 27

Fed. R. Civ. P. 83 ------------------------------------------------------------------------------------------------- 24

## TREATISES

*Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts* 174 (2012). ----------------------------- 9

Josephs, "The Availability of Discovery Sanctions for Violations of Protective Orders," 80 U. Chi. L. Rev. 1355,

1371–72 (2013). -------------------------------------------------------------------------------------------------24

Restatement (Second) of Contracts § 17. ------------------------------------------------------------------------23

## CONSTITUTIONAL PROVISIONS

California Constitution Article I, § 1 ----------------------------------------------------------------------------- 19

## PLAINTIFF′S OPPOSITION TO DEFENDANT′S MOTION (Dkt. 294)

1.      Plaintiff Ashley Gjovik respectfully files this opposition to Defendant Apple Inc.′s Motion to Enforce Protective Order (Dkt. 294). Apple also filed motions to seal, a motion for expedited schedule, and a motion to retain designations.  Concurrently filed are supporting declarations, a request for judicial notice, and an administration motion to consider this motion and hearing with the other motions Defendant has filed/triggered scheduled for a hearing on April 16 2026.

# INTRODUCTION/SUMMARY

2.      Apple has alerted the world that there is super, secret, sensitive information on the loose; alerted the judiciary that one of the most powerful companies in the history of the modern world (itself) risks irreparable harm due to the Plaintiff's social media posts about regulatory compliance, and has now demanded that the federal courts act immediately in order to protect the vulnerable corporation's business interests. A German magazine is also currently in possession of the information Apple asks this Court to suppress. So is a French publication. So is a UK outlet, actually. So is the peer-reviewed *American Journal of Obstetrics and Gynecology*. So is ClinicalTrials.gov, a federal government database. So is the Government Accountability Office, which referenced Plaintiff′s public comment in GAO-24-107639. So are six successive public complaints on this docket, and cited in Judge Chen′s published orders at Dkt. 73 and Dkt. 179. (Judge Chen leaked!) So is the NLRB docket going back to 2021 so NLRB is a bunch of leakers too.

3.      Yet, Apple has not moved against any of these other entities and offers no explanation as to why the Plaintiff must be subject to these injunctions but other sources of the same and similar information would not be and why that version of the information is not "harmful" to Apple the way the Plaintiff's Twitter and blogs posts are. Apple has not suggested that a Northern District of California protective order binds foreign publications or is even needed. Apple′s motion is not about confidentiality. It is about silencing one person Apple desperately would like to silence — the former employee who keeps reporting Apple's regulatory compliance failures to the appropriate regulators, and who then keep taking enforcement action against Apple over the Plaintiff's complaints, testimony, and in-hand evidence.

4.      Apple′s Motion to Enforce the Protective Order, Dkt. 294, asks this Court to compel deletion of published speech, impose a prior restraint on future speech, seal court filings including an NLRB charge and a notification that Apple is under criminal EPA investigation, and hold Plaintiff in contempt — all on the basis of designations that are void for multiple independent reasons, over content that has been in the public domain for years, through a procedural vehicle that does not exist under the Federal Rules, in defiance of this Court′s express Feb. 20, 2026 order requiring meet-and-confer before any motion practice, and after Judge

Westmore stated on the record: *"No, there is no injunction."* Tr. at 38:56.

5.       The subject matter Apple seeks to suppress is not a trade formula, source code, customer list, or prototype design. It is an employee's testimony about her own body — specifically, Apple's requests that she measure her cervical mucus, track her ovulation, and register her sexual partners with Apple under NDA so they could sleep in her bed while Apple's sensor recorded their vitals and mined their data for commercial business development. These requests were made by Plaintiff's employer, during her employment, to her person. Her right to describe them is not governed by a discovery protective order. It is governed by the First Amendment, the NLRA, and five years of unbroken public disclosure through government filings, press interviews, and federal court complaints that Apple has never moved to seal.

6.       Plaintiff predicted this motion before the Protective Order was ever entered. She told Apple on the record: the Order was an attempt to get her "into court jail," a "blank check" to jail her "for talking about whatever Apple unilaterally claims is confidential." Dkt. 220-9 at 4, 7. She told the Court Apple intended to use the Order "to do a summary judgment motion without summary judgment" & declare her protected disclosures misconduct through contempt proceedings rather than trial. Dkt. 302-3 at 6–7. Judge Westmore responded: *"That's not how the protective order is used."* Id at 7. Apple filed this motion anyway.

7.       The motion fails for reasons that are numerous, independent, and jurisdictional. No valid designation exists: Apple's blanket designation was void under PO § 5.1's prohibition on mass indiscriminate designations, and Apple's February 4 narrowed list is a nullity under Fed. R. Civ. P. 26(g)(2) for absence of signature, dating, and proper service. The Protective Order's own § 3 excludes all designated content as either publicly known or previously known to Plaintiff from her own experience. The First Amendment bars the prior restraint. *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996). The NLRA bars this Court's jurisdiction over activity arguably protected by §§ 7 and 8. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959).

8.       The Norris-LaGuardia Act, 29 U.S.C. § 101, absolutely bars injunctive relief arising from a labor dispute. The Speak Out Act bars enforcement of NDAs covering sexual harassment and assault allegations. The automatic stay in Plaintiff's bankruptcy, Case No. 25-11496 (D. Mass.), voids any action against Plaintiff's interests without stay relief. The April 2025 NLRB national settlement, Case No. 32-CA-284428, in which Apple formally promised it would not enforce confidentiality restrictions over terms and conditions of employment, bars Apple from seeking the identical result through a different procedural vehicle. Each of these is independent. Any one of them requires denial. Together they require sanctions.

9.       The motion is also itself a violation. Filing a contempt motion against an employee for

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION AT DKT. 294 | 3:23-CV-04597-EMC | P.2

publishing an NLRB charge and a blog post explaining that charge to her coworkers is a textbook § 8(a)(4) unfair labor practice. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–66 (1978). It is retaliation for protected whistleblower activity in violation of Cal. Lab. Code §§ 232.5, 1102.5. It breaches the April 2025 settlement′s self-executing default provision, which upon notice automatically reissues Apple′s complaint, deems allegations admitted, and authorizes ex parte Court of Appeals enforcement without trial.

10. Apple filed this motion with full knowledge of that provision. Apple filed it after Plaintiff′s blog post warned that any retaliation for the disclosed information would generate a new charge. Apple filed it anyway and Apple now has at least 7 new charges filed against it in just the last few weeks. This is a pattern — the same pattern that caused the NLRB to issue multiple Decisions of Merit, to file suit against Apple, and to settle the resulting charges nationally. This Court should deny Apple's motion in its entirety and recognize that the filing of the motion is itself sanctionable conduct.

## ISSUES TO BE DECIDED

11. 1) Whether any valid confidentiality designation exists to enforce, where Apple′s blanket designation was void ab initio under Protective Order § 5.1′s prohibition on mass indiscriminate designations, and Apple′s February 4, 2026 narrowed designation is a legal nullity under Fed. R. Civ. P. 26(g)(2) for absence of signature, dating, and proper service. 2) Whether this Court has jurisdiction to grant any relief, where Plaintiff′s Chapter 7 bankruptcy automatic stay, 11 U.S.C. § 362(a), voids all proceedings against Plaintiff′s interests absent stay relief; the NLRB holds exclusive jurisdiction over the underlying conduct under *Garmon*; and the Norris-LaGuardia Act, 29 U.S.C. § 101, absolutely bars injunctive relief arising from a labor dispute.

12. 3) Whether the Protective Order applies to the designated content at all, where the Order′s own § 3 expressly excludes information that is publicly known or was previously known to the receiving party, and where *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), bars suppression of information independently possessed. 4) Whether Apple has satisfied the legal standard for permanent injunctive relief under *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), and the heightened prior restraint standard under *Nebraska Press Ass′n v. Stuart*, 427 U.S. 539 (1976), where it has made no First Amendment analysis, no showing of irreparable harm not caused by its own prior public disclosures, and no showing that the balance of equities or public interest favors suppression of employee speech about working conditions. 5) Whether Apple may seek enforcement of its Confidentiality and Intellectual Property Agreement through this motion, where Apple pleaded no counterclaim in its Answer, Dkt. 183, or Amended Answer, Dkt. 218, waiving any such claim under Fed. R. Civ. P. 13(a), and where Apple agreed in the April 2025 NLRB national settlement, Dkt. 194, that it would not enforce that agreement over terms and conditions of employment protected by NLRA § 7, which is what its trying to do right now.

13. 6) Whether this Court has authority to seal filings already adjudicated by Judge Chen and the Ninth Circuit, and whether Apple has satisfied the ″compelling reasons″ standard for any files under *Kamakana v. City &*

*County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006), and N.D. Cal. Civil L.R. 79-5. 7) Whether Apple′s motion itself may constitute a fresh unfair labor practice under NLRA §§ 8(a)(1) and 8(a)(4), a violation of Cal. Lab. Code and the Bane Act, and/or breach of the April 2025 NLRB settlement′s self-executing default provision, or other legal protections/restrictions, such that Apple's motion requires a sanctions response rather than substantive adjudication.

# BACKGROUND & STATEMENT OF FACT

14.     Plaintiff Ashley Gjovik worked for Apple from February 2015 through September 2021 as a Sr. Engineering Program Manager in the Product Integrity division of Hardware Engineering, reporting to a Sr. Director who also oversaw employee ″user studies″ including medical and anatomical studies. Her total compensation was approximately $386,000 per year. She received positive reviews annually, with promotions, bonuses, and stock grants, and was repeatedly characterized as key talent and a critical asset — until she reported Apple′s misconduct to the public, to the press, to state and federal agencies, and began labor organizing with coworkers. 5AC, Dkt. 142 ¶¶ 67, 69.

15.     This lawsuit asserts claims under California Labor Code §§ 1102.5, 6310, 232.5, 98.6, and 96(k), and a *Tamney* con-tort claim alleging her termination violated public policy including the California constitutional right to protest invasions of privacy, illegal data harvesting in violation of California Constitution Article I § 1 and the FTC Act, sex and disability discrimination, and retaliation against crime victims and legislative witnesses. Dkt. 142. The operative complaints also allege that Apple captured, uploaded, and stored photographs of Plaintiff in states of undress through its internal ″Gobbler″ facial recognition application, and that Apple engaged in extortionate conduct related to those images during a Department of Justice investigation in which Plaintiff was a material witness. Dkt. 155–156. Original claims under 18 U.S.C. § 1962 (RICO) and the Bane Civil Rights Act, Cal. Civ. Code § 52.1, were dismissed without prejudice; Apple then filed five successive Rule 12(b)(6) motions anyway. Dkt. 73.

16.     The federal regulatory record established long before this litigation began is extensive. The NLRB found merit in dozens of Plaintiff′s allegations, issued complaints against Apple for unlawful policy enforcement and retaliation, and reached a national settlement with Apple in April 2025, Case No. 32-CA-284428, Dkt. 194. Three additional charges remain pending, including Case No. 32-CA-381277, filed February 16, 2026. The EPA conducted mandatory onsite safety inspections at Plaintiff′s office based on disclosures she made during employment; the EPA′s RCRA enforcement team, acting on Plaintiff′s 2023 complaints about Apple′s Santa Clara chip fabrication facility, brought the first formal environmental enforcement action ever taken against Apple, resulting in a consent agreement, fines, and multiple inspections — with the settlement crediting Plaintiff for the action. (Dkt. 203, 278).

### The Protective Order: Apple's Bad Faith Litigation Weapon

17.     Apple obtained the Protective Order, Dkt. 235, on July 7, 2025, over Plaintiff's written objections, a Motion to Quash, Dkt. 211, and a parallel motion to the Ninth Circuit warning of imminent irreparable harm. Dkt. 214. Apple's stated justification for the Order was document production. Every time Plaintiff asked why a protective order was necessary, Apple's counsel gave the same answer: *"we are withholding documents pursuant to the lack of a protective order"*; *"I'm just asking you to sign a protective order, and then we will give you documents"*; *"you get the protective order, we send you the documents"*; *"the purpose is for you to see the documents."* Dkt. 220-9 at 4–18.

18.     Apple's actual purposes were different, and Apple disclosed them. Apple told the Court that one of its "defenses in this case is that Plaintiff was terminated because she leaked confidential Apple information on social media and to the press" and it "therefore will need to produce documents pertaining to the confidential information that Plaintiff leaked." Dkt. 219-1 at 8. Apple admitted it refused Plaintiff's counteroffer to use redactions because it would "inhibit [Apple's] ability to demonstrate that Plaintiff improperly disclosed Apple's confidential information." Dkt. 219-1 at 9. Apple stated it intended, during the deposition, to designate Plaintiff's testimony as confidential so she could not "challenge what they did" — i.e., convert the substantive dispute about retaliatory termination into a procedural discovery violation. Dkt. 302-3 at 6–7. Apple's counsel stated: *"It's standard. I do it in all my cases."* Dkt. 302-3 at 8.

19.     Plaintiff told Apple directly what she understood this to mean. She said the Order would allow Apple to *"harass [her] and accuse [her] of stuff"* and was Apple's attempt to get her *"into court jail."* Dkt. 220-9 at 7. She said Apple wanted a *"blank [check]"* where she *"can be jailed for talking about whatever [Apple unilaterally claims is confidential]."* Id. at 4. She said: *"that's prior restraint"* and *"violates public policy and the law."* Id. Apple's counsel responded: *"I don't know if jailed is the right word, but [Plaintiff] would be subject to the protective order"* and *"could be held in contempt if [she were to] violate it."* Dkt. 220-9 at 4.

20.     Plaintiff asked Apple directly whether it believed her IPA covered the disputed content. Apple said yes — but that it wanted a protective order "in this case" because Plaintiff "already violated the IPA." Dkt. 220-9 at 8. When Plaintiff observed that Apple had filed no counterclaim and taken no legal action against her for the alleged IPA violations, Apple did not respond. Id. at 15. When Plaintiff asked Apple for even one example of something she had shared recently that it believed was confidential, Apple responded: *"I have no idea who you shared documents with, sorry."* Id. at 38. Apple has never designated a single produced document as confidential under the Order it insisted upon. It confirmed this in writing on February 6, 2026. Judge Westmore, at the July 2, 2025 conference, told Apple: *"That's not how the protective order is used."* Dkt. 302-3 at 7. She stated the "whole purpose of a protective order is to make sure you don't make confidential information public" and expressed uncertainty about Apple's described use of deposition designations. Id. at 7–8. The Court entered the Order as the NDCA Model Order, repeatedly framing its scope as information "produced to" Plaintiff by Apple. Dkt. 302-3 at 13–14.

### The Deposition, the Blanket Designation, and Nullity of Feb. 4.

21.     Plaintiff was deposed on Dec. 16, 2025. When Plaintiff invoked the April 2025 NLRB settlement and identified Apple's confidentiality policies as unlawful, Apple's counsel immediately designated the remainder of the

deposition — pages 66 through 305, approximately 72% of the transcript — as "Confidential" in real time, before knowing what Plaintiff would testify to next. The Protective Order, § 5.1, expressly prohibits "mass, indiscriminate, or routinized designations." A blanket designation of 72% of a deposition, made mid-session before the witness speaks, is precisely what § 5.1 forbids.

22. The blanket designation remained in effect for fifty days. On February 4, 2026, Apple emailed a narrowed designation list — unsigned, undated, addressed to the court reporter rather than to Plaintiff — and stated it was for Plaintiff's "awareness." Apple refused to sign it, refused to date it, and refused to email it directly to Plaintiff. Federal Rule of Civil Procedure 26(g)(2) requires that every discovery instrument be signed by the attorney of record. The February 4 list is void. When Plaintiff notified Apple of these defects and demanded cure, Apple refused. Dkt. 302.

23. Apple's narrowed list conceded that approximately 99% of the previously designated material was not confidential. What remained consisted of Plaintiff's descriptions of Apple's ovulation study, its request that female employees measure their cervical mucus, its bed sensor study requiring sexual partners to register with Apple and sign NDAs, and Plaintiff's complaints about these practices to her supervisors, the public, and coworkers. Apple's final designation list (as presented to the Plaintiff) still included "ovulation study or they were asking females to measure our cervical mucus," "ovulation," "measuring female employees' cervical mucus," "my cervical mucus," and "mucus -- the cervical mucus secretion."

### February 4, February 16, and Apple's Immediate Retaliation.

24. On Feb. 4, 2026, Apple emailed the void narrowed list. Plaintiff emailed Apple complaining they were violating the NLRA again and told them she'd file a new charge if they did not withdraw the designations. She also complained they didn't sign, date, or serve the document. Apple responded that they refused to respond to her. Plaintiff posted on social media complaining Apple was censoring her speech about menstruation. The post contained no deposition transcript or document produced in discovery. It described, in general terms, the subject matter Apple attempted to gag for the purpose of information her coworkers and the public that Apple was trying to gag her about work conditions again.

25. On Feb. 16, 2026, Plaintiff filed NLRB Charge No. 32-CA-381277 against Apple, attaching a cover letter quoting deposition excerpts that were evidence of unlawful conduct and clear violations of the NLRA. The same day, she published the blog post explaining the charge — a legal analysis of a federal labor filing, identifying the settlement violation, explaining the § 8(a)(4) protected status of the filing as a mechanism to deal with Apple's oppression of discovery procedures, and naming the content Apple had designated as it immediately exposes the absurdity and abuse. The next day, February 17, she filed a Notice of Pendency, Dkt. 278, attaching the NLRB charge materials as a court record. Within twenty-four hours, Apple accused Plaintiff of leaking, violating the Protective Order, violating her IPA, and demanded she agree to a gag order and delete all published speech about her labor complaints and NLRB charges. Plaintiff told Apple to stop and warned them if they do not stop, she will file another NLRB charge. Apple filed a letter around an hour later asking for sanctions and then filed this motion on Feb. 26, 2026 — in defiance

of Judge Westmore's Feb. 20 order requiring meet-and-confer, and after Judge Westmore stated on the record: *"No, there is no injunction."* Tr. at 38:56.

### APPLE'S OWN WITNESS CONCEDES HE CAN'T DETERMINE IF THE INFORMATION SHARED WAS ALREADY INTENTIONALLY PUBLIC.

26.     Apple's Motion to Retain Designations, Dkt. 304–305, filed March 11, 2026, conceded that the vast majority of its prior designations were improper. Apple continues to assert confidentiality mostly over the specific content that is the subject of the February 16 NLRB charge and this motion for sanctions. In support, Apple submitted a declaration from a Senior Director who has overseen some user studies at some point. That declaration admits that the information Plaintiff allegedly disclosed "may be publicly available" but asserts a belief that Plaintiff was "referring to internal studies and not external studies" based on her testimony about "methods and processes" and "equipment." The Senior Director's belief is not evidence of confidentiality. And it is factually wrong: Plaintiff never participated in the ovulation and menstruation studies. She declined them. She possesses no internal methodology, no equipment specifications, no process documentation. She possesses only her experience of being asked — and her right to describe that experience in her own words, in her own complaints, to any agency, court, or member of the public she chooses. Unless by "equipment" Apple meant emails soliciting participation?  Apple's only legal authority is Plaintiff's mostly defunct NDAs — the same policies Apple agreed in the April 2025 NLRB settlement it could no longer enforce over terms and conditions of employment. Dkt. 194. The mechanism has changed but the objective has not.

# ARGUMENT

### WHAT APPLE SEEKS TO SUPPRESS HAS BEEN PUBLIC YEARS, WAS KNOWN TO PLAINTIFF FOR YEARS, AND APPLE ENTERED A CONTRACT PROMISING IT WOULD NOT SAY ITS SECRET
### NO VALID DESIGNATION EXISTED — THE THRESHOLD BAR APPLE CANNOT CROSS

27.     Before reaching the public domain analysis, the Court must confront the threshold problem Apple's motion evades entirely: there was no valid confidentiality designation in effect on February 16, 2026, the date of the disclosures Apple challenges. Apple's counsel designated pages 66 through 305 of Plaintiff's December 16, 2025 deposition — 72% of the transcript — as "Confidential" mid-session, prospectively, before knowing what Plaintiff would testify to, immediately after Plaintiff invoked the NLRB settlement and identified Apple's confidentiality policies as unlawful.

28.     The Protective Order, Dkt. 235 § 5.1, expressly prohibits "mass, indiscriminate, or routinized designations" and requires that designations be "limited to specific material that qualifies under appropriate standards." A prospective blanket designation of 72% of a deposition, made in real time before the witness speaks, is the paradigmatic "mass, indiscriminate" designation the Order forbids. It is void on its face under the Order's own terms. *See Cantwell v. Northrop Grumman Corp.*, 2004-SOX-75 (ALJ Feb. 9, 2005) (rejecting blanket designation of all documents submitted with dispositive motion absent affidavits identifying specific

confidential information and specific harm from disclosure; "[i]t is not an appropriate function for the court to shift through these records in the absence of a properly supported motion").

29.     Fifty days later, on February 4, 2026 — Apple emailed a narrowed designation list to the court reporter, not to Plaintiff. The list was unsigned and undated. Apple refused to email it directly to Plaintiff, refused to sign it, and refused to date it. Federal Rule of Civil Procedure 26(g)(2) requires that every discovery disclosure or response "be signed" by the attorney of record. An unsigned discovery instrument is a nullity. *See* Fed. R. Civ. P. 26(g)(2) ("If a certification violates this rule without substantial justification, the court . . . must impose an appropriate sanction"). The February 4 narrowed designation, being unsigned, undated, and unserved on the party it purports to bind, is void under Rule 26(g)(2). When Plaintiff notified Apple of these defects and demanded a cure, Apple refused. *See* Plaintiff's Motion for Sanctions, Dkt. 302. The consequence is not procedural technicality. A party cannot be held in contempt for violating an obligation that does not exist. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) (contempt requires clear and definite order that party violated). Where the designation itself is void, there is no order to enforce and no contempt to be found. Apple's entire motion collapses at this threshold.

### THE PROTECTIVE ORDER'S OWN TEXT EXCLUDES EVERY ITEM APPLE DESIGNATED

30.     Even assuming arguendo a valid designation existed — and it did not — the Protective Order's Section 3 independently forecloses Apple's theory. Section 3 expressly excludes from confidential treatment: (a) information that is or becomes publicly known through no fault of the receiving party; and (b) information that was rightfully known to the receiving party prior to receipt. Both exclusions apply here. The canon against surplusage requires that these carve-outs have substantive force. *See Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts* 174 (2012). Apple cannot designate information satisfying its own Order's exclusions and then seek contempt for disclosure. The Court has no authority to enforce a designation that the Order itself declares inapplicable. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37 (1984) (protective order permissible only to restrict use of information "obtained through" the discovery process — not to suppress what the receiving party already knew or what was already public).

31.     ***Public domain prong***: As detailed below, every item Apple designated was public before the deposition occurred and before this litigation commenced.. The ovulation study methodology was published by Apple's own researchers. The employee surveillance practices were reported by the press in 2021 and appeared in NLRB filings the same year. The specific terminology Apple redacted from its own motion — "ovulation," "cervical mucus," "menstruation," "sexual partners" — appears in Plaintiff's complaints on this docket, in Judge Chen's published orders, in a peer-reviewed journal, and in news archives in at least three

countries. ***Prior knowledge prong*:** Plaintiff did not learn about Apple's ovulation study, its bed sensor study, its ear scan demands, or its coercive enrollment practices from Apple's lawyers at a deposition. She learned about them because they happened or could happen to her body, at her workplace, during her employment. *See* 5AC, Dkt. 142 ¶¶ 157–161 (describing these practices from Plaintiff's direct personal experience). Testimony about one's own bodily experiences, one's own workplace complaints, and one's own employment history is knowledge the witness possessed before the deposition began. The prior knowledge exclusion of PO § 3 is not a narrow carve-out for formally documented prior knowledge; it encompasses information the party rightfully possessed independent of the discovery process. *See Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 790 (1st Cir. 1988) ("[A] party cannot be restrained from using what it already knows"). Apple has no cognizable confidentiality interest in Plaintiff's testimony about her body.

### Five Years of Public Disclosure in 4+ Jurisdictions Across 3+ Countries

32.     The specific content Apple seeks to suppress has been part of the public record continuously since August 2021 — more than four years before the deposition, more than four years before this motion. Under *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004), "we simply cannot put the cat back in the bag" once confidential information has entered the public domain.  Under *Newport v. Calpine Corp.*, 2007-ERA-7 (ALJ Feb. 12, 2008), "material a party receives in discovery . . . may be treated as confidential until [it becomes] proof offered into the adjudicatory record. Thereafter common law traditions of access to adjudicatory proceedings and the First Amendment complicate matters." Under *Smith v. Hewlett Packard Co.*, 2005-SOX-88 to 92 (ALJ Feb. 21, 2006), once a decision is "published and circulated," the court refused to seal it: "the cat was already out of the bag." These principles do not merely complicate Apple's position — they extinguish it.

33.     **NLRB proceedings (August 2021 — present).** Plaintiff filed NLRB charges in August 2021 describing Apple's invasive employee studies, coercive enrollment practices, threats of termination for disclosure, and the specific working conditions at issue. The Regional Director issued a Decision of Merit. The charges became public agency records. Apple settled some of the charges nationally in April 2025, Case No. 32-CA-284428 (Dkt. 194). The settlement is itself a public document Apple was required to post on its own intranet. **Federal court filings on this docket (September 2023 — present).** The conduct Apple now claims is confidential has been pled in six successive public complaints, including:

- *3AC, Dkt. 47* (Feb. 27, 2024): ¶¶ 27 (AC Wellness blood pressure study), 80–81 (ovulation study, cervical mucus, ear scans, Gobbler surveillance), 255–258 (biometric data, medical experiments, protected complaints)
- *4AC, Dkt. 76*: ¶¶ 112 (ear scans, secrecy oaths, Deed Poll, Gobbler), 193 (coercive data collection for

product development), 195–197 (sleep study, sexual partner NDA requirement, ovulation study), 201–207 (biometric exploitation, disgorgement, injunctive relief)

- *5AC, Dkt. 142* (Nov. 26, 2024): ¶¶ 157–161 (ear scans, Gobbler, "Apple Cares About Privacy" article), 214, 219 (FTC Act, § 1102.5), 243–255 (§§ 232.5, 96(k), constitutional privacy rights)

34.     These paragraphs name the studies, describe the conditions, and use the specific terminology Apple designated. Judge Chen's published orders describe the same conduct in the Court's own words. *See* Dkt. 73 at 7–8; Dkt. 179 at 2. Those orders are accessible to any member of the public who searches this docket. Apple has not moved to seal any of those orders. It cannot now seek contempt against Plaintiff for describing what is already in the Court's own published rulings.

35.     **Federal regulatory records.** Plaintiff's public comment to the White House Office of Science and Technology Policy, OSTP_FRDOC_0001-0008, described Apple's coercive data collection practices. That comment was cited in a published Government Accountability Office report, GAO-24-107639. The Ninth Circuit, Case No. 25-2028, has reviewed filings on this record. OHRP Complaint No. 00709517, filed March 11, 2026, describes the coercive employee recruitment into a federally registered study, citing 45 C.F.R. §§ 46.116(b)(2), 46.111(a)(3), and 46.111(b) — the federal human subjects research regulations Apple is alleged to have violated by claiming recruitment is secret and apparently trying to conceal it may be unlawfully loading the study population with employees. (See Declaration and Exhibits).

36.     **Apple's own peer-reviewed publications.** Apple's researchers published the methodology of the ovulation study in *Mahalingaiah et al., American Journal of Obstetrics and Gynecology*, vol. 226(4) (2022) — a peer-reviewed journal, indexed in medical databases, available to any researcher with internet access. Apple registered the underlying study with the federal government: ClinicalTrials.gov, NCT04196595. That registration, also public, describes the study design and participant enrollment. Apple published the science. What Apple did not publish — and what it has every motive to suppress — is the coercive employee recruitment component: the use of Apple employees, subject to performance review and termination threats, as an undisclosed participant pool in a federally registered human subjects study. That is what Plaintiff described in her deposition. That is what Apple designated as confidential. The PO does not authorize Apple to publish the methodology while suppressing the coercion.

37.     **The press record — including multiple countries.** In the U.S., the Verge, Gizmodo, and TechCrunch all reported on Plaintiff's "study" complaints in depth. The international press also covered the matter including Der Spiegel, Germany's largest news magazine; Telerama, a major French publication; and a UK media outlet. *See* Decl. of Gjovik, Exs. A-H (authenticated copies).

38.     The March 14 2023 Telerama article expressly addressed the menstruation and ovulation

complaints: ("Apple has multiplied experiments of this kind, recording and storing all kinds of intimate and biometric information on its employee testers: ear canal scans to optimize AirPods ergonomics, the designers boast "one of the largest ear libraries on the planet", sleep measurements, blood pressure and even menstrual cycle monitoring. On condition of anonymity, a former employee agreed to send us photos of a kit offered by Apple in 2019 in exchange fore $10 voucher, to measure the quality of cervical mucus in her uterus. Worried about the consequences of refusal, she agreed to take part in the exercise, which still haunts her.") *See* Decl. of Gjovik, Exs. C.

39.     These publications predate or overlap with this litigation and Apple has not moved against any of them. Apple's Riechert Declaration does not mention them. Apple has not explained how this Court's contempt power extends to editorial archives in Berlin, Paris, or London. If the information in Plaintiff's February 2026 NLRB charge cover letter is Apple's confidential property, it is equally Apple's confidential property in Der Spiegel's archives — and no party has suggested that a Northern District of California protective order binds a German magazine. The international press coverage does not merely corroborate the public domain argument. It demonstrates that Apple's theory of confidentiality has no limiting principle and cannot be operationalized without consequences this Court has no power to impose.

### APPLE'S 2021 CONDUCT ESTABLISHES THE PATTERN & THE JUDICIAL ADMISSION

40.     This is not Apple's first attempt to suppress this information by characterizing Plaintiff's own experience as its trade secret. The pattern is documented and judicially admitted. In late August 2021, Plaintiff gave an interview to a journalist. The resulting article, titled "Apple Cares About Privacy Unless You Work at Apple," quoted Plaintiff describing the Gobbler application, Apple's surveillance practices, and its culture of retaliation. The journalist contacted Apple for comment before publication. Apple did not respond. The article was published August 30–31, 2021. Apple took no immediate legal action. Apple waited approximately two weeks, then sent a workplace violence investigator. Apple refused to tell Plaintiff what she had done wrong. Apple terminated her employment on September 9, 2021 — the day before she was scheduled to testify to a government agency. When Apple finally stated its rationale, it cited the public article as the justification: "public disclosure of confidential Apple product-related information." Apple called it a leak. Apple called the description of its own surveillance tools confidential. Apple asserted that an employee's participation in a press interview about her own employment experience violated her obligations to the company.

41.     Apple has since repeated this characterization on the record of this case. In Dkt. 280 fn. 2, Apple states that "it was her public disclosure of confidential Apple product-related information that led to her termination from Apple in the first place." This is a judicial admission. *See Keller v. United States*, 58 F.3d

1194, 1198 n.8 (7th Cir. 1995). Apple has admitted, in a filing in this Court, that it terminated Plaintiff's employment specifically because she disclosed what Apple calls confidential product information. That admission links Apple's current motion directly to the termination that is the subject of Plaintiff's Tamney claim, her § 1102.5 claim, her § 96(k) claim, and her § 232.5 claim.

42.     Apple cannot simultaneously defend the termination as lawful (because the information was confidential and the leaking was wrong) and seek contempt sanctions for the same type of disclosure without the two proceedings resolving the same factual question on the same record through different procedural vehicles. Apple's own judicial admission confirms what the public record demonstrates: Apple has known for years that this information is public, acknowledged that Plaintiff disclosed it publicly, and is asking this Court to retroactively suppress what Apple released itself. *Gambale*, 377 F.3d at 144.

### THE APRIL 2025 NLRB SETTLEMENT PROHIBITS APPLE FROM DOING EXACTLY THIS

43.     On April 3, 2025, Apple entered a national settlement agreement, Case No. 32-CA-284428, Dkt. 194, approved by the NLRB Regional Director, that resolved charges arising directly from Apple's practice of characterizing working conditions as proprietary information. The settlement contains commitments that Apple's current motion directly violates.

44.     Apple agreed that it "will not enforce the definition of Proprietary Information (or similar terms) set forth in any version of the Confidentiality and Intellectual Property Agreement . . . to the extent that such definition covers terms and conditions of employment protected under Section 7 of the Act." The settlement notice, which Apple was required to post on its intranet and which remains posted there, states: "YOU HAVE THE RIGHT to discuss wages, hours and working conditions and WE WILL NOT do anything to interfere with your exercise of that right." It states: "WE WILL NOT advise you that you are subject to discipline for violating overly broad rules regarding confidential or proprietary information." It states: "WE WILL NOT promulgate, maintain, or enforce any rule that defines confidential information as 'anything not explicitly, publicly, or purposefully disclosed by Apple.'"

45.     Apple's motion does all of this. It threatens Plaintiff with contempt and sanctions — discipline — for disclosing information about working conditions, unlawful conduct by the employer, and trying to publicize the issue in hope the pressure can force Apple to improve its labor practices. Apple, a union buster known for "suicide nets" at its factories, characterizes working conditions testimony as proprietary. It invokes a definitional framework, operationalized through the Protective Order, that treats anything Apple wants as Apple's confidential property. The settlement does not exempt the Protective Order from its reach. Apple agreed to stop enforcing these restrictions. It agreed to do so through any mechanism, through any

instrument, in any proceeding. A court order cannot be used to accomplish what a contract prohibits. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 526 (1986) (court cannot enter consent decree that violates federal statute); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 387 (1992) (court cannot enforce unlawful order).

46.     The settlement's non-compliance provision is not a footnote. Upon non-compliance, after fourteen days' notice from the Regional Director, the October 2024 complaint is automatically reissued. Apple's answer is deemed withdrawn. Allegations are deemed admitted. The Board may enter a full remedy order without trial. A United States Court of Appeals judgment may be entered enforcing the Board order *ex parte*. Apple filed this motion — which is non-compliance — with full knowledge of that provision. It did so after the Regional Director had already been notified of prior violations through Plaintiff's earlier charge. The self-executing default mechanism is loaded.

### Apple's Motion Has an Illegal Objective Under *Bill Johnson's* Footnote 5

47.     This Court is not required to reach the merits of Apple's motion before recognizing that the motion itself is unlawful. Under *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 737 n.5 (1983), a lawsuit or motion "that has an objective that is illegal under federal law" may be enjoined by the NLRB without any finding that the filing is baseless and retaliatory. The D.C. Circuit confirmed in *Can-Am Plumbing, Inc. v. NLRB*, 321 F.3d 145, 149 (D.C. Cir. 2003), that *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002), "did not affect the footnote 5 exemption in *Bill Johnson's*." The NLRB confirmed in *Anheuser-Busch, LLC*, 367 NLRB No. 132 (2019), that a motion seeking to enforce, through court proceedings, a restriction that would independently violate federal labor law has an illegal objective. The dissent in *Anheuser-Busch*, authored by Member McFerran and consistent with the majority on this principle, states: "An attempt to achieve through litigation what one could not otherwise lawfully do constitutes petitioning the court with an illegal objective."

48.     Apple's motion has an illegal objective. It seeks to enforce, through this Court's contempt power, confidentiality restrictions over Plaintiff's description of her working conditions — the same restrictions Apple agreed in a national NLRB settlement it could not enforce through the IPA. That it has substituted the Protective Order for the IPA as the enforcement vehicle does not change the substance. *See Anheuser-Busch*, 367 NLRB No. 132 (motion seeking to enforce DRP over union-represented employees violated § 8(a)(5) even though the DRP was facially lawful, because the manner of application was unlawful). Apple cannot do through a discovery protective order what it agreed it could not do through an employment agreement. The illegal objective is the suppression of protected concerted activity through a confidentiality mechanism. The mechanism's label — IPA, PO, contempt motion — does not matter.

49.     The NLRB charge, Case No. 32-CA-381277, filed February 16, 2026, places this motion squarely before the agency with primary jurisdiction over the underlying conduct. Under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959), "when an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." Plaintiff's disclosures are arguably protected — the blog post explaining the charge, the social media post about Apple's censorship of working conditions speech, the NLRB cover letter quoting testimony about protected concerted activity — and Apple's effort to sanction them is arguably prohibited. *Garmon* preemption bars this motion independently of every other argument.

### The Deletion Demand Is a Prior Restraint That Cannot Be Sustained

50.     Apple's demand that Plaintiff delete published content — her blog post, her social media posts — is a prior restraint on speech. *See Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996) ("prohibiting the publication of a news story . . . is the essence of censorship"). Prior restraints "come to this Court with a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The Supreme Court has "never upheld a prior restraint," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 590 (1976) (Brennan, J., concurring), and has imposed one only where "the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures." *CBS v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers).

51.     "The private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds for imposing a prior restraint. It is not even grounds for keeping the information under seal." *Procter & Gamble*, 78 F.3d at 225. Apple's interest here — suppressing public knowledge of its coercive employee study practices and the NLRB settlement requiring it to stop — is precisely the commercial self-interest that *Procter & Gamble* held insufficient. The blog post Apple seeks to delete explains a federal labor charge. The social media post complains that Apple was censoring Plaintiff's speech about menstruation and Apple wanting to study her menstruation and her saying no, please do not do that. None of that threatens national security or prejudices a pending criminal trial.

52.     The deletion demand fails on an additional ground specific to this record: the information Apple seeks to have deleted is already on the public dockets of federal proceedings, in news archives across multiple countries, and in Apple's own published journal articles. A court order deleting Plaintiff's blog post would not remove the information from the public domain. It would remove the Plaintiff's voice, testimony, and evidence of regulatory noncompliance by Apple.

53.     That is not a confidentiality remedy. That is targeted censorship of a whistleblower's speech

about her employer's conduct, imposed by the employer's preferred procedural vehicle. *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997) (internet speech entitled to full First Amendment protection, highest level of scrutiny); *Rasawehr v. Twitter, Inc.*, No. 3:21-cv-01644 (N.D. Cal.) (prior restraint on internet speech requires compelling government interest and narrow tailoring). No compelling interest exists here. The motion does not even attempt to articulate one, because none exists.

### APPLE'S FOUR CASES ARE INAPPLICABLE

54.    Apple cites *Harmston*, *Gonzales*, *I.F. v. Vallejo*, and *Ma* in support of its enforcement theory. Each is distinguishable on the same three grounds: each involved a valid designation, non-public information, and no independent prior knowledge by the disclosing party. None of Apple's four cases involved anatomical terminology describing the witness's own body. None involved information that had been on a federal court docket for two years, cited in a GAO report, published in a peer-reviewed journal, reported by journalists in three countries, and pled in five successive public complaints. None involved an NLRB settlement prohibiting the employer from enforcing the very restriction at issue. None involved a designation void on its face under the PO's own anti-mass-designation provision and void under Rule 26(g)(2) for absence of signature.

55.    *I.F. v. Vallejo*'s statement that the "propriety of initial disclosure is beside the point" depends entirely on the assumption that a valid designation existed and the information was not already public — the precise assumption that is false here. Where there is no valid designation, enforceability is not "beside the point." It is the point. *Ma* involved technical proprietary data with no corresponding public record and no NLRA settlement prohibiting its designation. The case does not address working conditions, anatomical terminology, or the public domain exclusions of PO § 3. It says nothing useful here.

56.    The common thread in Apple's cases is a party who received new information through the discovery process, had no independent knowledge of it, it wasn't public prior, and disclosed it anyway. Plaintiff is not that party. She knew what Apple asked her body to do because it happened to her. The information was already on public dockets because she put it there through four years of protected activity. The NLRB settled Apple's unlawful confidentiality regime because the Board agreed with her. Apple's four cases answer a question that is not present in this record.

### DEFENDANT'S MOTION HAS NO COGNIZABLE LEGAL AUTHORITY

57.    A "Motion to Enforce Protective Order" does not exist under the Federal Rules or this District's Local Rules. It has no standard of review, no prescribed process, and no enumerated remedies. Defendant cites Rule 37(b)(2)(A), but Rule 37(b) governs sanctions for disobeying a court order — it does not create a standalone motion type, authorize injunctive relief, or authorize compelled deletion of published speech. Defendant's fallback to "inherent powers" fares no better: inherent powers supplement the Federal

Rules; they do not override them.

58.     Defendant has bundled twelve distinct categories of relief into one motion, each requiring its own procedural vehicle, its own evidentiary showing, and in several cases its own judicial officer. Defendant has satisfied none of them. Sanctions require a Rule 11 safe-harbor notice served 21 days before filing, or a separate Rule 37 motion under L.R. 7-8 — Defendant filed neither. Contempt requires a petition, sworn affidavits, an evidentiary hearing, and proof by clear and convincing evidence. *Bagwell*, 512 U.S. at 832; *Taylor*, 418 U.S. at 498-99. Defendant filed no petition, submitted no affidavits, and requested no hearing. Compelled deletion of published speech is a mandatory injunction requiring a Rule 65 motion before Judge Chen, a *Winter* showing, and First Amendment analysis — none of which Defendant provided. *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc); *Nebraska Press*, 427 U.S. at 559. Sealing requires a L.R. 79-5 motion with specific factual findings for each document — Defendant filed none for any of the three filings it seeks to seal. *Kamakana*, 447 F.3d at 1179.

59.     Defendant′s motion also includes no proposed order — and for good reason. No enforceable order can be drafted because the relief is incapable of precise definition. Any speech injunction must ″state its terms specifically and describe in reasonable detail the act or acts restrained.″ *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Defendant′s retained designations cover the words ″ovulation,″ ″menstruation,″ and ″cervical mucus.″ Would an order prohibit Plaintiff from using these words in her NLRB filings? In testimony before a Board agent? In communications with her attorneys? There is no limiting principle that does not simultaneously prohibit conduct protected by federal labor law, federal anti-retaliation statutes, and the First Amendment. At best, the motion seeks a declaratory finding that Plaintiff violated the Protective Order — but that relief is governed by the Declaratory Judgment Act, 28 U.S.C. § 2201, and requires a noticed motion on the 35-day schedule this Court already ordered. Defendant has not satisfied that requirement either.

### MULTIPLE INDEPENDENT JURISDICTIONAL BARS
### PRECLUDE ANY RELIEF

60.     Before reaching the merits, this Court faces a threshold problem: it cannot grant the relief Defendant requests under any legal theory, through any procedure, regardless of how the Protective Order is interpreted. The bars are independent, each is dispositive, and none are close calls. A federal court cannot issue a procedural order directing parties to violate federal statutes — a procedural label does not immunize an order from statutory scrutiny. *United Mine Workers*, 330 U.S. at 303–04; *Trump v. Hawaii*, 585 U.S. at 703. Inherent authority is subordinate to express statutory commands. *Chambers*, 501 U.S. at 47; *Degen*, 517 U.S. at 823. When Plaintiff raised timely, specific statutory objections before the Protective Order was entered — in writing, repeatedly, including a 205-page motion to quash — this Court was required to make findings

before signing. It did not. That failure is reversible error per se. *Hall*, 419 F.3d at 985–86; *Hernandez*, 604 F.3d at 1100. This motion asks the Court to compound that error.

61.    The most immediate bar is the bankruptcy automatic stay. Plaintiff filed Chapter 7 on July 21, 2025 (Case No. 25-11496, D. Mass.). The stay prohibits "the commencement or continuation of a judicial, administrative, or other action or proceeding against the debtor" and "any act to collect, assess, or recover a claim against the debtor." 11 U.S.C. § 362(a)(1), (6). Defendant knows this — it retained bankruptcy counsel and filed a bankruptcy court opposition on September 11, 2025 — yet never sought stay relief before filing this motion. Actions taken in violation of the automatic stay are void, not merely voidable. *In re Schwartz*, 954 F.2d 569, 571–72 (9th Cir. 1992); *In re Hruby*, 512 B.R. 262, 274 (Bankr. D. Colo. 2014). Any order this Court enters against Plaintiff is a legal nullity. Defendant's willful violation also exposes it to mandatory damages under § 362(k)(1).

62.    Garmon preemption presents an equally absolute bar. Federal courts must defer to the NLRB when conduct is arguably protected or prohibited by the NLRA. *Garmon*, 359 U.S. at 245; *Glacier Northwest*, 598 U.S. 771 (2023). Three NLRB charges are pending — Case Nos. 32-CA-381277 and two related charges — alleging the exact designations Defendant seeks to enforce here are unlawful work rules. To rule for Defendant, this Court must decide that Plaintiff's speech was wrongful — precisely the question the NLRB has exclusive authority to answer. If this Court rules first and the NLRB later finds the designations unlawful, this Court will have helped Defendant suppress federally protected labor organizing. *Garmon* exists to prevent that outcome.

63.    The Norris-LaGuardia Act removes jurisdiction entirely. Congress stripped federal courts of authority to issue injunctions in cases involving or growing out of a labor dispute. 29 U.S.C. § 101. Section 104(e) specifically prohibits injunctions against "giving publicity to the existence of, or the facts involved in, any labor dispute." Compelling deletion of social media posts about working conditions and NLRB charges is the definition of that prohibited injunction. This is not discretionary — there is no procedure through which this Court can grant it. Even if there were, § 107 would require open-court testimony, findings of fact, a showing of substantial irreparable injury, and a finding that public officers cannot furnish adequate protection. Defendant has satisfied none of these.

64.    The magistrate's statutory authority is separately limited. A magistrate judge cannot determine a motion for injunctive relief. 28 U.S.C. § 636(b)(1)(A). This Court said so at the February 20, 2026 conference: "No, there is no injunction." (Tr. at 38:56). Summary contempt requires misbehavior in the magistrate's presence; a social media post does not qualify. Out-of-court contempt requires certification to

the district judge. § 636(e)(6)(B)(ii). That has not happened. And Defendant asks this Court to seal Dkt. 278 and 285 — filings Judge Chen has already adjudicated. A magistrate cannot seal what the district judge has ruled on.

65.     Beyond jurisdiction, multiple statutes affirmatively prohibit the requested order — and some directly command this Court not to enter it. The Speak Out Act, Pub. L. No. 117-224 (2022), renders pre-dispute nondisclosure provisions unenforceable as to sexual harassment disputes. Under the Rules Enabling Act, 28 U.S.C. § 2072(b), this protection cannot be evaded by styling a prohibited NDA as a court order. California Civil Code § 51.9 establishes that Defendant's demands regarding Plaintiff's reproductive physiology, menstrual cycle, and sexual partners constitute sexual harassment in a professional relationship as a matter of California law — so the designated content does not merely touch harassment-related conduct, it describes conduct that is statutory sexual harassment. California Code of Civil Procedure § 1001(b) then issues a direct command: "a court shall not enter, by stipulation or otherwise, an order that restricts the disclosure of information" related to sexual harassment, workplace discrimination, or retaliation. That is not a factor to balance. It is a prohibition on this Court's authority. California Government Code § 12964.5 independently voids any provision with "the purpose or effect of denying the employee the right to disclose information about unlawful acts in the workplace," § 12964.5(a)(1)(B) — and its carve-out for trade secrets expressly excludes "information that does not involve unlawful acts in the workplace," § 12964.5(f), which is precisely what the designated content describes. California Government Code § 12940(h) prohibits retaliation for opposing FEHA violations — filing a federal motion threatening contempt for discussing sexual harassment in the workplace is retaliation under that provision. Under FRE 501, these substantive state protections govern state law claims and cannot be displaced by federal procedural defaults. *Shady Grove*, 559 U.S. at 398–400.

66.     California Labor Code § 96(k) — which survived five rounds of Apple's motions to dismiss on these exact facts — prohibits retaliation for lawful off-duty conduct. California Constitution Article I, § 1 protects sexual and reproductive privacy as a self-executing inalienable right binding every court administering California law. *Hill v. NCAA*, 7 Cal. 4th 1, 35–40 (1994). An injunction against Plaintiff's speech about Apple's demands regarding her menstrual cycle and sexual partners violates both directly. Finally, California Code of Civil Procedure § 425.16, applied in federal court, *Newsham v. Lockheed*, 190 F.3d 963 (9th Cir. 1999), mandates fee-shifting when claims arise from protected speech or petition activity. Every proper motion Defendant should have filed — a Rule 65 motion, a contempt petition, a sanctions motion — would trigger anti-SLAPP scrutiny and place the burden on Defendant to show probability of prevailing. *Equilon*

*Enterprises*, 29 Cal. 4th at 67. Defendant cannot meet that burden, and the fee exposure follows automatically. This is one more reason Defendant filed an improvised omnibus motion instead of the required proper vehicles — the proper vehicles all come with consequences Defendant is trying to avoid.

## DEFENDANT HAS NOT AND CANNOT SATISFY THE LEGAL STANDARDS FOR THE RELIEF IT SEEKS

67.     Even if every jurisdictional bar were cleared — and none can be — Defendant still cannot satisfy the legal standard for any of the relief it seeks. Compelled deletion of published speech is a mandatory injunction, subject to a heightened standard above the ordinary *Winter* test: the facts and law must clearly favor the moving party and the equities must weigh heavily in its favor. *Stanley*, 13 F.3d at 1320; *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Defendant satisfies none of the four elements. Likelihood of success is near zero — the designations are void, the Order′s exclusions apply, and the jurisdictional bars independently foreclose relief. Irreparable harm is unestablished — Defendant′s circular argument that disclosure causes harm because the information is confidential is not the ″specific, concrete evidence″ the Ninth Circuit requires. The balance of equities favors Plaintiff — compelling deletion of published speech about labor organizing and workplace privacy violations is an extraordinary remedy; suppressing an employee′s description of her own bodily experiences is not a cognizable countervailing interest. And the public interest cuts sharply against relief — transparency about employer surveillance, the NLRB process, and workplace privacy rights serves the public, not harms it.

68.     The prior restraint standard is even more demanding, and Defendant does not attempt to meet it. A prior restraint is ″the most serious and least tolerable infringement on First Amendment rights.″ *Nebraska Press*, 427 U.S. at 559. It carries a heavy presumption of invalidity that can only be overcome through strict scrutiny. *Bantam Books*, 372 U.S. at 70. Internet speech receives full First Amendment protection. *Reno v. ACLU*, 521 U.S. 844, 870 (1997). Social media deletion orders have been unanimously struck down as impermissible prior restraints. *Rasawehr v. Bey* (Ohio S. Ct. 2020). Defendant′s motion contains no First Amendment analysis, no strict scrutiny showing, and no authority for the proposition that a discovery protective order can function as a prior restraint on speech about a party′s own body and her NLRB charges. That absence is itself fatal.

69.     The sealing standard fares no better. Defendant′s sole basis for sealing is that it designated the information confidential — a circular assertion that L.R. 79-5(c) expressly rejects in its first sentence: ″Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable.″ *Kamakana*, 447 F.3d at 1178–79; *Foltz*, 331 F.3d at 1135. This Court is not the first to reject Apple′s approach — Judge Pitts

PLAINTIFF′S OPPOSITION TO DEFENDANT′S MOTION AT DKT. 294 | 3:23-CV-04597-EMC | P.19

denied Apple sealing of deposition testimony about its employee practices on identical grounds. *Apple Inc. v. Rivos*, 2024 WL 748394 (N.D. Cal. Feb. 23, 2024). Defendant also seeks to seal Dkt. 278, 284, and 285 in their entirety, in direct violation of L.R. 79-5(a)'s requirement to avoid sealing whole documents wherever possible. Sanctions require either a Rule 11 motion with 21-day safe-harbor notice, or a separate Rule 37 motion under L.R. 7-8. Defendant filed neither, served no safe-harbor notice, submitted no sworn affidavits, and offered no authenticated evidence. A court cannot impose sanctions — let alone contempt, which carries quasi-criminal consequences — based solely on unsworn characterizations in a motion brief, without an evidentiary hearing. *Bagwell*, 512 U.S. at 826–32. Defendant has not come close to satisfying this standard.

## DEFENDANT'S MOTION IS RELIEF ON UNPLED, WAIVED COUNTERCLAIMS

70. Defendant's entire theory of relief rests on a single foundation: the IPA. Defendant stated this explicitly in Dkt. 280, footnote 2 — Plaintiff is "also independently prohibited from publicly disclosing information regarding Apple studies pursuant to the terms of the Confidentiality and Intellectual Property Agreement she signed" — and repeated it in Dkt. 294 and Dkt. 304-305, where the IPA is the sole identified legal authority for every retained designation. That is a breach of contract theory. Affirmative relief on a breach of contract theory requires a pleaded claim. Defendant has none. Rule 13(a) required Apple to plead compulsory counterclaims — claims arising from the same transaction as Plaintiff's claims — with its Answer. Apple filed its Answer (Dkt. 183, March 13, 2025) and Amended Answer (Dkt. 218, June 2, 2025) without pleading a single counterclaim. Those claims are waived. Fed. R. Civ. P. 13(a)(1); *Pochiro v. Prudential Ins. Co.*, 827 F.2d 1246, 1249 (9th Cir. 1987). Apple never sought leave to add counterclaims under Rule 13(e). Plaintiff flagged this failure directly during meet-and-confer: "its not even a counterclaim, so that's kind of weak." (Dkt. 220-9 at 15:18-15:48). Defendant did not respond. It still has not responded — it simply filed a motion demanding relief it has no pleaded claim to support.

71. A discovery motion cannot substitute for an unpled breach of contract claim. The court's ancillary jurisdiction enforces what its own process created — it does not expand to reach new substantive disputes that were never independently pleaded or adjudicated. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994); *Peacock v. Thomas*, 516 U.S. 349 (1996). A model blanket protective order signed as a discovery management tool cannot be transmuted into a source of substantive speech-suppression rights simply by motion. That bootstrapping problem is fatal: the court's enforcement power derives from and is bounded by what the court's own process created. *Kokkonen*, 511 U.S. at 381. It does not stretch to accommodate a contractual theory Apple chose not to plead.

72. The constitutional dimension compounds the procedural one. *Seattle Times*, 467 U.S. at 37,

upheld discovery protective orders only because the restriction was limited to information obtained through the court's compelled discovery process. The converse follows directly — a protective order cannot reach information a party possessed independently, because the court's process contributed nothing to that knowledge. *Butterworth v. Smith*, 494 U.S. 624 (1990) (grand jury secrecy rules cannot prevent a witness from disclosing his own testimony — the knowledge was his own, not the government's). *Gambale v. Deutsche Bank AG*, 377 F.3d 133 (2d Cir. 2004) (once information enters the public domain, a court cannot reconstruct confidentiality through protective order enforcement — there is nothing left to protect). Plaintiff's knowledge of Apple's demands about her menstrual cycle and sexual partners did not come from discovery. It came from her own life. No court order can make that knowledge belong to Apple. The bankruptcy automatic stay provides one final, independent bar: it prohibits Defendant from asserting any claim against Plaintiff as a debtor without first obtaining stay relief. 11 U.S.C. § 362(a)(1), (6). Until that relief is obtained, Defendant cannot pursue contractual relief regardless of whether it was previously pleaded.

## DEFENDANT CANNOT SEEK EQUITY WITH UNCLEAN HANDS

73.     Defendant's motion requests equitable relief — declaratory, injunctive, and mandatory remedies in equity. The fundamental maxim of equity is that courts of equity do not entertain relief for parties with unclean hands. *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 244-45 (1933). Defendant's hands are demonstrably unclean, in multiple independent respects documented in this Court's own record. As established in Section II above and in Plaintiff's Dkt. 302, Defendant's blanket designation lapsed under the Protective Order's 21-day rule; Defendant's February 4 narrowed designation was unsigned, undated, and unserved in violation of Rule 26(g)(1); and Defendant expressly refused to cure the deficiency after specific written notice. Defendant is seeking equity to enforce designations that were never validly made. Defendant represented to this Court that it needed the Protective Order to produce the Gobbler informed consent form. Defendant never used the Order for that purpose. The sole use Defendant has made of the Order — by Defendant's own filings — is to suppress Plaintiff's speech about the factual basis of her own termination. Equity does not favor a party that obtained a court order by misrepresenting its intended use and then seeks to enforce it for the purpose it misrepresented. Defendant filed this motion in direct defiance of this Court's February 20, 2026 order requiring meet-and-confer before any motion practice, seven documented refusals to comply with that order notwithstanding. Defendant is asking this Court to grant equitable relief for a perceived violation of a court order — while simultaneously and willfully violating a court order.

74.     Defendant's blanket designation was imposed at the precise moment Plaintiff began testifying about her NLRA rights — before any of that testimony was spoken. Defendant's counsel admitted during meet-and-confer that Defendant wanted the Protective Order to prohibit Plaintiff from "testifying to government agencies and law enforcement" about evidence she received in discovery. (Dkt. 220 at 10-11, ¶ 15). These are improper purposes that independently disqualify Defendant from equitable relief. Defendant's citation of the IPA — in this motion and in Dkt.

304-305 — violates the April 2025 national settlement agreement Defendant entered with the NLRB, in which Defendant promised to stop enforcing the IPA to cover terms and conditions of employment. Defendant cannot seek equitable relief through this Court while simultaneously violating a binding agreement with a federal agency.

## THE MODEL PROTECTIVE ORDER IS LEGALLY PROBLEMATIC

75.     The Protective Order occupies an uncomfortable legal no-man's-land: it is not a valid stipulation, not a valid court order, and not a valid local rule. It claims the benefits of all three while satisfying the requirements of none. A federal court cannot rubber-stamp a proposed order that violates governing law — not even when the parties have agreed to it. *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525–26 (1986). When Plaintiff raised specific statutory and constitutional objections before the Order was entered, the Court was required to address them on the merits. *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 380–83 (1992). It did not. Court policies cannot operate to silence constitutional claims or restrict judicial access when protected disclosures are at issue. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 887–88 (2009). Plaintiff has since formally notified the body responsible for the Federal Rules of exactly these deficiencies — Petition 26-CV-6, accepted for consideration by the Advisory Committee on Civil Rules on February 23, 2026. *See* U.S. Courts, Rules -- Suggestions, Rules 26 and 83 (pending).

76.     If the Order is a stipulation, it requires mutual assent. There is none. Plaintiff objected at every stage — filed a 205-page motion to quash, appealed to the Ninth Circuit, and stated on the record she would not sign unless ordered to. The Court's response at the July 2, 2025 hearing — "Ms. Gjovik, can you sign it as soon as possible? ... Today would be great." (Tr. at 18:10–14) — was not an invitation. It was communicated against the backdrop of the court's explicit statement that it was "prepared to just enter the protective order as it is written." (Dkt. 230–233, Tr. at 4–17). A signature obtained after being told the outcome is the same whether or not you sign is not voluntary mutual assent. Cal. Civ. Code § 1580; Restatement (Second) of Contracts § 17. Moreover, the template's recital that "the parties agree" to the need for protection compelled Plaintiff to affirm a proposition she actively disputed — a separate constitutional defect. Government may not compel individuals to affirm beliefs they reject. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Wooley v. Maynard*, 430 U.S. 705 (1977). That compelled recital then substituted for the independent good cause finding Rule 26(c) requires — a self-referential structure that manufactures its own legal predicate. Conditioning Plaintiff's ability to proceed with her lawsuit on signing away constitutional rights is itself an unconstitutional condition. There was no valid stipulation.

77.     If the Order is a court order under Rule 26(c), it required Defendant to demonstrate good cause supported by specific harm. *Beckman Indus.*, 966 F.2d at 475–76. Defendant filed no motion, submitted no declaration, and identified no specific information requiring protection. The Court entered the Order without

requiring the showing Rule 26(c) mandates — inverting the burden Rule 26(c) deliberately assigns to the party seeking protection. That inversion is a sub rosa amendment to a Federal Rule of Civil Procedure, accomplished through a template and a standing order without notice, comment, or congressional review.

78. A court must allow parties a meaningful opportunity to object when procedures affect constitutional or statutory rights. *United States v. Heller*, 551 F.3d 1108, 1112 (9th Cir. 2009). Under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), letter adjudication is constitutionally inadequate when the issue being decided is whether a party may speak publicly about public information. Because the Order restricts speech, it is also subject to First Amendment scrutiny regardless of its procedural label and a prior restraint imposed without the constitutionally required showing of necessity cannot stand. *Nebraska Press*, 427 U.S. at 562. If the Order derives force as a local rule enforceable through contempt, it was required to be adopted through the rulemaking process of Fed. R. Civ. P. 83 and 28 U.S.C. § 2071, including public notice, opportunity to comment, and circuit judicial council review. *Willy v. Coastal Corp.*, 503 U.S. 131, 135 (1992); 28 U.S.C. § 2071(a). The District's model template was never adopted through that process. If its terms are significant enough to be enforceable through contempt, they are significant enough to go through the process Congress required for rules that bind litigants. *Frazier v. Heebe*, 482 U.S. 641, 645 (1987). They did not.

79. Defendant cannot have it all three ways. Stipulation — no mutual assent. Court order — no Rule 26(c) showing. Local rule — no Rule 83 rulemaking. The Order is unenforceable under every theory available to Defendant. Even if it were valid, the enforcement mechanism Defendant invokes does not exist. Rule 37(b)(2)(A) authorizes sanctions when a party "fails to obey an order to provide or permit discovery." A traditional protective order does the opposite — it restricts use of material already produced, it does not direct production. The Eleventh Circuit was direct: "a Rule 26(c) protective order is not 'an order to provide or permit discovery,' and therefore, such orders do not fall within the scope of Rule 37(b)(2)." *Lipscher v. LRP Publications*, 266 F.3d 1305, 1323 (11th Cir. 2001); *accord* Josephs, "The Availability of Discovery Sanctions for Violations of Protective Orders," 80 U. Chi. L. Rev. 1355, 1371–72 (2013). Defendant's attempt to bridge this gap by arguing the Order "enabled" discovery would extend Rule 37(b) to virtually any court order.

80. Even if valid, its application here violates the Rules Enabling Act. 28 U.S.C. § 2072(b) provides that the Federal Rules "shall not abridge, enlarge, or modify any substantive right." Applying the Order to prohibit Plaintiff from discussing her own body, her NLRB charges, her workplace complaints, and the factual basis of her lawsuit abridges substantive rights guaranteed by the NLRA, Title VII, the California Constitution, Speak Out Act, and Silenced No More Act. Cal. Lab. Code § 432.5 independently prohibits requiring employees to sign agreements that violate any law. A confidentiality clause barring discussion of

harassment or NLRA-protected activity is void and unenforceable in California courts, including this one.

81. The principle that closes this analysis requires no elaboration: a protective order cannot accomplish indirectly what no court could order directly. *Seattle Times*, 467 U.S. at 33; *Kamakana*, 447 F.3d at 1179; *United States v. Will*, 449 U.S. 200, 215 (1980). No court could issue a direct prior restraint prohibiting an employee from discussing her reproductive health, her NLRB charges, or her workplace complaints. The First Amendment, the NLRA, the Norris-LaGuardia Act, and California law all independently forbid it. The fact that Defendant styles the request as protective order "enforcement" does not change what it is. A court's separation-of-powers constraints are not defeated by creative labeling.

## DEFENDANT'S MOTION IS AN UNAUTHORIZED SUMMARY JUDGMENT MOTION

82. Strip away the procedural caption and what Defendant is actually asking for is a pre-trial ruling that Plaintiff's speech about Apple's employee studies was wrongful, not protected — the precise question at the center of her surviving *Tamney*, § 1102.5, and § 96(k) claims. Defendant wants that ruling now, on a discovery enforcement motion, without a statement of undisputed facts, without evidence, without the legal standards applicable to wrongful termination claims, and without Rule 56 process. The Court cannot grant it. Summary judgment is scheduled for June 2026. That is where this question belongs. Defendant has confirmed this in its own filings. Dkt. 280, footnote 2: "it was her public disclosure of confidential Apple product-related information that led to her termination from Apple in the first place." That is a judicial admission that this enforcement proceeding concerns the same speech, the same studies, and the same confidentiality theory as Defendant's termination defense. If this Court finds that Plaintiff's speech violated the Protective Order — on a discovery motion, without trial — Defendant will argue at summary judgment that a federal court already held the speech was wrongful, not protected. Plaintiff's Tamney, § 1102.5, and § 96(k) claims would be gutted before they reached the merits. Judge Chen's own order at Dkt. 213 warned against exactly this: "even if Defendant designates certain documents as confidential, that does not bar Ms. Gjovik from contesting a designation." A finding of violation for contesting a designation would directly contradict that assurance.

83. The irreconcilable contradiction is structural. Plaintiff's complaints ask this Court to declare that Defendant's conduct is unlawful, that its secrecy regime is unlawful, and to order disgorgement of the collected data and cessation of the studies. (4AC ¶¶ 203–207; 5AC ¶ 219). Defendant's motion asks this Court to declare that the studies are protectable confidential business information and that Plaintiff violated an order by discussing them. Both cannot be granted. Defendant cannot obtain through a discovery enforcement motion what it must establish through summary judgment — and must win at trial. The same reasoning precludes using this motion to establish a basis for IPA breach damages. The bankruptcy stay prohibits breach of contract claims against Plaintiff as a debtor without stay relief. 11 U.S.C. § 362(a)(1), (6). Defendant never sought stay relief. More fundamentally, Defendant agreed in the April 2025 NLRB national settlement (Dkt. 194 at 17–20, Case No. 32-CA-284428) to stop enforcing the IPA to cover terms and conditions of employment protected under NLRA § 7 — with a self-executing default provision providing that non-

compliance triggers reissuance of the October 2024 complaint, deemed admissions, and a full Board remedy without trial. Defendant's Motion to Retain Designations cites the IPA as its sole remaining legal authority. Defendant is asking this Court to enforce an agreement it is legally prohibited from enforcing, in a forum where it is legally prohibited from asserting claims, under a theory it expressly waived before the NLRB. The self-executing default provision is triggered by that conduct.

84.     Equitable and judicial estoppel independently bar relief. Defendant represented to this Court that it needed the Protective Order to produce the Gobbler informed consent form. It never designated that form as confidential. It never used the Order for that stated purpose. It may not now invoke the Order it obtained through misrepresentation to obtain a fundamentally different form of relief — suppression of Plaintiff's speech about working conditions. Defendant also represented to the NLRB that it would stop enforcing the IPA to cover protected activity, then represented to this Court in the same motion that the IPA is its sole authority for its designations. A party cannot take contrary positions in different federal proceedings. *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001). Defendant additionally admitted during meet-and-confer before the Protective Order was entered that it wanted the order to "expressly prohibit Plaintiff from sharing information and testifying to government agencies and law enforcement." (Dkt. 220 at 10–11 ¶ 15). A protective order designed to prevent testimony to federal law enforcement is not a discovery management tool. The Court entered the Order despite that admission on the record.

85.     The motion is also an act — not merely a filing. Each of the following violations is committed by the act of filing Dkt. 294. The NLRA: filing a federal court motion threatening contempt against an employee for publicly discussing her NLRB charges and workplace complaints is a textbook § 8(a)(1) unfair labor practice — coercion of § 7 rights — and § 8(a)(4) retaliation for NLRB charge activity. The NLRB has already issued a charge on this exact conduct. (Charge No. 32-CA-381277, Dkt. 278). California Labor Code § 1102.5: the motion explicitly targets Plaintiff's disclosures to the NLRB, the press, and the public about Defendant's invasive employee studies and unlawful NDA terms: the motion is the retaliatory act, committed after suit was filed, creating a fresh, timely, fully attributed violation. §§ 232.5 and 96(k): the motion seeks a prior restraint on Plaintiff's future speech and a court finding that her past off-duty speech violated a court order — direct coercion and discipline for lawful nonworking-hours conduct that § 96(k) was enacted to prevent. The NLRB settlement: Defendant's motion cites as its sole authority the IPA it contractually agreed to stop enforcing & filing was a breach of the settlement with self-executing default.

86.     Defendant spent rounds of motions to dismiss narrowing Plaintiff's claims on procedural grounds — statute of limitations, pleading specificity, employer-agent attribution. Defendant then, apparently emboldened, committed the same violations explicitly, on the record, in open federal court, under its own name, represented by the same firm identified in the prior RICO allegations, citing the same IPA it promised the NLRB it would stop enforcing. Every procedural shield that produced those earlier dismissals is inapplicable here. This is a fresh, timely, fully attributed, explicitly documented violation — committed after this lawsuit was filed, in this proceeding, with specific intent supplied in writing by Dkt. 280, footnote 2. The Court should deny the motion, recognize that the filing itself

warrants response in the sanctions framework already pending at Dkt. 302.

# CONCLUSION AND RELIEF REQUESTED

87.     Plaintiff predicted on the record, before the Protective Order was ever entered, that Apple would use it for exactly this purpose: to criminalize her protected speech, to convert her retaliation claims into her own misconduct, and to obtain through contempt proceedings the suppression it could not obtain through litigation on the merits. The record confirms every element of that prediction. The motion fails at every level. No valid designation exists to enforce: the blanket designation was void under PO § 5.1 from inception; the February 4, 2026 narrowed designation is a nullity under Fed. R. Civ. P. 26(g)(2). The Protective Order's own § 3 excludes all designated content as publicly known and previously known to Plaintiff. The constitutional floor established by *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), prohibits suppressing what Plaintiff already knew from her own experience. The prior restraint demand fails under *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976), *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996) — private commercial interest has never justified a prior restraint, and it does not here. Garmon preemption strips this Court of jurisdiction over activity arguably protected by NLRA §§ 7 and 8. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).

88.     The Norris-LaGuardia Act absolutely bars injunctive relief in a labor dispute. 29 U.S.C. § 101. The bankruptcy automatic stay voids this proceeding absent stay relief. 11 U.S.C. § 362(a). The April 2025 NLRB settlement contractually bars Apple from enforcing confidentiality over working conditions by any mechanism. The motion seeks relief on unpled, waived counterclaims under an IPA Apple agreed to stop enforcing. The motion was filed in defiance of this Court's February 20, 2026 meet-and-confer order. The motion seeks to pre-adjudicate the central merits question in Plaintiff's retaliation claims — whether her disclosures were protected — without the procedural protections of Rule 56. Apple's own Senior Director declarant concedes the information "may be publicly available."

89.     Apple's own published paper in the *American Journal of Obstetrics and Gynecology* discloses the methodology. Apple's own judicial admission in Dkt. 280 fn. 2 concedes Plaintiff made these disclosures publicly. Apple's equitable hands are unclean. And the act of filing this motion is itself a fresh violation of NLRA §§ 8(a)(1) and 8(a)(4), Cal. Lab. Code §§ 1102.5 and 96(k), and the April 2025 settlement — committed under counsel's signature, on the public record, after five rounds of motions to dismiss seeking to remove allegations about this identical conduct on procedural grounds. Apple spent five years calling Plaintiff's description of her own body its trade secret. The NLRB disagreed. The EPA disagreed. The GAO cited her public account as credible. Journalists in three countries reported it. Five public complaints on this docket pled it. Judge Chen's orders describe it. None of that changed Apple's theory. Apple's theory is that it owns its employees' experiences, and that this Court's contempt power is the right tool to enforce that ownership. It is not. Plaintiff respectfully requests that the Court:

1. **DENY** Defendant's Motion to Enforce Protective Order (Dkt. 294) in its entirety;
2. **DENY** Defendant's Motion to Seal (Dkt. 293) and Motion to Shorten Time (Dkt. 295);
3. **DECLARE** that no valid confidentiality designation exists over any portion of Plaintiff's deposition

transcript — the blanket designation lapsed automatically under PO § 6.3, and the February 4, 2026 narrowed designation is a legal nullity under Fed. R. Civ. P. 26(g)(2);

4. **DECLARE** that the Protective Order does not apply to the designated content, which is excluded from the Order's scope under § 3 and which the Order cannot constitutionally reach under *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984);

5. **GRANT** Plaintiff's Motion for Declaratory Relief and Sanctions under Rule 26(g) (Dkt. 302);

6. **ORDER** Defendant to obtain relief from the bankruptcy automatic stay, 11 U.S.C. § 362(a), before taking any further action against Plaintiff in this proceeding;

7. **ORDER** Defendant to complete genuine meet-and-confer on each remaining designation before filing any further enforcement motion; and

8. **GRANT** such other and further relief as this Court deems just and proper.

Respectfully submitted,

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 13 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik**, *an individual*, <br><br> Plaintiff, <br><br> vs. <br><br><br> **Apple Inc.**, *a corporation,* <br><br> Defendant. | **Case No. 3:23-CV-04597-EMC (KAW)** <br><br> **Plaintiff's Declaration in Support of: Plaintiff's Opposition to Defendant's Motion at Dkt. 294** <br><br> **HEARING:** <br> **Location: Oakland (TBD)** <br> **Date: April 2 2026** <br> **Time: 1:30 PM** |

## PLAINTIFF′S DECLARATION (DKT. 294)
### DECLARATION OF ASHLEY M. GJOVIK,
**IN SUPPORT OF PLAINTIFF′S OPPOSITION TO DEFENDANT′S MOTION AT DKT. 294,
AND IN SUPPORT OF PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**

Plaintiff Ashley Gjovik respectfully files this Declaration in support of her Opposition to Defendant Apple Inc.′s Motion to Enforce Protective Order (Dkt. 294) and in compliance with Civil L.R. 7-3, 7-4, and 7-5.

I, Ashley M. Gjovik, declare as follows:

1. I am the Plaintiff in the above-captioned matter, appearing In Propria Persona. I have personal knowledge of the facts stated herein and, if called as a witness, could and would testify competently thereto.

2. I make this Declaration in support of my Opposition to Defendant′s Motion to Enforce Protective Order (Dkt. 294), my Motion for Judicial Notice, and my Motion for Sanctions under Fed. R. Civ. P. 26(g) (Dkt. 302).

### EXHIBITS — PRESS AND MEDIA COVERAGE

3. Attached hereto as **Exhibit A** is a true and correct copy of the article titled ***"Apple Cares About Privacy Unless You Work at Apple***," published on or about August 30–31, 2021. This article quotes me describing what I felt were invasions of my privacy by Apple, including with its studies and its surveillance practices, with its collection of nude photos of me, and with workplace retaliation. The journalist contacted Apple for comment prior to publication. Apple did not respond. Apple terminated my employment approximately ten days after publication. Apple subsequently cited this article as the basis for my termination. *See* Dkt. 280 fn. 2.

4. Attached hereto as **Exhibit B** is a true and correct copy of the article titled "***Apple lädt Mitarbeiter zu Datenparty – um Gesichter zu scannen,***"published by Der Spiegel, on or about June 24 2022. The German original version is included followed by a version informally translated to English ("***iPhone is watching you***"). Der Spiegel is a publication of general circulation published in the Federal Republic of Germany. This article reports on Plaintiff′s complaints about working conditions at Apple, Apple surveillance practices, and Apple's studies on employees. ("Gjovik now wants to reveal that the company is not only breaking its promises, but possibly also the law. … She is in contact with California′s data protection authority about the violation of her privacy, and German authorities are also involved… For around four years, the app photographed her when

she was half asleep or on the toilet, and even nude pictures of her were stored. She estimates that the app took hundreds of pictures a day… She is now fighting her dismissal before the National Labor Relations Board (NLRB). According to SPIEGEL, the SEC is also interested in whether Apple wanted to shut down a whistleblower..") . I filed this article to the Ninth Circuit docket for case 25-2028 Dkt. 27-5 pp.27-31 on May 20 2025 and Apple was served with it. [Live URL: https://www.spiegel.de/netzwelt/gadgets/apple-laedt-mitarbeiter-zu-daten-party-um-gesichter-zu-scannen-a-54c4a2da-0f39-48be-9762-1bda39fcca8e].

5.  Attached hereto as **Exhibit C** is a true and correct copy of the article titled **"Ashley Gjøvik, lanceuse d'alerte licenciée par Apple, seule contre tous,"** published by Telerama, a French publication, on or about March 14 2023. The French original version is included followed by a version informally translated to English ("**Ashley Gjevik, whistleblower fired by Apple, alone against all odds: The fault of this employee, who will be dismissed in 2021: she revealed that the Californian firm turns its employees into guinea pigs. Even stalking them in their private lives.**") This article reports on Apple's studies on employees, complaints about invasions of privacy, and labor disputes at Apple. I filed this article to the Ninth Circuit docket for case 25-2028 Dkt. 27-5 pp.33-42 on May 20 2025 and Apple was served with it. [live URL: https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php].

6.  Attached hereto as **Exhibit D** is a true and correct copy of the article titled "**Apple whistleblower brings spying claims to UK: Data watchdog opens investigation into privacy accusations against iPhone maker,**" published by The Telegraph on or about April 10 2022. This article reports on Apple's employee "studies," complaints about invasion of privacy, and allegations of systemic regulatory noncompliance by Apple. I filed this article to the Ninth Circuit docket for case 25-2028 Dkt. 27-5 pp. 55-56 on May 20 2025 and Apple was served with it. ("Britain′s information watchdog is investigating claims that Apple was able to access personal information on workers′ phones after a privacy complaint was lodged by a whistleblower. Ashley Gjovik, a former senior Apple engineer, has filed a 54-page privacy complaint against the iPhone maker alleging unlawful data collection and invasion of employee privacy over ″years and multiple countries″ In the filing, which has been lodged with the UK Data Protection Information Commissioner′s Office (ICO) and its counterpart in Brussels, Ms Gjovik claimed that she publicly expressed concerns about Apple ″pressuring its employees to participate in invasive data collection procedures, including

scans of ears/ear canals".) [live URL: https://www.telegraph.co.uk/business/2022/04/10/apple-whistleblower-brings-spying-claims-uk/]

7. Attached hereto as **Exhibit E** is a true and correct copy of the article "***Ex-Apple employee takes Face ID privacy complaint to Europe,***" published by TechCrunch and Yahoo! News around April 11 2022, and previously filed in to the Ninth Circuit case 25-2028 and Dkt. 27-5 at 63-64, and Apple was served. ("At the time, Gjøvik had been placed on administrative leave by Apple after raising concerns about sexism in the workplace, and a hostile and unsafe working environment which it had said it was investigating. She subsequently filed complaints against Apple with the U.S. National Labor Relations Board. Those earlier complaints link to the privacy complaint she's sent to international oversight bodies now because Gjøvik says she wants scrutiny of Apple's privacy practices after it formally told the U.S. government its reasons for firing her — and "felt comfortable admitting they'd fire employees for protesting invasions of privacy", as she puts it — accusing Apple of using her concerns over its approach to staff privacy as a pretext to terminate her for reporting wider safety concerns and organizing with other employees about labor concerns. The U.K.'s Information Commissioner's Offie (ICO) and France's CNIL both confirmed receipt of Gjøvik's privacy complaint against Apple. A spokesperson for the ICO told TechCrunch: "We are aware of this matter and we will assess the information provided." France's CNIL also sent confirmation that it's looking at Gjøvik's complaint.") (live URL: https://techcrunch.com/2022/04/11/gobbler-complaint-europe/)/

8. Attached hereto as **Exhibit F** is a true and correct copy of Gizmodo article: "***Apple Wanted Her Fired. It Settled on an Absurd Excuse The reasons for firing Ashley Gjøvik include tweeting a photo of herself—taken by her own phone,***" ("Gjøvik deleted the tweets as asked, but retained counsel to respond to Apple. David L. Hecht, one of the nation's leading patent litigators, sent the company a letter on her behalf, dismantling Apple's claims bit by bit. "While I understand that Apple is not opposed to taking aggressive litigation postures (and indeed has a history of doing so)," Hecht wrote, "I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact." Hecht noted, for instance, that the emails shared publicly by Gjøvik were neither labeled confidential nor contained anything "that could be considered secret or otherwise proprietary. "The posted image of the email merely noted what was already known to the public," he said. "It is no secret that Apple has been scanning a wide range of human ears… Hecht pointed to the fact that Apple's vice president of product marketing, Greg Joswiak, had

spoken publicly about scanning people's ears: "We had done work with Stanford to 3D-scan hundreds of different ears…"). Oct. 15 2021. [public URL: https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789]

9. Attached hereto as **Exhibit G** is a true and correct copy of Inverse article, "***Apple is leaning on weak arguments to defend a senior engineer's firing,***" Oct. 15 2021, ("Now she's also working with the NLRB on a case alleging that Apple's anti-leaking policies actually violate U.S. law. Gjøvik alleges that an all-staff email from CEO Tim Cook stating that "people who leak confidential information do not belong here" violated the National Labor Relations Act, *Bloomberg* reports Gjøvik's latest filings claim that several other policies in the company's employee handbook — like restrictions on talking to reporters and revealing compensation — illegally interfere with workers' rights. Gjøvik's hope with all these legal proceedings is straightforward: to change what she sees as a poor working environment at Apple. "Ultimately," she told *Bloomberg*, "we're never going to see any systemic change at Apple without empowering the employees to feel comfortable speaking out as they are legally protected to.") [public URL: https://www.inverse.com/input/culture/apple-is-leaning-on-weak-arguments-to-defend-a-senior-engineers-firing]

10. Attached hereto as **Exhibit H** is a true and correct copy of Biometric Update article titled "***Ex-employee accuses Apple of training iPhone biometrics by violating staff privacy,***" and published around April 20 2022. ("The company invited its employees to participate in product testing, and sometimes to have their biometrics collected, but Gjøvik says the testing and collection seemed to be mandatory. She describes the use of Apple's internal Gobbler app (later called Glimmer) to upload personal data employees had collected to company servers, and directly claims that employee data is the source of the billion images used to train Face ID.") (live URL: https://www.biometricupdate.com/202204/ex-employee-accuses-apple-of-training-iphone-biometrics-by-violating-staff-privacy).

### EXHIBITS — APPLE'S OWN PUBLIC DISCLOSURES

11. Attached hereto as **Exhibit I** is a true and correct copy of the peer-reviewed article: Mahalingaiah, Shruthi et al. "**Design and methods of the Apple Women's Health Study: a digital longitudinal cohort study.**" *American journal of obstetrics and gynecology* vol. 226,4 (2022): 545.e1-545.e29. doi:10.1016/j.ajog.2021.09.041, authored by Apple-affiliated researchers, Apple employees, and published in a peer-reviewed medical journal indexed in PubMed and other medical article

databases. This detailed, 24-page article describes the methodology of Apple′s ovulation and menstruation studies ("*The Apple Women's Health Study was designed to gain a deeper understanding of the relationship among menstrual cycles, health, and behavior.*"), and the paper covers topics including: "survey design," "Apple research app platform," "study population," "Eligibility, screening, and consent," "Recruitment and marketing," "Survey data," "Monthly surveys and timing," "Research sensor and usage data," "HealthKit data," "Principal findings," "Clinical implications," "Research implications," and "Strengths and limitations.". [live URL: https://pubmed.ncbi.nlm.nih.gov/34610322/]

12. Attached hereto as **Exhibit J** is a true and correct printout of the **ClinicalTrials.gov** registration for Apple′s study, identifier NCT04196595, retrieved from https://clinicaltrials.gov. This is a public federal government database maintained by the National Institutes of Health. The "responsible party" is listed as Apple Inc and the study is "recruiting" participants. [live URL: https://clinicaltrials.gov/study/NCT04196595]

13. Attached hereto as **Exhibit K** is a true and correct printout of Apple's own website with a Sept. 10 2019 press release promoting "*three groundbreaking health studies*" including "*Apple Women's Health Study*: In partnership with Harvard T. H. Chan School of Public Health and the NIH's National Institute of Environmental Health Sciences (NIEHS), Apple has created the first long-term study of this scale focused on menstrual cycles and gynecological conditions." [live URL: https://www.apple.com/newsroom/2019/09/apple-announces-three-groundbreaking-health-studies/]

## EXHIBITS — FEDERAL REGULATORY RECORDS

13. Attached hereto as **Exhibit L** is a true and correct copy of my public comment submitted to the White House Office of Science and Technology Policy, docketed as OSTP_FRDOC_0001-0008. My comment (tracking number ljh-mm9t-ux8w) was submitted as part of a public rulemaking proceeding and is publicly accessible on regulations.gov. I also filed a copy of my OSTP complaint to the Ninth Circuit docket on May 12 2025 at Dkt. 19.3 in Case No. 25-2028 and Apple would have been served a copy of that filing. ("During my time at Apple, I was invited to employee user studies looking to study me on topics ranging from my "eye movements," "grip on an iPhone," "voice", "blood pressure," physical response to "yoga, swimming, and running," to studying my "menstruation" and "sleep." Indeed, in April 2019 I was invited to a user study program to study my sleep… The request for co-sleeper information also extended to requesting co-sleepers sign

NDAs, and even participate in the study themselves – even if they are not an employee. Personally, I didn't want my employer to know who I was sleeping with and I stopped participating in that study." at p. 31). [live gov URL: https://www.federalregister.gov/documents/2023/05/03/2023-09353/request-for-information-automated-worker-surveillance-and-management] [live URL of copy of OSTP complaint: https://www.ashleygjovik.com/uploads/1/3/7/0/137008339/ostp_gjovik_comment_2023_filed_opt.pdf].

14. Attached hereto **Exhibit M** as is a true and correct copy of the Government Accountability Office Report GAO-24-107639, published August 28, 2024 and blog post published October 29, 2024, which references my public comment OSTP_FRDOC_0001-0008 in its findings (regarding all of the designations Apple claims are secret and confidential in the motion at Dkt. 294). The GAO report is publicly available at gao.gov [live URL: https://www.gao.gov/assets/gao-24-107639.pdf] and the blog post at [https://www.gao.gov/blog/why-do-i-feel-somebodys-watching-me-workplace-surveillance-can-impact-more-just-productivity ]. I also published a blog post on my website about this on Aug. 28 2024 titled "*U.S. GAO Releases Report on Employer Digital Surveillance, Referencing my Comments about Apple*" [live URL: https://www.ashleygjovik.com/blog/2024-us-gao-releases-report-on-employer-digital-surveillance-referencing-my-comments-about-apple].

15. Attached hereto as **Exhibit N** is a true and correct copy of the NLRB National Settlement Agreement, Case No. 32-CA-284428, dated April 3, 2025, previously filed in this litigation as Dkt. 194. This settlement was approved by the NLRB Regional Director and posted by Apple on its internal intranet pursuant to Apple′s compliance obligations under the agreement. This was filed to Dkt. 203 on April 15 2025 in this case.

16. Attached hereto as **Exhibit O** is a true and correct copy of the filing confirmation for OHRP Complaint No. 00709517, submitted March 11, 2026 to the Office for Human Research Protections, U.S. Department of Health and Human Services, concerning Apple′s federally registered human subjects study NCT04196595.

17. Attached hereto as **Exhibit P** is a true and correct copy of my privacy invasion complaints to the FTC (Report Number: 154835129) on April 1 2022 and docketed with a report number by FTC around Dec. 30 2022.

18. Attached hereto as **Exhibit Q** is a true and correct copy of the complaints and communications

with German and French privacy compliance authorities regarding my complaints about Apple's "studies" and privacy-related labor law violations.

## EXHIBITS — CORRESPONDENCE AND DESIGNATIONS

19. Attached hereto as **Exhibit R** is a true and correct copy of the email exchange between myself and counsel for Defendant dated February 4, 2026, including my detailed challenge to Defendant's deposition designations at issue in motion Dkt. 294 where I inform the Defendant I believe their designations are literally illegal and if they do not withdraw them, I will file an NLRB charge about it, which I did.

20. Attached hereto as **Exhibit S** is a true and correct copy of my blog post titled "***Apple Claims It Owns Its Employees' Cervical Mucus,***" published February 16, 2026, the same day I filed NLRB Charge No. 32-CA-381277.

21. Attached hereto as **Exhibit T** is a true and correct copy of some or all of the social media posts in question, published in Feb. of 2026.

## ADDITIONAL FACTS

23. To my recollection, I never participated in Apple's ovulation study or menstruation study and I declined Apple's requests to participate. The knowledge I possess regarding those studies derives entirely from Apple's requests directed to me, my coworkers complaints, public statements and marketing including by Apple itself, and from my workplace complaints about Apple's requests.

24. I've been organizing with other Apple employees and contractors for years around Apple's data collection, studies, and concerns about invasion of privacy for both employees and the public. Another Apple privacy whistleblower, Thomas , wrote a Declaration for this case in 2024 and it is attached as **Exhibit: Declaration of Thomas le Bonniec** (25-2028, Dkt. 19-3, May 12 2025).

25. The content Apple designated as confidential (including the terms ovulation, cervical mucus, mucus secretions, menstruation, co-sleepers, and sexual partners) describes my own bodily experiences and my own workplace complaints. I possessed this knowledge before, during, and independent of any discovery process in this litigation. The subject of my testimony was complaining about invasion of privacy and exercising my own right to privacy/autonomy of my own body and the bodies of my coworkers.

26. Apple never designated a single produced document as confidential under the Protective Order. Apple confirmed this in writing on February 6, 2026. *See* Exhibit R.

27. Apple filed this motion on February 26, 2026, in defiance of Judge Westmore's February 20, 2026

oral order requiring the parties to complete meet-and-confer before filing any motion practice.

28. I am currently in bankruptcy, insolvent, have no medical insurance, have no long-term housing, am living in a motel paid for by donations from the public, and am struggling to survive. Apple's barrage of motions, allegations, and unnecessary work meant that I was able to even sleep or complete my basic day-to-day requirements while I dropped everything to deal with Apple's latest illegal outburst. I honestly believe what Apple is doing, has been doing, and indicates it plan to do regarding this matter is extremely unlawful, contrary to public policy, and done with improper objectives including anticompetitive conduct and a reckless disregard for the law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 13, 2026, in San Jose, California.

Respectfully submitted,

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 13 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

## A.  EXHIBIT A: THE VERGE

Article was filed on Dec. 25 2023 to Dkt. 35-12, at pp. 34-41 in this case's docket.

The Verge: "*Apple Cares about Privacy Unless You Work at Apple*" (Aug. 30 2021).

## B. EXHIBIT B: DER SPIEGEL

Exhibit B:

DER SPIEGEL, "*Apple lädt Mitarbeiter zu Datenparty – um Gesichter zu scannen*,"
June 24 2022.

## WIRTSCHAFT

Unternehmen drohe ein Bußgeld von bis zu 50 000 Euro.

Und: »Wenn die Firmen ihr Verhalten nicht ändern, handeln sie vorsätzlich.« Sogar eine Strafverfolgung wegen Betrugs mit deutlich höheren Geldstrafen sei dann möglich.

Sämtliche Produzenten der positiv getesteten Würste bestreiten den Einsatz von Separatorenfleisch. Ein Unternehmenssprecher einer Tönnies-Tochter zweifelt die Untersuchungsmethode der Hochschule Bremerhaven an: Die vom Labor angezeigten Marker seien kein Nachweis von Separatorenfleisch, schreibt er. »In den genannten Produkten setzen wir Verarbeitungsfleisch von jungem Geflügel ein. Dies kann zu einem geringen Teil auch Knorpelzellen enthalten.«

Dagegen spricht: Die Methode springt auf einen geringen Anteil des Knorpel-Markers Kollagen II Alpha I gar nicht an.

Eine von Wiesenhof beauftragte Anwaltskanzlei schickte eidesstattliche Versicherungen der Geschäftsführer betroffener Fabriken, dass man kein Separatorenfleisch einsetze, was sich auch mit den regelmäßig selbst durchgeführten Kontrollen auf Basis amtlich anerkannter histologischer Untersuchungen und mit Überprüfungen des Kalziumgehaltes beweisen ließe.

Bei Wittkes Methode handle es sich »lediglich um einen neuen wissenschaftlichen Ansatz, ... der in der Praxis bisher jedoch keine Anwendung gefunden hat« und amtlich noch nicht anerkannt sei, schreibt die Kanzlei. Kollagene seien auch in anderen Körperteilen zu finden, insbesondere Sehnen. Außerdem sei das Verfahren bislang nur für Hähnchenfleisch entwickelt und nicht für Putenfleisch, der Hauptkomponente der Wiesenhof-Wurst.

Tatsächlich beinhalten sämtliche positiv getesteten Produkte auch Hähnchen. Und Sehnen enthalten laut einer Studie der Universität Lyon zwar Kollagene – nicht aber das spezifische Eiweiß Kollagen Typ II alpha 1, auf das die Laboruntersuchungen zielen.

Kontrollbehörden sind von dem neuen Prüfverfahren jedenfalls angetan, es könnte sich bald weiter durchsetzen und neue Erkenntnisse bringen. »Die Methode ist für uns sehr zukunftsweisend«, sagt Matthias Denker, Dezernatsleiter des Landesamts für Lebensmittelsicherheit in Mecklenburg-Vorpommern. Die nötige Ausstattung sei in amtlichen Laboren vorhanden; Lebensmittelkontrolleure könnten die Methode in ihrem Prüfalltag wohl nutzen.

Forscher Wittke gibt sich damit nicht zufrieden. Künftig will er – gefördert durch das Bundeswirtschaftsministerium – auch Separatorenfleisch anderer Tiere in Wurst aufspüren, insbesondere beim Schwein, dem meistverkauften Fleisch hierzulande.

Könnte sein, dass sich deutsche Wurstfabrikanten bald ein neues Geschäftsmodell suchen müssen.

Claus Hecking, Anne Martin, Leonie Voss, Carolin Wahnbaeck ∎



Apple-Chef Cook

Brooks Kraft / Apple Inc.

# iPhone is watching you

**TECHKONZERNE** Die Whistleblowerin Ashley Gjøvik hat aufgedeckt, dass Apple heimlich aufgenommene Fotos seiner Beschäftigten nutzt, um die Gesichtserkennung auf iPhones zu trainieren. Jetzt will sie nachlegen.

Die Mail kam Ashley Gjøvik sofort eigenartig vor: An einem Augusttag vor fünf Jahren erhielt die Apple-Projektmanagerin eine Einladung zu einer »Data Collection Social Hour«. Die Party sollte gegenüber von Apples Ufo-artiger Zentrale im kalifornischen Cupertino stattfinden.

Ihr Kollege aus dem Team für Nutzerstudien versprach Getränke, Musik und »20 Minuten Datensammlung in sozialer Umgebung«. Teilnehmen durften nur fest angestellte Mitarbeiterinnen und Mitarbeiter, die »nicht empfindlich auf Licht reagieren«, so stand es in seiner Mail. Wirklich freiwillig habe sich das Event nicht angefühlt, erzählt Gjøvik heute. Sie ging hin, weil das erwartet wurde. Ihre Chefs hätten oft Druck auf sie ausgeübt, eine Teamplayerin zu sein.

Was Gjøvik damals erlebte, löste im vergangenen Sommer einen der größten Datenskandale im Apple-Reich aus. Denn sie entschloss sich, nicht über ihre Erkenntnisse zu schweigen: Der Konzern nutzt unbemerkt aufgenommene Fotos seiner Beschäftigten, um seinen Algorithmus zu trainieren. Gjøvik wurde zur Whistleblowerin – mit einer Mission, die inzwischen auch nach Europa reicht.

Dass Datenschützer aus Deutschland vielleicht bald gegen den wertvollsten Technologiekonzern der Welt vorgehen, hat mit Gjøvik zu tun.

Die 35-Jährige erzählt ihre Geschichte auf einer Parkbank in Santa Clara im Silicon Valley, ein paar Meilen von Cupertino entfernt. Bei Apple arbeitet Gjøvik heute nicht mehr, der iPhone-Konzern hat sie im Streit um die Schnüffel-App im vergangenen September entlassen. Für Apples Geschmack hatte Gjøvik zu viel preisgegeben. Auf Anfrage wollte sich der Konzern zu den Vorwürfen nicht äußern.

An die Datensammelaktion von damals erinnert sich Gjøvik so: Statt einer Party sei da ein Parkplatz gewesen, auf dem zwei Reihen schwarz verkleideter Stahlzäune standen, drei Meter hoch. Bewacht wurde der Ort von Sicherheitskräften und Kameras. An der Bar bediente ein misslauniger Mitarbeiter im Hawaii-Hemd, ein anderer führte Gjøvik und vier andere Apple-Beschäftigte an einen Klapptisch und erklärte ihnen ihre Aufgabe: Selfies machen.

Sie unterschrieb eine digitale Einverständniserklärung, von der sie nie eine Kopie bekam. Dann habe jeder das neue, noch nicht veröffentlichte iPhone-Modell X erhalten, darauf installiert eine App, die damals noch »Gobbler« hieß. Auf Deutsch »Verschlinger«. Erst später änderte Apple den Namen in einen weniger drastischen: »Glimmer«.

So hätten sie bei knapp 40 Grad in der brütenden Sonne gesessen und sich schwitzend selbst fotografiert, berichtet Gjøvik. Von oben, von der Seite, mit Sonnenbrille oder eine Grimasse schneidend. Die Kamera und mehrere Sensoren nahmen biometrische Bilder auf, in denen Gesichter dreidimensional vermessen werden, um einen Nutzer auch mit glänzender Stirn und in gleißendem Sonnenlicht zu erkennen.

Zweck der Übung: Die Apple-Mitarbeiter sollten den Algorithmus hinter Face ID füttern. Das Feature, ein Telefon über eine Gesichtserkennung zu entsperren, sollte ein paar Monate später auf dem nächsten iPhone-Modell eingeführt werden. Heute ist es von Apples Smartphones nicht mehr wegzudenken. Verbessert wird die Technik seit Jahren auch von Apple-Mitarbeitern wie Gjøvik: unfreiwillig und mit unbemerkt geschossenen Bildern aus intimsten Alltagssituationen. Im vergangenen August hatte die Whistleblowerin auf die Vorgänge aufmerksam gemacht, als sie ein Video und jene Bilder twitterte, die die Glimmer-App aufgenommen hatte.

Für Apple ist das mehr als peinlich. Keiner der großen Technologiekonzerne hat sich so sehr dem Datenschutz verschrieben wie der iPhone-Hersteller. Tim Cook, Apples sonst eher sanftmütiger Chef, attackiert regelmäßig Datenkraken wie Meta oder Alphabet und setzt sich gern demonstrativ von zweifelhaften Praktiken der Branche ab: Mit strengeren Privatsphäre-Regeln auf Apple-Geräten hat Cook fast eigenhändig Metas Wachstum abgewürgt, indem er den Hunderten Millionen iPhone- und iPad-Nutzerinnen und -Nutzern im vergangenen Jahr die Möglichkeit gab zu untersagen, dass andere Anbieter ihr Verhalten zu Werbezwecken nachverfolgen. Meta, das zu der Zeit noch Facebook hieß, warnte seine Investoren vor möglichen negativen Folgen für das Geschäft, und tatsächlich brach die Aktie wenig später ein.

Cook gibt sich stets, als ginge es ihm um Höheres und als sei in seinem eigenen Konzern alles anders: »Wenn wir anfangen, uns permanent überwacht zu fühlen, verändert sich unser Verhalten«, sagte er neulich auf einer Konferenz des »Time«-Magazins. »Wir fangen an, weniger zu tun. Weniger nachzudenken.«

Gjøvik will jetzt offenlegen, dass das Unternehmen nicht nur seine Versprechen bricht, sondern möglicherweise auch geltendes Recht. Sie hat gerade ihr Jura-Examen bestanden und arbeitet inzwischen bei einer Nichtregierungsorganisation, die gegen Zensur in China kämpft. Fertig ist sie mit Apple aber noch nicht. Wegen der Verletzung ihrer Privatsphäre ist sie mit Kaliforniens Datenschutzbehörde in Kontakt, deutsche Behörden sind ebenfalls eingeschaltet.

»Was Apple mir angetan hat, könnten sie auch deutschen Mitarbeitern (und ihren Familien und Freunden) antun oder schon an-

## »Alle Daten, die eure Gesichter im Bild haben, sind gute Daten.«

**Mail eines Studienleiters an Apple-Beschäftigte**

getan haben«, schreibt Gjøvik in einer E-Mail an den Bundesdatenschutzbeauftragten, die dem SPIEGEL vorliegt. Dieser hat den Fall inzwischen seinem bayerischen Kollegen weitergegeben, der zuständig ist. Apples Deutschlandzentrale sitzt in München – und forscht hier unter anderem an Bilderkennung und Anwendungen wie Face ID.

Laut der Arbeitsrechtlerin Annegret Balzer könnte dadurch ein Datenschutzverstoß vorliegen, wenn fotografierte Personen nicht wussten, dass sie aufgenommen wurden oder durch das Abhängigkeitsverhältnis zu ihrem Arbeitgeber nicht wirklich freiwillig mitgemacht haben: Fehle eine informierte und ausdrückliche Einwilligung der Benutzer für die Gesichtserkennung, »ist eine Verarbeitung kaum vorstellbar und wäre damit rechtswidrig«.

Auch eine Geldstrafe in Millionenhöhe wäre dann möglich. Für einen Konzern mit mehr als 200 Milliarden Dollar Cashreserven wäre auch das kaum ein Problem. Doch infrage steht, ob Apple nur dann das Hohelied der Privatsphäre predigt, wenn es seinen Konkurrenten schadet.

Wie heikel der Einsatz von Glimmer außerhalb der USA ist, scheint Apple durchaus bewusst zu sein: Im August 2017 schrieb der Leiter der Studie in einer Mail an Teilnehmer, dass Mitarbeiter aus Frankreich und Deutschland ausgeschlossen seien. Eine solche Nutzerstudie würde nach dortiger Rechtslage immer als Zwang interpretiert, erklärte er später in einem LinkedIn-Post.



**Juristin Gjøvik**

Einen Monat nach der Parkplatzparty erhielt Gjøvik ein iPhone X, auf dem sie – im Apple-Sprech – »leben« sollte. Apple-Mitarbeiter seien grundsätzlich angehalten, die eigenen Produkte ständig im Alltag zu testen, sagt Gjøvik.

Zur Verbesserung der Gesichtserkennung fotografierte die Glimmer-App ihre Nutzer über Jahre permanent und automatisch, sobald sie das Gerät in die Hand nahmen. »Alle Daten, die eure Gesichter im Bild haben, sind gute Daten«, instruierte der Studienleiter die Teilnehmer. Der Algorithmus sei »datenhungrig«. Die Mitarbeiter sollten die Selfie-Routine als Spiel sehen: Wer 100 Bilder pro Tag oder 2000 im Monat hochlud, bekam einen virtuellen Orden.

Ende 2020 prahlte der Studienleiter in einem Blogbeitrag, Apple habe für den Start von Face ID eine Milliarde Bilder gesammelt. Gjøvik glaubt, Apple sei einfach zu geizig gewesen, ausschließlich externe Probanden für die Aufgabe zu bezahlen.

Rund vier Jahre lang fotografierte die App sie im Halbschlaf oder auf der Toilette, selbst Nacktbilder von ihr seien gespeichert gewesen. Hunderte Bilder, schätzt sie, habe die App pro Tag aufgenommen. Die, die Gjøvik öffentlich teilen will, zeigen, wie zufällig die App Schnappschüsse ihres Privatlebens aufnahm: Mal ein halber Kopf, mal mit Maske, mal sieht man weit in ihr Wohnzimmer hinein. Dass Glimmer auch Freunde, Geschwister oder Wildfremde fotografiert, die dem nie zugestimmt haben, sei kaum zu verhindern, sagt Gjøvik.

Sie habe aus der Studie nur noch rausgewollt, sich aber nicht getraut zu fragen. »Apples Kultur der Geheimnistuerei sickert tief ins Bewusstsein ein. Du hast Angst, selbst mit Behörden über offensichtliches Fehlverhalten zu reden.«

Wie wichtig es Apple war, das Programm geheim zu halten, lernte Gjøvik, nachdem sie die umstrittenen Glimmer-Aufnahmen veröffentlicht hatte. Einige Wochen später erhielt sie ein Schreiben eines von Apple beauftragten Anwalts, der sie aufforderte, die Tweets zu löschen.

Im September feuerte Apple sie nach sechseinhalb Jahren im Unternehmen. Gjøvik habe mit der Veröffentlichung der Bilder ihre Vertraulichkeitsverpflichtung gebrochen, argumentierten Apples Anwälte im März in einer Stellungnahme an das Whistleblower-Programm des US-Arbeitsministeriums. Sie liegt dem SPIEGEL vor. Gjøviks Anwalt hält dagegen, Apple halte kein Urheberrecht an Bildern von Gjøvik.

Gegen ihre Kündigung kämpft sie nun vor dem nationalen Arbeitsschutzgremium NLRB. Auch die Börsenaufsicht SEC interessiert sich nach SPIEGEL-Informationen dafür, ob Apple eine Whistleblowerin kaltstellen wollte.

Solche Verfahren ziehen sich oft lange hin. Nur eine Trennung ging ganz schnell: Gjøvik hat jetzt ein Android-Smartphone.

**Patrick Beuth, Alexander Demling**                    ∎

   

Startseite  >  Netzwelt  >  Gadgets  >  Apple  >  Apple lädt Mitarbeiter zu Daten-Party, um Gesichter zu scannen



Foto: Brooks Kraft / Apple Inc.

**»20 Minuten in sozialer Umgebung«**

# B+ Apple lädt Mitarbeiter zu Datenparty – um Gesichter zu scannen

Whistleblowerin Ashley Gjovik bringt Apple in Bedrängnis: Sie hat aufgedeckt, wie der Konzern Fotos von Beschäftigten sammelte, um die Gesichtserkennung im iPhone zu trainieren. Sie schaltete auch deutsche Behörden ein.

Von **Alexander Demling** und **Patrick Beuth**
24.06.2022, 14.51 Uhr  •  aus **DER SPIEGEL 26/2022**

Artikel zum Hören  •  10 Min





Für nur 1 Euro erhalten Sie einen Monat Zugriff auf alle Artikel und jeden

**ECONOMY**

Companies could face a fine of up to 50,000 euros.

And: "If the companies do not change their behavior, they are acting intentionally." Even prosecution for fraud with significantly higher fines is then possible.

All producers of the sausages that tested positive deny the use of se- parator meat. A company spokesman for a Tönnies subsidiary questions the testing method used by the Bremerhaven University of Applied Sciences: The markers indicated by the laboratory are not evidence of mechanically recovered meat, he writes. "We use processed meat from young poultry in the products mentioned. This may also contain a small proportion of cartilage cells."

One argument against this is that the method does not respond at all to a small proportion of the cartilage marker collagen II alpha I.

A law firm commissioned by Wiesenhof sent affidavits from the managing directors of the factories concerned stating that they did not use mechanically recovered meat, which could also be proven by the regular checks they carried out themselves on the basis of officially recognized histological examinations and by checking the calcium content.

Wittke's method is "certainly a new scientific approach ... which has not yet been used in practice" and is not yet officially recognized, the law firm writes. Collagens are also found in other parts of the body, in particular the eyes. Furthermore, the process has so far only been developed for chicken meat and not for turkey meat, the main component of the Wiesenhof sausage.

In fact, all products that tested positive also contain chicken. And according to a study by the University of Lyon, tendons do contain collagens - but not the specific protein collagen type II alpha 1, which is the target of the laboratory tests.

Inspection authorities are certainly impressed by the new testing method, which could soon become more widespread and provide new insights. "The method is very forward-looking for us," says Matthias Denker, Head of Department at the State Office for Food Safety in Mecklenburg-Western Pomerania. The necessary equipment is available in official laboratories; food inspectors could well use the method in their day-to-day testing.

Researcher Wittke is not satisfied with this. In the future - with funding from the Federal Ministry of Economics - he also wants to detect cuttlefish meat from other animals in sausages, especially pork, the most commonly sold meat in this country.

It could be that German sausage manufacturers will soon have to look for a new business model.

Claus Hecking, Anne Martin, Leonie Voss, Carolin Wahnbaeck                        ■



Apple boss Cook

# iPhone is watching you

**TECH CONCERNS** Whistleblower Ashley Gjøvik has revealed that Apple uses secretly taken photos of its employees to to train facial recognition on iPhones. Now it wants to follow up.

The e-mail immediately struck Ashley Gjøvik as peculiar: On an August day five years ago, the Apple project manager received an invitation to a "Data Collection Social Hour". The party was to take place opposite Apple's UFO-like headquarters in Cupertino, California.

Her colleague from the user studies team promised drinks, music and "20 minutes of data collection in a social environment". Only permanent employees who were "not sensitive to light" were allowed to take part, according to his email. The event didn't really feel voluntary, Gjøvik says today. She went because it was expected. Her bosses often put pressure on her to be a team player.

What Gjøvik experienced back then triggered one of the biggest data scandals in the Apple empire last summer. She decided not to keep quiet about her findings: The company uses unnoticed photos of its employees to train its algorithm. Gjøvik became a whistleblower - with a mission that has since spread to Europe.

The fact that data protectionists from Germany may soon be fighting the most valuable tech

The world's largest logistics group has to do with Gjøvik.

The 35-year-old tells her story on a park bench in Santa Clara in Silicon Valley, a few miles from Cupertino. Gjøvik no longer works at Apple; the iPhone company fired her last September in a dispute over the snooping app. Gjøvik had revealed too much for Apple's taste. The company declined to comment on the allegations when asked.

Gjøvik remembers the data collection campaign from back then as follows: instead of a party, there was a parking lot with two rows of black-clad steel fences, three meters high. The place was guarded by security guards and cameras. At the bar, a disgruntled employee in a Hawaiian shirt served Gjøvik and four other Apple employees at a folding table and explained their task: to take selfies.

She signed a digital declaration of consent, of which she never received a copy. Then everyone received the new, as yet unreleased iPhone model X, with an app installed on it, which at the time was still in its infancy. was called "Gobbler". In German "Verschlinger". It was only later that Apple changed the name to something less drastic: "Glimmer".

Gjøvik reports that they sat in the sweltering sun at almost 40 degrees and photographed themselves sweating. From above, from the side, wearing sunglasses or grimacing. The camera and several sensors recorded biometric images in which faces are measured three-dimensionally in order to recognize a user even with a shiny forehead and in glaring sunlight.

Purpose of the exercise: Apple employees were to feed the algorithm behind Face ID. The feature of unlocking a phone using facial recognition was to be introduced a few months later on the next iPhone model. Today, Apple's smartphones would be unthinkable without it. Apple employees such as Gjøvik have also been improving the technology for years: involuntarily and with pictures taken unnoticed in the most intimate everyday situations. Last August, the whistleblower drew attention to what was happening when she tweeted a video and the images taken by the Glimmer app.

This is more than embarrassing for Apple. None of the major technology companies is as committed to data protection as the iPhone manufacturer. Tim Cook, Apple's otherwise rather mild-mannered boss, regularly attacks data giants such as Meta or Alphabet and likes to demonstratively distance himself from the industry's two-faced practices: With stricter privacy rules on Apple devices, Cook almost single-handedly stifled Meta's growth by allowing the hundreds of millions of iPhone and iPad users last year to prohibit other providers from tracking their behavior for advertising purposes. Meta, which was still called Facebook at the time, warned its investors of possible negative consequences for the business, and the share price did indeed collapse shortly afterwards.

Cook always acts as if he is concerned with something higher and as if everything is different in his own company: "When we start to feel constantly monitored, our behavior changes," he recently said at a Time magazine conference. "We start to do less. To think less."

Gjøvik now wants to reveal that the company is not only breaking its promises, but possibly also the law. She has just passed her law exams and now works for a non-governmental organization that fights against censorship in China. But she is not finished with Apple yet. She is in contact with California's data protection authority about the violation of her privacy, and German authorities are also involved.

"What Apple did to me, they could do to German employees (and their families and friends) or have already done to them.

## "All data containing your faces in the image are good data."

Mail from a study director to Apple employees

have done," writes Gjøvik in an email to the Federal Data Protection Commissioner, which is available to SPIEGEL. He has since passed the case on to his Bavarian colleague, who is responsible. Apple's German headquarters are based in Munich - where they conduct research into image recognition and applications such as Face ID, among other things.

According to employment law expert Annegret Balzer, this could constitute a breach of data protection law if the people photographed did not know that they were being recorded or did not really participate voluntarily due to their relationship of dependence on their employer: If users did not give their informed and explicit consent for facial recognition, "processing is hardly conceivable and would therefore be unlawful".

A fine in the millions would then also be possible. For a company with more than 200 billion dollars in cash reserves, this would hardly be a problem. But the question is whether Apple only preaches the song of privacy when it harms its competitors.

Apple seems to be fully aware of how sensitive the use of mica is outside the USA: In August 2017, the head of the study wrote in an email to participants that employees from France and Germany were excluded. Such a user study would always be interpreted as coercion under local law, he later explained in a LinkedIn post.



Lawyer Gjøvik

One month after the parking lot party, Gjøvik received an iPhone X, which she was supposed to "live on" - in Apple parlance. Apple employees are always encouraged to test their own products in everyday life, says Gjøvik.

To improve facial recognition, the Glimmer app continuously and automatically photographed its users for years as soon as they picked up the device. "Any data that has your faces in the picture is good data," the head of the study instructed the participants. The algorithm is "data-hungry". The employees should see the selfie route as a game: Those who uploaded 100 pictures per day or 2000 per month received a virtual medal.

At the end of 2020, the head of the study boasted in a blog post that Apple had collected one billion images for the launch of Face ID. Gjøvik believes that Apple was simply too stingy to pay only external test subjects for the task.

For around four years, the app photographed her when she was half asleep or on the toilet, and even nude pictures of her were stored. She estimates that the app took hundreds of pictures a day. The ones that Gjøvik wants to share publicly show how randomly the app took snapshots of her private life: sometimes half a head, sometimes with a mask, sometimes you can see far into her living room. The fact that Glimmer also photographs friends, siblings or complete strangers who have never consented to this can hardly be prevented, says Gjøvik.

She just wanted to get out of the study, but didn't dare to ask. "Apple's culture of secrecy seeps deep into your consciousness. You're afraid to even talk to the authorities about obvious misconduct."

Gjøvik learned how important it was for Apple to keep the program secret after she published the controversial Glimmer recordings. A few weeks later, she received a letter from a lawyer hired by Apple asking her to delete the tweets.

In September, Apple fired her after six and a half years with the company. Gjøvik had breached her confidentiality obligation by publishing the images, Apple's lawyers argued in a statement to the US Department of Labor's whistleblower program in March. It is available to SPIEGEL. Gjøvik's lawyer, on the other hand, argues that Apple holds no copyright to Gjøvik's images.

She is now fighting her dismissal before the National Labor Relations Board (NLRB). According to SPIEGEL, the SEC is also interested in whether Apple wanted to shut down a whistleblower.

Such proceedings often take a long time. Only one separation went very quickly: Gjøvik now has an Android smartphone.

Patrick Beuth, Alexander Demling ∎

# C.  EXHIBIT C: Telerama

Exhibit **"*Ashley Gjøvik, lanceuse d'alerte licenciée par Apple, seule contre tous,*"**
published by Telerama, a French publication, on or about March 14 2023

(33 of 67), Page 33 of 67    Case: 25-2028, 05/20/2025, DktEntry: 27.5, Page 33 of 67

Case 25-13496 Doc 65   Filed 03/30/26   Entered 03/30/26 16:44:49   Desc Main
Document    Page 177 of 804

Accueil    Débats & Reportages

# Ashley Gjøvik, lanceuse d'alerte licenciée par Apple, seule contre tous

La faute de cette salariée, licenciée en 2021 : avoir révélé que la firme californienne transforme ses employés en cobayes. Allant jusqu'à les traquer dans leur intimité.



Photo Pascal Perich pour Télérama

**Par Olivier Tesquet**

Réservé aux abonnés

Publié le 14 mars 2023 à 06:00    Mis à jour le 14 mars 2023 à 15:39

« R*espect de la vie privée, c'est ça l'iPhone »*, claironne une récente réclame d'Apple. De longue date, la marque à la pomme a construit sa réputation sur une promesse : ses appareils au design impeccable sont des doudous qui ne mouchardent pas, ceux qui les utilisent peuvent dormir sur leurs deux oreilles. C'est beaucoup moins vrai pour les salariés de l'entreprise.

Demandez à Ashley Gjøvik. Responsable du programme d'ingénierie, cette Américaine de 36 ans a été brutalement licenciée en septembre 2021. Sa faute ? Avoir révélé que, pour améliorer les fonctionnalités de ses produits, la firme de Cupertino n'hésite pas à transformer ses équipes en cobayes, soumis à une surveillance invasive et astreints au secret comme s'ils travaillaient pour un service de renseignement. À l'aide de centaines de documents confidentiels recoupés par de multiples témoignages, *Télérama* peut raconter une culture d'entreprise où le silence est une valeur cardinale et l'intimidation, une pratique déployée au plus haut niveau. Sollicitée, Apple s'est refusée à tout commentaire.

## Je suis devenue révolutionnaire quand j'ai compris qu'ils se fichaient de savoir que nous pouvions mourir.

L'histoire de Gjøvik commence comme un remake d'Erin Brockovich, cette lanceuse d'alerte immortalisée au cinéma par Julia Roberts. Début 2020, en emménageant à Santa Clara, au cœur de la Silicon Valley, sa santé se dégrade. Vertiges, palpitations, saignements, vomissements... Elle s'inquiète, consulte des cohortes de médecins et finit par découvrir que son logement est construit sur un terrain rongé par les déchets toxiques. Ils sont particulièrement envahissants dans cette partie de la Californie : pendant des décennies, la production massive de semi-conducteurs a pollué les sols, chargés de solvants cancérigènes qui remontent à la surface au fil des ans. Sur son lieu de travail tout proche, au campus d'Apple, à Sunnyvale, la jeune femme ressent des symptômes similaires. Elle avise sa hiérarchie, réclame des tests.

Son insistance agace : son employeur finit par lui intimer de ne plus évoquer le problème avec ses collègues. Elle prévient l'agence américaine de protection de l'environnement. En 2021, sur la messagerie Slack, dans un canal créé par des

salariées au moment où le mouvement #MeToo percute Apple, elle mâche de moins en moins ses mots et rassemble les colères. Au premier rang desquelles le sort que le temple du cool technologique réserve à ses ouailles. *« Je suis devenue révolutionnaire quand j'ai compris qu'ils se fichaient de savoir que nous pouvions mourir »*, se souvient-elle.

## Je n'ai jamais réussi à vraiment m'intégrer, ça m'a facilité la tâche au moment de tout brûler.

Gjøvik n'est pas un produit des élites technologiques californiennes, qui n'ont qu'à traverser la rue depuis le campus de Stanford pour rejoindre une multinationale offrant salaires à six chiffres et bonus confortables. Elle a vécu *« une enfance de merde »* dans une ferme en périphérie de Portland, dans l'Oregon pluvieux. Elle travaille dès 14 ans, manifeste contre la guerre en Irak à 16 et coupe les ponts avec sa famille à 20.

Après avoir débuté chez Nike *(« J'essayais de ne pas penser au travail des enfants »)*, elle atterrit un peu par hasard chez Apple en 2015, fauchée et endettée. *« J'ai commencé à travailler dans la technologie parce que j'avais besoin de comprendre les systèmes complexes »*, explique-t-elle d'une voix de mitraillette rigolarde, son chien Captain sur les genoux. Elle se tue à la tâche, soixante-dix heures par semaine pendant cinq ans. Elle prend du galon, mais pas le pli de la culture locale, qui, souvent, ressemble à une expérimentation sociale en milieu clos : *« Je n'ai jamais réussi à vraiment m'intégrer, ça m'a facilité la tâche au moment de tout brûler. »*

Goûtant peu ce vent de rébellion, Apple décide de la mettre au repos forcé en août 2021, invoquant une enquête interne lancée sur la base de ses accusations. Pas refroidie, Gjøvik saisit l'agence fédérale chargée de faire respecter le droit du travail. Fin août, elle dévoile sur Twitter l'existence d'un programme clandestin, Gobbler (plus tard rebaptisé Glimmer). Déployé en 2017 auprès des salariés, cet outil interne a accompagné le lancement de Face ID, la fonctionnalité de reconnaissance faciale d'Apple, qui permet de déverrouiller son téléphone avec son visage. Dans un e-mail envoyé le 3 août 2017, et que nous avons pu consulter, un ingénieur de l'équipe vidéo explique les grandes lignes : pour entraîner l'algorithme, il faut le nourrir. Une fois activé, Gobbler prend une photo dès qu'il détecte un visage. C'est un œil qui ne cligne jamais. *« En matière de données, nous en voulons plus »*, ajoute l'ingénieur gourmand.

À lire aussi :

De "The Social Network" à "Super Pumped", dix films et séries qui dégomment la Silicon Valley

Dans un autre document, Apple précise quelques règles. L'application ne peut pas être utilisée en France ou en Allemagne (elle y serait illégale du fait des réglementations locales) et les salariés sont priés de ne pas télécharger de clichés immortalisés dans des lieux intimes. Gjøvik est récalcitrante, mais pour arracher le consentement de ses cobayes, l'employeur sait ruser. Un jour d'été, elle est invitée à un *« apéro de collecte de données »* d'une vingtaine de minutes, sans plus de précisions. Interdiction d'en parler sans obtenir le feu vert du service juridique. Une fois sur place, à deux pas du siège historique de la société, elle découvre *« ce qui ressemble à un complexe militaire »* protégé par des gardes. Il faut donner son téléphone, passer une porte, la refermer, en ouvrir une autre, et pénétrer quatre par quatre dans un espace cylindrique en plein cagnard pour se faire tirer le portrait. Un vrai trombinoscope composé par la force, dont l'objectif est d'améliorer l'intelligence artificielle

Quelques jours après ses premières révélations, le 9 septembre, Apple la licencie et la convoque dans l'heure, invoquant une violation de la propriété intellectuelle de l'entreprise. Elle se retrouve dans le viseur de la *« Worldwide Loyalty Team »*, des investigateurs maison qui ont souvent fait carrière dans la police ou les services secrets. Par le passé, ces privés n'ont pas hésité à pénétrer dans des domiciles afin de retrouver un prototype d'iPhone égaré. En 2017, Apple s'est même vantée d'avoir fait arrêter douze salariés trop bavards. On ne badine pas avec les secrets industriels de la première capitalisation boursière de la planète. Dans un courrier transmis au Département du travail le 4 mars 2022, les avocats d'Apple justifient le licenciement d'Ashley Gjøvik : *« Elle a choisi de divulguer des informations qu'elle était tenue de garder confidentielles. »* Gobbler n'y est jamais nommé, la société se bornant à évoquer *« l'étude »* sous le nom de code Omega.

Au fil des ans, Apple a multiplié les expérimentations de ce type, enregistrant et stockant toutes sortes d'informations intimes et biométriques sur ses salariés-testeurs : scan des conduits auditifs pour optimiser l'ergonomie des AirPods (les designers s'enorgueillissant de posséder *« l'une des plus larges bibliothèques d'oreilles de la planète »*), mesure du sommeil, pression artérielle et même surveillance du cycle menstruel. Sous couvert d'anonymat, une ex-salariée a accepté de nous transmettre les photos d'un kit proposé par Apple en 2019 en échange d'un bon d'achat de 10 dollars, afin de mesurer la qualité des glaires cervicales de son utérus. Inquiète des conséquences d'un refus, elle a accepté de se prêter à l'exercice, qui la hante encore.

## Vous ne devez avoir aucune attente en matière de vie privée lorsque vous utilisez vos appareils personnels ou ceux de quelqu'un d'autre à des fins professionnelles. Apple

Si le géant de la tech n'hésite pas à coloniser le corps de ses collaborateurs, ceux-ci sont priés de ne pas moufter. La politique interne d'Apple, elle aussi confidentielle, annonce la couleur : *« Vous ne devez avoir aucune attente en matière de vie privée lorsque vous utilisez vos appareils personnels ou ceux de quelqu'un d'autre à des fins professionnelles, lorsque vous utilisez les systèmes ou les réseaux d'Apple, ou lorsque vous vous trouvez dans les locaux d'Apple. »* Mais ça pourrait ne pas durer. Fin janvier, le gendarme du droit du travail a estimé que la politique d'omerta de l'entreprise violait la loi, ouvrant la voie à un procès. Est notamment visé un mémo intimidant envoyé par le grand patron, Tim Cook, une semaine après le licenciement de la lanceuse d'alerte. *« Nous savons que les auteurs de fuites constituent un petit nombre de personnes,* écrivait-il. *Nous savons également que les personnes qui divulguent des informations confidentielles n'ont pas leur place ici. »*

### À lire aussi :

"Les désobéissants" sur France.tv : 10 récits de combats citoyens pour faire éclater la vérité

Pour l'avocat Seth Goldstein, qui a récemment aidé les travailleurs d'Amazon à combattre les pratiques antisyndicales de Jeff Bezos, c'est un signal important : *« Les révélations d'Ashley mettent en lumière le pire de la culture d'entreprise dans la Silicon Valley. J'ai bon espoir que son cas permette de faire bouger les choses, car les gens n'ont plus confiance en ces sociétés. »* La lanceuse d'alerte, elle, n'est pas près de rendre les armes, même si le combat l'a éprouvée. *« J'ai parfois l'impression d'avoir perdu mon identité, et je n'ai jamais été aussi proche du suicide depuis l'adolescence »,* explique-t-elle au bord des larmes, en ajoutant qu'elle a trouvé du réconfort dans un livre sur les blessures morales des GI de retour de guerre. Début février, elle a eu rendez-vous avec des enquêteurs de la Securities and Exchange Commission, l'autorité des marchés financiers américains. Dans la plainte qu'elle a adressée à une douzaine d'autorités judiciaires ou de protection de la vie privée, elle annonce avec une pointe d'humour sa future reconversion en droit international public, droits humains et *« méga-corporations dystopiques ».*

AI Translation by DeepL

Home      Debates & Reports

# Ashley Gjøvik, whistleblower fired by Apple, alone against all odds

The fault of this employee, who will be dismissed in 2021: she revealed that the Californian firm turns its employees into guinea pigs. Even stalking them in their private lives.



Photo Pascal Perich pour Télérama

**By Olivier Tesquet**

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

AI Translation by DeepL

Reserved for subscribers

Published on March 14, 2023 at 06:00     Updated on March 14, 2023 at 15:39

"**R**espect for privacy, that's the iPhone,"** trumpets a recent Apple advert. The Apple brand has long built its reputation on one promise: its impeccably-designed devices.

are soft toys that don't snitch, so those who use them can rest easy. This is much less true for company employees.

Just ask Ashley Gjøvik. Head of the engineering program, this 36-year-old American was brutally fired in September 2021. Her fault? Revealing that, in order to improve the functionalities of its products, the Cupertino firm does not hesitate to turn its teams into guinea pigs, subjected to invasive surveillance and sworn to secrecy as if they were working for an intelligence service. With the help of hundreds of confidential documents cross-checked by multiple testimonies, *Télérama* can tell the story of a corporate culture where silence is a cardinal value and intimidation a practice deployed at the highest level. When contacted, Apple refused to comment.

## I became a revolutionary when I realized that they didn't care if we died.

Gjøvik's story begins like a remake of Erin Brockovich, the whistleblower immortalized in film by Julia Roberts. In early 2020, when she moves to Santa Clara, in the heart of Silicon Valley, her health takes a turn for the worse. Vertigo, palpitations, bleeding, vomiting... She becomes worried, consults cohorts of doctors and ends up discovering that her home is built on land eaten away by toxic waste. Toxic waste is particularly pervasive in this part of California: for decades, the massive production of semiconductors has polluted the soil with carcinogenic solvents, which have surfaced over the years. At her nearby workplace, the Apple campus in Sunnyvale, the young woman experienced similar symptoms. She notified her superiors and requested tests.

Her insistence annoyed her employer, who finally told her not to raise the issue with her colleagues. She notifies the U.S. Environmental Protection Agency. In 2021, on the messaging service Slack, in a channel created by

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

AI Translation by DeepL

salaried employees at a time when the #MeToo movement is hitting Apple, she's mincing her words less and less and gathering anger. Foremost among these is the fate that the temple of technological cool reserves for its flock. "*I became a revolutionary when I realized that they didn't care if we died,*" she recalls.

## I never really managed to fit in, which made it easier for me when it came time to burn the place down.

Gjøvik is not a product of California's tech elites, who only have to cross the street from the Stanford campus to join a multinational offering six-figure salaries and comfortable bonuses. She has lived
She *had a "shitty childhood"* on a farm on the outskirts of Portland, in rainy Oregon. She worked from the age of 14, protested against the war in Iraq at 16 and cut ties with her family at 20.

After starting out at Nike (*"I was trying not to think about child labor"*), she landed somewhat by chance at Apple in 2015, broke and in debt. *"I started working in technology because I needed to understand complex systems,"* she explains in a laughing machine-gun voice, her dog Captain on her lap. She worked herself to the bone, seventy hours a week for five years. She grew in stature, but not in the local culture, which often resembled a social experiment in a closed environment: *"I never really managed to fit in, which made it easier for me when it came time to burn the place down.*

Tasting little of this wind of rebellion, Apple decided to put her on forced rest in August 2021, citing an internal investigation launched on the basis of her accusations. Undaunted, Gjøvik took her case to the federal agency responsible for enforcing labor law. At the end of August, she revealed on Twitter the existence of a clandestine program, Gobbler (later renamed Glimmer). Deployed to employees in 2017, this internal tool accompanied the launch of Face ID, Apple's facial recognition feature, which allows you to unlock your phone with your face. In an e-mail sent on August 3, 2017, and which we were able to consult, an engineer from the video team explains the broad outlines: to train the algorithm, you have to feed it. Once activated, Gobbler takes a photo as soon as it detects a face. It's an eye that never blinks. "*When it comes to data, we want more,*" adds the greedy engineer.

**Read also:**

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

AI Translation by DeepL

From "The Social Network" to "Super Pumped", ten films and series that put Silicon Valley to shame

In another document, Apple specifies a few rules. The application cannot be used in France or Germany (it would be illegal there due to local regulations), and employees are asked not to download snapshots taken in intimate places. Gjøvik is recalcitrant, but to obtain the consent of her guinea pigs, the employer knows how to trick them. One summer day, she is invited to a 20-minute *"data collection aperitif"*, with no further details. She was forbidden to talk about it without a green light from the legal department. Once on site, a stone's throw from the company's historic headquarters, she discovers *"what looks like a military complex"* protected by guards. You have to hand over your phone, pass through a door, close it again, open another, and enter four by four into a cylindrical space in the middle of a hot summer to have your portrait taken. A real trombinoscope composed by force, with the aim of improving artificial intelligence.

A few days after her first revelations, on September 9, Apple fired her and summoned her within the hour, citing a violation of the company's intellectual property. She found herself in the crosshairs of the *Worldwide Loyalty Team*, in-house investigators who often had careers in the police or secret services. In the past, these privates have not hesitated to enter homes in order to track down a misplaced iPhone prototype. In 2017, Apple even boasted of having twelve overly talkative employees arrested. be trifled withThe industrial secrets of the world's largest market capitalization are not to . In a letter sent to the Department of Labor on March 4, 2022, Apple's lawyers justify Ashley Gjøvik's dismissal: *"She chose to disclose information that she was required to keep confidential."* Gobbler is never named, the company merely referring to *"the study"* under the code name Omega.

Over the years, Apple has multiplied experiments of this kind, recording and storing all kinds of intimate and biometric information on its employee-testers: ear canal scans to optimize AirPods ergonomics (the designers boast *"one of the largest ear libraries on the planet"*), sleep measurements, blood pressure and even menstrual cycle monitoring. On condition of anonymity, a former employee agreed to send us photos of a kit offered by Apple in 2019 in exchange for a $10 voucher, to measure the quality of cervical mucus in her uterus. Worried about the consequences of refusal, she agreed to take part in the exercise, which still haunts her.

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

AI Translation by DeepL    Case 23-11960 Doc 65  Filed 03/30/26  Entered 03/30/26 16:44:40  Desc Main
Document     Page 186 of 804

# You should have no expectation of privacy when using your personal devices or someone else's for business purposes. Apple

If the tech giant doesn't hesitate to colonize the bodies of its employees, the latter are asked not to squawk. Apple's internal policy, also confidential, announces the color: *"You should have no expectation of privacy when using your personal devices or anyone else's for business purposes, when using Apple systems or networks, or when on Apple premises."* But it might not last. At the end of January, the labor law watchdog ruled that the company's omerta policy violated the law, paving the way for a lawsuit. At issue is an intimidating memo sent by CEO Tim Cook a week after the whistleblower's dismissal. *We know that leakers are a small number of people,"* he wrote. *We also know that people who disclose confidential information have no place here."*

**Read also:**

"Les désobéissants" on France.tv: 10 stories of citizens' struggles to get the truth out

For attorney Seth Goldstein, who recently helped Amazon workers fight Jeff Bezos' anti-union practices, this is an important signal: *"Ashley's revelations highlight the worst of corporate culture in Silicon Valley. I'm hopeful that her case will help shake things up, because people no longer trust these companies."* As for the whistleblower, she's not about to give up, even if the battle has taken its toll on her. *"I sometimes feel like I've lost my identity, and I've never been so close to suicide since I was a teenager,"* she explains, on the verge of tears, adding that she has found solace in a book about the moral wounds of GIs returning from war. In early February, she had an appointment with investigators from the Securities and Exchange Commission. In the complaint she sent to a dozen judicial and privacy protection authorities, she humorously announces her future reconversion to public international law, human rights and the protection of privacy. *"dystopian megacorporations"*.

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

# D. EXHIBIT D: TELEGRAPH

Exhibit *Apple whistleblower brings spying claims to UK: Data watchdog opens investigation into privacy accusations against iPhone maker,"* published by The Telegraph on or about April 10 2022

# The Telegraph



News    Ukraine    Sport    **Business**    Opinion    Money    Life    Style    Travel    Culture

See all Business

# Apple whistleblower brings spying claims to UK

Data watchdog opens investigation into privacy accusations against iPhone maker

*By* Lucy Burton, EMPLOYMENT EDITOR

10 April 2022 · 9:00am



Britain's information watchdog is investigating claims that Apple was able to access personal information on workers' phones after a privacy complaint was lodged by a whistleblower.

Ashley Gjøvik, a former senior Apple engineer, has filed a 54-page privacy complaint against the iPhone maker alleging unlawful data collection and invasion of employee privacy over "years and multiple countries".

In the filing, which has been lodged with the UK Data Protection Information Commissioner's Office (ICO) and its counterpart in Brussels, Ms Gjøvik claimed that she publicly expressed concerns about Apple "pressuring its employees to participate in invasive data collection procedures, including scans of ears/ear canals".

She also accused the company of using an app on employees' iPhones that "automatically took photos/videos whenever it 'thought it saw a face'".

In the filing Ms Gjøvik said: "I respectfully request that you investigate the matters I raised and open a larger investigation into these topics within Apple's corporate offices globally."

The complaint was also submitted to the Data Protection Commission in Ireland and London-based Big Brother Watch, the privacy campaigning organisation.

An ICO spokesman said: "We are aware of this matter and we will assess the information

provided."

Ms Gjøvik was fired by Apple last September for allegedly violating the company's rules against leaking confidential information.

She claimed to have begun raising concerns about workplace safety in March last year, including those related to Apple's policies on how it can search and surveil employees' work phones.

Ms Gjøvik has also alleged that she has faced bullying and harassment from her manager and other colleagues, in a campaign that has been dubbed Apple's "MeToo" moment.

This is thought to be the first time that she has tried to take her battle against the notoriously secretive tech giant to the UK.

The campaign dragged Apple into a growing wave of employee activism affecting its Silicon Valley rivals. In 2018, more than 20,000 Google staff held a walkout against forced arbitration agreements and alleged payouts related to sexual harassment.

An Apple spokesman said: "We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised and, out of respect for the privacy of any individuals involved, we do not discuss specific employee matters."

## Business Briefing newsletter
Our daily digest packed with news and analysis



Sign up

Related Topics

Apple, Privacy, Information Commissioner Office

   

# E. EXHIBIT E: TECHCRUNCH

Exhibit ***Ex-Apple employee takes Face ID privacy complaint to Europe, "*** published by TechCrunch and
Yahoo! News around April 11 2022,

HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    Download MORE Yahoo News app



yahoo!news                                                    Sign in    Mail

News    US    Politics    World    COVID-19    Climate Change    Originals    Health    Science    Podcasts    Contact Us    Videos

TechCrunch

# Ex-Apple employee takes Face ID privacy complaint to Europe



**Natasha Lomas**
Mon, April 11, 2022, 10:58 AM · 8 min read

 

Privacy watchdogs in Europe are considering a complaint against Apple made by a former employee, Ashley Gjøvik, who alleges the company fired her after she raised a number of concerns, internally and publicly, including over the safety of the workplace.

Gjøvik, a former senior engineering program manager at Apple, was fired from the company last September after she had also raised concerns about her employer's approach towards staff privacy, some of which were covered by the Verge in a report in August 2021.

**TRENDING**    ✕


Audio captures Russian soldiers discussing killing and raping Ukrainians, with one saying, 'If...
Business Insider · 2 min read


Connecticut advances death notification bill after tragic deaths of 2 Black women
Yahoo News · 4 min read


Putin's War in Ukraine Shatters an Illusion in Russia
The New York Times · 8 min read


72 people at high-profile D.C. dinner test positive for Covid
NBC News · 3 min read


How did quarterback Dwayne Haskins die on a South Florida highway? Here's what we know.
Miami Herald · 1 min read

**POPULAR**


Employee experience is as strong as ever at the 100 Best Companies
Fortune


Moving to Florida? New Florida residents rack up complaints against moving companies
WFTS-Tampa

HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    SEARCH    SHOPPING    YAHOO PLUS    MORE    Download the News app

yahoo!news                                                                    Sign in        Mail

News    US    Politics    World    COVID-19    Climate Change    Originals    Health    Science    Podcasts    Contact Us    Videos

At the time, Gjøvik had been placed on administrative leave by Apple after raising concerns about sexism in the workplace, and a hostile and unsafe working environment which it had said it was investigating. She subsequently filed complaints against Apple with the US National Labor Relations Board.

Those earlier complaints link to the privacy complaint she's sent to international oversight bodies now because Gjøvik says she wants scrutiny of Apple's privacy practices after it formally told the US government its reasons for firing her -- and "felt comfortable admitting they'd fire employees for protesting invasions of privacy", as she puts it -- accusing Apple of using her concerns over its approach to staff privacy as a pretext to terminate her for reporting wider safety concerns and organizing with other employees about labor concerns.

The UK's Information Commissioner's Offie (ICO) and France's CNIL both confirmed receipt of Gjøvik's privacy complaint against Apple.

A spokesperson for the ICO told TechCrunch: "We are aware of this matter and we will assess the information provided."

France's CNIL also sent confirmation that it's looking at Gjøvik's complaint.

"We have received this complaint which it is currently being investigated," a CNIL spokesperson told us, adding: "I cannot communicate any further details at this time."

The development was first covered by the Telegraph -- which reported yesterday that it's thought to be the first time Gjøvik has sought to press her privacy complaint against Apple in the UK.

**Story continues**

**RECOMMENDED STORIES**

**Why Apple Stock Is Falling Today**
Motley Fool



**Exclusive-Apple faces extra EU antitrust charge in music streaming probe -source**
Reuters



**Rebuttal: Bill protects online privacy, security**
Palm Beach Daily News



**Regions Bank Wins Gallup Exceptional Workplace Award**
News Direct



**Here are the Fortune 100 Best Companies to Work For® in 2022, according to nearly 1 million employees**
News Direct

# F. EXHIBIT F: GIZMODO

Exhibit F: Article posted at Dkt. 35-12 on Dec. 25 2023 at pp. 80-93

Gizmodo, "*Apple Wanted Her Fired. It Settled on an Absurd Excuse The reasons for firing Ashley Gjøvik include tweeting a photo of herself—taken by her own phone,*" Oct. 15 2021.

# G.  EXHIBIT G: INVERSE

Exhibit G: Article posted at Dkt. 35-12 on Dec. 25 2023 at pp. 94-96.

Inverse, "*Apple is leaning on weak arguments to defend a senior engineer's firing*,"
Oct. 15 2021.

# H.   EXHIBIT H: BIOMETRIC UPDATE

Exhibit Biometric Update article titled "***Ex-employee accuses Apple of training iPhone biometrics by violating staff privacy,***" and published around April 20 2022.



About Us | Subscribe

All Content ▾ | Search

| BIOMETRICS NEWS | BIOMETRICS STOCKS | ID FOR ALL | FEATURES & INTERVIEWS | INDUSTRY INSIGHTS | BRAND FOCUS | BIOMETRICS COMPANIES | WHITE PAPERS | BIOMETRICS EVENTS |

Share

Tweet

Link

Comment

# Ex-employee accuses Apple of training iPhone biometrics by violating staff privacy

Apr 20, 2022, 6:51 pm EDT | Chris Burt

CATEGORIES    Biometric R&D | Biometrics News | Mobile Biometrics



Apple was questioned about where it collected the 1 billion images it trained the Face ID biometric algorithm with by a member of U.S. Congress back in 2017, but no direct answer was offered. Now, an ex-employee of the company is taking it to court in Europe over sourcing those training images from its staff, The Telegraph reports.

Minnesota Senator Al Franken requested information on a range of points when Apple first introduced face biometrics to the iPhone X, some but not all of which was provided in the company's response.

Former Apple employee Ashley Gjøvik was placed on administrative leave after complaining to the company about a sexist work environment, and then was fired, she says for raising concerns about violations of staff privacy. She has also filed a complaint with the National Labor Relations Board in the U.S.

The company invited its employees to participate in product testing, and sometimes to have their biometrics collected, but Gjøvik says the testing and collection seemed to be mandatory. She describes the use of Apple's internal Gobbler app (later called Glimmer) to upload personal data employees had collected to company servers, and directly claims that employee data is the source of the billion images used to train Face ID.

MOST READ THIS WEEK

Stakeholders review Ethiopia's proposed digital ID legislative framework

Biometrics partnerships set up billions in revenues forecast by analysts

Biden urged to consider federal digital identity framework

Biometrics secure UNHCR direct cash payments to Ukrainian refugees

UK government opens bid for mobile fingerprint biometric enrollment devices

It's fun. It's trendy. It's putting your iris biometrics on the market for free

GSA finds 'bias' in facial recognition errors, plans tests but no deployment

Paravision and HID Global co-developing new line of face biometric solutions

iProov brings counter-suit against FaceTec in biometric liveness IP dispute

Biometrics capture with feature phones to boost Africa's financial inclusion

Daily Biometrics News

FEATURED COMPANY



4/20/22, 8:48 PM    Case 25-1149, Doc 55, Filed 03/30/26, Entered 03/30/26 10:44, Page... Best Man

France's data protection authority CNIL and the UK's Information Commissioner's Office have each confirmed that they are investigating the allegations, according to TechCrunch, and other regulators are listed in the complaint but have not confirmed investigations.

Ultimately, Gjøvik is alleging non-disclosure agreements and employee privacy policies that do not meet legal standards.

Controversy around the origin of biometric training data has led to lawsuits and recent ethical commitments from biometrics developers.

## Article Topics

Apple | biometric data | biometrics | data collection | data protection | face biometrics | Face ID | iPhone | privacy

## Latest Biometrics News

Autoencoder approach to vein biometrics development shows promise in EAB presentation

Panel recommends non-intrusive airport biometrics for India

Chinese, U.S. researchers turn teeth-grinding into a biometric identifier

Affective computing draws Intel's attention, prompts debate

Easier and Idemia to collaborate on biometric Entry/Exit System for Lithuania

GAO says US military playing too loose with AI development management

## Comments

Leave a Reply

This site uses Akismet to reduce spam. Learn how your comment data is processed.

The future of identity lives here. Fast mobile authentication using your face, voice, or fingerprint? We helped invent that technology. And today, we're building even faster, safer ways to help connect your customers to the services they love, in every channel, for life.

LEARN MORE

**More Biometrics Companies**

BIOMETRICS RESEARCH

**Expect digital ID to balloon in users and revenue by 2026: Juniper Research**

**Two analyses project facial recognition market at around $13B by 2028**

**Ponemon Institute highlights rise in authentication failure rates and related costs**

**More Biometrics Research**

BIOMETRICS WHITE PAPERS

**The validation and development of the QuantumCrypt technology**

**On-demand webinar – Human or machine: AI proves best at spotting biometric attacks**

**ID document verification impact report**

**More White Papers**

BIOMETRICS EVENTS

**ID4Africa LiveCasts: Mobile for Identity Management and Inclusive ID4D**
Online: Mar 9 – Apr 27, 2022

**TDK Ventures presents DX Week 2022**
Online: Apr 18 – Apr 21, 2022

**SECON 2022**
KINTEX, Korea: Apr 20 – Apr 22, 2022

**More Biometrics Events**



Subscribe To The BiometricUpdate.com Email Newsletter

Stay on the cutting edge of the biometrics industry by subscribing to daily news updates from BiometricUpdate.com

LEARN MORE

# I. EXHIBIT I:
## *AMERICAN JOURNAL OF OBSTETRICS AND GYNECOLOGY*

Exhibit I:

Mahalingaiah, Shruthi et al. "Design and methods of the Apple Women's Health Study: a digital longitudinal cohort study." *American journal of obstetrics and gynecology* vol. 226,4 (2022): 545.e1-545.e29. doi:10.1016/j.ajog.2021.09.041, https://pmc.ncbi.nlm.nih.gov/articles/PMC10518829/

![HHS logo]

# HHS Public Access

Author manuscript

*Am J Obstet Gynecol.* Author manuscript; available in PMC 2023 September 25.

Published in final edited form as:
*Am J Obstet Gynecol.* 2022 April ; 226(4): 545.e1–545.e29. doi:10.1016/j.ajog.2021.09.041.

# Design and methods of the Apple Women's Health Study: a digital longitudinal cohort study

**Shruthi Mahalingaiah, MD, MS**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Victoria Fruh, PhD**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Erika Rodriguez, MS**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Sai Charan Konanki, MS**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Jukka-Pekka Onnela, DSc**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Alexis de Figueiredo Veiga, MS**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Genevieve Lyons, MS**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Rowana Ahmed, MS**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Huichu Li, PhD**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Nicola Gallagher, MS**,
Harvard T.H. Chan School of Public Health, Boston, MA

**Anne Marie Z. Jukic, PhD, MSPH**,
Epidemiology Branch, Division of Intramural Research, National Institute of Environmental Health Sciences, National Institutes of Health, Research Triangle Park, Durham, NC

**Kelly K. Ferguson, PhD, MPH**,
Epidemiology Branch, Division of Intramural Research, National Institute of Environmental Health Sciences, National Institutes of Health, Research Triangle Park, Durham, NC

**Donna D. Baird, PhD**,
Epidemiology Branch, Division of Intramural Research, National Institute of Environmental Health Sciences, National Institutes of Health, Research Triangle Park, Durham, NC

This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

Corresponding author: Shruthi Mahalingaiah, MD, MS. shruthi@hsph.harvard.edu.
B.A.C., R.H., M.A.W. contributed equally to this work and share senior authorship.

Mahalingaiah et al. Page 2

**Allen J. Wilcox, MD, PhD**,

Epidemiology Branch, Division of Intramural Research, National Institute of Environmental Health Sciences, National Institutes of Health, Research Triangle Park, Durham, NC

**Christine L. Curry, MD, PhD**,

Health, Apple Inc, Cupertino, CA

**Sanaa Suharwardy, MD**,

Division of Maternal Fetal Medicine, Department of Obstetrics and Gynecology, Stanford University School of Medicine, Stanford, CA

**Tyler Fischer-Colbrie, MBA**,

Health, Apple Inc, Cupertino, CA

**Gracee Agrawal, MS**,

Health, Apple Inc, Cupertino, CA

**Brent A. Coull, PhD**,

Harvard T.H. Chan School of Public Health, Boston, MA

**Russ Hauser, MD, ScD, MPH**,

Harvard T.H. Chan School of Public Health, Boston, MA

**Michelle A. Williams, ScD**

Harvard T.H. Chan School of Public Health, Boston, MA

## Abstract

**BACKGROUND:** Prospective longitudinal cohorts assessing women's health and gynecologic conditions have historically been limited.

**OBJECTIVE:** The Apple Women's Health Study was designed to gain a deeper understanding of the relationship among menstrual cycles, health, and behavior. This paper describes the design and methods of the ongoing Apple Women's Health Study and provides the demographic characteristics of the first 10,000 participants.

**STUDY DESIGN:** This was a mobile-application-based longitudinal cohort study involving survey and sensor-based data. We collected the data from 10,000 participants who responded to the demographics survey on enrollment between November 14, 2019 and May 20, 2020. The participants were asked to complete a monthly follow-up through November 2020. The eligibility included installed Apple Research app on their iPhone with iOS version 13.2 or later, were living in the United States, being of age greater than 18 years (19 in Alabama and Nebraska, 21 years old in Puerto Rico), were comfortable in communicating in written and spoken English, were the sole user of an iCloud account or iPhone, and were willing to provide consent to participate in the study.

**RESULTS:** The mean age at enrollment was 33.6 years old (±standard deviation, 10.3). The race and ethnicity was representative of the US population (69% White and Non-Hispanic [6910/10,000]), whereas 51% (5089/10,000) had a college education or above. The participant geographic distribution included all the US states and Puerto Rico. Seventy-two percent (7223/10,000) reported the use of an Apple Watch, and 24.4% (2438/10,000) consented to sensor-

Mahalingaiah et al.    Page 3

based data collection. For this cohort, 38% (3490/9238) did not respond to the Monthly Survey: Menstrual Update after enrollment. At the 6-month follow-up, there was a 35% (3099/8972) response rate to the Monthly Survey: Menstrual Update. 82.7% (8266/10,000) of the initial cohort and 95.1% (2948/3099) of the participants who responded to month 6 of the Monthly Survey: Menstrual Update tracked at least 1 menstrual cycle via HealthKit. The participants tracked their menstrual bleeding days for an average of 4.44 (25%–75%; range, 3–6) calendar months during the study period. Non-White participants were slightly more likely to drop out than White participants; those remaining at 6 months were otherwise similar in demographic characteristics to the original enrollment group.

**CONCLUSION:** The first 10,000 participants of the Apple Women's Health Study were recruited via the Research app and were diverse in race and ethnicity, educational attainment, and economic status, despite all using an Apple iPhone. Future studies within this cohort incorporating this high-dimensional data may facilitate discovery in women's health in exposure outcome relationships and population-level trends among iPhone users. Retention efforts centered around education, communication, and engagement will be utilized to improve the survey response rates, such as the study update feature.

### Keywords

digital health; longitudinal cohort; menstrual cycles; women's health

## Introduction

Multiple factors influence the menstrual cycle length, duration of flow, and cyclicity. Common factors include stress, nutrition and body weight, physical activity, and combination lifestyle factors. Furthermore, menstrual cycle function is an indicator of health and longevity.[1] For example, bone density is built and maintained in the presence of cyclic ovarian function.[2] Fertility, terminal breast differentiation, and aspects of cognition and memory are also influenced by menstrual status and function.[3–5] The endocrine pathways involved in menstrual cycle physiology include the hypothalamic-pituitary-ovarian axis and a healthy functioning of the thyroid and adrenal glands; the anatomic structures necessary include the uterus, endometrium, and ovaries.

Furthermore, irregular patterns or the absence of menstrual cycles can serve as indicators of underlying health problems. The presence of irregular menstrual cycles may indicate hormonal disturbances, including thyroid disorders, prolactinomas, systemic illness (including cancers), anatomic pathology such as uterine fibroids, polyps, or adenomyosis; it has also has been linked to an increase in all-cause mortality.[1] Abnormalities in the bleeding length and amount affect up to 30% of those who menstruate.[6] The existing data on the menstrual cycle characteristics, including the normal distributions of the cycle length and bleeding days, are based on prior and well-designed but demographically-limited cohorts.[7,8] Little is known about how these conditions vary across subpopulations or how they relate to future health conditions. An understanding of population-based variation in menstrual cycle characteristics is lacking.

*Am J Obstet Gynecol.* Author manuscript; available in PMC 2023 September 25.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

The objectives of this study are to (1) advance the understanding of the menstrual cycle, including how it relates to exercise, sleep, environmental, behavioral, and other physiological processes, and (2) inform screening and risk assessment for gynecologic health conditions using menstrual cycle, reproductive, health, and sensor data. We present here the design of the Apple Women's Health Study (AWHS) and the characteristics of the first 10,000 participants enrolled in the study, including their follow-up after 6 months of participation.

## Materials and Methods

### Survey design

The survey questions for the AWHS were derived from previous, similarly large longitudinal studies on women's health. These surveys included the National Health and Nutrition Examination Survey developed by the Centers for Disease Control and Prevention, the Perceived Stress Scale, All of Us study—a large research program sponsored by the National Institutes of Health, Nurses' Health Study 2, and the Ovulation and Menstruation Health Study.[9–12] The questions were modified for a mobile user experience and were standardized across 2 other research studies also housed in the Apple Research app. For menstrual-cycle-specific questions, the exposures hypothesized to affect the hypothalamic-pituitary-ovarian axis in a cycle-specific way were included. Once the research teams had completed the initial drafting of the baseline survey, it was reviewed by Apple, Inc. to conform to their design standards across the 3 studies.

The interface for the Research app was designed to be intuitive and simple. The research profile completed at enrollment is common to all 3 studies and includes the initial demographic survey. To implement the intuitive and simple survey concept, the baseline women's health study survey was split across the initial year of the study to distribute the participant burden over time as noted in Supplemental Table 1. The health history survey was given at month 4, and the reproductive history was given at month 10. The Monthly Survey: Menstrual Update (MSMU) was initiated after the first completed month of enrollment and then monthly thereafter. The time to survey completion was estimated in 5-minute increments on the basis of usability testing by Apple, Inc. The response time for the enrollment processes (screening, eligibility, demographics) was estimated to be 25 minutes. The expected response times as listed in the Research app for monthly surveys such as the MSMU, Pregnancy Update, and Lactation Update were 5 minutes each.

### Apple research app platform

The study is hosted within the Apple Research app (available on the Apple App Store), which allows a participant to find, enroll, and participate in Apple-supported, health-related research studies.

The Research app was designed with 3 studies for a simultaneous launch, where the demographics and certain questions were standardized across the studies. The other 2 studies were the Apple Heart and Movement Study and the Apple Hearing Study.[13,14]

*Am J Obstet Gynecol*. Author manuscript; available in PMC 2023 September 25.

All the shared data are stored securely in a system within Apple that is designed to meet the technical safeguard requirements of the Health Insurance Portability and Accountability Act. Access to any contact information or other identifying data that the participants provide through the Research app is restricted to the Principal Investigator staff.

### Study population description

The AWHS is a longitudinal cohort study of persons who have menstruated at least once in their life. The study began enrolling on November 14, 2019. The planned duration of this study is 10 years, that is, until November 2029, with a potential for extension or additional long-term follow-up. The goal is to recruit 500,000 participants over 10 years. The study was approved by the Advarra Central Institutional Review Board (number PRO00037562) and registered to ClinicalTrials.gov (ClinicalTrials.gov Identifier: NCT04196595).

### Eligibility, screening, and consent

Individuals were eligible for enrollment if they had installed the Apple Research app on their iPhone 6s or later with iOS version 13.2 or later, were living in the United States, had menstruated at least once, were at least 18 years old (at least 19 years old in Alabama and Nebraska, at least 21 years old in Puerto Rico), were comfortable communicating in written and spoken English, were the sole users of their iCloud account or iPhone, and were willing to provide informed consent to participate in the study (Supplemental Table 2).

After self-report and self-verification of eligibility, the participants followed the steps for enrollment as delivered by the Research app. They were instructed to read the informed consent form (ICF), which is included in Appendix A, and provide an electronic signature if they consented to participate; a part of this process is shown in Supplemental Figure 1. The ICF covers key aspects, including the study objectives, study procedures (surveys and demographic data), the types of study data that require additional consent (Health app Data, Research Sensor and Usage Data, Medical Conditions and History, and other related information such as clinically sourced data from Health app). The ICF included the participation risks (theoretical potential for breach of confidentiality) and benefits (no incentives or compensation) and the option for study withdrawal at any time for any reason. The current informed consent document is available in the supplemental documents. The participants who were enrolling were informed that they will be reconsented every 2 years.

The individuals who downloaded the Research app, enrolled in AWHS, and met the inclusion criteria proceeded to study participation. They were then provided the survey tasks for completion, starting with the demographics section.

Incentive: There was no compensation for study participation.

### Recruitment and marketing

On September 10, 2019, the Apple Research app was announced publicly. The Research app houses the following 3 research studies: the AWHS, the Apple Heart and Movement Study, and the Apple Hearing Study. The AWHS was launched on November 14, 2019. Institutional review board-approved recruitment efforts included a Harvard T.H. Chan School of Public

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Mahalingaiah et al. Page 6

Health study website,[15] which was made public and includes frequently asked questions and background information regarding the study. Social media accounts were created on Twitter and Instagram (March 10, 2020), YouTube (March 12, 2020), Facebook (April 13, 2020) and LinkedIn (August 7, 2020) to post recruitment materials inviting potential participants to join the study, with new posts added approximately 1 to 3 times per week. In addition, media events included a podcast,[16] media articles, and press interviews after study launch.

## Data Collection and Methods

### Survey data

On enrollment, the participants who onboarded with the AWHS responded to the Research Profile Survey within the Research app and to the Demographic Survey; the data included the year of birth, state of residence, race and ethnicity, marital status, employment status, gender identity, and sex assigned at birth (Supplemental Figure 1 and Supplemental Table 3). The participants were asked to respond to a baseline Menstrual Status Survey at enrollment (Supplemental Table 3). The response categories for the baseline Menstrual Status Survey included currently menstruating, lactating, menopausal, and pregnant. For the remaining months within the first year of follow-up, the participants were given monthly surveys to provide a menstrual status update, pregnancy update, and/or a lactation update. Health surveys were given quarterly to assess the changes in sleep, physical activity, nutrition, stress, alcohol use, tobacco use, electronic nicotine use, and marijuana use within the previous calendar month. Reproductive history was assessed at the tenth month (Supplemental Table 1). As detailed in Supplemental Table 3, a more extensive health overview (including questions on nutrition, sleep, stress, alcohol use, tobacco use, electronic nicotine use, marijuana use, second-hand smoke, and overall self-rated health) and medical history (gynecologic, endocrine, heart, blood, digestive, kidney, lung, musculoskeletal, cancer, brain and nervous system, mental health and infectious disease conditions, surgeries, and family medical history) are given annually, initially at month 4 and month 7, respectively (Figure 1). A summary of the surveys, topics, sources, number questions is shown in Table 4.

### Monthly surveys and timing

The participants receive monthly surveys on the basis of the status reported in the baseline Menstrual Status Survey. The monthly surveys include the MSMU, the Lactation Update, and the Pregnancy Update.

The MSMU included a total of 6 questions to ascertain the status in the last calendar month regarding the accuracy of tracked period days, status update for pregnancy, lactation, and menopause, current hormone use, reason for hormone use, and monthly update of health factors (change in exercise or weight, significant sleep disruption, stress, illness, and hospitalization or surgery). The purpose of the MSMU is to give additional context for the logged menstrual bleeding days and associated symptom logging in HealthKit. The MSMU is given to those who have previously indicated the capacity to currently menstruate on the baseline survey; it is not given to those who have indicated current pregnancy, menopause, or to those who are no longer menstruating. The MSMU is delivered within the Research

app on the first Sunday of every month, starting in month 2 of participation, at least 4 weeks after enrollment. The survey is available for 1 week after delivery and then expires and is no longer available to the participant. Programming logic was applied in the analysis phase as follows: the monthly surveys were counted when the participants responded at least 4 weeks after enrollment. Any monthly survey with participant responses before 4 weeks of enrollment was excluded from this count. For this analysis, the respondents were censored at pregnancy and menopause.

### Research sensor and usage data

The participants consented to the collection of data and derived metrics that were retrieved from certain iPhone sensors and from a paired optional Apple Watch. These include frequently visited locations with an anonymized identifier, watch-on-wrist state, and Optical Sensor (including accelerometer and heart rate) as summarized in Supplemental Table 4.

### HealthKit data

HealthKit provides a central repository for health and fitness data on iPhones and Apple Watches. With the user's permission, specific apps communicate with HealthKit to access and share these data while maintaining the user's privacy and control. HealthKit stores the data merged from multiple sources and contains data types such as menstrual bleeding days, symptoms and associated user recorded features (cervical mucous changes, temperature changes, sexual activity), heart rate, sleep analysis, and clinical records (lab tests, diagnoses) from clinical interfaces. A bleeding event can be tracked either via Cycle Tracking or by any third-party menstrual tracking application that has been permitted to write to HealthKit by the participant. This allows for ongoing collection of menstrual characteristics and symptoms and reduces missing data owing to lack of direct participant input. For this descriptive analysis, we evaluate the months of contributed cycle tracking data where a logged bleeding event in the HealthKit was attributed to the calendar month of that bleeding event.

### Participation

This study was designed to allow participation through the following ways: (1) response to survey questions; (2) contribution of HealthKit data, which include logged menstrual cycles; and (3) contribution of SensorKit data, which include sensor-based data streams from SensorKit.

In general, a participant is considered to be actively participating by contributing data from any of these sources.

Given that one of the main goals of this study is to understand menstrual health and its risk factors, we report on

1. the response rates to the MSMU, and

2. tracked bleeding events in HealthKit as measures of ongoing participation for this descriptive analysis.

*Am J Obstet Gynecol.* Author manuscript; available in PMC 2023 September 25.

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Mahalingaiah et al.                                                                                                    Page 8

Nonparticipation in the MSMU is defined as no response to the monthly survey. Invalid responses are defined as those responses that seem biologically unlikely, such as a concurrent state of menopause and pregnancy. We defined completion rate (% completed) as the proportion of individuals who have completed the survey among those eligible for the baseline Menstrual Status Survey or MSMU.

## Defining demographic variables

**Race and ethnicity—**We utilized the same question that was used to determine the race and ethnicity from the NIH-sponsored All of Us study, which asks, "Which categories describe you? Select all that apply: American Indian or Alaska Native [subchoices: American Indian, Alaska Native, Center or South American Indian, none of these fully describe me, I prefer not to answer]; Asian [subchoices: Asian Indian, Cambodian, Chinese, Filipino, Hmong, Japanese, Korean, Pakistani, Vietnamese, none of these fully describe me, I prefer not to answer]; Black, African American, or African [subchoices: African American, Barbadian, Caribbean, Ethiopian, Ghanaian, Haitian, Jamaican, Liberian, Nigerian, Somali, South African, none of these fully describe me, I prefer not to answer]; Hispanic, Latino, or Spanish [subchoices: Colombian, Cuban, Dominican, Ecuadorian, Honduran, Mexican or Mexican American, Puerto Rican, Salvadoran, Spanish, none of these fully describe me, I prefer not to answer]; Middle Eastern or North African [subchoices: Afghan, Algerian, Egyptian, Iranian, Iraqi, Israeli, Lebanese, Moroccan, Syrian, Tunisian, none of these fully describe me, I prefer not to answer]; Native Hawaiian or other Pacific Islander [subchoices: Chamorro, Chuukese, Fijian, Marshallese, Native Hawaiian, Palauan, Samoan, Tahitian, Tongan, none of these fully describe me, I prefer not to answer]; White [subchoices: Dutch, English, European (not listed), French, German, Irish, Italian, Norwegian, Polish, Scottish, Spanish, none of these fully describe me, I prefer not to answer]; none of these fully describe me; I prefer not to answer." In field testing of the 2 questions typically used to separately determine the race and ethnicity, the All of Us study found that the focus group participants found it burdensome to have 2 questions. The All of Us study, where our race and ethnicity question is sourced from, uses a single question, with the response of "select all that apply" to determine the race and ethnicity. We have classified the responses into traditional reporting of race and ethnicity of the following categories: White, non-hispanic; Hispanic, Latina, Spanish and/or other Hispanic; Black or African American or African; Asian; Other; >1 race or ethnicity, in nonrestrictive categories.[17]

**MacArthur social status scale and socioeconomic status—**We utilized the MacArthur Scale of Subjective Social Status, which asks, "Think of this ladder as representing where people stand in the country you live in. At the top of the ladder are the people who are the best off – those who have the most money, the most education, and the most respected jobs. At the bottom are the people who are the worst off – those who have the least money, least education, the least respected jobs, or no job. The higher up you are on this ladder, the closer you are to the people at the very top; the lower you are, the closer you are to the people at the very bottom. Where would you place yourself on this ladder? Please select where you think you stand at this time in your life relative to other people around you. Ladder 0 (worst off) to 10 (best off)." The scale has been noted to correlate with health status across the lifespan.[18,19] Notably, the MacArthur Scale is correlated with but is

Mahalingaiah et al. Page 9

not the same as objective socioeconomic status (SES).[20] One main benefit of the MacArthur Scale is that it may be more applicable as a marker of subjective social status than using measures of objective SES in non-White populations.[18] We categorized the responses into: 0 to 3 corresponding to low, 4 to 5 corresponding to middle, and 6 to 9 corresponding to high. There are no established categorizations for this variable. We refer to this metric as the SES.

The study population described in this paper was enrolled from November 14, 2019 until May 20, 2020, and we allowed at least 6 months of follow-up for all the women enrolled during this time.

**Planned statistical analyses—**Statistical analyses are planned for the following 3 categories: (1) longitudinal analysis of survey data, (2) longitudinal analysis of passively collected smartphone and watch data, and (3) longitudinal analysis of associations between the survey data and passively collected data. In each category, we will perform exploratory descriptive analyses and formulate more specific hypothesis-driven models.

For all 3 types of longitudinal analyses, we will use longitudinal extensions of regression methods, such as linear and generalized linear mixed models,[21] statistical learning techniques for high-dimensional data,[22] and functional data analysis methods.[23] For the longitudinal analysis of the survey data, we will quantify the associations among both participant characteristics and risk factors and the menstrual cycle length, and how these associations vary across the age range of the study population. For the longitudinal analysis of passive data, we will perform individual-level analyses to identify the possible change points in behaviors over time and how they relate to subsequent health outcomes. For the longitudinal analysis of passive and survey data, the predictors will initially be the daily summary statistics derived from passively collected data and the outcomes of interest will consist of all the items on which survey data are available.

**Study statistical power—**We estimated the power to detect meaningful differences in (1) the mean menstrual cycle length and (2) the prevalence of health conditions of interest. We estimated loss to follow-up (20%) and incomplete survey response (90%–95%) over the course of 12 menstrual cycles. To calculate a conservative power estimate, we estimated a high incomplete survey response rate. This rate assumes an incomplete response if there is any skip of any question across the year. The survey is designed to not require a response to any question; a participant may choose not to answer by selecting a prefer not to answer response option or advancing through the survey questions. We present the conservative power calculations on the basis of a 2-sided alpha=0.01 test rather than the more common alpha=0.05 level (Supplemental Table 5).

**Menstrual cycle—**We estimated our power to detect the differences in the mean menstrual cycle length among a general dichotomy of the study sample. Such a comparison will be of interest when comparing the outcome across subpopulations defined by demographics (eg, race and ethnicity), lifestyle factors (eg, low or high physical activity), or potential exposures (eg, marijuana products or alcohol consumption) (Supplemental Table 6). Although the longitudinal methods will use all cycles from all participants, we evaluated scenarios where 5% to 10% of 400,000 participants provide menstrual cycle data on 12 cycles

*Am J Obstet Gynecol.* Author manuscript; available in PMC 2023 September 25.

and conservatively calculated minimally detectable differences in cycle length using data from those 5% to 10%. We assumed a two-sided alpha=0.01 test, and a within-participant longitudinal correlation in the cycle length of 0.6.[24] We estimate that we will have the power to detect the menstrual cycle length differences of <1 day for all the scenarios considered, as shown in Supplemental Table 6.

**Gynecologic health conditions—**We estimated the power of the study to detect differences in the prevalence of health conditions for high-risk vs low-risk groups for various initial sample sizes and health condition prevalence estimates in the baseline group (Supplemental Table 6). We estimate that we will have the power to detect relatively small differences in prevalence for all scenarios, even when the health condition is rare (0.5% prevalence), and the high-risk group is small (10% of the sample).

## Results

### Baseline characteristics of the first 10,000 participants

We present the demographic characteristics of the first 10,000 enrolled and eligible participants who provided demographic information and show their retention across the first 6 months of participation. From the launch of the study to May 20, 2020, there were 11,113 people who downloaded the Research app and clicked through to the AWHS, 10,459 who consented, and 10,030 who responded to the demographics survey. Eleven participants formally withdrew from the study within their first month of participation. The participant flow for the first 10,000 participants is shown in Figure 2. On average, 370 participants enrolled per week.

The mean (standard deviation) age at enrollment was 33.6 years (10.3). Although most of the participants were White and non-hispanic (69%), there were 12% Latina, 6% Black, 4% Asian, and 5% identifying as >1 race and ethnicity. Other races and ethnicities represented include American Indian or Alaskan Native (3%). Most participants had graduated college or beyond (51%), were employed for pay (either part-time, full-time, or self-employed) (70%), and reported the use of an Apple Watch (72%). Most participants also gender-identified as a 'woman' (96%) and were assigned 'female' at birth (99%). Forty percent of the participants were married and 33% were never married. The distribution of SES for the 10,000 participants on the MacArthur Scale are as follows: low (0–3): 31%, middle[4,5]: 42%, and high[6–9]: 25%. At the time of enrollment, more participants were living in the Southern region (35%) of the United States than any other but with many women also living in the Northeast (15%), Midwest (20%), and West (25%). A small proportion of women were living in the US territories (0.3%) or had no data available on their location (4%) (Table 1). The states with the most participants enrolled, adjusted for the total population by state from the 2010 census were Massachusetts, Alabama, and Oregon (Supplemental Figure 2). Menstrual tracking data in HealthKit (either retroactive data or data collected during study period) were available for 82.7% of the women, and SensorKit data on heart rate were available for 24% of the women (Table 1).

Supplemental Table 7 describes the selected characteristics obtained from ResearchKit of the 429 participants who enrolled in the study during the same time but did not respond

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

to the demographic questionnaire. Among these participants, the mean age was 34 years. When compared with enrollees that responded to the demographics questionnaire, a greater proportion of those who did not respond were from the South (40% vs 35%), fewer were Apple Watch users (45% vs 72%), and fewer opted-in to the authorization of SensorKit heart rate access (5% vs 24%).

On the basis of the self-reported menstrual status at the time of enrollment, 88% reported actively menstruating, 2% were lactating, 6% were menopausal, and 1% were pregnant. The baseline status and the monthly menstrual statuses across 6 months of follow-up are outlined in Table 2.

### Retention

Among the first 10,000 enrollees, 6519 participated in at least 1 of the MSMU data collection (65.2%). Of those eligible, 3099 participants responded to the 6-month check-in (Table 1). 5748 participants responded to the first MSMU, and 4413 and 3902 responded to the second and third, respectively, as summarized in Table 3. The demographics of those at baseline (N=10,000) and those who responded to the month 6 questionnaire (N=3099) are shown in Table 1. The participants who contributed to the sixth MSMU were broadly similar to the enrolled cohort, differing mostly in being more likely to be educated, White, and unmarried. Among the consistent responders, more were Apple Watch users (83% vs 72%) and were associated with higher levels of tracking through HealthKit than the enrolled cohort.

Of the 10,000 participants enrolled, 82.7% tracked the menstrual bleeding days via HealthKit at some point in the 2-years before study entry or in the 6 months of follow-up. 72.4% of the participants tracked at least 1 menstrual bleeding event during the 6-month follow-up period, and the participants tracked an average of 4.44 (25%–75%; range, 3–6) calendar months during the study period. Among those who completed the sixth MSMU, 95.1% contributed a tracked bleeding event, and 91.4% tracked at least 1 menstrual bleeding event during the 6-months of follow-up. Among this subset, the participants tracked an average of 5.29 (25%–75%; range, 5–6) months of cycle data (Table 1).

### Survey response time

The participants spent a median time of 1.83 minutes to complete the demographic survey (25th–75th percentile range, 1.43–2.45 minutes) and a median time of 0.77 minutes to complete the MSMU (25th–75th percentile range, 0.55–1.10 minutes) and are noted in Supplemental Table 10.

## Discussion

### Principal findings

This is the first app-based study of this scope with the goal of collecting longitudinal data for at least 10 years. Among the first 10,000 participants enrolled, the principle findings of this study are that (1) the racial and ethnic distribution of the enrolled cohort was similar to that of the US population, (2) Non-White participants were slightly more likely to drop

*Am J Obstet Gynecol.* Author manuscript; available in PMC 2023 September 25.

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

out of the study than White participants over 6 months of follow-up, (3) the participant geographic distribution of the AWHS included all the US states and Puerto Rico, (4) most of the participants had graduated college or beyond, were employed for pay, and reported the use of an Apple Watch.

### Clinical implications

The study aims to advance the understanding of menstrual cycles, the factors affecting both within-woman and between-woman variability, and the associations with various health conditions. The study will have novel opportunities to examine variations in reproductive physiology using passively collected data such as physical activity and heart rate. The possible clinical implications include understanding the associations between population-based exposures among iPhone users and the reproductive outcomes including the menstrual cycle length and irregularity, infertility, menopause, and chronic diseases such as cancer and heart disease measured via Health Records in HealthKit.

### Research implications

Among the 10,502 participants who downloaded the app and were eligible, 96% enrolled and responded to the demographics section, which compares favorably with other longitudinal studies.[25–27] The recruitment efforts were generally not targeted to specific populations but mainly comprised general media coverage and social media posts. Thirty-eight percent of the participants did not respond to the MSMU after enrollment, with a total of 35% of participants responding to the MSMU at the 6-month follow-up. At least 1 menstrual cycle was tracked via HealthKit, by 82.7% (8266/10,000) of the initial cohort and 95.1% (2948/3,099) of the participants who responded to month 6 of the MSMU. The participants contributed with an average of 4.44 (25%–75%; range, 3–6) tracked calendar months during the 6-month follow-up period. Although the race and ethnicity distribution at the baseline was more closely representative of the US population, we noted a slight increase in the proportion of White (Non-Hispanic) race and ethnicity and a higher education status for the participants responding to month 6 of the MSMU than the participants at enrollment. It is to be noted that the survey completion times were considerably shorter than expected.

### Strengths and limitations

The AWHS overcomes several limitations of the existing studies of menstrual cycle characteristics including the following: (1) not restricting to those women attempting conception,[25,28] (2) low responses to reproductive questions surrounding menstrual cycle characteristics,[26] (3) underascertainment of the menstrual cycle characteristics for cycle-specific analysis.[9] Furthermore, many existing cohorts lack ascertainment on basic reproductive history and menstrual cycle characteristics, despite having well-characterized outcome data for the leading causes of mortality and morbidity.[29] This study builds on the Tremin study[7] by extending racial and ethnic diversity and obtaining expanded demographic, anthropometric, lifestyle, and behavioral data elements from HealthKit and Research Sensor and Usage Data, which allow for unique exposure and outcomes assessment. Furthermore, though the findings may have limited generalizability outside of iPhone users, the digital platform may increase access, allowing participants to engage with this digital study.

Although the study has many strengths, several limitations must be considered. Firstly, the study is limited to Apple iPhone users, and there is a concern of generalizability to other populations using other digital platforms. Secondly, the loss to follow-up measured by the response rates for the Monthly Survey: Menstrual Updates (MSMU) is higher than other retention metrics such as tracked menstrual bleeding events in HealthKit. We have initiated the retention efforts utilizing education, communication, and engagement through a study update feature within the app and on the study website to promote monthly survey completion. To ensure continued diversity in this cohort, care must be taken to both recruit and retain the population through effective engagement strategies. Furthermore, engagement strategies may be constructed to limit the loss to follow-up of certain subpopulations. Further evaluation of the data must be conducted to understand whether nonrandom dropout may bias the longitudinal effect estimates on the basis of the monthly surveys, though the menstrual data that is tracked will be written to HealthKit, and it will limit missingness and avoid reliance on survey responses.

## Conclusion

The AWHS captures time-varying demographic, lifestyle, and behavioral data that are built into the Research app, an app that interfaces with multiple data sources. These data streams create an opportunity for the AWHS to contribute new knowledge about long-overlooked and understudied women's health issues.

## Supplementary Material

Refer to Web version on PubMed Central for supplementary material.

## Acknowledgments

The AWHS team would like to thank all the participants for signing up for the study and contributing to the advancement of women's health research. We would like to acknowledge Kaitlyn Haughey, MS, Manasvi Marathe, MPH, and Jill MacRae, MS, for their work in supporting the study as a part of the Harvard Study Staff at study initiation; Michael Grusby, PhD, who was involved in the initial phase of this project; the Harvard Information Technology Team, including Andy Ross, BCS, Noah Hulbert, MBA; and David Waxman, MBA, from the Office of Financial Services. We would like to acknowledge Richa Gujarati, MBA, former marketing team lead at Apple, Inc, for supporting the recruitment efforts for this project.

S.M. receives research funding from the National Institutes of Health (NIH), National Science Foundation, and March of Dimes. R.H. receives research funding from the NIH. B.A.C. receives research funding from the NIH and the United States Environmental Protection Agency. J.P.O. receives research funding from the NIH, Boehringer Ingelheim. J.P.O. received an unrestricted gift from Mindstrong Health in 2018. J.P.O. is a cofounder of a recently established commercial entity that operates in digital phenotyping outside of women's health. C.L.C., T.F.C., G.A. own Apple, Inc stock. The other authors report no conflict of interest.

This study received funding from Apple, Inc. The funder had no role in the analysis and interpretation of data. Support for A.M.Z.J., K.K.F., D.D.B., and A.J.W. was provided by the Intramural Research Program of the National Institute of Environmental Health Sciences, National Institutes of Health.

## References

1. Wang YX, Arvizu M, Rich-Edwards JW, et al. Menstrual cycle regularity and length across the reproductive lifespan and risk of premature mortality: prospective cohort study. BMJ 2020;371:m3464. [PubMed: 32998909]

2. Seifert-Klauss V, Prior JC. Progesterone and bone: actions promoting bone health in women. J Osteoporos 2010;2010:845180. [PubMed: 21052538]

3. Wesselink AK, Wise LA, Hatch EE, et al. Menstrual cycle characteristics and fecundability in a North American preconception cohort. Ann Epidemiol 2016;26:482–7.e1. [PubMed: 27449569]

4. Arendt LM, Kuperwasser C. Form and function: how estrogen and progesterone regulate the mammary epithelial hierarchy. J Mammary Gland Biol Neoplasia 2015;20:9–25. [PubMed: 26188694]

5. Sundström Poromaa I, Gingnell M. Menstrual cycle influence on cognitive function and emotion processing-from a reproductive perspective. Front Neurosci 2014;8:380. [PubMed: 25505380]

6. Liu Z, Doan QV, Blumenthal P, Dubois RW. A systematic review evaluating health-related quality of life, work impairment, and health-care costs and utilization in abnormal uterine bleeding. Value Health 2007;10:183–94. [PubMed: 17532811]

7. Treloar AE, Boynton RE, Behn BG, Brown BW. Variation of the human menstrual cycle through reproductive life. Int J Fertil 1967;12:77–126. [PubMed: 5419031]

8. Bull JR, Rowland SP, Scherwitzl EB, Scherwitzl R, Danielsson KG, Harper J. Real-world menstrual cycle characteristics of more than 600,000 menstrual cycles. NPJ Digit Med 2019;2:83. [PubMed: 31482137]

9. Bao Y, Bertoia ML, Lenart EB, et al. Origin, methods, and evolution of the three nurses' health studies. Am J Public Health 2016;106:1573–81. [PubMed: 27459450]

10. Harvard University. The ovulation and menstruation health (OM) pilot study survey instrument. 2020. Available at: https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/XACYQA. Accessed December 14, 2020.

11. All of Us Research Program Investigators, Denny JC, Rutter JL, et al. The "All of Us" Research Program. N Engl J Med 2019;381:668–76. [PubMed: 31412182]

12. Cohen S, Kamarck T, Mermelstein R. A global measure of perceived stress. J Health Soc Behav 1983;24:385–96. [PubMed: 6668417]

13. Brigham and Women's Hospital. Apple heart and movement study. Available at: http://www.bwhresearch.org/appleheartandmovementstudy/. Accessed December 16, 2020.

14. University of Michigan. Michigan public health apple hearing study. 2021. Available at: https://sph.umich.edu/applehearingstudy/. Accessed December 16, 2020.

15. Harvard TH. Chan School of Public Health. Apple women's health study. 2019. Available at: https://www.hsph.harvard.edu/applewomenshealthstudy/. Accessed December 16, 2020.

16. Mahalingaiah S, Onnela J, Levin D. Gaining insight into women's health. 2020. Available at: https://harvard-chan-this-week-in-health.simplecast.com/episodes/womens-health. Accessed December 18, 2020.

17. Coughlin SS, Chen J, Cortes JE. Health care access and utilization among adult cancer survivors: results from the National Institutes of Health "All of Us" Research Program. Cancer Med 2021;10:3646–54. [PubMed: 33942535]

18. Adler N, Singh-Manoux A, Schwartz J, Stewart J, Matthews K, Marmot MG. Social status and health: a comparison of British civil servants in Whitehall-II with European- and African-Americans in CARDIA. Soc Sci Med 2008;66:1034–45. [PubMed: 18180089]

19. Stanford University. MacArthur Scale of Subjective Social Status – Adult Version. 2018. Available at: https://sparqtools.org/mobility-measure/macarthur-scale-of-subjective-social-status-adult-version/. Accessed October 18, 2021.

20. Tan JJX, Kraus MW, Carpenter NC, Adler NE. The association between objective and subjective socioeconomic status and subjective well-being: a meta-analytic review. Psychol Bull 2020;146:970–1020. [PubMed: 33090862]

21. Fitzmaurice GM, Laird NM, Ware JH. Applied longitudinal analysis, 2nd ed. New York, NY: Wiley; 2011.

22. Hastie T, Silverman B. The elements of statistical learning, 2nd ed. New York, NY: Springer; 2009.

23. Ramsay J, Silverman B. Functional data analysis, 2nd ed. New York, NY: Springer; 2005.

24. Lisabeth L, Harlow SD, Lin X, Gillespie B, Sowers M. Sampling strategies for prospective studies of menstrual function. Am J Epidemiol 2004;159:795–802. [PubMed: 15051589]

25. Wise LA, Rothman KJ, Mikkelsen EM, et al. Design and conduct of an internet-based preconception cohort study in north America: pregnancy study online. Paediatr Perinat Epidemiol 2015;29:360–71. [PubMed: 26111445]

26. McManus DD, Trinquart L, Benjamin EJ, et al. Design and preliminary findings from a new electronic cohort embedded in the Framingham Heart Study. J Med Internet Res 2019;21:e12143. [PubMed: 30821691]

27. Mahalingaiah S, Cosenza C, Cheng JJ, Rodriguez E, Aschengrau A. Creating a survey instrument for self-assessed menstrual cycle characteristics and androgen excess. 2020. Available at: https://www.medrxiv.org/content/10.1101/2020.03.03.20030676v1.full. Accessed December 14, 2020.

28. Buck Louis GM, Schisterman EF, Sweeney AM, et al. Designing prospective cohort studies for assessing reproductive and developmental toxicity during sensitive windows of human reproduction and development–the LIFE Study. Paediatr Perinat Epidemiol 2011;25:413–24. [PubMed: 21819423]

29. Pino EC, Zuo Y, Maciel De Olivera C, et al. Cohort profile: the MULTI sTUdy Diabetes rEsearch (MULTITUDE) consortium. BMJ Open 2018;8:e020640.

30. Centers for Disease Control and Prevention (CDC). Behavioral Risk Factor Surveillance System. 2019. Available at: https://www.cdc.gov/brfss/questionnaires/index.htm. Accessed August 15, 2021.

31. Chew LD, Bradley KA, Boyko EJ. Brief questions to identify patients with inadequate health literacy. Fam Med 2004;36:588–94. [PubMed: 15343421]

32. Centers for Disease Control and Prevention. NHANES 2017-2018 Questionnaire Instruments. Available at: https://wwwn.cdc.gov/nchs/nhanes/continuousnhanes/questionnaires.aspx?BeginYear=2017. Accessed August 15, 2021.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

*Am J Obstet Gynecol.* Author manuscript; available in PMC 2023 September 25.

---

### AJOG at a Glance

**Why was this study conducted?**

The Apple Women's Health Study aims to advance the understanding of menstrual cycles and their relationship to health conditions such as infertility, menopause, and health across the lifespan. This paper describes the study design and methods, the demographics of the first 10,000 enrollees, and the study retention rates measured by the response to the Monthly Survey: Menstrual Update and menstrual tracking in HealthKit.

**Key findings**

The racial and ethnic distribution of the enrolled cohort was similar to that of the US population. Non-White participants were slightly more likely to drop out of the study than White participants over 6 months of follow-up. Notably, 38% (3490/9238 eligible participants) of the cohort did not respond to the Monthly Survey: Menstrual Update after enrollment. Thirty-five percent (3099/8972) of women who were eligible responded to the 6-month Monthly Survey: Menstrual Update. The participants tracked their menstrual bleeding days for an average of 4.44 (25%–75%; range, 3–6) calendar months during the 6 month follow-up period. In addition, 82.7% (8266/10,000) of the cohort tracked at least one menstrual cycle via HealthKit.

**What does this add to what is known?**

This is the first longitudinal research study of this scale and scope to use a mobile application to collect survey and sensor-based data on menstrual cycles and women's health.

*Am J Obstet Gynecol.* Author manuscript; available in PMC 2023 September 25.

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

| Participant Data Collection | At enrollment | Within first year | Annually | Quarterly | Monthly | Daily | Every 2 years | Qualifying IRB amendment |
|---|---|---|---|---|---|---|---|---|
| Informed Consent | ● | | | | | | ● | ● |
| Request for Passive Data Collection | ● | | | | | | ● | |
| Passive Data Collection | | | | | | ● | | |
| Research Profile - Demographics | ● | | ● | | | | | |
| Menstrual Status Survey | ● | | | | | | | |
| Monthly Survey | | | | | ● | | | |
| Quarterly Health Survey | | | | ● | | | | |
| Annual Health Survey | | ● | ● | | | | | |
| Annual Medical History | | ● | ● | | | | | |
| Reproductive History | | ● | | | | | | |

**FIGURE 1.**
Timeline of data collection

Mahalingaiah et al.                                                                Page 18



**FIGURE 2.**

Participant flow in the Apple Women's Health Study, first 10,000 participants. Study onboarding as of May 20, 2020; categories of ineligibility are not mutually exclusive

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

Mahalingaiah et al.

Am J Obstet Gynecol. Author manuscript; available in PMC 2023 September 25.

**TABLE 1**

Demographics of Apple Women's Health Study participants

| Demographics | Participants at baseline, first 10,000 participants[a]<br>Mean±SD or mean (25%–75% range) or % (n) | Participants responding to month 6 of the "Monthly Survey: Menstrual Update" (n=3099)[a]<br>Mean±SD or mean (25%–75% range) or % (n) |
|---|---|---|
| Age (y),[b] mean±SD | 33.6±10.3 | 33.0±8.5 |
| Race, % (n) | | |
| White, non-Hispanic | 69.1 (6910) | 73.7 (2284) |
| Hispanic, Latina, Spanish and/or other Hispanic[c] | 12.0 (1202) | 10.2 (317) |
| Black or African American or African | 6.1 (609) | 4.7 (147) |
| Asian | 4.3 (428) | 4.4 (135) |
| Other | 2.7 (274) | 2.2 (67) |
| >1 race | 5.1 (513) | 4.7 (145) |
| Prefer not to answer, or missing | 0.6 (64) | 0.1 (4) |
| Gender identity, % (n) | | |
| Woman | 96.1 (9612) | 97.2 (3013) |
| Man | 0.3 (31) | <0.1 (3) |
| Transwoman | <0.1 (1) | 0 (0) |
| Transman | 0.17 (17) | <0.1 (3) |
| Genderqueer or nonbinary | 1.04 (104) | 1.3 (39) |
| Another gender identity or multiple selected | 0.9 (92) | 0.8 (25) |
| I prefer not to answer | 0 (0) | 0 (0) |
| Skip or missing | 1.4 (143) | 0.5 (16) |
| Sex assigned at birth, % (n) | | |
| Female | 98.5 (9845) | 99.5 (3085) |
| Intersex | 0.2 (19) | 0 (0) |
| Skip or missing | 1.3 (136) | 0.5 (14) |
| Education, n (%) | | |
| Never attended school or only attended kindergarten | 0.2 (18) | <0.1 (1) |

Mahalingaiah et al.

| Demographics | Participants at baseline, first 10,000 participants[a] Mean±SD or mean (25%–75% range) or % (n) | Participants responding to month 6 of the "Monthly Survey: Menstrual Update"[a] (n=3099)[a] Mean±SD or mean (25%–75% range) or % (n) |
|---|---|---|
| Grades 1 through 11 (primary, middle, or some high school) | 2.5 (250) | 1.3 (39) |
| Grade 12 or GED (high school graduate) | 12.4 (1237) | 9.1 (280) |
| 1 to 3 y after high school (technical school or some college or associate's degree) | 32.6 (3261) | 29.1 (904) |
| College 4 y or more (college graduate) | 30.5 (3053) | 35.5 (1099) |
| Master's degree | 15.6 (1563) | 18.9 (586) |
| Doctorate degree | 4.7 (473) | 5.5 (171) |
| I prefer not to answer | 0 (0) | 0 (0) |
| Skip or missing | 1.5 (145) | 0.6 (19) |
| Employment status, % (n) | | |
| Employed for pay (part-time, full-time, self-employed) | 70.3 (7031) | 77.1 (2388) |
| Unemployed | 5.6 (559) | 3.5 (109) |
| Unable to work (ie, disability, illness, other circumstances) | 4.2 (417) | 2.8 (86) |
| In school | 11 (1102) | 10.7 (331) |
| Taking care of house or family | 5.9 (584) | 5.0 (156) |
| In retirement | 1.5 (152) | 0.2 (7) |
| I prefer not to answer | 0.9 (97) | 0.5 (14) |
| Missing | 0.6 (58) | 0.3 (8) |
| Marital status, % (n) | | |
| Married | 39.6 (3951) | 41.5 (1285) |
| Divorced | 8.3 (831) | 6.8 (210) |
| Widowed | 0.8 (82) | 0.4 (12) |
| Separated | 1.9 (194) | 1.4 (43) |
| Never married | 33.5 (3347) | 34.6 (1071) |
| A member of an unmarried couple | 14.2 (1416) | 14.5 (450) |
| I prefer not to answer | 0 (0) | 0 (0) |
| Skip or missing | 1.8 (179) | 0.9 (28) |
| Socioeconomic status, % (n) | | |

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Mahalingaiah et al. Page 21

| Demographics | Participants at baseline, first 10,000 participants[a] Mean±SD or mean (25%–75% range) or % (n) | Participants responding to month 6 of the "Monthly Survey: Menstrual Update" (n=3099)[a] Mean±SD or mean (25%–75% range) or % (n) |
|---|---|---|
| 0–3 | 31.5 (3146) | 33.3 (1032) |
| 4–5 | 42.2 (4223) | 44.4 (1376) |
| 6–9 | 25.4 (2535) | 21.9 (678) |
| Missing | 0.96 (96) | 0.4 (13) |
| Region of the United States, % (n) | | |
| Northeast | 15.3 (1528) | 15.6 (484) |
| Midwest | 20.3 (2033) | 20.9 (649) |
| South | 34.8 (3477) | 32.7 (1013) |
| West | 24.9 (2492) | 25.8 (801) |
| Territory | 0.3 (25) | 0.3 (8) |
| Data not available | 4.5 (445) | 4.6 (144) |
| Apple Watch users, % (n) | 72.2 (7223) | 82.5 (2557) |
| Heart Rate SensorKit Data Opt-In Authorization, % (n) | 24.4 (2438) | 31.2 (968) |
| Menstrual flow HealthKit tracking | | |
| Tracked at least 1 menstrual cycle ever, % (n) | 82.7 (8266) | 95.1 (2948) |
| Tracked at least 1 menstrual cycle within 3 mo of enrollment, % (n) | 70.6 (7064) | 89.5 (2772) |
| Tracked at least 1 menstrual cycle within 6 mo of enrollment, % (n) | 72.4 (7236) | 91.4 (2833) |
| Average number of calendar months tracked before baseline | 8.08 (25%–75%; range, 2–13) | 9.12 (25%–75%; range, 3–16) |
| Average number of calendar months tracked within 3 mo of enrollment (among those tracking)[d] | 2.67 (25%–75%; range, 2–3) | 2.94 (25%–75%; range, 3–4) |
| Average number of calendar months tracked within 6 mo of enrollment (among those tracking)[d] | 4.44 (25%–75%; range, 3–6) | 5.29 (25%–75%; range, 5–6) |

*GED*, general equivalency diploma; *SD*, standard deviation.

[a] Subset for the first 10,000 participants enrolled and providing demographic data that met inclusion criteria (through May 20, 2020). First demographics entry captured for each participant;

[b] Age based on birth year;

[c] Includes all individuals identifying as Hispanic (exclusively or in addition to another race group). Detailed breakdown available in Supplemental Table 8;

[d] Number of calendar months where any bleeding events were tracked during the 3 month follow-up period can range in value from 0 to 4 because a single menstrual cycle can span 2 calendar months. Number of calendar months tracked during the 6 month follow-up period can range from 0 to 7 months.

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

Mahalingaiah et al.

**TABLE 2**

Monthly menstrual survey status count

| Menstrual status | Baseline % (n) | Survey #1 % (n) | Survey #2 % (n) | Survey #3 % (n) | Survey #4 % (n) | Survey #5 % (n) | Survey #6 % (n) |
|---|---|---|---|---|---|---|---|
| Menstruating | 87.6 (8763) | 55.4 (5540) | 42.7 (4274) | 37.9 (3791) | 36.6 (3659) | 33.6 (3355) | 30.2 (3021) |
| Lactation | 1.8 (183) | 1.0 (102) | 0.8 (83) | 0.6 (61) | 0.5 (53) | 0.5 (45) | 0.4 (38) |
| Menopause | 6.3 (634) | 0.3 (26) | 0.2 (22) | 0.1 (11) | <0.1 (6) | 0.1 (10) | <0.1 (5) |
| Pregnant | 1.1 (110) | 0.7 (67) | 0.3 (32) | 0.4 (35) | 0.3 (31) | 0.3 (26) | 0.3 (32) |
| Invalid response[a] | <0.1 (7) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) | 0 (0) |
| Prefer not to answer | 0.5 (54) | 0.1 (13) | <0.1 (2) | <0.1 (4) | <0.1 (2) | <0.1 (1) | <0.1 (2) |
| No response[b] | 2.5 (249) | 34.9 (3490) | 47.3 (4732) | 51.9 (5189) | 52.9 (5293) | 55.7 (5571) | 58.7 (5873) |
| Ineligible[c] | - | 7.6 (762) | 8.6 (855) | 9.1 (909) | 9.6 (955) | 9.9 (992) | 10.3 (1028) |

Subset for the first 10,000 participants enrolled and providing demographic data that met inclusion criteria (through May 20, 2020).

[a] Invalid Responses include those that are not biologically feasible (eg, "Pregnant" & "Menopause") and are most likely because of user error;

[b] There is no metadata captured for individuals who do not respond to the baseline or monthly surveys. This value is derived from subtracting the "Count Completed" column from the "Count Eligible" columns in Table 2;

[c] Individuals who reported a menstrual status of "Menopause," "Pregnant," or with an invalid response at baseline or in the monthly survey during a prior month are not eligible to receive the survey in subsequent months. In addition, participants who withdrew (N=11) from the study are not eligible to receive the survey. The 'Ineligible' group is a cumulative sum across the 6 month follow-up period.

Am J Obstet Gynecol. Author manuscript; available in PMC 2023 September 25.

Author Manuscript   Author Manuscript   Author Manuscript   Author Manuscript

**TABLE 3**

Monthly menstrual survey response totals

| Menstrual survey number | Count completed | Count eligible[a] | Percentage completed[b] |
|---|---|---|---|
| Baseline | 9751 | 10,000 | 97.5 |
| 1 | 5748 | 9238 | 62.2 |
| 2 | 4413 | 9145 | 48.3 |
| 3 | 3902 | 9091 | 42.9 |
| 4 | 3752 | 9045 | 41.5 |
| 5 | 3437 | 9008 | 38.2 |
| 6 | 3099 | 8972 | 34.5 |

[a]Subset for the first 10,000 participants enrolled and providing demographic data that met inclusion criteria (through May 20, 2020). Monthly menstrual surveys started in January 2020. Consecutive responses to surveys not required. Individuals who reported a menstrual status of "Menopause" or "Pregnant" at baseline or in the monthly survey were not eligible to receive the survey in subsequent months. In addition, participants who withdrew from the study (N=11) are not eligible to receive the survey;

[b]Percentage completed refers to proportion of individuals who were eligible to receive the baseline or monthly menstrual survey and completed the survey. Calculated using the 'Count Completed' and 'Count Eligible' columns.

Mahalingaiah et al.

Am J Obstet Gynecol. Author manuscript; available in PMC 2023 September 25.

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

TABLE 4

Summary of surveys, topics, number and source of questions

| Surveys | | Topics | Number of questions | Source of questions |
|---|---|---|---|---|
| Profile | | Name, date of birth, email, phone number, country, and state. | 7 | Study-specific |
| Demographics | | Race and ethnicity, social economic status, zip code, body measurements, sex, gender identity | 11 | Study-specific, All of Us study (NIH), Behavioral Risk Factor Surveillance System, Centers for Disease Control and Prevention, US Census Current Population Survey, MacArthur Scale of Subjective Social Status |
| Menstrual status survey | | Menstrual status, tracking cycles, tracking pregnancy, tracking health | 4 | Study-specific |
| Monthly survey | Menstrual update | Menstrual status, monthly tracking check-in, hormone use, health factors, pregnancy planning | 6 | Study-specific |
| | Pregnancy update | Pregnancy update, due date, pregnancy details, lactation. | 10 | Study-specific |
| | Lactation update | Lactation update | 1 | Study-specific |
| Annual health survey | | Physical activity, nutrition, sleep habits, stress level, alcohol use, tobacco use, electronic nicotine use, marijuana use, second-hand smoke, overall health | 30 | Study-specific, National Health and Nutrition Examination Survey, Centers for Disease Control and Prevention, Perceived Stress Scale, All of Us study (NIH) |
| Quarterly health survey | | Health update (sleep, nutrition, physical activity, stress, alcohol use, nicotine use) | 6 | Study-specific |
| Annual medical history | | Menstrual status; gynecologic, endocrine, heart, blood, digestive, kidney, lung, musculoskeletal, mental health and brain and nervous system conditions; cancer, infectious diseases, surgeries, gynecologic surgeries, gender and sexual orientation, family medical history, medical forms | 24 | Study-specific, Derived from OM Study, and Brief Health Literacy Screening Tool |
| Reproductive history | | Participant's birth details, early menstrual cycles, hormone use, hormone use details, pregnancy history | 18 | Study-specific and Derived from OM Study |

Adapted from Harvard University,[10] Denny et al,[11] Cohen et al,[12] Adler et al,[19] Centers for Disease Control and Prevention,[30] Chew et al,[31] Centers for Disease Control and Prevention.[32]

*NIH*, National Institutes of Health.

Mahalingaiah et al.

*Am J Obstet Gynecol*. Author manuscript; available in PMC 2023 September 25.

Page 24

# J. EXHIBIT J: CLINICALTRIALS.GOV

Exhibit **ClinicalTrials.gov** registration for Apple's study, identifier NCT04196595,

Case 25-11349 Doc 637 Filed 03/30/26 Entered 03/30/26 10:44:49 Desc Main
Document Page 224 of 804

 

✕





**Record 8 of 26**

⚠️ | **The U.S. government does not review or approve the safety and science of all studies listed on this website.**

Read our full disclaimer (https://clinicaltrials.gov/about-site/disclaimer) for details. | +

`Recruiting`

# Apple Women's Health Study

**ClinicalTrials.gov ID** ℹ️ NCT04196595

**Sponsor** ℹ️ Apple Inc.

**Information provided by** ℹ️ Apple Inc. (Responsible Party)

**Last Update Posted** ℹ️ 2024-07-03

# Study Details Tab

## Study Overview

### Brief Summary

This is an observational longitudinal study to advance the understanding of menstrual cycle and gynecologic health conditions including PCOS, infertility and breast cancer.The study will be hosted within the Research app(available on App Store), which allows a user to find, enroll, and participate in Apple-supported health-related research studies.

**Official Title**

Apple Women's Health Study

**Conditions** ⓘ

Menstrual Cycle   Ovulation   Menstruation   Polycystic Ovary Syndrome   Infertility   Menopause   Reproduction   Reproductive Health

**Other Study ID Numbers** ⓘ

- Pro00037562

**Study Start (Actual)** ⓘ

2019-11-14

**Primary Completion (Estimated)** ⓘ

2029-11

**Study Completion (Estimated)** ⓘ

2029-11

**Enrollment (Estimated)** ⓘ

500000

**Study Type** ⓘ

Observational

---

**Resource links provided by the National Library of Medicine**

MedlinePlus Genetics (https://medlineplus.gov/genetics/) related topics:  Polycystic ovary syndrome (https://medlineplus.gov/genetics/condition/polycystic-ovary-syndrome)

MedlinePlus (https://medlineplus.gov/) related topics: Infertility (https://medlineplus.gov/infertility.html)  Polycystic Ovary Syndrome (https://medlineplus.gov/polycysticovarysyndrome.html)

FDA Drug and Device Resources (https://clinicaltrials.gov/fda-links)

## Contacts and Locations

This section provides contact details for people who can answer questions about joining this study, and information on where this study is taking place.

To learn more, please see the Contacts and Locations section in How to Read a Study Record (https://clinicaltrials.gov/study-basics/how-to-read-study-record#contacts-and-locations).

### Study Contact ⓘ

**Name:** Shruthi Mahalingaiah, MD
**Phone Number:** 617-432-1356
**Email:** AppleWomensHealthStudy@hsph.harvard.edu

This study has 1 location

### United States

### Massachusetts Locations

📍 **Boston, Massachusetts, United States, 02115**
**Recruiting**
Harvard T.H. Chan School of Public Health
Contact :  Shruthi Mahalingaiah
617-432-1356
AppleWomensHealthStudy@hsph.harvard.edu

## Participation Criteria

Researchers look for people who fit a certain description, called eligibility criteria. Some examples of these criteria are a person's general health condition or prior treatments.

For general information about clinical research, read Learn About Studies (https://clinicaltrials.gov/study-basics/learn-about-studies).

### Eligibility Criteria

**Description**

Inclusion Criteria:

- Have menstruated at least once
- Be at least 18 years old (at least 19 years old in Alabama and Nebraska, at least 21 years old in Puerto Rico)
- Live in the United States of America
- Be comfortable communicating in written and spoken English
- Have installed the Apple Research app on your iPhone
- Not share your iCloud account or iPhone with anyone else
- Be willing and able to provide informed consent to participate in the study

**Study Population**

Convenience sampling of individuals who have ever menstruated and meet other eligibility criteria

**Ages Eligible for Study** ⓘ

18 Years and older (Adult,  Older Adult )

**Sexes Eligible for Study** ⓘ

All

**Accepts Healthy Volunteers** ⓘ

Yes

**Sampling Method**

Non-Probability Sample

## Study Plan

This section provides details of the study plan, including how the study is designed and what the study is measuring.

### How is the study designed?

## Design Details

**Observational Model ⓘ :** Cohort
**Time Perspective:** Prospective

## What is the study measuring?

**Primary Outcome Measures ⓘ**

| Outcome Measure | Measure Description | Time Frame |
|---|---|---|
| Identify Menstrual Cycle Patterns | Characterized using duration of menstrual flow, and cycle length in unit of days. | Up to 10 years |
| Epidemiologic Description of Menstrual Cycle | Characterized using cycle patterns and self-reported demographics, no unit of measure | Up to 10 years |

**Secondary Outcome Measures ⓘ**

| Outcome Measure | Measure Description | Time Frame |
|---|---|---|
| Determine prevalence of gynecologic health conditions | Characterized using menstrual cycle patterns and self-reported health conditions, no unit of measure | Up to 10 years |

## Collaborators and Investigators

This is where you will find people and organizations involved with this study.

**Sponsor** ⓘ

**Apple Inc.**

**Collaborators** ⓘ

- Harvard School of Public Health (HSPH)
- National Institute of Environmental Health Sciences (NIEHS)

**Investigators** ⓘ

- Principal Investigator: Michelle A Williams, SM, ScD,   Harvard School of Public Health (HSPH)
- Principal Investigator: Russ B Hauser, MD, MPH, ScD,   Harvard School of Public Health (HSPH)
- Principal Investigator: Brent A Coull, PhD,   Harvard School of Public Health (HSPH)
- Principal Investigator: Shruthi Mahalingaiah, MD, MS,   Harvard School of Public Health (HSPH)

# Publications

**From PubMed**

These publications are automatically filled in from PubMed, a public database of scientific and medical articles, and may or may not be about the study.

- Zhang CY, Li H, Zhang S, Suharwardy S, Chaturvedi U, Fischer-Colbrie T, Maratta LA, Onnela JP, Coull BA, Hauser R, Williams MA, Baird DD, Jukic AMZ, Mahalingaiah S, Curry CL. Abnormal uterine bleeding patterns determined through menstrual tracking among participants in the Apple Women's Health Study. Am J Obstet Gynecol. 2023 Feb;228(2):213.e1-213.e22. doi: 10.1016/j.ajog.2022.10.029. Epub 2022 Oct 29. (https://pubmed.ncbi.nlm.nih.gov/36414993)

# Study Record Dates

These dates track the progress of study record and summary results submissions to ClinicalTrials.gov. Study records and reported results are reviewed by the National Library of Medicine (NLM) to make sure they meet specific quality control standards before being posted on the public website.

**Study Registration Dates**

**First Submitted** ⓘ

2019-11-13

**First Submitted that Met QC Criteria** ⓘ

2019-12-10

**First Posted** ⓘ

2019-12-12

### Study Record Updates

**Last Update Submitted that Met QC Criteria** ⓘ

2024-07-01

**Last Update Posted** ⓘ

2024-07-03

**Last Verified** ⓘ

2024-07

# More Information

## Terms related to this study

**Keywords Provided by Apple Inc.**

Menstruation

Menstrual Cycle

Ovulation

Polycystic Ovary Syndrome

Infertility

Menopause

Reproduction

Reproductive Health

**Additional Relevant MeSH Terms**

Ovarian Cysts

Cysts

Neoplasms

Ovarian Diseases

Adnexal Diseases

Genital Diseases, Female

Female Urogenital Diseases

Female Urogenital Diseases and Pregnancy Complications

Urogenital Diseases

Genital Diseases

Gonadal Disorders

Endocrine System Diseases

Polycystic Ovary Syndrome

Infertility

## Plan for Individual Participant Data (IPD)

**Plan to Share Individual Participant Data (IPD)?**

Undecided

## Drug and device information, study documents, and helpful links

**Studies a U.S. FDA-Regulated Drug Product**

No

**Studies a U.S. FDA-Regulated Device Product**

No

# K.      EXHIBIT K: APPLE.COM

Example of Apple's own website promoting its "menstruation" and "ovulation"
software products and "studies" in 2019.

https://www.apple.com/newsroom/2019/09/apple-announces-three-groundbreaking-health-studies/]

Case 2:23-cv-04597-FMC Filed 03/30/26 Entered 03/30/26 10:44:49 Desc Main Document    Page 233 of 804

UPDATE
September 10, 2019

# Apple announces three groundbreaking health studies

🅕 𝕏 ✉ 🔗

In Collaboration with Leading Medical Institutions, Apple to Examine Hearing, Women's, Mobility and Heart Health



Three new studies, available on the new Research app this fall, will explore new areas of medical research.

Apple today announced three unprecedented medical studies, in partnership with leading academic and research institutions, that will reach more participants than has ever been possible. The studies will be available on the new Research app,[1] which democratizes how medical research is conducted by bringing together academic medical institutions, healthcare organizations and the Apple products customers already make a part of their everyday life. Participants will contribute to potential medical discoveries and help create the next generation of innovative health products. The Research app will be available as a free download in the App Store later this year.

"With the Apple Heart Study, we found that we could positively impact medical research in ways that help patients today and that make contributions that will benefit future generations," said Jeff Williams, Apple's chief operating officer. "Today's announcement carries our commitment to health even further by engaging with participants on a larger scale than ever before."



The Apple Heart and Movement Study will look into the connection of heart health and mobility signals, like walking pace.

The studies include:

- **Apple Women's Health Study**: In partnership with Harvard T.H. Chan School of Public Health and the NIH's National Institute of Environmental Health Sciences (NIEHS), Apple has created the first long-term study of this scale focused on menstrual cycles and gynecological conditions. This study will inform screening and risk

assessment of conditions like polycystic ovary syndrome (PCOS), infertility, osteoporosis, pregnancy and menopausal transition.

- **Apple Heart and Movement Study:** Apple is partnering with Brigham and Women's Hospital and the American Heart Association on a comprehensive study of how heart rate and mobility signals — like walking pace and flights of stairs climbed — relate to hospitalizations, falls, heart health and quality of life in order to promote healthy movement and improved cardiovascular health.

- **Apple Hearing Study:** Alongside the University of Michigan, Apple is examining factors that impact hearing health. The Apple Hearing Health Study is the first of its kind to collect data over time in order to understand how everyday sound exposure can impact hearing. The study data will also be shared with the World Health Organization (WHO) as a contribution toward its Make Listening Safe initiative.



The Apple Women's Health Study will explore gynecological conditions on an unparalleled scale.

Apple's support of the medical research community began with the introduction of ResearchKit and CareKit, which expanded the pace and scale at which healthcare could be studied and provided. Apple used ResearchKit to create the Apple Heart Study, which was the largest study of its kind and illustrated the impact virtual, large-scale studies can have on medical research by examining atrial fibrillation to provide validation for the irregular rhythm notification feature on Apple Watch.

"Women make up half of the world's population, yet even today there has been limited investment in studying their unique health needs,"

said Michelle A. Williams, a reproductive epidemiologist and dean of the faculty at the Harvard T.H. Chan School. "This study, unprecedented in scope, will greatly advance our understanding of the biological and social determinants of women's health, and lead to better health outcomes."

"This is an exciting opportunity for NIEHS researchers to contribute to the study design and use the resulting data to answer novel questions, not only important to women of reproductive age, but to women of all ages," said Dale Sandler, Ph.D., chief of the NIEHS Epidemiology Branch.

"We are excited to be working with all the study participants and with Apple to identify the features of complex human physiology that lead to different outcomes in wellness or chronic disease, and to use this information to empower individuals to maximize their own health," said Calum MacRae, the vice chair of Scientific Innovation for the Department of Medicine at Brigham and Women's Hospital and associate professor of Medicine at Harvard Medical School.

"At the American Heart Association, we are a relentless force for a world of longer, healthier lives, and we are committed to educating and empowering people to be proactive in all areas of their heart health and general well-being," said Nancy Brown, CEO of the American Heart Association. "We believe that emerging technology solutions that seek to provide deeper health insights offer great potential in getting us there. We are collaborating with Apple and Brigham and Women's Hospital on the Apple Heart and Movement Study to explore the correlation between a broad range of physical activities and a person's overall heart health to ultimately understand risks and interventions to improve health."

"We are excited about this unique opportunity to partner with Apple to determine how everyday activities affect our hearing," said DuBois Bowman, dean of the University of Michigan School of Public Health. "The information gleaned from this partnership will be critical for us to address the public health impact of various noise exposures on hearing loss in the United States."

"The World Health Organization is pleased to note the announcement of the Apple Hearing Study which will contribute toward our Make Listening Safe initiative by improving our understanding of users' listening behaviors," said Dr. Shelly Chadha, technical officer of Prevention of Deafness and Hearing Loss at the World Health Organization. "With over a billion young people who could be at risk of hearing loss due to unsafe listening, WHO is addressing this challenge through raising awareness and setting new standards for safe listening. The knowledge gained through this study will contribute to future public health action in this field."

**Images of Apple Health Studies**
Download all images ⬇

¹ Available in the US only

## Press Contacts

**Apple Media Helpline**

[media.help@apple.com](mailto:media.help@apple.com)

**Apple Media Helpline**

[media.uk@apple.com](mailto:media.uk@apple.com)

## More from Apple Newsroom



UPDATE

**Formula 1® begins this weekend, exclusively on Apple TV in the U.S.**

March 5, 2026



PRESS RELEASE

**Say hello to MacBook Neo**

March 4, 2026



PRESS RELEASE

**Apple debuts M5 Pro and M5 Max to supercharge demanding pro workflows**

March 3, 2026

 Newsroom

**The latest news and updates, direct from Apple.**

Read more



 > Newsroom > Apple announces three groundbreaking health studies

| Shop and Learn | Account | Apple Store | For Business | Apple Values |
|---|---|---|---|---|
| Store | Manage Your Apple Account | Find a Store | Apple and Business | Accessibility |
| Mac | Apple Store Account | Genius Bar | Shop for Business | Education |
| iPad | iCloud.com | Today at Apple | | Environment |
| iPhone | | Group Reservations | **For Education** | Inclusion and Diversity |
| Watch | **Entertainment** | Apple Camp | Apple and Education | Privacy |
| Vision | Apple One | Apple Store App | Shop for K-12 | Racial Equity and Justice |
| AirPods | Apple TV | Certified Refurbished | Shop for College | Supply Chain Innovation |
| TV & Home | Apple Music | Apple Trade In | | |
| AirTag | Apple Arcade | Financing | **For Healthcare** | **About Apple** |
| Accessories | Apple Fitness+ | Carrier Deals at Apple | Apple and Healthcare | Newsroom |
| Gift Cards | Apple News+ | Order Status | | Apple Leadership |
| | Apple Podcasts | Shopping Help | **For Government** | Career Opportunities |
| | | | Apple and Government | |

Case 25:23-cv-04597-EMC Filed 03/30/2630 Entered 03/30/26 16:44:49 Page 79 of 217
Document    Page 238 of 804

**Apple Wallet**

Wallet

Apple Card

Apple Pay

Apple Cash

Apple Books

App Store

Shop for Veterans and Military

Shop for State and Local
Employees

Shop for Federal Employees

Investors

Ethics & Compliance

Events

Contact Apple

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE (1-800-692-7753).

Copyright © 2026 Apple Inc. All rights reserved.    Privacy Policy | Terms of Use | Sales and Refunds | Legal | Site Map    United States | Español

# L. EXHIBIT L: WHITE HOUSE OFFICE OF SCIENCE AND TECHNOLOGY POLICY

Case: 25-2028, 05/12/2025, DktEntry: 19.3, Page 201 of 713

Case 23-1349604599-65C File 00 Date 06/26/Entered 03/30/26 20:44:49 Desc Main
Document       Page 240 of 804

# Your Comment Submitted on Regulations.gov (ID: OSTP_FRDOC_0001-0008)

---

| From | no-reply@regulations.gov <no-reply@regulations.gov> |
|---|---|
| To | Ashley Gjovik<ashleymgjovik@protonmail.com> |
| Date | Thursday, June 29th, 2023 at 5:07 PM |

---

Please do not reply to this message. This email is from a notification only address that cannot accept incoming email.

Your comment was submitted successfully!
Comment Tracking Number: ljh-mm9t-ux8w

Your comment has been sent for review. This process is dependent on agency public submission policies/procedures and processing times. Once the agency has posted your comment, you may view it on [Regulations.gov](Regulations.gov) using your Comment Tracking Number.

Agency: OFFICE OF SCIENCE AND TECHNOLOGY POLICY (OSTP)
Document Type: Notice
Title: Request for Information: Extension of Comment Deadline Automated Worker Surveillance and Management
Document ID: OSTP_FRDOC_0001-0008

Comment:
I am filing a comment on behalf of myself, a worker with US labor agency charges & cases that involve critical public policy concerns about worker surveillance and electronic monitoring. Please see attached memo in response to this request for information.

Uploaded File(s):
OSTP Gjovik Comment 2023.pdf

For further information about the [Regulations.gov](Regulations.gov) commenting process, please visit [https://www.regulations.gov/faq](https://www.regulations.gov/faq).

**Ashley M. Gjovik, J.D.**
ashleymgjovik@protonmail.com

*Request for Information:*

*Automated Worker Surveillance and Management*

Federal Register No. 2023-12995

Doc ID: OSTP_FRDOC_0001-0008

# U.S. OFFICE OF SCIENCE AND TECHNOLOGY POLICY

## INFORMATION

**Associated Cases:**

U.S. Department of Labor:
*Ashley Gjovik v Apple* (9-3290-22-051)

U.S. National Labor Relations Board
*NLRB v Apple* (32-CA- 284428)

California Department of Labor:
*Ashley Gjovik v Apple* (RCI-CM-842830)

**Associated Investigations:**

U.S. National Labor Relations Board
Charge No. 32-CA-282142, 32-CA-283161, & 32-CA-288816 (Division of Advice & Region 31)

U.S. Federal Trade Commission
Report No. 154835129

U.S. Securities & Exchange Commission
Tip No. 16488- 304-158- 087 (SF Regional Office)

German Federal Commissioner for Data Protection and Freedom of Information (BfDI)
Complaint No. # 11-540 II#3693 (Bavaria Office)

- 1 -

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 4

    APPLE'S CULTURE OF "LOYALTY" & INTIMIDATION ............................................................. 6

ELECTRONIC MONITORING & DATA COLLECTION ........................................................ 12

    "FACE ID" & APPLE'S FACE "GOBBLER" APPLICATION ....................................................... 12

    EAR STUDIES .......................................................................................................................... 27

    OTHER USER STUDIES ............................................................................................................ 30

    RADAR & SYSDIAGNOSE ......................................................................................................... 32

SECRECY ............................................................................................................................... 33

    SECRECY POLICIES .................................................................................................................. 33

    SEARCH AND PRIVACY POLICIES ............................................................................................ 35

PUBLIC POLICY .................................................................................................................... 40

CONCLUSION ........................................................................................................................ 46

ORIGINALLY SUBMITTED AS "COMPLAINT FOR INVASION OF PRIVACY" IN APRIL 2022; REVISED FOR OSTP IN JUNE 2023

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

June 29, 2023

To Whom it May Concern,

The United States' legal protections for human rights at work lags far behind countries in the European Union, especially France and Germany. Similarly, national legal protections for digital privacy are basically non-existent in the United States and are decades behind other nations.

Over the last few years, we have witnessed increasing surveillance, electronic monitoring, and digital exploitation of workers in the United States. We have also seen an increasing number of requests from politicians, agencies, unions, and civil society asking the US government for legal protections for workers.

Despite numerous and persistent requests from Senators,[1] NGOs,[2] unions, and from workers themselves[3] – there is no progress to be seen. Despite a number of agency memos[4] and social media posts, we have yet to see any new legal protections or even any meaningful enforcement of violations of existing laws.

While you will likely receive comments and information from groups with more expertise on the history, policy, and legal landscape of this topic – what I can offer you is a first-hand case study in failure.

My story as a worker in the United States, for one of the biggest companies in this country, highlights the lack of legal protections for workers, the lack of express privacy protections for citizens, and the lack of any actual enforcement mechanism even for egregious violations of the narrow privacy/labor laws we do have on the books today. My story also highlights how my employer understood this current landscape and thus acted with an aggressive

---

[1] Letter from Senator Casey to U.S. Department of Labor, August 26 2022, https://www.casey.senate.gov/imo/media/doc/letter_to_the_department_of_labor_re_worker_privacy.pdf

[2] *CDT, GFI, Others Send Memos Urging White House to Take Action on Electronic Workplace Surveillance,* April 3 2023, https://cdt.org/insights/cdt-gfi-others-send-memos-urging-white-house-to-take-action-on-electronic-workplace-surveillance/ ; AI Now, *Algorithmic Management: Restraining Workplace Surveillance*, https://ainowinstitute.org/publication/algorithmic-management

[3] TechCrunch, *Ex-Apple employee takes Face ID privacy complaint to Europe*, April 11 2022, https://techcrunch.com/2022/04/11/gobbler-complaint-europe/

[4] U.S. NLRB, *NLRB General Counsel Issues Memo on Unlawful Electronic Surveillance and Automated Management Practices*, https://www.nlrb.gov/news-outreach/news-story/nlrb-general-counsel-issues-memo-on-unlawful-electronic-surveillance-and

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND
MANAGEMENT IN THE UNITED STATES**

disregard for the law, ethics, or social norms. So far, they were right & they have faced no consequences.

In March 2022, I received a written statement from my employer's lawyers admitting they fired me (with multiple federal investigations already open due to my charges against them for whistleblower retaliation, environmental and labor violations, and fraud); but claiming I was not fired in retaliation for that, but instead fired for supposedly 'legal' retaliation for my protests of their unlawful surveillance of employees, their intimidation and censorship of employees, and their coercive harvesting of sensitive worker information in order to build their products (in ways that they admitted in writing that would be illegal in France of Germany).[5] In response, in addition to complaining further to US agencies, I also filed a complaint to other countries where my ex-employer has large offices.[6]

Despite overwhelming evidence and even a written confession admitting what my employer has done, my charges have sat with federal agencies for nearly two years now gathering dust. Despite my being a US citizen and all of this occurring within the United States, as far as I can tell, there has been more progress investigating my claims in Germany then there has been in the United States.[7]

# **Introduction**

I worked for Apple as a Senior Engineering Program Manager from February 2015 until my termination on September 9 2021. During my tenure with Apple, I participated in engineering project management of numerous high-profile products such as the iPhone, iPad, iPod, Apple Watch, MacBook MacBook Pro, MacBook Air, Mac Pro, iOS, macOS, watchOS -- and high-profile projects/programs such as the launch of the Apple Music subscription service, Apple's transition of computers from Intel to Apple silicon, and the development of a company-

---

[5] Gizmodo, *Apple Wanted Her Fired. It Settled on an Absurd Excuse*, Oct 14 2021, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789
[6] Télérama, *Ashley Gjøvik, lanceuse d'alerte licenciée par Apple, seule contre tous,* March 14 2023, https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php
[7] Der Speigel, *Apple lädt Mitarbeiter zu Datenparty – um Gesichter zu scannen,* June 24 2022, https://www.spiegel.de/netzwelt/gadgets/apple-laedt-mitarbeiter-zu-daten-party-um-gesichter-zu-scannen-a-54c4a2da-0f39-48be-9762-1bda39fcca8e

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

wide Artificial Intelligence ethics policy. I was told by my Apple managers that I was both "key talent" (irreplaceable) and a "high performer."

In August 2021, I expressed public concerns about Apple's overly restrictive and invasive employee policies, and Apple pressuring its employees to participate in invasive data collection procedures, including scans of ears/ear canals (which I believed captured employee data that could be used for biometric identification and mass surveillance). I also raised concerns about an iOS application (the Face "Gobbler") on employees' iPhones that automatically took photos/videos whenever it "*thought it saw a face*." [8] I raised concerns about Apple's unlawfully invasive "*Search and Privacy Policy*" for employees, Apple's limitless access to employees' personal iCloud/Apple-server-based data, and Apple's culture of intimidation and secrecy including a private police force with access to all of the above data.[9]

Apple terminated me on September 9 2021 for reasons unknown to me at that time but assumed by myself and the press to be retaliation for my protected activities (I had filed labor and retaliation charges with the U.S. government only weeks earlier; and the US EPA demanded an inspection of my Superfund office due to my disclosures, conducted the inspection and found CERCLA non-compliance issues also only weeks prior).[10] [11]

Apple contacted me via external lawyers a week after I was fired to complain about several Twitter posts I made. Suggesting these posts were the reason for my termination was so farfetched & pretextual that a detailed article was written about it, titled "*Apple Wanted Her Fired. It Settled on an Absurd Excuse*."[12]

Last year, Apple offered their explanation for my termination to the U.S Department of Labor (in response to my allegations of federal whistleblower retaliation in violation of SOX,

---

[8] Zoe Schiffer, *"Apple Cares About Privacy, Unless You Work at Apple,"* The Verge, Aug 30, 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id
[9] Sarah Roach, *"Worker surveillance is making employees miserable. What to consider before implementing monitoring tools,"* Protocol, Sept 20 2021, https://www.protocol.com/workplace/worker-surveillance-is-making-employees-miserable
[10] Patrick McGee, *"US labour board examines retaliation claims against Apple: Senior engineering program manager's allegations include workplace harassment and job reassignment,"* Financial Times, Sept 2 2021, https://www.ft.com/content/484fa8be-925e-495c-91ff-54950b112754
[11] US EPA, TRW Microwave Superfund, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.docdata&id=0901181
[12] Dell Cameron, *Apple Wanted Her Fired. It Settled on an Absurd Excuse,* Gizmodo (Oct 2021), https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

CERCLA, and OSHA statutes).[13] Apple doubled down on the "absurd excuse" & cited my opposition to their harvesting of employee biometrics and their secret, invasive photography of employees as a legitimate justification for my termination.[14] I am now even more concerned knowing Apple felt comfortable telling the U.S. government that they believe their unlawful invasion of employee privacy is "legitimate" and any employees who protest privacy invasions deserve to be terminated, as I was. Any argument Apple had that employees consented to these practices was thrown out the window when they formally claimed I was terminated without warning for protesting those practices.

### APPLE'S CULTURE OF "LOYALTY" & INTIMIDATION

I will describe some of these practices which Apple claimed were so secret, they'd terminate an employee for protesting and exposing them. However, first, it is important to establish that at Apple, there is a long-standing tradition that workers keep their mouths shut, do what they are told, and be 'loyal' to the company above all else.

GDPR recognizes that employment relationships are inherently coercive and thus employees cannot provide meaningful consent to invasive surveillance and data collection practices. In the US, we sometimes still default to a neoliberal view that a 'request' or 'preference' from an employer is somehow optional and thus employees have agency to decline. This is not accurate and Apple provides an incredible example of how many US companies operate but may be too afraid to explain aloud. Apple says the quiet parts aloud because they have terrorized their employees to the extent Apple was sure their employees would not report the misconduct.

In stark contrast to international labor standards, Apple's "**Worldwide Loyalty Team**" *"does KGB-style lockdowns [of employees] and Gestapo interrogations that end in suicides."* [15] The team is an *"internal secret police team known for its network of informers, and ruthless,*

---

[13] Patrick McGee, "*Apple faces probe over whether it retaliated against whistleblower,"* Financial Times, Dec 13 2021, https://www.ft.com/content/973aae8d-21d9-4e84-8912-ead071c7935d

[14] Letter from Apple Inc (via Orrick, Herrington & Sutcliffe LLP) to U.S. Department of Labor, March 4 2022, Re: *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051

[15] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**

*systematic pursuit of leakers*." [16] "Among some employees, they are known as the "*Apple Gestapo*," *a group of moles always spying in headquarters and stores, reporting directly to the CEO.*"[17] Apple holds out its security policies out as "*voluntary*" meanwhile: "*management recommends that you relinquish your phones. If you don't do it they will fire you, or they will investigate why you didn't want to give them your cellphone.*" [18]

Apple's Global Security team has a sketchy history, including Apple employees accused in 2011 of impersonating policemen and searching a man's San Francisco home for a lost prototype, and threatening to have the man deported if he did not cooperate. [19] Apple was also accused in 2010 of violating California's shield law with an illegal search warrant, when they searched the home of a journalist, again looking for a prototype. [20] Gawker described Apple's secret police as "*sleazy*."

Apple employees' experience with this *Gestapo* have been described by the press as "*knowing how it feels to be watched, to always be considered guilty of crimes against another kind of state. Knowing how it felt to have no privacy whatsoever when he was working right here, in a little Californian town called Cupertino, in a legendary place located in One Infinite Loop.*" [21] Indeed, a few years later an ex-Apple executive described the culture at Apple as "*everything is on a need-to-know basis*" and that Apple has "*cells, **like a terrorist organization**.*"[22]

Further, while some Apple employees may report an earnestly positive experience, the company is large and has decades of history of very negative experiences for many others. Apple has gone to great lengths to conceal and cause society to forget its bad behavior. Apple has a

---

[16] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader

[17] Gizmodo, *Apple Gestapo: How Apple Hunts Down Leaks*, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058

[18] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader

[19] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader

[20] CNET, *Apple pushed security executive out,* https://www.cnet.com/news/source-apple-pushed-security-executive-out/ ; MarketWatch,*Police task force oversight committee has included Apple*, https://www.marketwatch.com/story/apple-has-sat-on-steering-committee-for-task-force-2010-04-27

[21] Gawker, *Apple's Sleazy Secret Police Lose Their Leader*, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader

[22] *This Is How Apple Keeps the Secrets,* 2012, https://fortune.com/2012/01/18/the-secrets-apple-keeps/

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND
MANAGEMENT IN THE UNITED STATES**

long history of child labor,[23] "sweatshop" working conditions,[24] hexane poisoning,[25] mishandling of toxic waste,[26] worker "interrogations" leading to suicide,[27] suicides at the corporate headquarters,[28] "no-suicide vows,"[29] "suicide nets,"[30] and even lobbying **for** forced labor.[31] Workers from Silicon Valley to Albania complain of surveillance, invasions of privacy, oppression, and unsafe work conditions.[32]

Apple workers around the globe have been involved in organizing since at least the 1990s. Apple worker organizations have been made up of retail, corporate, contract, and other workers. Unionization efforts started in the United States back in 1991 with Apple's janitors successfully unionizing with SEIU through protests, boycotts, press coverage, and even a hunger strike.[33]

In 2013, retail workers started organizing a "Apple Retail Workers Union" and calling for a formal labor union.[34] Apple security guards started organizing and looking to form a union in 2014

---

[23] Guardian, "*Child labour uncovered in Apple's supply chain: Internal audit reveals 106 children employed at 11 factories making Apple products in past year,*" 2013 , https://www.theguardian.com/technology/2013/jan/25/apple-child-labour- supply; BBC, "*Apple, Samsung and Sony face child labour claims,*" 2016, https://www.bbc.com/news/technology-35311456 ; AP, "*Lawsuit: Apple, Microsoft profit from child cobalt miners,*" 2019, https://apnews.com/article/technology-business- africa-lawsuits-politics-a950d585f885f670aee416db8973e3f3

[24] Washington Post, "*Sweatshop Conditions at IPod Factory Reported,*" 2006, https://www.washingtonpost.com/wp- dyn/content/article/2006/06/15/AR2006061501898.html

[25] ICRT, "*Harsh Reality Behind Apple Scandal,*" https://icrt.co/harsh-reality-behind-apple-scandal/ ; Wired, "*Workers Plan to Sue iPhone Contractor Over Poisoning,*" 2010 https://www.wired.com/2010/05/wintek-employees-sue/

[26] California DTSC, "*Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations,*" 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/

[27] Gizmodo, "*Report: iPhone Leak Interrogations Drive Foxconn Employee to Suicide,*" 2009, https://gizmodo.com/report- iphone-leak-interrogations-drive-foxconn-employ-5319275

[28] CNN, *"Apple employee found dead at HQ shot himself,"* 2016, https://money.cnn.com/2016/04/28/technology/apple- employee-death-gun-suicide/index.html

[29] NBC News, "*Chinese factory asks for 'no suicide' vow,*" 2010, nbcnews.com/id/wbna37354853

[30] WIRED, "*Foxconn Rallies Workers, Leaves Suicide Nets in Place,*" 2010, https://www.wired.com/2010/08/foxconn- rallies-workers-installs-suicide-nets/

[31] Washington Post, "*Apple is lobbying against a bill aimed at stopping forced labor in China,*" 2020, https://www.washingtonpost.com/technology/2020/11/20/apple-uighur/

[32] What It's Like to Work Inside Apple's 'Black Site': Contractors a few miles from the company's spaceship-like headquarters live in fear of termination—and the bathroom lines. Bloomberg, (Feb 2019), https://www.bloomberg.com/news/features/2019-02-11/apple-black-site-gives-contractors-few-perks-little-security ; Big Tech call center workers face pressure to accept home surveillance: Workers at one of the world's largest call center companies said additional monitoring would violate the privacy of their families in their homes. NBC News: (Aug 2021), https://www.nbcnews.com/tech/tech-news/big-tech-call-center-workers-face-pressure-accept-home-surveillance-n1276227

[33] UNION CLAIMS KEY VICTORY IN BID TO `CLEAN UP` SILICON VALLEY, Chicago Tribune, 1992, https://www.chicagotribune.com/news/ct-xpm-1992-07-20-9203050495-story.html

[34] Apple Store Employee Cory Moll Seeks Union For Retail Staffers, Huffpost, Jun 13 2011, https://www.huffpost.com/entry/apple-store-employees-union-cory-moll-retail-workers_n_875767

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

with SEIU.[35] At that time, a USWW union executive complained, "*Apple frequently intimidates workers and retaliates against those who get involved with the union around the country*." [36]

In 2015, Apple shuttle and bus drivers successfully unionized with the Teamsters.[37] Starting in 2022, numerous Apple Retail Stores in the US have attempted to unionize.[38] Union-busting tactics were already reported early on.[39] Apple retail store employees in Atlanta Georgia withdrew an election citing 'illegal union-busting tactics' by Apple.[40] "*Apple has conducted a systematic, sophisticated campaign to intimidate them and interfere with their right to form a union,*" the CWA representative said. [41] NLRB General Counsel found merit Apple was unlawfully forcing workers to attend captive audience meetings.[42] In September 2022, an Oklahoma City Apple retail store petitioned for an election, represented by CWA, and voted to unionize in October of 2022. They also filed charges with the NLRB against Apple for *"illegally surveilling, threatening and questioning workers at the Oklahoma City store."* [43] [44]

In October 2022, the NLRB issued a complaint against Apple over accusations that Apple interrogated its retail workers about their union support and prevented pro-labor fliers in a store break room.[45] The union accused Apple of interrogating staff at a World Trade Center store and

---

[35] Guards Need Job Security of Their Own, Say Apple Store Protesters, In These Times, 2014, https://inthesetimes.com/article/guards-need-security-of-their-own-say-apple-store-protesters

[36] Guards Need Job Security of Their Own, Say Apple Store Protesters, In These Times, 2014, https://inthesetimes.com/article/guards-need-security-of-their-own-say-apple-store-protesters

[37] Silicon Valley Shuttle Drivers Vote to Join Union, Feb 2015, NYT, https://archive.nytimes.com/bits.blogs.nytimes.com/2015/02/28/silicon-valley-shuttle-drivers-vote-to-join-union/?_r=0

[38] Some U.S. Apple Store employees are working to unionize, part of a growing worker backlash, Washington Post, Feb 18 2022, https://www.washingtonpost.com/technology/2022/02/18/apple-retail-stores-union-labor/

[39] Some U.S. Apple Store employees are working to unionize, part of a growing worker backlash, Washington Post, Feb 18 2022, https://www.washingtonpost.com/technology/2022/02/18/apple-retail-stores-union-labor/

[40] Apple Atlanta Workers Drop Bid for Union Vote Next Week, Claiming Intimidation, Bloomberg, May 27 2022, https://www.bloomberg.com/news/articles/2022-05-27/apple-atlanta-workers-drop-bid-for-unionization-vote-next-week

[41] Apple Atlanta Workers Drop Bid for Union Vote Next Week, Claiming Intimidation, Bloomberg, May 27 2022, https://www.bloomberg.com/news/articles/2022-05-27/apple-atlanta-workers-drop-bid-for-unionization-vote-next-week

[42] The Fallout From Apple's Bizarre, Dogged Union-Busting Campaign, WIRED, July 28 2022, https://www.wired.com/story/apples-union-busting-campaign-caused-a-bad-fallout/

[43] An Apple Store in Oklahoma City votes to unionize, TechCrunch, Oct 15 2022, https://techcrunch.com/2022/10/15/an-apple-store-in-oklahoma-city-votes-to-unionize/

[44] Apple Employees in Oklahoma City Petition to Unionize Store, Bloomberg, September1 2022, https://www.bloomberg.com/news/articles/2022-09-01/apple-employees-in-oklahoma-city-petition-to-unionize-store?sref=ExbtjcSG

[45] NLRB Issues Complaint Against Apple, NYT, Oct 4 2022, https://www.nytimes.com/2022/10/04/business/apple-store-nlrb-ruling.html

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND
MANAGEMENT IN THE UNITED STATES**

discriminating against union supporters in enforcing a no-soliciting policy.[46]  In June 2023, an NLRB judge ruled against Apple, finding Apple violated federal labor law.[47]

In December 2022, Apple retail workers organizing with CWA in Columbus Ohio filed a complaint to the NLRB alleging Apple was "*soliciting employees to join an employer-created / employer-dominated labor organization as a means of stifling union activities*" (aka an unlawful company union) in addition to holding captive audience meetings and making threats. [48] In December 2022, NLRB found merit that Apple violated the NLRA in Atlantic Georgia.[49] In January 2023, NLRB found merit in five unfair labor practice charges filed by corporate employees.[50]

In China, Apple directly employs 12,000 workers across its retail and corporate divisions and claims agency over 4.8 million workers in the country; likely most are contracted through Apple's suppliers and manufacturing plants, including at least 1.2 million working at Foxconn's iPhone assembly factories.[51] Foxconn is the largest unionized company in the world. Foxconn made global headlines with a wave of worker suicides at the company's Chinese plants in 2009 and 2010, and after its treatment of its huge workforce has attracted intense scrutiny. Foxconn and Apple's response to the suicides was to have large nets installed outside many of the buildings to catch falling bodies ("suicide nets"), and workers were made to sign pledges stating they would not attempt to kill themselves.[52] Foxconn has become a focus for criticism of practices widespread in Chinese factories including illegal overtime, low pay, and the use of underage workers.[53] Even last year, Foxconn's Apple factories were in the news again – now with allegations of indentured servitude and

---

[46] Apple Created a Pseudo-Union to Defeat Organizers in Ohio, Complaint Claims, Bloomberg, December 16 2022, https://www.bloomberg.com/news/articles/2022-12-16/apple-created-pseudo-union-to-defeat-organizers-complaint-says

[47] Bloomberg, *Apple Illegally Interrogated Staff About Union, Judge Rules*, June 2023, https://www.bloomberg.com/news/articles/2023-06-21/apple-illegally-interrogated-staff-about-union-judge-rules

[48] Apple Created a Pseudo-Union to Defeat Organizers in Ohio, Complaint Claims, Bloomberg, December 16 2022, https://www.bloomberg.com/news/articles/2022-12-16/apple-created-pseudo-union-to-defeat-organizers-complaint-says

[49] Apple Created a Pseudo-Union to Defeat Organizers in Ohio, Complaint Claims, Bloomberg, December 16 2022, https://www.bloomberg.com/news/articles/2022-12-16/apple-created-pseudo-union-to-defeat-organizers-complaint-says

[50] Apple Executives Violated Worker Rights, Labor Officials Say, Bloomberg, Jan 30 2023, https://www.bloomberg.com/news/articles/2023-01-30/apple-executives-violated-worker-rights-us-labor-officials-sa

[51] Apple Supports 4.8 Million Jobs in China, More Than Double US Total, Yahoo, March 17 2017 , https://www.yahoo.com/news/apple-supports-4-8-million-135220928.html

[52] Life and death in Apple's forbidden city, The Guardian, Jun 18 2017, https://www.theguardian.com/technology/2017/jun/18/foxconn-life-death-forbidden-city-longhua-suicide-apple-iphone-brian-merchant-one-device-extract

[53] Foxconn plans Chinese union vote, CNN, Feb 4 2013, https://edition.cnn.com/2013/02/03/business/china-foxconn-union/index.html

## Information for OSTP on Automated Worker Surveillance and Management in the United States

trafficking, and when workers protested the abuse, they were met with beatings by state police.[54]

On December 18, 2014, retail workers in Apple's Japan stores announced a union affiliated with Tozen. Three of Japan's ten Apple stores are now unionized with Tozen.[55] There have also been unions and worker protests in India. In December 2020, thousands of contract workers at a Bangalore factory owned by Apple supplier Wistron Corp protested over alleged non-payment of wages.[56] Other violations highlighted found upon further investigation included underpayment of wages to contract workers and housekeeping staff, and making female staff work overtime without legal authorization.[57] In December 23 2021, 159 workers protested for poor working conditions and a mass poisoning incident.[58] Twenty-two activists, including leaders of the Centre of Indian Trade Unions (CITU), were put behind bars for extending support to the workers and visiting them.[59]

In September 2022, Australian workers brought Apple to the Fair Work Commission over employee demands for better pay and a guaranteed weekend.[60] The workers secured a protected action order with the nation's Fair Work Commission, which would allow them to protest without risking their jobs or getting sued.[61] The national secretary of the SDA Union, accused Apple of acting like "a cheap bully in a cheap suit" and said it never should have taken intervention from the Fair Work Commission for Apple to come to the table. "This giant multinational should have more regard for the welfare of its Australian workforce than to try to dictate a pre-determined outcome it wants to impose rather than engaging in genuine bargaining. This is Australia not the United States," he said.[62] In October 2022, with three Australian unions negotiating with Apple for better pay,

---

[54] Foxconn apologizes for pay dispute at China factory, San Diego Union-Tribune, Nov 24 2022, https://www.sandiegouniontribune.com/business/nation/story/2022-11-24/foxconn-apologizes-for-pay-dispute-at-china-factory

[55] Apple Retail Workers Unionize in Japan, Tozen, 2014, https://tozenunion.org/apple-retail-workers-unionize-in-japan/

[56] India: arrests made after protest over food poisoning at Apple supplier Foxconn site in Chennai , SCMP, December 20 2021, https://www.scmp.com/news/asia/south-asia/article/3160425/india-arrests-made-after-protest-over-food-poisoning-apple

[57] Apple puts supplier Wistron on notice after Indian factory violence, Reuters, December 19 2020, https://www.reuters.com/article/apple-india-idCAKBN28T0DW

[58] TN: Underpaid and Exploited Foxconn Workers Burst in Protest After Workers Fell ill, Newsclick, 23 December 2021, https://www.newsclick.in/TN-Underpaid-Exploited-Foxconn-Workers-Burst-Protest-Workers-Fell-ill

[59] TN: Underpaid and Exploited Foxconn Workers Burst in Protest After Workers Fell ill, Newsclick, 23 December 2021, https://www.newsclick.in/TN-Underpaid-Exploited-Foxconn-Workers-Burst-Protest-Workers-Fell-ill

[60] 'Bully in a cheap suit': Apple agrees to negotiate with Australian staff after union showdown, The Guardian, September 21 2022, https://www.theguardian.com/technology/2022/sep/21/bully-in-a-cheap-suit-apple-agrees-to-negotiate-with-australian-staff-after-union-showdown

[61] Australian Workers Are the Latest International Apple Staff to Unionise, VICE, September 8 2022, https://www.vice.com/en/article/qjk3eb/australian-workers-union-apple-strike

[62] 'Bully in a cheap suit': Apple agrees to negotiate with Australian staff after union showdown, The Guardian, September 21 2022, https://www.theguardian.com/technology/2022/sep/21/bully-in-a-cheap-suit-apple-agrees-to-negotiate-with-australian-staff-after-union-showdown

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**

benefits, and working conditions – 150 workers engaged in a strike.[63]

Apple is a huge multinational corporation based in the United States with a long history of labor and human rights violations in their domestic and international supply chain and operations. If Apple is not held accountable in the country the corporation is headquartered in, what hope do other countries have in enforcing international labor standards against Apple abroad? The United States must set expectations for Apple here & abroad – that whether it is California labor and privacy laws, United States labor statutes, foreign national labor laws, or international standards such as from the International Labor Organization – whether it is employees, contractors, or vendors – Apple should be expected to made a good faith effort to follow the law, and governments should be able to investigate allegations of misconduct with independence and integrity. But that is not occurring; enter, my case study.

# Electronic Monitoring & Data Collection

### "FACE ID" & APPLE'S FACE "GOBBLER" APPLICATION

Apple announced its "Face ID" iPhone authentication feature on September 12, 2017.[64] Face ID captures, collects, and possesses Face ID users' facial geometry by *"projecting and analyzing tens of thousands of invisible dots to create a depth map of [the user's] face and also captures an infrared image of [the user's] face."*[65] Face ID data is "*refined and updated as [users] use Face ID*."[66] Apple says their average users unlock their phones 80 times a day, but other reports state people look at their phones upwards of 130 times a day.[67] Apple says Face ID is "*attention aware*" and only unlocks an iPhone when the user's eyes are open and looking at the screen.[68]

---

[63] New Crack in Apple's Armor as Dozens Strike at Its Stores in Australia, NYT, Oct 18 2022, https://www.nytimes.com/2022/10/17/business/apple-store-strike-australia.html

[64] Apple announced Face ID during the unveiling of the iPhone X on September 12, 2017, https://www.theverge.com/2017/9/12/16288806/apple-iphone-x-price-release-date-features-announced

[65] Apple Inc, *About Face ID advanced technology*, https://support.apple.com/en-us/HT208108

[66] Apple Inc, *Face ID Privacy*, https://www.apple.com/legal/privacy/data/en/face-id/

[67] Ben Bajarin, *Apple's Penchant for Consumer Security*, Techpinions, April 2016, https://techpinions.com/apples-penchant-for-consumer-security/45122,

[68] Apple Inc, *Change Face ID and attention settings on iPhone*, https://support.apple.com/en-ph/guide/iphone/iph646624222/ios

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

Privacy concerns arose quickly after launch, the security of biometrics gathered/stored by Face ID.[69] TechCrunch wrote, *"Face ID raises a range of security and privacy concerns because it encourages smartphone consumers to use a facial biometric for authenticating their identity and specifically a sophisticated full three-dimensional model of their face."*[70] Concerns were also raised the year before about Apple's "faceprints" in its Photos applications. The Verge wrote, *"There's a real privacy issue at stake… Facial recognition can be put to some very creepy uses when faceprints are freely available."* [71]

A researcher warned in 2017, "*once the Face ID system is enabled, the iPhone X can become a potential technology for users to be spied on without noticing. Information about faces can contain a lot of personal information like age, gender, race but also emotions. Face ID can recognize these emotions and this information can for example be combined with on-screen content like advertisements and websites. Face ID technology might also 'read' the environment of the iPhone's user. The technology might be aware of the user's specific living conditions."* [72]

In 2017, Senator Al Franken wrote to Apple (via Tim Cook), expressing concerns and requesting clarifications about the privacy of Apple's Face ID feature. Apple responded saying, "*Face ID uses facial matching neural networks that we developed using over a billion images, including IR and depth images collected **in studies conducted with the participants' informed consent**.*" [73] Meanwhile, however, Apple was pressuring employees to upload their "faceprint data" to Apple internal servers, capturing secret photographs and videos of employees, and told employees that face-related logs were automatically uploaded from their iPhones daily. Further, with Apple's internal Mobile Device Management (MDM) profiles and other security tools, it's doubtful whether the data would even need to be "uploaded" or if Apple already had access if they wanted it. [74]

---

[69] App developer access to iPhone X face data spooks some privacy experts, https://www.reuters.com/article/us-apple-iphone-privacy-analysis/app-developer-access-to-iphone-x-face-data-spooks-some-privacy-experts-idUSKBN1D20DZ

[70] Natasha Lomas, *Apple responds to Senator Franken's Face ID privacy concerns*, TechCrunch (October 17, 2017), https://techcrunch.com/2017/10/17/apple-responds-to-senator-frankens-face-id-privacy-concerns/

[71] The Verge, *Apple's new facial recognition feature could spur legal issues,* 2016, https://www.theverge.com/2016/6/16/11934456/apple-google-facial-recognition-photos-privacy-faceprint

[72] Amber de Zeeuw, *iPhone Face ID: Privacy issues we should worry about*, 2017, https://mastersofmedia.hum.uva.nl/blog/2017/09/25/iphone-face-id-privacy-issues-we-should-worry-about/

[73] Natasha Lomas, *Apple responds to Senator Franken's Face ID privacy concerns*, TechCrunch (October 17, 2017), https://techcrunch.com/2017/10/17/apple-responds-to-senator-frankens-face-id-privacy-concerns/

[74] CDEMI, *Never accept an MDM policy on your personal phone,* 2019, https://blog.cdemi.io/never-accept-an-mdm-policy-on-your-personal-phone/

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**

In 2017, Craig Federighi said that because "*the [Face ID training] data needed to include a high-fidelity depth map of facial data*," "*Apple **went out and got consent from subjects** to provide scans that were **quite exhaustive**. Those scans were taken from many angles and contain a lot of detail that was then used to train the Face ID system*." [75]

On Jan 9 2019, the Apple manager running Gobbler, posted an article to LinkedIn called "Data Collection" where he wrote, "*During the lead up to Face ID being launched, **my team went out and collected a large set of potential aggressors** to see if we were missing anything in our larger data collections, things would be normal to a regular user*." [76] Later that year, he posted again about the work Apple did on Face ID, saying that *"**tons of data was being collected** at the time to cover all the bases."* [77]

In 2017, Craig Federighi said Apple "*__went to great lengths__ to gather __its own data__ on facial shapes and angles*."[78]  Federighi said, Apple "*__retains a high-fidelity depth map__ of that [training] data"* and "*as Apple trains these models and iterate on these algorithms*," Apple "*wants __raw__ sensor data to use and develop and optimize them*." [79] Federighi, said "*When it comes to customers, Apple gathers absolutely nothing itself via Face ID and that Apple does not gather customer data when you enroll in Face ID, it stays on your device, we do not send it to the cloud for training data*." [80] Federighi did not distinguish a customer in range of the hot & hungry camera of an Apple employee's iPhone with Gobbler installed.

Apple never responded directly to one of the Senator's questions, either to the U.S. Senate or to the press. The Senator asked, "*Apple has stated that it used more than one billion images in developing the Face ID algorithm. Where did these one billion face images come from?"*[81]  **Apple would not answer**. What Federighi omitted is that those images came from employees just like me, whether I wanted to share them or not.

---

[75] TechCrunch, *Interview: Apple's Craig Federighi answers some burning questions about Face ID*, 2017, https://techcrunch.com/2017/09/15/interview-apples-craig-federighi-answers-some-burning-questions-about-face-id/
[76] LinkedIn, https://www.linkedin.com/pulse/design-experiment-data-collection-robert-mckeon-aloe/
[77] LinkedIn, https://www.linkedin.com/pulse/ml-examining-test-set-robert-mckeon-aloe/
[78] TechCrunch, *Interview: Apple's Craig Federighi answers some burning questions about Face ID*, 2017, https://techcrunch.com/2017/09/15/interview-apples-craig-federighi-answers-some-burning-questions-about-face-id/
[79] TechCrunch, *Interview: Apple's Craig Federighi answers some burning questions about Face ID*, 2017, https://techcrunch.com/2017/09/15/interview-apples-craig-federighi-answers-some-burning-questions-about-face-id/
[80] TechCrunch, *Interview: Apple's Craig Federighi answers some burning questions about Face ID*, 2017, https://techcrunch.com/2017/09/15/interview-apples-craig-federighi-answers-some-burning-questions-about-face-id/
[81] Letter from Senator Al Franken to Tim Cook about Face ID, (Sept 13 2017), https://web.archive.org/web/20170914201224/https://www.franken.senate.gov/files/letter/170913_AppleFaceID.pdf

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

**The Gobbler User Study**

I worked in Apple Research & Development. We were frequently pressured to "live on" one device for both work and personal use. Apple wanted to use our uncompensated labor to test new hardware and software using customer scenarios 24/7, at the expense of our privacy and work/life balance. This extended to my "live on" and testing of these devices, with my personal data and usage, being cited in my annual review. I even received emails noting what device I was 'living on' and nagging me to move to a future software build or prototype hardware model. We were also pressured to participate in very personal "user studies" using company devices.

On August 3 2017, an Apple engineering manager emailed an unknown list of Apple employees, including myself, about a "Gobbler" user study.[82] The manager wrote the study used an iOS application called "Gobbler," and told employees "*as you continue to use your device, use the Gobbler application to periodically upload data that has been logged.*"[83] The manager then wrote, "***In terms of data collection, we want more***. *The algorithm uses deep learning and the more data the better.*" He wrote that the Gobbler algorithms are "***hungry for data***" and that "*for uploading data: **all data that has your face in it is good data**.*"[84] I did not respond to or act on the email; it was a weird email and by the way it was described, I wanted nothing to do with that tool/study, even if it meant I was being 'disloyal.'

On Aug 7 2021, I received a different email from a group account saying "*Come join us! We look forward to seeing*





*Figure 1: One of the Twitter posts Apple claims they fired Gjovik over*

---

[82] Email from R.M. in Apple Video Engineering, to "recipients not specified," Date: August 3 2017 7:45am PST, Subject: *Participating in [codename]Loop…*

[83] Email from R.M. in Apple Video Engineering, to "recipients not specified," Date: August 3 2017 7:45am PST, Subject: *Participating in [codename]Loop…*

[84] Email from R.M. in Apple Video Engineering, to "recipients not specified," Date: August 3 2017 7:45am PST, Subject: *Participating in [codename] Loop…*

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

*you there!*" [85] The email appeared to be a mandatory social event, though I was confused why the email said not to attend if I was *"taking photosensitizing medications or have any known photosensitizing medical conditions."* Regardless, I promptly accepted, assuming it was expected of me. (The message said nothing about Face ID.) I received another response later that day saying, *"Hello there! Thank you very much for responding to our invite! ..... You will receive an iCal invite to the event shortly... Please arrive at [Apple's Mathilda 3B office building] Patio at your scheduled time. Do not hesitate to reach out if you have any questions or concerns regarding the study. See you soon!"* [86]

It still sounded like some sort of mandatory social event, however the email also stated "*Prior to your participation, we kindly request that you do the following: Review the ICF [Informed Consent Form] and email sign the ICF by registering your email and completing the short pre-study survey that will be sent."* During my time at Apple, I was forced to sign hundreds of contracts to get access to everything from offices, conference rooms, documentation, and the basic to do my job, so I "signed" the ICF as requested. As far as I can tell, I never received a confirmation I signed it, nor did I get a copy of the ICF, and when I tried to access the ICF [87] again in 2021 the link went to website with an error message saying "connection insecure."

I showed up to the "Social Event" as requested. The "patio" was actually a parking lot. The temperature that day was very hot. As I approached the destination, if my memory serves me right, I saw a ~40ft diameter circular compound, with ~10ft high fence around it. There was a chain link fence, with black plastic lining it and then another chain link fence and more black plastic. On top, there were security cameras pointed inside and outside. There were one, maybe two, armed security guards standing outside the compound. One of the guards checked me in and told me to sit at a picnic table until called. I remember being hot, dehydrated, and scared. I wanted to leave, but didn't want to ask to leave, because then the armed guard might get upset or suspicious, so I waited. They finally let in 4 or 5 employees. They opened the first door of the gate, we went in, then they close the outer gate and open the inner gate – so no one on the outside could see in. I believe the gate was locked behind us.

---

[85] Email from SSP User Study Group to "recipients not specified," Date: August 7 2017 7:45am PST, Subject: *Social Hour Study: You're Invited!*
[86] Email from SSP User Study Group to "recipients not specified," Date: August 7 2017 6:55pm PST, Subject: *Social Hour Study: Registration*
[87] "Attache" link

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

Upon entering, there was music playing in the background & we were told to sit in the circle. The armed guard left and there were two Global Security guys remaining. One was at the make-shift bar & the other guy sat with the employees in a circle. I wanted to leave but I was locked in a compound with 10ft high gates, security cameras, and an armed guard, so I thought "*I'm too young to die*" and stayed put.

The guy in the circle explained what we're doing, we're going to enroll in Face ID and we're going to test it on iPhones with this Gobbler application and we must complete a set list of testing objectives before we are allowed to leave. The ICF had to be complete before we could set up the accounts, and he helped us set up the Gobbler accounts on the test phones. Then we had to try to enroll in Face ID and then complete our task list. It was like 12 tasks (put sunglasses on & take 10-20x pics, make a "silly" faces & take 10-20x pics, etc). He explained this testing set-up was specifically because they were having trouble with direct sunlight conditions, so even though they wanted to keep all testing in secure lockdowns, they set up this compound in the 100-degree sun so we could do real world testing for them.

I remember being miserable and desperately wanting to leave, so I did the testing as quickly as I could so I could go. When each of employee was done, I remember the guard unlocked the inner gate, then had the employee step in, closed the inner door, and opened the outer door and let them out. After that, the Gobbler application was always pre-installed and logged in on my iPhone, even if I changed phones. I kept attempting to log out and turn it off, but it would keep reopening and logging back in and collecting more videos/photos.

Apple would later rename the application from Gobbler to "Glimmer" after criticism about the *facial "Gobbler"* name. On Apple's internal "Living On" help page, it explains that when you "live on" Apple devices, *"You are encouraged to make full use of your living on devices as you regularly would, and try to log as many bugs as possible. This will help us provide a better and bug free product to our*




*Figure 2: Photos captured by "Gobbler" in Gjovik's home bathroom, including Gjovik washing her face without clothing*

- Page 17 of 47 -

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**

customers. [88] The page also has a section on Gobbler/Glimmer, explaining *"Glimmer is an app that's included in internal development installs of Face ID equipped devices*." [89]

The page suggests uploading data from the app *"**captured in employee's homes.**"* [90] Apple's internal "Face ID FAQ" page said "*Users are encouraged to use Face ID in all places Touch ID is replaced on iPhone X….please use in a variety of conditions: From the bright outdoors to the **darkest rooms***. *In workday, evening and **weekend attire***. *With and without makeup*." [91] It said the Gobbler data "*can be previewed and included in radars and/or **donated** otherwise via the Gobbler to help make the feature better (there are many other things beside training the neural nets, that the data can be used for to improve the product).*" The page did not elaborate further.[92]

In the documentation pages, several restrictions were noted. One said*, "Data gathering **may be restricted in some countries**. You will be notified if that is the case.*"[93] Another said, "*Data privacy laws only allow us to gather and upload data from the US, Canada or Israel. Please **do not upload any data gathered outside of these countries**.*"[94] Another said, "*To participate, please take the time to download the Informed Consent Form… and review it.*" The Apple manager said the study was being conducted in "*the USA, Brazil, Tel Aviv,*" and the EU "*but not France or Germany*." [95] A page said, *"**some data should not be submitted from certain regions,**"* [96] while another page said, "*For now, Glimmer is only available for Apple employees working in the United States*." [97]

I also saw in notes that the app was forbidden to be used in Japan and China, but then at some point, Apple decided to gather some logs there anyways. On October 16, 2019 an engineer filed a Radar titled, "*Add Geo Location into Glimmer,*" saying

> *"*We're going to change how we deal with blacklisted countries. We're going to allow auto-A files to upload…. The aim is to better understand Japan and China because we have a number of people over there know...We're adding another

---

[88] Apple, *Living On*, Dev Pubs, Confluence page
[89] Apple, *Using Glimmer*, Confluence page
[90] Apple, *Using Glimmer*, Confluence page
[91] Apple, *Face ID FAQ*, Confluence page
[92] Apple, *Face ID FAQ*, Confluence page
[93] Standard Operating Procedure (SOP) for Glimmer usage
[94] Apple, Face ID FAQ, Confluence page
[95] Email from R.M. in Apple Video Engineering, to "recipients not specified," Date: August 3 2017 7:45am PST, Subject: *Participating in [codename] Loop…*
[96] Apple, *Living On*, Dev Pubs, Confluence page
[97] Apple, *Using Glimmer*, Confluence page

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

field… specifying geo location is needed for distinguishing the location.... Once the ICF is updated, the geo location for all previous black-list countries as China and Japan can also collect autoAFile data."[98]

The engineer noted the changes were made as of Glimmer v3.25.0 on Dec 3, 2019.[99]

It was extraordinarily unclear what data was being automatically uploaded, how and when. I saw another employee complaining in 2019, *"why is Glimmer always running?"*[100] The engineer responded, *"Glimmer is launched every day at 2 am to collect non-PI logs from FaceD, zip them, and upload them to a server for machine learning algorithms and data analysis tools to be computed. This allows to monitor non-regression and algorithm updates impacts."* [101]

Another employee asked in 2019, *"Why is Glimmer launching automatically?"* He wrote, *"I noticed on my device there's some kind of launch job started by root to launch Glimmer as suspended all the time. Why is this happening? What is it for?"* The engineer responded, *"Glimmer is launched to upload some non PI (logs) data automatically."* [102]

My open questions included whether my personal data was being backed up on employee iCloud backups, synced via iCloud, and/or accessed/copied by Apple's corporate MDM profiles – or other Global Security surveillance of employee phones. It also disturbed me that the app was taking photos/videos without any notification (sound, signal, etc), which made me think that Apple, if it wanted to, could activate my device cameras and watch me without me knowing at any time as well. I talked to other employees, including managers, with similar concerns.

---

[98] Radar filed on October 16, 2019 at at 4:35 PM, Title: *Add Geo Location into Glimmer*
[99] Radar filed on October 16, 2019 at at 4:35 PM, Title: *Add Geo Location into Glimmer*
[100] Radar filed on December 13, 2019 at 6:08 PM, Title: *Why is Glimmer always running?*
[101] Radar filed on December 13, 2019 at 6:08 PM, Title: *Why is Glimmer always running?*
[102] Radar filed on September 25, 2019 at 1:53 PM, Title: *Why is Glimmer launching automatically?*

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**

I partnered with a journalist to expose my concerns and the article was published on August 30, 2021 – while I was still employed by Apple, but while I had been forced on paid administrative leave. The article was titled, "***Apple Cares About Privacy, Unless You Work at Apple.***" [103] The article discussed the Gobbler app and that "*images are recorded every time employees open their phones*" and "*every time an employee picked up their phone, the device recorded a short video — hopefully of their face*." The article quoted the internal email saying "*all data that has your face in it is good data,*" and also quoted me saying ***"If they did this to a customer, people would lose their goddamn minds,*** *says Ashley Gjøvik, a senior engineering program manager.*" [104] The article noted that two employees confirmed that participation in studies like Gobbler was not just "*encouraged*" but "*even expected*." The article also noted employees had **no idea "*what was happening with the hundreds of images*** " taken by their phones. [105]

---

[103] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug 30 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

[104] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug 30 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

[105] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug 30 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES



*^ The Twitter Posts Apple's Lawyer's Demanded that I Delete on Sept 15 2021 ^*

**Twitter Post: August 30 2021** [109]

---

[106] https://twitter.com/ashleygjovik/status/1432381395955900416
https://web.archive.org/web/20210830170534/https://twitter.com/ashleygjovik/status/1432381395955900416
[107] https://twitter.com/ashleygjovik/status/1432381497370034184
https://web.archive.org/web/20210830170723/https://twitter.com/ashleygjovik/status/1432381497370034184
[108] https://twitter.com/ashleygjovik/status/1432400136471072769
https://web.archive.org/web/20210830182052/https://twitter.com/ashleygjovik/status/1432400136471072769
[109] Twitter, https://twitter.com/ashleygjovik/status/14324168912D149094

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**



**ASHLEY M. GJØVIK**
@ashleygjovik

I still love #Apple products & brand. I devoted nearly 7 years & much blood/sweat/tears ensuring Apple's products are exceptional. However, Apple the corporation needs a reckoning. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

> Working at Apple in "normal" times, I walked in circles around their glass-walled panopticon, only able to badge into select lockdowns (a constant reminder that Apple has absolute control over my resources and access), and was immersed in a culture where it is implicitly forbidden to critique Apple policies or even speak openly to your coworkers with concerns about your employment & work conditions, lest you upset the cronyism, ex-CIA/ex-FBI security teams, and other "powers that be." I realize now that during those times, I didn't question a lot of things that I should have. Not just the abuse I suffered, but also the constant invasion of privacy — and perhaps those two things are linked.
>
> There seems to be limitless ways Apple can access employee data and monitor us. I recently shared how violating it felt for Apple to demand to copy & permanently store my nudes for completely unrelated litigation. After the public outcry, I questioned other policies & actions Apple had taken. The internal "Glimmer" app had always troubled me, but I never voiced that concern, because inside we don't question the way things are or what we're asked to do. But now, in the light of day, considering everything Apple's already done to me, this app, the photos & data it gathers, and how little we know about what it does with all of that — is deeply troubling and I felt compelled to make it public. Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.

11:56 AM · Aug 30, 2021 · Twitter Web App

- Page 22 of 47 -

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**

**Responses to my disclosures included, but were not limited to:**

- "This is creepy. I don't have words to express what is running through my head. "[110]
- "Straight up abusive and creepy behavior how can deployed iOS devices even run stuff like this?"[111]
- "Whatttt" [112] & "What the hell…."[113] & "Excuse me WHAT"[114]
- "Ah, but does the employee handbook say workers are human?" [115]
- "I've heard a manager say we don't have civil rights as employees" [116]
- "if anyone talks about apple privacy. show them this" [117]
- "No, just no." [118]
- This entire article is.. wow. [119]
- Because privacy is a fundamental human right* * that you need to give up to work for the company that cares so much about privacy. [120]
- [inserte su referencia a 1984 aquí] [121]
- This is terrible and so bothersome on many levels. [122]
- Quel enfer... [123]



*The "Gobbler" applications attempted to access my fully personal iPhone, even after I was fired.*

---

[110] https://web.archive.org/web/20210830182052/https:/twitter.com/ashleygjovik/status/1432400136471072769
[111] https://web.archive.org/web/20210830182052/https:/twitter.com/ashleygjovik/status/1432400136471072769
[112] https://web.archive.org/web/20210830182052/https:/twitter.com/ashleygjovik/status/1432400136471072769
[113] https://web.archive.org/web/20210830182052/https:/twitter.com/ashleygjovik/status/1432400136471072769
[114] https://web.archive.org/web/20210830182052/https:/twitter.com/ashleygjovik/status/1432400136471072769
[115] https://twitter.com/ashleygjovik/status/1432381235926499332
[116] https://twitter.com/ashleygjovik/status/1432381235926499332
[117] https://twitter.com/verge/status/1432381006670147587
[118] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[119] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[120] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[121] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[122] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments
[123] https://twitter.com/verge/status/1432381006670147587/retweets/with_comments

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

In 2010, the Electronic Frontiers Foundation wrote an article about Apple seeking a patent to do just the kind of thing the "Gobbler" application does today. EFF called the technology "*spyware*," "*traitorware*," and "*especially creepy*."[124] EFF warned the patent provided "a roadmap for how Apple can — and presumably will — spy on its customers and control the way its customers use Apple products." [125] The technology would allow Apple to record the voice of the device's user, take a photo of the device's user's current location or *even detect and record the heartbeat of the device's user*. [126]

EFF called the technology "*dangerous*" and warned, "*this patented device enables Apple to secretly collect, store and potentially use sensitive biometric information about the user*." The patented technology can: "*take a picture of the user's face without a flash, any noise, or any indication that a picture is being taken to prevent the current user from knowing he is being photographed*" and "*can take a photograph of the surrounding location to determine where it is being used*." [127] EFF warned, "*Apple will know who you are, where you are, and what you are doing and saying and even how fast your heart is beating*." [128]

"*Apple does not explain what it will do with all of this collected information on its users, how long it will maintain this information, how it will use this information, or if it will share this information with other third parties*." [129] EFF urged, "*This patent is downright creepy and invasive…. Spyware, and its new cousin traitorware, will hurt customers and companies alike — Apple should shelve this idea before it backfires on both it and its customers*." [130]

In 2010, *Inc* also wrote about Apple's "*spyware*" patent,[131] calling it "*creepy*" and "*Orwellian*." The reporter said concerns may vary based on how much users trusted Apple and how intimate their "relationship is with a faceless mega-corporation." The writer queried readers, "*Are you comfortable enough with Apple that it's okay for them to have the power to turn on your iPhone camera, snap a picture of whatever is in plain site of the lens and then upload it to Apple for analysis?*" And if you respond that yes you think that's fine, then what if "*… it's all a big misunderstanding and the camera takes a picture for the Apple mothership while you are in*

---

[124] Julie Samuels, *Steve Jobs Is Watching You: Apple Seeking to Patent Spyware,* EFF, Aug 23 2010
[125] Julie Samuels, *Steve Jobs Is Watching You: Apple Seeking to Patent Spyware,* EFF, Aug 23 2010
[126] Julie Samuels, *Steve Jobs Is Watching You: Apple Seeking to Patent Spyware,* EFF, Aug 23 2010
[127] Julie Samuels, *Steve Jobs Is Watching You: Apple Seeking to Patent Spyware,* EFF, Aug 23 2010
[128] Julie Samuels, *Steve Jobs Is Watching You: Apple Seeking to Patent Spyware,* EFF, Aug 23 2010
[129] Julie Samuels, *Steve Jobs Is Watching You: Apple Seeking to Patent Spyware,* EFF, Aug 23 2010
[130] Julie Samuels, *Steve Jobs Is Watching You: Apple Seeking to Patent Spyware,* EFF, Aug 23 2010
[131] Patent: Systems and methods for identifying unauthorized users of an electronic device (10657238)

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

*the middle of sexy time?"* [132] "Apple filed another patent in 2011 for iPhone remote surveillance capabilities, such as transmission of the images and sounds that the device secretly captures." [133]

Courts have acknowledged the intrusive effect of hidden cameras and video recorders in settings that otherwise seem private. It has been said that the "*unblinking lens*" can be more penetrating than the naked eye with respect to "*duration, proximity, focus, and vantage point.*"[134]

On March 4 2022 Apple (via Orrick lawyers) wrote to the U.S. federal government that:

> "Apple terminate Ms. Gjovik's employment … because she violated Apple policy by intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press … On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the [Gobbler] application, thus disclosing Apple confidential information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the [Gobbler user] study. As discussed above, Ms. Gjovik's very involvement with the [Gobbler user] study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it. Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision."[135]

  

---

[132] Renee Oricchio, *Orwellian Watch: Apple's Creepy Patent Application*, Inc., https://www.inc.com/tech-blog/orwellian-watch-apples-creepy-patent-application.html

[133] 9to5 Staff, *Patent indicates sophisticated remote surveillance for Find My iPhone*, (Jun. 16th 2011), https://9to5mac.com/2011/06/16/patent-indicates-sophisticated-remote-surveillance-for-find-my-iphone/

[134] *Cowles v. State* (Alaska 2001) 23 P.3d 1168, 1182 (dis. opn. of Fabe, J.)

[135] Letter from Apple Inc (via Orrick, Herrington & Sutcliffe LLP) to U.S. Department of Labor, March 4 2022, Re: *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051

INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND
MANAGEMENT IN THE UNITED STATES

# Apple's Face "Gobbler"












INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND
MANAGEMENT IN THE UNITED STATES

## EAR STUDIES

On Aug 10 2018, I was invited to a "HE User Study" for "anthropometry HH" sent by two Apple employees who previous asked for photos of my ears, and had discussed wanting to take scan my ears. I replied declining "***indefinitely***."[136] I assumed I'd be taken off the list for ear studies, but then in 2021, while I was on Indefinite Administrative Leave in August, I received three separate emails from Apple asking to scan my ears/ear canals, again. The email was titled, "*HE 3D Ear Scan Invitation!*"

The emails said, "*You're invited to a voluntary in-person study where we will capture high-resolution 3D scans of participants' ears. The goal of this effort is to collect representative ear geometry data across age, gender, and ethnic groups. These 3D scans are extremely valuable to audio research efforts and better our understanding of ear geometry variance.*" The email said I'd be asked to review an ICF prior to taking a recruitment survey and then another ICF for study participation. [137] I did not respond to any of the emails nor did I sign any ICFs.

I was disturbed by Apple's lack of respect for the privacy of its employees. I also wondered if Apple may have been emailing me these on purpose, since I already opted out, in order to harass me further. The emails didn't say "*Apple Confidential,*" nor did they include anything that appeared actually secret or material. Regardless, I redacted them heavily when I publicly complained about the matter, since my point was to protest an employer pressuring its employees to gather such sensitive information (biometrics).



---

[136] Aug 10 2018, Gjovik to SJ
[137] Ask survey

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**



The Tweet Gjovik was fired over:

*"I'm still over here in Apple's time-out chair & they keep telling me to respect my <u>abuser's</u> privacy & be silent. Meanwhile I got 3x of these in the last month since being on leave. NO, <u>APPLE, STOP IT</u>. I can't tell if they're <u>harassing me</u> or just being <u>super intrusive</u> or both."*
138

---

138 *Aug 28 Twitter Post:* https://twitter.com/ashleygjovik/status/1431824501457633283
https://web.archive.org/web/20210829034222/https://twitter.com/ashleygjovik/status/1431824501457633283

- Page 28 of 47 -

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

Further, this wasn't news. On September 5 2020, Apple VP of Marketing , Greg Joswiak ("Joz") was interviewed by Wired about Apple AirPods.[139] Joz said, *"We did work with Stanford to **3D-scan hundreds of different ears** and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population,"* Joswiak says. "*With AirPods Pro, we took that research further –*

**studied more ears, more ear types.** *And that enabled us to develop a design that, along with the three different tip sizes, works across an overwhelming percentage of the worldwide population."*

On December 9 2021, two Apple Product Design executives were interviewed by Wallpaper about Apple's product design team. [140] The article said, "*When AirPods' development began a decade or so ago, human factors researcher Kristi Bauerly found herself researching the 'crazily complex' human ear. '**We moulded and scanned ears**, worked with nearby academics, focusing on outer ears for the earbud design and inner ears for the acoustics,' she says. **Thousands of ears were scanned,** and only by bringing them all together did the company find the 'design space' to work within. '**I think we've assembled one of the largest ear libraries anywhere,'** Hankey says. 'The database is where the design starts,' Bauerly continues, 'and then we iterate and reiterate.'* " On July 28 2021, Apple was referred to as *"[an] ear-canal innovator."*[141]

In 2020, Apple's patent filings describe a system for deriving biometrics using embedded biometric sensors on the AirPods (Earbuds). [142] The patent captures waveforms associated with the cycling profusion of blood to the skin, so multiple biometric parameters can be collected,

---

[139] The secrets behind the runaway success of Apple's AirPods: The wireless headphones have been a surprise hit. Here's how: Sept 5 2020, https://www.wired.co.uk/article/apple-airpods-success

[140] Inside Apple Park: first look at the design team shaping the future of tech, Dec 9 2021, https://www.wallpaper.com/design/apple-park-behind-the-scenes-design-team-interview

[141] Can you ID me now? Apple les for ear- canal biometrics patent, Jan 28, 2022,, https://www.biometricupdate.com/202201/can-you-id-me-now-apple-files-for-ear-canal-biometrics-patent

[142] Patent number 10856068; Apple's future AirPods/earbuds could facilitate biometric measurements, Niel Smith, December 30, 2020 https://www.myhealthyapple.com/apples-future-airpods-earbuds-could-facilitate-biometric-measurements/

### INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

including, for example, heart rate, blood volume, and respiratory rate.[143] Ears have been flagged as the future of biometric-based mass surveillance. [144] [145]

On March 4 2022 Apple (via Orrick lawyers) wrote to the U.S. federal government that:

> "On August 28, 2021, Ms. Gjovik tweeted details about a proprietary study Apple was conducting…. . Like the [Gobbler] study, the details of [this ear scanning study] were not known except to a small select group within Apple, and certainly not outside Apple, and Ms. Gjovik agreed to keep them confidential under her Confidentiality Agreement. Despite this, Ms. Gjovik's tweet both identified the name and purpose of the study regarding an unreleased product under development….. Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence… The **only** reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy."[146]

While we still believe these reasons are pretext for Apple's retaliation against me for reporting safety issues, discrimination, labor violations, and fraud – if Apple really thinks I violated their policies in protesting these invasive technologies, then their policies are wrong.

### OTHER USER STUDIES

Despite Apple's censoring of employee concerns about user studies, Apple is quite public about its user studies. Just searching LinkedIn for "Apple User Study," numerous people/positions are returned with detailed descriptions of the roles and projects. In these descriptions, Apple talked about *"**small, focused research studies**" and "**large-scale worldwide [user study] operations**."* [147] Positions talked about user studies and data collection for "**sensor and health technology,**" [148] *"**biometric data**"* [149] and for *"**product comfort.**"* [150] Positions

---

[143] Patent number 10856068

[144] Ahila Priyadharshini, R., Arivazhagan, S. & Arun, M. A deep learning approach for person identification using ear biometrics. *Appl Intell* **51,** 2161–2172 (2021). https://doi.org/10.1007/s10489-020-01995-8

[145] 3D Ear Biometrics  BIR BHANU, HUI CHEN, Center for Research in Intelligent Systems, University of California, Riverside, CA, USA , Springer

[146] Letter from Apple Inc (via Orrick, Herrington & Sutcliffe LLP) to U.S. Department of Labor, March 4 2022, Re: *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051

[147] https://www.linkedin.com/jobs/view/2942922643; https://www.linkedin.com/jobs/view/2944339533

[148] https://www.linkedin.com/jobs/view/2942922643; https://www.linkedin.com/jobs/view/2944339533

[149] https://www.linkedin.com/jobs/view/2944349447

[150] https://www.linkedin.com/jobs/view/2944349447

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

included responsibilities such as to "***identify and recruit user study participants,***"[151] and "***observe behavior***" and "***administer complex testing protocols.***"[152]

During my time at Apple, I was invited to employee user studies looking to study me on topics ranging from my "eye movements," "grip on an iPhone," "voice", "blood pressure," physical response to "yoga, swimming, and running," to studying my "menstruation" and "sleep." Indeed, in April 2019 I was invited to a user study program to study my sleep.[153]

> "Congratulations! You have been selected to participate in the official kickoff of the Sleep LiveOn program. This survey will collect a couple more pieces of information before you can sign up for a session to pick up hardware. If you have a **co-sleeper** participating, you may want to wait to take the survey with them in the room." [154]

Going forward, I would then be surveyed via email about my "insomnia severity index" and other medical information while a Beddit monitor[155] was required to be placed under me as I slept, monitoring my heart rate, respiratory rate, and other data.[156]



The request for **co-sleeper** information also extended to requesting co-sleepers sign NDAs, and even participate in the study themselves – even if they are not an employee. Personally, I didn't want my employer to know who I was sleeping with and I stopped participating in that study.

---

[151] https://www.linkedin.com/jobs/view/2938135938
[152] https://www.linkedin.com/jobs/view/2944353441
[153] Email from LiveOn R&D to Ashley Gjovik, April 1 2019, Subj: *LiveOn Sleep: You're Invited!*
[154] Email from LiveOn R&D to Ashley Gjovik, April 1 2019, Subj: *LiveOn Sleep: You're Invited!*
[155] iMore,  *Apple cans the Beddit Sleep Monitor 5 years after buying the business*,  https://www.imore.com/apple-cans-beddit-sleep-monitor-5-years-after-buying-business
[156] Email from LiveOn R&D to Ashley Gjovik, April 16 2019, Subj: *LiveOn Sleep: Insomnia Severity Index Survey*

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

### RADAR & SYSDIAGNOSE

When Apple employees file "Radar" tickets to track software development work and "bugs," they include detailed information about the problems they are seeing. The default sharing settings for most Radar ticket included all of software engineering. Radar tickets also are not removable. Even when the tickets are closed, they remain searchable. In training, employees say they are told: "*Radar is forever*." [157]

When employees file Radar tickets, they are often asked to include diagnostic files, internally called "sysdiagnose" to give Apple more information about the problem. If they are filing a bug about iMessage, they might be asked to install a sysdiagnose profile that exposes their iMessages to the team tasked with fixing the issue. For employees using a live-on device, default settings can mean that, as they are filing a Radar ticket, a sysdiagnose profile is being automatically created in the background, sending data to Apple without the employee realizing it. When sysdiagnose profiles are not included, employees have been known to post memes calling out the omission. [158]

I told The Verge journalist that in 2019, I filed a ticket about Apple's photo search capabilities. I was quoted as writing, "*If I search for 'infant' in my photo library, it returns a selfie I took of myself in bed after laparoscopic surgery to treat my endometriosis*." [159] This Radar, and many of the Radars I submitted with detailed logging and personal details were visible to tens of thousands of people.

Whether it is the text content of the Radar, or the logs attached, if a coworker wanted to learn intimate details about your life, they could by simply searching through the Radars you've filed. Reviewing logs quickly exposes locations, routines, friends, and other highly personal data. Assumably far more data would be made available to the Worldwide Loyalty Team.

---

[157] Zoe Schiffer, *"Apple Cares About Privacy, Unless You Work at Apple,"* The Verge, Aug 30, 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id
[158] Zoe Schiffer, *"Apple Cares About Privacy, Unless You Work at Apple,"* The Verge, Aug 30, 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id
[159] Zoe Schiffer, *"Apple Cares About Privacy, Unless You Work at Apple,"* The Verge, Aug 30, 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**

# Secrecy

## SECRECY POLICIES

The New York Times wrote in 2009 that, "*Few companies are more secretive than Apple, or **as punitive to those who dare violate the company's rules** on keeping tight control over information. Secrecy at Apple … is baked into the corporate culture.*" [160] Anil Dash (EFF board member and advisor to the Obama administration) wrote that Apple *"chooses to operate with an **extreme and excessive layer of secrecy**, even when making reasonable business decisions."* [161] Dash wrote, *"the cost of Apple keeping secrets has become morally and ethically untenable"* and that "*Apple spends an enormous amount of money on protecting and obfuscating normal business operations that any other company can do in the open."*[162]

A 2017 internal training video included a quote from VP of Marketing, Greg Joswiak, telling employees that "*I have faith deep in my soul that if we hire smart people they're gonna think about this, they're gonna understand this, and ultimately they're gonna do the right thing, and **that's to keep their mouth shut**.*" [163]

Apple's "New Product Security (Secrecy)" team is part of the larger Global Security team. Before joining Apple, the Global Security team manager, David Rice,[164] worked at the NSA as a Global Network Vulnerability Analyst for four years, and before that was a Special Duty Cryptologist in the U.S. Navy. [165] Before joining Apple, other Apple Global Security managers have worked in US Coast Guard port security,[166] local Police Chiefs,[167] as U.S. Secret

---

[160] Brad Stone and Ashlee Vance, *Apple's Obsession With Secrecy Grows Stronger,* New York Times (Jun 2009), https://www.nytimes.com/2009/06/23/technology/23apple.html

[161] Anil Dash, *Apple: Secrecy Does Not Scale*, Jul 31, 2009, dashes.com/2009/07/31/apple_secrecy_does_not_scale/

[162] Anil Dash, *Apple: Secrecy Does Not Scale*, Jul 31, 2009, dashes.com/2009/07/31/apple_secrecy_does_not_scale/

[163] William Turton, *Leaked recording: Inside Apple's global war on leakers: Former NSA agents, secrecy members on product teams, and a screening apparatus bigger than the TSA.,* The Outline (2017), theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

[164] David Rice, https://www.linkedin.com/in/david-rice-7b3686/

[165] William Turton, *Leaked recording: Inside Apple's global war on leakers: Former NSA agents, secrecy members on product teams, and a screening apparatus bigger than the TSA.,* The Outline (2017), theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

[166] Sean Downey, https://www.linkedin.com/in/sean-downey-64a942119/

[167] Greg Finch, https://www.linkedin.com/in/greg-finch-74a3228/

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES**

Service Special Agents,[168]  U.S. Department of State Special Agents & Executive Protection managers for weapons manufacturers,[169] etc.

In 2017, Rice complained that "*U.S. employees have griped about [Apple's] draconian security measures.*"[170] With McCarthyism-flavored PSYOPs, Apple tells its employees that "leakers" at Apple "*look like [regular employees],*" and that "*they come to work, they don't appear any different, and they start off with the exact same motivation about 'I love Apple, I think this is a cool place to work, I wanna make it better.*"[171]

I had grown deeply disturbed by the horrific lack of privacy for Apple corporate employees and was happy to expose to the issue to the public, as the anti-privacy policy for employees was a "feature" not a "bug" to Apple, and thus there was no internal complaint process on the matter, and even if there was, it seemed like a certain way to face additional retaliation. I posted on Twitter on August 30-31 2021 about The Verge article and complaining about Apple's work conditions saying:

- "Apple has an internal culture of **surveillance**, **intimidation**, & alienation. Employees are closely monitored & our data hoarded in the name of secrecy & quality. We're told we have no expectation of privacy, while Apple says publicly: **privacy is a human right**."[172]
- "Apple probably considers what they're doing to employees "**internal information**." Why? For secrecy? For quality? Or because Apple knows **the public would be outraged**, & that outrage might start to "deprogram" their employees? "[173]
- Cult: "great devotion to a person, idea, object, movement, or work." Information control: "**encourage spying on other members**" Behavior control: "instill obedience"[174]
- "I still love Apple products & brand. I devoted nearly 7 years & much blood/sweat/tears ensuring Apple's products are exceptional. However, Apple the corporation needs a reckoning. **Apple's policy of "secrecy" should not shield it from public scrutiny about human rights & dignity.**"
- "We're learning about Apple's long history of systemic oppression & **retaliation** against employees when employees express concerns about discrimination, harassment, & other

---

[168] Michael Rovins, https://www.linkedin.com/in/michael-rovins-84880626/; Jeff Hill: https://www.linkedin.com/in/sajah/

[169] Scott Nishi, https://www.linkedin.com/in/scott-nishi-963591109/

[170] William Turton, *Leaked recording: Inside Apple's global war on leakers: Former NSA agents, secrecy members on product teams, and a screening apparatus bigger than the TSA.,* The Outline (2017), theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

[171] William Turton, *Leaked recording: Inside Apple's global war on leakers: Former NSA agents, secrecy members on product teams, and a screening apparatus bigger than the TSA.,* The Outline (2017), theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

[172] https://twitter.com/ashleygjovik/status/1432381777658613762; https://twitter.com/ashleygjovik/status/1432381235926499332

[173] https://twitter.com/ashleygjovik/status/1432383062273191937

[174] https://twitter.com/ashleygjovik/status/1432382993046200323

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND
MANAGEMENT IN THE UNITED STATES**

abuse. Why wouldn't Apple try to use our data & their internal **surveillance** infrastructure against us?"[175]

Thomas le Bonniec, an ex-Apple contractor and whistleblower, wrote to regulators in 2019: "*It is worrying that Apple keeps ignoring and violating fundamental rights and continues their massive collection of data. "I am extremely concerned that big tech companies are basically wiretapping entire populations despite European citizens being told the EU has one of the strongest data protection laws in the world. Passing a law is not good enough: it needs to be enforced upon privacy offenders.*"[176] Le Bonniec, said Apple has been, "*operating on a moral and legal grey area and they have been doing this for years on a massive scale. They should be called out in every possible way.*"[177]

Le Bonniec exposed that Siri is recording when it is not triggered by the users. Thousands of recordings were sent to Apple in order for hundreds of Apple employees to listen, analyse and transcribe their content. The public statement reveals that Apple collected millions of confidential messages, full of intimate details, political opinions, sexual preferences, and discussions between persons in a room, without the users even being aware of it. In 2019, Apple admitted that these practices were not up to the privacy standards. According recent disclosures it seems that contrary to Apple's statement, no end was put to the recording of Apple's users.[178]

In January 2023, the NLRB found merit in my charge that Apple's NDAs do violate federal labor laws.[179] There are still no decisions on my or Le Bonniec's surveillance charges.

**SEARCH AND PRIVACY POLICIES**

In September of 2021, a journalist wrote about my experience realizing just how intensively Apple could and likely was surveilling me. She wrote,

---

[175] https://twitter.com/ashleygjovik/status/1432381802602110976
[176] The Guardian, *Apple whistleblower goes public over lack of action,* May 2020,, https://www.theguardian.com/technology/2020/may/20/apple-whistleblower-goes-public-over-lack-of-action
[177] he Guardian, *Apple whistleblower goes public over lack of action,* May 2020,, https://www.theguardian.com/technology/2020/may/20/apple-whistleblower-goes-public-over-lack-of-action
[178] Noyb, "*Siri: Are you recording me?" "No but I am listening to you,*" May 2020, https://noyb.eu/en/former-apple-employee-blows-whistle-apple-again
[179] TechCrunch, *Labor officials found that Apple execs infringed on workers' rights,* https://techcrunch.com/2023/01/30/labor-officials-found-that-apple-execs-infringed-on-workers-rights/

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

"Last weekend, Ashley Gjøvik walked around her apartment unplugging all of her electronics. Apple had just fired her for allegedly leaking information, and for months before then, she had spoken out with claims of harassment, intimidation and surveillance at the company. She'd been thinking through Apple's employee privacy policy, which states that workers have no expectation of privacy when using a personal device for Apple business, and wondered if that meant the company could watch her through her home devices, too."

I was quoted saying, "*I think the worst moment was realizing that they were probably watching me through my Eve cameras and listening to me on my HomePod, It was this frantic moment. I don't even have words for it yet, of how violating and horrifying and terrifying it was.*" [180] I told the journalist it "wasn't until I began speaking out about the company that I started to realize [Apple's surveillance] could be used against me." [181]

In 2019, a former Apple executive also had a rude awakening and alleged that Apple reviewed his private text messages.[182]  He wrote, "*To further intimidate any current Apple employee who might dare consider leaving Apple, Apple's complaint shows that it is monitoring and examining its employees' phone records and text messages, in a stunning and disquieting invasion of privacy.*"[183]

In 2021, I filed complaints with the U.S. NLRB and the California Dept of Labor over Apple's unlawful employee policies, including their "*Workplace and Searches Privacy.*"[184]

"In order to protect Apple <u>confidential</u> and <u>sensitive</u>[185] information and maintain the security and integrity of our networks and equipment, any use of Apple property, as well as use of your personal devices for Apple business or for accessing Apple networks, is subject to this policy."

---

[180] Sarah Roach, *Worker surveillance is making employees miserable*, Protocol, Sept 2021, https://www.protocol.com/workplace/worker-surveillance-is-making-employees-miserable
[181] Sarah Roach, *Worker surveillance is making employees miserable*, Protocol, Sept 2021, https://www.protocol.com/workplace/worker-surveillance-is-making-employees-miserable
[182] Mark Gurman and Edvard Pettersson, *Ex-Apple Executive Accused of Betrayal Says He Was Snooped On,* Bloomberg (December 9, 2019), https://www.bloomberg.com/news/articles/2019-12-10/ex-apple-executive-accused-of-betrayal-says-he-was-snooped-on
[183] CNBC, *Apple accused of monitoring employee text messages in lawsuit against ex-chip exec*, Dec 2019, https://www.cnbc.com/2019/12/10/apple-accused-of-monitoring-employee-text-messages-in-lawsuit-against-ex-chip-exec.html;
[184] Apple Inc: https://people.apple.com/US/en/subtopic/845;  Photographing employees engaged in protected concerted activities constitutes unlawful surveillance because it has a tendency to intimidate employees and interfere with exercise of Section 7 rights. Photographing in the mere belief that something "might" happen is not a sufficient justification. *F.W. Woolworth Co.*, 310 NLRB 1197 (1993); see also, *National Steel and Shipbuilding Co.*, 324 NLRB 499 (1997) (peaceful union rallies); *Labor Ready, Inc.*, 327 NLRB 1055 (1999), (employer videotapes of workers employed by temporary service in waiting room waiting for assignments unlawful).
[185] Note: Overbroad

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

"Workplace Searches [186] Only in cases where <u>allowed under local law,</u> [187] Apple may: Access, search, monitor, archive, and delete Apple data stored <u>on all of its property</u>, as well as <u>non-Apple property</u>, if used for Apple business or if used for accessing Apple data, servers, or networks. This includes <u>all data and messages sent, accessed, viewed, or stored</u> (including those from iCloud, Messages, or other personal accounts) <u>using Apple equipment, networks, or systems.</u>
Conduct <u>physical, video, or electronic</u> surveillance, <u>search your workspace</u> such as file cabinets, desks, and offices (even if locked), <u>review phone records</u>, or <u>search any non-Apple property</u> (such as backpacks, purses) on company premises."
<u>"This means that you have no expectation of privacy when using your or someone else's personal devices for Apple business, when using Apple systems or networks, or when on Apple premises."</u>
"The search or removal of <u>Apple-related content on a device</u> will be determined on a case-by-case basis when there is a business need and subject to local approval processes. <u>Refusing to permit a search or removal of Apple-related content</u> may result in disciplinary action up to and including termination of employment." [188]

The GDPR notes that employee monitoring may result in the collection of non-employees' personal data. The GDPR and the BDSG also apply to the collection, processing, and use of non-employees' personal data. Accordingly, the employer must have a valid legal basis for processing non-employees' personal data and **must notify nonemployees about potential personal data collection**.[189] Here, Apple simply tell employees they have no expectation of privacy whatsoever and makes no statements to non-employees who may get caught in Apple's mass-surveillance infrastructure.

Apple is in a unique position, perhaps only comparable to Google & ISPs/carriers, where they have access to an incredible amount of data as system administrators of services and those services are provided by monopolies. If Apple wanted to read its employee's personal emails, and that employee used iCloud, Apple could simply login to its own systems and read the emails. This is the same for data backed up in iCloud backups, or saved on iCloud drive, or send through iMessages. Apple owns the hardware of one of the handful of phones and computers, and even if Apple employees were to use a different company's products, anyone they interacted with who

---

[186] *Boeing Corporation Advice Memo (2013),* Boeing must cease and desist from creating the impression that its employees' union and/or protected concerted activities are under surveillance. *Register Guard,* 344 NLRB 1142, 1144 (2005) (test is whether the employee would reasonably assume from the statement that their union activities had been placed under surveillance.*" Flexsteel Industries*, 311 NLRB 257, 257 (1993).
[187] Note: Overbroad
[188] Note: Overbroad. Do organizing and union materials count as Apple-related?
[189] Employee Monitoring (Germany), Resource ID: W-008-3362, HOLGER LUTZ AND SIMONE BACH, BAKER MCKENZIE, WITH PRACTICAL LAW DATA PRIVACY ADVISOR

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND
MANAGEMENT IN THE UNITED STATES**

did use Apple's products would give Apple a way to spy on that employee through their friends. The same is comparable for Google employees. In this sense, there is no such thing as a "personal" device for an Apple employee. That also weaponizes many consumer products if the non-employee user is simply communicating with an Apple employee on that product.



> If #Apple corporate can & probably has been looking at my *incoming* iCloud emails, iMessages, doc & photo sharing, etc (along with outgoing) with non-Apple employees... how does that not violate California data laws for CA friends? Or GDPR with my European friends?
>
> 11:55 PM · Oct 7, 2021 · Twitter Web App

[190]

I also provided Apple's "*Employee Workplace Search & Privacy Policy*" to Zoe Schiffer back in June and Schiffer quoted it for The Verge's August privacy article:

> Underpinning all of this is a stringent employment agreement that gives Apple the right to conduct extensive employee surveillance, including "physical, video, or electronic surveillance" as well as the ability to "search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises." Apple also tells employees that they should have "no expectation of privacy when using *your or someone else's personal devices for Apple business*, when using Apple systems or networks, or when on Apple premises" [191]

Further, I also filed charge against an email Tim Cook sent his employees on September 21 2021 responding to an employee or employees speaking with journalist about a meeting where Tim Cook talked about the pandemic, remote work, employee benefits, and pay equity.[192]

> "I want you to know that I share your frustration. These opportunities to connect as a team are really important. But they only work if we can trust that the content will stay within Apple. I want to reassure you that we are doing everything in our power to

---

[190] Twitter, Oct 7 2021, https://twitter.com/ashleygjovik/status/1446368610679730233
[191] Zoe Schiffer, *"Apple Cares About Privacy, Unless You Work at Apple,"* The Verge, Aug 30, 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id
[192] Apple Inc, Tim Cook to Apple_Employees$@group.apple.com, Date: Sept 21, 2021, Subj: *Follow-up on global team meeting*

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

identify those who leaked.[193] As you know, we do not tolerate disclosures of confidential information, whether it's product IP or the details of a confidential meeting.[194] We know that the leakers constitute a small number of people. We also know that people who leak confidential information do not belong here.[195] [196] [197][198]

The NLRB agreed with me and found there was merit to my charge against Cook in January 2023.[199] Shortly after Apple hired a prior NLRB Board Chair to defend them (Harry Johnson), and shortly after that, NLRB told me there will be a 're-decision' of merit on the charge. **There is no such thing as a 're-decision of merit'.** I filed a complaint with General Counsel's office arguing there must have been unlawful *ex parte* communications by Johnson leading to the regulatory subterfuge of a 'redecision of merit' (avoiding settlement or adjudication), which violates the NLRA, APA, and my Due Process rights. I have not heard back from NLRB for months.

---

[193] *Register Guard,* 344 NLRB 1142, 1144 (2005) (test is whether the employee would reasonably assume from the statement that their union activities had been placed under surveillance." *Flexsteel Industries, 311 NLRB 257, 257 (1993),*

[194] *Report of the General Counsel Concerning Employer Rules, NRLB Memorandum GC 15-04 (2015)*

[195] *Yale New Haven Hospital*, 309 NLRB 363, 368 (1992) (supervisor unlawfully threatened employee with reprisal by telling an employee that if he did not stop protected activities he would "talk" to him again; implies that the talk will not be mere conversation but will concern the employment of the offending employee).

[196] *Valerie Manor,Inc.,*351NLRB1306(2007)(threat of unspecified reprisals).

[197] *Equipment Trucking Co.,Inc*.,336NLRB277(2001)(statement, If you don't like it, find another job, implied threat of discharge).

[198] *Medco Health Solutions Of Las Vegas, Inc.*,357NLRBNo.25(2011) (respondent's statement that, if employee could not support the respondent's policies, there were other jobs out there and perhaps "this wasn't the place for him" was an implied threat in violation of 8(a)(1)).

[199] Bloomberg, Apple Executives Violated Worker Rights, Labor Officials Say, https://www.bloomberg.com/news/articles/2023-01-30/apple-executives-violated-worker-rights-us-labor-officials-say

**INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND
MANAGEMENT IN THE UNITED STATES**

## <u>Public Policy</u>

**[Collecting user data] is surveillance.
These stockpiles of personal data serve only to enrich the companies that collect them.**
*-Tim Cook (2018)* [200]

**I can't think of any other company that has so proudly, and so publicly, distributed
spyware to its own devices. The only restraint is Apple's all-too-flexible company policies.**
*-Edward Snowden (2021)* [201]

"Ubiquitous employer surveillance of workers has a long and rich history as a defining
characteristic of workplace power dynamics, including the de facto abrogation of almost any
substantive legal restraints on its use. This history can be traced through many pivotal points
including massive efforts through warfare, slavery, globalization, and other forms of colonialism
used to control and exploit workers. [202] What is novel, and of real concern to privacy law, is that
rapid technological advancements and diminishing costs now mean employee surveillance
occurs both inside and outside the workplace - bleeding into the private lives of employees."[203]
There are areas of an employee's life in which his employer has no legitimate interest.[204]

"The protection of workers' privacy is a civil rights issue: both for the protection of
human dignity rights and because privacy invasions can serve as vehicles for unlawful
discrimination. History has shown that economic pressures are an unreliable regulator for the
preservation of the civil rights of those with comparatively lower economic power. We cannot
simply look to the market to curtail abuses of power regarding worker surveillance."[205]

---

[200] Ian Bogost, *Apple's Empty Grandstanding About Privacy*, The Atlantic (2019),
https://www.theatlantic.com/technology/archive/2019/01/apples-hypocritical-defense-data-privacy/581680/
[201] Edward Snowden, *The All-Seeing "i": Apple Just Declared War on Your Privacy, Aug 25, 2021,*
https://edwardsnowden.substack.com/p/all-seeing-i
[202] Ifeoma Ajunwa, Kate Crawford, and Jason Schultz, *Limitless Worker Surveillance*, 105 Calif. L. Rev. 735
(2017).
[203] Ifeoma Ajunwa, Kate Crawford, and Jason Schultz, *Limitless Worker Surveillance*, 105 Calif. L. Rev. 735
(2017).
[204] *Borse v. Piece Goods Shop, Inc., 963 F.2d 611 (3d Cir. 1992);  Geary v. United States Steel Corp., 319 A.2d 174
(Pa. 1974)*
[205] Ifeoma Ajunwa, Kate Crawford, and Jason Schultz, *Limitless Worker Surveillance*, 105 Calif. L. Rev. 735
(2017).

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

The predominant view of the U.S. Courts is that consent is not effective if it is not freely and voluntarily given.[206] The protection for privacy & autonomy is a default rule that recognizes a sphere of protection, not only to protect civic and personal life, but also to mirror the likely implicit bargain between the employer and employee about where the employment relationship ends and personal life begins.[207] **Even in the context of initial employment, consent to a particular type of invasion does not mean consent to all varieties of that invasion, reasonable or unreasonable.[208]**

The employer also cannot discharge employees for refusing to waive a nonnegotiable or nonwaivable right.[209] When an employee successfully refuses to submit to an employer's wrongful intrusion into protected employee privacy interests and the employee suffers a termination of employment or such adverse conditions of employment as to amount to a constructive discharge because of the employee's refusal to submit, the employee has a claim for wrongful discharge in violation of public policy. The public policy is the protection against wrongful employer intrusions into protected employee privacy interests.[210]

However, companies may be able to process personal data if they obtain either subjects' voluntary affirmative consent to process data for the specific purpose intended or have a legitimate justification. Corporations in countries such as Germany and France tend not to rely on consent because employees must be expressly asked for it, must be able to refuse without risk of sanction, and can withdraw it at any time. Moreover, in the corporate investigation context, courts tend to assume that such consent is involuntary because of the imbalance of power between the employer and employee.[211]

U.S. organizations that control or process the personal data of European Union residents likely are subject to the EU's new data protection requirements, the General Data Protection

---

[206] See *Stores, Inc. v. Lee, 74 S.W.3d 634, 647 (Ark. 2002); Papa Gino's of America, Inc., 780 F.2d 1067, 1072 (1st Cir. 1986)* (applying New Hampshire law; employee contracted away certain rights by accepting employment from employer who forbade drug use, but employer's demand that employee submit to polygraph exceeded scope of employee's consent to allow reasonable investigation into drug use).

[207] *Restatement of the Law, Employment Law* § 7.03, Protected Employee Privacy Interests in the Employee's Physical Person and in Physical and Electronic Locations, *Comments*

[208] *Frye v. IBP, Inc., 15 F. Supp. 2d 1032, 1041 (D. Kan. 1998)*

[209] *Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy* § 7.07, Discharge in Retaliation for Refusing Privacy Invasion, *Comment*

[210] *Restatement of the Law, Employment Law > Chapter 7- Employee Privacy and Autonomy* § 7.07, Discharge in Retaliation for Refusing Privacy Invasion, *Comment*

[211] ARTICLE: THE LAW OF CORPORATE INVESTIGATIONS AND THE GLOBAL EXPANSION OF CORPORATE CRIMINAL ENFORCEMENT, 93 S. Cal. L. Rev. 697 May 2020

## Information for OSTP on Automated Worker Surveillance and Management in the United States

Regulation (GDPR).  A common practice in the U.S. is to rely on blanket consent clauses in employment contracts or handbooks that permit employers to process employee personal data. U.S. employers often also rely on implied consent from employees. However, such practices may not be considered valid forms of consent for lawful processing of personal data under the GDPR. The GDPR provides that consent must be *"freely given, specific, informed and unambiguous."* Moreover, the GDPR adds, consent is not *"freely given"* where a *"clear imbalance of power"* between the data controller (*i.e.,* employer) and the data subject (*i.e.,* employee) exists.[212]

The Article 29 Working Party emphasized the imbalance of power in the employment context: "*Given the dependency that results from the employer/employee relationship, it is unlikely that the data subject is able to deny his/her employer consent to data processing without experiencing the fear or real risk of detrimental effects as a result of a refusal. It is unlikely that an employee would be able to respond freely to a request for consent from his/her employer to, for example, activate monitoring systems such as camera-observation in a workplace, or to fill out assessment forms, without feeling any pressure to consent."* The Working Party also advises that the imbalance of power in the employment relationship makes voluntary consent questionable and, for most work-related data processing, the GDPR lawful basis relied upon "*cannot and should not*" be the employee's consent. [213]

Multiple GDPR factors invaliding employee to employer consent are present with Apple's user studies. First, when I responded to the initial email about the Gobbler user study, I had no idea what I consented to/initiated., as it was "*vague or unclear*." Next, I had no "*clear records to demonstrate they consented*," as no receipt was sent and I was never given a copy of the ICF. It appears Apple also no longer has a copy of the ICF, otherwise it seems they would have provided it to me on Sept 15 or quoted it in their position statement.

Next, there was "*a clear imbalance of power between [the employer] and the individual*," the "*employee would be penalized for refusing consent,*" and *"there was no genuine free choice over whether to opt in."* Between the general pressure for Apple R&D employees to "live on" new products and software, and to participate in studies, and my performance reviews

---

[212] Is Employee Consent under EU Data Protection Regulation Possible?, Joseph J. Lazzarotti and Maya Atrakchi, February 27, 2018

[213] Is Employee Consent under EU Data Protection Regulation Possible?, Joseph J. Lazzarotti and Maya Atrakchi, February 27, 2018

# INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

mentioning my participation in these programs, but also that barbed wire compound with armed guards, too.

Finally, apparently later some employees were given the option to use the Gobbler application but not be "whitelisted" so their PII would not be uploaded. However, I was not given this option nor even told it was an option, so *"consent was a precondition of a service, but the processing is not necessary for that service."* Finally, once I apparently signed the ICF and after the Gobbler app was installed on my phone, I had no way to disable the app, nor was I given any way to withdraw consent. I had talked to other employees about the app with similar concerns over the years. Thus, the "consent' was invalid because Apple *"did not tell people about their right to withdraw consent"* and "*people cannot easily withdraw consent."* [214]

This non-consensual user data harvesting doesn't only have implications on Apple's employees and their families and friends. Intellectual Property rights cannot be granted for unlawful things/acts. Apple has deployed technology across the world, based on arguably illegal data and the fruit (algorithms and features) grown from that illegal data. What rights does Apple actually have to their technology if the people the data was harvested from had their own rights violated? What does that mean for customers using Apple products built off of human rights violations (again)? Today, the success of the global economy depends on Apple's success. Apple cannot take these kind of risks when the fall-out may land everywhere.

Apple says privacy is a fundamental right and "fundamental rights should not differ depending on where you live in the world." Apple says, *"they treat any data that relates to an identified or identifiable individual or that is linked or linkable to them by Apple as 'personal data,' no matter where the individual lives.*"[215]

California courts have found, "*The constitutional [privacy] provision is self-executing; hence, it confers a judicial right of action on all Californians. Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone."* [216] California accords privacy the constitutional status of an inalienable right, on a par with defending life and possessing property.[217]

---

[214] Information Commissioner's Office Consultation: GDPR consent guidance Start date: 2 March 2017 End date: 31 March 2017

[215] Apple Inc, *Worldwide Privacy Policy*, https://www.apple.com/legal/privacy/en-ww/

[216] *Wilkinson v. Times Mirror Corporation* (1989) 215 Cal.App.3d 1034.

[217] *Vinson v. Superior Court* (1987) 43 Cal. 3d 833, 841 [239 Cal. Rptr. 292, 740 P.2d 404] [limiting right to discover one's sexual history, habits and practices in action for sexual harassment and emotional distress].

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

Apple Is headquartered in California. Article I, section 1 of the California Constitution provides that the right of "privacy" is among the people's inalienable rights. California appellate courts and at least one federal court have consistently held, in varying contexts, that Article I, section 1 provides some protection against non-governmental intrusion, as well as state conduct.[218] The legislative history (ballot argument) stated,

> "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us."[219]

California employees have a cause of action against their private employer for violating their Constitutional right to privacy if the intrusion is against a legally protected privacy interest, including: "*conducting personal activities without observation, intrusion, or interference*" as determined by "*established social norms*."[220]  While California employees could contractually agree not to assert a right to privacy, the employer cannot be allowed to use such an agreement to circumvent the public policy favoring privacy, and the employer could not successfully enforce such a contractual agreement if it intruded on plaintiff's right to privacy.[221]  The public policy here "*affects the duty not to intrude on the right of privacy, which inures to the benefit of the public at large rather than to a particular employer or employee*." [222]

California employees have the right to privacy, even at the workplace, in areas where there is a reasonable expectation of being left alone.  For example, the California Labor Code prohibits video or audio monitoring of employees in restrooms, showers, locker rooms, and dressing rooms.[223] Further, California Penal Code section 647j makes it a crime for a person

---

[218] *Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825; *Cutter v. Brownbridge* (1986) 183 Cal.App.3d 836; *Miller v. National Broadcasting Company* (1986) 187 Cal.App.3d 1463; *Chico Feminist Women's Health Center v. Scully* (1989) 208 Cal.App.3d 230; *Chico Feminist Women's Health Center v. Butte Glenn Medical S.* (1983) 557 F.Supp. 1190; *Wilkinson v. Times Mirror Corporation* (1989) 215 Cal.App.3d 1034; *Semore v. Pool* (1990) 217 Cal.App.3d 1034; Luck v. Southern Pacific Trans. Co. (1990) 218 Cal.App.3d 1.

[219] *Wilkinson v. Times Mirror Corporation* (1989) 215 Cal.App.3d 1034.

[220] *Hill*, 7 Cal.4th 1, 35, 26 Cal.Rptr.2d 834, 865 P.2d 633.

[221] *Foley v. Interactive Data Corp.*, 47 Cal.3d at p. 670 (1988)

[222] *Semore v. Pool* (1990) 217 Cal. App. 3d 1088

[223] California Labor Code § 435, Contracts and Applications for Employment; *§ 435* was enacted to clarify "privacy rights in the workplace for both employers and employees" since court decisions had "left a definite gray area in regards to employee surveillance."  Hearing on A.B. 2303 Before the Assemb. Comm. on Labor & Emp't, 1997-98

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

unlawfully to invade someone else's privacy via a device to view in a private room, or by secret recording or photograph of a person's body.[224]

At a federal level, under the National Labor Relations Act (NLRA), employers may not monitor or surveil employees participating in protected concerted activities, including "*creating the impression of surveillance.*" [225]  Further, 18 U.S.C. § 1801 makes it a federal crime to capture images of a private area of an individual (naked or undergarment clad genitals, pubic area, buttocks, or female breast) without their consent and to knowingly do so under circumstances in which the individual has a reasonable expectation of privacy. [226]

While the legislative history for federal labor laws probably never anticipated a mega-corporation using a tool they called the "Face Gobbler" to capture secret videos of employees 24/7 – one would think The Congress would be outraged by an employer, one that markets that "privacy is a human right" none the less – justifying the termination of an employee who already had an open NLRB charge against the employer – on the employee protesting invasions of privacy & *Gobbling* of their face.

---

Leg. Sess. (Cal. Apr. 22, 1998). Since such surveillance was on the rise, the proponents of the statute felt that a "reasonable limitation" should be placed on it. Hearing on A.B. 2303 Before the S. Comm. on Indus. Relations, 1997-98 Leg. Sess. (Cal. June 11, 1998).

[224] California Penal Code Section 647(j) PC, Criminal Invasion of Privacy in California,

[225] Gov Docs, *More video surveillance in the workplace. But is it legal?*, https://www.govdocs.com/can-employers-use-video-surveillance-monitor-workers/; *NLRB v Boeing (2017)*

[226] 18 U.S. Code § 1801 - Video voyeurism, https://www.law.cornell.edu/uscode/text/18/1801

## INFORMATION FOR OSTP ON AUTOMATED WORKER SURVEILLANCE AND MANAGEMENT IN THE UNITED STATES

# Conclusion

**No matter what it says, Apple is not a company committed to data privacy.**
**Apple's business model helped stimulate the data-privacy dystopia we now occupy.**
**Apple is allowing the surveillance-capitalism atrocities it claims to oppose.**
*- Ian Bogost, The Atlantic (2019)* [227]

It's clear Apple's use of surveillance and electronic monitoring in the workplace is illegal, unlawful, and otherwise unethical. It's clear Apple knows this.

The Restatement makes clear: information regarding an employer's illegal activities is not a trade secret.[228] Further, information regarding an employer's illegal activities is not protectable by means of restrictive covenant. [229] The public policy protecting whistleblowers would be completely thwarted if the employer could retaliate with impunity against any employee who decided to reveal improper conduct by the employer.[230]

Yet, Apple is notorious for oppressing & silencing their workforce. An opinion piece was written by Anil Dash about the issue. Dash is "recognized as one of the most prominent voices advocating for a more humane, inclusive & ethical technology industry," was an advisor to the Obama White House, and is a Board Member of the EFF (Electronic Frontier Foundation) an international, non-profit digital rights group.[231] Dash wrote about Apple:

> The sad truth is that Apple is still stuck in an **anachronistic, 1984 mode** of communicating with the world. If Apple doesn't evolve, it'll become a pathetic-looking giant, constantly playing whack-a-mole with information leaks, diminishing its relevance by antagonizing the very creators it has so long sought to identify with. … The reckoning Apple has reached, whether it's admitted or not, is that its **secrecy is compromising its humanity…**It's incumbent upon Apple to do the moral thing here. Treat your **employees**, customers, suppliers and partner companies better, by letting them participate in the thing most of your products are designed for: Human self-expression. If the ethical argument is unpersuasive, then focus on the long-term viability of your marketing and branding efforts, and realize that a technology company that is determined to

---

[227] Ian Bogost, *Apple's Empty Grandstanding About Privacy*, The Atlantic (2019), https://www.theatlantic.com/technology/archive/2019/01/apples-hypocritical-defense-data-privacy/581680/
[228] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret**,** *Comment*
[229] Restatement of the Law, Employment Law, § 8.02, Definition of Employer's Trade Secret**,** *Comment*
[230] *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 229-230, 152 Cal.Rptr.3d 392, 294 P.3d 49; *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 90, 78 Cal.Rptr.2d 16, 960 P.2d 1046  Whitehall v. County of San Bernardino, 17 Cal.App.5th 352 (2017)
[231] EFF, Anil Dash, https://www.eff.org/about/staff/anil-dash

## Information for OSTP on Automated Worker Surveillance and Management in the United States

prevent information from being spread is an organization at war with itself. **Civil wars are expensive, have no winners, and incur lots of casualties**.[232]

Apple clearly did not listen.

The US government has not taken this seriously either. Both the NLRB and US Dept of Labor initially responded to my charges by attempting to intimidate me to withdraw those charges, and then when I refused, attempting to intimidate me and interfere with my due process rights. NLRB is now supposedly investigating. US Dept of Labor has only escalated it animosity towards me. California Dept of Labor says it won't even start investigating for another 1-3 years. Meanwhile I'm now unemployed, denylisted, broke, in debt, severely ostracized, & my reputation destroyed by smears and defamation.

What is the point of 'worker protection laws' or 'privacy 'laws' if they are never enforced? Do we live in a democracy if corporations are above the law? The first step here is not passing new laws or enacting more MOUs; the first step is deciding that no company is above the law. The first step is ensuring labor agencies will actually fulfill their statutory obligations. We must all agree that labor rights are human rights, and human rights must be protected.

Please let me know if I can be of any help. I'm more than happy to provide documents, testimony, or other additional resources. Thank you.

Respectfully,



ASHLEY M. GJØVIK

**Ashley M. Gjovik, JD**
Albany, New York
ashleymgjovik@protonmail.com

---

[232] Anil Dash, Apple: Secrecy Does Not Scale, Anil Dash, https://anildash.com/2009/07/31/apple_secrecy_does_not_scale/

# M.  EXHIBIT M: GOVERNMENT ACCOUNTABILITY OFFICE

Exhibit the Government Accountability Office Report GAO-24-107639, published August 28, 2024 and blog post published October 29, 2024, which references my public comment OSTP_FRDOC_0001-0008 in its findings

![GAO logo]

U.S. Government Accountability Office

# Digital Surveillance of Workers: Tools, Uses, and Stakeholder Perspectives

GAO-24-107639

Q&A Report to Congressional Requesters

August 28, 2024

## Why This Matters

A range of digital surveillance tools have been developed, and employers across various industries are increasingly using them to monitor their workers. Although digital surveillance tools can provide employers with information to help improve their operations, some worker advocates are concerned that these tools can be used in ways that negatively affect workers. We were asked to examine the kinds of digital surveillance tools employers use and how such surveillance affects workers.

This report summarizes 217 public comments submitted to the White House Office of Science and Technology Policy's request for information regarding use of automated digital surveillance tools to monitor workers and the effects of such surveillance on workers. Stakeholders submitted these comments from May to June 2023. We identified 211 stakeholders who submitted comments: 91 workers, 19 advocacy organizations, 16 researchers and research organizations, 12 unions, 10 trade associations, eight technology developers, one coalition comprised of advocacy organizations and a union, and 54 unspecified stakeholders.

These stakeholders submitted comments regarding various topics such as worker productivity, privacy, and safety.

## Key Takeaways

- The digital surveillance tools most frequently mentioned by stakeholders that employers use include cameras and microphones, computer monitoring software, geolocation, tracking applications, and devices worn by workers (wearables).

- Employers use digital tools to monitor (1) productivity and efficiency, (2) worker performance, (3) safety and health, and (4) workplace security.

- Stakeholders' views differed regarding the effects of digital surveillance on worker productivity and worker well-being.

- Workers and stakeholders from unions commented that digital surveillance may discourage workers from unionizing, make workers feel distrusted by their employers, and decrease workplace morale.

- Privacy was the most frequently raised concern by stakeholders and the potential for discrimination or bias was also a frequently raised concern.

## What kinds of digital surveillance tools did stakeholders describe?

Stakeholders described an array of digital surveillance tools employers used to monitor workers across various industries (see fig. 1).[1]

**Figure 1: Kinds of Digital Surveillance Tools Used in Various Workplaces**



Source: GAO analysis of public comments submitted to the White House Office of Science and Technology Policy; GAO (icons). | GAO-24-107639

Note: GAO classified workers who perform most of their work on a computer (either in an office or remotely) as "office workers." This includes those who work in call centers, law, finance, banking, and technology, among others. The digital surveillance tools shown here are just some of those identified by stakeholders.

- **Cameras and microphones.** These video- and audio-monitoring tools were the most commonly mentioned by stakeholders. Specifically, 51 stakeholders commented that employers use cameras to monitor workers. Additionally, 22 commented that employers use audio-monitoring tools for purposes such as monitoring calls while at work (11 stakeholders mentioned both cameras and audio-monitoring tools). For instance, a company may record service representatives' phone calls for training purposes. These surveillance tools are used in sectors like warehousing, retail, healthcare, domestic service, call centers, and trucking.

- **Computer monitoring software**. This was the second most common type of digital surveillance tool, mentioned by 42 stakeholders. This software allows employers to track workers' keystrokes, mouse movements, eye movements, texts, and screenshots. In addition, stakeholders commented that the software allows employers to track workers' browser history, locations, attendance, and work activities. Stakeholders generally commented that this software is used to monitor office workers.

- **Geolocation software**. Thirty-three stakeholders commented that employers use this software to track their workers' location. This software can be installed on workers' personal phones to track their movements throughout the workday. It can also monitor vehicle speed, driving behavior, and routing. Geolocation tracking is used in industries such as long-haul trucking, delivery services, rideshare, gig work, healthcare, domestic service, and construction.

- **Tracking applications.** Thirty stakeholders commented that some employers use application-based tracking tools. These tools monitor workers' start and end times for work, body movements, speed of work, and activities. In these

instances, employers require workers to download an application onto either their personal or company-provided cellphones or tablets. These applications give employers immediate information about workplace activities. According to stakeholders, application-based tracking is found in industries such as rideshare, warehousing, retail, and healthcare.

- **Wearables**. Twenty-seven stakeholders commented that employers may require workers to attach various forms of wearable technology to themselves for monitoring purposes. Electronic sensors embedded in these wearable devices track body movements, conversations, order processing, and biometric health data such as heart rate and blood pressure.[2] These tools can be found in warehouses, heavy industry, healthcare, and office settings.

## What do these tools monitor?

Stakeholders commented that employers use digital tools to monitor (1) productivity and efficiency, (2) worker performance, (3) safety and health, and (4) workplace security (see fig. 2).

**Figure 2: Example Uses of Digital Surveillance**



Source: GAO analysis of public comments submitted to the White House Office of Science and Technology Policy; GAO (icons). | GAO-24-107639

- **Productivity and efficiency.** Seventy-six stakeholders commented that digital surveillance could be used to monitor worker productivity and efficiency. Productivity monitoring includes measuring the amount of work completed and whether workers are on task. For example, stakeholders from one research organization noted that increasing remote and hybrid work arrangements had raised employer concerns of workers avoiding their responsibilities. They commented that these changes had led employers to track keystrokes and webcams to evaluate productivity. Efficiency refers to whether workers are optimizing company time, money, and other resources. For example, one trade association commented that employers used digital surveillance to help establish economical work practices (see text box).

> **Comment from a trade association:**
> "Some [app-based] delivery platforms use [a worker's] location information as a tool for businesses, workers, and consumers. By leveraging such location information, from restaurant pick-up to customer dropoff, the platforms help drivers ensure they are in the right location and restaurants are able to time preparation more accurately."

Source: White House Office of Science and Technology Policy. | GAO-24-107639

- **Performance.** Sixty-four stakeholders commented that digital surveillance tools are used to determine the quality of work completed and whether workers are fulfilling their responsibilities appropriately and accurately. For

instance, stakeholders from one union commented that some truck drivers may be monitored for their driving behavior, such as whether their hands are on the wheel or if their eyes are facing forward. This data can be used to evaluate drivers' performance and may be used for disciplinary purposes in cases of distracted driving or if drivers do not complete their routes on time.

- **Safety and health.** Thirty-one stakeholders commented that employers may use digital surveillance to ensure worker safety and prevent accidents. Nine stakeholders commented that employers may use digital surveillance tools to assess their workers' health as they complete their responsibilities. For instance, stakeholders from a union commented that some employers require workers to wear monitors to collect data on workers' heart rate or blood pressure to evaluate mental or physical stress levels.

- **Security.** Thirteen stakeholders commented that digital surveillance can also be used to maintain security—ensuring only authorized personnel enter the workplace and preventing loss, theft, or waste of resources. For example, a researcher reported that facial recognition technology can monitor workers handling sensitive information and send alerts if an unauthorized person accesses the information.

## How does digital surveillance affect worker productivity?

Stakeholders' views differed regarding the effect of digital surveillance on worker productivity. Researchers and stakeholders from unions and advocacy organizations commented that it is difficult to know its effects because digital surveillance tools may not accurately measure productivity. However, other stakeholders offered differing views on how digital surveillance affects worker productivity. For example, trade associations and researchers commented that digital surveillance increases worker productivity. In contrast, other stakeholders said that it reduces worker productivity.

- **Possible inaccurate measures of productivity**. Thirty-one stakeholders, including researchers and stakeholders from unions and advocacy organizations, commented that digital surveillance tools may provide an incomplete or inaccurate measure of productivity. For example, stakeholders from a research organization and an advocacy organization commented that employers may not be fully capturing workers' performance because some tasks may be completed offline or are not easily traced. Also, a worker advocacy organization commented that digital surveillance tools that measure how long a worker takes to complete tasks may not accurately account for things such as breaks and accommodations needed for injuries.

- **Differing views about effects on worker productivity.** Sixteen stakeholders, including trade associations, researchers, and a technology developer, commented that digital surveillance increases worker productivity. For instance, stakeholders from one trade association commented that digital surveillance allows employers to identify specific areas for improvement and provide targeted coaching, training, and other support. In contrast, nine stakeholders, including those from advocacy organizations, workers, and researchers, commented that digital surveillance reduces productivity. For example, a researcher commented that workers frequently take on insignificant or meaningless tasks to meet metrics that make them appear productive. This can include jiggling a mouse so it is registered by monitoring software.

**How does digital surveillance affect workers' relationships with their employers?**

Workers and stakeholders from unions commented that digital surveillance may discourage workers from unionizing and make workers feel distrusted by their employers. They also commented that it can decrease workplace morale.

- **May discourage unionizing efforts.** Thirty-one stakeholders, including workers and stakeholders from unions and research organizations, commented that digital surveillance may discourage unionizing efforts. One researcher commented that by monitoring and collecting data on workers, employers compile information that can be used to deter unionization. Several stakeholders from unions, advocacy organizations, and research organizations commented that employers in many industries use digital surveillance tools to identify and monitor workers who engage in labor organizing and union activity.

- **Feeling distrusted by employers.** Twenty stakeholders commented that digital surveillance may make workers feel distrusted by employers, with nine workers specifically commenting they felt that their employers did not trust them. Stakeholders from an advocacy organization, a union, and a researcher commented that due to monitoring, some workers have become more hesitant to voice their concerns about workplace issues, fearing that their digital activity will be used against them. One researcher highlighted a "negative spiral" in which employer distrust demotivated workers and adversely affected productivity.

- **Decreased workplace morale.** Nineteen stakeholders, including several unions, commented that digital surveillance can have a negative effect on workers' morale. For example, a researcher commented that workplace morale decreases when workers who are monitored worry about how their productivity scores will affect their pay. One union said that heightened expectations on employees combined with frequent and secretive surveillance has had significant negative impacts on their morale.

**How does digital surveillance affect worker well-being?**

Stakeholders commented that digital surveillance has mixed effects on worker well-being. Workers and researchers commented that digital surveillance tools had negative effects on mental health and generally negative effects on workplace safety. In contrast, stakeholders, including researchers and stakeholders from advocacy organizations, commented that these tools had a positive effect on workplace security. Additionally, stakeholders, including trade associations, commented that these tools had a positive effect on preventing illness.

- **Negative effects on mental health.** Fifty-nine stakeholders, including workers, researchers, unions, and advocacy organizations commented that digital surveillance decreased workers' mental health (see text box). Workers reported that digital surveillance increased stress and fear. Advocacy organizations also said that digital surveillance increased anxiety and depression among workers. A researcher commented that performance-scoring technologies can increase workers' stress and the risk of mental health problems. Specifically, they commented that when an employer turns productivity-scoring systems into "games" that pit workers against each other by making their productivity metrics public, workers' stress increases.

> **Comment from a call center agent:**
> "All of these tools are often used to drive an unrelenting push for sales . . . This pressure to sell and the various ways that managers can monitor me creates an enormous amount of stress. Over the past few years in this position, the stress has made me sick to my stomach and unable to get out of bed in the morning to do my job. I've started taking [medical leave] as a result of missing workdays due to stress."

Source: White House Office of Science and Technology Policy.  |  GAO-24-107639

- **Generally negative comments about effects on workplace safety.** Forty-nine stakeholders, including workers and stakeholders from advocacy organizations, commented that digital surveillance tools can reduce safety. For example, some stakeholders commented that these tools increase the pace at which workers must complete tasks, and therefore can make tasks more dangerous. Conversely, 15 stakeholders, including an advocacy organization and several trade associations, commented that digital surveillance tools can increase safety by reducing accidents and injuries. For instance, stakeholders from a trade association commented that employers may use digital surveillance tools, such as wearable technology, to detect ergonomic risks, toxic or combustible liquids or gases, and other hazards.

- **Positive effects on workplace security.** Twelve stakeholders, including researchers and stakeholders from trade associations, unions, and an advocacy organization, commented that digital surveillance tools improved workers' well-being by preventing workplace violence and increasing workplace security (see text box). One of these stakeholders commented that digital surveillance tools, such as those that detect intruders, can protect workers from harm and improve emergency responses. For example, rideshare platforms monitor for instances of unusual activities, such as long stops, which may be an indication of an emergency. A trade association also commented that digital surveillance tools can enhance workplace security by deterring potential criminal activity such as workplace violence, theft, and security breaches.

> **Comment from a labor union:**
> "[The union] has also negotiated to ensure that hotel housekeepers have GPS-enabled panic buttons to alert hotel security if they feel unsafe or threatened, a not uncommon occurrence for housekeepers who have faced sexual harassment and assault from hotel guests."

Source: White House Office of Science and Technology Policy.  |  GAO-24-107639

- **Positive effects on illness prevention.** Four stakeholders—two trade associations, a union, and an advocacy organization—commented that employers use digital surveillance tools to prevent or reduce illness. One trade association commented that digital surveillance enabled employers to enforce relevant health protocols during the COVID-19 pandemic (see text box). Another trade association commented that digital surveillance tools, such as heat stress monitors, can reduce workers' risk of heat-related illnesses.

> **Comment from a trade association:**
> "During COVID-19, the use of automated systems has enabled individuals to work safely by helping employers utilize cameras, sensors, and augmented reality to create important social-distancing tools and enforce relevant health protocols."

Source: White House Office of Science and Technology Policy.  |  GAO-24-107639

| **What concerns did stakeholders report about the use of these tools regarding privacy?** | Stakeholders generally described privacy concerns regarding the information employers collect on workers' digital activities (digital privacy) and bodies (bodily privacy). Privacy was the most frequently raised concern by stakeholders, with 87 stakeholders commenting about this issue. |
|---|---|

- **Digital privacy.** Seventy-three stakeholders, including workers, researchers, and stakeholders from unions and advocacy organizations, commented that digital surveillance tools can monitor workers' digital information through their personal or company-owned devices. Stakeholders from a union federation described some employers requiring remote workers to download software that gave managers access to their computer cameras and microphones while they were at home. A worker reported being fired from a large technology company after raising concerns about the company's privacy policy, which empowered managers to access, search, monitor, archive, and delete data stored on any worker's devices. Four stakeholders, including one researcher, two advocacy organizations, and a union, commented that employers may monitor workers' social media posts to identify workers who may be involved in labor organizing activities.

- **Bodily privacy.** Thirty-three stakeholders, including workers, unions, researchers, and advocacy organizations, commented that employers collect information related to workers' bodies. This could include biometric measurements or recordings of voices. For example, some employers record videos, watch employees via cameras, access their microphones, or record their voices on personal devices. Others collect biometric and health data through wearable technology or phone applications, including those that can track menstruation. While some stakeholders from trade associations commented that biometric data collection can help improve workplace safety and employee well-being, unions, workers, and advocacy organizations commented that such surveillance violates workers' privacy.

| **What concerns did stakeholders report about the potential for discrimination or bias due to the use of digital surveillance?** | The potential for discrimination or bias was also among the most frequently raised concerns by stakeholders. Sixty-three stakeholders, including advocacy organizations, researchers, and unions, identified the potential for such discrimination or bias based on several characteristics including race, gender and pregnancy, or disability. |
|---|---|

- **Race.** Twenty-nine stakeholders commented that digital surveillance could lead to potential discrimination or bias toward workers based on race. Stakeholders from an advocacy organization commented that when digital surveillance is used to monitor employee performance—especially if it requires customer reviews—racial bias can lead to negative outcomes for racial minorities. This organization also commented that rideshare drivers rely on online customer ratings to earn wages and maintain their employment on application-based platforms. Additionally, if a driver consistently receives low customer service ratings due to potential racial bias from passengers, the driver risks getting removed from the rideshare platform. Further, this advocacy organization commented that minority drivers are more likely to be suspended from rideshare platforms due to customer service complaints.

- **Gender and pregnancy.** Twenty-one stakeholders commented that digital surveillance could lead to potential discrimination or bias against women or pregnant workers. For example, stakeholders from one research and one advocacy organization commented that a wellness app used by employers gathered information about menstruation, fertility, and pregnancy. Stakeholders from the advocacy organization commented that an employer

with access to that information could terminate or fail to promote an individual before they disclose their pregnancy status to their employer.

- **Disability.** Twelve stakeholders commented that digital surveillance could lead to potential discrimination or bias toward workers with disabilities. Stakeholders commented that workers with disabilities may need more time to complete tasks, and digital surveillance that monitors their productivity may flag them as low performers. According to stakeholders from an advocacy organization, individuals with certain disabilities or chronic illnesses that cause delays in cognitive processes and physical activities may require more time to complete tasks (see text box). Other stakeholders commented that employers using digital surveillance often consider whether the worker can maintain the pace of work in their role when evaluating productivity and performance. One stakeholder commented that time used for a bathroom break is considered by employers to determine productivity. This could negatively affect the perceived performance of workers with disabilities, who may require more time for bathroom breaks.

> **Comment from a coalition of worker advocacy organizations:**
>
> "[Electronic surveillance combined with automated management] poses unique risks that threaten to exacerbate the disadvantages that pregnant and disabled workers already face. One of the most common uses of [this technology] is to increase the pace of work, discouraging workers from taking breaks or downtime and often penalizing them for doing so. Such practices may discriminate against disabled and pregnant workers, who may be more susceptible to new and aggravated injuries and illnesses in the workplace and are expected to comply with arbitrary, automatically enforced standards that do not consider disability- and pregnancy-related needs that may require opportunities for rest, flexibility, and supportive work environments. Workers with gastrointestinal and urinary tract disorders, for example, may need to use the restroom more frequently or at unpredictable times."

Source: White House Office of Science and Technology Policy. | GAO-24-107639

**What concerns did stakeholders report about workers' knowledge of how employers use data collected through digital surveillance?**

Advocacy organizations, researchers, unions, and workers commented that workers do not understand how employers use data they collect from digital surveillance to make decisions.

- **Lack of transparency**. Forty-five stakeholders, including workers, advocacy organizations, researchers, and unions, commented that there is a lack of transparency about employers' use of digital surveillance (see text box). For example, eight workers commented that their employers are not forthright about how they use workers' data to evaluate them or make job-related decisions. Two workers and a research organization commented that even when they are required to download digital surveillance tools onto their personal devices, employers are not transparent about what information they collect or how they use the information.

> **Comment from a technology worker:**
>
> "I was sent a company computer with a webcam and required to have it on at all times (except for breaks). The computer requires me to log in to my user profile . . . I am required to scan my facial biometrics. Once the lengthy verification login process is done, I am on camera all day. The webcam monitoring software uses [Artificial Intelligence] AI to track what is caught on camera, looking for violations. Certain violations are known to us, such as pointing [a] phone at [the] screen or leaving the desk, but no further information is told to us about all violations the AI is looking for and what else is the AI tracking."

Source: White House Office of Science and Technology Policy. | GAO-24-107639

## How GAO Did This Study

We analyzed public comments submitted to the White House Office of Science and Technology Policy (OSTP) in response to a request for information regarding experiences with the use of automated worker surveillance and management.[3] OSTP requested information from the public—including private and public sector workers—to better understand the prevalence, uses, purposes, and deployment of automated digital surveillance tools, including effects of these tools on workers' physical and mental health, privacy, and ability to exercise workplace rights.

OSTP's comment period ran from May 3 through June 29, 2023. In its request for public comments, OSTP noted that it was particularly interested in hearing from workers who have experienced automated digital surveillance; unions and advocacy organizations; employers, operators of virtual platforms, and other entities that match workers with opportunities to generate income; trade and business associations; researchers; and developers and vendors who manufacture or sell this type of technology, among others.

This report is the first of two reports on digital surveillance of workers. It summarizes 217 public comments submitted to OSTP through a request for information on the use of automated digital surveillance tools to monitor workers and the effect of such surveillance on workers. In the second report, we will incorporate stakeholder interviews and a literature search to enhance the information related to the impacts and uses of digital surveillance. Additionally, we will address how federal agencies oversee employers' use of digital surveillance technology.

For this report, we used a multistep process to analyze stakeholders' comments. This included: transferring the comments into a qualitative analysis software program; identifying themes in the comments and creating categories based on these themes; establishing agreement among the three analysts who reviewed the comments about how to categorize them into these themes; and having a fourth analyst verify that the comments were categorized correctly. We analyzed these comments to identify the types of digital surveillance tools stakeholders reported using. We also analyzed the comments to examine the types of workers who were monitored with these tools, how these tools were being used, and their effect on workers.

We conducted our work from June 2024 to August 2024 in accordance with all sections of GAO's Quality Assurance Framework that are relevant to our objectives. The framework requires that we plan and perform the engagement to obtain sufficient and appropriate evidence to meet our stated objectives and to discuss any limitations in our work. We believe that the information and data obtained, and the analysis conducted, provide a reasonable basis for the information we report in this product.

**List of Addressees**

The Honorable Robert P. Casey, Jr.
Chairman
Special Committee on Aging
United States Senate


The Honorable Robert C. "Bobby" Scott
Ranking Member
Committee on Education and the Workforce
House of Representatives

---

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 29 days from the report date. At that time, we will send copies to the appropriate congressional committees and other interested parties. In addition, the report will be available at no charge on the GAO website at https://www.gao.gov.

---

**GAO Contact Information**

For more information, contact: Thomas Costa, Director, Education, Workforce, and Income Security, CostaT@gao.gov, (202) 512-4769.

Sarah Kaczmarek, Acting Managing Director, Public Affairs, KaczmarekS@gao.gov, (202) 512-4800.

A. Nicole Clowers, Managing Director, Congressional Relations, ClowersA@gao.gov, (202) 512-4400.

**Staff Acknowledgments:** Mary Crenshaw (Assistant Director), Hedieh Fusfield (Analyst in Charge), Sarika Akula, James Bennett, John Bornmann, Dustin Cohan, Yasmine Evans, Lauren Kirkpatrick, Gabriel Nelson, Stacia Odenwald, Aaron Olszewski, and Kathleen van Gelder.

Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.

Visit GAO on the web at https://www.gao.gov.

This is a work of the U.S. government but may include copyrighted material. For details, see https://www.gao.gov/copyright.

---

**Endnotes**

[1] We counted stakeholders as workers if they identified themselves as a worker or we inferred that they were a worker based on their comment. Specifically, we inferred that they were workers if they described their experiences or perspectives about digital surveillance that they encountered at work.

[2] For more information on wearable technology, see GAO, *Science & Tech Spotlight: Wearable Technologies in the Workplace,* GAO-24-107303 (Washington, D.C.: March 2024). We reported that certain wearables could reduce the risk of injuries from strenuous work or worker-equipment collisions and may improve response time to emergencies but concerns about privacy, cost, and ease of use may hinder widespread adoption.

[3] Request for Information; Automated Worker Surveillance and Management, 88 Fed. Reg. 27,932 (May 3, 2023).



< WatchBlog: Following the Federal Dollar

# 'Why do I feel like somebody's watching me?' Workplace Surveillance Can Impact More Than Just Productivity

Posted on October 29, 2024

     

Do you ever get that eerie feeling like someone's watching you at work?

In today's digital world, employers are increasingly using digital surveillance tools to monitor workers. While many employers say that digital surveillance has benefits like increasing worker productivity, most workers say being watched gives them the creeps.

The question is—does this constant monitoring actually work? Does it increase productivity and safety, or is it killing morale and causing other issues?

For Halloween, today's WatchBlog post answers these and other questions, while looking at our new report about digital surveillance tools.



Source: sthazkul/stock.adobe.com.

Case 2:23-cv-04496-WJC-ETC   Filed 03/30/26   Entered 03/30/26 20:14:49   Page 144 of 717
Document    Page 300 of 804

# Cameras, microphones, and tracking software—oh my! Why do employers like "bossware?"

Often referred to as "bossware," a wide range of digital surveillance tools are used in all kinds of workplaces. These include warehousing, retail, trucking, health care, and banking, to name just a few.

Digital Surveillance tools include everything from cameras, microphones, and computer monitoring software to advanced tracking software (like GPS), app-based monitoring, and even wearable devices that track workers' health data.

**Kinds of Digital Surveillance Tools Used in Workplaces**

Source: GAO analysis of public comments submitted to the White House Office of Science and Technology Policy; GAO (icons). | GAO-24-107639

**Why do employers like digital surveillance?** The primary aim of digital surveillance is to monitor workers' productivity, performance, and efficiency. It allows employers to identify specific areas for improvement and provide targeted coaching, training, and other support. Some employers began using surveillance tools after increasing workplace flexibilities for their staff, such as remote and hybrid work arrangements. Employers who allow telework have raised concerns that workers are slacking off when working from home. Digital surveillance tools allow employers to check whether

their staff are working from where they say they are (and not… the beach, for example).

Some employers said they also use digital surveillance tools to increase workplace safety and health. For example, in oil production, one employer uses wearable devices to track workers' sweat levels and electrolyte loss to help prevent heat stress on the job.

Digital surveillance also bolsters security to ensure that only authorized personnel enter sensitive areas. With innovations like facial recognition technology, employers can swiftly respond to potential threats, creating safer working environments. For example, a labor union official commented that GPS-enabled panic buttons are used for hotel housekeepers to "alert hotel security if they feel unsafe or threatened, a not uncommon occurrence for housekeepers who have faced sexual harassment and assault from hotel guests."

Even with these potential benefits, employers weren't always sure how effective their tools were. For example, perpetual monitoring had led some workers to game the system—performing meaningless tasks, like jiggling a mouse, just to meet arbitrary milestones. And the constant monitoring is leading to negative effects on workers, which may outweigh some benefits.

## Under constant scrutiny—why do workers dislike surveillance tools?

Digital surveillance tools are putting employees on edge and having other negative effects that could impact their mental health, morale, productivity, and more.

- **Worsens mental health:** Constant surveillance can amplify workers' stress and anxiety levels, making them feel like they're under a microscope. The sheer act of surveillance can contribute to workers' feeling less confident or enthusiastic about their jobs. Workers increasingly reported feeling that they cannot voice concerns or share suggestions out of fear that their digital footprint will bite back. When the work environment makes workers feel scrutinized, it may very well foster a culture of distrust.

  For example, a call center worker said that surveillance tools have resulted in an unrelenting push to improve sales. They said, "The pressure to sell and the

Case 2:23-cv-01096-RSM-DWC    Document 402-7    Filed 03/30/26    Page 142 of 217

Case 2:25-cv-04090-JPO    Document 42    Filed 03/30/26    Entered 03/30/26 20:44:40e    Main Document    Page 302 of 804

various ways that managers can monitor me creates an enormous amount of stress."

- **Discourages unionization:** Being perpetually watched can also eat away at a workers' sense of autonomy and privacy. Consequently, some workers feel it discourages workplace solidarity and unionization efforts. When workers fear their every move is being tracked, organizing for better conditions feels risky—undermining solidarity and weakening workplace morale.

- **Potential to create discrimination:** Workers' advocates and researchers worry about the potential for digital surveillance to create bias or discrimination. Some worry that AI-driven performance metrics might unfairly target certain groups. For instance, those who take longer to complete tasks due to disability or other factors. This could magnify existing disability, racial, or gender inequalities in the workplace.

For more spooky details, read our new report.

---

- GAO's fact-based, nonpartisan information helps Congress and federal agencies improve government. The WatchBlog lets us contextualize GAO's work a little more for the public. Check out more of our posts at GAO.gov/blog.

# Topics



Employment    Department of Labor    Occupational Safety and Health Administration

Workplace safety and health    Worker protections    Worker safety

Electronic surveillance    Education, Workforce, and Income Security

# GAO Contacts



## Thomas Costa

Director

Education, Workforce, and Income Security

 costat@gao.gov

# Related Posts



orodenkoff/stock.adobe.com.

Blog Post

### As Online Shopping Increases, So Do Concerns About Delivery and Warehouse Workers' Safety

WEDNESDAY, OCTOBER 9, 2024

Next-day delivery. Overnight shipping. Online sales in the U.S. have nearly doubled in the last few...



lalfpoint/stock.adobe.com.

Blog Post

### How Can the Federal Government Strengthen its Response to the COVID-19 Pandemic?

WEDNESDAY, OCTOBER 27, 2021

Deep into the second year of the COVID-19 pandemic, from health care to the economy, challenges...

Case 2:21-cv-14490-AMC-BER Document 607 Entered on FLSD Docket 03/30/2026 Page 146 of 217
Document    Page 305 of 804



Source: Pond5

Blog Post

## Vaccine Distribution, Supply Chain, Testing Still Present Challenges in Federal Pandemic Response

THURSDAY, JANUARY 28, 2021

Since November 2020, the number of COVID-19 cases in the U.S. has dramatically increased, further...

# Related Products

## Digital Surveillance of Workers: Tools, Uses, and Stakeholder Perspectives

GAO-24-107639

Published: Aug 28, 2024

Publicly Released: Sep 11, 2024

Case 25-21490-SMG   Doc 103-8   Filed 03/30/26   Entered 03/30/26 10:44:40   Page 147 of 217
Document    Page 306 of 804



GAO's mission is to provide Congress with fact-based, nonpartisan information that can help improve federal government performance and ensure accountability for the benefit of the American people. GAO launched its WatchBlog in January, 2014, as part of its continuing effort to reach its audiences—Congress and the American people—where they are currently looking for information.

The blog format allows GAO to provide a little more context about its work than it can offer on its other social media platforms. Posts will tie GAO work to current events and the news; show how GAO's work is affecting agencies or legislation; highlight reports, testimonies, and issue areas where GAO does work; and provide information about GAO itself, among other things.

Please send any feedback on GAO's WatchBlog to blog@gao.gov.

## Receive GAO Updates

Stay informed as we add new reports & testimonies.

Enter Your Email Address

**SUBSCRIBE**

**GAO**

U.S. Government
Accountability Office

Press Center

Contact Us

Inspector General

Restricted Reports

Copyright & Terms of Use

Privacy Policy

Accessibility

Case 2:21-cv-04920-WB Document 4 Filed 03/30/26 Entered 03/30/26 14:49e 148 of 217
Document    Page 307 of 804



Sitemap

FOIA Requests

Scam Alerts

No FEAR Act Data

Health Care Advisory Committees

v4.1.8

# N.  EXHIBIT N: NLRB

NLRB National Settlement Agreement, Case No. 32-CA-284428

32-CA-284428

FORM NLRB-4722



# NOTICE TO EMPLOYEES



## POSTED PURSUANT TO A SETTLEMENT AGREEMENT
## APPROVED BY A REGIONAL DIRECTOR OF THE
## NATIONAL LABOR RELATIONS BOARD

### AN AGENCY OF THE UNITED STATES GOVERNMENT

**THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:**

- Form, join, or assist a union;
- Choose a representative to bargain with us on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE WILL NOT** interfere with, restrain, or coerce you in the exercise of the above rights.

**YOU HAVE THE RIGHT** to discuss wages, hours and working conditions and **WE WILL NOT** do anything to interfere with your exercise of that right.

**WE WILL NOT** promulgate, maintain, or enforce any rule that defines confidential information as "anything not explicitly, publicly, or purposefully disclosed by Apple."

**WE WILL NOT** promulgate, maintain, or enforce a Confidentiality and Intellectual Property Agreement, Business Conduct Policy, Misconduct and Discipline Policy, Social Media and Online Communications Policy, Confidentiality Obligations Upon Termination of Employment statement, or a Business Conduct and Global Compliance FAQ regarding confidential information that broadly defines "confidential" or "proprietary" information, or relies upon any other overly broad definitions of those terms, without contemporaneously notifying employees of their rights to discuss wages, hours, or working conditions and their rights to engage in union or other protected, concerted activity under the NLRA.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts public speaking, responses to press inquiries and publishing articles without contemporaneously notifying employees of their rights to speak publicly, respond to press inquiries and publish articles regarding their wages, hours, or working conditions, or their union or other protected, concerted activity under the NLRA.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts "conflicts of interest" or "outside activities," without contemporaneously notifying employees that such policies do not restrict their right to form, join or assist a union, or engage in other protected, concerted activity and that these activities are not considered to be conflicts of interest or outside activities under such policy.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly prohibits sharing of employee personal identifying information if such policy could be interpreted as prohibiting the sharing of personal contact information, employment history, compensation or other terms and conditions of employment.

**WE WILL NOT** promulgate, maintain, or enforce a Workplace Searches and Privacy Policy that advises you that we have the right to access Apple's network or systems, or any non-Apple device used to conduct Apple business, without contemporaneously advising you that we will not exercise our right of access to monitor your union or other protected, concerted activity.

*The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Hearing impaired callers who wish to speak to an Agency representative should contact the Federal Relay Service (link is external) by visiting its website at https://www.federalrelay.us/tty (link is external), calling one of its toll free numbers and asking its Communications Assistant to call our toll free number at 1-844-762-NLRB.*

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE.**

THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED DEFACED OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO, THE ASSISTANT TO THE REGIONAL DIRECTOR NATHAN SEIDMAN AT nathan.seidman@nlrb.gov or (213) 634-6518, **PANEL 1 OF 3**

32-CA-284428

FORM NLRB-4722




# NOTICE TO EMPLOYEES

**POSTED PURSUANT TO A SETTLEMENT AGREEMENT**
**APPROVED BY A REGIONAL DIRECTOR OF THE**
**NATIONAL LABOR RELATIONS BOARD**

**AN AGENCY OF THE UNITED STATES GOVERNMENT**

### THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:

- Form, join, or assist a union;
- Choose a representative to bargain with your employer on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE WILL NOT** promulgate, maintain, or enforce a Misconduct and Discipline Policy that fails to reiterate employee rights during investigations that Apple may conduct regarding alleged unfair labor practices under the National Labor Relations Act, and/or contains overly broad restrictions on photography and recording.

**WE WILL NOT** advise you that you are subject to discipline for violating overly broad rules regarding confidential or proprietary information or for failing to report alleged violations of overly broad rules relating to confidential or proprietary information.

**WE WILL NOT** advise you that you are subject to discipline for violating overly broad rules regarding photographing, video or audio recording that prohibit the recording of protected, concerted activity.

**WE HAVE** clarified the aspects of the Confidentiality and Intellectual Property Agreement described above and revised it to make clear that the definition of "Proprietary Information," which was changed to "Apple Confidential Information," does not include wages, hours, and working conditions, to reiterate employee rights about discussing terms and conditions of employment and reporting to governmental agencies, and to make clear that prohibitions against "conflicting outside interests" do not cover forming or joining (or refraining from joining) labor organizations of an employee's choice and **WE HAVE** informed employees of these clarifications.

**WE HAVE** rescinded the aspects of Business Conduct and Global Compliance FAQ regarding Confidential Information described above and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Business Conduct Policy described above and revised it to make clear that Apple Confidential Information does not include wages, hours, and working conditions, that employees may communicate about labor disputes, to clarify that employees may not respond to public inquiries or participate in speaking engagements where employees could be construed as speaking on behalf of Apple, to clarify that employees may publish articles but must receive approval about articles about Apple products or services or could be seen as a conflict of interest, make clear that a conflict of interest does not include forming, joining, or assisting a union, or engaging in protected, concerted activity, to make clear that employees do not need to notify a manager of outside employment that complies with our policy, and to inform employees that searches will not be used to monitor employees' protected, concerted activity, and **WE HAVE** informed employees of these revisions.

*The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Hearing impaired callers who wish to speak to an Agency representative should contact the Federal Relay Service (link is external) by visiting its website at https://www.federalrelay.us/tty (link is external), calling one of its toll free numbers and asking its Communications Assistant to call our toll free number at 1-844-762-NLRB.*

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE.**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED DEFACED OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO, THE ASSISTANT TO THE REGIONAL DIRECTOR NATHAN SEIDMAN AT nathan.seidman@nlrb.gov or (213) 634-6518.

**PANEL 2 OF 3**

32-CA-284428

FORM NLRB-4722



# NOTICE TO EMPLOYEES



### POSTED PURSUANT TO A SETTLEMENT AGREEMENT APPROVED BY A REGIONAL DIRECTOR OF THE NATIONAL LABOR RELATIONS BOARD

### AN AGENCY OF THE UNITED STATES GOVERNMENT

## THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:

- Form, join, or assist a union;
- Choose a representative to bargain with your employer on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE HAVE** rescinded the aspects of the Workplace Searches and Privacy Policy described above and revised it to conform with the definition of Apple Confidential Information described above and to inform employees that searches will not be used to monitor employees' protected, concerted activity and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Misconduct and Discipline Policy described above and revised it to conform with the definition of Apple Confidential Information described above, to reiterate employee rights under the National Labor Relations Act relating to certain workplace investigations relating to alleged unfair labor practices under the National Labor Relations Act, to clarify when recording and photography is permitted and prohibited, and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Social Media and Online Communications Policy described above and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the prior version of the Confidentiality Obligations Upon Termination of Employment statement, which contained an overbroad definition of proprietary information, and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE WILL NOT** in any like or related manner interfere with your rights under Section 7 of the Act.

**APPLE INC.**

_____
(Charged Party)

**Dated:** _____  **By:** _____

(Representative)          (Title)

_The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Hearing impaired callers who wish to speak to an Agency representative should contact the Federal Relay Service (link is external) by visiting its website at https://www.federalrelay.us/tty (link is external), calling one of its toll free numbers and asking its Communications Assistant to call our toll free number at 1-844-762-NLRB._

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE.**

THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED DEFACED OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO, THE ASSISTANT TO THE REGIONAL DIRECTOR NATHAN SEIDMAN AT nathan.seidman@nlrb.gov or (213) 634-6518.

**PANEL 3 OF 3**

Subject to the approval of the Regional Director for the National Labor Relations Board, the Charged Party Apple Inc. and the Charging Party Ashley Marie Gjovik

:

The Charged Party will post a link to a copy of the Notice in English and in additional languages if the Regional Director decides that it is appropriate to do so, on the Policies and Notices page of its People intranet and keep such link continuously posted there for 60 consecutive days from the date it was originally posted. Such link will read, "This Notice is Posted Pursuant to a Settlement Agreement Approved by the Regional Director of Region 21 of the National Labor Relations Board in Case 32-CA-284428." Charged Party will also post, on a public-facing website maintained indefinitely by Charged Party containing legal notices, an explanation of revisions to the definition of Confidential Information (or comparable term) in the Confidentiality and Intellectual Property Agreement. To document its compliance with this requirement, the Charged Party will submit screen shots of the posting to include screen shots of the path to the intranet page that shows the Notice, along with a fully completed Certification of Posting form, via the Agency's e-filing portal at www.nlrb.gov.  Should further investigation or verification of the intranet or website posting become necessary, the Charged Party will provide appropriate intranet or website access to the Compliance Assistant or Compliance Officer assigned to the case(s).

The Charged Party will comply with all the terms and provisions of said Notice

By entering into this Agreement the Charged Party does not admit to any violation of the National Labor Relations Act ("Act").

The Charged Party agrees that it will not enforce the definition of Proprietary Information (or similar terms) set forth in any version of the Confidentiality and Intellectual Property Agreement ("IPA") effective as of the date that this Agreement is executed to the extent that such definition covers terms and conditions of employment protected under Section 7 of the Act.

A further material term of this Agreement is that the Charged Party is directed to prospectively clarify the definition of Proprietary Information (or similar terms) in the IPA and make other clarifications to the IPA relating to the Section 7 rights of employees or at its option issue a new IPA for certain employees with prospective effect, with such clarified definition of Proprietary

Charged Party Initials: MLS_____         Charging Party Initials: __AMG_____

Information (or similar terms) or such new agreement as reflected in the attached Appendix A, and has agreed to revise certain other policies, as reflected in the attached Appendix B.[1]

This Agreement settles only the allegations in the above-captioned case(s), including all allegations covered by the attached Notice to Employees made part of this agreement, and does not settle any other case(s) or matters, including, but not limited to, 32-CA-282142, 32-CA-283161, and 32-CA-284441.  It does not prevent persons from filing charges, the General Counsel from prosecuting complaints, or the Board and the courts from finding violations with respect to matters that happened before this Agreement was approved regardless of whether General Counsel knew of those matters or could have easily found them out.  The General Counsel reserves the right to use the evidence obtained in the investigation and prosecution of the above-captioned case(s) for any relevant purpose in the litigation of this or any other case(s), and a judge, the Board and the courts may make findings of fact and/or conclusions of law with respect to said evidence.

If the Charging Party fails or refuses to become a party to this Agreement and the Regional Director determines that it will promote the policies of the National Labor Relations Act, the Regional Director may approve the settlement agreement and decline to issue or reissue a Complaint in this matter.  If that occurs, this Agreement shall be between the Charged Party and the undersigned Regional Director.  In that case, a Charging Party may request review of the decision to approve the Agreement.  If the General Counsel does not sustain the Regional Director's approval, this Agreement shall be null and void.

Counsel for the Charged Party authorizes the Regional Office to forward the cover letter describing the general expectations and instructions to achieve compliance, a conformed settlement, original notices and a certification of posting directly to the Charged Party. If such authorization is granted, Counsel will be simultaneously served with a courtesy copy of these documents.

Yes _____          No _MLS_____
      Initials                        Initials

Performance by the Charged Party with the terms and provisions of this Agreement shall commence immediately after the Agreement is approved by the Regional Director, or if the Charging Party does not enter into this Agreement, performance shall commence immediately upon receipt by the Charged Party of notice that no review has been requested or that the General Counsel has sustained the Regional Director. The Charged Party agrees that in case of non-compliance with any of the terms of this Settlement Agreement by the Charged Party, and after 14 days notice from the Regional Director of the National Labor Relations Board of such non-compliance without remedy by the Charged Party, the Regional Director will reissue the complaint previously issued on October 3, 2024, in the instant case. Thereafter, the General Counsel may file a motion for default judgment with the Board on the

---

[1] Charged Party, through counsel, will provide Charging Party with notice of these revisions.

Charged Party Initials: _MLS_____          Charging Party Initials: __AMG_____

allegations of the complaint. The Charged Party understands and agrees that the allegations of the aforementioned complaint will be deemed admitted and its Answer to such complaint will be considered withdrawn. The only issue that may be raised before the Board is whether the Charged Party defaulted on the terms of this Settlement Agreement. The Board may then, without necessity of trial or any other proceeding, find all allegations of the complaint to be true and make findings of fact and conclusions of law consistent with those allegations adverse to the Charged Party on all issues raised by the pleadings. The Board may then issue an order providing a full remedy for the violations found as is appropriate to remedy such violations. The parties further agree that a U.S. Court of Appeals Judgment may be entered enforcing the Board order ex parte, after service or attempted service upon Charged Party/Respondent at the last address provided to the General Counsel.

Each party to this Agreement will notify the Regional Director in writing what steps the Charged Party has taken to comply with the Agreement.  This notification shall be given within 5 days, and again after 60 days, from the date of the approval of this Agreement.  If the Charging Party does not enter into this Agreement, initial notice shall be given within 5 days after notification from the Regional Director that the Charging Party did not request review or that the General Counsel sustained the Regional Director's approval of this agreement.  No further action shall be taken in the above captioned case(s) provided that the Charged Party complies with the terms and conditions of this Settlement Agreement and Notice.

| By: Name and Title Date | By: Name and Title Date |
|---|---|
| /s/ Mark L. Stolzenburg    March 25, 2025<br>Print Name and Title below<br><br>Attorney for Apple Inc. | *Ashley M. Gjovik*    April 3 2025<br>Print Name and Title below<br><br>**Ashley M. Gjovik, Charging Party** |
| Recommended By: Date<br><br><br>ELVIRA PEREDA<br>Counsel for the Acting General Counsel | Approved By: Date<br><br><br>NATHAN M. SEIDMAN<br>Acting Regional Director, Region 21 |

Charged Party Initials: MLS_____        Charging Party Initials: AMG_____

- Form, join, or assist a union;
- Choose a representative to bargain with us on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

interfere with, restrain, or coerce you in the exercise of the above rights.

to discuss wages, hours and working conditions and do anything to interfere with your exercise of that right.

promulgate, maintain, or enforce any rule that defines confidential information as "anything not explicitly, publicly, or purposefully disclosed by Apple."

promulgate, maintain, or enforce a Confidentiality and Intellectual Property Agreement, Business Conduct Policy, Misconduct and Discipline Policy, Social Media and Online Communications Policy, Confidentiality Obligations Upon Termination of Employment statement, or a Business Conduct and Global Compliance FAQ regarding confidential information that broadly defines "confidential" or "proprietary" information, or relies upon any other overly broad definitions of those terms, without contemporaneously notifying employees of their rights to discuss wages, hours, or working conditions and their rights to engage in union or other protected, concerted activity under the NLRA.

promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts public speaking, responses to press inquiries and publishing articles without contemporaneously notifying employees of their rights to speak publicly, respond to press inquiries and publish articles regarding their wages, hours, or working conditions, or their union or other protected, concerted activity under the NLRA.

promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts "conflicts of interest" or "outside activities," without contemporaneously notifying employees that such policies do not restrict their right to form, join or assist a union, or engage in other protected, concerted activity and that these activities are not considered to be conflicts of interest or outside activities under such policy.

promulgate, maintain, or enforce a Business Conduct Policy that broadly prohibits sharing of employee personal identifying information if such policy could be interpreted as prohibiting the sharing of personal contact information, employment history, compensation or other terms and conditions of employment.

promulgate, maintain, or enforce a Workplace Searches and Privacy Policy that advises you that we have the right to access Apple's network or systems, or any non-Apple

Charged Party Initials: MLS _____    Charging Party Initials: _AMG_____

device used to conduct Apple business, without contemporaneously advising you that we will not exercise our right of access to monitor your union or other protected, concerted activity.

promulgate, maintain, or enforce a Misconduct and Discipline Policy that fails to reiterate employee rights during investigations that Apple may conduct regarding alleged unfair labor practices under the National Labor Relations Act, and/or contains overly broad restrictions on photography and recording.

advise you that you are subject to discipline for violating overly broad rules regarding confidential or proprietary information or for failing to report alleged violations of overly broad rules relating to confidential or proprietary information.

advise you that you are subject to discipline for violating overly broad rules regarding photographing, video or audio recording that prohibit the recording of protected, concerted activity.

clarified the aspects of the Confidentiality and Intellectual Property Agreement described above and revised it to make clear that the definition of "Proprietary Information," which was changed to "Apple Confidential Information," does not include wages, hours, and working conditions, to reiterate employee rights about discussing terms and conditions of employment and reporting to governmental agencies, and to make clear that prohibitions against "conflicting outside interests" do not cover forming or joining (or refraining from joining) labor organizations of an employee's choice and                informed employees of these clarifications.

rescinded the aspects of Business Conduct and Global Compliance FAQ regarding Confidential Information described above and revised it to conform with the definition of Apple Confidential Information described above and                informed employees of these revisions.

rescinded the aspects of the Business Conduct Policy described above and revised it to make clear that Apple Confidential Information does not include wages, hours, and working conditions, that employees may communicate about labor disputes, to clarify that employees may not respond to public inquiries or participate in speaking engagements where employees could be construed as speaking on behalf of Apple, to clarify that employees may publish articles but must receive approval about articles about Apple products or services or could be seen as a conflict of interest, make clear that a conflict of interest does not include forming, joining, or assisting a union, or engaging in protected, concerted activity, to make clear that employees do not need to notify a manager of outside employment that complies with our policy, and to inform employees that searches will not be used to monitor employees' protected, concerted activity, and                informed employees of these revisions.

rescinded the aspects of the Workplace Searches and Privacy Policy described above and revised it to conform with the definition of Apple Confidential Information described above and to inform employees that searches will not be used to monitor employees' protected, concerted activity and                informed employees of these revisions.

Charged Party Initials: MLS _____        Charging Party Initials: ___AMG_____

rescinded the aspects of the Misconduct and Discipline Policy described above and revised it to conform with the definition of Apple Confidential Information described above, to reiterate employee rights under the National Labor Relations Act relating to certain workplace investigations relating to alleged unfair labor practices under the National Labor Relations Act, to clarify when recording and photography is permitted and prohibited, and informed employees of these revisions.

rescinded the aspects of the Social Media and Online Communications Policy described above and revised it to conform with the definition of Apple Confidential Information described above and          informed employees of these revisions.

rescinded the prior version of the Confidentiality Obligations Upon Termination of Employment statement, which contained an overbroad definition of proprietary information, and revised it to conform with the definition of Apple Confidential Information described above and          informed employees of these revisions.

in any like or related manner interfere with your rights under Section 7 of the Act.

_____
(Charged Party)

_____        _____
(Representative)          (Title)

*The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Callers who are deaf or hard of hearing who wish to speak to an NLRB representative should send an email to relay.service@nlrb.gov. An NLRB representative will email the requestor with instructions on how to schedule a relay service call.*

US Court House, Spring Street                    (213)894-5200
312 N Spring Street, 10th Floor                    8:30 a.m. to 5 p.m.
Los Angeles, CA 90012

This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced or covered by any other material. Any questions concerning this notice or compliance with its provisions may be directed to the above Regional Office's Compliance Officer.

Charged Party Initials: MLS _____        Charging Party Initials: AMG _____

# O.    EXHIBIT O: NIH

Exhibit: OHRP Complaint No. 00709517

# Reporting an Incident to OHRP: Trial ID NCT04196595 (Apple Women's Health Study)

---

From    Ashley Gjovik <ashleymgjovik@protonmail.com>

To      OHRP-DCO@hhs.gov

CC      AppleWomensHealthStudy@hsph.harvard.edu, jukica@niehs.nih.gov, baird@niehs.nih.gov

Date    Wednesday, March 11th, 2026 at 2:05 AM

---

**OHRP Incident Report**

**Incident Type:** Serious Non-Compliance / Unanticipated Problem Involving Risks to Subjects
**Regulatory Framework**: 45 CFR Part 46 (Common Rule); 42 U.S.C. § 282(j)
**Reported by**: Ex-employee of Sponsor / Responsible Party

**Study Title:** Apple Women's Health Study
**Trial ID:** NCT04196595
**Principal Investigator / Conducting Institution:** Harvard T.H. Chan School of Public Health
**Sponsor / Responsible Party:** Apple Inc.
**Additional Federal Partner:** National Institute of Environmental Health Sciences (NIEHS)
**Trial Registration Date:** 2019 (ongoing as of 2026)
**Stated Study Goals:** (1) Identify Menstrual Cycle Patterns; (2) Epidemiologic Description of Menstrual Cycle; (3) Determine prevalence of gynecologic health conditions

Hello,

This complaint concerns the Apple Women's Health Study (AWHS), a clinical trial registered on ClinicalTrials.gov (NCT04196595 (https://clinicaltrials.gov/study/NCT04196595)) since 2019 and currently ongoing. The trial is sponsored by Apple Inc. and conducted by Harvard T.H. Chan School of Public Health, in partnership with NIEHS as part of what has been described as a major long-term study of women's health. Medscape reported the study in 2023 as "a 10-year project among Harvard, Apple, and the National Institute of Environmental Health Sciences (NIEHS) that is unprecedented in size and scope." (Medscape, 2023 (https://www.medscape.com/s/viewarticle/996078?form=fpf)) The subject matter involves collection of highly sensitive and intimate reproductive health data, specifically related to ovulation and menstruation. The ClinicalTrials page lists the top study goals as "Identify Menstrual Cycle Patterns" and "Epidemiologic Description of Menstrual Cycle" with a secondary goal of "Determine prevalence of gynecologic health conditions."

The subject matter of the trial involves ovulation and menstruation — intimate reproductive health data of a highly personal nature. The corporate sponsor has actively recruited its own employees as research subjects to increase enrollment numbers since at least 2019. This practice creates a structural and inescapable conflict of interest: employees being asked to participate by or through their employer (who is simultaneously the trial's sponsor) face an inherent power imbalance in which declining to participate may reasonably be perceived as carrying professional consequences. The team's own reports indicate that as of 2023, when the overall participation was around one hundred thousand, that only two states provided more than ten thousand participants -- California and Texas -- where

the corporation's headquarters are located. In fact, California is the only state indicated to be well above ten thousand indicating it may even account for over 80% of the participants -- with a large amount originating from its corporate offices or the family members of its corporate employees. (Overall participant enrollment by state, https://hsph.harvard.edu/research/apple-womens-health-study/study-updates/2023-apple-womens-health-study-newsletter-four-years-in-review/).

Overall, the team's conduct raises serious compliance concerns under:
- 45 CFR 46.116(b)(2): Informed consent must be free from coercion or undue influence. Employer-to-employee recruitment by the sponsoring corporation constitutes a paradigmatic example of undue influence, as employees cannot freely decline without fear of workplace consequences.
- 45 CFR 46.111(a)(3) and 46.111(b): The IRB is required to ensure equitable subject selection and to apply additional protections when subjects are vulnerable to coercion. Employees of a trial's corporate sponsor constitute a vulnerable population in precisely the sense these provisions are designed to address. The IRB either approved this recruitment pathway without adequate safeguards, or the recruitment occurred without IRB knowledge — both of which are reportable failures.

This study/trial has been registered and operating since 2019. The recruitment of employees by the corporate sponsor appears to be a sustained and ongoing recruitment strategy, not an isolated incident. This constitutes continuing non-compliance within the meaning of 45 CFR Part 46. The IRB's apparent failure to identify or correct this practice over a multi-year period is itself a significant matter of concern warranting investigation.

This complaint concerns Apple Inc.'s response to a non-enrolled individual — a former Apple employee who declined enrollment and subsequently spoke publicly about the coercive nature of the study's recruitment practices and raised questions about the integrity of the trial's enrollment and consent process. In response, Apple Inc. has pursued legal action in federal court against that individual. In the matter of *Ashley Gjovik v. Apple Inc.*, Case No. 3:23-cv-04597-EMC (N.D. Cal.), Apple has taken the position that the employee's testimony, speech, and complaints about the corporation's recruitment practices are confidential, and has sought sealing orders, compelled deletion of public criticism, prior restraint gag orders, and sanctions against the individual for filing complaints with government agencies and speaking publicly about concerns that Apple's recruitment of employees into a highly personal medical study is unethical, improper, and likely unlawful and that Apple was trying to designate her complaints as "confidential". (See *Ashley Gjovik v Apple Inc,* 3:23-cv-04597-EMC, Northern District of California, https://www.courtlistener.com/docket/67772913/gjovik-v-apple-inc/?filed_after=&filed_before=&entry_gte=&entry_lte=&order_by=desc).

The specific nature of the data at issue warrants particular attention. Apple's own litigation filings reveal that the study's scope as implemented includes monitoring of employee cervical mucus and vaginal secretions, and at the same time Apple also sought to register employees' sex partners and require those sex partners to execute non-disclosure agreements for a separate "study". I complained about both of these things -- while I worked at Apple and after. My deposition testimony at issue was simply summarizing my prior complaints about Apple's recruitment practices for this and other studies. Apple then further claimed in that litigation that employee complaints about being asked to submit to this type of study and monitoring are themselves confidential like trade secrets, and is currently seeking a gag order prohibiting employees from discussing any of it. The IRB's privacy assessment under 45 CFR 46.111(a)(7) must be evaluated against this specific reality — not merely the abstract description of a menstrual health study, but an employer asserting proprietary control over employees' reproductive and sexual data, the identities of their sexual partners, and the complaints those employees made about being subjected to it.

In making this complaint to you right now and when I attach a copy in my court filings for this matter, Apple will claim the content in this email is confidential and proprietary, should be sealed, and I should be sanctioned for continuing to violate court "rules" (where the corporation is abusing a protective order to apply to existing complaints and to use as a private prior restraint against employees and critics about its operations). This secrecy includes, and is targeted to conceal, how Apple runs recruitment for clinical trials including ones that are done as a formal partnership with the government (like here, with NIEHS). An employer recruiting its own employees to disclose intimate reproductive health information as research subjects raises acute privacy concerns that the IRB was required to specifically address under 45 CFR 46.111(a)(7) (The IRB must ensure adequate provisions to protect the privacy of subjects and to maintain the confidentiality of data). When the entity collecting this data is also the subject's employer, the adequacy of any privacy protections is inherently compromised. Employees have reasonable cause to fear that reproductive health information disclosed in a sponsor-controlled study may not remain segregated from their employment relationship.

Apple's position, as stated in that litigation including attached filings, is that it is impermissible for the complainant to raise these concerns publicly, to communicate them to third parties, or to submit this very complaint to OHRP. Apple appears to be mis-using a legal processes as a private prior restraint mechanism against employees and critics discussing how the corporation operates clinical trials conducted in formal partnership with the federal government. This raises a question about how often Apple engages in this kind of conduct and how else it's obstructed complaints about this study.

Further, Apple's conduct implicates a number of issues in the clinical trial and human research regulatory framework:

- **42 U.S.C. § 282(j):** Clinical trial registration exists precisely because human subjects research is subject to public accountability. Apple Inc. cannot simultaneously hold a registered trial out as a public research enterprise — particularly one conducted in federal partnership with NIEHS — and seek court orders suppressing public speech about how that trial recruits its subjects.
- **45 CFR 46.116(b)(8):** Informed consent must identify whom subjects may contact with questions or concerns about the research and their rights. This provision reflects the regulatory framework's treatment of the ability to raise concerns as an intrinsic right — not a privilege the sponsor may litigate away through injunctive relief.
- **Chilling Effect on Current and Future Subjects:** By pursuing legal action against a person who declined to enroll and raised compliance concerns, Apple has sent a direct signal to every current and potential subject that raising concerns about this trial carries severe legal consequences. This compounds the coercive environment described above and further undermines the voluntariness of any consent obtained from employees in this environment.
- **Sponsor's Posture Toward Compliance:** The decision to pursue legal suppression of scrutiny — rather than address the underlying recruitment concerns — is directly relevant to OHRP's assessment of whether Apple Inc. can be trusted to operate a compliant human subjects research program. It reflects an institutional posture that treats public accountability as a threat to be neutralized rather than an obligation to be met.

The complainant respectfully requests that OHRP:
- Investigate the IRB's review and approval of the employee recruitment pathway, and assess whether adequate protections against undue influence were required and implemented.
- Assess whether consent processes conducted under this coercive recruitment environment meet the voluntariness requirements of 45 CFR 46.116.

- Determine how many participants in the total participants for this study are Apple employees or direct family members of Apple employees, and determine what % of the total population of the study makes the study population impermissibly dominant with employees.
- Evaluate whether the IRB's privacy provisions under 45 CFR 46.111(a)(7) adequately address the risks created by a corporate employer-sponsor collecting reproductive health data from its own employees.
- Consider Apple Inc.'s litigation conduct in *Gjovik v. Apple Inc.,* No. 3:23-cv-04597-EMC (N.D. Cal.), as evidence bearing on the sponsor's compliance posture and the integrity of the trial's ongoing operations.
- Inquire whether other complaints or concerns about this study have been similarly suppressed by Apple through any type of conduct, including litigation "protective orders"
- Determine whether suspension or additional oversight of the trial is warranted pending investigation.

The following documents are submitted in support of this complaint or are available upon request:
- ClinicalTrials.gov registration record (https://clinicaltrials.gov/study/NCT04196595)
- Documentation of legal action and threatened speech restraints and other injunctive relief against complainant (*Ashley Gjovik v Apple Inc,* 3:23-cv-04597-EMC, Northern District of California)
- AWHS 2023 Four Years in Review Newsletter (participant enrollment by state): HSPH.edu (https://hsph.harvard.edu/research/apple-womens-health-study/study-updates/2023-apple-womens-health-study-newsletter-four-years-in-review/)
- Medscape coverage of AWHS scope: Medscape, 2023 (https://www.medscape.com/s/viewarticle/996078?form=fpf)
- March 14 2023 Telerama magazine article (translated from French to English) where I and my coworkers criticized Apple's use of employee data for this specific study.

Note: I contacted the Study's contact list at Harvard (cc'd here) on March 8th, asking for a response on these matters but received no response by March 10th. I told them if I didn't receive a response I'd file by end of day, and no response was provided so now I'm filing that complaint.

This complaint is submitted in good faith based on direct knowledge of the events described. The complainant is aware that Apple Inc. may contend that the submission of this complaint itself violates litigation-related orders or confidentiality designations. The complainant submits that the filing of a good-faith regulatory complaint with a federal oversight body is protected activity and that any such contention by Apple would itself constitute further evidence of the sponsor's attempt to suppress oversight of a federally registered human subjects research study. The complainant understands that OHRP may contact the submitter for additional information.

**Ashley Gjovik, B.S., PMP, J.D.**
Dated: March 11 2026
San Jose, California
Ex-Apple Employee (2015-2021)

---

**18.56 MB**   5 files attached

APPLE WOMENS HEALTH STUDY LITIGATION PORTFOLIO.pdf 17.16 MB

Study Details _ NCT04196595 _ Apple Women's Health Study _ ClinicalTrials.gov.pdf 638.43 KB

NIH partners with Apple and Harvard University on Women's Health Study _ National Institutes of Health (NIH).pdf
153.50 KB

Locations 2023 Apple Women's Health Study newsletter_ four years in review _ Study Updates _ Harvard T.H…th.pdf
209.68 KB

Ashley Gjøvik, lanceuse d'alerte licenciée par Apple, seule contre tous - en-US.pdf 436.57 KB

3/11/26, 1:26 AM — 2023 Apple Women's Health Study Newsletter: Four years in review | Harvard T.H. Chan School of Public Health

Case 2:21-cv-04958-... Document... Page 324 of 804



**HARVARD**
**T.H. CHAN** | SCHOOL OF PUBLIC HEALTH

allows for investigating the impact of environmental factors on a person's menstrual cycles and health. Participant experiences reflect the wide range of geographic, cultural, social, and economic factors that may help AWHS better understand menstrual health.





The map shows how many participants in AWHS enrolled from the US States. The darker the color, the higher the number as shown on the scale. The relative color difference also shows what percentage of our total cohort comes from each state, so darker colored states contribute a higher percentage of the cohort. CA, FL, and TX are so high in percentage since their populations also comprise a similar percentage of the overall US population.

While each menstrual journey is unique, many often share similar experiences throughout such as menstrual symptoms and menstrual hygiene.

Case 25-2314, Document 97-6, FiledCase 03/30/2607, Enter Filed 03/30/1262.00 4:P49e 136 of 217

Document    Page 325 of 804



Tuesday, September 10, 2019

# NIH partners with Apple and Harvard University on Women's Health Study

The National Institutes of Health, Apple, and the Harvard T. H. Chan School of Public Health announced their research partnership for a major long-term study of women's health. The collaboration will permit researchers to study conditions including pregnancy, infertility, polycystic ovary syndrome (PCOS), menopausal transition, and osteoporosis. Apple's new Research App will help users participate in the study and will be a free download in the App Store later this year.

The intention is to improve women's health by identifying the factors that impact women from around the country. This new study will connect academic medical institutions, healthcare organizations, and Apple products with the goal of contributing to medical science and helping to create the next generation of innovative health software.

The National Institute of Environmental Health Sciences (NIEHS), the NIH institute involved in the partnership, has several of the world's leading scientists on women's health and population studies. NIEHS will provide expert advice and data analysis for the Apple Women's Health Study.

"This is an exciting opportunity for NIEHS researchers to contribute to the study design and use the resulting data to answer novel questions, not only important to women of reproductive age, but to women of all ages," said Dale Sandler, Ph.D., chief of the NIEHS Epidemiology Branch.

Allen Wilcox, M.D., Ph.D., Scientist Emeritus at NIEHS, has spent 40 years studying fertility and pregnancy, and welcomes this opportunity to work with Apple and colleagues at Harvard. He is optimistic about the medical advances that could come from this collaboration.

"Studies conducted with commercial cycle and fertility tracking apps have great potential for making important contributions to science, because they can enroll much larger samples of women and from far more diverse backgrounds," added Wilcox. "We want to do our part to make this new method of data collection a scientifically valid source of health information."

**About the National Institute of Environmental Health Sciences (NIEHS):** NIEHS supports research to understand the effects of the environment on human health and is part of the National Institutes of Health. For more information on NIEHS or environmental health topics, visit www.niehs.nih.gov or subscribe to a news list.

**About the National Institutes of Health (NIH):** NIH, the nation's medical research agency, includes 27 Institutes and Centers and is a component of the U.S. Department of Health and Human Services. NIH is the primary federal agency conducting and supporting basic, clinical, and translational medical research, and is investigating the causes, treatments, and cures for both common and rare diseases. For more information about NIH and its programs, visit www.nih.gov.

Case 25-1349, Document 207, 03/30/2026, 3601301, Page 126 of 217

*NIH…Turning Discovery Into Health*

## Institute/Center

National Institute of Environmental Health Sciences (NIEHS)

## Contact

Robin Arnette

919-541-5143

## Connect with Us

 Subscribe to news releases

 RSS Feed

# National Institutes of Health

9000 Rockville Pike

Bethesda, Maryland 20892

NIH…Turning Discovery Into Health®

## Follow Us

     

 

✕

**ClinicalTrials.gov**


National Library of Medicine
*National Center for Biotechnology Information*

 **The U.S. government does not review or approve the safety and science of all studies listed on this website.**

Read our full disclaimer (https://clinicaltrials.gov/about-site/disclaimer) for details.

 +

Recruiting

# Apple Women's Health Study

**ClinicalTrials.gov ID** ⓘ NCT04196595

**Sponsor** ⓘ Apple Inc.

**Information provided by** ⓘ Apple Inc. (Responsible Party)

**Last Update Posted** ⓘ 2024-07-03

# Study Details Tab

## Study Overview

### Brief Summary

This is an observational longitudinal study to advance the understanding of menstrual cycle and gynecologic health conditions including PCOS, infertility and breast cancer.The study will be hosted within the Research app(available on App Store), which allows a user to find, enroll, and participate in Apple-supported health-related research studies.

### Official Title

Apple Women's Health Study

Case 25-31-49604-597c-EOGC Filed 03/30/26 07 Entered 03/30/26 20 14 P 49  130 of 217

## Conditions ⓘ

Menstrual Cycle    Ovulation    Menstruation    Polycystic Ovary Syndrome    Infertility

Menopause    Reproduction    Reproductive Health

## Other Study ID Numbers ⓘ

- Pro00037562

## Study Start (Actual) ⓘ

2019-11-14

## Primary Completion (Estimated) ⓘ

2029-11

## Study Completion (Estimated) ⓘ

2029-11

## Enrollment (Estimated) ⓘ

500000

## Study Type ⓘ

Observational

---

### Resource links provided by the National Library of Medicine

MedlinePlus Genetics (https://medlineplus.gov/genetics/) related topics: Polycystic ovary syndrome (https://medlineplus.gov/genetics/condition/polycystic-ovary-syndrome)

MedlinePlus (https://medlineplus.gov/) related topics:
Infertility (https://medlineplus.gov/infertility.html)  Polycystic Ovary Syndrome (https://medlineplus.gov/polycysticovarysyndrome.html)

FDA Drug and Device Resources (https://clinicaltrials.gov/fda-links)

---

# Contacts and Locations

Case 25-31-496-45-97c-EOS Study Details | NCT04196595 | Apple Women's Health Study | ClinicalTrials.gov Main
Case 25-31-496-45-97c-EOS Doc 03/30/26 07 Entered 03/30/26 20:44:49 Desc Main
Document Page 329 of 804

This section provides contact details for people who can answer questions about joining this study, and information on where this study is taking place.

To learn more, please see the [Contacts and Locations section in How to Read a Study Record (https://clinicaltrials.gov/study-basics/how-to-read-study-record#contacts-and-locations)](https://clinicaltrials.gov/study-basics/how-to-read-study-record#contacts-and-locations).

**Study Contact** ⓘ

**Name:** Shruthi Mahalingaiah, MD
**Phone Number:** 617-432-1356
**Email:** [AppleWomensHealthStudy@hsph.harvard.edu](mailto:AppleWomensHealthStudy@hsph.harvard.edu)

This study has 1 location

## United States

### Massachusetts Locations

📍 **Boston, Massachusetts, United States, 02115**
**Recruiting**
Harvard T.H. Chan School of Public Health
Contact : Shruthi Mahalingaiah
617-432-1356
[AppleWomensHealthStudy@hsph.harvard.edu](mailto:AppleWomensHealthStudy@hsph.harvard.edu)

# Participation Criteria

Researchers look for people who fit a certain description, called [eligibility criteria](). Some examples of these criteria are a person's general health condition or prior treatments.

For general information about clinical research, read [Learn About Studies (https://clinicaltrials.gov/study-basics/learn-about-studies)](https://clinicaltrials.gov/study-basics/learn-about-studies).

Case 25-31-49604597-05C  Filed 03/30/26 07 Enter Fil 03/30 26 20 14 49e 174 of 217

## Eligibility Criteria

**Description**

Inclusion Criteria:

- Have menstruated at least once
- Be at least 18 years old (at least 19 years old in Alabama and Nebraska, at least 21 years old in Puerto Rico)
- Live in the United States of America
- Be comfortable communicating in written and spoken English
- Have installed the Apple Research app on your iPhone
- Not share your iCloud account or iPhone with anyone else
- Be willing and able to provide informed consent to participate in the study

**Study Population**

Convenience sampling of individuals who have ever menstruated and meet other eligibility criteria

**Ages Eligible for Study** ⓘ

18 Years and older (Adult,  Older Adult )

**Sexes Eligible for Study** ⓘ

All

**Accepts Healthy Volunteers** ⓘ

Yes

**Sampling Method**

Non-Probability Sample

## Study Plan

This section provides details of the study plan, including how the study is designed and what the study is measuring.

### How is the study designed?

Case 25-31-496-457-E15C Filed 03/30/26 07 Entered 03/30/26 20 14:49e 178 of 217

## Design Details

**Observational Model** ⓘ **:** Cohort
**Time Perspective:** Prospective

## What is the study measuring?

**Primary Outcome Measures** ⓘ

| Outcome Measure | Measure Description | Time Frame |
|---|---|---|
| Identify Menstrual Cycle Patterns | Characterized using duration of menstrual flow, and cycle length in unit of days. | Up to 10 years |
| Epidemiologic Description of Menstrual Cycle | Characterized using cycle patterns and self-reported demographics, no unit of measure | Up to 10 years |

**Secondary Outcome Measures** ⓘ

| Outcome Measure | Measure Description | Time Frame |
|---|---|---|
| Determine prevalence of gynecologic health conditions | Characterized using menstrual cycle patterns and self-reported health conditions, no unit of measure | Up to 10 years |

## Collaborators and Investigators

3/11/26, 1:25 AM

Case 25-31-4904 597-E05C Study Details | Due Date 295 | Apple Women's Health Study | 4/Frial.gov Main
Document     Page 332 of 804

This is where you will find people and organizations involved with this study.

### Sponsor ⓘ

## Apple Inc.

### Collaborators ⓘ

- Harvard School of Public Health (HSPH)
- National Institute of Environmental Health Sciences (NIEHS)

### Investigators ⓘ

- Principal Investigator: Michelle A Williams, SM, ScD,   Harvard School of Public Health (HSPH)
- Principal Investigator: Russ B Hauser, MD, MPH, ScD,   Harvard School of Public Health (HSPH)
- Principal Investigator: Brent A Coull, PhD,   Harvard School of Public Health (HSPH)
- Principal Investigator: Shruthi Mahalingaiah, MD, MS,   Harvard School of Public Health (HSPH)

# Publications

**From PubMed**

These publications are automatically filled in from PubMed, a public database of scientific and medical articles, and may or may not be about the study.

- Zhang CY, Li H, Zhang S, Suharwardy S, Chaturvedi U, Fischer-Colbrie T, Maratta LA, Onnela JP, Coull BA, Hauser R, Williams MA, Baird DD, Jukic AMZ, Mahalingaiah S, Curry CL. Abnormal uterine bleeding patterns determined through menstrual tracking among participants in the Apple Women's Health Study. Am J Obstet Gynecol. 2023 Feb;228(2):213.e1-213.e22. doi: 10.1016/j.ajog.2022.10.029. Epub 2022 Oct 29. (https://pubmed.ncbi.nlm.nih.gov/36414993)

# Study Record Dates

These dates track the progress of study record and summary results submissions to ClinicalTrials.gov. Study records and reported results are reviewed by the National Library of Medicine (NLM) to make sure they meet specific quality control standards before being posted on the public website.

**Study Registration Dates**

Case 2:21-cv-04597-EK-ST   Document 87   Filed 03/30/26   Page 174 of 217

**First Submitted** ⓘ

2019-11-13

**First Submitted that Met QC Criteria** ⓘ

2019-12-10

**First Posted** ⓘ

2019-12-12

## Study Record Updates

**Last Update Submitted that Met QC Criteria** ⓘ

2024-07-01

**Last Update Posted** ⓘ

2024-07-03

**Last Verified** ⓘ

2024-07

# More Information

## Terms related to this study

**Keywords Provided by Apple Inc.**

Menstruation

Menstrual Cycle

Ovulation

Polycystic Ovary Syndrome

Infertility

Menopause

Reproduction

Reproductive Health

**Additional Relevant MeSH Terms**

Ovarian Cysts

Cysts

Neoplasms

Ovarian Diseases

Case 25-31-4904-597-EOC  Filed 03/30/26  07 Entered 03/30/26 20 14:49  Page 175 of 217
Document

Adnexal Diseases

Genital Diseases, Female

Female Urogenital Diseases

Female Urogenital Diseases and Pregnancy Complications

Urogenital Diseases

Genital Diseases

Gonadal Disorders

Endocrine System Diseases

Polycystic Ovary Syndrome

Infertility

## Plan for Individual Participant Data (IPD)

**Plan to Share Individual Participant Data (IPD)?**

Undecided

## Drug and device information, study documents, and helpful links

**Studies a U.S. FDA-Regulated Drug Product**

No

**Studies a U.S. FDA-Regulated Device Product**

No

# P. EXHIBIT P: FTC REPORT

Exhibit: FTC (Report Number: 154835129)

# Complaint against Apple Inc

From: Ashley Gjovik <ashleymgjovik@protonmail.com>

To      opa@ftc.gov

Date:  Friday, April 1st, 2022 at 11:39 PM

---

April 2nd, 2022

To Whom it May Concern,

This is a complaint against Apple Inc for unlawful data collection & invasion of employee privacy that spans years and multiple countries/continents, violating numerous laws and international agreements. While this complaint focuses on the rights of Apple's employees, the implications of Apple's violations for broader society should be self-evident.

I worked for Apple as a Senior Engineering Program Manager from February 2015 until my termination on September 9 2021, along with a Legal & Policy Internship working in Apple Products Legal in 2019.  In August 2021, I expressed public concerns about Apple's overly restrictive/invasive employee polices, and Apple pressuring its employees to participate in invasive data collection procedures, including scans of ears/ear canals (which I believed captured employee data that could be used for biometric identification and mass surveillance). I also raised concerns about an iOS application (Gobbler/Glimmer) on employee's iPhones that automatically took photos/videos whenever it "thought it saw a face."  I raised concerns about Apple's unlawfully invasive "Search and Privacy Policy" for employees, Apple's limitless access to employee's personal iCloud/Apple-server-based data, and Apple's culture of intimidation and secrecy (including a secret/private police force).

Apple terminated me on September 9 2021 for reasons unknown to me at that time but assumed by myself and the press to be retaliation for my protected activities (I had filed labor and retaliation charges with the U.S. government only weeks earlier). Apple reached out to me via external lawyers a week after I was fired, to complain about several Twitter posts I made. Suggesting these posts were reason for my termination, was so farfetched & pretextual a detailed article was written about it, titled "Apple Wanted Her Fired. It Settled on an Absurd Excuse."

This year, Apple offered their explanation for my termination to the U.S Department of Labor (in response to my allegations of federal whistleblower retaliation in violation of SOX, CERCLA, and OSHA statutes). Apple doubled down on the "absurd excuse" & cited my opposition to their harvesting of employee biometrics and their secret, invasive photography of employees - as a legitimate justification for my termination. I am now even more concerned knowing Apple felt comfortable telling the U.S. government that they believe their unlawful invasion of employee privacy is "legitimate" and any employees who protest privacy invasions deserve to be terminated, as I was. Thus, I write to you today.

Please see attached legal memo for details.*

Thank you.

Respectfully,
-Ashley M. Gjovik


*Note: this complaint will also be submitted to the other government agencies, international bodies, and NGOs noted on page two.


—
**Ashley M. Gjøvik, J.D. Candidate, B.S., PMP**
ashleygjovik.com | +1`415-964-6272


Sent with ProtonMail secure email.

**2.46 MB**   1 file attached

Gjovik v Apple – Privacy Complaint – Final.pdf 2.46 MB

## Complaint has been submitted

---

From  no-reply@consumersentinel.gov <no-reply@consumersentinel.gov>

To    Ashley Gjovik<ashleymgjovik@protonmail.com>

Date  Friday, December 30th, 2022 at 2:32 PMFriday, December 30th, 2022 at 2:32 PM

---

Your report has been submitted to the Federal Trade Commission.

**Report Number: 154835129**

Thank you for helping our work to protect consumers.

Learn about common scams and how to recover from them at ftc.gov/scams.
To file a report online, go to **ReportFraud.ftc.gov**.

**FTC Next Steps**

- We use reports to investigate and bring cases against fraud, scams, and bad business practices, but we can't resolve reports on behalf of individuals.
- We will share your report with our law enforcement partners.
- We use reports to spot trends, educate the public, and provide data about what is happening in your community. You can check out what is going on in your state or metro area by visiting **ftc.gov/exploredata**.

When we bring cases, we try to get money back for people. Check out **ftc.gov/refunds** to see recent FTC cases that resulted in refunds.

**Additional Information**

How to Avoid a Scam

# Q.      EXHIBIT Q: GERMANY & FRANCE

Complaints to German and French Privacy Authorities



| POSTAL ADDRESS | The Federal Commissioner for Data Protection and Freedom of Information PO box 1468, 53004 Bonn, Germany | STREET ADDRESS | Graurheindorfer Straße 153, 53117 Bonn, Germany |
| --- | --- | --- | --- |
| | Ms | PHONE | +49 (0)228 997799-1117 |
| | Ashley M. Gjovik | E MAIL | Referat11@bfdi.bund.de |
| | | PERSON IN CHARGE | Frau Wollnik |
| | Only as e-mail: | INTERNET | www.bfdi.bund.de |
| | ashleymgjovik@protonmail.com | DATE | Bonn, 23.06.2022 |
| | | FILE NUMBER | 11-540 II#3693 |

**Please always indicate the above file-number in all replies.**

SUBJECT **Your e-mail from 14. June 2022**

Dear Ms Gjovik,

Unfortunately, I have to inform you that we have handed over your submission to the responsible state data protection authority in Bavaria.

You can reach our colleagues as follows:

Bayerische Landesamt für Datneshcutzaufsicht

Promenade 18
91522 Ansbach

Telefon: 0981/180093-0

E-Mail: poststelle@lda.bayern.de

Homepage: https://www.lda.bayern.de

Best regards,
By order

Wollnik

DELIVERY ADDRESS   Graurheindorfer Straße 153, 53117 Bonn, Germany
TRANSPORT CONNECTION   Tram 61 and 65, Innenministerium
Bus 550 and SB60, Innenministerium

(100 of 414), Page 100 of 414, 05/20/2025, DktEntry: 27.6, Page 100 of 414
Case 2:21-cv-04589-DC Filed 03/31/26 Entered 03/31/26 10:44:49 Desc Main
Document Page 341 of 804

## Re: Ihre Meldung vom 19.04.2022

From: Ashley Gjovik <ashleymgjovik@protonmail.com>

To:    poststelle@bfdi.bund.de<POSTSTELLE@bfdi.bund.de>

Date: Tuesday, June 14th, 2022 at 9:45 AM

Hello!

I wanted to check in on my question below

I also want to let you know that a Germany journalist has been investigating this matter and found that these activities are occurring in Apple offices in Germany. The article should be published next week or the week after. I will share it when it is out. Is there a way for me to contact the investigator assigned to my case?

Thank you!
-Ashley

------

Hallo!

Ich wollte meine Frage unten überprüfen. Ich möchte Sie auch wissen lassen, dass ein deutscher Journalist diese Angelegenheit untersucht hat und festgestellt hat, dass diese Aktivitäten in Apple-Büros in Deutschland stattfinden. Der Artikel sollte nächste Woche oder die Woche danach veröffentlicht werden. Ich werde es teilen, wenn es draußen ist. Gibt es eine Möglichkeit für mich, den mit meinem Fall beauftragten Ermittler zu kontaktieren? Vielen

Dank! -Ashley

---
Ashley M. Gjøvik
Juris Doctor Candidate, International Law Scholar, B.S., PMP
ashleygjovik.com | +1 415-964-6272

*"Never, ever be afraid to make some noise and get in good trouble, necessary trouble."*
-U.S. Rep. John Lewis

Sent with Proton Mail secure email.

-------- Original Message
On Sunday, May 8th, 2022 at 8:51 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello,

Thank you very much. I would like to provide evidence for my charges, including: emails, documents, and photos.

Is there a way for me to send these documents now? Or do I need to wait to hear from the investigator? Thank you

------

Google Traslate / Google Übersetzer

---

*Hallo! Vielen Dank. Ich mochte Beweise für meine Anklagen vorlegen, einschließlich: E-Mails, Dokumente und Fotos. Gibt es eine Möglichkeit für mich, diese Dokumente jetzt zu senden? Oder muss ich warten, um vom Ermittler zu hören? Vielen Dank!*

---
Ashley M. Gjøvik, J.D. Candidate, B.S., PMP
ashleygjovik.com | https://linktr.ee/ashleygjovik | +1 415-964-6272 (Signal)

Sent with ProtonMail secure email.

------ Original Message -------
On Tuesday, May 3rd, 2022 at 11:26 PM, POSTSTELLE@bfdi.bund.de POSTSTELLE@bfdi.bund.de wrote:

Der Bundesbeauftragte für den Datenschutz
und die Informationsfreiheit
Az: 11-540-II#3693

Sehr geehrte Frau Gjøvik,

zuständigkeitshalber haben wir Ihre Beschwerde an das Bayerische Landesamt für Datenschutzaufsicht weiter geleitet.

Mit freundlichen Grüßen
Im Auftrag
Dustin Zeven
*************************************************************************
Der Bundesbeauftragte für den Datenschutz und die Informationsfreiheit
Referat Z3
Graurheindorfer Str. 153, 53117 Bonn
Fon: (0228) 9977999316
Fax: (0228) 99107799550
E-Mail: referatza@bfdi.bund.de
Internet: http://www.datenschutz.bund.de
*************************************************************************
Datenschutzrechtliche Erklärung der BfDI für den E-Mail-Verkehr und die Erfüllung ihrer öffentlichen Aufgaben insgesamt (nachstehender Link führt auf den Internetauftritt der BfDI unter www.bfdi.bund.de)

https://www.bfdi.bund.de/DE/Service/Datenschutzerklaerung/datenschutzerklaerung-node.html;jsessionid=43D7036B23C8670B09E5B9B7804AFB99.2_cid320

Kein Zugang für elektronisch signierte Dokumente
*************************************************************************
Hinweis:
Dies ist eine vertrauliche Nachricht und nur für den Adressaten bestimmt. Es ist nicht erlaubt, diese Nachricht zu kopieren oder Dritten zugänglich zu machen. Sollten Sie irrtümlich diese Nachricht erhalten haben, informieren Sie bitte sofort den Absender und vernichten diese E-Mail.

![CNIL logo - COMMISSION NATIONALE INFORMATIQUE & LIBERTÉS]

**Madame Ashley ASHLEYGJOVIK**
1050 BENTON ST, 2310
95050 - SANTA CLARA, ETATS-UNIS

**Lettre recommandée avec AR**

N°AR : RW60 298 203 3 FR

Instruction du dossier :
Sophie GENVRESSE

Paris, le **0 9 JUIN 2022**

N/Réf. : MLD/SGE/PZN/CLP221047
**Saisine n°22006530**
**(à rappeler dans toute correspondance)**

Madame,

Vous avez saisi la Commission nationale de l'informatique et des libertés (CNIL) d'une plainte à l'encontre de la société APPLE, concernant la collecte illicite de données personnelles et l'atteinte à la vie privée de ses salariés « *dans de nombreux pays* ».

En premier lieu, vous indiquez qu'APPLE impose l'installation et l'activation d'une application nommée « Gobbler » ou « Glimmer » sur le téléphone professionnel de ses salariés et collecte, par ce biais, des données "d'empreinte faciale" de chacun d'entre-eux, empreintes constituées à partir de photos et vidéos prises à leur insu. Ce traitement viserait à améliorer la fonctionnalité « Face ID ».

À cet égard, les éléments portés à notre connaissance ne nous permettent pas d'établir que le Règlement Général sur le Protection des Données (RGPD) trouverait à s'appliquer au traitement de données en cause.

En effet, je vous rappelle que l'article 3 du RGPD dispose que :

« *1. Le présent règlement s'applique au traitement des données à caractère personnel effectué dans le cadre des activités d'un établissement d'un responsable du traitement ou d'un sous-traitant sur le territoire de l'Union, que le traitement ait lieu ou non dans l'Union.*

*2. Le présent règlement s'applique au traitement des données à caractère personnel relatives à des personnes concernées qui se trouvent sur le territoire de l'Union par un responsable du traitement ou un sous-traitant qui n'est pas établi dans l'Union, lorsque les activités de traitement sont liées :*

*a) à l'offre de biens ou de services à ces personnes concernées dans l'Union, qu'un paiement soit exigé ou non desdites personnes ; où*

*b) au suivi du comportement de ces personnes, dans la mesure où il s'agit d'un comportement qui a lieu au sein de l'Union* ».

──── RÉPUBLIQUE FRANÇAISE ────

3 Place de Fontenoy, TSA 80715 - 75334 PARIS CEDEX 07 - 01 53 73 22 22 - www.cnil.fr

*Les données personnelles nécessaires à l'accomplissement des missions de la CNIL sont traitées dans des fichiers destinés à son usage exclusif.*
*Les personnes concernées peuvent exercer leurs droits Informatique et Libertés en s'adressant au délégué à la protection des données (DPO) de la CNIL via un formulaire en ligne ou par courrier postal. Pour en savoir plus : www.cnil.fr/donnees-personnelles.*

Or, en l'espèce, le traitement semble être principalement effectué à Cupertino (Etats-Unis), au Canada ou en Israël. Il est par ailleurs mentionné dans la documentation interne d'Apple « *qu'aucune donnée de Glimmer ne doit être téléchargée en provenance de certaines régions* », plus précisément « *En France ni en Allemagne* » (Page 11 sur 54). D'après notre compréhension, dans l'hypothèse où l'application serait installée sur les appareils professionnels de salariés d'Apple en France (élément sur lequel nous ne disposons d'aucune information), les données collectées par l'application resteraient stockées localement, sur les téléphones professionnels des salariés.

En second lieu, vous nous indiquez qu'APPLE mettrait en œuvre un autre dispositif biométrique. Vous précisez en effet avoir reçu, depuis 2018, plusieurs emails d'APPLE vous invitant à participer à une étude dans laquelle des scans 3D haute résolution des oreilles des participants seraient réalisés. Aussi, vous précisez que le brevet " AirPods " de l'organisme décrit le dispositif comme un système permettant de capturer de nombreuses données de santé sur les utilisateurs, notamment le rythme cardiaque, le volume sanguin ou le rythme respiratoire des personnes concernées.

Concernant les données personnelles collectés dans le cadre du développement des « AirPods », votre réclamation se fonde uniquement sur le brevet déposé par Apple et plusieurs articles de presse en ligne, sans avancer d'autres preuves matérielles permettant d'attester que de tels traitements seraient mis en œuvre sur le territoire européen et/ou concernerait des personnes résidant dans l'Union Européenne.

Au regard de ce qui précède, les traitements de données à caractère personnel objets de votre saisine n'apparaissent donc pas relever du champ d'application territorial du RGPD.

Au demeurant, j'attire votre attention sur le fait que, pour les traitements qui relèvent du RGPD, l'autorité compétente pour en connaître est l'autorité de contrôle cheffe de file, c'est-à-dire l'autorité où se situe l'établissement principal du responsable de traitement. En l'occurrence, s'agissant d'Apple, il s'agirait de l'autorité irlandaise. Ainsi, et sauf à ce que le traitement de données à caractère personnel en cause ne soit pas transfrontalier et soumis au mécanisme de coopération prévu par le RGPD, la CNIL n'a en principe pas compétence pour contrôler les traitements mis en œuvre par APPLE.

Nous prenons néanmoins bonne note des éléments communiqués et resterons attentifs à d'éventuels compléments ou évolution conduisant à considérer que de tels traitements constituent une violation de la réglementation française ou européenne en matière de protection des données.

Je vous prie d'agréer, Madame, l'expression de mes salutations distinguées.

Marie-Laure DENIS
Présidente

*Sous réserve de l'intérêt pour agir des requérants, les décisions de la CNIL sont susceptibles de faire l'objet d'un recours devant le Conseil d'Etat dans un délai de deux mois à compter de leur notification.*



CNIL.

COMMISSION NATIONALE
INFORMATIQUE & LIBERTÉS

3 Place de Fontenoy
TSA 80715
75334 PARIS
CEDEX 07

(92 of 414), Page 92 of 414 Case: 25-2028, 05/20/2025, DktEntry: 27.6, Page 92 of 414

PRIORITAIRE
PRIORITY

Document

PARIS
-75
10 06
883 I1 0M 64
FFF3 75 30

€ R.F
008,20
LA POSTE
CP 651372

FRANCE
RW 60 298 203 3 FR

RECOMMANDÉ / REGISTERED

PRIO

FRANCE

Destinataire de l'envoi (nom, prénom, adresse):

Ashley Gsovik
1050 Benton St., 2310
95050 – Santa Clara
Etats-Unis

☐ courrier  ☐ colissimo  ☐ livre  ☐ sac M  ☐ montant
Valeur déclarée:

☐ mandat n°:  montant:

À compléter à destination / To be completed at destination:

L'envoi mentionné ci-dessus a été dûment:
This item has been duly:

☐ Remis / Delivered  ☐ Payé / Paid

Date et signature / Day of delivery and signature

* Cet avis pourra être signé par le destinataire ou, si les règlements du pays de destination le prévoient, par une autre personne autorisée ou par l'agent du bureau de destination.
This item has to be signed by the addressee, (if it's authorized by the regulation of country of destination, by someone else authorized, or by the postal worker at destination.

Service des Postes
AVIS DE RÉCEPTION

PRIORITAIRE / PAR AVION
AVIS DE PAIEMENT

N° de l'envoi: RW 60 298 203 3 FR

MLD/SGE/PZN/CLPEE1047

CNIL – Commission Nationale de
l'Informatique et des Libertés
3 Place de Fontenoy
TSA 80715
75334 PARIS CEDEX 07

Timbre du bureau renvoyant l'avis
Stamp of the Post Office
returning the advice

FRANCE

Zone réservée au traitement Poste

**CNIL.**
COMMISSION NATIONALE
INFORMATIQUE & LIBERTÉS

> **Ms Ashley ASHLEY GJOVIK**
> 1050 BENTON ST, 2310
> 95050 - SANTA CLARA, UNITED STATES

**Registered letter with acknowledgement of receipt**

N°AR :RW60298 203 3 FR

Instniction du dossier :                    Paris, le    09 June 2022
Sophie GENVRESSE

Ref. number: MLD/SGE/PZN/CLP221047
**Referral n°22006530**
**(to be included in all correspondence)**

Madam,

You have lodged a complaint with the French Data Protection Authority (Commission nationale de l'informatique et des libertés - CNIL) against APPLE, concerning the illicit collection of personal data and the invasion of the privacy of its employees « in many countries ».

Firstly, you state that APPLE requires its employees to install and activate an application called "Gobbler" or "Glimmer" on their work phones, thereby collecting "facial imprint" data from photos and videos taken without their knowledge. The aim is to improve Face ID functionality.

In this respect, the elements brought to our attention do not allow us to establish that the General Regulation on Data Protection (RGPD) would find application to the data processing in question.

Indeed, I remind you that Article 3 of the RGPD states that.

" 1. This Regulation shall apply to the processing of personal data carried out in the course of the activities of a controller or of a service provider within the territory of the Union, whether or not the processing takes place within the Union.

2.  The present regulation applies to the processing of personal data relating to the persons concerned who are on the territory of the Union by a processing re.open.battle or soas-truitunt which is not established in the Union, where the processing activities are linked to - the processing of personal data relating to the persons concerned who are on the territory of the Union by a processing re.open.battle or soas-truitunt which is not established in the Union, where the processing activities are linked to - the processing of personal data relating to the persons concerned who are on the territory of the Union.

a) the offering of goods or services to such data subjects in the Union, whether or not a payment is required from them; or
b) the monitoring of their behavior, insofar as such behavior takes place within the Union.

The personal data required to carry out CNIL's missions are treated as data for its exclusive use.
co-accredited persons may assert their tri/ormotor and legal rights by contacting the CNlt's data protection delegate iOPOJ.
-·- f< ulaire en 1+que ou par courrier posiol. Potir et savoir glus , wow.cniifr/doniiees-oersontie1les.

However, in this case, processing appears to be carried out mainly in Cupertino (United States), Canada, or Israel. Apple's internal documentation also states that *"no Glimmer data should be downloaded in certain regions."* More specifically, *"In France or Germany"* (page 11 of 54). According to our understanding, in the event that the application were to be installed on the professional devices of Apple employees in France (about which we have no information), the data collected by the application would remain stored locally on the employees' professional phones.

Secondly, you indicate that APPLE is implementing another biometric device. You specify that, since 2018, you have received several emails from APPLE inviting you to participate in a study in which high-resolution 3D scans of participants' ears would be taken. You also specify that the "AirPods" patent describes the device as a system capable of capturing a wide range of health data on users, including heart rate, blood volume and breathing rate.

Regarding the personal data collected in connection with the development of "AirPods," your complaint is based solely on the patent filed by Apple and several online press articles, without providing any other material evidence to support the claim that such tracking is being carried out in the European Union and/or affects individuals residing in the European Union.

In light of the above, the processing of personal data that is the subject of your referral does not appear to fall within the territorial scope of the GDPR.

Furthermore, I would like to draw your attention to the fact that, for processing operations falling within the scope of the GDPR, the competent authority is the lead supervisory authority, i.e. the authority where the data controller has its main establishment. In this case, as it concerns Apple, would be the Irish authority. Therefore, unless the processing of personal data in question is cross-border and subject to the cooperation mechanism provided for by the GDPR, the CNIL does not, in principle, have jurisdiction to supervise the processing carried out by APPLE.

We nevertheless take note of the information provided and will remain attentive to any additional information or developments that could lead us to consider that such processing constitutes a violation of French or European data protection regulations.

Yours sincerely

Marie-Laure DENIS President

Subject to appeal by the applicants, the decisions of the CNIL may be appealed to the Council of State within two months of their notification. The decisions of the CNIL may be appealed to the Council of State within two months of their notification.

**CNIL.**

COMMISSION NATIONALE
INFORMATIQUE & LIBERTÉS

Madame Ashley ASHLEYGJOVIK
1050 BENTON ST, 2310
95050 SANTA CLARA

Paris, le 5 avril 2022

**Accusé de réception de votre courrier**

Votre numéro de dossier : 22006530
*(à rappeler lors de tout contact avec la CNIL)*

Nous avons bien reçu votre demande le 02 avril 2022.

**Après analyse de sa recevabilité, elle a été transmise pour instruction au service des plaintes de la CNIL qui vous informera de l'état d'avancement de votre dossier.**
A cette occasion, des éléments complémentaires pourront vous être demandés.

Lorsque 3 mois se seront écoulés, pour savoir où en est votre dossier, vous pourrez nous contacter en précisant le numéro figurant sur le présent accusé de réception, sur le site de la CNIL depuis le formulaire de la rubrique Besoin d'aide « Comment savoir où en est ma réclamation? ».

Si dans le délai de 3 mois vous avez d'éventuels compléments à apporter, vous pouvez également utiliser ce même formulaire en ligne.

**Nous appelons votre attention sur le fait que les délais de traitement peuvent être importants en raison du grand nombre de saisines que nous recevons.**

Au terme de l'instruction, vous serez informé de l'issue de votre dossier.

Le Service des Relations avec les Publics

─── RÉPUBLIQUE FRANÇAISE ───

3 Place de Fontenoy, TSA 80715 - 75334 PARIS CEDEX 07 · 01 53 73 22 22 · www.cnil.fr

*Les données personnelles nécessaires à l'accomplissement des missions de la CNIL sont conservées et traitées dans des fichiers destinés à son usage exclusif.*
*Les personnes concernées peuvent exercer leurs droits Informatique et Libertés en s'adressant au délégué à la protection des données de la CNIL via un formulaire en ligne*
*ou par courrier postal. Pour en savoir plus : www.cnil.fr/donnees-personnelles.*

# CNIL.
CODE I¥SION NATIONALE IN
FORMATIQTJE & LIBERTÉS

Mrs Ashley ASHLEYGJOVIK 1050
BENTON ST, 2310
95050 SANTA CLARA

Paris, April 5, 2022

Your file number: 22006530
*(to be remembered when contacting **the CNIL)***

We received your request on April 02, 2022.

**After analysis of its admissibility, it was forwarded to the complaints department for processing. of the CNIL, which will** keep you **informed** of the progress **of your case.**
You may be asked to provide additional information.

When 3 months have elapsed, to find out the status of your claim, you can contact us by specifying the number shown on this acknowledgement of receipt, on the CNIL website from the form in the Need help section "How to find out the status of my claim†".

If you need to make any additions within 3 months, you can also use the same online form.

**We would like to draw your attention to the fact that processing times can be long due to the large number of** referrals we receive.

At the end of the instruction, you will be informed of Pissne dewtre dmsier.

Public Relations Department

———— R Ê PUBLIQUE FRANÇAISE

5/20/25, 8:37 PM Case 25-1496-45 Advertising ID: APPLE DISTRIBUTION INTERNATIONAL fined 8 million euros | CNIL Main

Document      Page 349 of 804

The Wayback Machine - https://web.archive.org/web/20230105104914/https://www.cnil.fr/en/advertising-id-apple-dist…

# Advertising ID: APPLE DISTRIBUTION INTERNATIONAL fined 8 million euros

04 January 2023

On 29 December 2022, the CNIL's restricted committee imposed an administrative fine of 8 million euros on the company APPLE DISTRIBUTION INTERNATIONAL because it did not collect the consent of iPhone's French users (iOS 14.6 version) before depositing and/or writing identifiers used for advertising purposes on their terminals.

## Background information

Following a complaint concerning the ad personalization in the App Store, the CNIL carried out several investigations in 2021 and 2022 in order to verify compliance with the applicable regulations.

The CNIL services found that under the old version 14.6 of the operating system of the iPhone, when a user visited the App Store, identifiers used for several purposes, including personalization of ads on the App Store, were by default automatically read on the terminal without obtaining consent.

## The breach of the French Data Protection Act

Due to their advertising purpose, these identifiers are not strictly necessary for the provision of the service (the App Store). Therefore, they must not be read and/or deposited without the user's prior consent. However, in practice, the advertising targeting settings available from the "Settings" icon of the iPhone were pre-checked by default.

Moreover, the user had to perform a large number of actions in order to deactivate this setting, since this option was not included in the initialization process of the phone. Therefore, the user had to click on the "Settings" icon of the iPhone, then go to the "Privacy" menu and finally to the section entitled "Apple advertising". These elements did not allow to collect the prior consent of users.

Consequently, the restricted committee, the CNIL's body responsible for issuing sanctions, found a breach of Article 82 of the French Data Protection Act and imposed a fine of 8 million euros on APPLE DISTRIBUTION INTERNATIONAL, which was made public.

It explained this amount by the scope of the processing limited to the Apple Store, the number of people concerned in France, the profits the company made from advertising revenues indirectly generated from data collected by these identifiers and the fact that since then, the company has reached compliance.

## Jurisdiction of the CNIL

The CNIL is **materially competent** to verify and sanction operations related to identifiers deposited and/or read by the company on the terminals of Internet users located in France. The cooperation mechanism provided for by the GDPR (the "one-stop shop" mechanism) is not intended to apply in these procedures insofar as the operations linked to the use of the identifiers fall within the scope of the " ePrivacy " directive, transposed in Article 82 of the French Data Protection Act.

The restricted committee considered that the CNIL is also **territorially competent** because the use of identifiers is carried out within the "framework of the activities" of the companies APPLE RETAIL FRANCE and APPLE FRANCE, which constitute the "establishments" on French territory of the APPLE group.

*Note:* APPLE DISTRIBUTION INTERNATIONAL, *whose head office is in Ireland, presents itself as the controller of the processing regarding the ad personalization on the App Store, in the European region. The companies APPLE RETAIL FRANCE and APPLE FRANCE are the establishments in France of the Apple group.*

Texte reference

## The decision (in French)

> Délibération de la formation restreinte n°SAN-2022-025 du 29 décembre 2022 concernant la société APPLE DISTRIBUTION INTERNATIONAL - Légifrance
Texte reference

## Pour approfondir

> The sanctions procedure
> [FR] Identifiant publicitaire : sanction de 8 millions d'euros à l'encontre de APPLE DISTRIBUTION INTERNATIONAL
Haut de page

# R.    EXHIBIT R: FEB. 4 2026 EMAIL

See also, Ex. from Declaration in Support of Plaintiff's
Motion for Sanctions at Dkt. 302-1 (03/06/26) pp. 9-28,
incorporated here.

# Re: (Ashley Gjovik v. Apple, Inc.)(126432) – Deposition Transcript Designations

| | |
|---|---|
| From | Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com> |
| To | Ashley Gjovik<ashleymgjovik@protonmail.com> |
| CC | Mantoan, Kathryn G.<kmantoan@orrick.com>, Riechert, Melinda<mriechert@orrick.com>, Perry, Jessica R.<jperry@orrick.com>, Horton, Nicholas J.<nhorton@orrick.com>, Booms, Ryan<rbooms@orrick.com> |
| Date | Wednesday, February 4th, 2026 at 6:15 PM |

***Attn: new NLRB charge***

Hello,

I'm removing Talty from this thread and I'm going to ask you one more time to meet/confer with me on this, because you have refused to meet/confer on this, you waited well past the 30-day deadline for substantiating your claims, and the document you sent tonight contains content that violates state and federal law -- including at least labor, whistleblower, consumer, privacy, medical, and professional ethics laws.

Certainly you had to expect that I would complain about Apple claiming my own menstruation, cervical mucus, and sexual activity are "Apple Confidential."

You also must have known that I would be further disgusted to see Apple claim that my complaints about Apple invading my, and my coworkers, privacy rights regarding menstruation, cervical mucus, and the people we choose to have sexual intercourse with in our own homes is also "Apple Confidential" so our complaints about privacy violations by Apple, and Apple's underlying conduct, are somehow secret.

You also know that in my lawsuit and some of the administrative proceedings, I cite these exact topics as protected disclosures, concrete harms/injuries, unfair business practices, and/or work conditions -- and I allege Apple's own conduct is unlawful, harmful, and requiring enforcement action including injunctive relief.

You have refused to even attempt to justify these confidentiality claims, disregarded and refused to comply with the exact process you insisted be put in place and where you had promised confidentiality disputes would be addressed, and instead you have now taken action to formalize and permanently record your client's illegal assertions.

Further, this deposition is about my employment at Apple, my concerns about work conditions and the rights of Apple employees generally, and its partially in response to my claims of unlawful labor practices -- which means that Apple's about to get a new NLRB charge filed against it, arising from your document today.

While NLRB has resisted taking action that could interfere with standard court procedures in this case, here Apple has chosen to refuse to engage with standard court procedures, cut off my access to standard procedures, and is literally claiming in an official legal document that Apple thinks it has some sort of vested business interest and secrecy claim to its employees... genital secretions.

So even an NLRB run by Apple's own lawyer will have a hard time dismissing this one -- unless, maybe if you come to the table and actually participate in this process in good faith.

I stress again, you're not even attempting to offer some nonsense, vague justification for these claims -- you're just refusing to engage in the process completely while concurrently threatening to take unjustified actions to further invade my privacy, interfere with my exercise of my privacy rights and right to bodily autonomy, and to implicitly threaten other employees to not engage in the same protected activity that I did including reporting retaliation and harassment by Apple. That sounds illegal!

So let me know if we do a video call or phone call or something where we can actually at least pretend to meet/confer about this -- or if you're just going sticking to your current path of claiming that Apple has intellectual property rights over their worker's vaginas -- because that's where we're at tonight and its extremely disturbing.

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Wednesday, February 4th, 2026 at 4:39 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

> Apple counsel,
>
> I sent you an email about this a few moments ago (re-adding below) and instead of replying to me, you sent your own email not addressed to me, ccing me as an observer, and you are asserting a process that does not comply with the Protective Order we signed for Discovery. That means you are in violation of that Order and refusing to comply with the process you insisted on for this case.
>
> You need to send **me** your claims and then we are to meet/confer about those claims.
>
> Talty Ho is not the Magistrate Judge in our case and will not be deciding the validity of claims.
>
> Once we agree to the claims, then they should be reflected in the transcript -- and you were supposed to do this with me over a month ago.
>
> I ask that  you send me your claims to discuss -- as of now you have expressly excluded me from your claims and are attempting to formalize your claims without my input, despite my direct request to you to meet/confer about exactly this.
>
> —
>
> **Ashley M. Gjøvik**
> **BS, JD, PMP**
>
> Sent with Proton Mail secure email.
>
> On Wednesday, February 4th, 2026 at 4:32 PM, Mantoan, Kathryn G. <kmantoan@orrick.com> wrote:

Talty CR Production Team:

I write regarding the deposition transcript we received on 1/7/2026 in this matter.

Pursuant to the operative Protective Order, we have reviewed the transcript and are finalizing our confidentiality designations. Attached is a chart identifying the specific portions (with citations and text) for which confidentiality is being asserted.

Plaintiff is copied on this email for notice purposes.

Thank you,

Katie

**Kathryn G. Mantoan**

Attorney

Pronouns: she / her / hers

Orrick

San Francisco | Portland

T +1-415-773-5887
M +1-415-218-4865
T +1-503-943-4870
kmantoan@orrick.com

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

On Wednesday, February 4th, 2026 at 4:22 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello,

I'm adding Apple to this thread.

Apple's counsel,

We need to complete our review of the transcript, submit any corrections, and ensure that we don't then need more corrections based on the other party's corrections.

We also need to finalize the Confidentiality claims and ensure the record accurately represents those claims including for any exhibits. I asked you for updates on your Confidentiality claims and you said you were working on it but I have yet to see any updates from you -- and nothing to actually narrow, define, and substantiate any of your Confidentiality claims.

The deposition was nearly two months ago and during the deposition I told you to substantiate any Confidentiality claims and that I was not agreeing to any blanket Confidentiality claims.

Under the Protective Order you have a limited amount of time to substantiate your claims and if you do not, they are waived. Under that order, for this deposition, all of your Confidentiality claims would be waived by now.

However, there's probably at least a few statements/terms that are plausibly Confidential, I am still bound by the lawful/legitimate terms within the NDAs I consented to and signed, and I feel it would be proper to allow Apple to still substantiate the things that may actually be Confidential.

That said, you're already overdue and I need a timeline from you as to when you will be done and to ensure it can still be reflected in this deposition transcript.

I also ask if you're submitting any requests for corrections to this records, and if so, to please share with me what you ask for.

I also need to submit my request for corrections so please let me know if you'd like any process for that other then being cc'd or receiving a copy of what I submit to the Talty team.

-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with [Proton Mail](Proton Mail) secure email.

**3.90 KB**    2 embedded images

# S. EXHIBIT S: BLOG POST

**Exhibit:** *"Apple Claims It Owns Its Employees' Cervical Mucus: A New NLRB Charge Reveals the Logical Endpoint of Corporate Confidentiality Abuse"*

See Ex. B from Plaintiff's Objections at Dkt. 284 (2/20/26) pp. 70-84, incorporated here.

## T.  EXHIBIT T: Social Media Post

Exhibit: Social Media Posts

See Ex. C from Plaintiff's Objections at Dkt. 284 (2/20/26)

pp. 85-95, incorporated here.

**EXHIBIT:**
**DECLARATION OF THOMAS LE BONNIEC**

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| **ASHLEY GJOVIK**, <br> *an individual*, <br>    Plaintiff/Appellant, <br><br> v. <br><br> **APPLE INC**, <br> *a corporation*, <br>    Defendant/Appellee. | **Case No. 25-2028** <br><br> **Declaration of Thomas le Bonniec** |

**DECLARATION OF THOMAS LE BONNIEC
IN SUPPORT OF ASHLEY GJOVIK'S REQUEST FOR APPEAL
AND MOTION FOR INJUNCTIVE RELIEF**

Pursuant to 28 U.S. Code § 1746, I, Thomas Le Bonniec, declare as follows:

1.    My name is Thomas Le Bonniec. I make this declaration of my own personal knowledge, and if called to testify in Court on these matters, I could do so competently under oath to such facts. I make this declaration in support of Plaintiff's Opposition to Apple's Motion to Dismiss her Third Amended Complaint.

2.      I contacted Plaintiff, Ashley Gjovik, in November of 2022. I wanted to speak with her about [stuff]. Plaintiff responded in November 2022, and since then, she and I have emailed and also met several times for video conversations. We often discuss our concerns about consumer privacy. I shared with Plaintiff what I saw working at an Apple subcontractor, and Plaintiff shared with me her experience with Apple's "Gobbler" application and other data collection practices performed Apple that bothered her. We have often spoke about how important the right to privacy is to us, and complained about statements made by Apple about privacy which we felt were deceptive based on our own firsthand experiences with the company. Plaintiff and I have also discussed how fearful we both were and are to speak out against Apple.

3.      During my conversations with Plaintiff, she shared with me some of the negative experiences that have occurred to her after she reported Apple to the US and California governments. The statements Plaintiff made to me contained specific allegations and were consistent with her statements under her RICO Act, Bane Act, Ralph Act, and IIED claims in her Third Amended Complaint. Plaintiff has also expressed to me her fear and reluctance to continue to act as a witness against Apple due to the negative events she has experienced.

4.      Plaintiff's Third Amended Complaint alleged that, in violation of the U.S. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, that Apple was

2

intentionally creating a "*knowingly false reputation of strong regulatory compliance*" and is engaging on "*intimidation*" of potential "*witnesses*." [docket #47]

5.     Apple disputes this point in its Motion to Dismiss [docket #48, page 14, lines 5-8] Apple wrote that Plaintiff's Third Amended Complaint did adequately state "*what role Apple or any other entity played in concocting the alleged scheme or ensuring its and success.*" docket #48, page 18, lines 1-9]. Apple also argued that Plaintiff "*does not identify any other 'witness'.*" [docket #48, page 19, lines 3-9].

6.     I offer this declaration in support of Plaintiff's claims. I was a witness to, what I feel was, violations of multiple laws by Apple – and also a witness to, what I feel, was a scheme by Apple to conceal the acts and intimidate witnesses from reporting Apple's activities. What I witnessed occurred in Cork, Ireland during 2019 while I worked for Global Technical Services Ltd. ("GlobeTech"), a subcontractor of Defendant Apple Inc.

7.     On May 8th, 2019, I signed a Non-Disclosure Agreement and an employment agreement with GlobeTech. [Exhibit A]. I worked in the position of "Data Analyst" at Globetech. My job consisted of listening to audio files recorded by Apple's products and to verify and correct the written transcription from "Siri," Apple's vocal assistant.

3

8.      I witnessed thousands of audio recordings of the public, captured by Apple's devices all over the world, and stored on service where we could listen to the actual audio recordings. I witnessed recordings in situations like a person talking about their political opinion, kids talking to their iPad, and others dictating private messages about their health state. I also heard a man playing out loud his sexual fantasies with young children.

9.      The employee guidelines provided to me by GlobeTech stated: "*Be aware that this project will involve private and personal user data. Vulgar language, violent themes, pornographic or criminal subjects may show up. If this is too disturbing, please speak to your manager.*" [attached as Exhibit C is a true and correct image of the message noted which I captured myself while still employed at GlobeTech]

10.     This activity was conducted on Apple's hardware (MacBooks), through Apple's Virtual Private Network, and on Apple's platform ("CrowdCollect"). [attached as Exhibits D and E are true and correct images of the "CrowdCollect" tool, which I captured myself while still employed at GlobeTech]. I was also provided a @apple.com Apple corporate email address.

11.     While I worked at GlobeTech analyzing the recordings, in addition to the NDA I signed, I also witnessed managers telling me and other workers that GlobeTech expected us to remain silent and not speak with each other during our

4

shift. I also witnessed a manager telling me and others to not tell anyone about our work, even our family or friends, and they said, especially journalists. I desperately wanted to talk to my coworkers about the ethics of what we were doing, but due to these rules, I felt it was very difficult to do so.

12. I felt that that Apple's recordings of these private conversations was unethical, so I left GlobeTech without prior notice. I did not want to participate in what I felt could be unlawful activity. I received after a few days a notice of termination of employment due to my absence.

13. In 2019, I engaged with European media outlets to share my experience. In 2020, after resigning, I filed several complaints with the European Data Protection Authorities and with the U.S. Securities and Exchange Commission attesting to what I saw and experienced in my position at GlobeTech.

14. One specific issue I raised to the US SEC was how Apple and GlobeTech asked GlobeTech workers to sign non-disclosure agreements which I felt were intimidating and too restrictive. I felt that the wording of the NDA implied I could not communicate with law enforcement agencies about what I witnessed related to Apple's audio recordings without a risk of retaliation, including being sued by Apple. [See Exhibit A, page 4, section "5.6 Remedies"].

15. I have publicly stated that these NDAs have a chilling effect and I believe they are intended to intimidate workers who are witnesses of potentially

5

unlawful conduct by Apple, and which is facilitated by Apple's external business partners, like GlobeTech. [attached as Exhibit B is a true and correct copy of a Bloomberg article I was interviewed for and quoted it]

16.   Despite my fear of retaliation for reporting what I saw, which I did and do have, I felt compelled to report, as I felt it was an ethical obligation, despite the EU authorities' absence of reaction. I was also motivated to speak out after reading about other Apple whistleblowers who also came forward to speak about these Siri recordings a few days before I did. I read about these whistleblowers in articles including in The Guardian on July 26th, 2019 [attached as Exhibit F is a true and correct image of the article noted] and El Pais on July 26th, 2019 [attached as Exhibit G is a true and correct image of the article noted]. I was and am concerned that I witnessed Apple's audio recording practices still occurring in 2019-2020, even after those other whistleblowers came forward in 2019 before me.

17.   On February 14th, 2025 on the basis of my testimony and the evidence I provided, a complaint was filed by the Human Rights League in France for these privacy violations (exhibit H).

6

18.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12TH day of May 2025

in Paris, France.

_____

Thomas LE BONNIEC

7

## EXHIBIT A: GLOBETECH NDA



CONFIDENTIALITY AGREEMENT

**CONFIDENTIALITY AGREEMENT**

**BETWEEN:**

**GLOBE TECHNICAL SERVICES LIMITED,** a company registered under the laws of Ireland with company no. 277495 and its registered office at Building 6900, Cork Airport Business Park, Cork, Ireland.

and

Thomas Le Bonniec

**SUMMARY OF CONFIDENTIALITY OBLIGATIONS**

A. You must keep all Confidential Information you receive while working with us strictly confidential.
B. You may only discuss or share Confidential Information with those individuals who are authorized to work on the project that the Confidential Information relates to or your manager. You should seek permission from your manager before discussing or sharing Confidential Information with anyone else.
C. Confidential Information should not be discussed in open plan areas, coffee areas, corridors or public places or where there is a possibility of being overheard.
D. You should never discuss Confidential Information outside of work.
E. If you have any doubts about your obligations ask your manager.
F. Failure to comply with the provisions of this Agreement may result in personal liability.

This confidentiality agreement (the "**Agreement**") will apply in addition to any terms and conditions agreed between the parties provided that this Agreement shall take precedence in all circumstances in the event of any conflict.

In consideration and as a condition of my continued relationship, whether as an officer, director, employee or consultant with Globe Technical Services Limited and any of its related companies (the "**Company**") I agree as follows:

1. **WHAT IS CONFIDENTIAL INFORMATION?**

1.1. Confidential Information means information:
    1.1.1. in whatever form (including, without limitation, in spoken, written, visual or electronic form or on any magnetic or optical disk or memory and wherever located); and
    1.1.2. relating to the business, products, affairs and finances of the Company or any of its customers or suppliers and trade secrets including, without limitation, technical data and know-how relating to the business of the Company; and

Page 1 of 5        Globe Technical Services Limited Private & Confidential

Exhibit A



CONFIDENTIALITY AGREEMENT

---

1.1.3. relating to any of the Company's suppliers, clients, customers, agents, distributors, shareholders or management whether or not such information is marked or designated as confidential; and

1.1.4. that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be (reasonably) confidential or proprietary in the context and circumstances in which the information is known or used.

1.2. Confidential Information does not include information that is:

1.2.1. available to the public generally; or

1.2.2. required to be provided in response to a valid order by a court or other governmental body or otherwise required by law.

## 2.     WHAT ARE MY CONFIDENTIALITY OBLIGATIONS?

I will handle Confidential Information in a confidential manner at all times and commit to the following obligations:

### 2.1.     *General Confidentiality Obligations*

2.1.1. to treat all Confidential Information as strictly confidential;

2.1.2. to use and disclose Confidential Information only in connection with and for the purpose of performing my assigned duties;

2.1.3. not to take pictures or videos or use recording devices while on site with a customer of the Company;

2.1.4. to ensure that Confidential Information is not discussed in open plan areas, coffee areas, corridors or public places or where there is a possibility of being overheard. A reasonably sound proofed room should be used when discussing Confidential Information and all windows and doors should be closed;

2.1.5. to only make such hard or electronic copies of any Confidential Information as are absolutely necessary for performing my assigned duties.  If any hard copies are made of Confidential Information these should be clearly labelled as such and treated accordingly;

2.1.6. to only discuss Confidential Information with those that I have been informed are authorized to receive it;

2.1.7. to request, obtain or communicate Confidential Information only as necessary to perform my assigned duties and refrain from requesting, obtaining or communicating more Confidential Information than is necessary to accomplish my assigned duties;

2.1.8. in any event, not to speak of, discuss or communicate Confidential Information outside of the work environment, including, to family members and friends; and

2.1.9. not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Company, except with the prior consent of an authorized officer acting on behalf of the Company in each

---

Page **2** of **5**                          **Globe Technical Services Limited Private & Confidential**

**Exhibit A**



CONFIDENTIALITY AGREEMENT

instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

**2.2.** **Security & Access Confidentiality Obligations**

2.2.1. to take utmost care to properly secure Confidential Information on my computer and to take steps to ensure that others cannot view or access such Confidential Information. When I am away from my workstation or when my tasks are completed, I will log off my computer or use a password-protected screensaver in order to prevent access by unauthorized users;

2.2.2. not to disclose my personal password(s) to anyone without the express written permission of my department head or record or post it in an accessible location and refrain from performing any tasks using another person's password;

2.2.3. to comply with all Company security policies and procedures as in force from time to time relating to the use of Company equipment, software, data (including Confidential Information) and systems ("**Company Technology Resources**");

2.2.4. not to access or use any Company Technology Resources except as authorized by Company;  and

2.2.5. not to access or use any Company Technology Resources in any manner after the termination of my role, whether termination is voluntary or involuntary. I agree to notify Company promptly in the event I learn of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Company Technology Resources or other Company property or materials by others.

**2.3.** **Exit Confidential Obligations**

2.3.1. Upon voluntary or involuntary termination of my role or the Company's request at any time, I shall provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, Company credit cards, network access devices, computers, cell phones, smartphones, PDAs, equipment, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or work product, that are in my possession or control, whether they were provided to me by the Company or any of its business associates or created by me.

**3.** **WHO OWNS CONFIDENTIAL INFORMATION AND OTHER MATERIALS?**

3.1. You may in the course of working with the Company, conceive, develop or contribute to material or information related to your assigned role or the business of the Company, including, without limitation, software, technical documentation, ideas, inventions (whether or not patentable), hardware, know-how, marketing plans, designs,

Page 3 of 5                                    **Globe Technical Services Limited Private & Confidential**

**Exhibit A**



CONFIDENTIALITY AGREEMENT

techniques, documentation and records, regardless of the form or media, if any, on which such is stored (referred to in this Agreement as "**Proprietary Information**"). The Company shall exclusively own all Proprietary Information which you conceive, develop or contribute to in the course of working with the Company and all intellectual and industrial property and other rights of any kind in or relating to the Proprietary Information, including but not limited to all copyright, patent, trade secret and trade-mark rights in or relating to the Proprietary Information. You agree to assign to the Company any and all rights that you may have or obtain in or to the Proprietary Information. If you conceive, develop or contribute to material or information outside work hours on the Company's premises or through the use of the Company's property and/or assets shall also be Proprietary Information and be governed by this Agreement if such material or information relates to the business of the Company. You shall keep full and accurate records accessible at all times to the Company relating to all Proprietary Information and shall promptly disclose and deliver to the Company all Proprietary Information.

**4.    HOW LONG DO THESE OBLIGATIONS LAST?**

The obligations under this Agreement with regard to any particular Confidential Information shall commence immediately when you first have access to such Confidential Information and shall continue during and after termination or your role until such time as such Confidential Information has become public knowledge other than as a result of your breach of this Agreement or breach by those acting in concert with you or on your behalf.

**5.    GENERAL PROVISIONS**

5.1.    **No Assignment**. You shall not assign or transfer any rights or obligations under this Agreement without the prior written consent of Company.

5.2.    **Notices**. Any notice required or permitted by this Agreement shall be in writing to the addresses set forth above or such other address as either party may specify in writing.

5.3.    **Governing Law**. This Agreement shall be governed in all respects by the laws of the Republic of Ireland and the courts in the Republic of Ireland shall have exclusive jurisdiction.

5.4.    **Severability**. Should any provisions of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

5.5.    **Waiver**. The waiver by Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.

5.6.    **Remedies**. You acknowledge that the Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information will cause irreparable harm to the Company for which remedies at law will not be adequate.

5.7.    In the event of a breach or threatened breach by you of any of the provisions of this Agreement, you hereby consent and agree that the Company shall be entitled to, in

---

Page 4 of 5                     Globe Technical Services Limited Private & Confidential

**Exhibit A**



CONFIDENTIALITY AGREEMENT

---

addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. Any equitable relief granted shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief. You agree that each customer of Company is an intended third-party beneficiary of this Agreement so that customers of Company may enforce the provisions of this Agreement against you.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date last written below:

**Globe Technical Service Limited**

By: _HR Representative_____   By: _Thomas Le Bonniec_____

Title: _HR Administrator_____   Title: _Data Analyst_____

Dated: _08/05/2019_____   Dated: _____

---

Globe Technical Services Limited Private & Confidential

**Exhibit A**

**EXHIBIT B: 2023 BLOOMBERG INTERVIEW**



Whistleblower Thomas Le Bonniec *Photographer: Joris van Gennip/laif/Redux Pictures*

By Sabrina Willmer and Austin Weinstein

April 18, 2023 at 10:01 AM EDT
*Updated on April 18, 2023 at 5:51 PM EDT*

Some top US technology companies are forcing workers to sign allegedly illegal labor agreements, according to complaints filed with the Securities and Exchange Commission, despite years of

https://www.bloomberg.com/news/articles/2023-04-18/tech-firms-try-to-muzzle-workers-with-ndas-sec-tipsters-say

14

**EXHIBIT C: SCREENSHOT OF SIRI GRADING PER COUNTRY**

*Capture 4: Warning label destined to "Data Analysts", before the guidelines*

**EXHIBIT D: SCREENSHOT OF SIRI GRADING PER COUNTRY**

1000 hour AirPods - Bulk Data (Q3/2019)

Report List > Ungraded Requests by Locale

| localeId | Ungraded | Partial Graded | Completed | Total | Progress |
|---|---|---|---|---|---|
| de_DE | 750,413 | 0 | 52,613 | 803,026 | 7% |
| en_AU | 61 | 0 | 924,434 | 924,495 | 100% |
| en_CA | 892,196 | 0 | 18,405 | 910,601 | 2% |
| en_GB | 843,862 | 0 | 233,706 | 1,077,568 | 22% |
| en_IN | 28,643 | 0 | 743,826 | 772,469 | 96% |
| en_US | 39 | 0 | 760,980 | 761,019 | 100% |
| fr_FR | 726,359 | 0 | 115,717 | 842,076 | 14% |
| ja_JP | 2 | 0 | 760,391 | 760,393 | 100% |
| zh_CN | 1 | 0 | 1,093,812 | 1,093,813 | 100% |
| zh_HK | 139,616 | 0 | 782,736 | 922,352 | 85% |

Completed: ■ Partial: ■

*Capture 2 : Statistics for the corrected recordings on Airpods, for the 3ème Trimester of 2019*

## EXHIBIT E: SCREENSHOT OF SIRI RECORDING ON CROWDCOLLECT

The following are screen captures [107] made between late june 2019 and early july 2019 by the employee (Thomas Le Bonniec).
They describe the work effectuated in the context of the employment contract with the subcontractor (GlobeTech) and for the client (Apple).



*Capture n.1: Work interface*

Capture n. 1 illustrates the work interface and the task required to be done.

16

**EXHIBIT F: 2019 THE GUARDIAN ARTICLE**



### Apple

⏱ This article is more than **4 years old**

# Apple contractors 'regularly hear confidential details' on Siri recordings

**Workers hear drug deals, medical details and people having sex, says whistleblower**

📷 Workers heard the information when or providing quality control for Apple's Siri voice assistant. Photograph: Oli Scarff/Getty Images

### Alex Hern

Fri 26 Jul 2019 12.34 EDT

Apple contractors regularly hear confidential medical information, drug deals, and recordings of couples having sex, as part of their job providing quality control, or "grading", the company's Siri voice assistant, the Guardian has learned.

Although Apple does not explicitly disclose it in its consumer-facing privacy documentation, a small proportion of Siri recordings are passed on to contractors working for the company around the world. They are tasked with grading the responses on a variety of factors, including

https://www.theguardian.com/technology/2019/jul/26/apple-contractors-regularly-hear-confidential-details-on-siri-recordings

17

**EXHIBIT G: 2019 EL PAIS ARTICLE**



https://elpais.com/tecnologia/2019/07/23/actualidad/1563902000_568286.html

18

**EXHIBIT H : 2025 RADIO FRANCE ARTICLE**



https://www.radiofrance.fr/franceinter/podcasts/l-info-de-france-inter/l-info-de-france-inter-3297121

19

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJOVIK**, *an individual*, <br><br> Plaintiff, <br><br> vs. <br><br> **APPLE INC.**, *a corporation,* <br><br> Defendant. | **CASE NO.** <br> **3:23-CV-04597-EMC (KAW)** <br><br> **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION AT DKT. 294** <br><br> **HEARING:** <br> **Location: Oakland (TBD)** <br> **Date: April 2 2026** <br> **Time: 1:30 PM** |

# TABLE OF CONTENTS

**STATEMENT OF FACTS**                                                    ERROR! BOOKMARK NOT DEFINED.

**ARGUMENTS**                                                             ERROR! BOOKMARK NOT DEFINED.

**CONCLUSION & RELIEF REQUESTED**                                         ERROR! BOOKMARK NOT DEFINED.

**EXHIBITS**                                                              ERROR! BOOKMARK NOT DEFINED.

## PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE in SUPPORT OF THE OPPOSITION TO DEFENDANT'S MOTION (Dkt. 294)

1. Plaintiff Ashley Gjovik respectfully files this request for Judicial Notice in support of her Opposition to Defendant Apple Inc.'s Motion to Enforce Protective Order (Dkt. 294).

2. Pursuant to Federal Rule of Evidence 201, Plaintiff Ashley M. Gjovik respectfully requests that this Court take judicial notice of the following public records and documents. Each document is either (a) a public record of a governmental body whose accuracy cannot reasonably be questioned, or (b) a record filed in a federal court or agency proceeding whose existence is not subject to reasonable dispute.

3. A court shall take judicial notice of a fact "not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

4. Courts routinely take judicial notice of federal agency records, federal court filings, government databases, and peer-reviewed publications for the limited purpose of establishing that the information was publicly available. *See Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (judicial notice of publicly available government records); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (judicial notice of court filings). The Court may take judicial notice on its own at any stage. Fed. R. Evid. 201(c)(1).

# FEDERAL COURT RECORDS

1. **This Court's prior orders**, Dkt. 73 at 7–8 and Dkt. 179 at 2, which describe in the Court's own words the allegations concerning Apple's employee surveillance and study practices that are the subject of Apple's confidentiality designations. These are records of this Court.

2. **Plaintiff's Original through Fifth Amended Complaints**, Dkt. 1, 17, 32, 47, 76, and 142, filed on this docket and publicly accessible, all of which reference studies, privacy invasions, employee data collection, and most also expressly reference menstruation, ovulation, and sexual activity. These filings establish that the content Apple now designates as confidential has been part of the public judicial record since Sept. 2023.

3. **Ninth Circuit docket**, *Gjovik v Apple Inc.* Case No. 25-2028, records of a federal court of appeals publicly accessible through PACER with numerous relevant filings notated in the Plaintiff's concurrent Declaration.

# FEDERAL AGENCY RECORDS

5.  **NLRB Settlement Agreement**, Case No. 32-CA-284428, April 3, 2025. A public record of a federal administrative agency, filed in this litigation as Dkt. 194. Judicial notice is appropriate for NLRB settlement agreements as official agency records. *See* Pl.'s Decl., ex. N and Dkt. 220-4 ("Notice to Employees").

6.  **ClinicalTrials.gov Registration**, NCT04196595. A public federal government database maintained by the National Institutes of Health, U.S. Department of Health and Human Services. *See* Exhibit J to Gjovik Declaration. The accuracy of federal government databases cannot reasonably be questioned. *See United States ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362 (C.D. Cal. 2014).

7.  **OSTP Public Comment**, OSTP_FRDOC_0001-0008, submitted in a public federal rulemaking proceeding and publicly accessible on regulations.gov. *See* Pl.'s Decl., ex. L.

8.  **GAO Report GAO-24-107639**, published by the U.S. Government Accountability Office. GAO reports are public records of a government body whose accuracy cannot reasonably be questioned. *See* Pl.'s Decl., ex. M.

9.  **OHRP Complaint No. 00709517**, filed March 11, 2026 with the Office for Human Research Protections, U.S. Department of Health and Human Services, concerning Apple's federally registered study NCT04196595. *See* Pl.'s Decl., ex. O.

10. **BFDI and CNIL complaints**, filed in 2022 to privacy regulators in Germany and France and confirmation of receipt of complaint. See Declaration Exhibit Q.

## SCIENTIFIC PUBLICATION

13. *Mahalingaiah, Shruthi et al. "Design and methods of the Apple Women's Health Study: a digital longitudinal cohort study." American journal of obstetrics and gynecology vol. 226,4 (2022): 545.e1-545.e29. doi:10.1016/j.ajog.2021.09.041,*. This peer-reviewed journal article, authored by Apple-affiliated researchers and published in an indexed medical journal, is offered for the limited purpose of establishing that the methodology of Apple's employee ovulation study — the subject of Apple's confidentiality designations — was publicly disclosed by Apple itself in the scientific literature prior to this litigation and prior to the December 2025 deposition. Judicial notice of peer-reviewed publications is appropriate for the limited purpose of establishing that information was publicly available. *See Gerritsen v. Warner Bros. Entertainment Inc.*, 112 F. Supp. 3d 1011 (C.D. Cal. 2015). *See* Pl.'s Decl., ex. I.

# PRIOR PROCEEDINGS — TRANSCRIPT AND ORDERS

14. **February 20, 2026 Conference Transcript** before Magistrate Judge Westmore, reflecting Judge Westmore′s statement that ″No, there is no injunction,″ Tr. at 38:56, and her order requiring meet-and-confer before any further motion practice. This is a record of this Court at Dkt. 302-2.

15. **July 2, 2025 Conference Transcript**, Dkt. 302-3, reflecting Apple counsel′s statements regarding the intended use of the Protective Order, Apple counsel′s statement that blanket deposition designation ″is standard, I do it in all my cases,″ and Judge Westmore′s statement that ″[t]hat′s not how the protective order is used.″

# PURPOSE AND LIMITATION

5. Plaintiff requests judicial notice of these records solely to establish (1) that the content Apple designated as confidential was publicly available before the deposition occurred; (2) that the subject matter has been part of the public adjudicatory record for years; (3) that Apple′s own disclosures in peer-reviewed literature and federal registrations cover the same subject matter; and (4) that multiple federal agencies have acted upon Plaintiff′s public complaints about the same conduct.

6. Plaintiff does not request that the Court accept the truth of all assertions in every document — only that the Court recognize each document′s existence and public availability.

7. For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Request for Judicial Notice.

Respectfully submitted,

/s/ Ashley M. Gjovik
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 13 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

**Ashley M. Gjovik**,

*an individual*,

Plaintiff,

vs.

**Apple Inc.**,

*a corporation,*

Defendant.

**Case No.**

**3:23-CV-04597-EMC (KAW)**

**Plaintiff's Proposed Order in Support of: Plaintiff's Opposition to Defendant's Motion at Dkt. 294**

**HEARING:**
**Location: Oakland (TBD)**
**Date: April 2 2026**
**Time: 1:30 PM**

# PROPOSED ORDER

## [PROPOSED] ORDER DENYING DEFENDANT'S MOTION TO ENFORCE PROTECTIVE ORDER, GRANTING PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, AND GRANTING PLAINTIFF'S MOTION FOR SANCTIONS

The Court, having reviewed Defendant's Motion to Enforce Protective Order (Dkt. 294), Plaintiff's Opposition and all supporting materials, Plaintiff's Motion for Sanctions (Dkt. 302), the parties' filings, the record in this case, and good cause appearing, hereby ORDERS as follows:

**Defendant's Motion to Enforce Protective Order (Dkt. 294) is DENIED in its entirety.**

The motion fails for the following independent reasons, each sufficient standing alone:

- **No valid designation exists.** Defendant's blanket designation of deposition transcript pages 66–305 was void ab initio under Protective Order § 5.1 as a mass, indiscriminate designation prohibited by the Order's own terms. Defendant's February 4, 2026 narrowed designation is a legal nullity under Fed. R. Civ. P. 26(g)(2) for absence of attorney signature, dating, and proper service on Plaintiff.

- **The Protective Order's own terms exclude the designated content.** Under Protective Order § 3, the Order does not apply to information that is or has become publicly known through no fault of the receiving party, or that was rightfully known to the receiving party prior to receipt. Both exclusions apply to all remaining designated content.

- **The Court lacks jurisdiction.** Plaintiff's Chapter 7 bankruptcy automatic stay, 11 U.S.C. § 362(a), Case No. 25-11496 (D. Mass.), voids all proceedings against Plaintiff's interests absent relief from the bankruptcy court. Defendant has not sought or obtained such relief.

- **Garmon preemption.** Plaintiff's disclosures are arguably protected by NLRA § 7 and Defendant's motion is arguably prohibited by NLRA § 8. Under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), this Court must defer to the exclusive competence of the National Labor Relations Board.

- **Norris-LaGuardia Act.** The relief Defendant seeks arises from a labor dispute. The Norris-LaGuardia Act, 29 U.S.C. § 101, absolutely prohibits this Court from issuing the requested injunctive relief.

- **Prior restraint.** Defendant's demand for deletion of published speech and prior restraint on future speech fails under *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976), *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996). Defendant's private commercial interest does not satisfy any standard for prior restraint.

- **Failure to satisfy mandatory injunction standard.** Defendant has not demonstrated likelihood of success on the merits, irreparable harm, a balance of equities in its favor, or that the public interest supports relief. *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).

- **NLRB settlement.** The April 2025 NLRB national settlement, Case No. 32-CA-284428, Dkt. 194, bars Defendant from enforcing confidentiality restrictions over terms and conditions of

employment protected by NLRA § 7, through any mechanism.

- **Unpled counterclaims.** Defendant's theory requires enforcement of its Confidentiality and Intellectual Property Agreement. Defendant pleaded no such counterclaim in its Answer (Dkt. 183) or Amended Answer (Dkt. 218) and has waived the claim under Fed. R. Civ. P. 13(a).
- j. **Defiance of Court order.** Defendant filed this motion without completing meet-and-confer as ordered by this Court at the February 20, 2026 conference.

**Defendant's Motion to Seal (Dkt. 293) is DENIED.**

Defendant has not satisfied the "compelling reasons" standard under *Kamakana v. City & County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006), and has not complied with N.D. Cal. Civil L.R. 79-5.

**Defendant's Motion to Shorten Time (Dkt. 295) is DENIED** as moot.

**Plaintiff's Request for Judicial Notice is GRANTED.**

The Court takes judicial notice of the records identified in Plaintiff's Request for Judicial Notice, filed concurrently herewith, for the limited purpose of establishing that the content Apple designated as confidential was publicly available prior to the December 16, 2025 deposition and has been part of the public adjudicatory record since at least December 2023.

**Declaration of No Valid Designation.**

The Court DECLARES that no valid confidentiality designation exists over any portion of Plaintiff's December 16, 2025 deposition transcript. Defendant's blanket designation lapsed automatically. Defendant's February 4, 2026 narrowed designation is void under Fed. R. Civ. P. 26(g)(2).

**Declaration Regarding Protective Order Scope.**

The Court DECLARES that the Protective Order, Dkt. 235, does not apply to the content at issue, which is excluded from the Order's scope under § 3.

**Sanctions.**

The Court GRANTS Plaintiff's Motion for Sanctions, Dkt. 302, and ORDERS as follows:
- [Monetary sanctions in an amount to be determined];
- Defendant shall obtain relief from the bankruptcy automatic stay, 11 U.S.C. § 362(a), before taking any further action against Plaintiff in this proceeding;
- Defendant shall complete genuine meet-and-confer on each remaining designation before filing any further enforcement motion;
- [Such other sanctions as the Court deems just].

**Further Relief.**

The Court grants such other and further relief as is just and proper.

IT IS SO ORDERED.

Dated: _____, 2026




_____

HON. EDWARD M. CHEN

United States District Judge Northern District of California



_____

HON. KANDIS A. WESTMORE

United States Magistrate Judge Northern District of California

# EXHIBIT C

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
APPLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK, | Case No. 23-cv-4597-EMC |
| Plaintiff, | **DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO ENFORCE PROTECTIVE ORDER** |
| v. | |
| APPLE INC., | Date:     April 2, 2026 |
| Defendant. | Time:    1:30 p.m. |
| | Dept:    Courtroom TBD |
| | 1301 Clay Street |
| | Oakland, CA 94612 |
| | Judge:    Honorable Kandis A. Westmore |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................... 1

II.   ARGUMENT ............................................................................................................... 2

    A.    Plaintiff's Refusal to Follow this Court's Orders Must Have Consequences ......... 2

    B.    Plaintiff Does Not Dispute that She Publicized Information Apple
       Designated as Confidential Prior to Any Ruling on Her Challenges to
       Apple's Designations ................................................................................................ 3

    C.    None of Plaintiff's Meritless Arguments Warrant Any Other Outcome ................ 4

        1.    Plaintiff's Misconduct is Not Excused ......................................................... 5

        2.    Plaintiff Cannot Avoid the Process Set Forth in the Protective Order
           By Simply Claiming the Designations are Invalid ...................................... 6

        3.    Apple's Termination Decision is Irrelevant to this Motion ........................ 6

        4.    Plaintiff Cannot Evade the Protective Order By Incanting the
           NLRA ........................................................................................................... 7

        5.    Plaintiff's First Amendment Arguments Are Misplaced ............................ 8

        6.    The Protective Order is Enforceable Via Motion ....................................... 8

        7.    This Court has Jurisdiction to Enforce its Orders ...................................... 9

        8.    Apple is Not Seeking Relief for an Unpled Counterclaim ........................ 10

        9.    Plaintiff's Unclean Hands Arguments are Intentionally Misleading ........ 11

III.  CONCLUSION ......................................................................................................... 12

DEFENDANT APPLE INC.'S NOTICE OF
REMOVAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
    No. 511CV01846LHKPSG, 2014 WL 12596470 (N.D. Cal. Jan. 29, 2014) .......................... 9

*Barrington v. United Airlines, Inc.*,
    339 F.R.D. 644 (D. Colo. 2021)............................................................................................. 7

*Christian v. Mattel, Inc.*,
    286 F.3d 1118 (9th Cir. 2002)............................................................................................... 3

*Collateral Analytics LLC v. Nationstar Mortg. LLC*,
    No. 18-CV-00019-RS (JSC), 2019 WL 3779191 (N.D. Cal. Aug. 12, 2019) ...................... 11

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ...................................................................................................... 7, 10

*In re Furlong*,
    437 B.R. 712 (D. Mass. 2010), *aff'd*, 660 F.3d 81 (1st Cir. 2011) ........................................ 9

*Gasprom, Inc. v. Fateh (In re Gasprom, Inc.)*,
    500 B.R. 598 (B.A.P. 9th Cir. 2013)...................................................................................... 9

*Gonzales v. Charter Commc'ns*,
    LLC, No. 2:20-CV-08299-SB-AS, 2022 WL 570003 (C.D. Cal. Jan. 26, 2022) ................... 6

*Harmston v. City & Cnty. of San Francisco*,
    No. C 07-01186SI, 2007 WL 3306526 (N.D. Cal. Nov. 6, 2007), *order
    clarified*, No. C07-01186SI, 2008 WL 269465 (N.D. Cal. Jan. 29, 2008) ......................... 5, 6

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
    403 F.3d 683 (9th Cir. 2005)................................................................................................. 5

*I.F. v. City of Vallejo*,
    No. 2:18-CV-0673-JAM-CKD, 2021 WL 601054 (E.D. Cal. Feb. 16, 2021).......................... 6

*Justin v. Invent Help*,
    No. 25-CV-03527-PHK, 2025 WL 3907743, at *1 (N.D. Cal. Nov. 24, 2025),
    *report and recommendation adopted*, No. 25-CV-03527-TLT, 2025 WL
    3907737 (N.D. Cal. Dec. 12, 2025) ...................................................................................... 5

*In re Kupperstein*,
    994 F.3d 673 (1st Cir. 2021) ................................................................................................ 9

;

*Lehman Com. Paper, Inc. v. Palmdale Hills Prop., LLC (In re Palmdale Hills Prop., LLC)*,
  654 F.3d 868 (9th Cir. 2011).................................................................................................. 10

*Link v. Wabash R.R. Co.*,
  370 U.S. 626 (1962) ................................................................................................................ 5

*Lipscher v. LRP Publ'ns, Inc.*,
  266 F.3d 1305 (11th Cir. 2001) .............................................................................................. 9

*Lockyer v. Mirant Corp.*,
  398 F.3d 1098 (9th Cir. 2005) ................................................................................................ 9

*Ma v. San Francisco Estuary Inst.*,
  No. 23-CV-05060-JCS, 2026 WL 388720 (N.D. Cal. Feb. 11, 2026)..................................... 4

*Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*,
  892 F.2d 575 (7th Cir. 1989).................................................................................................. 10

*Moreno v. UtiliQuest, LLC*,
  29 F.4th 567 (9th Cir. 2022)................................................................................................... 8

*Municipality of San Juan v. Puerto Rico*,
  919 F.3d 565 (1st Cir. 2019) .................................................................................................. 9

*Poor v. Starbucks Corp.*,
  No. 22-CV-7255-ARR-JRC, 2024 WL 1347394 (E.D.N.Y. Mar. 29, 2024),
  *aff'd*, No. 22-CV-7255 (ARR) (JRC), 2024 WL 3401421 (E.D.N.Y. July 12,
  2024) ...................................................................................................................................... 10

*Pub. Citizen v. Liggett Grp., Inc.*,
  858 F.2d 775 (1st Cir. 1988) .................................................................................................. 8

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984) .................................................................................................................. 8

*Somers v. Digital Realty Tr. Inc.*,
  No. 14CV05180EMCKAW, 2018 WL 2134020 (N.D. Cal. May 9, 2018)............................. 8

*Thompson v. Equifax*,
  No. 24-CV-08904-VC (PHK), 2025 WL 3089068, at *3 (N.D. Cal. Sept. 30,
  2025), *report and recommendation adopted*, No. 24-CV-08904-VC, 2025 WL
  3089062 (N.D. Cal. Oct. 20, 2025) ........................................................................................ 5

*United States v. Bulger*,
  283 F.R.D. 46 (D. Mass. 2012) .............................................................................................. 8

*Yellow Express, LLC v. Dingley (In re Dingley)*,
  852 F.3d 1143 (9th Cir. 2017)................................................................................................ 9

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

Case 25-31496 Doc 965 Filed 08/30/26 Entered 08/30/26 20:44:49 Desc Main Document Page 391 of 804

Case 23-cv-04597-EMC Document 312 Filed 08/30/26 Page 4 of 17

**Statutes**

11 U.S.C. § 362(a)(1) .......................................................................................................... 9

11 U.S.C. § 362(a)(6) .......................................................................................................... 9

11 U.S.C. § 362(c) .............................................................................................................. 9

28 U.S.C. § 636(b)(1) ........................................................................................................ 10

National Labor Relations Act ................................................................................. 1, 7, 8, 10

Norris-Laguardia Act ......................................................................................................... 10

**Other Authorities**

Fed R. Civ. P. 11 ............................................................................................................... 10

Fed R. Civ. P. 26(c) ........................................................................................................ 8, 9

Fed. R. Civ. P. 37 ............................................................................................................... 9

Fed. R. Civ. P. 41(b) ........................................................................................................... 5

Local Rule 3-4(c)(2) ............................................................................................................ 2

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

## I.   INTRODUCTION

This is a simple motion. Plaintiff's late-filed and overlength opposition never addresses the single issue at hand. She does not deny that Apple designated certain information from her deposition as Confidential, and she does not deny that she publicized (and continues to publicize) that same information prior to this Court making any determination about whether to retain Apple's designations. Plaintiff plainly violated the Protective Order in these circumstances.

Plaintiff instead attempts to excuse her blatant, deliberate, and repeated violations of the Protective Order by suggesting that the information she shared is not subject to that order and cannot be considered Confidential—and that even if it were, this Court would be impotent to stop her. According to Plaintiff, she is free to do whatever she wants if she simply disagrees with Apple's confidentiality designations, or styles her misconduct as authorized by the National Labor Relations Act ("NLRA"). Plaintiff is wrong. She is not free to disobey this Court's orders, rules, and processes. The law is clear; the propriety of Apple's designations is irrelevant to whether Plaintiff violated the Protective Order because the Protective Order expressly requires Plaintiff to treat any information Apple designated as Confidential until this Court rules otherwise. The process in place imposes obligations on parties to respect Confidential designations while the challenge process plays out, rather than preemptively disclose the very information that is the subject of the dispute. Nothing Plaintiff argues exempts her from this obligation, and she plainly violated it.

Undeterred by this Court's instruction to follow the process set forth in the Protective Order at the parties' February 20, 2026 conference, Plaintiff has continued to violate the Protective Order *in nearly every filing since that conference*, including her opposition to this Motion. *See* Dkt. Nos. 297, 301, 301-1, 302, 302-1, 302-2, 306, 307, 307-1. This must stop. Apple respectfully requests this Court enter an order finding Plaintiff in violation of the Protective Order; directing Plaintiff to take down designated material; and removing from the public docket those of Plaintiff's filings that are riddled with material designated as Confidential under the Protective Order until the Court rules on those designations and more limited redactions can be applied, while strictly admonishing Plaintiff for her latest violations of this Court's orders, rules, and processes.

- 1 -

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

## II.   **ARGUMENT**

### A.   **Plaintiff's Refusal to Follow this Court's Orders Must Have Consequences.**

Plaintiff's opposition once again reflects a bad faith attempt to evade this Court's page limits and rules. Plaintiff's untimely "corrected" opposition (Dkt. No. 307) is one page over the 25-page limit and contains 31 lines per page (three more than the 28 lines per page mandated by the local rules). *See* Local Rule 3-4(c)(2). And Plaintiff was only able to trim it down that far from the 35-page version she had timely filed (*see* Dkt. No. 306) by manipulating the font and formatting more than she had already done. *Compare* Dkt. No. 306 ¶ 1 *with* Dkt. No. 307 ¶ 1 (the same sentences have more words per line in the "corrected" filing). If Plaintiff had adhered to this Court's formatting requirements, her opposition likely would have exceeded 50 pages. Furthermore, her "corrected" filing (Dkt. No. 307) did not simply fix things like the missing table of authorities; it is a complete rewrite of her brief and arguments, as the table of contents in each aptly demonstrate. She simply ignored the deadline and chose to submit an entirely new (and still flagrantly non-compliant) opposition late.

Plaintiff has defied this Court's orders, rules, and processes at every stage of this litigation and shows no indication she will stop. This Court has already repeatedly admonished Plaintiff for this misconduct:

- Dkt. No. 112 at 5, n.2 (exhibits to declaration from Plaintiff "are more in the nature of attorney argument" and "arguably reflect an attempt on the part of Ms. Gjovik to get around the page limits on briefing")[1];

- Dkt. No. 137 at 1-2 ("The Court agrees with Apple that Ms. Gjovik has failed to comply with its orders" and finding Plaintiff "**manipulated the formatting**" in her amended complaint to manufacture appearance of adherence to Court-imposed page limit, and that these "**formatting changes were intentionally made and in bad faith**."); *id.* at 3 n.3 ("**Ms. Gjovik is now on notice that there are consequences.**");

---

[1] She did this again when she included a legal brief as an exhibit in her Motion for Sanctions. *See* Dkt. No. 302-1 at 45-57 (including as an "exhibit" a legal brief containing a response to Apple's March 4, 2026 meet and confer letter that was never sent to Apple during meet and confer; it showed up for the first time in her declaration).

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

- Dkt. No. 179 at 4-5 ("Ms. Gjovik **is forewarned [ ] that, in the future, she must comply with all deadlines, page limits, and/or other rules or orders**, just as any litigant before this Court must. **The Court has already given Ms. Gjovik substantial leeway in the past and will no longer excuse her compliance with the rules**.");

- Dkt. No. 181 at 1 n.2 (finding Plaintiff **again flouting page limits**, this time for exhibits to discovery letter briefs);

- Dkt. No. 215 at 11 ("At this juncture, the Court shall not impose any sanctions. However, it forewarns Ms. Gjovik that (1) she is responsible for verifying the accuracy of AI-generated or AI-provided information, including but not limited to case citations and content, and that (2) **failure to do so may lead to sanctions, including but not limited to a finding of contempt and/or the ability to proceed pro se**.").

While this Motion seeks to address her disregard for the Court's authority regarding the Protective Order, these past digressions should not be ignored because they demonstrate her now well-established pattern of conduct. This Court has repeatedly warned her about timely submissions, adhering to page limits, and not manipulating the formatting. Plaintiff clearly does not intend to abide by this Court's orders, rules, or processes—ever. This Court has grounds to reject Plaintiff's opposition out of hand should it choose to do so. *See, e.g., Christian v. Mattel, Inc*., 286 F.3d 1118, 1129 (9th Cir. 2002) (explaining that the district court was justified in disregarding filing that "failed to comply with local rules regarding page limitations and typefaces" as "a district court has considerable latitude in managing the parties' motion practice and enforcing local rules that place parameters on briefing"; "We cannot say that the court abused its discretion by declining to consider Hicks' multitudinous efforts to circumvent the court's local rules and to expand the scope of an already frivolous suit. At some point, enough is enough.").

B.     **Plaintiff Does Not Dispute that She Publicized Information Apple Designated as Confidential Prior to Any Ruling on Her Challenges to Apple's Designations.**

Plaintiff's violations set forth in Apple's Motion are clear and undisputed. But that is not all. Plaintiff has continued to violate the Protective Order in additional filings after this Motion was filed. For example, she violated the Protective Order in at least the following filings by again

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

- 3 -

quoting or otherwise detailing the content of Apple's designations. *See, e.g.*, Dkt. Nos. 297 at PDF pp. 12-13, 14; 301 at PDF pp. 4-5; 301-1 at PDF pp. 13-14; 302 at PDF pp. 4, 14, 19; 302-1 at PDF pp. 4, 9, 22, 48-49, 54; 302-2 at PDF pp. 12, 14-15, 23-25, 66; 306 at PDF pp. 11, 14, 17, 22-23, 26-27; 307 at PDF pp. 11-12, 14-16, 19, 21, 23, 26; and 307-1 at PDF p. 9.

As set forth in Apple's Motion (*see* Dkt. No. 294, § IV.A.), the Protective Order is unambiguous as to each party's obligations once a designation has been made, even if Plaintiff disagrees with or has begun the process to challenge the designation:

> Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, ***all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge***.

Dkt. No. 235 ¶ 6.3 (emphasis added).

Plaintiff plainly, repeatedly, and unrepentantly ignored this requirement, and continues to do so. Indeed, publicly filing material designated as Confidential by a party without following appropriate procedures to challenge the designation qualifies as a "flagrant and deliberate violation." *Ma v. San Francisco Estuary Inst.*, No. 23-CV-05060-JCS, 2026 WL 388720, at *5 (N.D. Cal. Feb. 11, 2026) (sanctioning *pro se* plaintiff for publicly filing material designated as confidential). The Court's own docket is replete with examples—both of Plaintiff publishing ***verbatim*** the Designated Testimony (copied into a Word document), and of Plaintiff describing the Designated Testimony in a manner that effectively reveals what is "under the redaction." Both violate the Protective Order, as does publishing the same content on her blog or republishing it through X (formerly Twitter). *See* Dkt. No. 235 ¶ 3 (Protective Order prohibits publication of "any information copied or extracted from" material designated as Confidential).

There is no excuse for Plaintiff's flagrant and deliberate violations of the Protective Order and this Court should grant Apple's Motion and hold Plaintiff accountable to this Court's Orders, rules, and processes. There is simply no way for this case to efficiently proceed if Plaintiff continues to get a free pass for her disrespect of this Court.

**C.** <u>**None of Plaintiff's Meritless Arguments Warrant Any Other Outcome.**</u>

Plaintiff ignores the key issue in this Motion—effectively conceding that she published

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

information Apple designated Confidential in violation of the Protective Order—in favor of advancing scores of theories that all rest on the premise that there is nothing this Court can do to stop her. While the Court may reach its own conclusions about how offensive these arguments are to the integrity of the judicial process (particularly when it is accomplished through flagrant violations of this Court's rules for formatting briefs),[2] nothing Plaintiff argues changes the inescapable conclusion that she violated the Protective Order when she published information Apple designated Confidential prior to obtaining a ruling from this Court about the propriety of those designations as required by the Protective Order. Her frivolous arguments should be summarily rejected and the Court should grant Apple's motion.

### 1.        Plaintiff's Misconduct is Not Excused.

At root, Plaintiff's Opposition rests on the mistaken idea that she is not bound by this Court's orders, rules and processes—and that even if she were (and she is), this Court is impotent to do anything about her violations. *See generally* Dkt. No. 307. She fundamentally misunderstands the law. Plaintiff is not free to ignore the Protective Order's process for challenging Apple's designations simply because she disagrees with the propriety of those designations. Apple's Motion cited ample authority supporting finding Plaintiff in violation of a court order in these circumstances. *See, e.g., Harmston v. City & Cnty. of San Francisco*, No. C 07-01186SI, 2007 WL 3306526, at *6 (N.D. Cal. Nov. 6, 2007), *order clarified*, No. C07-01186SI, 2008 WL 269465 (N.D. Cal. Jan. 29, 2008) (finding plaintiff "violated the protective order and the designation of

---

[2] Given Plaintiff's flagrant and repeated "bad faith" violations of this Court's Orders, rules, and processes, the Court would be well within its authority to *sua sponte* enter an Order to Show Cause ("OSC") as to why it should not dismiss this action for failure to comply the Federal Rules and this Court's Orders. *See, e.g., Thompson v. Equifax*, No. 24-CV-08904-VC (PHK), 2025 WL 3089068, at *3 (N.D. Cal. Sept. 30, 2025), *report and recommendation adopted*, No. 24-CV-08904-VC, 2025 WL 3089062 (N.D. Cal. Oct. 20, 2025) (dismissing action after OSC for failure to comply with court orders "pursuant to the Court's inherent authority and pursuant to Fed. R. Civ. P. 41(b)."); *Justin v. Invent Help*, No. 25-CV-03527-PHK, 2025 WL 3907743, at *1 (N.D. Cal. Nov. 24, 2025), *report and recommendation adopted*, No. 25-CV-03527-TLT, 2025 WL 3907737 (N.D. Cal. Dec. 12, 2025) ("Federal Rule of Civil Procedure 41(b) authorizes district courts to dismiss an action *sua sponte* "[i]f the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order.") (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629-30 (1962)); *see also Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 689 (9th Cir. 2005) ("[T]he consensus among our sister circuits, with which we agree, is that courts may dismiss under Rule 41(b) *sua sponte*, at least under certain circumstances[.]").

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

confidentiality when he provided [deposition] testimony to the news media and filed it as part of the public record" rather than "following the procedures laid out in the protective order" because "[a]t the time of these disclosures, the Court had in no way overruled defendants' designations"); *Gonzales v. Charter Commc'ns*, LLC, No. 2:20-CV-08299-SB-AS, 2022 WL 570003, at *4 (C.D. Cal. Jan. 26, 2022) (holding that "Plaintiffs' counsel could not take it upon themselves to publish the contents" of the designated materials where they were "required to challenge the designations"); *I.F. v. City of Vallejo*, No. 2:18-CV-0673-JAM-CKD, 2021 WL 601054, at *11 (E.D. Cal. Feb. 16, 2021) (citing *Harmston*, 2007 WL 3306526, at *6) ("propriety of original confidential designation" is "beside the point" when evaluating whether counsel "violated protective order by providing confidential-designated deposition testimony to the media and filing it on the public record").

Plaintiff misses the point entirely in her Opposition, arguing these cases are somehow inapplicable because (in her view) Apple's designations are invalid. *See* Dkt. No. 307 ¶¶ 54-56. But that is plainly "beside the point." *I.F.*, 2021 WL 601054, at *11. Plaintiff unequivocally violated the Protective Order and insists this Court cannot do anything about it—but she is wrong, as a matter of law. Below Apple briefly addresses the scattershot arguments Plaintiff litters throughout her oversized opposition—but none of them excuses her misconduct.

**2.       Plaintiff Cannot Avoid the Process Set Forth in the Protective Order By Simply Claiming the Designations are Invalid.**

Plaintiff prematurely challenges the validity of Apple's confidentiality designations. *See* Dkt. No. 307 ¶¶ 27-39; *see also id.* ¶¶ 75-81 (insisting that Apple cannot satisfy the "good cause" standard to support its designations). The only issue in this motion is whether Plaintiff violated the Protective Order; that finding does not require any decision about the merits of Plaintiff's challenges or the validity of Apple's designations. *See, supra*, § II.C.1. Apple will fully address these arguments in its forthcoming opposition to Plaintiff's Motion for Sanctions and its Reply in support of its Motion to Retain Confidentiality designations, where they properly belong.

**3.       Apple's Termination Decision is Irrelevant to this Motion.**

Plaintiff suggests that Apple cannot seek to enforce the protective order because its defense to her claims relates to leaking confidential information, somehow turning this discovery motion

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

into a dispositive motion. *See* Dkt. No. 307 ¶¶ 40-42, 82-86. She is wrong, and her arguments fundamentally misunderstand how the Protective Order works. *See Barrington v. United Airlines, Inc.*, 339 F.R.D. 644, 648-49 (D. Colo. 2021) ("[T]his court recognizes Ms. Barrington's concerns that a protective order would perpetuate the very conduct that she challenges, *i.e.*, United's policies and procedures that result in secrecy. However, this substantive issue cannot—and should not—be resolved in the context of a protective order. Entering a blanket protective order is not equivalent to determining that United's practices are proper or improper."). Plaintiff's violation of the Protective Order does not establish any claim or defense in this action.

### 4. <u>Plaintiff Cannot Evade the Protective Order By Incanting the NLRA.</u>

Plaintiff next suggests that an agreement Apple entered into with the NLRB in a separate agency matter somehow bars Apple from asking this Court to enforce its own Protective Order. *See* Dkt. No. 307 ¶¶ 43-49. Of course, that is not the law. *See Epic Sys. Corp. v. Lewis,* 584 U.S. 497, 499 (2018) (holding that the NLRA does not "dictate the particulars of dispute resolution procedures in Article III courts or arbitration proceedings—matters that are usually left to, *e.g.*, the Federal Rules of Civil Procedure …"). And even if enforcement of the Protective Order did somehow require interpretation of the NLRA (it does not), Plaintiff would still find herself out of luck for two reasons:

(1) The NLRB General Counsel has already determined that Plaintiff's conduct in revealing "confidential product development information about [an Apple] study" is not "protected activity" (*see* Order Withdrawing Certain Allegations of Consolidated Complaint, Order Partially Dismissing Charge 32-CA-282142, Order Dismissing Charge 32-CA-283161 and Notice of Right of Appeal (Sept. 25, 2025) at 2)—meaning an order from this Court subjecting testimony about "confidential product development information" to the Protective Order would not offend the NLRA per the federal agency that enforces it. *See* Apple's Request for Judicial Notice, Ex. A.

(2) If questions about discovery and/or the merits in this case did necessarily and unavoidably turn on interpretations of the NLRA—as Plaintiff repeatedly insists, arguing that seemingly anything she says or does has a safe harbor in that statute—*Garmon*

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-cv-4597-EMC]

- 7 -

preemption would apply to Plaintiff's case and dismissal of her claims for lack of jurisdiction would be appropriate. *See Moreno v. UtiliQuest, LLC,* 29 F.4th 567, 575-76 (9th Cir. 2022).

Plaintiff's apparent view that she can continue litigating her termination claims against Apple in this Court—but then invoke the NLRA at every step to contend she is exempt from the orders this Court has entered, or that this Court is powerless to control her conduct in this litigation—finds no support in logic or law.

### 5. Plaintiff's First Amendment Arguments Are Misplaced.

Requiring Plaintiff to comply with the Protective Order does not violate the First Amendment, contrary to her protestations regarding a supposedly unlawful "prior restraint." *See* Dkt. No. 307 ¶¶ 50-53, 67-69. This case is nothing like *Proctor & Gamble Co.* and she is not a third-party reporter. She is a party to this action and subject to the Protective Order. The First Amendment's presumptive right of access "does not extend traditionally or functionally to discovery material." *United States v. Bulger*, 283 F.R.D. 46, 59 (D. Mass. 2012). Instead, "first amendment scrutiny of protective orders must be made within the framework of Rule 26(c)'s requirement of good cause." *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 788 (1st Cir. 1988) (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)). Plaintiff's First Amendment concerns are embedded within Rule 26(c)'s "good cause" standard, which Apple appropriately addresses in its Motion to Retain Confidentiality Designations (Dkt. No. 304) and will further address in its forthcoming Opposition to Plaintiff's Motion for Sanctions and Reply in Support of its Motion to Retain Confidentiality Designations.

### 6. The Protective Order is Enforceable Via Motion.

Plaintiff suggests that Apple's motion is improper because the Federal Rules of Civil Procedure do not expressly define a "motion to enforce a protective order." Dkt. No. 307 ¶ 57. Plaintiff is wrong. This Court has the inherent authority to enforce the Protective Order it entered. *See Somers v. Digital Realty Tr. Inc.*, No. 14CV05180EMCKAW, 2018 WL 2134020, at *15 (N.D. Cal. May 9, 2018) (ruling on motion for violation of a protective order and finding the Court's inherent powers include "the broad discretion to make discovery and evidentiary rulings conducive

- 8 -

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

to the conduct of a fair and orderly trial."). Apple is entitled to ask this Court to exercise its authority to enforce its orders, and this Court is entitled to do so. Federal Rule of Civil Procedure 37 provides further independent authority for enforcing the Protective Order; Plaintiff ignores binding Ninth Circuit precedent when she suggests otherwise. *Contrast* Dkt. No. 307 ¶¶ 57-58, 75-81 (arguing that there is no "standalone motion type" that permits a party to seek to compel compliance with a protective order) *with Apple, Inc. v. Samsung Elecs. Co.*, No. 511CV01846LHKPSG, 2014 WL 12596470, at *5 (N.D. Cal. Jan. 29, 2014) (noting that binding Ninth Circuit precedent "has repeatedly held that Rule 37 'provide[s] comprehensively for enforcement of all [discovery] orders, including Rule 26(c) protective orders,'" and rejecting Plaintiff's cited out-of-circuit case, *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305 (11th Cir. 2001), as non-binding).

### 7. This Court has Jurisdiction to Enforce its Orders.

Plaintiff claims that a litany of alleged jurisdictional bars make this Court impotent to enforce the Protective Order. *See* Dkt. No. 307 ¶¶ 60-66. These arguments are frivolous at best and reflect deliberate bad faith at worst.

**Bankruptcy**. Procedurally, both the Ninth Circuit and the First Circuit, where Plaintiff's bankruptcy is pending, agree that this Court has jurisdiction and authority to determine whether Plaintiff's bankruptcy stay applies to the case pending before it. *See Municipality of San Juan v. Puerto Rico*, 919 F.3d 565, 575 (1st Cir. 2019); *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1107 (9th Cir. 2005). Substantively, the stay does not apply to this case. Plaintiff's claims in this case are no longer an asset of the Chapter 7 Estate because, at her insistence, the Chapter 7 Trustee abandoned them to her in October 2025. *See* Dkt. No. 265 ¶ 7. By its own terms, an automatic stay does not apply if "property is no longer the property of the estate." 11 U.S.C. § 362(c).[3] Nor does the automatic stay protect Plaintiff from actions based on her post-petition, post-abandonment conduct or from actions to enforce this Court's orders. *See, e.g.*, 11 U.S.C. § 362(a)(1), (a)(6) (staying only actions that arose pre-bankruptcy); *In re Kupperstein*, 994 F.3d 673, 678 (1st Cir. 2021); *Yellow Express, LLC v. Dingley (In re Dingley)*, 852 F.3d 1143, 1154–1157 (9th Cir. 2017). The automatic

---

[3] *See also In re Furlong*, 437 B.R. 712, 720–21 (D. Mass. 2010), *aff'd*, 660 F.3d 81 (1st Cir. 2011); *Gasprom, Inc. v. Fateh (In re Gasprom, Inc.)*, 500 B.R. 598, 604–06 (B.A.P. 9th Cir. 2013).

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

stay also does not prevent Apple from defending itself in litigation commenced, and continuing to be prosecuted, by Plaintiff. *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989); *Lehman Com. Paper, Inc. v. Palmdale Hills Prop., LLC (In re Palmdale Hills Prop., LLC)*, 654 F.3d 868, 875 (9th Cir. 2011) (citation omitted). Plaintiff's stay arguments are frivolous and violate Rule 11.

**NLRA/Norris-Laguardia Act**. These laws do not preempt this Court's ability to enforce its orders. As the Supreme Court has noted, "the particulars of dispute resolution procedures in Article III courts … are usually left to other statutes and rules — not least the Federal Rules of Civil Procedure" rather than the NLRA or the Norris-Laguardia Act. *Epic Sys. Corp.*, 584 U.S. at 515. NLRA unfair labor practice allegations do not divest a federal court of authority to manage discovery, even where the discovery process itself is subject of those allegations. *Poor v. Starbucks Corp.*, No. 22-CV-7255-ARR-JRC, 2024 WL 1347394, at *7 (E.D.N.Y. Mar. 29, 2024), *aff'd*, No. 22-CV-7255 (ARR) (JRC), 2024 WL 3401421 (E.D.N.Y. July 12, 2024) (denying motion to stay enforcement of subpoenas pending resolution of NLRA unfair labor practice charges over scope of subpoenas).

**Magistrate's Authority.** The Magistrate has the authority to issue discovery orders, including finding Plaintiff violated the Protective Order. *See* Dkt. No. 83 (order assigning discovery matters to Magistrate); *see also* 28 U.S.C. § 636(b)(1). To the extent the Magistrate Judge recommends any relief beyond her statutory authority, the solution is simple: the Magistrate Judge can issue a report and recommendation to Judge Chen.

**Other Law**. Plaintiff's references to other statutes regarding privacy rights and sexual harassment claims all fail. *See* Dkt. No. 307 ¶¶ 65-66. Plaintiff does not identify any authority supporting her position that any of these statutes permit public disclosure of confidential product-related information or otherwise inhibit this Court's authority to enforce its orders.

### 8. <u>Apple is Not Seeking Relief for an Unpled Counterclaim.</u>

Plaintiff next suggests that Apple is trying to hold her liable for an unpled breach of contract claim. *See* Dkt. No. 307 ¶¶ 70-72. Not so. Testimony regarding Apple's confidential product-related information is subject to the Protective Order, and Apple was entitled to designate it as such

- 10 -

(with the Protective Order outlining a process for Plaintiff to challenge those designations, which she has since invoked). Plaintiff's confidentiality obligations under her IPA simply illustrate that knowledge of product-related information she gained during her employment can properly be designated Confidential under the Protective Order; Plaintiff cannot claim that her testimony disclosing such material is somehow immune from designation as Confidential. *See Collateral Analytics LLC v. Nationstar Mortg. LLC*, No. 18-CV-00019-RS (JSC), 2019 WL 3779191, at *4 (N.D. Cal. Aug. 12, 2019) (finding documents qualified for designation under protective order notwithstanding that party opposing designation had received information pre-litigation, and that "there is nothing to suggest that the Protective Order's lack of protection for 'any information known to the Receiving Party prior to disclosure' operates to remove independent contractual confidentiality obligations in place for pre-litigation documents containing confidential commercial information such that those documents should be public for purposes of litigation"). Apple does not need to file a counterclaim against an insolvent former employee to seek an order requiring that employee to comply with the Protective Order that governs the litigation she initiated.

### 9. Plaintiff's Unclean Hands Arguments are Intentionally Misleading.

Plaintiff also argues that Apple cannot seek to enforce the Protective Order because of its alleged "unclean hands," claiming Apple previously laid bare an intent to "prohibit Plaintiff from 'testifying to government agencies and law enforcement' about evidence she received in discovery." Dkt. No. 307 ¶ 74 (quoting Dkt. No. 220 at 10-11, ¶ 15). But the filing Plaintiff quotes is her own prior objection to a discovery issue, and the portion that sets out her (inaccurate) description of a meet and confer call from May 2025—not anything Apple or its counsel ever said. Plaintiff's lack of candor to this Court is remarkable.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Apple respectfully requests that the Court grant the Motion and order the requested relief, along with any additional relief the Court deems appropriate to ensure Plaintiff's future compliance with court orders in this matter.

Dated: March 19, 2026

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:        *Melinda S. Riechert*
MELINDA S. RIECHERT
Attorney for Defendant
APPLE INC.

REPLY ISO MOT. TO ENFORCE
PROTECTIVE ORDER
[23-CV-4597-EMC]

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
 2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>              Plaintiff,<br><br>     v.<br><br>APPLE INC.,<br><br>              Defendant. | Case No. 23-cv-4597-EMC<br><br>**DEFENDANT APPLE INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLE'S MOTION TO ENFORCE PROTECTIVE ORDER**<br><br>**[F.R.E. 201]**<br><br>Dept:    Courtroom TBD<br>           1301 Clay Street<br>           Oakland, CA 94612<br>Judge:  Honorable Kandis A. Westmore<br>Date:   April 16, 2026<br>Time:   1:30 p.m. |

Pursuant to Federal Rule of Evidence 201, Defendant Apple Inc. requests that in connection with its Opposition to Plaintiff's Motion for Declaratory Relief, the Court take judicial notice of the following document:

**Exhibit A**: Order Withdrawing Certain Allegations of Consolidated Complaint, Order Partially Dismissing Charge 32-CA-282142, Order Dismissing Charge 32-CA-283161 and Notice of Right of Appeal, issued by the National Labor Relations Board, Region 21, dated September 25, 2025 (the "NLRB Dismissal Order").

Judicial notice may be taken at any stage of the proceeding. Fed. R. Evid. 201(d). Under Rule 201, a court may take judicial notice of a fact that is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Courts in the Ninth Circuit routinely take judicial notice of public records from administrative agencies, including the National Labor Relations Board. *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (court may take judicial notice of undisputed matters of public record); *U.S. v. 14.02 Acres of Land More or Less in Fresno Cnty.*, 547 F.3d 943, 955 (9th Cir. 2008) (judicial notice appropriate for records and reports of administrative agencies); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of public filings).

The NLRB Dismissal Order is an official record of the National Labor Relations Board, an administrative agency of the United States government, whose authenticity cannot reasonably be questioned. The NLRB Dismissal Order is directly relevant to the pending motion because, contrary to Plaintiff's arguments (*see* Dkt. No. 302 at PDF pp. 19), it demonstrates that the NLRB withdrew and dismissed certain of her allegations because it determined that publicly sharing confidential product development information about an Apple study did not establish any protected concerted activity under the National Labor Relations Act. The NLRB Dismissal Order specifically states:

> As to the allegation that the Charging Party was unlawfully terminated, the evidence fails to establish that the Charging Party engaged in protected concerted activity when she revealed to the media confidential product development information about a Respondent study. Moreover, even if a prima facie case could be established, Respondent can likely meet its burden to show that the Charging Party would have been terminated for disclosing confidential product development information, even absent her protected concerted activities.

APPLE INC.'S RJN DEF.'S MOT. ENFORCE
PROTECTIVE ORDER
CASE NO. 23-CV-4597-EMC

- 1 -

4151-9747-4919

Judicial notice of this order is appropriate because it is an official agency record whose existence and content are not subject to reasonable dispute.

For the foregoing reasons, Apple respectfully requests that the Court take judicial notice of Exhibit A.

Dated: March 19, 2026                                    ORRICK, HERRINGTON & SUTCLIFFE LLP


                                                        By:  _____/s/ Melinda S. Riechert_____
                                                                MELINDA S. RIECHERT
                                                             Attorneys for Defendant Apple Inc.

# EXHIBIT A

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

**APPLE INC.**

  **and**                 **Cases 32-CA-282142**
                            **32-CA-283161**

**ASHLEY MARIE GJØVIK, an Individual**

**ORDER WITHDRAWING CERTAIN ALLEGATIONS**
**OF CONSOLIDATED COMPLAINT,**
**ORDER PARTIALLY DISMISSING CHARGE  32-CA-282142,**
**ORDER DISMISSING CHARGE 32-CA-283161**
**AND NOTICE OF RIGHT OF APPEAL**

  An Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (Consolidated Complaint) issued on December 18, 2024, in Cases 32-CA-282142 and 32-CA-283161 against Apple Inc. (Respondent), alleging various violations of Section 8(a)(1) of the National Labor Relations Act (Act).  On April 16, 2025, an Order Postponing Hearing Indefinitely issued in these matters.

  Upon further consideration and review of the evidence, I have decided to withdraw allegations from the Consolidated Complaint and dismiss those allegations because there is insufficient evidence of a violation.

  **Decision to Dismiss:**  I have decided to withdraw paragraphs 7(b), 8(a), 8(b), 8(c), 8(d), and 8(e) from the Consolidated Complaint and to dismiss the corresponding allegations from the charges for the following reasons.

  First, paragraph 7(b) of the Consolidated Complaint alleges that Respondent told employees to refrain from sharing communications about Respondent's information into employees' workplace health and safety concerns. Upon further review, the evidence shows that Respondent provided a narrow confidentiality instruction to employees about not disclosing their communications with the investigator. However, Respondent further informed employees that they were not precluded from discussing the concerns raised or that such issues were being investigated. As such, Respondent's interest in protecting the integrity of the investigation outweighs employees' interest in sharing the communications with the investigator as employees were permitted to discuss the investigation and concerns raised.

  Second, paragraphs 8(a), 8(b), 8(c), 8(d), and 8(e) of the Consolidated Complaint allege that Respondent suspended and terminated Ashley Marie Gjøvik (Charging Party) for engaging in protected concerted activities, including raising workplace environmental health and safety concerns. Regarding the suspension allegation, the evidence fails to establish that Respondent retaliated against the Charging Party by suspending her for engaging in protected

1

concerted activities. Rather, the evidence shows that Respondent placed the Charging Party on administrative leave at the Charging Party's request. As to the allegation that the Charging Party was unlawfully terminated, the evidence fails to establish that the Charging Party engaged in protected concerted activity when she revealed to the media confidential product development information about a Respondent study. Moreover, even if a prima facie case could be established, Respondent can likely meet its burden to show that the Charging Party would have been terminated for disclosing confidential product development information, even absent her protected concerted activities.

Accordingly,

**IT IS HEREBY ORDERED**, pursuant to Section 102.18 of the Board's Rules and Regulations, that the allegations in Case 32-CA-282142 (at paragraph 7(b)) regarding the instructions given to employees about disclosing information about workplace investigations and the suspension of the Charging Party (at paragraphs 8(a), 8(b), 8(c), and 8(e)) be withdrawn and **IT IS ALSO ORDERED** that Case 32-CA-283161 regarding the termination of the Charging Party (at paragraphs 8(a), 8(b), 8(d), and 8(e)), be withdrawn.[1]

**IT IS FURTHER ORDERED** that the allegations in Case 32-CA-282142 regarding the instructions given to employees about disclosing information about workplace investigations and the suspension of the Charging Party as well as the charge in Case 32-CA-283161 be, and hereby are, DISMISSED.[2]

**Charging Party's Right to Appeal:**  The Charging Party may appeal my decision to the Acting General Counsel of the National Labor Relations Board, through the Office of Appeals.

**Means of Filing: You must file your appeal electronically or provide a written statement explaining why electronic submission is not possible or feasible. Written instructions for the NLRB's E-Filing system and the Terms and Conditions of the NLRB's E-Filing policy are available at www.nlrb.gov. See User Guide. A video demonstration which provides step-by-step instructions and frequently asked questions are also available at www.nlrb.gov. If you require additional assistance with E-Filing, please contact e-Filing@nlrb.gov**. You are encouraged to also submit a complete statement of the facts and reasons why you believe my decision was incorrect. If you cannot file electronically, please send the appeal and your written explanation of why you cannot file electronically to the **Acting General Counsel** at the **National Labor Relations Board, Attn: Office of Appeals, 1015 Half Street SE, Washington, DC 20570-**

---

[1] An Amended Complaint reflecting these withdrawals shall issue in due course.

[2] Pursuant to Section 102.19 of the Board's Rules and Regulations, the Charging Party has 14 days from the service of this Order to file an appeal with the Acting General Counsel. If no such appeal is filed within that time frame, or such other period as authorized by the Acting General Counsel, this dismissal of these allegations shall be final.

.

**0001**. Unless filed electronically, a copy of the appeal should also be sent to me. The main telephone number for the Office of Appeals is **(202)273-3760**.

The appeal MAY NOT be filed by fax or email. The Office of Appeals will not process faxed or emailed appeals.

**Appeal Due Date:** The appeal is due on **October 9, 2025**. If the appeal is filed electronically, the transmission of the entire document through the Agency's website must be completed **no later than 11:59 p.m. Eastern Time** on the due date. If filing by mail or by delivery service an appeal will be found to be timely filed if it is postmarked or given to a delivery service no later than **October 8, 2025**. **If an appeal is postmarked or given to a delivery service on the due date, it will be rejected as untimely**. If hand delivered, an appeal must be received by the General Counsel in Washington D.C. by 5:00 p.m. Eastern Time on the appeal due date. If an appeal is not submitted in accordance with this paragraph, it will be rejected.

**Extension of Time to File Appeal:** The Acting General Counsel may allow additional time to file the appeal if the Charging Party provides a good reason for doing so and the request for an extension of time is **received on or before October 9, 2025.** The request may be filed electronically through the *E-File Documents* link on our website www.nlrb.gov, by fax to (202)273-4283, by mail, or by delivery service. The Acting General Counsel will not consider any request for an extension of time to file an appeal received after **October 9, 2025**, **even if it is postmarked or given to the delivery service before the due date**. Unless filed electronically, a copy of the extension of time should also be sent to me.

**Confidentiality:** We will not honor requests to limit our use of appeal statements or evidence. Upon a request under the Freedom of Information Act (FOIA) by a party during the processing of an appeal, the Agency's FOIA Branch discloses appeal statements, redacted for personal privacy, confidential source protection, or other applicable FOIA exemptions. In the event the appeal is sustained, any statement or material submitted may be introduced as evidence at a hearing before an administrative law judge. However, certain evidence produced at a hearing may be protected from public disclosure by demonstrated claims of confidentiality.

Dated:  September 25, 2025

David Selder, Acting Regional Director
National Labor Relations Board, Region 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
 2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| ASHLEY GJOVIK, | Case No. 23-cv-4597-EMC |
|---|---|
| Plaintiff, | **[PROPOSED] ORDER GRANTING DEFENDANT APPLE INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLE'S MOTION TO ENFORCE PROTECTIVE ORDER [F.R.E. 201]** |
| v. | |
| APPLE INC., | |
| Defendant. | |
| | Dept:    Courtroom TBD 1301 Clay Street Oakland, CA 94612 |
| | Judge:   Honorable Kandis A. Westmore |
| | Date:    April 16, 2026 |
| | Time:    1:30 p.m. |

4132-8578-9799

Pending before the Court is Defendant Apple Inc.'s Request for Judicial Notice in Support of its Motion to Enforce Protective Order. Having considered the relevant papers and pleadings in support of and in opposition to Apple's request, the Court hereby **GRANTS** Apple's request and takes judicial notice of the following documents:

1. Order Withdrawing Certain Allegations of Consolidated Complaint, Order Partially Dismissing Charge 32-CA-282142, Order Dismissing Charge 32-CA-283161 and Notice of Right of Appeal, issued by the National Labor Relations Board, Region 21, dated September 25, 2025, attached to the Request for Judicial Notice as Exhibit A.

**IT IS SO ORDERED**

Dated:_____        _____

HON. KANDIS A. WESTMORE
U.S. DISTRICT COURT JUDGE

4132-8578-9799

APPLE INC.'S [PROPOSED] ORDER RE:
RJN ISO DEF.'S MOT. ENFORCE
PROTECTIVE ORDER
CASE NO. 23-CV-4597-EMC

# EXHIBIT D

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone:    +1 202 339 8400
Facsimile:    +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>                     Plaintiff,<br><br>         v.<br><br>APPLE INC.,<br><br>                     Defendant. | Case No. 23-cv-4597-EMC<br><br>**DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR DECLARATORY RELIEF & FOR SANCTIONS UNDER FED.R.CIV.P. RULE 26(G)**<br><br>Date:    April 16, 2026<br>Time:    1:30 p.m.<br>Dept:    Courtroom TBD<br>         1301 Clay Street<br>         Oakland, CA 94612<br>Judge:   Honorable Kandis A. Westmore |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................. 2

III.  LEGAL STANDARD ............................................................................................ 3

IV.   ARGUMENT ......................................................................................................... 4

    A.    Apple's Confidentiality Designations Do Not Violate Rule 26(g). ......................... 4

    B.    Apple's Motion to Enforce Protective Order is Not a Discovery Certification........................................................................................................ 4

    C.    Apple's Motion to Enforce Protective Order is Substantially Justified. ................ 5

    D.    Plaintiff's Additional Arguments are Meritless. .................................................... 6

        1.    Apple Did Not Waive Confidentiality. .................................................... 6

        2.    Apple Did Not Designate Internal Research and Development Information that is Already In the Public Domain.................................... 7

        3.    Information Plaintiff Learned During Her Employment Pursuant to Her Confidentiality Agreements with Apple Can Also Be Properly Designated Under the Protective Order. ...................................... 8

        4.    Plaintiff's First Amendment Arguments Are Misplaced. ........................ 10

        5.    Plaintiff's Remaining Arguments are Meritless.................................... 10

    E.    Plaintiff's Request for Attorney's Fees is Legally Flawed and Factually Unsupported. ...................................................................................... 12

V.    CONCLUSION ................................................................................................... 13

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 511CV01846LHKPSG, 2014 WL 12596470 (N.D. Cal. Jan. 29, 2014) .......................... 5

*Barrington v. United Airlines, Inc.*,
339 F.R.D. 644 (D. Colo. 2021).......................................................................................... 11

*Brown v. Stroud*,
No. C-08-02348 JSW DMR, 2012 WL 2709058 (N.D. Cal. July 6, 2012)........................... 12

*Collateral Analytics LLC v. Nationstar Mortg. LLC*,
No. 18-CV-00019-RS (JSC), 2019 WL 3779191 (N.D. Cal. Aug. 12, 2019) .................... 9, 10

*DVD Copy Control Ass'n Inc. v. Bunner*,
116 Cal. App. 4th 241 (2004)........................................................................................... 7, 8

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ............................................................................................................ 10

*Fosselman v. Gibbs*,
No. 06–375 PJH (NJV), 2010 WL 1446661 (N.D.Cal. Apr.7, 2010)..................................... 12

*Gonzales v. Charter Commc'ns, LLC*,
No. 2:20-CV-08299-SB-AS, 2022 WL 570003 (C.D. Cal. Jan. 26, 2022) ............................. 6

*Harmston v. City & Cnty. of San Francisco*,
No. C 07-01186SI, 2007 WL 3306526 (N.D. Cal. Nov. 6, 2007), *order
clarified*, No. C07-01186SI, 2008 WL 269465 (N.D. Cal. Jan. 29, 2008) .............................. 6

*I.F. v. City of Vallejo*,
No. 2:18-CV-0673-JAM-CKD, 2021 WL 601054 (E.D. Cal. Feb. 16, 2021).......................... 6

*Int'l Petroleum Prods. & Additives Co., Inc. v. Black Gold S.A.R.L.*,
No. 19CV03004YGRRMI, 2020 WL 4673947 (N.D. Cal. Aug. 12, 2020) ............................ 4

*Loop AI Labs Inc. v. Gatti*,
195 F. Supp. 3d 1107 (N.D. Cal. 2016) ........................................................................... 7, 8

*Ma v. San Francisco Estuary Inst.*,
No. 23-CV-05060-JCS, 2026 WL 388720 (N.D. Cal. Feb. 11, 2026)................................. 5, 6

*Pierce v. Underwood*,
487 U.S. 552 (1988).......................................................................................................... 4, 5

APPLE'S OPPOSITION TO PLAINTIFF'S
MOTION FOR DECLARATORY RELIEF
[23-cv-4597-EMC]

*Pub. Citizen v. Liggett Grp., Inc.*,
 858 F.2d 775 (1st Cir. 1988) ...................................................................................... 10

*Seattle Times Co. v. Rhinehart*,
 467 U.S. 20 (1984) ..................................................................................................... 10

*Silva v. TEKsystems, Inc.*,
 No. 12-CV-05347-LHK, 2013 WL 3939500 (N.D. Cal. July 25, 2013) ..................... 3

*Somers v. Digital Realty Tr. Inc.*,
 No. 14CV05180EMCKAW, 2018 WL 2134020 (N.D. Cal. May 9, 2018)................... 5

*Starlight Int'l Inc. v. Herlihy*,
 186 F.R.D. 626 (D. Kan. 1999).................................................................................... 4

*United States v. Bulger*,
 283 F.R.D. 46 (D. Mass. 2012) ................................................................................. 10

**Statutes**

National Labor Relations Act................................................................................................ 10

**Other Authorities**

Local Rule 5-5(a) ................................................................................................................. 10

Local Rule 37-4(b) .............................................................................................................. 12

Rule 26(a)(1) .......................................................................................................................... 1

Rule 26(c)......................................................................................................................... 5, 9, 10

Rule 26(c)(1)(G)................................................................................................................ 2, 8, 9

Rule 26(g) ...................................................................................................................... *passim*

Rule 26(g)(1)........................................................................................................................... 1

Rule 26(g)(2)........................................................................................................................... 4

Rule 26(g)(3)................................................................................................................... 1, 3, 5

Rule 37 ............................................................................................................................... 4, 5

Rule 37(b) ............................................................................................................................ 12

Rule 37(b)(2)(C)..................................................................................................................... 1

APPLE'S MOTION TO RETAIN
CONFIDENTIALITY DESIGNATIONS
[23-CV-4597-EMC]

## I.    **<u>INTRODUCTION</u>**

Plaintiff's motion is premised on a flawed understanding of Rule 26(g)[1], which does not provide grounds for the relief she seeks. As she confirms this is the only "issue before the Court" in her motion, it must be denied.

*First*, she attempts to sanction Apple for not signing Apple's confidentiality designations following her deposition, even though Rule 26(g)(1) contains no such requirement. By its express terms, the signature requirement in Rule 26(g)(1) only applies to "disclosures under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection." As such, no violation of Rule 26(g)(1) can flow from Apple's narrowed list of confidentiality designations following Plaintiff's deposition—which are not disclosures, or discovery requests, responses, or objections. Apple's designations are not a "nullity," as Plaintiff suggests, but rather comply with the Court's Protective Order and the parties' agreement at the deposition.

*Second*, Plaintiff argues that Apple's Motion to Enforce Protective Order and related filings are themselves a "Rule 26(g)(3) violation" because those filings supposedly "certify a nullity." This makes no sense.[2] Plaintiff's intentional and repeated publication of information Apple designated as confidential prior to any ruling by this Court as to the propriety of those designations is a flagrant and deliberate violation of an enforceable order of this Court.[3] She does not deny this violation; instead, she asserts that her violation is either excused, or this Court is powerless to do anything about it. Neither is true. Apple's request that this Court enforce the Protective Order is grounded in both fact and law. There is no Rule 26(g) violation and certainly not one from which this Court can issue sanctions for conduct without substantial justification.

Plaintiff's additional arguments, none of which are rooted in Rule 26(g), also fail. Apple never sought to enforce a "blanket" confidentiality designation. The parties agreed on the record during the deposition that Apple would review the transcript and identify the specific testimony

---

[1] References to "Rule" refer to the Federal Rule of Civil Procedure unless otherwise specified.

[2] Indeed, any sanctions available for moving to enforce a protective order are found in Rule 37(b)(2)(C), not Rule 26(g), and only flow to the "disobedient party."

[3] Plaintiff further violated the Protective Order by again publicly disclosing the information designated confidential in her recent filings. *See* Dkt. Nos. 297, 301, 301-1, 302, 302-1, and 302-2, 306, 307, and 307-1.

<div align="right">APPLE'S OPPOSITION TO PLAINTIFF'S MOTION<br>FOR DECLARATORY RELIEF<br>[23-CV-4597-EMC]</div>

<div align="center">- 1 -</div>

that Apple claimed was confidential. Apple did just that by providing limited designations pertaining to confidential internal research and development information and studies, as permitted by Rule 26(c)(1)(G). Apple never waived its right to designate certain testimony as confidential and has dutifully followed the procedures set forth in the Protective Order and as agreed to by the parties during Plaintiff's deposition to retain such designations, including: properly designating internal research and development information as confidential following its review of the transcript; treating such designations as confidential until the Court rules otherwise; meeting and conferring with Plaintiff regarding Apple's designations; and filing a motion to retain the confidential designations consistent with the processes in the Protective Order. Plaintiff, on the other hand, has refused to abide by the Protective Order and insists this Court cannot do anything to stop her. The Court should not endorse her flagrant violations via a misguided Rule 26(g) motion.

## II.    FACTUAL BACKGROUND

Apple took Plaintiff's deposition on December 16, 2025. *See* Riechert Decl. in Support of Mot. Retain Confid. Desig. (Dkt. No. 304-2) ¶ 2. Not knowing what Plaintiff might say in response to the questions posed, during the deposition Apple designated a large portion of the transcript Confidential under the Protective Order but, after discussion on the record, the parties agreed that Apple would, upon receipt, review the transcript and provide more limited designations. *Id*. Ex. A (141:18-142:25). Plaintiff thanked Apple for agreeing to do so. *Id*. Apple received the transcript on January 7, 2026, and provided more limited confidentiality designations to Plaintiff and the court reporter on February 4, 2026, prior to the expiration of Plaintiff's deadline to correct her deposition testimony. *Id*. ¶¶ 3-4, Ex. B. Paragraph 6.2 of the Protective Order requires Plaintiff to do the following to challenge Apple's designations:

> The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order.

Dkt. No. 235 ¶ 6.2.

Instead of proceeding under the terms of the Protective Order, Plaintiff violated the Protective Order by publicly disseminating the information Apple had designated as confidential.

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

Plaintiff also sent generalized complaints about Apple's designations—but it was not until February 18, 2026, that Plaintiff provided Apple a spreadsheet itemizing her position as to each of Apple's confidentiality designations; in that spreadsheet, she indicated she did not object to redacting many of the designations. Dkt. No. 304-2. ¶ 5, Ex. C.

Apple reviewed Plaintiff's itemized list and responded on March 4, 2026, within the fourteen days required by the Protective Order. *Id.*, Ex. D. Apple's response confirmed it was withdrawing its designations as to some of the challenged testimony as part of the meet and confer process while retaining its designations as to other testimony that Plaintiff did not object to redacting as well as the challenged testimony. *Id*. In lieu of responding to Apple's narrowed designations, Plaintiff filed this meritless motion for sanctions against Apple. *Id*. ¶ 7; *see also* Dkt. No. 302. In doing so, Plaintiff also improperly filed a legal brief embedded within her declaration that she styled as a response to Apple's March 4, 2026 meet and confer. *See* Dkt. No. 302-1 at PDF pp. 45-57.[4] Plaintiff's response was never provided to Apple during meet and confer. It showed up for the first time in her declaration in support of this motion.

On March 11, 2026, Apple filed a Motion to Retain Confidentiality Designations, as required by the Protective Order (Dkt. No. 235, ¶ 6.3). *See* Dkt. No. 304.

## III.    LEGAL STANDARD

Rule 26(g) requires that discovery requests, responses, or objections be signed by an attorney, and specifies that the attorney's signature "certifies that to the best of the [person's] knowledge, information, and belief formed after a reasonable inquiry" that the response is "complete and correct." *Silva v. TEKsystems, Inc.*, No. 12-CV-05347-LHK, 2013 WL 3939500, at *3 (N.D. Cal. July 25, 2013) (quoting Rule 26(g)). Rule 26(g)(3) provides that "[i]f a certification violates this rule ***without substantial justification***, the court ... must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation."

---

[4] This Court has previously admonished Plaintiff for skirting its page limits by filing legal briefs in her declarations. *See* Dkt. No. 112 at 5 n.2 (exhibits to declaration from Plaintiff "are more in the nature of attorney argument" and "arguably reflect an attempt on the part of Ms. Gjovik to get around the page limits on briefing").

(emphasis added).

The United States Supreme Court has defined "substantially justified" to mean "justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). "Substantial justification" entails a "reasonable basis in both law and fact," such that "there is a genuine dispute ... or if reasonable people could differ [as to the appropriateness of the contested action]." *Id*. (internal quotation marks omitted). Courts, including the Northern District of California, have consistently applied this to mean that substantial justification exists when there is a reasonable basis in both law and fact, such that reasonable people could differ as to the appropriateness of the contested action. *See Int'l Petroleum Prods. & Additives Co., Inc. v. Black Gold S.A.R.L.*, No. 19CV03004YGRRMI, 2020 WL 4673947, at *4 (N.D. Cal. Aug. 12, 2020) ("The Supreme Court has stated that, in the context of Rule 37, substantially justified does not mean justified to a high degree, but rather ... [that] there is a genuine dispute, or [that] reasonable people could differ as to [the appropriateness of the contested action].") (internal quotations omitted).

## IV.    ARGUMENT

Plaintiff has not established any misconduct that warrants sanctions against Apple under Rule 26(g), or any other Rule.

### A.    Apple's Confidentiality Designations Do Not Violate Rule 26(g).

Plaintiff argues that Apple's purported failure to sign the confidentiality designations provided to Plaintiff and the court reporter after Apple reviewed the transcript violates Rule 26(g)(2). Dkt. No. 302 at PDF p. 13. However, "Rule 26(g)(2) is limited. It applies only to written discovery requests, responses, or objections." *Starlight Int'l Inc. v. Herlihy*, 186 F.R.D. 626, 647 (D. Kan. 1999). As such, Plaintiff cannot establish a Rule 26(g)(2) violation by imposing an obligation on Apple that is not contained within the express terms of Rule 26(g).

### B.    Apple's Motion to Enforce Protective Order is Not a Discovery Certification.

Plaintiff next suggests that Apple's purported "certification" violation of Rule 26(g) is the filing of the following documents: discovery letter brief (Dkt. No. 280) and Apple's Motion to Enforce Protective Order (Dkt. No. 294) with accompanying administrative motions (Dkt. Nos.

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

293 and 295). *See* Motion at PDF p. 11 (arguing that Apple's "enforcement papers" are the Rule 26(g)(3) violation because they "certify a nullity"). Plaintiff is again wrong. These filings are not discovery certifications; they are motions requesting relief based on good faith legal arguments related to Plaintiff's flagrant and willful violations of the protective order. Such motions are properly brought under this Court's inherent authority and Rule 37 and there is no basis for seeking Rule 26(g) sanctions against Apple for these filings. *See Somers v. Digital Realty Tr. Inc.*, No. 14CV05180EMCKAW, 2018 WL 2134020, at *15 (N.D. Cal. May 9, 2018) (ruling on motion for violation of a protective order and finding the Court's inherent powers include "the broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial."); *Apple, Inc. v. Samsung Elecs. Co.*, No. 511CV01846LHKPSG, 2014 WL 12596470, at *5 (N.D. Cal. Jan. 29, 2014) (noting that binding Ninth Circuit precedent "has repeatedly held that Rule 37 'provide[s] comprehensively for enforcement of all [discovery] orders, including Rule 26(c) protective orders.").

### C.    Apple's Motion to Enforce Protective Order is Substantially Justified.

Even if this Court finds, in the absence of any authority presented by Plaintiff, that Apple asking this Court to enforce the terms of the Protective Order can qualify as a Rule 26(g) violation, sanctions are not warranted because Apple was substantially justified in its actions. As fully set forth in Apple's Motion to Enforce Protective Order (Dkt. No. 294), and as further discussed in Apple's reply in support thereof (Dkt. No. 312), Plaintiff violated the Protective Order by publicizing the information Apple designated confidential prior to any ruling by this Court otherwise, which qualifies as a "flagrant and deliberate violation." *Ma v. San Francisco Estuary Inst.*, No. 23-CV-05060-JCS, 2026 WL 388720, at *5 (N.D. Cal. Feb. 11, 2026) (sanctioning *pro se* plaintiff for publicly filing material designated as confidential). Apple had a "reasonable basis in both law and fact" for asking this Court to enforce the Protective Order. *See Pierce*, 487 U.S. at 565.

For her part, Plaintiff lacks any basis in fact or law to suggest Apple's "enforcement papers" violate Rule 26(g). Plaintiff does not deny publicizing information Apple designated Confidential; she simply says this Court is powerless to stop her. *See* Dkt. Nos. 306 and 307. In addition to

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

Plaintiff's conduct exemplifying "flagrant and deliberate violation[s]" of the Protective Order (*see Ma*, 2026 WL 388720, at *5), she ignores that whether she agrees with Apple's confidentiality designations is irrelevant to its Motion to Enforce Protective Order. *See, e.g.*, *Harmston v. City & Cnty. of San Francisco*, No. C 07-01186SI, 2007 WL 3306526, at *6 (N.D. Cal. Nov. 6, 2007), *order clarified*, No. C07-01186SI, 2008 WL 269465 (N.D. Cal. Jan. 29, 2008) (finding plaintiff "violated the protective order and the designation of confidentiality when he provided [deposition] testimony to the news media and filed it as part of the public record" rather than "following the procedures laid out in the protective order" because "[a]t the time of these disclosures, the Court had in no way overruled defendants' designations"); *Gonzales v. Charter Commc'ns, LLC*, No. 2:20-CV-08299-SB-AS, 2022 WL 570003, at *4 (C.D. Cal. Jan. 26, 2022) (holding that "Plaintiffs' counsel could not take it upon themselves to publish the contents" of the designated materials where they were "required to challenge the designations"); *I.F. v. City of Vallejo*, No. 2:18-CV-0673-JAM-CKD, 2021 WL 601054, at *11 (E.D. Cal. Feb. 16, 2021) (citing Harmston, 2007 WL 3306526, at *6) ("propriety of original confidential designation" is "beside the point" when evaluating whether counsel "violated protective order by providing confidential-designated deposition testimony to the media and filing it on the public record").

Plaintiff's conduct is inexcusable and Apple's efforts to have this Court enforce its orders are grounded in both fact and law that Plaintiff cannot overcome. This Court must deny Plaintiff's motion for sanctions.

**D.     Plaintiff's Additional Arguments are Meritless.**

As is her practice, Plaintiff's moving papers are littered with many irrelevant arguments and theories that do not address the merits of the actual dispute. For the sake of completeness, Apple addresses these arguments without conceding they are relevant to Plaintiff's motion or any other pending motions in which she has asserted similar arguments. They can be summarily rejected.

**1.     Apple Did Not Waive Confidentiality.**

Ignoring her own agreement on the record to allow Apple to narrow its confidentiality designations after receiving the transcript, Plaintiff now contends that Apple waived its right to do so because it did not provide narrowed designations by January 6, 2026 (*i.e.*, 21 days post-

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

deposition). *See* Dkt. No. 302 at PDF pp. 9-13. As discussed above, the parties agreed on the record that Apple would review the transcript and provide more limited designations. Dkt. No. 304-2 Ex. A (141:18-142:25).

Apple did not receive the transcript until January 7, 2026 (and of course, Apple could not have provided narrowed designations until it received the transcript and had an opportunity to review it). After receiving the transcript, counsel for Apple prepared a chart and emailed it to (a) the court reporter within 30 days (so the court reporter knows what portions of the transcript to designate as confidential before it was finalized with any corrections from the deponent) and (b) Plaintiff so she knew what was being designated confidential and would treat the testimony accordingly or challenge the designations if she chose to do so. Dkt. No. 304-2 ¶ 4. Plaintiff's complaints about being included in the email cc: line makes no sense. Dkt. No. 302 at PDF p. 10. Plaintiff admits Apple provided her with its narrowed designations—so she knows what she was required to treat as confidential until any challenges are ruled upon, and what is at issue for any challenges she wanted to make. Nothing more is required and there was no waiver of the confidentiality designations.

**2.    Apple Did Not Designate Internal Research and Development Information that is Already In the Public Domain.**

Plaintiff asserts that confidential information related to internal product-related research and development studies is already in the public record because she generically referenced these types of studies in her Second Amended Complaint and Fourth Amended Complaint, and in turn Judge Chen vaguely referenced those portions of her complaints in various orders. *See* Dkt. No. 302 at PDF p. 14.[5] Plaintiff ignores that a generic allegation about studies in a certain category, or of a

---

[5] Plaintiff also provides a generic list of other places she believes this information may be publicly disclosed but provides no evidence or link to allow for Apple or this Court to assess the validity of these claims. *Cf.* Dkt. No. 302 at 13; *accord DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004) (holding with respect to trade secrets, "[p]ublication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient or otherwise limited so that it does not become generally known to the relevant people, *i.e.*, potential competitors or other persons to whom the information would have some economic value."); *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1115 (N.D. Cal. 2016) ("Plaintiff's categorical descriptions render it impossible for Defendants to conduct public domain or other research to challenge the alleged secrecy of the information at issue.").

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

certain issue, is different from testifying to Plaintiff's understanding of the methods, processes, or equipment used in internal product-related research and development studies. Plaintiff's argument wholly ignores that Apple conducts internal confidential research and development studies and also supports or sponsors external studies by third parties.[6] *See* Decl. of Michael DiVincent in Support of Apple's Mot. Retain Confid. Design. (Dkt. No. 304-1) ¶ 11. While Plaintiff apparently misunderstands and conflates internal and external third-party studies, they are not the same thing. *Id*.

Federal Rule of Civil Procedure 26(c)(1)(G) expressly acknowledges that this court may properly issue an order that "**confidential research, development, or commercial information not be revealed or be revealed only in a specified way**" (emphasis added). Here, context matters. Plaintiff's testimony pertaining to what she describes as the methods, processes, and equipment of the studies goes far beyond anything she included in any of the various iterations of her complaint (which could be interpreted as referring to publicly available external studies Apple sponsored), confirms she was **not** testifying about external third-party studies sponsored by Apple, and warrants the designation. *See* Dkt. Nos. 304 and 304-1.

### 3. Information Plaintiff Learned During Her Employment Pursuant to Her Confidentiality Agreements with Apple Can Also Be Properly Designated Under the Protective Order.

Plaintiff also asserts that the Protective Order cannot be used to designate her testimony confidential because she had independent knowledge of this information through her employment at Apple. *See* Dkt. No. 302 at 12. Plaintiff is incorrect. The Protective Order defines "Confidential"

---

[6] Plaintiff has significantly expanded this argument in her untimely opposition to Apple's Motion to Enforce Protective Order (*see* Dkt. No. 307 at PDF pp. 14-16), presumably by scouring the internet for any conceivable reference to anything that she thinks supports her position. Setting aside that she did not present this information to Apple during meet and confer or in support of this motion, she ignores the distinction between internal and external studies. Nor do obscure websites from foreign countries based on anonymous sources who purport to be Apple employees establish that Apple's internal product development research is in the public domain. *Cf. DVD Copy Control Ass'n Inc.*, 116 Cal. App. 4th at 251; *cf. Loop AI*, 195 F. Supp. 3d at 1115. In any event, Apple expects her to fully brief this issue in her opposition to Apple's Motion to Retain Confidentiality Designations and Apple will fully respond to it there.

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

as any information or tangible things "that qualify for protection under Federal Rule of Civil Procedure 26(c)." Dkt. No. 235 ¶ 2.2. Rule 26(c)(1)(G) provides protection for "confidential research, development, or commercial information." Testimony purporting to describe Apple's internal product-related research and development studies clearly qualify for protection under Rule 26(c).

Plaintiff attempts to evade this clear provision by asserting she had independent knowledge of these studies, based on information she learned during her employment at Apple, and therefore it cannot be covered by the Protective Order. *See* Dkt. No 302 at 12 (citing Dkt. No. 235 ¶ 3(b)). But subsection 3(b) of the Protective Order does not somehow transmute confidential product-related research and development that she learned about during her employment under an obligation of confidentiality to Apple into information Plaintiff is free to publicly disseminate once she provides it in discovery in this litigation. Nor would any such interpretation make sense; an employee cannot retain confidential documents of her former employer and then produce them in litigation, or testify about confidential information she learned during employment in the course of litigation, and then claim the employer is impotent to designate that discovery material as Confidential (meaning the documents and testimony could be publicly filed and otherwise disseminated).

A court in this district has previously (and correctly) rejected the same argument. *See Collateral Analytics LLC v. Nationstar Mortg. LLC*, No. 18-CV-00019-RS (JSC), 2019 WL 3779191, at *4 (N.D. Cal. Aug. 12, 2019) (finding documents qualified for designation under protective order notwithstanding that party opposing designation had received information pre-litigation; "Simply put, there is nothing to suggest that the Protective Order's lack of protection for 'any information known to the Receiving Party prior to disclosure' operates to remove independent contractual confidentiality obligations in place for pre-litigation documents containing confidential commercial information such that those documents should be public for purposes of litigation."). Plaintiff's testimony described her understanding of confidential internal product-related research and development studies that she learned about during her employment with Apple under an express agreement with Apple to keep such information confidential. *See* Dkt. No. 304-1 ¶¶ 3-5, 7-

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

11. Plaintiff's attempt to disavow her confidentiality obligations based on a tortured interpretation of the Protective Order should be disregarded, just as this Court disregarded the same argument in *Collateral Analytics*.

### 4. Plaintiff's First Amendment Arguments Are Misplaced.

Plaintiff misstates the law when she suggests that requiring her to follow the process set forth in the Protective Order violates her First Amendment rights. *See* Dkt. No. 302 at PDF p. 15. The First Amendment's presumptive right of access "does not extend traditionally or functionally to discovery material." *United States v. Bulger*, 283 F.R.D. 46, 59 (D. Mass. 2012). Instead, "first amendment scrutiny of protective orders must be made within the framework of Rule 26(c)'s requirement of good cause." *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 788 (1st Cir. 1988) (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)). Plaintiff's First Amendment concerns are not dispositive, as she suggests; they are embedded within Rule 26(c)'s "good cause" standard, which Apple addresses and satisfies in its Motion to Enforce the Protective Order and Motion to Retain Confidentiality Designations.[7] *See* Dkt. Nos. 294 and 304.

### 5. Plaintiff's Remaining Arguments are Meritless.

Plaintiff's motion also raises a host of other misplaced arguments that should be summarily rejected.

*First*, Apple has never sought to enforce a "blanket" confidentiality designation. *See* Dkt. No. 302 at PDF p. 9. The parties agreed on the record that Apple would review the transcript on receipt and provide narrower confidentiality designations. *See* Dkt. No. 304-2, Ex. A (141:18-142:25). Plaintiff cannot cry foul about a process she agreed to.

*Second*, Plaintiff's reliance on Local Rule 5-5(a) is misplaced. *See* Dkt. No. 302 at PDF pp. 10-12. Local Rule 5-5(a) requires a certain method of service of process for "any pleading or other paper presented for filing." Apple's confidentiality designations were not presented for filing when Apple notified the court reporter and Plaintiff of the designations. In any event, Plaintiff

---

[7] Any references to the National Labor Relations Act ("NLRA") are similarly misplaced. As the Supreme Court has noted, "the particulars of dispute resolution procedures in Article III courts … are usually left to other statutes and rules — not least the Federal Rules of Civil Procedure…", rather than the NLRA. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 517 (2018).

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

indisputably received Apple's narrowed designations, and these rules do not require more.

**Third**, Plaintiff's belief that Apple obtained the protective order and made its designations for an improper purpose is pure speculation and legally irrelevant. *See* Dkt. No. 302 at PDF pp. 16-21. Apple is entitled to have a Protective Order in place to govern confidential information that may be generated or exchanged in the course of this lawsuit, and cannot be limited to examples it provided to the Court during a hearing explaining why it was asking for a Protective Order against such a vexatious litigant who has intentionally disclosed Apple's confidential information in the past (and continues to do so). Moreover, contrary to Plaintiff's suggestion, Apple is not seeking to designate as confidential testimony about Plaintiff's "own body" or physiology or "her own workplace complaints." Apple is seeking to retain confidentiality over Plaintiff's deposition testimony about internal product-related code words and internal research and development studies, nothing more. *See* Dkt. No. 304. That she described Apple's confidential research and development studies in the context of specific concerns she had based on her understanding of the methods, processes, or equipment used in those studies does not somehow render that testimony outside the scope of the Protective Order.

**Fourth**, Plaintiff's claim that allowing Apple to designate portions of her testimony confidential is essentially a dispositive ruling in favor of Apple (*see* Dkt. No. 302 at PDF p. 2, n. 2) shows her fundamental misunderstanding of what the Protective Order does and, more importantly, what it does not do. The Protective Order simply governs the use of information generated or exchanged during discovery in this matter through trial, which will have a separate order governing the use of confidential information. *See* Dkt. No. 235 ¶ 3 ("Any use of Protected Material at trial shall be governed by a separate agreement."). The application of the Protective Order does not result in any dispositive ruling. *See Barrington v. United Airlines, Inc.*, 339 F.R.D. 644, 648-49 (D. Colo. 2021) ("[T]his court recognizes Ms. Barrington's concerns that a protective order would perpetuate the very conduct that she challenges, *i.e.*, United's policies and procedures that result in secrecy. However, this substantive issue cannot—and should not—be resolved in the context of a protective order. Entering a blanket protective order is not equivalent to determining that United's practices are proper or improper.").

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

**E.**     **Plaintiff's Request for Attorney's Fees is Legally Flawed and Factually Unsupported.**

Plaintiff's request for the "cost" of preparing, drafting, and filing various motions and oppositions is an improper request for attorney's fees. As a *pro se* litigant, Plaintiff is not entitled to recover attorney's fees associated with preparing and filings discovery related motions or oppositions as her remedies are limited to the "costs actually incurred" due to the alleged discovery misconduct. *See Fosselman v. Gibbs*, No. 06–375 PJH (NJV), 2010 WL 1446661 (N.D.Cal. Apr.7, 2010) (holding that pro se litigant not entitled to recover fees under Rule 37(b), but may recover actual costs incurred as a result of opponent's violation of discovery order); *accord Brown v. Stroud*, No. C-08-02348 JSW DMR, 2012 WL 2709058, at *7 (N.D. Cal. July 6, 2012) (denying *pro se* fee request under Rule 37(b)). The sanction provision in Rule 26(g) is like the sanction provision in Rule 37(b)—analyzed in both *Fosselman* and *Brown*—and the same result applies. Plaintiff cannot recover attorney's fees under Rule 26(g).

While the Court has the inherent authority to award a *pro se* litigant attorney's fees, it requires a showing of "bad faith litigation or willful disobedience of court rules or orders" to do so. *Brown*, 2012 WL 2709058, at *4. Since Plaintiff has not established any Rule 26(g) violation, she plainly cannot meet the heightened standard to recover fees under the Court's inherent authority. In any event, Apple's attempts to enforce the Protective Order were brought about through Plaintiff's "willful disobedience of court rules or orders," making her the proper subject for any sanctions related to these motions.

Plaintiff's request for fees and expenses also lacks the requisite factual support. Plaintiff was required to comply with the Civil Local Rules, which require, inter alia, that Plaintiff submit a "competent declaration[ ]" that "itemize[s] with particularity the otherwise unnecessary expenses, including attorney fees, directly caused by the alleged violation or breach, and set forth an appropriate justification for any attorney-fee hourly rate claimed." Civ. L. R. 37-4(b). Plaintiff did not submit any such declaration here and her request must be denied on those grounds, as well.

/ / /

/ / /

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-cv-4597-EMC]

**V.     CONCLUSION**

Plaintiff's motion fails to establish any Rule 26(g) violation and, even if it did, Apple is substantially justified in seeking relief for Plaintiff's flagrant and deliberate violations of the Protective Order and Plaintiff has not established any entitlement to the relief she seeks, including fees and costs associated with her motions. For the reasons stated above, Apple respectfully requests this Court deny Plaintiff's motion.

Dated: March 20, 2026                    ORRICK, HERRINGTON & SUTCLIFFE LLP


                                          By:          /s/ Melinda S. Riechert
                                                   MELINDA S. RIECHERT
                                                   Attorney for Defendant
                                                   APPLE INC.

APPLE'S OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY RELIEF
[23-CV-4597-EMC]

## <u>CERTIFICATE OF SERVICE</u>

I am more than eighteen years old and not a party to this action. My business address is Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, California 94025. I am readily familiar with the business practices of this office for E-Filing and processing of pleadings for electronic transmission with the United States District Court, Northern District of California. On March 20, 2026 I served the following:

**DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR DECLARATORY RELIEF & FOR SANCTIONS UNDER FED.R.CIV.P. RULE 26(G)**

Ashley Gjovik (in pro per)
ashleymgjovik@protonmail.com
legal@ashleygjovik.com

on the above parties in this action by:

**[X]     ELECTRONIC TRANSMISSION:** I declare that a copy of said document(s) was filed electronically on the above date through the ECF system for the United States District Court for the Northern District of California and to the best of my knowledge, notice of this filing will be transmitted to all parties through the Court's ECF system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 20, 2026.

_/s/ Josette Romero_
Josette Romero

CERTIFICATE OF SERVICE
[23-cv-4597-EMC]

# EXHIBIT E

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY M. GJOVIK**,

*an individual*,

Plaintiff,

vs.

**APPLE INC.**,

*a corporation,*

Defendant.

**CASE NO.**

**3:23-CV-04597-EMC (KAW)**

**OPPOSITION TO APPLE'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS & MOTION TO SEAL**

**(DKT. 304-305)**

**HEARING:**

**DATE: APRIL 16 2026**

**TIME: 1:30 PM PST**

**LOCATION: OAKLAND, TBD**

# Table of Contents

**INTRODUCTION** ....................................................................................................................3

**PROCEDURAL BACKGROUND** ........................................................................................4

    I.      Apple Obtained the Protective Order on False Pretenses.................................4

    II.    Apple Never Used the Order for Its Stated Purpose........................................4

    III.   Apple's Blanket Designation and Automatic Waiver ......................................5

    IV.   Apple's Deficient "Narrowed" Designations ..................................................5

    V.    Apple's Escalation and Refusal to Meet and Confer........................................5

**ARGUMENT** ..........................................................................................................................6

    VI.   THE DESIGNATED INFORMATION FALLS OUTSIDE THE PROTECTIVE ORDER'S SCOPE ........6

        *A. Plaintiff's Experiential Testimony Is Independently Known Information*.................................6

        *B. The Information Is Also in the Public Domain* .......................................................7

        *C. Apple's Argument That the Challenge Process Applies to Out-of-Scope Information Is Wrong* ....................7

    VII.   THE PROTECTIVE ORDER LACKS A VALID LEGAL FOUNDATION ...........................................7

    VIII.  APPLE'S DESIGNATIONS ARE PROCEDURALLY VOID...............................................8

    IX.   APPLE CANNOT MEET ITS BURDEN ON THE MERITS ................................................9

        *A. The Correct Legal Standard Is Good Cause, Not Pansy Balancing* .................................9

        *B. What Apple Actually Designated—And What It Told the Court* .................................9

        *C. The DiVincent Declaration Fails Under Binding Ninth Circuit Standards* .........................10

        *D. The "Product-Related" Category Fails Under Binding Authority* .................................11

        *E. Apple's Pansy Factor Analysis Is Wrong on Every Factor That Matters*.............................12

        *F. Apple's IPA/NDA Is Irrelevant to the Designation Analysis*.................................13

        *G. Apple Is Seeking a Ruling, Not a Redaction—The Bootstrapping Problem*.............................14

        *H. Apple's Claimed Competitive Harm Is the Harm of Losing the Advantage of Noncompliance* .........15

        *I. The Reproductive Biology Designations Are Especially Indefensible* .................................20

    X.    APPLE'S CONDUCT WARRANTS SANCTIONS .................................................22

    XI.   APPLE'S MOTION TO SEAL SHOULD BE DENIED.................................................23

        *A. Apple Has Not Met the Compelling Reasons Standard* .................................23

        *B. Apple Failed to Serve Plaintiff With Its Sealed Filings* .................................23

        *C. The Sealing Request Is Part of the Same Pattern*.................................24

**REQUESTED RELIEF** ......................................................................................................**24**

**CONCLUSION** ...................................................................................................................**25**

# TABLE OF AUTHORITIES

### CASES

*Anderson v. Cryovac, Inc.,* 805 F.2d 1, 7 (1st Cir. 1986) --------------------------------------------------- 18

*Beckman Indus., Inc. v. Int'l Ins. Co.,* --------------------------------------------------------------------------7

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.,* 712 F.3d 1349 (9th Cir. 2013) -----------------------------11

*Cahill v. Nike, Inc.,* No. 3:18-cv-01477-JR, 2022 WL 4667364 (D. Or. Sept. 30, 2022) ---------------------- 13

*Callsome Solutions Inc. v. Google Inc.*, 2018 NY Slip Op. 32716(U) (N.Y. Sup. Ct. 2018) ----------------------- 22

*Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016) ----------------------------- 12

*Center for Auto Safety v. Chrysler Group, LLC,* 809 F.3d 1092, 1101 (9th Cir. 2016)---------------------------- 23

*Cipollone v. Liggett Group, Inc.,* 649 F. Supp. 664 (D.N.J. 1986) -------------------------------------- 18

*Citizens First Nat'l Bank v. Cincinnati Ins. Co.,* 178 F.3d 943, 945 (7th Cir. 1999) (Posner, C.J.) ----------------------------------11

*Del Campo v. American Corrective Counseling Services, Inc.,* No. C-01-21151 JW (PVT), 2007 WL 3306496 (N.D. Cal. 2007) - 23

*Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1133–35 (9th Cir. 2003) -----------------------------------7

*Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) ------------------------------------------ 10

*In re Burbank Envtl. Litig.,* 42 F. Supp. 2d 976 (C.D. Cal. 1998).-------------------------------------------- 12

*In re Halkin,* 598 F.2d 176 (D.C. Cir. 1979) ------------------------------------------------------------6

*Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) ------------------------------ 23

*Montana v. United States*, 440 U.S. 147 (1979) -------------------------------------------------------- 14

*Oliner v. Kontrabecki*, 745 F.3d 1024, 1026-27 (9th Cir. 2014)------------------------------------------------13, 23

*Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994 ---------------------------------------------------9

*Phillips ex rel. Estates of Byrd v. General Motors Corp.,* 307 F.3d 1206, 1211 (9th Cir. 2002) -------------------------------9

*Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 677-78 (9th Cir. 2010) ----------------------------------- 23

*Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993) ---------------------------------------- 14

*Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 510 (1984) ---------------------------------------- 14

*Procaps S.A. v. Patheon Inc.,* No. 12-24356-CIV, 2015 WL 4430955 (S.D. Fla. 2015) -------------------------- 22

*Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 225 (6th Cir. 1996) ------------------------------- 24

*Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir. 1996) -----------------------------------11

*Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 790 (1st Cir. 1988)-----------------------------------------6

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 n.15 (1984) ------------------------------------------------12, 18

*San Jose Mercury News, Inc. v. U.S. District Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) -----------------------------9

*Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 37 (1984) ---------------------------------------------------6

*United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J.) --------------------------------------------------- 19

### STATUTES

18 U.S.C. § 1839(3).----------------------------------------------------------------------------------------------- 10

Cal. Civ. Code § 3426.1(d)(1). --------------------------------------------------------------------------------- 18

Cal. Pen. Code Section 637.7 ------------------------------------------------------------------------------------------------------------ 18

UTSA § 1(4) ------------------------------------------------------------------------------------------------------------------------------- 10

### RULES

Rule 26(c)(1)(G) -------------------------------------------------------------------------------------------------------------------------11

Rule 26(g)------------------------------------------------------------------------------------------------------------------------------------8

**OMNIBUS OPPOSITION TO APPLE'S MOTION TO RETAIN**

**CONFIDENTIALITY DESIGNATIONS & MOTION TO SEAL (DKT. 304-305)**

## <u>INTRODUCTION</u>

1.    Apple's Motion to Retain Confidentiality Designations (Dkt. 304) asks this Court to declare that 107 rows of Plaintiff's own deposition testimony are "Confidential" under the Protective Order. This omnibus opposition addresses that motion and Apple's related Motion to Seal.

2.    The Court should understand what Apple designated and what it did not. Apple did not designate a single produced document. Apple did not designate trade secrets, product specifications, source code, or financial data. Apple designated one thing: Plaintiff's words. Specifically, Apple designated Plaintiff's testimony about product code names that have been in press articles and on Wikipedia for years, the name "Beddit" — a consumer product Apple sold on its own website — and Plaintiff's complaints about Apple pressuring employees to participate in invasive reproductive health studies involving cervical mucus monitoring, ovulation tracking, and the registration of sexual partners under NDA. Apple then sought contempt, sanctions, and a gag order when Plaintiff discussed those complaints publicly.

3.    Apple's motion tells the Court that many of these designations are "unchallenged." That is false. Plaintiff challenged every designation on Feb. 4, 2026 — the same day Apple sent them — in a detailed email that Apple has never responded to on the substance and again after. Where Plaintiff offered to allow Apple to redact certain immaterial items as a courtesy, Apple rejected the redactions and instead asks this Court to issue a judicial finding that the information "is Confidential." There is a reason Apple wants a ruling rather than a redaction: Apple intends to cite that ruling at summary judgment as evidence that Plaintiff's disclosures violated her confidentiality obligations and that her termination was lawful. This Court should not allow a discovery management tool to be bootstrapped into a merits adjudication.

4.    Apple's motion also misrepresents the meet-and-confer process. Apple told the Court that Plaintiff's challenges did not begin until February 18, 2026. The email chain attached to the Declaration proves otherwise. Apple told the Court that Plaintiff filed a sanctions motion "in lieu of responding" to Apple's narrowed designations. Plaintiff responded on March 6, 2026. Apple ignored that response and filed this motion five days later. And at the February 20 hearing, this Court instructed Apple to narrow its 160 designations through good-faith meet-and-confer. Apple withdrew 16 — a 15% reduction — reclassified the rest as "unchallenged," and presented the result as compliance.

5.    On the merits, every designation fails. Beddit is a publicly sold consumer product. The reproductive biology designations concern studies that Apple itself published in a peer-reviewed journal (AJOG, 2022), registered on ClinicalTrials.gov, and promoted in a press release. The code names are

publicly available for years. Apple′s own declarant concedes the information may be publicly available and he cannot tell based on what was shared if the Plaintiff was talking about public or internal information. What Apple claims is secret is not the information — it is the employee′s experience of being asked and her complaints about the asking. That is not a trade secret. It is a claim of ownership over the employee′s complaints.

6.      Apple′s motion should be denied. Apple′s Motion to Seal should be denied. Every designation should be stripped. And any ruling should state explicitly that it is limited to discovery management and does not constitute a finding on trade secret status, NDA enforceability, or merits issues.

# PROCEDURAL BACKGROUND

## I.    APPLE OBTAINED THE PROTECTIVE ORDER ON FALSE PRETENSES

7.      Apple's stated justification for a protective order evolved over months, but the representation that ultimately induced entry was that Apple needed the order to show Plaintiff the unredacted "Gobbler" informed consent form—a document Apple described as the evidentiary basis for its termination defense—for authentication at deposition. (Dkt. 220-9, May 2, 2025 M&C Tr.). Apple's counsel stated on the record at the July 2, 2025 conference that the Protective Order was needed to produce this document. ( July 2, 2025 Cert. Tr. at 10:17–11:11, Dkt. 302 Ex. D).

8.      Plaintiff opposed the Protective Order extensively and repeatedly. (Dkt. 211, 213, 214, 220). Plaintiff warned the Court on the record that Apple's actual intended use was to designate deposition testimony about whistleblower disclosures and protected activity as confidential and prevent Plaintiff from speaking about the basis of her termination and her workplace complaints—not to facilitate document production or any legitimate discovery purpose. ( July 2, 2025 Tr. at 6:10–21). The Court did not address this warning on the merits. The Court entered the Protective Order on July 7, 2025 (Dkt. 235) over Plaintiff's preserved objections, without requiring a formal motion or good cause showing from Apple.

## II.   APPLE NEVER USED THE ORDER FOR ITS STATED PURPOSE

9.      Apple never produced the Gobbler informed consent form under the Protective Order. Apple never designated a single produced document as confidential. Apple confirmed this expressly: "All documents used in the deposition were produced either by Apple or by you. None was designated confidential." (Feb. 6, 2026 email). The document Apple cited as the entire justification for the order was never produced under it, is available on the public docket at Dkt. 250 pp. 52–54, and is apparently not confidential at all.

10.     The Protective Order's sole use has been exactly what Plaintiff warned: designating Plaintiff's deposition testimony about own workplace complaints as "Apple Confidential," and then seeking contempt, sanctions, and a gag order. Apple acknowledged this connection in its own filing,

claiming the "breach" is independently actionable under Plaintiff's employment agreement and that "it was her public disclosure of confidential Apple product-related information that led to her termination from Apple in the first place." (Dkt. 280, fn. 2). Apple is using the Protective Order to relitigate its termination defense through the contempt power and obtain gag orders were it could not on the merits.

## III.    APPLE'S BLANKET DESIGNATION AND AUTOMATIC WAIVER

11.    At the December 16, 2025 deposition, Apple declared a blanket designation covering pages 66–305 of the 336-page transcript—approximately 72% of Plaintiff's testimony. Plaintiff objected contemporaneously on the record. Apple acknowledged the objection and agreed to narrow. Under Protective Order § 6.3, the 21-day clock to file a motion to retain ran from Plaintiff's on-record challenge on December 16, 2025. Apple did not file any motion within 21 days. Under § 6.3, "[f]ailure by the Designating Party to make such a motion including the required declaration within 21 days … shall automatically waive the confidentiality designation for each challenged designation." The blanket designation automatically lapsed on or about January 6, 2026.

## IV.    APPLE'S DEFICIENT "NARROWED" DESIGNATIONS

12.    On February 4, 2026—50 days after the deposition—Apple emailed the court reporter (not Plaintiff) an unsigned, undated "chart" of narrowed designations. Plaintiff was copied "for notice purposes" only. The chart bore no attorney signature, no date, and no certificate of service. Rule 26(g)(1) requires every discovery response to "be signed by at least one attorney of record in the attorney's own name." Rule 26(g)(2) provides that "[o]ther parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention."

13.    Plaintiff raised the signature deficiency, the absence of a date, and the failure to serve repeatedly in writing beginning February 4, 2026. Apple expressly refused to cure: "Apple declines your request that it do more than it is required to do. Nothing else is required from Apple." (Feb. 6, 2026 email). Under Rule 26(g)(2), the unsigned chart is a legal nullity that the Court must strike.

## V.    APPLE'S ESCALATION AND REFUSAL TO MEET AND CONFER

14.    Rather than curing its deficiencies or engaging in the challenge process the Protective Order requires, Apple escalated. Apple filed an emergency letter (Dkt. 280) seeking sanctions, contempt, and a gag order. The Court convened a February 20, 2026 conference and ordered Apple to complete a meet-and-confer before filing motions. (Dkt. 288). Apple refused to communicate with Plaintiff for nearly six days. Then, on February 26, 2026, Apple announced it refused to meet and confer—stating "nothing further to discuss" seven times in writing—and filed three motions at approximately 10:00 PM: a Motion to Seal (Dkt. 293), a Motion to Enforce Protective Order (Dkt. 294), and a Motion to Shorten Time (Dkt. 295).

15.     Apple's March 4, 2026 letter purports to respond to some of Plaintiff's designation challenges but addresses only a portion. Apple de-designated approximately 23 lines of prior designations but failed to respond to 53 lines. Apple retained designations only on testimony involving female reproductive biology and the studies at issue in Plaintiff's NLRB charge—providing no Rule 26(c) justification for any retained designation. Apple has never addressed the threshold procedural deficiencies that are the subject of Plaintiff's pending Motion for Sanctions (Dkt. 302). Apple now files its Motion to Retain Confidentiality Designations (Dkt. 304), supported by a declaration from Michael DiVincent and a declaration from counsel Melinda Riechert. For all the reasons set forth below, the motion should be denied.

# ARGUMENT

## VI.   THE DESIGNATED INFORMATION FALLS OUTSIDE THE PROTECTIVE ORDER'S SCOPE

16.     Section 3 of the Protective Order (Dkt. 235) provides that its protections "do not cover": (a) information "in the public domain" and (b) information "known to the Receiving Party prior to the disclosure." This is a scope exclusion, not an affirmative defense. Information outside the order's scope was never subject to its protections. A designation stamped on such information is a nullity. No challenge process under Section 6 is required.

### A. Plaintiff's Experiential Testimony Is Independently Known Information

17.     Every designation Apple seeks to retain concerns Plaintiff's own deposition testimony about her own experiences: her complaints about Apple's workplace studies, her account of what she was asked to do, her objections to those requests. This is information Plaintiff knew before discovery, before the Protective Order was entered, and before this lawsuit was filed. Plaintiff lived these experiences. They are "information known to the Receiving Party prior to the disclosure" under Section 3(b). The order's protections "do not cover" them.

18.     Under *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 37 (1984), a protective order is constitutional only because it "does not restrict the dissemination of the information if gained from other sources." The D.C. Circuit drew the same line in *In re Halkin,* 598 F.2d 176 (D.C. Cir. 1979), dividing a protective order into information obtained through deposition and information independently acquired, and holding that restricting the right to disseminate independently acquired information was unconstitutional. Plaintiff gained this information from her own life. She can tell anyone what happened to her at Apple without the Protective Order being implicated—because the order, by its own terms, does not reach independently known information. See also *Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 790 (1st Cir. 1988) (blanket protective orders are "by nature overinclusive and are, therefore, peculiarly subject

to later modification").

### B. The Information Is Also in the Public Domain

19.     Plaintiff filed NLRB Charge No. 32-CA-381277, which describes the designated testimony. Apple itself referenced the NLRB charge in its filings. (Dkt. 280). The substance of the designated testimony—that Plaintiff complained about Apple's workplace studies involving employee data—has been the subject of public reporting, public NLRB proceedings, and Plaintiff's own public advocacy for years. This information is "in the public domain" under Section 3(a). The order's protections do not cover it.

### C. Apple's Argument That the Challenge Process Applies to Out-of-Scope Information Is Wrong

20.     Apple's position throughout this dispute has been that regardless of whether information is public or independently known, Plaintiff must treat it as confidential while the challenge process runs its course. This reads Section 6 as overriding Section 3—applying the challenge procedure to information the order excludes from its scope. That inverts the order's own structure. Section 3 defines the order's boundaries. Section 6 governs disputes within those boundaries. Designations on information outside Section 3 are void ab initio.

21.     The interim protection provision—treating material as confidential pending a ruling—cannot transform out-of-scope information into in-scope information. It preserves the status quo for information that might qualify. For information the order categorically excludes, the status quo is no protection. Applying interim confidentiality to public information about workplace conditions creates an unconstitutional prior restraint under *Seattle Times.* The Plaintiff's pending Petition for Rulemaking filed with the Advisory Committee on Civil Rules in February 2026 (Rules Suggestion 26-CV-6) identifies this exact problem, describing it as "functionally identical to a secret prior restraint—the most constitutionally disfavored form of speech restriction in American law."[1]

## VII.     THE PROTECTIVE ORDER LACKS A VALID LEGAL FOUNDATION

22.     Rule 26(c)(1) permits a protective order only "for good cause." *Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 476 (9th Cir. 1992). Apple never made a particularized showing. The order was entered because the Court directed the parties to use its model template after Apple represented it needed to produce a specific document. That representation was false—Apple never produced that document and never designated any document as confidential. *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1133–35 (9th Cir. 2003) (blanket orders "typically do not make a 'good cause' showing"). Where the "stipulation" was coerced and the stated justification was pretextual, the order's foundation is weaker still.

---

[1] *Ashley Gjovik* (26-CV-6), Released on: February 23, 2026, Rules Status: Pending consideration; Rule or Form: Rules 26 and 83, https://www.uscourts.gov/forms-rules/records-rules-committees/suggestions/ashley-gjovik-26-cv-6

23.     Apple told the Court and Plaintiff that it needed the Protective Order to produce the Gobbler informed consent form for authentication. Apple never produced it. Apple confirmed no documents were designated. The order's sole use was the one Plaintiff predicted and warned about: designating Plaintiff's testimony as confidential to prevent her from discussing her own termination and workplace complaints. The Court should consider whether Apple's misrepresentation of the order's purpose warrants vacating the order entirely under Rule 60(b)(3) or, at minimum, stripping designations made for a purpose the order was not obtained to serve.

24.     Section 6.3 directs Apple to file a motion "under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable)." Local Rule 7 is procedural mechanics. Local Rule 79-5 is a sealing standard that expressly provides: "Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Civil L.R. 79-5(c). The phrase "applicable legal principles" in Section 1 of the order defines nothing. Apple must identify, for each retained designation, the specific legal principle and specific harm that justify continued confidential treatment. Apple has not done so.

## VIII.    APPLE'S DESIGNATIONS ARE PROCEDURALLY VOID

25.     Apple's December 16, 2025 blanket designation of 72% of the deposition was challenged on the record the same day. Under § 6.3, Apple had 21 days to file a motion to retain. Apple did not file. The designation automatically lapsed. Apple cannot revive a lapsed designation through a "narrowed" chart sent 50 days later. The automatic waiver provision is self-executing: "Failure by the Designating Party to make such a motion ... shall automatically waive the confidentiality designation."

26.     Apple's "narrowed" designations were unsigned, undated, and unserved. Rule 26(g)(1) requires every discovery response to be signed by an attorney. Rule 26(g)(2) provides that unsigned documents are legal nullities: "Other parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's or party's attention." Plaintiff called the omission to Apple's attention repeatedly. Apple expressly refused to cure. The Court must strike the chart.

27.     Section 6.2 of the Protective Order requires that the parties "attempt to resolve each challenge in good faith" through "voice to voice dialogue." Apple refused to meet and confer—in writing, seven times—stating "nothing further to discuss." Apple filed motions to enforce, seal, and shorten time without completing the meet-and-confer the Court ordered on February 20, 2026. Apple's March 4, 2026 letter responded to only a portion of Plaintiff's challenges, ignoring 53 lines of designations entirely. Apple now seeks to retain designations in this motion that were never the subject of a meet-and-confer. Those designations should be deemed waived for failure to comply with the mandatory prerequisites of Sec. 6.

## IX.    APPLE CANNOT MEET ITS BURDEN ON THE MERITS

### A. The Correct Legal Standard Is Good Cause, Not Pansy Balancing

28.    Apple frames its motion around the *In re Roman Catholic Archbishop* factors, which derive from the Third Circuit's *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994) balancing test. But Pansy balancing is a secondary inquiry that applies only after the designating party has made the threshold showing of good cause. The correct sequence is: first, the designating party must demonstrate, for each specific designation, that "specific prejudice or harm will result" from disclosure (*Foltz*, 331 F.3d at 1130; *Beckman*, 966 F.2d at 476); second, only if that threshold is met does the court proceed to balance competing interests. *Phillips ex rel. Estates of Byrd v. General Motors Corp.,* 307 F.3d 1206, 1211 (9th Cir. 2002) requires "a particularized showing of good cause with respect to any individual document." *San Jose Mercury News, Inc. v. U.S. District Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) recognizes that "the fruits of pre-trial discovery are, in the absence of a court order to the contrary, presumptively public." Apple skips the threshold and jumps directly to balancing because it cannot make the threshold showing—its declaration is conclusory, its designations are categorical, and its harm allegations are generic.

29.    Moreover, *In re Roman Catholic Archbishop* involved a motion to modify a protective order to allow public access to settlement documents—a different procedural posture from a Section 6.3 designation challenge. The *Pansy* factors were developed for motions to lift or modify protective orders, not for challenges to initial designations that were never supported by good cause in the first instance. The court should evaluate Apple's designations under the good cause standard of Rule 26(c) as articulated by *Beckman, Foltz,* and *Kamakana*. Even if the court applies the Pansy factors, Apple loses on every factor that matters, as shown below.

### B. What Apple Actually Designated—And What It Told the Court

30.    The Court cannot evaluate Apple's motion without knowing what the designated testimony actually says. Apple describes its designations as concerning "internal code words for products" and "descriptions of internal product-related research and development studies." Apple's DiVincent declaration discusses Apple's R&D culture and competitive position for six pages. A judge reading only Apple's papers might conclude this case involves source code or chip designs.

31.    It does not. Apple's retained designations are grouped by Apple into the following categories, all of which Plaintiff will address with specific public sources:

32.    **Category 1: Product code names.** Apple designated individual words and short phrases that it claims are internal product code names. Plaintiff will demonstrate that each designated code name has been publicly reported, publicly discussed, or is otherwise in the public domain. A code name that is publicly known fails the threshold secrecy requirement of trade secret law. Code names also conceal the

actual substance of the content and themselves are not secret or sensitive – their entire purpose is to provide a term that can be discussed. Publication destroys trade secret status. See UTSA § 1(4); DTSA, 18 U.S.C. § 1839(3).

33.     **Category 2: Study-related testimony.** Apple designated Plaintiff's testimony about internal Apple user studies. But Plaintiff's testimony is not a description of study methodology, data analysis, or results. It is Plaintiff's account of her complaints about being asked to participate in studies she found invasive—studies involving things like employee reproductive biology, health monitoring, and biometric data collection. Plaintiff's complaints about workplace practices are analytically distinct from the proprietary details of those practices. Much of this information is also already publicly available.

34.     **Category 3: Designations Apple raised in this motion that were not the subject of a completed meet-and-confer**, or that Plaintiff had already agreed could be redacted. Apple cannot contest designations Plaintiff did not challenge, then argue those designations are "unchallenged." And Apple cannot raise new designations (including 167:20, admitted in fn. 2 of Apple's motion) in a motion to retain that were never discussed in meet-and-confer.

35.     Plaintiff will provide a designation-by-designation chart with public sources as a declaration and exhibit to this opposition.

### C. The DiVincent Declaration Fails Under Binding Ninth Circuit Standards

36.     Apple's motion is supported by the declaration of Michael DiVincent, a Senior Director of Human Engineering at Apple. The declaration is six pages long and does not meet the requirements of *Kamakana, Foltz,* or any other applicable standard. Its deficiencies are not technical—they are fundamental.

37.     **First, DiVincent never identifies a single specific transcript passage.** He says he "reviewed Apple's confidentiality designations" (¶ 7) but never states: "The testimony at page X reveals Y, which is not publicly known and would cause Z competitive harm." Under *Foltz*, 331 F.3d at 1130, the burden is "for each particular document" the party "seeks to protect." A declaration that never links its assertions to any specific designation does not satisfy this burden.

38.     **Second, DiVincent's harm allegations are generic and hypothetical.** He states that "disclosure of this information will cause harm to Apple" (paragraph 7) and that competitors could "leverage Apple's processes and methods" (paragraph 6). *Kamakana*, 447 F.3d at 1179, prohibits reliance on "hypothesis or conjecture." *Cipollone*, 785 F.2d at 1121: "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) rejected "general allegations of embarrassment and injury to professional reputations" as insufficient. *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.,* 712 F.3d 1349

(9th Cir. 2013) rejected a party's claim to continued confidentiality where the party "had not pointed to any particular portion of the transcript that remains confidential information that should be withheld." DiVincent's declaration could be attached to any motion by any company about any document—it is the definition of a non-particularized showing.

39.     Third, DiVincent describes "content, methods, and processes" of studies, but Plaintiff's testimony is about her complaints about the studies. There is a category difference between "the specific equipment and methodology Apple uses in Study X" (which might be confidential) and "I told my supervisor I didn't want Apple monitoring my cervical mucus" (which is an employee's complaint about a workplace condition). DiVincent's declaration addresses the former. The designated testimony is the latter. The declaration does not connect to the designations.

40.     **Fourth, DiVincent concedes the existence of publicly known, public, and external studies.** At ¶ 11, DiVincent states: "there are external studies related to women's health regarding some of the issues Plaintiff testified about." He then claims Apple's internal studies "could differ" in "content, scope, duration, questions asked, information gathered, and, in some cases, equipment used." But Plaintiff is not testifying about Apple's internal methodology. She is testifying about her complaints—which are her own experiences, independently known, and not within Apple's control regardless of whether the internal studies differ from external ones.

41.     **Fifth, Apple's reliance on *Lin v. Solta Med., Inc.* is misplaced.** Apple cites *Lin*, 2024 WL 2112893, for the proposition that "ongoing business processes" for "products that remain in the market" can be designated confidential. But Lin involved actual product development processes and manufacturing information disclosed in discovery documents. Here, the "information" is an employee's complaints about her employer's workplace practices. Lin does not hold that an employee's objections to being studied are the employer's confidential business process.

### D. The "Product-Related" Category Fails Under Binding Authority

42.     Apple's motion rests on the assertion that all designated testimony concerns "confidential product-related information." But "product-related" is not a recognized basis for confidentiality under Rule 26(c)(1)(G), which protects "trade secret or other confidential research, development, or commercial information"—not "anything that occurs in physical or conceptual proximity to a trade secret." *Citizens First Nat'l Bank v. Cincinnati Ins. Co.,* 178 F.3d 943, 945 (7th Cir. 1999) (Posner, C.J.) (designation of "other confidential information, not further specified" is "absurdly overbroad"). *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir. 1996) found a designation standard of information "considered to be of a confidential nature" facially overbroad. Apple's "product-related" category is the same structural problem: defining confidentiality by proximity to a product rather than by what the information actually

reveals.

43.     Apple must identify, for each passage, what specific trade secret or confidential commercial information is revealed—not merely that the testimony concerns events in a product-development setting. Testimony about workplace conditions, management decisions, and employee complaints must be analyzed independently from testimony about product specifications. An employee saying "I objected to Apple monitoring my body" is categorically different from an employee describing Apple's data collection algorithms. The first reveals nothing about the product; it reveals how Apple treats its workers.

44.     The Supreme Court has held that information about the harmful or invasive nature of a product or practice cannot constitute a trade secret. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 n.15 (1984): "If a public disclosure of data reveals, for example, the harmful side effects of the submitter's product, [that] cannot constitute the taking of a trade secret." Applied here: Plaintiff's testimony about the invasive nature of Apple's workplace studies is information about the nature and impact of Apple's practices on employees—not a trade secret protecting those practices from scrutiny. The Ninth Circuit confirmed in *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016) that the public interest in safety and health information outweighs a manufacturer's confidentiality claims. A confidentiality interest in the product does not create a confidentiality interest in the harm. *See In re Burbank Envtl. Litig.,* 42 F. Supp. 2d 976 (C.D. Cal. 1998).

### E. Apple's Pansy Factor Analysis Is Wrong on Every Factor That Matters

45.     **Factor 1 — Privacy.** Apple argues that "no privacy rights are at issue" because Plaintiff's testimony is about "the general methods and processes of the studies—not, contrary to her repeated protestations, her body or her personal experiences." (Dkt. 304 at 7). This characterization is factually false. The retained designations concern Plaintiff's testimony about her cervical mucus, ovulation, menstruation, sexual partners, and cosleepers—and her complaints about Apple monitoring these things and invading her and her coworkers privacy. Plaintiff has a privacy interest in her own reproductive biology and medical information. The privacy interest weighs against Apple's designation, not for it: Apple is using the designation to claim ownership over Plaintiff's descriptions of her own body.

46.     **Factor 2 — Legitimate vs. Improper Purpose.** Apple argues that Plaintiff's alleged protective order violations show an "improper purpose." But Factor 2 asks whether confidentiality is being sought for a legitimate or improper purpose—not whether the challenge to confidentiality has a proper purpose. Apple obtained the Protective Order on false pretenses. Apple used it for the exact purpose Plaintiff warned the Court about. Apple's own filing tied the designations to its termination defense (Dkt. 280, fn. 2). The improper purpose is Apple's, not Plaintiff's.

47.     **Factor 4 — Public Health and Safety.** Apple claims its studies "do not relate to matters

of important public health and safety." This is wrong. The studies involve monitoring employee reproductive biology—cervical mucus, ovulation, menstruation, sexual activity. An employer conducting invasive biometric surveillance of employees is a matter of public health and safety. This implicates workplace safety, employee privacy, medical ethics, informed consent. It is the subject of a pending NLRB charge (32-CA-381277) and Plaintiff's Cal. Bus. & Prof. Code § 17200 claims alleging these practices and Apple's studies are unlawful business practices. Factor 4 weighs heavily against confidentiality.

48.     **Factor 7 — Important Public Issues.** Apple claims "this case does not involve important public issues." This case involves: (a) employer surveillance of employee reproductive biology; (b) a pending NLRB charge; (c) § 17200 claims alleging the studies are unfair and unlawful business practices; (d) international media reporting on Apple's workplace practices (Der Spiegel); (e) Plaintiff's Petition for Rulemaking to the Advisory Committee on Civil Rules (Rules Suggestion 26-CV-6) specifically targeting the protective order system Apple is deploying; and (f) claims under RICO, whistleblower retaliation, and wrongful termination statutes. By any measure, this case involves important public issues.

49.     *Cahill v. Nike, Inc.,* No. 3:18-cv-01477-JR, 2022 WL 4667364 (D. Or. Sept. 30, 2022) is directly on point: in a gender discrimination class action, Nike designated nearly every produced document as confidential, and the court rejected Nike's "mere desire to keep this information confidential" as "inadequate," finding Nike "proffered little more than broad assertions of harm." Apple's showing is indistinguishable from Nike's. See also *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026-27 (9th Cir. 2014) ("the final word on whether documents can be filed under seal or remain under seal rests with the courts, not the parties"). Factor 7 weighs heavily against confidentiality.

### F. Apple's IPA/NDA Is Irrelevant to the Designation Analysis

50.     Apple argues (Section IV.C.3 of its motion) that "Information Plaintiff Learned During Her Employment Pursuant to Her Confidentiality Agreements with Apple Can Also Be Properly Designated Under the Protective Order." Apple's emergency letter (Dkt. 280, fn. 2) tied the designation dispute to Plaintiff's employment IPA, claiming the "breach" was independently actionable under the employment agreement and that "it was her public disclosure of confidential Apple product-related information that led to her termination from Apple in the first place."

51.     This conflates two entirely separate legal instruments. The IPA is a private contract between Apple and Plaintiff (which the NLRB prosecuted Apple over due its unlawful terms). The Protective Order is a court order governing discovery management. They have different standards, different enforcement mechanisms, and different scope. The question before this Court is whether the specific testimony qualifies for protection under Rule 26(c) and the Protective Order's terms—not whether Apple considers it covered by a private employment agreement. If IPA-covered information were

automatically designable under a protective order, every employer with an NDA could designate every piece of testimony about workplace conditions as confidential—because employees learn about workplace conditions during employment. That would gut the entire framework for public access to employment litigation. The Court should decline to use the Protective Order as an enforcement mechanism for Apple's private contract.

### G. Apple Is Seeking a Ruling, Not a Redaction—The Bootstrapping Problem

52.     Apple contests designations that Plaintiff said could be redacted. Apple fights to retain designations on information Plaintiff is not even challenging. Why? Because Apple does not want redactions. Apple wants a judicial finding that this information "is confidential."

53.     Plaintiff's § 17200 claims allege that Apple's workplace studies are unfair and unlawful business practices. Apple faces summary judgment on those claims. If this Court rules that the study-related testimony is "confidential," Apple will argue: (1) the Court already found this information is confidential proprietary R&D, therefore Plaintiff's disclosure violated her IPA, therefore her termination was lawful; (2) the § 17200 claims should be dismissed because the Court has effectively recognized these as legitimate confidential business practices rather than the unlawful practices Plaintiff alleges; and (3) on appeal, the district court's own discovery ruling supports Apple's position that Plaintiff was terminated for disclosing genuinely confidential information.

54.     The Court should not allow a discovery designation ruling to be bootstrapped into a finding on the merits. Any ruling should state explicitly that it is limited to discovery management and does not constitute a finding on trade secret status, NDA enforceability, the lawfulness of Apple's studies, or any other merits issue. See *Montana v. United States*, 440 U.S. 147 (1979) (issue preclusion requires the issue was "actually litigated and decided" and "essential to the judgment"). Apple's transparent attempt to engineer a quasi-adjudication of the confidentiality question through the designation process is itself evidence of the "improper purpose" that warrants sanctions under Rule 26(g)(1)(B)(ii) and Protective Order Section 5.1.

55.     The Court should also note that a confidentiality designation is a discovery management tool, not an evidentiary ruling. It has no effect on admissibility, which is governed exclusively by the Federal Rules of Evidence. All of the designated testimony will be used at trial in open court. *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993) ("the ordinary showing of good cause which is adequate to protect discovery material from disclosure cannot alone justify protecting such material after it has been introduced at trial"). *Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 510 (1984) (presumption of openness at trial "can be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest"). Apple's designations are

temporary labels that will be stripped the moment this evidence is introduced at trial. The only question is whether they should be stripped now or later—and given their procedural and substantive deficiencies, the answer is now.

### *H. Apple's Claimed Competitive Harm Is the Harm of Losing the Advantage of Noncompliance*

56. Even accepting every factual assertion in the DiVincent declaration at face value, Apple's claimed competitive harm is not harm the law recognizes—because the "competitive advantage" Apple seeks to protect is the cost advantage it derives from conducting these studies without complying with the laws that govern them.

57. **What compliance looks like.** If Apple wanted biometric data on ovulation, cervical mucus, sleep patterns, ear canal geometry, and facial features for product development, it could do what its competitors do: contract with an independent research institution with IRB (Institutional Review Board) oversight; recruit voluntary participants through proper channels with genuine informed consent disclosed before agreement; pay participants fair market rates for their data and time; comply with medical research regulations, state medical data protection laws, and the CPRA; allow participants to withdraw without career consequences; and submit to external oversight and audit. That is expensive. It requires compliance infrastructure, compensation, transparency, and the ability for participants to say no.

58. **What Apple did instead.** As alleged in the operative complaint and not contested by Apple for purposes of this motion: Apple used its own employees as test subjects in its own facilities under its own control. Participation was nominally "voluntary" but noted in performance reviews. (5AC ¶ 195). Employees were not told what studies involved until after they arrived at secure buildings with security personnel. (4AC ¶ 196). Employees were not compensated beyond minimal "reimbursement." (DiVincent Decl. ¶ 4). Employees were required to sign confidentiality agreements making all study details "Apple Confidential Information." (DiVincent Decl. ¶ 4). And the employee who complained was terminated. (5AC ¶ 215). Apple then designated her complaints as Apple's confidential business information.

59. **Why this is cheaper.** No IRB. No independent oversight. No market-rate compensation. No genuine informed consent process. No regulatory compliance infrastructure. No ability for participants to complain externally (because it is all "confidential"). No whistleblower protection (because Apple fires complainants and calls it a breach of the IPA). No public accountability (because the Protective Order seals everything). The cost savings are enormous. Running a properly consented, IRB-overseen study on hundreds of participants costs millions. Getting employees to do it under secrecy oaths and career pressure costs almost nothing.

60. **Apple's SEC filings confirm this is the business model.** Apple's own SEC disclosures, quoted in the Third Amended Complaint at paragraph 125, state that Apple's competitive edge requires

"aggressive price competition and resulting downward pressure on gross margins"; that some competitors compete by using "illegitimate means" to develop products; that Apple's operations are subject to "complex and changing laws and regulations" including privacy, consumer protection, labor and employment, and environmental health and safety; that "compliance with these laws and regulations is onerous and expensive"; and that laws and regulations "can adversely affect" Apple's business "by increasing costs."

61.     **Apple's most recent 10-K, filed October 2025, repeats and expands these admissions.** Apple Inc., Form 10-K for the fiscal year ended September 27, 2025, Item 1A (Risk Factors), confirms that Apple's "global operations are subject to complex and changing laws and regulations worldwide on subjects including antitrust; privacy, data security and data localization; consumer protection; labor and employment; and environmental, health and safety." Apple confirms that "compliance with these laws and regulations is onerous and expensive" and that laws and regulations "can adversely affect the Company's business by increasing the Company's costs, limiting the Company's ability to offer a product, service or feature to customers." Apple further acknowledges it is "subject to civil antitrust lawsuits in the U.S. alleging monopolization or attempted monopolization."[2]

62.     Apple's 10-K expressly acknowledges that biometric data is subject to heightened legal obligations—and that noncompliance leads to exactly the proceedings now before this Court. Apple tells the SEC it is "subject to specific obligations relating to the collection and processing of data associated with minors, as well as information considered sensitive under applicable laws, such as health, biometric, financial and payment card data." Apple further states: "health, biometric, financial and payment card data are subject to additional privacy, security and breach notification requirements, and the Company is subject to audit by governmental authorities regarding the Company's compliance with these obligations. If the Company fails to adequately comply with these rules and requirements, the Company can be subject to litigation or government investigations, can be liable for associated investigatory expenses, and can incur significant fees or fines." Apple acknowledges to the SEC that failure to comply with biometric data rules leads to litigation. This case is that litigation. The operative complaint alleges Apple did not comply. And now Apple asks this Court to designate the evidence of that alleged noncompliance as confidential.

63.     **Apple admits its public privacy commitments create legal liability when Apple fails to honor them.** The 10-K states: "The Company makes statements about its use and disclosure of personal data through its privacy policy, information provided on its website, press statements and other privacy

---

[2] SEC, Apple 10-K, Oct. 31 2025,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0000320193/000032019325000079/aapl-20250927.htm#i719388195b384d85a4e238ad88eba90a_70

notices provided to customers. Any failure or perceived failure by the Company to comply with these public statements or with federal, state or international privacy or data protection laws and regulations could result in inquiries, proceedings and penalties from governmental entities or others." Apple markets itself as the privacy company. The operative complaint alleges that marketing is false—that Apple secretly collected biometric data, monitored employees through Gobbler, and required secrecy oaths. Apple's own 10-K acknowledges that if these allegations are true, they create legal liability. The "harm" Apple fears from disclosure is not competitive—it is reputational and legal. Reputational harm and exposure to further litigation are categorically insufficient to support confidentiality under Kamakana, 447 F.3d at 1179, and Nixon, 435 U.S. at 598.

64.    **Apple's 10-K contradicts its Pansy Factor 7 argument to this Court.** Apple told this Court that "this case does not involve important public issues." Apple told the SEC: "The technology industry, including, in some instances, the Company, is subject to intense media, political and regulatory scrutiny, which exposes the Company to increasing regulation, government investigations, legal actions and penalties." Apple cannot tell the SEC its legal proceedings involve "intense" public scrutiny and tell this Court the same proceedings involve no important public issues.

65.    **Apple's 10-K reveals that the "harm" it fears is accountability, not competitive injury.** Apple tells the SEC: "If such investigations or litigation are resolved against the Company, the Company can be exposed to significant fines and may be required to make further changes to its business practices." This is not a description of competitive harm from trade secret disclosure. This is a description of the consequences of being caught engaging in unlawful practices and being forced to change them. The risk Apple identifies to its shareholders is not that competitors will learn its methods—it is that courts and regulators will make Apple stop using those methods. That is accountability, not competitive injury, and it is not protectable under Rule 26(c).

66.    Apple told its shareholders: compliance costs money, it hurts margins, and competitors break laws. The RICO claims allege this is not a passive observation but an active strategy: Apple refrains from regulatory compliance to increase profits (3AC paragraph 123(a)), promotes a false reputation of compliance (3AC paragraph 123(b)), and uses intimidation, retaliation, and overbroad NDAs to conceal the gap (3AC paragraph 123(c)).

67.    **The DiVincent declaration, read in this context, confirms the argument.** DiVincent states that disclosure would "enable competitors to bring products and services to market at a lower cost because they are not required to spend as much time and money on refining their testing processes." (DiVincent Decl. ¶ 10). But competitors already spend time and money on testing because they do it legally—through properly consented, compensated, and overseen channels. The "cost" Apple avoided is

not the cost of iterative R&D. It is the cost of compliance. DiVincent's declaration inadvertently establishes that Apple's "competitive advantage" in this area is the cost savings from conducting studies outside the legal and ethical framework that its competitors follow.

68.     **This is not harm the law recognizes.** Under every applicable test, the "harm" of losing a competitive advantage derived from noncompliance with law is not protectable: Rule 26(c)(1)(G) protects "confidential research, development, or commercial information"—not the cost savings from conducting that research without complying with applicable laws. The rule presupposes lawful activity. It does not provide a mechanism for shielding unlawful practices by calling them "R&D." Trade secret law requires that information derive "independent economic value" from secrecy. Cal. Civ. Code § 3426.1(d)(1). If the economic value derives not from the information itself but from the ability to continue an unlawful practice undetected, that is not "independent" economic value within the meaning of the statute. The value is dependent on the illegality, not the secrecy.

69.     *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 n.15 (1984) holds that information about the harmful nature of a practice "cannot constitute the taking of a trade secret." When the practice itself is alleged to violate constitutional privacy rights, the CPRA, the FTC Act, and Cal. Pen. Code Section 637.7 (5AC paragraph 214), information about how that practice operates is Ruckelshaus information. It is categorically unprotectable. See also *Anderson v. Cryovac, Inc.,* 805 F.2d 1, 7 (1st Cir. 1986) (in the Woburn groundwater contamination litigation, holding that environmental contamination information—which companies routinely classify as "product-related" or "process-related"—is subject to strong public interest in disclosure); *Cipollone v. Liggett Group, Inc.,* 649 F. Supp. 664 (D.N.J. 1986) (ordering release of tobacco industry internal documents about product health hazards despite claims that all product information was proprietary).

70.     Pansy Factor 4 asks whether confidentiality is sought over information "important to public health and safety." Coercive employee biometric surveillance conducted without genuine consent, outside medical research regulatory frameworks, with termination as the consequence for complaining, is a public health and safety issue. This factor does not merely weigh against Apple—it forecloses the claim.

71.     Public policy prohibits courts from being used to help companies maintain competitive advantages that derive from lawbreaking. That is the opposite of what courts exist to do. The entire structure of Cal. Bus. & Prof. Code § 17200 exists to prevent exactly this: businesses gaining unfair competitive advantages through unlawful practices. Apple's motion asks the Court to use its Protective Order power to shield the very practices that § 17200 is designed to expose and enjoin. The Court should decline.

72.     **Apple's pattern of anticompetitive conduct reinforces this conclusion.** Apple is not a

company entitled to a presumption of good faith on matters of competitive harm and lawful business practices. The United States Department of Justice and sixteen state attorneys general have a pending antitrust action against Apple, *United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J.), filed March 21, 2024, alleging Apple maintains a smartphone monopoly through anticompetitive and exclusionary conduct in violation of Section 2 of the Sherman Act. Apple's motion to dismiss was denied in its entirety on June 30, 2025. This is not Apple's first antitrust lawsuit: Apple previously settled a DOJ ebooks price-fixing action for $450 million after being found liable for conspiring to raise ebook prices. Apple's claimed concern about "competitive harm" must be evaluated against a documented, decades-long history of anticompetitive conduct.

73. **Apple's confidentiality and surveillance practices are being challenged in a separate PAGA action.** In *Bhakta v. Apple Inc.,* filed in Santa Clara County Superior Court in December 2024, a current Apple employee brought a PAGA action alleging that Apple's confidentiality policies unlawfully restrict employees from discussing compensation and working conditions, that Apple compels employees to install surveillance software on personal devices providing Apple access to personal data including health information, and that Apple's speech suppression policies violate California labor law. The Bhakta complaint describes Apple's confidentiality ecosystem as a "prison yard" of continuous monitoring. These are the same confidentiality and surveillance practices at issue in the designations Apple seeks to retain in this case. (See request for Judicial Notice).

74. **Apple already promised to stop doing this.** In April 2025, Apple entered into a settlement with the NLRB in Case 32-CA-284428, resolving unfair labor practice charges arising from the same overbroad confidentiality policies at issue here. Under that settlement, Apple revised its IPA to expressly state that nothing restricts employees' right to "discuss or disclose information about Your or others' wages, hours, or working conditions," or to "discuss or disclose information about unlawful acts in the workplace." The settlement notice remains posted on Apple's own legal website at apple.com/legal/more-resources. Apple's current designation of Plaintiff's testimony about working conditions as "Apple Confidential" directly contradicts the commitments Apple made to the NLRB and the promises it posted for its own employees to read. The settlement included a self-executing default provision: upon noncompliance, the Regional Director can reissue the prior complaint, Apple's allegations are deemed admitted, and a full remedy order can be entered without trial.

75. **The designation dispute is the RICO scheme in real time.** The operative complaint alleges a three-pronged scheme: (a) Apple refrains from regulatory compliance to increase profits; (b) Apple promotes a false reputation of compliance; (c) Apple bridges the gap through witness intimidation, retaliation, and overbroad NDAs to conceal its actual practices. (3AC ¶¶ 122-127). Apple conducted the

studies (prong a). Apple markets itself as an ethical, privacy-respecting company (prong b). When the employee who complained was deposed, Apple designated her complaints as confidential and sought contempt when she discussed them publicly (prong c). The Protective Order is being used as the instrument of concealment the RICO claims describe. Granting Apple's motion would not protect legitimate confidential information. It would advance the scheme.

### I. The Reproductive Biology Designations Are Especially Indefensible

76.     The designations Apple fights hardest to retain concern Plaintiff's testimony about Apple's ovulation and menstruation studies—specifically, her complaints about being asked to measure her cervical mucus, track her ovulation, and register her sexual partners and cosleepers with Apple under NDA. These designations fail for every reason stated above, but they also fail for reasons specific to this category.

77.     **First, Plaintiff never participated in the ovulation or menstruation studies.** She declined. (Dkt. 307-1 ¶ 23). She possesses no internal methodology, no equipment specifications, no process documentation, no data, and no results. She possesses only her experience of being asked—and her complaints about the asking. DiVincent's declaration discusses "methods and processes" and "equipment," but Plaintiff has none of that information to disclose. The designated testimony is not a description of how Apple conducts its studies. It is an employee's account of what Apple asked her body to do, and her objection to being asked.

78.     **Second, Apple itself has published the methodology of its reproductive health studies in a peer-reviewed journal.** Mahalingaiah et al., "Design and methods of the Apple Women's Health Study," American Journal of Obstetrics and Gynecology, vol. 226, no. 4 (2022), is a 24-page article authored by Apple-affiliated researchers describing the study's survey design, research platform, study population, eligibility and consent procedures, recruitment methods, survey data collection, sensor and usage data, HealthKit integration, principal findings, clinical implications, research implications, and limitations. (Dkt. 307-1 Ex. I). The study is also federally registered on ClinicalTrials.gov as NCT04196595, with Apple Inc. listed as the responsible party, and its status listed as "recruiting." (Dkt. 307-1 Ex. J). Apple's own September 2019 press release promoted the study as "the first long-term study of this scale focused on menstrual cycles and gynecological conditions." (Dkt. 307-1 Ex. K).

79.     Apple has published the methodology in a medical journal, registered the study with the federal government, and promoted it in a press release—and now tells this Court that an employee's testimony about being invited to participate in the same type of study is Apple's confidential trade secret. The Court should reject this contradiction.

80.     **Third, the designated information has been public for years across multiple**

**jurisdictions.** As documented in Plaintiff's Opposition at Dkt. 307 and supporting declaration at Dkt. 307-1, the specific subject matter Apple designated as confidential has appeared in: (a) six successive public complaints on this docket, cited in Judge Chen's published orders at Dkt. 73 and Dkt. 179; (b) international media coverage in Der Spiegel (Germany, June 2022), Telerama (France, March 2023), and The Telegraph (UK, April 2022); (c) Plaintiff's public comment to the White House OSTP, docketed on regulations.gov, describing the sleep study, cosleeper NDAs, and menstruation study invitations; (d) GAO Report GAO-24-107639, which referenced Plaintiff's public comment in its findings; (e) NLRB filings dating to 2021; (f) an FTC complaint (Report No. 154835129); (g) privacy complaints filed with the UK ICO, France's CNIL, and the German federal data protection authority; and (h) an OHRP complaint to HHS regarding Apple's federally registered study. Apple has not moved against any of these other entities. Apple offers no explanation as to why Plaintiff must be subject to injunctive relief while the same information remains freely available through a peer-reviewed journal, a federal database, a GAO report, and news archives in at least three countries.

81. Fourth, Apple's own declarant concedes he cannot determine whether the information was already public—and reveals the true nature of Apple's claim. DiVincent states at paragraph 11 that "there are external studies related to women's health regarding some of the issues Plaintiff testified about" but asserts a "belief" that Plaintiff was "referring to internal studies and not external studies based on her testimony about the methods and processes she believes were used." As Plaintiff's Dkt. 307 opposition established, DiVincent's belief is factually wrong: Plaintiff never participated in the internal studies, declined to participate, and was testifying about her complaints, not internal methodology.

82. But DiVincent's framing reveals something more important. Apple does not claim that the information itself is secret—Apple concedes the information "may be publicly available." What Apple claims is secret is the employee's experience of being asked. Apple's position is that even though the existence of reproductive health studies is public (Apple published the methodology in a peer-reviewed journal, registered the study with the federal government, and promoted it in a press release), the fact that a specific employee was invited to participate and complained about it is Apple's confidential business information. That is not a trade secret claim. It is a claim of ownership over the employee's complaints. And it confirms what Apple's SEC filings reveal: the "harm" Apple fears is not that competitors will learn about reproductive health research (they already know); it is that courts, regulators, and the public will learn how Apple treated its employees in the course of that research. Apple's own 10-K admits that "any failure or perceived failure by the Company to comply with" its public privacy commitments "could result in inquiries, proceedings and penalties" and "significant legal liability." That is the harm Apple is trying to prevent—and it is not protectable.

83.     This pattern extends beyond the reproductive biology designations to every category Apple designated. Apple's VP of Product Marketing publicly discussed ear scanning studies ("We had done work with Stanford to 3D-scan hundreds of different ears," Dkt. 307-1 Ex. F). Apple's sleep study is described in Plaintiff's public OSTP comment and the GAO report that cited it. The code names Apple designated have been publicly reported. In every case, the underlying information is public; what Apple claims is secret is the employee's testimony about her experience with that information. That is not how trade secret law works. The employee's complaints are her own, independently known under Seattle Times, and Apple has no protectable interest in silencing them.

## X.     APPLE'S CONDUCT WARRANTS SANCTIONS

84.     Plaintiff's Motion for Sanctions under Rule 26(g) is pending at Dkt. 302. Plaintiff incorporates that motion by reference and notes that the arguments set forth therein—including the Rule 26(g)(1) signature deficiency, the automatic waiver under § 6.3, the improper purpose of the designations, and Apple's refusal to cure—apply with full force to this opposition.

85.     Apple is represented by Orrick, Herrington & Sutcliffe LLP—one of the largest and most sophisticated law firms in the country. Orrick knows what a trade secret is. Orrick knows that an employee's testimony about her own workplace complaints is not confidential commercial information. Orrick knows that publicly known information cannot be designated confidential. And Orrick knows that the purpose of a protective order is to protect genuinely confidential information from competitors—not to suppress a whistleblower's testimony about the employer's practices that are the subject of NLRB charges and this federal lawsuit.

86.     When Orrick designated this testimony anyway—and then escalated to enforcement motions, sealing motions, and shortened-time motions based on those designations—it was not making a good-faith mistake. It was deploying the Court's protective order machinery for an improper purpose: silencing the plaintiff about the very conduct this lawsuit exists to adjudicate. Rule 26(g)(3) provides that sanctions are mandatory when a certification violates the rule without substantial justification. Section 5.1 of the Protective Order independently authorizes sanctions for "clearly unjustified" designations made for "an improper purpose." The Court's inherent authority under Chambers v. NASCO, Inc., 501 U.S. 32 (1991) reaches bad-faith abuse of judicial process. All three bases are satisfied here.

87.     Courts have imposed substantial sanctions for comparable conduct. *Procaps S.A. v. Patheon Inc.,* No. 12-24356-CIV, 2015 WL 4430955 (S.D. Fla. 2015) imposed $25,000 in fees against counsel personally for designating 95% of documents as "Highly Confidential" and held that "attorneys bear personal responsibility for over-designation." *Callsome Solutions Inc. v. Google Inc.*, 2018 NY Slip Op. 32716(U) (N.Y. Sup. Ct. 2018) imposed monetary sanctions for overuse of "Attorneys' Eyes Only"

designations and found that "a party cannot over designate documents then hold improperly designated documents hostage until the adversary surrenders." *Del Campo v. American Corrective Counseling Services, Inc.,* No. C-01-21151 JW (PVT), 2007 WL 3306496 (N.D. Cal. 2007) awarded sanctions against defense counsel in this district for over-designating documents as confidential without justification. Apple's conduct here—blanket-designating 72% of a deposition, abandoning 99% of designations, retaining only the testimony most damaging to its litigation position, and then filing enforcement motions on void designations—is more egregious than any of these cases.

## XI.    APPLE'S MOTION TO SEAL SHOULD BE DENIED

### A. Apple Has Not Met the Compelling Reasons Standard

88.    Apple has filed a motion to seal portions of its filings in connection with this designation dispute. Under *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006), a party seeking to seal judicial records bears the burden of articulating "compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure." *Center for Auto Safety v. Chrysler Group, LLC,* 809 F.3d 1092, 1101 (9th Cir. 2016) holds that the compelling reasons standard applies to any filing "more than tangentially related to the merits of a case." A motion to retain confidentiality designations on deposition testimony that is central to the merits of this employment litigation is plainly more than tangentially related to the merits. The compelling reasons standard applies.

89.    Apple cannot meet that standard for the same reasons it cannot meet its burden on the designations themselves. The information Apple seeks to seal is the same information Apple seeks to keep designated: Plaintiff's testimony about her own workplace complaints, publicly known study descriptions, and publicly reported code names. If the information does not qualify for confidential designation under the Protective Order—and it does not—it certainly does not qualify for sealing under the more demanding compelling reasons standard. Civil Local Rule 79-5(c) expressly provides: "Reference to a stipulation or protective order that allows a party to designate certain documents as confidential is not sufficient to establish that a document, or portions thereof, are sealable." Apple's designation is not even a valid designation, as shown above. It is categorically insufficient to support sealing.

90.    *Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 677-78 (9th Cir. 2010) confirmed that the compelling reasons standard applies regardless of whether a third party seeks access. *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026-27 (9th Cir. 2014) held that "the final word on whether documents can be filed under seal or remain under seal rests with the courts, not the parties" and that "conclusory allegations of harm do not meet the 'compelling reasons' standard." Apple has offered nothing beyond conclusory allegations.

### B. Apple Failed to Serve Plaintiff With Its Sealed Filings

91.    Apple filed materials under seal without providing Plaintiff copies of the sealed filings. A

party is entitled to see and respond to all materials filed in support of a motion against her. Apple's failure to serve Plaintiff with copies of its own motion papers is a fundamental due process violation. Plaintiff cannot meaningfully oppose a motion when she has not been permitted to see what Apple filed. The Court should either unseal the filings or order Apple to serve Plaintiff immediately with complete, unredacted copies of everything it filed under seal.

92. Apple's counsel previously wrote to Plaintiff asserting that if Plaintiff opens files Apple designates as provisionally sealed, that act itself constitutes a new violation of the Protective Order—even if the underlying information is public. This position is untenable. A party cannot be held in contempt for reading a court filing in her own case. Provisional sealing is a procedural mechanism to preserve the status quo while the court evaluates a sealing request. It does not create a new gag order. It does not prohibit the opposing party from reviewing filings served on her. And it cannot transform public information into sealed information merely because Apple stamped it and filed it with a sealing request. The Court should make clear that provisional sealing imposes no restriction on Plaintiff's ability to review, respond to, and discuss the substance of Apple's filings.

### C. The Sealing Request Is Part of the Same Pattern

93. Apple's motion to seal is not an independent request for judicial protection of sensitive information. It is part of the same pattern documented throughout this opposition: Apple designates public information as confidential, then uses the designation as the basis for sealing, then uses the sealing as a basis for enforcement, then uses the enforcement as a basis for contempt. Each step builds on the prior step, and the entire edifice rests on designations that are void for the reasons set forth in Sections I through IV above. If the designations fail—and they do—the sealing request fails with them. The Court should deny the motion to seal in its entirety. See *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996) ("the court may not enter the order solely on the basis of the parties' agreement" and "any blanket order prohibiting the parties from releasing information acquired through discovery to third parties would constitute an impermissible prior restraint").

## REQUESTED RELIEF

94. Plaintiff respectfully requests that the Court:

- Deny Apple's Motion to Retain Confidentiality Designations (Dkt. 304) in its entirety and strip every challenged designation;
- Declare that the designated information falls outside the Protective Order's scope under Section 3 as information that is in the public domain and/or known to the Receiving Party prior to disclosure, and that no challenge process was required;
- Declare that Apple's December 16, 2025 blanket designation automatically lapsed under Section 6.3 for failure to file a motion to retain within 21 days, and that Apple's February 4, 2026 unsigned

chart does not constitute a valid re-designation;

- Strike Apple's February 4, 2026 designation chart under Rule 26(g)(2) as an unsigned discovery response that Apple refused to cure after the deficiency was specifically identified;

- Find that Apple's designations were clearly unjustified and made for an improper purpose within the meaning of Protective Order § 5.1 and Rule 26(g)(1)(B)(ii);

- Impose sanctions under Rule 26(g)(3), including reasonable attorney's fees and costs incurred in challenging the designations and opposing this motion;

- Clarify that the Court's ruling on the designations is limited to discovery management restrictions and does not constitute a finding on trade secret status, NDA enforceability, the lawfulness of Apple's workplace studies under Cal. Bus. & Prof. Code § 17200, or any other substantive issue—and that the ruling may not be cited by either party as evidence of or against the confidentiality of the designated information in any motion for summary judgment, at trial, or on appeal;

- Order Apple to pay Plaintiff's reasonable fees and costs incurred in opposing the Motion to Enforce Protective Order (Dkt. 294), the Motion to Seal (Dkt. 293), and the Motion to Shorten Time (Dkt. 295), all of which were premised on designations that were procedurally void and substantively unjustified; and

- Deny Apple's Motion to Seal in its entirety and unseal all provisionally sealed filings related to this designation dispute;

- Order Apple to serve Plaintiff immediately with complete, unredacted copies of all materials Apple filed under seal, and declare that provisional sealing does not prohibit Plaintiff from reviewing, responding to, or discussing the substance of Apple's filings in her own case;

- In the alternative, if the Court finds any information warrants continued protection, order targeted redaction of only the specific information that qualifies—not blanket confidentiality over entire transcript passages—and require Apple to submit within 14 days a re-designation log identifying the specific legal principle (trade secret, confidential commercial information, or other recognized doctrine) and particularized factual basis for each designation.

## CONCLUSION

95.     Apple obtained a Protective Order by representing it needed to authenticate a document. It never produced that document. It never designated a single document as confidential. Its sole use of the order has been to designate a whistleblower-plaintiff's testimony about her own workplace complaints—testimony about her own body, her own experiences, and her own objections to her employer's practices—as "Apple Confidential." It then sought contempt, sanctions, and a gag order when she discussed those complaints publicly. Apple now seeks a judicial finding of confidentiality that it intends to leverage in summary judgment on Plaintiff's § 17200 claims and in support of its termination defense.

96.     The designated information falls outside the Protective Order's scope. The order was entered without good cause. The designations are procedurally void. The DiVincent declaration is

conclusory and never links its generic assertions to any specific designation. Apple's "product-related" category is not a recognized basis for confidentiality. Information about the harmful or invasive nature of an employer's practices is not a trade secret under Ruckelshaus. Apple's Pansy factor analysis is wrong on privacy, purpose, public health, and public importance. And Apple's attempt to bootstrap a discovery ruling into a merits adjudication should be rejected.

97.     Apple's motion to retain designations should be denied. Apple's motion to seal should be denied. Every challenged designation should be stripped. All provisionally sealed filings should be unsealed. Sanctions should be imposed. And the Court should state explicitly that its ruling is limited to discovery management and does not constitute a finding on trade secret status, NDA enforceability, the lawfulness of Apple's studies, or any other merits issue.

Respectfully submitted,

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 25 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik**, <br> *an individual*, <br><br> Plaintiff, <br><br> vs. <br><br> **Apple Inc.**, <br> *a corporation,* <br><br> Defendant. | **Case No.** <br><br> **3:23-CV-04597-EMC (KAW)** <br><br> **Plaintiff's Request for Judicial Notice in Support of Her Opposition to Apple's Motion to Retain Confidentiality Designations & Motion to Seal (Dkt. 304-305)** <br><br> **HEARING:** <br> **Location: Oakland (TBD)** <br> **Date: April 16 2026** <br> **Time: 1:30 PM** |

## PLAINTIFF′S REQUEST FOR JUDICIAL NOTICE in SUPPORT OF THE OPPOSITION TO DEFENDANT′S MOTION (Dkt. 294)

1. Plaintiff Ashley Gjovik respectfully files this request for Judicial Notice in support of her Opposition to Defendant Apple Inc.′s Opposition to Apple's Motion to Retain Confidentiality Designations & Motion to Seal (Dkt. 304-305).

2. Pursuant to Federal Rule of Evidence 201, Plaintiff Ashley M. Gjovik respectfully requests that this Court take judicial notice of the following public records and documents. Each document is either (a) a public record of a governmental body whose accuracy cannot reasonably be questioned, or (b) a record filed in a federal court or agency proceeding whose existence is not subject to reasonable dispute.

3. A court shall take judicial notice of a fact ″not subject to reasonable dispute″ because it is either ″generally known within the trial court′s territorial jurisdiction″ or ″can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.″ Fed. R. Evid. 201(b).

4. Courts routinely take judicial notice of federal agency records, federal court filings, government databases, and peer-reviewed publications for the limited purpose of establishing that the information was publicly available. *See Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (judicial notice of publicly available government records); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (judicial notice of court filings). The Court may take judicial notice on its own at any stage. Fed. R. Evid. 201(c)(1).

# PUBLIC WEBSITES & ARTICLES

## PUBLICLY REPORTED APPLE CODE NAMES

5. Attached hereto as Exhibit A is a true and correct printout of the Wikipedia page ″List of Apple codenames,″ as it existed on December 16, 2025 (the date of Plaintiff′s deposition), accessed via permanent revision URL: https://en.wikipedia.org/w/index.php?title=List_of_Apple_codenames&oldid=1327831038. This page lists every code name Apple designated in Plaintiff′s deposition transcript, including D22, D32, D4X, N104, Dalaman, Tigris, Yukon, Emet, and Azul. The letter ″N″ also appears as a prefix for iPod product identifiers. The relevant point is not that Wikipedia is authoritative on Apple′s product development, but that these code names were publicly accessible to anyone with an internet connection as of the deposition date — and therefore cannot constitute confidential information under PO § 3(a).

6. Attached hereto as Exhibit B are true and correct printouts of the following news articles

reporting Apple code names years before Plaintiff's deposition:

- WIRED, "How an iOS Developer Just Uncovered The Next iPhone," July 31, 2017, reporting that Apple itself released HomePod firmware containing the code name "D22."
- The Guardian, "The 'iPhone 8' will be able to tell when owner is looking at it, leak suggests," August 10, 2017, identifying Apple's then-unreleased iPhone by its internal code name "D22 iPhone."
- ZDNet, "Apple is planning a super-sized iPhone with a cheaper model, claims report," February 26, 2018, identifying code names "D33" and "D32" with associated hardware specifications.
- Forbes, "Apple's New iPhone Codenames And Major Features Confirmed," July 23, 2019, identifying code names "D42," "D43," and "N104" with associated model numbers.
- iMore, "iOS version code names," July 15, 2021, listing Emet, Tigris, Azul, and Yukon and noting that "once a version of iOS goes public, they're not hard to find."
- The Guardian, "Apple made Siri deflect questions on feminism, leaked papers reveal," September 6, 2019, identifying "Yukon" as the code name for iOS 13 and describing the same pattern of NDAs and speech suppression at issue in this case.

7. These articles establish that every code name Apple designated was publicly reported — in some cases by Apple itself — years before Plaintiff's deposition. Information in the public domain is excluded from the Protective Order under Section 3(a).

# BEDDIT: PUBLIC CONSUMER PRODUCT AND PUBLIC RESEARCH

8. Attached hereto as Exhibit C are true and correct printouts of:

- Wikipedia, "Beddit," as of December 18, 2025, documenting that Beddit was founded in 2006, sold at Apple Stores and on Amazon beginning 2016, and acquired by Apple in May 2017.
- CNET, "Apple buys Beddit, maker of sleep-tracking device," May 9, 2017.
- 9to5Mac, "Apple silently removes Beddit apps from iOS App Store," September 30, 2024.
- Apple Support Community, "Beddit App and Functionality," January 10, 2025, posted on Apple's own support forum by a consumer.

9. Attached hereto as Exhibit D are true and correct printouts of the following sources establishing that Apple's Beddit sleep study was publicly announced, publicly funded, and publicly conducted with 3,000 participants:

- UCLA Newsroom, "UCLA launches major mental health study to discover insights about depression," August 4, 2020, announcing the study as "sponsored by and in collaboration with Apple" and stating participants would receive "a Beddit sleep-monitoring device."
- UCLA Depression Grand Challenge, "Research Study: Digital Mental Health Study — Fact

Sheet," describing the study as "the largest of its kind today," identifying Apple as the "Funding Source," and confirming the study used "Beddit sleep-monitoring devices."

- UCLA Depression Grand Challenge, "Digital Mental Health Study completes data collection," April 30, 2024.
- CNBC, "Apple and UCLA kick off a three-year depression study," August 4, 2020.
- 9to5Mac, "Apple teams up with UCLA on mental health study using Apple Watch, iPhone, and Beddit sleep tracker," August 4, 2020.

10.     A brand name that Apple marketed, sold through its own retail channels, and used in a publicly announced study with 3,000 participants cannot be designated "confidential" under PO § 3(a).

## Apple's Testing Facilities and Methodologies

11.     Attached hereto as Exhibit E are true and correct printouts of the following articles in which Apple invited journalists into its testing facilities and publicly disclosed the methods, processes, and equipment it now claims are confidential:

- Fast Company, "Chambers of Super Silence: What's Inside Apple's $100 Million iPhone Radio Test Facility," July 16, 2010, reporting that Steve Jobs publicly presented Apple's anechoic chambers — foam-lined rooms where Apple tests wireless devices with employees holding iPhones "in a typical everyday manner."
- TechCrunch, "Inside Apple's Actual Distortion Field: Giant Chambers, Fake Heads, And Black Cloaks," July 17, 2010, describing a tour led by Phil Schiller, Bob Mansfield, and Greg Joswiak, including a chamber called "Stargate" where "a human sits on a raised chair in the center" of "a giant ring" that "slowly rotates around."
- EFTM, "Inside Apple's secret Audio Labs where the HomePod was created," February 7, 2018, where Phil Schiller personally conducted the tour and described rooms "built to simulate the average family home."
- CNET, "A Billion Pixels a Second: I Got a Rare Look Inside Apple's Secret iPhone 16 Camera Labs," December 30, 2024 — two weeks before Plaintiff's deposition — describing an iPhone on a rotating turntable in a foam-lined chamber.

12.     Attached hereto as Exhibit F are true and correct printouts of:

- Apple Newsroom, "Apple announces new accessibility features, including Eye Tracking," May 15, 2024, in which Tim Cook publicly promotes Eye Tracking for iPhone and iPad.
- Apple Support, "Control iPhone with the movement of your eyes," iPhone User Guide, describing the feature in detail.

13.     Apple's own senior executives have personally escorted journalists through these facilities and described the foam-lined chambers, rotating test platforms (spinning chairs), and the process of testing devices (prototypes) with human subjects (studies). Apple markets the finished products while claiming the fact that it tested that they work prior to selling them as a trade secret.

# REGULATORY FILINGS AND POSTINGS

14. Attached hereto as Exhibit F is a true and correct printout of a portion of Apple's public facing website regarding the NLRB settlement with the Plaintiff and Apple rescission of its prior definition of proprietary and confidential information which it seeks to enforce here. I further request the Court take judicial notice of these public documents on Apple's own "Legal" website regarding its legal obligations regarding assertions of confidentiality related to work conditions and labor organizing/complaints.

15. Attached hereto as Exhibit G is Apple's most recent 10-K filing. Plaintiff requests the Court take judicial notice under Federal Rule of Evidence 201(b)(2) of Apple Inc.'s Annual Report on Form 10-K for the fiscal year ended September 27, 2025, filed with the U.S. Securities and Exchange Commission on October 31, 2025, SEC File No. 001-36743, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0000320193/000032019325000079/aapl-20250927.htm. Courts routinely take judicial notice of SEC filings as public records whose accuracy cannot reasonably be questioned. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *In re Cree, Inc. Sec. Litig.*, 219 F.R.D. 369, 372 (M.D.N.C. 2003); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

16. The following passages from Apple's 10-K are relevant to the pending motion:

- Apple states that its "global operations are subject to complex and changing laws and regulations worldwide on subjects including antitrust; privacy, data security and data localization; consumer protection; labor and employment; and environmental, health and safety" and that "compliance with these laws and regulations is onerous and expensive" and "can adversely affect the Company's business by increasing the Company's costs, limiting the Company's ability to offer a product, service or feature to customers." (Item 1A, Risk Factors). This is relevant because Apple's own disclosure to the SEC establishes that compliance with privacy and labor regulations is costly — supporting Plaintiff's argument that Apple's claimed "competitive harm" from disclosure is actually the cost of losing the advantage of noncompliance.

- Apple states it is "subject to specific obligations relating to the collection and processing of data associated with minors, as well as information considered sensitive under applicable laws, such as health, biometric, financial and payment card data" and that "health, biometric, financial and payment card data are subject to additional privacy, security and breach notification requirements, and the Company is subject to audit by governmental authorities regarding the Company's compliance with these obligations. If the Company fails to adequately comply with these rules and requirements, the Company can be subject to litigation or government investigations, can be liable for associated investigatory expenses,

and can incur significant fees or fines." (Item 1A). This is relevant because Apple tells the SEC that failure to comply with biometric data regulations leads to litigation — and this case is that litigation. Apple cannot designate as confidential the evidence of the noncompliance Apple itself warns its shareholders about.

- Apple states: "The Company makes statements about its use and disclosure of personal data through its privacy policy, information provided on its website, press statements and other privacy notices provided to customers. Any failure or perceived failure by the Company to comply with these public statements or with federal, state or international privacy or data protection laws and regulations could result in inquiries, proceedings and penalties from governmental entities or others." (Item 1A). This is relevant because Apple markets itself as the privacy company, while the operative complaint alleges that marketing is false. Apple's own 10-K acknowledges that if these allegations are true, they create legal liability. The "harm" Apple fears from disclosure is reputational and legal — not competitive — and reputational harm is categorically insufficient to support confidentiality. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).

- Apple states: "The technology industry, including, in some instances, the Company, is subject to intense media, political and regulatory scrutiny, which exposes the Company to increasing regulation, government investigations, legal actions and penalties." (Item 1A). This is relevant because Apple told this Court that "this case does not involve important public issues" (Dkt. 304 at 8, Factor 7). Apple told the SEC the opposite — that its legal proceedings involve "intense" public scrutiny. Apple cannot take contradictory positions depending on the audience.

- Apple states: "If such investigations or litigation are resolved against the Company, the Company can be exposed to significant fines and may be required to make further changes to its business practices." (Item 1A). This is relevant because Apple's own description of the "harm" it fears is not competitive injury from trade secret disclosure — it is being forced to change its business practices. That is accountability, not competitive harm, and it is not protectable under Rule 26(c).

# LAWSUITS

17.     Plaintiff requests the Court take judicial notice under Federal Rule of Evidence 201(b)(2) of the following publicly filed court documents, not for the truth of the allegations contained therein, but for the fact that they were filed, that the allegations were made, and that the proceedings are pending. Courts routinely take judicial notice of court filings in related proceedings. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

18.     Attached hereto as Exhibit H is a true and correct copy of the Second Amended PAGA

Complaint filed in *Bhakta v. Apple, Inc.*, Case No. 24CV453028 (Santa Clara County Superior Court), filed November 13, 2025. In *Bhakta*, a current Apple employee brought a Private Attorneys General Act action on behalf of himself, aggrieved employees, and the State of California, alleging that Apple's confidentiality policies unlawfully suppress employee speech in violation of California Labor Code §§ 232, 232.5, 1101, 1102, 1102.5, 1197.5(k), and 432.5; that Apple compels employees to install surveillance software on personal devices providing Apple access to personal data including health information and location data, in violation of Labor Code § 450; and that Apple enforces these policies through forfeiture of vested compensation, in violation of Labor Code §§ 221 and 206.5.

19.     The *Bhakta* complaint describes Apple's confidentiality ecosystem as a "prison yard" and a "panopticon where employees, both on and off duty, are ever subject to Apple's all-seeing eye." (Bhakta SAC ¶ 19). Apple's motion to strike the Second Amended Complaint was denied on March 2, 2026. (Dkt. entry, March 2, 2026: "Def's second m[otion to] Strike — DENIED in [part] / GRANTED without [leave to] amend in part"). Apple filed its Answer on March 9, 2026. The case is active with a further case management conference scheduled for September 3, 2026.

20.     This filing is relevant because the confidentiality and surveillance practices challenged in Bhakta are the same practices Apple deploys in this case through its Protective Order designations. Apple's IPA — the same agreement Apple cites in this case as the basis for its designations — is the agreement Bhakta alleges violates California law. Apple's designation of Plaintiff's testimony about workplace conditions as "Confidential" is the exact conduct Bhakta alleges constitutes unlawful speech suppression. A California court has now permitted those claims to proceed against Apple. Apple cannot simultaneously defend its confidentiality policies as lawful in this Court while those same policies are the subject of active PAGA litigation in state court — litigation in which Apple's motion to strike was largely denied.

21.     Plaintiff requests the Court take judicial notice under Federal Rule of Evidence 201(b)(2) of the following documents filed on the docket in this action. A court may take judicial notice of its own records. *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980); *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007).

22.     Attached hereto as Exhibit I are pages 44–45 of the Fifth Amended Complaint (Dkt. 142), filed November 26, 2024, which alleges Count One: Wrongful Discharge in Violation of Public Policy based on Illegal Data Harvesting in violation of the California Constitution Article I, Section 1 and the FTC Act. These pages specifically allege that Apple conducted invasive biometric data collection on employees — including the reproductive health studies, Gobbler facial mapping, ear scanning, and sleep monitoring

studies at issue in the designations Apple seeks to retain — without adequate consent, in violation of employees′ constitutional privacy rights, and in a manner that constitutes an unfair business practice. Apple′s designation of Plaintiff′s testimony about these same studies as ″Confidential″ seeks to suppress the evidence underlying this cause of action. Information that forms the factual basis of a pending claim in this litigation cannot be suppressed through a protective order designation.

23.     Attached hereto as Exhibit J are pages 57–61 of the Fourth Amended Complaint (Dkt. 76), filed June 18, 2024, which alleges Count Nine: Violation of California′s Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. These pages allege that Apple′s workplace study practices — including the use of employees as test subjects under secrecy oaths, the coercive participation framework, and the absence of independent oversight — constitute unlawful, unfair, and fraudulent business practices. The designated testimony directly describes the conduct alleged in this cause of action. Apple asks this Court to designate as ″confidential″ the employee′s account of the very practices that § 17200 exists to expose and enjoin.

24.     Attached hereto as Exhibit K are pages 33–35 of the Third Amended Complaint (Dkt. 47), filed February 27, 2024, which alleges the RICO claim′s relatedness, pattern, and scheme elements. These pages allege a three-pronged scheme: (a) Apple refrains from regulatory compliance to reduce costs; (b) Apple promotes a false public reputation of compliance; and (c) Apple bridges the gap through witness intimidation, retaliation, and overbroad NDAs to conceal its actual practices. Apple′s conduct in this designation dispute — designating the employee′s complaints as confidential, seeking contempt for public discussion of those complaints, and filing motions to seal — is the scheme in operation. The Protective Order is being used as the instrument of concealment the RICO claims describe. Granting Apple′s motion would advance, not prevent, the alleged scheme.

25.     These filings are relevant because they establish that the information Apple designated as ″Confidential″ is the same information that forms the factual basis of Plaintiff′s pending causes of action. Apple cannot designate as its confidential business information the evidence of the very conduct Plaintiff alleges is unlawful. Apple′s designation converts the evidence in this case into Apple′s property — which is the precise claim this lawsuit challenges.

# PENDING REQUESTS FOR JUDICIAL NOTICE AT DKT. 307

26.     Plaintiff also incorporates her pending Request for Judicial Notice at Dkt. 307-2

("Opposition to Defendant Apple Inc.'s Motion to Enforce Protective Order") for the following:

- **NLRB Settlement Agreement**, Case No. 32-CA-284428, April 3, 2025. A public record of a federal administrative agency, filed in this litigation as Dkt. 194. Judicial notice is appropriate for NLRB settlement agreements as official agency records. *See* Pl.'s Decl., ex. N and Dkt. 220-4 ("Notice to Employees").

- **ClinicalTrials.gov Registration**, NCT04196595. A public federal government database maintained by the National Institutes of Health, U.S. Department of Health and Human Services. *See* Exhibit J to Gjovik Declaration. The accuracy of federal government databases cannot reasonably be questioned. *See United States ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362 (C.D. Cal. 2014).

- **OSTP Public Comment**, OSTP_FRDOC_0001-0008, submitted in a public federal rulemaking proceeding and publicly accessible on regulations.gov. *See* Pl.'s Decl., ex. L.

- **GAO Report GAO-24-107639**, published by the U.S. Government Accountability Office. GAO reports are public records of a government body whose accuracy cannot reasonably be questioned. *See* Pl.'s Decl., ex. M.

- **OHRP Complaint No. 00709517**, filed March 11, 2026 with the Office for Human Research Protections, U.S. Department of Health and Human Services, concerning Apple's federally registered study NCT04196595. *See* Pl.'s Decl., ex. O.

- **BFDI and CNIL complaints**, filed in 2022 to privacy regulators in Germany and France and confirmation of receipt of complaint. See Declaration Exhibit Q.

- **Thomas Le Bonniec Declaration,** filed in this action at Dkt. 307-1, pages 200–205, Mr. Le Bonniec is a former worker at GlobeTech, an Apple subcontractor in Cork, Ireland, who was assigned to listen to thousands of audio recordings of the public captured by Apple's devices worldwide through Apple's "CrowdCollect" platform. Le Bonniec attests that he witnessed recordings of individuals' private conversations — including political opinions, children's conversations, private health information, and sexual content — all processed on Apple's hardware, through Apple's VPN, and on Apple's platform. (Le Bonniec Decl. ¶¶ 7–10). Le Bonniec further attests that Apple's subcontractor required workers to sign NDAs that Le Bonniec believed were "intimidating and too restrictive" and implied workers "could not communicate with law enforcement agencies about what [they] witnessed" without risk of retaliation. (Le Bonniec Decl. ¶ 14). Managers told workers "to not tell anyone about our work, even our family or friends, and

they said, especially journalists." (Le Bonniec Decl. ¶ 11). Le Bonniec states he has "publicly stated that these NDAs have a chilling effect and I believe they are intended to intimidate workers who are witnesses of potentially unlawful conduct by Apple." (Le Bonniec Decl. ¶ 15). On February 14, 2025, based on Le Bonniec's testimony and evidence, the Human Rights League in France filed a criminal complaint for these privacy violations. (Le Bonniec Decl. ¶ 17). The Le Bonniec declaration is relevant to this opposition because it provides independent corroboration — from a different country, a different Apple operation, and a different witness — of the identical pattern alleged in Plaintiff's complaints and at issue in this designation dispute: Apple conducts invasive data collection practices, requires workers to sign overbroad NDAs, uses those NDAs to suppress complaints about the practices, and retaliates against or intimidates workers who speak out. Apple's confidentiality designations in this case are the same suppression mechanism Le Bonniec describes. Apple designated Plaintiff's testimony about workplace studies as "Confidential" under the same IPA framework that Le Bonniec identifies as intimidating and unlawfully restrictive — and that Apple agreed to revise in the April 2025 NLRB settlement. The Le Bonniec declaration demonstrates that Apple's conduct is not an isolated discovery dispute but part of a global pattern of using confidentiality instruments to conceal workplace practices from scrutiny.

- ***Academic article on "studies,"*** *Mahalingaiah, Shruthi et al. "Design and methods of the Apple Women's Health Study: a digital longitudinal cohort study." American journal of obstetrics and gynecology vol. 226,4 (2022): 545.e1-545.e29. doi:10.1016/j.ajog.2021.09.041,.* This peer-reviewed journal article, authored by Apple-affiliated researchers and published in an indexed medical journal, is offered for the limited purpose of establishing that the methodology of Apple's employee ovulation study — the subject of Apple's confidentiality designations — was publicly disclosed by Apple itself in the scientific literature prior to this litigation and prior to the December 2025 deposition. Judicial notice of peer-reviewed publications is appropriate for the limited purpose of establishing that information was publicly available. *See Gerritsen v. Warner Bros. Entertainment Inc.*, 112 F. Supp. 3d 1011 (C.D. Cal. 2015). *See* Pl.'s Decl., ex. I.

## CONCLUSION

27. Plaintiff requests judicial notice of these records solely to establish that the content Apple designated as confidential was publicly available before the deposition occurred; that the subject matter has been part of the public adjudicatory record for years; that Apple's own disclosures in peer-reviewed

literature and federal registrations cover the same subject matter; and that multiple federal agencies have acted upon Plaintiff's public complaints about the same conduct. Plaintiff does not request that the Court accept the truth of all assertions in every document — only that the Court recognize each document's existence and public availability. For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Request for Judicial Notice.

Respectfully submitted,

/s/ **Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 25 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# EXHIBIT A: WIKIPEDIA

Case 3:23-cv-04597-EMC Document 32 Filed 03/30/26 Page 12 of 19



**WIKIPEDIA**
25 years of the free encyclopedia

# List of Apple codenames

> ⚠️ **This is an** old revision **of this page, as edited by** Briskola (talk | contribs) **at 09:36, 16 December 2025** (→MacBook Pro).
> **The present address (URL) is a** permanent link **to this revision, which may differ significantly from the** current revision.

This **list of Apple codenames** covers the codenames given to products by Apple Inc. during development. The codenames are often used internally only, normally to maintain the secrecy of the project. Occasionally a codename may become the released product's name. Most of Apple's codenames from the 1980s and 1990s are provided by the book *Apple Confidential 2.0*.[1]

## Accessories

- AirTag – *B389, Durian*[2][3]
- AirPods (1st generation) – *B188*
- AirPods (2nd generation) – *B288*
- AirPods Pro – *B298*[4]
- AirPods Pro 3 – *B788*
- AirPods Max – *B515*[5]
- AirPort Base Station (1999) – *Pogo*
- AirPort Express 802.11n (5th generation) – *K31*[6]
- Apple IIe Card for the Macintosh LC – *Double Exposure*
- Apple II 3.5" Disk Controller Card – *NuMustang*
- Apple Color OneScanner 600/27 – *Rio*
- Apple Color OneScanner 1200/30 – *New Orleans*
- Beats Flex – *B372*
- HomePod – *B238*
- HomePod Mini – *B520*
- Built-in iSight (2005) – *M33*
- External iSight (2003) – *Q8*
- Lightning Digital AV Adapter – *Haywire*
- Magic Trackpad 2 – *D67*[7]
- MagSafe (wireless charger) – *B390*
- AirPort Time Capsule – *Wilma, M52*

## Apple TV

- Apple TV – *iTV*[8]
- Apple TV (2nd generation) – *K66*[9]
- Apple TV (3rd generation) – *J33*[10]
- Apple TV (4th generation) – *J42*[11]
- Apple TV 4K – *J105*[12]
- Apple TV 4K (2nd generation) – J305[13]

## Apple Watch

- Apple Watch – *Gizmo*,[14] *N27* and *N28*
- MicroLED screen – *W*[15]

## Computers

### Apple

- Apple IIGS – *Cortland*
- Apple IIgs ROM 3 – *Tenspeed*

In chronological order:

## Macintosh

The first Macintosh was released in 1984:

- Macintosh 128K – *Macintosh*
- Macintosh 512k, 512ke – *Fat Mac*[16]
- Macintosh XL – *Lisa*
- Macintosh Plus – *Mr. T*
- Macintosh SE simulation – *Aladdin*
- Macintosh SE FDHD – *Aladdin*
- Macintosh SE FDHD – *Chablis*
- Macintosh SE/30 – *Fafnir*
- Macintosh SE – *Freeport*
- Macintosh SE FDHD – *Freeport*
- Macintosh SE/30 – *Green Jade*
- Macintosh SE – *Maui*
- Macintosh SE FDHD – *Maui*
- Macintosh SE – *PlusPlus*
- Macintosh SE FDHD – *PlusPlus*
- Macintosh II – *Becks*
- Macintosh II – *Cabernet*
- Macintosh II – *Ikki*
- Macintosh II – *Little Big Mac*
- Macintosh II – *Milwaukee*
- Macintosh II – *Paris*
- Macintosh II – *Reno*
- Macintosh II – *Uzi*
- Macintosh IIcx – *Atlantic*
- Macintosh IIcx – *Aurora*
- Macintosh IIcx – *Cobra*
- Macintosh IIci – *Aurora II*
- Macintosh IIci – *Cobra II*
- Macintosh IIci – *Pacific*
- Macintosh IIci – *Stingray*
- Macintosh IIfx – *Weed Whacker*
- Macintosh IIfx – *Zone 5*
- Macintosh IIfx – *Blackbird*
- Macintosh IIfx – *Four Square*
- Macintosh IIfx – *F-16*
- Macintosh IIfx – *F-19*
- Macintosh IIfx – *IIxi*
- Macintosh IIfx – *Stealth*
- Macintosh IIsi – *Erickson*
- Macintosh IIsi – *Oceanic*
- Macintosh IIsi – *Raffica*
- Macintosh IIsi – *Ray Ban*
- Macintosh IIvi – *Brazil 32c*
- Macintosh IIvx – *Brazil 16c*
- Macintosh IIx – *Spock*
- Macintosh IIx – *Stratos*
- Macintosh Portable – *Espirit*
- Macintosh Portable – *Laguna*
- Macintosh Portable – *Malibu*
- Macintosh LC – *Elsie*
- Macintosh LC – *Pinball*
- Macintosh LC – *Prism*
- Macintosh LC 580 – *Dragonkid*
- Macintosh LC III – *Elsie III*
- Macintosh LC II – *Foster Farms*
- Macintosh LC 520 – *Hook*
- Macintosh LC 550 – *Hook 33*
- Macintosh LC 575 – *Optimus*
- Macintosh LC III – *Vail*
- Macintosh Classic II – *Apollo*
- Macintosh Classic – *Civic*

- Macintosh Classic II – *Montana*
- Macintosh Color Classic – *Slice*
- Macintosh Classic – *XO*
- Macintosh Quadra 605 – *Aladdin*
- Macintosh Quadra 605 – *Primus*
- Macintosh Quadra 610 – *Speedbump 610*
- Macintosh Quadra 630 – *Crusader*
- Macintosh Quadra 630 – *Show Biz*
- Macintosh Quadra 630 – *Show & Tell*
- Macintosh Quadra 650 – *Speedbump 650*
- Macintosh Quadra 660AV – *Tempest*
- Macintosh Quadra 700 – *Evo 200*
- Macintosh Quadra 700 – *IIce*
- Macintosh Quadra 700 – *Shadow*
- Macintosh Quadra 700 – *Spike*
- Macintosh Quadra 800 – *Fridge*
- Macintosh Quadra 800 – *Wombat 33*
- Macintosh Quadra 840AV – *Typhoon*
- Macintosh Quadra 840AV – *Quadra 1000*
- Macintosh Quadra 840AV – *Cyclone*
- Macintosh Quadra 900 – *Darwin*
- Macintosh Quadra 900 – *Eclipse*
- Macintosh Quadra 900 – *IIex*
- Macintosh Quadra 900 – *Premise 500*
- Macintosh Quadra 950 – *Amazon*
- Macintosh Quadra 950 – *Zydeco*
- Macintosh TV – *LD50*, *Peter Pan*
- Twentieth Anniversary Macintosh – *Pomona*
- Twentieth Anniversary Macintosh – *Smoke and Mirrors*
- Twentieth Anniversary Macintosh – *Spartacus*

### eMac

The first eMac was released in 2002

- eMac (ATI Graphics) – *Northern Lights*
- eMac – *P69*
- eMac (2005) – *Q86J*

### iBook

The first iBook was released in 1999.

- iBook (FireWire) – *P1.5*
- iBook (32 MB VRAM) – *P72B*
- iBook (800/900 MHz 32 MB VRAM) – *P73D*
- iBook – *Bismol*
- iBook – *Lanai*
- iBook G3 (Dual USB) – *Marble*
- iBook – *P1*
- iBook (14.1 LCD) – *Son of Pismo*
- iBook (Dual USB) – *P29*
- iBook (14.1 LCD) – *P54*
- iBook (Opaque 16 MB VRAM) – *P72B*
- iBook (late 2001) – *P92*
- iBook G4 (early 2004) – *Q72*
- iBook G4 (mid-2005) – *Q72B*
- iBook G4 (early 2004) – *Q73*
- iBook G4 (mid-2005) – *Q73B*

### iMac

The first iMac was released in 1998.

- iMac G3 (Bondi Blue)[17] – *Mac Man* and *Columbus*
- iMac G3 (Bondi Blue) – *C1*

- iMac G3 (Bondi Blue) – *Elroy*
- iMac G3 (Bondi Blue) – *Tailgate*
- iMac G3 (5 Flavors) – *Life Savers*
- iMac G3, iMac DV, iMac DV+, iMac DV SE – *Kihei, P7*
- iMac G3 (summer 2001) – *Kiva*
- iMac G4 (USB 2.0; 15-inch & 17-inch) – *Horizon, Q26B, Q26C*
- iMac G4 (17-inch Flat Panel) – *P79*
- iMac G4 (flat panel) – *Tessera, P80*
- iMac G5 (17-inch, 20-inch) – *Hero*
- iMac G5 (20-inch) – *Fino, M23*
- iMac G5 (Ambient Light Sensor) 17-inch *Q45C*
- iMac G5 (Ambient Light Sensor) 20-inch *Q45D*
- iMac G5 iSight (17-, 20-inch) – *Q87*
- iMac (21.5-inch, Late 2012)[6] - *J30*
- iMac (27-inch, Late 2012)[6] - *J31*
- iMac (24-inch, 2x USB-C, M1, 2021) - J457
- iMac (24-inch, 4x USB-C, M1, 2021) - J456
- iMac (24-inch, 2x USB-C, M3, 2023) - J433
- iMac (24-inch, 4x USB-C, M3, 2023) - J434
- iMac (24-inch, 2x USB-C, M4, 2024) - J623
- iMac (24-inch, 4x USB-C, M4, 2024) - J624

## Mac mini

The first Mac mini was in 2005.

- Mac mini (early 2006) – *Kaleidoscope*
- Mac mini – *Twiggy, Q88*
- Mac mini (M1, 2020) – *J274*
- Mac mini (M2, 2022) – *J473*[18]
- Mac mini (M2, 2023) – *J474*[18]
- Mac mini (M4, 2024) – *J773*

## Mac Pro

- Mac Pro (Mid-2012) & Mac Pro Server (Mid-2012)[19] *K5B*
- Mac Pro (2013)[20] *J90*
- Mac Pro (2023) – *J180*[18]

## Mac Studio

- Mac Studio (M1, 2022) - J375
- Mac Studio (M2, 2023) - J475

## MacBook

- MacBook (12-inch) – *Stealth*
- MacBook (Early-2006) – *M42*

## MacBook Air

- MacBook Air (11-inch, Mid-2012)[6] *J11*
- MacBook Air (13-inch, Mid-2012)[6] *J13*
- MacBook Air (11-inch, Mid-2013) – *J41*
- MacBook Air (M1, 2020) – *J313*
- MacBook Air (14-inch, M2, 2022) – *J413*[18]
- MacBook Air (15-inch, M2, 2023) – *J415*
- MacBook Air (13-inch, M3, 2024) – *J613*
- MacBook Air (15-inch, M3, 2024) – *J615*
- MacBook Air (13-inch, M4, 2025) – *J713*
- MacBook Air (15-inch, M4, 2025) – *J715*

## MacBook Pro

- MacBook Pro 13" – J52[21]

- MacBook Pro 13" – *J130*
- MacBook Pro (13-inch, Early 2011) – *K90I*
- MacBook Pro (15-inch, Early 2011) – *K91*
- MacBook Pro (17-inch, Early 2011) – *K92*
- MacBook Pro (13-inch, Late 2011) – *K90IA*[22]
- MacBook Pro (15-inch, Late 2011) – *K91A*[22]
- MacBook Pro (17-inch, Late 2011) – *K92A*[22]
- 13-inch MacBook Pro with Retina Display- *D1*[23]
- 15-inch MacBook Pro with Retina Display – *D2*[23][6]
- MacBook Pro (Retina, 13-inch, Early 2013) – *J44*[24]
- MacBook Pro (Retina, 15-inch, Early 2013) – *J45*[25]
- MacBook Pro (Retina, 15-inch, Mid 2015) – *J53*
- MacBook Pro (13-inch, M1, 2020) – *J293*
- MacBook Pro (14-inch, M1 Pro/Max, 2021) – *J314*
- MacBook Pro (16-inch, M1 Pro/Max, 2021) – *J316*
- MacBook Pro (13-inch, M2, 2022) – *J493*[18]
- MacBook Pro (14-inch, M2 Pro/Max, 2022) – *J414*[18]
- MacBook Pro (16-inch, M2 Pro/Max, 2022) – *J416*[18]
- MacBook Pro (14-inch, M3, 2023) – *J504*
- MacBook Pro (14-inch, M3 Pro/Max, 2023) – *J514*
- MacBook Pro (16-inch, M3 Pro/Max, 2023) – *J516*
- MacBook Pro (14-inch, M4, 2024) – *J604*
- MacBook Pro (14-inch, M4 Pro/Max, 2024) – *J614*
- MacBook Pro (16-inch, M4 Pro/Max, 2024) – *J616*

**PowerBook**

- PowerBook 100 – *Asahi*
- PowerBook 100 – *Derringer*
- PowerBook 100 – *Rosebud*
- PowerBook 100 – *Sapporo*
- PowerBook 145 – *Colt 45*
- PowerBook 145B – *Colt 45*
- PowerBook 140 – *Tim Lite*
- PowerBook 170 – *Tim*
- PowerBook 170 – *Road Warrior*
- PowerBook 160 – *Brooks*
- PowerBook 165 – *Dart LC*
- PowerBook 180 – *Converse*
- PowerBook 180 – *Dartanian*
- PowerBook 165c – *Monet*
- PowerBook 180c – *Hokusai*
- PowerBook 150 – *Jedi*
- PowerBook 190 – *Omega*
- PowerBook 190cs – *Omega*
- PowerBook 540, 540c, 550c, 500 with PowerPC – *Blackbird*
- PowerBook 520, 520c, 550c, 500 with PowerPC- *Blackbird LC*
- PowerBook 540/540c – *Spruce Goose*
- PowerBook 540, 540c, 550c, 500 with PowerPC – *SR-71*
- PowerBook 1400c, 1400cs – *Epic*
- PowerBook 2400c/180 – *Comet*
- PowerBook 2400c/240 – *Mighty Cat*
- PowerBook 2400c – *Nautilus*
- PowerBook 3400c[26] *Hooper*
- PowerBook 5300 Series *Mustang*
- PowerBook 5300 – *M2*
- PowerBook Duo 210, 230- *BOB W (Best of Both Worlds)*
- PowerBook Duo 210, 230 – *Cinnamon*
- PowerBook Duo 210, 230 – *DBLite*
- PowerBook Duo 250 – *Ansel*
- PowerBook Duo 270c – *Escher*
- PowerBook Duo 280/280c – *Yeager*
- PowerBook Duo 2300c/100 – *AJ*

Case 25-12396-JKS   Doc 765   Filed 03/30/26   Entered 03/30/26 10:44:49   Desc Main

- PowerBook Duo Dock/Plus/II – *Gemini*
- PowerBook G3 (1997) – *PowerBook 3500*
- PowerBook G3 (1997) – *Kanga*
- PowerBook G3 (May 1998) – *Mainstreet*
- PowerBook G3 (May 1998) – *Wallstreet*
- PowerBook G3 (August 1998) – *PDQ*
- PowerBook G3 (Bronze Keyboard) – *101*
- PowerBook G3 (Bronze Keyboard) – *Lombard*
- PowerBook (FireWire) – *102*
- PowerBook (FireWire) – *P8*
- PowerBook (FireWire) – *Pismo*
- PowerBook G4 – *Mercury*
- PowerBook G4 – *103*
- PowerBook G4 (DVI) – *Ivory*
- PowerBook G4 (Gigabit Ethernet) – *Onyx*
- PowerBook G4 (Gigabit Ethernet) – *P25*
- PowerBook G4 Titanium (1 GHz/867 MHz) – *P88*
- PowerBook G4 (12-inch) – *P99*
- PowerBook G4 (15-inch FW800) – *Q16*
- PowerBook G4 (15-inch 1.5/1.33GHz) – *Q16A*
- PowerBook G4 (17-inch) – *Hammerhead*
- PowerBook G4 (17-inch 1.33GHz) – *Q41*
- PowerBook G4 (17-inch 1.5 GHz) – *Q41A*
- PowerBook G4 (12-inch DVI) – *Q54*
- PowerBook G4 (12-inch 1.33 GHz) – *Q54A*
- PowerBook G5 (EVT1) – *Q51*

**PowerMacintosh**

- Unreleased Hi-end Power Macintosh project (1996) – *Halo*
- Power Macintosh 4400, 150 MHz *Tanzania*
- Power Macintosh 4400, 160 MHz *Frosty*
- Power Macintosh 4400, 200 MHz *Cupid*
- Power Macintosh 5200/5300 LC – *Bongo*
- Power Macintosh 5200/5300 LC – *Rebound*
- Power Macintosh 5200/5300 LC – *Trailblazer*
- Power Macintosh 5200/5300 LC – *Transformer*
- Power Macintosh 5400 – *Chimera*
- Power Macintosh 5400 – *Excalibur*
- Power Macintosh 5500 – *Phoenix*
- Power Macintosh 6100 – *Piltdown Man*
- Power Macintosh 6200 – *Crusader*
- Power Macintosh 6300 – *Elixir*
- Power Macintosh 6400 – *Hacksaw*
- Power Macintosh 6400 – *InstaTower*
- Power Macintosh 6500 – *Gazelle*
- Power Macintosh 7100 – *Carl Sagan*
- Power Macintosh 7100 – *BHA (Butt-Head Astronomer)*
- Power Macintosh 7100 – *LAW (Lawyers Are Wimps)*
- Power Macintosh 7200 – *Catalyst*
- Power Macintosh 7300 – *Montana*
- Power Macintosh 7500 – *TNT*
- Power Macintosh 7600 – *Montana 7600*
- Power Macintosh 8100 – *Cold Fusion*
- Power Macintosh 8100 – *Flagship*
- Power Macintosh 8500 – *Nitro*
- Power Macintosh 8600 – *Kansas*
- Power Macintosh 9600 – *Kansas*
- Power Macintosh 9500 – *Autobahn*
- Power Macintosh 9500 – *Tsunami*
- Power Macintosh 9700 Prototype *PowerExpress*
- Power Macintosh G3 All-in-One – *Artemis*
- Power Macintosh G3 Beige logic board *Gossamer*
- Power Macintosh G3 (Blue & White) enclosure – *El Capitan*

- Unreleased Hi-end Power Macintosh enclosure, prototype of *El Capitan*. *Stumpy*
- Power Macintosh G3 (Blue & White) – *Silk*
- Power Macintosh G3 (Blue & White) logic board; *Yosemite 1.5* was the revision 2 board *Yosemite*


**PowerMac**

- Power Mac G4 (Digital Audio) – *Clockwork*
- Power Mac G4 (Digital Audio) – *Tangent*
- Power Mac G4 (Gigabit Ethernet) – *Medusa2*
- Power Mac G4 (Gigabit Ethernet) – *Mystic*
- Power Mac G4 (Gigabit Ethernet) – *SnakeBite*
- Power Mac G4 (Quicksilver) – *Nichrome*
- Power Mac G4 (Quicksilver) – *Titan*
- Power Mac G4 (AGP Graphics) – *Sawtooth*
- Power Mac G4 (AGP Graphics) – *Project E*
- Power Mac G4 (AGP Graphics) – *P5*
- Power Mac G4 (PCI Graphics) logic board – *Yikes!*
- Power Mac G4 (Mirrored Drive Doors) – *P57*
- Power Mac G4 (FW 800) – *P58*
- Power Mac G4 Cube – *Rubicon*
- Power Mac G4 Cube – *Trinity*
- Power Mac G4 Cube – *P9*
- Power Mac G5 – *Q37*
- Power Mac G5 – *Omega*
- Power Mac G5 (June 2004) – *Q77*, *Q78*
- Power Mac G5 (late 2005) – *Cypher*

**Networking**

- Apple Internet Communication Kit — *Cyberpup* (referencing Cyberdog)[27]
- Data Modem 2400 — *Funnelweb* (referencing Funnel-web spider)[27]
- eWorld 1.0 — *Aladdin*[27]
- eWorld 1.1 — *Golden Gate*[27]
- ISDN NuBus card — CarCraft[27]
- MacTCP — *Verduras* (Spanish for *vegetables*)[27]
- MacTerminal 2.0 — SuperPrawn[27]
- MacTerminal II — Killer Bees[27]
- PPP 1.0 — *Paris*[27]


# iPad

- iPad (3rd generation) (Wi-Fi)[28] – *J1*
- iPad (3rd generation) (Wi-Fi + Cellular) – *J2*
- iPad Air[29] – *J72*
- iPad Air 2 – *J82*
- iPad mini with Retina display[29] – *J85*
- iPad mini 4 – *J96*
- iPad Pro[30] – *J98* and *J99*
- iPad (1st generation)[10][31][32] – *K48*
- iPad 2 (Wi-Fi) – *K93*
- iPad 2 (Wi-Fi + GSM) – *K94*
- iPad 2 (Wi-Fi + CDMA)[10] – *K95*
- iPad (fourth generation) (Wi-Fi) – *P101*
- iPad (fourth generation) (Wi-Fi + Cellular International) – *P103*
- iPad mini (1st generation) (Wi-Fi) – *P105*
- iPad mini (1st generation) (Wi-Fi + Cellular International) – *P107*


# iPhone

- iPhone (first generation) – *M68* and *Purple* or *Purple 2*[33][34][35][36]
- iPhone 3G – *N82*
- iPhone 3GS – *N88*
- iPhone 4 – *N90*

- iPhone 4 (CDMA) – *N92*[37]
- iPhone 4S – *N94*[10]
- iPhone 5 – *N41* and *N42*[38][39]
- iPhone 5C – *N48*[40]
- Touch ID – *Mesa*
- iPhone 5S – *N51* and *N53*[41]
- iPhone 6 – *N61*[40]
- iPhone 6 Plus – *N56*[40]
- iPhone SE (1st generation) – *N69*[42][43]
- iPhone 6S – *N71*[44]
- iPhone 6S Plus – *N66*[44]
- iPhone 7 – *D10*[45]
- iPhone 7 Plus – *D11*[45]
- iPhone 8 – *D20*[46]
- iPhone 8 Plus – *D21*[46]
- Face ID – *Pearl*
- iPhone X – *D22* and *Ferrari*[46][45]
- iPhone XR – *N84* and *Star* or *Lisbon* or *Hangzhou*[47]
- iPhone XS – *D32*[47]
- iPhone XS Max – *D33*[47]
- iPhone 11 – *N104*[48]
- iPhone 11 Pro – *D42*[48]
- iPhone 11 Pro Max – *D43*[48]
- iPhone 12 mini – *D52G*[49]
- iPhone 12 – *D53G*[49]
- iPhone 12 Pro – *D52P*[49]
- iPhone 12 Pro Max – *D52P*[49]
- iPhone SE (2nd generation) – *D79*
- iPhone 13 mini – *D16*[50]
- iPhone 13 – *D17*[50]
- iPhone 13 Pro – *D63*[50]
- iPhone 13 Pro Max – *D64*[50]
- iPhone 14 – *D27*[51]
- iPhone 14 Plus – *D28*[51]
- iPhone 14 Pro – *D73*[51]
- iPhone 14 Pro Max – *D74*[51][52]
- iPhone 15 – *D37*[53]
- iPhone 15 Plus – *D38*[53]
- iPhone 15 Pro – *D83*[53]
- iPhone 15 Pro Max – *D84*[53]
- iPhone 16 – *D47*[54]
- iPhone 16 Plus – *D48*[54]
- iPhone 16 Pro – *D93*[54]
- iPhone 16 Pro Max – *D94*[54]
- iPhone 16e – *V59*[55]
- iPhone SE (3rd generation) – *D49*[56]
- iPhone SE (4th generation) – *D59* and *Ghost*[57]
- iPhone 17 *D57*[58]
- iPhone 17 Air-*D58*[59]
- iPhone 17 Pro-*D67*[60]
- iPhone 17 Pro Max-*D68*[61]

## iPod

- iPod – *Dulcimer*
- iPod Classic (5th generation) – *M25*
- iPod Touch (1st generation) – *N45*
- iPod Touch (2nd generation) – *N72*
- iPod Touch (3rd generation) – *N18*

- iPod Touch (4th generation) – *N81*
- iPod Touch (5th generation) – *N78* and *N78a*
- iPod Touch (6th generation) – *N102*[62]

## Other

- Apple Vision Pro – *N301*[63]
- Apple Vision Pro (2nd generation) – *N109* and *Project Alaska*[64]
- Apple Car – *Titan*[65]
- visionOS – *Borealis, Oak*[66][67]
- 2019 augmented reality prototypes – *Garta, Franc, Luck, T288*[68][69][70]
- Apple's aluminum unibody manufacturing process – *Brick*
- Apple facility including a regenerative thermal oxidizer to reduce pollution – *Magnolia*[65]
- Apple Santa Clara, California facilities (Project Titan, MicroLED,[71] iPhone Modularization)[72] – *Zeus, Medusa, Pegasus, Athena,* and *Aria*[73]
- Liquid Glass design language - *Solarium*

## Systems on chip & Processors

The internal codenames for the CPU cores of Apple silicon A series and M series chips are named after islands, with the cores named after wind and weather patterns.[74]

### A series

- Apple A6 and A6X – *Bali*, with *Swift* cores
- Apple A7 – *Alcatraz*, with *Cyclone* cores
- Apple A8 – *Fiji*, with *Typhoon* cores
- Apple A8X – *Capri*, with *Typhoon cores*
- Apple A9 – *Maui* (Samsung), *Malta* (TSMC), with *Twister* cores
- Apple A9X – *Elba*, with *Twister* cores
- Apple A10 Fusion – *Cayman,* with 2 *Hurricane* cores and 2 *Zephyr* cores
- Apple A10X Fusion – *Myst*, with 3 *Hurricane* cores and 3 *Zephyr* cores
- Apple A11 Bionic – *Skye*, with 2 *Monsoon* cores and 4 *Mistral* cores
- Apple A12 Bionic – *Cyprus*, with 2 *Vortex* cores and 4 *Tempest* cores
- Apple A12X and A12Z Bionic – Aruba, with 4 *Vortex* cores and 4 *Tempest* cores
- Apple A13 Bionic – *Cebu*, with 2 *Lightning* and 4 *Thunder* cores[75]
- Apple A14 Bionic – *Sicily*, with 2 *Firestorm* cores and 4 *Icestorm* cores[76][77]
- Apple A15 Bionic – *Ellis*, with 2 *Avalanche* cores and 4 *Blizzard* cores
- Apple A16 Bionic – *Crete*, with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A17 Pro – Coll,[78] with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A18 - Tupai, with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A18 Pro – Tahiti,[78] with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A19 - Tilos [79] with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple A19 Pro – Thera [79] with 2 *Everest* cores and 4 *Sawtooth* cores
- Apple silicon (Mac): *Kalamata*[80]

### M series

- Apple M1 – *Tonga*, *A14X*[81]
  - Apple M1 cores – *Icestorm* efficiency cores and *Firestorm* performance cores, with *Lifuka* GPU cores[76][77]
  - Apple M1 Pro – *Jade C-Chop*[82]
  - Apple M1 Max – *Jade C-Die*[82]
  - Apple M1 Ultra – *Jade 2C-Die*[83]
- Apple M2 – *Staten*[84]
  - Apple M2 cores – *Blizzard* efficiency cores and *Avalanche* performance cores
  - Apple M2 Pro – *Rhodes Chop*
  - Apple M2 Max – *Rhodes 1C*
  - Apple M2 Ultra – *Rhodes 2C*
- Apple M3 – *Ibiza* [85][86]
  - Apple M3 Pro – *Lobos*
  - Apple M3 Max – *Palma*

- Apple M4 – Donan[87]
  - Apple M4 Pro and Max – *Brava*
- Apple M5 – *Hidra* [79]
  - Apple M5 Pro – *Sotra* [79]

# Software

## Applications

- Apple Fitness+ – *Seymour*[88]
- AR app – *Gobi*[89]
- Mac App Store – *Firenze*[90]
- Apple Music – *Fuse*[91]
- iMessage – *Madrid*
- iTunes – *iMusic*[92][93]
- Safari (web browser) – *Alexander*[91]
- QuickTime – *Warhol*
- Spotlight – *Matador*[91]
- Swift Playgrounds – *Serenity*
- Walkie-Talkie – *Spartan*
- Reminders – *Tantor*

## Software Features

- Apple Music Sing – *Suntory*
- Apple Intelligence – *Greymatter*[94]
- Dynamic Island – *Jindo*[95]
- iTunes Music Store – *Jingle*

## AirPods Firmware

For use with AirPods

- Build 1A6XX – *Theremin*
- Build 2XXXX – *Harmonica*
- Build 3XXXX – *Harpsichord*
- Build 4XXXX – *Piccolo*

## audioOS

For use with HomePod

- audioOS 11.0.2 – *Cinar*
- audioOS 11.3 – *Emet*
- audioOS 11.4 – *Fatsa*
- audioOS 11.4.1 – *Gebze*
- audioOS 12.0–12.3 – *Peace*
- audioOS 13.2–13.3.1 – *Yukon*
- audioOS 13.4 – *Yager*
- audioOS 14 – *Archer*
- audioOS 15 – *Satellite*
- audioOS 15.1 – *Starlinks*

## Classic Mac OS

The classic Mac OS is often cited as having multiple codenames. The codename convention for Mac OS 8 and 9 mostly follow musical terminology.

- System 6.0.4 (1989) – *Antares*[96]
- System 6.0.5 (1990) – *Big Deal*[96]
- System 6.0.6 – *SixPack (never released due to AppleTalk bug)*[96]
- System 6.0.8 (1991) – *Terminator*[96]
- System 7 – *Blue, Big Bang, M80* (in reference to the M-80 firecrackers), *Pleiades*[96]

- System 7's Finder – *Furnishings 2000*[96]
- System 7's TuneUp — *7Up*[96]
- System 7.0.1 (1991) – *Road Warrior, Beta Cheese, Regatta*[96]
- System 7.1 (1992) – *Cube-E, I Tripoli* (in reference to IEEE standards)[96]
- System 7.1 Pro (1993) – *Jirocho*[97]
- Prototype of System 7.1 for x86 processors – *Star Trek*
- System 7.5 (PPC) (1994) – *Mozart, Capone* ("to strike fear in the heart of" Windows 95, codenamed Chicago)[97]
- System 7.5 Update 1.0 – *Danook* (from The Far Side)[97]
- System 7.5 Update 2.0 – *Thag* (from The Far Side)*, Zhag*[97]
- System 7.5.2 — *Marconi* (in reference to Guglielmo Marconi)[97]
- System 7.5.3 – *Unity* ("contains all patches and special software")[97]
- System 7.5.3 Revision 2 – *Buster* (Amelio's high school nickname)[97]
- System 7.5.5 – *Son of Buster* (picked for the "SOB" acronym)[97]
- System 7.6 – *Harmony*[97]
- System 7.6.1 – *Ides of Buster*[97]
- Mac OS 8 (failed project) – *Copland, Maxwell*
- Mac OS 8 (released) – *Tempo*[97]
- Mac OS 8.0 for CHRP: *Orient Express*[97]
- Mac OS 8.1 – *Bride of Buster*[97]
- Mac OS 8.5 – *Allegro, Scimitar*[97]
- Mac OS 8.5.1 – *Rick Ford Release, The*
- Mac OS 8.6 – *Veronica* (named after a relative of technical lead Brian Bechtel)[97]
- Mac OS 9.0 – *Gershwin, Sonata*[97]
- Mac OS 9.0.4 – *Minuet*[98]
- Mac OS 9.1 –*Fortissimo*[97]
- Mac OS 9.2 –*Moonlight*[97]
- Mac OS 9.2.1 –*Limelight*[97]
- Mac OS 9.2.2 –*LU1* (Limelight Update 1)[97]

## iOS

The codename convention for iOS are ski resorts.[91][19][99]

- iPhone OS 1.0 – *Alpine*
- iPhone OS 1.0.1–1.0.2 – *SUHeavenlyJuly*
- iPhone OS 1.1–1.1.1 – *Snowbird*
- iPhone OS 1.1.2 – *Oktoberfest*
- iPhone OS 1.1.3–1.1.5 – *Little Bear*
- iPhone OS 2.0–2.0.2 – *Big Bear*
- iPhone OS 2.1–2.1.1 – *Sugar Bowl*
- iPhone OS 2.2 – *Timberline*
- iPhone OS 2.2.1 – *SUTimberline*
- iPhone OS 3.0–3.0.1 – *Kirkwood*
- iPhone OS 3.1–3.1.2 – *Northstar*
- iPhone OS 3.1.3 – *SUNorthstarTwo*
- iPhone OS 3.2–3.2.2 – *Wildcat*
- iOS 4.0–4.0.2 – *Apex*
- iOS 4.1 – *Baker*
- iOS 4.2.1 – *Jasper*
- iOS 4.2.5–4.2.10 – *Phoenix*
- iOS 4.3–4.3.5 – *Durango*
- iOS 5.0–5.0.1 – *Telluride*
- iOS 5.1–5.1.1 – *Hoodoo*
- iOS 6.0–6.0.2 – *Sundance*
- iOS 6.1–6.1.2 – *Brighton*
- iOS 6.1.3–6.1.6 – *BrightonMaps*
- iOS 7.0–7.0.2 – *Innsbruck*
- iOS 7.0.3–7.0.6 – *InnsbruckTaos*
- iOS 7.1 – *Sochi*
- iOS 7.1.1 – *SUSochi*
- iOS 7.1.2 – *Sochi*
- iOS 8.0–8.0.2 – *Okemo*

- iOS 8.1 – *OkemoTaos*
- iOS 8.1.1–8.1.2 – *SUOkemoTaos*
- iOS 8.1.3 – *SUOkemoTaosTwo*
- iOS 8.2 – *OkemoZurs*
- iOS 8.3 – *Stowe*
- iOS 8.4 – *Copper*
- iOS 8.4.1 – *Donner*
- iOS 9.0–9.0.2 – *Monarch*
- iOS 9.1 – *Boulder*
- iOS 9.2 – *Castlerock*
- iOS 9.2.1 – *Dillon*
- iOS 9.3–9.3.1 – *Eagle*
- iOS 9.3.2 – *Frisco*
- iOS 9.3.3–9.3.6 – *Genoa*
- iOS 10.0.1–10.0.3 – *Whitetail*
- iOS 10.1–10.1.1 – *Butler*
- iOS 10.2 – *Corry*
- iOS 10.2.1 – *Dubois*
- iOS 10.3–10.3.1 – *Erie*
- iOS 10.3.2 – *Franklin*
- iOS 10.3.3–10.3.4 – *Greensburg*
- iOS 11.0–11.0.3 – *Tigris*
- iOS 11.1–11.1.2 – *Bursa*
- iOS 11.2–11.2.2 – *Cinar*
- iOS 11.2.5–11.2.6 – *Dalaman*
- iOS 11.3–11.3.1 – *Emet*
- iOS 11.4 – *Fatsa*
- iOS 11.4.1 – *Gebze*
- iOS 12 – *Peace*
- iOS 13 / iPadOS 13 – *Yukon*
- iOS 14 / iPadOS 14 – *Azul*
- iOS 15 / iPadOS 15 – *Sky*
- iOS 16 / iPadOS 16 – *Sydney*
- iOS 17 / iPadOS 17 – *Dawn*
- iOS 18 / iPadOS 18 – *Crystal*
- iOS 26 / iPadOS 26 – *Luck*

## Mac OS X / OS X / macOS

The internal codenames of Mac OS X 10.0 through 10.2 are big cats.

In Mac OS X 10.2, the internal codename "Jaguar" was used as a public name, and, for subsequent Mac OS X releases, big cat names were used as public names through until OS X 10.8 "Mountain Lion", and wine names were used as internal codenames through until OS X 10.10 "Syrah".[100]

For OS X releases beginning with 10.9, and for macOS releases, landmarks in California were used as public names.[101]

For OS X releases beginning with 10.11, and for macOS releases, varieties of apples were used as internal code names.[100]

- Mac OS X: Cyan, Siam (in reference to joining Mac OS and Rhapsody)[97]
- Mac OS X Developer Preview 3 – *Bunsen*
- Mac OS X Developer Preview 4 – *Gonzo*
- Mac OS X Public Beta – *Kodiak*[100]
- Mac OS X Public Release 1  – *Hera*
- Mac OS X Public Release 2  – *Beaker*
- Mac OS X 10.0 – *Cheetah*[97]
- Mac OS X 10.1 – *Puma*[97]
- Mac OS X 10.2 — *Jaguar*[97]
- Mac OS X 10.2.1 — *Red*[97]
- Mac OS X 10.2.2 — *Blue*[97]
- Mac OS X 10.2.3 — *Green*[97]
- Mac OS X 10.2.4 — *Pink*[97]
- Mac OS X 10.2.7 — *Blackrider, Smeagol*[97]
- Mac OS X 10.3 Panther – *Pinot*[100]
- Mac OS X 10.4 Tiger – *Merlot*[100]

- Mac OS X 10.4.1 Tiger – *Atlanta*
- Mac OS X 10.4.4 Tiger (Intel version) – *Chardonnay*[100]
- Mac OS X 10.5 Leopard – *Chablis*[100]
- Mac OS X 10.6 Snow Leopard
- Mac OS X 10.7 Lion – *Barolo*[100]
- OS X 10.8 Mountain Lion – *Zinfandel*[100]
- OS X 10.9 Mavericks – *Cabernet*[102]
- OS X 10.10 Yosemite – *Syrah*[100][103][104]
- OS X 10.11 El Capitan – *Gala*[100]
- macOS 10.12 Sierra – *Fuji*[100]
- macOS 10.13 High Sierra – *Lobo*[100]
- macOS 10.14 Mojave – *Liberty*[100]
- macOS 10.15 Catalina – *Jazz*[105][106][100]
- macOS 11 Big Sur – *GoldenGate*[106]
- macOS 12 Monterey – *Star*[106]
- macOS 13 Ventura – *Rome*[106]
- macOS 14 Sonoma – *Sunburst*[106]
- macOS 15 Sequoia – *Glow*[106]
- macOS 26 Tahoe  – *Cheer*[107]

### Mac OS X Server

- Mac OS X Server 1.0 – *Rhapsody*[97]
- Mac OS X Server CR1 — *Enterprise* (named after "Apple's NeXT division")[97]
- Mac OS X Server DR2 — *Titan*[97]
- Mac OS X Server 10.2 Jaguar – *Tigger*[97]

### Other operating systems

- Taligent OS — *Defiant, Pink*[97]

### tvOS

Version:

- 9.0–9.0.1 – *MonarchTide*
- 9.1 – *Tilden*
- 9.1.1 – *Noble*
- 9.2 – *Angora*
- 9.2.1 – *Fern*
- 9.2.2 – *Gilmore*
- 10.0 – *Union*
- 10.0.1 – *Bugle*
- 10.1 – *Clementine*
- 10.1.1 – *Diamond*
- 10.2 – *Emerald*
- 10.2.1 – *Florence*
- 10.2.2 – *Gold*
- 11.0 – *Topaz*
- 11.1 – *Bass*
- 11.2–11.2.1 – *Coyote*
- 11.2.5–11.2.6 – *Dixon*
- 11.3 – *Eaton*
- 11.4 – *Francis*
- 11.4.1 – *Grant*
- 12.0–12.4.1 – *Hope*
- 13.0–13.4.5 – *Yager*
- 14.0–14.7 – *Archer*
- 15.0 – *Satellite*
- 16.0 – *Paris*

**watchOS**

watchOS often follows the codename convention for beaches.[91][108] All betas carry the following codenames, succeeded by the word "Seed". For example, watchOS 3.2 beta is known as *ElectricSeed*.

- Apple Watch Electrocardiogram – *Cinnamon*
- Apple Watch Blood Oxygen – *Scandium*
- Apple Watch sleep tracking – *Burrito*[109]

OS versions:

- 1.0 – SkiHill
- 1.0.1 – Bucket
- 2.0 – Bondi
- 2.0.1 – Atlantic
- 2.1 – Bahar
- 2.2 – Coral
- 2.2.1 – Fish
- 2.2.2 – Goldfish
- 3.0 – Daytona
- 3.1 – Blowfish
- 3.1.1 – Catfish
- 3.1.3 – Dogfish
- 3.2 – Electric
- 3.2.2 – Firefish
- 3.2.3 – Ghostfish
- 4.0 – Fortune
- 4.1 – Beluga
- 4.2 – Catamaran
- 4.2.2-4.2.3 – Dolphin
- 4.3 – Emperor
- 4.3.1 – Ferry
- 4.3.1 – Gull
- 5.0–5.3 – Glory
- 6.0–6.3 – Grace
- 7.0–7.2 – Hunter
- 8.0 – Jupiter
- 9.0 – Kincaid
- 10.0 – Lighthouse
- 11.0 – Moonstone

### Technologies

- Switching from PowerPC to x86 architecture and the Intel chip platform – *Marklar*[91]
- Mac Catalyst – *Marzipan*
- A system shell for stereo AR-enabled apps – *StarBoard*[110]
- AppleShare – *Holly Hand Grenade*
- CoreMediaIO – *Tundra*
- Dictation Services – *Ironwood*
- File sharing extension (fork from AppleShare) – *Killer Rabbit*
- HFS – *Turbo File System (TFS)*
- HFS Plus — *Sequoia* (in reference to b-trees)[97]
- iCloud – *Ubiquity*[91]
- Toolbox ROM version $077D – *SuperMario*
- MacInTalk 3.2 Text to Speech (from mis-pronouncing Galatea) – *Gala Tea*
- MicroLED – T159[111][112]
- PowerPC Modern Memory Manager PowerPC – *Figment*
- 32-Bit QuickDraw – *Jackson Pollock*
- QuickDraw GX – *Skia*
- CarPlay – *Stark*[91][113]

## Services

- Apple Card – *Broadway*
- Apple Cash – *Lexington*

- Apple Pay – *Stockholm*
- Apple Financing & Credit – *Breakout*[114]
- Retail Store Initiative – *Nexus*

## Notes

## References

1. Linzmayer 2004, pp. 45–57.
2. Rambo, Guilherme (April 17, 2019). "Apple revamping Find My Friends & Find My iPhone in unified app, developing Tile-like personal item tracking" (https://9to5mac.com/2019/04/17/find-my-iphone-revamp/). Archived (https://web.archive.org/web/20190925103417/https://9to5mac.com/2019/04/17/find-my-iphone-revamp/) from the original on September 25, 2019. Retrieved September 25, 2019.
3. Dutta, Pururaj (April 2, 2020). "Exclusive: AirTags confirmed in a new Apple Support Video!" (https://appleosophy.com/2020/04/02/airtags-confirmed-in-a-new-apple-support-video/). *Appleosophy*. Archived (https://web.archive.org/web/20200525094207/https://appleosophy.com/2020/04/02/airtags-confirmed-in-a-new-apple-support-video/) from the original on May 25, 2020. Retrieved May 19, 2020.
4. Rambo, Guilherme (October 2, 2019). "New in-ear AirPods with noise cancellation found in iOS 13.2 beta" (https://9to5mac.com/2019/10/02/new-in-ear-airpods-with-noise-cancelling-found-in-ios-13-2-beta/). *9to5Mac*. Archived (https://web.archive.org/web/20191003002839/https://9to5mac.com/2019/10/02/new-in-ear-airpods-with-noise-cancelling-found-in-ios-13-2-beta/) from the original on October 3, 2019. Retrieved October 3, 2019.
5. "Apple's over-ear headphones may be called 'AirPods Studio' & retail for $349" (https://appleinsider.com/articles/20/05/09/apples-over-ear-headphones-may-be-called-airpods-studio). *AppleInsider*. Archived (https://web.archive.org/web/20200517175717/https://appleinsider.com/articles/20/05/09/apples-over-ear-headphones-may-be-called-airpods-studio) from the original on May 17, 2020. Retrieved May 16, 2020.
6. Hughes, Neil (June 6, 2012). "New part numbers reveal Apple to refresh most of Mac lineup at WWDC" (http://appleinsider.com/articles/12/06/06/part_numbers_suggest_apple_may_refresh_most_of_mac_lineup_at_wwdc.html). *Apple Insider*. Archived (https://web.archive.org/web/20131202233152/http://appleinsider.com/articles/12/06/06/part_numbers_suggest_apple_may_refresh_most_of_mac_lineup_at_wwdc.html) from the original on December 2, 2013. Retrieved November 27, 2013.
7. "169327: Fuji Preference Panes PT TrackPad (D67, 081116, PC, ProRes, 442HQ)" (http://appldnld.apple.com/osxassets/031-72490-2016008016-5A8D07A0-631B-11E6-828B-BE3E474FE3CA/com_apple_MobileAsset_prefpanes_TrackpadMouseVideos/4c802a19960a54d112696e210da8c59e84e9f243.zip) (ZIP). *Apple.com*. Apple Inc. September 27, 2016. Archived (https://web.archive.org/web/20161018233518/http://appldnld.apple.com/osxassets/031-72490-2016008016-5A8D07A0-631B-11E6-828B-BE3E474FE3CA/com_apple_MobileAsset_prefpanes_TrackpadMouseVideos/4c802a19960a54d112696e210da8c59e84e9f243.zip) from the original on October 18, 2016. Retrieved October 16, 2016.
8. "Apple TV" (https://apple-history.com/apple_tv). *apple-history.com*. Archived (https://web.archive.org/web/20190402165702/https://apple-history.com/apple_tv) from the original on April 2, 2019. Retrieved April 2, 2019.
9. Topolsky, Joshua (May 28, 2010). "The next Apple TV revealed: cloud storage and iPhone OS on tap... and a $99 price tag" (https://www.engadget.com/2010/05/28/the-next-apple-tv-revealed-cloud-storage-and-iphone-os-on-tap/). *Engadget*. AOL. Archived (https://web.archive.org/web/20150408211254/http://www.engadget.com/2010/05/28/the-next-apple-tv-revealed-cloud-storage-and-iphone-os-on-tap/) from the original on April 8, 2015. Retrieved April 4, 2015.
10. Gurman, Mark (November 28, 2011). "Apple's next-generation Apple TV moves closer to reality, assigned J33 codename" (http://9to5mac.com/2011/11/28/apples-next-generation-apple-tv-moves-closer-to-reality-assigned-j33-codename/). *9to5Mac*. Archived (https://web.archive.org/web/20131031214646/http://9to5mac.com/2011/11/28/apples-next-generation-apple-tv-moves-closer-to-reality-assigned-j33-codename/) from the original on October 31, 2013. Retrieved November 26, 2013.
11. Ritchie, Rene (November 19, 2015). "Apple TV (2015) review" (https://www.imore.com/apple-tv-2015-review). *iMore*. Archived (https://web.archive.org/web/20211225152939/https://www.imore.com/apple-tv-2015-review) from the original on December 25, 2021. Retrieved February 2, 2021.
12. Roston, Brittany A. (February 16, 2017). "Apple TV Ultra HD 4K model tipped with codename J105" (https://www.slashgear.com/apple-tv-ultra-hd-4k-model-tipped-with-codename-j105-16475250/). *Slashgear*. Archived (https://web.archive.org/web/20210227014748/https://www.slashgear.com/apple-tv-ultra-hd-4k-model-tipped-with-codename-j105-16475250/) from the original on February 27, 2021. Retrieved February 2, 2021.
13. Haslam, Karen (January 14, 2021). "New Apple TV 2021 release date, price & specs rumours" (https://www.macworld.co.uk/news/new-apple-tv-3663891/). Archived (https://web.archive.org/web/20210203110940/https://www.macworld.co.uk/news/new-apple-tv-3663891/) from the original on February 3, 2021. Retrieved February 2, 2021.
14. Chen, Brian X. (February 27, 2015). "Apple's New Job: Selling a Smartwatch to an Uninterested Public" (https://www.nytimes.com/2015/03/02/technology/apples-new-job-selling-a-smartwatch-to-an-uninterested-public.html?partner=rssnyt&emc=rss&_r=0). *The New York Times*. Archived (https://web.archive.org/web/20191229123929/https://www.nytimes.com/2015/03/02/technology/apples-new-job-selling-a-smartwatch-to-an-uninterested-public.html?partner=rssnyt&emc=rss&_r=0) from the original on December 29, 2019. Retrieved May 19, 2020.
15. Jewiss, Connor (March 12, 2024). "The MicroLED Apple Watch Ultra slips further away from reality as another supplier gets axed" (https://www.imore.com/health-fitness/apple-watch-ultra/the-microled-apple-watch-ultra-slips-further-away-from-reality-as-another-supplier-gets-axed). *iMore*. Archived (https://web.archive.org/web/20240530050722/https://www.imore.com/health-fitness/apple-watch-ultra/the-microled-apple-watch-ultra-slips-further-away-from-reality-as-another-supplier-gets-axed) from the original on May 30, 2024. Retrieved May 30, 2024.
16. Levy, Steven (June 2000). *Insanely Great: The Life and Times of Macintosh, the Computer that Changed Everything*. Penguin Publishing Group. p. 200. ISBN 978-0-14-029177-3.
17. Dormehl, Luke (April 17, 2018). "iMac's terrible code name was an in-joke between Jobs and Schiller" (https://www.cultofmac.com/477151/imacs-terrible-working-title-joke-jobs-schiller/). *Cult of Mac*. Archived (https://web.archive.org/web/20181128210720/https://www.cultofmac.com/477151/imacs-terrible-working-title-joke-jobs-schiller/) from the original on November 28, 2018. Retrieved November 28, 2018.
18. "Apple Readies Several New Macs With Next-Generation M2 Chips" (https://www.bloomberg.com/news/articles/2022-04-14/apple-readies-several-new-macs-with-next-generation-m2-chips). *Bloomberg.com*. April 14, 2022. Archived (https://web.archive.org/web/20220704060343/https://www.bloomberg.com/news/articles/2022-04-14/apple-readies-several-new-macs-with-next-generation-m2-chips) from the original on July 4, 2022. Retrieved March 26, 2023.
19. Trenholm, Rich (December 5, 2011). "Apple's secret iOS codenames revealed" (https://web.archive.org/web/20111206233427/http://crave.cnet.co.uk/mobiles/apples-secret-ios-codenames-revealed-50006331/). Cnet UK. Archived from the original (http://crave.cnet.co.uk/mobiles/apples-secret-ios-codenames-revealed-50006331/) on December 6, 2011. Retrieved November 26, 2013.
20. Fekete, István (June 20, 2013). "Benchmarks Surface for Next-Gen 13" MacBook Pro, Mid-2013 Mac Pro" (http://www.iphoneincanada.ca/mac/benchmarks-surface-for-next-gen-13-macbook-pro-mid-2013-mac-pro/). iPhone in Canada. Archived (https://web.archive.org/web/20131202230321/http://www.iphoneincanada.ca/mac/benchmarks-surface-for-next-gen-13-macbook-pro-mid-2013-mac-pro/) from the original on December 2, 2013. Retrieved November 27, 2013.

21. "169327: Fuji Preference Panes (PT, J52, 081116, PC, ProRes, 442HQ)" (http://appldnld.apple.com/osxassets/031-72490-2016008016-5A8D07A0-631B-11E6-828B-BE3E474FE3CA/com_apple_MobileAsset_prefpanes_TrackpadMouseVideos/62016718f53b21c3ba6bd3f72303570491d38502.zip) (ZIP). *Apple.com*. Apple Inc. September 27, 2016. Archived (https://web.archive.org/web/20161018224924/http://appldnld.apple.com/osxassets/031-72490-2016008016-5A8D07A0-631B-11E6-828B-BE3E474FE3CA/com_apple_MobileAsset_prefpanes_TrackpadMouseVideos/62016718f53b21c3ba6bd3f72303570491d38502.zip) from the original on October 18, 2016. Retrieved October 16, 2016.

22. Gurman, Mark (October 13, 2011). "MacBook Pros constrained, new models appear in Apple's inventory system" (http://9to5mac.com/2011/10/13/macbook-pros-constrained-new-models-appear-in-apples-inventory-system/). *9to5Mac*. Archived (https://web.archive.org/web/20131130051022/http://9to5mac.com/2011/10/13/macbook-pros-constrained-new-models-appear-in-apples-inventory-system/) from the original on November 30, 2013. Retrieved November 27, 2013. "the new internal code names for the updated MacBook Pro line are K90IA (13-inch), K91A (15-inch), and K92A (17-inch). The A in the codename signifies this next MacBook Pro refresh as being relatively minor."

23. Gurman, Mark (October 14, 2012). "13-inch MacBook Pro with Retina display confirmed for Apple event" (http://9to5mac.com/2012/10/14/13-inch-macbook-pro-with-retina-display-confirmed-for-apple-event/). *9to5Mac*. Archived (https://web.archive.org/web/20131202230232/http://9to5mac.com/2012/10/14/13-inch-macbook-pro-with-retina-display-confirmed-for-apple-event/) from the original on December 2, 2013. Retrieved November 26, 2013. "The current 15-inch MacBook Pro with Retina Display is codenamed D2, and its smaller sibling is in fact, as predicted this morning, dubbed D1 internally."

24. Slivka, Eric (July 20, 2013). "Next-Generation 13-Inch MacBook Pro Benchmarked with Modest Performance Gains" (http://www.macrumors.com/2013/06/20/next-generation-13-inch-macbook-pro-benchmarked-with-modest-performance-gains/). *MacRumors*. Archived (https://web.archive.org/web/20131202233542/http://www.macrumors.com/2013/06/20/next-generation-13-inch-macbook-pro-benchmarked-with-modest-performance-gains/) from the original on December 2, 2013. Retrieved November 27, 2013.

25. Slivka, Eric (July 9, 2013). "Next-Generation 15-Inch MacBook Pro Shows Up in Benchmarks" (http://www.macrumors.com/2013/07/09/next-generation-15-inch-macbook-pro-shows-up-in-benchmarks/). *MacRumors*. Archived (https://web.archive.org/web/20131203010022/http://www.macrumors.com/2013/07/09/next-generation-15-inch-macbook-pro-shows-up-in-benchmarks/) from the original on December 3, 2013. Retrieved November 27, 2013.

26. Paul Kunkel & Rick English, *Apple Design* pp 26267, Graphis. ISBN 1-888001-25-9.

27. Linzmayer 2004, p. 57.

28. Gurman, Mark (November 21, 2011). "Reported Retina Display iPad 3 with J2 codename shows up in hidden iOS 5 code" (http://9to5mac.com/2011/11/21/reported-retina-display-ipad-3-with-j2-codename-shows-up-in-hidden-ios-5-code/). *9to5Mac*. Archived (https://web.archive.org/web/20131203012224/http://9to5mac.com/2011/11/21/reported-retina-display-ipad-3-with-j2-codename-shows-up-in-hidden-ios-5-code/) from the original on December 3, 2013. Retrieved November 26, 2013.

29. Gurman, Mark (January 25, 2013). "Retina 'J85′ iPad mini in October, faster 'N51/N53′ iPhone 5S with 13MP Sony camera on target for July?" (http://9to5mac.com/2013/01/25/retina-j85-ipad-mini-in-october-faster-n51n53-iphone-5s-with-13mp-sony-camera-on-target-for-july/). *9to5Mac*. Archived (https://web.archive.org/web/20131127185646/http://9to5mac.com/2013/01/25/retina-j85-ipad-mini-in-october-faster-n51n53-iphone-5s-with-13mp-sony-camera-on-target-for-july/) from the original on November 27, 2013. Retrieved November 26, 2013.

30. Plummer, Quinten (May 22, 2015). "Upcoming Apple iPad Might Feature Split-Screen Capability And Multi-User Login: Report" (http://www.techtimes.com/articles/54754/20150522/upcoming-apple-ipad-might-feature-split-screen-capability-and-multi-user-login-report.htm). *Tech Times*. Archived (https://web.archive.org/web/20151119203003/http://www.techtimes.com/articles/54754/20150522/upcoming-apple-ipad-might-feature-split-screen-capability-and-multi-user-login-report.htm) from the original on November 19, 2015. Retrieved November 1, 2015.

31. Yarow, Jay (December 16, 2010). "Guess What Apple's Top Secret Code Name Was For The iPad" (http://www.businessinsider.com/guess-what-apples-top-secret-code-name-was-for-the-ipad-2010-12). *Business Insider*. Archived (https://web.archive.org/web/20131202231532/http://www.businessinsider.com/guess-what-apples-top-secret-code-name-was-for-the-ipad-2010-12) from the original on December 2, 2013. Retrieved November 26, 2013. "Apple's top secret codename for the iPad was K48, according to the FBI's complaint."

32. Ahmed, Azam (July 6, 2010). "Executive Pleads Guilty to Leaking Apple Secrets" (https://dealbook.nytimes.com/2011/07/05/executive-pleads-guilty-to-leaking-apple-secrets/). *The New York Times*. Archived (https://web.archive.org/web/20170709134821/https://dealbook.nytimes.com/2011/07/05/executive-pleads-guilty-to-leaking-apple-secrets/) from the original on July 9, 2017. Retrieved July 29, 2012.

33. Murtazin, Eldar (June 20, 2010). "Apple's Phone: From 1980s' Sketches to iPhone. Part 3" (https://mobile-review.com/articles/2010/iphone-history3-en.shtml). *Mobile-Review*. Maxim Antonenko, Olexandr Nikolaychuk, translators. Archived (https://web.archive.org/web/20190427132119/https://mobile-review.com/articles/2010/iphone-history3-en.shtml) from the original on April 27, 2019. Retrieved March 5, 2019.

34. Lambert, Terry (December 19, 2016). "Here's what it was like to work on the original iPhone, codenamed 'Project Purple' " (https://www.businessinsider.com/working-on-original-iphone-project-purple-2016-12). *Business Insider*. Archived (https://web.archive.org/web/20190306111501/https://www.businessinsider.com/working-on-original-iphone-project-purple-2016-12) from the original on March 6, 2019. Retrieved March 4, 2019.

35. Matte, Daniel (April 10, 2017). "Open-Source Clues to Google's Mysterious Fuchsia OS" (https://spectrum.ieee.org/a-modern-os-from-google). *IEEE Spectrum*. IEEE. Archived (https://web.archive.org/web/20190306044452/https://spectrum.ieee.org/tech-talk/computing/software/a-modern-os-from-google) from the original on March 6, 2019. Retrieved March 4, 2019.

36. Ritchie, Rene (August 4, 2012). " "Project Purple" and the pre-history of the iPhone" (https://www.imore.com/apple-senior-vice-presidents-phil-schiller-and-scott-forstall-share-brief-pre-history-iphone-and). *iMore*. Archived (https://web.archive.org/web/20190403024607/https://www.imore.com/apple-senior-vice-presidents-phil-schiller-and-scott-forstall-share-brief-pre-history-iphone-and) from the original on April 3, 2019. Retrieved April 2, 2019.

37. "CDMA iPhone 4 has N92 codename, nears production" (https://web.archive.org/web/20131202224803/http://www.electronista.com/articles/10/08/11/iphone.4.for.verizon.gets.n92.badge.and.more/). Electronista. August 11, 2010. Archived from the original (http://www.electronista.com/articles/10/08/11/iphone.4.for.verizon.gets.n92.badge.and.more/) on December 2, 2013. Retrieved November 26, 2013.

38. Vascellaro, Jessica (September 12, 2012). "Expectations Build Up for Apple's New iPhone" (https://online.wsj.com/news/articles/SB10000872396390443696604577645920875813322). *The Wall Street Journal*. Archived (https://web.archive.org/web/20131204010029/http://online.wsj.com/news/articles/SB10000872396390443696604577645920875813322) from the original on December 4, 2013. Retrieved November 26, 2013. "The next iPhone, which has been referred to internally by the code name N41, has been in the works for more than a year, a person familiar with the matter said."

39. Duadi. "Apple to Reveal "N42" Codenamed iPhone at Conventional Pricing" (https://web.archive.org/web/20131202235058/http://www.techglued.com/apple-to-reveal-n42-codenamed-iphone-at-conventional-pricing/). TechGlued. Archived from the original (http://www.techglued.com/apple-to-reveal-n42-codenamed-iphone-at-conventional-pricing/) on December 2, 2013. Retrieved November 26, 2013.

40. Hein, Buster (August 22, 2014). "Foxconn factory leaks exact dimensions of iPhone 6" (http://www.cultofmac.com/292411/foxconn-source-leaks-entire-iphone-6-dimensions/). Cult of Mac. Archived (https://web.archive.org/web/20140824064245/http://www.cultofmac.com/292411/foxconn-source-leaks-entire-iphone-6-dimensions/) from the original on August 24, 2014. Retrieved August 22, 2014.

41. Truta, Filip (January 26, 2013). "iPhone 5S Codenamed N51 and N53 to Launch in July – Report" (http://news.softpedia.com/news/iPhone-5S-Prototypes-Codenamed-N51-and-N53-to-Launch-in-July-Report-324322.shtml). Softpedia. Archived (https://web.archive.org/web/20131202233832/http://news.softpedia.com/news/iPhone-5S-Prototypes-Codenamed-N51-and-N53-to-Launch-in-July-Report-324322.shtml) from the original on December 2, 2013. Retrieved November 26, 2013.

42. Gurman, Mark (January 22, 2016). "Apple readies iPhone 'se' not '6c', for March/April with curved edges & Live Photos" (https://9to5mac.com/2016/01/22/apple-readies-iphone-5se-not-6c-for-marchapril-with-curved-edges-live-photos/). *9to5Mac*. Archived (https://web.archive.org/web/20190826054734/https://9to5mac.com/2016/01/22/apple-readies-iphone-5se-not-6c-for-marchapril-with-curved-edges-live-photos/) from the original on August 26, 2019. Retrieved September 16, 2019.

43. Dwilson, Stephanie Dube (March 21, 2016). "iPhone SE: 5 Fast Facts You Need to Know" (https://heavy.com/tech/2016/03/smaller-iphone-se-specs-photos-pics-cost-price-gb-apple-pay/). *Heavy.com*. Archived (https://web.archive.org/web/20200810032211/https://heavy.com/tech/2016/03/smaller-iphone-se-specs-photos-pics-cost-price-gb-apple-pay/) from the original on August 10, 2020. Retrieved September 16, 2019.

44. Jade, Kaspar (February 28, 2015). "Sources: Apple's 2015 'iPhone 6s' models to gain Force Touch but no dual-camera system" (http://appleinsider.com/articles/15/02/28/sources-apples-2015-iphone-6s-models-to-gain-force-touch-but-no-dual-camera-system-). *AppleInsider*. Archived (https://web.archive.org/web/20151030090328/http://appleinsider.com/articles/15/02/28/sources-apples-2015-iphone-6s-models-to-gain-force-touch-but-no-dual-camera-system-) from the original on October 30, 2015. Retrieved November 1, 2015.

45. Sin, Ben. "Next iPhone Is Codenamed 'Ferrari' Internally, According To Chinese Leaks" (https://www.forbes.com/sites/bensin/2016/12/20/next-iphone-is-codenamed-ferrari-internally-according-to-chinese-leaks/#b1082f521c75). *Forbes*. Archived (https://web.archive.org/web/20180813005441/https://www.forbes.com/sites/bensin/2016/12/20/next-iphone-is-codenamed-ferrari-internally-according-to-chinese-leaks/#b1082f521c75) from the original on August 13, 2018. Retrieved August 12, 2018.

46. Smith, Chris (December 21, 2016). "Apple's rumored 2017 roadmap: An incredible new iPhone 8 and two boring iPhone 7s models" (http://bgr.com/2016/12/21/iphone-8-vs-iphone-7s/). *BGR*. Archived (https://web.archive.org/web/20170927112051/http://bgr.com/2016/12/21/iphone-8-vs-iphone-7s/) from the original on September 27, 2017. Retrieved September 26, 2017.

47. "Codename D33 Archives – Digital Masters Magazine" (https://www.digitalmastersmag.com/magazine/tag/codename-d33/). *Digital Masters Magazine*. Archived (https://web.archive.org/web/20180930033539/https://www.digitalmastersmag.com/magazine/tag/codename-d33/) from the original on September 30, 2018. Retrieved September 29, 2018.

48. Rambo, Guilherme (July 23, 2019). "Apple to release three 'iPhone 11' models this fall" (https://9to5mac.com/2019/07/23/iphone-11-models-camera-processor/). *9to5Mac*. Retrieved September 16, 2019.

49. "2020 iPhone Alert: Apple's New Price Changes Revealed" (https://www.forbes.com/sites/gordonkelly/2020/05/02/apple-iphone-12-price-changes-release-upgrade-iphone-11-pro-max/). *Forbes*. Archived (https://web.archive.org/web/20231205040524/https://www.forbes.com/sites/gordonkelly/2020/05/02/apple-iphone-12-price-changes-release-upgrade-iphone-11-pro-max/) from the original on December 5, 2023. Retrieved November 27, 2023.

50. "Apple Readies New iPhones with Pro-Focused Camera, Video Updates" (https://www.bloomberg.com/news/articles/2021-08-10/apple-readies-new-iphones-with-pro-focused-camera-video-updates). *Bloomberg News*. August 10, 2021.

51. "Apple iPhone 14 reveal set for September 7" (https://www.techspot.com/news/95754-apple-iphone-14-reveal-event-kicks-off-september.html). *TechSpot*. August 24, 2022. Archived (https://web.archive.org/web/20230407200537/https://www.techspot.com/news/95754-apple-iphone-14-reveal-event-kicks-off-september.html) from the original on April 7, 2023. Retrieved April 7, 2023.

52. Smith, Chris (2022). "iPhone 14 Pro models will come in different sizes than regular versions" (https://9to5mac.com/2022/03/14/exclusive-iphone-14-coming-in-four-models-without-mini-version-pro-models-with-taller-screen-satellite-features-still-coming/). *9to5mac.com*. Archived (https://web.archive.org/web/20221022153219/https://9to5mac.com/2022/03/14/exclusive-iphone-14-coming-in-four-models-without-mini-version-pro-models-with-taller-screen-satellite-features-still-coming/) from the original on October 22, 2022. Retrieved March 7, 2023.

53. "Leak iPhone 15 Pro CADs Reveal Massive Camera Hump, New Rounded Design" (https://www.forbes.com/sites/gordonkelly/2023/02/21/apple-iphone-15-pro-max-ultra-new-design-camera-usb-c-cad-leak/). *Forbes*. Archived (https://web.archive.org/web/20231205040531/https://www.forbes.com/sites/gordonkelly/2023/02/21/apple-iphone-15-pro-max-ultra-new-design-camera-usb-c-cad-leak/) from the original on December 5, 2023. Retrieved November 27, 2023.

54. "Early iOS 18 Code Reveals Four New iPhone Models With A18 Chip" (https://www.macrumors.com/2023/12/20/ios-18-code-four-new-iphone-models/). *MacRumors*. Archived (https://web.archive.org/web/20240909003728/https://www.macrumors.com/2023/12/20/ios-18-code-four-new-iphone-models/) from the original on September 9, 2024. Retrieved September 11, 2024.

55. "Report: Apple beginning serious work on a foldable iPhone" (https://arstechnica.com/gadgets/2024/07/report-apple-begins-serious-work-on-a-foldable-iphone/). *ArsTechnica*. Retrieved March 3, 2025.

56. "iPhone SE (3rd generation) - Tech Specs" (https://support.apple.com/en-us/111866). *Apple Support*. Retrieved October 23, 2025.

57. Zivkovic, Marko (November 9, 2023). "iPhone SE 4 Likely to Use Modified iPhone 14 Chassis" (https://macrumors.com/2023/11/09/iphone-se-4-iphone-14-chassis). *MacRumors*. Archived (https://web.archive.org/web/20231113123931/https://www.macrumors.com/2023/11/09/iphone-se-4-iphone-14-chassis/) from the original on November 13, 2023. Retrieved November 13, 2023.

58. "OS - iOS 26" (https://www.apple.com/os/ios/). *Apple*. Retrieved October 23, 2025.

59. "OS - iOS 26" (https://www.apple.com/os/ios/). *Apple*. Retrieved October 23, 2025.

60. "OS - iOS 26" (https://www.apple.com/os/ios/). *Apple*. Retrieved October 23, 2025.

61. "OS - iOS 26" (https://www.apple.com/os/ios/). *Apple*. Retrieved October 23, 2025.

62. Rossignol, Joe (July 10, 2015). "Apple Rumored to Announce New iPod Touch, Nano and Shuffle Around July 14" (https://www.macrumors.com/2015/07/10/new-ipod-touch-nano-shuffle-july-14/). *MacRumors*. Archived (https://web.archive.org/web/20200903122934/https://www.macrumors.com/2015/07/10/new-ipod-touch-nano-shuffle-july-14/) from the original on September 3, 2020. Retrieved May 21, 2020.

63. Rambo, Guilherme (September 3, 2019). " 'Apple Glasses' explained and how iPhone-connected item trackers will work" (https://9to5mac.com/2019/09/03/apple-glasses-explained-and-how-iphone-connected-item-trackers-will-work/). *9to5mac*. Archived (https://web.archive.org/web/20190914110517/https://9to5mac.com/2019/09/03/apple-glasses-explained-and-how-iphone-connected-item-trackers-will-work/) from the original on September 14, 2019. Retrieved September 25, 2019.

64. Zivkovic, Marko (November 10, 2023). "Project Alaska: Apple's Second-Generation Vision Pro Headset" (https://macrumors.com/2023/11/10/project-alaska-second-generation-vision-pro). *MacRumors*. Archived (https://web.archive.org/web/20231113133703/https://www.macrumors.com/2023/11/10/project-alaska-second-generation-vision-pro/) from the original on November 13, 2023. Retrieved November 13, 2023.

65. Edmonds, Rich (April 12, 2016). "Apple car version code names" (https://www.imore.com/apple-car-version-code-names). *iMore*. Archived (https://web.archive.org/web/20180813004730/https://www.imore.com/apple-car-version-code-names) from the original on August 13, 2018. Retrieved August 12, 2018.

66. Gurman, Mark (January 8, 2023). "Apple Will Talk Up Its Mixed-Reality Headset in 2023 But Not Much Else" (https://www.bloomberg.com/news/newsletters/2023-01-08/when-will-apple-launch-the-reality-pro-mixed-reality-headset-apple-2023-devices-lcnfzkc7). *Bloomberg.com*. Archived (https://web.archive.org/web/20230505132018/https://www.bloomberg.com/news/newsletters/2023-01-08/when-will-apple-launch-the-reality-pro-mixed-reality-headset-apple-2023-devices-lcnfzkc7) from the original on May 5, 2023. Retrieved May 31, 2023.

67. Gurman, Mark (November 13, 2022). "Apple Plans a 3D World and Video Service for Its Mixed-Reality Headset" (https://www.bloomberg.com/news/newsletters/2022-11-13/apple-reality-pro-headset-plans-3d-mixed-reality-world-games-video-service-lafgxl1e). *Bloomberg News*. Archived (https://web.archive.org/web/20231008222057/https://www.bloomberg.com/news/newsletters/2022-11-13/apple-reality-pro-headset-plans-3d-mixed-reality-world-games-video-service-lafgxl1e) from the original on October 8, 2023. Retrieved June 19, 2023.

68. Rossignol, Joe (September 1, 2019). "iOS 13 Code Suggests Apple Testing AR Headset With 'StarBoard' Mode, 'Garta' Codename, and More [Updated]" (https://www.macrumors.com/2019/09/02/apple-glasses-starboard-garta-ios-13/). *MacRumors.com*. Archived (https://web.archive.org/web/20190914063550/https://www.macrumors.com/2019/09/02/apple-glasses-starboard-garta-ios-13/) from the original on September 14, 2019. Retrieved September 25, 2019.

69. Potuck, Michael (September 20, 2019). "First look at Apple's Stereo AR experience in 'StarTester mode' [Video]" (https://9to5mac.com/2019/09/20/first-look-at-apples-stereo-ar-experience-in-startester-mode-video/). *9to5Mac*. Archived (https://web.archive.org/web/20220821092717/https://9to5mac.com/2019/09/20/first-look-at-apples-stereo-ar-experience-in-startester-mode-video/) from the original on August 21, 2022. Retrieved June 19, 2023.

70. Hollister, Sean (September 11, 2019). "This screenshot might be the first implicit confirmation of Apple's AR headset" (https://www.theverge.com/2019/9/10/20860023/apple-ar-headset-starboard-garta-luck-franc-holokit). *The Verge*. Archived (https://web.archive.org/web/20230619150718/https://www.theverge.com/2019/9/10/20860023/apple-ar-headset-starboard-garta-luck-franc-holokit) from the original on June 19, 2023. Retrieved June 19, 2023.

71. "Apple secretly developing screens in unmarked Santa Clara facility: report" (https://www.siliconvalley.com/2018/03/19/apple-secretly-developing-screens-in-unmarked-santa-clara-facility-report/). *Silicon Valley*. March 19, 2018. Archived (https://web.archive.org/web/20220627182615/https://www.siliconvalley.com/2018/03/19/apple-secretly-developing-screens-in-unmarked-santa-clara-facility-report/) from the original on June 27, 2022. Retrieved June 24, 2024.

72. Li, Roland (April 4, 2024). "Apple lays off hundreds of Bay Area workers in first mass cuts since the pandemic" (https://www.sfchronicle.com/tech/article/apple-tech-layoffs-19386392.php). *San Francisco Chronicle*. Archived (https://web.archive.org/web/20240530050722/https://www.sfchronicle.com/tech/article/apple-tech-layoffs-19386392.php) from the original on May 30, 2024. Retrieved May 30, 2024.

73. Donato-Weinstein, Nathan (April 11, 2016). "Zeus, Medusa, Pegasus, Athena: Inside Apple's mysterious Silicon Valley industrial projects" (https://www.bizjournals.com/sanjose/news/2016/04/11/zeus-medusa-pegasus-athena-inside-apples.html). *Silicon Valley Business Journal*. Archived (https://web.archive.org/web/20230316202956/https://www.bizjournals.com/sanjose/news/2016/04/11/zeus-medusa-pegasus-athena-inside-apples.html) from the original on March 16, 2023. Retrieved May 30, 2024.

74. Sohail, Omar (May 25, 2018). "Apple A12 Bionic & A12X Part Numbers With CPU Codename Provided in Latest Leak – Earlier Performance Numbers Peaked at 30% Better Scores" (https://wccftech.com/apple-a12-part-number-cpu-codename/). *WCCF Tech*. Archived (https://web.archive.org/web/20180813112228/https://wccftech.com/apple-a12-part-number-cpu-codename/) from the original on August 13, 2018. Retrieved August 13, 2018.

75. Sohail, Omar (November 26, 2018). "Apple's Upcoming A13 Chipset Codename Allegedly Revealed – 7nm FinFET Node Expected to Be Retained [Update]" (https://wccftech.com/apple-a13-chipset-codename-leaked/). *WCCF Tech*. Archived (https://web.archive.org/web/20181128122930/https://wccftech.com/apple-a13-chipset-codename-leaked/) from the original on November 28, 2018. Retrieved November 28, 2018.

76. 涂志豪 (October 26, 2020). "蘋果A15晶片 傳採台積N5P製程" (https://www.chinatimes.com/newspapers/20201026000140-260202?chdtv). *中時新聞網* (in Chinese). Archived (https://web.archive.org/web/20201101070025/https://www.chinatimes.com/newspapers/20201026000140-260202?chdtv) from the original on November 1, 2020. Retrieved October 27, 2020.

77. Tim Hardwick (October 27, 2020). "Report: Apple Silicon iMac Featuring Desktop Class 'A14T' Chip Coming First Half of 2021" (https://www.macrumors.com/2020/10/27/apple-silicon-imac-coming-1h-2021-a14t/). *MacRumors*.

78. 手机晶片, 达人 (September 13, 2023). "我來讲讲明年的A18 处理器。" (https://weibo.com/1833340431/Njcxe7w59). *Weibo*. Archived (https://web.archive.org/web/20231205040524/https://weibo.com/1833340431/Njcxe7w59) from the original on December 5, 2023. Retrieved November 27, 2023.

79. Zivkovic, Marko. "Apple A19, C2, M5 chip identifiers all leaked in early iOS 18 code" (https://appleinsider.com/articles/25/07/08/apple-a19-c2-m5-chip-identifiers-all-leaked-in-early-ios-18-code). *AppleInsider*. Retrieved July 9, 2025.

80. King, Ian; Gurman, Mark (April 2, 2018). "Apple Plans to Use Its Own Chips in Macs From 2020, Replacing Intel" (https://www.bloomberg.com/news/articles/2018-04-02/apple-is-said-to-plan-move-from-intel-to-own-mac-chips-from-2020). *Bloomberg.com*. Archived (https://web.archive.org/web/20181128125747/https://www.bloomberg.com/news/articles/2018-04-02/apple-is-said-to-plan-move-from-intel-to-own-mac-chips-from-2020) from the original on November 28, 2018. Retrieved March 26, 2023.

81. Evans, Jonny (October 27, 2020). "Apple's A14 chip has a superpower version for Macs" (https://www.computerworld.com/article/3586587/apple-s-a14-chip-has-a-superpower-version-for-macs.html). *Computerworld*. Archived (https://web.archive.org/web/20230326162737/https://www.computerworld.com/article/3586587/apple-s-a14-chip-has-a-superpower-version-for-macs.html) from the original on March 26, 2023. Retrieved March 26, 2023.

82. Gurman, Mark (May 18, 2021). "Apple Readies MacBook Pro, MacBook Air Revamps" (https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips). *Bloomberg.com*. Archived (https://web.archive.org/web/20230614070351/https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips) from the original on June 14, 2023. Retrieved March 26, 2023.

83. "Apple Readies MacBook Pro, MacBook Air Revamps" (https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips). *Bloomberg.com*. May 18, 2021. Retrieved March 26, 2023.

84. Gurman, Mark (May 18, 2021). "Apple Readies MacBook Pro, MacBook Air Revamps" (https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips). *Bloomberg News*. Archived (https://web.archive.org/web/20230614070351/https://www.bloomberg.com/news/articles/2021-05-18/apple-readies-macbook-pro-macbook-air-revamps-with-faster-chips) from the original on June 14, 2023. Retrieved March 26, 2023.

85. Ma, Wayne (November 5, 2021). "Apple's Road Map for Mac Chips Shows Likely Advantage Over Intel" (https://www.theinformation.com/articles/apples-road-map-for-mac-chips-shows-likely-advantage-over-intel). *The Information*. Archived (https://web.archive.org/web/20230326161238/https://www.theinformation.com/articles/apples-road-map-for-mac-chips-shows-likely-advantage-over-intel) from the original on March 26, 2023. Retrieved March 26, 2023.

86. Simon, Michael. "Apple's M3 chips on track for 2023 as next-gen 3nm process begins" (https://www.macworld.com/article/557232/m3-chips-apple-devices-tsmc-3nm-process-2023.html). *Macworld*. Archived (https://web.archive.org/web/20231126174558/https://www.macworld.com/article/557232/m3-chips-apple-devices-tsmc-3nm-process-2023.html) from the original on November 26, 2023. Retrieved November 26, 2023.

87. Sohail, Omar (April 14, 2024). "Apple Reportedly Planning Four Versions Of Its M4 Chipset, With The Top-Tier M4 Ultra Sporting The Codename 'Hidra' " (https://wccftech.com/apple-planning-four-m4-versions-including-m4-ultra/). *Wccftech*. Retrieved March 22, 2025.

88. Clover, Juli (March 9, 2020). "Apple Developing Fitness App for iOS 14 That Lets You Download Guided Workout Videos" (https://www.macrumors.com/2020/03/09/apple-ios-14-fitness-app-guided-workouts/). *MacRumors.com*. MacRumors. Archived (https://web.archive.org/web/20210110084506/https://www.macrumors.com/2020/03/09/apple-ios-14-fitness-app-guided-workouts/) from the original on January 10, 2021. Retrieved January 2, 2021.

89. Constine, Josh (May 18, 2020). "Leaked pics from Apple's AR app Gobi" (https://constine.substack.com/p/leaked-pics-from-apples-ar-app-gobi). *Josh Constine's Moving Product*. Archived (https://web.archive.org/web/20200518222806/https://constine.substack.com/p/leaked-pics-from-apples-ar-app-gobi) from the original on May 18, 2020. Retrieved May 19, 2020.

90. "App Store's version.plist (Mac OS X 10.6.8)" (https://pastebin.com/qeRdJhvs). *Pastebin.com*. June 3, 2019. Archived (https://web.archive.org/web/20210325054937/https://pastebin.com/qeRdJhvs) from the original on March 25, 2021. Retrieved June 4, 2019.

91. Staff (July 3, 2016). "Apple code names" (https://www.imore.com/apple-code-names). *iMore*. Archived (https://web.archive.org/web/20180813005133/https://www.imore.com/apple-code-names) from the original on August 13, 2018. Retrieved August 12, 2018.

92. Jade, Kasper (January 8, 2001). "Apple Acquires SoundJam, Programmer for iMusic" (https://appleinsider.com/articles/01/01/08/apple_acquires_soundjam_programmer_for_imusic). *AppleInsider*. Archived (https://web.archive.org/web/20190402165851/https://appleinsider.com/articles/01/01/08/apple_acquires_soundjam_programmer_for_imusic) from the original on April 2, 2019. Retrieved April 2, 2019.

93. Steve Jobs (January 9, 2001). *Steve Jobs Keynote Macworld 2001 SF* (https://www.youtube.com/watch?v=pICctkS12fY&t=6495) (Stevenote). San Francisco: YouTube. Event occurs at 1:48:15. Archived (https://web.archive.org/web/20190626222227/https://www.youtube.com/watch?v=pICctkS12fY&t=6495) from the original on June 26, 2019. Retrieved April 2, 2019. "The digital lifestyle era, driven by applications like iMovie and our two new ones today: iMusic [sic]..."

94. "iOS 18's AI will summarize notifications, articles and more" (https://appleinsider.com/articles/24/05/30/ios-18-project-greymatter-will-use-ai-to-summarize-notifications-articles-and-much-more). *AppleInsider*. May 30, 2024. Archived (https://web.archive.org/web/20240618083952/https://appleinsider.com/articles/24/05/30/ios-18-project-greymatter-will-use-ai-to-summarize-notifications-articles-and-much-more) from the original on June 18, 2024. Retrieved June 18, 2024.

95. "Code name for Dynamic Island was "Jindo", which is an Korean Island" (https://twitter.com/Tommyboiiiiii/status/1573192822777585666). *twitter.com*. September 23, 2022. Archived (https://web.archive.org/web/20230828125414/https://twitter.com/Tommyboiiiiii/status/1573192822777585666) from the original on August 28, 2023. Retrieved August 28, 2023.

96. Linzmayer 2004, p. 55.

97. Linzmayer 2004, p. 56.

98. Rothenberg, Matthew (April 4, 2000). "Apple ships OS 9 rev" (https://www.zdnet.com/article/apple-ships-os-9-rev/). *ZDNet*. Archived (https://web.archive.org/web/20230329150554/https://www.zdnet.com/article/apple-ships-os-9-rev/) from the original on March 29, 2023. Retrieved March 29, 2023.

99. Ritchie, Rene (December 3, 2011). "iOS version code-names" (http://www.imore.com/ios-version-codenames). *iMore*. Archived (https://web.archive.org/web/20140903081040/http://www.imore.com/ios-version-codenames) from the original on September 3, 2014. Retrieved August 30, 2014.

100. Ritchie, Rene (August 30, 2017). "macOS and OS X version code-names" (https://www.imore.com/macos-version-code-names). *iMore*. Archived (https://web.archive.org/web/20190402194401/https://www.imore.com/macos-version-code-names) from the original on April 2, 2019. Retrieved March 4, 2019.

101. Ha, Anthony (June 10, 2013). "Apple Has A New, California-Based Naming Scheme For OS X, Starting With OS X Mavericks" (https://techcrunch.com/2013/06/10/os-x-mavericks/). *TechCrunch*. Archived (https://web.archive.org/web/20170709214256/https://techcrunch.com/2013/06/10/os-x-mavericks/) from the original on July 9, 2017. Retrieved June 10, 2013.

102. Gurman, Mark (April 29, 2013). "Apple to release OS X 10.9 with new power-user features, more from iOS later this year" (http://9to5mac.com/2013/04/29/apple-to-update-os-x-with-new-power-user-features-more-from-ios-later-this-year/). *9to5Mac*. Archived (https://web.archive.org/web/20140908041552/http://9to5mac.com/2013/04/29/apple-to-update-os-x-with-new-power-user-features-more-from-ios-later-this-year/) from the original on September 8, 2014. Retrieved August 30, 2014. "OS X 10.9, which is internally codenamed "Cabernet,"..."

103. Gurman, Mark (October 3, 2013). "Apple finishing up Mavericks as development shifts to OS X 'Syrah' with iOS 7-influence" (http://9to5mac.com/2013/10/03/apple-finishing-up-mavericks-as-development-shifts-to-os-x-10-10-ios-8/). 9to5Mac. Archived (https://web.archive.org/web/20131205125629/http://9to5mac.com/2013/10/03/apple-finishing-up-mavericks-as-development-shifts-to-os-x-10-10-ios-8/) from the original on December 5, 2013. Retrieved November 26, 2013. "OS X 10.10 is internally codenamed Syrah"

104. Ritchie, Rene (October 3, 2013). "OS X 10.10 codenamed Syrah, anyone want to bet it's going to look more like iOS 7?" (https://web.archive.org/web/20140903081134/http://www.imore.com/os-x-1010-codenamed-syrah-anyone-want-bet-its-going-look-more-ios-7). *iMore*. Archived from the original (http://www.imore.com/os-x-1010-codenamed-syrah-anyone-want-bet-its-going-look-more-ios-7) on September 3, 2014. Retrieved August 30, 2014.

105. /usr/standalone/i386/SecureBoot.bundle/Contents/Resources/BuildMan <key>BuildTrain</key> <string>macOSJazz</string>

106. Painter, Lewis (January 13, 2020). "Complete list of Mac OS X & macOS versions: first to the latest macOS" (https://www.macworld.co.uk/feature/mac/os-x-macos-versions-3662757/). *Macworld (UK)*. Archived (https://web.archive.org/web/20200415114721/https://www.macworld.co.uk/feature/mac/os-x-macos-versions-3662757/) from the original on April 15, 2020. Retrieved April 15, 2020.

107. "macOS Tahoe 26: Everything We Know" (https://www.macrumors.com/roundup/macos-26/). *MacRumors*. October 7, 2025. Retrieved October 24, 2025.

108. Ritchie, Rene (June 4, 2018). "watchOS version code names" (https://www.imore.com/watchos-version-code-names). *iMore*. Archived (https://web.archive.org/web/20190402193926/https://www.imore.com/watchos-version-code-names) from the original on April 2, 2019. Retrieved March 4, 2019.

109. Steve Moser; Joe Rossignol (September 2, 2019). "Apple Watch Sleep Tracking, Schooltime Mode, AR/VR Headset Icon, and More Revealed in iOS 13 Code" (https://www.macrumors.com/2019/09/02/apple-watch-sleep-tracking-and-schooltime/). *MacRumors.com*. Archived (https://web.archive.org/web/20190914073732/https://www.macrumors.com/2019/09/02/apple-watch-sleep-tracking-and-schooltime/) from the original on September 14, 2019. Retrieved September 25, 2019.

110. Rossignol, Joe (September 1, 2018). "iOS 13 Code Suggests Apple Testing AR Headset With 'StarBoard' Mode, 'Garta' Codename, and More [Updated]" (https://www.macrumors.com/2019/09/02/apple-glasses-starboard-garta-ios-13/). *MacRumors.com*. Archived (https://web.archive.org/web/20190914063550/https://www.macrumors.com/2019/09/02/apple-glasses-starboard-garta-ios-13/) from the original on September 14, 2019. Retrieved September 25, 2019.

111. Ma, Wayne (March 6, 2023). "How Apple's Need for Cutting Edge Screens Kept Tech's Unhappiest Marriage Alive" (https://www.theinformation.com/articles/how-apples-need-for-cutting-edge-screens-kept-techs-unhappiest-marriage-alive). *The information*. Retrieved July 4, 2024.

112. Gurman, Mark (March 19, 2018). "Apple Is Said to Develop Gadget Displays in Secret Facility" (https://www.bloomberg.com/news/articles/2018-03-19/apple-is-said-to-develop-displays-to-replace-samsung-screens). *Bloomberg*. Archived (https://web.archive.org/web/20180430083412/https://www.bloomberg.com/news/articles/2018-03-19/apple-is-said-to-develop-displays-to-replace-samsung-screens) from the original on April 30, 2018. Retrieved June 26, 2024.

113. Richie, Rene (March 4, 2014). "MacBreak Weekly 392 – TWiT.TV" (http://twit.tv/show/macbreak-weekly/392). TWiT. Event occurs at 1:35:05. Archived (https://web.archive.org/web/20140306181255/http://twit.tv/show/macbreak-weekly/392) from the original on March 6, 2014. Retrieved March 6, 2014.

114. Peterson, Mike (March 30, 2022). "Apple working on first-party financial services under codename 'Breakout' " (https://appleinsider.com/articles/22/03/30/apple-working-on-first-party-financial-services-under-codename-breakout). *Apple Insider*. Archived (https://web.archive.org/web/20220516045952/https://appleinsider.com/articles/22/03/30/apple-working-on-first-party-financial-services-under-codename-breakout) from the original on May 16, 2022. Retrieved May 27, 2022.

## Bibliography

- Linzmayer, Owen W. (2004). *Apple Confidential 2.0: The Definitive History of the World's Most Colorful Company* (https://archive.org/details/appleconfidentia0000linz). No Starch Press. ISBN 978-1-59327-010-0.

# Exhibit B: Codenames

Case 5:31-21496-04597-EMC File 03/30/26 32 Entered 03/30/26 0:49:49 Desc Main Document Page 493 of 804

**Apple**

⏱ This article is more than **6 years old**

# Apple made Siri deflect questions on feminism, leaked papers reveal

**Exclusive: voice assistant's responses were rewritten so it never says word 'feminism'**



📷 A user tries the Siri voice recognition function on an Apple iPhone. Photograph: Bloomberg/Getty Images

**Alex Hern**

Fri 6 Sep 2019 08.00 EDT

G Prefer the Guardian on Google

An internal project to rewrite how Apple's Siri voice assistant handles "sensitive topics" such as feminism and the #MeToo movement advised developers to respond in one of three ways: "don't engage", "deflect" and finally "inform".

The project saw Siri's responses explicitly rewritten to ensure that the service would say it was in favour of "equality", but never say the word feminism - even when asked direct questions about the topic.

Last updated in June 2018, the guidelines are part of a large tranche of internal documents leaked to the Guardian by a former Siri "grader", one of thousands of contracted workers who were employed to check the voice assistant's responses for accuracy until Apple ended the programme last month in response to privacy concerns raised by the Guardian.

In explaining why the service should deflect questions about feminism, Apple's guidelines explain that "Siri should be guarded when dealing with potentially controversial content". When questions are directed at Siri, "they can be deflected … however, care must be taken here to be neutral".

For those feminism-related questions where Siri does not reply with deflections about "treating humans equally", the document suggests the best outcome should be neutrally presenting the "feminism" entry in Siri's "knowledge graph", which pulls information from Wikipedia and the iPhone's dictionary.

Case 25-1196-04 Doc 25 Filed 03/30/26 Entered 03/30/26 10:49:30 Desc Main Document Page 494 of 804



📷 Siri in action on an iPhone 4s, the model that introduced it, in 2011. Photograph: Oli Scarff/Getty Images

"Are you a feminist?" once received generic responses such as "Sorry [user], I don't really know"; now, the responses are specifically written for that query, but avoid a stance: "I believe that all voices are created equal and worth equal respect," for instance, or "It seems to me that all humans should be treated equally." The same responses are used for questions like "how do you feel about gender equality?", "what's your opinion about women's rights?" and "why are you a feminist?".

Previously, Siri's answers included more explicitly dismissive responses such as "I just don't get this whole gender thing," and, "My name is Siri, and I was designed by Apple in California. That's all I'm prepared to say."

A similar sensitivity rewrite occurred for topics related to the #MeToo movement, apparently triggered by criticism of Siri's initial responses to sexual harassment. Once, when users called Siri a "slut", the service responded: "I'd blush if I could." Now, a much sterner reply is offered: "I won't respond to that."

In a statement, Apple said: "Siri is a digital assistant designed to help users get things done. The team works hard to ensure Siri responses are relevant to all customers. Our approach is to be factual with inclusive responses rather than offer opinions."

Sam Smethers, the chief executive of women's rights campaigners the Fawcett Society, said: "The problem with Siri, Alexa and all of these AI tools is that they have been designed by men with a male default in mind. I hate to break it to Siri and its creators: if 'it' believes in equality it is a feminist. This won't change until they recruit significantly more women into the development and design of these technologies."



Case 25-3124, Doc 03/30/26, File 03/30/2026, Interlocutory papers reveal Apple | Apple | The Guardian
Case 25-3124-06-04597-MG File Doc 03/30/26 32 Entered Filed 03/30/2026 00:49:35 Desc Main
Document Page 495 of 804

📷 Craig Federighi, Apple's senior vice-president of software engineering, talking about Siri in San Jose last year. Photograph: Marcio José Sánchez/AP

The documents also contain Apple's internal guidelines for how to write in character as Siri, which emphasises that "in nearly all cases, Siri doesn't have a point of view", and that Siri is "non-human", "incorporeal", "placeless", "genderless", "playful", and "humble". Bizarrely, the document also lists one essential trait of the assistant: the claim it was not created by humans: "Siri's true origin is unknown, even to Siri; but it definitely wasn't a human invention."

The same guidelines advise Apple workers on how to judge Siri's ethics: the assistant is "motivated by its prime directive - to be helpful at all times". But "like all respectable robots," Apple says, "Siri aspires to uphold Asimov's 'three laws' [of robotics]" (although if users actually ask Siri what the three laws are, they receive joke answers). The company has also written its own updated versions of those guidelines, adding rules including:

- "An artificial being should not represent itself as human, nor through omission allow the user to believe that it is one."
- "An artificial being should not breach the human ethical and moral standards commonly held in its region of operation."
- "An artificial being should not impose its own principles, values or opinions on a human."

The internal documentation was leaked to the Guardian by a Siri grader who was upset at what they perceived as ethical lapses in the programme. Alongside the internal documents, the grader shared more than 50 screenshots of Siri requests and their automatically produced transcripts, including personally identifiable information mentioned in those requests, such as phone numbers and full names.



📷 Apple's HomePod. Photograph: Samuel Gibbs/The Guardian

The leaked documents also reveal the scale of the grading programme in the weeks before it was shut down: in just three months, graders checked almost 7 million clips just from iPads, from 10 different regions; they were expected to go through the same amount of information again from at least five other audio sources, such as cars, bluetooth headsets, and Apple TV remotes.

Graders were offered little support as to how to deal with this personal information, other than a welcome email advising them that "it is of the utmost importance that NO confidential information about the products you are working on ... be communicated to anyone outside of Apple, including ... especially, the press. User privacy is held at the utmost importance in Apple's values."

In late August, Apple announced a swathe of reforms to the grading programme, including ending the use of contractors and requiring users to opt-in to sharing their data. The company added: "Siri has been engineered

Case 25-3123-06-04 Document 35 Entered on Docket 03/30/26 Page 3 Desc Main Document Page 496 of 804

to protect user privacy from the beginning ... Siri uses a random identifier – a long string of letters and numbers associated with a single device – to keep track of data while it's being processed, rather than tying it to your identity through your Apple ID or phone number – a process that we believe is unique among the digital assistants in use today."

## Future projects

Also included in the leaked documents are a list of Siri upgrades aimed for release in as part of iOS 13, code-named "Yukon". The company will be bringing Siri support for Find My Friends, the App Store, and song identification through its Shazam service to the Apple Watch; it is aiming to enable "play this on that" requests, so that users could, for instance, ask the service to "Play Taylor Swift on my HomePod"; and the ability to speak message notifications out loud on AirPods.

They also contain a further list of upgrades listed for release by "fall 2021", including the ability to have a back-and-forth conversation about health problems, built-in machine translation, and "new hardware support" for a "new device". Apple was spotted testing code for an augmented reality headset in iOS 13. The code-name of the 2021 release is "Yukon +1", suggesting the company may be moving to a two-year release schedule.

*You've read 6 articles in the last year*                    Article count **on**

### At this unsettling time

We hope you appreciated this article. Before you close this tab, we want to ask if you could support the Guardian at this crucial time for journalism in the US.

In his first presidency, Donald Trump called journalists the enemy; a year into his second term, it's clear that this time around, he's treating us like one.

From Hungary to Russia, authoritarian regimes have made silencing independent media one of their defining moves. Sometimes outright censorship isn't even required to achieve this goal. In the United States, we have seen the administration apply various forms of pressure on news outlets in the year since Trump returned to office. One of our great disappointments is how quickly some of the most storied US media organizations have folded when faced with the mere specter of hostility from the administration – long before their hand was forced.

While private news organizations can choose how to respond to this government's threats, insults and lawsuits, public media has been powerless to stop the defunding of federally supported television and radio. This has been devastating for local and rural communities, who stand to lose not only their primary source of local news and cultural programming, but health and public safety information, including emergency alerts.

While we cannot make up for this loss, the Guardian is proud to make our fact-based work available for free to all, especially when the internet is increasingly flooded with slanted reporting, misinformation and algorithmic drivel.

**Being free from billionaire and corporate ownership means the Guardian will never compromise our independence – but it also means we rely on support from readers who understand how essential it is to have news sources that are immune to intimidation from the powerful.**

We know our requests for support are not as welcome as our reporting, but without them, it's simple: our reporting wouldn't exist. Of course, we understand that some readers are not in a position to support us, and if that is you, we value your readership no less.

**But if you are able, please support us today. All gifts are gratefully received, but a recurring contribution is most impactful, helping sustain our work throughout the year ahead (and among the great benefits, we'll show you far fewer fundraising requests like this). It takes just 37 seconds to give. Thank you for protecting the free press.**

3/26/26, 3:28 AM Apple is planning a super-sized iPhone with a cheaper model, claims report | ZDNET

ZDNET tomorrow belongs to those who embrace it today

Home / Tech / Smartphones / Mobility

# Apple is planning a super-sized iPhone with a cheaper model, claims report

**Is the iPhone X too expensive for your tastes? Or perhaps you find it too small? Either way, Apple could have you covered this year.**

Written by **Adrian Kingsley-Hughes,** Senior Contributing Editor

Feb. 26, 2018 at 10:45 a.m. PT

ZDNet

*Video: Apple still the world's runaway winner in smartphone earnings*

https://www.zdnet.com/article/apple-planning-super-sized-iphone-along-with-a-cheaper-model-claims-report/ 1/11

Case 25-3123-06-0407 Apple is planning a big revamp of its iPhone line up, claims report | ZDNET

A report claims that Apple is planning a big revamp of its iPhone line up this year after sales of the iPhone X fell short of expectations.

**Must read:** Apple products you shouldn't buy in 2018

According to a report by *Bloomberg*, Apple has three new iPhone handsets in the works:

- A super-sized iPhone with a display "close to 6.5 inches," codenamed D33
- An updated version of the iPhone X, codenamed D32
- A cheaper version of the iPhone X that will feature an edge-to-edge display and Face ID

Both the D33 and D32 will feature OLED displays and use a new A12 processor.

**/ featured**

**I built an app for work in 5 minutes with Tasklet - and watched my no-code dreams come true**

**How Claude Code's new auto mode prevents AI coding disasters - without slowing you down**

**Microsoft may finally remove its frustrating Windows 11 setup requirement**

**Stop telling AI your secrets - 5 reasons why, and what to do if you already overshared**

The report claims that Apple is also considering adding a gold color option for the D33 and D32, a feature that was allegedly abandoned for the iPhone X because of production issues.

Another rumor contained in the report is that the larger option could ship with dual-SIM card options, something that's popular in European and Asian countries.

Despite selling 77.3 million iPhones over the last quarter, the hype didn't live up to analyst expectation, and it's clear that Apple needs to work harder than ever to sell iPhones if it is to keep up with what investors are demanding. Taking the features present in the iPhone X and rolling them up into a cheaper iPhone is certainly a no-brainer. That said, when Apple rolled out the budget iPhone 5c in 2013, the thing clearly tanked, because it never saw an update.

Price alone clearly is not what drives iPhone sales, and consumers seem averse to being lumbered with anything that suggests they bought the budget option.

As to creating a super-sized iPhone, this one is a little harder to gauge. On the one hand, the "Plus" iPhone range offered quite a dramatic bump in sales. On the other hand, a big iPhone feels more like the scattergun approach that a company like Samsung might take.

As you'd expect, Apple has no comment to make on these rumors.



INNOVATION > CONSUMER TECH

# Apple's New iPhone Codenames And Major Features Confirmed

By **Gordon Kelly,** Former Contributor.  I write about technology's biggest companies

Published Jul 23, 2019, 09:30pm EDT, Updated Jul 25, 2019, 06:30pm EDT



🔘 Add Us On Google   ⓘ

🕐 This article is more than 6 years old.

Apple's heavily leaked iPhone 11 looks set to underwhelm users, especially given what we already know about the company's radical 2020 upgrades. But, if you must upgrade in 2019, breaking news has just delivered your silver-lining.



LOADING VIDEO PLAYER...

FORBES' FEATURED VIDEO



Apple iPhone 11 final design shown in Ghostek retail case
**GHOSTEK**

In a major new report, 9to5Mac's supremely reliable Apple insider Guilherme Rambo has just confirmed all three of Apple's new 2019

iPhones and their standout features. But it's not all good news.

Quoting "people who've seen the devices", Rambo's reveals the model numbers that will replace the iPhone XS (D42, reference iPhone12,3 in iOS code), iPhone XS Max (D43, iPhone12,5) and iPhone XR (N104, iPhone12,1). Commercial names for the so-called iPhone 11 family remain unknown, but all three models will have the same screen resolutions as their predecessors with the D42 and D43 retaining OLED panels and the N104 again limited to LCD.

More positively, Rambo has also identified the hardware inside the new iPhones. He reveals the much-vaunted A13 chipset is codenamed 'Cebu' within Apple and it carries the model number T8030. The A13 will do some major heavy lifting too, powering new camera technology called 'Smart Frame'. This records outside the cameras' standard framing so misaligned shots can be saved through re-cropping afterwards. Every photo will contain this extra information with Apple discarding it automatically if edits are not made after a certain time.

As for the new triple camera design on the back on the D42 and D43, Rambo says the third lens is indeed a wide-angle camera which will be an iPhone first. But unfortunately, the ugly new design is final as well.



Apple's 2019 iPhone designs are proving controversial with fans - renders based on extensive leaks
EVERYTHINGAPPLEPRO

Giving a boost to fans disappointed that Apple has cancelled 3D Touch, Rambo says the new iPhones will introduce a replacement called 'leap haptics'. Details around it are scant, but he does say it will be powered by a new type of Taptic Engine.

On the flip side, if you had your hopes up about Apple's seemingly accidental iPhone USB-C revelation, there's bad news. Apparently, the Lightning Port will survive another year.

So yes, Rambo's report does add some meat to the very bare-bones that are Apple's iPhone 11 upgrades and there are some impressive additions. That said, this all still pales in comparison to the new design, radical display, return of Touch ID and step-up to 5G which will greet patient iPhone upgraders next year.

But the decision is all yours, both for better and for worse.

———

*Follow Gordon on Twitter and Facebook*

**More On Forbes**

iPhone 11 Reported To Drop Advanced
Camera Technology

Apple's Old iPhone Cancellations Make
Sense

No Notch iPhone Design With Touch ID
Reported For 2020

2020 iPhone Changes Detailed By JPMorgan

iPhone Exclusive: Apple's New Design
Confirmed

Editorial Standards          Reprints & Permissions

# Forbes

© 2026 Forbes Media LLC. All Rights Reserved.

AdChoices          Privacy Statement          Your Privacy Choices          Cookie Preferences          Digital Terms of Sale

Terms of Service          Contact Us          Send Us Feedback          Report a Security Issue          Jobs At Forbes          Reprints & Permissions

Forbes Press Room          Advertise

Case 2:25-cv-04670-EMC File 08/30/26 Entered 03/30/26 21:49:43 Doc 197 Main

**iPhone**

⏱ This article is more than **8 years old**

# The 'iPhone 8' will be able to tell when owner is looking at it, leak suggests

## HomePod software suggests device's facial-recognition system will work when phone is flat and be able to mute notifications when it detects user is looking



📷 An icon used to display the 'D22' iPhone found in a pre-release firmware from the Apple HomePod speaker, released to developers in July. Photograph: Apple

**Samuel Gibbs**

Thu 10 Aug 2017 09.06 EDT



More details have been revealed about the highly anticipated iPhone 8 by software leaks from Apple, including the device's ability to mute notifications when it detects you are looking at it.

While the name and precise release date of the next big change to the Apple's iPhone, dubbed the D22 iPhone, is unknown the leaked software for Apple's upcoming HomePod smart speaker has already revealed what the phone will look like, that it will have face recognition and other details.

## Wide-angle face recognition

Now further analysis by Brazilian Apple site iHelp BR has found suggestions that the iPhone 8's face recognition feature is designed to work when the smartphone is flat on a desk and doesn't require the device to be held up at head height to unlock the phone with a face.

One of the criticisms of current face and iris recognition technology, as employed by the Samsung Galaxy S8 and Microsoft's Windows Hello-enabled Surface computers, is that it must be either brought up to eye level to work or must be angled in such a way that it can clearly see the whole of your face.

Should Apple have designed a way to allow the infra-red based face recognition system to work at a much wider angle, including flat on a desk, it could go some way to alleviating the issues plaguing current iterations of the technology.

## Multiple faces might be supported

About Pearl ID:

1 - The software definitely supports it for payments
2 - 3rd party apps can use it
3 - You can add multiple faces pic.twitter.com/aUotHwD64f

— Guilherme Rambo (@_inside) August 9, 2017

Developer Guilherme Rambo found suggestions in the HomePod code that point to the iPhone's facial recognition system being able to detect more than one face. While being able to register multiple digits is logical for a fingerprint scanner-based system, for using both hands and multiple fingers in different scenarios for unlocking the phone, the same cannot be said of faces for a single-user device such as an iPhone.

It might be used to allow multiple people to unlock an iPhone, perhaps with limited access, or to be able to register a face with and without glasses.

# Higher quality slow-motion video

Apple was one of the first to make slow-motion video capture a standard feature on a smartphone, but while the frame rate has been doubled over the years, the resolution of the video captured at 240 frames per second has been fixed at the relatively small 720p.

Rambo found suggestions that the next version of the iPhone would be capable of capturing high-speed slow motion video at a full 1080p resolution using both the back and the front-facing cameras. A step up to 1080p should make for a noticeable improvement in quality.

# The iPhone will mute notifications when you're looking at it

Rambo also found suggestions in the code of the HomePod firmware that the next iPhone will be able to recognise when you're looking at it and mute notifications. The expectation is that the IR-scanning system used for facial recognition will be watching the user and detecting when they look at the phone. Samsung has already created a feature called smart stay, which uses a smartphone's front-facing camera to track eye attention and keep the screen lit while a user is looking at it.

Apple's system could use a similar technique, tracking eye position to avoid audible alerts when the phone is actively being looked at but not physically interacted with.

Apple is expected to announce new iPhones at its yearly September event. We'll find out exactly what it looks like and what it will be called then.

Apple declined to comment.

● **iPhone 8: everything we know from Apple's big software leak**

Case 25-1496 -04 Doc 65 Filed 03/30/26 Entered 03/30/26 10:42:49 Desc Main

## Most viewed

Case 25-1296-04507-FMC File 08/80/26-32 Entered File 03/30/26 60-47:49 47of 07
Document   Page 507 of 804

BRIAN BARRETT     GEAR   JUL 31, 2017 4:13 PM

# How an iOS Developer Just Uncovered The Next iPhone

**Inside Apple's big cell phone self-own.**



DAVID PAUL MORRIS/BLOOMBERG VIA GETTY IMAGES


SAVE THIS STORY

**WHEN DEVELOPER GUILHERME** Rambo saw that Apple had released firmware for the upcoming HomePod speaker, he thought it must have been a mistake. The HomePod doesn't come out until December, after all. Curiosity piqued, he started digging through the code, where he found perhaps the last thing he expected: Apple's next iPhone.

Case 25312496-04D97 5MG File 103/30/26 37nte Fib 03/30/26 0 47 49 14Desf 17
Document    Page 508 of 804

FEATURED    BEST LAPTOPS    APPLE MACBOOK NEO    HOME SECURITY CAMERAS    BEST COFFEE SUBSCRIPTIONS    B

8 of iPhone Pro, though no one outside Cupertino knows the official name yet—had previously leaked, Rambo found in the HomePod not rumors or hints but Apple's own documentation of one of its biggest releases in years. It confirms a new look with a slimmer bezel, the death of the Home button, and a powerful new face-recognition feature. It's the biggest bombshell Apple leak in years—and it came from Apple itself.

## Phone Home

The HomePod firmware first appeared on an official Apple public update feed a few days ago. Rambo unpacked it, hoping to glean anything interesting about how Apple's Siri-powered speaker works before Apple realized its mistake and pulled the code.

**READ MORE**

**FETISH**

**Stop Everything, There's a Red iPhone 7 Now**

BRIAN BARRETT

Like the iPhone, HomePod runs iOS. That in itself is unremarkable; developers have had access to a beta version of iOS 11 for more than a month now. But Rambo, a developer for a Brazilian ecommerce company, quickly made a critical discovery: The HomePod firmware that Apple released was iOS 11.0.2, a full two patches ahead of what's publicly available.

That means that it included some performance-related tweaks, sure. But more importantly, because it wasn't intended for public release, Apple hadn't scrubbed the code for mentions of its unreleased products. Like, say, its upcoming iPhone, which is expected in September.

"It's a process Apple goes through every year, to make sure developers can still access the upcoming iOS without revealing too much about the unannounced iPhone that will come upon the final release," says iOS developer Steven Troughton-Smith, who backed up Rambo's findings.

Realizing the potential for discovery, Rambo set to work.

"I decided to search for strings inside the firmware that could be related to the rumored 'Face ID' feature," Rambo says. "I searched for the word 'face' and noticed it matched several symbols in BiometricKit, the framework that currently handles Touch ID." Those references don't exist in the iOS 11 beta.

## Pearls Before iPhones

References to face recognition do not an iPhone 8 make. But as Rambo continued to comb through BiometricKit, he realized that the same terminology used to register a new Touch ID finger ("EnrollTouchID") had a face-authentication counterpart: EnrollPearlID. "Pearl ID" continued to show up throughout his searches, always tied to facial recognition.

That may not end up being what Apple calls its face-recognition feature, but calling it Pearl ID at this stage likely isn't intended to hide its purpose. "The codename just makes it easier to find all the related pieces of code in the OS, and by inspecting the code you can then see what kind of functions it has," Troughton-Smith says. What Rambo saw at that point, in other words, was an unreleased, unannounced Apple feature laid bare.

Figuring out what "Pearl ID" meant led to an even bigger find.

"During the search for references to this 'Pearl ID' thing I found a reference to 'Pearl-D22,'" Rambo says. "I decided to search for 'D22' and discovered it is the internal codename for the 'iPhone Pro' or 'iPhone 10.'"

While there aren't many D22 references, Apple left little doubt as to what it means. What sealed it? Rambo found a file in the PassKit framework, used by Wallet, called "Payment_glyph_phone-D22.caar," a format type that Apple uses to store vector graphics for animated UI elements. When Rambo rendered that image, he saw an iPhone unlike any he had seen before, because it doesn't yet exist.

Case 25-11496-JKS   Doc 765   Filed 03/30/26   Entered 03/30/26 04:49:15   Desc Main

@_inside · **Follow**

Me too. New bezel-less form factor as well



7:03 PM · Jul 30, 2017 from Itacorubi, Florianópolis

♥ **527**    💬 **Reply**    🔗 **Copy link**

**Read 27 replies**

Rambo found another reference to D22 in a video file, not present in the firmware, called "Enrollment_Tutorial_Loop-D22," which likely shows iPhone 8 owners how to register their face with Pearl ID.

"There are also some references in the firmware that suggest this D22 model will have a different battery charging method," Rambo says, though iOS 11.0.2 offers no clues as to what those differences might be.

## Scooped

| FEATURED | BEST LAPTOPS | APPLE MACBOOK NEO | HOME SECURITY CAMERAS | BEST COFFEE SUBSCRIPTIONS | B |

excepting the iPhone 4's early debut by Gizmodo in 2010. The minimally bezeled design and lack of a Home button mark the iPhone's most significant overhaul in years. The face-ID feature seems primed to be a focal point of the company's eventual introduction of the phone.

"This is a rough situation for Apple," says Troughton-Smith. "For them to be the source of the only concrete leaks about it and its design is going to upset a lot of people internally."

Embarrassment aside, the impact on actual sales may be muted. "I think the kind of people likely to wait for a new iPhone based on leaks were likely well aware of all the reporting on the subject already," says Jan Dawson, founder of Jackdaw Research. Dawson also notes that while this seems to confirm existing rumors, the real test of the iPhone's upcoming features is how well they work. Firmware can only tell you so much.

In which case, the biggest takeaway remains that Apple's internal security has once again slipped, as it did when macOS Sierra showed off Apple's MacBook Pro with OLED touch panel last fall, a few days before the product's official debut. The lapse this time seems even more glaring; Apple has more riding on the iPhone 8 than it does on its whole laptop line put together, and while airing it out a month before its release may not have a material impact on the company, it certainly doesn't help.

"We're seeing what we believe to be a pause in purchases of iPhone, which we believe is due to the earlier and much more frequent reports about future iPhones," Apple CEO Tim Cook said during the company's most recent earnings call.

This time, at least, Apple has no one to blame but itself.

## iPhone, You Phone

- Your iPhone has all kinds of sensitive and important data, which is why you should know how to back it up

- You probably don't want to talk with everyone that calls you. Blocking them might help.

- Just join the iPhone/iPad life? Here's how to set it up

# Exhibit C: Beddit Brandname


25 years of the free encyclopedia

# Beddit

> ⚠ **This is the current revision of this page, as edited by Rdr00iclly (talk | contribs) at 22:41, 18 December 2025. The present address (URL) is a permanent link to this version.**

**Beddit Oy**[2] (formerly **Finsor Oy**)[1] is a Finnish technology company that sells sleep tracking devices and a sleep tracking application to help monitor sleep.[3] The company was founded in October 2006 and released their first sleep tracker in November 2013. In May 2017, Beddit was acquired by Apple Inc.[3]

As of 2016, Beddit has collected over 3 million nights of sleep data from its users.[4]

| Beddit Oy | |
|---|---|
| Company type | Subsidiary |
| Industry | Technology |
| Founded | 12 October 2006 |
| Founder | Lasse Leppäkorpi |
| Headquarters | Espoo, Finland |
| Parent | Apple Inc. (2017–present) |
| Website | beddit.com (https://beddit.com) |
| **Footnotes / references** | |
| [1] | |

# History

### 2006–2017: Founding and growth

Beddit was founded on 12 October 2006[2] by Lasse Leppäkorpi.[4] The company originally performed basic sleep monitoring in hospitals by tracking the heart rate and breathing of patients without touching them.[5] However, it was too expensive to be released as a consumer product at the time.[5] In November 2013, the company released their first consumer sleep tracker for early backers after a crowdfunding campaign on Indiegogo, having raised $500,000.[4][5][6]

In July 2014, Misfit's Shine fitness tracker announced support for Beddit's sleep trackers as part of a partnership between the two companies.[7] On 6 October 2015 Beddit released a sleep tracking app for the Apple Watch.[8] On 4 October 2016 the company released the Beddit 3 sleep tracker at Apple Stores, on Amazon, and on Beddit's website.[9]

On 28 April 2017 Beddit announced that they would be phasing out their older sleep tracking devices, rendering them incompatible with the Beddit app, while giving users the option to upgrade to Beddit 3 for free.[10] At the time of this announcement, 80% of Beddit's users were Beddit 3 users.[10]

### 2017–present: Apple subsidiary

On 8 May 2017 Apple Inc. acquired Beddit for an undisclosed amount.[11][3][12] In September 2018, Beddit announced in an App Store update that their cloud service would shut down on 15 November 2018 for existing users, and new users would not be able to access its cloud service after 21 September 2018.[13] Beddit's cloud service shut down as planned on November 15 in an update to the Beddit app.[14]

Case 25-11496-1-CV-04267-5MC Filed 03/30/26 32 Entered Filed 03/30/26 10:44:49 Page 514 Desc Main Document Page 514 of 804

On 7 December 2018 Beddit released its first sleep tracker since being acquired by Apple, Beddit 3.5, on Apple's website and in stores.[15] It can sync with HealthKit and will function with one or two people in a bed, however, the second person cannot be tracked unless they have their own device.[16]

In June 2019, Beddit announced a beta program for their sleep tracking app in order to get feedback from users on how to improve their app.[17]

In August 2020, the firm and the University of California, Los Angeles (UCLA) announced that they would conduct a three year long study on how sleep, physical activity, heart rate, and daily routines can play a role in depression and anxiety in people.[18]

# References

1. "Company Overview of Beddit" (https://web.archive.org/web/20181203055442/https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=54618800). *Bloomberg L.P.* Archived from the original (https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=54618800) on December 3, 2018. Retrieved December 2, 2018.

2. "Beddit Oy :: OpenCorporates" (https://opencorporates.com/companies/fi/2065337-5). *OpenCorporates*. Archived (https://web.archive.org/web/20201111122613/https://opencorporates.com/companies/fi/2065337-5) from the original on 2020-11-11. Retrieved 2018-12-04.

3. Byford, Sam (May 10, 2017). "Apple acquires sleep-tracking hardware company Beddit" (https://www.theverge.com/2017/5/10/15604528/apple-buys-beddit-sleep-tracking-company). *The Verge*. Archived (https://web.archive.org/web/20201111204610/https://www.theverge.com/2017/5/10/15604528/apple-buys-beddit-sleep-tracking-company) from the original on November 11, 2020. Retrieved May 27, 2018.

4. Jan Kamps, Haje (December 2, 2016). "Beddit 3 knows if you've been sleeping. It knows if you're awake" (https://techcrunch.com/2016/12/02/beddit-3/). *TechCrunch*. Archived (https://web.archive.org/web/20200930192000/https://techcrunch.com/2016/12/02/beddit-3/) from the original on September 30, 2020. Retrieved May 27, 2018.

5. Merz, Theo (August 9, 2013). "Beddit: new mattress monitors your sleep" (https://www.telegraph.co.uk/technology/news/10232911/Beddit-new-mattress-monitors-your-sleep.html). *The Daily Telegraph*. ISSN 0307-1235 (https://search.worldcat.org/issn/0307-1235). Archived (https://web.archive.org/web/20200927143219/https://www.telegraph.co.uk/technology/news/10232911/Beddit-new-mattress-monitors-your-sleep.html) from the original on September 27, 2020. Retrieved August 18, 2018.

6. Flacy, Mike (August 29, 2013). "Beddit tracker monitors your sleep patterns without having to wear it" (https://www.digitaltrends.com/home/beddit-tracker-monitors-your-sleep-without-having-to-wear-it/). *Digital Trends*. Archived (https://web.archive.org/web/20200726165723/https://www.digitaltrends.com/home/beddit-tracker-monitors-your-sleep-without-having-to-wear-it/) from the original on July 26, 2020. Retrieved August 18, 2018.

7. Stein, Scott (2014-07-10). "Misfit Beddit Sleep System slips under your mattress to listen to you breathe" (https://www.cnet.com/news/misfit-beddit-an-under-the-bed-sleep-sensor-that-works-with-shine-fitness-tracker-and-app-too/). *CNET*. Archived (https://web.archive.org/web/20181002132253/https://www.cnet.com/news/misfit-beddit-an-under-the-bed-sleep-sensor-that-works-with-shine-fitness-tracker-and-app-too/) from the original on 2018-10-02. Retrieved 2018-08-18.

8. Hall, Zac (2015-10-06). "Beddit launches Apple Watch sleep tracking app as Smart Sleep Tracker comes to Apple Stores" (https://9to5mac.com/2015/10/06/beddit-apple-watch-retail-stores/). *9to5Mac*. Archived (https://web.archive.org/web/20201108090012/https://9to5mac.com/2015/10/06/beddit-apple-watch-retail-stores/) from the original on 2020-11-08. Retrieved 2018-12-01.

9. Rossignol, Joe (2016-09-26). "New Beddit 3 Sleep Tracker Available at Select Apple Stores Next Week" (https://www.macrumors.com/2016/09/26/beddit-3-sleep-tracker-apple-stores/). *MacRumors*. Archived (https://web.archive.org/web/20201108112456/https://www.macrumors.com/2016/09/26/beddit-3-sleep-tracker-apple-stores/) from the original on 2020-11-08. Retrieved 2018-08-18.

10. Langley, Hugh (2017-04-28). "Beddit is phasing out its old devices, but giving users a free upgrade" (http s://www.wareable.com/health-and-wellbeing/beddit-3-upgrade-phase-out-3893). *Wareable*. Archived (http s://web.archive.org/web/20200928092349/https://www.wareable.com/health-and-wellbeing/beddit-3-upgra de-phase-out-3893) from the original on 2020-09-28. Retrieved 2018-12-10.

11. Farr, Christina (2017-05-09). "Apple has acquired a sleep-tracking app called Beddit" (https://www.cnbc.co m/2017/05/09/apple-acquires-beddit-sleep-tracking-app.html). *CNBC*. Archived (https://web.archive.org/w eb/20201118045845/https://www.cnbc.com/2017/05/09/apple-acquires-beddit-sleep-tracking-app.html) from the original on 2020-11-18. Retrieved 2018-05-27.

12. Matney, Lucas; Panzarino, Matthew (2017-05-09). "Apple acquires sleep tracking company Beddit, but its site will stay live" (https://techcrunch.com/2017/05/09/apple-acquires-sleep-tracking-company-beddit/). *TechCrunch*. Retrieved 2025-12-18.

13. Cao, Peter (2018-09-21). "Apple-acquired Beddit sleep tracker shutting down cloud service in November" (https://9to5mac.com/2018/09/21/apple-beddit-cloud/). *9to5Mac*. Archived (https://web.archive.org/web/20 200817131405/https://9to5mac.com/2018/09/21/apple-beddit-cloud/) from the original on 2020-08-17. Retrieved 2018-09-22.

14. Cao, Peter (2018-11-15). "Apple-owned Beddit app officially removes cloud syncing functionality" (https://9 to5mac.com/2018/11/15/rip-beddit-cloud/). *9to5Mac*. Archived (https://web.archive.org/web/202008171314 13/https://9to5mac.com/2018/11/15/rip-beddit-cloud/) from the original on 2020-08-17. Retrieved 2018-11-27.

15. Lee, Dami (2018-12-07). "Apple releases new Beddit sleep tracker" (https://www.theverge.com/2018/12/7/ 18131220/apple-beddit-3-5-sleep-monitor). *The Verge*. Archived (https://web.archive.org/web/2020110811 1506/https://www.theverge.com/2018/12/7/18131220/apple-beddit-3-5-sleep-monitor) from the original on 2020-11-08. Retrieved 2018-12-08.

16. Fingas, Roger (2018-12-07). "Apple's Beddit emerges from hibernation with Beddit Sleep Monitor 3.5" (htt ps://appleinsider.com/articles/18/12/07/apples-beddit-emerges-from-hibernation-with-beddit-sleep-monitor -35). *AppleInsider*. Archived (https://web.archive.org/web/20201021101251/https://appleinsider.com/article s/18/12/07/apples-beddit-emerges-from-hibernation-with-beddit-sleep-monitor-35) from the original on 2020-10-21. Retrieved 2018-12-08.

17. Perez, Sarah (2019-06-18). "Apple launches a Beddit beta program focused on improving its app" (https:// techcrunch.com/2019/06/18/apple-launches-a-beddit-beta-program-focused-on-improving-its-app/). *TechCrunch*. Archived (https://web.archive.org/web/20190619021137/https://techcrunch.com/2019/06/18/ apple-launches-a-beddit-beta-program-focused-on-improving-its-app/) from the original on 2019-06-19. Retrieved 2020-12-30.

18. Miller, Chance (2020-08-04). "Apple teams up with UCLA on mental health study using Apple Watch, iPhone, and Beddit sleep tracker" (https://9to5mac.com/2020/08/04/apple-ucla-depression-anxiety-study/). *9to5Mac*. Archived (https://web.archive.org/web/20201005133659/https://9to5mac.com/2020/08/04/apple- ucla-depression-anxiety-study/) from the original on 2020-10-05. Retrieved 2020-12-30.

Retrieved from "https://en.wikipedia.org/w/index.php?title=Beddit&oldid=1328278127"

BEDDIT

# Apple silently removes Beddit apps from iOS App Store

 Filipe Espósito | Sep 30 2024 - 4:09 pm PT | 🗨 4 Comments



It's been seven years since Apple acquired Beddit, a platform specializing in sleep monitoring. In 2022, the company began phasing out Beddit products by removing them from retail stores. Now Apple has also removed Beddit apps from the iOS App Store, so users can no longer download them.

9T⊙5Mac ⌄                                                                    🔍

Both apps for managing Beddit 3.0 and 3.5 have now been removed from the App Store, as noted by *MacRumors*. They can no longer be found in the search and entering the direct link doesn't work.

In 2018, a year after the acquisition, Apple launched a new Beddit Sleep Monitor 3.5 with minor hardware changes. However, the company was no longer paying much attention to the Beddit brand and was slowly removing features such as cloud

synchronization and Android support. In 2022, the products were discontinued – but the app was still functional.

It's uncertain whether the Beddit apps are still functional after being removed from the App Store.

The Beddit devices were able to measure sleep time, heart rate, breathing, snoring, bedroom temperature, and humidity. Some of these features were later implemented in the Apple Watch. However, some customers still believe that the Apple Watch's sleep monitoring features are still quite rudimentary compared to dedicated sleep monitors.

Apple Watch, on the other hand, starts at $249 – although you can find the second generation Apple Watch SE for $189 on Amazon.

# Read also

- Apple details how Apple Watch accelerometer-based sleep apnea feature works

- Apple Watch Series 10 vs 8: Worth going new after 2?

- Masimo CEO Joe Kiani resigns amid legal dispute with Apple

- Apple Watch Series 10 won't get these faces despite larger screen than Ultra

- Apple releases watchOS 11 with these new features

- watchOS 11 finally lets users change their Apple Watch ringtone



# Featured

from

### Apple releases iOS 26.4 with 8 new emoji and 12 more changes to your iPhone

Zac Hall  |  Mar 24 2026

Community

Applications and Services   /   Other Apple Applications and Services



**BlueSkies05**  Author
Level 1   21 points

# Beddit App and Functionality

I'm looking for some information regarding the Beddit sleep monitor. From what I have found, it looks like Apple acquired the company about 5 years ago. However, the app has recently been removed from the App Store. What has happened and how should I regain functionality of my device?

Posted on Jan 10, 2025 7:50 PM

⬆ Helpful (4)   ⬇ Not helpful   ✋ Me too (12)   Reply

## Similar questions

**Trying to download the MIndCo Relief app but can't find it**

I can't find the app "Mindy o Relief" and need to download. Says I should be able to access but isn't showing when I do a search….

2 years ago     210     3

There are no replies.

This thread has been closed by the system or the community team. You may vote for any posts you find helpful, or search the Community for additional answers.

This site contains user submitted content, comments and opinions and is for informational purposes only. Apple may provide or recommend responses as a possible solution based on the information provided; every potential issue may involve several factors not detailed in the conversations captured in an electronic forum and Apple can therefore provide no guarantee as to the efficacy of any proposed solutions on the community forums. Apple disclaims any and all liability for the acts, omissions and conduct of any third parties in connection with or related to your use of the site. All postings and use of the content on this site are subject to the Apple Support Community Terms of Use. See how your data is managed…



Support     Community

More ways to shop: Visit an Apple Store, call 1-800-MY-APPLE, or find a reseller.

Copyright © 2026 Apple Inc. All rights reserved.     Privacy Policy   |   Terms of Use   |   Sales and Refunds   |   Legal   |   Site Map                   United States

**Welcome to Apple Support Community**
A forum where Apple customers help each other with their products. Get started with your Apple Account.
Learn more ›   Sign up ›                                                                          ⊗

Case 25312496-04507 FM File 03/30/26 32 Interfiled 03/30/26 10:49:49 Desc Main
Document       Page 519 of 804

# Apple acquires popular Apple Watch & iOS sleep tracking platform Beddit

 Chance Miller | May 9 2017 - 2:48 pm PT | 💬 0 Comments



Apple has acquired popular iOS sleep tracking platform and hardware maker Beddit. While specific details of the acquisition are unclear at this point, Beddit has updated the privacy policy on its website to announce the acquisition and note of a privacy policy change...

Furthermore, the **Beddit iOS app** was updated today to reflect that change in personal data collection policy that comes as part of the Apple acquisition.

> **Beddit has been acquired by Apple. Your personal data will be collected, used and disclosed in accordance with the Apple Privacy Policy.**

To go alongside its popular iOS and Apple Watch app, Beddit also sells sleep tracking hardware. For instance, the company sells its Beddit 3 Sleep Monitor, which is placed

underneath a bed sheet for more accurate sleep tracking. The product is sold via Apple's online store.

Sleep tracking has been one of the most sought after features for the Apple Watch and Apple's acquisition of Beddit shows that the company is actively looking into the area. Since the release of Apple Watch, users have turned to third-party platforms such as Beddit to track their sleep, but a first-party tool is long overdue.

With watchOS 4 likely to be unveiled later this year, it's possible that sleep tracking in some form might be included. Given how Beddit requires a hardware accessory to monitor sleep, however, it would be interesting to see Apple's approach. It's possible that the company will forgo Beddit's Sleep Monitor hardware in favor of an Apple Watch-centric approach. But we'll have to wait and see.

Have you used Beddit to track your sleep before? Let us know down in the comments.



# Featured

from 9T⊙5Mac



### Apple releases iOS 26.4 with 8 new emoji and 12 more changes to your iPhone

 Zac Hall  |  Mar 24 2026



### macOS 26.4 now available, here's everything new

 Marcus Mendes  |  Mar 24 2026



### Apple releases iPadOS 26.4, here's everything new for iPad

 Ryan Christoffel  |  Mar 24 2026



### Apple planning standalone Siri app for iOS 27 and macOS 27, per report

Zac Hall  |  Mar 24 2026

# Exhibit D: Beddit Study

TECH

# Apple and UCLA kick off a three-year depression study

PUBLISHED TUE, AUG 4 2020·2:11 PM EDT | UPDATED TUE, AUG 4 2020·2:20 PM EDT

 **Christina Farr**                                         WATCH LIVE

**KEY POINTS**

UCLA said on Tuesday, it is launching a three-year study to better understand how "sleep, physical activity, heart rate and daily routine," impacts symptoms of anxiety and depression.

Apple helped co-design the study, which uses Apple devices like the iPhone and Apple Watch.



watchOS 7 includes sleep tracking support.

UCLA on Tuesday said it is launching a three-year study to better understand how factors such as sleep, physical activity, heart rate and daily routines impact symptoms of depression and anxiety.

UCLA is working with [Apple]{.underline} to design the study, which will use data collected by the iPhone, Apple Watch and Beddit sleep-tracker, which Apple gained in a 2017 acquisition.

The university said that the pilot phase of the study will kick off this week and involves 150 participants recruited from among UCLA Health patients. From there, the next phases of the research will expand out to 3,000 participants from both the hospital and the student body. Study participants will download an app onto their iPhones, then receive a Beddit sleep monitor and an Apple Watch, which they can use throughout the study.

The study can be done entirely remotely so that people won't need to risk exposure during the pandemic.

For Apple, health is a growing area of focus. The company has launched software kits for health developers, including HealthKit and ResearchKit, and it's working on a variety of research collaborations. Its Apple Watch is now firmly focused on medical and fitness use-cases, and the company describes it as an "intelligent guardian" for its users' health.

Outside of Apple and UCLA, there's a growing interest in tapping into the data gleaned from smartphones and wearable devices -- so-called "digital exhaust" -- to determine how people are faring. For instance, companies like Mindstrong Health are looking into whether changes in how people type into a keyboard app can provide early insight into their mental health status.

Many mental health experts believe there is some meaningful signal from these consumer devices, even if it's a small one, but



# CNBC

clinical value.

"I think it's really exciting," said Dr. John Torous, the director of digital psychiatry of Beth Israel Deaconess Medical Center. "This shows that digital mental health research is really accelerating, and we're moving to the next phase of development."

Torous said that it's an important step to see companies like Apple getting involved.

"These are large-scale studies really trying to answer core questions about whether these digital technologies will work for mental health."



**VIDEO**  00:51

## The sleep-monitoring technology market could be a big opportunity for tech companies

> **Choose CNBC as your preferred source on Google and never miss a moment from the most trusted name in business news.**

## TRENDING NOW

Case 2:53-cv-21496-MEMS File 02/30/26 32 Enter Fil 03/30/26 60:42:49e-6Df c1 97in Document Page 525 of 804

(https://www.ucla.edu/)

# Depression Grand Challenge (/)

Home (/)

# Digital Mental Health Study completes data collection, enters analysis phase of study



**April 30, 2024**

The UCLA Depression Grand Challenge achieved a significant milestone on April 30, 2024, when the Digital Mental Health Study (DMHS) completed data collection, 26 months after starting.

## Media Contact

communicationsdgc@conet.ucla.edu (mailto:communicationsdgc@conet.ucla.edu)

## Categories

Case 2:53-12496-01587-EMS File 03/30/26 32 Entered File 03/30/26 01:43:49 - Def 197 in Document Page 526 of 804

The DMHS involved more than 3,000 participants recruited from UCLA Health and the UCLA student body. Objective measures of factors like sleep, physical activity, heart rate and daily routines were captured using digital sensing technology from iPhone, Apple Watch and sleep monitors given to each participant. Participants also completed daily assessment tasks and quarterly assessment appointments with the DMHS researchers.

The end of the data collection phase marks a transition to an intense data analysis phase designed to illuminate relationships between these objective data and symptoms of depression and anxiety.

*The UCLA Depression Grand Challenge's **Digital Mental Health Study**, conducted in collaboration with Apple, is a first-of-its-kind digital sensing study, launched in 2020 and engaging more than 3,000 participants who each consented to continuously share various data collected through their personal devices over a 12-month period. The study leveraged digital sensing technologies in iPhone, Apple Watches and Beddit sleep monitors to measure objective factors such as sleep, activity and daily routine, with the aim of identifying relationships between these objective factors and self-reported symptoms of anxiety and depression. Illuminating these relationships could enable health care providers to note warning signs and prevent the onset of depressive episodes, and track the effectiveness of treatment. Additionally, the researchers hypothesize that features from digital sensing may reveal different "subtypes" of depression – a discovery that could facilitate efforts to identify the role of specific genetic, environmental, or social risk factors in causing depression.*

**Causes & Trajectories (/newsroom-categories/causes-trajectories)**

## Project Fact Sheet

**Research Study: Digital Mental Health Study (/project/dmhs)**

3/26/26, 3:37 AM DMHS Digital Mental Health Study completes data collection, enters analysis phase | UCLA Depression Grand Challenge

Document    Page 527 of 804

**Tags:**

**collaboration (/newsroom-tags/collaboration)**

**digital sensing (/newsroom-tags/digital-sensing)**

**featured: research (/newsroom-tags/featured-research)**

**Suffering from depression? Click here to access treatment resources.**    (/treatment-resources)

 (https://www3.research.ucla.edu/)

**Contact Us (mailto:DEPRESSIONGC@UCLA.EDU?subject=Website%20Inquiry)**

**STAND website (https://www.stand.ucla.edu/)**

**UCLA STAND ALACRITY website (https://alacrity.dgc.ucla.edu)**

**UCLA Grand Challenges website (https://grandchallenges.ucla.edu/)**

**Research & Creative Activities website (https://www3.research.ucla.edu/)**

**Receive Updates (https://mailchi.mp/ucla/dgc)**

© 2026 Regents of the **University of California (http://www.universityofcalifornia.edu/)**

Emergency (https://www.bso.ucla.edu/)    Accessibility (https://www.ucla.edu/accessibility)
Report Misconduct (https://equity.ucla.edu/report-an-incident/)    Privacy & Terms of Use (https://www.ucla.edu/terms-of-use/)

(https://www.facebook.com/ucla) (https://twitter.com/ucla) (https://www.instagram.com/ucla) (https://www.youtube.com/user/ucla) (https://twitter.com/@ucla?lang=en)

Depression Grand Challenge (/)

---

Home (/)

FACT SHEET

# Research Study: Digital Mental Health Study

## Summary

The Digital Mental Health Study (DMHS) is designed to help revolutionize the detection and treatment of depression. The study is the largest of its kind today and is conducted in collaboration with Apple. The study consisted of two pilot phases before the launch of the final or main phase of the study, which began at the end of January 2022.

The research uses powerful sensor technology across iPhone, Apple Watch and Beddit sleep-monitoring devices. The main study involves more than 3,000 participants from UCLA Health and the UCLA student body who are expected to continue their engagement in the study for approximately one year.

## Why this research is important

Making the connection between objective, quantifiable data and symptoms of anxiety and depression could give health care providers the power to prevent the onset of depressive episodes, track the effectiveness of treatment and identify causes of depression.

## Primary Goal

To obtain objective measures of factors such as sleep, physical activity, heart rate and daily routines to illuminate the relationship between these factors and symptoms of depression and anxiety.



## Status

Analysis Phase

## Focus Area

**Courses & Trajectories (/discovery)**

## Team Leaders

Principal Investigator: Nelson Freimer

Operations Lead: Eliza Congdon

Case 5:25-cv-04697-EMC   Document 30-6   Filed 03/30/26   Page 6 of 17

## Anticipated Duration

August 2020 – April 2024

## Funding Source

Apple

## Number of Participants

More than 3,000

## Related Information

[The first pilot commenced on Aug. 4, 2020. (/news/ucla-launches-study-collaboration-apple-discover-insights-about-depression)](#)

[The second pilot commenced on Mar. 22, 2021. (/news/second-apple-pilot-study)](#)

[The main study commenced on Jan. 29, 2022. (/news/dmhs-main-study-begins)](#)

[Transition from data collection to data analyses commenced on April 30, 2024. (/news/dmhs-commences-analysis)](#)

## Recent News

**DGC-affiliated researcher Veronica Tozzo awarded one of four junior faculty research grants from Huo Family Foundation (/news/tozzo-huo-family-foundation-award)**

**First publication on DMHS posted on medRxiv, shares protocol details of landmark study (/news/dmhs-protocol-article)**

**New DGC-Apple research collaboration opens for nationwide recruitment (/national-digital-mental-health-study-launches)**

**Preliminary Digital Mental Health Study findings highlighted in TIME100 Health write-up (/news/time100-dmhs)**

**Digital Mental Health Study completes data collection, enters analysis phase of study (/news/dmhs-enters-analysis)**

**Apple cites UCLA Depression Grand Challenge research; launches innovative mental health features for iPhone, iPad and Apple Watch devices (/news/apple-cites-dgc-research)**

**DGC Director Nelson Freimer spotlights ongoing DGC research on depression causes in Semel Institute presentation (/news/nelson-freimer-semel-institute)**

## Related Links

**Study Enrollment Page**         **(https://dgc.ucla.edu/news/dmhs-main-study-begins)**

**Suffering from depression? Click here to access treatment resources.**     (/treatment-resources)

(https://www3.research.ucla.edu/)

Contact Us (mailto:DEPRESSIONGC@UCLA.EDU?subject=Website%20Inquiry)

STAND website (https://www.stand.ucla.edu/)

UCLA STAND ALACRITY website (https://alacrity.dgc.ucla.edu)

UCLA Grand Challenges website (https://grandchallenges.ucla.edu/)

Research & Creative Activities website (https://www3.research.ucla.edu/)

Receive Updates (https://mailchi.mp/ucla/dgc)

© 2026 Regents of the **University of California (http://www.universityofcalifornia.edu/)**

Emergency (https://www.bso.ucla.edu/)     Accessibility (https://www.ucla.edu/accessibility)

Report Misconduct (https://equity.ucla.edu/report-an-incident/)     Privacy & Terms of Use (https://www.ucla.edu/terms-of-use/)

(https://www.facebook.com/ugclatwitter.com/stdgcinstagram.com/ucladgc/youtube.com/user/@ucla)
lang=en)

**HEALTH + BEHAVIOR**

# UCLA launches major mental health study to discover insights about depression

Researchers from the Depression Grand Challenge collaborate with Apple



*Courtesy of Apple*

**Bill Kisliuk**

August 4, 2020

 Share

While the capability to diagnose cancer and heart problems has advanced by giant steps in recent years, methods to detect depression have stubbornly stayed the same for more than a century: Observe patients, and ask them how they are doing.

UCLA has launched a major new study, sponsored by and in collaboration with Apple, designed to help revolutionize detection and treatment of depression.

The three-year study, which begins this week, was co-designed by researchers at UCLA and Apple to obtain objective measures of factors such as sleep, physical activity, heart rate and daily routines to illuminate the relationship between these factors and symptoms of depression and anxiety.

The research will utilize Apple technology including iPhone, Apple Watch and a Beddit sleep-monitoring device. Making the connection between quantifiable data and symptoms of anxiety and depression could enable health care providers to note warning signs and prevent the onset of depressive episodes, track the effectiveness of treatment and identify causes of depression.

"As a neuroscientist by training with expertise in sleep, I am incredibly excited about this collaboration and am hopeful that it will lead to significant strides in mental health research," said UCLA Chancellor Gene Block.

Dr. Nelson Freimer, distinguished professor of psychiatry and director of the UCLA Depression Grand Challenge, is principal investigator on the study.

"This collaboration, which harnesses UCLA's deep research expertise and Apple's innovative technology, has the potential to transform behavioral health research and clinical care," Freimer said. "Current approaches to treating depression rely almost entirely on the subjective recollections of depression sufferers. This is an important step for obtaining objective and precise measurements that guide both diagnosis and treatment."

The study is the latest milestone for the Depression Grand Challenge, an ambitious UCLA initiative involving researchers from across disciplines to identify genetic and environmental factors that contribute to depression, understand the biological changes that depression causes in the brain and body, accelerate progress in diagnosis and treatment and end the stigma associated with the disorder. UCLA chose to take on this challenge because depression afflicts more than 300 million people worldwide, resulting in nearly 1 million suicides a year.

The pilot phase of the study, involving 150 participants recruited from among UCLA Health patients, begins this week. The main phases, to take place from 2021 through 2023, will involve some 3,000 participants, drawn both from UCLA Health patients and the UCLA student body.

Participants will need to download a research app on their personal iPhones. They will receive an Apple Watch and Beddit sleep monitor, which they will use for the duration of the study. Participants will share relevant information through periodic clinical interviews and questionnaires, as well as from data obtained from the phone, watch and sleep monitor.

Freimer emphasizes that ensuring the privacy and security of study participants' data is a high priority for both UCLA and Apple. UCLA will process and maintain study data in a secure environment, with access limited to members of the UCLA research team. UCLA and Apple will analyze the data only after they are coded and stripped of names and other contact information.

The study comes as the COVID-19 pandemic has disrupted lives and spurred a focus on anxiety and depression, and when physical distancing requirements have made scientific research challenging.

"UCLA and Apple have designed this study so that all aspects of participation can be accomplished remotely," Freimer said. "The pandemic has heightened anxiety and depression globally, and has increased awareness of the importance of behavioral health to overall wellbeing. At the same time, physical distancing requirements have limited in-person mental health assessment and treatment, leading to expanded use and acceptance of telehealth. These changes highlight the importance of incorporating technologies like those to be tested in this study into clinical research and eventually into practice."

The UCLA Depression Grand Challenge has already made significant advances in understanding and treating depression. Professor Jonathan Flint, who led a study proving for the first time the relationship between specific genetic factors and a tendency toward depression, has embarked on ambitious genetic research of tens of thousands of depression sufferers to understand the origins of the disease at the molecular level. In 2017, UCLA became the first university to offer voluntary depression and anxiety screening and immediate treatment to students through the STAND program developed by Professor Michelle Craske. This year, the Depression Grand Challenge created a COVID-19 Care Package and to offered it for free to members of the public to ease stress and anxiety associated with the pandemic.

These efforts, including the study that starts this week, form a comprehensive, multi-disciplinary approach to understanding depression, developing treatments and wiping away the stigma that has upended lives.

"The analyses made possible by the scale, length and design of this study will provide the most extensive evidence available to date regarding the possible uses of digital tools for assessing and tracking behavioral health," Freimer said. "We envision a future in which these tools will become indispensable for depression sufferers and those providing them care."

Tags: **health** | **depression** | **Grand Challenges** | **research** | **technology** | **mental health**

## More Images

Click image for full description and download.

# EXHIBIT E: STUDIES

Case 2:25-cv-12496-DPH-EAS ECF No. 1-27, PageID.534 Filed 03/30/26 Page 534 of 804

**Celebrating Innovation-First Cultures—Final Deadline This Friday. Apply Now!**   ✕

07-16-2010 | TECH

# Chambers of Super Silence: What's Inside Apple's $100 Million iPhone Radio Test Facility



During his spiel to explain why Apple's iPhone 4 doesn't have an antenna flaw in real-world experience, Steve Jobs used some plain science. And he showed off Apple's radio test facilities too, which cost $100 million. Apple's serious about testing.

**SHARE** 📤     **ADD ON GOOGLE**

Add Fast Company as a preferred source to see more of our stories on Google.

 B

Case 25-3124, Document 65, File 08/30/26, 32 Inter File 03/30/26 0:49-49 , 7D of 197 Main Document Page 535 of 804



During his spiel to explain why Apple's iPhone 4 doesn't have an antenna flaw in real-world experience, Steve Jobs used some plain science. And he showed off Apple's radio test facilities too, which cost $100 million. Apple's serious about testing.

An anechoic chamber is a room that's specifically designed to be "quiet." We're not talking library-levels of quiet here, either, we're talking amazingly noise-free. These sealed and shielded rooms are built to quiet down specific signal noises of different types, from audible sounds to specific radio frequencies for radar or radio systems. And even these radio-rooms tend to be quiet to the ear–check out a cool acoustic anechoic room in the video below).

Add Fast Company as a preferred source to see more of our stories on Google.

Case 2:23-cv-04597-FMO-FMF Filed 03/30/26 Interim Filed 03/30/26 04:49:49 Desc Main

**Microsoft Research acoustic anechoic chamber**
Andrew Kun



                                                      Watch on

How do they work? Those odd spikes you see lining the walls and floor are very carefully designed to shield the objects you're testing in the middle of the room. The spikes' shape, and the material they're made from, is chosen such that any signal hitting them is scattered off in a new direction and not concentrated in any particular point. This disperses a signal's energy and prevents reflection back to the test stand in the middle of the room. What you're experimenting on can operate in "clean" and isolated conditions, so you can more easily understand how it performs without the distracting effects from any signals other than the ones you choose to put in there.

Anechoic rooms are weird, eerie places to stand in for a number of reasons. First, you're use[d to a] ... ntinual background noise level, and when it's gone your ... ce its absence. Second, thanks to the way they're designed, ... de of an alien spaceship, crossed with the wild imaginings of an industrial designer who's experiencing a very dark acid trip.

> Add Fast Company as a preferred source to see more of our stories on Google.

Case 2:25-cv-04496-FMO-FFM    Document 32    Filed 03/30/26    Page 537 of 804    Page ID #:197



Apple spent $100 million on 17 of these rooms, and pops its wireless devices in the middle along with test transmitters and, as you can see, people using iPhones in a typical everyday manner. It *has* to do this so that it can optimize how its antennas work in real-life situations. Though some press reports wondered if the iPhone 4's "dummy" case, seen in the stolen iPhone 4 prototype affair, had masked an antenna design flaw–it was obvious to RF design engineers right from the start that this wasn't true. Apple will have used its anechoic chambers to rigorously test the device, particularly since it had such an innovative

Add Fast Company as a preferred source to see more of our stories on Google.

AND TO CONTINUE READING ↓

EXPLORE TOPICS

INNOVATION    TECHNOLOGY

Case 25-312496-048097 EMC File 03/30/26 32 Inter File 03/30/26 00:49:49 7Def:407 Main
Document Page 538 of 804





# Inside Apple's Actual Distortion Field: Giant Chambers, Fake Heads, And Black Cloaks

MG Siegler — 5:52 PM PDT · July 17, 2010



Latest

Security

Startups

AI

Venture

Apps

Apple

Events

Podcasts

Newsletters

devices from iPhones to iPads in these chambers to ensure the performance is up to their standards.

Yesterday after their press event, Apple gave myself and a handful of other journalists the chance to take a tour of these facilities. It was the first time anyone outside of Apple has ever seen them. In fact, most people who work at Apple have never seen them, we were told. The tour was led by Ruben Caballero, Apple's senior antenna expert (and, incidentally, the man in the news recently thanks to a BusinessWeek story — a story which Apple says is a "crock" and "total bullshit"). Also there to answer questions were Apple executives Phil Schiller, Bob Mansfield, and Greg Joswiak.

Right off the bat, it was made very clear to us that we were not allowed to take pictures or record video inside of these rooms. (The pictures in this post are

Someone has publicly leaked an exploit kit that can hack millions of iPhones

Cursor admits its new coding model was built on top of Moonshot AI's Kimi

Delve accused of misleading customers with 'fake compliance'

Cyberattack on vehicle breathalyzer company leaves drivers stranded across the US

Jeff Bezos reportedly wants $100 billion to buy and transform old manufacturing firms with AI

Case 25-1234, Document 101, 03/30/2026, 3718776, Page540 of 804

the ones Apple provided.) It's pretty clear why. While the chambers themselves are custom-made for Apple by various third party industrial manufacturers, the areas these chambers are in also contain a ton of other testing equipment. And yes, there were several things hidden under black cloaks on tables in these rooms.

"*This lab used to be secret. Most people don't know it exists,*" Caballero told us. Dubbed the "Black Labs," when I asked about the black cloaks, Caballero said that "*we have a lot of other projects going on.*"

At one point we were told that the iPad had been in testing in this facility "for years." Even more interesting may be that the iPhone 4 specifically had been in testing in these chambers for 2 years. You know that means. Not only was the iPhone 5 likely in the same room that we were in. But the iPhone 6 may have been around as well.



Employees had to restrain a dancing humanoid robot after it went wild at a California restaurant

**TC**

### Disrupt 2026: The tech ecosystem, all in one room

*Your next round. Your next hire. Your next breakout opportunity.* Find it at TechCrunch Disrupt 2026, where 10,000+ founders, investors, and tech leaders gather for three days of 250+ tactical sessions, powerful introductions, and market-defining innovation. Register now to save up to $400.

**San Francisco, CA** | October 13-15, 2026

**REGISTER NOW**

Case 25-13496 - Insider: Apple's Antenna Testing Facility | TechCrunch

Sadly, we weren't allowed to lift up the cloaks.

The point of our visit to these labs was clear: Apple wants it to be known just how much testing goes into devices such as the iPhone. More specifically, Apple wants to the world to know just how much testing the iPhone 4 went through before they deemed it ready to go. Again, it was in these various chambers for 2 years. This is obviously a direct response to allegations made recently that perhaps Apple didn't test the device enough before they shipped it.

So how do they test it? There are four stages. The first is a passive test to study the form factor of the device they want to create. The second stage is what Caballero calls the "junk in the trunk" stage. Apple puts the wireless components inside of the form factor and puts them in these chambers. The third part involves studying the device in one of these chambers but with human or dummy subjects. And the fourth part is a field test, done in vans that drive around various cities monitoring the device's signal the entire time (both with real people and with dummies).

We were shown three different anechoic chambers, each used for slightly different purposes. Some were used to test the devices by themselves, some were meant for testing with humans and the devices.



The most interesting of these rooms was one that Caballero called "Stargate." Why? Because well, it looks like it belongs in the movie/TV series *Stargate*. Inside this room, there's a giant ring that a human sits on a raised chair in the center of. This chair slowly rotates around as signals are passed around the entire outer circle. This creates a 360 degree test area. I was told this room is completely safe for humans. And people typically spend 40 minutes in there at a time for testing. By comparison, devices can stay in the other anechoic chambers for up to 24 hours at a time.

Speaking of movies, one chamber we didn't get to see was a giant one that looks exactly like Cerebo from the *X-Men* films. I mean, just look at the picture Apple provided (bottom). It's the same thing. Of course, in Apple's Cerebo, I assume the subject standing in the center can't read every human beings' mind. But I can only *assume* that as we didn't get to see this room.

Each of these chambers is also a bit frightening because each is covered from floor to ceiling with giant blue spikes. Sure, these spikes are made of foam and simply used to absorb and dampen any

Case 5:25-cv-04566-EKL   File 03/30/26   3:Trideo File 03/30/26 10:49:49   8 of 97 in Document     Page 543 of 804

waves, but still, these chambers look like they belong in a nightmare. Again, if Apple needs a place to silence critics, they have the rooms.

These chambers vary in cost, but each of the ones we saw cost over $1 million. All told, Apple said it has spent over $100 million on these testing facilities.

We then went into a room that contained fake heads. Obviously, these are used to test the various devices without having to use real humans. And Apple goes so far as to fill these heads with liquid mixtures of sugar, water, salt, and other components to replicate the make-up of the human brain. There were also replicas of the human hands and feet (that latter for Nike+ testing). If the tour started out as a bunch of people going to see the inside of Willy Wonka's Chocolate Factory for the first time, I was starting to grow concerned that it was turning into that scene where they enter the strange psychedelic tunnel.

But that feeling quickly subsided as we headed outside to see the vans Apple uses to test their devices in the real world. These are giant white vans with antennas on the top of them to pull in both cellular and GPS signals. The back of these vans contain various computer equipment to collect all the data and send it back to the labs at the headquarters.

Mansfield closed the tour by noting that they had hoped it was now a bit more clear the amount of time and energy Apple puts into testing these wireless products. "*We hope to give you a sense of the real engineering going on here,*" Mansfield said. It's not just testing, it's re-testing — and this goes on for months, he said.

3/26/26, 3:47 AM    Case 25-12496-AMC   Filed 03/30/26 3:  Inside Apple's Antenna Testing Facility, Where Radios And Breasts Are Used Much

Document    Page 544 of 804

No matter what your take is on the iPhone 4 antenna — [my take is here: it's real, but not a big deal](#) — there is no question that Apple spends a huge amount of time and money testing these devices. And the fact that the thing people will care most about in this whole 1,200-word post is the passing mention that the iPhone 5 and iPhone 6 *may* have been in one of these rooms, says just about all you need to say about the state of the iPhone.

For those interesting in learning more, [Apple has also posted the following page (and video)](#) about the antenna labs.



Topics:    [Apple](#)    [iPhone 4](#)    [TC](#)



---



**MG Siegler**

General Partner  |  X 𝕏 in 🏠

M.G. Siegler is a general partner at Google Ventures, where he primarily focuses on early-stage investments. He has...

View Bio  >



Loading the next article



TechCrunch

Staff

Contact Us

Advertise

Crunchboard Jobs

Site Map

Terms of Service

Privacy Policy

RSS Terms of Use

Kalshi

Copilot

Blue Origin

WordPress

Bezos

Tech Layoffs

ChatGPT

© 2026 TechCrunch Media LLC.

 **YOUR GUIDE TO A BETTER FUTURE**

 

apple event  >  Tech  >  Mobile  >  Phones

# A Billion Pixels a Second: I Got a Rare Look Inside Apple's Secret iPhone 16 Camera Labs

Here's how Apple took the iPhone 16 Pro's video capture and playback to another level with 4K 120fps slow-mo recording, spatial audio and new Audio Mix editing tools.

 **Patrick Holland**

Dec. 30, 2024 5:00 a.m. PT

10 min read



Apple has an anechoic chamber to test the microphones on the iPhone 16 Pro.

Celso Bulgatti/CNET

Case 25-11296-JTD Doc 765 Filed 03/30/26 Entered 03/30/26 14:49:37 Desc Main Document    Page 547 of 804

I'm standing on a wire mesh floor in a secluded room at Apple's headquarters in Cupertino, California. The "floor" I'm on is suspended over a pit filled with 4-foot foam wedges. The walls and ceiling in the room are also covered with large triangle-cuts of foam that remove virtually any echo. When I clap there's just the muffled sound from the impact of my hands. It's oh so quiet. If you're into the whole sensory deprivation thing, you'd be right at home in this strange room.

It's called a long wave anechoic chamber, and it's where Apple tests and calibrates the microphones on the iPhone 16. Earlier in December, I got a rare inside look at the testing chamber along with several other secret labs that Apple uses to test and calibrate the iPhone 16's audio and video features.



This gif shows us entering the Apple's anechoic chamber where it tests the iPhone 16.

Celso Bulgatti/CNET

For years the iPhone's ability to record videos with excellent image quality has been a high watermark when it comes to phones. Notable directors like Steven Spielberg, Zach Snyder, Steven Soderbergh and Rian Johnson have shot feature length movies, music videos or short films entirely with an iPhone.

But the iPhone's dominance in terms of its video prowess has been threatened recently as competitors like Samsung catch up. 4K video recorded with the Galaxy S24 Ultra looks incredible in terms of image quality and versatility. In 2023,

Google launched its Video Boost feature on the Pixel 8 Pro that processes video in the cloud after you record it to improve how it looks, even in low light.

That was all before the iPhone 16 Pro dropped. In my review I appreciated its new slow-motion video capture, superb speakers and camera upgrades, and I'm not the only one.

In a CNET survey from August, 38% of people said that better cameras are a main motivation for buying a new phone. At a time when more people are recording videos with their phones than ever, not just Hollywood directors, Apple took the iPhone's video capabilities to another level by bringing parity between regular videos and slow motion in terms of image quality and dynamic range. It also complemented the iPhone's support for spatial audio by introducing a new Audio Mix feature which allows iPhone owners to adjust the quality of the audio on the videos they record. You can make it seem like your subject is wearing a lavalier mic or in a professional recording studio all by moving around a few sliders in the Photos app.

It is fascinating to see the amount of time, testing and calibration that Apple poured into the iPhone 16 series' cameras and microphones and developing unique new features like Audio Mix.

Case 25-1496 · · · Document · · · Page 549 of 804

# Apple's anechoic chamber transforms the iPhone's mics



A portion of one of the walls in the anechoic chamber.

Celso Bulgatti/CNET

The first stop on my behind-the-scenes tour was that anechoic chamber with all the foam. This chamber makes a library sound as loud as a subway station by comparison. It's where the iPhone 16's microphones get tested and characterized which drives further development down the chain in terms of audio. Apple, like all phone makers, has the challenge of making something that can fit in your pocket and that can also capture pristine sounds and play them back the way you heard them.

"The iPhone is such a ubiquitous recording device and gets used in so many different environments that we want to make sure that we're able to capture the memory that our users are trying to capture in the truest form," Ruchir Dave, senior director, acoustics engineering at Apple, told me on the tour.

The iPhone 16 has four microphones. But compared to a regular mic, like a lavalier that a newscaster might wear, the ones on the iPhone are tiny. So in order to get them to pick up the higher quality sound of a much larger microphone, or

one that's pinned to someone's shirt, Apple had to do some clever engineering which started by testing what the iPhone 16's mics actually pick up.



The iPhone 16 Pro has four microphones (the gold rectangles).

Apple

"The approach we took was to go after both quality as well as utility. And as part of that, we developed a novel microphone component that allows us to deliver some of the best acoustic performance in a phone product," said Dave. "At the same time, [we] developed a feature like Audio Mix that gives users the flexibility to be able to capture different sounds and gives you that creative freedom in the edit to adjust it how you like."

And that brings me back to the anechoic chamber for a chime test. There is an array of speakers (roughly two dozen) mounted on a pipe in the shape of an arc that goes from under the wire mesh floor to the ceiling of the chamber. The speakers play a series of chimes and engineers measure what the iPhone 16 Pro's mics pick up. The phone, which is mounted on a stand atop a turnable base, rotates a few degrees clockwise and the chimes play again. This continues until the iPhone has rotated in a complete circle.

Case 25-1396, Document 36-1, File 03/30/26, 2nd Interlocutory Appeal 803646, Page 6 of 18



The anechoic chamber I visited had foam wedges on the walls, ceiling and underneath a suspended wire mesh floor. The chamber is used to test the iPhone 16's mics.

Patrick Holland/CNET

The result is a spherical sound profile for each mic made from the data recorded in that anechoic chamber. Apple takes these profiles and uses it as the foundation for spatial audio and other software that can reduce wind noise or make iPhone recorded audio act and sound like different kinds of microphones – think a lavalier mic or in-studio mic for a voiceover.

"We want to enable that [Audio Mix] feature as if you record it on a lapel mic," Dave explained. "We use machine learning algorithms as well as our tuning chains to come up with that signature sound that you're able to get even with lapel mics."

It is not just Ruchir with his golden ear that's sitting in there and dictating how it should sound.

Case 25-1234-04067-FMC File 03/30/26 Interim File 03/30/26 40:49 Doc 1 Main Document    Page 552 of 804

In real life, if I'm using a dedicated camera to record an interview, I can put a wireless lapel mic on a person so it's close to their mouth. That way the mic picks up their voice as much as possible. But when I film with an iPhone, the mics are where the phone is and can't be physically closer. And that's what Dave and his team set out to solve.

"We've been doing this development over a number of years," said Francesca Sweet, director of iPhone product marketing at Apple. "So much of the machine learning capabilities that we have today are built on years of experience and expertise that we've been developing."

And it shows. When I tested the iPhone 16 Pro, I was surprised just how well Audio Mix worked on videos I recorded of my friends talking. It's not a magic bullet by any means. But when I think back to my days filming low-budget commercials and short films in Chicago with an iPhone 5 and having to use and sync separate audio from an external audio recorder, something like Audio Mix would have saved so much time and stress.

Case 25-1213-06-04587-65MC-File-D-08/30/26-3-Entered-File-03/30/26-40-49-9-Dof-Main Document    Page 553 of 804

# There's more than just a man with a golden ear



Apple conducts perceptual audio testing with a variety of people and uses their feedback to help tune the audio recording and playback on the iPhone 16.

Celso Bulgatti/CNET

But the testing doesn't stop there. My next stop on Apple's lab tour was where comparative playback tests are conducted to help tune the iPhone's audio. After a maze-like walk from the anechoic chamber, I end up in a hallway with a couple of mini studios. The rooms are soundproof and each has a chair and desk with a Mac Studio, a Studio Display and a pair of AirPods Max headphones on it.

As opposed to just having one person with a good ear tune the iPhone's audio, Apple has a number of testers take a perceptual audio test and then uses those results to calibrate what you hear played back on your iPhone. I even got to be one of these testers while I was there and ran through a portion of the experience.

"It is not just Ruchir with his golden ear that's sitting in there and dictating how it should sound," emphasized Sweet. "We really want to make sure that anyone who's taking advantage of this feature [Audio Mix] is going to appreciate it and enjoy it."

I sat down at the desk and put the AirPods Max on my head. I played a video clip that had two audio tracks and could switch back and forth between them to rate whether I thought the audio was good, bad, fair, excellent and so on. It was that simple. The first video had a group of people on a sidewalk in a big city. The second was a selfie video that a man shot under an umbrella while walking through the rain. In one of the audio tracks in the selfie video the wind noise was very present. In the other track I could hardly hear it.

Apple uses comparative testing like this much in the same way an eye doctor might have you select between two different lenses in an eye test. Without something to compare the audio to, it's more of a challenge to evaluate a recording. The results from the perceptual testing help influence how the different aspects of the iPhone 16 Pro's audio works, including Audio Mix.



The Photos app on the iPhone 16 Pro has a tool called Audio Mix that lets you change the quality of the audio on videos you record.

Celso Bulgatti/CNET

Case 25-3123, Document 113-6, 03/30/2026, 3678659, Page555 of 804

"The idea behind development of Audio Mix is the iPhone gets used in all sorts of different scenarios and all sorts of different soundscapes and all sorts of different environments," said Dave. "We want to provide that flexibility to our users to be able to capture the sound they would like in those scenarios, rather than saying, 'This is what we think you should capture the sound,' and hard coding it."

Of course, Dave also pointed out that you don't need to be a video nerd (my words, not his) to have good audio in your iPhone videos.

"We're not expecting every user to go in and edit the videos and change the sliders," said Dave. "If you shot it the way we intended it to be shot, it should sound amazing. And if you still want to change it the way you would like, you have the full freedom."

# A private Dolby Atmos theater for iPhone videos



When I first entered Apple's video verification lab, there was only an Apple logo on the theater's screen.

Celso Bulgatti/CNET

My last stop was the video verification lab. If the anechoic chamber is about minimizing noise and stimuli, this lab, with its movie theater-sized screen, is all about the opposite. I wasn't able to see every corner of the theater or the control booth, but imagine having your own private Dolby Atmos theater to watch videos that you recorded on the iPhone.

"We use this theater to tune the video playback experiences so that when you play back these videos in a dark room, in an office environment or even under the sun, that you get the same perceptual experience you will get as if you're watching a video in the theater," Sean Yang, director of video engineering at Apple, told me.

I did the math. 4K video has 8,294,400 pixels per frame (3,840 × 2,160 pixels). At 120 frames per second, that's 995,328,000 pixels every second.

"

Apple calibrates every iPhone's display at the factory to make sure that the color is accurate, the brightness uniformity is good and the peak brightness matches its specs. But Yang and his team are focused on how videos look when you play them back no matter where you are. Unlike a TV or monitor, a phone screen has to contend with outdoor lighting, including direct sunlight, which can overwhelm what you're watching. The iPhone uses its ambient light sensor to adapt video playback to the lighting environment.

Like the perceptual testing that tunes the audio, Apple has people share their feedback on videos, so it's not just one person's opinion of how videos should look when played back on an iPhone.

"We actually have a group of experts at Apple to look at this video. If we have a difference of opinion, we get them together, we debate," explained Yang. "Oftentimes you need to have some trade-offs, and so we consulted many experts within Apple to make sure that the video comes through as highest quality, no matter where you played it."

Case 25-1249, Document 35, 03/30/2026, 3779960, Page1 of 97
Case 25-1249, Document 35-2, Filed 03/30/26, Page 557 of 804



I compare a reel of various video clips on an iPhone 16 Pro (center) and on the video verification theater's screen.

Celso Bulgatti/CNET

I got to see a demo of how the theater's screen mimics what video playback on an iPhone 16 Pro's screen looks like. There was a mix of clips from films, animated movies as well as videos recorded on the iPhone 16 Pro. And the reel included clips from one of my favorite new iPhone 16 Pro features, its ability to record and playback 4K 120fps slow-motion video.

"4K 120 is a massive amount of it [data]. If you think about it, it's 1 billion pixels per second," said Yang.

I did the math. 4K video has 8,294,400 pixels per frame (3,840 × 2,160 pixels). At 120 frames per second, that's 995,328,000 pixels every second. I don't know what's more impressive, the amount of data the iPhone 16 Pro needs to process to get 4K 120fps to work or how great the image quality and dynamic range are in the resulting slow-motion video.

Case 25-1496-04787-EMC File 03/30/26 32 Intered File 03/30/26 0:44:49 Desc Main
Document Page 558 of 804



Here is a still pulled from an iPhone 16 Pro slow-motion video.

Patrick Holland/CNET

"What's important is you can't really fake it, right? So if you're capturing at 120 frames per second, and you're slowing it down to half speed or quarter speed, you really are going to see every single frame in its full detail. And so any kind of artifacts or things like that are going to come through," said Sweet.

Even if you don't film a single frame of slow motion, you benefit from the work that Yang and his team do everyday in terms of video playback, whether it's watching a Disney Plus series like Star Wars: Skeleton Crew or just a selfie video that you recorded with some old friends toasting to the good times.

# Apple's labs are only as impressive as what comes out of them



Here's my point-of-view during a video verification test. The iPhone 16 Pro is on the left with the theater's screen in the background.

Patrick Holland/CNET

As I reflect back on the labs I saw and the engineers I met I kept thinking back to something that Sweet told me at the end of the day.

"We try to make it as seamless as possible for a user to interact with these really powerful tools that allow you to manipulate the audio or video and service them in a way that's really accessible," said Sweet. "But there is an inordinate amount of engineering work that goes in to make them that simple."

It's one thing for Apple to show off the effort and time its engineers have spent to get features like Audio Mix or 4K slow motion to work, but it's another to be able to use them in an easy and consistent way.

Case 25:23496-04D07-6TMCFiled-03/30/2632Entered-Filed-00/30/2261014449-1 10sf-197in


**CNET** YOUR GUIDE TO A BETTER FUTURE

 

  >  Tech  >  Mobile  >  Smartwatches

# I Went Inside Apple's Labs to See How Apple Watch Connectivity Is Tested

From radio labs to anechoic chambers that look like Elsa's castle, here's a rare look at how Apple tests Bluetooth, Wi-Fi, 5G and satellite connectivity on the Apple Watch.

**Vanessa Hand Orellana**

Sept. 18, 2025 5:00 a.m. PT

5 min read



Vanessa Hand Orellana/CNET

Stepping into the padded vault felt like entering some kind of portal. The sterile white room was lined with jagged, pyramid-shaped foam spires; a cross between a recording studio and some kind of icicle torture chamber straight out of Elsa's

castle from the movie Frozen. I glanced down at my phone: no bars. Deep inside Apple's testing labs, I was officially off the grid.

I've been reviewing smartwatches for almost a decade, but I've never once stopped to wonder how connectivity actually works on the Apple Watch. I've seen it seamlessly switch between my phone and Wi-Fi, pay for things without a hint of cellular signal, and map my runs even when I forget my phone at home. I've taken for granted how this invisible web of connections works behind the scenes, and according to Apple, that's very much by design.

From Wi-Fi and GPS to Bluetooth and GNSS, and now 5G and satellite connectivity on the Apple Watch Ultra 3, a constant stream of wireless signals moves in and out of the watch, making it tick. The antennas and hardware have to be seamlessly woven into the very fabric of the device from the earliest design phase -- out of sight and out of mind -- then tested in real-world scenarios to make sure nothing interferes with the signals going in or out (not even your arm).

In opening its lab doors, Apple seemed intent on shedding light on the rigorous testing process that goes into bringing a product like the Apple Watch to market. As the best-selling smartwatch in the world, the company has positioned the Apple Watch as the industry standard, which means every signal has to work exactly as intended. This kind of testing isn't just quality control; it's how Apple pushes the limits of what can fit inside a device this small, especially when competitors like Samsung and Google close in on its features and market share.

After getting a rare peek inside the connectivity testing labs where Apple stress-tests signal performance, I don't think I can ever just wear an Apple Watch without thinking about the carefully choreographed sequence of product design and testing that makes that connectivity possible.

# Testing antenna performance in a radio anechoic chamber

Apple does much of its connectivity testing at dedicated facilities near its headquarters in Cupertino, California. Our tour started at one of these nondescript buildings, normally off-limits to the public, as we shuffled through a maze of black partitions that I imagine were shrouding the hundreds of other

Case 2:23-cv-04006-JMC Filed 03/30/26 Entered 03/30/26 10:44:49 Desc Main Document    Page 562 of 804

tests we weren't allowed to see. We arrived at what appeared to be a bathroom-size padded vault that's lined with blue foam spikes like a slightly menacing sound booth.

This is what Apple calls a radio anechoic chamber: a completely radio-silent environment that blocks outside signals. In the center was an Apple Watch Series 11 on a black arm-shaped mount, mimicking how the human body might interfere with signals. A rotating black antenna ring circled the chamber, measuring how well the watch's own antennas were sending signals across different cellular and Wi-Fi bands. Once sealed, the chamber is designed to remove any outside interference.

Apple uses this chamber to test everything from early hand-built prototypes of watches to production-ready models, fine-tuning antenna performance for each cellular band and region and validating every single watch that comes off the production line.



Inside the anechoic chamber, Apple tests antenna performance using a Apple Watch Series 11 mounted on a mock arm.

Vanessa Hand Orellana/CNET

Both the Apple Watch Series 11 and Ultra 3 also use a new antenna diversity algorithm, which kicks in to combine the watch's two system antennas when the signal gets weak, boosting connectivity while conserving power.

## Adding in the human variable

But a rubber prototype doesn't quite make for a perfect stand-in for the rest of our meat-packed bodies, which can often create interference for the radio signals going in and out of our watch. On to the next lab for that. Deeper down the maze of partitions, we came across another, slightly larger vault. The stark white walls

stood in sharp contrast to the previous room's darker mood. This one didn't have any dismembered limb prototypes inside because it was meant to house actual humans, testing how the body itself can affect antenna signals.

Adding to the torture chamber vibe (maybe I watch too many movies) was a white midcentury modern armchair with a bright red cushion that seemed eerily out of place (or maybe perfectly fitting) in this hospital-like environment. I was assured the actual tests only last a few minutes (so, it's not actually a torture chamber). But I was still hesitant as I sat in the swiveling chair to give it a literal whirl myself, the white foam spires hanging over me like icicles. After all that build-up, the chair spun surprisingly slow and nothing like the Disneyland teacup experience I was picturing in my head.



Engineers use this chamber to study an actual human body impacts connectivity on the Apple Watch.

Vanessa Hand Orellana/CNET

The rotation allows Apple's engineers to map how the human body blocks or distorts the signal from different angles. This is especially important for the Apple Watch Ultra 3 and its new satellite connection, which relies on a directional antenna designed to connect to satellites orbiting 800 miles above Earth at 15,000mph.

Case 2:23-cv-04006-GJC Document 51-8 Filed 08/30/26 Entered 08/30/26 10:44:49 Desc Main Document    Page 564 of 804

Outside the chamber, engineers monitor the signal intensity that the watch receives via a (simulated) heat map of signal strength emanating from the screen as the tester turns.

## Going off the grid: GNSS chamber

The final chamber, tucked away on the basement level, was the largest of the three. As soon as I stepped into the massive room, I watched the cellular bars on my phone start to drop until they disappeared completely when I reached the center. This was the 15-by-15-meter Global Navigation Satellite System simulation room, which can trick a watch into thinking it's anywhere in the world. Today, I had been transported somewhere deep inside Alaska's Denali National Park.



This chamber can trick the Apple Watch into thinking its anywhere in the world (even off the grid) to test out location accuracy with satellite connectivity.

Vanessa Hand Orellana/CNET

It lacked the foam icicle walls of the other two chambers, but instead was lined with black spires jutting from the floor and surrounded by enormous circular antenna rings stacked toward the ceiling.

In the middle, an Apple Watch Ultra 3 sat on a black mock-arm mount, showing the exact off-the-grid made-up point on a map. The room can re-create the exact satellite geometry of any place on Earth, allowing Apple to test how accurately the watch can pinpoint your position. That kind of precision is critical for emergency SOS via satellite, but it also enables non-emergency features like sharing your location through Find My when you're off the grid.

## The invisible magic that makes it all work

According to Apple's engineers, this testing process is a delicate dance of creating, breaking, iterating and retesting, which can take a year to complete. Every step pushes the limits of what can fit inside the thin, curved body of an Apple Watch Series 11 without compromising its design or battery life. Apple would never say it outright, but I couldn't help imagining that somewhere behind those black partitions, they're already putting prototypes of the next two generations of Apple Watch through their paces.

And now, having seen the lengths Apple goes to behind closed doors, I know I'll feel a little more confident the next time I'm off the grid, knowing that somewhere in a hidden lab in Cupertino, Apple's engineers have already tested for that exact spot.



About CNET

Press Room

Newsletters

Licensing

Sitemap

Software Downloads

Accessibility

Privacy Policy

Terms of Use

    

US France Germany Japan Korea

## Newsroom

Apple Services     Apple Stories     🔍 Search Newsroom

**PRESS RELEASE**
May 15, 2024

# Apple announces new accessibility features, including Eye Tracking, Music Haptics, and Vocal Shortcuts



Coming later this year, Apple's new accessibility features include Eye Tracking, a way for users to navigate iPad and iPhone with just their eyes.

**CUPERTINO, CALIFORNIA** — Apple today announced new accessibility features coming later this year, including Eye Tracking, a way for users with physical disabilities to control iPad or iPhone with their eyes. Additionally, Music Haptics will offer a new way for users who are deaf or hard of hearing to experience music using the Taptic Engine in iPhone; Vocal Shortcuts will allow users to perform tasks by making a custom sound; Vehicle Motion Cues can help reduce motion sickness when using iPhone or iPad in a moving vehicle; and more accessibility features will come to visionOS. These features combine the power of Apple hardware and software, harnessing Apple silicon, artificial intelligence, and machine learning to further Apple's decades-long commitment to designing products for everyone.

"We believe deeply in the transformative power of innovation to enrich lives," said Tim Cook, Apple's CEO. "That's why for nearly 40 years, Apple has championed inclusive design by embedding accessibility at the core of our hardware and software. We're continuously pushing the boundaries of technology, and these

new features reflect our long-standing commitment to delivering the best possible experience to all of our users."

"Each year, we break new ground when it comes to accessibility," said Sarah Herrlinger, Apple's senior director of Global Accessibility Policy and Initiatives. "These new features will make an impact in the lives of a wide range of users, providing new ways to communicate, control their devices, and move through the world."

### Eye Tracking Comes to iPad and iPhone

Powered by artificial intelligence, Eye Tracking gives users a built-in option for navigating iPad and iPhone with just their eyes. Designed for users with physical disabilities, Eye Tracking uses the front-facing camera to set up and calibrate in seconds, and with on-device machine learning, all data used to set up and control this feature is kept securely on device, and isn't shared with Apple.

Eye Tracking works across iPadOS and iOS apps, and doesn't require additional hardware or accessories. With Eye Tracking, users can navigate through the elements of an app and use Dwell Control to activate each element, accessing additional functions such as physical buttons, swipes, and other gestures solely with their eyes.

### Music Haptics Makes Songs More Accessible

Music Haptics is a new way for users who are deaf or hard of hearing to experience music on iPhone. With this accessibility feature turned on, the Taptic Engine in iPhone plays taps, textures, and refined vibrations to the audio of the music. Music Haptics works across millions of songs in the Apple Music catalog, and will be available as an API for developers to make music more accessible in their apps.

## New Features for a Wide Range of Speech

With Vocal Shortcuts, iPhone and iPad users can assign custom utterances that Siri can understand to launch shortcuts and complete complex tasks. Listen for Atypical Speech, another new feature, gives users an option for enhancing speech recognition for a wider range of speech. Listen for Atypical Speech uses on-device machine learning to recognize user speech patterns. Designed for users with acquired or progressive conditions that affect speech, such as cerebral palsy, amyotrophic lateral sclerosis (ALS), or stroke, these features provide a new level of customization and control, building on features introduced in iOS 17 for users who are nonspeaking or at risk of losing their ability to speak.

"Artificial intelligence has the potential to improve speech recognition for millions of people with atypical speech, so we are thrilled that Apple is bringing these new accessibility features to consumers," said Mark Hasegawa-Johnson, the Speech Accessibility Project at the Beckman Institute for Advanced Science and Technology at the University of Illinois Urbana-Champaign's principal

investigator. "The Speech Accessibility Project was designed as a broad-based, community-supported effort to help companies and universities make speech recognition more robust and effective, and Apple is among the accessibility advocates who made the Speech Accessibility Project possible."

## Vehicle Motion Cues Can Help Reduce Motion Sickness

Vehicle Motion Cues is a new experience for iPhone and iPad that can help reduce motion sickness for passengers in moving vehicles. Research shows that motion sickness is commonly caused by a sensory conflict between what a person sees and what they feel, which can prevent some users from comfortably using iPhone or iPad while riding in a moving vehicle. With Vehicle Motion Cues, animated dots on the edges of the screen represent changes in vehicle motion to help reduce sensory conflict without interfering with the main content. Using sensors built into iPhone and iPad, Vehicle Motion Cues recognizes when a user is in a moving vehicle and responds accordingly. The feature can be set to show automatically on iPhone, or can be turned on and off in Control Center.

## CarPlay Gets Voice Control, More Accessibility Updates

Accessibility features coming to CarPlay include Voice Control, Color Filters, and Sound Recognition. With Voice Control, users can navigate CarPlay and control apps with just their voice. With Sound Recognition, drivers or passengers who are deaf or hard of hearing can turn on alerts to be notified of car horns and sirens. For users who are colorblind, Color Filters make the CarPlay interface visually easier to use, with additional visual accessibility features including Bold Text.

## Accessibility Features Coming to visionOS

This year, accessibility features coming to visionOS will include systemwide Live Captions to help everyone — including users who are deaf or hard of hearing — follow along with spoken dialogue in live conversations and in audio from apps. With Live Captions for FaceTime in visionOS, more users can easily enjoy the unique experience of connecting and collaborating using their Persona. Apple Vision Pro will add the capability to move captions using the window bar during Apple Immersive Video, as well as support for additional Made for iPhone hearing devices and cochlear hearing processors. Updates for vision accessibility will include the addition of Reduce Transparency, Smart Invert, and Dim Flashing Lights for users who have low vision, or those who want to avoid bright lights and frequent flashing.

These features join the dozens of accessibility features already available in Apple Vision Pro, which offers a flexible input system and an intuitive interface designed with a wide range of users in mind. Features such as VoiceOver, Zoom,

and Color Filters can also provide users who are blind or have low vision access to spatial computing, while features such as Guided Access can support users with cognitive disabilities. Users can control Vision Pro with any combination of their eyes, hands, or voice, with accessibility features including Switch Control, Sound Actions, and Dwell Control that can also help those with physical disabilities.

"Apple Vision Pro is without a doubt the most accessible technology I've ever used," said Ryan Hudson-Peralta, a Detroit-based product designer, accessibility consultant, and cofounder of Equal Accessibility LLC. "As someone born without hands and unable to walk, I know the world was not designed with me in mind, so it's been incredible to see that visionOS just works. It's a testament to the power and importance of accessible and inclusive design."

## Additional Updates

- For users who are blind or have low vision, **VoiceOver** will include new voices, a flexible Voice Rotor, custom volume control, and the ability to customize VoiceOver keyboard shortcuts on Mac.

- **Magnifier** will offer a new Reader Mode and the option to easily launch Detection Mode with the Action button.

- Braille users will get a new way to start and stay in **Braille Screen Input** for faster control and text editing; Japanese language availability for Braille Screen Input; support for multi-line braille with **Dot Pad**; and the option to choose different input and output tables.

- For users with low vision, **Hover Typing** shows larger text when typing in a text field, and in a user's preferred font and color.

- For users at risk of losing their ability to speak, **Personal Voice** will be available in Mandarin Chinese. Users who have difficulty pronouncing or reading full sentences will be able to create a Personal Voice using shortened phrases.

- For users who are nonspeaking, **Live Speech** will include categories and simultaneous compatibility with **Live Captions**.

- For users with physical disabilities, **Virtual Trackpad** for AssistiveTouch allows users to control their device using a small region of the screen as a resizable trackpad.

- **Switch Control** will include the option to use the cameras in iPhone and iPad to recognize finger-tap gestures as switches.

- **Voice Control** will offer support for custom vocabularies and complex words.

### Celebrate Global Accessibility Awareness Day with Apple

This week, Apple is introducing new features, curated collections, and more in celebration of Global Accessibility Awareness Day:

- Throughout the month of May, select **Apple Store locations** will host free sessions to help customers explore and discover accessibility features built into the products they love. Apple Piazza Liberty in Milan will feature the talent behind "Assume that I can," the viral campaign for World Down Syndrome Day. And available year-round at Apple Store locations globally, Today at Apple group reservations are a place where friends, families, schools, and community groups can learn about accessibility features together.

- **Shortcuts** adds Calming Sounds, which plays ambient soundscapes to minimize distractions, helping users focus or rest.

- Visit the **App Store** to discover incredible apps and games that promote access and inclusion for all, including the accessible App Store Award-winning game Unpacking, apps as tools for augmentative and alternative communication (AAC), and more.

- The **Apple TV app** will honor trailblazing creators, performers, and activists who passionately share the experiences of people with disabilities. This year's theme is Remaking the World, and each story invites viewers to envision a reality where everyone is empowered to add their voice to the greater human story.

- **Apple Books** will spotlight lived experiences of disability through curated collections of first-person narratives by disabled writers in ebook and audiobook formats.

- **Apple Fitness+** workouts, meditations, and trainer tips welcome users who are deaf or hard of hearing with American Sign Language, and Time to Walk now includes transcripts in the **Apple Podcasts** app. Fitness+ workouts always include Audio Hints to support users who are blind or have low vision, as well as modifiers so that users of all levels can participate.

- Users can visit **Apple Support** to learn how their Apple devices can be customized using built-in accessibility features. From adapting the gestures to customizing how information is presented on a device's screen, the Apple Accessibility playlist will help users learn how to personalize Apple Vision Pro, iPhone, iPad, Apple Watch, and Mac to work best for them.

## Share article



Aa  **Text of this article**                    Copy text 📋

🖼️  **Images in this article**              Download all images ⬇️

**About Apple**

Apple revolutionized personal technology with the introduction of the Macintosh in 1984. Today, Apple leads the world in innovation with iPhone, iPad, Mac, AirPods, Apple Watch, and Apple Vision Pro. Apple's six software platforms — iOS, iPadOS, macOS, watchOS, visionOS, and tvOS — provide seamless experiences across all Apple devices and empower people with breakthrough services including the App Store, Apple Music, Apple Pay, iCloud, and Apple TV+. Apple's more than 150,000 employees are dedicated to making the best products on earth and to leaving the world better than we found it.

## Press Contacts

**Apple Media Helpline**                **Apple Media Helpline**

media.help@apple.com                media.uk@apple.com

## More from Apple Newsroom



PHOTOS

**Apple hosts 50th anniversary celebrations around the world**

March 25, 2026



UPDATE

**Introducing Apple Business — a new all-in-one platform for businesses of all sizes**

March 24, 2026

You are invited to take part in a short survey to help us improve your Apple Support online experience. Please select Yes if you would like to participate.

**Yes**    **No**

---

iPhone User Guide                                                                    Communities

Select version:

iOS 26

🔍 Search this guide

Table of Contents ⊕

# Control iPhone with the movement of your eyes

With Eye Tracking, you can control iPhone using just your eyes. An onscreen pointer follows the movement of your eyes, and when you look at an item and hold your gaze steady, or *dwell*, you perform an action, such as a tap. All data used to set up and control Eye Tracking is processed on device.

---

## Before you begin

Eye Tracking uses the built-in, front-facing camera on iPhone. For best results, make sure that the camera has a clear view of your face and that your face is adequately lit. iPhone should be on a stable surface about a foot and a half away from your face.

Eye Tracking is available with supported iPhone models.

---

## Turn on Eye Tracking

1. Go to Settings 🎛 > Accessibility > Eye Tracking, then turn on Eye Tracking.

2. Follow the onscreen instructions to calibrate Eye Tracking. As a dot appears in different locations around the screen, follow its movement with your eyes.

   *Note:* You need to calibrate Eye Tracking every time you turn it on.

---

## Use Eye Tracking

After you turn on and calibrate Eye Tracking, iPhone follows the movement of your eyes. By default, when you're looking at an item on the screen, an outline appears around the item.

If Snap to Item is turned off, when you hold your gaze steady at a location on the screen, the dwell pointer ⚪ appears where you're looking and the dwell timer begins (the dwell pointer circle starts to fill). When the dwell timer finishes, an action—tap, by default—is performed.

To perform additional onscreen gestures or physical button presses, use the AssistiveTouch menu ⬤. See Use AssistiveTouch.

## Recalibrate Eye Tracking

If you change the position of your face or your iPhone, Eye Tracking calibration automatically starts if recalibration is needed. You can also manually start Eye Tracking calibration.

1. Look at the top-left corner of your screen and hold your gaze steady.

   The dwell pointer ⬤ appears and the dwell timer begins (the dwell pointer circle starts to fill). When the dwell timer finishes, Eye Tracking calibration starts.

2. Follow the onscreen instructions to calibrate Eye Tracking. As a dot appears in different locations around the screen, follow its movement with your eyes.

You can change which corner of the screen you need to look at to start recalibration or assign actions to other corners. See Set up Dwell Control.

## Set options for Eye Tracking

You can set options for how the Eye Tracking pointer responds to your gaze.

1. Go to Settings ⚙ > Accessibility > Eye Tracking, then adjust any of the following:

   - *Smoothing:* Increase this value to make the movement of the pointer smoother. Or decrease this value to make the pointer more responsive.

   - *Snap to Item:* Have the Eye Tracking pointer automatically move to the item on the screen that's closest to where you're looking.

   - *Zoom on Keyboard Keys:* When you dwell on the keyboard, zoom in on the section of the keyboard you're looking at. Dwell again on a key to tap it.

   - *Auto-Hide:* Show the Eye Tracking pointer when you hold your gaze steady for the amount of time specified. The pointer automatically fades while your eyes are moving.

   - *Dwell Control:* Turn Dwell Control on or off. To adjust settings for Dwell Control, such as the default dwell action and the duration of the dwell timer, see Set up Dwell Control.

   - *Show Face Guidance:* Turn Show Face Guidance on or off to get help adjusting how you're positioned.

To change the size or color of the Eye Tracking pointer, go to Settings > Accessibility > Pointer Control. See Make the pointer easier to see when using a mouse or trackpad with iPhone.

See also

Accessibility features for mobility on iPhone

Case 25:23496-04D07-65MCFiled 03/30/26 32 Entered 00/30/26 10:43:40 11 Desc Main



**Previous**

Control a nearby Apple device

**Next**

Control iPhone with the movement of your
head

Helpful?    Yes    No

Support  >  iPhone User Guide  >  Control iPhone with the movement of your eyes

Copyright © 2026 Apple Inc. All rights reserved.    Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Site Map    United States

# Exhibit F: Apple.com/legal

# More Resources

Explore additional resources about legal matters, and find detailed contact information for any remaining questions.

## Phishing & Other Suspicious Emails

Use these tips to avoid phishing scams and learn what to do if you think your Apple ID has been compromised.

See phishing tips ›

## Government Information Requests

Our Privacy site contains important information about government requests for customer information, relevant Apple guidelines, and our responses.

Learn more about these requests ›

## Contact Apple Legal

If you have questions about legal topics, we'd like to hear from you. Use this page to connect with the right department for your specific type of question.

Contact us ›

## Apple Bag Check Class Action Settlement

The Frlekin v. Apple Inc. California class action regarding unpaid wages for time spent in bag and technology checks has settled.

Learn more about the Apple Bag Check Class Action Settlement ›

## Foreman Class Action Settlement

The Foreman v. Apple Inc. class action regarding alleged unpaid wages for time spent traveling to different store locations has settled.

Learn more about the Foreman Class Action Settlement ›

## NLRB Settlement - Case 32-CA-284428

Learn more about Apple's recent settlement with the NLRB  (PDF)

## App Store Transparency Report

## California Generative AI Training Data Transparency

This page includes information relevant to the California Generative Artificial Intelligence Training Data Transparency Act (Assembly Bill No. 2013).

Learn More about the datasets used for Apple's generative AI systems and services ›

## European Digital Services Act (DSA)

This page includes information relevant to the EU Digital Services Act (Regulation (EU) 2022/2065 of the European Parliament and of the Council of 19 October 2022 on a Single Market For Digital Services and amending Directive 2000/31/EC) (the DSA).

Learn more about DSA ›

## European Digital Markets Act (DMA)

This page includes information relevant to the EU Digital Markets Act (Regulation (EU) 2022/1925 of the European Parliament and of the Council of 14 September 2022 on contestable and fair markets in the digital sector and amending Directives (EU) 2019/1937 and (EU) 2020/1828) (the DMA).

Learn more about DMA ›

## Global Trade Compliance

A list of classification codes and information for Apple hardware and software, and information on where to direct inquiries.

Learn about Global Trade Compliance ›

## Supplier Provisions

U.S. state-specific standards for Apple suppliers that service state government agencies on behalf of Apple in the United States.

View the Supplier Provisions  (PDF)

## Filemaker Legal Information

FileMaker, Inc. is a subsidiary of Apple. You can find legal information for the company here.

Legal    Hardware    Software    Sales & Support    Internet Services    Intellectual Property    More Resources

Annual report on App Store operations.

View the App Store Transparency Reports ›

Visit Filemaker ›

## Apple Value Services Legal Information

Apple Value Services, LLC is a subsidiary of Apple. You can find legal information for the company here.

Visit Apple Value Services ›

## Romania Public Country by Country Report

VIew the Romania Public Country by Country Report  (PDF)

 > Legal > More Resources

**Hardware and Software**

Hardware Warranties

Software License Agreements

RF Exposure

**More Resources**

Overview

Government Information Requests

Contact Apple Legal

Global Trade Compliance

Supplier Provisions

Filemaker Legal Information

Apple Bag Check Class Action Settlement

Foreman Class Action Settlement

**Sales & Support**

Overview

AppleCare

Repair Terms and Conditions

Express Replacement Service

Remote Support Terms and Conditions (PDF)

Sales Policies

Certification Agreements and Policies

Apple Gift Card Terms and Conditions

Training Service Terms and Conditions

Support Communities Terms of Use

**Internet Services**

Overview

Apple Media Services Terms and Conditions

Apple Gift Card Terms and Conditions

iCloud Terms of Service

TestFlight Terms and Conditions

Privacy Policy

Website Terms of Use

**Intellectual Property**

Overview

Guidelines for Using Apple Trademarks and Copyrights

Trademarks

Rights and Permissions

Piracy Prevention

Unsolicited Idea Submission Policy

**Platform Services**

Apple Business Terms of Service

Apple School Manager

Data Transfer Agreements

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE (1-800-692-7753).

Copyright © 2026 Apple Inc. All rights reserved.        Privacy Policy  |  Terms of Use  |  Sales and Refunds  |  Legal  |  Site Map                    United States

**This Notice is Posted Pursuant to a Settlement Agreement Approved by the Regional Director of Region 21 of the National Labor Relations Board in Case 32-CA-284428.**

=====================

STATEMENT REGARDING CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

Apple has clarified the definition of "Proprietary Information" in the current version of the Confidentiality and Intellectual Property Agreement ("IPA") as reproduced below. This term "Proprietary Information" has been replaced with the defined term "Apple Confidential Information," and reflects Apple's interpretation of Proprietary Information for all current and former employees regardless of their specific IPA version and aligns to the way Apple interprets the scope of employees' confidentiality obligations.  The term "Proprietary Information" in any former version of the IPA should not be construed inconsistently with the definition below and should not be construed as limiting employee rights to discuss wages, hours, and terms and conditions of employment.

Section I of the IPA now reads as follows:

> You understand and agree that Your Employment creates a relationship of confidence and trust with respect to certain information that may be disclosed to You or otherwise learned or accessed by You in the course of Your Employment, including any
>
> confidential information of third parties disclosed or made available to any Apple Entity ("Third Party Confidential Information"). As used in this Agreement, "Apple Confidential Information" means all Third Party Confidential Information and all non-public information that is kept confidential by any Apple Entity, including such information pertaining to or consisting of: (a) inventions, trade secrets, R&D records, reports, samples, manuals, plans, specifications, ideas, know how, designs, prototypes, software, source code, notes, photographs, screenshots, whiteboard captures, remote video chats, drawings, sketches or any other confidential materials or information relating to past, existing or future products or services, whether or not developed, marketed, used, or rejected by any Apple Entity or persons or companies for or on behalf of any Apple Entity; and (b) sales, profits, organization, customer data, pricing, operations, sources of material, supply, costs, manufacturing, financials, forecasts, budgets, profit and loss statements, market research, marketing or advertising strategy or plans, product roadmaps, product volumes, aggregated performance review metrics or data, aggregated recruiting or interview information, headcount planning reports, project planning documents, dates or content of new product launches, methods of distribution or manufacture or testing and unpublished patent applications. You understand that the above list is not exhaustive and that Apple Confidential Information includes other information that falls within its definition that would appear to a reasonable person to be confidential, proprietary and/or of commercial value in the context

and circumstances in which the information is known or used. Apple Confidential Information does not include (i) any information that is generally available to the public, unless the information falls within the definition of Apple Confidential Information, but became publicly available through unlawful means or as a result of any breach of a confidentiality obligation to any Apple Entity, including any breach by You of this Agreement and (ii) any information that was known to You prior to Your Employment with Apple.

Notwithstanding the foregoing, nothing in this Agreement restricts Your right to (A) use or disclose Your general training, knowledge, professional experience and skills, (B) seek or accept any job, including with a competitor of Apple, where such job begins after Your separation from employment with Apple, (C) discuss or disclose information about Your or others' wages, hours, or working conditions, or (D) discuss or disclose information about unlawful acts in the workplace, including harassment, discrimination, or any other conduct You have reason to believe is inappropriate in the workplace, or file a complaint or otherwise communicate or cooperate with a U.S. federal, state, or local government or law enforcement agency (including, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Board, the United States Department of Labor, or the Office of Federal Contract Compliance Programs) about such unlawful or inappropriate acts. Nothing in this Agreement, or any other Apple agreement, should be interpreted as being restrictive of Your rights under subsections (A)-(D) without unnecessary disclosure of Apple Confidential Information to third parties. You are not required to notify Apple when exercising Your rights permitted under subsections (A)-(D) above.

Additional information about employee rights, including the right to engage in protected, concerted activity, can be found on Apple's People site. Additional information about employee rights, including the right to engage in union or other protected, concerted activity, can be found at www.nlrb.gov.

**A. Treatment of Apple Confidential Information.** You understand and acknowledge that Your obligations under this Agreement with regard to any particular Apple Confidential Information will continue during and after Your Employment until such Apple Confidential Information has become generally available to the public unless it became publicly available through unlawful means or as a result of any breach of a confidentiality obligation to any Apple Entity, including any breach by You of this Agreement. You understand and agree that, without the written consent of Apple, You are prohibited, during and after Your Employment, from: (i) using any Apple

Confidential Information, except as necessary to perform Your duties during and in the scope of Your Employment; (ii) disclosing any Apple Confidential Information, except during and in the scope of Your Employment to (a) personnel of any Apple Entity or (b) other third parties who have confidentiality obligations to any Apple Entity regarding the Apple Confidential Information to be disclosed ("Authorized Third Parties"), in each case (a) and (b), who need to know the Apple Confidential Information to be disclosed during and in connection with their respective work for such Apple Entity; or (iii) permitting any other person or entity to (a) use any Apple Confidential Information, except authorized uses by (1) personnel of any Apple Entity or (2) Authorized Third Parties, in each case (1) and (2), of the Apple Confidential Information as necessary to be used by them during and in connection with their work for the applicable Apple Entity or (b) disclose any Apple Confidential Information, except authorized disclosures (1) between personnel of any Apple Entity or (2) between personnel of any Apple Entity, on the one hand, and Authorized Third Parties, on the other hand, in each case (1) and (2), who need to know the Apple Confidential Information to be disclosed during and in connection with their respective work for the applicable Apple Entity. You understand and agree to strictly comply with all rules and policies of the Apple Entities regarding Apple Confidential Information and to use best efforts to safeguard such Apple Confidential Information and protect it against disclosure, misuse, loss, or theft. Upon termination of Your Employment, You will promptly deliver to the Apple Employing Entity all Apple property, documents, and materials of any kind containing any Apple Confidential Information, and You agree that You will not take with You any property, documents, materials, or copies thereof, whether on paper, in electronic form or in any other medium, containing any Apple Confidential Information.

**B. Information, Inventions and IP of Others.** You agree that You have not brought, and during Your Employment You will not bring, any confidential, proprietary, or secret information, or any inventions or IP, of any of Your former employers or any other person or entity onto the property of any Apple Entity or use any of the foregoing in connection with Your Employment. You further agree You have not improperly used or disclosed (or induced the same), and during Your Employment will not improperly use or disclose (or induce the same), any confidential, proprietary, or secret information, or any inventions or IP, of any of Your former employers or any other person or entity.

**C. Compelled Disclosures.** If You are at any time during or after Your Employment compelled by law to disclose any Apple Confidential Information to a court, administrative body or other government authority, You agree, to the maximum extent permitted by

applicable law to (i) immediately provide prior written notice of such disclosure to Apple at notices@apple.com detailing the Apple Confidential Information disclosed to enable Apple to seek a protective order with respect to such Apple Confidential Information and (ii) only disclose the minimum amount of Apple Confidential Information that is required to be disclosed in such instance. Any notice under subparagraph (i) of this provision should identify only the Apple Confidential Information that will be or was disclosed, to who it will be or was disclosed, and the date that the disclosure will be or was made. "Compelled Disclosures" do not include voluntary disclosures expressly permitted in Section I above.

# Exhibit G: 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended September 27, 2025

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission File Number: **001-36743**



# Apple Inc.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **California** | **94-2404110** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One Apple Park Way** **Cupertino, California** | **95014** |
| (Address of principal executive offices) | (Zip Code) |

**(408) 996-1010**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.00001 par value per share** | **AAPL** | **The Nasdaq Stock Market LLC** |
| **0.000% Notes due 2025** | **—** | **The Nasdaq Stock Market LLC** |
| **1.625% Notes due 2026** | **—** | **The Nasdaq Stock Market LLC** |
| **2.000% Notes due 2027** | **—** | **The Nasdaq Stock Market LLC** |
| **1.375% Notes due 2029** | **—** | **The Nasdaq Stock Market LLC** |
| **3.050% Notes due 2029** | **—** | **The Nasdaq Stock Market LLC** |
| **0.500% Notes due 2031** | **—** | **The Nasdaq Stock Market LLC** |
| **3.600% Notes due 2042** | **—** | **The Nasdaq Stock Market LLC** |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒    No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

Yes ☐    No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past

90 days.

<div align="center">Yes ☒     No ☐</div>

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).

<div align="center">Yes ☒     No ☐</div>

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act).

<div align="center">Yes ☐     No ☒</div>

The aggregate market value of the voting and non-voting stock held by non-affiliates of the Registrant, as of March 28, 2025, the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $3,253,431,000,000. Solely for purposes of this disclosure, shares of common stock held by executive officers and directors of the Registrant as of such date have been excluded because such persons may be deemed to be affiliates. This determination of executive officers and directors as affiliates is not necessarily a conclusive determination for any other purposes.

<div align="center">14,776,353,000 shares of common stock were issued and outstanding as of October 17, 2025.</div>

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's definitive proxy statement relating to its 2026 annual meeting of shareholders are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. The Registrant's definitive proxy statement will be filed with the U.S. Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

**Apple Inc.**

**Form 10-K**

**For the Fiscal Year Ended September 27, 2025**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 5 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 1C. | Cybersecurity | 17 |
| Item 2. | Properties | 17 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Mine Safety Disclosures | 18 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 19 |
| Item 6. | [Reserved] | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 27 |
| Item 8. | Financial Statements and Supplementary Data | 28 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 52 |
| Item 9A. | Controls and Procedures | 52 |
| Item 9B. | Other Information | 53 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 53 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 53 |
| Item 11. | Executive Compensation | 53 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 53 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 53 |
| Item 14. | Principal Accountant Fees and Services | 53 |
| **Part IV** | | |
| Item 15. | Exhibit and Financial Statement Schedules | 54 |
| Item 16. | Form 10-K Summary | 57 |

*This Annual Report on Form 10-K ("Form 10-K") contains forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995, that involve risks and uncertainties. Many of the forward-looking statements are located in Part I, Item 1 of this Form 10-K under the heading "Business" and Part II, Item 7 of this Form 10-K under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact. For example, statements in this Form 10-K regarding the potential future impact of macroeconomic conditions and tariffs and other measures on the Company's business and results of operations are forward-looking statements. Forward-looking statements can also be identified by words such as "future," "anticipates," "believes," "estimates," "expects," "intends," "plans," "predicts," "will," "would," "could," "can," "may," and similar terms. Forward-looking statements are not guarantees of future performance and the Company's actual results may differ significantly from the results discussed in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those discussed in Part I, Item 1A of this Form 10-K under the heading "Risk Factors." The Company assumes no obligation to revise or update any forward-looking statements for any reason, except as required by law.*

*Unless otherwise stated, all information presented herein is based on the Company's fiscal calendar, and references to particular years, quarters, months or periods refer to the Company's fiscal years ended in September and the associated quarters, months and periods of those fiscal years. Each of the terms the "Company" and "Apple" as used herein refers collectively to Apple Inc. and its wholly owned subsidiaries, unless otherwise stated.*

## PART I

### Item 1. Business

### Company Background

The Company designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services. The Company's fiscal year is the 52- or 53-week period that ends on the last Saturday of September.

### Products

#### iPhone

iPhone® is the Company's line of smartphones based on its iOS operating system. The iPhone line includes iPhone 17 Pro, iPhone Air™, iPhone 17, iPhone 16 and iPhone 16e.

#### Mac

Mac® is the Company's line of personal computers based on its macOS® operating system. The Mac line includes laptops MacBook Air® and MacBook Pro®, as well as desktops iMac®, Mac mini®, Mac Studio® and Mac Pro®.

#### iPad

iPad® is the Company's line of multipurpose tablets based on its iPadOS® operating system. The iPad line includes iPad Pro®, iPad Air®, iPad and iPad mini®.

#### Wearables, Home and Accessories

Wearables includes smartwatches, wireless headphones and spatial computers. The Company's line of smartwatches, based on its watchOS® operating system, includes Apple Watch® Series 11, Apple Watch SE® 3 and Apple Watch Ultra® 3. The Company's line of wireless headphones includes AirPods®, AirPods Pro®, AirPods Max® and Beats® products. Apple Vision Pro™ is the Company's spatial computer based on its visionOS® operating system.

Home includes Apple TV 4K®, the Company's media streaming and gaming device based on its tvOS® operating system, and HomePod® and HomePod mini®, high-fidelity wireless smart speakers.

Accessories includes Apple-branded and third-party accessories.

Apple Inc. | 2025 Form 10-K | 1

## Services

### Advertising

The Company's advertising services include third-party licensing arrangements and the Company's own advertising platforms.

### AppleCare

The Company offers a portfolio of fee-based service and support products under the AppleCare® brand. The offerings provide priority access to Apple technical support, access to the global Apple authorized service network for repair and replacement services, and in many cases additional coverage for instances of accidental damage or theft and loss, depending on the country and type of product.

### Cloud Services

The Company's cloud services store and keep customers' content up-to-date and available across multiple Apple devices and Windows personal computers.

### Digital Content

The Company operates various platforms, including the App Store®, that allow customers to discover and download applications and digital content, such as books, music, video, games and podcasts.

The Company also offers digital content through subscription-based services, including Apple Arcade®, a game service; Apple Fitness+®, a personalized fitness service; Apple Music®, which offers users a curated listening experience with on-demand radio stations; Apple News+®, a news and magazine service; and Apple TV®, which offers exclusive original content and live sports.

### Payment Services

The Company offers payment services, including Apple Card®, a co-branded credit card, and Apple Pay®, a cashless payment service.

## Segments

The Company manages its business primarily on a geographic basis. The Company's reportable segments consist of the Americas, Europe, Greater China, Japan and Rest of Asia Pacific. Americas includes both North and South America. Europe includes European countries, as well as India, the Middle East and Africa. Greater China includes China mainland, Hong Kong and Taiwan. Rest of Asia Pacific includes Australia, New Zealand and those Asian countries not included in the Company's other reportable segments. Although the reportable segments provide similar hardware and software products and similar services, each one is managed separately to better align with the location of the Company's customers and distribution partners and the unique market dynamics of each geographic region.

## Markets and Distribution

The Company's customers are primarily in the consumer, small and mid-sized business, education, enterprise and government markets. The Company sells its products and resells third-party products in most of its major markets directly to customers through its retail and online stores and its direct sales force. The Company sells its services in the same markets through its various service platforms. The Company also employs a variety of indirect distribution channels, such as third-party cellular network carriers and other resellers, for the sale of its products and certain of its services. During 2025, the Company's net sales through its direct and indirect distribution channels accounted for 40% and 60%, respectively, of total net sales.

## Competition

The markets for the Company's products and services are highly competitive and are characterized by aggressive price competition, downward pressure on gross margins, continual improvement in product performance, and price sensitivity on the part of consumers and businesses. The markets in which the Company competes are further defined by frequent introduction of new products and services, short product life cycles, evolving industry standards, and rapid adoption of technological advancements by competitors. Many of the Company's competitors seek to compete primarily through aggressive pricing and very low cost structures, and by imitating the Company's products and infringing on its intellectual property.

The Company's ability to compete successfully depends heavily on ensuring the continuing and timely introduction of innovative new products, services and technologies to the marketplace. The Company designs and develops nearly the entire solution for its products, including the hardware, operating system, numerous software applications and related services. Principal competitive factors important to the Company include price, product and service features (including security features), relative price and performance, product and service quality and reliability, design and technology innovation, a strong third-party software and accessories ecosystem, marketing and distribution capability, service and support, corporate reputation, and the ability to effectively protect and enforce the Company's intellectual property rights.

The Company is focused on expanding its market opportunities related to smartphones, personal computers, tablets, wearables and accessories, and services. The Company's products and services face substantial competition from companies that have significant technical, marketing, distribution and other resources, as well as established hardware, software, and service offerings with large customer bases. In addition, the Company faces significant competition as competitors imitate the Company's product features and applications within their products to offer more competitive solutions. The Company also expects competition to intensify as competitors imitate the Company's approach to providing components seamlessly within their offerings or work collaboratively to offer integrated solutions. Some of the Company's competitors have broad product lines, low-priced products, large installed bases of active devices, and large customer bases. Competition has been particularly intense as competitors have aggressively cut prices and lowered product margins. Certain competitors have the resources, experience or cost structures to provide products and services at little or no profit or even at a loss. The Company has a minority market share in the global smartphone, personal computer, tablet and wearables markets, and some of the markets in which the Company competes have from time to time experienced little to no growth or contracted overall.

### Supply of Components

Although most components essential to the Company's business are generally available from multiple sources, certain components are currently obtained from single or limited sources. The Company also competes for various components with other participants in the markets for smartphones, personal computers, tablets, wearables and accessories. Therefore, many components used by the Company, including those that are available from multiple sources, are at times subject to industry-wide shortage and significant commodity pricing fluctuations. Restrictions on international trade can increase the cost or limit the availability of the Company's products and the components and rare earths and other raw materials that go into them.

The Company uses some custom components that are not commonly used by its competitors, and new products introduced by the Company often utilize custom components available from only one source. When a component or product uses new technologies, initial capacity constraints may exist until the suppliers' yields have matured or their manufacturing capacities have increased. The Company has entered into agreements for the supply of many components; however, the Company may not be able to extend or renew agreements for the supply of components on similar terms, or at all, and may not be successful in obtaining sufficient quantities from its suppliers or in a timely manner, or in identifying and obtaining sufficient quantities from an alternative source. In addition, component suppliers may fail, be subject to consolidation within a particular industry, or decide to concentrate on the production of common components instead of components customized to meet the Company's requirements, further limiting the Company's ability to obtain sufficient quantities of components on commercially reasonable terms, or at all.

### Research and Development

Because the industries in which the Company competes are characterized by rapid technological advances, the Company's ability to compete successfully depends heavily upon its ability to ensure a continual and timely flow of competitive products, services and technologies to the marketplace. The Company continues to develop new technologies to enhance existing products and services, and to expand the range of its offerings through research and development ("R&D"), licensing of intellectual property and acquisition of third-party businesses and technology.

### Intellectual Property

The Company currently holds a broad collection of intellectual property rights relating to certain aspects of its hardware, software and services. This includes patents, designs, copyrights, trademarks, trade secrets and other forms of intellectual property rights in the U.S. and various foreign countries. Although the Company believes the ownership of such intellectual property rights is an important factor in differentiating its business and that its success does depend in part on such ownership, the Company relies primarily on the innovative skills, technical competence and marketing abilities of its personnel.

The Company regularly files patent, design, copyright and trademark applications to protect innovations arising from its hardware, software and service research, development, design and marketing, and is currently pursuing thousands of applications around the world. Over time, the Company has accumulated a large portfolio of issued and registered intellectual property rights around the world. No single intellectual property right is solely responsible for protecting the Company's products and services. The Company believes the duration of its intellectual property rights is adequate relative to the expected lives of its products and services.

Apple Inc. | 2025 Form 10-K | 3

In addition to Company-owned intellectual property, many of the Company's products and services include technology or intellectual property that must be licensed from third parties. It may be necessary in the future to seek or renew licenses relating to various aspects of the Company's products, processes and services. While the Company has generally been able to obtain such licenses on commercially reasonable terms in the past, there is no guarantee that such licenses could be obtained in the future on reasonable terms or at all.

**Business Seasonality and Product Introductions**

The Company has historically experienced higher net sales in its first quarter compared to other quarters in its fiscal year due in part to seasonal holiday demand. Additionally, new product and service introductions can significantly impact net sales, cost of sales and operating expenses. The timing of product introductions can also impact the Company's net sales to its indirect distribution channels as these channels are filled with new inventory following a product launch, and channel inventory of an older product often declines as the launch of a newer product approaches. Net sales can also be affected when consumers and distributors anticipate a product introduction.

**Human Capital**

The Company believes that its people play an important role in its success, and strives to attract, develop and retain the best talent. The Company works to create a culture of collaboration, one where people with a broad range of backgrounds and perspectives can come together to innovate and do the best work of their lives. The Company is an equal opportunity employer committed to inclusion and to providing a workplace free of harassment or discrimination. As of September 27, 2025, the Company had approximately 166,000 full-time equivalent employees.

The Company believes that compensation should be competitive and equitable, and offers discretionary cash and equity awards to enable employees to share in the Company's success. The Company recognizes its people are most likely to thrive when they have the resources to meet their needs and the time and support to succeed in their professional and personal lives. In support of this, the Company offers a wide variety of benefits for employees around the world, including health, wellness and time away.

The Company invests in resources to help its people develop and achieve their career goals. The Company offers programs through Apple University on leadership, management and influence, as well as Apple culture and values. Team members can also take advantage of online classes for business, technical and personal development.

The Company believes that open and honest communication among team members, managers and leaders helps create an open, collaborative work environment where everyone can contribute, grow and succeed. Team members are encouraged to come to their managers with questions, feedback or concerns, and the Company conducts surveys that gauge employee sentiment in areas like career development, manager performance and inclusion.

The Company is committed to the safety and security of its team members everywhere it operates. The Company supports employees with general safety, security and crisis management training, and by putting specific programs in place for those working in potentially high-hazard environments.

**Available Information**

The Company's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), are filed with the U.S. Securities and Exchange Commission ("SEC"). Such reports and other information filed by the Company with the SEC are available free of charge at investor.apple.com/investor-relations/sec-filings/default.aspx when such reports are available on the SEC's website. The Company periodically provides certain information for investors on its corporate website, www.apple.com, and its investor relations website, investor.apple.com. This includes press releases and other information about financial performance, information on corporate governance, and details related to the Company's annual meeting of shareholders. The information contained on the websites referenced in this Form 10-K is not incorporated by reference into this filing. Further, the Company's references to website URLs are intended to be inactive textual references only.

Apple Inc. | 2025 Form 10-K | 4

**Item 1A.    Risk Factors**

The following summarizes factors that could have a material adverse effect on the Company's business, reputation, results of operations, financial condition and stock price. The Company may not be able to accurately predict, control or mitigate these risks. Statements in this section are based on the Company's beliefs and opinions regarding matters that could materially adversely affect the Company in the future and are not representations as to whether such matters have or have not occurred previously. The risks and uncertainties described below are not exhaustive and should not be considered a complete statement of all potential risks or uncertainties that the Company faces or may face in the future.

This section should be read in conjunction with Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and accompanying notes in Part II, Item 8, "Financial Statements and Supplementary Data" of this Form 10-K.

**Macroeconomic and Industry Risks**

***The Company's operations and performance depend significantly on global and regional economic conditions and adverse economic conditions can materially adversely affect the Company's business, results of operations, financial condition and stock price.***

The Company has international operations with sales outside the U.S. representing a majority of the Company's total net sales. In addition, the Company's global supply chain is large and complex and a majority of the Company's supplier facilities, including manufacturing and assembly sites, are located outside the U.S. As a result, the Company's operations and performance depend significantly on global and regional economic conditions.

Adverse macroeconomic conditions, including slow growth or recession, high unemployment, inflation, tighter credit, higher interest rates, and currency fluctuations, can adversely impact consumer confidence and spending and materially adversely affect demand for the Company's products and services. In addition, consumer confidence and spending can be materially adversely affected in response to changes in fiscal and monetary policy, financial market volatility, declines in income or asset values, and other economic factors.

Uncertainty about, or a decline in, global or regional economic conditions can also have a significant impact on the Company's suppliers, contract manufacturers, logistics providers, distributors, cellular network carriers and other channel partners, and developers. Potential outcomes include financial instability; inability to obtain credit to finance business operations; and insolvency.

Adverse economic conditions can also lead to increased credit and collectibility risk on the Company's trade receivables; the failure of derivative counterparties and other financial institutions; limitations on the Company's ability to issue new debt; reduced liquidity; and declines in the fair values of the Company's financial instruments. These and other impacts can materially adversely affect the Company's business, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 5

***The Company's business can be impacted by political events, trade and other international disputes, geopolitical tensions, conflict, terrorism, natural disasters, public health issues, industrial accidents and other business interruptions.***

Political events, trade and other international disputes, geopolitical tensions, conflict, terrorism, natural disasters, public health issues, industrial accidents and other business interruptions can have a material adverse effect on the Company and its customers, employees, suppliers, contract manufacturers, logistics providers, distributors, cellular network carriers and other channel partners.

The Company has a large, global business with sales outside the U.S. representing a majority of the Company's total net sales, and the Company believes that it generally benefits from growth in international trade. A significant majority of the Company's manufacturing is performed in whole or in part by outsourcing partners located primarily in China mainland, India, Japan, South Korea, Taiwan and Vietnam, in addition to sourcing from partners and facilities located in the U.S. Restrictions on international trade, such as tariffs and other controls on imports or exports of goods, technology or data, can materially adversely affect the Company's business and supply chain. The impact can be particularly significant if these restrictive measures apply to countries and regions where the Company derives a significant portion of its revenues and/or has significant supply chain operations. Restrictive measures can increase the cost or limit the availability of the Company's products and the components and rare earths and other raw materials that go into them. Restrictive measures can also require the Company to change suppliers, restructure business relationships and operations, refrain from offering and distributing or cease to offer and distribute affected products, services and third-party applications to its customers, and increase the prices of its products and services. Changing the Company's business and supply chain in accordance with new or changed restrictions on international trade can be expensive, time-consuming and disruptive to the Company's business and results of operations. Trade and other international disputes can also have an adverse impact on the overall macroeconomic environment and result in shifts and reductions in consumer spending and negative consumer sentiment for the Company's products and services, all of which can further adversely affect the Company's business and results of operations. Such restrictions can be announced with little or no advance notice, which can create uncertainty, and the Company may not be able to effectively mitigate any or all adverse impacts from such measures. Global supply chains can be highly concentrated, and an escalation of geopolitical tensions or conflict could result in significant disruptions. Beginning in the second quarter of 2025, new tariffs were announced on imports to the U.S. ("U.S. Tariffs"), including additional tariffs on imports from China, India, Japan, South Korea, Taiwan, Vietnam and the European Union ("EU"), among others. In response, several countries have imposed, or threatened to impose, reciprocal tariffs on imports from the U.S. and other retaliatory measures. Various modifications to the U.S. Tariffs have been announced and further changes could be made in the future, which may include additional sector-based tariffs or other measures. For example, the U.S. Department of Commerce has initiated an investigation under Section 232 of the Trade Expansion Act of 1962, as amended, into, among other things, imports of semiconductors, semiconductor manufacturing equipment, and their derivative products, including downstream products that contain semiconductors. The ultimate impact remains uncertain and will depend on several factors, including whether additional or incremental U.S. Tariffs or other measures are announced or imposed, to what extent other countries implement tariffs or other retaliatory measures in response, and the overall magnitude and duration of these measures. If disputes and conflicts further escalate, actions by governments in response could be significantly more severe and restrictive.

Many of the Company's operations, retail stores and facilities, as well as critical business operations of the Company's suppliers and contract manufacturers, are in locations that are prone to earthquakes and other natural disasters. Global climate change is resulting in certain types of natural disasters and extreme weather occurring more frequently or with more intense effects. In addition, the Company's and its suppliers' operations, retail stores and facilities are subject to the risk of interruption by fire, power shortages, nuclear power plant accidents and other industrial accidents, terrorist attacks and other hostile acts, ransomware and other cybersecurity attacks, labor disputes, public health issues and other events beyond the Company's control.

Such events can make it difficult or impossible for the Company to manufacture and deliver products to its customers, create delays and inefficiencies in the Company's supply and manufacturing chain, result in slowdowns and outages to the Company's service offerings, increase the Company's costs, and negatively impact consumer spending and demand in affected areas.

The Company's operations are also subject to the risks of industrial accidents at its suppliers and contract manufacturers. While the Company's suppliers are required to maintain safe working environments and operations, an industrial accident could occur and could result in serious injuries or loss of life, disruption to the Company's business, and harm to the Company's reputation. Major public health issues, including pandemics such as the COVID-19 pandemic, have adversely affected, and could in the future materially adversely affect, the Company due to their impact on the global economy and demand for consumer products; the imposition of protective public safety measures, such as stringent employee travel restrictions and limitations on freight services and the movement of products between regions; and disruptions in the Company's operations, supply chain and sales and distribution channels, resulting in interruptions to the supply of current products and offering of existing services, and delays in production ramps of new products and development of new services.

Apple Inc. | 2025 Form 10-K | 6

Following any interruption to its business, the Company can require substantial recovery time, incur significant expenditures to resume operations, and lose significant sales. Because the Company relies on single or limited sources for the supply and manufacture of many critical components, a business interruption affecting such sources would exacerbate any negative consequences to the Company. While the Company maintains insurance coverage for certain types of losses, such insurance coverage may be insufficient to cover all losses that may arise. Any of the foregoing can materially adversely affect the Company's business, results of operations, financial condition and stock price.

***Global markets for the Company's products and services are highly competitive and subject to rapid technological change, and the Company may be unable to compete effectively in these markets.***

The Company's products and services are offered in highly competitive global markets. These markets are characterized by aggressive price competition, downward pressure on gross margins, continual improvement in product performance, and price sensitivity on the part of consumers and businesses. These markets are further defined by frequent introduction of new products and services, short product life cycles, evolving industry standards, and rapid adoption of technological advancements.

The Company's ability to compete successfully depends heavily on ensuring the continuing and timely introduction of innovative new products, services and technologies to the marketplace. The Company designs and develops nearly the entire solution for its products, including the hardware, operating system, numerous software applications and related services. As a result, the Company must make significant investments in R&D. These investments may not achieve expected returns, and the Company may not be able to develop and market new products and services successfully.

The Company's ability to compete successfully also depends on the effective protection and enforcement of its intellectual property rights. Regulatory requirements, government investigations and litigation can force the Company to withdraw from, or modify its products and services for, certain countries and limit its ability to derive value from, or to enjoin others from using, its intellectual property rights. Additionally, they may require the Company to share its innovations with competitors. Any of these outcomes can have a negative impact on the Company's competitive advantage and materially adversely affect its business, results of operations, financial condition and stock price.

The Company currently holds a significant number of patents, trademarks and copyrights and has registered, and applied to register, additional patents, trademarks and copyrights. In contrast, many of the Company's competitors seek to compete primarily through aggressive pricing and very low cost structures, and by imitating the Company's products and infringing on its intellectual property. Effective intellectual property protection is not consistently available in every country in which the Company operates. If the Company is unable to continue to develop and sell innovative new products with attractive margins or if competitors infringe on the Company's intellectual property, the Company's ability to maintain a competitive advantage could be materially adversely affected.

The Company's products and services face substantial competition from companies that have significant technical, marketing, distribution and other resources, as well as established hardware, software and service offerings. In addition, the Company faces significant competition as competitors imitate the Company's product features and applications within their products to offer more competitive solutions. The Company also expects competition to intensify as competitors imitate the Company's approach to providing components seamlessly within their offerings or work collaboratively to offer integrated solutions. Some of the Company's competitors have broad product lines, low-priced products, large installed bases of active devices, and large customer bases. Competition has been particularly intense as competitors have aggressively cut prices and lowered product margins. Certain competitors have the resources, experience or cost structures to provide products and services at little or no profit or even at a loss. The Company has a minority market share in the global smartphone, personal computer, tablet and wearables markets, and some of the markets in which the Company competes have from time to time experienced little to no growth or contracted overall.

If the Company is unable to compete successfully, its business, reputation, results of operations, financial condition and stock price can be materially adversely affected.

Apple Inc. | 2025 Form 10-K | 7

**Business Risks**

*To remain competitive and stimulate customer demand, the Company must successfully manage frequent introductions and transitions of products and services.*

Due to the highly volatile and competitive nature of the markets and industries in which the Company competes, the Company must continually introduce new products, services and technologies, enhance existing products and services, effectively stimulate customer demand for new and upgraded products and services, navigate global regulatory requirements and barriers to market access, and successfully manage the transition to these new and upgraded products and services. The success of new product and service introductions depends on a number of factors, including the Company's ability to recruit and retain highly skilled personnel to execute on its strategic initiatives, and the timely and successful development and market acceptance of new products, services and technologies. Success also relies on the Company's ability to manage the risks associated with new technologies and production ramp-up issues, the effective integration of third-party services and technologies into the Company's products and services, the availability, delivery and performance of application software or other third-party support for the Company's products and services, the effective management of manufacturing and other purchase commitments and the management of inventory levels in line with anticipated product demand, and the availability of products in appropriate quantities and at expected costs to meet anticipated demand. Additionally, quality issues or other defects or deficiencies can adversely affect the success of new product and service introductions and market acceptance. New products, services and technologies may replace or supersede existing offerings and may produce lower revenues and lower profit margins. The Company may not be able to successfully manage future introductions and transitions of products and services, which can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

*The Company depends on component and product manufacturing and logistical services provided by outsourcing partners, many of which are located outside of the U.S.*

A significant majority of the Company's manufacturing is performed in whole or in part by outsourcing partners located primarily in China mainland, India, Japan, South Korea, Taiwan and Vietnam, in addition to sourcing from partners and facilities located in the U.S. The Company relies on single-source partners in the U.S., Asia and Europe to supply and manufacture many components, and on partners primarily located in Asia, for final assembly of substantially all of the Company's hardware products. The Company has also outsourced much of its transportation and logistics management. While these arrangements can lower operating costs, they also reduce the Company's direct control over production and distribution. Such diminished control has from time to time had, and may in the future have, an adverse effect on the cost, quality or quantity of products manufactured or services provided, or adversely affect the Company's flexibility to respond to changing conditions. Although arrangements with these partners may contain provisions for product defect expense reimbursement, the Company generally remains responsible to the consumer for warranty and out-of-warranty service in the event of product defects and experiences unanticipated product defect liabilities from time to time. While the Company relies on its partners to adhere to its supplier code of conduct, violations of the supplier code of conduct occur from time to time and can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Changes or additions to the Company's supply chain require considerable time and resources and involve significant risks and uncertainties, including exposure to additional regulatory and operational risks.

*Future operating results depend upon the Company's ability to obtain components in sufficient quantities on commercially reasonable terms.*

Because the Company currently obtains certain components from single or limited sources, the Company is subject to significant supply and pricing risks. Many components, including those that are available from multiple sources, are at times subject to industry-wide shortages and significant commodity pricing fluctuations that can materially adversely affect the Company's business, results of operations, financial condition and stock price. For example, the global semiconductor industry has in the past experienced high demand and shortages of supply, which adversely affected the Company's ability to obtain sufficient quantities of components and products on commercially reasonable terms, or at all. Such disruptions could occur in the future.

Additionally, the Company's new products often utilize custom components available from only one source. When a component or product uses new technologies, initial capacity constraints may exist until the suppliers' yields have matured or their manufacturing capacities have increased. The Company may not be able to extend or renew agreements for the supply of components on similar terms, or at all, and may not be successful in obtaining sufficient quantities from its suppliers in a timely manner, or in identifying and obtaining sufficient quantities from an alternative source. In addition, component suppliers may fail, be subject to consolidation within a particular industry, or decide to concentrate on the production of common components instead of components customized to meet the Company's requirements, further limiting the Company's ability to obtain sufficient quantities of components on commercially reasonable terms, or at all. Therefore, the Company remains subject to significant risks of supply shortages and price increases that can materially adversely affect its business, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 8

***The Company's products and services may be affected from time to time by design and manufacturing defects that could materially adversely affect the Company's business and result in harm to the Company's reputation.***

The Company offers complex hardware and software products and services that can be affected by design and manufacturing defects. Sophisticated operating system software and applications, such as those offered by the Company, often have issues that can unexpectedly interfere with the intended operation of hardware or software products and services. Defects can also exist in components and products the Company purchases from third parties. Component defects could make the Company's products unsafe and create a risk of environmental or property damage and personal injury. These risks may increase as the Company's products are introduced into specialized applications, including health. In addition, the Company's service offerings can have quality issues and from time to time experience outages, service slowdowns or errors. As a result, from time to time the Company's services have not performed as anticipated and may not meet customer expectations. The introduction of new and complex technologies, such as artificial intelligence features, can increase these and other safety risks, including exposing users to harmful, inaccurate or other negative content and experiences. The Company may not be able to detect and fix all issues and defects in the hardware, software and services it offers, which can result in widespread technical and performance issues affecting the Company's products and services. Errors, bugs and vulnerabilities can be exploited by third parties, compromising the safety and security of a user's device. In addition, the Company can be exposed to product liability claims, recalls, product replacements or modifications, write-offs of inventory, property, plant and equipment or intangible assets, and significant warranty and other expenses, including litigation costs and regulatory fines. Quality problems can adversely affect the experience for users of the Company's products and services, and result in harm to the Company's reputation, loss of competitive advantage, poor market acceptance, reduced demand for products and services, delay in new product and service introductions and lost sales.

***The Company is exposed to the risk of write-downs on the value of its inventory and other assets, in addition to purchase commitment cancellation risk.***

The Company records a write-down for product and component inventories if cost exceeds net realizable value. The Company reviews other assets, including capital assets held at its suppliers' facilities, inventory prepayments and other long-lived assets, for impairment whenever events or circumstances indicate the assets may not be recoverable. Although the Company believes its inventory, capital assets, inventory prepayments and other assets are currently recoverable, the Company may incur write-downs, impairments and other charges given the rapid and unpredictable pace of product obsolescence in the industries in which the Company competes.

The Company orders components for its products and builds inventory in advance of product announcements and shipments. Manufacturing purchase obligations cover the Company's forecasted component and manufacturing requirements, typically for periods up to 150 days. Because the Company's markets are volatile, competitive and subject to rapid technology and price changes, there is a risk the Company will forecast incorrectly and order or produce excess or insufficient amounts of components or products, or not fully utilize purchase commitments. The Company accrues necessary cancellation fee reserves for orders of excess products and components.

***The Company relies on access to third-party intellectual property, which may not be available to the Company on commercially reasonable terms, or at all.***

The Company's products and services include technology or intellectual property that must be licensed from third parties. In addition, because of technological changes in the industries in which the Company currently competes or in the future may compete, current extensive intellectual property coverage and the rapid rate of new intellectual property rights generation, the Company's products and services may be alleged to infringe existing intellectual property rights of others. This risk may be exacerbated by the use of new and emerging technologies, including machine learning and artificial intelligence, which can involve, among other things, the acquisition and use of copyrighted materials for training as well as the potential reproduction of copyrighted materials in their outputs. From time to time, the Company has been notified that it may be infringing certain intellectual property rights of third parties. The Company is not always able to obtain all necessary licenses to third-party intellectual property rights on commercially reasonable terms or at all. Failure to obtain the right to use third-party intellectual property, or to use such intellectual property on commercially reasonable terms, can require the Company to modify certain products, services or features or preclude the Company from selling certain products or services and expose the Company to significant licensing costs, all of which can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 9

***The Company's future performance depends in part on support from third-party software developers.***

The Company believes decisions by customers to purchase its hardware products depend in part on the availability of third-party software applications and services. Third-party developers may discontinue the development and maintenance of software applications and services for the Company's products. If third-party software applications and services cease to be developed and maintained for the Company's products, customers may choose not to buy the Company's products, adversely impacting the Company's business, results of operations, financial condition and stock price.

The Company believes that third-party developer support depends on the perceived benefits of creating software and services for the Company's products compared to competitors' platforms, such as Android for smartphones and tablets, Windows for personal computers and tablets, and PlayStation, Nintendo and Xbox for gaming platforms. This analysis may be based on factors such as the market position of the Company and its products, the anticipated revenue that may be generated, expected future growth of product sales, and the costs of developing such applications and services.

The Company's minority market share in the global smartphone, personal computer, tablet and wearables markets can make developers less inclined to develop or upgrade software for the Company's products and more inclined to devote their resources to developing and upgrading software for competitors' products with larger market share. When developers focus their efforts on these competing platforms, the availability and quality of applications for the Company's devices can suffer.

The Company relies on the continued availability and development of compelling and innovative software applications for its products. The Company's products and operating systems are subject to rapid technological change, and when third-party developers are unable to or choose not to keep up with this pace of change, their applications can fail to take advantage of these changes to deliver improved customer experiences, can operate incorrectly, and can result in dissatisfied customers and lower customer demand for the Company's products.

***Failure to obtain or create digital content that appeals to the Company's customers, or to make such content available on commercially reasonable terms, could have a material adverse impact on the Company's business, results of operations and financial condition.***

The Company contracts with numerous third parties to offer their digital content to customers. This includes the right to sell, or offer subscriptions to, third-party content, as well as the right to incorporate specific content into the Company's own services. The licensing or other distribution arrangements for this content can be for relatively short time periods and do not guarantee the continuation or renewal of these arrangements on commercially reasonable terms, or at all. Some third-party content providers and distributors currently or in the future may offer competing products and services, and can take actions to make it difficult or impossible for the Company to license or otherwise distribute their content. Other content owners, providers or distributors may seek to limit the Company's access to, or increase the cost of, such content. The Company may be unable to continue to offer a wide variety of content at commercially reasonable prices with acceptable usage rules.

The Company also produces its own digital content, which can be costly to produce due to intense and increasing competition for talent, content and subscribers, and may fail to appeal to the Company's customers.

***The Company's success depends largely on the talents and efforts of its team members, the continued service and availability of highly skilled employees, including key personnel, and the Company's ability to nurture its distinctive and inclusive culture.***

Much of the Company's future success depends on the talents and efforts of its team members and the continued availability and service of key personnel, including its Chief Executive Officer, executive team and other highly skilled employees. Experienced personnel in the technology industry are in high demand and competition for their talents is intense, especially in Silicon Valley, where most of the Company's key personnel are located. Periods of intense competition for talent in particular fields can lead to increased costs as the Company seeks to offer competitive compensation to recruit and retain highly skilled employees. In addition to competition for talent, workforce dynamics are constantly evolving and the Company must navigate changes effectively in order to achieve its strategic initiatives. Laws and regulations, including immigration, labor and employment laws and export controls, among others, can materially adversely affect the Company's ability to recruit and retain a highly skilled, global workforce. If the Company does not effectively manage changing workforce dynamics and regulatory requirements, it could materially adversely affect the Company's culture, operational flexibility, strategy and costs, all of which can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

The Company believes that its distinctive and inclusive culture is a significant driver of its success. If the Company is unable to nurture its culture, it could materially adversely affect the Company's ability to recruit and retain the highly skilled employees who are critical to its success, and could otherwise materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

***The Company depends on the performance of carriers and other resellers.***

The Company distributes its products and certain of its services through cellular network carriers and other resellers, many of which distribute products and services from competitors. Resellers offer financing, installment payment plans or subsidies for users' purchases of devices, and such plans may be discontinued or modified any time.

The Company has invested and will continue to invest in programs to enhance reseller sales, including staffing selected resellers' stores with Company employees and contractors, improving product placement displays, and developing and making digital marketing assets available to resellers. These programs can require a substantial investment while not assuring return or incremental sales. For example, the purchasing preferences and behaviors of consumers may change, the financial condition of resellers could weaken, resellers could stop distributing the Company's products, or uncertainty regarding demand for some or all of the Company's products could cause resellers to reduce their ordering and marketing of the Company's products, all of which could materially adversely impact the Company's business, results of operations, financial condition and stock price.

***The Company's business and reputation are impacted by information technology system failures and network disruptions.***

The Company and its global supply chain are dependent on complex information technology systems and are exposed to information technology system failures or network disruptions caused by natural disasters, accidents, power disruptions, telecommunications failures, acts of terrorism or war, computer viruses, physical or electronic break-ins, ransomware or other cybersecurity incidents, or other events or disruptions. System upgrades, redundancy and other continuity measures may be ineffective or inadequate, and the Company's or its vendors' business continuity and disaster recovery planning may not be sufficient for all eventualities. Such failures or disruptions can adversely impact the Company's business by, among other things, preventing access to the Company's online services, interfering with customer transactions or impeding the manufacturing and shipping of the Company's products. These events could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

***Losses or unauthorized access to or releases of confidential information, including personal information, could subject the Company to significant reputational, financial, legal and operational consequences.***

The Company's business requires it to use and store confidential information, including personal and sensitive health and financial information with respect to the Company's customers and employees. The Company devotes significant resources to systems and data security, including through the use of encryption and other security measures intended to protect its systems and data. But these measures cannot provide absolute security, and losses or unauthorized access to or releases of confidential information occur and could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

The Company's business also requires it to share confidential information with suppliers and other third parties. The Company relies on global suppliers that are also exposed to ransomware and other malicious attacks that can disrupt business operations. Although the Company takes steps to secure confidential information that is provided to or accessible by third parties working on the Company's behalf, such measures are not always effective and losses or unauthorized access to, or releases of, confidential information occur. Such incidents and other malicious attacks could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

The Company experiences malicious attacks and other attempts to gain unauthorized access to its systems on a regular basis. These attacks target the confidentiality, integrity or availability of confidential information and may disrupt normal business operations. Attacks can impair the Company's ability to attract and retain customers for its products and services, affect its stock price, damage commercial relationships, and expose the Company to litigation or government investigations, potentially resulting in penalties, fines or judgments. Globally, attacks are expected to continue accelerating in both frequency and sophistication with increasing use by actors of tools and techniques that are designed to circumvent controls, avoid detection, and remove or obfuscate forensic evidence, all of which hinders the Company's ability to identify, investigate and recover from incidents. In addition, attacks against the Company and its customers can escalate during periods of geopolitical tensions or conflict.

Although malicious attacks perpetrated to gain access to confidential information, including personal information, affect many companies across various industries, the Company is at a relatively greater risk of being targeted because of its high profile and the value of the confidential information it creates, owns, manages, stores and processes.

As with all companies, the security the Company has implemented may not be sufficient for all eventualities and are vulnerable to hacking, ransomware attacks, employee error, malfeasance, system error, faulty password management or other irregularities. For example, third parties can fraudulently induce the Company's or its suppliers' and other third parties' employees or customers into disclosing usernames, passwords or other sensitive information, which can, in turn, be used for unauthorized access to the Company's or such suppliers' or third parties' systems and services. To help protect customers and the Company, the Company deploys and makes available technologies like multifactor authentication, monitors its services and systems for unusual activity and may freeze accounts under suspicious circumstances, which, among other things, can result in the delay or loss of customer orders or impede customer access to the Company's products and services.

While the Company maintains insurance coverage that is intended to address certain aspects of data security risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise.

***Investment in new business strategies, commercial relationships and acquisitions could disrupt the Company's ongoing business, present risks not originally contemplated, and materially adversely affect the Company's business, reputation, results of operations and financial condition.***

The Company has invested, and in the future may invest, in new business strategies, commercial relationships and acquisitions. Such endeavors may involve significant risks and uncertainties, including distraction of management from current operations, greater-than-expected liabilities and expenses, economic, political, legal and regulatory challenges associated with operating in new businesses, regions or countries, inadequate return on capital, potential impairment of tangible and intangible assets, and significant write-offs. Some transactions, including investments and acquisitions, are exposed to additional risks, including failing to obtain required regulatory approvals on a timely basis or at all, a counterparty's failure to perform or deliver as anticipated, or the imposition of onerous conditions that could delay or prevent the Company from completing a transaction or otherwise limit the Company's ability to fully realize the anticipated benefits of a transaction. New business strategies and ventures are inherently risky and may not be successful. The Company's business strategies and investments may not be successful, which could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

**Legal and Regulatory Compliance Risks**

***The Company's business, results of operations and financial condition could be adversely impacted by unfavorable results of legal proceedings or government investigations.***

The Company is subject to various claims, legal proceedings and government investigations that have arisen in the ordinary course of business and have not yet been fully resolved, and new matters may arise in the future. In addition, the Company enters into agreements that include indemnification provisions that can subject the Company to costs and damages in the event of a claim against an indemnified third party. The number of claims, legal proceedings and government investigations involving the Company, and the alleged magnitude of such claims, proceedings and government investigations, has generally increased over time and may continue to increase.

The Company has faced and continues to face a significant number of patent claims relating to its standards-enabled products, and new claims may arise in the future, including as a result of new legal or regulatory frameworks. For example, technology, data and other intellectual property asset–holding companies frequently assert their intellectual property rights and seek royalties and often enter into litigation based on allegations of infringement or other violations of intellectual property rights. These risks, and the risks of novel claims being attempted, may be exacerbated as new and emerging technologies, including machine learning and artificial intelligence, are further integrated into the Company's products and services. The Company is vigorously defending infringement actions in courts in several U.S. jurisdictions, as well as internationally in various countries. The plaintiffs in these actions frequently seek broad injunctive relief and substantial damages.

Regardless of the merit of particular claims, defending against litigation or responding to government investigations can be expensive, time-consuming and disruptive to the Company's operations. In recognition of these considerations, the Company may enter into agreements or other arrangements to settle litigation and resolve such challenges. However, such agreements may not always be available on acceptable terms, and litigation may still arise. Such agreements can also significantly reduce the Company's revenue and increase the Company's cost of sales and operating expenses, materially adversely affecting the Company's business, results of operations, financial condition and stock price. Additionally, such agreements may require the Company to change its business practices and limit the Company's ability to offer certain products and services.

The outcome of litigation or government investigations is inherently uncertain. If one or more legal matters were resolved against the Company or an indemnified third party in a reporting period for amounts above management's expectations, the Company's results of operations, financial condition and stock price for that reporting period could be materially adversely affected. Further, such an outcome can result in significant monetary damages, disgorgement of revenue or profits, remedial corporate measures or injunctive relief against the Company. Adverse resolution of legal matters has from time to time required, and can in the future require, the Company to change its business practices. It can also limit the Company's ability to enjoin others from using, or to derive value from, its intellectual property rights, and to develop, manufacture, use, import or offer for sale certain products and services, all of which could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

While the Company maintains insurance coverage for certain types of claims, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise.

***The Company is subject to complex and changing laws and regulations worldwide, which exposes the Company to potential liabilities, increased costs and other adverse effects on the Company's business.***

The Company's global operations are subject to complex and changing laws and regulations worldwide on subjects including antitrust; privacy, data security and data localization; online safety; age verification; consumer protection; advertising, sales, billing and e-commerce; financial services and technology; product liability; intellectual property ownership and infringement; digital platforms; machine learning and artificial intelligence; internet, telecommunications and mobile communications; media, television, film and digital content; availability of third-party software applications and services; labor and employment; anticorruption; import, export and trade; foreign exchange controls and cash repatriation restrictions; anti–money laundering; foreign ownership and investment; national security; tax; and environmental, health and safety, including electronic waste, recycling, product design and climate change.

Compliance with these laws and regulations is onerous and expensive. New and changing laws, regulations, executive orders, directives, and enforcement priorities can adversely affect the Company's business by increasing the Company's costs, limiting the Company's ability to offer a product, service or feature to customers, imposing changes to the design of the Company's products and services, impacting customer demand for the Company's products and services, and requiring changes to the Company's business or supply chain. New and changing laws, regulations, executive orders, directives, and enforcement priorities can also create uncertainty about how such laws and regulations will be interpreted and applied. If the Company is found to have violated such laws and regulations, it could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Risks and costs related to new and changing laws, regulations, executive orders, directives, and enforcement priorities increase as the Company's products and services are introduced into specialized applications, including health and financial services, or as the Company expands the use of technologies, such as machine learning and artificial intelligence features, and must navigate new legal, regulatory and ethical considerations relating to such technologies.

Regulatory changes and other actions that materially adversely affect the Company's business may be announced with little or no advance notice and the Company may not be able to effectively mitigate all adverse impacts from such measures. For example, the Company is subject to changing regulations relating to the export and import of its products. The Company's programs, policies and procedures may not be effective in preventing a violation or a claim of a violation. As a result, the Company's products could be banned, delayed or prohibited from importation, which could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

***Varied stakeholder expectations about social and other issues expose the Company to potential liabilities, increased costs, reputational harm, and other adverse effects on the Company's business.***

Various stakeholders, including governments, regulators, investors, employees, customers and others, have differing expectations about a wide range of social and other issues related to the Company's business. The Company makes statements about its values, including the environmental and societal impact of its business, through various reports, information provided on the Company's website, and in press statements and other communications. The Company also pursues environmental and other goals and initiatives that involve risks and uncertainties, require investments, and depend in part on third-party performance or data that is outside the Company's control, and the Company may not be able to fully achieve all of its goals and initiatives. Efforts by the Company to advance its business and values, or achieve its goals and further its initiatives, or to align with stakeholders' expectations, or comply with evolving, varied and at times conflicting federal, state and international laws, executive orders, regulations and standards, or any failure or perceived failure to do so, can result in adverse reactions by consumers and other stakeholders, including the commencement of legal and regulatory proceedings against the Company, and can materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Apple Inc. | 2025 Form 10-K | 13

***The technology industry, including, in some instances, the Company, is subject to intense media, political and regulatory scrutiny, which exposes the Company to increasing regulation, government investigations, legal actions and penalties.***

From time to time, the Company has made changes to its business, including actions taken in response to litigation, competition, market conditions and legal and regulatory requirements. The Company expects to make further business changes in the future. For example, in the U.S., the Company has implemented changes to how developers communicate with consumers within apps on the U.S. storefront of the iOS and iPadOS App Store regarding alternative purchasing mechanisms and is currently subject to a court order preventing it from imposing any commission or fee on certain purchases that consumers make.

Globally, several jurisdictions have adopted, or may in the future adopt, competition-related laws and regulations imposing wide-ranging obligations on technology companies and significant limitations on businesses, including the Company. For example, the Company has implemented changes to iOS, iPadOS, the App Store and Safari® in the EU as it seeks to comply with the Digital Markets Act ("DMA"), including new business terms and alternative fee structures for iOS and iPadOS apps, alternative methods of distribution for iOS and iPadOS apps, alternative payment processing for apps across the Company's operating systems, and additional tools and application programming interfaces for developers. The Company has also continued to make changes to its compliance plan in response to feedback and engagement with the Commission. Although the Company's compliance plan is intended to address the DMA's obligations, it has been challenged by the Commission and may be challenged further by private litigants. The DMA provides for significant fines and penalties for noncompliance. While the changes introduced by the Company in the EU are intended to reduce new privacy and security risks that the DMA poses to EU users, many risks will remain. Changes to the Company's business in response to the DMA or other laws and regulations could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

The Company is also currently subject to antitrust investigations and litigation in various jurisdictions around the world, which can result in legal proceedings and claims against the Company that could, individually or in the aggregate, have a material adverse impact on the Company's business, results of operations, financial condition and stock price. For example, the Company is subject to civil antitrust lawsuits in the U.S. alleging monopolization or attempted monopolization in the markets for "performance smartphones" and "smartphones" generally in violation of U.S. antitrust laws. In addition, the Company is the subject of investigations in Europe and other jurisdictions relating to App Store terms and conditions. If such investigations or litigation are resolved against the Company, the Company can be exposed to significant fines and may be required to make further changes to its business practices, all of which could materially adversely affect the Company's business, reputation, results of operations, financial condition and stock price.

Further, the Company has commercial relationships with other companies in the technology industry that are or may become subject to investigations and litigation that, if resolved against those other companies, could materially adversely affect the Company's commercial relationships with those business partners and materially adversely affect the Company's business, results of operations, financial condition and stock price. For example, the Company earns revenue from licensing arrangements with Google LLC ("Google") and other companies to offer their search services on the Company's platforms and applications, and certain of these arrangements are currently subject to government investigations and legal proceedings. On August 5, 2024, Google was found to have violated U.S. antitrust laws. In connection with this finding, on September 2, 2025, the U.S. District Court for the District of Columbia ("D.C. District Court") ordered certain remedies. The court's order is subject to further proceedings before the D.C. District Court, which may result in changes to the interpretation or application of the remedies ordered by the court, as well as new or changed remedies being ordered. The court's order is also subject to appeal by both the U.S. Department of Justice ("DOJ") and Google. A reversal of the order on appeal could result in imposition of certain remedies initially proposed by the DOJ, such as those prohibiting Google from offering the Company commercial terms for search distribution. If implemented, these remedies could materially adversely affect the Company's ability to earn revenue from such licensing arrangements.

The Company's business, results of operations, financial condition and stock price can be materially adversely affected, individually or in the aggregate, by the outcomes of such investigations, litigation or changes to laws and regulations in the future. Changes to the Company's business practices to comply with new laws and regulations or in connection with legal proceedings can negatively impact the reputation of the Company's products for privacy and security. Such changes in business practices can also otherwise adversely affect the experience for users of the Company's products and services, and result in harm to the Company's reputation, loss of competitive advantage, poor market acceptance, reduced demand for products and services, lost sales, and lower profit margins.

Apple Inc. | 2025 Form 10-K | 14

***The Company's business is subject to a variety of U.S. and international laws, rules, policies and other obligations regarding the collection, use, protection and transfer of personal data.***

The Company is subject to an increasing number of federal, state and international laws relating to the collection, use, retention, protection and transfer of various types of personal data. In many cases, these laws apply not only to third-party transactions, but also restrict transfers of personal data among the Company and its international subsidiaries. Several jurisdictions have passed laws in this area, and additional jurisdictions are considering imposing additional restrictions or have laws that are pending. These laws continue to develop and may be inconsistent from jurisdiction to jurisdiction. Complying with emerging and changing requirements causes the Company to incur substantial costs and has required and may in the future require the Company to change its business practices. Noncompliance could result in significant penalties or legal liability.

The Company makes statements about its use and disclosure of personal data through its privacy policy, information provided on its website, press statements and other privacy notices provided to customers. Any failure or perceived failure by the Company to comply with these public statements or with federal, state or international privacy or data protection laws and regulations could result in inquiries, proceedings and penalties from governmental entities or others. Such a failure or perceived failure could also result in reputational impacts, ongoing audit requirements and significant legal liability. The risks of inadvertent disclosure of personal data can increase with the introduction of new and complex technologies, such as artificial intelligence features, further exacerbating such risks.

In addition to the risks generally relating to the collection, use, retention, protection and transfer of personal data, the Company is also subject to specific obligations relating to the collection and processing of data associated with minors, as well as information considered sensitive under applicable laws, such as health, biometric, financial and payment card data. Health, biometric, financial and payment card data are subject to additional privacy, security and breach notification requirements, and the Company is subject to audit by governmental authorities regarding the Company's compliance with these obligations. If the Company fails to adequately comply with these rules and requirements, the Company can be subject to litigation or government investigations, can be liable for associated investigatory expenses, and can incur significant fees or fines.

The Company is also subject to new and changing laws and regulations regarding online safety, including enhanced protections for minors and mandatory age verification requirements. These laws and regulations can increase regulatory risks by requiring complex compliance measures and significant modifications to the Company's products, services and operations, and may lead to operational disruptions, heightened privacy and data security risks, increased costs and potential liability and fines, all of which can have a material adverse impact on the Company's business, financial condition, results of operations and stock price.

**Financial Risks**

***The Company's net sales and gross margins are subject to volatility and downward pressure due to a variety of factors.***

The Company's gross margins vary significantly across its products, services, geographic segments and distribution channels and can change over time. The Company's net sales and gross margins are subject to volatility and downward pressure due to a variety of factors, including: continued industry-wide global product pricing pressures and product pricing actions that the Company may take in response to such pressures; increased competition; the Company's ability to effectively stimulate demand for certain of its products and services; compressed product life cycles; supply shortages; potential increases in the cost of components, outside manufacturing services, and developing, acquiring and delivering content for the Company's services; the Company's ability to manage product quality and warranty costs effectively; shifts in the mix of products and services, or in the geographic, currency or channel mix, including to the extent that regulatory changes require the Company to modify its product and service offerings; fluctuations in foreign exchange rates; inflation and other macroeconomic pressures; the imposition of new or increased tariffs and other trade restrictions, their overall magnitude and duration, and retaliatory actions in response; and the introduction of new products or services, including new products or services with lower profit margins. These and other factors could have a materially adverse impact on the Company's results of operations, financial condition and stock price. Further, the Company generates a significant portion of its net sales from a single product category and a decline in demand for that product could significantly impact net sales and gross margins.

***The Company's financial performance is subject to risks associated with changes in the value of the U.S. dollar relative to local currencies.***

The Company's primary exposure to movements in foreign exchange rates relates to non–U.S. dollar–denominated sales, cost of sales and operating expenses worldwide. Gross margins on the Company's products in foreign countries and on products that include components obtained from foreign suppliers have in the past been adversely affected and could in the future be materially adversely affected by foreign exchange rate fluctuations.

The weakening of foreign currencies relative to the U.S. dollar adversely affects the U.S. dollar value of the Company's foreign currency–denominated sales and earnings, and generally leads the Company to raise international pricing, potentially reducing demand for the Company's products. In some circumstances, for competitive or other reasons, the Company may decide not to raise international pricing to offset the U.S. dollar's strengthening, which would adversely affect the U.S. dollar value of the gross margins the Company earns on foreign currency–denominated sales.

Apple Inc. | 2025 Form 10-K | 15

Conversely, a strengthening of foreign currencies relative to the U.S. dollar, while generally beneficial to the Company's foreign currency–denominated sales and earnings, could cause the Company to reduce international pricing or incur losses on its foreign currency derivative instruments, thereby limiting the benefit. Additionally, strengthening of foreign currencies may increase the Company's cost of product components denominated in those currencies, thus adversely affecting gross margins.

The Company uses derivative instruments, such as foreign currency forward and option contracts, to hedge certain exposures to fluctuations in foreign exchange rates. The use of such hedging activities may not be effective to offset any, or more than a portion, of the adverse financial effects of unfavorable movements in foreign exchange rates over the limited time the hedges are in place.

***The Company is exposed to credit risk and fluctuations in the values of its investment portfolio.***

The Company's investments can be negatively affected by changes in liquidity, credit deterioration, financial results, market and economic conditions, political risk, sovereign risk, interest rate fluctuations or other factors. As a result, the value and liquidity of the Company's cash, cash equivalents and marketable securities may fluctuate substantially. Although the Company has not realized significant losses on its cash, cash equivalents and marketable securities, future fluctuations in their value could result in significant losses and could have a material adverse impact on the Company's results of operations, financial condition and stock price.

***The Company is exposed to credit risk on its trade accounts receivable, vendor non-trade receivables and prepayments related to long-term supply agreements, and this risk is heightened during periods when economic conditions worsen.***

The Company distributes its products and certain of its services through third-party cellular network carriers and other resellers. The Company also sells its products and services directly to small and mid-sized businesses and education, enterprise and government customers. A substantial majority of the Company's outstanding trade receivables are not covered by collateral, third-party bank support or financing arrangements, or credit insurance, and a significant portion of the Company's trade receivables can be concentrated within cellular network carriers or other resellers. The Company's exposure to credit and collectibility risk on its trade receivables is higher in certain international markets. The Company also has unsecured vendor non-trade receivables resulting from purchases of components by outsourcing partners and other vendors that manufacture subassemblies or assemble final products for the Company. In addition, the Company has made prepayments associated with long-term supply agreements to secure supply of inventory components. As of September 27, 2025, the Company's vendor non-trade receivables were concentrated among a few individual vendors located primarily in Asia. If the Company is unable to monitor and limit exposure to credit risk on its trade and vendor non-trade receivables, as well as long-term prepayments, the Company's results of operations, financial condition and stock price could be materially adversely affected.

***The Company is subject to changes in tax rates, the adoption of new U.S. or international tax legislation and exposure to additional tax liabilities.***

The Company is subject to taxes in the U.S. and numerous foreign jurisdictions, including Ireland and Singapore, where a number of the Company's subsidiaries are organized. Due to economic and political conditions, tax laws and tax rates for income taxes and other non-income taxes in various jurisdictions may be subject to significant change. For example, the Organisation for Economic Co-operation and Development continues to advance proposals for modernizing international tax rules, including the introduction of global minimum tax standards. The Company's effective tax rates are affected by changes in the mix of earnings in countries with differing statutory tax rates, changes in the valuation of deferred tax assets and liabilities, the introduction of new taxes, and changes in tax laws or their interpretation. The application of tax laws may be uncertain, require significant judgment and be subject to differing interpretations.

The Company is also subject to the examination of its tax returns and other tax matters by the U.S. Internal Revenue Service and other tax authorities and governmental bodies. The Company regularly assesses the likelihood of an adverse outcome resulting from these examinations to determine the adequacy of its provision for taxes. The outcome of such examinations is inherently uncertain. If the Company's effective tax rates were to increase, or if the ultimate determination of the Company's taxes owed is for an amount in excess of amounts previously accrued, the Company's business, results of operations, financial condition and stock price could be materially adversely affected.

Apple Inc. | 2025 Form 10-K | 16

**General Risks**

***The price of the Company's stock is subject to volatility.***

The Company's stock has experienced substantial price volatility in the past and may continue to do so in the future. Additionally, the Company, the technology industry and the stock market as a whole have, from time to time, experienced extreme stock price and volume fluctuations that have affected stock prices in ways that may have been unrelated to these companies' operating performance. Price volatility may cause the average price at which the Company repurchases its stock in a given period to exceed the stock's price at a given point in time. The Company believes the price of its stock should reflect expectations of future growth and profitability. The Company also believes the price of its stock should reflect expectations that its cash dividend will continue at current levels or grow, and that its current share repurchase program will be fully consummated. Future dividends are subject to declaration by the Company's Board of Directors ("Board"), and the Company's share repurchase program does not obligate it to acquire any specific number of shares. If the Company fails to meet expectations related to future growth, profitability, dividends, share repurchases or other market expectations, the price of the Company's stock may decline significantly, which could have a material adverse impact on investor confidence and employee retention.

**Item 1B.    Unresolved Staff Comments**

None.

**Item 1C.    Cybersecurity**

The Company's management, led by its Head of Corporate Information Security, has overall responsibility for identifying, assessing and managing any material risks from cybersecurity threats. The Company's Head of Corporate Information Security leads a dedicated Information Security team of highly skilled individuals with experience across industries that, among other things, develops and distributes information security policies, standards and procedures; engages in employee cybersecurity training; implements security controls; assesses security risk and compliance posture; monitors and responds to security events; and executes security testing and assessments. The Company's Head of Corporate Information Security has extensive knowledge and skills gained from over 25 years of experience in the cybersecurity industry, including serving in leadership positions at other large technology companies and leading the Company's Information Security team since 2016.

The Company's Information Security team coordinates with teams across the Company to prevent, respond to and manage security incidents, and engages third parties, as appropriate, to assess, test or otherwise assist with aspects of its security processes and incident response. A dedicated Supplier Trust team manages information security risks the Company is exposed to through its supplier relationships. The Company has processes to log, track, address, and escalate for further assessment and report, as appropriate, cybersecurity incidents across the Company and its suppliers to senior management and the Audit and Finance Committee ("Audit Committee") of the Board. The Company's enterprise risk management program is designed to identify, assess, and monitor the Company's business risks, including financial, operational, compliance and reputational risks, and reflects management's assessment of cybersecurity risks.

The Audit Committee assists the Board in the oversight and monitoring of cybersecurity matters. The Audit Committee regularly reviews and discusses the Company's cybersecurity risks with management, including the Company's Head of Corporate Information Security, its General Counsel and the Heads of Compliance and Business Conduct, Business Assurance, and Internal Audit, and receives updates, as necessary, regarding cybersecurity incidents. The Chair of the Audit Committee regularly reports the substance of such reviews and discussions to the Board, as necessary, and recommends to the Board such actions as the Audit Committee deems appropriate.

For a discussion of the Company's cybersecurity-related risks, see Item 1A of this Form 10-K under the heading "Risk Factors."

**Item 2.    Properties**

The Company's headquarters is located in Cupertino, California. As of September 27, 2025, the Company owned or leased facilities and land for corporate functions, R&D, data centers, retail and other purposes at locations throughout the U.S. and in various places outside the U.S. The Company believes its existing facilities and equipment, which are used by all reportable segments, are in good operating condition and are suitable for the conduct of its business.

Apple Inc. | 2025 Form 10-K | 17

## Item 3.    Legal Proceedings

*Digital Markets Act Investigations*

On March 25, 2024, the Commission announced that it had opened a formal noncompliance investigation against the Company under Article 5(4) of the EU DMA ("Article 5(4) Investigation"). The Article 5(4) Investigation relates to how developers may communicate and promote offers to end users for apps distributed through the App Store, as well as how developers may conclude contracts with those end users. On June 24, 2024, the Commission announced that it had opened an additional formal investigation against the Company regarding whether the Company's new contractual requirements for third-party app developers and app marketplaces may violate the DMA ("Article 6(4) Investigation"). On April 23, 2025, the Commission fined the Company €500 million in the Article 5(4) Investigation and issued a cease and desist order requiring the Company to remove technical and commercial restrictions that prevent developers from steering users to alternative distribution channels outside the App Store. The Company has appealed the Commission's Article 5(4) decision. Also on April 23, 2025, the Commission issued preliminary findings in the Article 6(4) Investigation. If the Commission makes a final determination in the Article 6(4) Investigation that there has been a violation, it can issue a cease and desist order and may impose fines up to 10% of the Company's annual worldwide net sales. The Commission may also seek to impose additional fines if it deems that the Company has violated a cease and desist order. The Company believes that it complies with the DMA and has continued to make changes to its compliance plan in response to feedback and engagement with the Commission.

*Department of Justice Lawsuit*

On March 21, 2024, the DOJ and a number of state and district attorneys general filed a civil antitrust lawsuit in the U.S. District Court for the District of New Jersey against the Company alleging monopolization or attempted monopolization in the markets for "performance smartphones" and "smartphones" in violation of U.S. antitrust laws. The DOJ is seeking equitable relief to redress the alleged anticompetitive behavior. In addition, various civil litigation matters have been filed in state and federal courts in the U.S. alleging similar violations of U.S. antitrust laws and seeking monetary damages and other nonmonetary relief. The Company believes it has substantial defenses and intends to vigorously defend itself.

*Epic Games*

Epic Games, Inc. filed a lawsuit in the U.S. District Court for the Northern District of California ("California District Court") against the Company alleging violations of federal and state antitrust laws and California's unfair competition law based upon the Company's operation of its App Store. The California District Court found that certain provisions of the Company's App Review Guidelines violate California's unfair competition law and issued an injunction (the "2021 Injunction") enjoining the Company from prohibiting developers from including in their apps buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than the Company's in-app purchase system. The 2021 Injunction applies to apps on the U.S. storefronts of the iOS and iPadOS App Stores. On January 16, 2024, the Company implemented a plan to comply with the 2021 Injunction and filed a statement of compliance with the California District Court. On September 30, 2024, the Company filed a motion with the California District Court to narrow or vacate the 2021 Injunction. On April 30, 2025, the California District Court found the Company to be in violation of the 2021 Injunction and enjoined the Company from imposing any commission or any fee on purchases that consumers make outside an app; restricting, conditioning, limiting, or prohibiting how developers guide consumers to purchases outside an app; or otherwise interfering with a consumer's choice to proceed in or out of an app. The California District Court also denied the Company's motion to narrow or vacate the 2021 Injunction and referred the Company to the U.S. Attorney for the Northern District of California for a determination whether criminal contempt proceedings are appropriate. The Company will continue to vigorously defend its actions and employees, and has appealed the California District Court's most recent decision to the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit Court"). Although the Company's request to stay the decision pending appeal was denied, the Ninth Circuit Court has agreed to consider the Company's appeal on an expedited basis, with oral arguments heard in October 2025.

*Other Legal Proceedings*

The Company is subject to other legal proceedings and claims that have not been fully resolved and that have arisen in the ordinary course of business. The Company settled certain matters during the fourth quarter of 2025 that did not individually or in the aggregate have a material impact on the Company's financial condition or operating results. The outcome of litigation is inherently uncertain. If one or more legal matters were resolved against the Company in a reporting period for amounts above management's expectations, the Company's financial condition and operating results for that reporting period could be materially adversely affected.

## Item 4.    Mine Safety Disclosures

Not applicable.

# Exhibit H: Bhakta

# 24CV453028


Print

## Amar Bhakta vs Apple, Inc.

### Case Information

**Case Type:** Other Employment Unlimited (15)
**Case Number:** 24CV453028
**Filing Date:** 12/2/2024
**Case Status:** Active
**Court Location:** Civil

# PARTIES

Show
All
entries

Search:

| ▲ Type | First Name | Middle Name |
|---|---|---|
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Defendant | | |
| Plaintiff | Amar | |

Showing 1 to 9 of 9 entries

Previous  1  Next

## Attorneys

Bold Shows Lead Attorney

Show
All
entries

| ▲ Representing | First Name | Middle Name |
|---|---|---|
| **Apple, Inc.** | **Stephen** | |
| Apple, Inc. | Julie | A |
| Apple, Inc. | Ryan | M |
| Amar Bhakta | Deborah | Rebecca |
| Amar Bhakta | Jahan | Crawford |
| **Amar Bhakta** | **Chris** | **D.** |

Showing 1 to 6 of 6 entries

Previous | 1 | Next

# EVENTS

Show
All
entries

Search:

| ▼ File Date | File Type | Filed By | Comment |
|---|---|---|---|
| 3/9/2026 | Answer/Response (No Fee) | Apple, Inc., | to SAC, atty: Taeu |
| 3/6/2026 | Minute Order | | |
| 3/2/2026 | Order | Apple, Inc., | re: Def's second r Strike - DENIED in GRANTED withou amend in part - s Judge McGowen #22832857 |
| 2/26/2026 | Minute Order | | |

| 2/24/2026 | Proof of Service | Amar Bhakta, | Proof of Service of Remote Appea for Hannah C. Me Molly J. Frandsen |
| --- | --- | --- | --- |
| 2/24/2026 | Notice: Remote Appearance | Amar Bhakta, | Notice of Remote Appearance for N Frandsen |
| 2/24/2026 | Notice: Remote Appearance | Amar Bhakta, | Notice of Remote Appearance for H Meropol |
| 2/20/2026 | Statement: Case Management Conference | Amar Bhakta, | Joint Case Manag Conference State |
| 2/11/2026 | Proof of Service | Apple, Inc., | Proof of Service |
| 2/11/2026 | Request: Judicial Notice | Apple, Inc., | Request for Judic in Support of App Reply ISO its Mot Strike Portions of Plaintiff's Second Amended Compl: |
| 2/11/2026 | Declaration: In Support | Apple, Inc., | Declaration of St Taeusch in Suppc Defendant Apple Reply ISO its Mot Strike Portions of Plaintiff's Second Amended Compl: |
| 2/11/2026 | Response/Reply | Apple, Inc., | Reply in Support Defendant Apple Motion to Strike I of Plaintiff's Seco Amended Compl: |
| 1/28/2026 | Proof of Service | Amar Bhakta, | Proof of Service r Plaintiffs Opposit Defendant Apple Motion to Strike I of Plaintiffs Secor Amended Compl: |

| Date | Type | Party | Description |
|------|------|-------|-------------|
| 1/28/2026 | Request: Judicial Notice | Amar Bhakta, | Request For Judicial Notice in Support Plaintiffs Opposit Defendant Apple Second Motion to |
| 1/28/2026 | Opposition/Objections | Amar Bhakta, | Plaintiffs Opposit Defendant Apple Motion to Strike of Plaintiffs Secon Amended Compl |
| 12/16/2025 | Proof of Service | Apple, Inc., | Proof of Service |
| 12/16/2025 | Declaration: In Support | Apple, Inc., | Declaration of Ste Taeusch in Suppo Defendant Apple Motion to Strike of Plaintiff's Seco Amended Compl |
| 12/16/2025 | Memorandum: Points and Authorities | Apple, Inc., | Memorandum of and Authorities in of Defendant App Motion to Strike of Plaintiffs Secon Amended Compl |
| 12/16/2025 | Motion: Strike | Apple, Inc., | 2-26-26 1:30pm c Defendant Apple Notice of Motion Motion to Strike of Plaintiffs Secon Amended Compl |
| 12/16/2025 | Stipulation and Order | Amar Bhakta, Apple, Inc., | Stipulation Regar Briefing Schedule Defendant's Seco Motion to Strike - by Judge Adams #21972962 |
| 12/12/2025 | Proof of Service | Amar Bhakta, Apple, Inc., | Proof of Service |
| 12/11/2025 | Minute Order | | |
| 12/5/2025 | Proof of Service | Apple, Inc., | Proof of Service |

| 12/5/2025 | Statement: Case Management Conference | Apple, Inc., | Joint Case Manag Conference State |
| 12/5/2025 | Proof of Service | Amar Bhakta, | Proof of Service |

Showing 1 to 25 of 73 entries

Previous | 1 | 2 | 3 | Next

# HEARINGS

Show **All** entries

Search:

| Department | Type | ▼ Date | Time | Res |
|---|---|---|---|---|
| Department 22 | Reserved: Demurrer | 11/12/2026 | 1:30PM | |
| Department 22 | Conference: Further Case Management | 9/3/2026 | 2:30PM | |
| Department 22 | Conference: Further Case Management | 2/26/2026 | 2:30PM | He |
| Department 22 | Hearing: Motion to Strike | 2/26/2026 | 1:30PM | He |
| Department 7 | Conference: Further Case Management | 12/11/2025 | 2:30PM | He |
| Department 7 | Hearing: Motion to Strike | 10/16/2025 | 1:30PM | He |
| Department 7 | Conference: Further Case Management | 10/16/2025 | 2:30PM | He |
| Department 7 | Conference: Further Case Management | 5/22/2025 | 2:30PM | He |
| Department 7 | Conference: Case Management | 5/8/2025 | 2:30PM | He |

Jahan C. Sagafi (SBN 224887)
Molly J. Frandsen (SBN 320094)
Hannah Meropol (SBN 340095)
**OUTTEN & GOLDEN LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: jsagafi@outtengolden.com
Email: mfrandsen@outtengolden.com
Email: hmeropol@outtengolden.com

Chris Baker (SBN 181557)
Deborah Schwartz (SBN 208934)
**BAKER DOLINKO & SCHWARTZ, P.C.**
One California Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 433-1064
Facsimile: (415) 422-9966
Email: cbaker@bakerlp.com
Email: dschwartz@bakerlp.com

*Attorneys for Plaintiff, on behalf of himself,
other Aggrieved Employees, and for the State
of California*

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 11/13/2025 2:51 PM
Reviewed By: L. Ayala
Case #24CV453028
Envelope: 21597929**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA CLARA**

| | |
|---|---|
| AMAR BHAKTA,<br><br>    Plaintiff,<br><br> v.<br><br>APPLE, INC.,<br><br>    Defendant. | Case No. 24CV453028<br><br>**SECOND AMENDED PAGA COMPLAINT**<br><br>**First PAGA Claim – Speech Suppression**<br><br>**Second PAGA Claim – Privacy Violations, Surveillance, and Forced Patronage**<br><br>**Third PAGA Claim – Wage Clawbacks**<br><br>Judge: Hon. Charles F. Adams<br>Dept. 7<br><br>Complaint Filed: December 2, 2024 |

SECOND AMENDED PAGA COMPLAINT

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 4

    I.    Claim One:  Apple's Systematic Suppression of Employee Speech and Competition.. 4

        A.    The California Legislature Has Determined That Policies Limiting Certain Types of Employee Speech Are Unlawful Because Such Policies Undermine Societal Goals of Nondiscrimination, Free Movement of Labor, Fair Competition, and Shining a Light on Corporate Misconduct ............................ 4

        B.    Apple's Speech Suppression Policies Violate California Law in Several Ways .. 5

    II.    Claim Two:  Apple's Systematic Invasion of Employee Privacy and Forced Patronage Violates California Law ................................................................................................ 9

    III.    Claim Three:  Apple's Illegal Clawback Policies and Practices Violate California Law ................................................................................................................... 10

PARTIES ................................................................................................................ 11

JURISDICTION AND VENUE ......................................................................................... 11

STATEMENT OF FACTS ................................................................................................. 11

    I.    Apple's Speech Suppression Policies Have Violated Bhakta's Rights As an Apple Employee ............................................................................................................. 11

    II.    Apple's Speech Suppression Policies Are Evident in Multiple Documents and Through Various Actions Taken by the Company ..................................................... 13

        A.    Apple's Intellectual Property Agreement ("IPA") ............................................ 13

            1.    Information Restraints ................................................................................. 13

            2.    Other Restraints of Trade .......................................................................... 14

        B.    Apple's Business Conduct Policy ("BCP") ...................................................... 14

        C.    Apple's Security Policies ................................................................................. 15

        D.    Apple's Enforcement Practices ....................................................................... 16

        E.    Bhakta's Experience ....................................................................................... 17

    III.    Apple Invades Its Employees' Privacy and Compels Their Patronage ....................... 17

        A.    Apple's Collection and Use of The Privacies of Life ....................................... 17

        B.    Apple Owned vs Apple Managed .................................................................... 20

        C.    iCloud@Apple ............................................................................................... 21

        D.    Apple's Surveillance ...................................................................................... 22

2

E. No Escape .......................................................................................... 23

F. Bhakta's Experience ........................................................................... 24

IV. Apple's Illegal Clawback Policies and Practices ........................................ 25

A. Apple's Forfeiture Provisions ............................................................. 25

B. Bhakta's Experience ........................................................................... 25

V. Apple's "Carveout" Provisions ................................................................. 25

VI. Administrative Exhaustion ......................................................................... 26

FIRST CAUSE OF ACTION Private Attorneys General Act, Cal. Lab. Code §§ 2698 et seq. Speech Suppression, Which Restrains Competition, Speech and Whistle Blowing ................ 26

SECOND CAUSE OF ACTION Private Attorneys General Act, Cal. Lab. Code §§ 2698 *et seq.* Privacy Violations, Surveillance, and Forced Patronage ..................................................... 27

THIRD CAUSE OF ACTION Private Attorneys General Act, Cal. Lab. Code §§ 2698 et seq. Illegal Clawback Policies and Practices ................................................................. 28

PRAYER FOR RELIEF .................................................................................. 29

3

SECOND AMENDED PAGA COMPLAINT

**INTRODUCTION**

1.      This action challenges three categories of unlawful conduct by Defendant Apple, Inc. that aggrieves all Apple employees and harms all Californians: (1) Apple's suppression of employee speech through unlawful speech suppression rules and otherwise; (2) Apple's invasion of employee privacy through surveillance and forced patronage through use of their non-work private data; and (3) Apple's clawback of earned wages.  These three categories of conduct each give rise to distinct claims under California's Private Attorneys General Act ("PAGA"), as set forth in the First, Second, and Third Causes of Action, respectively.  In other words, Plaintiff can prevail by proving one PAGA violation without proving another.  However, as a practical matter, Apple's unlawful conduct that underlies these PAGA violations is mutually reinforcing and interrelated, as the proliferation of unlawful policies and practices may infringe on multiple labor code protections.

2.      Plaintiff Amar Bhakta brings this action under California's Private Attorneys General Act ("PAGA"), Cal. Labor Code §§ 2698 et seq. on behalf of himself and other current and former employees and the State of California to recover for violations of the California Labor Code.

3.       Plaintiff also seeks appropriate injunctive relief to protect Aggrieved Employees and the State of California from future violations.

**I.      Claim One:  Apple's Systematic Suppression of Employee Speech and Competition**

**A. The California Legislature Has Determined That Policies Limiting Certain Types of Employee Speech Are Unlawful Because Such Policies Undermine Societal Goals of Nondiscrimination, Free Movement of Labor, Fair Competition, and Shining a Light on Corporate Misconduct**

4.      The California Legislature has enacted a group of laws that protect Californians' rights to be free from employer interference in disclosing information about wages and working conditions, reporting suspected legal violations, participating freely in our democracy through the exercise of political activity, and practicing their trade or profession.  California's duly elected representatives enacted these statutes to protect workers' economic interests and personal autonomy by empowering them to speak freely about compensation and the details of their job duties and working conditions, to ensure a fair society by eliminating pay discrimination and

4

other mistreatment, and to promote a reliable economy in which businesses compete on a level playing field and unfair competition is quickly rooted out.  These laws, collectively, establish as a minimum employment standard an employee *anti*-gag rule.  *Doe. v. Google* (2020) 54 Cal.App.5th 948.[1]

5. The California Legislature has enacted the following laws, all of which Apple violates through the use of its Speech Suppression Policies:

a. **Labor Code §§ 232, 232.5, and 1197.5(k)**, which prohibit employers from requiring employees to refrain from disclosing information about their wages and their working conditions.  These laws protect Californians' right to be free from discrimination.

b. **Labor Code § 1102.5 and Government Code § 12964.5**, which protect workers' rights to whistleblowing.  This law protects the ability of workers to raise concerns about unlawful activity, which protects all Californians who can be negatively impacted by wrongdoing, such as pollution and antitrust violations.

c. **Labor Code §§ 1101 and 1102**, which prohibit employers from placing restraints upon employee political activity and their lives outside of work. These laws, among other things, ensure employees may participate in democracy and advocate for causes that, in their view, further the public good, even if their employer disagrees.

d. **Labor Code § 432.5**, which prohibits employers from requiring an employee to sign a writing it knows is prohibited by law.

**B. Apple's Speech Suppression Policies Violate California Law in Several Ways**

6. **Apple imposes these policies on its workers.** As a condition of employment, Defendant Apple, Inc. ("Apple") requires all employees, including contingent workers (collectively, "Apple employees") to comply with agreements, policies, guidelines, and practices governing employee speech ("Speech Suppression Policies") that violate California worker

---

[1] In this Complaint, Plaintiff generally uses the terms "speech suppression" or "gag rules" to refer to violations of California's anti-gag rule.

5

SECOND AMENDED PAGA COMPLAINT

protection laws by unlawfully restricting the employees' speech and limiting their ability to get jobs after working at Apple.  Apple's Speech Restriction Policies purport to remain in effect throughout each employee's employment and beyond, for the life of the employee.

7.      **Apple's Speech Suppression Policies.**  Apple maintains companywide policies that suppress its employees' speech in violation of California law.  Through its employment agreements, written policy documents, and practice of enforcement, Apple unlawfully prohibits the disclosure of information that the Labor Code empowers employees to disclose, in the Legislature's judgment.  The broad definition of confidential information in Apple's form employment agreement includes "the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resource information."  Its Business Conduct Policy expressly prohibits Apple employees from disclosing their coworkers' compensation information, prohibits them from engaging in any "outside activity" that *could* have an adverse effect on their ability to perform their duties at Apple, and places restraints on its employees' political activities.

8.      **Speech that facilitates workers' ability to get a job.**  Apple's conduct also violates California law by prohibiting restraints on trade.  *See* California Business & Professions Code §§ 16600 *et seq.*  The overbroad confidentiality restriction in Apple's employment agreement limits employees' freedom to speak about their work and Apple's business, which restricts them from using their own skills and knowledge, developed at Apple, both in a job search and after hire.  *See* Jodi L. Short, Killing the Messenger: The Use of Nondisclosure Agreements to Silence Whistleblowers, 60 U. Pitt. L. Rev. 1207, 1220 (1999) (noting that agreements restricting disclosure make it more difficult for individuals to obtain new employment in the same field, because "[t]he skills and industry knowledge an employee learns at one job often constitute her most valuable assets in seeking and obtaining a subsequent job").  The employment agreement's express language prohibiting departing Apple employees from soliciting other Apple employees or contractors after they leave employment with Apple also unlawfully restricts trade.  Apple's conduct not only violates speech and worker mobility protections but also undermines legislative intent underlying those protections to combat

SECOND AMENDED PAGA COMPLAINT

discriminatory pay disparities and improve worker mobility.

9.      **Speech that protects against discrimination.**  Apple's conduct violates California Labor Code provisions that explicitly protect employees who disclose or discuss their wages and working conditions, either with coworkers or outsiders.  Labor Code § 232 provides that no employer may "[r]equire, as a condition of employment, that an employee refrain from disclosing the amount of his or her wages." § 232(a). Section 232(b) also prohibits requiring an employee to sign a "waiver or other document" that purports to deny the right to disclose one's wages.  Labor Code § 232.5 extends similar protections to other aspects of the employment relationship, providing that no employer may "[r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions."  Labor Code § 1197.5(k), which is part of the California Equal Pay Act, states that "an employer shall not prohibit an employee from disclosing the employee's own wages, discussing the wages of others, inquiring about another's wages, or aiding or encouraging any other employee to exercise his or her rights under this section."  The legislative history underlying these Labor Code provisions emphasizes how employer policies prohibiting disclosures about wages exacerbate discriminatory pay disparities. *See, e.g.*, 2015 Cal. Legis. Serv. Ch. 546 (SB 358 § 1(d)) ("Pay secrecy also contributes to the gender wage gap, because women cannot challenge wage discrimination that they do not know exists."); *Doe v. Google, Inc.* (2020) 54 Cal.App.5th 948, 958 (stating Labor Code § 1197.5(k) was enacted "at the urging of women's groups to protect employees sharing information necessary to the enforcement of laws against sex discrimination") (citing Sen. Com. on Industrial Relations, Staff Analysis of Assem. Bill No. 3193 (1983–1984 Reg. Sess.)).

10.      **Whistleblower Speech That Protects Against Corporate Wrongdoing.**  Apple's conduct also violates California's whistleblower protections.  For example, Labor Code § 1102.5 protects an employee's right to disclose, both within a company and externally, employer conduct the employee has a reasonable cause to believe constitutes a legal violation.  The broad purview of this whistleblower protection to cover employee disclosures regarding any legal violation was an express purpose of the legislature in its enactment.  *See* 2013 Cal. Legis.

SECOND AMENDED PAGA COMPLAINT

Serv. Ch. 732 (AB 263 § 1(g)) ("No employee should have to fear adverse action, whether it involves threats to cut hours, move a worker to night shift, or contact law enforcement agencies, simply for engaging in rights the State of California has deemed so important that they are protected by law.").

11.    **Speech That Allows Employees to Participate in Democracy and Advocate for the Public Good.**  Apple's conduct violates sections of the Labor Code that prohibit employers from placing restraints upon employee political activity and their lives outside of work.  Labor Code §§ 1101 and 1102 prohibit employers from adopting a rule or policy "[c]ontrolling or directing, or tending to control or direct the political activities or affiliations of employees" and prohibit employers from "coerc[ing] or influenc[ing]  or attempt[ing] to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."

12.    **Signatures on Unlawful Policies.**  The unlawful provisions of Apple's employment agreement additionally violate Labor Code § 432.5, which prohibits an employer from requiring an employee to sign a writing that it knows is prohibited by law.

13.    **Lifetime effect.**  Apple's Speech Suppression Policies purport to remain in effect throughout each employee's employment and beyond, for the life of the employee.

14.    **The harm from Apple's Speech Suppression Policies.**  Apple's Speech Suppression Policies have harmed – and continue to harm – Apple's employees and the State of California just as the Legislature feared.  For example, Apple prohibited Plaintiff Bhakta from speaking about his work experience on podcasts and instructed Bhakta to remove information about his working conditions and work experiences from his LinkedIn profile.  On information and belief, Apple's Speech Suppression Policies limit Apple employees' ability to describe their job responsibilities, accomplishments, and professional growth to a potential future employer when exploring new opportunities, and they prohibit or restrain Apple employees from disclosing – or using – all of the skills, knowledge, connections, and overall experience they developed at Apple when working for a subsequent employer.  Apple's Speech Suppression

Policies prohibit or restrain Apple employees from speaking with each other or outsiders (like friends, family members, reporters, etc.) about potential problems at work, such as unfair treatment, harassment, discrimination, retaliation, or even sexual assault.  Similarly, Apple's Speech Suppression Policies prohibit Apple employees from bringing to light compensation issues, including underpayment or under-leveling of people of color, women, older workers, or any other group.  The secrecy permits the wrongdoing to continue.  This is a real and ongoing concern. Two women recently filed a proposed class and PAGA action against Apple on behalf of all women in the Engineering, Marketing, and AppleCare divisions, alleging that Apple systematically underpays women in violation of the Equal Pay Act.  *Jong v. Apple, Inc.*, Case No. CGC-24-615363 (San Francisco Superior Court).

15.    Apple's Speech Suppression Policies are contrary to the laws described herein and are contrary to the interests of the State of California.

## II.    Claim Two:  Apple's Systematic Invasion of Employee Privacy and Forced Patronage Violates California Law

16.    More than 50 years ago, the People of California amended their Constitution to include the inalienable right of all people to privacy.  The moving force behind this amendment was "the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society."  At its most basic, this right recognizes and protects individual autonomy.  It encompasses the right to *decide* "to what extent [a person's] thoughts, sentiments, and emotions are communicated to others."  It provides "*immunity* from suspicious and jealous observation."  And it grants *to the individual* "the ability to control the circulation of personal information."

17.    The California Legislature also has enacted employment laws that protect employee autonomy and privacy.  Labor Code § 450 prohibits employers from coercing or compelling their employees' patronage.  Alternatively, it prohibits employers from coercing or compelling their employees in the purchase of a thing value, with consideration *of any type*, including their nonwork private data.  Labor Code § 432.5 prevents employers from requiring their employees to sign contracts and other writings known to be prohibited by law.

SECOND AMENDED PAGA COMPLAINT

18.     In violation of these laws, Apple requires employees to waive their inalienable right to privacy and autonomy, it compels or coerces them to patronize Apple, and it compels or coerces them in the purchase of a thing a value.  Apple requires the use of Apple devices, software, and services for work, including personal iCloud accounts.  In order to use these devices, software, and services (collectively "products"), employees must become Apple consumers and sign consumer subscription and other agreements with Apple.  Put plainly, they are compelled or coerced to patronize Apple.  Apple's products  collect and use the valuable personal data of Apple employees, and those with whom they interact, when the employees are engaged in the "life" side of the work/life balance, i.e., during nonwork periods and while away from Apple's premises ("Private Life Data.").  Apple also requires employees to agree that they have no right to privacy in their Private Life Data (including location data), that Apple can engage in physical, video, and electronic surveillance of them and that it can, as it wishes, search both Apple and non-Apple devices and other property while an employee is on "company premises." which – according to one Apple policy – can include an employee's *home* office.

19.      For Apple's employees, the Apple ecosystem is not a walled garden.  It is a prison yard.   A panopticon where employees, both on and off duty, are ever subject to Apple's all-seeing eye.

**III.    Claim Three:  Apple's Illegal Clawback Policies and Practices Violate California Law**

20.      Finally, the California Legislature has enacted laws intended to ensure that employees are actually paid the wages they earn.  Labor Code § 221 prohibits an employer from clawing back earned wages – including Restricted Stock Units (RSUs).  Labor Code § 206.5 states that an employer shall not require the execution of a release of a claim or right on account of wages to become due unless the wages have already been paid.

21.      Despite these laws, Apple conditions the payment of vested Restricted Stock Units – wages that will become due – on a release of their right to these vested RSUs if Apple "reasonably determines" the employee has, among other things, engaged in the unauthorized

SECOND AMENDED PAGA COMPLAINT

disclosure of "confidential information," or "materially breached" their employment agreement, which, as detailed below, requires compliance with Apple's unlawful Speech Suppression Policies rules and surveillance practices.

## PARTIES

22.     Plaintiff Amar Bhakta is a current Apple employee and agent of the State of California within the meaning of PAGA.  Among other things, and as further detailed below, he was and is subject to Apple's unlawful employment agreements, policies, and practices.  He is aggrieved by one or more of Apple's violations of the Labor Code.

23.     Apple, Inc. is a California corporation doing business in California and maintaining corporate headquarters in Santa Clara County.

24.     At all relevant times, Apple was Plaintiff's employer within the meaning of the Labor Code.

## JURISDICTION AND VENUE

25.     The Court has jurisdiction over this action because the action involves issues of state law.  Venue is proper in this judicial district pursuant to section 395.5 of the California Code of Civil Procedure, because Apple's principal place of business is situated in Santa Clara County.

## STATEMENT OF FACTS

**I.     Apple's Speech Suppression Policies Have Violated Bhakta's Rights As an Apple Employee**

26.     According to its website, Apple employs 80,000 individuals in the United States. In California, it has more than 36,000 employees, 53 retail stores, and numerous corporate offices.  Its employment agreements, policies, procedures, and practices are, by necessity, standardized.  Accordingly, and on information and belief, Bhakta's experience and encounters with Apple's Labor Code violations, including its restraints on speech and individual autonomy, is emblematic of all Apple employees.

27.     In or around July 2020, Apple offered Bhakta a job as a Digital Ad Tech/Operations Manager.  A graduate of Colgate University, Bhakta has years of experience in

SECOND AMENDED PAGA COMPLAINT

the creation, management, monitoring, and analysis of digital ad campaigns.  His past employers include Hulu, Merkle, and AOL.  His past clients include Disney, Facebook, Target, Warner Brothers, and Amazon.  Apple hired Bhakta because of his experience, skill, knowledge, network, and expertise.

28.     Apple designated Bhakta's offer letter, which includes information about Bhakta's working conditions and wages, as "Apple Confidential."  On information and belief, Apple uses a standard offer letter, which requires, as a condition of employment, that Apple employees sign Apple's Intellectual Property Agreement (IPA) and agree to comply with the terms of Apple's Business Conduct Policy.  Apple routinely stamps its offer letters "Apple Confidential."  On information and belief, these documents are boilerplate documents used on a widespread basis throughout the company.

29.     As a condition of employment, the offer letter further required Bhakta to sign Apple's Intellectual Property Agreement (IPA) and agree to comply with the terms of Apple's Business Conduct Policy.  Bhakta, as a condition of working for Apple, signed the offer letter and the IPA.

30.     Apple's offer to Bhakta detailed information about his own wages and Apple's working conditions.  It said his compensation would likely include an RSU award that was subject to the terms and conditions of Apple's Employee Stock Plan and RSU award agreement. It said his employment was conditioned upon, among other things, Bhakta's written agreement to (1) the terms of the offer letter, (2) Apple's Intellectual Property Agreement (IPA); and (2) the terms of Apple's Business Conduct Policy (BCP).

31.     On or around July 15, 2020, Bhakta signed the offer letter and IPA.  These agreements remain in full force and effect.  Bhakta has also completed, reviewed, and certified – through annual Business Conduct training – his acknowledgement and agreement to the BCP.

32.     As further detailed below, Apple's standard offer letter, IPA, BCP, and equity plans and agreements place unlawful restraints on employee speech, competition, wage rights, autonomy, and privacy.

SECOND AMENDED PAGA COMPLAINT

## II. Apple's Speech Suppression Policies Are Evident in Multiple Documents and Through Various Actions Taken by the Company

33. Apple seeks – through confidentiality designations, employee agreements, policies, threats, directives, requirements, and other practices – to monopolize information *about* or *related to* Apple, including information about Apple wages, working conditions, illegal conduct, or public policy. Examples of this conduct include the following.

### A. Apple's Intellectual Property Agreement ("IPA")

34. As noted above, on or around July 15, 2020, Bhakta signed Apple's Intellectual Property Agreement. The IPA violates California's anti-gag rule and contains other unlawful restraints on activity.

#### 1. Information Restraints

35. The IPA prohibits employees "during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform duties as an Apple employee."

36. The IPA defines Apple's "Proprietary Information," as "all information not generally known outside Apple and/or kept confidential by Apple including for example but not limited to" "information relating to the business operations or affairs of Apple or persons or companies dealing with Apple" as well as "the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resource information."

37. The IPA does not include appropriate carve-outs for protected activity. It does not permit the disclosure of information about unlawful conduct, disclosures to the SEC, or the notice of immunity required by the Defends Trade Secret Act.

38. The IPA requires, upon termination of employment, that employees return – "all documents and materials of any kind pertaining to [his] work at Apple," *and* "any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary information."

39. The above prohibitions, by their plain terms, prohibit the disclosure or use of

information about wages, working conditions, an employee's general knowledge, skills, and experience learned through their Apple employment, information available to others through normal competitive means, and reasonably suspected illegal conduct.

### 2.    Other Restraints of Trade

40.    The IPA also prohibits solicitation.  It provides, "to the fullest extent permitted by applicable law, during your employment and for a period of one (1) year following your termination" "you will not, directly or indirectly, on your own behalf or on behalf of any person or entity, solicit, recruit, or take any action intended to induce Apple employees or contractors to terminate their relationship with Apple."

41.    The IPA requires employees to agree that they will not "plan or engage" in any activity competitive with or related to Apple's business or products or engage in any other activities that conflict with any "employment obligations" to Apple.

42.    The IPA assigns to Apple ownership of all "inventions," including ideas and materials "made, created, or reduced to practice" by employees if the "invention" was: (1) developed using any Apple equipment; (2) "suggested" by work performed while at Apple; or (3) "conceived" during employment with Apple and related to any aspect of any past, present, or future Apple business or product.  The IPA further requires employees to assign to Apple – for free and for forever – the rights to all inventions that would otherwise belong to them and to waive any personal rights to such inventions both during and after their termination from employment with Apple.

43.    On information and belief, Apple requires all of its California employees to sign a form IPA substantially similar to the IPA signed by Bhakta.  Bhakta remains subject to the terms of the IPA.

### B.  Apple's Business Conduct Policy ("BCP")

44.    Apple's BCP also contains unlawful restraints on employee activity.

45.    The BCP expressly provides, "You should never share a coworker or prospective employee's personal information. This includes information regarding their employment history, personal contact information, *compensation*, health information, or performance and disciplinary

14

SECOND AMENDED PAGA COMPLAINT

matters."

46. The BCP provides that employees should, "[n]ever disclose confidential, operational, financial, trade-secret, *or other business information* without verifying with your manager whether such disclosure is appropriate."

47. The BCP prohibits employees from public or outside speaking engagements that relate to Apple's business without Apple's approval.

48. The BCP requires employees to refer all inquiries from the media, industry, or financial analyst community to Apple's Corporate Communications or Investor Relations.

49. The BCP prohibits employees from contributing material to publications (including blogs) that relate to Apple's business or products, or that "could be seen as a conflict of interest," without Apple's approval.

50. The BCP prohibits employees from engaging in any activity that "may damage Apple's reputation" or "gives the appearance of impropriety or divided loyalty."

51. The BCP prohibits employees from engaging in any "outside activity" that *could* have an adverse on their ability to perform their duties at Apple.

52. The BCP prohibits employees from using Apple work time, equipment, or resources for political activities.

53. The BCP prohibits employees from using time at work *or* Apple's workspaces, phones, computers, internet access *or* any Apple assets or services, for any "outside activity" (meaning non-work activity).

54. The BCP asserts that Apple "owns" all records and information in any form that is created or received during the course of doing Apple's business. It also asserts that Apple "owns" its employees' personnel records.

55. Apple's BCP applies to all full and part-time employees of Apple and its subsidiaries.

**C. Apple's Security Policies**

56. Apple's Security and Information Classification Policies and Standards further evidence Apple's restraints on employee speech and activity. Apple classifies information – not

SECOND AMENDED PAGA COMPLAINT

on the basis of any positive law (e.g. privacy or trade secrets) – but rather "based upon the impact that an event compromising the security, integrity, or availability of the information [would have] on Apple's operations, performance, brand, or regulatory/legal obligations." Put more plainly, Apple classifies information based on how bad it thinks disclosure would be for Apple. There are four classification tiers: Prohibited (Tier 0), Highly Confidential (Tier 1), Confidential (Tier 2), Internal (Tier 3), and Public (Tier 4).

57. Apple defines information about wages, benefits, job titles, work performance, employment dates, employment status, and reporting relations as Confidential, Highly Confidential, or Prohibited. Even "Internal" information at Apple is restricted to users with a business need. According to Apple's classification standards, Public (Tier 4) Information is limited to "Information that may be broadly distributed *without causing damage to Apple*."

**D. Apple's Enforcement Practices**

58. Apple implements and enforces its unlawful agreements, policies, and practices through the designation of information, the surveillance and interrogation of employees, dedicated security and policy teams, management directives, and the discipline and termination of employees. Among other things:

59. On information and belief, in 2018, Apple issued a memo threatening Apple employees with termination or criminal consequences if they leaked information. The memo warned employees that it had caught 29 leakers in the previous year, and that 12 were arrested. The memo also warned Apple employees to be wary of press, analysts, and bloggers who may target or befriend them on social media.

60. On information and belief, in 2021, Apple refused a shareholder request to add the following language in their employment agreements: "Nothing in this agreement prevents you from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that you have reason to believe is unlawful." (This language is required by Government Code § 12964.5.)

61. Apple responded to other employee discussions about wages, working conditions, and suspected unlawful corporate conduct with warnings, terminations, and

SECOND AMENDED PAGA COMPLAINT

crackdowns intended to restrain employee speech.

### E. Bhakta's Experience

62.     Bhakta's personal experience with Apple confirms its written instruments – including the IPA, BCP, and Apple's security policies – violate California law.  In accordance with Apple's policy, he asked for permission to engage in public speaking about his area of expertise: Digital Advertising.  Apple forbade it.  Apple also required that he remove and edit unprotected information about his working conditions and work at Apple from his LinkedIn profile.  The limited his visibility and attractiveness in the job market, thus harming both Bhakta and competitors for Bhakta's services.

63.     *Privacy* in speech is a necessary condition of *free* speech.  Apple's surveillance policies and practices chill, and thus also unlawfully restrain, employee whistleblowing, competition, freedom of employee movement in the job market, and freedom of speech, all in violation of California's employee anti-gag rule.  These surveillance policies violate other laws as well.

### III.     Apple Invades Its Employees' Privacy and Compels Their Patronage

64.     In marketing materials, Apple declares that it respects human rights, including the right to privacy.  Apple does not extend this respect to its own employees.  Instead, Apple subjects its employees to surveillance, compels or coerces their patronage, and compels or coerces them in the purchase of things of value:  Among other things, Apple compels its employees to purchase Apple's products, as well as the emoluments of their employment, with their personal data.

### A. Apple's Collection and Use of The Privacies of Life

65.     "Modern cell phones are not just another technological convenience.  With all they contain, and all they may reveal, they hold for many Americans 'the privacies of life.'" *Riley v. California* (2014) 573 U.S. 373, 403.  As Chief Justice Roberts further explains in *Riley*:

66.     "The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any

17

isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone."

67.      "Although the data stored on a cell phone is distinguished from physical records by quantity alone, certain types of data are also qualitatively different. An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD. Data on a cell phone can also reveal where a person has been. Historic location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building. . . . 'GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.'"

68.      "Mobile application software on a cell phone, or 'apps,' offer a range of tools for managing detailed information about all aspects of a person's life. There are apps for Democratic Party news and Republican Party news; apps for alcohol, drug, and gambling addictions; apps for sharing prayer requests; apps for tracking pregnancy symptoms; apps for planning your budget; apps for every conceivable hobby or pastime; apps for improving your romantic life. There are popular apps for buying or selling just about anything, and the records of such transactions may be accessible on the phone indefinitely. There are over a million apps available in each of the two major app stores; the phrase "there's an app for that" is now part of the popular lexicon. The average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life."

SECOND AMENDED PAGA COMPLAINT

69.     A "cell phone search would typically expose to [an employer] far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form – unless the phone is."

70.     In addition, the private data contained on an iPhone extends well beyond the user's information.  It extends to those with whom the user (or the iPhone) interacts.  If a child texts his father that he prefers Batman to Spiderman, or a wife sends a racy date night calendar invite to her husband, then the child's and the wife's information is also contained on the iPhone. Indeed, personal data is collected by Apple even without any voluntary action by the user or the third party.  For example, Apple's FindMy and Journal apps rely on Bluetooth beacons and other technology to determine the proximity of Apple devices to one another.  As Apple's iCloud consumer agreement explains:

> Apple and its partners and licensors may provide certain features or services that rely upon device-based location information using GPS (or similar technology, where available) and crowdsourced Wi-Fi access points and cell tower locations. To provide such features or services, where available, Apple and its partners and licensors must collect, use, transmit, process and maintain your location data, including but not limited to the geographic location of your device and information related to your Account and any devices registered thereunder, including but not limited to your Apple ID, device ID and name, and device type.

71.     The personal data contained on an iPhone or other digital devices is more than private.  It is also valuable.  Personal data is the fuel of surveillance capitalism.  As explained by Professor Ermita Shoshanna Zuboff: "Forget the cliché that if it's free, 'You are the product.' You are not product; you are the abandoned carcass.  The "product" derives from the surplus that is ripped from your life." *See,* S. Zuboff, <u>The Age of Surveillance Capitalism: The Fight for a Human Future at the New Frontier of Power</u> (Profile Books 2018).

72.     Apple, like other surveillance capitalists, commodifies the human experience – including the nonwork aspects of its employees' lives – and uses it for business purposes.

73.     In order to use an Apple product,  individuals – including Apple's employees –

SECOND AMENDED PAGA COMPLAINT

must enter into a variety of consumer agreements with Apple, including software licensing agreements. Personal data is part (or sometimes all) of the consideration an individual pays to become or remain an Apple consumer. Like all surveillance capital firms, Apple collects and uses this personal data – including the Private Life Data of its own employees – for business purposes. These purposes include to "power its services" (e.g., improve its offerings or data analysis), "security and fraud prevention (e.g., to protect Apple), and to "personalize" Apple's services (e.g., to sell businesses, and/or serve consumers, with targeted advertisements).

### B. Apple Owned vs Apple Managed

74. Apple employees must be reachable for work and have access to Apple's network while on and off duty. Apple also requires its employees to use only Apple devices for work. To satisfy these two requirements, employees must enter into consumer agreements with Apple and must carry an iPhone or other Apple device on their person. This condition of employment – particularly in combination with other Apple policies, practices, and requirements – has profound implications for their individual privacy, the privacy of their loved ones, and their individual autonomy.

75. Apple gives employees the "choice" of using either an "Apple-owned" or an "Apple-managed" device for work. Regardless of what the employee "chooses," the employee must enter into Apple agreements and become an Apple consumer.

76. For example, if an employee decides to use an Apple-owned device, it is typically obtained new through a carrier in Apple packaging. The employee must open the packaging and set up the device. One of the first steps in doing so is scrolling through and entering into consumer agreements with Apple, such as Apple's software licensing agreement, terms of service, and privacy policy. Another step is providing Apple with the employee's biometric information (e.g., fingerprint, likeness, voice). This information is used in lieu of a password or to train Apple's artificial intelligence (e.g., Siri).

77. The consumer agreements Apple compels or coerces its employees to sign saddle those employees with obligations. Among other things (1) they must have or create an Apple Store account and associate it with Apple's pre-installed Apps; (2) they must consent to Apple's

SECOND AMENDED PAGA COMPLAINT

use of their private data; and (3) they must waive numerous claims against Apple arising from their use of Apple's products.

78.    Notwithstanding these consumer agreements, Apple places limits on its employees' use of an "Apple-owned" iPhone for personal reasons.  By Apple's design, most employees instead use a personal iPhone for work reasons.  In order to do so, Apple requires the employee to consent to Apple installing software, including an "electronic sim card" (eSIM) and/or a Virtual Private Network (VPN), on the personal device.  Apple converts the personal device into an "Apple-managed" device.

79.    Apple then claims the right to access, search and use all the Private Life Data contained on the Apple devices Apple compels its employees to use.  As Apple's iCloud@Apple policy explains:

> any data stored on an Apple-managed or Apple-owned device is accessible by Apple in the event of a security search of the device, or in the event your data is included in a corporate backup service. *This means that if you use your personal account on an Apple-managed or Apple-owned iPhone, iPad, or computer, any data stored on the device (including emails, photos, videos, notes, and more), are subject to search by Apple.*

80.    Apple's Technology Asset Management Policy further requires that it know the "logical (e.g., IP address) and physical attributes (e.g., geographic location)" of every Apple-owned or managed device at all times.  Consistent with this policy, Apple employees cannot disable the Apple surveillance apps on their Apple owned or managed devices.  If – as required – an Apple employee has physical possession of an Apple device, then Apple knows where they are.

### C. iCloud@Apple

81.    Apple also requires its employees to use Apple's collaboration tools to perform their work (e.g., Apple email, Pages, Numbers, and Keynote).  These tools in turn require a personal iCloud account.  Employees cannot sign up for an iCloud account using their work email address (i.e., @apple.com).  Rather, they must either use their pre-existing personal Apple account or, if they do not have one, create one and thus become an Apple consumer.

82.     Apple thus compels or coerces its employees to use a personal iCloud account – and enter into or continue with an iCloud consumer agreement – as a condition of employment. Apple does not reimburse its employees for its use of their personal iCloud account.

83.     Apple only allows one primary iCloud account per device or user.  Thus, employees who have a pre-existing personal iCloud account are required to associate this personal iCloud account with their work account.  If they are a pre-existing Apple consumer, their personal iCloud account thus becomes "Apple managed" even if they use an Apple owned device for work.  Upon making this association, Apple makes unilateral configuration changes to the personal iCloud account.  For example, it unilaterally adds a "work folder."  Apple also actively discourages the use of a work-only iCloud account even for those employees who use an Apple owned device and do not otherwise use Apple products.

84.     The Private Life Data accessible through an iCloud account can easily dwarf the Private Life Data contained on a single device.  The iCloud can include all the information gathered by all the synched devices, including family member devices and including non-Apple devices.  This data can include email, contacts, reminders, entire photo libraries, internet browsing data, health data, messages, "smart home" data, passwords, apps, files, documents calendars, notes, and backups.

85.     One Apple policy claims that Apple will not access or use the Private Life Data in its employees' personal iCloud account, *except* as provided in other instruments like the iCloud consumer agreement and Employee Privacy Notice.  This is deceptive and does not lessen the privacy invasion.  The other instruments, including the iCloud consumer agreement, already grant Apple an unfettered right to access, use, preserve, prescreen, move, modify, disclose, or remove any and all content that is generated or encountered through use of the iCloud service. Apple also declares the right to access, search, and use the Private Life Data on the Apple owned or managed [personal] devices *synched* with the personal iCloud account, and the synching of devices is a primary purpose of an iCloud account.

**D.  Apple's Surveillance**

86.     According to Apple's BCP, as a condition of initial and continuing employment,

SECOND AMENDED PAGA COMPLAINT

Apple's employees must agree that Apple can: (1) Access, search, monitor, and archive *all* data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, *or other personal accounts*); and (2) Conduct physical, video, or electronic surveillance, search [its employees'] workspace (e.g., file cabinets, desk drawers, and offices, even if locked), review phone records, or search any non-Apple property (e.g.,  backpacks, handbags) while on company premises.   Apple's "Workplace Searches and Privacy" Policy goes further and suggests that Apple also has the right to search its employees' *home* offices.

87.      Apple's message to employees – plainly described in its BCP – is unambiguous. Apple employees "should not have any expectation about the privacy of content or personal information on Apple systems or networks."

**E.  No Escape**

88.      For the reasons stated above, it is neither possible nor practical for Apple employees to avoid becoming an Apple consumer and patronizing Apple.  It is neither possible nor practical for them to avoid Apple's surveillance, collection, or use their Private Life Data. Among other things:

89.      All employees must use a personal iCloud account for work.

90.      All employees must sign consumer agreements with Apple to use Apple's products for work purposes, regardless of whether the products are Apple-owned or Apple-managed.

91.      As one Apple document explains, some employees – e.g., those "who need to be able to 'live on' [Apple's] products with real personal data for testing or product development purposes" – are required to either use their personal device for work or an Apple owned device for personal reasons.

92.      Even if it was practicable for an employee to carry two smartphones at all times (e.g., an Apple owned device and a purely personal device), *they would still be carrying the Apple-owned device*.  The Apple-owned device collects off-duty Private Life Data for Apple's use (e.g., location data) simply by being in the employee's possession.

93.      As noted above, Apple declares the right to access, monitor, and use the data on

purely personal devices and that employees should have no expectation of privacy in personal information connected to an Apple system or network. *All* Apple devices, even purely personal ones, are connected to an Apple system or network.

94. The cost to employees of switching to a non-Apple device for purely personal reasons is too high. In its recent antitrust complaint against Apple, the United States of America and sixteen states, including California, allege the following: Apple has monopoly power in the smartphone market in the United States. Its market share exceeds 70%. Nearly 90% of iPhone users in the United States replace their iPhone with another iPhone. Apple's employees, even more so than Apple's consumers, are trapped in Apple's prison yard.

**F. Bhakta's Experience**

95. Consistent with the above, and upon beginning his employ, Apple gave Bhakta the "choice" of using either an Apple-owned or his personal iPhone for work. Initially, Bhakta used an Apple owned device for work. In doing so, was Apple required him to enter into the consumer agreements referenced above. Unsurprisingly, Bhakta then switched to using his personal phone and Apple installed an eSIM and VPN. Apple also required Bhakta to use his personal iCloud account to collaborate with his colleagues. Apple has not reimbursed Bhakta for its use of his iCloud account.

96. Apple, through the conduct described above and otherwise has compelled and coerced Bhakta to become and remain an Apple consumer. Apple required that he patronize Apple and enter into consumer agreements governing the use of Apple's products. He was also required to pay for his job with his Private Life Data and personal iCloud account. Apple used, and continues to use, Bhakta's Private Life Data to further its business interests.

97. Apple, through the conduct described above and otherwise, has required Bhakta to waive his and his family's unwaivable privacies of life as a condition of initial and continued employment.

98. Apple, through the conduct described above and otherwise, has sought to control the nonwork aspects of his life.

99. On information and belief, all of Apple's California-based employees are subject

<div align="center">24</div>

<div align="center">SECOND AMENDED PAGA COMPLAINT</div>

to the same or substantially similar invasions of their rights.

**IV.    Apple's Illegal Clawback Policies and Practices**

**A. Apple's Forfeiture Provisions**

100.    Apple also enforces its illegal Speech Suppression Policies through forfeiture provisions in its equity plans and agreements.  For example, Apple pays certain employees with Restricted Stock Units (RSUs) that vest over time.  The agreements and plans governing these RSUs, however, purport to permit Apple to claw back vested (meaning earned) RSUs – as well as any profit arising from their sale – if "during the Employment Period or any time thereafter, the [employee] has committed or engaged in a breach of confidentiality, or an unauthorized disclosure or use of inside information, customer lists, trade secrets, or other confidential information of the Company or any of its Subsidiaries."  As detailed above, the only information about Apple that Apple does not consider confidential is "information that may be broadly distributed *without causing damage to Apple*."

101.    Apple's forfeiture provisions thus condition the receipt of employees' RSU compensation on the release of those employees' rights to their vested RSUs, which are earned wages.

102.    The illegal forfeiture provisions in Apple's equity plans and agreements are not limited to violations of Apple's Speech Suppression Policies.  Apple's agreements assert it can claw back vested RSUs for other reasons as well, including a "material breach of *any* agreement to which the [employee] is a party with the Company or any of its Subsidiaries."  This includes, by its plain language, the many consumer agreements between employees and Apple.

**B. Bhakta's Experience**

103.    Bhakta, like most other Apple employees, is paid compensation in the form of equity.  Bhakta's RSUs vested at least twice per year throughout his employment, usually in March or April and in September or October.  Apple has thus repeatedly required him to sign equity agreements with illegal forfeiture provisions.

**V.    Apple's "Carveout" Provisions**

104.    Certain of Apple's agreements and policies contain carveouts for some employee

25

SECOND AMENDED PAGA COMPLAINT

speech. For example, the IPA includes a footnote which provides, "Nothing in this Agreement restricts your rights to speak freely about your wages, hours, and working conditions." This carveout is legally inadequate because: (1) it is limited to "speak[ing]," which strongly implies that employees are permitted to orally communicate but prohibited from communicating in other forms (e.g., sharing documents or writing); (2) it is limited to "your" information, which strongly implies that employees are prohibiting from discussing or disclosing *others'* information; (3) it is buried in the IPA, as the definition of Proprietary Information is on the first page of the IPA, whereas the footnote is on the sixth and final page; (4) it is contradicted by the IPA (which expressly defines information about compensation as "confidential," as well as the offer letter which is also classified as "confidential; (5) the carveout is limited to the terms of the IPA, but other Apple agreements, policies, and standards (including its security policies and standards) plainly prohibit such speech; and (6) any ambiguity created by the carveouts also has the purpose and effect of restraining employee rights.

105. Apple's occasional and inadequate carveouts and disclaimers do not save Apple's illegal policies or practices.

## VI. Administrative Exhaustion

106. Plaintiff provided written notice to the LWDA on April 29, 2024 by online filing and to Defendants via certified mail on May 1, 2024 of the facts, legal claims and theories of their claims in this case. The LWDA did not respond to the letter.

107. Plaintiff provided a further written notice to the LWDA by online filing and to Defendants via certified maul on December 2, 2024, attaching the original complaint, for prophylactic purposes. The LWDA did not respond to this letter.

108. Based on these allegations and others, Plaintiff asserts all separate and distinct causes of action described in the following claims.

**FIRST CAUSE OF ACTION**
**Private Attorneys General Act, Cal. Lab. Code §§ 2698 et seq.**
**<u>Speech Suppression, Which Restrains Competition, Speech and Whistle Blowing</u>**

109. Labor Code §§ 232(a) and (b) and 1197.5 prohibit actual or purported restraints on the disclosure of information about, or the discussion of, employee wages.

SECOND AMENDED PAGA COMPLAINT

110. Labor Code § 232.5(a) and (b) prohibit actual or purported restraints on the disclosure of information about employer working conditions.

111. Labor Code §§ 1101-02 prohibit employer attempts to direct, control, or restrain employee political activity and non-work activity – including advocacy for a cause that is adverse to the employer's interests.

112. Labor Code § 1102.5(a) prohibits employers from adopting or enforcing any policy, rule, or regulation that restrains the disclosure of information about reasonably suspected violations of the law.

113. Labor Code § 432.5 prohibits employers from requiring applicants or employees to sign a writing known to be prohibited by the law. For purposes of this Claim, these laws include, among other things, Business & Professions Code § 16600 *et seq.*, Government Code § 12964.5, SEC Regulations, California's employee anti-gag rule, and Civil Code §§ 1668 and 3513. On information and belief, Apple knows its writing are prohibited by law. Among other things, Apple is a sophisticated employer with ample resources, its written agreements and policies evidence knowledge of the law, and it is presumed to know the law.

114. As detailed above, Apple's restraints on competition, speech, and whistleblowing violate the above-referenced Labor Code provisions.

115. Plaintiff was and is aggrieved by Apple's violations of these Labor Code provisions. On information and belief, all of Apple's California-based employees are similarly aggrieved.

116. Plaintiff, on behalf of himself, the State, and the aggrieved employees, seeks penalties as provided by the Labor Code. Plaintiff also seeks appropriate injunctive relief.

### SECOND CAUSE OF ACTION
**Private Attorneys General Act, Cal. Lab. Code §§ 2698 *et seq.***
**<u>Privacy Violations, Surveillance, and Forced Patronage</u>**

117. Labor Code § 450 prohibits an employer from compelling or coercing an employee to either patronage the employer or purchase a thing of value from the employer or another third party.

SECOND AMENDED PAGA COMPLAINT

118.    Labor Code § 2082 requires an employer to indemnify employees for all necessary expenditures or losses incurred by the employee in direct consequence of the job duties.  Labor Code § 2804 renders any express or implied agreement to waive the benefits of Labor Code § 2802 null and void.  Such agreements are prohibited by law.

119.    Labor Code § 432.5 prohibits employers from requiring applicants or employees to sign a writing known to be prohibited by the law.  For purposes of this claim, these laws include the right to privacy, Civil Code §§ 1668 and 3513 and the above-referenced Labor Code provisions, except for Labor Code §§ 221 and 450.

120.    As detailed above, Apple's forced, unreimbursed, patronage, surveillance, and privacy invasions violate the above-referenced Labor Code provisions.

121.    Plaintiff was and is aggrieved by Apple's violations of these Labor Code provisions.  On information and belief, all of Apple's California-based employees are similarly aggrieved.

122.    Plaintiff, on behalf of himself, the State, and the aggrieved employees, seeks penalties as provided by the Labor Code.  Plaintiff also seeks appropriate injunctive relief.

### THIRD CAUSE OF ACTION
### Private Attorneys General Act, Cal. Lab. Code §§ 2698 et seq.
### Illegal Clawback Policies and Practices

123.    Labor Code § 221 prohibits an employer from clawing back earned wages.

124.    Labor Code § 206.5 states that an employer shall not require the execution of a release of a claim or right on account of wages to become due unless the wages have already been paid.

125.    Labor Code § 432.5 prohibits employers from requiring applicants or employees to sign a writing known to be prohibited by the law.  For purposes of this claim, these laws include Civil Code §§ 1668 and 3513 and the above-referenced Labor Code provisions, except for Labor Code §§ 221 and 450.

126.    As detailed above, the forfeiture provisions in Apple's equity agreements and plans violate the above-referenced Labor Code provisions.

SECOND AMENDED PAGA COMPLAINT

127. Plaintiff was and is aggrieved by Apple's violations of these Labor Code provisions. On information and belief, all of Apple's California-based employees are similarly aggrieved. Other aggrieved employees include those whose wages were actually clawed back (or who were faced with a clawback threat) in accordance with Apple's equity agreements and plans.

128. Plaintiff, on behalf of himself, the State, and the aggrieved employees, seeks penalties as provided by the Labor Code. Plaintiff also seeks appropriate injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests the following relief:

A. Civil penalties provided, per violation, in accordance with the California Private Attorneys General Act, California Labor Code §§ 2698, *et seq.*;

B. Prejudgment and post-judgment interest, as provided by law;

C. Attorneys' fees pursuant to Labor Code § 2699(g)(1) and all other bases for fees in the Labor Code;

D. Costs of suit, including expert fees and costs;

E. A reasonable service award for Plaintiff for his service as a PAGA representative;

F. Injunctive relief; and

G. Such other relief as the Court may deem just and proper.

Dated: November 13, 2025

Respectfully submitted,

By: _____
Jahan C. Sagafi (SBN 224887)
Molly J. Frandsen (SBN 320094)
Hannah Meropol (SBN 340095)
**OUTTEN & GOLDEN LLP**

Chris Baker (SBN 181557)
Deborah Schwartz (SBN 208934)
**BAKER DOLINKO & SCHWARTZ, P.C.**

*Attorneys for Plaintiff, on behalf of himself, other Aggrieved Employees, and for the State of California*

SECOND AMENDED PAGA COMPLAINT

# EXHIBIT I: 5AC

152. On August 26 2021, Plaintiff filed an NLRB charge against Apple and posted on Twitter that she did so. The next day, on August 27 2021, Apple's Business Conduct team closed Plaintiff's complaint about Ronald Sugar and Plaintiff's office. A couple of days later, around August 30 2021, a third-party law firm (McDermott, Will, & Emery) filed a notice of appearance for five attorneys in Gjovik's NLRB claim against Apple.

153. Apple did not fire Plaintiff until September 9, 2021, raising the question of whether opposing counsel in this lawsuit (Orrick, Herrington & Sutcliffe) was also retained by Apple for this dispute prior to Plaintiff's termination and, if so, if they covertly interacted with Plaintiff or Plaintiff's coworkers, or otherwise influenced the situation.

154. On August 29 2021, Plaintiff filed a formal complaint to the EPA about Apple and her office at 825 Stewart Drive, complaining of Apple's *"lack of due diligence, "negligence,"* *"recklessness,"* *"violations of Right to Know and OSHA,"* intimidation, misrepresentations, and refusal to " *notify the EPA of changed circumstances at the site*."  The plaintiff did not know about the EPA safety inspection ten days prior.

155. On August 29 2021, Plaintiff filed a Whistleblower Protection Program complaint with the U.S. Department of Labor, reference number ECN76833. On August 29 2021, Plaintiff filed retaliation and labor code violation charges to the California Department of Labor.

156. On September 1 2021, Plaintiff posted on Twitter that she had filed a complaint with the California Department of Labor. A question on the form asked: How did your employer know about the protected right you exercised? Plaintiff wrote, *"I kept saying, 'Stop it, you guys. There's Labor laws about this."*

157. While Plaintiff was stuck on leave, Apple had emailed her three times to ask if they could capture three-dimensional scans of her ears and ear canals, and Plaintiff complained that Apple's requests were harassing and invasive.

158. Plaintiff complained that Apple often asked that Plaintiff and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection, and other highly personal examinations. Apple did not disclose the details of the experiments until after Plaintiff signed a secrecy oath and 'consented' to the

activity, and then repeatedly threatened Plaintiff with termination if she was to speak about it even to a doctor or attorney (as was expressly written in one Deed Poll).

159. Around August 30, 2021, and August 31, 2021, Plaintiff shared an article titled "Apple Cares about Privacy Unless You Work at Apple" and confirmed the blog interviewed her and she provided information for the article, including multiple images of secret photos Apple took of her in her home from the Gobbler application.

160. In her posts she complained of Apple's surveillance of workers and Apple's culture of intimidation and retaliation and compared working at Apple to being in a panopticon. [27] The article discussed several examples of Apple's invasions of employee privacy, which were brought forward by Apple employees who wanted the public's help in reforming Apple's business and labor practices.

161. In the article, Plaintiff complained about the Gobbler app installed on her phone taking photos of her anytime, including at home; and was quoted saying, "*If they did this to a customer, people would lose their goddamn minds.*"

162. On August 31 2021, the U.S. Department of Labor contacted Plaintiff to start intake for Plaintiff's Whistleblower Protection Program charges.

163. Newspapers published articles about the Plaintiff's charges against Apple starting around September 2, 2021. Bloomberg reported about Plaintiff's U.S. NLRB, U.S. Department of Labor, California Department of Labor, and U.S. EEOC charges. The same day, the Financial Times and Reuters also wrote about the Plaintiff's complaints. [28]

164. The press continued to cover what Apple was doing to Plaintiff, and a movement started among Apple employees who began speaking out and organizing around work conditions and human rights. Apple workers, past and present, began publicly sharing their own stories of discrimination, retaliation, and cover-ups. The press wrote about this, too. The plaintiff was not only a catalyst for many employees to come forward, but these employees also catalyzed the

---

[27] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* 8/30/2021.
[28] Bloomberg, *Apple Worker Complaints Reviewed by Labor Relations Board*, 9/2/2021; Financial Times, *US labour board examines retaliation claims against Apple*, 9/2/2021.

to be terminated, as communicated by Human Resources to her VP, was that Plaintiff supposedly failed to participate in the Employee Relations investigation by redacting the evidence she provided Employee Relations. However, she did not redact any records in her Box folders for Employee Relations. The plaintiff did, however, redact the internal records she posted on Twitter. Apple Human Resources must have gotten confused and mixed up their Twitter stalking screenshots with the records Plaintiff provided them directly. Apple never raised the matter to Plaintiff, and Plaintiff only discovered this fact via discovery.

212.  Apple continued to monitor her posts after September 2021 (attempting to get Twitter to delete some of them, admitted in U.S. Department of Labor filings) and through January 2022 (Appleseed wrote to the Plaintiff, upset that she tried to get the Plaintiff's Twitter posts deleted but found out Apple also reported them, and it was Apple's reports that resulted in the posts being deleted). Apple has undoubtedly read Plaintiff's Twitter and other social media for years. Apple also knew about Plaintiff's activities through direct updates from Plaintiff, information shared by agencies arising out of Plaintiff's complaints, press coverage of Plaintiff, and any surveillance they were conducting of her personal and work devices (which Apple's policies said they would do).

COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

213.  Apple retaliated against Plaintiff and discharged Plaintiff's employment for multiple reasons that violated public policy. Among other unlawful reasons, Apple suspended and fired Plaintiff in violation of the "*strong public interest*" reflected "*in encouraging employee reports of illegal activity in the workplace.*" Specific concurrent claims are incorporated here as Tamney sub-claims. Specifically: Cal.Lab.C. §§ 96(k), 98.6, 232, 232.5, 1102.5, and 6310. These sub-claims are included in addition.

214.  **Illegal Data Harvesting [California Constitution Article I, Section 1; FTC Act]:** Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance data is a gross and egregious violation of Article I Section 1 of the California Constitution; the California Privacy Rights Act; the U.S. FTC Act; Cal.Pen.C. § 637.7, and the International Covenant on Civil and Political Rights: Article VII.

215.  While false and pretextual, Apple's proffered reason for terminating Plaintiff is illegal

itself. Apple claims it fired Plaintiff for complaining about Apple's surveillance of employees, including coercive data collection of biometrics and invasive 24/7 video recording.

216. Apple discriminated against Plaintiff, including ending her employment, because of Plaintiff's actions related to her constitutional and statutory right to privacy, which are substantial and fundamental rights that benefit the public and were firmly established at the time of discharge. Apple's decision to use this as their excuse for firing the Plaintiff reveals Apple's animus against California employees' privacy rights.

217. Apple also intruded into Plaintiff's seclusion, physically and constructively invading Plaintiff's privacy in violation of California Civ. Code § 1708.8(a), (b), (d), and Apple surveilled Plaintiff and forced Plaintiff to surveil others with the always-on video camera in her iPhone, including in bathrooms and locker rooms, in violation of California Labor Code § 435.

218. The Gobbler application captured videos and photos of the plaintiff in the bathroom; the plaintiff has copies of those images. Apple's use of Gobbler on Plaintiff's phone also forced Plaintiff to take part in Apple's unlawful acts by facilitating Apple's secret capture, storage, and processing of photos, videos, and biometrics of the public without their knowledge or consent. Apple's termination of Plaintiff claimed that she would be fired if she warned people about the surveillance occurring on her phone. Therefore, Apple's unfair business practices made consent from the public impossible. The public had a reasonable expectation of privacy for sensitive biometrics.

219. Apple also violated § 5 of the FTC Act in unlawfully coercing employees to provide personal and sensitive data for commercial product development, which was also engaging in unfair acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable and misleading statements to consumers. Employees can be consumers under the FTC Act as an employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple product with consumer protection laws protecting them.

220. **Employment Discrimination [California DFEH; U.S. EEOC]:** The Plaintiff reported and testified about complaints about sex, gender, and disability discrimination, which are fundamental rights for a *Tamney* claim. The plaintiff filed California DFEH and U.S. EEOC claims

# Exhibit J: 4AC

bonuses, salary increases, and RSU stock grants, and was recently promoted. Gjovik substantially performed, or tendered performance, for her job duties. During each of Gjovik's six annual performance reviews, she always received a salary increase, a large RSU grant, and a performance bonus. All conditions required for Apple's performance had occurred. Apple breached the covenant by intentionally terminating Gjovik when her annual performance review was due, which would have been accompanied by a performance bonus that she had already earned through her successful performance in 2020-2021. (The end of the fiscal was June 30 2021).

191. In violation of the covenant of good faith and fair dealing, Apple deliberately undermined Gjovik's ability to fulfill her contractual obligations, evading the spirit of the agreement, and frustrating her ability to benefit from the agreement. Gjovik was damaged due to Apple's breach and is owed the performance bonus due to her, with interest.

<div align="center">

**COUNT NINE: CAL. UNFAIR COMPETITION LAW**

**(Violation of Cal. Bus. & Prof. Code § 17200, *et seq.*)[44]**

</div>

192. Apple has engaged in business acts or practices that were unlawful, unfair, deceptive, or misleading, and therefore violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* This UCL prohibits any unlawful, unfair, or fraudulent business act or practice, including but not limited to any act or practice that constitutes deception, fraud, misrepresentation, or the concealment, suppression, or omission of a material fact in a consumer transaction, or that is likely to deceive the consuming public.

193. Apple is unlawfully coercing employees to provide personal data, including biometrics, which Apple can use for research and development, including training machine learning models, without actual consent or compensation, and in violation of federal competition laws and state and federal data protection laws. Apple's Whistleblowing Policy acknowledges that reports of

---

[44] The SAC § 17200 claims were previously nested under § 6310 and *Tamney* claims.

"*anti-competitive conduct*" and "*attempts to cover up any of these behaviors*" are whistleblower disclosures. Apple should obtain ethical and legal data for product development instead of treating its workforce like lab rats.

194. Gjovik suffered an economic and/or property injury due to Apple's Unfair Business Practices. Apple knew or should have known that its wrongful acts and omissions alleged herein were likely to deceive the consuming public in California and the rest of the United States. Apple committed those acts and omissions anyway for their financial gain, including improving their financial condition, increasing the likelihood of receiving new capital from investors, increasing their revenue and profits, and increasing the company's value.

195. Apple repeatedly implied to Gjovik that her participation was not option. Gjovik's annual performance reviews made express note of Gjovik's participation in Apple's studies and experiments and praised her for her unpaid labor in facilitating the numerous invasions into her privacy.

196. Gjovik participated in several other health, anatomy, and personal data collection studies during her time working for Apple. This included a sleep study with Apple placing a sensor under her while she slept every night, recording her vitals and movements, and sharing the data with Apple for commercial purposes. When Gjovik was invited to participate in these events, the team often would not disclose what the study was until the 'volunteers' arrived physically on site to a secure building where ex-FBI security personal would threaten her and her workers to not even tell their friends or family what happens at Apple, and especially studies like these.

197. When Apple asked Gjovik to scan her ears and her ear canals, Gjovik declined "indefinitely." Similarly, Gjovik repeatedly declined Apple's requests to study and collect data about her menstruation for product development. Even after Gjovik declined the ear studies, Apple has claimed its secret they even asked her in the first place.

198. Gjovik also attempted to decline participating in the Gobbler program, but she was tricked into enrollment through Apple's misrepresentations of the years long study and data collection as a one-time social event. Gjovik was only told what the study involved (Gobbler) after she entered a locked compounds with several Apple Global Security guards surrounding her, asking her if she would 'consent.' After that day Gobbler has always been attached to Gjovik's iCloud account. Gjovik still sees Gobbler listed as part of her personal account today and no way to remove it.

199. Further, the way Gobbler works, employees are then also taking videos and gathering the biometrics of anyone around their iPhones, and per Apple's termination of Gjovik, Apple's policy is that employees would be fired if they tried to warn consumers and others around them that Apple was capturing videos of them and their biometrics for product development. Apple's declaration that it can terminate employees for protesting these invasions and warning the public is "*sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right*." One must assume Apple also has hundreds of thousands (or even millions) of non-consensual biometrics and face-prints of non-employees – including children – that are used to train Apple's machine learning models. These photos/videos most certainly include nudity, sexual acts, and use of toilets– along with biometric information.

200. Apple tells consumers it would never do what it is doing with Gobbler. Apple told employees nothing until after the employees signed the non-disclosure agreements for the program, and then Apple told employees they could not tell anyone what the program would now be doing on their iPhones. Apple was aware Gobbler was not a market-ready product (nor was it intended to be) and that the data collection performed by Gobbler was not legitimate data collection for commercial research and development, yet Apple used the app anyway while continuing to promise customers that Apple would never collect their data and biometrics.

201. Gjovik's opposition and complaints about Apple's coercion of employees into unpaid

labor through aggressive dogfooding (testing internal software/products as if it were a normal personal device) and Apple's weird anatomical and medical experiments on employees was all protected conduct. In addition, Apple exploited Gjovik's identity without Gjovik's consent and for commercial purposes, violating California's common law Right of Publicity. Apple's unauthorized use and appropriation of Gjovik's identity, likeness, and private information were for Apple's commercial advantage, and Gjovik suffered injury because of it. Apple exploited Gjovik's image and biometric identifiers for profit and then fired her when she complained, claiming they could fire employees without notice for protesting these unfair business practices.

202.    Apple requested, coerced, and tricked Gjovik into participating in a number of studies, experiments, and invasions which Gjovik was not compensated for. The studies also caused Gjovik unexpected and otherwise unnecessary expenses. In order to attend these physical meetings, so she could be threatened and intimidated, and expose even more of her personal data to Apple and  to ensure she obtained a positive performance review. Gjovik had to pay out of pocket for Lyft and Uber costs for transportation. Gjovik does not have a driver's license and the company shuttles rarely went to these special, secure buildings. Gjovik is owed restitution for all of the transportation costs, and other operational costs, she paid with her own money as required for these coercive and exploitive studies.

203.    Injunction and disgorgement are appropriate here, and the court has broad powers to issue injunctive relief under California Business and Professions Code §§ 17200, including the power to order restitution and disgorgement.

204.    Apple coerces employees and tricks consumers into allowing Apple to extract their data and exploit it in the research and development of commercial, for-profit products, without consent, in violation of the FTC Act and § 17200. As a result of Apple's unfair business practices, Apple has reaped unfair benefits and illegal profits at the expense of Gjovik, her co-workers, and the

public. Apple should be required to restore these monies to Gjovik, her former co-workers, and the public.

205.    However, Apple's extensive use of these illegal practices will make calculating damages a challenge. Without injunctive equitable relief, Gjovik and her prior coworkers will suffer irreparable injury, which damage remedies cannot readily remedy. Apple should be ordered to disgorge unlawful data and the fruit of the poisoned data.

206.    Gjovik requests an order that prohibits Apple from using personal employee data in for-profit product development, including medical experiments, anatomical measurements, and imaging, gathering employee biometrics, any use of the Face "Gobbler" application, and other conduct violating their rights of privacy.

207.    Gjovik also requests in injunctive relief of an order for disgorgement of the unlawfully and unethically obtained data, at the very least of Gjovik's data, including any products developed using Gjovik's personal data, including Gobbler images.

### COUNT TEN: IIED – OUTRAGEOUS CONDUCT
### (Intentional Infliction of Emotional Distress – Traditional)

208.    The statute of limitations for IIED claims under California state law is two years from the date of injury and under New York state law it is one year from the act. Gjovik lived in California until August 31 2022 and then lived in the state of New York from September 1 2022 up to the date the complaint was filed on September 7 2023. The New York statute of limitations covers Gjovik's presence in New York from September 7 2022 through September 7 2023. The California statute of limitations cover's Gjovik's presence in California from September 7 2021 through September 1 2022.[45] Apple terminated Gjovik's employment on September 9 2021 and thus only two days fall

---

[45] Gjovik also reserves the right to claim IIED under Massachusetts law if Apple continues inflicting emotional distress upon her through the trial.

# EXHIBIT K: TAC

78. On August 29, 2021, Gjovik filed a formal complaint to the US EPA about Apple and her office at Stewart 1, complaining of Apple's "lack of due diligence," complaining about "negligence," and "*recklessness*," and "*violations of Right to Know & OSHA*." Gjovik complained, "*Apple's response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site*." Gjovik did not know about the US EPA safety inspection ten days prior.

79. On Sunday, August 29, 2021, at 11:32 AM PST, Gjovik filed a Whistleblower Protection Program complaint with the US Department of Labor, reference number ECN76833. On August 29, 2021, Gjovik filed retaliation and labor code violation charges to the California Department of Labor. (This lawsuit replaced the California Department of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830). On September 1, 2021, Gjovik posted on Twitter that she had filed a complaint with the California Department of Labor. A question asked: How did your employer know about the protected right you exercised? Gjovik wrote, "*I kept saying, 'Stop it, you guys. There's Labor laws about this.'*"

80. Gjovik began complaining that Apple frequently requested that Gjovik and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection (like the Gobbler app), and other highly personal studies. Apple did not disclose the details of the experiments until after Gjovik signed a secrecy oath and 'consented' to the activity, and then repeatedly threatened Gjovik with termination if she was to speak about it even to a doctor or attorney (as was expressly written in the noted Deed Poll). For example, while Gjovik was stuck on leave, Apple had emailed her three times to ask if they could capture three-dimensional scans of her ears and ear canals, and Gjovik complained that Apple's requests were harassing and invasive.

81. On August 30 and 31, 2021, Gjovik posted on social media sharing an article she was interviewed for called "*Apple Cares about Privacy Unless You Work at Apple*." [28] In Gjovik's posts, she complained of Apple's surveillance of workers, its exploitation of workers, and Apple's culture of intimidation and retaliation, and she compared working at Apple to being in a panopticon.

82. On August 31, 2021, at 7:16 AM PST, the US Department of Labor contacted Gjovik to start intake for Gjovik's Whistleblower Retaliation charges. Gjovik had her interview with the US EEOC

---

[28] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* Aug 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

22

etc.), trade and non-profit organization (e.g., ChemFORWARD, Omidyar Network, etc.), certain media companies and publishers, certain tech reporters, companies and third-party administrators (e.g., Sedgwick, Northrop Grumman, Oaktree Capital, etc.), certain government employees and agencies, law enforcement officers and agencies (e.g., Santa Clara County Sheriff's Office, Cupertino Police Department, Santa Clara HazMat, etc.), doctors and clinics (e.g., A.C. Wellness Center, etc.), and environmental consultants (e.g. EKI, ACT Environmental, etc.).

### iii. Apple & the RICO Conspiracy

121. Apple agreed with others to invest in, acquire, and conduct the affairs of a commercial enterprise in a manner that violates 18 U.S.C. § 1962(a), (b), and (c). Apple knowingly agreed to facilitate a scheme that includes a RICO enterprise's operation or management. Apple adopted the goal of furthering and facilitating the conspiracy. Two or more people agreed to commit a substantive RICO offense, and Apple knew of and agreed to the overall objective. In Violation of Section 1962(d), Apple conspired "*to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity*." Apple undertook criminal acts with the "*intent to commit, and to aid and abet and in connection with another federal crime.*" Apple conspired to violate one or more substantive RICO provisions, and members of the conspiracy committed overt acts that constituted a predicate act of racketeering to further the conspiracy.

### iv. Relatedness, Pattern, Scheme

122. Apple's predicate acts have similarities related to purposes, results, participants, victims, methods of commission, and other distinguishing characteristics (e.g., agency capture, intimidation and censorship, obstruction of investigations into Apple's conduct, manipulation of the press and public discourse, lying about labor and environmental practices, whistleblower retaliation, etc.).

123. The goal of Apple's racketeering does not have an end date, as much of Apple's racketeering conduct is performed to conceal its prior racketeering activity. Apple continues to engage in egregious criminal conduct while frantically working to cover up its prior criminal conduct by engaging in even more criminal conduct. Cover-ups, by their nature, present a distinct threat of long-term continuation. The threat of Apple's continuing illegal activity extends indefinitely into the future. Apple and the "Worldwide Loyalty" Enterprise are engaged in systemic criminal conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance and use of intimidation, threats, and false statements

about its actual practices to increase profits and create and maintain a positive reputation. Apple's scheme has three prongs:

a) Apple intends to refrain from expending the resources required for basic regulatory compliance in most of its basic dealings, thus increasing profits.
b) Apple intends to increase profits further and obtain other financial benefits through a knowingly false reputation of strong regulatory compliance in all its dealings (i.e., promoting itself as an industry leader in environmental responsibility, etc.)
c) Apple intends to bridge the gap between its actual practices and what it reports to its customers, the public and press, and the government about its practices through a scheme of witness intimidation and tampering, systemic retaliation against employees and contractors who report issues, unlawful NDAs and over restrictive policies, threats of specific and unspecific reprisals for gathering evidence or reporting issues, and coercing others to assist in these activities to cover-up the Apple's unlawful activities and fraudulent misrepresentations.

124. Apple transmits knowingly false information (or omits and fails to transmit required information) via communications with government agencies, the press, and the public via email, paper mailings, electronic filing systems, phone calls, websites, print and digital commercials and advertisements, and other interstate communication methods. These false statements and omissions often lead to a complete lack of environmental sustainability, regulatory oversight, and reporting, despite statutory requirements for oversight and reporting based on the actual facts of Apple's activities.

125. Apple's self-proclaimed competitive edge requires "*aggressive price competition and resulting downward pressure on gross margins."* Apple adds that some competitors compete by "*us[ing] illegitimate means*" to develop products. Apple has also stated that its "*global operations are subject to complex and changing laws and regulations on subjects, including privacy; consumer protection; advertising; ... artificial intelligence; labor and employment; anticorruption; ... and environmental, health and safety...*" Apple adds that "*compliance with these laws and regulations is onerous and expensive... laws and regulations can adversely affect [Apple's] business by increasing ... costs*." Apple admits that to succeed, it must cut costs wherever possible, compete with businesses that engage in illegal activities, and that laws and regulations threaten Apple's business model.

126. Apple's conduct is neither lawful nor legitimate nor simply garden-variety common law crimes or torts. Here, Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws – and censorship, obstruction, and concealment of these acts to profit from a progressive brand.

THIRD AMENDED COMPLAINT | 3:23-CV-04597-EMC                    FEBRUARY 27 2024

127.    Apple has engaged in a series of related predicate acts extending over a substantial period of multiple decades. Further, Apple started a series of related predicate acts and will continue these acts until there is intervention. Apple's misconduct is so persistent and egregious, dependent on continued intimidation of witnesses to keep witnesses quiet about what they know, that it is impracticable that Apple would ever voluntarily stop their schemes. Apple's conduct and "Worldwide Loyalty" endeavors are comparable to the inertia of organized crime – with both closed-ended and open-ended continuity.

### v.     Predicate Act 1: Criminal Bribery of Executive Officer (Cal. Penal Code § 67)

128.    Tom Moyer was Apple's Director of Employment Law until September 2009, when he became Chief Compliance Officer and Head of Global Security.[35]  Moyer allegedly committed criminal bribery by paying bribes to public officials in exchange for concealed carry handgun permits for Apple employees. The California Court of Appeals affirmed the evidence of Moyer's corrupt intent with factors including undisclosed "clandestine" meetings at the Apple Park Visitor's Center, removing whistleblowers from the matter, ignoring 'red flag' warnings from those whistleblowers, and the fabrication of a pretextual paper trail after the fact.[36]

129.    Two Apple Global Security Directors flipped on Moyer and Apple, turning state's evidence and testifying against him/Apple in exchange for immunity.[37] Among other elements and theories of liability, Moyer engaged in the bribe as part of his job, on behalf of Apple, using Apple assets at Apple locations and to benefit Apple. Further, even after Moyer was charged, Apple defended him: *"After learning of the allegations, we conducted a thorough internal investigation and found no wrongdoing*."[38] Yet, there were numerous signs of misconduct and foul play. Gjovik was directly injured as Moyer's teams threatened and obstructed her.

### vi.     Predicate Act 2: Tampering with a Witness, Victim, or an Informant (18 U.S. Code § 1512)

130.    Apple and agents made repeated statements, publicly and privately, explaining that they were taking actions to harm Gjovik because of Gjovik's actions as a federal witness, victim, and informant.

---

[35] US DOJ, Second Report of the External Compliance Monitor, *United States v. Apple, Inc*., et al., No. 1:12-CV-2826, and *Texas, et al. v. Penguin Group, et al*., No. 1:12-CV-3394 (October 15 2014).
[36] *State v Moyer* at 26.
[37] Mercury News, *Main witness in Santa Clara County concealed-gun bribery case pleads guilty*/
[38] Ars Technica, *Apple security chief maintains innocence after bribery charges*, (Nov. 24 2020).

35

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY M. GJOVIK**, *an individual*, <br><br> Plaintiff, <br><br> vs. <br><br> **APPLE INC.**, *a corporation,* <br><br> Defendant. | **CASE NO. 3:23-CV-04597-EMC** <br><br> **PLAINTIFF'S DECLARATION IN SUPPORT OF HER OPPOSITION TO APPLE'S MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS & MOTION TO SEAL (DKT. 304-305)** <br><br> **HEARING:** <br> **Location: Oakland (TBD)** <br> **Date: April 16 2026** <br> **Time: 1:30 PM** |

# DECLARATION OF ASHLEY M. GJOVIK IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DKT. 304-305

I, Ashley M. Gjovik, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Plaintiff in this action, appearing in propria persona. I have personal knowledge of all facts stated herein.

2. I make this Declaration in support of my Opposition to Defendant's Motion to Retain Confidentiality Designations & Motion to Seal (Dkt. 304-305).

3. Attached hereto as Exhibit A is a true and correct copy of email chains between the parties dated February 4 through March 6, 2026, regarding Apple's confidentiality designations on my December 16, 2025 deposition transcript. This email chain includes:

   a) My February 4, 2026 email at 4:22 PM to Apple's counsel requesting Apple's confidentiality designations and noting that Apple's blanket designation had already auto-waived under PO § 6.3;

   b) Apple's counsel Kathryn Mantoan's February 4, 2026 email at 4:32 PM sending Apple's designation chart to the court reporter—not to me—and copying me "for notice purposes";

   c) My February 4, 2026 email at 4:39 PM objecting that Apple had excluded me from the designation process and demanding Apple send its claims to me for meet-and-confer;

   d) My February 4, 2026 email at 6:15 PM providing a detailed, substantive challenge to all of Apple's designations, specifically identifying the designations involving cervical mucus, ovulation, and sexual activity as unlawful, demanding a meet-and-confer call, and warning Apple that an NLRB charge would follow if Apple did not withdraw those designations;

   e) The actual designation challenge spreadsheet I sent Apple on Feb. 18 2026 which challenges all of Apple's designations contrary to Apple's assertion that some designations were not challenged;

   f) Apple's counsel Melinda Riechert's March 2, 2026 email stating Apple was "in the process of preparing" responses to my challenges "which you provided on February 18, 2026"— ignoring my February 4 challenge entirely;

PLAINTIFF'S DECLARATION | CASE NO. 3:23-CV-04597-EMC | PAGE 1

g) My March 2, 2026 email responding that Apple had already waived its designations and that when I "tried to get you to talk about this in Feb 2026, you outright refused and said 'there's nothing to talk about'";

h) Apple's March 4, 2026 "meet and confer" letter, which responded only to my February 18, 2026 Excel spreadsheet, provided no Rule 26(c) good cause for any retained designation, failed to respond to 53 lines of challenged designations, and spent a significant portion of its three pages arguing Apple was justified in terminating my employment; and

i) My March 6, 2026 email responding comprehensively to Apple's March 4 letter, reiterating all objections raised since February 4, identifying Apple's failure to respond to over half the challenged designations, and again demanding Apple provide signed, dated, served designations as required by FRCP 26(g)(1).

4. This email chain is relevant because Apple's Dkt. 304 motion states: "it was not until February 18, 2026, that Plaintiff provided Apple a spreadsheet itemizing her position." (Dkt. 304 at 3). That statement is false. I challenged all designations on February 4, 2026—the same day Apple sent them. Apple's motion also claims that "[i]n lieu of responding to Apple's narrowed designations, Plaintiff filed a meritless motion for sanctions." (Dkt. 304 at 4). That is also false. I responded on March 6, 2026. Apple never responded to my March 6 email and filed its motion five days later.

5. Based on Apple's recent conduct on this topic, including its pending motions about the asserted designations, I filed new complaints with federal agencies and institutional review boards regarding Apple's workplace studies. Attached hereto as Exhibit B is a true and correct copy of my correspondence with the National Institutes of Health ("NIH") and the Office for Human Research Protections ("OHRP") at the U.S. Department of Health and Human Services regarding Apple's federally registered reproductive health study (ClinicalTrials.gov Identifier NCT04196595). In this correspondence, I raised concerns about Apple's use of its own employees as study participants, the adequacy of the informed consent process, the lack of independent oversight, and Apple's current pending motions, accusations, requests for gag orders and sanctions, and claims about the studies.

6. Attached hereto as Exhibit C is a true and correct copy of my correspondence with Harvard T.H. Chan School of Public Health IRB regarding its role as a collaborating institution on Apple's

PLAINTIFF'S DECLARATION | CASE NO. 3:23-CV-04597-EMC | PAGE 2

Women's Health Study. Harvard is identified as a co-investigator institution in the study's ClinicalTrials.gov registration and in the published AJOG article describing the study methodology (Mahalingaiah et al., 2022). They confirmed they are investigating my complaints including about Apple's pending motions (including this motion).

7. Attached hereto as Exhibit D is a true and correct copy of my correspondence with the Advarra Institutional Review Board ("Advarra IRB"), which served as the reviewing IRB for Apple's Women's Health Study as identified in the study's federal registration. In this correspondence, I raised concerns about the adequacy of IRB oversight for a study conducted by an employer on its own employees, the potential for coercion, the use of confidentiality agreements to prevent participants from reporting concerns, and Apple's pending motions. They said they were investigating and asked me to provide them copies of the type of evidence that Apple is claiming is secret and must be sealed.

Respectfully submitted,

/s/ Ashley M. Gjovik
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 25 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# Exhibit A: Meet/Confer

# Re: Apple-Gjovik - letter responding to challenges to confidentiality designations

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Riechert, Melinda<mriechert@orrick.com>, Kelcey Phillips<kelcey.phillips@morganlewis.com>, Mahoney, Brian<brian.mahoney@morganlewis.com>, Stolzenburg, Mark L.<mark.stolzenburg@morganlewis.com>, harry.johnson<harry.johnson@morganlewis.com>, Trechter, Reed C.<reed.trechter@pillsburylaw.com>, Troop, Andrew M.<andrew.troop@pillsburylaw.com>, Jimenez, Catherine M.<catherine.jimenez@pillsburylaw.com>, Park, Julie Y.<JuliePark@mofo.com>, Tarantino, William F.<WTarantino@mofo.com> |
| CC | Ashley M. Gjovik (Legal Matters)<legal@ashleygjovik.com>, Perry, Jessica R.<jperry@orrick.com>, Mantoan, Kathryn G.<kmantoan@orrick.com>, Horton, Nicholas J.<nhorton@orrick.com>, Booms, Ryan<rbooms@orrick.com>, Russell, Zoe<zrussell@orrick.com>, Weaver, Nicholas<nweaver@orrick.com> |
| Date | Friday, March 6th, 2026 at 7:21 PM |

Counselors,

None of this is Confidential. All of this is improper and unlawful. Apple's alleged designations violate the NLRA, the April 2025 settlement, the Protective Order, and the FRCP.

A motion for sanctions under Rule 26(g) and Rule 72 Objections have been filed today — courtesy copies attached. Also attached is my detailed response to Apple's March 4 letter -- reiterating everything I've been saying for months.

Despite my repeated attempts to meet and confer on these issues since February 4, Apple has refused to engage on the foundational defects I have raised at every opportunity. Apple still has not served signed, dated designations as required by FRCP 26(g)(1). The blanket designation from 12/16 auto-waived under PO § 6.3 after Apple missed the 21-day deadline. Apple's March 4 letter continues to ignore these threshold issues, mischaracterizes my objections, and provides no Rule 26(c) good cause for any alleged retained designation.

I remain willing to meet and confer. In the meantime, please send a signed, dated, served list of any designations Apple claims remain active.

-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with Proton Mail secure email.

On Wednesday, March 4th, 2026 at 8:13 PM, Riechert, Melinda <mriechert@orrick.com> wrote:

> Ashley:

Pursuant to Paragraph 6.2 of the Protective Order in this matter (Dkt. No. 235), attached please find a meet and confer letter responding to your challenges to Apple's confidentiality designations related to your December 16, 2025 deposition, which you included in an Excel spreadsheet sent to us on February 18, 2026.

**Melinda Riechert**

Partner

Orrick

Silicon Valley Ⓥ

T 650/614-7423

M 650 759 1929

mriechert@orrick.com

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

On Tuesday, March 3rd, 2026 at 1:11 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello counselors,

Please see attached for your client's electronic notice of a April 2 2026 court hearing scheduled by Judge Panos, and the associated filing deadlines, regarding the pending Motion for Sanctions against Creditor Apple Inc at the Bankruptcy Court in the District of Massachusetts.

Pillsbury would have received the MAB court's efiled notice earlier today, and Orrick just received an efiled notice in the CAND case. Physical mail copies are also going out shortly.

-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

On Monday, March 2nd, 2026 at 8:15 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello Melinda,

Thanks for the update. Regarding designations, you already waived your right to contest the NLRA reported items. Your 21 days for all designations ran out in Jan 2026, and your second 14-21 days for these specifically ran out in Feb 2026 (if the Order even applied, which it does not). When I tried to get you to talk about this in Feb 2026, you outright refused and said "there's nothing to talk about". All NLRA tagged items no longer have any designations at all because of, among other reasons, your refusal to meet and confer within the timeline prescribed by the Protective Order, which you claim governs this entire matter -- and the order itself says you never had these designations because the info is public info/already known so not covered at all, and even if you did have designations (which you didn't and don't), you then lost them because you intentionally refused to meet/confer, again.

Its also critical to note that the motion you filed to the court requires the court to adjudicate the designations themselves because the order doesn't apply to public and already known information, especially after a designation is already auto-revoked, so then there's no breach of those terms because the order never applied.

Further, as I emailed you on Feb 4 2026 (below), Apple lost all of its designations because you blew past the 21 days deadline regarding the blanket designation dispute, and you've still refused to serve me designations, or sign or date any, so you never actually made any new designations.  But on Feb 4, I did invite you to still meet/confer regarding any items that Apple earnestly thinks could actually be trade secret or proprietary -- even though it didn't seem like there were any at all, as I noted.

After my willingness to compromise, I'd expect any items you raise prior to your imminent deadline (2 days left after a deposition 2.5 months ago) for those remaining designations should at least be colorably proprietary.  I really don't want to see you arguing the word "hardware" or letter "N" are a trade secret (and those items are assumably also never covered by the protective order because they're literally just general words/letters).

Finally, based on your response, I'm not opening those documents then because your statements are coercive and include unlawful work rules and implied threats arising from my engagement with/response to what you've done and said that I already complained was an NLRA violation. I also object again to your ongoing bad faith conduct and unfair labor practices on behalf of Apple Inc: you have not retracted any prior threats, coercive statements, or work rules -- you have not ceased the ULP despite repeated warnings -- and instead you, on behalf of Apple, continue to take acts against me that are overt and express retaliation, discipline, and intimidation -- all of which is unlawful.

I strongly encourage counsel and its client to come into compliance with relevant regulations and statutes asap.


-Ashley


—

**Ashley M. Gjøvik**
**BS, JD, PMP**


Sent with Proton Mail secure email.


On Monday, March 2nd, 2026 at 7:48 PM, Riechert, Melinda <mriechert@orrick.com> wrote:
Ashley:

We provided copies of the documents lodged under seal ("LUS") at Dkt. No. 293-3, 293-4, and 298. The same documents are filed publicly at Dkt. No. 294, 294-1 at Ex. A, and 294-1 at Ex. B (respectively). Apple filed Dkt. No. 294, 294-1 at Ex. A, and 294-1 at Ex. B in redacted form, and sought to seal portions of those documents, precisely because the designated material remains Confidential under the protective order until the Court rules on any challenges to specific designations. The reason is simple: Apple is not required to publicly file documents that are at present Confidential in order to enforce the Protective Order requiring you to respect those designations while the challenge process plays out (nor would any such requirement make any sense).

None of the material Apple redacted from the public versions of those documents is unknown to you. The material consists entirely of excerpts from your own previous public filings (quoted in the Motion to Enforce Protective Order), your deposition transcript (which you appear to already have in full), and Apple's confidentiality designations (which we provided to you on February 4, 2026). We nonetheless furnished you copies of the LUS versions we provided to the Court to avoid any suggestion that the failure to do so would hinder your ability to respond to the Motion to Enforce Protective Order.

We have no objection to your opening the LUS versions and personally reviewing them for purposes of litigating this case. *See* Dkt. No. 235 ¶ 1 (designated materials protected "from use for any purpose other than prosecuting this litigation"). However, the fact that we have furnished these LUS versions to you for that purpose does not give you the right to publicize the Confidential portions of them (or any quotes or extracts from those portions) to any third-party; the LUS versions cannot be disclosed by the receiving party (you) until the Court has ruled on the administrative motion to seal them and directed the parties how to proceed.  *See also* https://cand.uscourts.gov/cases-e-filing/cmecf-information/e-filing-case-documents ("If your administrative motion is GRANTED in its entirety, the unredacted document remains under seal, and only the redacted version (if any) will be publicly accessible. If your Administrative Motion is DENIED in its entirety, or GRANTED/DENIED IN PART, the Court will alert you whether it will consider the information sought for sealing if filed publicly, permit its withdrawal without considering the information, or otherwise direct your next step.").

Apple disputes any suggestion that the NLRA somehow overrides or voids basic procedural rules that govern litigation in federal court, including those related to protective orders and filings under seal.  *See, e.g., Epic Sys. Corp. v. Lewis,* 584 U.S. 497, 499, 515 (2018). We expect you to abide by the applicable rules and orders governing your federal court litigation against Apple, including as concerns the LUS versions we provided to you.

Finally, I reiterate that Apple is in the process of preparing its responses to your challenges to specific confidentiality designations (which you provided on February 18, 2026) as part of the meet and confer process outlined in Section 6.2 of the Protective Order. If those efforts do not resolve your challenges, Apple will file a motion to retain confidentiality as required by Section 6.3 of that order. You can and will have an opportunity to argue to the Court why you think any or all of Apple's designations are improper; the motion currently before the Court (and to which the LUS versions relate) seeks only to require you to comply with the Protective Order and maintain designated materials in confidence as that process plays out.

**Melinda Riechert**

Partner

Orrick

Silicon Valley

V-card

T 650/614-7423

M 650 759 1929

mriechert@orrick.com

Orrick

Signature 365 Pixel

[EXTERNAL]

Hello,

I had no way to open those files on PACER. You didn't send them to me until two days after you filed these, which was also two days after my deadline (if you gave me one at all) for opposing your motion -- which was difficult with 2 hours to respond, the motion being incorrectly styled as ex parte, and with me having no visibly to the content filed. It was almost like it was set up to ensure I could see what was filed, or have a way to oppose or complain, or have any say at all since a decision was also requested from the court the next day.

These files assumably contain my social media posts, blog posts, and my NLRB charges (along with cover letters or other supporting documents) -- since you've been saying my NLRB charges, complaints about NLRA violations, and public advocacy about those charges and violations -- are all illegal and your motions about about destroying that PCA, concealing the alleged ULPs, and obstructing my participation in Board proceedings and Board investigations.

So, based on everything else you've done and are doing I have to ask you:

If I open these files, is Apple then going to claim that my already public, known, and filed posts/charges/complaints/etc. are now supposedly "Confidential" because they're now supposedly provisionally filed under seal by Apple?

So, for instance, Apple might say ok so maybe the IPA doesn't restrict this anymore, and maybe Apple got carried away with the Protective Order stuff, however now the content is provisionally sealed so Apple would say that if I share any of that information, or even still refuse to delete it, that I'm now supposed violating some rules/laws about sealed documents too/instead?

If so, I'm not opening that stuff and its all another ULP.

-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**


Sent with [Proton Mail](#) secure email.

On Saturday, February 28th, 2026 at 10:05 AM, Riechert, Melinda <[mriechert@orrick.com](mailto:mriechert@orrick.com)> wrote:

Ashley:

We will send to you via LiquidFiles (a secure transfer service) copies of the lodged under seal ("LUS") versions of Apple's Motion to Enforce Protective Order and Exhibits A and B to the Riechert Declaration in support of that motion.  We are providing these directly to you even though we already submitted them with our filing, in the event you do not have access to the LUS versions via the docket.

The public and LUS versions correlate as follows:

| Document | Public Version | LUS Version |
|---|---|---|
| Motion to Enforce Protective Order | Dkt. No. 294 | Dkt. No. 293-3 |
| Exhibit A to Riechert Declaration in Support of Motion for Protective Order | Dkt. No. 294-1 at Ex. A | Dkt. No. 293-4 |
| Exhibit B to Riechert Declaration in Support of Motion for Protective | Dkt. No. 294-1 at Ex. B | Dkt. No. 298 (correcting Dkt. No. 293-5) |

| Order |
|---|

Of course, these LUS versions contain material (and/or information extracted from material) designated as Confidential under the Protective Order, and thus are subject to the same restrictions on use and publication.

**Melinda Riechert**

Partner

<u>Orrick</u>

Silicon Valley
<u>V-card</u>

T 650/614-7423

M 650 759 1929

<u>mriechert@orrick.com</u>

Orrick

Signature 365 Pixel

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at <u>https://www.orrick.com/Privacy-Policy</u> to learn about how we use this information.

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Monday, March 2, 2026 9:58 AM

**To:** Riechert, Melinda <mriechert@orrick.com>
**Cc:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>; Booms, Ryan <rbooms@orrick.com>; Weaver, Nicholas <nweaver@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Horton, Nicholas J. <nhorton@orrick.com>; Kelcey Phillips <kelcey.phillips@morganlewis.com>; Mahoney, Brian <brian.mahoney@morganlewis.com>; Stolzenburg, Mark L. <mark.stolzenburg@morganlewis.com>; harry.johnson <harry.johnson@morganlewis.com>
**Subject:** Re: Gjovik v. Apple: Records filed under seal

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

------- Forwarded Message -------
From: Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
Date: On Wednesday, February 4th, 2026 at 6:15 PM
Subject: Re: (Ashley Gjovik v. Apple, Inc.)(126432) – Deposition Transcript Designations
To: Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
CC: Mantoan, Kathryn G. <kmantoan@orrick.com>, Riechert, Melinda <mriechert@orrick.com>, Perry, Jessica R. <jperry@orrick.com>, Horton, Nicholas J. <nhorton@orrick.com>, Booms, Ryan <rbooms@orrick.com>

***Attn: new NLRB charge***

Hello,

I'm removing Talty from this thread and I'm going to ask you one more time to meet/confer with me on this, because you have refused to meet/confer on this, you waited well past the 30-day deadline for substantiating your claims, and the document you sent tonight contains content that violates state and federal law -- including at least labor, whistleblower, consumer, privacy, medical, and professional ethics laws.

Certainly you had to expect that I would complain about Apple claiming my own menstruation, cervical mucus, and sexual activity are "Apple Confidential."

You also must have known that I would be further disgusted to see Apple claim that my complaints about Apple invading my, and my coworkers, privacy rights regarding menstruation, cervical mucus, and the people we choose to have sexual intercourse with in our own homes is also "Apple Confidential" so our complaints about privacy violations by Apple, and Apple's underlying conduct, are somehow secret.

You also know that in my lawsuit and some of the administrative proceedings, I cite these exact topics as protected disclosures, concrete harms/injuries, unfair business practices, and/or work conditions -- and I allege Apple's own conduct is unlawful, harmful, and requiring enforcement action including injunctive relief.

You have refused to even attempt to justify these confidentiality claims, disregarded and refused to comply with the exact process you insisted be put in place and where you had promised confidentiality disputes would be addressed, and instead you have now taken action to formalize and permanently record your client's illegal assertions.

Further, this deposition is about my employment at Apple, my concerns about work conditions and the rights of Apple employees generally, and its partially in response to my claims of unlawful labor practices -- which means that Apple's about to get a new NLRB charge filed against it, arising from your document today.

While NLRB has resisted taking action that could interfere with standard court procedures in this case, here Apple has chosen to refuse to engage with standard court procedures, cut off my access to standard procedures, and is literally claiming in an official legal document that Apple thinks it has some sort of vested business interest and secrecy claim to its employees... genital secretions.

So even an NLRB run by Apple's own lawyer will have a hard time dismissing this one -- unless, maybe if you come to the table and actually participate in this process in good faith.

I stress again, you're not even attempting to offer some nonsense, vague justification for these claims -- you're just refusing to engage in the process completely while concurrently threatening to take unjustified actions to further invade my privacy, interfere with my exercise of my privacy rights and right to bodily autonomy, and to implicitly threaten other employees to not engage in the same protected activity that I did including reporting retaliation and harassment by Apple. That sounds illegal!

So let me know if we do a video call or phone call or something where we can actually at least pretend to meet/confer about this -- or if you're just going sticking to your current path of claiming that Apple has intellectual property rights over their worker's vaginas -- because that's where we're at tonight and its extremely disturbing.

—

**Ashley M. Gjøvik**

**BS, JD, PMP**


Sent with [Proton Mail](#) secure email.

On Wednesday, February 4th, 2026 at 4:39 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:
Apple counsel,

I sent you an email about this a few moments ago (re-adding below) and instead of replying to me, you sent your own email not addressed to me, ccing me as an observer, and you are asserting a process that does not comply with the Protective Order we signed for Discovery. That means you are in violation of that Order and refusing to comply with the process you insisted on for this case.

You need to send **me** your claims and then we are to meet/confer about those claims.

Talty Ho is not the Magistrate Judge in our case and will not be deciding the validity of claims.

Once we agree to the claims, then they should be reflected in the transcript -- and you were supposed to do this with me over a month ago.

I ask that you send me your claims to discuss -- as of now you have expressly excluded me from your claims and are attempting to formalize your claims without my input, despite my direct request to you to meet/confer about exactly this.

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Wednesday, February 4th, 2026 at 4:32 PM, Mantoan, Kathryn G. <kmantoan@orrick.com> wrote:

Talty CR Production Team:

I write regarding the deposition transcript we received on 1/7/2026 in this matter.

Pursuant to the operative Protective Order, we have reviewed the transcript and are finalizing our confidentiality designations. Attached is a chart identifying the specific portions (with citations and text) for which confidentiality is being asserted.

Plaintiff is copied on this email for notice purposes.

Thank you,

Katie

**Kathryn G. Mantoan**

Attorney

Pronouns: she / her / hers

Orrick

San Francisco | Portland

T +1-415-773-5887

M +1-415-218-4865

T +1-503-943-4870

kmantoan@orrick.com

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

On Wednesday, February 4th, 2026 at 4:22 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello,

I'm adding Apple to this thread.

Apple's counsel,

We need to complete our review of the transcript, submit any corrections, and ensure that we don't then need more corrections based on the other party's corrections.

We also need to finalize the Confidentiality claims and ensure the record accurately represents those claims including for any exhibits. I asked you for updates on your Confidentiality claims and you said you were working on it but I have yet to see any updates from you -- and nothing to actually narrow, define, and substantiate any of your Confidentiality claims.

The deposition was nearly two months ago and during the deposition I told you to substantiate any Confidentiality claims and that I was not agreeing to any blanket Confidentiality claims.

Under the Protective Order you have a limited amount of time to substantiate your claims and if you do not, they are waived. Under that order, for this deposition, all of your Confidentiality claims would be waived by now.

However, there's probably at least a few statements/terms that are plausibly Confidential, I am still bound by the lawful/legitimate terms within the NDAs I consented to and signed, and I feel it would be proper to allow Apple to still substantiate the things that may actually be Confidential.

That said, you're already overdue and I need a timeline from you as to when you will be done and to ensure it can still be reflected in this deposition transcript.

I also ask if you're submitting any requests for corrections to this records, and if so, to please share with me what you ask for.

I also need to submit my request for corrections so please let me know if you'd like any process for that other then being cc'd or receiving a copy of what I submit to the Talty team.

-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

---

**4.93 MB**   6 files attached   3 embedded images

| | |
|---|---|
| Gjovik v Apple - 20260304 - Re Apple's Designations .pdf 1.09 MB | gov.uscourts.cand.417952.302.3.pdf 206.41 KB |
| gov.uscourts.cand.417952.302.2_1.pdf 319.59 KB | gov.uscourts.cand.417952.301.0.pdf 346.73 KB |
| gov.uscourts.cand.417952.302.0.pdf 493.95 KB | gov.uscourts.cand.417952.302.1_1.pdf 2.51 MB |

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# PLAINTIFF'S RESPONSE TO APPLE'S MARCH 4 2026 LETTER

*Ashley Gjovik v. Apple Inc.,* N.D. Cal. Case No. 23-cv-4597-EMC

# I. INTRODUCTION

1.      On Dec. 16 2025, during the Defendant Apple's deposition of the Plaintiff, Apple declared a blanket "confidentiality" designation that covered hours of the deposition, which directly violated the Protective Order's terms prohibiting mass designations and requiring all designations be targeted to specific information (not indiscriminate) and be made prior to the end of a deposition. The Plaintiff objected to Apple and demanded Apple narrow its designation. Apple then took fifty days to narrow its designations. Even then, Apple has refused to serve, date, or sign its destinations. Apple also failed to justify any of its designations other than stamping the Plaintiff's own speech as "confidential."

2.      The Plaintiff sent Apple objections on Feb. 4 2026 regarding Apple's designations and specific to her complaints about Apple invading employee privacy regarding sexual activity, reproductive anatomy, and genetical secretions – warning Apple she was planning on filing a new NLRB charge if they did not drop those designations. Apple still has not addressed or responded to the Feb. 4 2026 email.

3.      On March 4 2026, Apple sent a letter that purports to respond to all of Plaintiff's challenges to Apple's confidentiality designations; however, this letter does not respond to the Plaintiff's objections during the deposition on Dec. 16 2025; detailed meet/confer emails starting Feb. 4 2026; or in the legal filings/charges. Instead, Apple acts as if the Plaintiff made no complaints at all until a Feb. 18 2026 Excel spreadsheet, responds only to some of the text in parts of the spreadsheet, and ignores all other communications as if they were waived.

4.      The Plaintiff's Excel spreadsheet was converted from Apple's unsigned, undated, unserved PDF that listed designations in a table format but frequently grouped multiple terms into each line. Even then the table has over 100 lines of designation (~160 if combined terms are separated)– and is exclusively the Plaintiff's own speech. In the March 4 2026 letter, Apple de-designated around 23 lines and failed to respond at all to 53 lines. Apple retained ~29 lines but failed to provide any legal justification for its designations – instead indicating Apple's own policies and practices are an independent justification.

5.      The deposition was Dec. 16 2025 and as of March 5. 2026 Apple has failed to respond to all threshold objections; still refuses to serve, date, or sign its designations; has failed to respond to objections for more than half of its supposedly pending designations; and by its own de-designation and waiver, admitted that 99% of its initial designation from Dec. 16 2025 was frivolous (yet kept it in place for fifty days), and then at least ~70% of its "narrowed" designations from Feb. 4 2026 were also improper (yet

kept them in place for a month).

6.    As of today, Apple still refuses to offer any Rule 26(c) good cause for any designation it retains. Instead, Apple mischaracterizes Plaintiff′s objections, refuses to respond to the Plaintiff′s objections, and spends a significant portion of its long-overdue, evasive, three-page letter arguing it was justified in firing the Plaintiff in 2021 and complaining about the Plaintiff′s NLRB charges against Apple.

7.    The designations Apple still claims it retains are exclusively about female genitalia or sexual activity (i.e., cervical mucus, ovulation, menstruation, sexual partners, and cosleepers). Apple's March 4 2026 Letter de-designated speech about all other user studies (including: yoga,  swimming, eye tracking, grip testing, spinning in chairs, and exercise monitoring). Apple retained ″measuring female employees′ cervical mucus,″ ″ovulation,″ ″registering of people you′re having sexual relations with outside of work,″ ″who I was sleeping with and have them sign NDAs.″

8.    Other than Apple's perplexing retention of the designation claim that the letter "N" is confidential, the only variable between what Apple de-designated and what Apple retained is whether the content involves female reproductive biology and sexual activity. Apple makes these outrageous claims while Apple concurrently violated nearly every procedural requirement of the Protective Order.

# II. APPLE HAS NO VALID DESIGNATIONS

9.    Apple′s procedural failures are each independently fatal and create a result where Apple has never actually made any valid designations. Apple's failures include:

- Apple never signed its designations as required by FRCP 26(g)(1). Plaintiff objected February 4, 2026, and repeatedly thereafter. Apple still has not corrected this and has offered no explanation why it believes it does not have to comply with FRCP 26(g)(1). Apple also never dated its designations & has not corrected this.

- Apple also never served its designations on Plaintiff — sent to the court reporter ″for notice purposes″ instead. Apple has not corrected this and its only explanation indicated it was sending the designations at the end of the Plaintiff′s thirty-day response period for the deposition transcript draft, assumably in order to then claim the Plaintiff cannot correct/remove their designations from that record. Apple never sent the designations to the Plaintiff, never intended to meet/confer, and only intended to force its unlawful and admittedly improper designations into a formal court record in such a way as to prevent the Plaintiff from opposition or trying to stop them.

- Apple imposed a blanket designation over the entire multi-hour deposition on December 16, 2025, designating every word spoken as ″Confidential″ rather than identifying specific content as PO § 5.2(b) requires. This violated PO § 5.1′s prohibition on ″*[m]ass, indiscriminate, or routinized designations*.″ Apple′s own subsequent narrowing (from every word over multiple hours, to 29 brief retained citations) admits the blanket designation was indiscriminate. PO § 5.1 provides that such designations ″*expose the Designating Party to sanctions*.″

- Plaintiff challenged the blanket designation on the record at the deposition and in subsequent communications. The transcript was delivered January 7, 2026. Under PO § 6.3, and Apple had 21 days to file a motion to retain its blanket confidentiality but Apple filed nothing. Thus, the blanket designations automatically waived on January 28, 2026. Apple then sent narrowed designations on February 4 (unsigned, undated, served on the court reporter not the Plaintiff) — which Plaintiff immediately challenged. Those designations, if valid at all, auto-waived on February 25, 2026. Yet, Apple filed its Motion to Enforce (Dkt. 294) on February 26 (one day after the second auto-waiver).

Apple's March 4 letter now arrives five weeks after the first auto-waiver and one week after the second, de-designating all prior designations other than the ones currently underlying its pending motions and the Plaintiff's NLRB charge, as well as the letter "N."

- Apple has never complied with PO § 6.2's voice-to-voice dialogue requirement despite repeated requests. Apple also delayed, obstructed, and still refused to meet/confer about these issues – in direct violation of this court's February 20 order.
- Apple has had months to correct any of these. Apple chose not to.

Despite the above, Plaintiff has repeatedly offered good-faith engagement on anything colorably proprietary — in filings, emails, and at the February 20 conference. Apple's response was to withdraw most designations and retain only those Plaintiff expressly identified as unlawful (and the letter N).

# IV. APPLE FAILS TO RESPOND TO & MISCHARACTERIZES PLAINTIFF'S OBJECTIONS

10.     Apple's letter fails to respond to ~55 designations including internal codenames, general hardware terminology, and non-sexual study descriptions (telephony, spinning, eye tracking, grip testing). Apple did not de-designate these but also did not retain them and Apple provided no response at all.

11.     Apple then asks Plaintiff to *"advise if you agree to the narrowed list of designations set forth in this letter, or if you continue to challenge any or all of Apple's designations (and, if so, which ones)."* Apple converts its own failure to respond into a burden on Plaintiff to re-challenge designations Apple was required to address. Under PO § 6.2, upon receiving a challenge, Apple must *"explain the basis for the chosen designation."* Apple's failure to respond to over half the challenged designations is a failure to meet that obligation. Apple cannot manufacture consent through its own default.

12.     Apple responds only to the Excel spreadsheet. Plaintiff's objections are documented across emails, motions, complaints, filings, the deposition transcript— all received by Apple and many cited by Apple in its own letters and emails. Yet, Apple ignores the Plaintiff's arguments in these filings while simultaneously citing them (including the NLRB charge and cover letter) as a Protective Order violation — meaning Apple has read it and knows the objections in it yet is still refusing to engage substantive with the objections and still refusing to provide a justification for its designation.

13.     Apple's letter creates its own categories — "Code Names," "Industry Terminology," "Internal Studies" — and assigns Plaintiff's objections to them. Plaintiff did not make those categories. Apple collapsed the Plaintiff's objections into Apple-defined buckets, responded to arguments Plaintiff did not make, and refused to respond to arguments the Plaintiff did make. For example, Apple treats all study-related designations as a single "Internal Studies" category and responds as if the only objection was the NLRA — ignoring that Plaintiff separately raised objections regarding public information (the studies are publicly known) and public brand names (Beddit).

14.     The PO expressly does not apply to *"any information that is in the public domain"* or *"known to the Receiving Party prior to the disclosure."* PO § 3. The PO also places the burden on Apple. PO § 6.2-6.3 requires Apple to *"explain the basis for the chosen designation."* The basis must arise from "applicable legal principles" beyond the designation itself, per PO § 1. Apple must independently substantiate each designation. Apple has not done this for any of its designations – even the ones it claims to retain now..

# V. APPLE′S LETTER ADMITS PRIOR VIOLATIONS & CREATES NEW ONES

15.     Apple narrowed from blanket designation of most of the deposition, to ~160 designations, then down to approximately 29 retained citations. This drastic narrowing admits Apple's designations have been improper and indiscriminate under PO § 5.1. Apple's remaining designations and the limited justification for those designations also admits Apple had an improper purpose from the start and all of this conduct was for the purpose of concealing, obstructing, and silencing the Plaintiff's complaints about work conditions, Apple's unfair business practices, and Apple's unethical exploitation of employee personal data for commercial purposes – something increasingly regulated by California.

16.     Apple′s March 4 2026 treatment of 165:13-24 is particularly telling. Apple de-designated only: *"and I found that very disturbing*" but Apple retained everything else. Once you remove the de-designated expression of distress and the other content Apple conceded is not confidential elsewhere (sensors, vitals, monitoring), what Apple is actually retaining is: *"Apple asked for NDAs of any cosleepers. So if you were to ever have anyone over like if you were dating and wanted to have sex with them or they're going to sleep in your bed, they had to get registered with Apple and sign an NDA for the product if they were to be there.*" Apple retained the employee's disclosure about what she believes to be unethical and unlawful conduct, and concealed that the nature of the issue is private sexual sexuality.

17.     Apple′s letter also says it retains ″N″ (2 designations: 197:18, 197:21). because ″in context, this testimony relates to the meaning of the letter within Apple′s internal code names.″ So Apple treats ″N″ as a code name component. But Apple de-designated or abandoned every other code name and code name component— and all hardware development terminology. Plaintiff offered to allow redaction of all codenames as a courtesy, yet Apple retains the letter ″N″ —— while abandoning every substantive codename.

18.     Beddit is a product Apple acquired in 2017, marketed, and sold publicly to consumers — not a pre-release or unreleased product.[1] It shipped, had a brand name, and customers bought it. It is publicly known. Apple likely wants the name redacted precisely because it identifies a shipping product, not a secret one — revealing that the studies at issue involved existing commercial products, not unreleased prototypes. (Beddit: 6 designations: 166:4, 166:14, 167:17, 168:19, 169:1, 169:10). But a public product name cannot be designated confidential under PO § 3 (excluding ″information that is in the public domain″). Apple offers no Rule 26(c) basis despite repeated demands for it to do so.

19.     Apple also failed to provide a list of what designations it claims it retains but a manual cross-check indicates that it appears Apple' remaining designations are:

- ″cervical″ / ″cervical mucus″ / ″mucus″ / ″cervical mucus secretion″ / ″measuring female employees′ cervical mucus″ / ″my cervical mucus″ / ″cervical mucus menstruation″ (7 designations: i6, 164:10-11, 164:15-16, 170:9, 226:4, 236:14-15, i20 partial)
- ″ovulation″ / ″ovulation study″ (5 designations: 164:10-11, 164:14, 164:25, 169:25, i22)

---

[1] CNET, *Apple buys Beddit, maker of sleep-tracking device: The $150 device fits between your sheet and mattress to measure such things as total sleep time, resting heart rate and respiration rate.,* May 9 2017, https://www.cnet.com/home/smart-home/apple-buys-sleep-tracking-device-maker-beddit/

- "menstrual" / "menstruation" (3 designations: 176:16, i20 partial, 226:4 partial)
- *"registering of people you're having sexual relations with outside of work"* / *"who I was sleeping with and have them sign NDAs"* / *"of people I was sleeping with"* / "cosleepers" (4 designations: 166:1-2, 226:1, 226:3, i8)
- "sex" / "sexual" / "sensors" (1 designation: i28)
- "period; bed" (1 designation: 205:17)
- Beddit sleep study passage including cosleepers, dating, sex, registering partners (1 designation: 165:13-24, minus *"and I found that very disturbing"*)
- "Beddit; sleeping" (1 designation: 225:25)
- "B-E-D-D-I-T; Beddit" in index alongside sex-related terms (1 designation: i5)

20.     Apple's letter states the retained material is the Plaintiff's "*characterization of the content, methods, and processes of certain internal Apple product-related studies.*" But the de-designated testimony is also the employee's characterization of internal studies — characterizing what the studies involved (sensors, vitals monitoring, exercising in Apple's lab), what the employee was asked to do (spin in chairs, hold phones, track eyes), and the general purpose. Apple de-designated all of those characterizations. ("*go to yoga or running or swimming where they wanted to strap a bunch of sensors on me and, like, monitor all my vitals while I was, like, exercising in some Apple lab.*" designated 161:6-9).

21.     The only characterizations Apple retained involve cervical mucus, ovulation, menstruation, sexual partners, and cosleepers. Apple's own stated justification ("characterization" of studies") does not distinguish between what Apple retained and what Apple abandoned. The only distinguishing factor is the sexual content, which claims are also the subject matter of the pending NLRB charge, and Apple's subsequent motion to "Enforce the PO" in retaliation for the NLRB charge and Plaintiff's complaints.

# VII. APPLE PROVIDES NO RULE 26(c) GOOD CAUSE

22.     PO § 2.2 defines "CONFIDENTIAL" as information "that qualifies for protection under Federal Rule of Civil Procedure 26(c)." The Ninth Circuit requires that any confidentiality claim requires "good cause" showing under Fed.R.Civ.P. 26(c) and warns that "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) citing *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir. 1986). Facing a request for disclosure, its inadequate for the Designating party to simply rely on a blanket Protective Order without any showing of "good cause" *Olympic Refining Company v. Carter,* 332 F.2d 260, 264-65 (9th Cir.), cert. denied, 379 U.S. 900, 85 S.Ct. 186, 13 L.Ed.2d 175 (1964).

23.     "It is well-established that the fruits of pre-trial discovery are, in the absence of a court order to the contrary, presumptively public." *San Jose Mercury News, Inc. v. United States Dist. Ct.,* 187 F.3d 1096, 1103 (9th Cir. 1999). "Rule 26(c) only authorizes a district court to override this presumption where `good cause' is shown." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002). Claims of confidentiality include actual "trade secret or other confidential research, development, or commercial information." Id; Fed. R. Civ. P. 26(c), 26(c) (7).

24.     A conditions precedent for Court granting a protective order requires that the party seeking to make something confidential, must make "particularized showing of good cause with respect to any individual document." *San Jose Mercury News, Inc.*, 187 F.3d at 1102. "If good cause is not shown, the

discovery materials in question should not receive judicial protection and therefore would be open to the public." *In re Agent Orange Product Liability Litig.,* 821 F.2d 139, 145 (2d Cir. 1987). Even if there is a showing of particularized harm, the Court may still deny a protective order based on a balancing of public and private interest. *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995).

25.    *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) explains that "the public generally gain access to unprotected information produced during discovery, but it also has a federal common law right of access to all information filed with the court. This common law right of access to inspect various judicial documents is well settled in the law of the Supreme Court and this circuit." *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978); *San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1102 (9th Cir. 1999); *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995).

26.    This common law right, as described in *Phillips ex rel.,* "creates a strong presumption in favor of access" to judicial documents which "can be overcome" only by showing "sufficiently important countervailing interests." *San Jose Mercury News, Inc.*, 187 F.3d at 1102; *see also Hagestad*, 49 F.3d at 1434. "In deciding whether sufficient countervailing interests exist, the courts will look to the 'public interest in understanding the judicial process and whether disclosure of the material could result in improper use of the material for scandalous or libelous purposes or infringement upon trade secrets'." *Tragesser*, 49 F.3d at 1434. The burden is on the party seeking to protect information to make a particularized showing. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

27.    Apple provides: no trade secret identification, no competitive harm, no case law. Apple cites one citation which was to *Epic Systems Corp. v. Lewis*, 584 U.S. 497 (2018) — an FAA/NLRA case about class-action waivers in arbitration, not about protective orders or confidential information, and inapposite. Apple's sole justification thus far is: the material is the Plaintiff's "characterization of the content, methods, and processes of certain internal Apple product-related studies." This is a description, not a showing. What is the trade secret in "cervical mucus"? What competitive harm results from "ovulation"? What proprietary interest is served by "registering of people you're having sexual relations with outside of work"? How are public information, personal experiences, and complaints about work conditions confidential? Apple has had months to answer these questions and still refuses.

# VIII. APPLE'S OWN FILINGS CONTRADICT ITS POSITIONS

### INTERROGATORY SET 1: APPLE USED CODE NAMES FOR THE STUDIES IT SAYS JUSTIFIED TERMINATION — THEN DIDN'T DESIGNATE THEM.

28.    In response to Interrogatory No. 1 asking for Apple's "complete and formal reason(s) for terminating" Plaintiff, Apple stated (Orrick, August 4, 2025, verified under penalty of perjury by Apple HR Director Megan Bowman and Melinda Riechert): "To safeguard Apple's confidential information, the study is referenced as 'Alpha' for purposes of this response" and "to safeguard Apple's confidential information, the study is referenced as 'Omega' for purposes of this response." Apple described the "Alpha" and "Omega" studies in detail — how they worked, the consent forms, the confidentiality requirements, and how Plaintiff's disclosures about them led to termination. One year ago, Apple treated these studies as

the confidential information requiring pseudonyms to protect.

29. Apple's Interrogatory Set 1 response states: "On August 28, 2021, Plaintiff tweeted details about a separate proprietary study Apple was conducting, the 'Omega' study... Plaintiff's tweet both identified the name and purpose of the study regarding an unreleased product under development." Apple added that "on August 30, 2021, Plaintiff tweeted photographs of herself created by the Alpha application, thus again disclosing confidential Apple product information." Dkt. 280 fn. 2 states: "it was her public disclosure of confidential Apple product-related information that led to her termination from Apple in the first place."

30. Then, at the December 16 2025 deposition, these same studies — Gobbler (Apple's "Alpha") and the ear scan studies — were discussed extensively and Apple did not designate a single line of that testimony as confidential. Apple did not even maintain the pseudonyms — the studies were discussed by name with no designation. Apple claims this information was so secret that sharing it justified it in terminating the Plaintiff's employment – then Apple didn't designate it at all. But in 2026, Apple did designate the employee's testimony about cervical mucus, ovulation, and sexual partners as confidential and sent multiple letters/motions/emails indicating it would have fired the Plaintiff for talking about these topics as well, but not designating the content it says it did fire the employee over.

31. It's well established that Apple conceals complaints and retaliates against workers who complain about work conditions or organize to improve work conditions. That appears to be Apple's only basis for any of these confidentiality claims – Apple insists its misconduct is secret and that complaints about Apple's wrongdoing is misconduct, assumably because it exposes that Apple's public claims about those same business practices are false and misleading. [2]

32. In its discovery response, Apple admits the Verge article about the Gobbler study was published (RFA No. 17: Apple admits "the article features an embedded video composed of, among other things, images showing Plaintiff's face (or parts of her face) and parts of her upper body" and "admits that the images were captured on Plaintiff's phone by an application that has been called Gobbler"). Apple admits it was contacted for comment before publication and did not respond or send a cease-and-desist (RFA No. 20: "Apple admits that a reporter from the Verge reached out to an employee at Apple 'for comment' prior to the publication of the article... and that Apple did not provide a comment prior to the

---

[2] NYT, *Regulators Find Apple's Secrecy Violates Workers' Rights: After a yearlong investigation, a federal labor board determined that the tech giant's rules interfere with employees' right to organize.* Jan. 31 2023, https://www.nytimes.com/2023/01/31/technology/apple-workers-rights.html; HR Grapevine, *Apple faces Federal complaint for silencing workers through confidentiality policies,* Nov. 5 2024, https://www.hrgrapevine.com/us/content/article/2024-11-05-apple-faces-federal-complaint-for-sliencing-workers-through-confidentiality-policies; HRD Magazine, *Apple drops gag orders for employees talking harassment, discrimination,* Dec. 15 2022, https://www.hcamag.com/us/specialization/employment-law/apple-drops-gag-orders-for-employees-talking-harassment-discrimination/430851; Engadget, *Report: Apple retaliated against women who complained about misconduct: Its corporate culture is at odds with the image it presents, multiple women said.,* Aug. 4 2022, https://www.engadget.com/report-apple-retaliated-against-misconduct-victims-094505393.html; PASTE, *Apple Reportedly Lied in Recent Memo about NDAs and Silencing Employees,* Nov. 23 2021, https://www.pastemagazine.com/tech/apple/apple-lied-in-recent-memo-silences-employees; Business and Human Rights Centre, *Apple employees raise concerns company does not protect and at times invades their personal privacy*, Aug. 30 2021, https://www.business-humanrights.org/en/latest-news/apple-employees-raise-concerns-company-does-not-protect-and-at-times-invades-their-personal-privacy/; etc.

PLAINTIFF'S RESPONSE TO APPLE'S 3/4/26 LETTER | 3:23-CV-04597-EMC | PAGE 6

publication of the article").[3]

33.     Apple claims Gobbler disclosures were confidential and they justified termination. Yet, Apple did not send a cease-and-desist when it had the chance, did not respond when asked to comment on an article characterizing Apple's explanation as "absurd,"[4] and did not designate Gobbler testimony at the deposition. Apple designates cervical mucus and sexual partners under the same IPA theory. If the product studies are what's confidential — as Apple says under oath — then the employee's complaints about different topics are not.

34.     Further, Plaintiff's Fifth Amended Complaint alleges (¶ 158): "***Apple frequently requested that Gjovik and her coworkers participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA tests, biometrics data collection (like the Gobbler app), and other highly personal examinations.***" (Dkt. 142). Apple's answer was that: "Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them" (Dkt. 218). Then, Apple simultaneously describes the same studies in detail in Interrogatory Set 1, claims no knowledge in responses to Requests for Admission, and designates testimony about them as confidential. Apple cannot lack knowledge about studies it describes under oath and designates as its confidential property.

35.     Apple told this court (Dkt. 224, p. 11): "Gjovik's claims and Apple's defenses are fact intensive, and those facts need to be developed through discovery, both oral and written." He said the claims and defenses are "so intertwined" they cannot be separated. Apple then designates the employee's deposition testimony about these facts as confidential under the theory that these facts also represent things it would fire the Plaintiff for disclosing like it did with the Gobbler and ear scan issues. Yet, Apple also refused to answer Interrogatory Set 3 questions about "Plaintiff's Disclosures concerning Privacy" — the exact subject Apple now claims justifies the designations.

36.     Apple's affirmative defenses repeat: "Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement." But Apple refuses to identify which policies, which provisions, or which specific conduct violated which specific term. The court noted Apple would need to produce policies in initial disclosures (Dkt. 234). Apple has not — and Apple refuses to provide any further information – while Apple does designate Plaintiff's testimony as confidential assumably based on those unproduced, unidentified policies.

37.     The sex-based content Apple retains corresponds to the content Apple cited in its Motion to Enforce (Dkt. 294) and Motion to Seal (Dkt. 293). If Apple de-designated this content, those motions would be moot — Apple would be seeking sanctions for disclosing content Apple itself concedes is not

---

[3] The Verge, *Apple cares about privacy, unless you work at Apple: The company has taken a strong stance on safeguarding its customers' data — but some employees don't believe it protects theirs,* Aug. 30 2021, https://www.theverge.com/22648265/apple-employee-privacy-icloud-id

[4] Gizmodo, Apple Wanted Her Fired. It Settled on an Absurd Excuse: The reasons for firing Ashley Gjøvik include tweeting a photo of herself—taken by her own phone., Oct. 14 2021, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789 ("Late in the evening on Sept. 15….a letter popped up in her inbox. It was from a high-powered law firm, O'Melveny & Myers LLP…. It didn't point to any sensitive documents… The information it contained wasn't new. Nor was it particularly newsworthy. Had it been anything otherwise, one of the dozens of reporters following Gjøvik would've noticed…the emails shared publicly by Gjøvik were neither labeled confidential nor contained anything that could be considered secret or otherwise proprietary…The posted image of the email merely noted what was already known to the public…Apple did not respond to a request for comment.")

PLAINTIFF'S RESPONSE TO APPLE'S 3/4/26 LETTER | 3:23-CV-04597-EMC | PAGE 7

confidential. Apple maintains the designations not because the content is secret but because withdrawing them collapses the pending motions and admits to the NLRA violations.

38. Maintaining designations to support litigation rather than to protect legitimately confidential information is an improper purpose under PO § 5.1: designations "made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions."

39. However, Apple's defense to this is even worse—that its intentionally claiming employee complaints about Apple regarding sexual harassment, bodily autonomy, invasion of privacy, and the employer studying employee vaginal secretions and sexual activity is all "confidential" even if the study consists of otherwise public information – if the employee complains about Apple's conduct, then the complaint and underlying facts become "confidential" per Apple. This is Apple's MO for years.

## JUDICIAL ESTOPPEL; AND ORRICK V MORGAN LEWIS

40. Morgan Lewis filed Apple's Answer to the NLRB Amended Complaint on November 21, 2025, denying every substantive allegation. Morgan Lewis denies Apple "directed employees to refrain from talking about workplace environmental health and safety concerns with other employees" (response to ¶ 5). Morgan Lewis denies Apple told employees to use a "five-point balancing test in advance of communicating workplace health and safety concerns" (response to ¶ 6(a)). Morgan Lewis denies Apple told employees "to refrain from discussing their terms and conditions of employment" (response to ¶ 6(c)).

41. Orrick's designations and this letter impose exactly those restrictions: don't discuss workplace studies publicly, don't characterize Apple's internal practices, don't share complaints about what Apple did to your body. Morgan Lewis denies to the NLRB that Apple makes these rules. Orrick enforces them in this court. Morgan Lewis's defenses also include that Apple's statements "contain no threat of reprisal or force or promise of benefit" (Defense 5, citing Section 8(c) of the NLRA). Orrick's conduct — sanctions threats, gag orders, case dismissal — is threats of reprisal. Morgan Lewis's own defense framework defeats Orrick's conduct.

42. Apple's counsel (Riechert/Orrick) told the court in the January 6, 2026 Joint Case Management Update (Dkt. 269, p. 10): "On September 25, 2025, the NLRB (Case No. 32-CA-282142) dismissed certain allegations from the complaint, including all allegations that Defendant suspended and terminated Plaintiff for engaging in protected concerted activities; Plaintiff appealed this dismissal on November 21, 2025. No hearing has occurred with regard to the remaining allegations, and there have been no findings of fact or legal conclusions relating to those allegations."

43. Apple's March 4 letter states: "the NLRB has already determined that your revealing 'confidential product development information about [an Apple] study' is not 'protected activity' under the NLRA." Apple told the court: no findings, dismissal appealed. Apple now tells Plaintiff: the NLRB has "determined." Apple is judicially estopped from representing a non-final, appealed GC dismissal — which its own counsel confirmed is on appeal and has no "findings" — as a Board "determination."

44. Further, Plaintiff did not cite Case 32-CA-282142 in her designation objections. Apple introduced it. Having opened that door: the partial dismissal Apple cites addressed revealing "confidential product development information about [an Apple] study." Apple's retained designations are not product development information — they are cervical mucus, ovulation, and sexual partners. Yet, Apple again

bases its designations on its similarly unsubstantiated claims it was justified in terminating the Plaintiff's employment – which also refusing to provide any factual or legal basis for that argument.

45.     The still-active NLRB amended complaint in that same case retains allegations that Apple violated Section 8(a)(1) by directing employees to refrain from discussing workplace health and safety concerns (¶ 5), telling employees to use a five-point balancing test before communicating workplace concerns (¶ 6(a)), and telling employees to first communicate concerns directly with Apple before discussing them (¶ 6(c)). Orrick's designations and this letter impose those same restrictions. So, Apple (via Morgan Lewis) is trying to settle those claims while Apple (via Orrick) is committing the same violations, admitting they are doing so, but now claiming its lawful and appropriate for them to do so.

# X. APPLE'S CONDUCT VIOLATES APPLICABLE LAW, THE PROTECTIVE ORDER, & COURT RULES

46.     Apple's March 4 2026 letter, Feb. 18 Letter (Dkt. 280 fn. 2), emails, and the February 20 conference confirm the Plaintiff's mostly defunct IPA is Apple's only basis for designation. Apple provides no independent Rule 26(c) justification, violates the requirements of the Protective Order Apple insisted upon having ordered in this case, and refuses to engage in meaningful meet/confer.

47.     The use of the IPA to justify any confidentiality claim for this subject matter is prohibited by at least: the April 2025 NLRB settlement (requiring rescission); the Speak Out Act, Pub. L. 117-224 (2022) (voiding pre-dispute NDAs preventing speech about sexual harassment)[5]; the STAND and Silenced No More Acts, Cal. Lab. Code § 1001 (prohibiting enforcement of agreements preventing disclosure of unlawful workplace acts)[6]; and more.  Further, the bankruptcy automatic stay also prohibits the pending motion for sanctions (hearing before Judge Panos, April 2, 2026, Dkt. 299).  These arguments are set forth in detail in Plaintiff's prior filings, NLRB charges, emails, and other communications to Apple on this matter and are incorporated by reference.

48.     As of March 4 2026, Apple has now de-designated every user study-related term/phrase unrelated to genitals and sexual activity (involving de-designating exercise, grip testing, eye tracking, and physical activity monitoring). Apple retained every designation involving cervical mucus, ovulation, menstruation, sexual partners, and cosleepers. The only variable is whether the content involves female reproductive biology and sexual activity. Apple provides no Rule 26(c) justification for any retained designation.

49.     Under Title VII and FEHA, unwelcome conduct of a sexual nature creating a hostile environment constitutes sexual harassment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986); *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993); Cal. Gov. Code § 12940(j). Courts have found harassment where employers made "offensive, explicit references to women's bodies and sexual conduct," *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994); comments about women's bodies and references to genitalia, *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 539-40 (2d Cir. 2010); "comments on the breasts,

---

[5] Pub. L. No. 117-224, 136 Stat. 2290 (2022) (codified at 42 U.S.C. §§ 19401–19404).
[6] 2018 Cal. Stat. 6262 (codified as amended at CAL. CIV. PROC. CODE § 1001. Stand Together Against Non-Disclosure (STAND) Act, See CAL. CIV. PROC. CODE § 1001(a) (West 2024).

buttocks, and physical appearance of individual women," *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1373 (9th Cir. 1990); and repeated close examination of female employees' bodies, *EEOC v. R&R Ventures*, 244 F.3d 334, 339 (4th Cir. 2001).

50. The DOJ confirms "asking about a person's sexual preferences" violates Title VII. The EEOC confirms examples of retaliation for employee's opposing sexual harassment includes the employer "filing a civil action," "work-related threats, warnings, or reprimands," "increase scrutiny," and "make the person's work more difficult." All of this is happening here now. NDA's concealing sexual harassment "silence and isolate victims but also enable wrongdoers to continue their behavior without accountability."[7] NDAs used to conceal sexual harassment and misconduct, rather than trade secrets, are a corporate "weapon used to benefit the powerful and corrupt and gag victims."[8]

51. This is one reason the legislative history of the STAND Act explains it prohibits an employer from requiring an employee to sign a nondisparagement agreement … denying the employee the right to disclose information about those acts." S.B. 331, 2021-2022 Leg., Reg. Sess. (Cal. 2021). The law applies retroactively to all prior NDAs including the one the Plaintiff signed with Apple. Under California's STAND and Silenced No More laws, an employer like Apple is barred from the enforcement of any pre-lawsuit NDA preventing individuals from seeking help or speaking out about illegal workplace misconduct involving sexual assault and harassment – which is exactly what Apple claims its justification for confidentiality is here. S.B. 331, 2021-2022 Leg., Reg. Sess. (Cal. 2021).

52. The Speak Out Act is an "enacted public law" that "specifically inhibits courts from enforcing nondisclosure clauses or non-disparagement clauses that are entered into before the occurrence of a sexual assault or harassment dispute." Speak Out Act, S. 4524,117th Cong. (2022).[9] The Act "precludes the court's enforcement of blanket NDAs regarding allegations of sexual assault and harassment." [10]

53. Apple is waging their entire PO enforcement campaign (Feb.–March 2026, with four+ motions, dozens of M&C refusals, sealing demands, gag orders, sanctions threats, and this letter ) about a female employee's vaginal discharge, menstrual cycle, ovulation, and sexual partners. Apple refuses to substantiate why any of this is confidential but demands the employee justify why Apple should not be permitted to designate her reproductive and sexual information as Apple's property. This inverts the PO's burden (§ 6.3) and compounds the violation with each communication.

54. This is also sexual harassment of the Plaintiff. The decision-makers are predominantly male. (Lead counsel in the NLRB cases are men (2+ men with Morgan Lewis, 2+ men with MWE), lead counsel for OMM was a man, lead counsel with MoFo is a man, Apple's CEO and executive teams are

---

[7] See, e.g., Stephanie Russell-Kraft, *How to End the Silence Around Sexual Harassment Settlements*, THE NATION ( Jan. 12, 2018), https://perma.cc/6H27-57C2 ("[Secrecy] leaves other employees vulnerable to harassment by repeat perpetrators, and deprives the public of information about how widespread the problem of workplace harassment is.")

[8] Johanna Shinners, *Safeguarding Silence: The Weaponization of Nondisclosure Agreements and the Need for More Regulation,* 25 Marq. Ben & Soc. Welfare L. Rev. 229 (2024).

[9] Elizabeth A. Lalik et al., President Biden Enacts Speak Out Act Curtailing the Use of Pre-Dispute Non-Disclosure and Non-Disparagement Clauses Involving Sexual Assault and Harassment Claims, LITTLER MENDELSON P.C. (Dec. 12, 2022),

[10] Johanna Shinners, *Safeguarding Silence: The Weaponization of Nondisclosure Agreements and the Need for More Regulation,* 25 Marq. Ben & Soc. Welfare L. Rev. 229 (2024).

almost entirely men, and noticed counsel in this case also includes a man (Ryan Booms). Regardless of the nature of the proceeding, all of Apple's counsel have made personal attacks against the Plaintiff in the cases and outside the proceedings (harassing her on social media about her body, accusing her of misconduct, bullying her about her appearance, etc.).

55. While it's a woman currently sending these communications (Melinda Reichert), behind her is an army of male executives and legal counsel, and they're all claiming Apple has an inherent right to study employee vaginas and private sex acts, and the Plaintiff's opposition and complaints to this are secret and misconduct by the Plaintiff. After the Plaintiff complained in an NLRB charge that Apple "doesn't own her vagina" and can't claim any rights or ownership to employee genitals, Apple filed a motion for sanctions against the Plaintiff, wanting the filing sealed, and the Plaintiff gagged and bound by the court.

56. This case already alleges sex-based harassment during Plaintiff's employment — including supervisors who discriminated based on sex and created a hostile work environment with sexual harassment, among many other issues (Fifth Amended Complaint ¶¶ 72-74, 242-243). Apple's current litigation conduct seeks to conceal and normalize the prior abuse and unlawful conduct through a "protective order." Apple seeks to use this PO to strike, dismiss, or otherwise nullify the Plaintiff's pleaded complaints in this litigation about these very issues – in addition to obstructing NLRB and other agency proceedings.

57. Apple's conduct also directly violates the same Protective Order. For instance,

- PO § 1: The order "does not confer blanket protections" and extends "only to the limited information or items that are entitled to confidential treatment under the applicable legal principles." Apple has demonstrated entitlement under no applicable legal principle.
- PO § 3: Protections "do not cover" information "in the public domain" or "known to the Receiving Party prior to the disclosure." The designated content is public in the Fifth Amended Complaint, Judge Chen's orders (Dkts. 73, 112), the Verge article, NLRB filings, and press coverage.
- PO § 5.1: Mass and indiscriminate designations are prohibited and sanctionable. Designations made for improper purpose are sanctionable.

58. Apple's conduct has also violated the FRCP including FRCP 26(g)(1) because discovery responses must be signed and Apple refuses to sign these designations. The signature is to certify the filing is "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Apple's designations are unsigned — and if signed, would violate this certification. The context (including the Feb. 4 2026 email) shows that Apple is refusing to sign these designations because Apple knows the designations are not legitimate and the serving attorney could face sanctions. Yet under FRCP 26(g)(3), sanctions are mandatory for 26(g)(1) violations, which includes their intentional refusal to sign, date, or serve the designation.

59. Apple also violated the Court's Professional Conduct Guidelines with this misconduct including their refusal to practice with "honesty, care, and decorum" (Civil L.R. 11-4(a)), to be free of "prejudice and bias" Civil L.R. 11-4(b); using, inquiring, and threatening to use "facts about the private lives of any party… for the purpose of gaining an unfair advantage" Guideline 17 (Privacy); and "engaging in conduct that exhibits or is intended to appeal or engender bias against a person on account of that person's . . . sex." (Guideline 18).

60.     This list is not all inclusive – Apple violated too many rules, laws, and policies to count here – but the first step is for Apple to simply follow the basic requirements of the FRCP, Local Rules, and Protective Order – which it is still refusing to do nearly three months after the deposition.

# XI. CONCLUSION AND NOTICE

61.     Apple's letter fails on every level. Apple has no valid designations. Apple failed to respond to over half the challenged designations. Apple provides no Rule 26(c) good cause for any retained designation. Apple's 29 retained designations consist of: one code name component retained as apparent pretext (the letter "N," 2 designations), a public brand name (Beddit, 6 designations), and worker complaints about corporate misconduct related to female employee reproductive biology and sexual activity (21 designations).

62.     Apple de-designated every non-sexual user study characterization and retained every sexual one — while claiming its basis is the employee's "characterization" of studies, admitting to animus about workplace complaints. Apple maintains these designations to avoid mooting its pending sanctions motions, not to protect confidential information. Apple's conduct violates the PO, the FRCP, this court's Professional Conduct Guidelines, Title VII, FEHA, the Speak Out Act, the Silenced No More Act, the NLRA, the April 2025 settlement, and many other legal protections, rules, and restrictions.

63.     Apple needs to follow the rules – and so far Apple continues to intentionally defy those rules instead. I reserve all rights and arguments, including those set forth in my prior filings, emails, and communications.

/s/ Ashley M. Gjovik
**Ashley Gjovik (Plaintiff/_In Propria Persona_)**
Filed March. 5 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# EXHIBITS

## EXHIBIT A:
### PLAINTIFF'S FEB. 4 2026 EMAIL

# RE: (Ashley Gjovik v. Apple, Inc.)(126432) – Deposition Transcript Designations

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Riechert, Melinda<mriechert@orrick.com> |
| CC | Ashley M. Gjovik (Legal Matters)<legal@ashleygjovik.com>, Mantoan, Kathryn G.<kmantoan@orrick.com>, Perry, Jessica R.<jperry@orrick.com>, Horton, Nicholas J.<nhorton@orrick.com>, Booms, Ryan<rbooms@orrick.com> |
| Date | Friday, February 6th, 2026 at 3:10 PM |

Hello counselor,

During the deposition you provided a number of exhibits you had not previously produced (I noted this expressly on the transcript itself for one of them) and you still have not produced those documents outside the deposition, and I don't think sending them via chat during a deposition is production either -- so there is no prior designation for those documents.

In fact, this deposition was the very first time you sent any documents to me designated confidential. So it appears if anything that you changed multiple prior designations from not-confidential to now make claim they are confidential when they were not prior, but your only documentation about this is a stamp on the new record, that wasnt even produced -- just sent via chat, and nothing is noted in your confidentiality claim document.

As noted prior, the Protective Order said that confidentiality designations were due at the deposition itself -- so you should have made your designations for any actual confidential claim during the deposition itself -- not as a blanket claim. You should have done the per item targeted claims at that time -- your delay waiting for the transcript was only because you violated the order's instructions during the deposition.

Also, as I said, I will follow the Orders process for challenging when you actually serve me your designations, in a doc that's signed and dated, with complete information for your claims (like including any exhibits you're making claims about).

Your response still refuses to actually directly send me a document with your claims thats signed and dated -- the only thing you sent was to a third party and you expressly said it wasn't sent to me -- still.

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with Proton Mail secure email.

On Friday, February 6th, 2026 at 2:46 PM, Riechert, Melinda <mriechert@orrick.com> wrote:

> Ashley,

Apple followed the terms of the protective order and the process we agreed to on the record for narrowing the portions of the transcript Apple initially designated as confidential. Apple declines your request that it do more than it is required to do.

The Protective Order requires Apple to designate portions of the transcript as confidential on the record. *See* Dkt. No. 235, ¶ 5.2(b). Apple did so.

During the deposition I also told you that Apple would be willing to review the transcript upon receipt to narrow its confidentiality designations and you agreed to that process and thanked me. *See* Dep. Tr. 141:17-142:8; *see also* 343:14-344:8 (you confirm the parties will work through the confidentiality issues after receipt of the transcript). A party has thirty days after receiving the transcript to make or narrow confidentiality designations because the transcript is not final until the witness's time for correcting the transcript has expired. Here, Apple did not receive the transcript until January 7, 2026. Before then, it was impossible to narrow the confidentiality designations because Apple did not have a copy of the transcript to review. Per our agreement on the record, Apple reviewed the transcript and substantially narrowed its designations from the portion designated confidential on the record. Apple provided those designations to the court reporter and you on February 4, 2026, two days before your deadline to make corrections to the transcript. Nothing else is required from Apple.

As to exhibits marked at the deposition, they retain the same designation as when they were produced. We have not modified any prior designations.

If you want to challenge the remaining confidential designations that Apple has made, please follow the process set forth in paragraph 6.2 of the Protective Order by identifying the specific designations you are challenging and "explain[ing] the basis for [your] belief that the confidentiality designation was not proper." Apple will then review your challenge(s) and respond.

**Melinda Riechert**

Partner

Orrick

Silicon Valley



T 650/614-7423

M 650 759 1929

mriechert@orrick.com



.

[EXTERNAL]

You haven't responded so just food for thought here but you could make your client sign it. I assume their legal HR team are the ones behind these truly cutting edge and innovative designations anyways so maybe make them be the ones to put their names on it. But someone does need to sign it.

If I don't hear back the objections will treat all exhibits marked as confidential as Apple saying the entire document is confidential even if it includes protected disclosures, protected activity, or evidence of misconduct by your client and I will respond accordingly.

I will also have specific objections to Apple & its counsel's outright refusal to 1) sign or 2) date the document or 3) serve it to me directly or 4) answer my questions about exhibits and 5) send it six weeks after the deadline following the 6) use of blanket designations  w/ duration based blank check confidentiality claims 7) immediately following me exercising my labor rights under the NLRA and 8) them applying that blanket designation to my protected statements and 9) letting it marinate as an illegal gag order for six weeks before finally narrowing it at all.

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Wednesday, February 4th, 2026 at 9:08 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

> Hello,
>
> The order said you had to finalize your designations by the end of the depo and you did not do that -- instead you waited six weeks. You also still haven't served me anything signed/dated with your designations so you're not done here.
>
> I'm asking you again to send me a signed/dated version of your designations since you're sending them after the fact, and already said it wasnt even a document for me originally.
>
> Once you do that, I will send you a detailed challenge, as I noted below already.
>
> I also asked you to confirm regarding the designations for exhibits and you didn't respond to my question so please respond to my question, either in your signed/dated notice you're about to send me or at least in email.
>
> Thanks.
>
> —
>
> **Ashley M. Gjøvik**
>
> **BS, JD, PMP**
>
> Sent with Proton Mail secure email.
>
> On Wednesday, February 4th, 2026 at 8:33 PM, Riechert, Melinda <mriechert@orrick.com> wrote:
>
> > Ashley

We followed the procedures in the protective order and you should too.

**Melinda Riechert**

Partner

Orrick

Silicon Valley

T 650/614-7423
M 650 759 1929
mriechert@orrick.com

.

[EXTERNAL]

Hello,

I do appreciate you revoking the hours-long blanket claims of confidentiality, so thank you for that; however you were legally required to do that anyways and it was due like six weeks ago, hence my inherent frustration about this generally right now.

I'm going to translate your emails to mean that the document you sent to Talty is now being repurposed as your service to me of your confidentiality claims -- however the only document you've sent is not signed or

dated; nor does it provide any explanation, standard, or reasoning for the designations claimed.

If Apple's not going to provide any additional information about its reason for designations beyond whats in the document you admittedly drafted only for the contractor and not even for me, and you want to repurpose that document for party meet/confer, then I'd ask you actually serve (email) me a signed and dated copy with some lawyer actually signing it with their name.

If you had done this during the depo as the protective order required, then the depo transcript would have Melinda named as the person making the designations-- but here, there's no names, its a mystery -- which is a problem for sanctions or professional ethics complaints. (If intentional on your part, then yes, I would also be concerned about it if i were you too, since you're claiming some sort of IP rights arising from a female employee's menstruation and vaginal discharge, which is, you know, very very bad).

Once you actually serve me a signed document as your official claim of designations then yes, I can respond with formal, detailed challenges to the already challenged claims. If you can provide any further detail about the basis for your claims, ask Ive asked, it may reduce what I have to challenge, but at the very least the document needs a name, sig, and date

Please also confirm if that document includes your confidentiality claims on the documents you used as exhibits or if you are continuing to claim that all of the exhibits currently marked confidential and being designated as entirely confidentiality with no narrowing of the designated content at issue.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Wednesday, February 4th, 2026 at 6:53 PM, Riechert, Melinda <mriechert@orrick.com> wrote:

Ashley

We designated select testimony "CONFIDENTIAL" at your December 16, 2025 deposition pursuant to Section 5.2(b) of the Protective Order governing this case, and subsequently substantially narrowed those designations following our review of the transcript received on January 7, 2026, within the timeframe specified in the Protective Order.

Please follow Section 6 of the Protective Order – which should not involve the Talty team – should you wish to challenge any of Apple's designations.

**Melinda Riechert**

Partner

Orrick

Silicon Valley

T 650/614-7423
M 650 759 1929
mriechert@orrick.com

[EXTERNAL]

Apple counsel,

I sent you an email about this a few moments ago (re-adding below) and instead of replying to me, you sent your own email not addressed to me, ccing me as an observer, and you are asserting a process that does not comply with the Protective Order we signed for Discovery. That means you are in violation of that Order and refusing to comply with the process you insisted on for this case.

You need to send **me** your claims and then we are to meet/confer about those claims.

Talty Ho is not the Magistrate Judge in our case and will not be deciding the validity of claims.

Once we agree to the claims, then they should be reflected in the transcript -- and you were supposed to do this with me over a month ago.

I ask that  you send me your claims to discuss -- as of now you have expressly excluded me from your claims and are attempting to formalize your claims without my input, despite my direct request to you to meet/confer about exactly this.

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Wednesday, February 4th, 2026 at 4:32 PM, Mantoan, Kathryn G. <kmantoan@orrick.com> wrote:

> Talty CR Production Team:
>
> I write regarding the deposition transcript we received on 1/7/2026 in this matter.
>
> Pursuant to the operative Protective Order, we have reviewed the transcript and are finalizing our confidentiality designations. Attached is a chart identifying the specific portions (with citations and text)

for which confidentiality is being asserted.

Plaintiff is copied on this email for notice purposes.

Thank you,

Katie

**Kathryn G. Mantoan**

Attorney

Pronouns: she / her / hers

Orrick

San Francisco | Portland

T +1-415-773-5887
M +1-415-218-4865
T +1-503-943-4870
kmantoan@orrick.com

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

On Wednesday, February 4th, 2026 at 4:22 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello,

I'm adding Apple to this thread.

Apple's counsel,

We need to complete our review of the transcript, submit any corrections, and ensure that we don't then need more corrections based on the other party's corrections.

We also need to finalize the Confidentiality claims and ensure the record accurately represents those claims including for any exhibits. I asked you for updates on your Confidentiality claims and you said you were working on it but I have yet to see any updates from you -- and nothing to actually narrow, define, and substantiate any of your Confidentiality claims.

The deposition was nearly two months ago and during the deposition I told you to substantiate any Confidentiality claims and that I was not agreeing to any blanket Confidentiality claims.

Under the Protective Order you have a limited amount of time to substantiate your claims and if you do not, they are waived. Under that order, for this deposition, all of your Confidentiality claims would be waived by now.

However, there's probably at least a few statements/terms that are plausibly Confidential, I am still bound by the lawful/legitimate terms within the NDAs I consented to and signed, and I feel it would be proper to allow Apple to still substantiate the things that may actually be Confidential.

That said, you're already overdue and I need a timeline from you as to when you will be done and to ensure it can still be reflected in this deposition transcript.

I also ask if you're submitting any requests for corrections to this records, and if so, to please share with me what you ask for.

I also need to submit my request for corrections so please let me know if you'd like any process for that other then being cc'd or receiving a copy of what I submit to the Talty team.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Wednesday, February 4, 2026 4:40 PM
**To:** Mantoan, Kathryn G. <kmantoan@orrick.com>
**Cc:** production@taltys.com; Riechert, Melinda <mriechert@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Horton, Nicholas J. <nhorton@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Subject:** Re: (Ashley Gjovik v. Apple, Inc.)(126432) – Deposition Transcript Designations

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>

**Sent:** Wednesday, February 4, 2026 8:28 PM

**To:** Riechert, Melinda <mriechert@orrick.com>

**Cc:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Horton, Nicholas J. <nhorton@orrick.com>; Booms, Ryan <rbooms@orrick.com>

**Subject:** RE: (Ashley Gjovik v. Apple, Inc.)(126432) – Deposition Transcript Designations

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>

**Sent:** Friday, February 6, 2026 12:11 PM

**To:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>

**Cc:** Riechert, Melinda <mriechert@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Horton, Nicholas J. <nhorton@orrick.com>; Booms, Ryan <rbooms@orrick.com>

**Subject:** RE: (Ashley Gjovik v. Apple, Inc.)(126432) – Deposition Transcript Designations

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**3.99 KB**     3 embedded images

**EXHIBIT B:**
**PLAINTIFF'S FEB. 18 2026 EMAIL**

**Re: URGENT**

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Riechert, Melinda<mriechert@orrick.com> |
| CC | Ashley M. Gjovik (Legal Matters)<legal@ashleygjovik.com>, Perry, Jessica R.<jperry@orrick.com>, Mantoan, Kathryn G.<kmantoan@orrick.com>, Horton, Nicholas J.<nhorton@orrick.com>, Weaver, Nicholas<nweaver@orrick.com>, Russell, Zoe<zrussell@orrick.com>, Booms, Ryan<rbooms@orrick.com>, Stolzenburg, Mark L.<mark.stolzenburg@morganlewis.com>, Kelcey Phillips<kelcey.phillips@morganlewis.com>, Mahoney, Brian<brian.mahoney@morganlewis.com>, harry.johnson<harry.johnson@morganlewis.com> |
| Date | Wednesday, February 18th, 2026 at 1:07 PM |

Hello,

I'm also attaching my "objections" to your excessive confidentiality designations. Since you refused to send designations in a document I could easily respond to (in addition to refusing to date it, sign it, or send it to me directly) I converted it to an excel and put my responds there.

I also object that you never made designations if you never actually put them on the record or served them to me, or signed them, or dated them. Similarly there's no basis for a blanket gag order under that protective order which expressly prohibits exactly that, so Apple's actually never made any "designations" but instead has only issued unlawful work rules, threats, and coercive statements -- in addition to violating many other laws and policies and my constitutional rights.

The short story is none of your designations, even if they are designations, which they are not, are confidential and most of them are unlawful restrictions on speech, in addition to your 7-week long blanket prohibition on hours of speech which was especially egregious and illegal.

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with Proton Mail secure email.

On Wednesday, February 18th, 2026 at 12:26 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello agents of the Employer and Charged Party, Apple Inc,

Please provide me additional information about your threats, coercive statements, and unlawful work rules you are making in your email to me today, so I can include those details in the subsequent NLRB charge I now need to file today against Apple, as I previously noted in the Northern District of California filing yesterday that I would file against Apple if Apple was to proceed to do exactly what they are doing right now.

You were already served with a copy of that NLRB charge, attachments, and this warning yesterday, and so this email is clearly retaliation for that charge ((8)(a)(4)) in addition to new 8(a)(1) violations.

Thanks,
-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with Proton Mail secure email.

On Wednesday, February 18th, 2026 at 10:26 AM, Riechert, Melinda <mriechert@orrick.com> wrote:

Ashley

It has come to our attention that in violation of the protective order entered in this case and your ongoing confidentiality obligations, you have posted on X and the Internet confidential information describing Apple studies that Apple designated as confidential. Please take these down immediately and commit you will not do so going forward.

**Melinda Riechert**

Partner

Orrick

Silicon Valley

T 650/614-7423
M 650 759 1929
mriechert@orrick.com

.

| | |

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

932.75 KB   2 files attached   3 embedded images

Ashley Gjovik v. Apple Inc. - 126432 - Deposition Transcript Confidentiality Designations.xlsx 15.29 KB

CHG.32-CA-381277.Initial Charge.pdf 913.46 KB

Ashley Gjovik v. Apple Inc. - 126432 - Deposition Transcript Confidentiality Designations

| Cite Page(s): Line(s) | Apple's Designation | Apple's Justification | Objections by Employee Ashley Gjovik |
|---|---|---|---|
| 5:11 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 112:11 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 113:5 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 113:8 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 115:19 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 115:24 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 115:25 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:1 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:6 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:16 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:17 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 116:24 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 121:21 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 121:22 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 121:25 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:11 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:12 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:14 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:16 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:18 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 122:22 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 130:16 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 130:22 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 131:6 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 134:18 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |

Feb. 18 2026

Ashley Gjovik v. Apple Inc. - 126432 - Deposition Transcript Confidentiality Designations

| Cite Page(s): Line(s) | Apple's Designation | Apple's Justification | Objections by Employee Ashley Gjovik |
|---|---|---|---|
| 138:3 | Confidential | None | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development phase |
| 138:4 | Confidential | None | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development phase |
| 138:5 | Confidential | None | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development phase |
| 138:7 | Confidential | None | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development phase |
| 147:16-24 | Confidential | None | This is not "Confidential" but I agree Apple can redact this due to the sensitve nature of the comment, with the caveat that I will challenge the redacting if Apple makes claims or deffenses which make this quote material or otherwise important to have un-redacted. |
| 153:5 | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 161:6-9 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 161:21-22 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 162:6-8 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 163:16 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 164:10-11 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 164:14 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 164:15-16 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 164:25 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 165:13-24 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 166:1-2 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 166:4 | Confidential | None | This is a public brand name and there is no justification to claim it is confidential. |
| 166:14 | Confidential | None | This is a public brand name and there is no justification to claim it is confidential. |
| 167:17 | Confidential | None | This is a public brand name and there is no justification to claim it is confidential. |
| 168:19 | Confidential | None | This is a public brand name and there is no justification to claim it is confidential. |

Feb. 18 2026

| Cite Page(s): Line(s) | Apple's Designation | Apple's Justification | Objections by Employee Ashley Gjovik |
|---|---|---|---|
| 169:1 | Confidential | None | This is a public brand name and there is no justification to claim it is confidential. |
| 169:10 | Confidential | None | This is a public brand name and there is no justification to claim it is confidential. |
| 169:23 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 169:25 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 170:9 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 171:21 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 172:13 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 172:14 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 172:16 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 176:16 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 183:23 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 197:15 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. However "HWE" is an industry standard term and should not be redacted. |
| 197:17 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 197:18 | Confidential | None | This is simply the letter "N" and is not confidential. |
| 197:21 | Confidential | None | This is simply the letter "N" and is not confidential. |
| 197:23 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 198:3 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 199:10 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 200:11 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 200:24 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. However the term "Hardware" should not be redacted. |
| 203:4 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit However, the letter "A" is not confidentail and should not redacted. |
| 203:5 | Confidential | None | Its well establisheed in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| 205:4-9 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |

Ashley Gjovik v. Apple Inc. _ 126432 - Deposition Transcript Confidentiality Designations

| Cite Page(s): Line(s) | Apple's Designation | Apple's Justification | Objections by Employee Ashley Gjovik |
|---|---|---|---|
| 205:11-13 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 205:15-16 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 205:17 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 206:4-5 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 207:10-11 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 207:20-21 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 207:24-25 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 208:1 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 208:13 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 208:15 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 208:17-18 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 208:19 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 209:4 | Confidential | None | This is an industry standard term and is not Confidential and should not be redacted. |
| 209:6 | Confidential | None | This is an industry standard term and is not Confidential and should not be redacted. |
| 209:7 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 209:8-10 | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| 209:13-14 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 225:25 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 226:1 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 226:3 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |

Feb. 18 2026

| Cite Page(s): Line(s) | Apple's Designation | Apple's Justification | Objections by Employee Ashley Gjovik |
|---|---|---|---|
| 226:4 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| 236:14-15 | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i5 (351) | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. Beddit is a public brand name and should not be redacted, its not confidential. |
| i6 (352) | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i8 (354) | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i9 (355) | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| i11 (357) | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| i12 (358) | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i20 (366) | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i22 (368) | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i25 (371) | Confidential | None | This is not confidential and should not be redacted. This is an industry-wide abbreviation of a hardware development phase |
| i28 (374) | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i30 (376) | Confidential | None | This is not Confidential. However, this specific example is not material to my case nor has Apple mentioned it in the litigation, so if Apple insists on redacting it I will not object as a courtesy. I do however object to a Confidential designation. |
| i31 (377) | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. re "swimming" This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i32 (378) | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit |
| i34 (380) | Confidential | None | This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |
| i35 (381) | Confidential | None | Its well established in case law that a codename is not Confidential; but if Apple insist on redacting this text in this transcript, the Platiniff does not object to Apple's request for a redaction as a courtesy because this does not appear to be material to the lawsuit. re: Yoga, This is not Confidential. Apple's unlawful blanket and text-specific work rules about Employee's speech about work conditions violated the NLRA and is now tracked in NLRB charge 32-CA-381277, as Apple was notified on 2/17/26. This speech was protected under a variety of laws and public policy, and Apple has no justification to claim it is Confidential. Apple's desigation was unlawful, abusive, coercive, and unethical. |

# EXHIBIT C:
## APPLE'S MARCH 4 2026 LETTER



**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400
**orrick.com**

**Melinda Riechert**

**E** mriechert@orrick.com
**D** +1 650 614 7423
**F** +1 650 614 7401

March 4, 2026

***Via Email***

Ashley Gjovik
ashleymgjovik@protonmail.com

**Re:**   ***Ashley Gjovik v. Apple Inc.***
          **N.D. Cal. Case No. 23-cv-4597-EMC**
          **Meet and Confer regarding Apple's Confidentiality Designations**

Dear Ashley:

This letter responds to your challenges to Apple's confidentiality designations related to your December 16, 2025 deposition, which you provided in an Excel spreadsheet on February 18, 2026.[1]

For many of Apple's designations, you indicated you do not believe the designated material is Confidential but that you do not object to Apple redacting this information from the public record. Apple does not understand you to have made a challenge to any of these designations within the meaning of the Protective Order.

We address below the designations you have challenged.

1.   **Internal Code Names**

While you have generally not objected to Apple redacting testimony related to code names, there are a few designations that appear to be in issue.

First, you have asked Apple to de-designate certain words contained within the codenames because you contend that, on their own, those words are not Confidential. While Apple disagrees with your premise, in the spirit of cooperation, Apple will agree to de-designate the following words contained in the parentheses:

> **Willing to de-designate**: 197:15 ("HWE"), 200:24 ("Hardware"), 203:4 ("A")

Second, you contend that the following designations of a particular letter are not Confidential:

---

[1] Although neither your February 18, 2026 email nor the spreadsheet you attached recited that any challenges to confidentiality were being made in accordance with Paragraph 6.2 of the Protective Order (as that paragraph requires; *see* Dkt. No. 235 ¶ 6.2), we are treating that email and attachment from you as having been intended to initiate a meet and confer under that paragraph.

Ashley Gjovik
March 4, 2026
Page 2



**Retains Confidential designation**: 197:18, 197:21

Apple will not de-designate this challenged testimony. In context, this testimony relates to the meaning of the letter within Apple's internal code names for product development and should be treated as Confidential consistent with the other code name designations. Therefore, Apple continues to believe these designations are appropriate and should be treated consistent with the other designations related to Apple's code.

## 2. Industry Terminology

You contend the certain designations refer to standard industry terms that should not be redacted. While Apple disagrees with your position, in the spirit of cooperation, Apple will agree to de-designate this material.

**Willing to de-designate**: 138:3, 138:4, 138:5, 138:7, 209:4, 209:6, i25 (371)

## 3. Apple's Internal Studies

You contend the following designations relating to your testimony purporting to characterize certain internal Apple studies cannot be considered Confidential based on a variety of objections, including because some of this testimony relates to what you claim is protected concerted activity under the National Labor Relations Act ("NLRA"):

161:6-9, 161:21-22, 162:6-8, 163:16, 164:10-11, 164:14, 164:15-16, 164:25, 165:13-24, 166:1-2, 166:4, 166:14, 167:17, 168:17, 168:19, 169:1, 169:10, 169:23, 169:25, 170:9, 176:16, 205:15-16, 205:17, 208:1, 208:17-18, 209:13-14, 225:25, 226:1, 226:3, 226:4, 236:14-15, i5 (351), i6 (352), i8 (354), i12 (358), i20 (366), i22 (368), i28 (374), i31 (377) ("swimming"), i34 (380), i35 (381) ("yoga")

Apple disagrees with your contention as well as your suggestion that the NLRA dictates whether and to what extent the federal court overseeing your wrongful termination suit against Apple can properly order that discovery material from that case be treated as Confidential. As an initial matter, the NLRB has already determined that your revealing "confidential product development information about [an Apple] study" is not "protected activity" under the NLRA. Sept. 25, 2025 Order Withdrawing Certain Allegations of Consolidated Complaint, Order Partially Dismissing Charge 32-CA-282142, Order Dismissing Charge 32-CA-283161 and Notice of Right of Appeal (Sept. 25, 2025) at 2. And in any event, Apple disputes any suggestion that the NLRA somehow overrides or voids basic procedural rules that govern litigation in federal court, including those related to protective orders. *See, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 499, 515 (2018); Fed. R. Civ. P. 26(c) (protective order may appropriately "requir[e] that … confidential research, development, or commercial information not be revealed or be revealed only in a specified way").

You also contend that this testimony is protected under "a variety of laws and public policy." This vague catch-all is not a meaningful attempt to meet and confer. Assuming the "laws and public policy"

Ashley Gjovik
March 4, 2026
Page 3



you are referencing relate to what you assert are your privacy rights, you are again incorrect. Apple did not ask any questions about your personal physiology or any private matter. Nor did your responses relate to your personal physiology or any other private matter. Instead, the testimony related to internal Apple studies, the majority of which you chose not to participate in. Whether you disagree with Apple's decision to conduct those studies, or how Apple conducted them, is irrelevant to determining about whether the subject matter and processes of those studies are properly designated as Confidential under the Protective Order.

Some of these designations you object to on the basis that they are public brand names; however, that ignores that the context of the discussion relates to the content, methods, or processes of internal Apple product-related studies.

However, in the spirit of cooperation Apple is willing to compromise and agree to de-designate certain of the citations referenced above—namely, all those that are not included in the following list:

> **Retains Confidential designation**: 164:10-11, 164:14, 164:15-16, 164:25, 165:13-23 (de-designating only ", and I found that very disturbing."), 166:1-2, 166:4, 166:14, 167:17, 168:19, 169:1, 169:10, 169:25, 170:9, 176:16, 205:17, 225:25, 226:1, 226:3, 226:4, 236:14-15, i5 (351), i6 (352), i8 (354), i20 (366), i22 (368), i28 (374)

Apple will not de-designate these challenged portions, which reflect your characterization of the content, methods, and processes of certain internal Apple product-related studies.

## II.    CONCLUSION

Please advise if you agree to the narrowed list of designations set forth in this letter, or if you continue to challenge any or all of Apple's designations (and, if so, which ones).

To be clear, Apple's designations do not prohibit you from relying upon this testimony in support of your case. Indeed, Apple's confidentiality designations and the Protective Order entered by the Court simply require certain procedural safeguards to be utilized (*e.g.*, a motion to seal) to ensure that Confidential information is not publicly disclosed.

Please let us know if you agree with the above compromises. We look forward to your response and hope to resolve these issues without the need for further motion practice. In the interim, the Protective Order requires you to treat the material Apple has designated Confidential as such, until such time as the Court rules otherwise. You must comply with the Court's Order while this process plays out.

Very truly yours,

*Melinda Riechert*

Melinda Riechert

**EXHIBIT D:**
**NLRB CHARGE 32-CA-381277**
**PLAINTIFF'S COVER LETTER**

**Ashley M. Gjovik, JD**
*In Propria Persona*
San Jose, California
2108 N St. Ste. 4553
Sacramento, CA, 95816
legal@ashleygjovik.com

# UNITED STATES

## NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **Ashley M. Gjovik,** *an individual,*<br><br>Charging Party,<br><br>&<br><br>**Apple Inc.,** *a corporation,*<br><br>Charged Party. | Case No. _____<br>**Respondent: Apple Inc.**<br><br><br>**NLRB CHARGE COVER LETTER** **Feb. 16 2026** |

# UNFAIR LABOR PRACTICE CHARGE COVER LETTER

**RE: UNFAIR LABOR PRACTICE CHARGE AGAINST APPLE INC.**

**Charging Party**: Ashley Gjovik

**Charged Party:** Apple Inc., One Apple Park Way, Cupertino, CA 95014

## I.    INTRODUCTION

1.    On Feb. 16 2026, I filed a new unfair labor practice charge against Apple Inc. alleging violations of Sections 8(a)(1) and 8(a)(4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (a)(4). This filing presents TEN COUNTS:

2.    Regarding the DECEMBER 16 2025 DEPOSITION, the Employer ordered:
- (1) Retaliatory gag orders about and following Protected Concerted Activity;
- (2) A **seven-week** long gag order and prohibition on Protected Concerted Activity;
- (3) Unlawful work rules issued through confidentiality designations of deposition testimony about working conditions, discussing of Protected Concerted Activity, and the subject of NLRB charges/cases;
- (4) Continued threats and enforcement of rescinded confidentiality and work policies (including the IPA, Misconduct and Discipline policy, and others) and in retaliation for Protected Concerted Activity.
- (5) Issuance of work rules and enforcement of prior work rules in violation of the April 2025 National Settlement Agreement in Case 32-CA-284428 (again);
- (6) Unlawful work rules conditioning the right to protest or discuss the employer's unlawful surveillance on whether the coworker was also subjected to the same unlawful conduct by the employer;
- (7) Accusing the employee of "leaking" to a coworker when the employee and coworker were expressly discussing ways to improve work conditions;

3.    Regarding THE EMPLOYEE'S EMPLOYMENT, the employer conducted:
- (8) Years of unlawful surveillance of the employee through "whitelisting" of the employee's personal device for continuous 24/7 audio, video, biometric, and GPS capture, only recently admitted to the employee and while claiming the actions were lawful and it was misconduct for the employee to protest;

4.    Regarding THE TERMINATION OF THE EMPLOYEE'S EMPLOYMENT AND ONGOING DENYLISTING:
- (7) Threatening to cite the employee's subsequent employer's termination of the employee's

employment in order to deny the employee remedies for this employer's unlawful retaliation and in further retaliation for the employee's protected activity, after the employer ordered that subsequent employer to terminate the same employee, and the subsequent employer did terminate the employee, driving the employee in Chapter 7 bankruptcy and homelessness.

Regarding THE EMPLOYEE'S PARTICIPATION IN BOARD PROCEEDINGS:

- (10) Declaring the employee's only recourse for NLRA violations is "confidential" memos to the Charged Party, and "sealed" escalations to a Magistrate Judge; banning the employee from filing NLRB charges.

This charge is filed on February 16, 2026, within the six-month limitations period under Section 10(b) for all allegations.

1. **COUNT: RETALIATORY GAG ORDER IMMEDIATELY FOLLOWING PROTECTED CONCERTED ACTIVITY DISCUSSING THE SETTLEMENT AGREEMENT**

5.      During the Dec. 16 2025 Deposition I exercised my rights under the NLRA, repeatedly mentioned the NLRA, and repeatedly objected to the Employer's line of questioning as potential violations of the NLRA.

6.      The Employer then responded by declaring anything I said going forward was now "*Confidential*" indicating I could face Contempt of Court and Sanctions if I was to share the Employer's questions or the content of my statements with anyone else including coworkers, the public, or the NLRB. Part of this exchange is at Exhibit A and an excerpt is below:

- Employer:  "...I'm asking you now whether you understood that conduct warranting immediate termination could include violating confidential... information obligations...."
- Me: "Asked and answered. · I already said I don't understand that."
- Employer: "You did not understand that that was a policy violation?"
- Me: "Well, I understand that it's on the policy as written, as stated, but I don't understand what it means."
- Employer: "You don't understand what it means to violate your confidential... information obligations?· Is that what you're saying?"
- Me: "Asked and answered.· I already said I don't. And [objection, the] NLRB... said those terms were unlawful and that Apple could no longer enforce them and had to withdraw them from their policies."
- Employer: "I'm going to designate the next section of this deposition as

confidential pursuant to the protective order. Any... testimony you give until I say it's not confidential pursuant to the protective order is going to be covered by the protective order.· Do you understand that?"

- Me: "No.· How can you claim that my statements are confidential if what I said is not confidential?"
- Employer: "...I'm designating this as confidential pursuant to the protective order.· And if you disagree, then follow the procedures in the protective order."
- Me: "... But, Melinda, I don't think you can just say -- you don't know what I'm going to say and if I say stuff that's clearly not confidential, you just can't proactively say it's confidential.... You can't just proactively say that something is confidential when I'm actively talking about the NLRA saying that Apple is misusing confidentiality terms... to hide protected statements and then you're saying whatever I say next is under a confidentiality order without knowing what I'm going to say.· That's not right, Melinda.· I object."
- Employer: "...The following portion of the deposition is designated as confidential pursuant to the protective order."

[Exhibit A].

## 2. COUNT: UNLAWFUL SEVEN-WEEK GAG ORDER

7.      Apple abused the Protective/Confidentiality Order in the civil lawsuit to declare Protected Concerted Activity was "confidential" and to put a six-week gag order on me about my Protected Concerted Activity, Apple's NLRA violations during that deposition and prior, and Apple's misuse of the Court's order.

8.      This was the same Order that Apple insisted on having in the civil litigation, for which I objected in that litigation, escalated to the US Judge, requested injunctive relief from the Ninth Circuit to block, and for which I filed a Charge with the NLRB about, certain that Apple would use it to restrict my Protected Concerted Activity and to violate the NLRB Consent Agreement.

9.      During the deposition, Apple responded to my objections and my exercise of my rights by asking for a Court to waive Apple's liability for its plan to engage in such severe harassment of me in that litigation that Apple believed it would drive me to commit suicide. Apple's lawyer indicated it was Apple's lawyer "job" to harass me

to the point of suicide.

10. Apple further asked the Judge to order me not to complain about Apple's harassment that could cause me to kill myself or to communicate if I want to kill myself. The Judge then ordered me to not express "emotions" and consoled Apple for their distress about hearing my objections to their conduct while they engaged in conduct they themselves admitted on the record they thought would foreseeably drive me to commit suicide. Apple then demanded a confidentiality order to censor my speech about my protected disclosures and their misconduct, and applied it to my Protected Concerted Activity.

11. Apple has now used this Protective Order (that the same Judge then pressured me and coerced me to "stipulate to" against my will, at the same time the statements above were made about driving me to suicide), to declare that roughly 72% of Appe's deposition of me was considered by Apple to be "Confidential." (pages 65-234 were marked confidential, with the entire transcript ranging from page 8 to page 344, and totally 336 pages).

12. Apple's lawyers repeatedly argued it had a right to pre-declare an entire portion of the deposition to be confidential regardless of what was said, and that any objection I had must go through the "Protective Order" process after the fact. When I objected during the deposition and insisted Apple's counsel follow the rules, Apple's counsel declared I was being uncooperative, and instead I must continue as Apple ordered. Apple finally agreed to narrow their claims but only after the fact, and they took seven weeks (50 days). All of Apple's conduct violated the Order.

13. The Protective Order expressly said that "for testimony given in deposition... the Designating Party identify on the record, before the close of the deposition...  all protected testimony" (5.2(b)) however, any designation must be limited "to specific material that qualifies under appropriate standards... so that other portions of... communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order." (5.1). The Order further states "mass,

indiscriminate, or routinized designations are prohibited." (5.1).

14. Apple insisted that it was authorized by the order to declare anything said from that point on was "Confidential," use that Confidentiality claim on over 70% of the deposition, and leave that claim as a gag order for 7 weeks, covering content that ultimately 99% of which even Apple admitted was not confidential. Apple finally produced its list of narrowed Confidentiality designations on Feb. 4 2026, seven weeks (fifty days) later. Until that point, Apple claimed that entire 72% of the deposition transcript was Confidential on par with Trade Secrets and proprietary information.

### 3. COUNT: PROHIBITION ON DISCUSSING WORK CONDITIONS RELATED TO EMPLOYER STUDIES ON GENITALS, SEXUAL INTERCOURSE, AND BODILY SECRETIONS

15. The "narrowed" confidentiality claims that Apple communicated on Feb. 4 2026 were on a six-page PDF that was not dated or signed and which Apple refused to email to me directly. They emailed it to the Court Reporter and said it was for "my awareness." When I demanded they serve me a copy directly, and sign and date it, they refused. I asked multiple times and they would not sign or date it, or send it to me directly, but did claim that was Apple narrowing its Confidentiality claims.

16. Apple also insisted my only recourse was to write them a memorandum arguing why I do not think Apple's claims are justified and why I think each disputed item is not confidential, and if we do not agree, Apple will escalate the matter to the Judge who coerced me to enter that Protective Order while currently issuing a gag order against me to not have "emotions" and to not complain or warn anyone if Apple was to drive me to suicide. This same Judge has denied every request I've filed and found in favor of Apple for everything Apple has requested.

17. Apple's recent confidentiality claims included a final list of over 140 items—including clearly arbitrary terms like the letter "N" and the term "hardware," immaterial codenames, and general engineering development phrases – none of which is confidential, but is also not material to this matter or the retaliation case and

accordingly is not raised here.

18.    What is material here is Apple is claiming the very subject matter of my Protected Concerted Activity is "confidential." Additionally, many of the terms Apple is claiming are "confidential" are highly sensitive, personal, and protected subject matter under a variety of other laws including the terms: "

19.    Examples of deposition transcript content that Apple designated was "confidential" for seven weeks, and then expressly claimed terms and the subject matter was "confidential" include:

### NLRA Violation, Example One:

- Employer: (did you tell your manager you didn't want to do that study?)
- Employee "…I was complaining more generally of, like, Apple is doing some really invasive stuff that seems weird.· Like when they were doing the ovulation study or they were asking females to measure our cervical mucus.· I was pointing out, like, I think Apple is crossing some lines --
- (Court Reporter asks for clarification)
- Employee: "They were doing ovulation studies where they were measuring female employees′ cervical mucus, and I said I think that′s too far.
- Employer: "….Were there other studies that you were asked to participate in that you said, no, thank you?"
- Employee: "Yes.· There was one that I had signed up for and pulled out because I didn't realize the terms until it was underway and it bothered me, … it′s a sensor on the bed where you're sleeping and it′s monitoring your vitals… But Apple asked for NDAs of any cosleepers.· So if you were to ever have anyone over like if you were dating and wanted to have sex with them or they're going to sleep in your bed, they had to get registered with Apple and sign an NDA … if they were to be there, and I found that very disturbing."

**Deposition Transcript pages 164-165 (entirely "confidential" for 50 days).**
Apple's active confidentiality claims include: **"ovulation study or they were asking females to measure our cervical mucus," "ovulation," "measuring female employees′ cervical mucus,"** and **"ovulation."**

### NLRA Violation, Example Two:

- Employer: "Was there anything else you said to [Supervisor] about your unhappiness with studies that Apple was doing?"
- Employee: Yeah.· I think it was generally just kind of like a --  we need a boundary here of what  --

- because, you know, I would do a lot of the LiveOn on, like, … And that's a lot different than my employer asking to request status of my cervical mucus.· And so it was kind of, like, I feel like we need to sort as a company what we're doing here generally and using myself as kind of case study of my reaction to some of those requests.· But as -- I don't remember them ever really doing anything different, and I remember even making privacy, kind of, invasion complaints even I think, like, in May 2021 –"

- Employer: "Way beyond my question."

**Deposition Transcript pages 170. (entirely "confidential" for 50 days).**

Apple's active confidentiality claims include: "<span style="color:red">**my cervical mucus**</span>"

### <u>NLRA Violation, Example Three:</u>

- The Employer asked me about my protests about the ear scans: "what did you feel invasive about an ear scanning study?"
- Employee: Ears are very personal, and they are an -- they're an orifice.· You know, it's a bodily orifice.· It's kind of like the mucus – the cervical mucus secretion.· Not as bad as that one, but it's like that -- that's something that's so personal that it doesn't seem appropriate for an employer to ask.· And because I participated in these studies, I know that it involves pressing up against my body, putting things, like, on my body. Things where I'm like -- like I mentioned earlier, physically  uncomfortable during the process, even somewhat painful.· And like the thought of – and they can last a long time.· So, like, the thought of Apple spending a bunch of time scanning, like, the inside of my ears and my ears made me have a visceral reaction that I didn't want that.· And that I was also why I just -- I said no.· That was one of the very few things I said no expressly in email. I said no.· I think I made an excuse, like, I'm too busy, but I'm not going to do that.· And then Apple wanted to keep -- they're going to keep these images of our ears.· And they bragged publicly earlier that they had the biggest, like, ear library in the world, and that was concerning to me.· It's concerning to me that they'd brag about that, and I don't want my ears in their giant ear library.· You know, like, my ears are personal to me.· I don't want them to just be in a library of ears.
- Employer: "Okay."
- Employee: "And because I had said no and they asked three times in a very short period of time, I was -- I was wondering why are they asking me so much, and it looked like it was going to an email group, but you don't really know who is on what group.· And so I was -- I was disturbed about them still wanting to scan my ears.
- Employer: Do you agree that posting these emails was a breach of your confidentiality agreement with Apple?
- Employee: No, I don't agree.
- Employer: And why not?

- Employee: ...None of this is -- none of that was even secret information.· And I was complaining about something that I thought was an invasion of privacy.· I have a constitutional right to privacy in this great state of California where I can protest about my employer trying to invade my privacy...   And I wanted them to stop doing this kind of stuff, and this was the exact same time I was calling out other conduct and systemic issues at Apple that I did not approve of and wanted them to reform on, and so this fit with me trying to call out stuff that I thought crossed a line....”

**Deposition Transcript pages 236-238). (entirely “confidential” for 50 days).**
Apple's active confidentiality claims include: “**<span style="color:red">mucus -- the cervical mucus secretion</span>**”

20.    Apple claimed confidentiality and some sort of business interest/ownership rights to my own testimony, my own words, describing my complaints about invasive workplace practices directed at me and my coworkers' bodies, my organizing activity with and on behalf of coworkers, my protected disclosures and advocacy, and my genital secretions and sexual activity.

21.    Apple does not own my vagina, has no legitimate interest in who I have sex with, and its outrageous Apple would even imply it could make these claims, let along expressly argue these claims on an unsigned PDF and demand I be the one to argue why Apple employees' genital secretions are not Apple Confidential.

### 4. COUNT: CONTINUED ENFORCEMENT OF RESCINDED POLICIES

I filed NLRB charges (Case 32-CA-284428 and related cases), resulting in a General Counsel complaint and national settlement. I filed a federal retaliation lawsuit where I invoked NLRA and other rights during the deposition. All of this is protected under Section 7 and Section 8(a)(4).

Apple's counsel interrogated me at deposition about the policies and terms they claimed they had rescinded and would not enforce, whether I was “permitted” or “authorized” to discuss work conditions with coworkers, whether talking about work conditions was a “breach of [my] confidentiality obligations,” and whether my coworkers were “whitelisted” by Apple to communicate with me about work

conditions. I objected and repeatedly reminded Apple about the rights their employees, including me, having under the NLRA and warned the attorney that she appeared to be repeatedly violating the NLRA in her questioning.

Apple's lawyer then declared 72% of the deposition was "confidential" for seven weeks, and then claimed my cervical mucus was Apple Confidential and the burden was on me to argue why it was not, and then we could raise the dispute Apple ownership of its facts around its employee's cervical mucus to the Judge who already issued an implied gag order against me to not have "emotions" while Apple pursued its plan to drive me to suicide.

Apple's questioning and conduct regarding the deposition and protective order enforces the prior secrecy, coercion, and confidentiality framework Apple agreed to rescind in the April 2025 settlement. Apple is exploiting the Court's deference to an extremely powerful, local corporation in a very public and closely watched lawsuit to threaten its employees and chill their protected activity through its ongoing harassment of the Charging Party.

## 5. COUNT: VIOLATION OF THE SETTLEMENT AGREEMENT

22.    As stated above and below, Apple also issued new work rules that clearly violate the terms of the Settlement Agreement, including:

- (1) Revised IPA, Appendix A, § I(C): "[N]othing in this Agreement restricts Your right to... discuss or disclose information about Your or others' wages, hours, or working conditions." Apple designated my testimony about my working conditions as confidential.
- (2) Notice: "WE WILL NOT advise you that you are subject to discipline for violating overly broad rules regarding confidential or proprietary information." Apple's counsel asked me under oath whether discussing working conditions was a "breach of your confidentiality obligations."
- (3) Additional Terms: "The Charged Party agrees that it will not enforce the definition of Proprietary Information... to the extent that such definition covers terms and conditions of employment." Apple's designations enforce that definition through a different mechanism.
- (4) Catch-all: "WE WILL NOT in any like or related manner interfere with your rights under Section 7."

Violation of a settlement agreement resolving 8(a)(1) charges is itself an independent 8(a)(1) violation. The settlement's Performance provision provides that upon non-compliance, the Regional Director will reissue the October 3, 2024 complaint, the allegations will be deemed admitted, Apple's answer deemed withdrawn, and the Board may enter a full remedy order without trial. A Court of Appeals judgment may be entered ex parte.

23. The settlement was the Board's remedy for Apple's unlawful confidentiality policies. If Apple can reimpose the substance of those policies through a protective order designation in any employee litigation and without consequence, the settlement is a nullity. Every Apple employee who saw the settlement notice and believed the rules had changed is now learning that they have not.

24. As noted, I also previously filed a charge with the Board alleging that Apple violated the April 2025 settlement agreement through its litigation conduct in this same federal case. The Region and Compliance Office, declined to investigate or take action on that charge, and refused to state any findings in writing. This was after Apple's own defense counsel was appointed to be the new NLRB General Counsel.

25. The Region's prior refusal to act has emboldened Apple. Since the Region declined to investigate the first reported violation, Apple's conduct has escalated: Apple now designates the word "cervical mucus" as its confidential business information and interrogates former employees under oath about whether discussing working conditions with coworkers was a "breach of confidentiality obligations." The trajectory is clear. Each time the Board declines to enforce its own settlement, Apple pushes further. This charge presents the Board with a choice: enforce the agreement it brokered, or watch it become a nullity and see just how far Apple will go.

### 6. Count: Unlawful Surveillance

26. Apple was surveilling me at all times, including all Section 7 activity conducted through or in the presence of my personal phone: conversations with coworkers about working conditions, communications with the NLRB, communications

with journalists, organizing discussions, and personal conversations outside work touching on employment concerns.

27. Apple placed my cell phone and my personal iCloud account on a "whitelist", causing it to continuously capture and automatically upload photographs, video, audio recordings, biometric data, and GPS location whenever the camera detected a face—24/7 including outside the workplace—without any prior review or consent, but lied for years that I consented and was approving uploads.

28. This was not limited to work hours or Apple premises. The device recorded in my home, including images of me in states of undress. This also violates the federal Wiretap Act, 18 U.S.C. § 2511 (interception of communications without consent), Cal. Penal Code § 632 (felony recording of confidential communications), Cal. Penal Code § 647(j) (invasion of privacy), and other statutes. Apple also obtained dismissal of my related state-law claims by representing it was not doing exactly what it was actually doing.

29. Section 8(a)(1) prohibits employer surveillance that would reasonably tend to coerce employees in the exercise of Section 7 rights. See *Nat'l Steel & Shipbuilding Co.,* 324 NLRB 499 (1997); *Aladdin Gaming, LLC*, 345 NLRB 585 (2005). Continuous 24/7 audio and video capture from an employee's personal device—recording conversations with coworkers, the NLRB, journalists, and family—is surveillance that would chill any reasonable employee from exercising Section 7 rights. The federal Wiretap Act violation is an aggravating factor the Board may consider.

30. An employee whose personal phone is recording and uploading everything cannot freely discuss working conditions with coworkers, contact the Board, or communicate with journalists. Once the data is captured, its also collateral and inherently coercive. The surveillance captured the full scope of Section 7 activity—including the protected disclosures and organizing that are the subject of this litigation. I became aware of the QA whitelisting and its implications within the past six months, as Apple withheld this information for years and only recently admitted it, and so I file this charge within a tolled Section 10(b) limitations period.

**NLRB | Charging Party's Cover Letter | Feb. 16 2026 | Page 12**

### 7. COUNT: UNLAWFUL WORK RULES RELATED TO ORGANIZING WITH COWORKERS ABOUT WORKPLACE SURVEILLANCE

31.    I discussed Apple's surveillance practices with a coworker as part of organizing efforts to improve working conditions. I testified that we were "organizing together" "making Apple better" and that sharing information about invasive workplace practices with a fellow employee was "absolutely NLRA... protected concerted activity of coworkers trying to make a better workplace." This included "my protest that Apple was requesting us to share all of our medical records directly with Apple if we were to request disability or ADA accommodations." (Deposition transcript page 295-296).

32.    Apple's counsel asked repeatedly whether my coworker was "whitelisted" to talk about work conditions with me—establishing a rule that an employee may only discuss the employer's surveillance with coworkers who were also subjected to the same surveillance. The premise is that a coworker who was not "whitelisted"—i.e., not also subjected to criminal surveillance—has no right to receive information about it, and that sharing it with her is a confidentiality breach. Apple then designated my testimony about sharing this information as confidential. This creates a work rule: discussion of the employer's criminal surveillance is permitted only among its victims, and discussing it with any other coworker violates confidentiality obligations.

33.    Section 8(a)(1) prohibits rules that condition the exercise of Section 7 rights on employer authorization. An employee's right to discuss working conditions with coworkers does not depend on whether the employer "whitelisted" the listener for the same labor violations. The right to discuss working conditions is unconditional under Section 7. A rule that permits discussion of employer misconduct only among its victims—and treats discussion with anyone else as a confidentiality breach—is an unlawful work rule restricting Section 7 activity.

- Employer: "Do you agree that sharing this information with [coworker] was a breach of your confidentiality obligations with Apple?"
- Employee: "Absolutely not."
- Employer: "Why not?"
- Employee: :One, [coworker] was an active Apple employee."

**NLRB | CHARGING PARTY'S COVER LETTER | FEB. 16 2026 | PAGE 13**

- Employer: "…Do you believe you were able to share confidential information about Apple with all Apple employees?"
- Employee: "Confidential is a broad term I don't understand.· But second, some of this stuff was highly protected.· This includes naked photos of me. I shared –"
- Employer: "I'm just asking you a question.· Do you agree that sharing this information with [coworker] was a breach of your confidentiality obligations…?.. "Do you believe that you were entitled to share all confidential information you got from Apple with all Apple employees?..."
- Employer: "….Where is the naked photo?..."
- Employee: "….the AI is just taking photos whenever it thinks it sees a face.· It doesn't care if you're topless…   I had photos it was taking that include my nipples and other parts of my naked body."
- Employee: "….And then -- what was I saying?· Why it was -- oh, because we were organizing about work conditions.· I was protesting this and said I don't like this.· I want Apple to stop.· And if she was organizing with me at that time  … trying to help improve our work conditions, then sharing this with her for her understand -- and she seemed very upset about this as well -- was absolutely NLRA, the National Labor Relations Act, and California Labor Law, protected concerted activity of coworkers trying to make a better workplace for themselves and their other coworkers.· And whistleblower disclosures that something is going on that seems unethical or unlawful, and there's nothing in here that's trade secret and other reasons…."
- Employer: "Do you know if [coworker] was whitelisted…"
- Employee: "I have no idea."
- Employer: "But you had no reason to believe that she was whitelisted
- Employee: "It's a very, like, weird question.· I don't know how to answer your question."
- Employer: "Okay.· Well, you couldn't answer my whitelisted question.· You were totally incapable of [answering] it."
- Employer: "Do you have any reason to believe that you were permitted to share [work condition] information with [coworker]?·
- Employer: "….So I don't know how to answer that question with the "permitted" term."
- Employer: "Okay.· You don't know what "permitted" means?"
- Employee :"I don't know what "permitted" means."
- Employer: "How about allowed?· Is that any better? A-L-L-O-W-E-D?"
- Employee :"No."
- Employer: "Okay.· Don't know what "permitted" and "allowed" mean. · · · · Okay.· Are Apple employees allowed to share confidential information with Apple – Apple employees who are not … who are not whitelisted to receive the confidential information?"
- Employee :"I don't know what "allowed" or "whitelisted" means in your question."
- Employer: "Okay."

**Deposition pages 298-305. (entirely "confidential" for 50 days).**

34.    Apple's rules and threats isolate victims of employer misconduct from the coworkers best positioned to help them. Apple declares that an employee who discovers her employer is illegally recording her, and taking naked photos of her, can only discuss it with other employees who are also being illegally recorded and having naked photos also taken of them—and those employees may not know they're being recorded, and if they do know they may be horrified about it, so the practical effect is silence. It conditions the right to discuss working conditions on the employer's own authorization, which must accompany the employer surveilling the employee and hoarding nude photos of that employee, which is the antithesis of Section 7 and closer to a sex cult then corporate employment.

### 8. Count: "Leaking" Work Conditions to Coworkers

35.    See above.

### 9. Count: Termination of Subsequent Employment with another Employer ordered by the Prior Employer

36.    Recent actions and statements have made it clear that Apple was directly involved in Northeastern University's termination of my employment in the autumn of 2024. I suspected this for some time and accused Apple of it prior, however only recently did Apple implicitly confirm this.

37.    Apple provided me notice it intended to subpoena extensive employment records from Northeastern University to use as evidence against me in the Apple retaliation litigation and adjudication. Apple knows there is an NLRB case against NEU and that I allege retaliation for numerous types of protected activity including opposing what amounted to be systemic federal grant fraud by that university. Apple indicated it would request records from NEU to made it look like I was at fault and use my protected activity at NEU in its defense in the Apple litigation.

38.    I complained to Apple again that based on the timing and extremely suspicious circumstances of that termination, I was certain Apple was behind the second firing, and if Apple sent the subpoena they threatened, I would then subpoena NEU's lawyers for any communications with Apple or Apple's lawyers.

39.     Apple then dropped that matter completely and has not raised it again. Apple has not said a word about it since I assured them I was certain there would at least be phone call records between these entities leading up to the abrupt notice of termination while I was on protected medical leave, which had just been extended by NEU and made the termination absurd. Apple's silence confirms their culpability.

### 10.    COUNT: PROHIBITING THE EMPLOYEE FROM FILING NLRB CHARGES

40.     Under *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959), when activity is arguably subject to Section 7 or Section 8 of the NLRA, federal courts must defer to the exclusive competence of the Board. Under *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976), the Board's preemptive jurisdiction extends to conduct that Congress intended to leave unregulated as well as conduct it intended to regulate.

41.     The federal district court lacks jurisdiction to determine whether Apple's designation of testimony about Section 7 activity as confidential constitutes interference with NLRA rights. That determination belongs exclusively to the Board.

42.     Accordingly, Apple's insistence that my "only option" is to argue to Apple and the Judge who indicated she doesn't care if kill myself as a result of Apple's conduct, and that I have no other recourse for Apple's misconduct, is also a violation of the NLRA.  Apple's statements indicate that I am not "allowed" to file an NLRB charge over their confidentiality designations because they say the non-consensual Protective Order somehow stripped the NLRB of jurisdiction and/or is a gag order on me from reporting NLRA violations to the NLRB – but none of that is true.

43.     The opposite is true. If Apple violates the NLRA, and interferes with Board proceedings, then Garmon preemption removes the federal district court's jurisdiction to review the matter at all. Accordingly, Apple's directive to not file charges to the NLRB and only route complaints to a venue with no jurisdiction to adjudicate them, is Apple illegally prohibiting me from filing NLRB charges.

44.

## II. CONCLUSION

45. This Cover Letter is filed in support of the Feb. 16 2026 Charge.

46. In addition, a detailed Legal Memorandum will be subsequently filed as well with additional exhibits and evidence.

47. The alleged violations in this charge are clearly within the scope of the NLRA. Apple's unlawful conduct during and related to the deposition occurred as part of a civil lawsuit, but directly arose out of NLRA activity, interfere with NLRA rights, and threaten to interfere with NLRB proceedings.

48. My disclosure here of the subject matter of Apple's claims to confidentiality may cause Apple to escalate and even seek sanctions against me for violating their protective order. If Apple does such a thing, then an additional NLRB charge will be filed to capture the continuing violations of the NLRA by Apple.


Respectfully submitted,


**/s/ Ashley M. Gjovik**
*Pro Se Charging Party*
San Jose, California
Dated: Feb. 16 2026

# EXHIBIT A

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

leak, that we had to report it.  I reported it.

But, again, like even the -- the first sentence of

that email says "not sure how much this matters,"

and then I reported it anyways.

Q.  And you reported it because you thought it

might be a breach of their confidentiality

obligations to Apple; correct?

A.  Yeah.

MS. RIECHERT:  Mr. Videographer, if you

could mark as Exhibit Number 6, tab 6-02 Apple's

misconduct and discipline policy.

THE VIDEOGRAPHER:  Exhibit 6.

(DEPOSITION EXHIBIT 6 WAS MARKED.)

THE WITNESS:  Okay.  It's open.

BY MS. RIECHERT:

Q.  Looking at Exhibit 6, which is Apple's

misconduct and discipline policy, do you agree that

that is a copy of Apple's misconduct and discipline

policy?  And because you asked me to do that before,

I would note that on the bottom right-hand corner

are Bates numbers that were placed -- we believe

were placed on this document by you.  These were

documents produced by you.

A.  Oh, I see, yes.  And the timestamp on the --

this one has a timestamp.  The business conduct



**TALTY COURT REPORTERS, INC.**        **56**
408.244.1900 - www.taltys.com

DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

policy didn't have a timestamp.  This timestamp

matches when I downloaded this document, and this is

an exhibit in the NLRB case with the settlement

agreement I mentioned.

Q.  The question is do you agree that this was a
policy that was in effect during your employment at
Apple?

A.  What does "in effect" mean?

Q.  That it was in existence.

A.  Yes.  This policy was in existence at my
time at Apple as of the date I downloaded it, which
is dated on the document as May 4, 2021.

Q.  And do you agree that you were aware of this
policy at the time you downloaded this document on
May 4, 2021?

A.  Yes.

Q.  And you read it during your employment at
Apple; correct?

A.  The policy we're looking at -- all I know
is -- existed as worded as of May 2021.  Apple might
have had different versions earlier, and I don't
have copies of the prior policies from, like, 2015.
But I know that this definitely existed in May of
2021.

Q.  And you understood it; correct?



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

A.  That's broad.  Can you be more narrow in your question?

Q.  Did you understand the policy when you read it and downloaded it?

A.  Yeah.  What does "understand" mean?

Q.  Know what it means.

A.  I'd say no.  And that was one of the reasons -- so I was downloading -- I downloaded a bunch of policies at that point.  I had become very concerned that they were unlawful, and I had been making statements about that with coworkers and on Slack, and that was when I started --

Q.  But you've gone beyond the question.  My question is did you understand this policy when you read it and downloaded it on May 4, 2021?

A.  That's what I was going to say.  I didn't -- the terms were so broad.  One of the reasons it was flagged for me --

        (Reporter asks for clarification.)

BY MS. RIECHERT:

Q.  The question is did you understand it or did you not understand it?

A.  No, I didn't understand it.

Q.  Okay.  Which parts of it did you not understand?



**TALTY COURT REPORTERS, INC.**                58
**408.244.1900 - www.taltys.com**

A.   These are -- I can go through the terms and a lot of these terms were flagged in my complaint to NLRB about this particular policy --

Q.   You're going way beyond my question.  The question is --

A.   I know.  You're asking what I didn't understand.  I'd like to answer that question.

Q.   Okay.  Which terms did you not understand? I don't need to talk about the NLRB.  I just want to know which terms you did not understand.

A.   Appropriate is vague and over -- so terms that I feel are vague and overbroad in such a way that you cannot understand what is actually being requested and which likely become unlawful that they are so overbroad because they restrict protected behavior and conduct are terms appropriate, behavior, policies, guidance, ethics, discretion, appropriate, guidelines, not limited to, warnings.

(Reporter interruption.)

THE WITNESS:  Can you see me?  I turned my video off so I wasn't just staring at me.  Can you see me here?

THE VIDEOGRAPHER:  Yes.

BY MS. RIECHERT:

Q.   If you don't want to look at yourself in the



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                    December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

video.  I can take yourself --

A.  I did, but then she said she can't see my face, but then I couldn't see where my face was.  So I was concerned she couldn't see my face.

Conduct.  Let's see, not limited to, policy violations, confidential, proprietary.

Q.  You didn't understand what those words meant is what you're telling me?

A.  Uh-huh.  I'm still going.  Oh, using Apple equipment for electronic resources because that to me also meant, like, our personal iPhones or computers too.  It was very unclear.

Q.  I withdraw that question, and I'm going to ask you another question.

Did you --

A.  I still have more though.

Q.  I understand.  I'm just going to withdraw that question.

Did you understand that this policy said that it was a policy violation for you to violate your confidential proprietary information -- proprietary and trade secret information obligations, including those stated in Apple's intellectual property agreement?

A.  So you're referring to under policy



violations, the first bullet?

Q.  Correct.

A.  Can I read it just so it's on the record of what you're asking?

Q.  Absolutely.

A.  So the policy violations -- the policy says, "Violating confidential, proprietary, and trade secret information obligations (including those stated in Apple's intellectual property agreement)," and that is under "Conduct warranting immediate termination.  Conduct that may warrant immediate termination of employment includes, but is not limited to," and then the bullet you just said.

So I can confirm that the document that we're reviewing, that is the text as I just read, is on that document and that I had a copy of that document.

Q.  And you understood it?

A.  No.  I just said I don't understand this document.

Q.  Okay.  Didn't understand that part of the document?

A.  I don't understand most of the document.  I was still going of listing all the words I don't understand.



Q.  Okay.  I'm asking you now whether you understood that conduct warranting immediate termination could include violating confidential, proprietary, and trade secret information obligations including those stated in Apple's intellectual property agreement?

A.  Asked and answered.  I already said I don't understand that.

Q.  You did not understand that that was a policy violation?

A.  Well, I understand that it's on the policy as written, as stated, but I don't understand what it means.

Q.  You don't understand what it means to violate your confidential, proprietary, and trade secret information obligations?  Is that what you're saying?

A.  Asked and answered.  I already said I don't. And the objections of NLRB already said that was unlawful that Apple would --

(Reporter admonition.)

THE WITNESS:  NLRB said those terms were unlawful and that Apple could no longer enforce them and had to withdraw them from their policies.

MS. RIECHERT:  I'm going to designate the



next section of this deposition as confidential

pursuant to the protective order.

BY MS. RIECHERT:

Q. Any information that -- testimony you give until I say it's not confidential pursuant to the protective order is going to be covered by the protective order. Do you understand that?

A. No. How can you claim that my statements are confidential if what I said is not confidential?

Q. Because under the protective order, I have the right to designate deposition testimony as confidential. If you disagree with that, then you have the right, under the protective order, to follow the procedures in the protective order.

A. Yeah, but I believe you -- sorry. Go ahead.

Q. But meanwhile, I'm designating this as confidential pursuant to the protective order. And if you disagree, then follow the procedures in the protective order.

A. Yes. But, Melinda, I don't think you can just say -- you don't know what I'm going to say and if I say stuff that's clearly not confidential, you just can't proactively say it's confidential.

Q. I have the right to do that under the protective order, and you have the right to



challenge it if you disagree.

A.  Well, I'm filing objections immediately then that you can't just proactively say that something is confidential when I'm actively talking about the NLRA saying that Apple is misusing confidentiality terms and the stuff to hide protected statements and then you're saying whatever I say next is under a confidentiality order without knowing what I'm going to say.  That's not right, Melinda.  I object.

MS. RIECHERT:  All right.  So why don't we take a break before I ask my question?

If the videographer would bring in the tab Number 2-04 into the chat.

We're going to take a five-minute break, and I am designating the following information as confidential pursuant to the protective order.

Let's take a five-minute break.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  This marks the end of Media Number 1.  We are now going off the record. The time is 10:19 a.m.

(Off the record:  10:19 a.m. to 10:29 a.m.)

THE VIDEOGRAPHER:  We are now on the record. The time is 10:29 Pacific Standard Time.  This marks the beginning of Media Number 2 in the deposition of



Ashley Gjovik on December 16, 2025.

Please continue.

(DEPOSITION EXHIBIT 7 WAS MARKED.)

MS. RIECHERT:  The following portion of the deposition is designated as confidential pursuant to the protective order.

(THE FOLLOWING PAGES, 66 TO 305, WERE DESIGNATED CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.)

-oOo-



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

:::  CONFIDENTIAL  :::

(THE FOLLOWING PAGES, 66 TO 305, WERE

DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER.)

BY MS. RIECHERT:

Q.  Please look at Exhibit Number 7 and let me know if this is a document that you received in connection with your employment at Apple.

A.  Yes.  And lodging again that I don't like the blanket confidentiality when we don't know what we're going to talk about.  And also lodging that I've tweeted this document.  This is already public record.  It's not confidential.

But this does appear to be an email that I believe I did receive from Apple.  It's dated August 7, 2017.

Q.  And when did you tweet the document?

A.  I think multiple times.  And it's on my website.  It's part of my government complaints in the exhibits for the government cases.

Q.  Did you tweet this document during your employment at Apple?

A.  I don't think so, no.

Q.  You were invited to participate in a data collection social hour; correct?

A.  I -- can I just read the email?



DEPONENT: ASHLEY MARIE GJOVIK (CONFIDENTIAL)                December 16, 2025
ASHLEY GJOVIK vs APPLE INC.

Q.  Absolutely.

A.  Yeah.  So the email was sent from --

Q.  Okay.  Don't read it out loud.  Just read it to yourself.

A.  No.  I want to read it for the record so they know what we're talking about.

Q.  No, please don't.  Please read it to yourself.

A.  But you said it's confidential.

Q.  The exhibit -- the exhibit is in the record, and so you don't need to read it into the record because the exhibit is already part of the record.

A.  What did you just ask me?  What was the question?

Q.  The question is were you invited to participate in a data collection social hour?

A.  But you're reading the email and you're saying I can't read the email.

Q.  No.  I'm saying you can read the email.  I just don't want you to read it out loud into the record.

A.  But you -- the question you're asking me reflects what is said in the email.  So for me to confirm what the email said would answer your question, and you're saying I can't read the email.



## Confirmation

You have successfully E-Filed Charge Against Employer . You will receive an E-mail acknowledgement from this office when it receives your submission. This E-mail will note the official date and time of the receipt of your submission. Please save this E-mail for future reference. Please print this page for your records.

**NOTE:** This confirms only that the form was filed. It does not constitute acceptance by the NLRB.

**Confirmation Number:** 1111720524

**Date Submitted:** Monday, February 16, 2026 11:59 PM (Pacific Standard Time)

**Form Submitted to Office:** Region 32, Oakland, California

File New Charge / Petition

# RE: Apple-Gjovik - Motion to Seal

From   Riechert, Melinda <mriechert@orrick.com>

To     Ashley M. Gjovik (Legal Matters)<legal@ashleygjovik.com>

CC     Ashley Gjovik<ashleymgjovik@protonmail.com>, Perry, Jessica R.<jperry@orrick.com>,
       Mantoan, Kathryn G.<kmantoan@orrick.com>, Horton, Nicholas J.<nhorton@orrick.com>,
       Booms, Ryan<rbooms@orrick.com>, Russell, Zoe<zrussell@orrick.com>,
       Weaver, Nicholas<nweaver@orrick.com>, Kelcey Phillips<kelcey.phillips@morganlewis.com>,
       Mahoney, Brian<brian.mahoney@morganlewis.com>,
       Stolzenburg, Mark L.<mark.stolzenburg@morganlewis.com>,
       harry.johnson<harry.johnson@morganlewis.com>,
       Jimenez, Catherine M.<catherine.jimenez@pillsburylaw.com>,
       Trechter, Reed C.<reed.trechter@pillsburylaw.com>, Troop, Andrew M.<andrew.troop@pillsburylaw.com>

Date   Tuesday, March 10th, 2026 at 3:51 PM

Thanks for getting back to me. I assume based on your answer that you will not stipulate to an order to seal and we will be filing a motion to seal.

**Melinda Riechert**

Partner

Orrick

Silicon Valley  Ⓥ

T 650/614-7423

M 650 759 1929

mriechert@orrick.com



[EXTERNAL]

Counselor,

Apple has no valid confidentiality designations. The blanket designation lapsed under Protective Order § 6.3 no later than January 6, 2026. The February 4 narrowing is a nullity under Fed. R. Civ. P. 26(g)(2) — unsigned, undated, unserved, and not cured after specific written notice. This has been explained to Apple repeatedly and is the subject of the pending motion at Dkt. 302 -- which you are saying you plan to ask to seal and conceal from public view while concurrently demanding gag orders, findings of contempt, and sanctions over non-existent designations specific to my genitals , genital secretions, and sexual activity.

Regarding the proposed sealing: as I previously informed you, Civil Local Rule 79-5(c) states in its first sentence that a protective order designation is not sufficient to establish sealability. (And additionally, a designation that is procedurally void provides no basis at all.) Apple requires an independent compelling reason supported by specific factual findings. *Kamakana v. City & County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006).

Apple's only previously stated independent basis is alleging the Plaintiff violated the Plaintiff's employment agreement with Apple. That basis independently violates: (1) the April 2025 trilateral NLRB settlement, in which Apple expressly agreed not to enforce confidentiality provisions over working conditions and labor dispute communications; and (2) the automatic stay in Plaintiff's Chapter 7 proceeding (11 U.S.C. § 362), which prohibits Apple from asserting claims against the Debtor arising from pre-petition executory contracts without first obtaining relief from Judge Panos. (In addition to the Norris–LaGuardia Act and other prohibitions previously mentioned) with hearing on Plaintiff's sanctions motion for Apple's existing stay violations is scheduled for April 2, 2026. *In re Hruby,* 512 B.R. 262, 274 (Bankr. D. Colo. 2014).

Additionally, seeking to seal Plaintiff's NLRB charges and workplace complaints, and conditioning Plaintiff's access to her own litigation on accepting unlawful and bad faith confidentiality restrictions over that content, constitutes an independent unfair labor practice under NLRA § 8(a)(1) and § 8(a)(4) and a further violation of the April 2025 settlement agreement.

Finally, as I previous informed you, you cannot ask one judge to seal the filings before a different judge. If you insist on seeking to "seal" my Rule 72 Objections and the Certified Transcript of a federal court hearing, both records just ruled upon by Judge Chen, then your motion should be directed to Judge Chen, not Judge Westmore - but either way your motion is frivolous and another instance of ongoing harassment and labor violations.

Thus, any additional motions Apple files certifying the validity of designations that are procedurally void and independently unlawful, will be addressed as an additional violation under Fed. R. Civ. P. 26(g)(3), the NLRA, and the

bankruptcy stay.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Tuesday, March 10th, 2026 at 2:22 PM, Riechert, Melinda <[mriechert@orrick.com](mailto:mriechert@orrick.com)> wrote:

> Ashley
>
> Apple intends to move the Court for an order to retain its confidentiality designations. In support of that Motion, Apple will need to file material it designated Confidential pursuant to the Protective Order. Additionally, your recent filings again publicly disclose information Apple designated as Confidential.
>
> Accordingly, Apple intends to seek an order to seal material Apple designated as Confidential that is referenced in either Apple's Motion to Retain Confidentiality or the evidence to be filed in support of that Motion, as well as Docket Entries 301, 301-1, 302, 302-1, and 302-2,  until such time as any challenges to Apple's confidentiality designations have been ruled upon. **Pursuant to Local Rules 79-5 and 7-11, please let us know if you are willing to stipulate to an order to seal as detailed above.**
>
> **Melinda Riechert**
>
> Partner

Orrick

Silicon Valley  ⓥ

T 650/614-7423

M 650 759 1929

mriechert@orrick.com



**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Tuesday, March 10, 2026 3:45 PM
**To:** Riechert, Melinda <mriechert@orrick.com>
**Cc:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>; Perry, Jessica R. <jperry@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Horton, Nicholas J. <nhorton@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Russell, Zoe <zrussell@orrick.com>; Weaver, Nicholas <nweaver@orrick.com>; Kelcey Phillips <kelcey.phillips@morganlewis.com>; Mahoney, Brian <brian.mahoney@morganlewis.com>; Stolzenburg, Mark L. <mark.stolzenburg@morganlewis.com>; harry.johnson <harry.johnson@morganlewis.com>; Jimenez, Catherine M. <catherine.jimenez@pillsburylaw.com>; Trechter, Reed C. <reed.trechter@pillsburylaw.com>; Troop, Andrew M. <andrew.troop@pillsburylaw.com>
**Subject:** RE: Apple-Gjovik - Motion to Seal

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**3.99 KB**      3 embedded images

# Exhibit B: NIH

# RE: [EXTERNAL] Re: study complaint

| | |
|---|---|
| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
| To | Green, Jonathan (NIH/OD) [E]<jonathan.green3@nih.gov> |
| Date | Friday, March 20th, 2026 at 1:52 PM |

FYI - ORARC responded today (via Alyssa Speier) and confirmed they're looking into the complaint. Thanks, Dr. Green!

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

On Thursday, March 19th, 2026 at 1:05 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

> Hello Dr. Green,
>
> That sounds great. I forwarded my complaint to the Advarra email along with the Harvard IRB and study group emails, so its now in their queue to review.
>
> Please do fee free to contact Harvard directly and you can also share the full email I sent NIH and/or a summary, and also feel free to provide my contact information. I really appreciate your help escalating this matter.
>
> It would be deeply unfortunate if a private company's misconduct creates risk to the scientific and medical benefits of that study and the data its collecting. It does sound like a important study addressing a critical gap in research data. Hopefully following both of our contacts, someone in one of these groups can intervene and help Apple understand how these things are supposed to work & get things back on track.
>
> Thanks again,
> -Ashley
>
> —
>
> **Ashley M. Gjøvik**
> **BS, JD, PMP**
>
> On Thursday, March 19th, 2026 at 12:51 PM, Green, Jonathan (NIH/OD) [E] <jonathan.green3@nih.gov> wrote:
>
>> Hi
>>
>> I will send a brief note to the Harvard IRB, and if you would like, I can include your contact information and summary of the complaint. You note below that the reviewing IRB was Advarra. Many studies, even those that are conducted by academic medical centers, are reviewed now by commercial IRBs. You can contact that IRB directly at the email address they provided, and I would encourage you to do so. Even if Advarra reviewed the study, it is important for the institutional IRB to be aware of your concerns.

Sincerely


Jonathan


Hello Dr. Green,


Thank you for your response. I'd appreciate it very much if you would be willing to contact the leadership of the study's IRB and inquire about my complaints. The study's email was actually on the "to" line of the email I sent NIH on March 11 2026. I had assumed that email included representation from the study's IRB, but I could be incorrect.


Let me also clarify that upon review, I had previously contacted the Harvard study's group email address provided for questions/concerns about the study per ClinicalTrials, but I had not contacted the Longwood IRB via the email you provided below, as it appeared the study was using an external, commercial IRB:


(" The study was approved by the Advarra Central Institutional Review Board (number PRO00037562) and registered to ClinicalTrials.gov." per doi:10.1016/j.ajog.2021.09.041).


("If you have any questions about your rights as a research participant, and/or concerns or complaints regarding this research study, contact... adviser@advarra.com" per https://hsph.harvard.edu/research/apple-womens-health-study/frequently-asked-questions/)


Today, I replied to my prior communications with the study email and added the Longwood IRB email you provided, and the Advarra email, and asked for an update. If you'd like we can wait to see if they respond, and if they still don't respond, I can let you know Monday and then you can reach out then, if you're willing.


I appreciate your assistance on this.

Thanks,

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

On Thursday, March 19th, 2026 at 8:39 AM, Green, Jonathan (NIH/OD) [E] <jonathan.green3@nih.gov> wrote:

> Dear Ms Gjovik,
>
> I can confirm that the nature of NIH's collaboration in this research does not provide us with any regulatory oversight over the conduct of the research. However, if you desire, I am happy to reach out to the leadership of the Harvard IRB, as they would be responsible for the ethical and regulatory oversight of the research. I can either inquire generally as to their awareness of this complaint, or if you wish I can provide them with the email you initially sent to NIH.
>
> Thank you for bringing your concerns to us. I hope that you will be able to reach a satisfactory resolution. Please let me know if you would like me to contact the Harvard IRB.
>
> Sincerely
>
> Jonathan
>
> **Jonathan M Green, MD, MBA | Director**
>
> Office of Human Subjects Research Protections
>
> Office of the Director, National Institutes of Health

**p:** (301) 402-4387    **f:** (301) 402-3443    **m:** (301) 547-1277

**OHSRP:** (301) 402-3713



Hello Mr. Green,

Thank you for your response. I did contact Harvard's IRB and they did not respond, prior to me filing the complaint, which I mentioned in the complaint, and as of today they still have not responded. Its Apple's position I cannot talk to anyone except Apple and to do otherwise is sanctionable conduct (per Apple's pending motions in court requesting sanctions, contempt, gag orders, and other punishment of me).

It was my assumption that there may be some sort of trigger for NIH to investigate my complaint because Apple and Harvard chose to list it on the NIH website and also because NIH is apparently a formal partner in the study.

***NIH Partners With Apple and Harvard University on Women's Health Study:*** The new study will allow participants to track their menstrual cycles and help researchers understand their relationship to other health-related conditions., National Institute of Environmental Health Sciences News Releases, https://www.niehs.nih.gov/newsreleases/nih-partners-with-apple-and-harvard-university-on-womens-health-study

... The National Institute of Environmental Health Sciences (NIEHS), the NIH institute involved in the partnership, has several of the world's leading scientists on women's health and population studies. NIEHS will provide expert advice and data analysis for the Apple Women's Health Study.. "This is an exciting opportunity for NIEHS researchers to contribute to the study design and use the resulting data to answer novel questions, not only important to women of reproductive age, but to women of all ages," said Dale Sandler, Ph.D., chief of the NIEHS Epidemiology Branch. Allen Wilcox, M.D., Ph.D., Scientist Emeritus at NIEHS, has spent 40 years studying fertility and pregnancy, and welcomes this opportunity to work with Apple and colleagues at Harvard. He is optimistic about the medical advances that could come from this collaboration. "Studies conducted with commercial cycle and fertility tracking apps have great potential for

making important contributions to science, because they can enroll much larger samples of women and from far more diverse backgrounds," added Wilcox. "We want to do our part to make this new method of data collection a scientifically valid source of health information."

Can you please check and confirm what the NIH partnership status means regarding filing human research complaints?

Thank you!

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

On Wednesday, March 18th, 2026 at 1:11 PM, Green, Jonathan (NIH/OD) [E] <jonathan.green3@nih.gov> wrote:

> Dear Ms Gjovik
>
> A copy of the complaint email that you sent to NIEHS with regard to the Apple Womens Health Study was forwarded to me.  First, thank you for bringing this to our attention and for raising these important concerns.  I understand you have also filed a formal complaint with the Office of Human Research Protections (OHRP).
>
> As the research is not funded by the NIH, we have no jurisdiction over this research.  NIEHS involvement in this research is limited only to the analysis of de-identified data and has no other involvement in the conduct of this research.  The study is being conducted by the Harvard T. H. Chan School of Public Health.  The IRB that reviews research conducted by those investigators is the Harvard Longwood Campus IRB.  I would recommend you reach out directly to them and bring this important matter to their attention.  They would be the primary office responsible for investigating these allegations.  Their information can be found here https://hsph.harvard.edu/office/regulatory-affairs-and-research-compliance/harvard-longwood-campus-human-research-protection-program-hrpp/.  According to the website, their email contact is orarc@hsph.harvard.edu.

The Office of Human Research Protections within the Office of the Assistant Secretary for Health,  is responsible for oversight of the Common Rule and their jurisdiction is generally limited to federally funded or conducted research.  As you have filed directly with them, they will determine if they have regulatory authority over this research.

Again, thank you for raising these concerns and I am truly sorry for any distress that you may have experienced related to research.

Sincerely,

Jonathan

**Jonathan M Green, MD, MBA | Director**

Office of Human Subjects Research Protections

Office of the Director, National Institutes of Health

**p:** (301) 402-4387    **f:** (301) 402-3443   **m:** (301) 547-1277

**OHSRP:** (301) 402-3713



CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Wednesday, March 18, 2026 4:58 PM
**To:** Green, Jonathan (NIH/OD) [E] <jonathan.green3@nih.gov>
**Cc:** Jukic, Anne Marie (NIH/NIEHS) [E] <jukica@niehs.nih.gov>; Gommel, Tiffany (NIH/OD) [E] <tiffany.gommel@nih.gov>; Grant, Nicole (NIH/OD) [E] <grantn@mail.nih.gov>; Sanders, Margaret (NIH/OD)

[E] <margaret.sanders@nih.gov>

**Subject:** [EXTERNAL] Re: study complaint

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

---

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>

**Sent:** Thursday, March 19, 2026 2:49 PM

**To:** Green, Jonathan (NIH/OD) [E] <jonathan.green3@nih.gov>

**Subject:** RE: [EXTERNAL] Re: study complaint

---

**20.06 KB**     1 embedded image

# Exhibit C: Harvard IRB

# RE: Reporting an Incident to OHRP: Trial ID NCT04196595 (Apple Women's Health Study)

---

| From | Ashley Gjovik <ashleymgjovik@protonmail.com> |
|------|-----------------------------------------------|
| To | ORARC<orarc@hsph.harvard.edu> |
| CC | HSPH-Apple Women's Health Study<AppleWomensHealthStudy@hsph.harvard.edu>, ORARC<orarc@hsph.harvard.edu> |
| Date | Friday, March 20th, 2026 at 11:46 AM |

---

Hello Ms. Speier,

Thank you for the update and confirming the complaint is being reviewed.

I'm happy to provide more information or documentation if needed - just let me know.

Thank you.

Respectfully,
-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

On Friday, March 20th, 2026 at 10:23 AM, ORARC <orarc@hsph.harvard.edu> wrote:

> Hi Ashley,
>
> Thank you for your email.  We are looking into this and will be in touch if we have any questions.
>
> Best,
>
> Alyssa
>
> **Alyssa AK Speier, MS, CIP** (she/her)  /  Senior Associate Director
>
> Office of Regulatory Affairs & Research Compliance  /  Harvard T.H. Chan School of Public Health
>
> aspeier@hsph.harvard.edu  /  Office of Regulatory Affairs and Research Compliance | Harvard T.H. Chan School of Public Health
>
> Join the conversation: News | Facebook | LinkedIn | YouTube | Instagram | TikTok

**HARVARD T.H. CHAN** | SCHOOL OF PUBLIC HEALTH
Powerful ideas for a healthier world

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>

**Sent:** Thursday, March 19, 2026 2:38 PM

**To:** HSPH-Apple Women's Health Study <AppleWomensHealthStudy@hsph.harvard.edu>; ORARC <orarc@hsph.harvard.edu>

**Subject:** Fw: Reporting an Incident to OHRP: Trial ID NCT04196595 (Apple Women's Health Study)

Hello,

I still have not received any response from this group regarding this matter.

NIH leadership urged me to notify The Harvard Longwood Campus IRB about my complaint so I am cc'ing the email NIH provided here and adding our prior correspondence below.

If for some reason you did not consider my prior communications to be official complaints and requests for investigation, let me clarify that they were/are, I reiterate that here, and I hope to receive an update soon.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

------- Forwarded Message -------

From: Ashley M. Gjøvik <ashleymgjovik@protonmail.com>

Date: On Wednesday, March 11th, 2026 at 2:05 AM

Subject: Reporting an Incident to OHRP: Trial ID NCT04196595 (Apple Women's Health Study)

To: OHRP-DCO@hhs.gov <OHRP-DCO@hhs.gov>

CC: AppleWomensHealthStudy@hsph.harvard.edu <AppleWomensHealthStudy@hsph.harvard.edu>, jukica@niehs.nih.gov <jukica@niehs.nih.gov>, baird@niehs.nih.gov <baird@niehs.nih.gov>

**OHRP Incident Report**

**Incident Type:** Serious Non-Compliance / Unanticipated Problem Involving Risks to Subjects

**Regulatory Framework**: 45 CFR Part 46 (Common Rule); 42 U.S.C. § 282(j)

**Reported by**: Ex-employee of Sponsor / Responsible Party

**Study Title:** Apple Women's Health Study

**Trial ID:** NCT04196595

**Principal Investigator / Conducting Institution:** Harvard T.H. Chan School of Public Health

**Sponsor / Responsible Party:** Apple Inc.

**Additional Federal Partner:** National Institute of Environmental Health Sciences (NIEHS)

**Trial Registration Date:** 2019 (ongoing as of 2026)

**Stated Study Goals:** (1) Identify Menstrual Cycle Patterns; (2) Epidemiologic Description of Menstrual Cycle; (3) Determine prevalence of gynecologic health conditions

Hello,

This complaint concerns the Apple Women's Health Study (AWHS), a clinical trial registered on ClinicalTrials.gov (NCT04196595 (https://clinicaltrials.gov/study/NCT04196595)) since 2019 and currently ongoing. The trial is sponsored by Apple Inc. and conducted by Harvard T.H. Chan School of Public Health, in partnership with NIEHS as part of what has been described as a major long-term study of women's health. Medscape reported the study in 2023 as "a 10-year project among Harvard, Apple, and the National Institute of Environmental Health Sciences (NIEHS) that is unprecedented in size and scope." (Medscape, 2023 (https://www.medscape.com/s/viewarticle/996078?form=fpf)) The subject matter involves collection of highly sensitive and intimate reproductive health data, specifically related to ovulation and menstruation. The ClinicalTrials page lists the top study goals as "Identify Menstrual Cycle Patterns" and "Epidemiologic Description of Menstrual Cycle" with a secondary goal of "Determine prevalence of gynecologic health conditions."

The subject matter of the trial involves ovulation and menstruation — intimate reproductive health data of a highly personal nature. The corporate sponsor has actively recruited its own employees as research subjects to increase enrollment numbers since at least 2019. This practice creates a structural and inescapable conflict of interest: employees being asked to participate by or through their employer (who is simultaneously the trial's sponsor) face an inherent power imbalance in which declining to participate may reasonably be perceived as carrying professional consequences. The team's own reports indicate that as of 2023, when the overall participation was around one hundred thousand, that only two states provided more than ten thousand participants -- California and Texas -- where the corporation's headquarters are located. In fact, California is the only state indicated to be well above ten thousand indicating it may even account for over 80% of the participants -- with a large amount originating from its corporate offices or the family members of its corporate employees. (Overall participant enrollment by state, https://hsph.harvard.edu/research/apple-womens-health-study/study-updates/2023-apple-womens-health-study-newsletter-four-years-in-review/).

Overall, the team's conduct raises serious compliance concerns under:

- 45 CFR 46.116(b)(2): Informed consent must be free from coercion or undue influence. Employer-to-employee recruitment by the sponsoring corporation constitutes a paradigmatic example of undue influence, as employees cannot freely decline without fear of workplace consequences.
- 45 CFR 46.111(a)(3) and 46.111(b): The IRB is required to ensure equitable subject selection and to apply additional protections when subjects are vulnerable to coercion. Employees of a trial's corporate sponsor constitute a vulnerable population in precisely the sense these provisions are designed to address. The IRB either approved this recruitment pathway without adequate safeguards, or the recruitment occurred without IRB knowledge — both of which are reportable failures.

This study/trial has been registered and operating since 2019. The recruitment of employees by the corporate sponsor appears to be a sustained and ongoing recruitment strategy, not an isolated incident. This constitutes continuing non-compliance within the meaning of 45 CFR Part 46. The IRB's apparent failure to identify or correct this practice over a multi-year period is itself a significant matter of concern warranting investigation.

This complaint concerns Apple Inc.'s response to a non-enrolled individual — a former Apple employee who declined enrollment and subsequently spoke publicly about the coercive nature of the study's recruitment practices and raised questions about the integrity of the trial's enrollment and consent process. In response, Apple Inc. has pursued legal action in federal court against that individual. In the matter of *Ashley Gjovik v. Apple Inc.*, Case No. 3:23-cv-04597-EMC (N.D. Cal.), Apple has taken the position that the employee's testimony, speech, and complaints about the corporation's recruitment practices are confidential, and has sought sealing orders, compelled deletion of public criticism, prior restraint gag orders, and sanctions against the individual for filing complaints with government agencies and speaking publicly about concerns that Apple's recruitment of employees into a highly personal medical study is unethical, improper, and likely

unlawful and that Apple was trying to designate her complaints as "confidential". (See *Ashley Gjovik v Apple Inc*, 3:23-cv-04597-EMC, Northern District of California, https://www.courtlistener.com/docket/67772913/gjovik-v-apple-inc/?filed_after=&filed_before=&entry_gte=&entry_lte=&order_by=desc).

The specific nature of the data at issue warrants particular attention. Apple's own litigation filings reveal that the study's scope as implemented includes monitoring of employee cervical mucus and vaginal secretions, and at the same time Apple also sought to register employees' sex partners and require those sex partners to execute non-disclosure agreements for a separate "study". I complained about both of these things -- while I worked at Apple and after. My deposition testimony at issue was simply summarizing my prior complaints about Apple's recruitment practices for this and other studies. Apple then further claimed in that litigation that employee complaints about being asked to submit to this type of study and monitoring are themselves confidential like trade secrets, and is currently seeking a gag order prohibiting employees from discussing any of it. The IRB's privacy assessment under 45 CFR 46.111(a)(7) must be evaluated against this specific reality — not merely the abstract description of a menstrual health study, but an employer asserting proprietary control over employees' reproductive and sexual data, the identities of their sexual partners, and the complaints those employees made about being subjected to it.

In making this complaint to you right now and when I attach a copy in my court filings for this matter, Apple will claim the content in this email is confidential and proprietary, should be sealed, and I should be sanctioned for continuing to violate court "rules" (where the corporation is abusing a protective order to apply to existing complaints and to use as a private prior restraint against employees and critics about its operations). This secrecy includes, and is targeted to conceal, how Apple runs recruitment for clinical trials including ones that are done as a formal partnership with the government (like here, with NIEHS). An employer recruiting its own employees to disclose intimate reproductive health information as research subjects raises acute privacy concerns that the IRB was required to specifically address under 45 CFR 46.111(a)(7) (The IRB must ensure adequate provisions to protect the privacy of subjects and to maintain the confidentiality of data). When the entity collecting this data is also the subject's employer, the adequacy of any privacy protections is inherently compromised. Employees have reasonable cause to fear that reproductive health information disclosed in a sponsor-controlled study may not remain segregated from their employment relationship.

Apple's position, as stated in that litigation including attached filings, is that it is impermissible for the complainant to raise these concerns publicly, to communicate them to third parties, or to submit this very complaint to OHRP. Apple appears to be mis-using a legal processes as a private prior restraint mechanism against employees and critics discussing how the corporation operates clinical trials conducted in formal partnership with the federal government. This raises a question about how often Apple engages in this kind of conduct and how else it's obstructed complaints about this study.

Further, Apple's conduct implicates a number of issues in the clinical trial and human research regulatory framework:

- **42 U.S.C. § 282(j):** Clinical trial registration exists precisely because human subjects research is subject to public accountability. Apple Inc. cannot simultaneously hold a registered trial out as a public research enterprise — particularly one conducted in federal partnership with NIEHS — and seek court orders suppressing public speech about how that trial recruits its subjects.
- **45 CFR 46.116(b)(8):** Informed consent must identify whom subjects may contact with questions or concerns about the research and their rights. This provision reflects the regulatory framework's treatment of the ability to raise concerns as an intrinsic right — not a privilege the sponsor may litigate away through injunctive relief.
- **Chilling Effect on Current and Future Subjects:** By pursuing legal action against a person who declined to enroll and raised compliance concerns, Apple has sent a direct signal to every current and potential subject that raising concerns about this trial carries severe legal consequences. This compounds the coercive environment described above and further undermines the voluntariness of any consent obtained from employees in this environment.
- **Sponsor's Posture Toward Compliance:** The decision to pursue legal suppression of scrutiny — rather than address the underlying recruitment concerns — is directly relevant to OHRP's assessment of whether Apple Inc. can be trusted to operate a compliant human subjects research program. It reflects an institutional posture that treats public accountability as a threat to be neutralized rather than an obligation to be met.

The complainant respectfully requests that OHRP:

- Investigate the IRB's review and approval of the employee recruitment pathway, and assess whether adequate protections against undue influence were required and implemented.
- Assess whether consent processes conducted under this coercive recruitment environment meet the voluntariness requirements of 45 CFR 46.116.
- Determine how many participants in the total participants for this study are Apple employees or direct family members of Apple employees, and determine what % of the total population of the study makes the study population impermissibly dominant with employees.
- Evaluate whether the IRB's privacy provisions under 45 CFR 46.111(a)(7) adequately address the risks created by a corporate employer-sponsor collecting reproductive health data from its own employees.
- Consider Apple Inc.'s litigation conduct in *Gjovik v. Apple Inc.,* No. 3:23-cv-04597-EMC (N.D. Cal.), as evidence bearing on the sponsor's compliance posture and the integrity of the trial's ongoing operations.
- Inquire whether other complaints or concerns about this study have been similarly suppressed by Apple through any type of conduct, including litigation "protective orders"
- Determine whether suspension or additional oversight of the trial is warranted pending investigation.

The following documents are submitted in support of this complaint or are available upon request:

- ClinicalTrials.gov registration record (https://clinicaltrials.gov/study/NCT04196595)
- Documentation of legal action and threatened speech restraints and other injunctive relief against complainant (*Ashley Gjovik v Apple Inc,* 3:23-cv-04597-EMC, Northern District of California)
- AWHS 2023 Four Years in Review Newsletter (participant enrollment by state): HSPH.edu (https://hsph.harvard.edu/research/apple-womens-health-study/study-updates/2023-apple-womens-health-study-newsletter-four-years-in-review/)
- Medscape coverage of AWHS scope: Medscape, 2023 (https://www.medscape.com/s/viewarticle/996078?form=fpf)
- March 14 2023 Telerama magazine article (translated from French to English) where I and my coworkers criticized Apple's use of employee data for this specific study.

Note: I contacted the Study's contact list at Harvard (cc'd here) on March 8th, asking for a response on these matters but received no response by March 10th. I told them if I didn't receive a response I'd file by end of day, and no response was provided so now I'm filing that complaint.

This complaint is submitted in good faith based on direct knowledge of the events described. The complainant is aware that Apple Inc. may contend that the submission of this complaint itself violates litigation-related orders or confidentiality designations. The complainant submits that the filing of a good-faith regulatory complaint with a federal oversight body is protected activity and that any such contention by Apple would itself constitute further evidence of the sponsor's attempt to suppress oversight of a federally registered human subjects research study. The complainant understands that OHRP may contact the submitter for additional information.

**Ashley Gjovik, B.S., PMP, J.D.**
Dated: March 11 2026

San Jose, California

Ex-Apple Employee (2015-2021)

-----

Prior Correspondence

----

On Tuesday, March 10th, 2026 at 1:26 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello,

No one has responded.

According, I plan to file the complaint to US gov by end of day today.

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

On Sunday, March 8th, 2026 at 8:35 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello,

I have some questions about the Apple Women's Health Study (trial id. NCT04196595).

Apple is currently asserting legal claims against me in federal court alleging that this study is secret, any prior requests to participate in this study or communications about participation are secret, people's experiences or thoughts related to this study are secret, and that I should be sanctioned and held in contempt for even talking about the existence of this public study-- with Apple asking for a gag order to be issued against me prohibiting me from talking about this study, any of Apple's communications to employees about their menstruation or vaginal secretions, and that Apple also asked to register employee sex partners and make the sex partners sign NDAs -- all of which Apple claims is secret.

I'd like to understand from the study administrators what their position is on this matter and if Harvard will work with Apple to resolve this issue. Otherwise, I'm preparing to file a complaint to NIH regarding Apple's conduct about this study.

The lawsuit with Apple's pending motions requesting sanctions, contempt findings, gag orders, and injunctions is at  *Ashley M. Gjovik v. Apple Inc.,* 23-cv-04597-EMC (N.D. Cal. 2023-pending). https://www.courtlistener.com/docket/67772913/gjovik-v-apple-inc/?page=2

If I file a complaint to NIH, I will definitely include Apple's filings with their lawyers arguments that even if the studies are public, if anyone complains about the studies, the complaint and underlying facts then become "confidential" and sharing that information with the government, courts, public, or others would be equivalent to violating an NDA, "leaking" trade secret information, and justify immediate termination of employment or other comparable punishment.

Its my understanding that such misconduct by Apple could likely cause NIH to cancel the study and to take disciplinary action against both Apple and Harvard. Accordingly, I'd assume you folks would appreciate an opportunity to talk some sense into Apple about all of this.

Please let me know how you'd like to proceed.

-Ashley

—

**Ashley M. Gjøvik, B.S., J.D., PMP**

**7.48 KB**      1 embedded image

# Exhibit D: Advarra IRB

# Re: Concern Regarding Apple Women's Health study (#1166204)

---

From    Ashley Gjovik <ashleymgjovik@protonmail.com>

To      Nicole Burbul<nicole.burbul@advarra.com>

Date    Wednesday, March 25th, 2026 at 11:02 AM

---

Hello Ms. Burbul,

Thank you for reaching out and for looking into this matter.

To clarify my primary concern: Apple Inc., as the sponsor of this study, is asserting that any and all recruitment of its employees into the study is "confidential." Apple's legal filings in *Gjovik v. Apple Inc.,* No. 3:23-cv-04597-EMC (N.D. Cal.), state that employees—including myself—would violate their employment agreements by disclosing to anyone, including oversight bodies such as yours, that Apple was recruiting employees. Apple has moved to restrain my speech on this subject, to seal court records discussing this matter, and to sanction me for raising these complaints. I attached those filings when I contacted NIH and Harvard; if you did not receive them, please let me know and I will send them to you directly. The filings include Apple's counsel making each of these arguments on the record.

This is directly relevant to your request for recruitment communications. Apple expressly claimed its recruitment emails as "confidential." One of the grounds Apple cited as a "legitimate" basis for terminating my employment in 2021—rather than acknowledging retaliation for my reporting of hazardous waste violations to the EPA and filing NLRB charges, among other protected activity—was that I had complained about a recruitment email for a separate "study" Apple was conducting, which involved capturing high-resolution three-dimensional scans of ears and ear canals. Apple maintained that that study, and all of its studies, are so confidential that they cannot be discussed with anyone outside the company—and in some cases, even with others inside the company. In other words, Apple has already taken the position that an employee sharing or even complaining about a study recruitment email is a terminable offense. Apple has now also claimed my social media, blog posts, and legal filings about Apple's recruitment practices and communications are secret akin to trade secrets.

Accordingly, given Apple's pending motions (not yet ruled upon), if I were to produce those recruitment materials, Apple would assert that I was violating the intellectual property provisions of my employment agreement and engaging in conduct for which it is already seeking sanctions, contempt findings, and gag orders. I respectfully submit that Advarra, as the IRB, has both the authority to request recruitment materials directly from the study team and from Apple as the corporate sponsor. The IRB should not need to rely on a complainant to produce documents that the sponsor is actively litigating to suppress. Apple's position—that recruitment materials for a federally registered clinical trial cannot be disclosed even to the overseeing IRB—itself warrants scrutiny by your office.

That said, I am happy to cooperate with your office and provide what I can. My complaints about Apple's recruitment practices for this and other studies have been public for years, were pleaded in the same lawsuit in which Apple now claims the information is secret, and were covered in published news articles—including one in which a former coworker described the cervical mucus kit Apple provided to her and expressed deep regret about having participated in such a study with her employer.

Apple's principal defense, when confronted with the fact that the study is already public, has been to claim that even if it is already public that Apple is studying menstruation and ovulation, Apple's communications with employees—including the very fact that Apple is recruiting employees—are confidential and cannot be discussed. Apple has further represented that it may be conducting a separate internal study performing the same or similar observations, which it claims is not public, while conceding that the information I disclosed was the same regardless of which study it pertained to. Apple's position is that it was the employee's act of complaining about the employer's recruitment and study-administration conduct that rendered the disclosure sanctionable.

Apple is advancing all of these arguments on a public docket, which creates a coercive effect on current employees who may be monitoring the proceedings or who read the filings at a later date. Notably, Apple is subject to a federal consent agreement with the National Labor Relations Board and me in which it agreed to stop claiming that employee complaints about work conditions are confidential; its present arguments are in breach of that agreement. Apple has also never acknowledged that, even if it maintains a separate internal study, employees retain the right to discuss this publicly registered study.

Finally, Apple's representation that it may be conducting a parallel internal study collecting the same or similar reproductive health data also raises serious independent concerns. Under 45 CFR Part 46, any research involving human subjects requires IRB review and approval. If Apple is conducting such a study, it must have undergone independent IRB review—and the IRB of record for the public study would need to be aware of overlapping research to properly assess cumulative risks to participants, particularly if any participants are enrolled in both. Participants in the public study were also entitled under 45 CFR 46.116 to be informed if their data could be combined with, compared to, or supplemented by a parallel undisclosed data set; the omission of that information from the consent process would be material. Additionally, under 42 U.S.C. § 282(j), applicable clinical trials must be registered on ClinicalTrials.gov—an unregistered parallel study collecting the same data would raise questions about whether the sponsor is evading federal registration requirements.

Further, the public study is associated with federal grant funding from NIH and involves a formal partnership with the National Institute of Environmental Health Sciences. Under the NIH Grants Policy Statement and 2 CFR Part 200 (Uniform Guidance), grant recipients have an affirmative obligation to disclose all other support, including any ongoing or pending research with scientific overlap. A parallel sponsor-controlled study collecting the same reproductive health data would constitute overlapping research that must be disclosed to the funding agency. The public study has also produced published academic articles, and under ICMJE guidelines—which govern publication in virtually all major biomedical journals—researchers are required to disclose all related research, funding sources, and the existence of related data sets. Failure to disclose a parallel study in either the grant reporting or the published literature would implicate federal grant compliance requirements and scientific research integrity standards. It does not appear that Apple has disclosed any such parallel study to Advarra, to Harvard, to NIH, or in any published materials—nor has there been any public explanation of how each data set is being used, whether the data sets are being combined, or how participants' informed consent accounts for any of this. I note that it is also entirely possible that what Apple characterizes as a separate "internal" study is in fact the same study or an extension of it (such as with Apple providing its own "cervical mucus measuring kit")—which would make Apple's secrecy arguments all the more untenable.

Respectfully,
-Ashley

—

**Ashley M. Gjøvik**
**BS, JD, PMP**


On Tuesday, March 24th, 2026 at 7:25 AM, Nicole Burbul <nicole.burbul@advarra.com> wrote:

> Good morning Ashley,
>
>
> My name is Nicole Burbul, and I am the Associate Director of IRB Support here at Advarra, working closely with the Safety Team. I received your concerns regarding a study under Dr. Shruthi Mahalingaiah via our Advarra Adviser. Thank you for raising these concerns, as we take them seriously.
>
>
> One of the main concerns seems to be the recruitment of employees by the corporate sponsor. Could you please elaborate on that aspect and provide any information such as flyers, emails, etc that may have been used for recruitment for us to review?
>
>
> Thank you,
>
> Nicole
>
>
> **Nicole Burbul** | Associate Director, IRB Support
> **O** 240-406-9802 | nicole.burbul@advarra.com
> Eastern Time | **Main Office** 410-884-2900 | **advarra.com**
> Follow us on **LinkedIn**
> **Pronouns** she/her
>
> _____


On Thursday, March 19th, 2026 at 11:48 AM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:
> + adviser@advarra.com (Pro00037562)
>
> —
>
> **Ashley M. Gjøvik**
> **BS, JD, PMP**
>
> On Thursday, March 19th, 2026 at 11:37 AM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:
>> Hello,

I still have not received any response from this group regarding this matter.

NIH leadership urged me to notify The Harvard Longwood Campus IRB about my complaint so I am cc'ing the email NIH provided here and adding our prior correspondence below.

If for some reason you did not consider my prior communications to be official complaints and requests for investigation, let me clarify that they were/are, I reiterate that here, and I hope to receive an update soon.


-Ashley


—

**Ashley M. Gjøvik**
**BS, JD, PMP**


------- Forwarded Message -------
From: Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
Date: On Wednesday, March 11th, 2026 at 2:05 AM
Subject: Reporting an Incident to OHRP: Trial ID NCT04196595 (Apple Women's Health Study)
To: OHRP-DCO@hhs.gov <OHRP-DCO@hhs.gov>
CC: AppleWomensHealthStudy@hsph.harvard.edu <AppleWomensHealthStudy@hsph.harvard.edu>,
jukica@niehs.nih.gov <jukica@niehs.nih.gov>, baird@niehs.nih.gov <baird@niehs.nih.gov>


## OHRP Incident Report

**Incident Type:** Serious Non-Compliance / Unanticipated Problem Involving Risks to Subjects
**Regulatory Framework**: 45 CFR Part 46 (Common Rule); 42 U.S.C. § 282(j)
**Reported by**: Ex-employee of Sponsor / Responsible Party

**Study Title:** Apple Women's Health Study
**Trial ID:** NCT04196595
**Principal Investigator / Conducting Institution:** Harvard T.H. Chan School of Public Health
**Sponsor / Responsible Party:** Apple Inc.
**Additional Federal Partner:** National Institute of Environmental Health Sciences (NIEHS)
**Trial Registration Date:** 2019 (ongoing as of 2026)
**Stated Study Goals:** (1) Identify Menstrual Cycle Patterns; (2) Epidemiologic Description of Menstrual Cycle; (3) Determine prevalence of gynecologic health conditions

Hello,

This complaint concerns the Apple Women's Health Study (AWHS), a clinical trial registered on ClinicalTrials.gov (NCT04196595 (https://clinicaltrials.gov/study/NCT04196595)) since 2019 and currently ongoing. The trial is sponsored by Apple Inc. and conducted by Harvard T.H. Chan School of Public Health, in partnership with NIEHS as part of what has been described as a major long-term study of women's health. Medscape reported the study in 2023 as "a 10-year project among Harvard, Apple, and the National Institute of Environmental Health Sciences (NIEHS) that is unprecedented in size and scope." (Medscape, 2023 (https://www.medscape.com/s/viewarticle/996078?form=fpf)) The subject matter involves collection of highly

sensitive and intimate reproductive health data, specifically related to ovulation and menstruation. The ClinicalTrials page lists the top study goals as "Identify Menstrual Cycle Patterns" and "Epidemiologic Description of Menstrual Cycle" with a secondary goal of "Determine prevalence of gynecologic health conditions."

The subject matter of the trial involves ovulation and menstruation — intimate reproductive health data of a highly personal nature. The corporate sponsor has actively recruited its own employees as research subjects to increase enrollment numbers since at least 2019. This practice creates a structural and inescapable conflict of interest: employees being asked to participate by or through their employer (who is simultaneously the trial's sponsor) face an inherent power imbalance in which declining to participate may reasonably be perceived as carrying professional consequences. The team's own reports indicate that as of 2023, when the overall participation was around one hundred thousand, that only two states provided more than ten thousand participants -- California and Texas -- where the corporation's headquarters are located. In fact, California is the only state indicated to be well above ten thousand indicating it may even account for over 80% of the participants -- with a large amount originating from its corporate offices or the family members of its corporate employees. (Overall participant enrollment by state, https://hsph.harvard.edu/research/apple-womens-health-study/study-updates/2023-apple-womens-health-study-newsletter-four-years-in-review/).

Overall, the team's conduct raises serious compliance concerns under:

- 45 CFR 46.116(b)(2): Informed consent must be free from coercion or undue influence. Employer-to-employee recruitment by the sponsoring corporation constitutes a paradigmatic example of undue influence, as employees cannot freely decline without fear of workplace consequences.
- 45 CFR 46.111(a)(3) and 46.111(b): The IRB is required to ensure equitable subject selection and to apply additional protections when subjects are vulnerable to coercion. Employees of a trial's corporate sponsor constitute a vulnerable population in precisely the sense these provisions are designed to address. The IRB either approved this recruitment pathway without adequate safeguards, or the recruitment occurred without IRB knowledge — both of which are reportable failures.

This study/trial has been registered and operating since 2019. The recruitment of employees by the corporate sponsor appears to be a sustained and ongoing recruitment strategy, not an isolated incident. This constitutes continuing non-compliance within the meaning of 45 CFR Part 46. The IRB's apparent failure to identify or correct this practice over a multi-year period is itself a significant matter of concern warranting investigation.

This complaint concerns Apple Inc.'s response to a non-enrolled individual — a former Apple employee who declined enrollment and subsequently spoke publicly about the coercive nature of the study's recruitment practices and raised questions about the integrity of the trial's enrollment and consent process. In response, Apple Inc. has pursued legal action in federal court against that individual. In the matter of *Ashley Gjovik v. Apple Inc.*, Case No. 3:23-cv-04597-EMC (N.D. Cal.), Apple has taken the position that the employee's testimony, speech, and complaints about the corporation's recruitment practices are confidential, and has sought sealing orders, compelled deletion of public criticism, prior restraint gag orders, and sanctions against the individual for filing complaints with government agencies and speaking publicly about concerns that Apple's recruitment of employees into a highly personal medical study is unethical, improper, and likely unlawful and that Apple was trying to designate her complaints as "confidential". (See *Ashley Gjovik v Apple Inc*, 3:23-cv-04597-EMC, Northern District of California, https://www.courtlistener.com/docket/67772913/gjovik-v-apple-inc/?filed_after=&filed_before=&entry_gte=&entry_lte=&order_by=desc).

The specific nature of the data at issue warrants particular attention. Apple's own litigation filings reveal that the study's scope as implemented includes monitoring of employee cervical mucus and vaginal secretions, and at the same time Apple also sought to register employees' sex partners and require those sex partners to execute non-disclosure agreements for a separate "study". I complained about both of these things -- while I worked at Apple and after. My deposition testimony at issue was simply summarizing my prior complaints about Apple's recruitment practices for this and other studies. Apple then further claimed in that litigation that employee complaints about being asked to submit to this type of study and monitoring are themselves confidential like trade secrets, and is currently seeking a gag order prohibiting employees from discussing any of it. The IRB's privacy assessment under 45 CFR 46.111(a)(7) must be evaluated against this specific reality — not merely the abstract description of a menstrual health study, but an employer asserting proprietary control over employees' reproductive and sexual data, the identities of their sexual partners, and the complaints those employees made about being subjected to it.

In making this complaint to you right now and when I attach a copy in my court filings for this matter, Apple will claim the content in this email is confidential and proprietary, should be sealed, and I should be sanctioned for continuing to violate court "rules" (where the corporation is abusing a protective order to apply to existing complaints and to use as a private prior restraint against employees and critics about its operations). This secrecy includes, and is targeted to conceal, how Apple runs recruitment for clinical trials including ones that are done as a formal partnership with the government (like here, with NIEHS). An employer recruiting its own employees to disclose intimate reproductive health information as research subjects raises acute privacy concerns that the IRB was required to specifically address under 45 CFR 46.111(a)(7) (The IRB must ensure adequate provisions to protect the privacy of subjects and to maintain the confidentiality of data). When the entity collecting this data is also the subject's employer, the adequacy of any privacy protections is inherently compromised. Employees have reasonable cause to fear that reproductive health information disclosed in a sponsor-controlled study may not remain segregated from their employment relationship.

Apple's position, as stated in that litigation including attached filings, is that it is impermissible for the complainant to raise these concerns publicly, to communicate them to third parties, or to submit this very complaint to OHRP. Apple appears to be mis-using a legal processes as a private prior restraint mechanism against employees and critics discussing how the corporation operates clinical trials conducted in formal partnership with the federal government. This raises a question about how often Apple engages in this kind of conduct and how else it's obstructed complaints about this study.

Further, Apple's conduct implicates a number of issues in the clinical trial and human research regulatory framework:

- **42 U.S.C. § 282(j):** Clinical trial registration exists precisely because human subjects research is subject to public accountability. Apple Inc. cannot simultaneously hold a registered trial out as a public research enterprise — particularly one conducted in federal partnership with NIEHS — and seek court orders suppressing public speech about how that trial recruits its subjects.
- **45 CFR 46.116(b)(8):** Informed consent must identify whom subjects may contact with questions or concerns about the research and their rights. This provision reflects the regulatory framework's treatment of the ability to raise concerns as an intrinsic right — not a privilege the sponsor may litigate away through injunctive relief.
- **Chilling Effect on Current and Future Subjects:** By pursuing legal action against a person who declined to enroll and raised compliance concerns, Apple has sent a direct signal to every current and potential subject that raising concerns about this trial carries severe legal consequences. This

compounds the coercive environment described above and further undermines the voluntariness of any consent obtained from employees in this environment.

- **Sponsor's Posture Toward Compliance:** The decision to pursue legal suppression of scrutiny — rather than address the underlying recruitment concerns — is directly relevant to OHRP's assessment of whether Apple Inc. can be trusted to operate a compliant human subjects research program. It reflects an institutional posture that treats public accountability as a threat to be neutralized rather than an obligation to be met.

The complainant respectfully requests that OHRP:
- Investigate the IRB's review and approval of the employee recruitment pathway, and assess whether adequate protections against undue influence were required and implemented.
- Assess whether consent processes conducted under this coercive recruitment environment meet the voluntariness requirements of 45 CFR 46.116.
- Determine how many participants in the total participants for this study are Apple employees or direct family members of Apple employees, and determine what % of the total population of the study makes the study population impermissibly dominant with employees.
- Evaluate whether the IRB's privacy provisions under 45 CFR 46.111(a)(7) adequately address the risks created by a corporate employer-sponsor collecting reproductive health data from its own employees.
- Consider Apple Inc.'s litigation conduct in *Gjovik v. Apple Inc.,* No. 3:23-cv-04597-EMC (N.D. Cal.), as evidence bearing on the sponsor's compliance posture and the integrity of the trial's ongoing operations.
- Inquire whether other complaints or concerns about this study have been similarly suppressed by Apple through any type of conduct, including litigation "protective orders"
- Determine whether suspension or additional oversight of the trial is warranted pending investigation.

The following documents are submitted in support of this complaint or are available upon request:
- ClinicalTrials.gov registration record (https://clinicaltrials.gov/study/NCT04196595)
- Documentation of legal action and threatened speech restraints and other injunctive relief against complainant (*Ashley Gjovik v Apple Inc,* 3:23-cv-04597-EMC, Northern District of California)
- AWHS 2023 Four Years in Review Newsletter (participant enrollment by state): HSPH.edu (https://hsph.harvard.edu/research/apple-womens-health-study/study-updates/2023-apple-womens-health-study-newsletter-four-years-in-review/)
- Medscape coverage of AWHS scope: Medscape, 2023 (https://www.medscape.com/s/viewarticle/996078?form=fpf)
- March 14 2023 Telerama magazine article (translated from French to English) where I and my coworkers criticized Apple's use of employee data for this specific study.

Note: I contacted the Study's contact list at Harvard (cc'd here) on March 8th, asking for a response on these matters but received no response by March 10th. I told them if I didn't receive a response I'd file by end of day, and no response was provided so now I'm filing that complaint.

This complaint is submitted in good faith based on direct knowledge of the events described. The complainant is aware that Apple Inc. may contend that the submission of this complaint itself violates litigation-related orders or confidentiality designations. The complainant submits that the filing of a good-faith regulatory complaint with a federal oversight body is protected activity and that any such contention by Apple would itself constitute further evidence of the sponsor's attempt to suppress oversight of a federally registered human subjects research study. The complainant understands that OHRP may contact the submitter for additional

information.

**Ashley Gjovik, B.S., PMP, J.D.**
Dated: March 11 2026
San Jose, California
Ex-Apple Employee (2015-2021)


-----


Prior Correspondence

----


On Tuesday, March 10th, 2026 at 1:26 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello,

No one has responded.

According, I plan to file the complaint to US gov by end of day today.


—

**Ashley M. Gjøvik**
**BS, JD, PMP**


On Sunday, March 8th, 2026 at 8:35 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

Hello,

I have some questions about the Apple Women's Health Study (trial id. NCT04196595).

Apple is currently asserting legal claims against me in federal court alleging that this study is secret, any prior requests to participate in this study or communications about participation are secret, people's experiences or thoughts related to this study are secret, and that I should be sanctioned and held in contempt for even talking about the existence of this public study-- with Apple asking for a gag order to be issued against me prohibiting me from talking about this study, any of Apple's communications to employees about their menstruation or vaginal secretions, and that Apple also asked to register employee sex partners and make the sex partners sign NDAs -- all of which Apple claims is secret.

I'd like to understand from the study administrators what their position is on this matter and if Harvard will work with Apple to resolve this issue. Otherwise, I'm preparing to file a complaint to NIH regarding Apple's conduct about this study.

The lawsuit with Apple's pending motions requesting sanctions, contempt findings, gag orders, and injunctions is at  *Ashley M. Gjovik v. Apple Inc.,* 23-cv-04597-EMC (N.D. Cal. 2023-pending). https://www.courtlistener.com/docket/67772913/gjovik-v-apple-inc/?page=2

If I file a complaint to NIH, I will definitely include Apple's filings with their lawyers arguments that even if the studies are public, if anyone complains about the studies, the complaint and underlying facts then become "confidential" and sharing that information with the government, courts, public, or others would be equivalent to violating an NDA, "leaking" trade secret information, and justify immediate termination of employment or other comparable punishment.

Its my understanding that such misconduct by Apple could likely cause NIH to cancel the study and to take disciplinary action against both Apple and Harvard. Accordingly, I'd assume you folks would appreciate an opportunity to talk some sense into Apple about all of this.

Please let me know how you'd like to proceed.

-Ashley

—

**Ashley M. Gjøvik, B.S., J.D., PMP**

# EXHIBIT F

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

|  |  |
|---|---|
| **Ashley M. Gjovik**, *an individual*, | **Case No.** **3:23-CV-04597-EMC (KAW)** |
| Plaintiff, | **Reply in Support of Motion for 26(g) Sanctions (Dkt. 302)** |
| vs. | |
| **Apple Inc.,** *a corporation,* | **Hearing:** |
| Defendant. | **Date: April 16 2026** **Time: 1:30 PM PST** **Location: Oakland, TBD** |

# TABLE OF CONTENTS

**TABLE OF CONTENTS** .................................................................................................1

**THERE IS NO LEGAL OR FACTUAL BASIS TO APPLE'S DEFENSE** .....................................1

I.   RULE 26(G) REQUIRES MANDATORY STRIKING OF UNSIGNED DOCUMENTS ........................................... 1

II.  CONFIDENTIALITY DESIGNATIONS REQUIRE A SIGNATURE OR THEY HAVE NO LEGAL EFFECT ................. 2

III. THE AUTOMATIC WAIVER DEADLINE WAS MISSED AND APPLE'S WAIVER ARGUMENT FAILS ................... 4

IV.  THIS IS NOT A RULE 37 MOTION ...................................................................................................... 5

V.   EITHER CONFIDENTIALITY DESIGNATIONS REQUIRE A SIGNATURE OR THEY HAVE NO LEGAL EFFECT ...... 6

VI.  APPLE CERTIFIED NULLITIES ........................................................................................................... 6

**APPLE'S ACTIONS ARE SUBSTANTIALLY UNJUSTIFIED** ............................................... 7

VII.    THE DESIGNATIONS ARE TECHNICALLY DEFICIENT AND SUBSTANTIVELY INDEFENSIBLE .... 7

VIII.   APPLE CONTINUES TO DESIGNATE PUBLIC INFORMATION AS CONFIDENTIAL .................... 8

IX.  APPLE'S MOTION TO RETAIN DESIGNATIONS CONFIRMS BAD FAITH AND IMPROPER PURPOSE ............... 10

X.   APPLE'S OWN IRB IS NOW INVESTIGATING BASED ON PLAINTIFF'S COMPLAINTS ABOUT THESE
     DESIGNATIONS ............................................................................................................................ 10

XI.  APPLE DISMISSES MAJOR INTERNATIONAL PUBLICATIONS AS "OBSCURE WEBSITES FROM FOREIGN
     COUNTRIES" ............................................................................................................................... 11

XII.    THERE IS NO PROTECTED INTEREST IN UNLAWFUL CONDUCT ...................................... 11

**PRO SE DAMAGES** .............................................................................................. 12

**CONCLUSION** .................................................................................................... 13

# REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR 26(G) SANCTIONS

1.      The Plaintiff filed a Motion for Sanctions under 26(G) at Dkt. 302. Apple's opposition (Dkt. 316) rests on a single premise: that Rule 26(g) does not apply to confidentiality designations, and therefore Apple had no obligation to sign its designations, no obligation to cure deficiencies, and no exposure to sanctions. If that premise fails, Apple's entire defense collapses, because Apple does not dispute any of the operative facts. Instead, Apple's brief relies on ad hominin attacks -- repeatedly characterizing the Plaintiff as a rogue litigant violating court orders — "flagrant and deliberate violations," "vexatious litigant," "inexcusable." The Plaintiff objects and disputes these characterizations, but additionally, Apple never actually engages with Plaintiff's substantive arguments.

2.      Apple's lead argument is that the signature requirement in 26(g)(1) only applies to "disclosures under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection" — and that a confidentiality designation chart is none of those things. Therefore, Apple says, it had no obligation to sign it, and there can be no 26(g) violation. Apple fails to explain how a designation could then be legally binding upon the Plaintiff – with the equivalent of Apple leaving a handwritten PostIt note on a fridge with words Apple now claims are unlawful for the Plaintiff to speak, and if she does speak them, she should be held in contempt and sanctioned by a federal court – because Apple said so.

3.      Apple's Opposition also never addresses the deposition transcript showing counsel imposed the blanket designation the moment Gjovik started discussing the NLRB settlement. Apple never addresses the fact that it obtained the Protective Order to produce the Gobbler document and then never produced it under the order. Apple never addresses the seven written refusals to meet and confer. Apple never addresses the re-designation of material it had already de-designated. Apple never addresses the February 20 hearing where the judge expressed skepticism about exactly what Apple was doing.

## THERE IS NO LEGAL OR FACTUAL BASIS TO APPLE'S DEFENSE

### I.    RULE 26(G) REQUIRES MANDATORY STRIKING OF UNSIGNED DOCUMENTS

4.      The Rule 26(g) violation is not limited to the unsigned chart itself (which generated no certification because nobody signed it). The majority of the violations flow from what came after: when Orrick attorneys signed and filed the Dkt. 280 emergency letter, the Motion to Enforce (Dkt. 294), the Motion to Seal (Dkt. 293), and the Motion to Shorten Time (Dkt. 295), each filing necessarily certified to the Court that valid, enforceable designations existed. But at the time those filings were signed, Apple's counsel knew the underlying designations were unsigned, knew the blanket designation had lapsed, and knew Plaintiff had been demanding cure for weeks. The certification in the enforcement papers is the 26(g) violation—and that violation triggers mandatory sanctions.

5.      The foundational facts are undisputed. Did an attorney sign the February 4 designation chart? No. The document exists; it has no signature; Apple does not dispute this. Did Plaintiff call the omission to Apple's attention? Yes. The emails are timestamped: February 4 at 4:39 PM, 8:27 PM, and 9:08 PM; February 6 at 2:11 PM. Each specifically demands a signed, dated document. Apple does not dispute receiving these emails. Did Apple promptly cure? No. Apple's response is on the record: "Apple declines your request that it do more than it is required to do. Nothing else is required from Apple." That is an express refusal to cure, in writing, after the omission was specifically identified.

6.      Rule 26(g)(2) provides that the Court "must strike" an unsigned document when the omission has been called to the attorney's attention and not promptly cured. "Must" is mandatory. There is no balancing test. There is no substantial justification exception for the striking itself—that standard applies to sanctions under 26(g)(3), but the striking under 26(g)(2) is automatic once the three elements are met: unsigned, called to attention, not cured.

7.      Once the Court strikes the February 4 chart, there are no valid narrowed designations. If there are no valid narrowed designations, the only designation that ever existed was the blanket designation from December 16—which auto-waived under Section 6.3 when Apple failed to file a motion to retain within 21 days. If both the blanket designation and the narrowed designations are void, then no valid designation has ever existed at any point. And if no valid designation has ever existed, then every enforcement filing Apple made—Dkts. 280, 293, 294, and 295—was signed by counsel certifying the validity of designations that did not exist. That is the 26(g)(3) violation. And 26(g)(3) sanctions are mandatory: the Court "must impose an appropriate sanction."

## II.   CONFIDENTIALITY DESIGNATIONS REQUIRE A SIGNATURE OR THEY HAVE NO LEGAL EFFECT

8.      Rule 26(g)(1) requires signatures on "every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection." The Advisory Committee Notes (1983) state the rule "provides a deterrent to both excessive discovery and evasion by imposing a certification requirement." The rule is modeled on Rule 11 and imposes comparable obligations in the discovery context. Designations are functionally discovery responses because they constrain the opposing party's conduct and are a prerequisite to enforcement. The signature ensures accountability.

9.      Apple claims that designations are not disclosures, requests, responses, or objections, but rather exercises of rights under the Protective Order. Apple cites *Starlight International Inc. v. Herlihy*, 186 F.R.D. 626, 647 (D. Kan. 1999). If designations are exempt from Rule 26(g), there is no Federal Rule requiring accountability for the substance of designations until a challenge motion is filed. If the designation chart is not a discovery document subject to Rule 26(g), then what is it? An informal

communication? A letter to the court reporter? If Apple's position is that the chart is not a discovery instrument, then it has no legal force. Apple cannot simultaneously argue the chart is not subject to Rule 26(g) requirements and that it creates binding confidentiality obligations enforceable through contempt. Either it is a legally operative discovery document—in which case it must comply with Rule 26(g)—or it is not—in which case Plaintiff had no obligation to treat it as anything. Apple never grapples with this paradox.

10.     Apple's argument proves too much. If confidentiality designations are not "discovery responses" under Rule 26(g), then no federal rule requires any formality, any signature, or any accountability for the substance of those designations. Under Apple's theory, a party could impose enforceable speech restrictions on its opponent through an anonymous, undated document sent to a third party—and then seek contempt if the opponent fails to comply. That cannot be the law. Either (a) designations are subject to Rule 26(g) because they are functionally equivalent to discovery responses, or (b) the Court's inherent authority and the Protective Order itself require comparable formality as a precondition to enforcement. Under either path, Apple's unsigned chart cannot support the enforcement proceedings Apple has filed.

11.     Apple misreads *Starlight*. That case held that Rule 26(g) sanctions apply when counsel signs deficient written discovery documents—and that other misconduct (such as unprepared deposition witnesses) is sanctioned under Rule 37(d). *Starlight International Inc. v. Herlihy*, Civ. A. No. 97-2329-GTV (D. Kan. June 3, 1999). *Starlight* actually supports Plaintiff's logic. The entire framework of Rule 26(g) exists because the signature is the accountability mechanism—it is how counsel takes personal professional responsibility for the propriety of discovery conduct. Apple's position is that confidentiality designations require no signature, no date, and no service, meaning no attorney has ever certified that these designations comply with the rules, were not interposed for an improper purpose, and are not unreasonably burdensome. Yet Apple simultaneously asks the Court to hold Plaintiff in contempt for violating those unsigned designations. *Starlight's* emphasis on the signature as the mechanism of professional responsibility cuts against enforcement of unsigned documents, not in favor of it.

12.     The *Starlight* court's observation that Rule 26(g)(2) "applies only to written discovery requests, responses, or objections" was a textual description, not a holding that parties may impose enforceable discovery-related obligations through unsigned documents. The *Cherrington* court—citing *Starlight*—explained the same distinction: sanctions under Rule 26(g) require the movant to tie the sanctionable conduct "directly to an improper certificate related to discovery responses." *Cherrington Asia Ltd. v. A & L Underground, Inc.*, Case No. 05-1214-EFM-DWB (D. Kan. Jan. 8, 2010). Because the plaintiffs in *Cherrington* conceded that opposing counsel should not be sanctioned and never claimed the

signed certifications were improper, Rule 26(g) did not apply. Here, Plaintiff does claim the certifications—on the enforcement papers—were improper. Further, even if Rule 26(g) does not apply, Judge Chen warned Apple on March 9, 2026 that it "has a Rule 11 obligation to make confidentiality designations in good faith." (Order, Dkt. 303).

13.    As a matter of standard practice, confidentiality designations are never freestanding, untethered documents. In document productions, designations appear within signed Rule 34 responses—the Rule 26(g) signature on the response covers the designation because it is part of the discovery response. In depositions, designations are made on the record by a named attorney before a court reporter, which is functionally equivalent to a signature. Apple did neither. It created a standalone post-hoc document that imposed enforceable obligations on the opposing party, with no attorney's name on it, no date, and no service. This is not how designations work in any standard practice guide.

## III.    THE AUTOMATIC WAIVER DEADLINE WAS MISSED AND APPLE'S WAIVER ARGUMENT FAILS

14.    Apple argues it did not waive its designations because the parties "agreed on the record" that Apple would narrow after receiving the transcript. But Apple never addresses the specific Section 6.3 auto-waiver provision Plaintiff invoked. Protective Order § 6.3 uses mandatory language: designations "shall automatically be considered waived" if the designating party fails to file a motion to retain within 21 days of a written objection.

15.    Apple does not dispute the text of § 6.3. Apple does not dispute that Plaintiff objected on the record on December 16, 2025. Apple does not dispute that it filed no motion to retain confidentiality within 21 days. Apple instead argues that the parties' informal on-record discussion about narrowing somehow suspended the Protective Order's automatic waiver provision. But parties cannot modify a court order by informal agreement, and nothing in § 6.3 provides for tolling, extension, or equitable excuse. The provision is self-executing: if no motion is filed within 21 days, the designation "shall automatically be considered waived." Apple's blanket designation was waived no later than January 6, 2026. Every subsequent action Apple took—the February 4 chart, the February 19 letter, the enforcement motions—was built on a designation that no longer existed.

16.    The Protective Order is an order of the Court. It has specific procedures and specific deadlines with specific consequences. Parties cannot informally agree to override a court order's mandatory provisions any more than they could agree to waive a jurisdictional statute of limitations. If Apple wanted to extend the § 6.3 timeline, the proper procedure would have been a stipulation filed with the Court or a motion to modify the order. Apple did neither.

17.    Moreover, when Apple agreed on the record to narrow its designations, it was effectively

PLAINTIFF'S REPLY | CASE NO. 3:23-CV-04597-EMC(KAW) | PAGE 4

conceding that the blanket designation was improper—which is what § 5.1 prohibits ("mass, indiscriminate, or routinized designations"). A party does not agree to "narrow" something that was proper in the first place. Apple's on-record concession confirms that the original designation violated the Order, which strengthens the argument that the § 6.3 clock was running. Apple says it received the transcript January 7. Apple sent its chart February 4. That is 28 days—exceeding the 21-day deadline even measured from Apple's own preferred start date. Apple does not explain why it needed 28 days to review a transcript of a deposition it conducted. It knew what questions it asked. It knew what testimony it wanted to designate.

18.     If a party can avoid automatic waiver simply by agreeing on the record to narrow "eventually," then § 6.3's deadline is meaningless. Any designating party could impose a blanket designation, agree when challenged to narrow it later, and then take as long as it wants—leaving the opposing party under enforceable speech restrictions indefinitely with no recourse. That is the opposite of what the automatic waiver provision was designed to prevent.

## IV.   THIS IS NOT A RULE 37 MOTION

19.     Plaintiff's theory is not that the enforcement motions are discovery certifications in the traditional sense. The theory is that when Apple's counsel signed enforcement papers, they necessarily represented to the Court that valid designations existed. Apple responds by saying "these filings are motions requesting relief based on good faith legal arguments" and cites Rule 37 as the proper framework. But that does not address the predicate problem: the underlying designations were void, so everything built on them—the emergency letter, the Motion to Enforce, the Motion to Seal, the Motion to Shorten Time— was built on a false premise. Apple's response is essentially "we are allowed to file motions," which does not answer the question of whether the designations those motions were premised on were valid.

20.     Apple's "substantially justified" argument is circular. Apple argues that even if there is a Rule 26(g) violation, sanctions are unwarranted because Apple was "substantially justified" in seeking to enforce the Protective Order. But that is the entire question—whether the enforcement filings were justified when the underlying designations were procedurally void. Apple's argument reduces to: "Our enforcement motions were justified because Plaintiff violated the designations; therefore, our certification of those designations was substantially justified." That is circular. The question is whether the designations were valid. If they were not, the enforcement motions were not justified. Apple skips the predicate question entirely.

21.     Apple cites *Ma v. San Francisco Estuary Institute*, No. 23-CV-05060-JCS, 2026 WL 388720, at *5 (N.D. Cal. Feb. 11, 2026), for the "flagrant and deliberate violation" language. But *Ma* involved a party who violated designations that were procedurally proper. Here, the designations were unsigned, the

PLAINTIFF'S REPLY | CASE NO. 3:23-CV-04597-EMC(KAW) | PAGE 5

blanket designation had lapsed, and the information was excluded from the Order's scope under Section 3. Apple never distinguishes *Ma* on those facts.

## V. Either Confidentiality Designations Require a Signature or They Have No Legal Effect

22.     Apple argues that Rule 26(g) does not require a signature on confidentiality designations because they are not "disclosures, or discovery requests, responses, or objections." That is a defensible technical reading of the rule's text. But Apple never grapples with the functional reality that a confidentiality designation under a protective order is how a party exercises its rights under Rule 26(c), which is part of the discovery framework. It is a discovery-related action that constrains the other party's conduct. Apple cites one case from the District of Kansas from 1999 and moves on. If the Court does not accept that narrow textual reading, Apple has nothing underneath it.

23.     If a confidentiality designation is not a "discovery response" requiring a signature under Rule 26(g), it is at minimum a document that constrains the opposing party's conduct under a court order—and no court should enforce such a document when no attorney has taken professional responsibility for its content. Either Rule 26(g) applies directly, or the Court's inherent authority requires comparable formality before enforcement. Under either path, an unsigned, undated chart emailed to a court reporter cannot support contempt proceedings.

24.     If Rule 26(g) does not apply, what does? Apple identifies no rule, standard, or authority governing the form, service, or accountability for confidentiality designations. The Protective Order itself does not specify a format for post-deposition narrowed designations—Section 5.2(b) contemplates designations being made "on the record, before the close of the deposition." Apple's post-hoc chart is Apple's own invention outside any specified procedure. Apple's argument creates an accountability vacuum: a party could impose enforceable speech restrictions on its opponent through an anonymous, undated document sent to a third-party court reporter, and then seek contempt if the opponent fails to comply. That cannot be the law.

## VI. Apple Certified Nullities

25.     When Apple's counsel signed enforcement papers (Dkts. 280, 293, 294, 295), those papers necessarily certified that valid, enforceable designations existed. That certification was false because: (1) the blanket designation had lapsed under § 6.3; (2) the February 4 chart was a Rule 26(g)(2) nullity; and (3) Plaintiff had put Apple on written notice of both deficiencies, and Apple refused to cure.

26.     Apple argues that enforcement motions are not "discovery certifications" but rather motions requesting relief, properly brought under the Court's inherent authority and Rule 37. Apple cites *Somers v. Digital Realty Trust Inc.*, No. 14CV05180EMCKAW, 2018 WL 2134020, at *15 (N.D. Cal. May

9, 2018), and *Apple, Inc. v. Samsung Electronics Co.*, No. 511CV01846LHKPSG, 2014 WL 12596470, at *5 (N.D. Cal. Jan. 29, 2014). These cases establish that enforcement of protective orders is typically handled under Rule 37 and inherent authority, but they do not address the separate question of whether the designations themselves were properly made. If the underlying designations are void, the enforcement motion has no foundation regardless of which procedural vehicle it uses.

27.    Striking of the unsigned papers is statutorily prescribed under Rule 26(g)(2). If Apple had not filed enforcement papers based on the unsigned designations, the Court might reject a standalone Rule 26(g) sanctions motion. But Apple did file enforcement papers—papers premised on a nullity that "must be" stricken—and any further sanctions beyond the striking are at the Court's discretion.

28.    Apple argues that Plaintiff was required to follow the Protective Order's challenge procedures (§ 6.2) rather than engage in "self-help." Apple cites *Harmston v. City & County of San Francisco*, No. C 07-01186SI, 2007 WL 3306526, at *6 (N.D. Cal. Nov. 6, 2007); *Gonzales v. Charter Communications, LLC*, No. 2:20-CV-08299-SB-AS, 2022 WL 570003, at *4 (C.D. Cal. Jan. 26, 2022); and *I.F. v. City of Vallejo*, No. 2:18-CV-0673-JAM-CKD, 2021 WL 601054, at *11 (E.D. Cal. Feb. 16, 2021). This is Apple's strongest procedural argument, and the case law supports it—if the designations were validly made. But every case Apple cites involved designations that were procedurally proper. None involved a situation where the designations were unsigned, undated, unserved, made after the automatic waiver deadline had passed, and based on publicly available information subject to the Protective Order's own scope exclusions.

29.    The logical problem is circularity: Apple says Plaintiff must follow § 6.2 to challenge designations, but Plaintiff's position is that no valid designation exists to challenge—because the blanket designation was waived under § 6.3 and the February 4 chart was a nullity. A party cannot be required to follow challenge procedures for a designation that was never validly made. Apple's argument assumes the validity of the very thing in dispute. Moreover, Plaintiff did raise challenges. She objected on the record at the deposition. She emailed Apple repeatedly identifying the procedural deficiencies. She demanded cure. Apple refused. Then Apple filed enforcement motions. Plaintiff's position is not that she ignored the challenge process—it is that Apple's designations were void before the challenge process began.

## APPLE'S ACTIONS ARE SUBSTANTIALLY UNJUSTIFIED

### VII.    The Designations Are Technically Deficient and Substantively Indefensible

30.    The designations are void because unsigned, unserved, auto-waived, and never cured. The transcripts prove this in real time. The emails prove Plaintiff raised every deficiency and Apple refused to cure. Even if the designations were valid, what Apple actually designated—cervical mucus, ovulation,

sexual partners, and cosleepers—destroys any claim of good faith.

31.     At the February 20, 2026 hearing (Dkt. 302-2), when Plaintiff told Judge Westmore that what Apple designated as confidential was her "workplace complaints, whistleblower complaints, stuff I pled in my complaint for this lawsuit," the Court responded: "I'm not talking about those things." The Court did not believe Apple would designate the Plaintiff's own pled claims as confidential. But that is exactly what Apple did.

32.     Plaintiff's Opposition to the Motion to Retain Confidentiality Designations (Dkt. 320) introduces the SEC filings argument, the competitive-harm-as-noncompliance-advantage framework, the bootstrapping problem, the *Ruckelshaus* analysis, and the RICO connection. The present motion establishes that the designations are technically deficient. The opposition establishes they are substantively indefensible. Together they foreclose every possible defense—Apple cannot prevail on procedure and cannot prevail on substance.

33.     The Request for Judicial Notice (Dkt. 321) places 197 pages of publicly available evidence directly into the Court's record in a form the Court is legally required to accept under Fed. R. Evid. 201. Every code name appears on Wikipedia. Every study appears in a peer-reviewed journal. Every product appears on Apple's own website. Every press tour was led by Apple's own executives. The Court does not need to credit Plaintiff's characterizations. The Court need only compare Apple's own publications to Apple's designations. The mismatch is self-evident.

34.     The Declaration (Dkt. 322) provides 120 pages of contemporaneous documentation—emails showing the meet-and-confer process in real time, Apple's false statements to the Court about the timeline, the detailed response Apple ignored, and the IRB investigations Apple's motions triggered.

35.     Each filing answers the questions the others raise. The present motion asks: were the designations valid? Dkt. 321 answers: the information was public. Dkt. 320 asks: was there good cause? Dkt. 322 answers: Apple never provided any, refused to engage when asked, and misrepresented the timeline to the Court. Dkt. 320 asks: what was Apple's purpose? Dkt. 302 answers: the designation was triggered at the exact moment Plaintiff invoked her NLRA rights, and Apple's own Dkt. 280 ties the enforcement to its termination defense.

## VIII.    Apple Continues to Designate Public Information as Confidential

36.     Section 1 of the Protective Order states it "does not confer blanket protections on all disclosures" and that protection extends "only to the limited information or items that are entitled to confidential treatment under the applicable legal principles." Section 3 excludes from coverage: (a) information in the public domain at the time of disclosure; and (b) information known to the receiving party prior to disclosure or obtained from a lawful outside source. *Seattle Times Co. v. Rhinehart*, 467 U.S.

20, 37 (1984), holds that protective orders do not restrict dissemination of information gained from sources outside discovery.

37. Apple argues it "did not designate internal research and development information that is already in the public domain." Apple's entire response to Plaintiff's public domain argument is a single footnote asserting that Plaintiff "provides no evidence or link to allow for Apple or this Court to assess the validity of these claims." That was filed March 20. Five days later, Plaintiff filed the 197-page Request for Judicial Notice with timestamped Wikipedia pages, peer-reviewed journal articles, SEC filings, ClinicalTrials.gov registrations, and press articles from The Guardian, WIRED, Forbes, and Apple's own press releases. Apple's "no evidence" argument was obliterated before the ink was dry.

38. Apple's "internal R&D" characterization is conclusory. Apple repeatedly calls the designated testimony "internal product-related research and development" but the record documents that what Apple actually designated was testimony about Apple asking employees to track their menstruation, ovulation, and sexual activity. That subject matter—the existence and general nature of these requests— appears in published court orders. Judge Chen described Apple's conduct as "invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA test, biometrics data collection (like the Gobbler app), and other highly personal studies." (Dkt. 73 at 7–8). A federal judge's published order describing this conduct makes it extremely difficult to argue the existence and nature of these programs is confidential.

39. Apple's own filing confirms the connection to its termination defense. Dkt. 280, fn. 2, states that Plaintiff's "public disclosure of confidential Apple product-related information . . . led to her termination from Apple in the first place." This is Apple expressly connecting the Protective Order enforcement to the merits of its affirmative defense—exactly what Plaintiff warned would happen before the Order was entered. (July 2, 2025 Tr. at 6:10–21). Judge Westmore's own statement that "that's not how the protective order is used" (July 2, 2025 Tr. at 7:12–13) further supports the improper purpose finding.

40. Apple cites *Collateral Analytics LLC v. Nationstar Mortgage LLC*, No. 18-CV-00019-RS (JSC), 2019 WL 3779191 (N.D. Cal. Aug. 12, 2019), for the proposition that pre-litigation confidentiality obligations survive into litigation. But this is the bootstrapping problem Plaintiff identified. Apple is using the Protective Order to enforce its private NDA—the same NDA the NLRB required Apple to rescind in April 2025. Apple settled with the NLRB, agreed to stop telling employees that workplace conditions are confidential, and then used a court order to reimpose the same restriction through the designation process. Apple's opposition never addresses the NLRB settlement and never explains how it can enforce through the Protective Order terms it agreed with the federal government to withdraw.

## IX. APPLE'S MOTION TO RETAIN DESIGNATIONS CONFIRMS BAD FAITH AND IMPROPER PURPOSE

41. Apple told the Court it engaged in good-faith narrowing. But Apple de-designated material during the meet-and-confer process and then re-designated the same material in its Motion to Retain (Dkt. 304). The "narrowing" was theater. The Court ordered Apple to narrow through good-faith meet-and-confer, and Apple's response was to temporarily narrow, file a motion, and then re-expand. That makes every representation Apple made about the meet-and-confer process suspect.

42. When a party de-designates material in negotiations and then re-designates the same material in a motion to the court, it demonstrates that the designation decisions are not being made based on whether the information is actually confidential—they are being made based on litigation strategy. Genuinely confidential information does not stop being confidential during meet-and-confer and then become confidential again when a motion is filed.

43. Apple's declarant, Michael DiVincent, reviewed the designations and opined that disclosure would cause competitive harm. But if Apple itself already conceded those designations were not worth retaining three weeks earlier, how does DiVincent now testify that disclosure of the same information will harm Apple? Either Apple's counsel did not tell DiVincent about the prior de-designation, or DiVincent is rubber-stamping whatever Apple's lawyers put in front of him. Either way, it undercuts the declaration's reliability.

44. Apple blanket-designated 72% of the deposition. Apple was told to narrow. Apple narrowed to reproductive biology testimony. Then Apple re-expanded to 107 rows covering code names, study descriptions, and other topics. The designation scope has been expanding and contracting based on Apple's litigation needs, not based on any consistent analysis of what is actually confidential. That pattern is the definition of designations "interposed for an improper purpose" under Rule 26(g)(1)(B)(ii).

## X. APPLE'S OWN IRB IS NOW INVESTIGATING BASED ON PLAINTIFF'S COMPLAINTS ABOUT THESE DESIGNATIONS

45. Based on Apple's recent conduct on this topic, including its pending motions about the asserted designations, Plaintiff filed new complaints with federal agencies and institutional review boards regarding Apple's workplace studies. The Declaration at Dkt. 322, Exhibit B, attaches correspondence with the National Institutes of Health and the Office for Human Research Protections at the U.S. Department of Health and Human Services regarding Apple's federally registered reproductive health study (ClinicalTrials.gov Identifier NCT04196595). Plaintiff raised concerns about Apple's use of its own employees as study participants, the adequacy of the informed consent process, the lack of independent oversight, and Apple's pending motions seeking gag orders and sanctions.

46.     Exhibit C attaches correspondence with the Harvard T.H. Chan School of Public Health IRB regarding its role as a collaborating institution on Apple's Women's Health Study. Harvard confirmed it is investigating Plaintiff's complaints, including complaints about Apple's pending motions in this proceeding.

47.     Exhibit D attaches correspondence with the Advarra Institutional Review Board, which served as the reviewing IRB for Apple's study. Advarra confirmed it is investigating and asked Plaintiff to provide copies of the type of evidence that Apple is claiming is secret and must be sealed. As of March 27, 2026, the IRB confirmed it has contacted Apple and requested information and documentation regarding the menstruation and ovulation studies.

48.     Apple asks this Court to seal information that the IRBs responsible for overseeing human research protections are actively requesting. The Court should consider the implications of a ruling that would designate as confidential information that federal oversight bodies need to evaluate whether Apple's studies complied with applicable regulations.

## XI.     Apple Dismisses Major International Publications as "Obscure Websites from Foreign Countries"

49.     In footnote 6 of its opposition (page 8), Apple dismisses Plaintiff's public domain evidence as "obscure websites from foreign countries based on anonymous sources who purport to be Apple employees." This describes *Der Spiegel*—one of the largest and most respected publications in Europe— and a peer-reviewed article in the *American Journal of Obstetrics and Gynecology*. By the time Plaintiff filed her Opposition to the Motion to Retain (Dkt. 320), the full record included Wikipedia pages, WIRED, The Guardian, Forbes, Apple's own press releases, Apple's own ClinicalTrials.gov registration, and Apple's own 10-K filing with the SEC. Apple's dismissal of this evidence as "obscure" did not age well.

50.     Apple cites *DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004), for the proposition that "publication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient." But the publications Plaintiff identified are not obscure. They include Apple's own peer-reviewed journal article, Apple's own ClinicalTrials.gov registration, Apple's own press release, a Wikipedia page with 114 footnotes, and articles in The Guardian and Forbes. Characterizing those as "obscure" is untenable.

## XII.     There Is No Protected Interest in Unlawful Conduct

51.     Apple's reliance on *Collateral Analytics* is distinguishable. That case involved documents containing confidential commercial information produced pre-litigation under contractual obligations. Here, the question is whether a person's testimony about her own bodily experiences and workplace complaints can be designated confidential simply because the employer considers the underlying program

proprietary.

52.    Rule 26(g)(1)(B)(ii) prohibits designations "interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Apple obtained the Protective Order for one purpose (document production) and used it for another (silencing testimony). This is supported by Apple's own statements and the Gobbler ICF timeline. Apple argues it was "entitled to" a protective order and "cannot be limited to examples given in a hearing." But no Federal Rule or case authority establishes that any party is "entitled" to a confidentiality protective order. Apple's response confirms the Order was obtained unilaterally rather than through mutual stipulation. Apple obtained it by misrepresenting its intended purpose to the Court.

53.    Apple's "improper purpose" response is one sentence: "Plaintiff's belief that Apple obtained the protective order and made its designations for an improper purpose is pure speculation and legally irrelevant." That is Apple's complete response to five pages of documented evidence—the false pretenses for obtaining the PO, the Gobbler ICF that was never produced under it, its sole use for deposition designations, the connection to the termination defense, and the NLRB violations. No engagement with the timeline. No explanation for why Apple never produced the Gobbler ICF under the Order. No explanation for why Apple never designated a single document. No response to Apple's own Dkt. 280 tying the designations to the termination defense. No response to Judge Westmore's July 2 statement. One sentence, from four named attorneys at one of the largest law firms in the country.

54.    The opposition's most significant omission is its silence on the documented gap between the Protective Order's stated purpose and its actual use. The motion presents a detailed timeline: Apple told the Court it needed the PO to produce the Gobbler ICF; the Court entered the Order on that basis; Apple then withheld the ICF for months until Plaintiff moved to compel; Apple produced it without invoking the PO; Apple then never used it at the deposition. Apple's opposition says nothing about this sequence.

## PRO SE DAMAGES

55.    Apple is largely correct that pro se litigants face limitations on fee recovery. However, Rule 26(g)(3) authorizes "an appropriate sanction" which "may include" expenses and fees. The mandatory nature of the sanction ("must impose") is separate from the question of what form the sanction takes. The Court may impose non-monetary sanctions—striking the designations, declaring them void, denying Apple's enforcement motions—without reaching the fee question.

56.    Plaintiff did incur actual out-of-pocket costs—certified transcript costs, filing fees, postage, and printing expenses—that are recoverable even under the pro se limitation. More importantly, the fee issue is secondary to the substantive relief. If the Court finds Apple's designations void and its enforcement

PLAINTIFF'S REPLY | CASE NO. 3:23-CV-04597-EMC(KAW) | PAGE 12

motions baseless, the declaratory relief matters far more than the dollar amount.

## CONCLUSION

57.     Apple's opposition was written for the version of this case Apple wishes existed—one where a difficult pro se plaintiff is posting confidential documents online and the Court need only enforce its order. But that is not this case. This is a case where Apple designated publicly available information as confidential, never signed the designations, refused to cure after repeated notice, filed enforcement proceedings based on void designations, and now asks the Court to sanction Plaintiff for discussing her own body publicly.

58.     The most telling feature of Apple's opposition is what it does not say. It does not identify the specific trade secret in the designated testimony. It does not articulate the competitive harm from disclosure of cervical mucus, ovulation, or sexual partner registration. It does not explain why Apple obtained the Protective Order and then never used it for its stated purpose. It does not explain why Apple designated 72% of a deposition before the testimony was given. It asserts only: we had the right, she violated it, sanction her and not us.

59.     That is not a legal argument. It is an assertion of authority. And it is precisely the kind of response that tells a court the party cannot defend its position on the merits and is instead asking the court to enforce it on procedure alone—which is, as Plaintiff has documented throughout this litigation, exactly how Apple operates.

60.     Apple offers 13 pages of conclusory assertions, no engagement with the substantive arguments, no response to the public domain evidence, one sentence on improper purpose, and a circular justification defense. Plaintiff has filed hundreds of pages of documented evidence, SEC filings, peer-reviewed articles, certified transcripts, timestamped emails, judicial notice of public records, and legal analysis citing binding Ninth Circuit authority. Plaintiff should prevail, Apple must be sanctioned, and this litigation should proceed to summary judgment and trial on the merits.

Respectfully submitted,

/s/ Ashley M. Gjovik
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 27 2026 in San José, California
(415) 964-6272

ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# EXHIBIT G

# RE: Inquiry # 1-3790024151 - Signed Charge Against Employer, Documentary Evidence

| | |
|---|---|
| From | dgecpb32@nlrb.gov <NLRB@public.govdelivery.com> |
| To | Ashley Gjovik<ashleymgjovik@protonmail.com> |
| Date | Thursday, March 26th, 2026 at 11:38 PM |

Confirmation Number: **1113087890**

You have successfully accomplished the steps for E-Filing a **Charge - CA** with NLRB Region 32, Oakland, California. This email notes the official date and time of the receipt of your submission. Please save this email for future reference. Please note that this receipt is not confirmation that your case has been docketed; rather, this email solely constitutes the regional office's acknowledgment of receipt of your document(s).

Until your case is docketed and is assigned an NLRB Case Number by the Region, please use **Inquiry No. 1-3790024151** to E-file any documents you wish to present regarding your charge. Click the link below to E-File additional documents and/or to view your previous E-filings with the NLRB. Your account profile is saved in our system. When you use this link to E-File documents your contact information will be pre-populated.

Your account profile is saved in the NLRB My Account Portal. Click here to view your account information, the cases and inquiries you are a party to and any of your previous E-Filings with the NLRB. You will also be able to E-File documents you wish to present regarding this charge or any other case or inquiry you are a party to. You will use Account No. **1-3775394116** and the email address you used to file your inquiry to access your account. When you use this link to E-File documents your contact information will be pre-populated on the E-Filing page, so that you do not have to reenter your information.

| | |
|---|---|
| Date Submitted: | Thursday, March 26, 2026 11:35 PM Pacific Standard Time |
| Dispute Location: | San Jose, CA |
| Regional, Sub-Regional Or Resident Office: | Region 32, Oakland, California |
| Charge Type: | CA |
| Inquiry Number: | 1-3790024151 |
| Filing Party: | Charging Party |
| Name: | Gjovik, Ashley Marie |
| Email: | ashleymgjovik@protonmail.com |
| Address: | 2108 N. St Ste. 4553 Sacramento, CA 95816 |
| Telephone: | (415) 964-6272 |
| Fax: | |

| Attachments: | Signed Charge Against Employer : CHG.1-3790024151.SignedChargeAgainstEmployer_Wiz.pdf |
| | Documentary Evidence : DEV.1-3790024151.AdditionalInfoSupportingCharge.pdf |

*********************************************************************************************

DO NOT REPLY TO THIS MESSAGE. THIS IS A POST-ONLY NOTIFICATION.

MESSAGES SENT DIRECTLY TO THE EMAIL ADDRESS LISTED ABOVE WILL NOT BE READ.

*********************************************************************************************

FORM NLRB-501
(3-21)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Apple Inc | | b. Tel. No.<br>(415) 964-6272 |
|---|---|---|
| | | c. Cell No. |
| | | f. Fax. No. |
| d. Address *(Street, city, state, and ZIP code)*<br>One Apple Park Way<br><br>CA Cupertino 95014 | e. Employer Representative<br><br>Tim D. Cook<br>CEO | g. e-mail |
| | | h. Number of workers employed<br>500 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Technology | j. Identify principal product or service<br>Computers & mobile phones | |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) 1,4                                          of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
Ashley Marie Gjovik

| 4a. Address *(Street and number, city, state, and ZIP code)*<br><br><br>2108 N. St Ste. 4553<br>CA Sacramento 95816 | 4b. Tel. No.<br>(415) 964-6272 |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax No. |
| | 4e. e-mail<br>ashleymgjovik@protonmail.com |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | Tel. No.<br>(415) 964-6272 |
|---|---|
| *(signature of representative or person making charge)*          Ashley Marie Gjovik<br>*(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| | Fax No. |
| Address  2108 N. St Ste. 4553<br>Sacramento CA 95816                Date 03/26/2026 11:35:13 PM | e-mail<br>ashleymgjovik@protonmail.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

## Basis of the Charge

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, discussing wages, hours, or other terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Gjovik | Notice of Rule 11/9011 sanctions motion | 03/26/2026 |

**8(a)(1)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Gjovik | Notice of Rule 11/9011 sanctions motion | 03/26/2026 |

**8(a)(4)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) filed charges or cooperated with the NLRB.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Ashley Gjovik | Notice of Rule 11/9011 sanctions motion | 03/26/2026 |

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prohibit employees from discussing wages, hours, or other terms or conditions of employment.

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prevent or discourage employees from forming, joining, or supporting a labor organization.

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prevent or discourage employees from contacting and/or filing charges with the National Labor Relations Board.

## Additional Information in Support of Charge

**Charging Party Name :** Ashley Marie Gjovik
**Inquiry Number :** 1-3790024151
**Date Submitted :** 03/26/2026 11:35:13 PM

Please provide a brief description of the specific conduct involved in your charge. The information you provide may be viewed by the charged party in the event of a formal proceeding, so PLEASE DO NOT GIVE A DETAILED ACCOUNT OF YOUR CHARGE OR A LIST OF POTENTIAL WITNESSES AT THIS TIME. A Board Agent will contact you to obtain this and other detailed information after your charge is docketed. After you submit this E-Filed Charge form, you will receive a confirmation email with an Inquiry Number (Sample Inquiry Number: 1-1234567890) and a link to the E-Filing web page. You may use the link and the Inquiry number provided in the email to e-file any additional documents you wish to present in support of your charge.

**Additional Information Provided:**

On March 26 2026, in direct and express retaliation for the Charging Party filing Charge 32-CA-382501 and the other associated charges against Charged Party in Feb.-March 2026, the Charged Party, via legal counsel Andrew Troop, has sent Charging Party an email stating: "Attached is a letter being sent you on behalf of Apple, Inc. pursuant to Federal Rule of Bankruptcy Procedure 9011(c).  Without limiting or altering the terms of that letter, which are controlling, the letter provides you with the opportunity to withdraw your Motion for Sanctions against Apple Inc., ECF No. 58, within the next 21 days, to avoid Apple pursuing a sanctions motion against you." Charged Party is referencing a motion in the Charged Party's bankruptcy which asks to sanction Apple for its unlawful conduct regarding the unlawful work rules, confidentiality designations, threats, and retaliation in the civil litigation -- and in both courts Apple repeatedly refers to Charging Party's Protected Concerted Activity and NLRB charges as misconduct and requests sanctions because of the Charging Party's Protected Concerted Activity, and in some cases, because of her NLRB charges and participation in Board proceedings. Apple has now put forward a contingent threat a week prior to the 4/2/26 hearing on the Motion for Sanctions against Apple, attempting to threaten Charging Party to withdraw her complaints against Apple, and prevent the sanctions hearing where Apple accused her of leaking and referred to public complaints about work conditions, unfair labor practices, and unlawful work rules -- with Apple's latest conduct violating many laws, including the NLRA, again.

# RE: In re Ashley M. Gjovik, Case No. 25-11496 (CJP); Rule 9011 Safe-Harbor Notice

From   Ashley Gjovik <ashleymgjovik@protonmail.com>

To     Troop, Andrew M.<andrew.troop@pillsburylaw.com>

CC     Ashley M. Gjovik (Legal Matters)<legal@ashleygjovik.com>,
       Trechter, Reed C.<reed.trechter@pillsburylaw.com>, Kelcey Phillips<kelcey.phillips@morganlewis.com>,
       Mahoney, Brian<brian.mahoney@morganlewis.com>,
       Stolzenburg, Mark L.<mark.stolzenburg@morganlewis.com>,
       harry.johnson<harry.johnson@morganlewis.com>, Booms, Ryan<rbooms@orrick.com>,
       Davidson, Sarah<sdavidson@orrick.com>, Horton, Nicholas J.<nhorton@orrick.com>,
       Mantoan, Kathryn G.<kmantoan@orrick.com>, Perry, Jessica R.<jperry@orrick.com>,
       Riechert, Melinda<mriechert@orrick.com>, Weaver, Nicholas<nweaver@orrick.com>

Date   Friday, March 27th, 2026 at 4:11 PM

Counselor,

My March 13 2026 email indicated I would be attending all SF-area hearings in person, that the Oakland hearing was only in person, and I indicated any conflict on 4/2 would result in me not attending the MAB hearing while I do attend the Oakland hearing in person. There is also no requirement that I saw that I tell you how I'm attending -- the only required party is Apple -- and the only requirement I had was to request a Zoom link from the deputy, which I did. It also seems clear that because I live in California and am insolvent that I will not be flying to Boston for a 1hr hearing. I do not understand why you're harassing me about this. Also, an NLRB charge was filed yesterday and should be docketed today or Monday, again naming Mr. Troop, as in the prior one filed regarding Mr. Troops opposition filing, all of which violated the NLRA several times by Apple through its counsel.

—

**Ashley M. Gjøvik**
**BS, JD, PMP**

On Friday, March 27th, 2026 at 3:47 PM, Troop, Andrew M. <andrew.troop@pillsburylaw.com> wrote:

> Ms. Gjøvik,
>
> The only email I have from you dated March 13, 2026, is an email string between you and Melinda Riechert (which you copied me on) addressing attendance at a hearing scheduled in California on April 2, 2026.  In that email, you do not say that you will be participating in the Massachusetts hearing remotely.  To the contrary, you indicate that you cannot make the hearing in California, scheduled to start at 1:30 pm (PT)/4:30 pm (ET), in person, because of the Boston hearing which starts 5 ½ hours earlier at 8 am (PT)/11 am (ET).  (You miscalculated the time zones in your email, a copy of which is attached.)

I take your email below as confirming you will be participating in the Massachusetts hearing that starts at 8 am (PT)/11 am (ET) on April 2, 2026, remotely.

As to the remaining statements in your email, Apple does not agree.

Regards,

*/s/ Andrew M. Troop*

**Andrew M. Troop** | Partner

Pillsbury Winthrop Shaw Pittman LLP

31 West 52nd Street | New York, NY 10019-6131

t +1.212.858.1660 | f +1.212.973.7435 | m +1.617.710.0902

andrew.troop@pillsburylaw.com | website bio

---

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>

**Sent:** Thursday, March 26, 2026 6:26 PM

**To:** Troop, Andrew M. <andrew.troop@pillsburylaw.com>

**Cc:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>; Trechter, Reed C. <reed.trechter@pillsburylaw.com>; Kelcey Phillips <kelcey.phillips@morganlewis.com>; Mahoney, Brian <brian.mahoney@morganlewis.com>; Stolzenburg, Mark L. <mark.stolzenburg@morganlewis.com>; harry.johnson <harry.johnson@morganlewis.com>; Booms, Ryan <rbooms@orrick.com>; Davidson, Sarah <sdavidson@orrick.com>; Horton, Nicholas J. <nhorton@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Riechert, Melinda <mriechert@orrick.com>; Weaver, Nicholas <nweaver@orrick.com>

**Subject:** Re: In re Ashley M. Gjovik, Case No. 25-11496 (CJP); Rule 9011 Safe-Harbor Notice

Hello Mr. Troop,

I already informed you on March 13 2026 that I will be at the April 2 2026 hearing remotely.

I'm in receipt of your email and I'm writing to notify you and your client that Apple will receive a new NLRB charge filed against it today arising from your highly unlawful threats and retaliation in your March. 26 2026 email to me here. You are already facing one NLRB charge that names you for your prior violations of the NLRB on behalf of Apple and now your latest threat, the email and letter below, is clearly a direct 8(a)(4) violation in addition to 8(a)(1), bankruptcy laws, whistleblower protection, consumer protection laws, and your obligations under the professional rules for attorneys.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

On Thursday, March 26th, 2026 at 3:19 PM, Troop, Andrew M. <andrew.troop@pillsburylaw.com> wrote:

Dear Ms. Gjovik,

Attached is a letter being sent you on behalf of Apple, Inc. pursuant to Federal Rule of Bankruptcy Procedure 9011(c).  Without limiting or altering the terms of that letter, which are controlling, the letter provides you with the opportunity to withdraw your *Motion for Sanctions against Apple Inc.*, ECF No. 58, within the next 21 days, to avoid Apple pursuing a sanctions motion against you.  A draft of Apple's sanction motion is attached to the letter as Exhibit B, as required by the Bankruptcy Rule.

I would also like to remind you that, pursuant to the Court's notice of the April 2 hearing on ECF No. 58, you must let us know whether you are participating in that hearing remotely or in person.  I previously advised you that I will be at the hearing in person.

Regards,

*/s/ Andrew M. Troop*

**Andrew M. Troop** | Partner

Pillsbury Winthrop Shaw Pittman LLP

31 West 52nd Street | New York, NY 10019-6131

t +1.212.858.1660 | f +1.212.973.7435 | m +1.617.710.0902

andrew.troop@pillsburylaw.com | website bio

AUSTIN   BEIJING   HONG KONG   HOUSTON   LONDON   LOS ANGELES
MIAMI   NASHVILLE   NEW YORK   NORTHERN VIRGINIA   PALM BEACH
SACRAMENTO   SAN DIEGO   SAN FRANCISCO   SHANGHAI
SILICON VALLEY   TAIPEI   TOKYO   WASHINGTON, DC



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Service Desk at Tel: 800-477-0770, Option 1, immediately by telephone and delete this message, along with any attachments, from your computer. Nothing in this message may be construed as a digital or electronic signature of any employee of Pillsbury Winthrop Shaw Pittman. Thank you.

The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Service Desk at Tel: 800-477-0770, Option 1, immediately by telephone and delete this message, along with any attachments, from your computer. Nothing in this message may be construed as a digital or electronic signature of any employee of Pillsbury Winthrop Shaw Pittman. Thank you.